JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
KARIN B. SWOPE (Pro Hac Vice)
kswope@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
KEVIN J. BOUTIN (SBN 334965)
kboutin@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
STACEY M. LEYTON (SBN 203827)
sleyton@altber.com
MATTHEW MURRAY (SBN 271461)
mmurray@altber.com
CONNIE K. CHAN (SBN 284230)
cchan@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Fax: (415) 362-8064

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*
*(Additional Counsel Listed Below)*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION** | Case No. 3:21-md-02992-LAB-MSB **MASTER CONSOLIDATED COMPLAINT** |
| This Document Relates to All Actions | **JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION ....................................................................2

II.   JURISDICTION AND VENUE ...............................................5

III.  THE PARTIES .........................................................................6
      A.  Class Representative Plaintiffs .......................................6
      B.  Individual Plaintiffs ......................................................15
      C.  Defendants .....................................................................16

IV.   FACTUAL ALLEGATIONS ....................................................16
      A.  The Bank's Contract with EDD ....................................16
      B.  The Bank's Failure to Secure EDD Debit Cardholder Information .........22
      C.  The Bank's Use of Outdated, Vulnerable Magnetic Stripe Technology ..24
      D.  The Bank's Contractual Promises and Representations to Cardholders ...27
      E.  The Rampant Third-Party Fraud on EDD Debit Card Accounts ..........29
      F.  The Bank's Evasive and Ineffectual Response Prior to the Filing of
          Plaintiffs' Initial Class Action Complaint and The Court's Issuance
          of a Preliminary Injunction ..........................................33
          1.  The Bank's Policy and Practice of Not Employing Reasonable
              Practices and Procedures to Monitor for, Detect, Stop, and
              Promptly Notify Cardholders about Suspicious Transactions
              Involving their Cards and Accounts ................................34
          2.  The Bank's Policy and Practice of Making it Difficult for
              Cardholders to Report Unauthorized Transactions ........................36
          3.  The Bank's Policy and Practice of Automatically Denying
              Unauthorized Transaction Claims Without Reasonable
              Investigation or Explanation, Including Based Solely on a
              Highly Flawed "Claim Fraud Filter"................................37
          4.  The Bank's Policy and Practice of Automatically and Indefinitely
              Freezing Cardholders' Accounts When They Report Unauthorized
              Transactions, Based on a Highly Flawed "Claim Fraud Filter" ..........40
          5.  The Bank's Policy and Practice of Denying Reasonable Customer
              Service to Cardholders Seeking Assistance with Fraud Claims and
              the Unfreezing of Accounts ..........................................42
          6.  The Court Preliminarily Enjoins the Bank's Policies and Practices....45
          7.  The Bank's Policies and Practices Continue to Harm Cardholders.....48
      G.  Class Representative Plaintiffs' Allegations .........................................49
          1.  Jennifer Yick...................................................................49
          2.  Vanessa Rivera ...............................................................52
          3.  Candace Koole................................................................54

4.  Azuri Moon.................................................................................56

5.  Roland Oosthuizen.....................................................................58

6.  Rosemary Mathews ...................................................................60

7.  Carlos Rodriguez ......................................................................62

8.  J. Michael Willrich ...................................................................64

9.  Lindsay McClure ......................................................................66

10. Robert L. Wilson.......................................................................68

11. Clara Cajas ...............................................................................69

12. Stephanie Smith .......................................................................70

13. Alan Karam ..............................................................................71

14. Luis Perez ................................................................................74

15. Brian Wiggins ..........................................................................76

16. Jonathan Smith .........................................................................77

17. Alex Yuan ................................................................................78

18. Jory Zoelle ...............................................................................80

19. Cindy Baker .............................................................................81

20. Ursula Auburn .........................................................................82

21. Julie Hicks ...............................................................................83

22. Kuang Ting Chong ...................................................................83

23. Stephanie Moore .......................................................................85

24. Zinaida Petrova ........................................................................86

25. Claire Blankenship....................................................................87

H.  Individual Plaintiffs' Allegations ..............................................89

**V.   CLASS ACTION ALLEGATIONS** ...........................................................**228**

**VI.  CLAIMS FOR RELIEF** ...............................................................................**236**

**FIRST CLAIM FOR RELIEF**

Violations of the Electronic Fund Transfers Act
15 U.S.C. §§1693 et seq.; 12 C.F.R. §§1005.1 et seq. ..............................236

**SECOND CLAIM FOR RELIEF**

Violations of the California Consumer Privacy Act
Cal. Civ. Code §§1798.100 et seq. ...........................................................240

**THIRD CLAIM FOR RELIEF**

Violations of the California Customer Records Act
Cal. Civ. Code §§1798.80 et seq. ..............................................................244

**FOURTH CLAIM FOR RELIEF**
Violations of the California Unfair Competition Law
Cal. Bus. & Prof. Code §§17200 et seq.........................................................246

**FIFTH CLAIM FOR RELIEF**
Negligence and Negligence Per Se ...............................................................252

**SIXTH CLAIM FOR RELIEF**
Negligent Hiring, Supervision, and Retention ............................................255

**SEVENTH CLAIM FOR RELIEF**
Breach of Contract .........................................................................................255

**EIGHTH CLAIM FOR RELIEF**
Breach of Implied Contract............................................................................259

**NINTH CLAIM FOR RELIEF**
Breach of Implied Covenant of Good Faith and Fair Dealing ...............261

**TENTH CLAIM FOR RELIEF**
Breach of Fiduciary Duty................................................................................263

**ELEVENTH CLAIM FOR RELIEF**
Breach of Contract (Third-Party Beneficiaries)........................................267

**TWELFTH CLAIM FOR RELIEF**
Breach of Implied Covenant Of Good Faith and Fair Dealing
(Third-Party Beneficiaries) ...........................................................................269

**THIRTEENTH CLAIM FOR RELIEF**
Violations of Federal Due Process under the 14th Amendment
(42 U.S.C. §1983)...........................................................................................272

**FOURTEENTH CLAIM FOR RELIEF**
Violations of the California Due Process Clause
Cal. Const. Art. I, §7(A) ...............................................................................274

VII.   **PRAYER FOR RELIEF** .......................................................................**275**

VIII.   **JURY TRIAL DEMAND**.....................................................................**276**

1    Plaintiffs, by and through Plaintiffs' Interim Co-Lead Counsel, hereby file
2    this Master Consolidated Complaint for both the Class Action and Individual Cases
3    ("Master Complaint"). This Master Complaint is submitted to serve the
4    administrative functions of efficiency and economy and to present certain common
5    claims and common questions of fact and law for appropriate action by the Court
6    in the context of this multidistrict proceeding, pursuant to the Order Re Case
7    Management (Dkt. No. 48). The filing of this Master Complaint does not constitute
8    a waiver or dismissal of the underlying actions or claims therein.

9    Class representative plaintiffs Jennifer Yick, Vanessa Rivera, Candace
10   Koole, Azuri Moon, Roland Oosthuizen, Rosemary Mathews, Carlos Rodriguez, J.
11   Michael Willrich, Lindsay McClure, Robert L. Wilson, Clara Cajas, Stephanie
12   Smith, Alan Karam, Luis Perez, Brian Wiggins, Jonathan Smith**,** Alex Yuan, Jory
13   Zoelle, Cindy Baker, Ursula Auburn, Julie Hicks, Kuang Ting Chong, Stephanie
14   Moore, Zinaida Petrova, and Claire Blankenship (collectively, "Class
15   Representative Plaintiffs"), on behalf of themselves and all other similarly situated
16   individuals whose California unemployment and other public benefits are or were
17   paid through debit cards issued by Defendant Bank of America, N.A. ("Bank of
18   America" or "Bank") bring this class action against the Bank for violations of the
19   Electronic Funds Transfer Act at 15 U.S.C. §§1693 et seq. ("EFTA") and its
20   implementing regulations at 12 C.F.R. Part 1005 ("Regulation E"), violations of the
21   Due Process Clauses of the U.S. and California Constitutions, breach of contract,
22   negligence, and other state common law and statutory claims, to remedy Bank of
23   America's egregious maladministration of its obligations under the California
24   Employment Development Department's ("EDD") benefits payment programs.
25   Additionally, 241 individual plaintiffs (collectively, "Individual Plaintiffs") bring
26   the same causes of action against Bank of America on behalf of themselves only.
27   In violation of its constitutional, statutory, common law, and contractual obligations
28   to Plaintiffs and Class Members, the Bank has failed to take reasonable steps to

protect Plaintiffs' and Class Members' benefits from fraud, has deprived them of their statutory right to public benefits without providing them with notice or an opportunity to be heard, and has otherwise failed to ensure that they are able to receive and access the public benefits to which they are lawfully entitled.

# I.    INTRODUCTION

1.    Like millions of other Californians, Plaintiffs lost their jobs through no fault of their own during the COVID-19 pandemic. Plaintiffs and Class Members applied for unemployment and other public benefits through programs administered by California's EDD ("EDD benefits"). They were found eligible by EDD to receive, and initially did receive, the benefits to which they were and are lawfully entitled. Throughout the COVID-19 pandemic, Plaintiffs and Class Members have relied on these subsistence benefits to pay for food, housing, and other necessities of life.

2.    Pursuant to an exclusive contract between EDD and Bank of America, Plaintiffs and Class Members received their periodic benefits payments not from EDD directly, but through Bank-issued and Bank-administered prepaid debit cards ("EDD Debit Cards" or "Cards"), which are linked to individual Bank depository accounts ("EDD Debit Card Accounts" or "Accounts"). Although the Bank was entrusted with administering these critical EDD benefits, on which millions of vulnerable Californians' lives depend, and although the Bank was legally required to take necessary and reasonable steps to protect Plaintiffs' and Class Members' EDD Debit Cards and Accounts from fraudulent access by third parties, the Bank failed to do so and indeed treated these Cards and Accounts with *less* care than it affords its regular consumer debit and credit cardholders. Among other things, the Bank failed to secure Plaintiffs' and Class Members' sensitive Card and Account information and issued them EDD Debit Cards without the industry-standard, fraud-preventing EMV chip technology that the Bank has used on all its *regular consumer* customers' debit and credit cards since 2014. Instead, for its *government*

*benefits* customers, the Bank chose to issue debit cards with only outdated magnetic stripe technology, which makes those cards far more susceptible to skimming, cloning, and other schemes that have allowed third parties to fraudulently use and access Plaintiffs' and Class Members' EDD Debit Cards and Accounts. The Bank further breached its duties through its systemic practice of failing to take reasonable steps to secure Plaintiffs' and Class Members' personal and financial information, including failing to ensure that this information was appropriately handled and not misappropriated by the Bank's subcontractors and their employees and agents, including by customer service representatives and other call center agents. The Bank's systemically lax security practices enabled unauthorized persons to access Plaintiffs' and Class Members' personal and financial information and to make fraudulent, unauthorized transactions involving Plaintiffs' and Class Members' EDD Debit Cards and Accounts.

3.      In addition to the Bank acting negligently and in breach of its statutory and common law obligations to Plaintiffs and Class Members by failing to protect their EDD Debit Cards and Accounts, the Bank also has violated its statutory and common law obligations to Plaintiffs and Class Members by failing to implement adequate and reasonable systems, measures, and protections to permit: prompt and effective identification of fraud on Plaintiffs' and Class Members' Cards and Accounts, prompt submission of fraud claims (also referred to herein as unauthorized transaction claims), provisional access to already-approved benefits during the course of the Bank's investigations of fraud claims, prompt and accurate resolution of those claims, and prompt reimbursement of funds stolen from Plaintiffs' and Class Members' Accounts. For example, instead of providing an effective and timely process for Plaintiffs and Class Members to report fraud claims, the Bank adopted a series of "customer service" practices and policies that have required Plaintiffs and Class Members to spend dozens of hours on the phone with customer service, and that have otherwise frustrated and obstructed Plaintiffs' and

1   Class Members' efforts to submit such claims. When those Plaintiffs and Class
2   Members who persevered were finally able to reach the Bank's customer service
3   representatives to report that unauthorized transactions had fraudulently been
4   conducted on their EDD Debit Card Accounts, the Bank then violated their
5   statutory, common law, and constitutional due process rights by denying their fraud
6   claims without investigation or explanation and freezing their Accounts
7   indefinitely, thereby depriving them of access to their past *and future* disbursements
8   of EDD benefits without any prior notice or an opportunity to be heard.

9        4.    The cardholder agreement between Bank of America and each Plaintiff
10  and Class Member ("Cardholder Agreement") sets forth the Bank's "Zero Liability"
11  policy, which promises to protect each Plaintiff and Class Member from adverse
12  financial consequences if their EDD Debit Cards or Accounts are fraudulently used
13  or accessed by third parties. The Bank has not implemented this policy as promised,
14  which has caused Plaintiffs and Class Members to suffer significant financial losses
15  from third-party fraud, including by the Bank failing to have reasonable procedures
16  in place to identify and receive notifications of fraud, failing to adequately monitor
17  its customer service, establishing procedures that frustrate and obstruct timely
18  submission of fraud claims by Plaintiffs and Class Members, closing fraud claim
19  investigations without having conducted a reasonable investigation, and failing to
20  extend provisional credit to Plaintiffs and Class Members as required by law while
21  fraud claim investigations are underway. The Bank has also deprived Plaintiffs and
22  Class Members of their constitutional rights to notice and an opportunity to be heard
23  before causing their EDD Debit Cards and Accounts to be frozen or blocked for
24  extended periods of time, thereby depriving Plaintiffs and Class Members of access
25  to past, present, and future disbursements of unemployment and other government
26  benefits for which they have been found eligible.

27        5.    By the acts and omissions alleged here, Bank of America has violated
28  federal and state constitutional due process protections; violated EFTA and its

1    implementing Regulation E; violated California's Consumer Privacy Act, Customer
2    Records Act, and Unfair Competition Law; acted negligently; and breached its
3    Cardholder Agreement with Plaintiffs and Class Members, its contract with EDD
4    (to which Plaintiffs and Class Members are intended third-party beneficiaries), the
5    implied covenant of good faith and fair dealing under those contracts, and its
6    fiduciary duties to Plaintiffs and Class Members. These acts and omissions have
7    caused substantial financial and other harm to Plaintiffs and Class Members, and
8    unless promptly enjoined will cause them and the public to suffer immediate and
9    irreparable harm.

10                    **II.    JURISDICTION AND VENUE**

11          6.    This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C.
12   §1331 because this action arises under the federal Due Process Clause and the
13   Electronic Fund Transfers Act, 15 U.S.C. §§1693 et seq.; (b) 28 U.S.C. §1332(d)
14   because this is a class action in which the amount in controversy exceeds
15   $5,000,000, there are more than 100 putative Class Members, and the majority of
16   putative Class Members are citizens of a state different than the state of which Bank
17   of America is a citizen; (c) 28 U.S.C. §1332(a) because Plaintiffs and Class
18   Members are citizens of California, Bank of America is incorporated under the laws
19   of Delaware and has its principal place of business in North Carolina, and the
20   amount in controversy exceeds $75,000; and (d) supplemental jurisdiction under 28
21   U.S.C. §1367 with respect to the claims for relief arising under state law.

22          7.    This Court has specific personal jurisdiction over Bank of America
23   because the Bank has sufficient minimum contacts with California, has purposely
24   availed itself of the benefits and protection of California law, and conducts a
25   substantial amount of business in and with the State of California (including with
26   EDD), such that the Court's exercise of personal jurisdiction over the Bank is
27   reasonable and accords with due process.

28

8.     Venue is proper in this District pursuant to 28 U.S.C. §1407 and the Judicial Panel of Multidistrict Litigation's Transfer Order transferring the actions comprising this multidistrict litigation to this Court for coordinated or consolidated pretrial proceedings. *See* Dkt. No. 1. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because a substantial portion of the acts or omissions giving rise to the claims alleged occurred in this District, and because Bank of America is subject to the Court's personal jurisdiction with respect to this action.

### III.     THE PARTIES

**A.     Class Representative Plaintiffs**

9.     Class Representative Plaintiff Jennifer Yick resides in San Francisco, California. She is a real estate professional who found herself out of work during the COVID-19 pandemic. She then applied for and was found eligible by EDD to receive unemployment benefits in or about April 2020. Yick received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. She was then the victim of unauthorized transactions on her EDD Debit Card Account in November 2020. Yick promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Yick to suffer immediate and irreparable injury. *See infra* ¶¶114–126. Yick is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

10.     Class Representative Plaintiff Vanessa Rivera resides in Rancho Cucamonga, California. She worked as a lien negotiator until early 2020, when she became unemployed. She then applied for and was found eligible by EDD to receive unemployment benefits in or about January 2020. Soon thereafter, she received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. On or about January 29, 2021, she was then the victim of an unauthorized $800 ATM withdrawal from her EDD Debit Card Account, which occurred at a Bank of America ATM. Rivera promptly reported the unauthorized transaction to Bank of

America, which failed to comply with its legal obligations as alleged herein, causing Rivera to suffer immediate and irreparable injury. *See infra* ¶¶127–135. Rivera is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

11.     Class Representative Plaintiff Candace Koole resides in Temecula, California. She is a doula and a nanny who found herself out of work during the COVID-19 pandemic. She applied for and was found eligible by EDD to receive unemployment benefits. Soon thereafter, she received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. In December 2020, she was then the victim of unauthorized transactions on her EDD Debit Card Account. Koole promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Koole to suffer immediate and irreparable injury. *See infra* ¶¶136–143. Koole is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

12.     Class Representative Plaintiff Azuri Moon resides in Culver City, California. He is a music educator and a live and studio guitarist. He became unemployed early in the COVID-19 pandemic. He then applied for and was found eligible by EDD to receive unemployment benefits. Soon thereafter, in or about June 2020, he received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In October 2020, he was the victim of two unauthorized ATM withdrawals on his EDD Debit Card Account totaling $1,800. Moon promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Moon to suffer immediate and irreparable injury. *See infra* ¶¶144–151. Moon is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

13.     Class Representative Plaintiff Roland Oosthuizen resides in Lawndale, California. He was furloughed from his job working for ABM at Los Angeles

International Airport in or about April 2020 due to the COVID-19 pandemic. He then applied for and was found eligible by EDD to receive unemployment benefits. Oosthuizen received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In or about September 2020, Oosthuizen was the victim of five separate unauthorized transactions on his EDD Debit Card Account on five successive days in the amount of $1,000 each. Oosthuizen promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Oosthuizen to suffer immediate and irreparable injury. *See infra* ¶¶152–159. Oosthuizen is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

14.     Class Representative Plaintiff Rosemary Mathews resides in Lawndale, California. She lost her employment with the Staples Center catering department and with a yoga studio in March 2020 due to the COVID-19 pandemic. She then applied for and was found eligible by EDD to receive unemployment benefits. Mathews received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. In or about October 2020, Mathews was the victim of an unauthorized transaction on her EDD Debit Card Account in the amount of $1,000. Mathews promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Mathews to suffer immediate and irreparable injury. *See infra* ¶¶160–170. Mathews is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

15.     Class Representative Plaintiff Carlos Rodriguez resides in Chula Vista, California. Rodriguez's job as a real estate agent slowed to almost a complete stop during the COVID-19 pandemic. Rodriguez then applied for and was found eligible by EDD to receive unemployment benefits. Rodriguez received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his

1  benefits. In December 2020, Rodriguez was the victim of unauthorized transactions
2  that removed $1,130 from his EDD Debit Card Account. Rodriguez promptly
3  reported the unauthorized transactions to Bank of America, which failed to comply
4  with its legal obligations as alleged herein, causing Rodriguez to suffer immediate
5  and irreparable injury. *See infra* ¶¶171–176. Rodriguez is pursuing the claims
6  alleged herein on his own behalf and as a representative of all Class Members.

7      16.    Class Representative Plaintiff J. Michael Willrich resides in San
8  Diego, California. He is a hospitality professional who found himself out of work
9  during the COVID-19 pandemic. He then applied for and was found eligible by
10  EDD to receive unemployment benefits. Soon thereafter, he received a Bank of
11  America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his
12  benefits. He was then the victim of unauthorized transactions that removed
13  $5,083.75 from his EDD Debit Card Account. Willrich promptly reported the
14  unauthorized transaction to Bank of America, which failed to comply with its legal
15  obligations as alleged herein, causing Willrich to suffer immediate and irreparable
16  injury. *See infra* ¶¶177–186. Willrich is pursuing the claims alleged herein on his
17  own behalf and as a representative of all Class Members.

18      17.    Class Representative Plaintiff Lindsay McClure resides in California.
19  She is a visual merchandiser at Nordstrom who found herself out of work during
20  the COVID-19 pandemic. She then applied for and was found eligible by EDD to
21  receive unemployment benefits. Soon thereafter, she received a Bank of America
22  EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits.
23  McClure experienced fraudulent charges on her EDD Debit Card Account on or
24  around December 1, 2020. McClure promptly reported the unauthorized
25  transactions to Bank of America, which failed to comply with its legal obligations
26  as alleged herein, causing McClure to suffer immediate and irreparable injury. *See*
27  *infra* ¶¶187–191. McClure is pursuing the claims alleged herein on her own behalf
28  and as a representative of all Class Members.

18.   Class Representative Plaintiff Robert L. Wilson resides in Stockton, California. He worked in construction doing project management and estimating prior to the onset of the COVID-19 pandemic. After the pandemic hit, his work slowed to the point where there were no available opportunities for employment. He applied for and was found eligible by EDD to receive unemployment benefits. He received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. After becoming aware of approximately $2,600 in unauthorized transactions on his EDD Debit Card Account, Wilson reported these unauthorized transactions to the Bank, which failed to comply with its legal obligations as alleged herein, causing Wilson to suffer immediate and irreparable injury. *See infra* ¶¶192–194. Wilson is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

19.   Class Representative Plaintiff Clara Cajas resides in California. Cajas is a registered dental assistant who works as an instructor, who found herself out of work during the pandemic. She then applied for and was found eligible by EDD to receive unemployment benefits. Soon thereafter, she received a Bank of America EDD Debit Card with a magnetic stripe (no EMV chip) to access her benefits. She was then twice the victim of unauthorized transactions on her EDD Debit Card Account. Cajas promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Cajas to suffer immediate and irreparable injury. *See infra* ¶¶195–199. Cajas is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

20.   Class Representative Plaintiff Stephanie Smith resides in Tracy, California. Smith was a salesperson who lost her job in March 2020 because of the COVID-19 pandemic. She then applied for and was found eligible by EDD to receive unemployment benefits. In or about June 2020, she received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her

benefits. Despite never having used her Card for a purchase, ATM withdrawal, or other transaction (i.e., she only conducted online transfers through Bank of America's website), unauthorized transactions appeared on her EDD Debit Card Account in late November 2020. Upon discovering the unauthorized transactions, Smith immediately reported them to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Smith to suffer immediate and irreparable injury. *See infra* ¶¶200–202. Smith is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

21.     Class Representative Plaintiff Alan Karam resides in Palos Verdes Estates, California. He operates a food truck in the Los Angeles area, but he found himself out of work due to the COVID-19 pandemic. Karam then applied for and was found eligible by EDD to receive unemployment benefits. In or about June 2020, he received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In August 2020, his EDD Debit Card Account was subject to over $2,000 in unauthorized transactions, all of which occurred in New York while Karam was in California with his Card in his possession. Karam promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Karam to suffer immediate and irreparable injury. *See infra* ¶¶203–215. Karam is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

22.     Class Representative Plaintiff Luis Perez resides in Orange, California. He worked as a concrete carpenter until July 2020, when he became unable to continue working due to conditions of the COVID-19 pandemic. He applied for and was found eligible by EDD to receive unemployment benefits. Perez received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. He was then the victim of an unauthorized transaction on his EDD Debit Card Account in October 2020. Perez promptly reported the unauthorized transactions to

Bank of America, which failed to comply with its legal obligations as alleged herein, causing Perez to suffer immediate and irreparable injury. *See infra ¶¶216–224*. Perez is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

23.     Class Representative Plaintiff Brian Wiggins resides in Elk Grove, California. He worked as a security guard until he found himself out of work during the COVID-19 pandemic. He applied for and was found eligible by EDD to receive unemployment benefits. In August 2020, Wiggins received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In November 2020, he was the victim of unauthorized ATM withdrawals on his EDD Debit Card Account, including one in Georgia. Wiggins promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Wiggins to suffer immediate and irreparable injury. *See infra ¶¶225–228*. Wiggins is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

24.     Class Representative Plaintiff Jonathan Smith resides in Los Angeles, California. He applied for and was found eligible by EDD to receive unemployment benefits. Smith received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. He was then the victim of unauthorized transactions on his EDD Debit Card Account. Smith promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Smith to suffer immediate and irreparable injury. *See infra ¶¶229–236*. Smith is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

25.     Class Representative Plaintiff Alex Yuan resides in San Jose, California. He applied for and was found eligible by EDD to receive unemployment benefits. Yuan received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. He was then the victim of unauthorized transactions on

his EDD Debit Card Account. Yuan promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Yuan to suffer immediate and irreparable injury. *See infra* ¶¶237–245. Yuan is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

26.     Class Representative Plaintiff Jory Zoelle resides in California. She applied for and was found eligible by EDD to receive unemployment benefits. Zoelle received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. She was then the victim of unauthorized transactions on his EDD Debit Card Account. Zoelle reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Zoelle to suffer immediate and irreparable injury. *See infra* ¶¶246–249. Zoelle is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

27.     Class Representative Plaintiff Cindy Baker resides in California. She applied for and was found eligible by EDD to receive unemployment benefits. Baker received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. She was then the victim of unauthorized transactions on her EDD Debit Card Account. Baker reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Baker to suffer immediate and irreparable injury. *See infra* ¶¶250–253. Baker is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

28.     Class Representative Plaintiff Ursula Auburn resides in California. She applied for and was found eligible by EDD to receive unemployment benefits. Auburn received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. She was then the victim of unauthorized transactions on her EDD Debit Card Account. Auburn reported the unauthorized

1    transactions to Bank of America, which failed to comply with its legal obligations
2    as alleged herein, causing Auburn to suffer immediate and irreparable injury. *See*
3    *infra* ¶¶254–257. Auburn is pursuing the claims alleged herein on her own behalf
4    and as a representative of all Class Members.

5         29.    Class Representative Plaintiff Julie Hicks resides in Santa Clara
6    County, California. She applied for and was found eligible by EDD to receive
7    unemployment benefits. Hicks received an EDD Debit Card with a magnetic stripe
8    (but no EMV chip) to access her benefits. In September 2020, she was the victim
9    of unauthorized transactions on her EDD Debit Card Account. Hicks promptly
10   reported the unauthorized transaction to Bank of America, which failed to comply
11   with its legal obligations as alleged herein, causing Hicks to suffer immediate and
12   irreparable injury. *See infra* ¶¶258–260. Hicks is pursuing the claims alleged herein
13   on her own behalf and as a representative of all Class Members.

14        30.    Class Representative Plaintiff Kuang Ting Chong resides in Los
15   Angeles County, California. He applied for and was found eligible by EDD to
16   receive unemployment benefits. Chong received an EDD Debit Card with a
17   magnetic stripe (but no EMV chip) to access his benefits. In July 2020, he was the
18   victim of unauthorized transactions on his EDD Debit Card Account. Chong
19   promptly reported the unauthorized transaction to Bank of America, which failed
20   to comply with its legal obligations as alleged herein, causing Chong to suffer
21   immediate and irreparable injury. *See infra* ¶¶261–267. Chong is pursuing the
22   claims alleged herein on his own behalf and as a representative of all Class
23   Members.

24        31.    Class Representative Plaintiff Stephanie Moore resides in Los Angeles
25   County, California. She applied for and was found eligible by EDD to receive
26   unemployment benefits. Moore received an EDD Debit Card with a magnetic stripe
27   (but no EMV chip) to access her benefits. In July 2020, she was the victim of
28   unauthorized transactions on her EDD Debit Card Account. Moore promptly

reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Moore to suffer immediate and irreparable injury. *See infra* ¶¶268–273. Moore is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

32. Class Representative Plaintiff Zinaida Petrova resides in Big Bear City, California. She applied for and was found eligible by EDD to receive unemployment benefits. She received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. In May 2021, she was the victim of unauthorized transactions on her EDD Debit Card Account. Petrova promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Petrova to suffer immediate and irreparable injury. *See infra* ¶¶274–278. Petrova is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

33. Class Representative Plaintiff Claire Blankenship resides in Pomona, California. She applied for and was found eligible by EDD to receive unemployment benefits during the COVID-19 pandemic. She received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. In June and July 2021, she was the victim of unauthorized transactions on her EDD Debit Card Account. Blankenship promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Blankenship to suffer immediate and irreparable injury. *See infra* ¶¶279–284. Blankenship is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

**B.    Individual Plaintiffs**

34. The 241 Individual Plaintiffs (*see infra* ¶¶286–526) bring actions against Bank of America on behalf of themselves only, and not in a representative capacity on behalf of any of the putative classes alleged herein.

## C.     Defendants

35.     Defendant Bank of America, N.A., is a financial institution incorporated in the State of Delaware and headquartered in North Carolina that conducts a substantial amount of business in California, including pursuant to its exclusive contract with the State of California EDD to administer unemployment benefits and other benefit payments through EDD Debit Cards and Accounts.

36.     The true names and capacities of Defendants Does 1 through 50, inclusive, are currently unknown to Plaintiffs. Accordingly, Plaintiffs sue each and every Doe Defendant by such fictitious names. Each Doe Defendant, individually and collectively, is responsible in some manner for the unlawful acts alleged herein. Plaintiffs will seek leave of this Court to amend this Master Consolidated Complaint to reflect the true names and capacities of the Doe Defendants when their identities become known.

37.     Plaintiffs allege that at all times relevant to the events giving rise to this action, each and every Defendant was acting as an agent or employee of each of the other Defendants. Plaintiffs further allege that at all times relevant to those events, each and every Defendant was acting within the course and scope of that agency or employment at the direction of or with the full knowledge, permission, or consent of each and every other Defendant. In addition, each of the acts or omissions of each and every Defendant was made known to, and ratified by, each of the other Defendants.

## IV.     FACTUAL ALLEGATIONS

## A.     The Bank's Contract with EDD

38.     EDD is an agency of the State of California that is responsible for administering numerous benefits programs for low-income, unemployed, and other Californians, including programs providing Californians with EDD benefits, such as unemployment insurance ("UI") benefits, pandemic unemployment assistance

("PUA") benefits, pandemic emergency unemployment compensation benefits, disability insurance benefits, and paid family leave benefits.

39.   In 2010, Bank of America entered into an exclusive contract with EDD for the provision of Electronic Benefits Payment ("EBP") services, including issuance of Bank of America EDD Debit Cards through which individuals entitled to receive EDD benefits could access those benefits.

40.   On information and belief, Bank of America obtained that contract in part by falsely representing to EDD that it would provide "best-in-class" fraud monitoring.

41.   Beginning in or about July 2011, EDD began distributing EDD benefits pursuant to its contract with Bank of America, under which the default means of distributing EDD benefits payments has been through Bank-issued and Bank-administered EDD Debit Cards, rather than paper checks or other forms of payment.

42.   In or about 2015, Bank of America submitted a response to EDD's Request for Proposals ("2015 RFP Response" or "2015 Proposal") to extend the scope and duration of the contract. The 2015 Proposal was accepted by EDD and incorporated by reference into a new contract for EBP Services entered into between EDD and the Bank, with an initial term of August 1, 2016 through July 31, 2021 ("EDD–Bank Contract"). In its 2015 Proposal, the Bank represented that it had applied and would continue to apply "the most rigorous fraud detection procedures," including "the highest level of security and fraud safeguards" based on "multiple layers of extensive security" to ensure that EDD Debit Cardholders do not become the victims of fraud. The Bank's 2015 Proposal also represented that the Bank has provided and will continue to provide "fraud monitoring" as part of its "multi-faceted approach" to preventing and combatting fraud, and that it would provide "immediate response to emerging fraud trends" to ensure that fraudulent transactions would be "declined in real time." The 2015 Proposal further

represented that the Bank would provide "industry best-in-class" fraud investigations services, "applying specialized processes and tools to resolve fraud," and that "Bank of America is committed to being at the forefront of fraud and data security strategies, benefiting the EDD and [EDD's] claimants."

43.    In its 2015 Proposal, the Bank also represented that it would fully protect EDD Debit Cardholders in case they became victims of fraud. Specifically, the Bank represented that it would comply with all EFTA and Regulation E requirements and timelines with respect to error resolution and it provided assurance that its EDD Debit Cardholders (which includes Plaintiffs and Class Members) "should feel comfortable in dealing with disputed transactions knowing that we extend our Zero Liability protection on disputed claims, including ATM and pinned POS [point-of-sale] transactions." The Bank described its error resolution process as follows: "A Claimant can file a dispute by calling the Customer Service Center for complete instructions. . . . After selecting the 'dispute a transaction' option within our IVR [Interactive Voice Response], the cardholder will immediately speak with a live representative who will further review the transaction and any other possible fraudulent transactions with the cardholder. . . . Once a dispute is requested in our system, a case will be created within our claims tracking system and tracked until final resolution. Per Regulation E, within 10 business days of the initial dispute, we will promptly correct the error. . . . If more time is needed, we will temporarily credit the cardholder's account within 10 business days of the initiated dispute for the full disputed amount. There is no limitation or maximum to the credit amount provided. This will allow the account holder to use the funds while the claim is being resolved."

44.    The Bank's 2015 Proposal also made representations about the "[s]uperb customer service" levels it would guarantee EDD Debit Cardholders, boasting that "[w]e set the bar high and pride ourselves on serving each caller with swift, responsive service," and providing assurances that "[l]ong call hold waits and

busy signals are not tolerated at Bank of America. Your program's average speed of answer is 30 seconds and your average handle time is 230 seconds." Pursuant to the EDD–Bank Contract, the Bank promised, among other things, to provide an IVR system and live Customer Service Representative ("CSR") support available "24 hours a day, seven days a week." The Bank promised that live CSR agents would be available 24/7 to assist EDD Debit Cardholders with "[i]nvestigat[ing] transactions (fraud security, use)," "[p]rocess[ing] lost/stolen/damaged card reports," and "[c]heck[ing] on the Status of Disputed Transactions." The Bank further promised that "no call [would be] transferred to voicemail or automatically disconnected from the queue," that "calls [would] not [be] immediately placed on hold," that "the average wait time to speak to a live CSR" agent would be "no more than 30 seconds for 70 percent of the calls, and no more than two (2) minutes for all calls," and that the Bank would "monitor Customer Service calls to ensure quality service and address Customer complaints."

45.    On information and belief, EDD entered into the EDD–Bank Contract because of, and in reliance on, the Bank's representations in its 2015 Proposal.

46.    Pursuant to the terms of the EDD–Bank Contract, EDD and the Bank are engaged in a joint undertaking to administer the EDD benefits programs and to distribute EDD benefits payments to eligible claimants through EDD Debit Cards.

47.    EDD Debit Cards are the default payment method for EDD benefits, and EDD's website presents EDD Debit Cards as the exclusive means of receiving EDD benefits.[1] EDD promotes EDD Debit Cards as "a fast, convenient, and secure

---

[1] *See, e.g.*, EDD website, *Unemployment Insurance – After You File a Claim*, https://www.edd.ca.gov/unemployment/After_you_Filed.htm#receive ("When your first benefit payment is available, you will receive a debit card in the mail."); EDD Website, *Guide to Applying for Unemployment Benefits*, https://unemployment.edd.ca.gov/guide/receive-benefits ("Benefit payments for Unemployment Insurance, Pandemic Unemployment Assistance (PUA), Disability Insurance, and Paid Family Leave are all made using the Bank Debit

way to get your benefit payments," and advertises the many purported benefits of EDD Debit Cards, including: "Get your money sooner"; "Use it everywhere VISA is accepted (in stores, online, and by phone)"; "Withdraw cash at ATMs, banks, and stores with cash back options"; "Transfer funds to the financial institution of your choice at no additional cost"; "Be notified when a deposit is made to your card, or when you have a low balance"; and "Receive fraud protection from a Zero Liability Policy."[2]

48.    The EDD has delegated to the Bank the public functions of distributing EDD benefits to Cardholders. EDD Debit Cards and Accounts are an integral part of EDD's benefits distribution and administration system. Under the terms of the EDD–Bank Contract, those Accounts can only receive deposits from the EDD and no commingling of EDD benefits payments with other funds is permitted. The EDD–Bank Contract provides that the Bank "shall disburse to each claimant the entire amount the EDD authorizes" and "shall process all benefit payment amounts provided by the EDD without alteration or adjustment."

49.    The EDD–Bank Contract, which contains an express revenue-sharing agreement, creates a relationship of financial interdependency between EDD and Bank of America. Under the revenue-sharing agreement, the State of California benefits from delegating the administrative burdens of EDD benefits distribution to the Bank at no cost to the State, while the Bank benefits from collecting point-of-sale transaction fees and other fees from millions of EDD Debit Cardholders and vendors and from earning interest on EDD benefits funds that have been deposited into EDD Debit Card Accounts but that remain unspent by Cardholders (commonly referred to as "float").

_____

Card."). While it is possible for Cardholders to contact EDD to receive their benefits via paper checks instead of through EDD Debit Cards, that option is neither publicized nor easily accessed.

    [2] EDD website, *Debit Card*, https://www.edd.ca.gov/about_edd/The_EDD _Debit_Card.htm.

50.     The EDD–Bank Contract also authorizes and obligates the Bank to work jointly with EDD to combat EDD benefits enrollment fraud. Pursuant to those contractual responsibilities, the Bank purports to engage in a joint fraud-prevention undertaking with EDD. Pursuant to EDD's instructions, the Bank froze a number of Accounts for suspected enrollment fraud between approximately September 2020 and March 2021. None of those EDD-initiated freezes are at issue in this case.

51.     Between approximately September 2020 and February 2021, the Bank itself independently froze approximately 75,000 EDD Debit Card Accounts based on the Bank's assertions that those Cardholders had engaged in enrollment fraud. On information and belief, the Bank has since then independently frozen or blocked tens of thousands more Accounts and continues to do so, without EDD direction or authorization to freeze those Accounts. These are the Account freezes at issue in this case. The Bank has earned, and continues to earn, interest on funds in the Bank-frozen Accounts.

52.     If a Cardholder's Account is frozen by the Bank and the Cardholder contacts the Bank, the Bank informs the Cardholder that they must re-authenticate their identity and re-verify their EDD benefits eligibility with EDD before the Bank will unfreeze their Account—regardless of whether EDD itself has raised any question regarding the Cardholder's identity or benefits eligibility. When Plaintiffs and Class Members contacted EDD and were actually able to get through to a live representative, they were frequently told that there was no issue with their identity or benefits eligibility from EDD's perspective and that the issue was with Bank of America. Nevertheless, these Plaintiffs and Class Members continued to be unable to access the funds in their EDD Debit Card Accounts, which remained frozen.

53.     On October 15, 2020, after EDD had informed the Bank that it had identified Cardholders whose Accounts should be unfrozen, EDD sent the Bank a letter expressing concern that the Bank had neither confirmed compliance with EDD's requests that those Accounts be unfrozen, nor explained why it had not

complied. EDD further informed the Bank that it had become aware that the Bank was itself freezing additional Accounts based on the Bank's own suspicions but that the Bank had not notified EDD's fraud investigation division of such suspicions despite its contractual obligations to do so. EDD instructed the Bank to cease freezing additional Accounts and to explain why it had continued to freeze Accounts without EDD's authorization, and to reverse any such freezes. Finally, EDD informed the Bank that it was aware that the Bank had sent EDD draft notices to Cardholders whose Accounts the Bank had frozen and that the EDD had objected to the content of those notices, and asked for confirmation that the Bank would not send further notices without an understanding as to which Accounts would receive the notice and the language that would be used, to ensure that the language conformed to the language in EDD's own notices.

54.    The EDD–Bank Contract relieves EDD of any liability for "fraud, misuse, and lost or stolen debit cards," leaving the Bank solely liable for such fraud, misuse, loss, or theft. This potential liability creates a financial incentive for the Bank to circumvent its EFTA and other legal obligations to provide provisional credit and permanent reimbursement for fraudulent transactions that occur in EDD Debit Card Accounts.

**B.    The Bank's Failure to Secure EDD Debit Cardholder Information**

55.    Bank of America has failed to store, share, transmit, or otherwise use EDD Debit Cardholders' personally identifiable information, Card and Account information, and other financial data and information, including any such data or information learned in the course of providing customer service to Cardholders (collectively, "Cardholder Information") in a reasonably secure manner and consistent with the Bank's obligations to EDD and to Plaintiffs and Class Members. The Bank has also failed to act reasonably in its hiring, supervision, training, and retention of its agents, including its subcontractors and its subcontractors' employees and agents, who have access to Cardholder Information, including as a

result of staffing the Bank's Call Centers, interacting with Cardholders, and reviewing Cardholders' unauthorized transaction claims. The Bank has failed to take reasonable steps to ensure that its subcontractors and their employees and agents, including CSRs and other Call Center agents, maintain the security and confidentiality of Cardholder Information, including by failing to ensure: that all such agents were subject to reasonable background checks, that all such agents received reasonable training on maintaining the security and confidentiality of Cardholder Information, and that the Bank's subcontractors took reasonable steps to secure Cardholder Information from unnecessary or unauthorized access, disclosure, and exfiltration, including by the subcontractors' agents and employees.

56.    As a result of the Bank's acts and omissions alleged herein, Cardholder Information has been obtained by unauthorized third parties in a series of security breaches that have allowed Plaintiffs' and Class Members' benefits to be stolen out of their Accounts through unauthorized transactions. The Bank's repeated and ongoing failure to secure Plaintiffs' and Class Members' Cardholder Information violated and continues to violate the California Consumer Privacy Act, the Gramm-Leach-Bliley Act and rules and regulations promulgated thereunder that require the Bank to protect the security and confidentiality of its customers' nonpublic personal information, and the Bank's common law duty to take reasonable steps to protect Cardholder Information from unauthorized access, disclosure, and exfiltration, including by the Bank's own agents.

57.    Some EDD Debit Cardholders who have had money stolen from their Debit Card Accounts through unauthorized transactions received and activated their EDD Debit Cards, but never used their Cards.[3] Such unauthorized transactions

---

[3] *See, e.g.*, David Gotfredson, "California Unemployment: Fraudulent Charges Keep Popping up on Bank Debit Card Accounts," *ABC10 Sacramento (KXTV)* (Jan. 21, 2021), *available at* https://www.abc10.com/article/money /fraudulent-charges-edd-debit-card-accounts/509-5a8b0958-0b56-41fe-81af-

1   could only have occurred if the Bank failed to store, share, transmit, or otherwise

2   use Cardholder Information in a reasonably secure manner.

3       58.    For example, Plaintiff Stephanie Smith received her EDD Debit Card

4   in or about June 2020 and activated it on Bank of America's website the same day

5   that she received it. Immediately after activating the Card, she locked the Card in a

6   safe inside her home, and she did not subsequently take the Card out of the safe or

7   use it in any way. Her only activity on her EDD Debit Card Account thereafter was

8   to use Bank of America's website to transfer funds from her Account to her personal

9   consumer bank account (also with Bank of America). She never used the Card at an

10  ATM, for an online purchase, at a retail store, or for any other transaction. Despite

11  never using the Card, an unknown person or persons used the Cardholder

12  Information associated with Smith's EDD Debit Card and/or Account to make

13  unauthorized transactions in November 2020. Smith's Cardholder Information was

14  stolen due to the Bank's failure to prevent such thefts by its own agents.

15  **C.    The Bank's Use of Outdated, Vulnerable Magnetic Stripe Technology**

16      59.    When a debit or credit cardholder seeks to access funds on the card,

17  for example at a point-of-sale terminal or ATM, the Cardholder Information stored

18  on the card is first sent through a processing network operated by Visa. The first

19  step in that process occurs at the point of sale, where the card must either be swiped

20  or inserted into a card reader. The reader obtains the Cardholder Information stored

21  on the card and transmits it to the financial services provider through a computer

22  network, either at the time of the transaction or later in a "batch" with other

23  transactions.

24      60.    From the 1960s until approximately 10 years ago, magnetic stripes

25  were the standard for storing consumer information on debit cards and credit cards

26

27  e3ce446d0690 (reporting that an EDD Debit Cardholder experienced fraud despite
    the fact that he "never . . . used the card" and "only used the account number to

28  transfer money to [his] credit union").

in the United States. A magnetic stripe contains static data about the card, including the cardholder's name, the card number, and the card expiration date. This data is printed directly on the outside of the card and recorded on the magnetic stripe. When swiped through a reader, this data is collected and transmitted as part of the transaction process.

61.    Because the data on a magnetic stripe are static and easily readable, magnetic stripe cards are highly susceptible to fraud. One of several common methods of stealing information from magnetic stripe cards is called "skimming," a process by which a wireless transmitter affixed to a card reader collects the information on the magnetic stripe when the card is swiped or inserted and sends it to a nearby computer. The recipient can then use the information to clone the consumer's card, conduct unauthorized transactions, and access the bank account connected to the card.

62.    Personal data on magnetic stripe cards can also be captured by hackers on a large scale. For example, in 2013, hackers infiltrated the retailer Target's payment terminals and systematically captured the information of every swiped card for weeks, ultimately gathering the card information of tens of millions of people.[4] Card data collected in this manner can be sold on an underground market, where the stolen data can be used to make fraudulent purchases.

63.    Over the past decade, in an effort to stem the consumer fraud enabled by magnetic stripes, the financial services industry in the United States has adopted EMV chip technology as the industry standard. While magnetic stripes are "static," with the same card-identifying information provided for every transaction, EMV chips are "dynamic," meaning the data they contain can be interacted with, altered,

---

[4] Elise Hu, "Target Hack a Tipping Point in Moving Away from Magnetic Stripes," *NPR* (Jan. 23, 2014), *available at* https://www.npr.org/sections /alltechconsidered/2014/01/23/264910138/target-hack-a-tipping-point-in-moving-away-from-magnetic-stripes.

and updated. An EMV chip creates a unique electronic signature for each transaction, making data from past EMV chip card purchases useless to would-be thieves, thereby significantly reducing the risk of unauthorized transactions.

64.    In 2011, the same year the Bank began issuing EDD Debit Cards, the Bank announced it would offer EMV chips in corporate credit cards to its U.S. business customers who regularly traveled outside the United States.

65.    On September 30, 2014, the Bank announced that it would include EMV chip technology on "all new and reissued" consumer debit cards. In announcing this shift, a Bank of America executive stated that "chip technology is an important tool in increasing card security, and we want our customers to have the best possible experience when using their payment cards." The executive added that the "new chip-enabled cards will improve security of customers' transactions."[5]

66.    In 2015, card issuers and processors began a nationwide shift to EMV chip cards. By 2017, an estimated 855 million EMV chip cards had been issued to U.S. consumers, and such cards are now standard in the industry.

67.    In 2015, card-issuing banks and payment networks introduced a new policy that shifted liability for fraudulent transactions away from themselves and onto retailers and card issuers. As of October 1, 2015, retail merchants who did not have certified EMV chip readers became liable for fraudulent transactions if the consumer presented an EMV chip card. In essence, this meant that liability for consumer card fraud would fall on either the retailer or the card issuer, whichever was the least compliant with the EMV protocol.

68.    Bank of America acknowledges on its website that EMV chip technology "has been around for over 20 years and is the credit and debit card

---

[5] Bank of America Press Release, "Bank of America Begins Rollout of Chip Debit Cards" (Sept. 30, 2014), *BusinessWire*, available *at* https://www.businesswire.com/news/home/20140930005292/en/Bank-of-America-Begins-Rollout-of-Chip-Debit-Cards.

security standard in many countries around the world. When purchases are made using the chip feature at chip-enabled terminals, the transaction is more secure because of the process used to determine if the card is authentic. This makes the card more difficult to counterfeit or copy." The Bank also assures Cardholders on its website that "whether you use the magnetic stripe or the chip to make your purchase, you can have confidence in the protection and security features we provide for all credit and debit accounts."

69.     Bank of America has been aware for many years that EMV chip cards are significantly more secure than magnetic stripe cards and that EMV chip cards are the "debit card security standard." Despite that knowledge and despite the Bank's representations to EDD that it will "focus on claimants" while leveraging "rapidly evolving payment technology" and staying "at the forefront of payments innovation," the Bank chose to issue EDD Debit Cards using old, vulnerable magnetic stripe technology to hundreds of thousands of the most financially vulnerable Californians—Plaintiffs and Class Members. To this day, the Bank continues to issue EDD Debit Cards with no EMV chip, notwithstanding its announcement nearly seven years ago that it would include EMV chip technology on all consumer debit cards to help prevent fraud. Predictably, the issuance of EDD Debit Cards without EMV chips has led to rampant fraud, resulting in the ongoing loss of millions of dollars in EDD benefits intended to assist Californians who lost their jobs, including during the COVID-19 pandemic.

**D.     The Bank's Contractual Promises and Representations to Cardholders**

70.     Bank of America represented to Plaintiffs and Class Members, in its Cardholder Agreement and on its website, that they would not be responsible for unauthorized transactions on their EDD Debit Cards or Accounts because of the Bank's "Zero Liability" policy, under which the Bank would fully protect them against, and would reimburse them for, any unauthorized transactions. The Bank also represented to Plaintiffs and Class Members that they could call the Bank 24

hours a day 7 days a week to report any unauthorized transaction to live customer services representatives, and that the Bank would promptly investigate the transaction and determine whether it was unauthorized within 10 business days thereafter, except that if the Bank took longer than 10 business days (but in no event longer than 45 calendar days) to investigate the transaction, the Bank "will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

71.     In the Bank's California Employment Development Department Debit Card Account Agreement ("Cardholder Agreement"), to which all EDD Debit Cardholders must agree, Bank of America sets forth the above promises in detail. The Cardholder Agreement has an effective date of March 1, 2018, and thus has been effective throughout the Class Period, as defined below. The Cardholder Agreement states: "Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time . . . ." The Cardholder Agreement advises the Cardholder to "contact us at the number listed below AT ONCE if you believe your Card has been lost or stolen or if you believe that someone may use or has used your PIN assigned to your card without your permission. Telephoning is the best way of keeping your possible losses down." The Cardholder Agreement requires Cardholders to call or write to report an unauthorized transaction "no later than 60 days" after the Bank sent the statement on which the transaction appeared.

72.     The Cardholder Agreement promises that Bank of America "will determine whether an error occurred within 10 business days" after an unauthorized transaction is reported. The Cardholder Agreement reserves the right to "take up to 45 days to investigate" if the Bank "need[s] more time," in which case the Bank promises that "we will credit your Account within 10 business days for the amount

1    you think is in error, so that you will have the money during the time it takes us to

2    complete our investigation."

3        73.    Bank of America represents to EDD Debit Cardholders that the Bank's

4    customer service department representatives are continuously available to assist

5    with suspected fraud. On Bank of America's EDD Debit Card FAQ webpage, in

6    response to the question "What are the Bank of America EDD Debit Card Customer

7    Service hours?" Bank of America claims that "[f]or your convenience," Bank of

8    America's "dedicated customer service representatives are available 24 hours [a]

9    day, 7 days a week" by phone. The webpage further explains that the Bank's

10   customer service representatives can help with the following: "Resolve a question

11   about     your     account     statement,"    "Investigate    transactions,"    "Process

12   lost/stolen/damaged card reports," and "Request an emergency cash transfer." In its

13   Cardholder Agreement, Bank of America advises EDD Debit Cardholders that

14   "Telephoning is the best way of keeping your possible losses down." In addition,

15   Bank of America provides each EDD Debit Cardholder with a "Quick Reference

16   Guide," which prominently states that "customer service is available 24/7."

17   **E.     The Rampant Third-Party Fraud on EDD Debit Card Accounts**

18       74.    In the spring of 2020, the COVID-19 pandemic devastated California's

19   economy, and millions of workers lost their jobs due to business closures and mass

20   layoffs. The state's unemployment rate skyrocketed from 3.9% in January 2020 to

21   16.4% in April 2020, following closure orders issued by Governor Gavin Newsom

22   and county health officials. Industries such as hospitality, food service, retail trade,

23   and educational services were especially hard hit.

24

25

26

27

28



75.   As a result, millions of Californians turned to the EDD unemployment benefits programs administered by Bank of America to pay their bills and make ends meet. Since the start of the COVID-19 pandemic in March 2020, EDD has received at least 18.5 million claims for various unemployment benefits. In the first week of December 2020, EDD received 341,813 claims, a 600% increase from December 2019. Bank of America has issued more than 9 million EDD Debit Cards to individuals found by EDD to be eligible for unemployment benefits.

76.   As widely reported in the media and as described by California state legislators who report having heard from thousands of constituents, tens of thousands of EDD Debit Cardholders have been the victims of fraud throughout the pandemic, resulting in tens of millions of dollars having been stolen from their Accounts, including through fraudulent ATM withdrawals, such as many Plaintiffs and Class Members experienced.

77.   EDD Debit Cardholders have reported thousands of dollars stolen through unauthorized use of their EDD Debit Cards. These unauthorized transactions have taken various forms, including massive ATM withdrawals in

distant states and countries,[6] thousand-dollar charges at luxury vendors, and repeated transactions with food delivery services. Regardless of how or where the fraud has been carried out, the Bank's EDD Debit Cards have proven highly susceptible to unauthorized use.

78.    After criminals exploit the security vulnerabilities of the Bank's EDD Debit Cards and Accounts and misappropriate Cardholder Information, that information can be sold on the dark web, allowing the buyers to engage in unauthorized use of funds belonging to Plaintiffs and Class Members.[7]

79.    Such rampant third-party fraud was readily foreseeable given the rapid growth of the number of new unemployment benefits claims, as well as reports from early in the pandemic warning of the potential for fraud and exploitation of the unemployment benefits system by criminals. It is well known in the financial industry that crises such as economic recessions lead to an increase in scams, fraud, and other financial crimes. The early months of the COVID-19 pandemic in the United States—March through May 2020—made clear that the pandemic would be no exception. In late March 2020, the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law, injecting $2.2 trillion of relief into the American economy, including $260 billion in increased unemployment benefits, and hundreds of billions of dollars more in one-time cash payments to taxpayers and forgivable Paycheck Protection Program ("PPP") loans. This rapid influx of pandemic relief to individuals and businesses, combined with rapid growth in the number of new claims for UI, PUA, and other public benefits created a "perfect environment" for fraud that was widely reported in the American

---

[6] *See, e.g.*, CBSLA Staff, "Bank of America Freezes EDD Accounts of Nearly 350,000 Unemployed Californians for Suspected Fraud," *CBS Los Angeles* (Oct. 29, 2020), *available at* https://losangeles.cbslocal.com/2020/10/29/bank-of-america-freezes-edd-accounts-of-nearly-350000-unemployed-californians-for-suspected-fraud/.

[7] *See id.*

media,[8] and that led to a flood of warnings from government agencies and expert nongovernmental organizations about major increases in malicious cyber activity and financial fraud, including fraud targeting government unemployment benefits and consumer banking and credit services.[9] Reporting during the early months of

---

[8] Ari Shapiro & Martin Kaste, "The Pandemic Creates A Perfect Environment For New Types Of Fraud," *NPR All Things Considered* (May 21, 2020), https://www.npr.org/2020/05/21/860584461/the-pandemic-creates-a-perfect-environment-for-new-types-of-fraud (reporting experts saying that there was a "bonanza" and "gold rush right now" in pandemic-related financial crimes); Steve Inskeep & Martin Kaste, Washington State Hit Hard by Unemployment Fraud, *NPR Morning Edition* (May 22, 2020) ("scams thriving nationwide in the uncertain conditions created by the pandemic," including hundreds of millions of dollars lost by Washington state to fraudulent unemployment claims).

[9] *See, e.g.*, National Governor's Association, *Memorandum To: All Governors Re: COVID-19 and Cybersecurity* at 1 (Apr. 28, 2020) ("State agencies, critical infrastructure sectors, and the general public are experiencing waves of COVID-themed malicious cyber activity."); Greg Iacurci, "If there's coronavirus relief money, scammers will try and steal it," *CNBC* (May 6, 2020), https://www.cnbc.com/2020/05/06/scammers-are-looking-to-steal-your-coronavirus-relief-money.html ("Federal agencies like the IRS, Federal Trade Commission, Social Security Administration and FBI have warned consumers and business owners in recent weeks to be vigilant as fraudsters try to take advantage of them during the coronavirus pandemic," including by targeting government financial relief such as unemployment benefits); U.S. Dept. of Labor Press Release, *U.S. Department Of Labor Issues Guidance And Reminders To States To Ensure Integrity Of Unemployment Insurance Programs* (May 11, 2020), https://www.dol.gov/newsroom/releases/eta/eta20200511-1 (announcing new "targeted guidance and reminders . . . to help states guard against fraud and abuse of their unemployment insurance systems"); Mike Baker, "Feds Suspect Vast Fraud Network Is Targeting U.S. Unemployment Systems," *The New York Times* (May 16, 2020), *available at* https://www.nytimes.com/2020/05/16/us/coronavirus-unemployment-fraud-secret-service-washington.html; AnnaMaria Andriotis & Orla McCaffrey, "Borrower, Beware: Credit-Card Fraud Attempts Rise During the Coronavirus Crisis," *The Wall Street Journal* (May 27, 2020), *available at* https://www.wsj.com/articles/borrower-beware-credit-card-fraud-attempts-rise-during-the-coronavirus-crisis-11590571800 (reporting on the "big jump in attempted credit- and debit-card fraud since coronavirus shut down the U.S. economy" and that "[b]anks have increased their fraud projections for 2020").

the pandemic also noted that the major increases in fraudulent financial activity had, predictably, caused a corresponding increase in demand on customer service phone lines, causing many agencies and companies to hire additional customer service representatives.[10] Bank of America nonetheless failed to take reasonable measures to prepare for, prevent, or respond to the readily foreseeable wave of transactional fraud affecting its EDD Debit Cards and Accounts.

**F.    The Bank's Evasive and Ineffectual Response Prior to the Filing of Plaintiffs' Initial Class Action Complaint and The Court's Issuance of a Preliminary Injunction**

80.    Bank of America's ineffective response to the rampant transactional fraud on EDD Debit Cards and Accounts has taken various forms, as detailed herein, including failing to employ reasonable practices and procedures for monitoring, detecting, stopping, and notifying Plaintiffs and Class Members about highly suspicious transactions in their Accounts; not answering the customer service phone lines it advises Cardholders to call; establishing "customer service" procedures that frustrate and obstruct Plaintiffs' and Class Members' efforts to file fraud claims; opening fraud claims and then promptly closing them without conducting a reasonable and good faith investigation; unilaterally reversing "permanent" credits previously granted for unauthorized transactions without a reasonable and good faith basis and without advance notice to the Cardholder; failing to extend provisional credit to Cardholders without a reasonable and good

---

[10] *See, e.g.*, Baker, *supra* note 9 (phone calls reporting fraud "flooded" Washington state unemployment benefits agency and "forced the state to hire more people to answer the phones"); Andriotis *et al.*, *supra* note 9 (cardholders of major credit card issuers experiencing difficulty "getting customer-service representatives on the phone to remove charges and replace cards").

faith basis; and indefinitely freezing or blocking the Accounts of Cardholders who call Bank of America to report third-party fraud on their Accounts.[11]

1. **The Bank's Policy and Practice of Not Employing Reasonable Practices and Procedures to Monitor for, Detect, Stop, and Promptly Notify Cardholders about Suspicious Transactions Involving their Cards and Accounts**

81.    In its 2015 Proposal, Bank of America represented to EDD that, if EDD were to extend its contract to distribute EDD benefits through EDD Debit Cards and Accounts, the Bank "fully intend[s] to apply the most rigorous fraud detection procedures," including "employ[ing] the highest level of security and fraud safeguards" based on "multiple layers of extensive security" and a "multi-faceted approach to combat fraud." The Bank's 2015 Proposal specifically promises that Bank of America would provide "fraud monitoring" for all EDD Debit Cards and Accounts, and to employ technology that would provide "immediate response to emerging fraud trends" and allow fraudulent transactions to be "declined in real time." On information and belief, the Bank did not keep any of these promises with respect to Plaintiffs' and Class Members' Accounts during the Class Period (as defined herein), resulting in a flood of unauthorized transactions occurring on Plaintiffs' and Class Members' Accounts which went unchecked by the Bank.

82.    For example, at all relevant times, Bank of America knew that the vast majority of Plaintiffs and Class Members were residents of California based on a variety of information sources, including Plaintiffs' and Class Members' contact information, their EDD Debit Card and Account transaction histories, and the fact that EDD had determined them to be eligible to receive EDD benefits.

---

[11] Kenny Choi, "Victims of Bank of America Bank Debit Card Fraud Tell Stories of Fake Charges, Long Waits, Closed Claims," *KPIX–CBS SF Bay Area* (Dec. 22, 2020), *available at* https://sanfrancisco.cbslocal.com/2020/12/22/victims-of-bank-of-america-edd-debit-card-fraud-tell-stories-of-closed-claims-frustration-loss/.

83.     The Bank also knew about the COVID-19 pandemic and the fact that people were engaging in much less long-distance travel (including long-distance in-state, out-of-state, and out-of-country travel) during the pandemic, whether because of pandemic-related fears, pandemic-related travel restrictions imposed by state, national, and foreign governments, or other reasons. The Bank had a legal obligation, but failed, to use this knowledge to monitor for, detect, stop, and notify Cardholders about transactions involving their Card or Account that were suspicious because they were made during the pandemic at a significant distance from where a particular Cardholder resided—especially with respect to transactions being made hundreds of miles away or in another country.

84.     The Bank also had access to Plaintiffs' and Class Members' individual EDD Debit Card and Account transaction histories. The Bank had an obligation, but failed, to use this knowledge to monitor for, detect, stop, and notify Cardholders about multiple transactions involving their Card or Account that were suspicious because the multiple transactions were made close in time but at a great physical distance away from one another. For example, in November 2020, Class Representative Plaintiff Jennifer Yick used her EDD Debit Card for in-person transactions at stores in the San Francisco Bay Area on the same day or within one day of unauthorized DoorDash transactions that occurred in New York, Texas, and hundreds of miles away in Southern California. Yet the Bank failed to flag any of these transactions as suspicious, stop them, or promptly notify Yick about them.

85.     The Bank also had an obligation, but failed, to use Plaintiffs' and Class Members' individual EDD Debit Card and Account transaction histories and past Account access behaviors (e.g., logging into Accounts online, checking Account balances) to monitor for, detect, stop, and notify Cardholders about transactions involving their Card or Account and about Account access behaviors that were suspicious because they were significantly inconsistent with how the Cardholder had previously used their Card and Account. For example, Jennifer Yick had never

used her EDD Debit Card for transactions from DoorDash or to make any online transactions, but rather had always used her Card over the course of several months for purchasing necessities from brick-and-mortar stores located in or around the San Francisco Bay Area, such as gas stations, grocery stores, and retail stores like Target and Costco. Yet, Bank of America failed to flag as suspicious, stop, or notify her about the four unauthorized DoorDash transactions that occurred within two weeks of each other in November 2020 in New York, Texas, and Southern California.

86.     Indeed, at all relevant times, the Bank had the obligation, but failed, to employ reasonable policies and procedures for monitoring for, detecting, stopping, and promptly notifying Cardholders about highly suspicious transactions involving their Cards and Accounts, including but limited to using all the information at its disposal to satisfy its constitutional, statutory, common law, and contractual obligations to Plaintiffs and Class Members to monitor for, detect, stop, and promptly notify Cardholders about suspicious activity involving their Card or Account.

## 2. The Bank's Policy and Practice of Making it Difficult for Cardholders to Report Unauthorized Transactions

87.     The Bank has prevented many Plaintiffs and Class Members from being able to report fraud in a timely manner, or even at all. For starters, the Bank has established EDD Debit Card customer service phone lines as the virtually exclusive means for EDD Debit Cardholders to seek help regarding issues with their Cards or Accounts. Many Plaintiffs and Class Members, for example, have gone to Bank of America branches seeking assistance with their Cards or Accounts, only for Bank branch employees to tell them that they cannot assist EDD Debit Cardholders, and that the Cardholder must call the phone number on the back of their Card for assistance. Similarly, the Bank has generally not provided EDD Debit Cardholders with the option of communicating their customer service to the Bank by email, online chat, in-app chat, text, or other means now commonly available to

customers of financial institutions. Instead, EDD Debit Cardholders are largely limited to calling.

88. Calling the Bank's EDD Debit Card customer service phone lines, however, has often required Cardholders to endure hours-long wait times (with no option to receive a callback when a customer service agent becomes available), a variety of mishaps, and customer service agent incompetence. Notwithstanding the foreseeable spike in calls that the Bank knew or should have known would inevitably accompany the dramatic increase in unemployment benefits recipients during the pandemic, the Bank failed to appropriately staff its customer service call centers in a manner that would enable the Bank to honor its contractual commitments under the EDD–Bank Contract and to provide reasonable levels of assistance to the predictably large volume of EDD Debit Cardholders seeking assistance. As a result, Plaintiffs and Class Members attempting to report fraud or to inquire about potential fraud have been kept on hold for hours, have been disconnected without warning, have waited long periods of time to speak with someone only to be told to call back later, have been transferred to various departments with no apparent end or sent to voicemail, have had to deal with unhelpful automated agents, and have unsuccessfully attempted to reach the Bank by email.

### 3. The Bank's Policy and Practice of Automatically Denying Unauthorized Transaction Claims Without Reasonable Investigation or Explanation, Including Based Solely on a Highly Flawed "Claim Fraud Filter"

89. Even when Plaintiffs and Class Members have been able to report unauthorized transactions to the Bank, the Bank has had a policy and practice since at least October 2020 of automatically and summarily denying the fraud claims of EDD Debit Cardholders without adequate investigation or explanation, including based solely and exclusively on the results of the Bank's highly flawed and

unreliable automated "fraud filter" ("Claim Fraud Filter"), which it applies whenever an EDD Debit Cardholder reports an unauthorized transaction on their Account, purportedly to determine if the claimant is using a stolen identity. Pursuant to this policy and/or practice, the Bank has failed to provide provisional credit to tens or hundreds of thousands of Cardholders who filed a fraud claim and were flagged by the Bank's Claim Fraud Filter. Instead of investigating the claim and providing provisional credit as required by law, the Bank sent those Cardholders a form letter, often dated the very same day or within a day or two of the Cardholder's report of the unauthorized transactions, closing the Cardholder's claim. The form letter states: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any." The form letter does not provide any individualized information explaining what the Bank's investigation, if any, entailed, nor does it explain the basis for the Bank's determination.

90.    The Bank's form letter provides a telephone number that Cardholders should call if they wish to "request that [the Bank] reopen your claim for further consideration," but EDD Debit Cardholders who have called the Bank at that number to make such a request have been given erroneous information or have been told they cannot be helped. Even those who have submitted detailed documentation to the Bank substantiating their fraud claims, such as sworn statements, police reports, and documentary proof of their whereabouts at the time the fraudulent transactions occurred (e.g., that they were nowhere near the ATM from which their funds were withdrawn), have been often ignored and forced to go months without receiving any update from the Bank regarding the status of their claim. Some who submitted additional information simply received yet another form letter from the Bank summarily reaffirming without explanation the Bank's original decision

1    denying the fraud claim. Even those Cardholders whose claims have been reopened
2    were not issued provisional credit pending completion of the Bank's investigation
3    and were not guaranteed that the Bank's investigation would be completed within
4    a certain number of days.

5          91.   The Bank adopted its policy and practice of automatically denying the
6    fraud claims of EDD Debit Cardholders in an attempt to circumvent its obligations
7    under EFTA and Regulation E, which require the Bank to issue provisional credit
8    if it has not completed a good-faith investigation within 10 business days of a
9    Cardholder giving notice of an unauthorized transaction on their Account, to
10   complete a good-faith investigation of the claim within no more than 45 days, and
11   to permanently credit the Cardholder's Account for the amount of the transaction
12   unless the Bank has a reasonable basis for believing that the Cardholder authorized
13   or benefitted from the transaction. In implementing this unlawful policy and
14   practice, the Bank sought to protect its own financial interests at the expense of
15   legitimate claimants whose life-sustaining public benefits had been stolen from
16   their Bank of America Account.

17         92.   The Bank also implemented its policy and practice of automatically
18   denying the fraud claims of EDD Debit Cardholders *retroactively* by rescinding
19   "permanent" credits that the Bank had previously paid. Thus, many Plaintiffs and
20   Class Members who previously had been "permanently" credited with the amount
21   of the funds that had been stolen from them and who had been previously informed
22   by the Bank that their fraud claims were favorably resolved suddenly and without
23   explanation had that same amount *debited* from their Accounts, sometimes leaving
24   their Accounts with a negative balance. As a result, when those Cardholders
25   received their next EDD benefits payment deposit into their Account, they were not
26   actually able to access those benefits because the new EDD benefits payments were
27   credited against the negative balance in their Account that resulted from the Bank's
28   actions.

**4.  The Bank's Policy and Practice of Automatically and Indefinitely Freezing Cardholders' Accounts When They Report Unauthorized Transactions, Based on a Highly Flawed "Claim Fraud Filter"**

93.  In and around October 2020, the Bank implemented an additional policy and practice of responding to EDD Debit Cardholders who report unauthorized transactions by automatically and indefinitely freezing or blocking their Accounts without any prior notice, explanation, or opportunity to be heard, including based solely on the results of the Bank's highly flawed and unreliable automated Claim Fraud Filter. A Cardholder whose Account is frozen or blocked cannot access any funds in their Account; moreover, the Bank will not accept EDD benefits payments from EDD for deposit into a frozen Account. Thus, many Class Members have had the experience of reporting that they were **the victims** of fraudulent transactions and receiving assurances from the Bank that it will cancel their old EDD Debit Card and issue them a new one, only to discover that their new Card is useless because the Bank has frozen (or blocked) their Account. The Bank implements this policy and practice of freezing or blocking Accounts without any prior notice, thus depriving Cardholders of access to any EDD benefits that may have been in the Account at the time of the freeze or block. Moreover, the Bank's practice of freezing or blocking Accounts cuts off the affected EDD Debit Cardholders' access to any continuing benefits that the EDD deposits into the Cardholder's blocked Account or attempts to deposit into the Cardholder's frozen Account—EDD benefits to which EDD has determined the Cardholder is entitled. As a result, many EDD Debit Cardholders who are the victims of third-party fraud and who turn to the Bank for help, find themselves indefinitely deprived of access to *all* their EDD benefits and treated as if *they* are the criminals.

94.  Bank of America has frozen many Cardholders' Accounts for months on end, without providing them any information as to when their Accounts will be

unfrozen or how they can facilitate that unfreezing. Some EDD Debit Cardholders whose Accounts are frozen in this manner have eventually received a letter from the Bank weeks or months after the fact, but that letter simply states: "It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result . . . a freeze (or hold) has been placed on your account." The letter states that once the Bank freezes your Account, you "will be unable to use the prepaid debit card or access the money in your account," and that the Account "will not be available to receive any additional benefits that may be issued to you by [EDD]." The letter further states: "If a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and your balance will become available in accordance with the terms of the card account agreement and state agency guidelines," but the letter does not advise the affected Cardholder as to what steps they can take to regain access to their Account.

95. After Bank of America has frozen an EDD Debit Card Account in response to a report of transactional fraud, the Bank has had a policy and practice of telling the affected Cardholder that they are required to re-authenticate their identity and re-verify their benefits eligibility with EDD as a condition of unfreezing their Account—even if EDD itself has not raised any question regarding the individual's identity or eligibility for benefits. Bank of America has imposed this onerous and unreasonable condition on Cardholders who report third-party transactional fraud regardless of whether there is a reasonable basis for suspecting them of having committed benefits eligibility fraud, and despite knowing that EDD's call center has been completely overwhelmed by the surge in calls from unemployment benefits recipients throughout the pandemic and that many individuals who call EDD will never get through to a live agent. According to the State Auditor, EDD agents answered just 1.4% (697,132 of 50,251,351) of calls

received in July 2020, and just 6.3% (230,301 of 3,649,193) of calls received in October 2020.

96.     Even after Cardholders have complied with this onerous and unreasonable Bank-imposed requirement of contacting EDD and obtaining confirmation from EDD that they either do not need to re-verify or have successfully re-verified their benefits eligibility, Bank of America *still* has not unfrozen their EDD Debit Card Account, continuing without explanation to deprive Cardholders of access to their EDD benefits and refusing to process their fraud claims or refund their stolen money, sometimes for months longer.

**5.    The Bank's Policy and Practice of Denying Reasonable Customer Service to Cardholders Seeking Assistance with Fraud Claims and the Unfreezing of Accounts**

97.     Desperate and confused, EDD Debit Cardholders whose fraud claims have been summarily denied and/or whose EDD Debit Card Accounts have been suddenly frozen have spent months calling the Bank's customer service hotline, to no avail.

98.     The Bank has failed to appropriately staff its customer service call centers in a manner that would allow it to honor its contractual commitments under the EDD–Bank Contract and to provide reasonable levels of assistance to the predictably large volume of EDD Debit Cardholders seeking assistance during this pandemic. Further, the Bank has a policy and practice of failing to provide its customer service representatives the tools or authority necessary to assist Cardholders who call seeking assistance in resolving their fraud claims or unfreezing their Accounts. Although the Bank at some point in the Fall of 2020 hired additional customer service agents, on information and belief those newly hired customer service agents are not adequately trained and are not empowered to investigate or resolve fraud claims, and the number of customer service agents

continued to be too low to handle incoming calls, resulting in hours-long wait times if Cardholders can get through at all.

99.     Despite the Bank's promise of 24/7 customer service, Plaintiffs and Class Members have found themselves repeatedly kept on hold, sometimes for hours, waiting to speak to a live agent. Plaintiffs and Class Members have routinely been disconnected, hung up on, and treated rudely by overworked and overwhelmed agents. They often spend hours on hold with customer service, despite the Bank having represented in its Cardholder Agreement that "[t]elephoning is the best way of keeping your possible losses down." Even when Plaintiffs and Class Members finally reach customer service representatives, those representatives are unable to offer any meaningful assistance, often conveying false information and contradicting one another.

100.    The Bank's representatives also often provide erroneous information to Plaintiffs and Class Members regarding the source of their Account freezes. Countless Class Members have been told that the Bank has no control over the freeze, that EDD is the entity responsible for the freeze, and that only EDD has the power to unfreeze their Account. But when Class Members call EDD, EDD informs them that it has no control over their Account and that the freeze is entirely within Bank of America's control. Even when Class Members re-verify their identity with EDD, when EDD confirms their eligibility for benefits, and when EDD or Class Members convey this information to the Bank, the Bank *still* does not unfreeze their Accounts. In some cases, EDD has resumed paying benefits to Class Members through paper checks at the Class Members' request, but those Class Members continue to be unable to access funds in their Accounts, which remain frozen.

101.    The EDD has publicly stated that the responsibility to prevent fraudulent transactions and to address claims of unauthorized transactions lies entirely with Bank of America, stating on October 29, 2020, that EDD "has no direct access to debit funds on any accounts" and that those impacted by card issues should

1   contact Bank of America.[12] The agency has stated that it has no means to intervene

2   in Bank of America's procedures.

3        102.   Bank of America's inadequate response to EDD Debit Cardholders'

4   issues with fraud on their Cards and Accounts results from the Bank's failure to

5   adequately staff its customer-service and fraud-investigation departments, and from

6   Bank procedures that are designed to, or that the Bank knows or reasonably should

7   know will, frustrate and obstruct Cardholders' efforts to submit their claims and to

8   obtain reimbursement under EFTA and the Bank's "Zero Liability" policy.

9        103.   Many EDD Debit Cardholders have characterized their efforts to

10  obtain relief from the Bank for the wrongful conduct alleged herein as an "unofficial

11  full-time job trying to get the money back." One defrauded EDD Debit Cardholder

12  reported: "It's kind of like a nightmare . . . . Every day I'm wondering what's more

13  important. Do I get on the phone with the bank and try again so I have a place to

14  sleep tomorrow, or do I just accept that I'm going to be on the street and focus on

15  my job search? Because you can't do both."[13]

16       104.   A Bank of America customer service worker, addressing the Bank's

17  response to the influx of reports of third-party debit card fraud, stated: "We're

18  actually no longer allowed to tell them a timeframe, because we have no clue . . . .

19  Every day, I talk to 30 people with the same story. I just pray for them after my

20  shift, honestly."[14]

21

22

_____

23       [12] Matt Fountain, "Bank of America Froze SLO County Residents'
     Unemployment Benefits Because of Fraud," *San Luis Obispo Tribune* (Dec. 17,
24   2020), *available at* https://www.sanluisobispo.com/news/local
     /article247729155.html.
25
         [13] Lauren Hepler & Stephen Council, "How Bank of America Helped Fuel
26   California's Unemployment Meltdown," *CalMatters* (Nov. 20, 2020), *available at*
     https://calmatters.org/economy/2020/11/how-bank-of-america-helped-fuel-
27   californias-unemployment-meltdown/.

28       [14] *Id.*

105.   Bank of America's disregard for EDD Debit Cardholders' issues with fraud and the Bank's inadequate response contradicts the representations it made to the State in its proposal to administer the EDD public benefits program, in which the Bank represented, "we pride ourselves on providing stellar customer service to every caller. Long call hold waits and busy signals are not tolerated at Bank of America."

### 6.   The Court Preliminarily Enjoins the Bank's Policies and Practices

106.   On January 14, 2021, Plaintiff Jennifer Yick commenced the class action titled *Yick v. Bank of America, N.A.*, No. 3:21-cv-00376, in the U.S. District Court for the Northern District of California. *See Yick*, Dkt. No. 1. Eight related class actions were subsequently filed in the Northern District of California,[15] which the Court consolidated into *Yick* for all purposes on March 29, 2021.

107.   Shortly after Plaintiffs put the Bank on notice of their intent to move for a preliminary injunction, on or around March 18, 2021, the Bank announced that it was adopting a new policy and practice of "blocking" rather than "freezing" the Accounts of EDD Debit Cardholders who reported unauthorized transactions on their Account and who were flagged by the Bank's Claim Fraud Filter, and that it was converting some "frozen" Accounts to "blocked" status. According to the Bank, this new policy permits a Cardholder with a "blocked" Account to regain access to their Account by contacting the Bank and passing a Bank-administered

[15] *See Rodriguez v. Bank of America, N.A.*, No. 21-cv-00494 (N.D. Cal. filed Jan. 20, 2021); *Willrich v. Bank of America, N.A.*, No. 21-cv-00547 (N.D. Cal. filed Jan. 22, 2021); *McClure v. Bank of America, N.A.*, No. 21-cv-00572 (N.D. Cal. filed Jan. 25, 2021); *Oosthuizen v. Bank of America, N.A.*, No. 21-cv-00615 (N.D. Cal. filed Jan. 26, 2021); *Wilson v. Bank of America, N.A.*, No. 21-cv-00699 (N.D. Cal. filed Jan. 28, 2021); *Mosson v. Bank of America, N.A.*, No. 21-cv-00743 (N.D. Cal. filed Jan. 29, 2021); *Cajas v. Bank of America, N.A.*, No. 21-cv-00869 (N.D. Cal. filed Feb. 3, 2021); *Smith v. Bank of America, N.A.*, No. 21-cv-01466 (N.D. Cal. filed Mar. 1, 2021).

identity-verification process. At the same time, the Bank sent some Accountholders form letters dated March 18, 2021, informing them about this new policy. However, the Bank still does not provide Cardholders advance notice of the intended block (which, like a "freeze," denies the Cardholder access to all funds in their Account), and the Bank continues to block the Accounts of legitimate Cardholders based solely on the results of the Bank's Claim Fraud Filter, without any reasonable investigation.

108.   On April 1, 2021, Plaintiffs in the nine consolidated *Yick* class action cases filed a Motion for Preliminary Injunction and Provisional Class Certification under Rule 23(b)(2), seeking to enjoin the Bank's practices described herein. In opposing the motion, Bank of America confirmed that since October 2020, the Bank had maintained a policy and practice of (a) subjecting every EDD Debit Cardholder who submitted a claim of unauthorized transaction to an initial "Claim Fraud Filter," (b) automatically and without investigation denying the fraud claim of any EDD Debit Cardholder flagged by the Claim Fraud Filter, and (c) automatically and without investigation freezing or blocking the Account of any EDD Debit Cardholder flagged by the Claim Fraud Filter. The Bank further confirmed that between October 2020 and March 2021, it denied the fraud claims and froze or blocked the Accounts of tens of thousands of legitimate EDD Debit Cardholders based solely on the erroneous results of its Claim Fraud Filter. The Bank's Claim Fraud Filter has an extremely high false positive rate, and erroneously flagged tens of thousands of claimants as criminals using stolen identities when they were in fact legitimate EDD Debit Cardholders entitled to EDD benefits and who were wrongfully deprived of those statutory benefits as a result of the Bank's unlawful policies and practices.

109.   On May 17, 2021, the district court in *Yick* issued an Order Re Preliminary Injunction, holding that Plaintiffs "have demonstrated a strong likelihood of success" on claims for violations of the federal Electronic Fund

Transfers Act, for violations of California's Unfair Competition Law, and for breach of contract; and that Plaintiffs had shown irreparable injury. The district court provisionally certified a Rule 23(b)(2) class of all EDD Debit Cardholders who call the Bank to report unauthorized charges to their Accounts and ordered the parties to meet and confer regarding the appropriate scope of a preliminary injunction. *Yick*, Dkt. No. 89 (**Exhibit A**).

110.   On June 1, 2021, after the *Yick* parties engaged in an extensive meet-and-confer process, including a two-day settlement conference before U.S. Magistrate Judge Sallie Kim, the district court entered the parties' joint submission as a Preliminary Injunction. *Id.*, Dkt. No. 103 (**Exhibit B**). Among other things, the Preliminary Injunction: (a) prohibits the Bank from considering the results of the Bank's Claim Fraud Filter in investigating or resolving unauthorized transaction error claims ("Claims"); (b) prohibits the Bank from denying or closing Claims or denying provisional or permanent credit to claimants' Accounts without conducting and concluding an investigation into the alleged unauthorized transaction pursuant to EFTA and Regulation E; (c) prohibits the Bank from denying or closing Claims without providing the claimant a written explanation of the findings of its investigation, pursuant to EFTA and Regulation E; (d) prohibits the Bank from considering the results of the Bank's Claim Fraud Filter as a basis for freezing any Class Member's Account; (e) requires the Bank to reopen any Claim that it closed or denied based solely on the results of the Claim Fraud Filter and that it has not previously paid or previously reopened and investigated; (f) requires the Bank to investigate and resolve all such previously closed claims within specified time periods after the Class Member authenticates their identity with the Bank, and to issue provisional credit in the amount of the alleged error if the Bank's investigation is not completed within specified time limits; and (g) requires the Bank to establish dedicated toll-free numbers for Class Members seeking assistance with fraud claims (Claims Initiation Call Center) or frozen and blocked Accounts (Fraud Call Center),

to expand its Claims Initiation Call Center and Fraud Call Center hours to 24 hours per day, 7 days per week, to provide specified training to its Customer Service Representatives, and to staff its Claims Initiation Call Center and Fraud Call Centers to ensure an average speed to answer of no more than five minutes, 90 percent of the time.

### 7. The Bank's Policies and Practices Continue to Harm Cardholders

111. Notwithstanding the Preliminary Injunction prohibiting the Bank from considering the results of the Claim Fraud Filter as a basis for denying or closing unauthorized transaction claims or as a basis for "freezing" any Class Member's Account, the Bank continues to apply the Claim Fraud Filter to every Class Member who reports an unauthorized transaction and continues to rely on the results of the Claim Fraud Filter as a basis for "blocking" those Class Members' Accounts. Just as Class Members whose Accounts are "frozen" are denied access to funds in their Accounts, Class Members whose Accounts are "blocked" are likewise unable to access any EDD benefits still remaining in their Account and are unable to access any continuing EDD benefits that EDD deposits into their Account while their Account is blocked.

112. On information and belief, the Bank continues to block the Accounts of thousands if not tens of thousands of Class Members *each month* based solely on the results of the Bank's highly flawed and unreliable Claim Fraud Filter, thus depriving Class Members of access to critical unemployment and other public benefits to which the EDD has found they are entitled and on which they and their families depend for food, shelter, and other basic life necessities.

113. Moreover, Class Members continue to experience unauthorized transactions on their EDD Debit Card Accounts.

## G.    Class Representative Plaintiffs' Allegations

### 1.    Jennifer Yick

114.   In late November 2020, Yick was surprised when her EDD Debit Card was declined at a grocery store in the San Francisco Bay Area. She subsequently viewed her Account online and discovered that her Account balance, which she knew should have been over $400, had been drained to 70 cents due to four unauthorized transactions with DoorDash, a food delivery service, for what appeared to be orders from restaurants located in Texas, New York, and Southern California totaling over $400. The transactions posted to Yick's Account on November 2, 5, 8, and 16. Yick does not have a DoorDash account and did not make or authorize these transactions. Yick had never authorized anyone to use her Card, and she had never disclosed her Card PIN to anyone.

115.   Yick is a long-time San Francisco resident. She did not travel to Texas, New York, Southern California, or anywhere else outside the San Francisco Bay Area during or around the period in November 2020 when the unauthorized transactions occurred, and during which time there was a nationwide surge of COVID-19 cases and related California and federal government restrictions on travel. Indeed, Yick used her EDD Debit Card for in-person transactions at stores in the San Francisco Bay Area on the same day or within one day of three of the unauthorized transactions. Additionally, Yick had never used her EDD Debit Card for transactions from DoorDash or restaurants, and had never used her Card to make an online transaction. Rather, she had always used her Card for purchasing necessities from brick-and-mortar stores located in or around the San Francisco Bay Area, such as gas stations, grocery stores, and retail stores like Target and Costco.

116.   Bank of America knew or should have known about Yick's EDD Debit Card transaction history, that she appeared to be in the San Francisco Bay Area at the time of the unauthorized transactions, and that the COVID-19 pandemic and related fears and travel restrictions made it highly unlikely that Yick would have

been in Texas, New York, and Southern California at the time of the unauthorized transactions. Given this, Bank of America should have detected and flagged the unauthorized transactions as highly suspicious, stopped them, and notified Yick about them, but the Bank did none of these things. Instead, it just allowed the unauthorized transactions to happen.

117.   Over the course of more than a month, Yick repeatedly sought assistance through Bank of America's customer service phone lines, to no avail. She repeatedly waited on hold before being disconnected from the line; waited to speak to someone only to be told to call back later; was transferred to various departments without receiving any information; was sent to voicemail; was forced to deal with unhelpful automated agents; and unsuccessfully attempted to reach Bank of America by email. To date, Yick has not been reimbursed for the unauthorized transactions on her EDD Debit Card, nor has Bank of America provisionally credited her Account.

118.   Yick's experience seeking reimbursement from the Bank for the unauthorized transactions on her Account demonstrates the futility of EDD Debit Cardholders turning to Bank of America's customer service department for assistance. After discovering the fraudulent charges on her EDD Debit Card on December 1, 2020, Yick tried for days to contact a Bank of America agent who would assist her with the fraud on her Card. After calling the number on the back of her EDD Debit Card and waiting on hold, Yick eventually reached an agent who told her that her call needed to go to "claims." Despite Bank of America's representations of "24/7" customer service, the agent informed Yick that she would need to call back during business hours and provided her with a number to call. Yick called that number three times the following day, December 2, 2020, waiting on hold each time, only to have the system repeatedly hang up on her.

119.   Yick found another Bank of America customer service number and called it, only to again wait on hold before the system hung up on her. Calling this

number led Yick to an automated customer service agent which asked Yick for her Card number. Even though Yick provided her Card number when asked, the automated agent continued to repeat its request for Yick's Card number, without offering any sort of assistance.

120. On December 3, 2020, Yick tried once again to contact Bank of America by calling the number on the back of her EDD Debit Card. This time she reached a live customer service agent, who stated that she was adding notes to Yick's file to indicate that Yick was disputing the four DoorDash transactions and advised Yick to describe her claim in an email to a long email address involving a string of abbreviated words, which the agent read to her over the phone.

121. This email address does not appear in Yick's Cardholder Agreement, the "Quick Reference Guide" which accompanied her Card, or the Bank's EDD Debit Card FAQ webpage. Nevertheless, when Yick finally reached a live customer service representative, she was advised that sending an email to this previously undisclosed email address represented her best chance of recovering the funds stolen from her EDD Debit Card Account.

122. On December 6, 2020, Yick sent an email to that address, providing Bank of America with her name, address, partial Card number, and a summary of the disputed charges. The following evening, Yick's email provider (Gmail) sent her an email stating there was trouble delivering her email to that address, and that the system would attempt to deliver it for 45 more hours before sending a notification that delivery had failed.

123. On December 8, 2020, concerned with Bank of America's failures to respond, Yick filed a police report at her neighborhood precinct in San Francisco concerning the fraudulent charges on her EDD Debit Card Account.

124. On December 9, 2020, Gmail sent Yick a message reading: "Message not delivered . . . . The recipient server did not accept our requests to connect."

125.   On December 22, 2020, when Yick had not received further assistance or communication from Bank of America, she again attempted to email a summary of her claim to the same email address. She was notified three days later that her email was not delivered and that "[t]he recipient server did not accept our requests to connect."

126.   In short, Yick has followed the instructions in her Cardholder Agreement, and made consistent, diligent efforts to recover the funds stolen from her EDD Debit Card Account by multiple telephone calls and emails. Despite this, Bank of America's customer service department never offered Yick any meaningful response or assistance, but rather stymied her efforts at every turn. The Bank never reimbursed Yick for any of the unauthorized transactions, never provided her provisional credit, and never conducted a reasonable investigation of the unauthorized transactions.

### 2.   Vanessa Rivera

127.   Rivera received her EDD Debit Card in January 2020. It was her lifeline—she used it to buy essentials like gas and food for her and her young son.

128.   On January 29, 2021, someone fraudulently withdrew $800 from Rivera's EDD Debit Card Account at a Bank of America ATM. She received a message that the balance in her Account was $4.17, when she knew she should have had over $800 in the Account. She only received this message because she had set up her Account settings to automatically notify her if her Account balance fell below $30—it was not an alert from the Bank about suspected fraud. Rivera's Card was in her possession when the fraudulent withdrawal occurred, and she had never authorized anyone to use her Card or disclosed her Card PIN to anyone.

129.   That same day, Rivera logged into her Account online to see if there might have been a mistake and found that someone had conducted a balance inquiry from an ATM about an hour away from where she lives and then withdrew the $800. She immediately called Bank of America to submit a claim disputing the

transaction. The Bank representative she spoke with gave her a claim number, and Rivera assumed the claim would be investigated.

130. On February 4, 2021, Rivera called Bank of America again and was surprised to learn that the representative she had spoken with on January 29 never actually submitted her fraud claim and, instead, just put a "note" in her Account and mailed her a new Card. The Bank representative that Rivera spoke with on February 4 told Rivera that she (the February 4 representative) successfully submitted her fraud claim for investigation. The next week Rivera received in the mail a letter from the Bank stating that her claim was closed. The letter was dated February 5, 2021, just one day after her claim was submitted for investigation. On information and belief, the Bank failed to conduct a good-faith investigation of Rivera's fraud claim and did not have a reasonable basis for its determination that Rivera had authorized or benefitted from the transaction.

131. On February 6, 2021, Rivera received her replacement Card in the mail. She tried activating it online, but Bank of America's website indicated she was not allowed access to her Account. Rivera then called the number on the back of the Card to activate it and a Bank representative told her that her Account had been frozen due to fraudulent charges.

132. On March 3, 2021, Rivera received a letter from Bank of America stating that there had been fraud on her Account and informing her that her Account would remain frozen. This letter did not provide her with any useful information as to why her Account would remain frozen, but only stated that fraud is what had caused her Account to be frozen initially.

133. Rivera has spent at least 30 hours on the phone with Bank of America customer service about her $800 unauthorized transaction claim and trying to get her Account unfrozen. During these phone calls, she has felt belittled and treated like a criminal by Bank representatives, who have stated or implied that she was responsible for the fraud. On one occasion, a Bank of America representative told

her that she had done nothing wrong, but that her Account was frozen because of a Bank policy or protocol that requires Bank employees or agents to freeze an Account when an unauthorized transaction occurs on the Account.

134. Bank of America's summary denial of Rivera's unauthorized transaction claim and freezing of her Account caused Rivera extreme financial hardship and desperation. She went days without eating a full meal or eating only once a day. She had to break her young son's piggy bank so that she could have money to buy them food. She had her phone disconnected because she could not pay the bill, and did not have money for gas or public transportation, making it impossible for her to go to a job interview or to have a job requiring that she commute to and from work.

135. On April 1, 2021, Rivera became a class representative plaintiff in the *Yick* action (pursuant to an Amended Consolidated Complaint filed in that case) and submitted a declaration in support of the consolidated *Yick* plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification. Only then did Bank of America finally "reconsider" her months-old fraud claim, reimburse her the $800 at issue, and unfreeze her Account.

**3.     Candace Koole**

136. Koole started receiving EDD unemployment benefits through a Bank of America EDD Debit Card during the COVID-19 pandemic. She generally used her Card to pay for essentials like food, rent, medicine, and toiletries. She also used it to pay for hospital visits and dental work.

137. On December 30, 2020, Koole tried to use her EDD Debit Card at a grocery store to buy food for her and her young son, and the Card was repeatedly declined at the checkout stand. She left the groceries at the store and went home to check her Account balance. She was shocked to find her Account had just $7 in it, down from approximately $9,000 the week before. Her online Account statement showed that $8,760 had been fraudulent taken out of her Account by ATM

1    withdrawals—mostly withdrawals of the daily maximum of $1,000 per day at
2    several different ATM locations around Southern California until her Account was
3    nearly empty. She did not authorize these withdrawals, and her Card was in her
4    possession when they occurred. She also had never disclosed her Card PIN to
5    anyone and had never authorized anyone to use her Card.

6        138.   The same day, Koole called the Bank and submitted a claim disputing
7    the fraudulent transactions. During that call, a Bank representative told Koole that
8    her EDD Debit Card Account would be frozen as a result of her reporting fraud,
9    and Koole's Account was frozen that day. The Bank representative told Koole that
10   she was responsible for proving that she had not committed the fraud on her
11   Account and advised her to file a police report in support of her fraud claim.

12       139.   Immediately after speaking with the Bank, Koole attempted to file a
13   police report with the Riverside County Sheriff's Department. She could not
14   complete the report, however, because she did not know the "terminal ID numbers"
15   corresponding to the ATMs where money had been fraudulently withdrawn from
16   her Account. And because Koole's Account was frozen, she could not access her
17   Account online and, thus, could not access any details about the fraudulent
18   transactions, including the information necessary to complete the police report.

19       140.   In early January 2021, Koole received a letter from the Bank dated
20   December 31, 2020—just one day after she submitted her claim disputing the
21   fraudulent transactions—denying her claim. The only explanation in the letter for
22   why the Bank had denied her claim was the same generic explanation that the Bank
23   sent numerous other Plaintiffs and Class Members upon denying their claims:
24   "Your claim has been closed because we believe the account or the claim have been
25   the subject of fraud or suspicious activity." On information and belief, the Bank
26   failed to conduct a good-faith investigation of Koole's fraud claim and did not have
27   a reasonable basis for its determination that Koole had authorized or benefitted from
28   the transaction.

141.   In the months after the Bank rejected Koole's fraud claim and froze her Account, Koole repeatedly called the Bank about addressing these issues. Some Bank representatives said the status of her claim was pending, others that she needs to communicate with EDD, and others that her Account is completely closed. Many times, Bank representatives have told Koole that she needs to contact EDD to tell the agency to communicate with the Bank to unfreeze her Account. But she has called EDD and been told by EDD that their system does not show any issues with her Account. Koole has spent approximately 100 hours on the phone trying to resolve the issues relating to her Account.

142.   As a result of Bank of America's acts and failures to act, Koole's life changed drastically. Koole is a single mother with a young son. She was forced to live week to week, rationing out food for her child. She also had no way to get a job because of the COVID-19 pandemic, and every day she wondered if she would soon be homeless.

143.   On April 1, 2021, Koole became a class representative plaintiff in the *Yick* action (pursuant to an Amended Consolidated Complaint filed in that case) and submitted a declaration in support of the consolidated *Yick* plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification. Only then did Bank of America finally "reconsider" her months-old fraud claim. By letter dated April 6, 2021, the Bank informed Koole that it was granting her $8,760 fraud claim and that her Account would be permanently credited in that amount. Approximately one month after that, in or about early May 2021, the Bank finally restored Koole's access to her Account.

**4.     Azuri Moon**

144.   On or around October 20, 2020, when Moon tried to buy lunch at a restaurant, he was informed that his Bank Debit Card had insufficient funds. Knowing he should have had around two thousand dollars in his Account, he immediately checked his Account online and saw two separate ATM withdrawals

totaling $1,800, leaving him with virtually no money in his Account. Moon had never disclosed his Card PIN to anyone, and had never authorized anyone to use his Card, and did not authorize these ATM withdrawals.

145.   On October 21, 2020, Moon called Bank of America to report these unauthorized transactions. He spent 11 hours on the phone before he was able to get through to the claims department. Moon then submitted a fraud claim and a Bank of America representative told him that a decision would be made on his case in 30 days or so.

146.   In or about mid-November 2020, nearly a month after making his claim, Moon had not received any communication from the Bank, and so he contacted the Bank to get an update on his claim. Moon was shocked when a Bank of America representative told him that he was liable for the disputed transactions, and the Bank would not be returning the money. On information and belief, the Bank failed to conduct a good-faith investigation of Moon's fraud claim and did not have a reasonable basis for its determination that Moon had authorized or benefitted from the transaction. During that same phone call, the Bank representative told Moon that he could file a police report, write a detailed description of what happened, and fax it to Bank of America with his name, case number, and Card number. Having received no written communications from Bank of America, and thus forced to rely only on his personal notes, it was extremely difficult for him to file a police report. But he ultimately compiled everything that the Bank had asked for and faxed it to the Bank.

147.   From approximately November 15 to December 15, 2020, Moon was forced to live in his car because the funds he would have used to pay rent were stolen from his Account and not reimbursed by the Bank. He had to rely on the generosity of others to begin sleeping in a bed again. He routinely had to choose which bills to pay and which ones not to, resulting in significant late fees and interest charges.

148.    In or about mid-December 2020, nearly a month after faxing the Bank the police report and other documents that the Bank had requested, and having received no communication from the Bank, Moon called the Bank again to get an update. A representative told him that the Bank never received his fax. It turned out that a Bank representative had provided Moon with his *claim* number but mistakenly told him it was his *case* number, and the information in his fax reflected this mistake, derailing his fraud claim. Moon was told the Bank would not be able to process his claim until this was corrected. He then re-faxed everything with the information they requested.

149.    In late December 2020 or early January 2021, with his claim still unresolved, the Bank froze Moon's Account with no explanation. He called the Bank, and was informed that, as a result of the freeze, the Bank could not do anything to address his fraud claim.

150.    From the time he made his fraud claim in late October 2020 through late March 2021, Moon spent at least 50–60 hours on the phone with Bank of America trying to resolve the issues with his claim and the freezing of his Account, to no avail.

151.    On April 1, 2021, Moon became a class representative plaintiff in the *Yick* action (pursuant to an Amended Consolidated Complaint filed in that case) and submitted a declaration in support of the consolidated *Yick* plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification. Only then did Bank of America finally "reconsider" his fraud claim, reimburse his Account the $1,800, and unfreeze his Account.

**5.    Roland Oosthuizen**

152.    Every day from September 24 to 28, 2020, an unauthorized third party or parties withdrew $1,000 from Oosthuizen's EDD Debit Card Account, using Bank of America ATMs in the Los Angeles area. Oosthuizen did not make the withdrawals himself, did not authorize the withdrawals, and only learned about the

withdrawals when he logged into his EDD Debit Card Account on Bank of America's website to find that $5,000 was missing.

153.   Oosthuizen has always kept his original EDD Debit Card in his wallet. He does not know how unauthorized third parties gained access to his EDD Debit Card Account, but he believes his EDD Debit Card was fraudulently cloned.

154.   The Bank never notified Oosthuizen of this fraud, notwithstanding the highly suspicious withdrawal of the maximum daily ATM limit under the Cardholder Agreement of $1,000 per day for five straight days at different ATMs, which was a completely different pattern of withdrawal than Oosthuizen himself had ever undertaken.

155.   After discovering the fraudulent withdrawals from his EDD Debit Card Account on September 29, 2020, Oosthuizen promptly suspended his EDD Debit Card using the Bank of America online portal. The next day, Oosthuizen called Bank of America and—after waiting on hold for three hours—made a fraud claim concerning the missing $5,000. A Bank of America representative named Kaitlyn told Oosthuizen he should wait to hear back from Bank of America concerning his claim.

156.   Approximately two weeks later, Oosthuizen received a letter in the mail from Bank of America dated October 1, 2020—just two days after Oosthuizen had reported the fraud—which summarily closed his claim and failed to provide any substantive information concerning what Bank of America did to investigate his claim or its reason for closing the claim. On information and belief, the Bank failed to conduct a good-faith investigation of Oosthuizen's fraud claim and did not have a reasonable basis for its determination that Oosthuizen had authorized or benefitted from the transactions.

157.   Over the following months, Oosthuizen called Bank of America multiple times, typically waiting on hold for hours before, on occasion, reaching a live person. Oosthuizen spoke with a Bank representative named Tara on October

14, 2020. He requested that Bank of America re-open his case. Tara assured him during that call that his claim would be "escalated." Tara also requested that Oosthuizen fax the Bank documentation supporting his claim.

158.    On November 5, 2020, Oosthuizen faxed Bank of America a written statement regarding the theft, a police report information statement from when he made a report of the theft to the Los Angeles Sherriff's Department, and other documentation. In his fax, Oosthuizen specifically requested that Bank of America provide him with whatever documentation the Bank had relied upon when it denied his fraud claim. He did not receive a response to his fax. At no time during this process did the Bank provide him any provisional credit, causing him severe hardship. On information and belief, the Bank failed to a conduct good-faith investigation of Oosthuizen's fraud claim and did not have a reasonable basis for its determination that Oosthuizen had authorized or benefitted from the transactions.

159.    Only after Oosthuizen filed a class action lawsuit against Bank of America on January 26, 2021 did he receive a letter from the Bank dated January 27, 2021, stating that the Bank had performed an additional review of his claim and had credited him for the $5,000 that had been stolen from his EDD Debit Card Account. The Bank did not pay him any interest on the $5,000.

**6.    Rosemary Mathews**

160.    On October 12, 2020, an unauthorized third party or parties withdrew $1,000 from Mathews' EDD Debit Card Account, using a Bank of America ATM that Mathews has never herself used, leaving her with less than $500 in her Account.

161.    Mathews has always kept her EDD Debit Card with her, never let anyone borrow her Card, and has not disclosed her Card PIN to anyone. Mathews does not know how unauthorized third parties gained access to her EDD Debit Card Account, but she believes her Card was fraudulently cloned.

162.    The Bank never notified Mathews of the unauthorized withdrawal

1    from her Account. She only realized that the theft occurred when she checked her

2    Account balance on October 18, 2020, and found it was below $500. She was

3    horrified because she did not have enough money left to cover basic necessities.

4        163.   After discovering the fraudulent withdrawal of $1,000 from her

5    Account, Mathews on October 18, 2020 telephoned Bank of America at the number

6    on the back of her EDD Debit Card, only to be told that the claims department was

7    not open that day. The next day, she called and, after waiting on hold, made a claim.

8        164.   Approximately two weeks passed before Mathews received a letter in

9    the mail from Bank of America summarily closing her claim while failing to provide

10   any other information. On information and belief, the Bank failed to conduct a

11   good-faith investigation of Mathew's fraud claim and did not have a reasonable

12   basis for its determination that Mathews had authorized or benefitted from the

13   transactions.

14       165.   Over the following months, Mathews called Bank of America multiple

15   times, typically waiting on hold for hours before, on occasion, reaching a live

16   representative.

17       166.   On November 5, 2020, Mathews faxed to Bank of America a written

18   statement regarding the theft, a police report information statement from when she

19   made a report of the theft to the Los Angeles Sherriff's Department, and other

20   documentation. Mathews specifically requested that Bank of America provide her

21   with the documentation that the Bank purportedly relied upon when it denied her

22   fraud claim. She did not receive a response to her November 5, 2020 fax, and at no

23   time during this process did the Bank provide her any provisional credit, causing

24   her severe hardship.

25       167.   On or about December 22, 2020, Mathews realized that her EDD Debit

26   Card Account was frozen. She called the Bank, which told her that it had frozen her

27   Account on or about December 17, 2020.

28

168.   Only after Mathews filed a class action lawsuit against Bank of America on January 26, 2021, did she finally receive a letter from the Bank dated January 27, 2021 stating that the Bank had performed an additional review of her claim and had credited her with the $1,000 that had been fraudulently stolen from her EDD Debit Card Account.

169.   Even after receiving the Bank's letter dated January 27, 2021, Mathews was still unable to access those credited funds because her EDD Debit Card Account remained frozen. Although her Account had been frozen since December 2020, she did not receive a written notice from the Bank regarding the freeze until February 1, 2021. The notice did not provide her any details or information specific to her as to why her Account had been frozen. Sometime thereafter, without notification, the Bank unfroze her Account, which allowed her to withdraw the $1,000 from her Account. The Bank never credited her any interest on the $1,000. Mathews estimates she spent more than 100 hours calling the Bank in her attempts to recover the $1,000 or have her Account unfrozen.

170.   It was an extreme hardship for Mathews not to have access to her unemployment benefits. She had to borrow money from her son and other family members and suffered great stress trying to pay her bills each month. She began seeing a counselor because of depression and stress due to not receiving the unemployment benefits to which she was entitled.

**7.   Carlos Rodriguez**

171.   Plaintiff Carlos Rodriguez received $900 on his EDD Debit Card every two weeks after being found eligible for unemployment benefits during the COVID-19 pandemic.

172.   On or about December 17, 2020, Rodriguez started calling Bank of America to inquire about EDD benefits that should have already been, but did not appear to have been, deposited into his EDD Debit Card Account. For the previous couple of days, Rodriguez had been checking his Account to confirm receipt of the

deposit, but the funds were not there. Concerned about the whereabouts of those funds, Rodriguez researched his Account transaction history and noticed a $230 ATM withdrawal on December 10, 2020, and a $900 ATM withdrawal on December 17, 2020. Neither withdrawal was made or authorized by Rodriguez. The withdrawals were made at one or more ATMs in Los Angeles, while Rodriguez was in San Diego. Rodriguez further noticed that some unidentified person or persons had checked his Account balance without his authorization on November 30, 2020, and many times throughout December 2020.

173.   Alarmed by these transactions and the missing funds, Rodriguez promptly called Bank of America. The Bank replied that it had never received funds for his Account from the EDD. Rodriguez then called the EDD, which stated that it had deposited the $900 to his EDD Debit Card Account as scheduled. When Rodriguez followed up with the Bank, the Bank froze his Account and told him that 22,000 other individuals who receive their EDD unemployment benefits through EDD Debit Cards had also had funds stolen from their EDD Debit Card Accounts.

174.   In or about mid-February 2021, Rodriguez started receiving, at his request, bi-weekly EDD benefits payments in the form of paper checks that EDD mailed to him. EDD also paid Rodriguez via check for EDD benefits that were owed to him from the time that Bank of America froze his EDD Debit Card Account until the time he started receiving paper checks from EDD. He did not receive any interest on those funds.

175.   After Rodriguez filed a class action lawsuit against Bank of America in the Northern District of California in January 2021, and shortly after the Northern District Plaintiffs put the Bank on notice of their intent to move for a preliminary injunction, Rodriguez received a letter from Bank of America dated March 18, 2021, informing him of a new way to remove the hold (i.e., remove the freeze or block) on his EDD Debit Card Account. In April 2021, while the parties were briefing the Northern District Plaintiffs' Motion for Preliminary Injunction

1  and Provisional Class Certification, the Bank finally unfroze or unblocked
2  Rodriguez's Account, thereby restoring his access to his Account for the first time
3  since it was frozen many months earlier.

4  176.   Also in April 2021, the Bank sent Rodriguez a letter dated April 20,
5  2021—i.e., just one day before the Bank filed its opposition to the motion for
6  preliminary injunction on April 21 (*see Yick*, Dkt. No. 72)—informing him that the
7  Bank was issuing him a temporary credit for the funds that had been fraudulently
8  withdrawn from his Account. On April 22, the Bank made the credit permanent,
9  which it reported to the Court when it re-filed its opposition to the motion for
10  preliminary injunction on April 23 (*Yick*, Dkt. No. 76-16 at 5).

11  **8.    J. Michael Willrich**

12  177.   In late September or early October 2020, Willrich discovered that
13  $4,000 to $5,000 was missing from his EDD Debit Card Account. Bank of America
14  did not notify him of the fraud. Willrich had never disclosed his PIN to anyone and
15  had never authorized another person to his Card.

16  178.   Upon learning of the fraud, Willrich immediately went to a Bank of
17  America branch and reported it to a Bank representative. The Bank representative
18  told him that the Bank only "sponsors" the EDD Debit Card and that he should call
19  the phone number on the back of his Card for assistance.

20  179.   Over the course of months, Willrich repeatedly sought assistance
21  through Bank of America's customer service phone lines, but to no avail. When
22  Willrich was able to get through to a customer service representative, he was
23  informed that he needed to speak with the Claims Department. He asked if he could
24  file a claim online but was told by the representative that he could not. He was then
25  transferred to the Bank's Claims Department, where he waited on hold for three-
26  and-a-half hours before the system hung up on him. The day after that, Willrich
27  waited on hold for another hour before he had to terminate the call due to time
28  constraints.

180.   On the fourth day after discovering the fraud, Willrich awoke at 5:00 A.M. PST to call the Claims Department and was finally able to reach a Bank representative and submit a fraud claim regarding the unauthorized transactions. Willrich and the Bank representative spent approximately one hour going through every charge during a three-month period to ensure all fraudulent activity was accounted for.

181.   Approximately 3–4 days after submitting his claim, Willrich received a letter from Bank of America stating that his claim had been denied due to suspected fraud. On information and belief, the Bank failed to conduct a good-faith investigation of Willrich's fraud claim and did not have a reasonable basis for its determination that Willrich had authorized or benefitted from the transactions.

182.   In early November 2020, Willrich again got up at 5:00 A.M. PST to call the Bank of America Claims Department. He spoke with a Bank representative and explained that he had submitted a fraud claim that had been denied by Bank of America. He asked the representative to explain why his claim had been denied. The representative told Willrich that the letter that was sent to him was the result of a "glitch" and that many people were calling about the same issue. The representative then re-opened Willrich's initial claim and told Willrich to wait and see what happened.

183.   Willrich waited as instructed, but he received no communication from the Bank.

184.   It was not until approximately January 12, 2021, when Willrich attempted to withdraw money from his EDD Debit Card Account, that Willrich learned that money had been credited to his Account. At no point between the early November 2020 phone call and January 2021 did Willrich receive any communication from Bank of America regarding the status of his fraud claim, such as the status of the Bank's investigation or its determination.

185.   In or around January and February 2021, there were at least three occasions when Willrich attempted to use his EDD Debit Card to withdraw money from a Bank of America ATM and was denied. On these occasions, the ATM displayed the following message: "Your transaction has been cancelled." On at least one of these occasions, Willrich then went into the Bank of America branch where the ATM was located and asked a Bank employee for assistance. The employee told Willrich that his EDD Debit Card Account had been frozen again and that he needed to call the number on the back of his EDD Debit Card to receive assistance. Willrich called the phone number as instructed and, after a lengthy process, a Bank representative told him that the issue that had caused his Account to be frozen had been fixed. However, when Willrich returned to an ATM and attempted to use his EDD Debit Card to withdraw money from his Account, he was again denied, and the ATM displayed the same error message as it had before. After spending two days on the phone with Bank of America and numerous representatives, Willrich finally secured the ability to make electronic transfers from his Account. To the extent Willrich was able to obtain funds from his Account, it was only by transferring them out of his Account electronically.

186.   After Willrich filed a class action lawsuit against Bank of America on January 22, 2021, the Bank finally unfroze his Account.

**9.   Lindsay McClure**

187.   McClure experienced $1,003 in fraudulent charges on her EDD Debit Card Account on or around December 1, 2020, after her Card was skimmed, she believes, at a gas station where she had used her Card, and where reports indicated that other debit and/or credit cards had been skimmed. After becoming aware of the fraudulent and unauthorized charges on her Account, McClure repeatedly called to seek assistance through Bank of America's customer service, to no avail.

188.   McClure first called the Bank on December 1, 2020, as soon as possible after discovering the unauthorized transactions to report them as

fraudulent. She presented evidence over the phone regarding the unauthorized transactions, which the Bank representative acknowledged was indicative of fraud. The representative told her that a fraud investigation would take place over the following 30–45 days. Yet shortly thereafter, she received a letter from Bank of America dated December 2, 2020, indicating that the Bank had closed her fraud claim the day after she submitted it. On information and belief, the Bank failed to conduct a good-faith investigation of McClure's fraud claim and did not have a reasonable basis for its determination that McClure had authorized or benefitted from the transactions.

189.   She then followed up with the Bank to inquire about her fraud claim, and a Bank representative told her that Bank of America was investigating it. When she asked how that was possible considering the Bank's letter stating the claim had been closed, the Bank representative hung up on her.

190.   Several weeks later, without reaching any resolution regarding her fraud claim, Bank of America froze McClure's Account without any notice. McClure did not find out her Account was frozen until December 20, 2020, when she tried to use her Card at a drive-through and discovered that she could not access her funds. When McClure called Bank of America to inquire about this, a Bank representative told her that EDD had frozen her Account due to fraud on the Account. On information and belief, this statement was false. When McClure then contacted EDD, an EDD representative told her that the agency had no evidence of any fraud on her Account. McClure subsequently phoned Bank of America to convey to the Bank what EDD had told her, but her Account remained frozen.

191.   Only after McClure filed a class action lawsuit against Bank of America on January 25, 2021, did she finally receive a letter from the Bank dated January 27, 2021, stating that the Bank had performed an "additional review" of her claim and had credited her the $1,003 stolen from her Account; however, her Account remained frozen. At some time before the end of March 2021, the Bank

finally unfroze her Account, at which point McClure was finally able to regain access to the funds in her Account.

### 10.   Robert L. Wilson

192.   Wilson was approved by the EDD for unemployment benefits in or around April 2020, and he received an EDD Debit Card with a magnetic stripe (but no EMV chip) soon thereafter. In or about September 2020, $2,547.78 was stolen from his EDD Debit Card Account through unauthorized transactions. On or around October 3, 2020, the Bank froze Wilson's Account without any notice or explanation. Upon discovering that he could not access his Account, Wilson promptly contacted Bank of America and was informed that unauthorized transactions had occurred on his Account in Southern California. Wilson, who resides in Stockton, informed the Bank representative that he had not used his Card in Southern California. The representative told Wilson that the Bank would investigate the unauthorized transactions and, in the meantime, would provide him with provisional credit.

193.   Within a week or two, the Bank reversed that provisional credit and closed the investigation into his fraud claim, all without warning or explanation. Wilson subsequently attempted to contact the Bank to resolve these issues approximately 30 to 40 times without success. Eventually, he was able to get the Bank to unfreeze his Account.

194.   But the Bank continued to deprive Wilson of the stolen funds. After Wilson filed a class action against Bank of America and was one of the consolidated *Yick* plaintiffs who moved for a preliminary injunction against the Bank on April 1, 2021, however, Wilson contacted the Bank on April 17 to request that it reopen its investigation into his fraud claim. On April 29, the Bank finally granted his claim and credited his Account the full $2,547.78 at issue.

### 11.    Clara Cajas

195.    On or about January 12, 2021, an unauthorized ATM cash withdrawal in the amount of $700 was made from Cajas's EDD Debit Card Account. Cajas had never disclosed her Card PIN to anyone and had never authorized anyone to use her Card. Cajas reported the fraudulent withdrawal to the Bank within 24 hours of its occurrence. The Bank responded that it would send her a new EDD Debit Card within 24 hours.

196.    When Cajas did not receive the new Card, she called the Bank to inquire about the status of the new Card and was told that she would not receive a new Card because her Account had been frozen. Cajas subsequently received a letter from the Bank, dated January 14, 2021, informing her that her fraud claim related to the $700 ATM withdrawal had been closed. On information and belief, the Bank failed to conduct a good-faith investigation of Cajas's fraud claim and did not have a reasonable basis for its determination that Cajas had authorized or benefitted from the transactions.

197.    Cajas did not understand how Bank of America could have concluded its investigation within 48 hours of the fraudulent ATM withdrawal. She called the Bank and was told by another Bank agent that the agent could not talk to her because her Account was frozen.

198.    Following the unauthorized ATM withdrawal, and the freezing of her Account, Cajas repeatedly sought assistance through Bank of America's customer service phone lines, to no avail. Each time Cajas called the Bank, she spoke to a different agent. Even though she fully documented her claim, each call was treated as if she were calling for the first time. The agents were either unable or unwilling to assist Cajas in any meaningful way regarding her $700 fraud claim or helping her regain access to any of the remaining balance in her Account. She repeatedly waited on hold for extended periods; was repeatedly disconnected from the line; waited to speak to someone only to be told to call back later; was transferred to

1   various departments without being provided any meaningful assistance or helpful

2   information; was sent to voicemail; dealt with unhelpful automated agents; and

3   unsuccessfully attempted to sort out the issues with her Account in person at Bank

4   of America branches.

5       199.   On April 1, 2021, Cajas and the other plaintiffs in the consolidated

6   *Yick* action filed their Motion for Preliminary Injunction and Provisional Class

7   Certification. Only then did Bank of America "reconsider" Cajas's fraud claim. On

8   or about April 28, 2021, Bank of America finally issued Cajas a permanent credit

9   for the $700 at issue and unfroze her Account, thereby allowing Cajas to access her

10  Account for the first time in more than three months.

11      **12.    Stephanie Smith**

12      200.   Smith received her EDD Debit Card in or about June 2020 and

13  activated it on Bank of America's website the same day that she received it.

14  Immediately after activating the Card, she locked the Card in a safe inside her home,

15  and she did not subsequently take the Card out of the safe or use it in any way. Her

16  only activity on her EDD Debit Card Account thereafter was to use Bank of

17  America's website to transfer funds from her EDD Debit Card Account to her

18  personal consumer bank account (also with Bank of America). She never used the

19  Card at an ATM, for an online purchase, at a retail store, or for any other transaction.

20  She also never disclosed her Card number or PIN to anyone and never authorized

21  anyone to use her Card. Despite all this, an unknown person or persons used the

22  Cardholder Information associated with her EDD Debit Card and/or Account to

23  make three unauthorized transactions with DoorDash on or about November 23, 27,

24  and 30, 2020, totaling $225.84.

25      201.   On or about December 22, 2020, Smith discovered the three

26  unauthorized transactions and promptly called Bank of America. During the phone

27  call, she informed a Bank representative that she did not authorize the transactions,

28  and she submitted unauthorized transaction claims. During the phone call, a Bank

representative asked Smith various questions to verify her identity, including asking Smith to provide her full social security number, all of which Smith answered to the representative's satisfaction. After the phone call, Smith did not receive any information from the Bank to track her claims or any communication confirming that the Bank would investigate her claims. Ever since, Smith's claims have languished for months at the Bank without being resolved.

202.   To date, Smith has not received any communication from the Bank regarding her unauthorized transaction claims, has received no provisional credits from the Bank, and has not been reimbursed for the unauthorized transactions. On information and belief, the Bank failed to conduct a good-faith investigation of Smith's fraud claim and has no reasonable basis for a determination that Smith had authorized or benefitted from the transactions.

**13.   Alan Karam**

203.   In or around June 2020, Karam began receiving EDD benefits via a Bank of America EDD Debit Card. During the next two months or so, he used the Card to make small in-person purchases (primarily food and groceries) and to withdraw cash from ATMs, all within the State the California. All or virtually all the transactions that Karam made using his Card and Account from June 2020 through August 2020 were for $100 or less. He never disclosed his Card PIN to anyone and never authorized anyone to use his Card.

204.   On or around August 21, 2020, Karam checked his Account balance online and was shocked to discover that over $2,000 in fraudulent transactions had occurred on his Account. His online Account statement showed two purchases from Target for $954 each, another purchase from Target for $442.69, and one purchase from McDonald's for $4.34. All of these unauthorized transactions had been made in New York while Karam was in California with his Card in his possession.

205.   Karam is a life-long California resident. He did not travel to New York or anywhere else outside California at any time since the COVID-19 pandemic

began in March 2020, and during which time there were significant California and federal government restrictions on travel.

206.  Bank of America knew or should have known about Karam's EDD Debit Card transaction history, that he appeared to be in California at the time of the unauthorized transactions, that the size of the transactions were significantly and suspiciously higher than his past transactions, and that the COVID-19 pandemic and related fears and travel restrictions made it highly unlikely that Karam or anyone authorized by him were making these transactions in New York. Given this, Bank of America should have detected and flagged the unauthorized transactions on Karam's account as highly suspicious, stopped them, and notified Karam about them, but the Bank did none of these things.

207.  On August 21, 2020, the same day that he discovered the unauthorized transactions on his Account, Karam called the Bank's customer service department and submitted by phone a fraud claim disputing the unauthorized transactions. By August 24, the fraudulent charges had been credited back to his Account. Karam understood those to be permanent credits. To the extent the Bank considered them to be provisional credits under EFTA and Regulation E, those credits became permanent on October 6, 2021, after the Bank's 45-day period to investigation Karam's claims expired under those same laws.

208.  On November 17, 2020, however, Bank of America—without notice or explanation—debited the previously reimbursed funds from Karam's Account, causing his Account balance to go negative, and closed the investigation into his fraud claim.

209.  Upon discovering this, Karam immediately called Bank of America. Despite the Bank's promises of "24/7" customer service in its Cardholder Agreement and EDD–Bank Contract, the Bank representative with whom Karam spoke informed him that he would need to speak with the claims department, but that the claims department was closed and he would need to call back the next day.

210.   The next morning at 6:30 A.M. PST, Karam called the Bank again and was placed on hold for 45 minutes before being connected to a claims representative, who told Karam that there was nothing she could do for him and she would transfer him to someone else. Karam was then transferred to a mailbox requiring a code, which he did not know. The call then disconnected.

211.   Karam immediately called back and waited on hold for another 45 minutes before speaking with another Bank of America representative. This time Karam asked for the representative's extension in case the call was disconnected. The representative responded that he did not have one. Karam then asked for the representative's identification number, and the representative said that he did not have one of those either. When Karam asked for his name, the representative hung up.

212.   After being hung up on, Karam called back a third time. After waiting on hold for another extended period, he spoke with a representative named Delijah, who transferred him to a representative named Jane, who transferred him to a representative named Brandon, who transferred him to a female supervisor whose name Karam does not remember. At this point, this third phone call alone had lasted multiple hours. The female supervisor advised Karam to file a police report regarding the fraudulent transactions on his Account, and to submit written statements about each of the fraudulent transactions, both of which he did.

213.   In December 2020, Bank of America "reopened" one of Karam's fraud claims only to close it again without reimbursing him. On information and belief, the Bank failed to conduct a good-faith investigation of Karam's fraud claim during this "reopened" investigation and did not have a reasonable basis for its determination that Karam had authorized or benefitted from the transaction. The Bank did not provide Karam with provisional credit in connection with this reopened investigation or indeed in connection with any of his fraud claims after the Bank, in November 2020, summarily reversed its prior credits to Karam's

1   Account. For weeks, Karam continued to call Bank of America and ask why his
2   fraud claims had been closed, but he was never given a clear answer.

3       214.   In January 2021, frustrated with Bank of America, Karam sought out
4   and obtained legal counsel. On January 25, 2021, Karam's counsel sent Bank of
5   America a letter on behalf of Karam, co-Plaintiff Stephanie Smith, and all other
6   similarly situated persons, notifying the Bank of its violations of the California
7   Consumer Privacy Act, Cal. Civ. Code §1798.150(a), and demanding that the Bank
8   cure those violations by taking specific actions within 30 days. That letter was
9   delivered to the Bank by FedEx the following morning, on January 26.

10      215.   On or about January 28, 2021, the Bank finally credited Karam's
11  Account for the funds stolen from his Account in August 2020. The credits did not
12  include any interest for the time during which the Bank had deprived Karam of
13  access to those funds.

14  **14.   Luis Perez**

15      216.   In October 2020, Perez logged into his Bank of America EDD Debit
16  Card Account online to check his Account balance. He saw that EDD had deposited
17  $516 into his Account on October 15, 2020, and that, on the very same day,
18  someone had made an unauthorized withdrawal of $500 from an ATM at an
19  Albertson's. Perez had not been to an Albertson's that day. Perez had also never
20  disclosed his Card PIN to anyone and had never authorized anyone to use his Card.

21      217.   Perez immediately called Bank of America to report the unauthorized
22  transaction. He opened a fraud claim with a Bank of America customer service
23  representative on or around October 24, 2020.

24      218.   About a week or two later, Perez received a letter from the Bank dated
25  October 28, 2020, stating without explanation that his fraud claim had been denied.
26  The letter did not describe what efforts Bank of America had undertaken, if any, to
27  investigate Perez's claim, nor did the letter explain the basis for Bank of America's
28  decision not to refund Perez the funds stolen from his Account. On information and

belief, the Bank failed to conduct a good-faith investigation of Perez's fraud claim and did not have a reasonable basis for its determination that Perez had authorized or benefitted from the ATM withdrawal.

219.   Shortly after Perez received this letter from Bank of America summarily denying his claim, Perez called the Bank again to request that his claim be reopened and investigated. A Bank of America customer service representative told him that his claim would be investigated within 30 to 90 days.

220.   Sometime in December 2020, Perez discovered that his Bank of America EDD Debit Card Account had been frozen. He did not receive any notice that his Account had been frozen prior to him discovering the freeze.

221.   Upon discovering that his Account had been frozen, Perez again contacted Bank of America to regain access to his Account. Bank of America told Perez that they could do nothing about the freeze and that Perez would need to contact EDD. As instructed, Perez contacted EDD, and he was eventually able to re-verify his identity both online and by physically mailing verification documents to EDD. Despite these efforts, Perez's Bank of America Account remained frozen for months, during which time Bank of America continued to blame EDD for the freeze, and Perez continued to be denied access to the benefits that EDD had determined he was entitled to receive.

222.   On or around February 10, 2021, Perez again called Bank of America about the still unresolved $500 fraud claim and the freeze on his Account. A Bank of America representative told Perez that the Bank could not provide him any information about his fraud claim due to the freeze on his Account.

223.   On or around March 13, 2021, Perez finally received a check from EDD for all the benefits to which he had been entitled but had not been paid between December 2020 and March 2021. However, his Bank of America EDD Debit Card Account still remained frozen, and he still did not receive provisional or permanent credit for the $500 that had been stolen from his Account in October 2020.

224.   On April 1, 2021, Perez became a class representative plaintiff in the *Yick* action (pursuant to an Amended Consolidated Complaint filed in that case) and submitted a declaration in support of the consolidated *Yick* plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification. Only then did Bank of America finally "reconsider" his fraud claim, reimburse Perez for the $500 at issue, and unfreeze his Account.

**15.   Brian Wiggins**

225.   In November 2020, Wiggins discovered unauthorized ATM withdrawals from his EDD Debit Card Account, totaling $1,512, which were made in Santa Rosa, California, and Atlanta, Georgia.

226.   Wiggins promptly reported the fraud to Bank of America, but rather than the Bank investigating his unauthorized transaction claims and crediting his Account, the Bank froze his Account due to the fraud. A Bank of America customer service representative told him that EDD was responsible for freezing his account, but an EDD representative later told Wiggins that was not true. On information and belief, it was not EDD but Bank of America who made the decision to freeze Wiggins's Account. While his Account was frozen, Wiggins had no access to his unemployment benefits.

227.   Wiggins received no written or formal communication from Bank of America over the many months that his Account was frozen. In the meantime, his numerous attempts to resolve his issues through Bank of America's customer service were unsuccessful. He spent hours on hold trying to reach a live agent and was hung up on. On the occasions when he managed to reach a live agent, they consistently failed to give clear answers to his questions or to otherwise provide any meaningful assistance.

228.   Only after Wiggins filed a class action lawsuit against Bank of America in the U.S. District Court for the Eastern District of California were his Account issues finally resolved. On or about May 26, 2021, Wiggins received a

1    letter from Bank of America stating that the Bank was issuing a permanent $1,512

2    credit to his Account.

3         **16.**    **Jonathan Smith**

4       229.    Smith became unemployed as a result of the COVID-19 pandemic and

5    applied for unemployment benefits from the EDD. The EDD approved his

6    application, and Bank of America issued him an EDD Debit Card.

7       230.    Sometime in the fall of 2020, Smith attempted to use his Card at a

8    Bank of America ATM and was surprised to learn that his EDD Debit Card Account

9    displayed a negative balance. Smith quickly realized that he had been the victim of

10   two unauthorized withdrawals totaling $1,721.78 in July 2020. Bank of America

11   did not notify Smith of the unauthorized withdrawals; he made the unsettling

12   discovery himself only after the ATM displayed an Account balance far lower than

13   he expected.

14      231.    Smith promptly reported the fraud to Bank of America. The Bank

15   temporarily credited the disputed amount to his Account. After later determining

16   that Smith had been the victim of fraud and had not authorized the withdrawals, the

17   Bank made the credit permanent.

18      232.    Approximately one month later, however, Bank of America reversed

19   the $1,721.78 "permanent" credit, without any notice or explanation. On

20   information and belief, the Bank's reversal of the credit was not the result of a

21   reasonable investigation, and the Bank had no reasonable basis for believing that

22   Smith had authorized or benefitted from the transactions. As with the fraudulent

23   withdrawals, Smith discovered the credit reversal himself, only after his Card was

24   declined for insufficient funds.

25      233.    The Bank's reversal of the credit caused Smith's Account balance to

26   go negative. Subsequent deposits into Smith's Account were applied against the

27   negative balance, depriving him of hundreds of dollars in critical benefits.

28

234. Besides reversing the "permanent" credit, Bank of America also froze Smith's Account—once again, without any notice or explanation. Smith repeatedly contacted Bank of America's EDD customer service phone number for assistance with the matter. Like many other EDD Debit Cardholders, Smith was subjected to inordinately long wait times and dropped calls. On the rare occasion that Smith managed to get into contact with a live customer service representative, the representatives often treated him rudely and unprofessionally, including accusing him of lying without any reasonable basis for the accusation.

235. With his EDD Debit Card Account frozen, Smith was unable to access his unemployment benefits, causing him severe stress and anxiety about how he would be able to pay for basic necessities, such as rent, groceries, and therapy. Smith was ultimately forced to borrow money from friends and family to cover these costs.

236. Although Bank of America ultimately re-issued Smith a permanent credit for the amount of the unauthorized transaction, significant damage was done. He suffered needlessly for months as a direct result of Bank of America's decisions to leave EDD Debit Cards susceptible to fraud and unauthorized use, to deprive him of the $1,721.78 associated with his unauthorized transaction claims, to freeze his Account without providing any clear process or recourse for Smith to regain access to his Account, and to commit the other unlawful acts and omissions alleged herein.

**17.  Alex Yuan**

237. Yuan became unemployed as a result of the COVID-19 pandemic and applied for unemployment benefits from the EDD. The EDD approved his application, and Bank of America issued him an EDD Debit Card.

238. In or around August 2020, two separate $900 unauthorized ATM withdrawals were made from Yuan's EDD Debit Card Account in Los Angeles, California.

239.   Yuan promptly reported the fraud to Bank of America. In September 2020, the Bank temporarily credited $1,800 to his Account. In October 2020, the Bank determined that Yuan had been the victim of fraud and had not authorized the two $900 withdrawals, and the Bank made the $1,800 credit permanent.

240.   Shortly thereafter, however, Bank of America reversed the $1,800 "permanent" credit, without any notice or explanation. On information and belief, the Bank's reversal of the $1,800 credit was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that Yuan had authorized or benefitted from the transactions. As with the fraudulent $1,800 withdrawal, Yuan discovered the credit reversal himself.

241.   The Bank's reversal of the credit caused Yuan's Account balance to go negative. Subsequent deposits by the EDD into Smith's Account were applied against the negative balance, depriving him of hundreds of dollars in critical unemployment benefits.

242.   Yuan repeatedly contacted Bank of America's EDD Debit Card customer service phone number for assistance with the matter. Like many other EDD Debit Cardholders, Yuan experienced long wait times, dropped calls, and elusive answers as to why the purportedly "permanent" credit had been reversed and when and how the matter would be resolved.

243.   While continuing to deal with the impact of the first two fraudulent withdrawals, Yuan's Account experienced yet another $900 unauthorized withdrawal, which he also promptly reported to the Bank, bringing the total amount of fraudulent withdrawals from his Account to $2,700. Because Bank of America was failing to adequately safeguard his Account, Yuan then set up automated transfers, so that any unemployment benefits deposited into his Account would be transferred to a different, more secure bank account.

244.   In December 2020, Bank of America notified Yuan by mail that it had frozen his Account due to fraud. Thereafter, Bank of America—without any notice

to Yuan—unfroze his Account, at which point EDD resumed making deposits of unemployment benefits to his Account, though without Yuan being aware of it.

245.  The Bank still has not reimbursed Yuan for any of his three unauthorized transaction claims, totaling $2,700. On information and belief, the Bank did not conduct reasonable good-faith investigations of these claims, and the Bank had no reasonable basis for believing that Yuan had authorized or benefitted from the transactions.

### 18.   Jory Zoelle

246.  In or about June or July 2020, Zoelle was the victim of an unauthorized transaction on her EDD Debit Card Account, which was a charge for approximately $1,300 from a Target store in New Jersey. Zoelle reported the fraudulent transaction to the Bank, which reimbursed her by crediting her Account for the amount of the transaction in or about September 2020. That same month, however, the Bank froze her Account for several weeks, depriving her of access to the funds in her Account. On information and belief, the Bank lacked a reasonable basis to freeze her Account.

247.  In or about October 2020, after having frozen Zoelle's Account, the Bank took back its previous credit by debiting her Account for the amount of the unauthorized transaction, causing her Account balance to go negative. This left her without much needed EDD benefits because the Bank applied EDD's subsequent deposits of benefits into her Account against the negative balance.

248.  This began Zoelle's ordeal of repeatedly calling Bank of America to get the credit reinstated, often spending three to four hours on the phone waiting to speak to a Bank representative, and not getting clear answers to her questions. On approximately Zoelle's fifth or sixth such call, one Bank representative stated her belief that Zoelle's unauthorized transaction claim appeared to be completely legitimate, and further stated that she would do everything in her power to get the

credit reinstated to Zoelle's Account. Months later, however, Zoelle received a letter from the Bank denying her claim.

249.    To date, the Bank has refused or failed to reinstate the credit to Zoelle's Account. On information and belief, the Bank's denial of her unauthorized transaction claim was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that she had authorized or benefitted from the transaction.

**19.    Cindy Baker**

250.    On or about February 9 and 10, 2021, Baker was the victim of two consecutive unauthorized transactions on her EDD Debit Card Account, both of which were fraudulent ATM withdrawals of $1,000 (i.e., the EDD Debit Card's daily limit for ATM withdrawals), for a total of $2,000. She promptly reported the unauthorized transactions to Bank of America. On February 10, 2021, Bank of America froze her Account.

251.    This began Baker's ordeal of repeatedly calling Bank of America to try to resolve these issues with her Account. She spent at least 30 hours on the phone with Bank of America, regularly receiving information from Bank of America representatives that conflicted with what other representatives had told her and with the information contained in letters she received from Bank of America.

252.    The Bank initially denied her unauthorized transaction claims. On information and belief, the Bank's denial of her unauthorized transaction claim was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that she had authorized or benefitted from the transaction.

253.    It was not until approximately June 2, 2021, after Baker had continued to maintain her class action lawsuit against Bank of America, that the Bank reversed its prior decision and finally credited her Account for the $2,000 that had been stolen nearly four months earlier.

### 20.   Ursula Auburn

254.   On July 31, 2020, Auburn was the victim of six unauthorized transactions on her EDD Debit Card Account, all of which were transactions from what appears (based on her Account statement) to be a single Walgreens store in New York. The individual transactions were in the amounts of $507.03, $511.38, $455.95, $505.95, $505.95, and $505.95. She promptly reported the unauthorized transactions to Bank of America.

255.   On August 13, 2020, the Bank provisionally credited Auburn's Account for the amount of each of the unauthorized transactions. On October 9, 2020, however, the Bank reversed those provisional credits, creating a negative balance in her Account. This left her without much needed EDD benefits because the Bank applied EDD's subsequent deposits of benefits into her Account against the negative balance.

256.   On information and belief, the Bank's denial of her unauthorized transaction claim was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that she had authorized or benefitted from the transaction. Indeed, on October 10, 202, the day after the Bank reversed the prior credits to her Account, Auburn called the Walgreens in New York where the fraud had occurred and spoke with a manager, who informed her that the store had video surveillance footage of the unauthorized transactions, and that those transactions had consisted of person using a physical card in the store to purchase gift cards. The manager told Auburn that neither Bank of America nor anyone else had contacted the store to ask about or investigate the transactions, and that Auburn's phone call to the store was the first communication that the manager had received about the transactions.

257.   On October 27, 2020, after speaking with Auburn, a reporter with ABC 7 (Los Angeles) contacted Bank of America to inquire about the unauthorized

transactions on Auburn's Account. That very same day, Bank of America credited Auburn's Account in the amounts of the unauthorized transactions.

### 21.   Julie Hicks

258.   On September 3, 2020, an unauthorized third party made a $1,000 withdrawal (i.e., the EDD Debit Card's maximum daily ATM withdrawal amount) from Hicks' EDD Debit Card Account. In the next week, seven more $1,000 fraudulent withdrawals were made from Hicks's Account, such that the unauthorized withdrawals on Hicks's Account totaled $8,000. On September 11, 2020, Bank of America froze Hick's Account.

259.   Hicks timely reported the unauthorized withdrawals to Bank of America and subsequently verified her identity with the Bank and with EDD. Nonetheless, the Bank refused to reimburse her for the fraudulent withdrawals, and it refused to unfreeze her Account. On information and belief, the Bank's denial of her unauthorized transaction claims was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that Hicks had authorized or benefitted from any of the transactions.

260.   On July 20, 2021, Hicks filed a class action lawsuit against Bank of America in the U.S. District Court for the Northern District of California. Only after that, in or around August 2021, did Bank of America finally unfreeze her Account. However, the Bank has never credited her Account for the $8,000 at issue in her unauthorized transaction claim.

### 22.   Kuang Ting Chong

261.   On or about July 20, 2020, an unknown person used a cloned debit card to steal $1,000 in unemployment benefits from Chong's EDD Debit Card Account. Chong discovered the fraud on his Account and contacted Bank of America to report the fraud that same day.

262.   On July 21, 2020, Chong filed a police report with the Alhambra police department. The officer Chong spoke to initially confused him with another EDD Debit Cardholder who had also just had funds stolen from his Account.

263.   On July 31, 2020, Bank of America credited the $1,000 at issue to Chong's EDD Debit Card Account. On September 2, 2020, Chong received a notice from the Bank that it had completed its investigation, and that the $1,000 credit to his Account was now permanent.

264.   Despite having issued Chong a permanent credit, however, Bank of America subsequently sent a letter to Chong dated October 2, 2020, stating that the Bank was rescinding the $1,000 credit. The Bank rescinded the credit on October 4, 2020, creating a negative balance in his Account. While Chong continued receiving EDD direct deposits into his Account thereafter, he was denied access to some of these funds because they were applied against the negative Account balance created by Bank of America.

265.   With respect to the $1,000 debit that occurred on October 4, the transaction description in Chong's online Account on Bank of America's website claimed that the debit was made by "State of CA EDD Unemployment." On information and belief, this transaction description was false and misleading, as the debit was made by and at the direction of Bank of America.

266.   Chong repeatedly contacted the Bank and EDD in an effort to obtain access to his $1,000 in unemployment benefits that had been stolen out of his Account and was now being withheld by Bank of America. In an October 15, 2020 phone call with the Bank's claims department, Chong was told his issue would be resolved "in the order it was received."

267.   Only after Chong filed a class action lawsuit against Bank of America in the U.S. District Court for the Central District of California in November 2020 were his Account issues finally resolved. The following month, in December 2020,

1    the Bank finally granted his unauthorized transaction claim and re-issued him a

2    permanent credit for the $1,000 at issue.

3    **23.   Stephanie Moore**

4        268.   On July 18, 2020, Moore was the victim of a fraudulent $1,000

5    withdrawal from an ATM machine and a separate fraudulent transaction of $482 at

6    a Target retail store. These transactions depleted all the funds from her EDD Debit

7    Card Account. Moore did not authorize these transactions and received no benefit

8    from them. Moore discovered the fraud on July 18, 2020, when she tried to use her

9    EDD Debit Card to make a purchase and her Card was declined.

10        269.   That same day, within minutes of discovering that unknown persons

11   had depleted the funds in her Account, Moore reported the fraudulent withdrawal

12   to Bank of America. On or about July 30, 2020, the Bank provisionally credited

13   $1,482 to Moore's Account. On or about August 7 or 8, 2020, the Bank informed

14   Moore in writing that it had made the $1,482 credit permanent.

15        270.   On September 30, 2020, Moore attempted to use her EDD Debit Card

16   to purchase a tire for her vehicle. The transaction was declined. Moore attempted to

17   check the balance of her Account but was unable to log into her Account. On

18   information and belief, Bank of America froze Moore's Account on or about

19   September 30, 2020, without providing notice to Moore.

20        271.   Despite having received a permanent $1,482 credit from the Bank in

21   August 2020, Moore received a letter from the Bank on or about October 2, 2020,

22   stating that the Bank was rescinding the $1,482 credit. The Bank rescinded the

23   credit on October 4, 2020, creating a negative balance in her Account.

24        272.   The transaction description for the October 4 debit in Moore's online

25   Account on Bank of America's website claimed that the debit was made by "State

26   of CA EDD Unemployment." On information and belief, this transaction

27   description was false and misleading, as the debit was made by and at the direction

28   of Bank of America. Indeed, on October 12, 2020, Moore spoke with Bank of

America representative, who stated that it was Bank of America who debited the $1,482 from her Account.

273.    Only after Moore filed a class action lawsuit against Bank of America in the U.S. District Court for the Central District of California in November 2020 were her Account issues finally resolved. The following month, on or about December 1, 2020, the Bank finally granted her unauthorized transaction claim and re-issued her a permanent credit for the $1,482 at issue.

**24.    Zinaida Petrova**

274.    On May 30, 2021, Petrova viewed her monthly Account statement and was surprised to see two transfers from her Account totaling $9,500: (1) a $5,000 transfer on May 16, 2021, and (2) a $4,500 transfer on May 23, 2021. Petrova did not authorized or benefit from either of these transactions. On or information and belief, these were online transfers by which an unauthorized third-party transferred money from Petrova's Account to an unknown non-EDD Debit Card bank account. Petrova has made online transfers from her EDD Debit Card into a consumer checking account she has at Union Bank, but the unauthorized transactions were not transferred to her Union Bank checking account and do not appear on her Union Bank account statements.

275.    Upon discovering the two unauthorized transactions, Petrova promptly called the phone number on the back of her EDD Debit Card to dispute the transactions. She spoke with a Bank representative and submitted a fraud claim. The representative told her the Bank would contact her regarding the findings of its investigation. On June 10, 14, 15, 17, 24 and July 6 and 7, 2021, Petrova called the Bank's customer service line for an update about the status of her claim. Bank representatives told her that they either could not locate her claim or that her claim was still pending. At no point was Petrova's Account provisionally credited for the amount of disputed transactions, or indeed for any amount.

276.    On or about July 13, 2021, Petrova received a letter from Bank of

America dated July 6, 2021, stating that the Bank was denying her claim. The letter's explanation for the denial was as follows: "We confirmed that the transfers posted to the account you requested. We recommend you contact the person you sent the funds to directly for further assistance." This is impossible, however, because Petrova never transferred the funds, and because the Bank's representatives could not, did not know how, or refused to provide Petrova with the details of the transactions.

277.   On information and belief, the Bank's denial of her unauthorized transaction claims was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that Petrova had authorized or benefitted from any of the transactions.

278.   Petrova still has not been reimbursed for the $9,500 in fraudulent transactions on her Account.

**25.   Claire Blankenship**

279.   On or about July 23, 2021, Blankenship went to a local Bank of America branch and tried to use her EDD Debit Card to withdraw unemployment benefits deposited into her Account, but the Bank teller informed her that she had no money left in the Account.

280.   Confused, Blankenship promptly called the phone number on the back of her Card. A Bank of America customer service representative informed Blankenship that her Account was empty. The representative read aloud to Blankenship recent transactions on her Account, and she was able to identify six fraudulent transactions totaling $2,750: (1) a $190 transaction on June 14, 2021; (2) a $400 transaction on June 27, 2021; (3) a $60 transaction on July 6, 2021; (4) a $1,000 transaction on July 19, 2021; (5) a $1,000 transaction on July 20, 2021; and (6) a $100 transaction on July 21, 2021. Blankenship did not authorize or receive any benefit from any of these transactions.

281.   On the same phone call, Blankenship submitted a claim disputing the fraudulent transactions. The Bank representative told Blankenship that her EDD Debit Card would be blocked as a result of her reporting the fraud, and her Card was blocked that same day. The Bank representative told Blankenship that the Bank would send her a new Card, would investigate the fraudulent transactions, and would contact her when its investigation was complete.

282.   On July 28, 2021, Blankenship received and activated her new Bank of America EDD Debit Card. Like her original Card, her new Card does not have an EMV chip.

283.   Also on July 28, 2021, Blankenship received a form letter from Bank of America dated Monday, July 26, 2021—just one business day after she reported the unauthorized transactions—denying her claim. The letter's entire explanation for why her claim was denied is as follows: "We've completed our review of the above referenced claim and have determined that no error has occurred in this instance. We now consider your claim resolved. [¶] What you need to know [¶] The transaction activity in question was authorized and posted correctly to your account." The letter also states that Blankenship may call a Bank of America customer service line to request copies of the documents that the Bank relied in on reaching its decision. Blankenship immediately called the phone number and requested copies of the documents on which the Bank had relied. A Bank representative stated that the Bank would send her copies of the documents.

284.   More than three weeks later, Blankenship still has not received (over three weeks after requesting them) any documents from the Bank on which it relied in denying her claim, and the Bank still has not reimbursed her for any of the fraudulent transactions that occurred on her Account in June and July 2021.

*   *   *

285.   In addition to the Class Representative Plaintiffs, countless other Class Members have similarly reported not receiving any notification or communication

from Bank of America regarding fraudulent transactions in their EDD Debit Card Accounts, and instead discovered it themselves. Bank of America's fraud monitoring and controls have proven to be completely inadequate and ineffectual, in direct contradiction to the Bank's representations to Plaintiffs, Class Members, and the State. Instead of resolving Class Representative Plaintiffs' claims for these unauthorized transactions, as it is required to do by law, the Bank summarily closed the claims, failed to provide provisional credit, and froze and blocked their Accounts for indefinite periods of time. As a result of the conduct and omissions alleged herein, and despite the Bank's "Zero Liability" policy, Plaintiffs and Class Members have been deprived of unemployment benefits and other public benefits to which they are entitled by law, for weeks or months, causing them great, immediate, and irreparable harm.

**H.    Individual Plaintiffs' Allegations**[16]

286.    Paul Abarr is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In June 2020, he experienced fraudulent transactions on his Account totaling approximately $8,000. In June 2020, he discovered the fraud. In June 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate the claim. In June 2020, Bank of America illegally froze his Account. In May 2021, Bank of America unfroze his Account. Since May 2020, Bank of America has not credited him any money. Due to Bank of America withholding his funds, he was evicted from several places because he has not been able to pay rent for twelve months, had several pre-paid phones shut off because he cannot afford to pay them, and was forced to beg for food.

---

[16] The substance of Individual Plaintiffs' allegations are presented here as set forth in each of their complaints, after meeting and conferring with Individual Plaintiffs' liaison counsel. Unless otherwise indicated below, each Individual Plaintiff referenced herein (*see infra* ¶¶286–526) is a plaintiff in *Abarr v. Bank of America, N.A.*, No. 3:21-cv-01203-LAB-MSB ("*Abarr*").

287.   Kobe Abbott is a California resident. In August 2020, he applied to receive EDD benefits through Bank of America; however, Bank of America never sent him a Card to access his Account. Between August 2020 to March 2021, he experienced fraud on his Account. In March 2021, he discovered the fraud when he was finally able to access his online Account. In March 2021, he attempted to report the fraud to Bank of America; however, Bank of America has never answered a single call. Since August 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he could not pay his $1,000 rent from August 2020 to May 2021, leading to his move out in May 2021. He has not been able to afford his $900 monthly car payment since August 2020. He has not been able to afford his $40 monthly phone bill since August 2020. He struggles to buy food, gas, and clothing.

288.   Jordan Aders is a California resident. In August 2020, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling approximately $1,164. In December 2020, he discovered fraudulent transactions on his Account. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to speak with EDD regarding his issue and refused to credit his Account. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since December 2020, Bank of America has yet to credit him any money. Due to Bank of America withholding his funds, he lost his vehicle (the vehicle in which he used to live), lost all personal belongings inside the vehicle, including clothing, a 33" television, PlayStation, and other personal items. He missed three months of phone bills: December 2020–February 2021 at $60 per month, and could not afford to pay for food.

289.   Michael Adams[17] is a natural person residing in Los Angeles County, State of California. Adams has an EDD banking Account which Bank of America maintains supervision and control over per its contractual relationship with the State of California. Over the course of this relationship, Adams provided Bank of America with various pieces of personal identifiable information related to Adams, such as his personal finances. Such information includes, but is not limited to, Adams' name, address, social security number, date of birth, income level, and banking information (amounts and accounts). Upon receipt of this information, Bank of America stored or otherwise archived said information in some library, digital file, computer-based system or other technique, and thus at all times was entrusted with and maintained control of Adams highly sensitive information. At some point in 2020, a hacker was able to access Bank of America's technical system—presumably via a misconfiguration of a firewall (presuming Bank of America had a firewall in place). As such, this hacker was able to gain access to banking account information for tens of thousands of EDD Debit Card Accounts which Bank of America maintains, supervises and controls per its contract with the State of California. In November of 2020, Adams checked his Account and discovered he had funds missing. Adams reviewed his Account activity and determined he had been a victim of fraud and made all reasonable attempts to notify Bank of America of this fraudulent activity. After Adams submitted his claim for fraud regarding the ATM withdrawal(s) at issue, Bank of America canceled or froze Adams' EDD Debit Card as a result of submitting his fraud claim. To Adams' shock and dismay, some unknown individual had made ATM withdrawal(s), in the amount of $2,303. Adams did not make these withdrawals himself, did not authorize anyone to make the withdrawal on his behalf, and was still in possession of his Card

---

[17] Adams is the plaintiff in *Adams v. Bank of America, N.A.*, No. 2:21-cv-05521-LAB-MSB, originally filed in the U.S. District Court for the Central District of California (No. 2:21-cv-05521-FMO-JPR) ("*Adams*").

despite said withdrawals taking place. Adams submitted a fraud claim to Bank of America regarding the missing/stolen funds in June 2021. Bank of America did not provide a temporary credit/refund, so pursuant to EFTA, Bank of America had ten (10) days to properly investigate and remedy the fraud claim. Bank of America did neither. Bank of America sent Adams written correspondence dated June 4, 2021 denying his fraud claim, after allegedly performing a "reasonable" investigation. The basis for Bank of America's denial of Adams' claim is scant at best but nonetheless refused to refund or credit Adams the $2,303 sum. Despite Bank of America's efforts, Bank of America refused to perform any reasonable investigation regarding Adams' dispute and instead flatly denied Adams' claim. Bank of America's alleged "investigation" into Adams' dispute was clearly inadequate, not reasonable, not diligent, and failed to properly address Adams' issues regarding the $2,303 fraudulent withdrawal. Further evidencing Bank of America's woefully inadequate investigation is the fact that Bank of America has access to data, film, and other resources given that the fraudulent transaction took place at one of Bank of America's own financial centers (i.e., not a third-party ATM at convenience store, for example). Bank of America could have reasonably, easily and swiftly confirmed the $2,303 transaction as fraudulent and refunded or credited the funds over to Adams's Account. Instead, Bank of America failed to investigate properly, refused to credit or refund the transaction, while still nonetheless confirming that the withdrawal was subject to fraudulent activity.

290.   Jonathan Aguirre is a California resident. In December 2019, he began receiving EDD Benefits through Bank of America. In May 2020, he experienced fraud on his Account totaling approximately $806. In May 2020, he discovered the fraud when he attempted to withdraw money from the Account but had insufficient funds. In May 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to speak with EDD regarding his dispute. In May 2020, Bank of America froze his Account. The Account remained

frozen with no refund or credit for an entire year. In May 2021, Bank of America credited $403 to his Account. Due to Bank of America withholding his funds, he missed his rent payment in June 2020 and July 2020, missed his phone bill, missed his credit card bill, and missed insurance payments. Bank of America also caused him to not be able to purchase food or gas.

291.   Christopher Allison is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In January 2021, Bank of America froze him out of his Account due to alleged fraudulent activity. However, there had been no such fraud on the Account. In January 2021, he discovered the freeze when he tried to use his Card but was declined. In January 2021, he called Bank of America to report the problem. In response, Bank of America told him to talk to EDD regarding his dispute. In January 2021, Bank of America froze his Account. Since January 2021, Bank of America has yet to unfreeze his Account. Since January 2021, Bank of America has yet to credit him any money. Due to Bank of America withholding his funds, he missed three $600 rent payments, only avoiding eviction because he worked something out with his landlord. He cannot pay his $300 PG&E monthly bill due since January 2021. He also has struggled with depression due to Bank of America's conduct and has had suicidal thoughts.

292.   Kevin Alvarez is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. Between July 2020 and November 2020, he experienced fraud on his Account, totaling approximately $10,000. In September 2020, he discovered the fraud and immediately reported it to Bank of America by phone. In response, Bank of America told him he needed to resolve his issue with EDD. In November 2020, Bank of America froze his Account. Since July 2020, Bank of America has not credited him any of the stolen money. Due to Bank of America withholding his funds, he was forced out of his home after not being able to afford his rent at $950 per month for two months, he was forced to live on the streets (in the back of his car), he has missed every phone

payment since November 2020 at $130 per month, and he cannot afford to buy food or gas.

293.   Courtney Alvarez is a California resident. In January 2020, she began receiving EDD benefits through Bank of America. In February 2020, she experienced fraud on her Account, totaling between $1200-$1300. In March 2020, she discovered the fraudulent transactions on her Account. In March 2020, she reported the fraudulent transactions to Bank of America. In response, Bank of America told her that they were not certain where the money went and that they would open a claim. In March 2020, Bank of America froze her Account. Since March 2020, Bank of America has yet to unfreeze her Account. Since March 2020, Bank of America has yet to credit her any of the stolen funds. Due to Bank of America withholding her funds, she missed her rent payment for the months of March, April, and May at $250 per month and, as a result of missed rent, she was evicted. She missed paying her phone bill for the months of March, April, and May at $60 per month. She missed paying her gas bill for the months of March, April, and May at $45 per month. She also missed paying her electric bill for the months of March, April, and May at $75 per month. She was unable to pay the necessaries of life including money to buy food and put fuel in her vehicle. She was pregnant and was unable to purchase the necessary maternity clothes during this period.

294.   Rosa Alvarez[18] is, and at all times relevant to the allegations below was, a natural person residing in the Los Angeles, California. Beginning in April 1996, she worked as a Course Materials Manager at the Follet Bookstore at Cerritos College. As a result of the COVID-19 pandemic, she was laid off just two weeks shy of her 24th anniversary of working there. Unable to get another job, she began receiving unemployment benefits, which were paid directly from the State of

---

[18] Rosa Alvarez is the plaintiff in *Alvarez v. Bank of America, N.A.*, No. 3:21-cv-01176-LAB-MSB, originally filed in the U.S. District Court for the Central District of California (No. 2:21-cv-04643-DOC-PLA) ("*Alvarez*").

California onto her Bank of America EDD Debit Card Account. On or about Saturday, June 13, 2020, she was shopping and intended to pay for her purchase using her Bank of American EDD Debit Card. After she ran her EDD Debit Card, only $8.75 could be charged to her Card. She was not initially alarmed, believing it was a mistake with the vendor. On Monday, June 15, 2020, she called Bank of America to ensure that there were no problems with her Card. When she called, she learned that her Account balance was zero. During the call, she was told that $160 was withdrawn from her Card from an ATM in Corona, California. She immediately knew that the transaction was unauthorized because she had not been to Corona. When she informed Bank of America that the withdrawal was an unauthorized transaction, Bank of America instructed her to contact the Claims department and provided her with claim #200615300845. She immediately reviewed her Account statements from the Internet and highlighted all the fraudulent transactions, which were all ATM cash withdrawals beginning on May 17, 2020. She called Bank of America back, provided claim #200615300845, and notified the Bank about all the additional transactions that were fraudulent. Bank of America told her that she would be notified about the results of the Bank's investigation in 45 days. She called Bank of America on the week of July 6, 2020, to inquire about the status of the investigation. During that call, she spoke with Jester of Bank of America, who stated that the Bank had not done an investigation because she had not returned to the Bank the form that the Bank had sent her. She told Jester that she had not received anything in the mail from Bank of America. Jester told her that she was supposed to return the form to Bank of America within 10 days and that Jester was unable to resend the form. On or about July 10, 2020, she drove to the Bank of America branch in the city of Cerritos to see if she could complete the form in the Bank branch to process her identity theft claim. She was informed, however, that issues concerning EDD Debit Car Accounts cannot be handled in the branch, and that she could only resolve her issues by telephone. She

asked if she could be provided a copy of the form that needed to be completed to process her identity theft claim, and she was told No, not in the branch. On or about July 11, 2020, she called the Los Angeles Police Department and reported the theft of money from her EDD Debit Card Account. After she received a copy of the police report, she completed an Identity Theft Affidavit and attached all the requested documents (copy of the police report, her state identification card, proof of residency) to the Affidavit. She then mailed the Affidavit to Bank of America by certified mail, return receipt requested, on August 14, 2020. She never received a response to her Identity Theft Affidavit. On or about December 2, 2020, she sent Bank of America a letter by certified mail, return receipt requested, informing the Bank that she had not received a response to her Identity Theft Affidavit. She asked Bank of America to inform her if Bank of America needed any other documents to complete its investigation. In that same letter, she also asked the Bank to send her a copy of its investigation results and the documents used to reach the result, if its investigation was completed. She never received a response to her December 2, 2020 letter. As a result of Bank of America's unlawful acts and omissions as stated above, she suffered actual damages as described above.

295.    David Anderson is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In July 2020, he started experiencing fraudulent transactions on his Account, totaling approximately $1,500. In July 2020, he reported the fraud to Bank of America via phone call. Since July 2020, Bank of America's response to him was to tell him to talk to EDD about his problem. Bank of America also told him that a bank supervisor would call him but then nobody called. In August 2020, Bank of America credited him $1,500; however, Bank of America then reversed the credit and made his Account balance negative $1,500. Due to Bank of America's actions, he lost his place to live after not being able to pay his $900 rent and was forced to live in his friend's car. He lost all his belongings when they were stolen out of the car. He could not afford to buy

food or gas, or clothing. He also cannot afford to pay child support, which means he has not been able to see his children in six months.

296.    Rebekah Anderson is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In September 2020, she began experiencing fraud on her Account. In September 2020, she discovered the fraud when she attempted to withdraw money out of an ATM but could not access the funds. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her she needed to resolve her issue with EDD. In December 2020, Bank of America froze or closed her Account without notice. In April 2021, she received a letter from Bank of America stating her Account was unfrozen or reopened. Due to Bank of America's actions, she could not pay her rent at $330 per week, could not pay her phone bill at $135 per month, and could not afford to fix her truck which led to her losing a new part-time job in January 2021.

297.    Amanda Andrade is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In August 2020, she experienced fraud on her Account. In September 2020, she discovered the fraud. In September 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to contact EDD to resolve her issue. In September 2020, Bank of America froze her Account, which had $19,000 in it at the time. In February 2021, Bank of America unfroze her Account. Since September 2020, Bank of America has yet to credit her any of the stolen funds. Due to Bank of America's actions, she was evicted from her home after not being able to pay her rent from September 2020 to January 2021 at $1,500 per month. She also could not afford to pay her phone bill, car insurance, and gas bill because of Bank of America's actions.

298.    Samuel de los Angeles, Sr. is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In April 2021, he experienced fraud on his Account. In May 2021, he discovered the fraud. In May 2021, he reported the fraud to Bank of America via phone. In response, Bank of

America told him they would try and figure out his issue. In May 2021, Bank of America froze his Account, which had $0 in the Account at the time. Since May 2021, Bank of America has not lifted the freeze on his Account. Since May 2021, Bank of America has yet to credit him any of the stolen money. Due to Bank of America's actions, he was three weeks late on his $1,300 rent payment in June 2021, which carried a $100 penalty. He had to borrow money to pay his $105 cell phone bill. He could not afford food and gas.

299.  Sheila Anistik is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In March 2020, there was fraud on her Account. The fraud was an unauthorized international transaction totaling $4,000. In March 2020, she discovered the fraud by checking her Account balance. In March 2020, she reported the fraud to Bank of America, both by email and by phone. In response, Bank of America told her she needed to speak to EDD to resolve her issue. In March 2020, Bank of America froze her Account, which had $9,000 in it at the time. In March 2020, Bank of America credited her the $4,000; however, Bank of America did not unfreeze her Account for her to access the funds. Due to Bank of America's actions, she missed her $1,200 mortgage payment between April and June of 2020, eventually selling her home instead of losing it to eviction. She was unable to pay her electric bill at $230 per month, her gas bill at $175 per month, her water bill at $215 per month, and her cell phone at $45 per month, all between April and June of 2020. She was unable to buy medical necessities for her elderly mother. She also was unable to buy food and gas.

300.  Robert Arnoldstarr is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling approximately $5,000. In December 2020, he discovered the fraud when he checked his Account balance. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him that his issue was with EDD, and that Bank of America could not

help him. In December 2020, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. Since December 2020, Bank of America has yet to credit the stolen money to his Account. Due to Bank of America's actions, he missed five $2,100 rent payments starting in January 2021 and was promptly evicted. He is now homeless. In April 2021, his car was repossessed after missing five car payments totaling $4,000. He could not pay his credit card bills for five months starting in January 2021. He could not pay his $130 phone bill since January 2021. He cannot afford to pay for food or gas. He also cannot pay for doctor's bills.

301.   Vanessa Arrey is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. Between October 2020 to February 2021, she experienced fraud on her Account, totaling approximately $6,500. In April 2021, after certifying her claim with EDD, she discovered the fraud after she logged onto her Account. In April 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her she needed to verify her identification, only after Bank of America transferred her from department to department. In April 2021, Bank of America illegally froze her Account. In late April or early May 2021, Bank of America unfroze her Account. Since April 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed five $500 rent payments, leading to eviction and subsequent homelessness. She missed five $200 utility bills. She missed three $75 phone bills. She suffers from emotional distress.

302.   Christal Ayala is a California resident. On February 2, 2020, she began receiving EDD benefits through Bank of America. On March 1, 2021, Bank of America illegally froze her Account. Since March 2021, Bank of America has yet to unfreeze her Account. Since March 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $1,050 rent payment in March 2021, leading to eviction and subsequent homelessness for her and her children. She struggles to pay for motels for her children to have some sort of living

condition. She has been unable to afford her car payments since March 2021. She is unable to afford her car registration. She struggles to buy food, gas, and clothing for herself and her children.

303.   Celina Back is a California resident. In November 2020, she applied to receive EDD benefits through Bank of America; however, Bank of America did not send her a Card with access to her funds until March 2021. In March 2021, Bank of America illegally froze her Account, after she reported someone was fraudulently ordering new Cards from her Account. In late May 2021, Bank of America unfroze her Account. In May 2021, she experienced fraud on her Account, totaling approximately $17,000. In May 2021, she discovered the fraud when she logged into her Account. In May 2021, she reported the fraud to Bank of America via phone. In response, Bank of America opened a claim to investigate. In May 2021, Bank of America again illegally froze her Account. Since May 2021, Bank of America has yet to unfreeze her Account. Since May 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she has missed her $700 rent payment from April 2021 to present, her $236 car payments from April 2021 to present, her $100 monthly electric bill from April 2021 to present, and her $60 phone bill from April 2021 to present. She struggles to obtain food, gas, and clothing.

304.  Mark Barnette is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In June 2020, he experienced fraud on his Account. The fraudulent transactions were withdrawals totaling $8,000. In September 2020, he discovered the fraud. In September 2020, he contacted Bank of America to report the fraud. In response, Bank of America did not believe him, even when he physically went into a bank branch to prove his identification. In September 2020, Bank of America froze his Account. In May 2021, Bank of America unfroze his Account. In February 2021, Bank of America credited him $6,200. Due to Bank of America's actions, he was evicted from his

apartment in July 2020 and was forced to live on the streets in a tent. He missed seeing his daughter for the first time in seven years. He cannot afford food or gas. He has had to make two hospital visits as a result of living on the streets. His fiancé left him. He suffers from extreme emotional distress.

305.   Douglas Beckham is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In February 2021, he began experiencing fraud on his Account. The fraudulent transactions totaled $924. In February 2021, he discovered the fraud when he checked his Account balance. In February 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said he needed to speak with EDD to resolve the issue. In February 2021, Bank of America froze his Account, which had $934 in it at the time. Since February 2021, Bank of America has yet to credit him any of the stolen money. Due to Bank of America's actions, he could not afford his $550 rent payment from February 2021 to May 2021, forcing him to be evicted and live with his friend. He could not afford to pay his $200 utility bills from February 2021 to May 2021. He has not been able to pay his $60 monthly phone bill since February 2021. He had seven credit card accounts default because he could not pay his credit card bills. He cannot pay for food or gas.

306.   Sky Beehler is a California resident. In February 2020, she applied to receive EDD benefits through Bank of America; however, Bank of America did not send her a Card to access her Account. Between February 2020 and June 2020, she experienced fraud on her Account, totaling approximately $14,134. In June 2020, she discovered the fraud when she called Bank of America to inquire why Bank of America had not sent her a Card. In June 2020, she reported the fraud to Bank of America via phone. In response, Bank of America froze her Account until they could conduct and investigation. In June 2020, Bank of America froze her Account. Since June 2020, Bank of America has yet to unfreeze her Account, and has in fact closed her Account. Since June 2020, Bank of America has yet to credit her any

money. Due to Bank of America's actions, she missed paying her $1,300 rent payment from June 2020 to October 2020, and her landlord threatened eviction. She missed her $494 monthly car payment from June 2020 to October 2020, leading her to sell the car. She struggles to pay for her phone payments and her PG&E payments. She struggles to obtain food, gas, and clothing.

307.   Amber Bennett is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In July 2020, she experienced fraud on her Account, totaling approximately $300. In July 2020, she discovered the fraud when she checked her Account transaction history. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would open a claim and investigate. In late July or early August 2020, Bank of America illegally froze her Account. In late July or early August 2020, Bank of America unfroze her Account. In late July or early August 2020, Bank of America credited $300 to her Account; however, Bank of America reversed the credit, putting her Account into a balance of negative $300. Since August 2020, Bank of America has yet to re-credit her the fraudulently stolen money. Due to Bank of America's actions, she missed a $650 rent payment. She missed a $400 car payment which led to a $45 late fee. She struggles to buy food, gas, and clothing. She suffers from emotional distress.

308.   Forrest Berlt is a California resident. In October 2019, he began receiving EDD benefits through Bank of America. In October 2019, he began experiencing fraud. In October 2019, he discovered the fraud when he called Bank of America to see why he had not received any of his funds. In October 2019, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to verify his ID and to talk to EDD to resolve his issue. In October 2019, Bank of America froze his Account. In May 2020, he received a letter from Bank of America telling him his Account was unfrozen. Since October 2019, Bank of America has yet to credit him the funds he was due from EDD. In

May 2020, Bank of America credited him $5,000 from the fraudulent transactions. Due to Bank of America's actions, he missed rent payments between $400–$500 and was forced to live with friends and family. From October to December 2019, he was late on two car payments for $495/month. His car was impounded in December 2019. He had already made 28 of the 36 payments for the car at the time of the impounding. He struggled to obtain food, gas, and clothing.

309. Stone Blacksands is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In April 2020, Bank of America illegally froze his Account. Between April 2020 and September 2020, he called Bank of America, who told him he needed to verify his identification with EDD. Since April 2020, Bank of America has yet to unfreeze his Account. Since April 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he could not pay his $600 rent payments form April 2020 to July 2020, forcing him to find other housing options. He cannot afford to fix his recreational vehicle (RV), which he now lives in. He could not afford his $150 monthly phone bill, leading to a phone shut off. He cannot afford $5,000 for a clinical study program in which he is enrolled. He struggles to pay for food, gas, and clothing.

310. Dean Bommel is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In August 2020, he experienced fraud on his Account, totaling approximately $5,000 of overseas transactions. In August 2020, he discovered the fraud after he checked his Account history online. In August 2020, he reported the fraud to Bank of America via phone. In response, the Bank said they would freeze his Account and investigate. In August 2020, the Bank froze his Account. In August 2020, the Bank credited him money to his Account, yet did not credit him the international fees associated with the first fraudulent transactions on his Account. In December 2020, the Bank unfroze his Account. In January 2021, he again experienced fraud on his Account involving the same international companies. In January 2021, he discovered the fraud when he

checked his online Account. In January 2021, he reported the fraud to Bank of America via phone. In response, the Bank blamed him for the fraud and refused to credit him for the fraudulently stolen money. In January 2021, the Bank again froze his Account. In April 2021, the Bank unfroze his Account. Bank of America has yet to credit him for the second set of fraudulent transactions. Due to the Bank's actions, he missed his $1,100 rent payments from January 2021 to May 2021. He also missed electric bills totaling $6,000 and gas bills totaling $1,800. He struggles to obtain food and clothing.

311. Nicholas Brady is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In June 2020, he began experiencing fraud on his Account. The fraudulent transactions totaled $2,000 from ATM cash withdrawals. In June 2020, he discovered the fraud. In June 2020, he contacted Bank of America to report the fraud via phone. In response, Bank of America told him to talk to EDD to resolve his issue. In October 2020, Bank of America froze his Account. In October 2020, Bank of America unfroze his Account. In December 2020, Bank of America again froze his Account. In January 2021, Bank of America unfroze his Account, for a second time. In July 2020, Bank of America credited him the $2,000 that was fraudulently taken from his Account; however, the reversed the credit and put his Account into a negative balance. Since July 2020, Bank of America has yet to credit him the stolen money. Due to Bank of America's actions, he was evicted from his home in November 2020. He could not pay his cell phone bill with Verizon at $60 per month since September 2020, and as a result, went into default where Verizon turned him into collections. He had his child support licensed suspended because he had no funds to pay. He cannot buy food and had to go to a homeless shelter just to eat dinner. He also suffers from depression and extreme humiliation.

312. James Brooks is a California resident. In May 2020, he applied to receive EDD benefits through Bank of America; however, Bank of America did not

send him a Card with access to his Account until July 2020. Between June 2020 to July 2020, he experienced fraud on his Account, totaling approximately $11,529.06. In January 2021, he discovered the fraud when Bank of America told him a fraudulent person had been accessing his Account. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America took one day to investigate the claim before Bank of America denied the claim, finding no fraud. In January 2021, Bank of America froze his Account. In March 2021, Bank of America unfroze his Account. Since January 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his $800 rent payments from March 2021 to February 2021. He missed his phone bill, electric bill, and water bill from March 2021 to February 2021, totaling approximately $600. He struggles to buy food, gas, and clothing.

313.    Adam Brotman[19] resides in San Diego County, California. He became out of work during the COVID-19 pandemic. He then applied for and was found eligible by EDD to receive unemployment benefits. He received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access EDD benefits. He was then the victim of unauthorized transactions on his EDD Debit Card Account. He promptly reported the unauthorized transaction(s) to Bank of America, which failed to comply with its legal obligations as alleged herein, causing him to suffer immediate and irreparable injury. On October 22, 2020, two transactions were charged to his Account; (1) A transaction that he made at an ARCO gas station in San Diego, California and (2) a transaction at an ATM in Birmingham, England for $990.50 that he did not authorize. Brotman, in dire need of his funds to help bridge the gap between employment during the pandemic, was confused why Bank of America approved the ATM transaction in England that occurred on the same day as his transaction in California. The fraudulent transaction of $990.50 in

---

[19] Brotman is the plaintiff in *Brotman v. Bank of America, N.A.*, No. 3:21-cv-00520-LAB-MSB ("*Brotman*").

1   England drained his Account to $170.81 after the Bank's international transaction
2   fees. The fraudster stole $990.50 from him which is a great deal of money to him.
3   He intended to use the money to buy food and gasoline. Inexplicably, he did not
4   receive a notification about the highly unusual transaction in England, indicating
5   that Bank of America failed to detect the fraud. On October 27, 2020, after
6   discovering the fraudulent $990.50 transaction made in England on his Account, he
7   immediately called Bank of America and filed a fraud claim. Bank of America told
8   him to wait for a few days while it investigated the claim and stated it would get
9   back to him. On October 28, 2020, just one day after his fraud report, the Bank sent
10  him a letter that read in part: "Your claim has been closed because we believe the
11  account or the claim have been the subject of fraud or suspicious activity. Any
12  temporary credit that was applied to your account related to this claim, including
13  any related reimbursement of fees, has been or will be debited from your account
14  and reflected in your available balance, if any." The Bank's letter dated October 28,
15  2020 admits that Brotman's Account had been "the subject of fraud" and an error
16  did occur. It was required to correct the error within one business day under 15
17  U.S.C. §1693f(b). Not only was the Bank required to recredit the $990.50 resulting
18  from the error, it should have refunded the $20.81 of international transaction fees
19  it charged stemming from the error. To date, this has not occurred. Brotman was
20  shocked the claim was denied only one day after he informed Bank of America of
21  the error on his Account, which was made at an ATM thousands of miles away from
22  his home in San Diego, CA. He believed he would be protected and covered by
23  Bank of America and was utterly disappointed when the Bank did not return or
24  recredit the money to him so he could provide for himself during the pandemic
25  while it conducted a good faith investigation. His initial notice to the Bank occurred
26  well-within the sixty-day time limit imposed by 15 U.S.C. §1693f(a). He reported
27  the unauthorized transfer to the Bank many more times within sixty-days as outlined
28  below. The Bank continued to send him periodic statements, as required by 15

U.S.C. §1693f(a). The statements confirmed and showed the unauthorized transfer. Brotman called Bank of America routinely to report the fraud and request a refund. He would sit on hold for extended periods of time. Sometimes the call would become disconnected after being on hold for hours. Each time he reported the unauthorized transfer to agents at the Bank, he provided his name and other identifying information as required by 15 U.S.C. §1693f(a)(1). The agents were able to locate his Account, but they would not help him. He indicated to the Bank that he believed his Account contained errors in the form of an unauthorized electronic fund transfer under 15 U.S.C. §1693f(f)(1) and provided the amount and date of the transfer per 15 U.S.C. §1693f(a)(2). When he reported the fraud, he explained that the transfer occurred in England while he was in California. He set forth the reasons for his belief that the transfer was unauthorized error on the Bank's part and was fraudulent per 15 U.S.C. §1693f(a)(3). Upon information and belief, the Bank did not conduct any investigation when he reported the error. The Bank may have mailed him the alleged results of an "investigation" and determination within ten business days of notice, in an attempt to satisfy 15 U.S.C. §1693f(a)(3), but the letter the Bank sent him the next day after fraud notice was a form letter with no substantive information. The Bank did not conduct a good faith investigation and did not provisionally recredit his Account within ten business days after receiving notice of the unauthorized transfer as required by 15 U.S.C. §1693f(c). Around November 2020, Brotman reached another agent by phone and again reported the fraud and asked for help in the form of a recredit or refund. The agent told him that the call needed to go to "claims." Despite Bank of America's representations of "24/7" customer service, the agent informed him that he needed to call back during business hours and provided him with a number to call. Brotman called that number only to be put on hold for hours, and then hung up on. He was transferred to various departments to no apparent end, sent to voicemail, dealt with unhelpful automated agents, with no meaningful response. In December 2020, he

was able to speak with another Bank of America agent. He went through the transactions with the agent and reported the fraudulent $990.50 charge made in England again. The agent told him that his Account was frozen on December 17, 2020, and the Bank should have sent him a letter informing him. Unfortunately, he did not receive any such letter. The agent transferred him to the Claims Department who hung up on him without answering the phone. At no point did Brotman receive warning via mail, email, text, call or otherwise from Bank of America regarding the fraud on his Account or the ongoing widespread fraud affecting EDD Debit Cards or how defrauded EDD recipients should proceed. There was no notice even after the Bank had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. In his numerous calls to the Bank going back to October 2020, Brotman repeatedly requested additional information, clarification and documentation concerning the unauthorized transfers, but the Bank refused to provide it as required under 15 U.S.C. §1693f(f)(6). Assuming the Bank had a valid reason for the freeze and needed to conduct an investigation, Brotman should have been able to access his funds, including the stolen $990.50, after ten days under the EFTA. But that was not the reality for him. He was held hostage by the Bank with the only option of calling the Bank repeatedly and being placed on hold for hours and hours. In late January 2021, he called Bank of America's Claims Department again. A representative named Chris answered the phone and informed Brotman that on January 19, 2021, his claim shifted from "closed" to "pending maintenance." Brotman received no correspondence about the shift in status of his claim. On February 1, 2021, the Bank mailed Brotman an additional letter informing him that his Account had been frozen due to suspicious activity. On February 3, 2021, the Bank mailed him a letter stating his $990.50 had finally been returned and his Account was not frozen. The information was directly contrary to the letter the Bank had sent him two days before. The Bank did not return the $20.81 of international

transaction fees it charged him in connection with the fraudulent transaction and did not credit him for interest as required by 15 U.S.C. §1693f(b). Brotman reported the unauthorized transaction to the Bank in October 2020. A good faith investigation by the Bank was required to be completed forty-five days later under 15 U.S.C. §1693f(c). If the Bank determined in a good faith investigation during the forty-five period that an error did not occur, it was required to deliver or mail him an explanation of its findings within three business days after the conclusion of that good faith investigation under 15 U.S.C. §1693f(c). Instead, the Bank sent him a form letter the next day after he reported the fraud. This indicates the Bank had not performed any sort of investigation, much less a good faith investigation. The letter seemed to be an attempt to shield the Bank from liability. In its letter dated October 28, 2020, Bank of America failed to enclose any supporting documents to support its position that Brotman had committed the fraud. The Bank did not make a good faith investigation of the error. It did not have a reasonable basis for believing that his Account was not in error per 15 U.S.C. §1693f(e)(1). Initially, and then again well after the forty-five-day investigation period allowed, the Bank concluded that his Account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to it at the time of its investigation per 15 U.S.C. §1693f(e)(2). Brotman upheld his end of the Cardholder Agreement and the requirements of the EFTA and made consistent diligent efforts to report and recover the funds stolen from the Account. He made many telephone calls reporting the fraud. In spite of this, Bank of America's customer service department never offered him any meaningful response or assistance, but rather stymied his efforts at every turn.

314.   James Bruno is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In December 2020, he began experiencing fraud on the Account. The fraudulent transactions totaled $895. In December 2020, he discovered the fraud when he attempted to pay rent but was unable to do so. In

December 2020, he contacted Bank of America via phone to report the fraud. In response, Bank of America told him to wait to process his claim and to talk to EDD to resolve his issue. In December 2020, Bank of America froze his Account. In May 2021, Bank of America unfroze his Account. In May 2021, Bank of America credited him the $895 that was stolen. Due to Bank of America's actions, he missed rent of $1,600. He was forced to ask for an extension on paying his phone bill of $100. He also suffered from emotional distress.

315.   Beth Burns is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In April 2021, she experienced fraud on her Account. The fraudulent transaction was an ATM cash withdrawal of $980. In April 2021, Burns discovered the fraud when she attempted to use her Card but was declined and called Bank of America to understand why. In April 2021, she reported the fraud to Bank of America via phone, during the same call when she discovered the fraud. In response, Bank of America told her there was nothing they could do except send her a new Card, which Bank of America did on five separate occasions. In April 2021, Bank of America froze her Account. Since April 2021, Bank of America has yet to unfreeze her Account. Since April 2021, Bank of America has not credited her any money. Due to Bank of America's actions, she missed insurance payment of $60, missed phone bills of $70. She cannot buy food or gas and she also suffers from emotional distress.

316.   Dwight Burrow is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In December 2020, Bank of America illegally froze his Account, citing suspected fraudulent activity. In March 2021, Bank of America unfroze his Account. In March 2021, he experienced fraud on his Account, totaling approximately $200. In March 2021, he discovered the fraud after he checked his transaction history after reactivating his Account. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate and open a claim. In March 2021, Bank of

America again froze his Account. In April 2021, Bank of America unfroze his Account. In March 2021, Bank of America credited him the fraudulently stolen money; however, Bank of America reversed the credit one week later. Due to Bank of America's actions, he missed two $500 rent payments, leading to eviction. He struggled to pay for food, gas, clothing, and other basic life necessities, such as medication. He suffers from emotional distress.

317.   Mario Bynum is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. Between August 2020 and September 2020, he experienced fraud on his Account, totaling approximately $3,900. Between August 2020 and September 2020, he would discover and report the fraud to Bank of America; however, fraud would occur after each report. On October 4, 2021, $7,000 was taken from his Account, putting his Account balance at negative $2,000. In October 2020, Bank of America froze his Account. In January 2021, Bank of America unfroze his Account. In March 2021, Bank of America credited $3,777 to his Account. Due to Bank of America's actions, he missed his $1,000 rent from August 2020 to May 2021, leading to eviction in May 2021. He has struggled to make his $900 car payments since August 2020. He has struggled to pay his $40 phone bill since August 2020. He struggles to pay for food, gas, and clothing.

318.   Daniel Byrn is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In November 2020, he began experiencing fraud on his Account. The fraudulent transaction was an ATM cash withdraw totaling $400. In November 2020, he discovered the fraud when he attempted to pull money out of an ATM. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him his issue was with EDD and that EDD was responsible for freezing his Account. In November 2020, Bank of America froze his Account. In May 2021, Bank of America unfroze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he was forced to live with a family member. His cell

phone bill was $50 per month, which he could not pay for three months from January 2021 to April 2021. He could barely afford to pay for gas, which he needed to deposit the paper checks EDD began sending him. He had to borrow money from a friend in order to help with bills. He also is a recent burn victim and Bank of America caused his recovery to flare because of the stress it induced upon him.

319.   Joseph Calzado is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In February 2021, he experienced fraud on his Account, totaling approximately $400. In February 2021, he discovered the fraud when he checked his bank statements. In February 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would send him a new Card within a few days. In February 2021, Bank of America froze his Account. In March 2021, Bank of America unfroze his Account. Since February 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed two $370 rent payments, leading to eviction and subsequent homelessness. He missed two $98 cell phone bills. He missed two $80 credit card bills, leading to a drop in credit score. He cannot afford his car insurance or vehicle registration. He owes $1,500 to family members. He lost personal items of value during the eviction. He suffers from emotional distress.

320.   Stacey Camberos is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In February 2021, she began experiencing fraud on her Account. The fraudulent transactions were purchases at a store totaling $439.61. In February 2021, she discovered the fraud on her Account. In February 2021, she reported the fraud to Bank of America by phone. In response, Bank of America told her to call them back in a few weeks to resolve her issue. In February 2021, Bank of America froze her Account which had $32 in the Account at the time. In May 2021, Bank of America unfroze her Account. Due to Bank of America's actions, she has missed every rent payment since February 2021, at $500 per month. She cannot afford to pay to fix her car at $355, forcing her to borrow her

1  brother's car for transportation. She has been dropped by two cell phone carriers
2  because she could not pay her phone bill. She can barely afford to buy food for her
3  kids.

4    321.   Kimberly Carpenter is a California resident. In June 2020, she began
5  receiving EDD benefits through Bank of America. In October 2020, she
6  experienced fraud on her Account, totaling $200. In October 2020, she discovered
7  the fraud. In October 2020, she reported the fraud to Bank of America. In response,
8  Bank of America said they would investigate the claim. In July 2020, Bank of
9  America illegally froze her Account. Since July 2020, Bank of America has
10  unfrozen and then illegally re-frozen her Account six times. Since June 2020, Bank
11  of America has yet to unfreeze her Account. In 2020, Bank of America credited
12  $200 to her Account. Due to Bank of America's actions, she missed two phone
13  payments resulting in a phone shut off. She has missed two electrical bill payments.
14  She has missed two water bill payments. She struggles to afford food and clothing.
15  She also suffers from strokes, and Bank of America's actions has added extra stress
16  onto her condition.

17    322.   Patricia Castillo is a California resident. In early 2020, she began
18  receiving EDD benefits through Bank of America. In August 2020, she experienced
19  fraud on her Account. In August 2020, she discovered the fraud on her Account
20  when her Card was declined. In August 2020, she reported the fraud to Bank of
21  America via phone. In response, Bank of America transferred her between
22  departments and often dropped her call altogether. In July 2020, Bank of America
23  froze her Account. In March 2021, Bank of America unfroze her Account. In March
24  2021, Bank of America credited her $4,000. In May 2021, Bank of America credited
25  her an additional $900. Due to Bank of America's actions, she had her car
26  repossessed in February 2021. She has missed rent payments and had her phone
27  service ended after failing to pay her bill. She also cannot afford to buy food. She
28  also experiences extreme stress and anxiety.

323.   Richard Caton is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In March 2021, he experienced fraud on his Account. The fraudulent transactions totaled $4,500. In March 2021, he discovered the fraud when he checked his Account online. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate the claim and send him a new Card in the meantime. Bank of America also told him he needed to submit a new claim. In March 2021, Bank of America froze his Account. In May 2021, Bank of America unfroze his Account. Since March 2021, Bank of America has yet to credit him the stolen money. Due to Bank of America's actions, he could only pay $500 of his $800 monthly rent between March 2021 and May 2021. He struggled with food, clothing, and phone bills. He also struggled with extreme emotional distress.

324.   Susan Chapple is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In May 2020, she began experiencing fraud on her Account. The fraudulent transactions totaled $400. In May 2020, she discovered the fraud when she tried to withdraw money but was declined. In May 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would send her papers to fill out to verify her identity. In April 2021, she again experienced fraud on her Account. The fraudulent transactions totaled $500. In April 2021, she discovered the fraud when she checked her online Account balance. In April 2021, she reported the fraud to Bank of America via phone. In response, Bank or America told her they would file another claim. In June 2020, Bank of America froze her Account. In August 2020, Bank of America unfroze her Account. In June 2020, Bank of America credited $200 to her Account. In October 2020, Bank of America again froze her Account. In December 2020, Bank of America unfroze her Account. In June 2020, Bank of America credited $200 to her Account for the first fraudulent transactions. In April 2021, Bank of America credited $115 to her Account for the second fraudulent

transactions. Due to Bank of America's actions, she missed three rent payments of $400. She missed three storage facility payments of $176. She lost personal property from that storage unit. She missed four insurance payments of $226. She had her vehicle repossessed. She suffered medically as she is handicapped and cannot make doctor's appointments to verify collection of disability. She cannot transport herself to and from rehab. She also suffers from emotional distress.

325.   Randy Chase is a California resident. In April 2020, he was approved to receive EDD benefits through Bank of America. On December 19, 2020, Bank of America froze his Account, which had $13,600 in it at the time. Since December 2020, Bank of America has yet to unfreeze his Account. On January 28, 2021, Bank of America gave him $2,000 in cash and a cashier's check for $11,000. Due to Bank of America's actions, he is homeless and forced to live in a car in Denver, Colorado. He cannot repair his vehicle. He is forced to beg for money and cannot pay for food. He also suffers from emotional distress.

326.   Angela Chavez is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. Between March 2020 and July 2020, she experienced fraud on her Account, totaling approximately $8,500. In March 2020, she discovered the fraud. In March 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to resolve her issue with EDD. In December 2020, Bank of America illegally froze her Account. In March 2021, Bank of America unfroze her Account. Since March 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed three rent payments at $725 per month. She missed her light bill three times at $100 per month. She missed her cell phone bill three times at $180 per month. She missed her $10 monthly WIFI bill three times. She struggles to buy food, gas, and clothing for herself, and her children.

327.   Phillip Chavez is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In May 2021, he began to

1  experience fraud on the Account. The fraudulent transactions totaled $760. In May
2  2021, he discovered the fraud when he checked his Account after his Card was
3  declined attempting to order a ride share. In May 2021, he contacted Bank of
4  America to report the fraud via phone. In response, Bank of America told him they
5  would conduct an investigation into his claim, and he needed to wait for the results.
6  In May 2021, Bank of America froze his Account, which had $30 in it at the time.
7  In May 2021, Bank of America unfroze his Account and told him they credited
8  money into his Account; however, when he checked his Account, the balance
9  remained at $30. Since May 2021, Bank of America has yet to credit any money to
10 his Account. Due to Bank of America's actions, he could not afford food, cannot
11 afford to pay to get his car from the auto shop, and missed two phone bills at $100
12 each. He also suffers from emotional distress.

13      328.   Tiffany Cochran is a California resident. In February 2020, she began
14 receiving EDD benefits through Bank of America. In August 2020 and September
15 2020, she began experiencing fraud on her Account. The fraudulent transactions
16 totaled $30,000. In August 2020, she discovered the fraud when she failed to receive
17 her EDD benefits. In August 2020, she contacted Bank of America and reported the
18 fraud via phone. In response, Bank of America said they would send her a new Card
19 with $15,000 credit; however, she never received the Card. This process happened
20 two more times where Bank of America said would send her a Card with the
21 $15,000 loaded onto it, however, she never received any of the Cards. In October
22 2020, Bank of America froze her Account, which had $16,055 in it at the time. On
23 October 4, 2020, Cochran logged into her Account and found her Account was over-
24 drawn approximately $44,000. She again called Bank of America who informed her
25 to call California EDD. On October 5, 2020, her Account had $300 deposited into
26 it. The $300 deposits continued weekly for the month of October until Cochran
27 called and requested paper checks so that she could actually use the money as
28 opposed to it going towards the overdrawn amount in her Account. Since August

2020, Bank of America has yet to credit her any of the money stolen from her Account. Due to Bank of America's actions, she has been unable to pay rent since September 2020. She is unable to pay bills including internet, power, car insurance, and medical. She has been unable to provide for her son. She is forced to go days without eating. She cannot pay medical bills. She suffers from severe emotional distress.

329.   LaMar Collins is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In June 2020, he discovered fraud on his Account when he checked his transaction history. In June 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate his claims. In June 2020, Bank of America froze his Account. In July 2020, Bank of America unfroze his Account. Between October 2020 and December 2020, he again experienced fraud on his Account, totaling approximately $400. In December 2020, he discovered the fraud. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate. In December 2020, Bank of America froze his Account. In December 2020, Bank of America credited him $250 but denied another claim for $160. In February 2021, Bank of America unfroze his Account. Due to Bank of America's actions, he missed his $1,000 monthly rent payments from August 2020 to May 2021, leading to eviction in May 2021. He missed his car payments since August 2020. He missed his $40 phone bill since August 2020. He struggled to pay for food, gas, and clothing.

330.   Jennifer Contreras is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In June 2020, she experienced fraud on her Account. The fraudulent transaction totaled $5,000. In June 2020, she discovered the fraud when she checked her Account. In June 2020, she reported the fraud to Bank of America via phone. In response, Bank of America cancelled her EDD Debit Card. In October 2020, Bank of America froze her Account. In

December 2020, Bank of America unfroze her Account. However, Bank of America made her Account balance negative $5,000. In May 2021, Bank of America credited $7,200 to her Account. Due to Bank of America's actions, she missed three payments, leading to her eviction and leaving her currently homeless. She had her car repossessed. She could not afford to pay her phone bill or to pay for food. She is unable to get a job due to her current living conditions.

331.   Jose Contreras is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account, totaling approximately $1,200. In October 2020, he discovered the fraud when he checked his online Account transactions. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would send him a new Card and contact him within a few weeks regarding its investigation. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed five $3,500 rent payments. He missed six $200 storage payments. He was late on a car insurance payment, leading to a $120 fee. He struggles to pay for food, gas, and clothing. He suffers from emotional distress.

332.   Donmonique Corella is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. Between June 2020 and August 2020, she experienced fraud on her Account, totaling approximately $12,000, putting her Account in a balance of negative $6,000. In August 2020, she discovered the fraud when she attempted to use her Card, but it was declined. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would open a claim and investigate. In August 2020, Bank of America froze her Account. In February 2021, Bank of America unfroze her Account; however, Bank of America immediately re-froze her Account. In October 2020,

1   Bank of America credited $6,000 to her Account; however, Bank of America
2   reversed the credit in December 2020, and even took an additional $3,000 from her
3   Account, putting her Account at a balance of negative $9,000. Since December
4   2020, Bank of America has yet to credit her any money. Due to Bank of America's
5   actions, she missed her $1,600 rent payments from November 2020 to May 2021,
6   leading to eviction. She missed her car payments from November 2020 to January
7   2021, leading to car repossession. She has struggled to pay her phone bills since
8   November 2020, totaling $1,000. She has struggled to pay cable and internet bills
9   from November 2020 to present, totaling over $600 owed. She struggles to pay for
10  food and clothing.

11      333.   Victor Cardenas Cortez is a California resident. In March 2020, he
12  began receiving EDD benefits through Bank of America. In September 2020, Bank
13  of America illegally froze his Account. In September 2020, Bank of America
14  unfroze his Account. In October 2020, he experienced fraud on his Account,
15  totaling approximately $120. In October 2020, he discovered the fraud when he
16  logged into his Bank of America app and noticed the charges. In October 2020, he
17  reported the fraud to Bank of America via phone. In response, Bank of America
18  told him he needed to file a claim; however, Bank of America disconnected his call
19  before he could do so. In December 2020, Bank of America again illegally froze his
20  Account. Since December 2020, Bank of America has yet to unfreeze his Account.
21  Since October 2020, Bank of America has yet to credit him any money. Due to
22  Bank of America's actions, he missed a rent payment of $600, leading to eviction.
23  He is unable to afford basic childcare products for his child. He suffers from
24  emotional distress.

25      334.   Crystal Cortez-Gonzalez is a California resident. In May 2020, she
26  began receiving EDD benefits through Bank of America. In November 2020, she
27  began experiencing fraud on her Account. In November 2020, she discovered the
28  fraud when she checked her Account after her Card was declined. In November

2020, she contacted Bank of America and reported the fraud via phone. In response, Bank of America told her they would open a claim and to file a police report and that she needed to verify her ID. In December 2020, Bank of America froze her Account. Since December 2020, Bank of America has not unfrozen her Account. Since December 2020, Bank of America has not credited her any money. Due to Bank of America's actions, she has had no income since November 2020. She has been unable to pay for her cell phone bills ($100/month) since November 2020. She became homeless in January 2021 after not being able to pay rent on her father's house after her father passed away. She cannot afford money for food or gas. She also experiences emotional distress.

335.   Teresa D'Agostino Criado is a California resident. In August 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on her Account when someone tried to change the address associated with the Account. In October 2020, she discovered the fraud when Bank of America sent her an email. In October 2020, she called Bank of America to report the fraud. In response, Bank of America told her she needed to verify her identification. In October 2020, Bank of America froze her Account. Since October 2020, Bank of America has yet to unfreeze her Account. Since October 2020, Bank of America has not credited any money to her Account. Due to Bank of America's actions, she has had no income since October 2020. She was unable to pay her motel fees from October 2020 to January 2021 at $480 per week, resulting in homelessness. She struggles to buy food and gas.

336.   Heather Dale is a California resident. At the beginning of 2020, she began receiving EDD benefits through Bank of America. In 2020, she began experiencing fraud on her Account when someone tried to fraudulently change her address to her Account. In 2020, she discovered the fraud when she checked her online Account. In 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her that her issue was with EDD, and she needed

1   to talk to them to resolve the problem. At the end of 2020, Bank of America froze
2   her Account with $324 in it at the time. To date, Bank of America has yet to credit
3   her any money. Due to Bank of America's actions, she was unable to pay her phone
4   bill of $80 for two months and eventually had her line cancelled. She experienced
5   overdraft fees on her personal Bank of America account. She had a loan with Bank
6   of the West, and she was unable to pay her loan and it became delinquent and now
7   is terminated. She also struggles to buy food on a day-to-day basis.

8        337.   Michell de Vera is a California resident. In February 2020, she began
9   receiving EDD benefits through Bank of America. Between February 2020 and July
10  2020, and then again between September 2020 and January 2021, she experienced
11  fraud on her Account. In February 2020, she discovered the fraud when Bank of
12  America's fraud department contacted her. In February 2020 and again September
13  2020, she reported the fraud to Bank of America via phone. In response, Bank of
14  America would either tell her to resolve her issue with EDD or would not answer
15  her questions, hanging up on her mid call. Since February 2020, Bank of America
16  has yet to credit any money to her Account. Due to Bank of America's actions, she
17  missed rent payments from February 2020 to July 2020 and then again from
18  September 2020 to January 2021. She had to beg her landlord not to evict her. She
19  missed car payments from February 2020 to July 2020 and then again from
20  September 2020 to January 2021, at $220 per month. She missed car insurance
21  payments from February 2020 to July 2020 and then again from September 2020 to
22  January 2021, at $120 per month. She missed her cell phone bill from February
23  2020 to July 2020 and then again from September 2020 to January 2021, at $208
24  per month. She missed her PG&E bill from February 2020 to July 2020 and then
25  again from September 2020 to January 2021, at $125 per month. She missed her
26  furniture bill from February 2020 to July 2020 and then again from September 2020
27  to January 2021, at $112.47 per month. She also ended up in the emergency room
28  due to the stress Bank of America caused her.

338.   Timothy Deasy is a California resident. In September 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on his Account. The fraudulent transaction was an ATM withdrawal totaling $640. In November 2020, he discovered the fraud when he checked his Account after having insufficient funds for a purchase. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America denied his claim. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since December 2020, Bank of America has yet to credit him any of the stolen money. Due to Bank of America's actions, he missed a rent payment at $1,500, missed a phone bill at $200, and missed an insurance bill at $130. He also cannot afford food and suffers from extreme emotional distress.

339.   Luis Delariva is a California resident. In August 2020, he began receiving EDD benefits through Bank of America. In August 2020, he experienced fraud on his Account. The fraudulent transactions were all online purchases from stores such as Nike and Bed Bath & Beyond, totaling $6,000. In September 2020, he discovered the fraud when he checked his Account online. In September 2020, he contacted Bank of America to report the fraud via phone. In response, Bank of America told him to resolve his problem with EDD. In November 2020, Bank of America froze his Account when he could not verify himself and reversed the credit they gave him. After reversing the credit, Bank of America reported his Account at negative $6,511. Since November 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any funds. Due to Bank of America's actions, he could not pay his rent of $450 per month and was forced to be homeless in June 2020. He was dropped from his credit card because he was unable to make a payment since September 2020. He cannot even pay for his own food, relying on friends and family to provide. He also is suffering from serious depression.

340.   Delbert Delgado is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In March 2020, he experienced fraud on his Account when Bank of America sent his debit Card to the wrong address. The fraudulent transactions totaled a little over $10,000. In April 2020, he discovered the fraud when he called Bank of America trying to seek information regarding his Card. In April 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they are unable to help him with his issue. In December 2020, Bank of America froze his Account. In May 2021, Bank of America unfroze his Account. In April 2020, Bank of America credited him back $9,000; however, Bank of America reversed the credit and put his Account into a negative balance of $9,000. Due to Bank of America's actions, he was forced out of his home after not being able to pay his $1,300 rent since December 2020. He is forced to live on the streets, and on the back of his neighbor's porch. He has missed every phone payment to date since December 2020 at $65 per month. He had his car repossessed in December 2020 after not being able to pay his $350 per month payment. He is also the source of income for his mother and brother. His brother has down syndrome and now has no place to live because of Bank of America.

341.   Selena Delgado is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In June 2020, she experienced fraud on her Account. The fraudulent transactions were ATM withdrawals totaling $6,543. In June 2020, she discovered the fraud while making purchases that were declined due to insufficient funds. In June 2020, she reported the fraud to Bank of America via phone. In June 2021, she again experienced fraud on her Account. The fraudulent transactions totaled $14,000. In June 2021, she discovered the fraud when she checked her online Account balance. In June 2021, she reported the fraud to Bank of America via phone. In response, Bank of America claimed her issue was with EDD, after transferring her from department to department, claiming the next would solve her issue for her. In August 2020, Bank of America froze her Account,

which had approximately $10,584 in it at the time. Since August 2020, Bank of America has yet to unfreeze her Account. In August 2020, Bank of America provisionally credited her Account for the stolen money for four payments of $1,512, for a total of $6,048. On February 28, 2021, Bank of America removed the provisional credit for the stolen money that they originally provided from August 2020. Due to Bank of America's actions, from August 2020 to June 2021, she had difficulty paying rent, which was $475 per month, for a total of $5,225. From July 2020 to December 2020, she had missed car payments of $500 per month for a total of $3,000. Her car was repossessed in December 2020. From July 2020 to December 2020, she had difficulty paying her Boost cell phone bill of $110 per month for a total of $660. She struggles to buy food, gas, and clothing.

342.   Nickolaus Dirickson is a California resident. In October 2020, he began receiving EDD benefits through Bank of America. In November of 2020, Dirickson started experiencing fraud on his Account. The fraudulent transactions were withdrawals, totaling approximately $12,000. In January 2021, he discovered the fraud after he checked his online Account. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him this was an EDD issue, and he needed to verify his identification. In November 2020, Bank of America froze his Account. At the time Bank of America froze his Account, he had $4,200 in the Account. In March 2021, Bank of America unfroze his Account. In February 2021, Bank of America credited $4,600 to his Account due to Bank of America's actions, his credit score dropped 188 points within the last six months to which there are now marks on his credit. He was unable to purchase a car because of the low credit. He missed his rent payment in August 2020 through January 2021 at $1,800 per month, and as a result, became homeless. He was unable to pay car payments from November 2020 to January 2021, leading to repossession of his car. He was behind on cell phone payments with Verizon of a total of $1,800 beginning in November 2020.

343.   Lorina Dones is a California resident. In April 2020, she applied for EDD benefits through Bank of America; however, she was not approved to start receiving the benefits until September 2020. In September 2020, she experienced fraud on her Account. In September 2020, she discovered the fraud when Bank of America told her an Account had already been opened in her name. In September 2020, she reported the fraud to Bank of America via phone. In response, Bank of America kept telling her she needed to resolve her problem with EDD. In September 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. Since April 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed out on an entire year of rent, from April 2020 to April 2021, and would have been evicted if not for an eviction ban. She had to borrow money from her family to feed her kids.

344.   Anthony Douglas is a California resident. In February 2021, he began receiving EDD benefits through Bank of America. In April 2021, Bank of America froze his Account and stopped adding benefit funds. In April 2021, he contacted Bank of America to report the issue. In response, Bank of America told him they were waiting on instructions from EDD. In April 2021, Bank of America updated his Account stating six missing payments were all "paid," however, there were no funds in his Account. Since April 2021, Bank of America has yet to release the six missing payments to his Account. Due to Bank of America's actions, he has missed utility bills since April 2021 totaling $800. He has missed rent since April 2021 at $1,750 per month. He has missed every phone payment to date since April 2020 at $100 per month. He has missed every insurance bill since April 2021 at $464 per month.

345.   Benjamin Douglass is a California resident. In January 2020, he began receiving EDD benefits through Bank of America. In April 2020, he experienced fraud on his Account, totaling approximately $4,000. In April 2020, he discovered the fraud when he received an alert on his phone that his Account was under $10.

In April 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate the claim. In April 2020, Bank of America froze his Account. In June 2020, Bank of America unfroze his Account. In June 2020, Bank of America credited $4,000 to his Account. Due to Bank of America's actions, he struggled to pay his $1,000 rent in April and May 2020. He struggled to pay his $100 monthly phone bill in April and May 2020. He struggles to pay for food and clothing.

346.    Kayli Duey is a California resident. In May 2020, she applied to receive EDD benefits through Bank of America. In April 2020, she experienced fraud on her Account when a fraudulent individual applied for benefits in her name, who had taken out $5,430 in her name. In June 2020, she discovered the fraud when EDD told her someone applied for the benefits in her name. In June 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said there was nothing they could do and that they needed to wait until EDD handled an appeals process. In June 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. Due to Bank of America's actions, she has been unable to pay the $1,000 needed to get her car back that was impounded in October 2020. She was unable to make rental payments from November 2020 to January 2021, totaling $3,000 and was ultimately forced to give up her home and move in with a friend. She was unable to pay PG&E bills from November 2020 to January 2021 which totaled $1,500.

347.    Roxanne Eason is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In November 2020, she experienced fraud on her Account, totaling $9,000. In November 2020, she discovered the fraud when she checked her online Account. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would open a claim and reimburse her for fraudulently stolen money. In December 2020, Bank of America froze her Account. In January 2021, Bank of

America unfroze her Account, for one day, and promptly froze the Account again. Since January 2021, Bank of America has yet to unfreeze her Account. In January 2021, Bank of America credited her $1,000. Due to Bank of America's actions, she was unable to afford to fix her car when it broke down, so she was forced to take out a loan of $5,000 to repair the car. She accumulated countless medical bills during this period that she has been unable to pay. She was evicted from her home and forced to depend on her daughter. She lost relationships due to emotional turmoil. She also was forced to borrow money from her six siblings, her neighbor, her children and other personal friends leading her to extreme guilt and embarrassment.

348.   Peter Echeverria is a California resident. In June 2020, he applied to receive EDD benefits through Bank of America. In June 2020, he experienced fraud on his Account when a fraudulent person filed under his name with Bank of America. In June 2020, he discovered the fraud when he called Bank of America. In June 2020, he reported the fraud to Bank of America. In response, Bank of America said they would cancel the fraudulent Account and send him a new Card. In late August or early September 2020, Bank of America froze his Account. In May 2021, Bank of America unfroze his Account. Since June 2020, Bank of America has not credited any money to his Account. Due to Bank of America's actions, he missed three rent payments of $1,200 leading to his eviction. He missed four car insurance bills at $120 each. He struggles to buy food and gas. He also suffers from emotional distress.

349.   Linda Edwards is a California resident. In August 2020, she began receiving EDD benefits through Bank of America. In September 2020, she experienced fraud on her Account. In September 2020, she discovered the fraud when she checked her online transactions. In September 2020, she reported the fraud to Bank of America. In response, Bank of America told her they needed to freeze her Account due to a high level of suspicious activity. In September 2020,

Bank of America froze her Account. Since September 2020, Bank of America has yet to credit her any stolen money. Due to Bank of America's actions, she missed her rent payment in September 2020 at $650. She missed her car payment on six occasions at $349, leading to repossession in March 2021. She missed her car insurance payment on six occasions at $72.99. Her phone and cable have been off since November 2020 after missing monthly payments at $189. She struggles to buy food and gas.

350.   Maritza Escalante is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In March 2021, she experienced fraud on her Account, totaling approximately $2,000. In March 2021, she discovered the fraud while checking her Account online. In March 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her the issue was with EDD and she needed to call them to resolve it. In April 2021 Bank of America froze her Account. In June 2021, Bank of America unfroze her Account. In June 2021, Bank of America credited her $2,000. Due to Bank of America's actions, she missed rent payments, missed phone bills, cannot afford to pay for food or gas. She also suffers from emotional distress.

351.   Marley Espalin is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In July 2020, she experienced fraud on her Account. In July 2020, she discovered the fraud when she logged into her online Account. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they needed to freeze her Account but would send her $300. Bank of America also told her she needed to talk to EDD. In July 2020, Bank of America froze her Account. Since July 2020, Bank of America has yet to unfreeze her Account. Since July 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed two rent payments at $900 leading to her eviction, forcing her to be homeless. She missed four phone bills at $138. She missed five storage payments of $100. She cannot provide for her

children who now must live with other family. She suffers from emotional distress.

352.  Juan Estrada is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on his Account totaling $5,780. In November 2020, he discovered the fraud when he was on a phone call with Bank of America. In November 2020, he reported the fraud to Bank of America. In response, Bank of America told him they would investigate his problem, with no further information. In November 2020, Bank of America froze his Account. In February 2021, Bank of America unfroze his Account. In February 2021, Bank of America credited $2,860 to his Account. Due to Bank of America's actions, he suffers from emotional distress and cannot afford to buy food or other daily personal necessities.

353.  Dawn Farina is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In February 2021, she experienced fraud on her Account, totaling approximately $856.72. On February 2, 2021, she discovered the fraud when she checked her Account history. On February 2, 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said they needed a few days to investigate the claim and would eventually get back to her. On February 3, 2021, Bank of America froze her Account. On June 7, 2021, Bank of America unfroze her Account. In April 2021, Bank of America credited $856 to her Account. Due to Bank of America's actions, she missed two $500 rent payments, leading to eviction and subsequent homelessness. She cannot pay her $300 credit card bill, negatively affecting her credit score. She missed two $76 phone bills. She owes friends and family $3,000. She cannot pay her $500 vehicle registration. She cannot afford to pay $2,000 in tickets from her invalid vehicle registration. She missed her $87 car insurance payment. She cannot afford to support her children. She suffers from emotional distress.

354.  Cody Ferraro is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In May 2021, he experienced

fraud on his Account. In May 2021, he discovered the fraud when he attempted to withdraw cash from an ATM but had insufficient funds. In May 2021, he reported the fraud to Bank of America via phone, but Bank of America refuses to help him with his claim, often times dropping his calls. In May 2021, Bank of America froze his Account. Since May 2021, Bank of America has yet to unfreeze his Account. Since May 2021, Bank of America has yet to credit his Account, even after stating it was going to do so in June 2021. Due to Bank of America's actions, he missed a $200 storage payment. He is unable to pay his phone bill. He missed a rent payment of $800. He cannot pay for his car service or car insurance.

355.   Jacob Flores is a California resident. In October 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on his Account. In November 2020, he discovered the fraud when he called Bank of America to check on his funds in his Account. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him the issue was with EDD and he needed to contact them. In November 2020, Bank of America froze his Account. Since November 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he was late on $1,500 rental payments and fell behind from December 2020 through March 2021. He was late on car payments, missing January and February 2021. He was unable to timely pay his cell phone bill, cable bill and electric bill due to the frozen Account. His phone was turned off between January 2021 and March 2021 because he could not make the $200 monthly payments. He struggled to buy food and gas.

356.   Arnold Flores is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In August 2020, he experienced fraud on his Account. In August 2020, he discovered the fraud when he checked his Account. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him that he needed to speak to EDD to resolve his issue. In

1   August 2020, Bank of America froze his Account. Since August 2020, Bank of
2   America has yet to unfreeze his Account. Due to Bank of America's actions, he has
3   missed out on $1,000 rent payments since August 2020. From August 2020 to
4   November 2020, he could not pay his $320 car payments leading to repossession in
5   November 2020. From August 2020 to May 2021, he could not pay his $60 phone
6   bills. He struggles to buy food and gas. He also suffers from emotional distress.

7       357.   Stephanie Flores is a California resident. In August 2020, she began
8   receiving EDD benefits through Bank of America. In August 2020, Bank of
9   America froze her Account and refused to send her a Card to access her Account.
10  Since August 2020, she contacted Bank of America many times to resolve the issue.
11  In response, Bank of America told her she needed to speak with EDD. Since August
12  2020, Bank of America has refused her access to her funds or her Account. Due to
13  Bank of America's actions, she was evicted from her apartment and struggles to
14  provide for her children. She is unable to obtain loans or credit because of the
15  eviction. She is not eligible for other Benefits because her file still reads that she is
16  receiving Benefits, even though she has never seen any of those EDD funds.

17      358.   Anthony Franks is a California resident. In August 2020, he began
18  receiving EDD benefits through Bank of America. In October 2020, he experienced
19  fraud on his Account. In October 2020, he discovered the fraud when he checked
20  his Account and noticed he had not received his funds. In October 2020, he reported
21  the fraud to Bank of America. In response, Bank of America told him he needed to
22  re-verify his identity to access his funds. In October 2020, Bank of America froze
23  his Account. Since October 2020, Bank of America has yet to unfreeze his Account.
24  Since October 2020, Bank of America has yet to credit him any money. Due to bank
25  of America's actions, he missed two $450 rent payments in November and
26  December 2020, forcing him to live on the streets. He has missed every $100
27  monthly phone bill since October 2020. His car was repossessed in May 2021.

28      359.   Meredith Friday is a California resident. In April 2020, she began

receiving EDD benefits through Bank of America. In February 2021, she experienced fraud on her Account, totaling $740. In February 2021, she discovered the fraud. In February 2021, she reported the fraud to Bank of America via phone. In response, Bank of America would either tell her they would send her a replacement Card or tell her to talk to EDD to resolve her issue. In February 2021, Bank of America froze her Account. Since February 2021, Bank of America has yet to unfreeze her Account. In April 2021, Bank of America credit her $740. Due to Bank of America's actions, she could not pay her $1,900 monthly rent payment. She missed two car payments at $496 per month. She also suffers from severe depression and anxiety. She already sees a therapist due to the amount of anxiety, stress, depression, and other health issues Bank of America has caused her to endure. She now takes anti-depressants.

360.   Joseph Friend is a California resident. In February 2020, he applied to receive EDD benefits through Bank of America. In August 2020, he finally began receiving the EDD benefits, after months of Bank of America telling him to verify his identification, even though he had done so numerous times. In August 2020, he experienced fraud on his Account, totaling $800. In August 2020, he discovered the fraud when he attempted to withdraw money and checked his Account balance. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate. In August 2020, Bank of America froze his Account. In December 2020, Bank of America unfroze his Account. In December 2020, Bank of America credited him $206. Due to Bank of America's actions, he missed out on four weeks of motel payments of $634 per week starting in December 2020. He missed a car payment of $215 in December 2020 which led to his car being repossessed. He was unable to pay his phone bill of $71 in December 2020. He struggles to pay for gas.

361.   Abigail Galicia is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In November 2020, she

experienced fraud on her Account, totaling $300. In November 2020, she discovered the fraud when she checked her balance online. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America would at times tell her to talk to EDD, and other times would say the investigation on her Account was still ongoing. In November 2020, Bank of America froze her Account. Since November 2020, Bank of America has yet to unfreeze her Account. Since November 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed $375 monthly rent payments from November 2020 to January 2021 and from March 2021 to present. She missed $308 monthly car payments from November 2020 to January 2021 and from March 2021 to present. She missed $45 monthly phone bills from November 2020 to January 2021 and from March 2021 to present. She is unable to afford food and gas. She also suffers from emotional distress.

362. Latisha Gage is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In September 2020, she experienced fraud on her Account, totaling $3,000. In September 2020, she discovered the fraud after checking her Account when her Card was declined. In September 2020, she reported the fraud to Bank of America via fraud. In response, Bank of America told her they would open a claim and that she needed to call EDD to resolve her issue. In September 2020, Bank of America froze her Account. Since September 2020, Bank of America has yet to unfreeze her Account. Since September 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she could not pay her $1,334 monthly rent payments from March 2021 to April 2021. She could not pay her $657 monthly car payment from March 2021 to April 2021. She could not pay her $300 monthly phone bill from March 2021 to April 2021. She struggles to afford food. She also suffers from emotional distress.

363. Monica Garcia is a California resident. In March 2020, she began

receiving EDD benefits through Bank of America. In February 2021, she experienced fraud on her Account, totaling approximately $2,896. In February 2021, she discovered the fraud when she checked her Account after attempting to withdraw money from an ATM. In February 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said they would open a claim and that she should contact EDD to resolve her issue. In February 2021, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. Since February 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she was forced to move out of her apartment in May 2021 after not being able to afford rent. She also has fallen behind on phone bills, credit card bills, and car payments. She struggles to pay for food or gas.

364.   Glynda Gaynor is a California resident. In August 2020, she began receiving EDD benefits through Bank of America. In August 2020, she experienced fraud on her Account, totaling approximately $6,000. In August 2020, she discovered the fraud when she checked her Account transaction history. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would send her a new Card; however, each time Bank of America sent her a new Card, she could never access her funds. In November 2020, Bank of America illegally froze her Account. In March 2021, Bank of America unfroze her Account. In March 2021, Bank of America credited her a measly $200. Due to Bank of America's actions, she was unable to pay her $750 rent from November 2020 to present day. She missed her $750 monthly car payment from August 2020 to September 2020, leading to car repossession in September 2020. She missed her $99 storage fee, leading to an auction of her storage. She missed her $63 phone bill in June 2021, leading to a phone shut off. She struggles to pay for food, gas, and clothing.

365.   Laquitta George is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In August 2020, he experienced

fraud on his Account, totaling $7,000. In August 2020, he discovered the fraud after Bank of America reached out to him. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America would open a claim and investigate, however they have made no other response since then. In September 2020, Bank of America froze his Account. In October 2020, Bank of America unfroze his Account. Since September 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he has not been able to pay his $2,600 rent since October 2020, only keeping his lease because his landlord is experiencing the same problems with Bank of America. He has not been able to pay for his water, gas, and electric bill since October 2020, totaling $4,101. He had his car repossessed in October 2020. He has not been able to pay his full $418 phone payment since October 2020. He was unable to pay for a funeral for his mother who passed away in May 2021. He cannot afford to buy food for him or his children. He also suffers from extreme depression.

366.   Elizabeth Giddens is a California resident. In March 2020, she applied to receive EDD benefits through Bank of America; however, she could not access her Account until August 2020. In August 2020, she experienced fraud on her Account, totaling $18,000. In August 2020, she discovered the fraud when she checked her Account balance after finally gaining access to the Account. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would open a claim and provisionally credit her Account. In August 2020, Bank of America froze her Account. In September 2020, Bank of America unfroze her Account. In October 2020, Bank of America again froze her Account. In April 2021, Bank of America unfroze her Account. In August 2020, Bank of America credited her $18,000. In October 2020, Bank of America reversed the credit, putting her Account into a balance of negative $18,000. In April 2021, Bank of America credited her back the $18,000 again, plus an additional $5,000 to make up for the benefits that went to paying off the negative balance Due to Bank

1    of America's actions, she missed rent payments totaling $4,500 from October 2020
2    to April 2021, leading to her eventual eviction and forcing her to live in her car. She
3    missed her $508 car payments from October 2020 to April 2021, leading to her car
4    repossession in December 2020. She could not afford to provide for her children
5    and was forced to send them away. She struggles to buy food and gas.

6        367.   Seante Glassflowers is a California resident. In April 2020, she began
7    receiving EDD benefits through Bank of America. In November 2020, she
8    experienced fraud on her Account, totaling $543. In November 2020, she
9    discovered the fraud when she got a notification that money had been withdrawn
10   from her Account. In November 2020, she reported the fraud to Bank of America.
11   In response, Bank of America told her they would open a claim, but the claim could
12   take months to investigate. In November 2020, Bank of America froze her Account.
13   In May 2021, Bank of America unfroze her Account. In May 2021, Bank of
14   America credited her $543. Due to Bank of America's actions, she could not pay
15   her credit card or phone bill from November 2020 to May 2021. She could not
16   afford food for herself or her children. She could not afford to pay her daughter's
17   dentist bill. She could not afford to clean her children's clothes.

18       368.   Angela Gonzalez is a California resident. In April 2020, she applied to
19   receive EDD benefits through Bank of America; however, Bank of America did not
20   send her a Card with access to her funds until June 2020. In September 2020, she
21   experienced fraud on her Account, totaling $739. In September 2020, she
22   discovered the fraud when she tried to withdraw funds and was declined. In
23   September 2020, she reported the fraud to Bank of America via phone. In response,
24   Bank of America told her they would send her a new debit Card and would start a
25   claim for her. Bank of America further told her to resolve her issue with EDD. In
26   September 2020, Bank of America froze her Account. In May 2021, Bank of
27   America unfroze her Account and sent her a new Card. Since September 2020, Bank
28   of America has yet to credit her any money. Due to Bank of America's actions, she

missed three $1,200 monthly rent payments leading to her eviction and subsequent homelessness. She was unable to pay car insurance bills and had her car repossessed. She could not afford to pay her storage facility fees, leading to a loss of personal items. She struggles to buy food and gas. She suffers from emotional distress.

369.   Barton Gonzalez is a California resident. In March 2020, he applied to receive EDD benefits through Bank of America. However, he did not gain access to his Account until August 2020. Between March 2020 and August 2020, he experienced fraud on his Account, totaling approximately $15,000. In August 2020, he discovered the fraud when he checked his Account transaction history. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would send a new Card to access his Account. In August 2020, Bank of America froze his Account. In December 2020, Bank of America unfroze his Account. In June 2021, Bank of America finally credited $15,000 to his Account. Due to Bank of America's actions, he lost his property in December 2020, forcing him to live out of his car. He missed his $300 monthly car payments from October 2019 to January 2020, leading to car repossession in January 2020. He struggles to buy food and clothing.

370.   Lizet Gonzalez is a California resident. In September 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on her Account, totaling $900. In October 2020, she discovered the fraud when she received a text stating her Account had a balance of $0. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would investigate the claim. They further told her that she needed to talk to EDD regarding her issue. In October 2020, Bank of America froze her Account. In late October or early November 2020, Bank of America unfroze her Account. Since October 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed two months

of rent payments totaling $800. She has a phone bill debt of $1,400. She missed credit card payments totaling $460, leading to a credit score drop of 280 points. She cannot afford food or gas. She suffers from emotional distress.

371.    Lainie Ann Graham is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In November 2020, she experienced fraud on her Account. In November 2020, she discovered the fraud when she tried to use her Card but was declined. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her this was an EDD issue and to call them to resolve. In November 2020, Bank of America froze her Account. Since November 2020, Bank of America has yet to unfreeze her Account. Since November 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $1,600 rent payment in November 2020. She missed her $420 car payment in November and December 2020. Her Wells Fargo bank account was terminated, and she owes $204 in overdraft fees. She missed her $64 phone bill in November and December 2020. She struggles to pay for food, gas, and clothing.

372.    Audrey Grant is a California resident. In October 2020, she began receiving EDD benefits through Bank of America. In June 2021, she experienced fraud on her Account, totaling approximately $1,000. On June 7, 2021, she discovered the fraud when she attempted to withdraw money but was declined. On June 7, 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would send her a new Card. Since June 7, 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she was unable to pay her $3,000 monthly rent in June 2021.

373.    Willie Gray is a California resident. He receives EDD benefits through Bank of America. In April 2021, he experienced fraud on his Account, totaling $180. In April 2021, he discovered the fraud when he checked his Account online. In April 2021, he reported the fraud to Bank of America via phone. In response,

1   Bank of America told him the transactions looked accurate to them. Since April

2   2021, Bank of America has yet to credit him any money. Due to Bank of America's

3   actions, he was unable to pay $900 monthly rent from April 2021 to June 2021. He

4   was unable to pay his $45 monthly insurance bill from April 2021 to June 2021. He

5   was unable to pay his $45 monthly gas bill from April 2021 to June 2021. He was

6   unable to pay his $200 monthly electric bill from April 2021 to June 2021. He can

7   barely afford to buy food and gas.

8       374.   Sean Grimes is a California resident. In January 2021, he began

9   receiving EDD benefits through Bank of America. In January 2021, he experienced

10   fraud on his Account. In January 2021, he discovered the fraud when he checked

11   his Account balance online which read a balance of $0. In January 2021, he reported

12   the fraud to Bank of America via phone. In response, Bank of America kept sending

13   him a new Card, however, each time a new Card was sent, more fraud would occur.

14   From January 2021 to April 2021, Bank of America would freeze his Account every

15   time he reported fraud. From January 2021 to April 2021, Bank of America would

16   unfreeze his Account every time they sent him a new Card. Since January 2021,

17   Bank of America has yet to credit him any money. Due to Bank of America's

18   actions, he missed two $800 monthly rent payments. He missed his car insurance

19   and electricity bill totaling $1,000 per month. He struggles to pay for food and gas.

20   He struggles with emotional distress.

21       375.   Jeffrey Guadalajara is a California resident. In March 2020, he began

22   receiving EDD benefits through Bank of America. In August 2020, he experienced

23   fraud on his Account, totaling $10,401. In August 2020, he discovered the fraud

24   when he checked his Account and realized he was unable to access funds. In August

25   2020, he reported the fraud to Bank of America. In response, Bank of America said

26   he needed to contact EDD and verify himself. In August 2020, Bank of America

27   froze his Account. Since August 2020, Bank of America has yet to unfreeze his

28   Account. Since August 2020, Bank of America has yet to credit him any money.

1    Due to Bank of America's actions, he was unable to pay his mortgage, leading to

2    eviction and living on the streets for two months. He was diagnosed with Bell's

3    Palsy caused by the stress Bank of America put him through.

4         376.   Noah Guirguis is a California resident. In July 2020, he began

5    receiving EDD benefits through Bank of America. In September 2020, Bank of

6    America illegally froze his Account, after he reported to them someone had stolen

7    his Card. In June 2021, Bank of America unfroze his Account. Since September

8    2020, Bank of America has yet to credit him any money. Due to Bank of America's

9    actions, he could not make his $800 rent payments from September 2020 to January

10   2021. He could not make his $60 monthly car payments from September 2020 to

11   January 2021. He could not make his $80 phone payments from September 2020 to

12   January 2021. He could not pay his $40 monthly water and electric bill from

13   September 2020 to January 2021. He struggled to buy food, gas, and clothing.

14        377.   Lyndsey Gutcher is a California resident. In May 2020, she began

15   receiving EDD benefits through Bank of America. In May 2020, she experienced

16   fraud on her Account, totaling $5,430. In June 2020, she discovered the fraud when

17   she checked her Account balance online. In June 2020, she reported the fraud to

18   Bank of America via phone. In response, Bank of America told her they could not

19   send her a new Card until she verified her ID with EDD and that she should also

20   file a police report. In June 2020, Bank of America froze her Account. In late

21   January 2021 or early February 2021, Bank of America unfroze her Account. Since

22   June 2020, Bank of America has yet to credit her any money. Due to Bank of

23   America's actions, she missed seven $1,000 rent payments, leading to eviction and

24   subsequent homelessness. She missed three $111 car insurance payments. She

25   struggles to buy food and gas. She suffers from emotional distress.

26        378.   Andres Gutierrez is a California resident. In August 2020, he began

27   receiving EDD benefits through Bank of America. In August 2020, he experienced

28   fraud on his Account, totaling approximately $1,000. In August 2020, he discovered

the fraud when he checked his transaction history In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America first told him they would investigate him claim, then for the following weeks, Bank of America blamed his issue on EDD. In August 2020, Bank of America illegally froze his Account. In February 2021, Bank of America unfroze his Account. In March 2021, Bank of America again illegally froze his Account. Since March 2021, Bank of America has yet to unfreeze his Account. Since August 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his $750 monthly rent payments from August 2020 to March 2021, leading to eviction in March 2021. He is struggling to pay his new $400 rent payment and is on the brink of eviction again. He could not afford his $60 car payment, leading to car repossession in April 2021. He struggled to pay his phone bills and to obtain food and clothing.

379.   Angelica Gutierrez is a California resident In July 2020, she began receiving EDD benefits through Bank of America. In August 2020, she experienced fraud on her Account. In August 2020, she discovered the fraud when she checked her Account balance after attempting to withdraw funds. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would credit her the money back. In August 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. Since August 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $800 rent payment from December 2020 to April 2021, only avoiding eviction by borrowing money. She could not pay her $268 car insurance from December 2020 to April 2021. She could not pay her $60 phone bill from December 2020 to April 2021. She also had to borrow money just to buy life necessities. She also suffers from extreme stress and has been in and out of the hospital as a result.

380.   Crystal Gutierrez is a California resident. In late July or early August

2020, she began receiving EDD benefits through Bank of America. In August 2020, she experienced fraud on her Account, totaling $4,000. In August 2020, she discovered the fraud when she checked her transactions online. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to talk to EDD and verify her ID so they could resolve her issue. In November 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. In August 2020, Bank of America credited $1,200 to her Account. Due to Bank of America's actions, she failed to make rent payments for five months and was then evicted from her home and forced to live in her car. She was unable to pay bills such as her car insurance and phone bill which led her to lose her cell phone entirely. She is deprived of having a relationship with her son. She struggles to buy food and gas.

381.    Shant Hakopian is a California resident. In March or April 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account. In October 2020, he discovered the fraud when he attempted to make a purchase and his Card was declined, leading him to call Bank of America. In October 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would freeze his Account while they investigated. In October 2020, Bank of America froze his Account. In October 2020, Bank of America unfroze his Account. Since October 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed a $1,000 car payment. He struggles to buy food and gas.

382.    James Hanes is a California resident. In September 2020, he began receiving EDD benefits through Bank of America. On December 4, 2020, he experienced fraud on his Account, totaling approximately $65. On December 4, 2020, he discovered the fraud when he received a text alert. On December 4, 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate the claim. In December 2020, Bank of America

froze his Account. In June 2021, Bank of America unfroze his Account. In June 2021, Bank of America credited $65 to his Account. Due to Bank of America's actions, he missed a $400 rent payment in June 2021. He struggles to pay for food. He suffers from emotional distress.

383.   Micah Haney is a California resident. In August 2020, he applied to receive EDD benefits through Bank of America; however, a fraudulent person had already used his information to receive the benefits. In the months leading up to August 2020, he experienced fraud, totaling $14,240. In August 2020, he discovered the fraud when he attempted to apply for benefits but was rejected. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to speak to EDD to resolve his issue. In August 2020, Bank of America froze his Account. Since August 2020, Bank of America has yet to unfreeze his Account. Since August 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he has not been able to pay his $400 monthly rent since August 2020, leaving him homeless when he was evicted in April 2021. He has not been able to pay his $500 monthly car payments since August 2020, leading to car repossession in April 2021. He has been forced to borrow money to pay his $90 monthly phone bill. He struggles to buy food, gas, and clothing.

384.   Preston Hanna is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In February 2021, he experienced fraud on his Account, totaling $383. In February 2021, he discovered the fraud when he checked his Account balance and saw the missing funds. In February 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would open a claim, but after that Bank of America said there was nothing they could do to resolve his issue. In February 2021, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. In April 2021, Bank of America credited him $383. Due to Bank of America's

1   actions, he missed his $300 monthly rent payments from March 2021 to June 2021.

2   He missed his $200 phone bill from March 2021 to June 2021. He was unable to

3   pay $2,500 to fix his truck. He struggles to buy food, gas, and clothing.

4   385.   Rebecca Harden is a California resident. In January 2021, she began

5   receiving EDD benefits through Bank of America. In January 2021, she experienced

6   fraud on her Account, totaling $5,000. In January 2021, she discovered the fraud

7   when she checked her Account balance and saw the fraudulent transfer. In January

8   2021, she reported the fraud to Bank of America via phone. In response, Bank of

9   America said they would reimburse her the stolen money while they investigated.

10  Since January 2021, Bank of America has yet to credit her any money. Due to Bank

11  of America's actions, she was unable to pay her $875 monthly rent payment from

12  February 2021 to April 2021.

13  386.   Johnny Harper is a California resident. In May 2020, he began

14  receiving EDD benefits through Bank of America. In February 2021, he

15  experienced fraud on his Account, totaling $1,100. In March 2021, he discovered

16  the fraud when he checked his balance online. In March 2021, he reported the fraud

17  to Bank of America via phone. In response, Bank of America said they would

18  investigate, but gave no further information in the coming months. In February

19  2021, Bank of America froze his Account. In April 2021, Bank of America unfroze

20  his Account. Since February 2021, Bank of America has yet to credit him any

21  money. Due to Bank of America's actions, he missed payments on his property tax.

22  He missed a $595 car payment. He missed a $400 credit card payment. He missed

23  a $186 cable bill.

24  387.   Ivan Harris is a California resident. In late April or early May 2020, he

25  began receiving EDD benefits through Bank of America. In September 2020, Bank

26  of America froze his Account. In November 2020, Bank of America unfroze his

27  Account. Since September 2020, Bank of America has yet to credit him any money.

28  Due to Bank of America's actions, he missed his $600 monthly rent payment from

1    September 2020 to November 2020. He could not pay his $273 monthly car rent,
2    his $264 monthly cell phone bill, and his photography insurance.

3         388.   Markee Harris is a California resident. In April 2020, he began
4    receiving EDD benefits through Bank of America. In late May or early June 2020,
5    he experienced fraud on his Account, totaling $700. In June 2020, he discovered
6    the fraud. In June 2020, he reported the fraud to Bank of America via phone. In
7    December 2020, he again experienced fraud on his Account, totaling $350. In
8    December 2020, he discovered the fraud when he received a text alert, stating a
9    fraudulent person withdrew money from his Account. In December 2020, he
10   reported the fraud to Bank of America via phone. In response, Bank of America
11   told him that it was EDD who in fact withdrew the funds from his Account and he
12   needed to call EDD to fix the problem. In December 2020, Bank of America froze
13   his Account. In February 2021, Bank of America unfroze his Account. In February
14   2021, Bank of America credited $1,450 to his Account. Due to Bank of America's
15   actions, he missed rent payments totaling $1,100, leading to his eviction. He missed
16   phone bills totaling $165, leading to a cancelled phone. He was unable to pay child
17   support payments. He suffers from emotional distress.

18        389.   Steven Hart[20] is a natural person residing in Los Angeles County, State
19   of California. Hart has an EDD Debit Card Account which Bank of America
20   maintains supervision and control over per its contractual relationship with the State
21   of California. Over the course of this relationship, Hart provided Bank of America
22   with various pieces of personal identifiable information related to Hart, such as his
23   personal finances. Such information includes, but is not limited to, Hart's name,
24   address, social security number, date of birth, income level, and banking
25   information (amounts and accounts). Upon receipt of this information, Bank of

26

27        [20] Hart is the plaintiff in *Hart v. Bank of America, N.A.*, No. 3:21-cv-01175-
28   LAB-MSB, originally filed in the U.S. District Court for the Central District of
     California (No. 2:21-cv-04678-GW-JC) ("*Hart*").

America stored or otherwise archived said information in some library, digital file, computer-based system, or other storage medium, and thus at all times was entrusted with and maintained control of Hart's highly sensitive information. At some point in 2020, a hacker was able to access Bank of America's technical system—presumably via a misconfiguration of a firewall (presuming Bank of America had a firewall in place). As such, this hacker was able to gain access to banking Account information for tens of thousands of EDD Debit Card Accounts which Bank of America maintains, supervises, and controls per its contract with the State of California. In April of 2021, Hart checked his Account and discovered he had funds missing. Hart reviewed his Account activity and determined he had been a victim of fraud and made all reasonable attempts to notify Bank of America of this fraudulent activity. After Hart submitted his claim for fraud regarding the ATM withdrawal(s) at issue. Bank of America canceled or froze Hart's Card as a result of submitting his fraud claim. To Hart's shock and dismay, some unknown individual had made ATM withdrawal(s) in the amount of $853. Hart did not make these withdrawals himself, did not authorize anyone to make the withdrawal on his behalf, and was still in possession of his Card despite said withdrawals taking place. Hart submitted a fraud claim to Bank of America regarding the missing/stolen funds on April 7, 2021. Bank of America did not provide a temporary credit/refund, so pursuant to EFTA, Bank of America had ten (10) days to properly investigate and remedy the fraud claim. Bank of America did neither. After allegedly performing an investigation into Hart's fraudulent activity, Bank of America sent Hart written correspondence denying Hart's fraud claim. Bank of America's denial letter was dated April 8, 2021—one (1) day after Bank of America allegedly performed a "reasonable" investigation. The basis for Bank of America's denial of Hart's claim is scant at best. However, Bank of America does indeed confirm that fraudulent or suspicious activity took place in regard to the fraudulent withdrawal, but nonetheless refused to refund or credit Hart the $853 sum. Despite Hart's efforts,

1    Bank of America refused to perform any reasonable investigation regarding Hart's
2    dispute and instead flatly denied Hart's claim one (1) day after he submitted said
3    claim. Bank of America's alleged "investigation" into Hart's dispute was clearly
4    inadequate, not reasonable, not diligent, and failed to properly address Hart's issues
5    regarding the $853 fraudulent withdrawal. Further evidencing Bank of America's
6    woefully inadequate investigation is the fact that Bank of America has access to
7    data, film, and other resources given that the fraudulent transaction took place at
8    one of Bank of America's own financial centers (i.e., not a third-party ATM at a
9    convenience store, for example). Bank of America could have reasonably, easily
10   and swiftly confirmed the $853 transaction as fraudulent and refunded or credited
11   the funds over to Hart's Account. Instead, Bank of America failed to investigate
12   properly, refused to credit or refund the transaction, while still nonetheless
13   confirming that the withdrawal was subject to fraudulent activity. What is more,
14   Bank of America actually reversed its own decision and credited Hart the stolen
15   funds on or about May 10, 2021. This further evidences that Bank of America did
16   not perform a reasonable investigation within the requisite ten (10) days in violation
17   of EFTA.

18        390.   Bahram Hassanshahi is a California resident. In September 2020, he
19   applied to receive EDD benefits through Bank of America. Between August 2020
20   to September 2020, he experienced fraud on his Account, when a fraudulent person
21   received benefits under his name, totaling approximately $22,500. In September
22   2020, he discovered the fraud when he called Bank of America who told him
23   someone was already receiving benefits under his name. In September 2020, he
24   reported the fraud to Bank of America. In response, Bank of America told him they
25   would freeze the Account and report the fraud to EDD. In February 2021, he
26   reapplied to receive EDD benefits but was denied, because Bank of America failed
27   to inform EDD about the earlier fraud on the Account. Since September 2020, Bank
28   of America has yet to unfreeze his Account. Since September 2020, Bank of

1    America has yet to credit him any money. Due to Bank of America's actions, he

2    struggled to pay his $2,200 rent in September and November 2020, leading to his

3    eviction. He struggles to pay for food, gas, and clothing.

4         391.   Kaytricia Hayden is a California resident. In August 2020, she began

5    receiving EDD benefits through Bank of America. In October 2020, she

6    experienced fraud on her Account, totaling $500. In October 2020, she discovered

7    the fraud when she checked her transaction history online. In October 2020, she

8    reported the fraud to Bank of America via phone. In response, Bank of America

9    told her to speak to the bank where the money was fraudulently sent. Since October

10   2020, Bank of America has yet to credit her any money.

11        392.   Gretchen Heinz is a California resident. In March 2020, she began

12   receiving EDD benefits through Bank of America. On September 29, 2020, Bank

13   of America illegally froze her Account. On September 29, 2020, she called Bank of

14   America who reported they froze her Account due to suspicious activity; however,

15   she states there was no fraud on her Account. On October 25, 2020, Bank of

16   America unfroze her Account. On October 25, 2020, Bank of America credited her

17   $1,317. Due to Bank of America's actions, she missed a $500 rent payment. She

18   missed a $70 phone bill. She acquired a $2,000 debt owed to friends and family.

19   She suffers from emotional distress.

20        393.   Ronnie Hernandez is a California resident. In March 2020, he began

21   receiving EDD benefits through Bank of America. In November 2020, he

22   experienced fraud on his Account, totaling $600. In November 2020, he discovered

23   the fraud when he attempted to withdraw funds from his Account. In November

24   2020, he reported the fraud to Bank of America by going into the bank and speaking

25   with a representative. In response, the Bank of America representative told him he

26   needed to speak with EDD to resolve his issue. In November 2020, Bank of

27   America froze his Account. Since November 2020, Bank of America has yet to

28   unfreeze his Account. Since November 2020, Bank of America has yet to credit him

any money. Due to Bank of America's actions, he missed a $500 rent payment. He also suffers from emotional distress.

394. Ruben Hernandez is a California resident. In August 2020, he applied to receive EDD benefits through Bank of America; however, Bank of America did not send him access to his Account until November 2020. In November 2020, Bank of America illegally froze his Account. In January 2021, Bank of America unfroze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his $400 rent payment from August to September 2020, leading to eviction and subsequent homelessness. He cannot afford to maintain a phone each month. He struggles to obtain food and clothing. He suffers from emotional distress.

395. Vanessa Hernandez is a California resident. In August 2020, she applied to receive EDD benefits through Bank of America; however, Bank of America never sent her a Card with access to her Account. Between August 2020 and November 2020, she experienced fraud on her Account, totaling approximately $7,000. In November 2020, she discovered the fraud when she called Bank of America to inquire why Bank of America had not yet sent her a Card. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America refused to help her and send her a new Card, leading to her calling Bank of America for months. In November 2020, Bank of America froze her Account. In June 2021, Bank of America unfroze her Account. Since November 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she was evicted from her home in January of 2021 and owes $9,000 in rent for missing payments from July 2020 to January 2021 of $1,650 per month. She has missed car payments for three months, for a total of $864, and had her car repossessed in February 2021. She is behind on her credit card payments, totaling thousands of dollars. She was forced to sign over full custody of her children to her children's father, as she could no longer provide for them. She been unable to afford her

1   medication since November 2020. She suffers from emotional distress.

2       396.   Anthony Hollingsworth is a California resident. In March 2020, he
3   began receiving EDD benefits through Bank of America. In February 2021, he
4   experienced fraud on his Account, totaling $620. In February 2021, he discovered
5   the fraud while checking his Account balance online. In February 2021, he reported
6   the fraud to Bank of America via phone. In response, Bank of America said they
7   would provisionally credit him the money. In March 2021, Bank of America froze
8   his Account. Since March 2021, Bank of America has yet to unfreeze his Account.
9   In March 2021, Bank of America credited money back to his Account. Due to Bank
10  of America's actions, he missed all of his car mechanic payments, totaling $1,800,
11  leading to car repossession. He missed his $1,760 monthly rent payment from
12  December 2020 to March 2021, leading to eviction and subsequent homelessness.
13  He was unable to pay his $90 monthly phone bill from April 2021 to present. He
14  struggles to buy food and gas.

15      397.   Lindsie Holloway is a California resident. In May 2020, he began
16  receiving EDD benefits through Bank of America. In July 2020, he experienced
17  fraud on his Account, which left his Account with a balance of negative $13,000.
18  In July 2020, he discovered the fraud when he checked his Account and noticed the
19  balance. In July 2020, he reported the fraud to Bank of America. In response, Bank
20  of America said they would send out a replacement Card; however, Bank of
21  America sent the Card to an incorrect address, even after he told Bank of America
22  the address on file was fraudulent. In July 2020, Bank of America froze his Account.
23  In March 2021, Bank of America unfroze his Account. Since July 2020, Bank of
24  America has yet to credit him any of the stolen money. Due to Bank of America's
25  actions, he was evicted from his home in June of 2020 and is forced to live in the
26  back of his car. He has missed every phone payment to date since July 2020. He
27  cannot afford food or gas. He also suffers from a recent Traumatic Brain Injury
28  (TBI) and Bank of America's actions have worsened his condition.

398.   Crystal Horath is a California resident. In January or February 2020, she began receiving EDD benefits through Bank of America. In November 2020, she experienced fraud on her Account, totaling $300. In November 2020, she discovered the fraud when she checked her Account balance online. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said there was nothing they could do regarding reimbursement, but they would send her a replacement Card. In December 2020, she again experienced fraud on her Account, totaling $200. In December 2020, she again discovered the fraud by checking her Account balance. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would freeze the Account until she verified her identification. In December 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited her $268. Due to Bank of America's actions, she missed two rent payments leading to her eviction. She missed car insurance bills, leading to her inability to utilize the car. She suffers from emotional distress.

399.   Terrance Howze is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In January 2021, Bank of America illegally froze his Account. Since January 2021, Bank of America has yet to unfreeze his Account. Since January 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his $875 rent payments from January 2021 to May 2021, leading to eviction. He missed his $800 monthly utility bills from January 2021 to May 2021.

400.   Marcus De Hoyos is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In April 2020, he experienced fraud on his Account, totaling approximately $400. In May 2020, he discovered the fraud when he checked his Account balance online. In May 2020, he reported the fraud to Bank of America via phone. In response, Bank of America refused to help him, as they would send him from department to department every time he called.

In May 2020, Bank of America froze his Account. In June 2021, Bank of America unfroze his Account. Since May 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his rent payment beginning in May 2020. He was unable to pay his car registration fee of $125 in February 2021. He was behind on cell phone payments with Verizon of a total of $110 in May and June of 2020. He struggles to buy food and gas. He suffers from anxiety and seeks medical help now.

401.   Sharonna Hutchins is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In late July or early August 2020, she experienced fraud on her Account, totaling approximately $3,000. In late July or early August 2020, she discovered the fraud when she attempted to use her Card but was declined due to insufficient funds. In late July or early August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would send her a new Card to access her Account. In December 2020, she again experienced fraud on her Account, totaling $1,000. In December 2020, she discovered the fraud when she again tried to use her Card and was declined. In December 2020, she reported the fraud to Bank of America. In response, Bank of America told her they would send her a new Card, like they had done numerous times before. In September 2020, Bank of America froze her Account. In December 2020, Bank of America unfroze her Account. Since July 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed three $2,000 rent payments, leading to her eviction. She missed four $90 phone bills. She struggles to buy food, gas, and clothing.

402.   Quoc Huynh is a California resident. In April 2020, he applied and began to receive EDD benefits through Bank of America. However, he was not sent a Card and was unable to access his funds. In September 2020, he was able to speak with a Bank of America agent who informed him that his Account had been placed in the fraud department and was frozen. In October 2020, Bank of America unfroze

his Account and sent him a new Card. Bank of America has yet to credit him any money from when he began receiving benefits in April 2020 until his Account was un-frozen in October 2020 which he estimates to be thousands of dollars. Due to Bank of America's actions, he missed his $900 rent payments from June 2020 to August 2020, leading to his eviction in August 2020 and subsequent homelessness. He missed his electric bill, water bill, and gas bill from June 2020 to August 2020, totaling $3,000.

403.   John Idemudia is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In September 2020, he experienced fraud on his Account, totaling approximately $1,700 from two separate transactions. In September 2020, he discovered the fraud when he received an email that a fraudulent person withdrew the funds. In September 2020, he reported the fraud to Bank of America. In response, Bank of America told him they would investigate and open a claim. In September 2020, Bank of America froze his Account. In September or October 2020, Bank of America unfroze his Account. Since September 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he was unable to pay his $60 phone bill twice. He was unable to afford his $64 auto insurance twice. He was unable to pay his $800 rent for two months. He struggles to buy food, gas, and clothing.

404.   Juanita Isles is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on the Account, totaling approximately $1,700. In October 2020, she discovered the fraud when she was on the phone with Bank of America. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her there were many people experiencing issues and she needed to be patient to resolve her issue. In October 2020, Bank of America froze her Account. In January 2021, Bank of America unfroze her Account. Due to Bank of America's actions, she was late paying her cell phone bill and can barely afford to buy food,

1   gas, and clothing.

2      405.   Derrick Jabara is a California resident. In February 2020, he began

3   receiving EDD benefits through Bank of America. In March 2021, he experienced

4   fraud on his Account, totaling approximately $3,600. In March 2021, he discovered

5   the fraud when he checked his Account after his Card was declined. In March 2021,

6   he reported the fraud to Bank of America via phone. In response, Bank of America

7   told him he needed to resolve his issue with EDD. In March 2021, Bank of America

8   froze his Account. Since March 2021, Bank of America has yet to unfreeze his

9   Account. Since March 2021, Bank of America has yet to credit him any money.

10  Due to Bank of America, he was required to turn his phone into the finance

11  company after failing to pay his phone bill. He missed two $350 car payments in

12  April and May of 2021. He missed two $1,200 rent payments. He struggles to buy

13  food, gas, and clothing.

14     406.   Shreel Jackson is a California resident. In April 2020, she began

15  receiving EDD benefits through Bank of America. In February 2021, she

16  experienced fraud on her Account, totaling $880. In February 2021, she discovered

17  the fraud when she checked her Account balance online. In February 2021, she

18  reported the fraud to Bank of America via phone. In response, Bank of America

19  proceeded to blame EDD and told her she needed to talk to EDD to resolve her

20  issue. In February 2021, Bank of America froze her Account. In April 2021, Bank

21  of America unfroze her Account. In April 2021, Bank of America credited her for

22  the stolen money. Due to Bank of America's actions, she was late on her $500

23  weekly payment between February 2021 to April 2021. She was late on her $457

24  car payment between February 2021 to April 2021. She was late on her $89 car

25  insurance payment between February 2021 to April 2021. She was late on her $230

26  phone bill between February 2021 to April 2021, leading to cancellation. She

27  missed her $89 storage payment between February 2021 to April 2021. She

28  struggles to buy food, gas, and clothing. She suffers from emotional distress.

407. Robert Jaurigue Jr. is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In December 2020, Bank of America froze his Account after he attempted to withdraw funds from an ATM. Since December 2020, Bank of America has yet to unfreeze his Account. Since December 2020, Bank of America has yet to disperse his funds. Due to Bank of America's actions, he suffers from emotional distress.

408. Anthony Jeff is a California resident. In June 2020, he applied to receive EDD benefits through Bank of America; however, Bank of America never sent him his Card. Between June 2020 and August 2020, he experienced fraud on his Account, totaling approximately $17,000. In August 2020, he discovered the fraud. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would open a claim. In September 2020, Bank of America froze his Account. In October 2020, Bank of America unfroze his Account. Since June 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his rent payment from December 2020 to May 2021 at $950 per month, leading to his eviction. He missed his phone bill from December 2020 to May 2021 at $50 per month. He missed his utility bills from December 2020 to May 2021 at $200 per month. He struggles to buy food, gas, and clothing.

409. Evett Johnson is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $460. In December 2020, she discovered the fraud when she checked her Account balance online. In December 2020, she reported the fraud to Bank of America. In response, Bank of America transferred her from department to department and refused to give her a straight answer. In December 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. In April 2021, Bank of America credited $463 to her Account. Due to Bank of America's actions, she was unable to

see her daughter. She struggles to buy food, gas, and clothing. She also suffers from emotional distress and depression.

410.   Lester Johnson is a California resident. In January 2020, he began receiving EDD benefits through Bank of America. In March 2021, he experienced fraud on his Account, totaling approximately $800. In March 2021, he discovered the fraud when he called Bank of America to check on his Account balance. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to talk to EDD to resolve his issue. In May 2021, he again experienced fraud on his Account, totaling $680. In May 2021, he discovered the fraud when he attempted to buy groceries, but his Card was declined. In May 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would need to freeze the Account once again. In March 2021, Bank of America froze his Account. In May 2021, Bank of America unfroze the Account. In May 2021, Bank of America again froze the Account. Since May 2021, Bank of America has yet to unfreeze his Account. In May 2021, Bank of America credited him money from the first fraudulent transaction; however, Bank of America has yet to credit him the money from the second fraudulent transactions. Due to Bank of America's actions, he missed his rent payment three times. He missed three car insurance payments. He was unable to pay his cable bill, phone bill, and electric bill. He struggles to buy food, gas, and clothing.

411.   Terrell Johnson is a California resident. In February 2020, he applied to receive EDD benefits through Bank of America; however, he did not receive his Bank of America Card until August 2020. Between February 2020 to August 2020, he experienced fraud on his Account, totaling approximately $10,000. In August 2020, he discovered the fraud when he logged into his Account. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to file a claim and Bank of America would send him a new Card to access his Account. In August 2020, Bank of America illegally froze his Account.

In June 2021, Bank of America unfroze his Account; however, approximately $14,000 was missing from the time Bank of America originally froze his Account. Since August 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed three $1,200 rent payments, leading to eviction. He struggles to provide basic needs for his child. He struggles to afford food, gas, and clothing. He suffers from emotional distress.

412.   Brian Jones is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on his Account, totaling approximately $6,000. In November 2020, he discovered the fraud when he checked his Account balance online. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he should suspend his Card to avoid more fraudulent transactions. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he has been unable to pay $600 to repair his car. He struggles to purchase food, gas, and clothing.

413.   Victoria Jones is a California resident. In August 2019, she began receiving EDD benefits through Bank of America. In December 2020, Bank of America froze and closed her Account. In December 2020, she contacted Bank of America who told her the Account was closed due to fraudulent activity. Since December 2020, Bank of America has yet to unfreeze her Account. Due to Bank of America's actions, she missed her $1,900 rent payment in February 2021 and March 2021. She struggles to buy food, gas, and clothing.

414.   Olivia Kelly is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In August 2020, she experienced fraud on her Account, which led to Bank of America reporting a balance on her Account of negative $18,000. In August 2020, she discovered the fraud when she

checked her online Account. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they could not do anything and that she needed to call back in a week. In October 2020, Bank of America froze her Account and then unfroze her Account. Since August 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she cannot afford her car registration which has led to her receiving traffic tickets, which she also cannot afford. She lost access to her phone, internet and cable in January 2021 after failing to pay the bills.

415.   Erick Kessler is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In June 2020, he experienced fraud on his Account, totaling approximately $7,000. In June 2020, he discovered the fraud when he checked his Account balance. In June 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate and open a claim and to resolve his issue with EDD. In September 2020, Bank of America froze his Account. In October 2020, Bank of America unfroze his Account. In September 2020, Bank of America credited $7,000 to his Account; however, Bank of America reversed the credit, putting his Account into a balance of negative $7,000. Since September 2020, Bank of America has yet to recredit him any money. Due to Bank of America's actions, he could not afford to pay his storage unit since August 2020, meaning he lost thousands of dollars' worth of personal items, including furniture. He could not afford to pay rent since August 2020 at $1,550 per month, leading to eviction in October 2020. He has not paid his cell phone bill since August 2020 at $90 per month. He has missed every credit card payment since August 2020 and has had four accounts closed as a result. He has had to borrow thousands of dollars from family.

416.   Deandre Knight is a California resident. In February 2020, he began receiving EDD disability benefits through Bank of America. In July 2020, he began receiving EDD unemployment benefits through Bank of America. In July 2020,

October 2020, and January 2021, he experienced fraud on his Account totaling approximately $4,000. On each occasion, he discovered the fraud by checking his online Account balance. On each occasion, he reported the fraud to Bank of America via phone. In response, Bank of America would freeze his Account. In July 2020, October 2020, and January 2021, Bank of America froze his Account. On each occasion, Bank of America unfroze his Account. Since July 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed phone bills and car payments which combined for a total of $5,000. He struggles to obtain food, gas, and clothing.

417.   Corey Lawson is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In January 2021, he experienced fraud on his Account, totaling approximately $4,000. In January 2021, he discovered the fraud when he checked his Account history. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America would either tell him to wait for the investigation to finish or to contact EDD to resolve his issue. In January 2021, Bank of America froze his Account. In June 2021, Bank of America unfroze his Account. In May 2021, Bank of America credited $4,000 to his Account. Due to Bank of America's actions, he could not pay his $700 rent in January 2021, leading to eviction and subsequent homelessness. He could not pay his $100 utilities payment in January 2021. He has been unable to pay his $161 car insurance from January 2021 to present. He has not been able to afford to pay his $62 phone bill from January 2021 to present. He struggles to buy food, gas, and clothing.

418.   Sabrina Laxton is a California resident. In February 2020, she began receiving EDD benefits through Bank of America. In August 2020, Bank of America froze her Account. In September 2020, she discovered the frozen Account when her Card was declined. In September 2020, she contacted Bank of America who told her the Account was frozen due to suspected fraud; however, there had

1   been no fraud on her Account. Since September 2020, Bank of America has yet to
2   unfreeze her Account. Since September 2020, Bank of America has yet to credit her
3   any money. Due to Bank of America's actions, she was evicted from her home and
4   is now homeless. She was forced to sell her car just to afford food and other
5   necessities. She has missed phone bills. She suffers from emotional distress.

6   419.   Tonya Lind is a California resident. In March 2020, she applied to
7   receive EDD benefits through Bank of America; however, Bank of America never
8   sent her a Card to access her Account until August 2020. In October 2020, Bank of
9   America unexpectedly froze her Account. In October 2020, she contacted Bank of
10   America regarding her frozen Account. In response, Bank of America told her they
11   did not know why Bank of America froze her Account and they would investigate.
12   In October 2020, Bank of America reported her Account at a balance of negative
13   $13,000. In January 2021, Bank of America unfroze her Account. Since October
14   2020, Bank of America has yet to credit any money to her Account. Due to Bank
15   of America's actions, she missed two $400 rent payments leading to eviction and
16   subsequent homelessness. She missed car insurance bills and phone bills. She
17   struggles to buy food, gas, and clothing. She suffers from emotional distress.

18   420.   Limmie Littles is a California resident. In May 2020, he began
19   receiving EDD benefits through Bank of America. In March 2021, Bank of America
20   unexpectedly froze his Account. In March 2021, he called Bank of America who
21   said Bank of America froze his Account due to suspected fraudulent activity. He
22   confirmed that no activity on his Account was fraudulent. In response, Bank of
23   America told him he needed to verify his identification through EDD. Since March
24   2021, Bank of America has yet to unfreeze his Account. In March 2021, Bank of
25   America deactivated his Account. Due to Bank of America's actions, he missed two
26   $600 rent payments leading to eviction and subsequent homelessness. He missed
27   his $68 cable bills. He suffers from emotional distress.

28   421.   Ronda Lopez is a California resident. In March 2019, she began

receiving EDD benefits through Bank of America; she began PUA benefits in July 2020 through Bank of America. In February 2021, she experienced fraud on her Account, totaling approximately $1,500. In February 2021, she discovered the fraud when she checked her Account. In February 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her they could not help her and she needed to talk to EDD to resolve her issue. In February 2021, Bank of America illegally froze her Account. Since February 2021, Bank of America has yet to unfreeze her Account. Since February 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $495 rent payments from February 2021 to May 2021, leading to her eviction in May 2021 and subsequent homelessness. She cannot afford to repair her broken down car. She missed her $60 monthly phone bill from February 2021 to May 2021. She could not afford her $60 monthly WIFI bill from February 2021 to May 2021. She struggles to afford food, gas, and clothing. She now owes money to family and friends.

422.   Ernie Loredo is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In June 2020, he experienced fraud on his Account, totaling approximately $1,500. In March 2021, he discovered the fraud when he logged into his Account and looked at the transaction history. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him to resolve his issue with EDD. In March 2021, Bank of America froze his Account. In May 2021, Bank of America informed him his Account was no longer frozen; however, he was unable to log in and thus did not have access to his Account. In May 2021, Bank of America credited $457 to his Account. Due to Bank of America's actions, he missed his $700 rent payment between March and May 2021, leading to eviction in May 2021. He missed his $65 monthly car insurance payment between March and May 2021. He missed his $60 monthly phone bill between March and May 2021. She could not pay his utilities bill at $200. He struggles to buy food, gas, and clothing.

423.   Raina Madrid is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In February 2021, she experienced fraud on her Account. In February 2021, she discovered the fraud when her phone, which had access to her Account information, was stolen. In February 2021, she reported the fraud to Bank of America. In response, Bank of America sent her a new Card. In February 2021, Bank of America froze her Account. Since February 2021, Bank of America has yet to unfreeze her Account. Since February 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she has been unable to pay her $700 rent since February 2021, leading to her eviction and subsequent homelessness. She has been unable to pay her $80 utility bill since February 2021. She has been unable to pay her $270 car insurance, resulting in her car being impounded. She could not afford to pay her $130 storage fee, and as a result, has lost approximately $6,000 worth of personal items. She is unable to pay her $300 monthly phone bill, resulting in her phone cancellation.

424.   Mario Madrid is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on his Account, when a fraudulent person began receiving benefits under his name. The fraud totaled approximately $24,000 to $28,000. In November 2020, he discovered the fraud on his Account. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to resolve his issue with EDD. In November 2020, Bank of America froze his Account. Since November 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he is unable to pay for car repair payments totaling $1,200. He is unable to pay for his wife's medical bills, which are currently at $1,100. He had to borrow money and was continually late on his rent payment, which was $950 per month, which he has struggled to pay for the past ten months. He is currently having to live in the backyard of a friend's house. He

1  struggles to pay for food, gas, and clothes.

2      425.   Joseph Magallan is a California resident. In July 2020, he began

3  receiving EDD benefits through Bank of America. In December 2020, he

4  experienced fraud on his Account, totaling $80. In December 2020, he discovered

5  the fraud when he checked his online Account. In December 2020, he reported the

6  fraud to Bank of America via phone. In response, Bank of America said they would

7  open an investigation on the claim and get back to him in forty-five days. In

8  December 2020, Bank of America froze his Account. In February 2021, Bank of

9  America unfroze his Account. Since December 2020, Bank of America has yet to

10  credit him any money. Due to Bank of America's actions, he missed four $1,200

11  rent payments, leading to eviction and subsequent homelessness. He has missed his

12  phone bills. He suffers from emotional distress.

13      426.   Joseph Main is a California resident. In February 2020, he began

14  receiving EDD benefits through Bank of America. In July 2020, he experienced

15  fraud on his Account, totaling approximately $5,000. In July 2020, he discovered

16  the fraud when he checked his transaction history on his Account. In July 2020, he

17  reported the fraud to Bank of America via phone. In response, Bank of America

18  would often tell him to talk to EDD to resolve his issue or would just drop his call

19  altogether. In October 2020, Bank of America froze his Account. Since October

20  2020, Bank of America has yet to unfreeze his Account. In October 2020, Bank of

21  America credited him $5,000; however, Bank of America immediately reversed the

22  credit, sending his balance to negative $5,000. Due to Bank of America's actions,

23  he missed two rent payments in July and August 2020 at $1,200, leading to eviction

24  in September 2020. He missed two car payments at $480 per month in July and

25  August 2020, leading to repossession of the car in September 2020. He missed cell

26  phone bill payments at $90 in July and August 2020. He missed credit card

27  payments. He struggles to buy food, gas, and clothing.

28      427.   Danela Martinez is a California resident. In March 2020, she began

receiving EDD benefits through Bank of America. In January 2021, Bank of America froze her Account. In January 2021, she called Bank of America to understand why, yet Bank of America only told her she needed to speak to EDD and verify her identity with EDD before Bank of America could do anything. In March 2021, Bank of America unfroze her Account. Since January 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed eight $510 weekly rent payments. She missed two $60 monthly phone bills. She struggles to pay for food.

428.   Russell Matson Jr. is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In January 2021, he experienced fraud on his Account, totaling approximately $560. In January 2021, he discovered the fraud when he checked his transaction history. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America, after transferring him between departments, told him to talk to EDD to resolve his issue. In January 2021, Bank of America froze his Account. In March 2021, Bank of America unfroze his Account. Since January 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed two $2,250 rent payments in February and March 2021. He missed two electricity bill payments in February and March 2021 at $100. He missed two cell phone bills at $100, leading to Verizon cancelling his Account. He struggles to buy food, gas, and clothing.

429.   Vernon Matthews is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. Between December 2020 and April 2021, he experienced fraud on his Account, totaling approximately $6,600. In March 2021, he discovered the fraud when he checked his online statements while waiting for his next deposit. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would take the transfer of Accounts off his charges to prevent further fraud, however, Bank of America

failed to do so, as more fraud occurred. In March 2021, Bank of America froze his Account. Since March 2021, Bank of America has yet to credit him any money. In April 2021, Bank of America credited $1,984 to his Account. Due to Bank of America's actions, he had difficulty paying his water bill of about $120-$138 a month between March 2021 and June 2021. He had difficulty paying his power bill of about $100 a month between March 2021 and June 2021. He was unable to pay for his storage unit of $67 a month between March 2021 and June 2021. He had difficulty paying his T-Mobile cell phone bill of $20 per month between March 2021 and June 2021. He struggles to pay for food, gas, and clothing.

430.    Janelle Maurer is a California resident. In February 2020, she began receiving EDD benefits through Bank of America. In April 2021, she experienced fraud on her Account, totaling approximately $1,000. In April 2021, she discovered the fraud when she was unable to access any of the funds in her Account. In April 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said she needed to talk to EDD to resolve her issue. In April 2021, Bank of America froze her Account. Since April 2021, Bank of America has yet to unfreeze her Account. Since April 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed rent payments leading to eviction and subsequent homelessness. She is unable to pay her monthly phone bill. She is unable to pay for an advanced loan she acquired.

431.    Christina McCafferty is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In June or July of 2020, she experienced fraud on her Account, totaling approximately $1,500 to $2,500. In June or July 2020, she discovered the fraud when her Card and phone was stolen. In June or July 2020, she reported the fraud to Bank of America. In response, Bank of America said they would investigate the claim and that she should also contact EDD to resolve the issue. In August 2020, Bank of America credited her money; however, they subsequently reversed the credit leaving her Account balance at

negative $1,500. Her EDD benefits then began to pay off the negative balance. In December 2020, Bank of America credited her $1,500. Due to Bank of America's actions, she missed her $600 monthly rent payment between October 2020 and December 2020. She missed her $100 monthly phone bill between October 2020 and December 2020. She was unable to pay her credit card bill. She struggles to buy food, gas, and clothing.

432.   Brenda McCann is a California resident. In October 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on her Account, totaling approximately $25,000. In October 2020, she discovered the fraud when she checked her Account transaction history. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to contact Nevada EDD, as that was a location she previously applied for benefits. In November 2020, Bank of America froze her Account. Since November 2020, Bank of America has yet to unfreeze her Account. Since October 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she could not pay her $975 monthly rent payment from September 2020 to November 2020, leading to her eviction. She was unable to pay her $275 monthly car payment from October 2020 to December 2020, leading to her car being repossessed in January 2021. She has been unable to pay her $75 monthly phone bill. She struggles to buy food, gas, and clothing.

433.   Jennifer Meza[21] resides in Imperial County, California. Meza found herself out of work during the COVID-19 pandemic. Meza then applied for and was found eligible by EDD to receive unemployment benefits. Meza received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access EDD benefits. She was then the victim of unauthorized transactions on her EDD Debit Card Account. Meza promptly reported the unauthorized transactions to Bank of

---

[21] Meza is the plaintiff in *Meza v. Bank of America, N.A.*, No. 3:21-cv-00484-LAB-MSB ("*Meza*").

America, which failed to comply with its legal obligations as alleged herein, causing Meza to suffer immediate and irreparable injury. In mid-2020, Meza applied for and began receiving unemployment benefits through EDD. Around September 2020, Meza was surprised when her Card was declined at an ATM due to insufficient funds. Meza subsequently viewed her Account and discovered that the balance, which should have been approximately $7,000, had been drained to $2.67 as a result of numerous unauthorized transactions with ride share companies and luxury stores such as Coach. These transactions were executed in multiple states including New York. Meza, a single mother living in Calexico, was in awe that Bank of America would not flag her Account or notify her of these unusual purchases. These fraudulent charges totaling $6,904.83 were approved by Bank of America, prior to Meza learning of her Account's depletion. Inexplicably, Meza did not receive a notification about these highly unusual transactions, indicating that Bank of America failed to detect the instances of fraud. In September 2020, right after Meza discovered the fraudulent charges on her Account, Meza called Bank of America to report the unauthorized transfers. Around that same day, Meza visited the El Centro branch of Bank of America in-person and reported the unauthorized transfers. At the branch, the tellers and bankers refused to assist Meza. Meza was merely directed to call the Bank's EDD phone line while inside the branch. No Bank of America employee in the branch would answer Meza's questions or help her. An employee at the branch instructed Meza to enter an unoccupied office to use their phone to call the Bank's EDD phone line. The employee left Meza in the office alone to fend for herself. Not surprisingly, Meza's call was unproductive, so Meza begged for help from the bank's employees at the branch. The employees stated there was nothing they could do for Meza. Meza believed she would be protected and covered by Bank of America and was utterly disappointed when the Bank did not return or recredit the money to Meza so that she could provide for her child. Meza's initial notices to the Bank occurred well-within the sixty-day time limit

imposed by 15 U.S.C. §1693f(a). Meza reported the unauthorized transfers to the Bank many more times within sixty-days as outlined below. In response, all the Bank did was to continue to send Meza periodic statements, as required by 15 U.S.C. §1693f(a). The statements confirmed and showed the unauthorized transfers. From September 2020 to October 2020, Meza called Bank of America daily to report the fraud and request a refund. Meza would sit on hold for hours a day. Sometimes the call would become disconnected after being on hold for hours. Each time Meza reported the unauthorized transfers to agents at the Bank, she would provide her name and other identifying information as required by 15 U.S.C. §1693f(a)(1). The agents were able to locate Meza's Account, but they would not help her. Meza indicated to the Bank that she believed her Account contained errors in the form of unauthorized electronic fund transfers under 15 U.S.C. §1693f(f)(1) and provided the amount and dates of the transfers per 15 U.S.C. §1693f(a)(2). When Meza reported the fraud, she set forth the reasons for her belief that the transfers were unauthorized errors on the Bank's part and were fraudulent per 15 U.S.C. §1693f(a)(3). Upon information and belief, the Bank did not conduct any investigation when Meza reported the errors. The Bank certainly did not report or mail Meza the results of any such investigation and determination within ten business days of notice as required by 15 U.S.C. §1693f(a)(3). The Bank did not provisionally recredit Meza's Account within ten business days after receiving notice of the unauthorized transfers as required by 15 U.S.C. §1693f(c). Around October 2020, Meza reached another agent and again reported the fraud and asked for help in the form of a recredit or refund. The agent told Meza that her call needed to go to "claims." Despite Bank of America's representations of "24/7" customer service, the agent informed Meza that she would need to call back during business hours and provided Meza with a number to call. Meza called that number only to be put on hold over two hours, and then hung up on. Meza was transferred to various departments to no apparent end, sent to voicemail, dealt with unhelpful automated

agents, and sent Bank of America emails notifying the Bank of the fraud with no response. Around October 2020, Meza was able to speak with another Bank of America representative. Meza went through the transactions with the agent and reported a total of $6,904.83 fraudulent charges again. The agent told Meza that these funds would be flagged as fraudulent and the funds would be returned to Meza, but that did not happen. At no point did Meza receive communication via mail, email, text, call or otherwise from Bank of America regarding the fraud on her Account or the ongoing widespread fraud affecting EDD Debit Cards or how defrauded EDD recipients should proceed. There was no warning even after the Bank had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. In her numerous calls to the Bank going back to September 2020, Meza repeatedly requested additional information, clarification and documentation concerning the unauthorized transfers, but the Bank refused to provide it re 15 U.S.C. §1693f(f)(6). Meza asked Bank of America for the written transaction history for her Account during the timeframe when the fraudulent transactions occurred, but the Bank denied Meza access to those records and refused to help Meza. To date, Bank of America still has not returned Meza's stolen funds totaling $6,904.83. Apart from the stolen funds, Meza's was receiving EDD benefits of $167 a week deposited into her Account because that was the only option. Around January 6, 2021, Bank of America completely froze Meza's Account without warning. This denied Meza access to her benefits, even though EDD was still depositing $167 a week (distributed biweekly) into Meza's Account. When Meza inquired about the freeze, Bank of America falsely told Meza that it was EDD who was not authorizing the funds to be withdrawn. Meza called EDD only to find that her Account was 100% compliant with EDD. It was in fact Bank of America that had frozen the Account unilaterally without EDD's knowledge. Even assuming the Bank had a valid reason for the freeze and needed to conduct an investigation, Meza should have been able to

access her funds after ten days under the EFTA. But that was not the reality for Meza, who was left without any recourse. Meza was held hostage by Bank of America with the only option of calling the Bank repeatedly and being placed on hold for hours and hours. In early March 2021, the Bank un-froze Meza's Account and she was finally able to access some of her funds. Unfortunately, around March 15, 2021, Bank of America froze Meza's entire Account again without notice. There was roughly $900 of EDD benefits in the Account. Bank of America instructed Meza to re-verify her identity in order to un-freeze the Account. Meza had no choice but to comply and is now receiving her benefits by paper checks mailed to her by EDD. Meza is forced to cash the checks at a Bank of America branch because she does not have any other bank accounts. Bank of America charges Meza $8.00 to cash her checks at the branch, in addition to the huge hassle of having to drive to the branch through traffic and wait in line. This is all a result of the Bank's handling of Meza's Account. Around May 19, 2021, Meza received a devastating letter from Bank of America saying the $6,904.86 stolen from her will never be returned. In the letter, Bank of America stated: "we've completed an additional review of your case and concluded that our original decision was correct." This was the only letter or notice Meza ever received from the Bank related to the fraud. Meza reported the unauthorized transactions to the Bank in September 2020. Any investigation by the Bank was required to be completed forty-five days later under 15 U.S.C. §1693f(c). If the Bank determined in its investigation that an error did not occur, it was required to deliver or mail Meza an explanation of its findings within three business days after the conclusion of its investigation under 15 U.S.C. §1693f(c). In its letter, Bank of America failed to enclose any supporting documents to support its findings. In its letter, the Bank stated; "we relied on the enclosed documents to make our decision." But there were no enclosed documents with the letter. In its letter, the Bank stated; "based on this information, we're unable to credit your account and we now consider this dispute closed." But there was no information included or

cited in the letter. In its letter, there was nothing to support Bank of America's decision to withhold Meza's $6,904.83. All Meza received was a single piece of paper stating that her Claim number 200918303156 was closed. The Bank did not make a good faith investigation of the errors. It did not have a reasonable basis for believing that Meza's Account was not in error per 15 U.S.C. §1693f(e)(1). Bank of America knowingly and willfully concluded that Meza's Account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to it at the time of its investigation per 15 U.S.C. §1693f(e)(2). Meza has now lost all hope of recovering her stolen funds. Meza has accepted that she and her daughter are homeless and reduced to begging family to take them in. Meza could really use the $6,904.83 Bank of America refuses to return to her. Instead, Meza must attempt to provide for her daughter with the reduced EDD funds she receives after the Bank charges its check cashing fees. Meza upheld her end of the Cardholder Agreement and the requirements of the EFTA and made consistent diligent efforts to report and recover the funds stolen from her Account. She made many telephone calls and sent numerous emails reporting the fraud. In spite of this, Bank of America's customer service department never offered Meza any meaningful response or assistance, but rather stymied her efforts at every turn.

434.   Michael McCrary is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In February 2021, he experienced fraud on his Account, totaling approximately $900. In February 2021, he discovered the fraud after he tried to use his Card, but the Card was declined. In February 2021, he reported the fraud to Bank of America via phone. In response, Bank of America repeatedly told him he needed to resolve his issues with EDD. In February 2021, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. In May 2021, Bank of America credited $900 to his Account. Due to Bank of America's actions, he missed his $1,000 rent payment twice in March 2021 and April 2021. He could not pay his phone bill in March and

April 2021 at $90. He could not pay his light bill in March and April 2021 at $110. He could not pay his water bill in March and April 2021 at $111. He could not pay his cable bill in March and April 2021 at $69.99. He could not pay his credit card bill in March and April 2021 between $40 to $110. He could not pay his trash bill in March and April 2021 at $88. He struggles to buy food, gas, and clothing.

435.   Travis Middleton is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In April 2020, he experienced fraud on his Account, totaling approximately $12,000. In December 2020, he discovered the fraud when he checked his Account online transactions after failing to help his aunt pay taxes. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate the claim, nothing more. In January 2021, Bank of America froze his Account. In June 2021, Bank of America unfroze his Account. Since December 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he could not afford to pay for an apartment for him and his girlfriend. He could not uphold other financial obligations to family members. He struggles to buy food, gas, and clothing.

436.   Linda Miller is a California resident. In October 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on the Account, totaling approximately $2,000. In October 2020, she discovered the fraud when she checked her Account transactions online. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America continuously told her to talk to EDD to resolve her issue. In October 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited $2,000 to her Account. Due to Bank of America's actions, she missed her rent payment of $1,100 per month in October and November of 2020. She missed her car payment of $200 per month in October and November of 2020. She missed her cell phone payment

1    of $130 per month in October and November of 2020. She missed her cable
2    payment of $120 per month in October and November of 2020. She struggles to
3    buy food, gas, and clothing.

4        437.   Lavell Moore is a California resident. In September 2020, he began
5    receiving EDD benefits through Bank of America. Between December 2020 and
6    January 2021, he experienced several fraudulent transactions on his Account,
7    totaling approximately $500. In December 2020, he discovered the fraud. In
8    December 2020, he reported the fraud to Bank of America via phone. In response,
9    Bank of America said they would investigate the claim. In March 2021, Bank of
10   America illegally froze his Account. Since March 2021, Bank of America has yet
11   to unfreeze his Account. In January 2021, Bank of America credited him for the
12   first fraud claim, well after thirty days had passed since Bank of America opened
13   its investigation. Since March 2021, Bank of America has yet to credit him for the
14   frozen Account. Due to Bank of America's actions, he missed his $300 rent
15   payment in January 2021 through June 2021. He was unable to afford $600 to repair
16   his vehicle. He was unable to afford $62 for his monthly insurance bill. He struggles
17   to buy food, gas, and clothing.

18       438.   Sara Morales is a California resident. In July 2020, she began receiving
19   EDD benefits through Bank of America. In September 2020, she experienced fraud
20   on her Account, totaling approximately $1,900. In September 2020, she discovered
21   the fraud when Bank of America sent her a copy of her monthly transaction history.
22   In September 2020, she reported the fraud to Bank of America via phone. In
23   response, Bank of America said she would be sent a new Card and given provisional
24   credit. In December 2020, Bank of America froze her Account. In April 2021, Bank
25   of America unfroze her Account. In November 2020, Bank of America credited
26   $934.58 to her Account. Due to Bank of America's actions, she was evicted from
27   her home. She could not afford her phone bills totaling $260. She suffers from
28   emotional and physical distress. She struggles to pay for food, gas, and clothing.

439.   Albert Morales is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In July 2020, he experienced fraud on his Account, totaling approximately $9,000. In July 2020, he discovered the fraud when he checked his Account balance online. In July 2020, he reported the fraud to Bank of America via phone. In response, Bank of America repeatedly tells her she needs to resolve her issue with EDD. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since July 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his rent payment twice in December 2020 and January 2021 at $850 per month leading to eviction in February 2021. He missed two car payments in December 2020 and January 2021, at $350 per month leading to car repossession in March 2021. He cannot afford his PG&E bill at $1,500. He missed his phone bill in December 2020 and January 2021 at $90 per month. He struggles to pay for food, gas, and clothing.

440.   Sharise Morgan is a California resident. In late June or early July 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, when a fraudulent person attempted to register under her name in two different states. In December 2020, she discovered the fraud when EDD contacted her and notified her of the fraudulent activity. In December 2020, she reported the fraud to Bank of America. In response, Bank of America told her there was nothing they could do and that she needed to resolve her issue with EDD. In January 2021, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. Since December 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $1,400 monthly rent payment from December 2020 to April 2021, her $80 monthly PG&E bill from December 2020 to April 2021, and her $100 monthly water and trash bill from December 2020 to April 2021.

441.   Tiffany Morrell is a person residing in San Diego County.[22] Morrell became out of work and was unable to secure employment because of the COVID-19 pandemic. Morrell applied for and received EDD unemployment benefits in October 2020. Soon thereafter, Morrell received a Bank of America EDD Debit Card with a magnetic stripe (no EMV chip) to access Morrell's benefits; shortly thereafter Morrell was the victim of numerous unauthorized transactions on Morrell's Card; and despite its "Zero Liability" policy, and Morrell's repeated requests for help, Bank of America has been either unwilling or unable to return the funds fraudulently taken from Morrell's Account, nor remove the "Administrative Hold" on Morrell's Account. Morrell began collecting EDD benefits in March of 2020 when she was in need of funds to bridge the gap between employment during the pandemic. On or around October 17, 2020, Morrell went to a Bank of America ATM with the intention to take out funds in order to pay her credit card bill. Morrell was shocked to discover that her Account, which should have had $507, had been drained to $4.00. Morrell immediately called Bank of America's Customer Service number in attempt find out what happened to her Account. However, the Bank of America employee told Morrell to call that the claims department was closed and call back Monday, during business hours, 8:00 A.M. to 8:00 P.M. EST. Morrell called the Bank of America's claims department at 5:00 A.M. PST the following Monday to be first in line when Bank of America opened. Morrell was able to speak with a Bank of America representative that day who informed her that a fraudster had stolen funds out of her Account at a Citibank ATM in Grand Rapids, Illinois. The Bank of America employee told Morrell that a provisional credit for the stolen $503 would be disbursed to Morrell within a week along with a new Bank of America EDD Debit Card. After the conversation, Morrell was under the impression that the situation had been resolved and she would receive a new Card

---

[22] Morrell is the plaintiff in *Morrell v. Bank of America, N.A.*, No. 3:21-cv-00542-LAB-MSB ("*Morrell*").

with replacement funds shortly. On or around October 26, 2020, Morrell received two envelopes in the mail from Bank of America. The first was the Card she was expecting—a new EDD Debit Card to replace the Card that had been compromised. The second was a letter dated October 20, 2020, one day after Morrell spoke on the phone with Bank of America's claim department. The letter informed Morrell that she was responsible for the stolen $503 taken out of her Account in Illinois and Bank of America would not reimburse her for the stolen money. Morrell immediately went to the Bank of America ATM because she was confused as to whether the stolen funds had been replaced. To her disappointment they had not. Faced with extreme stress, fear, anxiety and frustration, Morrell again called Bank of America's claims department to figure out the reason Bank of America determined the stolen funds were Morrell's responsibility. On or around October 26, 2020, Morrell spoke with another Bank of America's claims department employee who told Morrell a glitch in the system triggered the letter to be sent to her. Therefore, the stolen funds were not deposited on her new Card and in order for Bank of America to reimburse the stolen funds, Morrell would have to restart the claims process. Morrell filed another fraud claim for the stolen $503 and was instructed to wait for her claim to be investigated. On or around November 2, 2020, approximately a week since Morrell had submitted her second claim to have the stolen funds reimbursed, Morrell began to grow anxious that Bank of America would force Morrell to restart the claims process again, or that Bank of America would not distribute the funds she needed in a timely manner or worse not at all. Therefore, Morrell decided to call Bank of America again in an attempt to get answers regarding the status of her fraud claim and when she could expect to receive her reimbursement for the stolen $503. That day Morrell waited on hold for six hours. While on hold Bank of America hung up on her multiple times, forcing Morrell to call back and be placed at the back of the line. That day, Morrell did not get through to any Bank of America representative. Little did Morrell know, this

1    experience would summarize her life for the next month. Morrell was aware that
2    Bank of America's claims department was open only Monday through Friday from
3    8:00 A.M to 8:00 P.M. EST. Morrell would wake up at 5:00 A.M. PST in attempt
4    to be the first in line. Despite Morrell's efforts, Morrell would spend nearly the
5    entire day on hold with Bank of America. Eventually, Morrell did get through to a
6    Bank of America employee. Morrell inquired into the status of her claim and was
7    advised that it was being processed and to wait two business days, so Morrell did
8    exactly that. By this time, Morrell was not surprised when two business days later
9    the funds had not been distributed to her Account. Morrell was faced with the reality
10   that she would again have to spend days on hold in order to get more information
11   regarding her claim. Eventually, Morrell made contact with Bank of America again,
12   and was advised that her claim would be processed in three to five business days.
13   Morrell waited again and at the end of the 5th business day, her reimbursement was
14   nowhere to be found. Morrell continued to wake up at 5:00 A.M. PST determined
15   to track down the status of her claim and the stolen $503 out of her Account.
16   Morrell, again after days of waiting on hold, reached a Bank of America employee
17   who this time advised her that the funds would be disbursed to her in seven to ten
18   business days. By this time, Morrell had little hope that the funds would be in her
19   Account within the time frame, but Morrell did the only thing she could do and
20   waited the 10 business days. Morrell was disappointed again when on the tenth day
21   she had not been reimbursed for the money stolen out of her Account. The next day,
22   Morrell started calling Bank of America again. On December 17, 2020, after days
23   on hold, she reached a Bank of America employee who rudely told Morrell that
24   Bank of America had no estimate as to when the funds would be distributed because
25   Morrell needed to allow Bank of America time to thoroughly investigate her claim.
26   Morrell submitted her first claim on October 19, 2020, for funds stolen out of her
27   Account in Illinois while Morrell was in San Diego County. Bank of America had
28   not reimbursed those funds by December 17, 2020, nearly two months later and

after Morrell had called more than 80 times. After the December 17, 2020 call, Morrell was extremely stressed, frustrated, and anxious. She had spent the past two months on the phone. Morrell has an ill 10-year-old daughter who requires Morrell's attention and regular medical treatment. Morrell decided to give up on her claim because she could no longer waste her days attempting to track down her stolen $503. On or around January 4, 2021, Morrell received two letters in the mail from Bank of America, both dated December 30, 2020. The first letter informed Morrell that Bank of America would be disbursing a temporary credit of $503 within two days while it conducts its investigation. The second letter informed Morrell that Bank of America had concluded its investigation and the $503 disbursement would be permanent. Morrell did in fact receive the stolen $503 on or around January 1, 2020. However, it was too little too late. This horrendous experience occurred after leaving funds in the Account for the first time. Now Morrell receives notifications when EDD her funds are deposited into her Account and no matter the time of the disbursement, Morrell immediately drives to a Bank of America ATM and pulls out as much as she can then goes to the Bank as soon as it opens to extract whatever is left to avoid going through a similar experience in the future. Bank of America's misconduct resulted in Morrell's inability to give her 10-year-old daughter the Christmas she deserved, and the attention she requires due to her condition. Morrell was late on rent and has only recently caught up with payments. Morrell, six months later, is still behind on her car note due to Bank of America's misconduct. Morrell followed the instructions on Morrell's Account agreement, and made consistent, diligent efforts to recover the funds stolen from Morrell's Account by making multiple telephone calls. Despite this, Bank of America's customer service department offered Morrell no meaningful response or assistance, and indeed has stymied Morrell's efforts at nearly every turn. At no point did Morrell received communication via mail, email, text, or otherwise from Bank of America regarding the ongoing widespread fraud affecting EDD Debit Cards or

how defrauded EDD recipients should proceed, even after Bank of America had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. The only option presented to individuals like Morrell has been to follow Bank of America's instructions to call the number on the debit Card in reliance on its representations of a "Zero Liability" policy and "24/7" customer service. Unfortunately, as Morrell has learned, Bank of America's representations are false. Proceeding in accordance with Bank of America's policies and recommendations offers scant hope of recovering lost funds timely. Per Bank of America's "Zero Liability" policy Morrell should have been able to access Morrell's funds after ten (10) days, even if there was an investigation that Bank of America deemed necessary. But that was not the reality for Morrell, who was left without recourse or other options. Morrell was held hostage by Bank of America with the only option of calling and being placed on hold repeatedly. Morrell was the victim of fraud resulting from Bank of America's lax security measures implemented to save money. Morrell followed all of Bank of America's designated procedures while attempting to recover stolen funds. Morrell cooperated with Bank of America by adhering to all its requests, which it said would allow Morrell to recover the money. Did it take ten days as promised? No, it took over four months.

442. Heather Morris is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $900. In December 2020, she discovered the fraud when her Card was declined for insufficient funds. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would open a claim and investigate the fraud. In December 2020, Bank of America illegally froze her Account. In February 2021, Bank of America unfroze her Account. In June 2021, Bank of America credited $468 to her Account. Due to Bank of America's actions, she missed three $750 rent

payments, forcing her to move out. She missed three $250 car payments, leading to vehicle repossession. She could not pay her credit card bill, leading to a ninety-three (93) point reduction of her credit score. She owes friends and family over $4,000. She suffers from emotional distress.

443.   Janette Mouck is a California resident. In March or April 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $900. In December 2020, she discovered the fraud when she attempted to use her Card for groceries and was declined. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would open an investigation. Other times Bank of America said she needed to talk to EDD as there was nothing Bank of America could do. In December 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited $200 to her Account. In June 2021, Bank of America again credited $200 to her Account. Due to Bank of America's actions, she missed three rent payments of $1,050. She missed three car lease payments of $400, leading to car repossession. She in turn lost her job because she had no car to get to work. She missed three cell phone bills of $100. She lost valuable personal items, including a wedding ring. She suffers from emotional distress. She struggles to purchase food and clothing.

444.   Robert Murphy is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling approximately $350. In December 2020, he discovered the fraud when he checked his online Account transactions. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America would transfer him between departments, eventually leading to a dropped call. In December 2020, Bank of America froze his Account. In early 2021, Bank of America unfroze his Account. In early 2021, Bank of America credited money to his Account. Due to Bank of America's actions, he missed three rent

payments, avoiding eviction by borrowing money from his grandparents. He missed his phone bills, leading to a shut off on his phone. He struggles to buy food, gas, and clothing.

445.   Sarah Murphy is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In April 2020, she experienced fraud on her Account, totaling approximately $5,000. In April 2020, she discovered the fraud when she was unable to sign into her Account. In April 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her she needed to resolve her issue with EDD. In April 2020, Bank of America froze her Account. Since April 2020, Bank of America has yet to unfreeze her Account. Since April 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $2,069 monthly rent in November 2020. She could not pay her $60 phone bill in November 2020. She could not pay her $100 car payment in November 2020. She struggles to buy food, gas, and clothing

446.   Kimberly Nicholson is a California resident. In May 2020, she applied to receive EDD benefits through Bank of America; however, she did not receive the benefits until October 2020. Bank of America told her she needed to verify her identification, which she had done numerous times, yet Bank of America never discharged her the funds. In December 2020, she experienced fraud on her Account, totaling approximately $2,000. In December 2020, she discovered the fraud when she looked at her transaction history online. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her she did not have enough proof regarding her claims. In December 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. Since December 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $800 monthly rent payments from December 2020 to March 2021. She missed her phone bill, electric bill, and water bill, totaling $200 per month from December 2020 to March 2021. She struggles to buy food and

clothing.

447.   Lelanya Ojeda is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In July 2020 and August 2020, she experienced fraud on the Account, totaling approximately $2,000. In July 2020, she discovered the fraud when she checked her Account transaction history. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her she needed to contact EDD to resolve her issue, even when she physically went into the bank. In January 2021, Bank of America froze her Account. In January 2021, Bank of America unfroze her Account. Since July 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed gas bills, electricity bills, and phone bills, leading to a phone shut off. She was unable to buy her children clothes for school.

448.   Frank Ortiz Jr. is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In December 2020, Bank of America froze his Account. In December 2020, he called Bank of America which told him that is had frozen the Account due to suspected fraud, even though Ortiz stated there was never any fraud on the Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since December 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he cannot pay his rent payment at $800 per month, from January 2021 to present. He cannot pay his car insurance at $700 for a period of six months. He cannot pay his utility bill at $350 per month, from January 2021 to present. He could not pay his $100 cell phone bill in January 2021, resulting in a shut off. He struggles to buy food, gas, and clothing

449.   Kelly Owen is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $300. In December 2020, she discovered the fraud when she checked her Account transaction history. In December 2020,

she reported the fraud to Bank of America via phone. In response, Bank of America said they would send her a new Card; however, Bank of America sent her an Arizona EDD card. In December 2020, Bank of America froze her Account. Since December 2020, Bank of America has yet to unfreeze her Account. Since December 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she was evicted from her home in February 2021 after not being able to pay the $650 rent. She had her car repossessed in February 2021 when she could not pay the $252 monthly bill. She has missed every phone payment to date since February 2021 after not being able to pay $40 per month. She must rely on friends and family to obtain daily life necessities.

450.   Mark Owensby is a California resident. In January 2021, he began receiving EDD benefits through Bank of America. In January 2021, he experienced fraud on his Account, totaling approximately $1,600. In January 2021, he discovered the fraud when he checked his Account transaction history. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him to talk to EDD to resolve his issue. In February 2021, Bank of America froze his Account. Since February 2021, Bank of America has yet to unfreeze his Account. In May 2021, Bank of America credited him $1,600. Due to Bank of America's actions, he missed two rent payments at $1,500 each. He missed his cell phone bill at $300 per month. He has $700 in late credit card fees. He missed his cable bill at $140 per month. He struggles to buy food, gas, and clothing for his family.

451.   Flouzel Paningbatan is a California resident. In February 2020, she began receiving EDD benefits through Bank of America. Between May 2020 to October 2020, she experienced fraud on her Account, totaling approximately $600. In December 2020, she discovered the fraud when she checked her Account transaction history. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to open claims, and they would

1   investigate. In December 2020, Bank of America illegally froze her Account. In
2   April 2021, Bank of America unfroze her Account. In April 2021, Bank of America
3   credited $441 to her Account; however, in May 2021, Bank of America reversed
4   the credit, sending her Account into a negative balance. In May 2021, Bank of
5   America credited $500 to her Account. Due to Bank of America's actions, she
6   missed her $500 rent payments from December 2020 to February 2021, leading to
7   eviction. She missed her car payment in December 2020, leading to repossession.

8       452.   Laura Payton[23] is a person residing in San Diego County, California.
9   Payton found herself out of work during, and unable to secure employment because
10  of, the COVID-19 pandemic. Payton applied for and received EDD unemployment
11  benefits in March 2020; soon thereafter, she received a Bank of America EDD Debit
12  Card with a magnetic stripe (no EMV chip) to access Payton's benefits. Shortly
13  thereafter Payton was the victim of unauthorized transactions on her Card; and
14  despite its "Zero Liability" policy, and Payton's repeated requests for help, Bank of
15  America has been either unwilling or unable to return the funds fraudulently taken
16  from Payton's Account, nor remove the "Administrative Hold" on Payton's
17  Account. In March of 2020, Payton began receiving EDD benefits when she needed
18  funds to bridge the gap between employment during the pandemic. On November
19  16, 2020, Payton received a payment of unemployment funds. Payton transferred
20  $200 to Payton's Wells Fargo account, leaving $683 in Payton's Bank of America
21  EDD Debit Card Account. On the same day, when Payton attempted to withdraw
22  the remaining balance of Payton's Bank of America Account from an ATM, the
23  ATM showed that the Account had zero funds. Immediately after noticing
24  fraudulent activity on her Account, Payton began her tireless quest to recover her
25  money from Bank of America. Payton promptly called Bank of America and
26  notified them about the fraudulent activity. Payton was transferred to the claims

27
28      [23] Payton is the plaintiff in *Payton v. Bank of America, N.A.*, No. 3:21-cv-00644-LAB-MSB ("*Payton*").

department and was put on hold for hours and never connected with a person. The next day, November 17, 2020, Payton continued to attempt to file a fraud claim with Bank of America over the phone. Payton was met with seemingly endless wait times, spanning anywhere from two to five hours, only to have Bank of America unceremoniously hang up on Payton several times. After spending hours on the phone, Payton was able to open a claim with Bank of America. Bank of America informed Payton that a balance inquiry was made on her Account and her funds were withdrawn from the ATM in Chula Vista. Payton informed Bank of America that these activities did not correspond to Payton's normal activities, because Payton never made this type of inquiry and Payton does not live in Chula Vista. Payton persistently contacted Bank of America along with EDD and spent many hours on the phone attempting to have her benefits restored. However, Bank of America did not issue any sort of refund or credit for the funds it allowed to be stolen from Payton. Payton faced further difficulties from Bank of America in her attempt to recover her money. Bank of America repeatedly told Payton that it would not proceed with her claim until her ID had been verified with EDD. However, when contacting EDD, Payton was told that Payton's ID had already been verified. Bank of America continued to deny that Payton's ID had been verified, delaying Payton's ability to regain her benefits. Prior to November 30, 2020, Payton was able to obtain a new Card from Bank of America to receive her EDD benefits. On November 30, 2020, Payton received an EDD payment on the new Card. In December 2020, Payton received another EDD payment on the new Card. Following the December payment, Bank of America froze her Account without notice. Bank of America froze the funds in the Account and Payton's future EDD deposits and prevented Payton from accessing her desperately needed money for almost three months. Bank of America has no reasonable method to identify and prevent fraud. The Bank froze Payton's Account and provided no notice, reason, or justification to Payton. Bank of America's draconian method of dealing with this

alleged "fraud" was to totally freeze Payton's Account without giving any sort of credit Payton could use to buy food. Payton was again forced to repeatedly contact Bank of America to recover her benefits. When Payton contacted the Bank, the Bank explained that Payton's Account was frozen due to fraudulent activity. Payton informed Bank of America that the fraud occurred on Payton's previous Card in November and asked Bank of America to unfreeze the Card. Bank of America refused to unfreeze Payton's Account and instead, put the fault and responsibility of the freeze on EDD, who do not have control over Bank of America's debit cards. Payton had to re-start her exhausting pursuit of recovering her money from Bank of America, contacting Bank of American and EDD, back and forth, in order to have her ID verified and her Account unfrozen spending hours and hours on the phone. On February 1, 2021, Bank of American mailed Payton a letter informing Payton that a freeze was placed on Payton's Account. Due to this, Payton was unaware when she would be able to receive her seriously needed EDD benefits and was forced to cover her expenses in alternative ways (borrowing money from family, selling her car, etc.). Later, Payton was transitioned from electronic deposits to paper checks for EDD benefits. This further complicated Payton's situation as she now receives her benefits weeks later than expected, harming her ability to cover her expenses even more—all because Bank of America could not perform its obligations. On March 18, 2021, Bank of America mailed Payton another letter, this time informing her that it had changed its process affecting Accounts that it had frozen and that it could work with Payton through a phone call to see if it could release the hold on her Card. Payton once again was forced to repeatedly contact Bank of America to unfreeze her Account and recover her benefits. Again, Payton had to spend hours of her day trying to contact Bank of America. To Bank of America, $683 might seem insignificant; however, for Payton that money was helping her pay rent, put food on the table, and stay afloat through the pandemic. Payton followed the instructions on Bank of America's Account agreement, and

made consistent, diligent efforts to recover the funds stolen from Payton's Account by making multiple telephone calls. Despite this, Bank of America's customer service department offered Payton no meaningful response or assistance for almost four months, and indeed has stymied Payton's efforts at nearly every turn. In addition, at no point did Payton receive communication via mail, email, text, or otherwise from Bank of America regarding the ongoing widespread fraud affecting EDD Debit Cards or how defrauded EDD recipients should proceed, even after Bank of America had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. The only option presented to individuals like Payton has been to follow Bank of America's instructions to call the number on the Card in reliance on its representations of a "Zero Liability" policy and "24/7" customer service. Unfortunately, as Payton has learned, Bank of America's representations are false. Proceeding in accordance with Bank of America's policies and recommendations offers scant hope of recovering lost funds timely. Per Bank of America's "Zero Liability" policy Payton should have been able to access Payton's funds after ten (10) days, even if there was an investigation that Bank of America deemed necessary. But that was not the reality for Payton, who was left without recourse or other options. Payton was held hostage by Bank of America with the only option of calling and being placed on hold repeatedly. Payton was the victim of fraud resulting from Bank of America's lax security measures implemented to save money. Payton followed all of Bank of America's designated procedures while attempting to recover stolen funds. Payton cooperated with Bank of America by adhering to all its requests it said would allow Payton to recover the money. Did it take ten days as promised? No, it took over four months.

453.   Ismael Pena, Jr. is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In September 2020, he experienced fraud on his Account, totaling approximately $2,400. In September

2020, he discovered the fraud when he checked his online Account history. In September 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said he needed to resolve his issue with EDD. In September 2020, Bank of America illegally froze his Account. Since September 2020, Bank of America has yet to unfreeze his Account. Since September 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his $475 rent payments between September 2020 to April 2021, meaning he was charged an additional $200 in late fees. He missed her phone bill from September 2020 to April 2021. He missed his cable bill between September 2020 to April 2021. He missed his electricity bill from September 2020 to April 2021.

454.    Ann Perez is a California resident. In March 2020, she applied to receive EDD benefits through Bank of America. Between March 2020 and September 2020, she experienced fraud on her Account, totaling approximately $14,000. In September 2020, she discovered the fraud when she called Bank of America to explain she had never received her EDD Debit Card. In September 2020, she reported the fraud to Bank of America via phone. In response, Bank of America rejected her claim and stated Bank of America would not credit her any money. In September 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. Since September 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her rent payment for December 2020 to March 2021 at $600 per month. She missed her car payment in October, November, and December of 2020 at $325.

455.    Paul Perez is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In January 2021, he experienced fraud on his Account, totaling approximately $570. In January 2021, he discovered the fraud when he checked his Account transaction history. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America continuously drops his calls and refuses to provide a clear answer to his problem.

In January 2021, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. Since January 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he was evicted from his home after not paying his $900 rent for two months in January and February 2021, forcing him to live out of his car. He cannot afford to buy food, gas, or clothing. He suffers from severe depression.

456.   Kenyon Perkins is a California resident. In April 2020, he applied to receive EDD benefits through Bank of America; however, Bank of America did not send him a Card with access to his funds until September 2020. Between April 2020 and September 2020, he experienced fraud on his Account, totaling approximately $13,000. In December 2020, he discovered the fraud when he was on the phone with Bank of America who told him he had been using his benefits between April and September 2020. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America continuously told him to contact EDD to resolve his issue. In December 2020, Bank of America froze his Account. In February 2021, Bank of America unfroze his Account. Since December 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his $1,750 monthly rent payments from December 2020 to February 2021. He missed his $469 monthly car payments from December 2020 to May 2021. He struggles to buy food, gas, and clothing.

457.   Melanie Piette is a California resident. In March 2020, she applied to receive EDD benefits through Bank of America and received her Card in July 2020. In July 2020, Bank of America illegally froze her Account. In November 2020, Bank of America unfroze her Account. In November 2020, she experienced fraud on her Account, totaling approximately $600. In November 2020, she discovered the fraud when she checked her Account transaction history. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said to contact EDD to resolve her issue. In February 2021, Bank of America

credited her for the fraudulent money that was taken. Due to Bank of America's actions, she could not pay her $700 monthly rent in July 2020 and was forced to move out. She now lives in her car or motels. She cannot afford the $4,500 to repair her car. She struggles to pay for food, gas, and clothing.

458.   Ryan Pita is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on his Account, totaling approximately $800. In November 2020, he discovered the fraud when he checked his Account balance. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would provisionally credit him the fraudulently stolen money. In December 2020, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. In November 2020, Bank of America credited $250 to his Account. Due to Bank of America's actions, he missed four $600 rent payments. He missed cell phone bills and could not use his vehicle. He struggles to buy food, gas, and clothing.

459.   Darnell Pitts is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In July 2020, he experienced fraud on his Account, totaling approximately $500. In July 2020, he discovered the fraud. In July 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would credit him the full amount taken from him. Bank of America did not credit him the full amount. In August 2020, he experienced fraud on his Account, totaling approximately $30. In August 2020, he discovered the fraud when he attempted to use his Card and it was declined. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would not credit him any money because Bank of America did not believe the transactions were fraud. In October 2020, he experienced fraud on his Account totaling approximately $600. In October 2020, he discovered the fraud. In October 2020, he reported the fraud to Bank of America via phone. In response,

Bank of America said they would investigate the claim. In April 2021, he experienced fraud for the last time, totaling approximately $430. In April 2021, he discovered the fraud. In April 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would freeze his Account and send him a new Card. In December 2020, Bank of America froze his Account. In January 2021, Bank of America unfroze his Account. In April 2021, Bank of America again froze his Account. In May 2021, Bank of America unfroze his Account. In July 2020 and again in May 2021, Bank of America credited money to his Account. Bank of America only credited him $80 total. Due to Bank of America's actions, he missed six $300 rent payments, leading to eviction. He missed three $180 cable bills. He missed five $80 phone bills. He missed two infrastructure payments, totaling $525. He struggles to pay for food. He suffers from emotional distress.

460.   Vannessa Pitts is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In July 2020, she experienced fraud on her Account, totaling approximately $1,800. In July 2020, she discovered the fraud when she checked her Account transaction history. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said the Bank of America fraud investigation team would investigate her claim. In September 2020, Bank of America froze her Account. In January 2021, Bank of America unfroze her Account. In August 2020, Bank of America credited $1,525.22 to her Account. Due to Bank of America's actions, she had to borrow money to pay rent from August 2020 to February 2021. She could not pay her $650 renter's insurance in August 2020. She could not pay her $100 cell phone bill from August 2020 to February 2021. She struggled to buy food, gas, and clothing.

461.   Misty Pointer is a California resident. In January 2021, she began receiving EDD benefits through Bank of America. In May 2021, she experienced fraud on her Account, totaling $500. On May 12, 2021, she discovered the fraud

when she checked her transaction history. On May 12, 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would investigate and give her provisional credit. On May 24, 2021, Bank of America credited her money to her Account. Due to Bank of America's actions, she was unable to make two car payments since May 2021, totaling $1,720. She was unable to pay her phone bill at $400 per month since May 2021. She struggles to obtain food, gas, and clothing.

462.   Tina Pomeroy is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In June 2020, she experienced fraud on her Account, totaling approximately $1,600. In June 2020, she reported the fraud to Bank of America via phone. In response, Bank of America would either tell her to talk to EDD or would abruptly end the call without giving an answer. In August 2020, October 2020, and December 2020, Bank of America froze her Account. In March 2021, Bank of America unfroze her Account for the final time. In August 2020, Bank of America credited $524 to her Account. Due to Bank of America's actions, she missed her rent payment in September 2020 and October 2020 at $500 per month. She missed her car payment in September 2020 and October 2020 at $348 leading to repossession in February 2021. She could not pay her storage fee at $78, meaning she lost personal items in the storage. She missed her phone payment in September 2020 and October 2020 at $65. She struggles to pay for food, gas, and clothing.

463.   Randle Posten is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account, totaling approximately $1,000. In October 2020, he discovered the fraud when he checked his Account transaction history. In October 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him to talk to EDD to resolve his issue. In October 2020, Bank of America froze his Account. In January 2021, Bank of America had yet to unfreeze

his Account, so he cancelled his Account with Bank of America and started receiving paper checks from EDD. Since October 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he could not afford his rent payment in October 2020 and November 2020 at $1,800 per month. He could not pay his insurance in October 2020 and November 2020 at $146 per month. He could not pay his phone bill in October 2020 and November 2020 at $60 per month, sometimes resulting in the phone being shut off. He could not pay his cable in October 2020 and November 2020 at $113 per month. He could not afford his gas and electricity bill at $200. He struggles to buy food, gas, and clothing for him and his family.

464.   Joshua Pummill is a California resident. In June 2020, he applied to receive EDD benefits through Bank of America. In June 2020, he experienced fraud on his Account, totaling approximately $1,300. In June 2020, he discovered the fraud when he called Bank of America to inquire on the whereabouts about his EDD Debit Card. In June 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him Bank of America would send him a new Card to access his funds. In January 2021, Bank of America closed his Account. Since June 2020, Bank of America has yet to credit him any money. Due to Bank of America, he missed two $300 rent payments. He missed two $100 phone bills. He struggles to buy food and keep up with personal hygiene.

465.   Andrea Quesada is a California resident. In November 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $600. In December 2020, she discovered the fraud when her Card was declined. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would freeze her Account and send her new papers to fill out followed by a new Card. In December 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited her

$600. Due to Bank of America's actions, she could not afford her electric bill from December 2020 to June 2021, owing a total of $600. She could not afford her $120 monthly phone bill from December 2020 to June 2021. She struggles to pay for food, gas, and clothing.

466.   Maurilio Quiroz is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In September 2020, he experienced fraud on his Account, totaling approximately $2,000. In September 2020, he discovered the fraud when he checked his Account transaction history. In September 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him to talk to EDD to resolve his issue or Bank of America would disconnect his call. In September 2020, Bank of America froze his Account. Since September 2020, Bank of America has yet to unfreeze his Account. Since September 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he has missed two rent payments and missed all utility bills.

467.   Mykela Raiff is a California resident. In March 2020, she applied to receive EDD benefits through Bank of America; however, Bank of America did not send her a Card until June 2020 and did not receive the EDD benefits until August 2020. In December 2020, Bank of America froze her Account. In February 2021, Bank of America unfroze her Account. In February 2021, Bank of America credited her approximately $3,000 to her Account. Due to Bank of America's actions, she missed four $800 rent payments, resulting in eviction. She missed four $60 phone bills. She struggles to buy food, gas, and clothing.

468.   Moaney Ray is a California resident. In March or April 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account, totaling approximately $1,000. In October 2020, he discovered the fraud when he checked his transaction history. In October 2020, he reported the fraud to Bank of America via phone. In response, Bank of America refused to help him, as they continuously transferred him between departments, and

often would disconnect his call. In October 2020, Bank of America froze his Account. Since October 2020, Bank of America has yet to unfreeze his Account. Since October 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he struggles to pay rent and his phone bill. He cannot afford the $5,000 to retain his car. He struggles to pay for food and clothing.

469.   Kawana Reed is a California resident. In February 2020, she began receiving EDD benefits through Bank of America. In January 2021, she experienced fraud on her Account, totaling approximately $6,500. In January 2021, she discovered the fraud. In January 2021, she reported the fraud to Bank of America via phone. In response, Bank of America transferred her between departments without giving her a resolution. In January 2021, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In June 2021, Bank of America credited her the entire amount that was fraudulently stolen. Due to Bank of America's actions, she missed her phone bill at $60 per month, to the point the phone was shut off. She missed her wireless bill at $70 per month. She missed her utility bill at $143. She struggles to buy food and cannot afford to wash her clothes

470.   Nehemiah Rima-Fleurima is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In April 2021, Bank of America froze his Account. Since April 2021, Bank of America has yet to unfreeze his Account. Since April 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he has been unable to pay his $70 monthly phone bill since April 2021. He has been unable to pay his $150 monthly storage bill. He has been unable to pay his $70 parking ticket. He struggles to obtain food, gas, and clothing.

471.   Rhonda Ritchey is a California resident. In December 2020, she began receiving EDD benefits through Bank of America. In January 2021, she experienced fraud on her Account, totaling approximately $8,000. In January 2021, she discovered the fraud when she logged into her Bank of America application on her

phone. In January 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would send her a new Card and paperwork to fill out that would fix her issue. Bank of America never sent the Card or the papers. In January 2021, Bank of America froze her Account. In February 2021, Bank of America deactivated her Account. Since January 2021, Bank of America has yet to unfreeze her Account. Since January 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed four $700 rent payments, leading to eviction and subsequent homelessness. She missed phone bills totaling $100. She missed her vehicle registration payment and car insurance payments. She lost her life insurance. Her credit score decreased as she was unable to pay her credit card payment. She struggles to keep up with personal hygiene and pay for food.

472.    Israel Rivera is a California resident. He began receiving EDD benefits through Bank of America. In August 2020, he experienced fraud on his Account, totaling approximately $4,000. In August 2020, he discovered the fraud when he checked his Account transaction history. In August 2020, he attempted to report the fraud to Bank of America via phone. Bank of America has yet to respond to a single phone call. In August 2020, Bank of America froze his Account. In June 2021, Bank of America unfroze his Account. In June 2021, Bank of America credited $5,000 to his Account. Due to Bank of America's actions, he was evicted from his home, forcing him to live in motels. His car was repossessed in August 2020 after missing four car payments. He cannot afford his $140 phone bill, leading to a shut-off. He could not afford his medication for his high blood pressure.

473.    Miguel Roa is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In January 2021, Bank of America froze his Account. In January 2021, every time EDD released his funds to Bank of America, Bank of America would freeze his Account due to suspected fraud. Since January 2021, Bank of America has yet to unfreeze his Account. Since January

1   2021, Bank of America has yet to credit him any money. Due to Bank of America's

2   actions, he missed two rental payments. He was unable to pay his phone bill, cable

3   bill, or electric bill.

4   474.   Carmen Robinson is a California resident. In August 2020, she began

5   receiving EDD benefits through Bank of America. In September 2020, Bank of

6   America froze her Account. Since September 2020, Bank of America has yet to

7   unfreeze her Account. Since September 2020, Bank of America has yet to credit her

8   any money. Due to Bank of America's actions, she has missed all phone payments.

9   She was forced to sell her vehicle and other personal items to afford food and

10   clothing for her and her children.

11   475.   Stanley Robinson[24] is a person residing in San Diego County. He

12   applied for and received EDD unemployment Benefits in October 2020. Soon

13   thereafter, he received a Bank of America EDD Debit Card with a magnetic stripe

14   (no EMV chip) to access his benefits; shortly thereafter he was the victim of

15   numerous unauthorized transactions on his Card; and despite its "Zero Liability"

16   policy, and Robinson's repeated requests for help, Bank of America has been either

17   unwilling or unable to return the funds fraudulently taken from his Account, nor

18   remove the "Administrative Hold" on his Account. In the worst unemployment

19   crisis in California's history, during an unprecedented pandemic, Bank of America

20   left Robinson and hundreds of thousands of EDD benefit recipients stranded. On

21   January 26, 2021, for example two transactions were fraudulently made by

22   unknown individuals: (1) $900 was taken out of an ATM; and (2) a $60 point-of-

23   sale transaction was made, both in Los Angeles, California. Neither of these

24   transactions were authorized by Robinson. These fraudulent transactions totaling

25   $960 left Robinson with only $98 in his Account. To make matters worse, Bank of

26   America froze his Account and locked him out from accessing his desperately

27

28   [24] Robinson is the plaintiff in *Robinson v. Bank of America, N.A.*, No. 3:21-cv-00541-LAB-MSB ("*Robinson*").

needed funds. In total, Bank of America actions cost him $1,058 of his $1,146 EDD benefits within a matter of hours. On January 2, 2021, he began his tireless quest to recover his money from Bank of America. He religiously called Bank of America every morning, afternoon, and evening for weeks. He spent hours daily on the phone attempting to have his benefits restored. Daily, he was met with hostility from Bank of America employees, accusations from Bank of America employees alluding that he had made these fraudulent transactions, or lackluster responses from Bank of America employees to his desperate pleas of help. Countless times Bank of America employees told him that there was nothing they could do for him. Robinson was met with seemingly endless wait times, only to be punctuated by automated recordings telling him that Bank of America was too busy for him, and he should call back later, then Bank of America unceremoniously would hang up on him. He followed this routine for a month. He has all but given up trying to recoup his $1,058 from Bank of America. He can log into his Account, see that it is still frozen, see his $98 that is rightfully his, but cannot access it. As of February 17, 2021, EDD gave up on Bank of America too, Robinson now receives his $1,146 benefit checks from EDD in the mail. As of March 25, 2021, Bank of America still has not returned the $960 which was fraudulently taken from his Account, nor have they unfrozen his Account. In total Bank of America has kept $1,058 from Robinson. To Bank of America, $1,058 might seem insignificant; however, for Robinson that money was helping him put food on the table, gas in his car, to stay afloat through the pandemic. Robinson followed the instructions on his Account agreement, and made consistent, diligent efforts to recover the funds stolen from his Account by making multiple telephone calls. Despite this, Bank of America's customer service department offered Robinson no meaningful response or assistance, and indeed has stymied his efforts at nearly every turn. At no point did Robinson receive communication via mail, email, text, or otherwise from Bank of America regarding the ongoing widespread fraud affecting EDD Debit Cards or how defrauded EDD recipients

should proceed, even after Bank of America had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. The only option presented to individuals like Robinson has been to follow Bank of America's instructions to call the number on the debit Card in reliance on its representations of a "Zero Liability" policy and "24/7" customer service. Unfortunately, as Robinson has learned, Bank of America's representations are false. Proceeding in accordance with Bank of America's policies and recommendations offers scant hope of recovering lost funds timely. Per Bank of America's "Zero Liability" policy Robinson should have been able to access Robinson's funds after ten (10) days, even if there was an investigation that Bank of America deemed necessary. But that was not the reality for Robinson, who was left without recourse or other options. Robinson was held hostage by Bank of America with the only option of calling and being placed on hold repeatedly. Robinson was the victim of fraud resulting from Bank of America's lax security measures implemented to save money. Robinson followed all of Bank of America's designated procedures while attempting to recover stolen funds. Robinson cooperated with Bank of America by adhering to all its requests it said would allow Robinson to recover the money. Did it take ten days as promised? No, it took over four months.

476. Joe Robles is a California resident. In May 2020, he applied to receive EDD benefits through Bank of America; however, he began receiving benefits in September 2020. Between October 2020 and December 2020, he experienced fraud on his Account, totaling approximately $1,609. In December 2020, he discovered the fraud after Bank of America sent him a letter stating there was fraudulent activity on his Account. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate the issue. In January 2021, Bank of America froze his Account. Since January 2021, Bank of America unfroze his Account. Since December 2020, Bank of America has

1  yet to credit him any money. Due to Bank of America's actions, he missed three

2  $450 rent payments, leading to eviction and forcing him to live in the back on his

3  car for three months. He missed three child support payments, totaling $1,104.

4  Struggles to buy food, gas, and clothing.

5      477.   Catrina Rodriguez is a California resident. In May 2020, she began

6  receiving EDD benefits through Bank of America. In January 2021, she experienced

7  fraud on her Account, totaling approximately $6,000. In January 2021, she

8  discovered the fraud when she logged onto her Account after failing to receive a

9  Card from Bank of America. In January 2021, she reported the fraud to Bank of

10  America via phone. In response, Bank of America told her she needed to call EDD

11  because Bank of America told her Bank of America was not in charge of freezing

12  and unfreezing EDD Debit Card Accounts. In January 2021, Bank of America

13  illegally froze her Account. In April 2021, Bank of America unfroze her Account.

14  In April 2021, Bank of America credited $800 to her Account; however, Bank of

15  America reversed the charge, putting her Account into a balance of negative

16  $797.13. In June 2021, Bank of America credited $2.85 to her Account. Due to

17  Bank of America's actions, she missed three $1,600 rent payments, leading to

18  eviction and subsequent homelessness. She could not afford her $1,700 settlement

19  fees. She had to borrow $3,000 from friends and family. She cannot afford her $250

20  storage fee, leading to her losing the storage and all personal items. She lost her

21  children to the State. She cannot afford daily necessities. She suffers from emotional

22  distress.

23      478.   Elana Martina Rojas de Charolet[25] is and at all times herein mentioned

24  was a natural person residing in the City of Chula Vista, in the County of San Diego,

25  in the United States of America. Rojas de Charolet is married to her husband,

26  Marco, who suffers from Parkinson's Disease. Prior to the pandemic, Rojas de

27
28      [25] Rojas de Charolet is the plaintiff in *Rojas de Charolet v. Bank of America, N.A.*, No. 3:21-cv-00925-LAB-MSB ("*Rojas de Charolet*").

Charolet was a chef working at the Hyatt Hotel in Downtown San Diego. Rojas de
Charolet's duties included cooking thousands of meals a day for the various
conventions held at the Hyatt. Before his Parkinson's Disease became advanced,
Marco Charolet was a structural engineer that worked on numerous projects in the
San Diego County area. After, Marco's income was reduced to government
disability only. As a result of Marco's illness, Rojas de Charolet became the only
breadwinner of the family, supplemented only by Marco's disability income. In
addition to being the sole earner of the family, Rojas de Charolet was also Marco's
only caregiver. As a result of COVID-19, Mrs. Rojas de Charolet was laid off from
her job as a chef at the Hyatt Hotel in Downtown San Diego. Rojas de Charolet was
instructed by her employer to apply for unemployment through the State of
California, and that she would be called back to work when operations at the Hotel
resumed. Rojas de Charolet applied for and began receiving unemployment from
the State of California. She received a Bank of America branded EDD Debit Card
with instructions to activate the Card to receive her EDD benefits, which were to be
loaded onto a Bank of America EDD Debit Card. Rojas de Charolet activated the
Account but did not take any money from the Account. Instead, she intended to first
utilize her savings before she accessed the income provided through unemployment
insurance. As a result, Rojas de Charolet stored her Bank of America EDD Debit
Card in her home, and did not initially use it—instead letting her the amount in the
Account increase. Finally, on May 21, 2020, Rojas de Charolet withdrew $700 from
her Card for the first time. On May 30, 2020, some unknown person withdrew $983
from Rojas de Charolet's Card using a Wells Fargo ATM. At the time of the May
30, 2020 withdrawal, Rojas de Charolet had her Card in her possession and had not
given anyone the PIN number. On May 31, 2020, some unknown person then
withdrew another $1,000 from a Bank of America ATM. At the time of the May
31, 2020 withdrawal, Rojas de Charolet had her Card in her possession and had not
given anyone the PIN number. On June 1, 2020, some unknown person withdrew

another $1,000 from a Bank of America ATM. At the time of the June 1, 2020 withdrawal, Rojas de Charolet had her Card in her possession and had not given anyone the PIN number. On June 2, 2020, some unknown person withdrew another $483 from a Citibank ATM. At the time of the June 2, 2020 withdrawal, Rojas de Charolet had her Card in her possession and had not given anyone the PIN number. Then, on June 2, 2020, Rojas de Charolet withdrew $500 from her EDD Debit Card from a Bank of America ATM. When Rojas de Charolet withdrew her money, she realized that her Account balance was $3,466 lower than it should be. This was the first time she learned of the fraud. Rojas de Charolet immediately called and notified Bank of America of the identity theft on the same day she learned of the theft. Bank of America acknowledged that high numbers of theft were being reported, but that Rojas de Charolet needed to call another number to process her ID theft claim. Rojas de Charolet called the number Bank of America told her to and spent more than six hours waiting on hold for someone to answer. Finally, the call was disconnected without anyone answering the call. The following day, and less than 24 hours after learning of the fraud, Rojas de Charolet called Bank of America's fraud department again, and waited four hours on hold, but no one answered the phone. Rojas de Charolet called the Bank of America customer service number for EDD Debit Card Accounts again and, again, reported the theft. Rojas de Charolet reported to Bank of America that she had waited on hold two days in a row, for six and four hours respectively, and the customer service agent told Rojas de Charolet that she had been getting reports of long hold times. She then told Rojas de Charolet she needed to keep trying. Rojas de Charolet asked the customer service representative to freeze the Card due to the theft, and the representative locked the Card. Rojas de Charolet made numerous other attempts to contact the fraud department, but never could reach an operator. On or about July 13, 2020, Rojas de Charolet mailed an FTC fraud affidavit concerning the ID theft to Bank of America, via certified mail. Rojas de Charolet waited for a response from Bank of America,

which could have been in the form of a credit of the stolen money to her Account or even a call from Bank of America to discuss the issue with her. Bank of America did nothing. It did not return the money stolen from the Account of Charolet de Rojas and it never contacted her in response to her an FTC fraud affidavit. On or about September 24, 2020, Rojas de Charolet wrote a letter to Bank of America to inquire about the results of the investigation of her stolen money. In that letter, Rojas de Charolet asked Bank of America to let her know if it needed any other documents to complete its investigation. Rojas de Charolet also stated that if its investigation was completed, she wanted to know the result thereof, and she requested a copy of the documents used to reach that result. Bank of America never responded to Rojas de Charolet's September 24, 2020 letter.

479. Jose Rodriguez Romo is a California resident. In February 2021, he began receiving EDD benefits through Bank of America. In March 2021, he experienced fraud on his Account, totaling approximately $1,000. In March 2021, he discovered the fraud when he tried to withdraw money from his Account. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they were unable to help him, and he needed to contact EDD to resolve his issue. In March 2021, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. In April 2021, Bank of America credited $1,003 to his Account. Due to Bank of America's actions, he was unable to pay his $650 rent in March 2021. He was unable to pay his car insurance, cell phone bill, or repair his vehicle.

480. Melissa Royston is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In September 2020, she experienced fraud on her Account, totaling approximately $1,400. In September 2020, she discovered the fraud when she checked her Account transaction history. In September 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her she would receive the credit for the fraudulently

stolen money. In October 2020, Bank of America froze her Account. Since October 2020, Bank of America has yet to unfreeze her Account. In September 2020, Bank of America credited $1,300 - $1,400 to her Account; however, Bank of America reversed the credit and took the money back. Due to Bank of America's actions, she was unable to pay her $350 monthly rent from September 2020 to December 2020. She was unable to pay her $350 water and electric bill from September 2020 to December 2020. Her credit score dropped as a result of not paying her credit card bill. She struggles to pay for food for her children.

481.   Raylene Salaz is a California resident. In June 2020, she was approved to receive EDD benefits through Bank of America; however, Bank of America never sent her a Card to access her funds. Between June 2020 and August 2020, she experienced fraud on her Account, totaling approximately $11,000. In August 2020, she discovered the fraud when she tried to access her Account. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her the debt would be wiped off until an investigation was completed. In September 2020, Bank of America froze her Account. In October 2020, Bank of America unfroze her Account. Since August 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her rent payments from November 2020 to January 2021, totaling $6,000, leading to her eviction in January 2021. She missed her car payments from November 2020 to January 2021, totaling $750, leading to car repossession in December 2020. She could not pay her cell phone bill or electric bill, totaling $475, She struggled to pay for food

482.   Miguel Salazar is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling approximately $4,000. In December 2020, he discovered the fraud when he checked his Account attempting to withdraw money. In December 2020, he reported the fraud to Bank of America via phone. In

response, Bank of America said he needed to resolve his issue with EDD, or Bank of America would disconnect his call. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. In April 2021, Bank of America credited $5,000 to his Account. Due to Bank of America's actions, he could not afford his phone bill, leading to a phone shut off. He could not afford to pay for his medication. He suffers from severe distress and mental health issues.

483. Frankie Saldate is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In November 2020, Bank of America illegally froze his Account. In May 2021, Bank of America unfroze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his $400 rent payments from November 2020 to March 2021. He was unable to pay his $85 monthly phone bill from November 2020 to January 2021. He was then unable to pay his $100 phone bill from February 2021 to April 2021. He has been unable to get a job as a result. He struggles to pay for medication for his son. He struggles to buy food, gas, and clothing.

484. Michael Schmidt is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account, totaling approximately $400. In October 2020, he discovered the fraud when he checked his Account balance. In October 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would send him a new Card. In April 2021, Bank of America credited $1,000 to his Account. Due to Bank of America's actions, he owes $3,000 to family members. He missed two $1,200 rent payments. He missed two $50 phone bills. She suffers from emotional distress.

485. Timothy Schmitz is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. Between May 2020 and June

2021, Bank of America froze his Account on three separate occasions. In 2021, Bank of America credited his funds. Due to Bank of America's actions, he struggled to pay his bills. He suffers from emotional distress and severe anxiety.

486.   Melissa Serrato is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on her Account, totaling approximately $2,500. In October 2020, she discovered the fraud when she attempted to make an online purchase. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her that it was EDD who was taking the money out of her Account. In December 2020, she again experienced fraud on her Account, totaling approximately $2,500. In December 2020, she discovered the fraud when she checked her online Account. In December 2020, she again reported the fraud to Bank of America via phone. In response, Bank of America could not give her a straight answer, sometimes telling her the Account was closed, other times telling her the Account was open and accessible. In December 2020, Bank of America froze her Account. Since December 2020, Bank of America has yet to unfreeze her Account. Since October 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she could not afford her $755 rent in October 2020. She missed her $215 car payment in December 2020. She struggles to buy food for her kids.

487.   Arminda Sevilla is a California resident. In January 2021, she began receiving EDD benefits through Bank of America. In February 2021, she experienced fraud on her Account, totaling approximately $2,500. In February 2021, she discovered the fraud when she checked her Account after her Card was declined. In February 2021, she reported the fraud to Bank of America via phone. In response, Bank of America transfers her between departments until Bank of America abruptly ends the call. Since February 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed four $1,500

rent payments. She missed three $500 car payments. She is behind on her phone bill, totaling $4,000. She is late on her utility bill at $400. She is late on her light bill at $3,000. She owes money to friends and family who lent her money.

488.    Jenna Silva is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In March 2021, Bank of America froze her Account. In March 2021, Bank of America told her they deactivated and froze her Account due to suspected fraudulent activity; however, she proclaims no fraud ever occurred on her Account. In April 2021, Bank of America unfroze her Account. Since March 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $500 rent payment in February 2021. She missed her $130 phone bill in February 2021. She missed her $15 storage bill in February 2021.

489.    Jessica Simpson is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In May 2020, she experienced fraud on her Account, totaling approximately $1,500. In July 2020, she discovered the fraud when she checked her online transaction history. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to contact EDD to resolve her issue. In November 2020, Bank of America froze her Account. In February 2021, Bank of America unfroze her Account. Since July 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $975 rent payments from November 2020 to February 2021. She missed her utilities bills from November 2020 to February 2021, totaling $800. She missed her $500 car payments between November 2020 to February 2021, leading to car repossession. She struggled to buy clothes for her children.

490.    Michael Sims II is a resident of California. In February 2020, he began receiving EDD benefits through Bank of America. Between August 2020 to September 2020, he experienced fraud on his Account, totaling approximately

$2,000. In September 2020, he discovered the fraud. In September 2020, he reported the fraud to Bank of America via phone. In response, Bank of America refused to give him an answer, more often than not abruptly dropping his call. In September 2020, Bank of America froze his Account. In March 2021, Bank of America unfroze his Account. Since September 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he was evicted from his apartment in November 2020 after not being able to pay his $950 rent payment for two months. He had his vehicle repossessed in January 2021 after missing three monthly payments of $350. He cannot pay off his credit card bill which is now at $3,000. He cannot pay his phone bill at $100 per month. He struggles to buy food, gas, and clothing.

491.  Denise Smith is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In November 2020, she experienced fraud on her Account, totaling approximately $1,283. In May 2021, she discovered the fraud after her Card was declined. In May 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would investigate the claim. On June 1, 2021, Bank of America credited $1,200 to her Account; however, Bank of America reversed the credit immediately after, putting her Account balance at negative $60. Since May 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she could not pay her life insurance premium of $25. She could not pay $47 for her electric bill. She could not pay her renter's insurance at $12.

492.  Nicole Smith is a California resident. In January 2020, she began receiving EDD benefits through Bank of America. In November 2020, she experienced fraud on her Account, totaling approximately $7,000. In November 2020, she discovered the fraud when she checked her Account online. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to resolve her issue with EDD. In February 2021, Bank of America

froze her Account. In April 2021, Bank of America unfroze her Account. Since November 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she could not afford her $550 rent payment from February 2021 to April 2021, leafing to eviction in April 2021. She missed three $450 car payments, leading to car repossession in April. She cannot afford her $175 monthly WIFI bill. She struggles to buy food, gas, and clothing for herself and her children.

493.    Jonathan Sparks is a California resident. In February 2021, he began receiving EDD benefits through Bank of America. In February 2021, he experienced fraud on his Account, totaling approximately $1,500. In February 2021, he discovered the fraud when he checked his Account online. In February 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to talk to EDD to resolve his issue. In February 2021, Bank of America froze his Account. In May 2021, Bank of America unfroze his Account. Since February 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed three rent payments from April 2021 to June 2021 at $3,000 each, leading him to be homeless for a week. He missed three phone payments from April 2021 to June 2021 at $48 per month. He also could not pay his child support payments, meaning he has not been able to see his daughter.

494.    Amy Stanfill is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In July 2020, she experienced fraud on her Account, totaling $5,000. In July 2020, she discovered this fraudulent transaction when she was purchasing food and her Card was declined. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would investigate the claim. In August 2020, Bank of America credited $3,133 to her Account; however, Bank of America reversed this credit in June 2021. Due to Bank of America's actions, she was unable to pay her $900 rent in August 2020 and September 2020, leading to eviction. She was forced to live in her car or

1   pay for motels, which has totaled $400. She could not pay her $90 phone bill in

2   August and September 2020. She could not afford to pay her $73 storage fee in

3   August and September 2020.

4       495.   Lucas Stephens is a California resident. In April 2019, he began

5   receiving EDD benefits through Bank of America. In June or July 2020, he

6   experienced fraud on his Account, totaling approximately $10,000. In June or July

7   2020, he discovered the fraud when he checked his Account balance. In June or July

8   2020, he reported the fraud to Bank of America via phone. In response, Bank of

9   America told him Bank of America would open a claim and he would receive a new

10  Card to access his funds. In August 2020, Bank of America froze his Account. Since

11  August 2020, Bank of America has yet to unfreeze his Account. Since August 2020,

12  Bank of America has yet to credit him any money. Due to Bank of America's

13  actions, he missed his $1,550 rent payments in July 2020 and then from December

14  2020 to February 2021, leading to eviction. He was unable to pay his PG&E bill

15  from November 2020 to February 2021. He has missed his $647 monthly car

16  payment since December 2020. He has missed his credit card bills. He struggles to

17  obtain food, gas, and clothing. He struggles from emotional distress.

18      496.   Crystal Stidham is a California resident. In March 2020, she began

19  receiving EDD benefits through Bank of America. In October 2020, she

20  experienced fraud on her Account, totaling approximately $19,000. In October

21  2020, she discovered the fraud when she checked her Account balance. In October

22  2020, she reported the fraud to Bank of America via phone. In response, Bank of

23  America told her to resolve her issue with EDD. Due to Bank of America's actions,

24  she was evicted in October 2020 after not being able to afford her $575 monthly

25  rent payment. She could not afford to pay to get her car out of a tow yard, a car

26  which she purchased the week before for $4,400. She missed her cell phone bill

27  three times from October 2020 to December 2020 at $62 per month. She struggles

28  to buy food and clothing.

497.   Danny Talia[26] is a person residing in San Diego County, California. Talia became out of work because of the COVID-19 pandemic. Talia applied for and received EDD unemployment benefits. Soon thereafter, Talia received a Bank of America EDD Debit Card with a magnetic stripe (no EMV chip) to access Talia's benefits. Around mid-2020, Talia sought EDD benefits when Talia needed funds to bridge the gap between employment and pay living expenses during the pandemic. Initially, Talia's unemployment claim was denied. But Talia won an appeal and received a lump sum payment of back-unemployment from EDD. The funds were deposited by EDD into a Bank of America Debit Card Account for Talia and Bank of America issued Talia a Card to access the funds. Notably, the Card did not have an EVM chip. Around August of 2020, Talia had roughly $11,000 of unemployment benefits in the Account. Talia was taking care to protect and safeguard the valuable funds. Talia did not perform any strange or suspicious transactions such as going to multiple ATM machines on the same day or purchasing goods overseas. Talia began to persistently call Bank of America day after day and spent many hours on the phone attempting to have the funds returned. Bank of America refused to issue any sort of refund or credit for the frozen funds so that Talia could buy food, gasoline etc. At one point, Bank of America told Talia it was EDD's fault the funds were frozen and to call EDD. But calling EDD was no easy task either. When Talia finally able to connect, EDD informed Talia it was entirely Bank of America's decision and fault. Talia began calling Bank of America again. On one of the calls an agent told Talia the funds would be returned in two days and Talia was ecstatic. Since Bank of America had frozen Talia's funds, Talia had borrowed money from friends and family and was late on rent. Talia was exuberant believing that the funds would be unfrozen in two days and began informing his friends, family etc. that he would pay them back in two days. But Bank of America did not keep its word. The

---

[26] Talia is the plaintiff in *Talia v. Bank of America, N.A.*, No. 3:21-cv-00676-LAB-MSB ("*Talia*").

funds were not released after the two days passed. Talia was extremely sad, embarrassed, and depressed when he had to tell his friends and family that he needed more time to pay them. Talia began calling Bank of America again. Eventually an agent told Talia the funds would be released in a week. Talia hesitantly told his friends and family he would pay them back in a week. A week passed and Bank of America did not return the funds. Talia was even more sad, embarrassed, and depressed when he had to tell his friends and family that he would not be paying them on the day he promised. This pattern happened several times. Bank of America promised to return the funds, Talia told his friends and family he would pay them soon, then it never happened. Talia lost all credibility with the people that lent him money. They simply did not believe him when he assured them that he would pay them back. This caused even more depression. The emotional roller coaster of thinking the money would be returned, then having it fall through, then happening again and again, coupled with losing all credibility with his friends and family was extremely draining on Talia. Around late 2020, Talia contracted COVID-19 and became very ill. He was tired and felt horrible. All he wanted was for Bank of America to return his money, but it refused. Talia was forced to take out high interest short term loans until even that option was no longer available. At this point things really began to go downhill for Talia. He had exhausted all his resources. He had no money, and no one would lend him any money. Talia became late on his car payment and other bills like his cell phone bill etc. Worst of all, Talia could not pay rent and his worst fear came true—Talia became homeless. Talia estimates he called Bank of America over one hundred (100) times since September of 2020. He spent hours on hold day after day speaking with unhelpful agents and estimates over one hundred (100) hours spent on the phone. As of April 13, 2021, Bank of America still has not returned the $11,000 it unlawfully confiscated from Talia. Talia followed the instructions on Bank of America's Account agreement and made consistent, diligent efforts to recover the funds by making multiple telephone

calls. Despite this, Bank of America's customer service department offered no meaningful response or assistance and has stymied Talia's efforts at every turn. At no point did Talia receive communication via mail, email, call, text, or otherwise from Bank of America regarding the ongoing widespread fraud affecting EDD Debit Cards or how defrauded EDD recipients should proceed, even after Bank of America had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. The only option presented to individuals like Talia has been to follow Bank of America's instructions to call the number on the Card in reliance on its representations of a "Zero Liability" policy and "24/7" customer service. Unfortunately, as Talia has learned, Bank of America's representations are false. Proceeding in accordance with Bank of America's policies and recommendations offers scant hope of recovering frozen funds timely. Per Bank of America's "Zero Liability" policy Talia should have been able to access Talia's funds after ten (10) days, even if there was an investigation that Bank of America deemed necessary. But that was not the reality for Talia, who was left without recourse or other options. Talia was held hostage by Bank of America with the only option of calling over and over. Talia is a victim of Bank of America's weak security measures implemented to save money. Talia followed all of Bank of America's designated procedures while attempting to recover the funds, which still have not been returned.

498.   Cesar Tamayo is a California resident. In December 2019, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling approximately $160. In December 2020, he discovered the fraud when he checked his Account transaction history. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America transferred him between departments, and would eventually drop his call. In December 2020, Bank of America froze his Account. In January 2021, Bank of America unfroze his Account. In January 2021, Bank of America credited

1   $1,800 to his Account. Due to Bank of America's actions, he fell behind on his
2   cable bills, light bills, and utility bills.

3   499.   Michelle Taylor is a California resident. In February 2021, she began
4   receiving EDD benefits through Bank of America. In February 2021, she
5   experienced fraud on her Account, totaling approximately $1,000. In February
6   2021, she discovered the fraud when she checked her transaction history. In
7   February 2021, she reported the fraud to Bank of America via phone. In response,
8   Bank of America told her to resolve her issue with EDD. In February 2021, Bank
9   of America illegally froze her Account. In May 2021, Bank of America unfroze her
10  Account. In June 2021, Bank of America credited $1,000 to her Account. Due to
11  Bank of America's actions, she missed her $1,450 rent payment between February
12  and June 2021. She missed her $365 car payment between February and June 2021.
13  She missed her $225 car insurance payment in February 2021, leading to a loss of
14  insurance. She was unable to pay her $254 cell phone bill in February and March
15  2021. She could not pay her $300 electric bill between February and June 2021. She
16  could not pay her $300 internet bill from between February and June 2021. She
17  struggles to buy food, gas, and clothing.

18  500.   Tonya Taylor is a California resident. In August 2020, she began
19  receiving EDD benefits through Bank of America. In December 2020, she
20  experienced fraud on her Account, totaling approximately $500. In December 2020,
21  she discovered the fraud when she received a fraud alert text message. In December
22  2020, she reported the fraud to Bank of America via phone. In response, Bank of
23  America told her to contact EDD to resolve her issue. In December 2020, Bank of
24  America froze her Account. In May 2021, Bank of America unfroze her Account.
25  Since December 2020, Bank of America has yet to credit her any money. Due to
26  Bank of America's actions, she missed three rent payments. She has missed four
27  car payments. She could not afford her cable which was shut off in January 2021.
28  She struggles to buy food, gas, and clothing. She also suffers from emotional

1    distress and severe depression.

2    501. Nicholas Tonna is a California resident. In March 2020, he began
3    receiving EDD benefits through Bank of America. Between March 2020 and
4    October 2020, he experienced fraud on his Account, totaling approximately
5    $25,000. In October 2020, he discovered the fraud after checking his Account
6    balance. In October 2020, he reported the fraud to Bank of America via phone. In
7    response, Bank of America would either tell him they would investigate his claim
8    or that he should resolve his issue with EDD. In December 2020, Bank of America
9    illegally froze his Account. In April 2021, Bank of America unfroze his Account.
10   Since October 2020, Bank of America has yet to credit him any money. Due to
11   Bank of America's actions, he is homeless and forced to live on the streets with his
12   emotional support dog. He is a diabetic and cannot afford the proper medication.
13   He cannot afford to pay $5,000 to get his car engine fixed so that he can go to work.
14   He missed four cell phone bill payments at $45 per month. He struggles to pay for
15   food, gas, and clothing.

16   502. Tasha Trammel is a California resident. In April 2020, she began
17   receiving EDD benefits through Bank of America. In March 2021, she experienced
18   fraud on her Account, totaling approximately $825. On March 8, 2021, she
19   discovered the fraud when she attempted to use her Card at an ATM. On March 8,
20   2021, she reported the fraud to Bank of America via phone. In response, Bank of
21   America told her to call back in a few days to apply for provisional credit. In March
22   2021, Bank of America froze her Account. In May 2021, Bank of America unfroze
23   her Account. In May 2021, Bank of America credited money to her Account. Due
24   to Bank of America's actions, she could not pay her full $1,100 rent payment in
25   April and May 2021. She was late on her $377 car payment in April and May 2021.
26   She could not afford to pay her cable bill, electric bill, and credit card bill. She
27   struggles to pay for food, gas, and clothing.

28   503. Jimmy Tressler is a California resident. In March 2020, he began

receiving EDD benefits through Bank of America. In May 2020, he experienced fraud on his Account, totaling approximately $7,000. In May 2020, he discovered the fraud when he checked his online Account. In May 2020, he reported the fraud to Bank of America. In response, Bank of America repeatedly tells him to resolve his issue with EDD. In September 2020, Bank of America illegally froze his Account. In June 2021, Bank of America unfroze his Account. In June 2021, Bank of America credited $180 to his Account. Due to Bank of America's actions, he missed his $1,184 rent payment between September 2020 to November 2020, leading to his eviction in November 2020, forcing him to live in a motel for the next three months at $95 per day. He could not afford his $360 car payment leading to car repossession in December 2020. He had another car repossessed in March 2021, after failing to pay his $245 monthly payment. He struggles to pay his $55 monthly phone bill. He suffered two hospital visits due to the stress of missing bills. He struggles to buy food, gas, and clothing.

504.   Jason Turnbull is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In February 2021, he experienced fraud on his Account, totaling approximately $1,500. In February 2021, he discovered the fraud when he logged onto his Bank of America app. In February 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would perform an investigation. In February 2021, Bank of America froze his Account. Since February 2021, Bank of America has yet to unfreeze his Account. Since February 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed rent payments totaling $3,600, leading to eviction and subsequent homelessness. He missed his phone bills totaling $2,000, leading to late fees totaling $6,000. He missed his renter's insurance payments, totaling $160. He was forced to borrow $3,000 from friends and family. He lost personal items, including thousands of dollars' worth of clothing. He struggles to pay for food and clothing. He suffers from emotional

1    distress.

2          505.   Thomas Turner is a California resident. In March 2021, he began

3    receiving EDD benefits through Bank of America. In March 2021, Bank of America

4    illegally froze his Account. In March 2021, he contacted Bank of America to

5    understand why Bank of America froze his Account; however, Bank of America

6    never gave him an answer. Since March 2021, Bank of America has yet to unfreeze

7    his Account. Since March 2021, Bank of America has yet to credit him any money.

8    Due to Bank of America's actions, he is homeless and is forced to live in the back

9    of his car, starting in June 2021. He struggles to buy food and clothing. She suffers

10   from emotional distress and anxiety.

11         506.   Reina Valadez is a California resident. In August 2020, she attempted

12   to apply for EDD benefits; however, she was unable to as a fraudulent person

13   already received benefits in her name. Between August 2020 and November 2020,

14   she experienced fraud on her Account, totaling $19,596. In November 2020, she

15   discovered the fraud when she was on the phone with Bank of America. In

16   November 2020, she reported the fraud to Bank of America via phone. In response,

17   Bank of America told her she needed to file two claims, one for $3,200 and one for

18   $16,396; however, Bank of America denied the second claim because the fraud

19   occurred too far in the past. In January 2021, Bank of America froze her Account.

20   In April 2021, Bank of America unfroze her Account. In May 2021, Bank of

21   America credited $3,200 to her Account. Due to Bank of America's actions, she

22   missed three $1,250 rent payments, leading to her homelessness. She struggles to

23   buy food and clothing and keep up basic personal hygiene. She suffers from

24   emotional distress.

25         507.   Juan Valenzuela is a California resident. In October 2020, he began

26   receiving EDD benefits through Bank of America. In October 2020, he experienced

27   fraud on his Account. In October 2020, he discovered the fraud when he checked

28   his transaction history. In October 2020, he reported the fraud to Bank of America

via phone. In response, Bank of America told him he needed to resolve his issue with EDD. In October 2020, Bank of America froze his Account. In December 2020, Bank of America unfroze his Account. Since October 2020, Bank of America has yet to provisionally credit him any money. Due to Bank of America's actions, he struggles to buy food, clothing, and gas, having to borrow money for these daily necessities.

508.   David Vasquez is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In late November or early December 2020, he experienced fraud on his Account, totaling approximately $886. In late November or early December 2020, he discovered the fraud when he attempted to use his Card, but his Account had insufficient funds. In late November or early December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would freeze his Account and he needed to go into a branch to verify his identification. In December 2020, Bank of America froze his Account. In January 2021, Bank of America unfroze his Account. In January 2021, Bank of America credited $357 to his Account; however, Bank of America has not credited any other money to his Account and stopped applying his benefits to his Account. Due to Bank of America's actions, he missed his rent payment from December 2020 to March 2021, leading to his eviction and subsequent homelessness. He is unable to afford the fee to remove his car from a tow yard. He lost nearly all person belongings during the eviction. He struggles to buy food and clothing. He suffers from emotional distress.

509.   Jessie Verdun[27] is and at all times herein mentioned was a natural person residing in the City of Santa Paula, in the County of Ventura, in the United States of America. In 2020, as a result of the COVID-19 pandemic, Verdun became

---

[27] Verdun is the plaintiff in *Verdun v. Bank of America, N.A.*, No. 3:21-cv-01196-LAB-MSB, originally filed in the U.S. District Court for the Central District of California (No. 2:21-cv-04494-AS) ("*Verdun*").

1  eligible for pandemic assistance income, and began receiving unemployment
2  benefits from the State of California, which were directly loaded onto Verdun's
3  Bank of America EDD Debit Card. On or about June 6, 2020, Verdun attempted to
4  purchase food using his Bank of America EDD Debit Card, but the purchase was
5  declined. After his purchase was declined, Verdun went home and accessed this
6  Bank of America EDD website, but he was locked out. On June 6, 2020, minutes
7  after learning he could not access his online Account, Verdun called Bank of
8  America and was told by the person answering the phone that $4,100 was missing
9  from his Account. During the June 6, 2020 call, the Bank of America representative
10  told Verdun that Verdun had previously called Bank of America and requested that
11  $4,100 to be transferred to his savings account. Verdun told Bank of America that
12  he never called Bank of America to make any such request. Bank of America
13  responded that its notes on the Account stated that someone called in, attempted the
14  transfer money from Verdun's Account, but did not have the information to confirm
15  the Account belonged to Verdun. The person pretending to be Verdun then called
16  back, verified the Account, and requested a transfer of money from the Account.
17  Verdun informed Bank of America that the caller was not him. He further asked
18  Bank of America why it would transfer the money when the caller could not verify
19  the Account on the first call. In response, Bank of America indicated it would only
20  freeze the Account, but could not process any type of fraud claim. The operator
21  stated that Verdun would have to call the claims department Monday to make a
22  claim. On or about June 8, 2020, Verdun called Bank of America in order to make
23  a claim in order to have his money returned to his Account. After waiting on hold
24  for 8 hours, he was able to provide Bank of America with information relating to
25  the fraud. However, all Bank of America would do was close his Account and open
26  a new one. In order to have his EDD Debit Card reissued, Bank of America required
27  that Verdun call a different number. Verdun called this number, and after waiting
28  hours on hold, he was able to request the replacement Card. And then, in order to

actually lodge a fraud claim with Bank of America that it would investigate, he had to call a third number. Verdun called this number, and despite being on hold for more than 8 hours, Bank of America never accepted his call. On June 8, 2020, Verdun called back and waited on hold the entire day, but no one answered the phone. On June 9, 2020, Verdun called and again waited on hold for hours, but no one answered the phone. While waiting on hold, Verdun also called the Ventura Police Department and filed an identity theft police report. On August 24, 2020, Verdun was able to get a copy of the police report (which was delayed due to COVID-19) and sent the report along with a completed FTC fraud affidavit to Bank of America. On September 22, 2020, after receiving no response from Bank of America, Verdun mailed the documents to Bank of America a second time, via certified mail, and further wrote that he had not heard any results from Bank of America regarding his request for an investigation to his claim of identity theft. Bank of America has not responded to either of the two letters seeking information about the status of his fraud investigation, and has not otherwise contacted Verdun about the fraud or requested any additional information. And Bank of America has not returned the disputed amount to Verdun. As a result of Bank of America's unlawful acts and omissions as stated above, Verdun suffered actual damages as described above.

510.   Manuel Villagomez is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on the Account, totaling approximately $300. In November 2020, he discovered the fraud when he attempted to withdraw money from his Account. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would open a claim and would send him a new Card. In December 2020, Bank of America illegally froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to

1   Bank of America's actions, he missed his $350 rent payments from November 2020

2   to March 2021. He could not afford his $346 car insurance for six months. He could

3   not pay his $60 monthly phone bill from December 2020 to January 2021 and again

4   in March and April of 2021. He suffers emotional distress.

5        511.   Luis Viramontes is a California resident. In March 2020, he began

6   receiving EDD benefits through Bank of America. In May 2020, and then again in

7   September 2020, he experienced fraud on his Account, totaling approximately

8   $2,900. In May 2020, he discovered the fraud when he attempted to use his Card,

9   but he had insufficient funds. In May 2020, he reported the fraud to Bank of

10  America via phone. In response, Bank of America told him Bank of America

11  experienced technical issues with regards to his Account. In May 2020, Bank of

12  America froze his Account. In February 2021, Bank of America unfroze his

13  Account. In February 2021, Bank of America credited $2,300 to his Account. Due

14  to Bank of America's actions, he was evicted in September 2020 after failing to pay

15  rent, forcing him to live in the back of his car. He missed car payments leading to

16  car repossession. He could not afford his phone payments, leading to a phone shut

17  off. He struggles to pay for food, gas, and clothing. He also suffers from extreme

18  stress and anxiety.

19       512.   Norman Walker is a California resident. In November 2020, he applied

20  to receive EDD benefits through Bank of America; however, Bank of America did

21  not send him a Card until January 2021. In January 2021, Bank of America illegally

22  froze his Account. In April 2021, Bank of America unfroze his Account. In May

23  2021, he discovered fraud on his Account, totaling approximately $9,736. The fraud

24  occurred in May and June of 2021, as a fraudulent person began receiving benefits

25  under his name. In May 2021, he reported the fraud to Bank of America via phone.

26  In response, Bank of America denied his claim and stated he would not receive any

27  money. Since January 2021, Bank of America has yet to credit him any money. Due

28  to Bank of America's actions, he missed four $550 rent payments, leading to

eviction, and subsequent homelessness. He missed two $380 car payments. He lost most of his personal belongings during the eviction. He owes $1,300 to friends and family. He struggles to buy food, gas, and clothing. He suffers from emotional distress.

513.   Jason Wallace is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In February and March 2021, he experienced fraud on his Account, totaling approximately $7,400. In February 2021, he discovered the fraud when he checked his Account transaction history. In February 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to wait the ten-day period to receive his funds and they would send him a new Card with access to his Account. In March 2021, Bank of America froze his Account. Since March 2021, Bank of America has yet to unfreeze his Account. Since March 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed three $1,500 rent payments, leading to eviction. He was unable to pay his $500 phone bill, leading to a shut off. He is unable to pay his credit card bills, leading to overdraft fees of $648. He struggles to pay for food, gas, and clothing.

514.   Cameren Wilburn is a California resident. In March 2020, he started receiving EDD benefits through Bank of America. In December 2020, Bank of America froze his Account for no reason. In December 2020, he contacted Bank of America about the issue. Since December 2020, Bank of America has yet to unfreeze his Account. Due to Bank of America's actions, he was forced out of his housing and cannot pay his car insurance. He suffers from extreme mental health issues.

515.   Denise Wilds is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. On March 9, 2021, she experienced fraud on her Account, totaling approximately $200. On March 11, 2021, she discovered the fraud when she checked her Account history. On March

11, 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said they would open a claim and investigate. In March 2021, Bank of America froze her Account. On April 15, 2021, Bank of America unfroze her Account. On April 27, 2021, Bank of America credited her $200. On May 25, 2021, Bank of America again illegally froze her Account. On May 31, 2021, Bank of America unfroze her Account. Due to Bank of America's actions, she missed a $2,480 rent payment. She missed a $553 car payment. She struggles to afford clothes for her children for school.

516.   Terrence Wilkins is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In July 2020, Bank of America illegally froze his Account. In July 2020, he contacted Bank of America, who told him he needed to contact EDD to gain access to his Account. Since July 2020, Bank of America has yet to unfreeze his Account. Since July 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he has not been able to pay his $103 phone bill, approximately ten times. He has not been able to pay his $1,000 rent payment since July 2020. He has not been able to pay his $249 monthly car insurance since July 2020. He struggles to pay for food, gas, and clothing.

517.   Zacharia Williams is a California resident. In January 2021, he applied to receive EDD benefits through Bank of America. In February 2021, Bank of America froze his Account and refused to send him a debit Card to access his funds. In February 2021, Bank of America told him he needed to contact EDD to resolve the issue. Since February 2021, Bank of America has yet to unfreeze his Account or allow him access to his funds. Due to Bank of America's actions, he cannot pay his $400 car insurance since February 2021. He cannot pay his $200 phone bill since February 2021. He struggles to buy food, gas, and clothing.

518.   Tyrisha Williams is a California resident. In 2020, she was entitled to EDD benefits, but she was not able to receive the benefits because a fraudster had

already filed for benefits in her name. In July 2020, she discovered someone stole her identity and utilized her personal information to receive EDD benefits through Bank of America. In July 2020, she discovered the fraud when the City of Los Angeles sent her a letter stating her food stamps would soon end. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America refused to listen to her, and continued to allow the fraudulent person to access the Account. The fraudster drained the Account to $0. In August 2020, Bank of America gave her access to the Account and credited $12,000 to the Account. She used that money for living expenses. However, Bank of America later reversed the credit, sending her Account into a balance of negative $12,000. In October 2020, Bank of America froze the Account. In January 2021, Bank of America unfroze the Account. Bank of America has yet to credit her any of the stolen money. Due to Bank of America's actions, she was evicted from her home in July 2020, after not being able to afford her $750 rent for three months. She was forced to let her children go and live with their father, because Williams could not afford to provide for them.

519.   Willie Williams is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. At the end of July 2020 or early August 2020, he experienced fraud on his Account, totaling approximately $10,000. In August 2020, he discovered the fraud when he attempted to make a purchase with his Card, yet the Card was declined. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to wait ninety (90) days to receive a response from the Bank regarding its investigation. In August 2020, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. Since August 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed four months of rent payment, leading to his eviction. His car was repossessed after he was unable to pay for the car payments. He was unable to pay his cable and

electricity bill. He was unable to pay his phone bill, leading to his phone shut off. He struggles to pay for food, clothing, and gas for his family.

520.   Latasha Williamson is a California resident. In February 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $4,700. In December 2020, she discovered the fraud when she logged into her online Account. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to resolve her issue with EDD. In December 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. In April 2021, Bank of America credited $2,600 to her Account; and then in June 2021, Bank of America credited $900 to her Account. Due to Bank of America's actions, she missed her $1,625 rent payment in December 2020 and January 2021, leading to eviction in January 2021. She could not payer her $60 water bill in December 2020 and January 2021. She could not pay her $125 electricity bill in in December 2020 and January 2021. She could not pay her $62 cable bill in December 2020 and January 2021. She could not pay her $100 phone bill in December 2020 and January 2021. She struggled to pay for food, gas, and clothing for her and her children. She suffers from emotional distress.

521.   Leanna Willis is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In August 2020, she experienced fraud on her Account, totaling approximately $15,000. In August 2020, she discovered the fraud when her Card was declined, and she checked her Account after. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America would either tell her to resolve her issue with EDD or would transfer her between departments. In August 2020, Bank of America froze her Account. In October 2020, Bank of America unfroze her Account. In August 2020, Bank of America credited $15,000 to her Account; however, Bank of America revered the credit, putting her Account into a balance of negative $15,000.

1   Due to Bank of America's actions, she is homeless because she was in the middle
2   of moving into a new apartment, for which she could not pay. She could not afford
3   her car insurance at $300, leading to car repossession in August 2020. She fell
4   behind on credit card payments. She struggles to buy food, gas, and clothing for
5   herself and her child.

6       522.   Lacey Wise is a California resident. In April 2020, she began receiving
7   EDD benefits through Bank of America. In June 2020, she experienced fraud on
8   her Account, totaling approximately $15,000. In June 2020, she discovered the
9   fraud when she attempted to use the Card but was declined. In June 2020, she
10   reported the fraud to Bank of America via phone. In response, Bank of America
11   told her to resolve her issue with EDD. In August 2020, Bank of America froze her
12   Account. In April 2021, Bank of America unfroze her Account. Since June 2020,
13   Bank of America has yet to credit her any money. Due to Bank of America's
14   actions, she missed her $1,950 rent payments from October 2020 to March 2021,
15   leading to her eviction in March 2021. She was unable to pay her $384 car payment
16   from August 2020 to September 2020, leading to car repossession in September
17   2020. She cannot afford her $320 car registration. From August 2020 to the present,
18   she has not been able to afford her $300 car payments, her $67 monthly phone bill,
19   her $120 monthly WIFI bill, or her $146 monthly electricity bill. She lost her son
20   to foster care after failing to pay for his schooling. She struggles to buy food, gas,
21   and clothing.

22       523.   Colton Wood is a California resident. In April 2020, he began
23   receiving EDD benefits through Bank of America. In December 2020, Bank of
24   America illegally froze his Account. In December 2020, he contacted Bank of
25   America, who told him the freeze was due to suspected fraudulent activity;
26   however, he never experienced any fraud on the Account. In December 2020, Bank
27   of America unfroze his Account; however, Bank of America immediately froze the
28   Account again. Since December 2020, Bank of America has yet to unfreeze his

1   Account. Since December 2020, Bank of America has yet to credit him any money.

2   Due to Bank of America's actions, he missed his $680 rent payment, leading to

3   eviction and subsequent homelessness. He cannot afford his $92 monthly phone

4   bill. He struggles to buy food, gas, and clothing. He suffers from emotional distress.

5   524.   Matthew Yeats is a California resident. In March 2020, he began

6   receiving EDD benefits through Bank of America. In December 2020, he

7   experienced fraud on his Account, totaling approximately $2,800. In December

8   2020, he discovered the fraud. In December 2020, he reported the fraud to Bank of

9   America via phone. In response, Bank of America transferred him between

10   departments, refusing to give an answer, and often dropping his call altogether. In

11   December 2020, Bank of America illegally froze his Account. In February 2021,

12   Bank of America unfroze his Account. Since December 2020, Bank of America has

13   yet to credit him any money. Due to Bank of America's actions, he missed rent

14   twice, totaling $1,600 in December 2020 and January 2021. He was late on two cell

15   phone payments at $90 per month. He has missed three child support payments at

16   $300 per month between December 2020 and February 2021.

17   525.   Glen Young is a California resident. In June 2020, he began receiving

18   EDD benefits through Bank of America. In June 2020, he experienced fraud on his

19   Account, totaling approximately $7,500. In June 2020, he discovered the fraud

20   when he contacted Bank of America since Bank of America had not sent him a Card

21   with access to his funds. In June 2020, he reported the fraud to Bank of America

22   via phone. In response, Bank of America blamed him for the fraud on his Account,

23   stating he was responsible for the fraud. In October 2020, Bank of America credited

24   $7,000 to his Account; however, Bank of America reversed the credit, reporting his

25   Account at a balance of negative $7,000. Since October 2020, Bank of America has

26   yet to credit his Account. Due to Bank of America's actions, he had his car

27   repossessed. He could not pay his rent at $500 per month and was forced to be

28   homeless and live out of his car with his wife and four dogs. He cannot pay his

1    insurance registration at $400. He cannot afford to pay for his car insurance at $70
2    per month. He cannot afford to buy food, gas, other daily necessity items, or to keep
3    up his personal hygiene, meaning he cannot get a job, as no one will hire him.

4    526.   Christopher Zettlemoyer is a California resident. In May 2020, he
5    began receiving EDD benefits through Bank of America. In April 2021, he
6    experienced fraud on his Account. In April 2021, he discovered the fraud when he
7    checked his Account balance. In July 2020, Bank of America froze his Account. In
8    October 2020, Bank of America unfroze his Account. Since October 2020, Bank of
9    America has yet to credit him any money to his Account. Due to Bank of America's
10   actions, he missed two rent payments. He missed his car insurance. He was unable
11   to afford medication for his diabetic aunt. He missed two car payments. He was late
12   on phone bills and credit card bills. He struggles buying food, gas, and clothing.

13                      **V.    CLASS ACTION ALLEGATIONS**

14   527.   Class Representative Plaintiffs bring this lawsuit individually and as a
15   class action pursuant to Federal Rule of Civil Procedure 23, seeking declaratory and
16   injunctive relief and damages on behalf of a class defined as follows (the "Class"):

17          All persons who were Bank of America EDD Debit Cardholders at any time
18          between January 1, 2020 and the present ("Class Period"), and whose
            eligibility for benefits EDD has not revoked for failure to establish valid
19          identity.

20
21   528.   Plaintiffs further seek declaratory and injunctive relief, restitution,
22   disgorgement, and statutory and actual damages on behalf of the following
23   Subclasses:

24          **Claim Denial Subclass:** All Class Members who, during the Class Period,
25          gave the Bank notice of a claim that an unauthorized transaction had occurred
            on their Account ("Claim") and whose Claim the Bank closed or denied
26          based on application of the Claim Fraud Filter.

27
28

**Credit Rescission Subclass:** All Class Members who, during the Class Period, received provisional or permanent credit from the Bank in connection with their Claim, which the Bank rescinded more than 45 days after the Class Member gave notice of the Claim.

**Account Freeze Subclass:** All Class Members whose EDD Debit Card Account the Bank froze during the Class Period based on application of the Claim Fraud Filter and later unfroze or later converted from frozen to blocked status and then unblocked.

**Account Block Subclass:** All Class Members whose EDD Debit Card Account the Bank blocked during the Class Period based on application of the Claim Fraud Filter and later unblocked.

**Failure to Unfreeze Subclass:** All Class Members whose EDD Debit Card Account the Bank froze or blocked during the Class Period and did not unfreeze or unblock after EDD instructed the Bank to unfreeze the Class Member's Account or informed the Bank that EDD had verified the Class Member's identity.

**Security Breach Subclass:** All Class Members whose Card, Account, or other personal information in the possession of the Bank or its agents was, during the Class Period, accessed or taken by a third party without the Class Member's consent.

**EMV Chip Subclass:** All Class Members whose EDD Debit Card, during the Class Period, did not include an EMV chip, and whose Card, Account, or other personal information was accessed or taken from the Card by a third party without the Class Member's consent.

529.   Plaintiffs reserve the right under Rule 23 to amend or modify the Class and Subclass descriptions and/or add one or more subclasses based on information obtained in the course of this litigation.

530.   All Class Members have suffered or are threatened with imminent injury during the Class Period, caused by Defendants' wrongful acts and omissions, as alleged herein.

531.   This action has been brought and may properly be maintained as a class action against Defendants pursuant to the following provisions of Rule 23.

a.   **Numerosity (Rule 23(a)(1))**: The members of the Class and each Subclass are so numerous that their individual joinder is impracticable. Bank of America provided millions of EDD benefits recipients with EDD Debit Cards that used only outdated magnetic stripe technology (no EMV chip) and subjected these individuals to an undue risk of experiencing fraudulent transactions on their EDD Debit Cards and Accounts. The identities of, and contact information for, those individuals may readily be obtained through the Bank's business records or the business records of its affiliated entities. Tens of thousands of EDD Debit Cardholders reported unauthorized transactions to the Bank and had their unauthorized transaction claims summarily closed or denied by the Bank without explanation and without issuance of provisional or permanent credit. Of those unauthorized transaction claims, at least 29,000 claims have since been reconsidered and paid, including under the Preliminary Injunction procedures. In addition, tens of thousands of EDD Debit Cardholders have had their Cards and Accounts frozen or blocked by the Bank.

b.   **Commonality and Predominance (Rule 23(a)(2) and 23(b)(3))**: Many questions of law and fact are common to the Class and Subclasses. These questions predominate over any questions affecting only individual Class Members. These common legal and factual issues include, but are not limited to:

i.   Whether the Bank had or has a policy and/or practice of denying EDD Debit Cardholders' unauthorized transaction claims without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction, including denying claims based solely on the results of the Claim Fraud Filter.

ii.   Whether the Bank had or has a policy and/or practice of denying EDD Debit Cardholders' unauthorized transaction claims without providing the Cardholder with a report of the results of the Bank's investigation of the claim that includes a written explanation of the Bank's findings.

iii.   Whether the Bank had or has a policy and/or practice of not provisionally or permanently crediting the Accounts of EDD Debit Cardholders in the amount of an unauthorized transaction claim within 10 business days of the Bank receiving notice of the claim, and without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction.

iv.   Whether the Bank had or has a policy and/or practice of knowingly and willfully denying EDD Debit Cardholders' unauthorized transaction claims.

v.   Whether the Bank had or has a policy and/or practice of automatically freezing the EDD Debit Card Accounts of Cardholders who report unauthorized transactions, including based solely on the results of the Claim Fraud Filter.

vi.   Whether the Bank had or has a policy and/or practice of failing to provide its customer service representatives with the training, tools, or authority necessary to reasonably assist EDD Debit Cardholders who call about resolving their unauthorized transaction claims or unfreezing their Accounts.

vii.   Whether the Bank violated or is violating EFTA and Regulation E by having a policy and/or practice of denying EDD Debit Cardholders' unauthorized transaction claims without having

1    conducted a good-faith investigation that results in the Bank
2    having a reasonable basis for believing that the Cardholder
3    authorized or benefitted from the transaction, including denying
4    claims based solely on the results of the Claim Fraud Filter.

5    viii.   Whether the Bank violated or is violating EFTA and Regulation
6    E by having a policy and/or practice of denying EDD Debit
7    Cardholders' unauthorized transaction claims without providing
8    the Cardholder with a report of the results of the Bank's
9    investigation of the claim that includes a written explanation of
10    the Bank's findings.

11    ix.   Whether the Bank is violating or violated EFTA and Regulation
12    E by having a policy and/or practice of not provisionally or
13    permanently crediting the Accounts of EDD Debit Cardholders
14    in the amount of an unauthorized transaction claim within 10
15    business days of the Bank receiving notice of the claim, and
16    without having conducted a good-faith investigation that results
17    in the Bank having a reasonable basis for believing that the
18    Cardholder authorized or benefitted from the transaction.

19    x.   Whether the Bank is a state actor under the "public function"
20    test, the "joint action" test, or any other test for state action
21    status.

22    xi.   Whether the Bank violated Plaintiffs' and Class Members'
23    federal or state due process rights by having a policy and/or
24    practice of automatically and indefinitely freezing and/or
25    blocking their EDD Debit Card Accounts, without providing
26    them with adequate notice or an opportunity to be heard, when
27    they report unauthorized transactions on their Accounts.

28

xii.   Whether the Bank owed a duty of care to Plaintiffs and Class Members, including because of the fiduciary relationship between the Bank and its EDD Debit Cardholders, under the EDD–Bank Contract, under the Cardholder Agreement, or under any other contract between the Bank and Cardholders.

xiii.   Whether Plaintiffs and Class Members are third-party beneficiaries of the EDD–Bank Contract.

xiv.   Whether the Bank breached its duties to Plaintiffs and Class Members, including by using outdated fraud-prevention technology in its EDD Debit Cards and Accounts, by not adequately monitoring EDD Debit Cards and Accounts for suspicious activity, by not conducting appropriate follow-up or investigation when unauthorized transaction claims were made, by failing to comply with EFTA and its own "Zero Liability" policy, and by otherwise failing to make Plaintiffs and Class Members whole for unauthorized transactions on their Accounts.

xv.   Whether the Bank acted negligently in its hiring, supervision, and retention of TTEC and other subcontractors and agents who have access to Plaintiffs' and Class Members' sensitive Cardholder Information.

xvi.   Whether TTEC was the Bank's actual, apparent, or ostensible agent in its negligent hiring, supervision, and retention of employees who mishandled or misappropriated Plaintiffs' and Class Members' sensitive Cardholder Information.

xvii.   Whether the Bank should be enjoined from freezing EDD Debit Card Accounts or from failing to take the reasonable steps necessary to avoid causing additional future harm to Plaintiffs

and Class Members as the result of the Bank's acts and omissions alleged herein.

xviii.   Whether the Bank should pay damages and interest or provide restitution, reimbursement, and/or other relief to Plaintiffs and Class Members.

c.   **Typicality (Rule 23(a)(3))**: Class Representative Plaintiffs' claims are typical of the claims of the members of the putative Class. Class Representative Plaintiffs, like all other members of the putative Class, sustained economic and other damages as a result of the Bank's wrongful acts and omissions as alleged herein. Class Representative Plaintiffs and members of the putative Class were and are similarly or identically harmed by the Bank's same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct as alleged herein.

d.   **Adequacy of Representation (Rule 23(a)(4))**: Class Representative Plaintiffs will fairly and adequately represent and protect the interests of the putative Class Members and have retained competent and qualified counsel with extensive experience in complex litigation and class action litigation. There are no material conflicts between the claims of the Class Representative Plaintiffs and the members of the putative Class that would make class certification inappropriate. Counsel for the putative Class will vigorously prosecute the claims of all putative Class Members.

532.   This action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure for the following reasons:

a.   **Class Action Status (Rule 23(b)(1)):** Class action status is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the thousands of putative Class Members would create a risk of establishing incompatible standards of conduct for the Bank and inconsistent results for Class Members. Class action status is also appropriate under Rule 23(b)(1)(B) because prosecution of separate actions by putative Class Members would create a risk of

adjudication with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action or would substantially impair or impede their ability to protect their interests.

b. **Declaratory and Injunctive Relief (Rule 23(b)(2))**: Certification under Rule 23(b)(2) is appropriate because the Bank acted or refused to act on grounds generally applicable to the putative Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the putative Class as a whole.

c. **Predominance and Superiority (Rule 23(b)(3))**: Certification of the Subclasses under Rule 23(b)(3) is appropriate because questions of law or fact common to putative Subclass Members predominate over any questions affecting only individual members, and because class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

d. **Issue Certification (Rule 23(c)(4))**: Certification of issues of liability and statutory and treble damages under Rule 23(c)(4) is appropriate because these issues are common to putative Class Members and resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

e. The Class and each Subclass is ascertainable from the Bank's own records, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member and each Subclass Member were infringed or violated in the same or similar fashion.

# VI.   CLAIMS FOR RELIEF[28]

## FIRST CLAIM FOR RELIEF

### VIOLATIONS OF THE ELECTRONIC FUND TRANSFERS ACT
### 15 U.S.C. §§1693 et seq.; 12 C.F.R. §§1005.1 et seq.

(Brought by All Plaintiffs)

533.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

534.   Plaintiffs bring this cause of action pursuant to the Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. §§1693 et seq., and Regulation E of EFTA, 12 C.F.R. §§1005.1–1005.20.

535.   Plaintiffs and Class Members provided notice to Bank of America within 60 days after Bank of America sent a period statement reflecting an unauthorized transaction (which is an "error" under Regulation E) consistent with 15 U.S.C. §1693f and 12 C.F.R. §1005.11. As reflected (or should be reflected in Bank of America's own records, absent the customer service failures alleged herein), Plaintiffs and Class Members provided sufficient information to identify the unauthorized transaction and reasons for their belief that the transaction was unauthorized.

536.   Bank of America violated 15 U.S.C. §1693f and 12 C.F.R. §1005.11, including but not limited to through its implementation of each of the following policies and/or practices:

a.   Adopting and implementing policies and practices designed to circumvent the Bank's statutory and regulatory obligations under 15 U.S.C. §1693f and Regulation E, including by frustrating and obstructing Plaintiffs' and Class Members' efforts to submit unauthorized transaction claims and by denying their

---

[28] Class Representative Plaintiffs do not incorporate the Individual Plaintiffs' Allegations (appearing *supra* at ¶¶286–526) into any of the Claims for Relief brought by Class Representative Plaintiffs.

claims without having conducted a reasonable investigation or having a reasonable basis for believing that the Cardholder had authorized or benefitted from the transaction in question;

b.      Failing to provide provisional credit to Plaintiffs and Class Members relating to error investigations that could not be resolved within 10 business days;

c.      Not issuing provisional credit to Plaintiffs and Class Members within 10 business days of the Bank receiving notice the Plaintiff's or Class Member's unauthorized transaction claim, despite the Bank having no intention of conducting a good-faith investigation of the claim within 10 business days, and despite not completing a good-faith investigation of the claim within 10 business days;

d.      Failing to conduct good-faith investigations into alleged errors or unauthorized transactions that Plaintiffs and Class Members timely reported to the Bank;

e.      Failing to conduct good-faith investigations into the alleged errors or unauthorized transactions within 45 days of the date that the Plaintiff or Class Member timely reported the alleged error or unauthorized transaction;

f.      Denying Plaintiffs' and Class Members' claims of error without having conducted a good-faith investigation, including by denying claims based solely on the results of the Bank's automated and highly unreliable and inaccurate Claim Fraud Filter;

g.      Denying Plaintiffs' and Class Members' claims of error without having a reasonable basis for concluding that their Accounts were not in error, and where the Bank could not reasonably have drawn its conclusion that no error occurred based on the evidence available to the Bank at the time;

h.      Denying Plaintiffs' and Class Members' claims of error without providing a report of the results of the Bank's investigation of the claim that

includes a written explanation of the Bank's findings.

        i.     Failing to credit Plaintiffs' and Class Members' EDD Debit Card Accounts with interest on the amounts of unauthorized transactions that Bank wrongly denied, for the period during which Plaintiffs and Class Members were without access to those funds;

        j.     Freezing Plaintiffs' and Class Members' EDD Debit Card Accounts in order to avoid the Bank's legal obligations and to prevent Plaintiffs and Class Members from accessing their funds; and

        k.     Unilaterally reopening claims of error long after they had already been resolved in the EDD Debit Cardholders' favor and debiting the amounts previously credited to the Cardholder's Account, without basis to do so.

537.   In situations where Bank of America has violated Regulation E by failing to provisionally credit Plaintiffs' and Class Members' EDD Debit Card Accounts within 10 business days of the reported error, the Bank has neither conducted a good faith investigation nor had a reasonable basis for believing that the Account was not in error. Plaintiffs and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

538.   Bank of America knowingly and willfully concluded that Plaintiffs' and Class Members' EDD Debit Card Accounts were not in error when such conclusion could not reasonably have been drawn from the evidence available to the Bank at the time of its investigation. Plaintiffs and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

539.   Bank of America violated EFTA and Regulation E by failing to limit Plaintiffs' and Class Members' liability as required by 15 U.S.C. §1693m and 12 C.F.R. §1005.6(b).

540.   Plaintiffs provided notice to Bank of America less than two business days after learning of the fraudulent transactions that occurred in their EDD Debit Card Accounts. Under 12 C.F.R. §1005.6(b)(1), Plaintiffs' and Class Members'

1   liability is capped at $50 in these circumstances. Bank of America has subjected
2   Plaintiffs and Class Members to far greater than $50 in liability through its wrongful
3   conduct as alleged herein.

4       541.   Under 12 C.F.R. §1005.6(b)(2), $500 is the maximum liability that
5   may be imposed on an accountholder who does not provide notice to the financial
6   institution within two business days after learning of a suspected unauthorized
7   transaction. Bank of America has subjected Plaintiffs and Class Members to far
8   greater than $500 in liability through its wrongful conduct as alleged herein.

9       542.   Regarding any Class Members who did not provide Bank of America
10  with actual notice within two business days of learning of a suspected unauthorized
11  transaction, the Bank was on constructive notice, under 12 C.F.R.
12  §1005.6(b)(5)(iii), of widespread unauthorized electronic fund transfers from EDD
13  Debit Card Accounts since the beginning of the COVID-19 pandemic. Since that
14  time, countless unauthorized fund transfers have occurred and continue to occur
15  from those Accounts. The volume of calls from EDD Debit Cardholders to the
16  Bank's customer service to report unauthorized transactions has been, and
17  continues to be, so great, and the Bank's customer service department is so
18  understaffed, that the Bank routinely causes EDD Debit Cardholders to wait on hold
19  for multiple hours. The widespread fraud specifically targeting EDD Debit
20  Cardholders has been widely reported in the media and has been the subject of
21  significant attention from California legislators.

22      543.   In no event should any Class Member be liable for over $500 of
23  damages under 12 C.F.R. §1005.6. Bank of America has violated 12 C.F.R. §1005.6
24  by imposing hundreds and thousands of dollars of liability on unemployed
25  Californians.

26      544.   As a direct and proximate result of Bank of America violations of
27  Regulation E, Plaintiffs and Class Members have lost money.

28      545.   Plaintiffs, on behalf of themselves and the Class, seek an injunction

1    barring Bank of America from denying provisional credit and denying fraud claims
2    without having timely conducted a good faith investigation of the alleged fraud and
3    without a reasonable basis for believing that the transaction was authorized, and
4    barring Bank of America from otherwise violating EFTA and Regulation E.
5    Plaintiffs, on behalf of themselves and the applicable Subclasses, further seek the
6    following relief: (a) actual damages with interest; (b) restitution of all EDD benefits
7    funds improperly debited by Bank of America; (c) statutory damages pursuant to
8    15 U.S.C. §1693m; (d) treble damages pursuant to 15 U.S.C. §1693f(e); and
9    (e) incidental and consequential damages suffered due to their inability to pay bills
10   or otherwise use their unemployment funds.

11                        **<u>SECOND CLAIM FOR RELIEF</u>**
12          **VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT**
13                      **Cal. Civ. Code §§1798.100 et seq.**
14       (Brought by Class Representative Plaintiffs and Individual Plaintiffs in the
15    *Abarr*, *Alvarez*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, *Rojas de Charolet*,
16                         *Talia*, and *Verdun* Actions)

17          546.   Plaintiffs repeat and incorporate by reference each and every allegation
18    set forth above, as though fully set forth here.

19          547.   The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code
20    §§1798.100 et seq., imposes a duty on businesses to take reasonable steps to protect
21    consumers' nonencrypted and nonredacted personal information, and provides a
22    private right of action to consumers whose nonencrypted and nonredacted personal
23    information has been subjected to unauthorized access and exfiltration, theft, or
24    disclosure as a result of a defendant business's breach of its duty to take reasonable
25    steps to protect that information.

26          548.   Plaintiffs and Class Members are "consumers" as defined in the
27    CCPA.

28          549.   Bank of America is a "business" as defined in the CCPA.

550.    Bank of America directly or indirectly collected Plaintiffs' and Class Members' personal information as defined in Cal. Civ. Code §1798.81.5(d)(1)(A), including but not limited to Plaintiffs' and Class Member's first names or first initials, last names, and account numbers or credit or debit card numbers (including but not limited to Plaintiffs' and Class Members' EDD Debit Card and Account numbers), in combination with any required security codes, access codes, or passwords that would permit access to Plaintiffs' and Class Members' financial accounts.

551.    On information and belief, Bank of America collected, stored, and/or transmitted Plaintiffs' and Class Members' personal information in a nonencrypted and nonredacted form or in some other form that permitted unauthorized third parties to access that information in violation of the CCPA.

552.    Bank of America had a duty under the CCPA to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiffs' and Class Members' personal information.

553.    Bank of America breached its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiffs' and Class Members' personal information by, among other things: (a) issuing EDD Debit Cards to Plaintiffs and Class Members with magnetic stripes but without EMV chip technology; (b) collecting Plaintiffs' and Class Members' personal information in an unsecure manner; (c) transmitting Plaintiffs' and Class Members' personal information in unencrypted or otherwise inadequately secured form or channels; (d) storing Plaintiffs' and Class Members' personal information, or permitting said information to be stored on unsecured or inadequately secured data storage devices, including at EDD; and (e) failing to take reasonable steps to ensure that its subcontractors and their employees and agents, including CSRs and other Call Center agents, maintained the confidentiality of Cardholders' personal information, including by failing to ensure that all such agents were subject to

background checks before or after being hired and failing to provide such agents proper training and supervision regarding their handling and maintaining the confidentiality of Cardholders' personal information, and by failing to secure Cardholders' personal information from unnecessary and unauthorized access by subcontractors' employees and others.

554.   Bank of America further failed to implement and maintain reasonable security measures by transmitting information regarding Plaintiffs' and Class Members' EDD Debit Cards to, and storing it on, unsecured or inadequately secured data storage devices, including at EDD.

555.   As a direct and proximate result of Bank of America's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiffs' and Class Members' personal information, Plaintiffs and Class Members suffered unauthorized access and exfiltration, theft, or disclosure of their nonencrypted and nonredacted personal information. Plaintiffs and Class Members never authorized such disclosure of their personal information.

556.   Bank of America knew or should have known that issuing EDD Debit Cards with magnetic stripes but without EMV chip technology was not a reasonable security procedure or practice appropriate to the nature of Plaintiffs' and Class Members' personal information and that a data breach resulting in the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and Class Members' personal information was clearly foreseeable.

557.   As a direct and proximate result of the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and Class Members' nonencrypted and nonredacted personal information, Plaintiffs and Class Members were injured and lost and continue to lose money or property, including but not limited to the monetary value of unauthorized transactions on the EDD Debit Cards issued by the Bank, the loss of Plaintiffs' and Class Members' protected privacy interests in the

1   confidentiality and privacy of their personal information, nominal damages, and
2   additional losses as described above.

3   558.   Plaintiffs and Class Members seek relief under Cal. Civ. Code
4   §1798.150(a), including but not limited to recovery of actual damages, injunctive
5   relief, declaratory relief, its costs of suit, attorney's fees pursuant to Cal. Code Civ.
6   Proc. §1021.5 or other appliable law, and any other relief the Court deems proper.

7   559.   On January 25, 2021, Class Representative Plaintiffs Smith and
8   Karam, through their undersigned counsel, on behalf of themselves and all others
9   similarly situated, sent a letter to Bank of America's registered agent for service of
10  process via FedEx, notifying Bank of America of its violations of Cal. Civ. Code
11  §1798.150(a) and demanding that the Bank cure them. That letter was delivered by
12  FedEx the following morning, on January 26, 2021. Bank of America did not
13  respond to the letter, and did not cure the noticed violations or provide Plaintiffs
14  with an express written statement that the violations had been cured and that no
15  further violations would occur, within 30 days after receiving the letter. Thereafter,
16  on March 1, 2021, Smith and Karam filed their Class Action Complaint in an action
17  that has now been consolidated into this matter. As a result, class-wide statutory
18  damages may be initiated against the Bank pursuant to Civ. Code §1798.150(b).

19  560.   On or about January 26, 2021, Plaintiffs Oosthuizen and Mathews,
20  through their undersigned counsel, each submitted a notice to Bank of America
21  pursuant to Cal. Civ. Code §1798.150(b) on behalf of themselves and all others
22  similarly situated, informing the Bank of its violations of the CCPA. The Bank did
23  not cure those violations or provide Plaintiffs with an express written statement that
24  the violations had been cured and that no further violations shall occur, as required
25  by the CCPA within 30 days after such notice. As a result, class-wide statutory
26  damages may be initiated against the Bank pursuant to Cal. Civ. Code
27  §1798.150(b).

28

561.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek relief under Cal. Civ. Code §1798.150(a), including but not limited to recovery of actual damages, statutory damages, injunctive relief, declaratory relief, its costs of suit, attorney's fees pursuant to Cal. Code Civ. Proc. §1021.5 or other appliable law, and any other relief the Court deems proper.

### THIRD CLAIM FOR RELIEF

**VIOLATIONS OF THE CALIFORNIA CUSTOMER RECORDS ACT**

**Cal. Civ. Code §§1798.80 et seq.**

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, and *Robinson* Actions)

562.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

563.    To ensure that personal information about California residents is protected, the California Legislature enacted the California Customer Records Act, which requires businesses suffering a data breach to promptly notify all persons whose "unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code §1798.82.

564.   Bank of America is a "business" within the meaning of Cal. Civ. Code §1798.80(a).

565.   Plaintiffs and Class Members are "individual[s]" within the meaning of Cal. Civ. Code §1798.80(d). Pursuant to Civ. Code §§1798.80(e) and 1798.82(h), "personal information" includes an individual's name, social security number, driver's license or state identification card number, and debit card and credit card information. "Personal information" under Civ. Code §1798.80(e) also includes address, telephone number, employment, and employment history.

566.   Bank of America maintains computerized data that includes personal information of Plaintiffs and Class Members. The security of that data was breached, resulting in unauthorized third parties fraudulently accessing Plaintiffs'

1    and Class Members' EDD Debit Card Accounts.

2        567.   The notification of such a breach required by Cal. Civ. Code §1798.82

3    must be made "immediately following discovery."

4        568.   By failing to promptly notify all affected Plaintiffs and Class Members

5    that their unencrypted personal information had been acquired (or was reasonably

6    believed to have been acquired) by unauthorized persons, Bank of America violated

7    Cal. Civ. Code §1798.82.

8        569.   The notification required by Cal. Civ. Code §1798.82 must be made in

9    plain language, list the information that was or is reasonably believed to have been

10   compromised, identify the date and time of the breach, state whether law

11   enforcement delayed the notice, provide a "general description of the breach

12   incident," and provide the "toll-free telephone numbers and addresses of the major

13   credit reporting agencies if the breach exposed a social security number or a driver's

14   license or California identification card number."

15       570.   Bank of America was required to provide the notification required by

16   Cal. Civ. Code §1798.82 to over 500 persons and was required to provide a sample

17   copy of its notification to the California Attorney General.

18       571.   Bank of America did not provide such notice, and thus did not provide

19   notice "in the most expedient time possible and without unreasonable delay," as

20   required by Cal. Civ. Code §1798.82.

21       572.   Bank of America's conduct as alleged herein was reckless and/or

22   deliberate.

23       573.   Plaintiffs and Class Members were injured by Bank of America's

24   violations of Cal. Civ. Code §1798.82. Bank of America's exposure of Plaintiffs'

25   and Class Members' personal information to unauthorized third parties resulted in

26   Plaintiffs and Class Members losing access to EDD benefits to which they are

27   entitled; exposed Plaintiffs and Class Members to increased risk of identity theft;

28   and reduced the value of Plaintiffs' and Class Members' personal information. Bank

of America's failure promptly to notify Plaintiffs and Class Members of the exposure of their personal information to unauthorized third parties as required by §1798.82 prevented Plaintiffs and Class Members from taking measures to prevent or mitigate these harms, including but not limited to by withdrawing or transferring funds from their Accounts before those funds were fraudulently removed or before those Accounts were frozen by Bank of America, and by closing Accounts and placing credit alerts on their Accounts to reduce the risk of identity theft.

574.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek all remedies available under Cal. Civ. Code §1798.84, including, but not limited to, actual damages and injunctive relief.

## FOURTH CLAIM FOR RELIEF

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW

### Cal. Bus. & Prof. Code §§17200 et seq.

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Alvarez*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, *Rojas de Charolet*, *Talia*, and *Verdun* Actions)

575.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

576.   California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §§17200 et seq.

577.   Bank of America's "unfair" acts and business practices include, among other things, the Bank's actions or inactions in: (a) failing to maintain, store, share, transmit, or otherwise use Plaintiffs' and Class Members' personal information (as defined under the CCPA) and Cardholder Information in a secure manner; (b) failing to issue EDD Debit Cards with EMV chips, despite having for years been aware of the risks associated with magnetic stripe technology and despite knowing the heightened vulnerability of EDD Debit Cardholders and their Accounts and

those Cardholders' heightened interest in securely, reliably, and timely accessing their EDD benefits; (c) failing to respond to the rise in demand for EDD benefits caused by or related to the COVID-19 pandemic by issuing chip cards; (d) falsely representing to Plaintiffs, Class Members, and EDD that it would provide "best-in-class" fraud monitoring and that it would remain "at the forefront of fraud and data security strategies benefiting the EDD and [EDD's] claimants"; (e) failing to protect Plaintiffs and Class Members from unauthorized transactions, including by failing to use readily available EMV chip technology in its EDD Debit Cards rather than outdated magnetic stripe technology that the Bank knew was susceptible to fraud; (f) failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify Plaintiffs and Class Members about suspicious transactions involving their Cards and Accounts, including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff or Class Member's Card and Account transaction history and past Account access behaviors; (g) failing to provide reasonable or adequate customer service assistance to Plaintiffs and other Class Members who complained of fraud, despite representing to them that such assistance would be available "24/7," and despite the Bank's awareness of rampant third-party fraud on EDD Debit Cards and Accounts; (h) establishing "customer service" procedures designed to frustrate and obstruct efforts by Plaintiffs and Class Members to file their fraud claims; (i) failing to adequately investigate and resolve Plaintiffs' and Class Members' claims of unauthorized transactions in a timely manner despite the Bank's promised "Zero Liability" policy for unauthorized transactions; (j) failing to extend provisional credit to Plaintiffs and Class Members in cases where the Bank was unable to timely investigate and resolve fraud claims; (k) automatically denying Plaintiffs' and Class Members' claims of unauthorized transactions

without investigation, explanation, or reasonable basis, including based solely on the results of a highly unreliable "fraud filter"; (l) rescinding, without explanation or legitimate basis, "permanent" credits the Bank had previously paid to EDD Debit Cardholders upon determining fraud had occurred in their Account; (m) freezing and/or blocking EDD Debit Card Accounts without a reasonable basis for believing that the Cardholders themselves had committed fraud, including based solely on the results of a highly unreliable "fraud filter," and for longer than it would reasonably take to investigate any such belief, all while failing to provide Cardholders any advance notice, prompt post-freeze notice, or any reasonable means of contesting the purported basis for the Account freeze; (n) freezing and/or blocking EDD Debit Card Accounts not to protect the Cardholders but to protect the Bank's own interests; and (o) failing to provide reasonable or adequate customer service to Plaintiffs and other Class Members seeking assistance in obtaining reimbursement for third-party fraud on their Accounts or in accessing their frozen Accounts, despite the Bank's representation in its 2015 RFP Response that "[u]nemployment and disability payments are critical, often times providing claimants the ability to secure housing or purchase necessary medical prescriptions."

578.   Bank of America's acts, omissions, and conduct as alleged herein are "unfair" under the UCL because those acts, omissions, and conduct offend public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class Members. The harm caused by Bank of America's conduct outweighs any potential benefits attributable to such conduct. There were reasonably available alternatives to further the Bank's legitimate business interests, including issuing EDD Debit Cards with EMV chips and creating and implementing procedures and resources adequate to timely conduct good-faith investigations into reported unauthorized transactions and to otherwise timely resolve reports of fraudulent activity on EDD Debit Card Accounts.

579. Bank of America has engaged in "unlawful" acts and business practices by, as set forth herein, violating the Electronic Fund Transfers Act, 15 U.S.C. §1693, and Regulation E; the California Consumer Privacy Act, Cal. Civ. Code §§1798.100 et seq.; the California Consumer Records Act, Cal. Civ. Code §§1798.80 et seq.; the Due Process Clauses of the U.S. and California Constitutions; and its common law obligations. Bank of America has further engaged in "unlawful" acts and business practices by violating the (a) the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§6801 et seq., and regulations promulgated thereunder (*see, e.g.*, 16 C.F.R. Parts 313, 314), which prohibit the Bank from disclosing its customers' nonpublic personal information to a nonaffiliated third party and require the Bank to take reasonable steps to protect the security and confidentiality of its customers' nonpublic personal information against anticipated security threats or hazards and unauthorized access or use (*see infra* ¶¶580–581), and (b) the California Financial Information Privacy Act ("CFIPA"), Cal. Fin. Code §§4050 et seq., which prohibits the Bank from negligently disclosing or sharing a consumer's nonpublic personal information with nonaffiliated third parties without the consumer's explicit prior consent (*see infra* ¶582).

580. The Bank is subject to the GLBA because it is a financial institution as defined under 15 U.S.C. §6809(3)(A), and is subject to the GLBA Safeguards Rule, 16 C.F.R. Part 314, because it is a financial institution that handles and maintains nonpublic personal information, as defined by 16 C.F.R. §313.3(n), including Plaintiffs' and Class Members' nonpublic personal information. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. §6801(b), requires financial institutions such as the Bank to protect the security, confidentiality, and integrity of customer information by developing, implementing, and maintaining a written comprehensive information security program that contains administrative, technical, and physical safeguards that are appropriate to the financial institution's size and complexity, the nature and scope

of its activities, and the sensitivity of the customer information at issue, including by (a) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (b) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (c) overseeing service providers by taking reasonable steps to select and retain service providers that are capable of maintaining appropriate safeguards for customer information, and requiring service providers by contract to implement such safeguards; and (d) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§314.3, 314.4.

581.   Throughout the Class Period, the Bank has violated each of the above requirements of the Safeguard Rule by failing to adequately secure Plaintiffs' and Class Members' nonpublic personal information, including when the Bank transferred that information to EDD and to the Bank's service providers, including but not limited to TTEC, and by failing to oversee its service providers' compliance with Safeguards Rule in connection with Plaintiffs' and Class Members' nonpublic personal information. Specifically, the Bank failed to take adequate steps to evaluate whether its service providers, including but not limited to TTEC, were capable of and actually were reasonably protecting Cardholders' nonpublic personal information. This failure violated the Safeguards Rule. On information and belief, the Bank also failed to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and failed to assess the sufficiency of any its own and its service providers' safeguards in place to control those risks. These failures also violated the Safeguards Rule.

582.   The Bank is subject to the CFIPA because it is a financial institution

as defined under Cal. Fin. Code §4052(c). The CFIPA prohibits from Bank from selling, sharing, transferring, or otherwise disclosing a consumer's nonpublic personal information to third parties without the consumer's explicit prior consent. *Id.* §§4052–4052.5, 4057. Nonpublic personal information under CFIPA is defined broadly to include any nonpublic personal financial information about the consumer that the Bank obtains from any source, including from the consumer, from transacting with the consumer, or from performing a service for the consumer. *Id.* §4052(a). Throughout the Class Period, the Bank violated the CFIPA because it disclosed Plaintiffs' and Class Members' nonpublic personal information to third parties without Plaintiffs' and Class Members' prior consent. As a result of the Bank's violations, their nonpublic personal information fell into criminal hands, depriving Plaintiffs and Class Members of the EDD benefits to which they were lawfully entitled.

583.   As a result of Bank of America's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to the funds lost to fraud that have not been reimbursed, the lost time value of money not timely reimbursed by Bank of America, fees paid to Bank of America, and lost interest that would have accrued on funds during the period of time when the funds were unavailable due to Bank of America's failure to timely and adequately investigate claims of unauthorized transactions and other violations of the UCL.

584.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek restitution, disgorgement, and other equitable relief, including injunctive relief (a) prohibiting the Bank from continuing its unfair and unlawful business practices, and (b) requiring the Bank to take reasonable measures to prevent future unauthorized use of EDD Debit Cards and Accounts, and (c) requiring the Bank to ensure timely and adequate processing of Cardholders' claims regarding unauthorized or fraudulent use of their Cards or Accounts.

### FIFTH CLAIM FOR RELIEF

### NEGLIGENCE AND NEGLIGENCE PER SE

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Alvarez*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, *Rojas de Charolet*, *Talia*, and *Verdun* Actions)

585.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

586.   Plaintiffs and Bank of America have a special relationship that gives rise to the Bank's duties to Plaintiffs and Class Members to act reasonably to: (a) safeguard their UI and other EDD benefits; (b) protect their Cards and Accounts from fraudulent access by unauthorized third parties, including by employing reasonable practices and procedures to protect the confidentiality and security of their Cardholder Information and by employing reasonable practices and procedures to monitor for, detect, stop, and promptly notify Cardholders about suspicious transactions involving their Cards and Accounts; (c) provide them reasonable and adequate notice that their EDD Debit Cards and Accounts were at risk of being subject to unauthorized use or had been subjected to unauthorized use; (d) protect them from unreasonable interference with their right and ability to continue to collect, receive, and access the EDD benefits to which they were entitled; (e) ensure that the Bank's customer service staffing levels, technology, and operations were capable of providing Plaintiffs and Class Members reasonably timely and effective customer service, including to address those customers' concerns about fraudulent or unauthorized transactions related to their EDD Debit Cards or Accounts; (f) timely and adequately investigate and resolve Plaintiffs' and Class Members' claims regarding unauthorized or fraudulent transactions; and (g) extend to Plaintiffs and Class Members provisional credit in cases where the Bank failed to timely resolve their fraud-related claims.

587.   Bank of America breached its duty to Plaintiffs and Class Members by, among other things: (a) failing to maintain, store, share, transmit, or otherwise use their personal information (as defined under the CCPA) and Cardholder Information in a secure manner; (b) failing to issue them EDD Debit Cards with EMV chips, despite having been well aware for years of the risks associated with magnetic stripe technology; (c) failing to protect their Accounts from fraudulent access by unauthorized third parties; (d) failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify them about suspicious transactions involving their Cards and Accounts, including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff or Class Member's Card and Account transaction history and past Account access behaviors; (e) failing to give them reasonable and adequate notice that their EDD benefits were and remain at risk of being vulnerable to fraudulent and unauthorized transactions; (f) failing to respond to the dramatic increase in EDD benefits and EDD benefits recipients caused by or related to the COVID-19 pandemic by issuing EDD Debit Cards with EMV chips to all new and existing EDD Debit Cardholders and by taking other reasonably prudent security measures to prevent fraudulent and unauthorized transactions; (g) failing to ensure its customer service operation was capable of providing reasonably timely and effective assistance to Plaintiffs and Class Members, including when they were victims of fraudulent or unauthorized transactions; (h) failing to process Plaintiffs' and Class Members' claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner, including by unreasonably automatically freezing EDD Debit Card Accounts without prior notice, reasonable investigation, or an opportunity to be heard; and (i) failing to extend provisional credit to Plaintiffs and Class Members when Bank of America failed to resolve their claims regarding

1  fraudulent or unauthorized transactions in a reasonably timely and adequate
2  manner. Bank of America's misconduct was intended to adversely affect Plaintiffs
3  and Class Members, who rely on Bank of America to access their UI and other EDD
4  benefits through their EDD Debit Cardholder Accounts managed exclusively by
5  Bank of America.

6      588.   Bank of America's misconduct concerning its failure to safeguard
7  EDD Debit Cardholders' funds is contrary to industry standards, which include
8  prescribing use of EMV chip technology in debit cards, as well as its own policies
9  and procedures for its *non*-EDD debit and credit cards and accounts, each of which
10 are secured through EMV chip technology.

11     589.   Bank of America's misconduct concerning its failure to adequately
12 protect Plaintiffs' and Class Members' data also violates, as set forth in more detail,
13 its obligations under the California Consumer Privacy Act, Cal. Civ. Code
14 §§1798.100 et seq.; the Gramm-Leach-Bliley Act, 15 U.S.C. §§6801 et seq.; the
15 California Financial Information Privacy Act, Cal. Fin. Code §§4050 et seq.; and
16 the California Consumer Records Act, Cal. Civ. Code §§1798.80 et seq. Plaintiffs
17 and Class Members are within the classes of persons that each of these statutes are
18 designed to protect, and Bank of America's conduct caused the precise harm to
19 Plaintiffs and Class Members that each of these statutes was designed to prevent.

20     590.   Bank of America's failure to comply with the California Consumer
21 Privacy Act, the Gramm-Leach-Bliley Act, the California Financial Information
22 Privacy Act, and the California Consumer Records Act constitutes negligence
23 per se.

24     591.   The harms inflicted upon Plaintiffs and other Class Members were
25 reasonably foreseeable because the Bank was and is well aware of the security risks
26 associated with magnetic stripe technology, and knew or should have known that
27 its customer service resources and/or procedures were insufficient to consider,
28 evaluate, and appropriately resolve issues stemming from the significant increase

in EDD benefits and EDD benefits recipients due to the sharp rise in unemployment in the State of California caused by or related to the COVID-19 pandemic, as well as the sharp, well-publicized rise in financial fraud during the COVID-19 pandemic, both of which would foreseeably lead to an increased demand for customer service by Plaintiffs and Class Members for all purposes, including for the purposes of reporting and attempting to resolve claims of fraudulent or unauthorized transactions. It was a near certainty, which the Bank knew or should have known, that Plaintiffs and Class Members would suffer significant and irreparable harm as a result of the Bank's morally blameworthy actions that caused tens of thousands of unemployed Californians to lose access to past, present, and future EDD benefits for which they had been found eligible and on which they relied for their survival during the pandemic.

592.   As a direct and proximate result of Bank of America's misconduct, Plaintiffs and Class Members have been deprived of their EDD benefits and have failed to receive accrued interest thereon.

593.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

### SIXTH CLAIM FOR RELIEF

### NEGLIGENT HIRING, SUPERVISION, AND RETENTION

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Alvarez*, *Rojas de Charolet*, and *Verdun* Actions)

594.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

595.   Bank of America hired various subcontractors, including but not limited to TTEC Holdings, Inc. ("TTEC"), to provide customer service, call center operations, and other services for the Bank and to perform various functions and services under the terms of the EDD–Bank Contract. These subcontractors and their employees and agents, including Customer Service Representatives, have access to

1   highly sensitive and confidential EDD Debit Cardholder Information, including
2   Plaintiffs' and Class Members' personally identifiable information, Card and
3   Account data, and other financial data and information.

4       596.   Acting as the Bank's agent, TTEC negligently hired hundreds if not
5   thousands of employees *en masse* to perform services for the Bank without ever
6   conducting a background check on these individuals. Bank of America granted
7   these unvetted agents access to EDD Debit Cardholders' highly sensitive and
8   confidential Cardholder Information, and further failed to take reasonable steps to
9   secure Cardholder Information from unnecessary or unauthorized access,
10  disclosure, and exfiltration, including by its subcontractors' agents and employees.
11  Neither Bank of America itself nor TTEC provided proper training or supervision
12  to these agents regarding handling and maintaining the confidentiality of
13  Cardholder Information.

14      597.   Given the Bank's and TTEC's failure to conduct background checks
15  or to take other reasonable security measures in hiring employees *en masse* to serve
16  as Bank of America Customer Service Representatives and other Bank agents, it
17  was reasonably foreseeable that such unvetted agents would compromise the
18  security of Plaintiffs' and Class Members' confidential Cardholder Information.

19      598.   Bank of America's and its subcontractors' negligent hiring, training,
20  supervision, and retention of Customer Service Representatives and other agents
21  who have access to highly confidential Cardholder Information harmed and
22  continues to harm Plaintiffs and Class Members by subjecting them to unreasonable
23  risk of fraud and exfiltration of their Cardholder Information and enabled a series
24  of internal data breaches committed by TTEC employees within the scope of their
25  employment, which harmed the Class Members whose information was
26  compromised.

27      599.   Under the terms of the EDD–Bank Contract, Bank of America is
28  required to track and report all incidents or security breach exposures of confidential

information that may have compromised an EDD Debit Cardholder's confidential Cardholder Information or the integrity and secure delivery of EDD benefits to the Cardholder. Bank of America thus knew or should have known that TTEC was or became unfit or incompetent to perform the work for which it was hired, including as a result of its negligent hiring, training, supervision, and retention of agents with access to confidential Cardholder Information, yet Bank of America continued to retain TTEC as a subcontractor to perform services under the EDD–Bank Contract.

600.   TTEC at all relevant times has been the actual, apparent, and ostensible agent of Bank of America, who has ratified TTEC's actions.

601.   As a direct and proximate result of Bank of America's and its agents' misconduct, Plaintiffs and Class Members have been deprived of their EDD benefits and have failed to receive accrued interest thereon.

602.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## SEVENTH CLAIM FOR RELIEF

## BREACH OF CONTRACT

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* Actions)

603.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

604.   Each Plaintiff and Class Member entered into a Cardholder Agreement with the Bank that requires the Bank to administer EDD benefits to them through prepaid debit cards.

605.   The Cardholder Agreement provides, among other things: "Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to the amount of the transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions." The Cardholder

Agreement further provides: "We will determine whether an error occurred within 10 business days after we hear from you — and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

606.   The Cardholder Agreement also provides that the Bank "will add funds to your Account . . . in accordance with instructions from the EDD" and that "[f]unds are available for your use on the day we have been instructed by the EDD to fund your Account." Those also limit the circumstances under which the Bank may deprive EDD Debit Cardholders of access to their funds by freezing their EDD Debit Card Accounts. As relevant here, the Cardholder Agreement provides that if the Bank "suspect[s] irregular, unauthorized, or unlawful activities may be involved" with the Account, it may freeze the Account, but only "pending an investigation of such suspected activities."

607.   Plaintiffs and Class Members performed all or substantially all of the material requirements that their Cardholder Agreement with Bank of America imposed on them, and they fulfilled all conditions precedent to Bank of America's performance, including, among other things, by contacting or attempting to contact Bank of America to reimburse them for fraudulently appropriated funds within the time specified in the Cardholder Agreement.

608.   Bank of America breached its promises to Plaintiffs and Class Members in its Cardholder Agreement by, among other things: (a) failing to timely and reasonably investigate and resolve their fraud claims; (b) failing to reimburse them for unauthorized transactions; (c) failing to provide them with provisional credit when the Bank's investigation into their fraud claims exceeds 10 business days; (d) failing to limit their liability for unauthorized transactions; (e) freezing or blocking their EDD Debit Card Accounts without a reasonable basis for suspecting

irregular, unauthorized, or unlawful activities in the Account, and beyond the length of time necessary for a reasonable investigation; (f) freezing or blocking their EDD Debit Card Accounts for reasons other than those specified in the Cardholder Agreement; (g) failing to make funds available to them for their use on the day the Bank has been instructed by the EDD to fund their Accounts; and (h) otherwise failing to make funds available to them in accordance with EDD's instructions.

609.   Plaintiffs and Class Members were harmed by Bank of America's conduct and have suffered actual damages in an amount equal to the difference in the value of the banking services for which they provided valuable consideration and the banking services they received.

610.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## EIGHTH CLAIM FOR RELIEF

### BREACH OF IMPLIED CONTRACT

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* Actions)

611.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

612.   Bank of America agreed to and was obligated to take reasonable steps to ensure that Bank's EDD Debit Card Accounts were secure against unauthorized transactions and that any claims regarding unauthorized transactions were adequately investigated and resolved.

613.   All parties understood that such protections and customer service obligations were integral and essential to Bank of America's business.

614.   Bank of America was obligated to provide Plaintiffs and Class Members with EDD Debit Card services that were suitable for their intended purpose of preserving and accessing EDD benefits as needed, rather than providing debit card services that failed to take reasonable steps to safeguard their money,

1  failed to warn or notify them in the event that their EDD Debit Cards or Accounts
2  were at risk of unauthorized use, or failed to adequately investigate or resolve
3  claims regarding unauthorized transactions.

4       615.   Bank of America did not take reasonable steps to protect Plaintiffs'
5  and Class Members' deposited funds from unauthorized transactions or to
6  adequately investigate or resolve claims regarding unauthorized transactions. In
7  fact, Bank of America willfully violated those interests by choosing to issue EDD
8  Debit Cards with cheaper, outdated magnetic stripe technology, which it knew to
9  be uniquely vulnerable to fraud, rather than using the same EMV chip technology
10  that the Bank has included in all of its consumer credit cards and debit cards for
11  more than six years, for the express purpose of protecting against fraud.

12       616.   Because Bank of America failed to take reasonable steps to protect
13  EDD Debit Cardholders' funds from being appropriated through unauthorized
14  transactions and failed to take reasonable steps to timely or adequately respond to
15  claims regarding unauthorized transactions, Bank of America breached its implied
16  contracts with Plaintiffs and Class Members.

17       617.   Bank of America's failure to fulfill its obligations to take reasonable
18  steps to protect its EDD Debit Cardholders' funds from being appropriated through
19  unauthorized transactions, and its failure to take reasonable steps to timely or
20  adequately respond to claims regarding unauthorized transactions resulted in
21  Plaintiffs and Class Members receiving banking services that were of less value
22  than they provided consideration for.

23       618.   Plaintiffs, on behalf of themselves and the Class and applicable
24  Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

25
26
27
28

**<u>NINTH CLAIM FOR RELIEF</u>**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the

*Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* Actions)

619.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

620.   There is a covenant of good faith and fair dealing implied in every contract and every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

621.   The covenant of good faith and fair dealing implied in the Bank's Cardholder Agreement with Plaintiffs and Class Members obligated the Bank, at a minimum: (a) to take reasonable and necessary steps to safeguard Plaintiffs' and Class Members' EDD benefits, including in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic; (b) to ensure that its customer service operation was capable of providing reasonably adequate and effective assistance to EDD Debit Cardholders who experienced or claimed to have experienced fraud on their EDD Debit Cards or Accounts; (c) to warn or notify Plaintiffs and Class Members if their public benefit funds were subject to, or at risk of being subject to, actual or suspected unauthorized use; (d) to timely and adequately investigate and resolve claims of unauthorized transactions involving Plaintiffs' and Class Members' EDD Debit Cards or Accounts; (e) to extend provisional credit to Plaintiffs and Class Members in cases where their fraud claims are not timely resolved; (f) to freeze or block EDD Debit Card Accounts only to protect them from third-party fraud and only for the period necessary to conduct a reasonable

investigation into whether third-party fraud occurred; (g) to make EDD benefits deposited into EDD Debit Card Accounts immediately available to Cardholders and not to freeze or block Accounts without a reasonable basis for believing that the Cardholders themselves have committed fraud; and (h) to not freeze or block Accounts out of concern for the Bank's own potential liability for third-party fraud.

622.   Bank of America breached the implied covenant of good faith and fair dealing by, among other things: (a) failing to take reasonable and necessary steps to safeguard Plaintiffs' and Class Members' EDD benefits, including but not limited to (i) failing to issue EDD Debit Cards with EMV chip technology, (ii) failing to employ reasonable practices and procedures to secure Plaintiffs' and Class Members' Cardholder Information and other sensitive personal information that could be used by third parties to effect unauthorized transactions, (iii) failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify Plaintiffs and Class Members about suspicious transactions involving their Cards and Accounts (including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff or Class Member's Card and Account transaction history and past Account access behaviors), and (iv) failing to promptly issue EDD Debit Cards with EMV chips and to increase its efforts with respect to securing personal information, fraud monitoring, and otherwise safeguarding benefits in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic; (b) failing to ensure its customer service operations were capable of providing effective assistance to EDD Debit Cardholders who experienced fraud on their EDD Debit Card or Account, including during the COVID-19 pandemic; (c) failing to warn or notify EDD Debit Cardholders that their EDD benefits were and remain subject to, or at risk of being

subject to, actual or suspected unauthorized use; (d) failing to timely or adequately process and investigate EDD Debit Cardholders' claims regarding unauthorized transactions; (e) failing to extend provisional credit in cases where EDD Debit Cardholders' fraud claims are not timely resolved; (f) freezing or blocking EDD Debit Card Accounts without a reasonable basis for believing that the Cardholders themselves had committed fraud, and for longer than it would reasonably take to investigate any such belief; (g) failing to provide EDD Debit Cardholders any reasonable means of contesting the Bank's purported basis for freezing their EDD Debit Card Accounts or for otherwise getting their Accounts unfrozen; and (h) freezing or blocking EDD Debit Card Accounts not to protect the Cardholders, but rather to protect the Bank itself, from liability for third-party fraud.

623.   As a direct and proximate result of Bank of America's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered actual losses and damages.

624.  Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## TENTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, and *Robinson* Actions)

625.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

626.   Bank of America knows and at all relevant times has known that Plaintiffs and Class Members, as public benefits recipients, are members of a uniquely vulnerable segment of the population, who depend on the prompt and accurate payment of the unemployment benefits and other EDD benefits to obtain their basic necessities of life, including food and shelter.

627. When Plaintiffs and Class Members submitted their claims for unemployment and other EDD benefits to EDD and were found eligible to receive those benefits, they were not given the choice of receiving those benefits through debit cards issued by any financial institution other than Bank of America. Bank of America holds the exclusive contract to implement and administer EDD's public benefits programs and is the only financial institution authorized to pay EDD benefits to program beneficiaries through the use of prepaid debit cards.

628. In order to obtain the Bank-issued EDD Debit Cards needed to access their EDD Debit Card Accounts, which is the default way of receiving EDD benefits, Plaintiffs and Class Members were required to provide the Bank with private and confidential personal and financial information, including information pertaining to their income, public benefits, employment status, finances, social security numbers, addresses, emails, telephone numbers, and all debit card account information.

629. The Bank, in turn, was provided access to all such personal, confidential, and financial information from Plaintiffs and Class Members, which the Bank stored and maintained, purportedly in confidence, and which the Bank was required to strictly maintain in confidence without public access or other disclosure absent the EDD Debit Cardholders' written consent. The Bank was also delegated the responsibility and authority to determine when, why, and how to deny Plaintiffs and Class Members access to EDD benefits to which they are entitled by freezing EDD Debit Card Accounts.

630. Plaintiffs and Class Members, as EDD benefits recipients who did not opt out of the default option of receiving their EDD benefits payments through EDD Debit Cards, were repeatedly assured that a EDD Debit Card was a "[f]aster, easier and more secure" way to receive their benefit payments and that the EDD Debit Cards and Accounts were secure from fraud. They reposed their trust and confidence in the Bank at all material times, including with respect to all of their

personal, confidential, and financial information and with respect to the Bank's ongoing maintenance of that information in confidence, without secretion or divulgence absent Plaintiffs' and Class Members' express written consent. Plaintiffs and Class Members entered into a contractual relationship with Bank of America solely to secure their peace of mind in accessing the subsistence EDD benefits to which they had been found eligible and on which they relied to pay for housing, food, and other daily necessities.

631.   Bank of America owes and continues to owe a fiduciary duty to Plaintiffs and Class Members. By virtue of its unequal bargaining power and its position as the financial institution charged with implementing EDD benefits programs, which gave the Bank delegated authority to determine when, why, and how to deny Plaintiffs and Class Members access to EDD benefits to which they are entitled by freezing EDD Debit Card Accounts, as well as unbridled access to Plaintiffs' and Class Members' personal, confidential, and financial information, and because of the Bank's superior knowledge, business responsibilities and duties—including those provided by law or statute—and its absolute ability to control or otherwise manipulate Plaintiffs' and Class Members' EDD Debit Card Account data in its system, the Bank assumed a fiduciary duty to Plaintiffs and Class Members not to deny them access to their Account funds without reasonable basis, and to secure and maintain the personal, confidential, and financial information that it received from Plaintiffs and Class Members, free from unauthorized intrusion, theft, or other disclosure.

632.   As a result of this relationship of trust and confidence, the unique nature of the EDD Debit Card Accounts that contain only EDD benefits, and the highly confidential nature of the records and data pertaining to Plaintiffs' and Class Members' EDD Debit Cards Accounts, and the Bank's duties to maintain the privacy of such information, the Bank owed Plaintiffs and Class Members the highest degree of loyalty, honesty, fidelity, trust, and due care in its fiduciary

obligations with respect to ensuring legitimate benefits recipients are not denied access to their Account funds, and with respect to securing and maintaining the privacy of their personal, confidential, and financial data in the Bank's possession. In order to comply with such duty, the Bank was required to use its utmost ability to ensure that legitimate benefits recipients are not denied access to their Account funds, and to protect, preserve, and secure Plaintiffs' and Class Members' private data and confidential information from unauthorized access, fraud, or theft and to take all necessary steps in order to do so, including encrypting such information and deploying sufficient data access security controls, EMV chips, and other measures, to frustrate and disable hackers, skimmers, cloners, or others from accessing such information for their personal profit or unlawful goals.

633.   Based on the acts or omissions alleged above, Bank of America breached its fiduciary duties to Plaintiffs and Class Members by failing to take all adequate and necessary steps to ensure legitimate benefits recipients are not denied access to their Account funds without reasonable basis, and to preserve, secure, and maintain the confidentiality and privacy of their EDD Debit Cards and Accounts and their personal, confidential, and financial information. The Bank independently breached its fiduciary duties to Plaintiffs and Class Members by failing to timely, fully, and adequately disclose that it had not taken the necessary steps to protect such information from unauthorized or fraudulent access and theft and that such information was at a heightened risk of breach by virtue of the Bank's data security failings and policies. The Bank also independently breached its fiduciary duties to Plaintiffs and Class Members by failing to timely, fully, and adequately disclose that it had not taken the necessary steps to monitor for, detect, stop, and promptly notify Plaintiffs and Class Members about suspicious transactions involving their Cards and Accounts.

634.   Bank of America recklessly or knowingly breached its fiduciary duty and consciously denied legitimate EDD benefits recipients' access to their EDD

Debit Card Account funds without reasonable basis, and it created an environment that made its data systems and Plaintiffs' and Class Members' EDD Debit Card Accounts and their access to EDD benefits prey to criminal hackers and thieves. Alternatively, and without prejudice to the foregoing, the Bank also breached its fiduciary duty by placing its own desire to achieve greater profits ahead of the financial security, privacy, and data security interests of Plaintiffs and Class Members.

635.   As a direct and proximate result of the Bank's violations of its fiduciary duty, Plaintiffs and Class Members have been injured and have suffered and will continue to suffer economic and non-economic losses in an amount to be determined according to proof at trial, and a constructive trust has been formed in which the Bank is an involuntary trustee for the benefit of Plaintiffs and Class Members concerning the Account funds that Plaintiffs and Class Members have lost or been unable to access.

636.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## ELEVENTH CLAIM FOR RELIEF

### BREACH OF CONTRACT (THIRD-PARTY BENEFICIARIES)

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* Actions)

637.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

638.   Bank of America and the State of California EDD entered into the EDD–Bank Contract, which is a valid and legally enforceable contract that requires Bank of America to administer EDD benefits to Plaintiffs and Class Members through EDD Debit Cards and Accounts.

639.   In seeking to obtain the EDD–Bank Contract and as a material term of that contract, the Bank represented to EDD that the Bank would protect the EDD

benefits deposited into EDD Debit Card Accounts by implementing strict and secure anti-fraud measures, and that it would provide reasonable and adequate customer service to EDD Debit Cardholders sufficient to ensure that any claims of fraud would be promptly considered, fully and fairly investigated, and timely resolved without hardship or cost to blameless Cardholders, including Plaintiffs and Class Members.

640.   As EDD benefits recipients and EDD Debit Cardholders, Plaintiffs and Class Members are intended third-party beneficiaries of the EDD–Bank Contract. Plaintiffs and Class Members would benefit from performance of the contract, providing that benefit was a motivating purpose of the contracting parties entering into the contract, and permitting Plaintiffs and Class Members to pursue a claim for breach of the contract seeking specific performance is consistent with the contract's objectives and the reasonable expectations of the contracting parties at the time of contracting.

641.   Plaintiff, Class Members, and the EDD performed all or substantially all of the material conditions imposed on them by the EDD–Bank Contract and fulfilled any and all conditions precedent to Bank of America's performance.

642.   Bank of America failed to perform as promised in the EDD– Bank Contract by, among other things: (a) failing to take adequate steps to prevent fraud on EDD Debit Cards and Accounts, including but not limited to failing to issue EDD Debit Cards that incorporate EMV chip technology and failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify Cardholders about suspicious transactions involving their Cards and Accounts (including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Cardholder resided, were made close in time but geographically far apart, or were significantly inconsistent with the Cardholder's Card and Account transaction history and past Account access behaviors); (b) failing to timely perform good-faith

investigations of unauthorized transactions involving EDD Debit Cards and Accounts; (c) failing to timely resolve claims of unauthorized transactions involving EDD Debit Cards and Accounts, including failing to have a reasonable basis for its determinations that challenged transactions were in fact authorized by the relevant EDD Debit Cardholder; (d) failing to timely reimburse Plaintiffs and Class Members for unauthorized transactions on their EDD Debit Cards and Accounts; (e) failing to timely provide provisional credit to Plaintiffs and Class Members when the Bank's investigation of fraud claims exceeds 10 business days; (f) failing to provide EDD Debit Cardholders with the kinds, levels, amount, and quality of customer service specified in the EDD–Bank Contract; and (g) failing to make commercially reasonable efforts in the context of the COVID-19 pandemic to provide the kinds, levels, amount, and quality of customer service to EDD Debit Cardholders that reasonably should have been provided to them in the context of the COVID-19 pandemic.

643.   Plaintiffs and Class Members were harmed by Bank of America's conduct in breaching the EDD–Bank Contract and have suffered actual damages in an amount equal to the difference in the value of the banking services that EDD Debit Cardholders were contractually entitled to receive and the value of banking services that EDD Debit Cardholders actually received.

644.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## TWELFTH CLAIM FOR RELIEF

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (THIRD-PARTY BENEFICIARIES)

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, and *Robinson* Actions)

645.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

646.   There is a covenant of good faith and fair dealing implied in every contract and every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other party or intended third-party beneficiaries to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

647.   The covenant of good faith and fair dealing implied in the EDD–Bank Contract obligated the Bank, at a minimum: (a) to take reasonable and necessary steps to safeguard Plaintiffs' and Class Members' EDD benefits, including in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic; (b) to ensure that its customer service operation was capable of providing reasonably adequate and effective assistance to EDD Debit Cardholders who experienced or claimed to have experienced fraud on their EDD Debit Cards or Accounts; (c) to warn or notify Plaintiffs and Class Members if their EDD benefit funds were subject to, or at risk of being subject to, actual or suspected unauthorized use; (d) to timely and adequately investigate and resolve claims of unauthorized transactions involving Plaintiffs' and Class Members' EDD Debit Cards or Accounts; (e) to extend provisional credit to Plaintiffs and Class Members in cases where their fraud claims are not timely resolved; (f) to freeze or block EDD Debit Card Accounts only to protect them from third-party fraud and only for the period necessary to conduct a reasonable investigation into whether third-party fraud occurred; (g) to make EDD benefits deposited into EDD Debit Card Accounts immediately available to Cardholders and not to freeze Accounts without a reasonable basis for believing that the Cardholders themselves have committed fraud; and (h) to not freeze or block Accounts out of concern for the Bank's own potential liability for third-party fraud.

648.   Bank of America breached the implied covenant of good faith and fair dealing by, among other things: (a) failing to take reasonable and necessary steps to safeguard Plaintiffs' and Class Members' EDD benefits, including but not limited to (i) failing to issue EDD Debit Cards with EMV chip technology, (ii) failing to employ reasonable practices and procedures to secure Plaintiffs' and Class Members' Cardholder Information and other sensitive personal information that could be used by third parties to effect unauthorized transactions, (iii) failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify Plaintiffs and Class Members about suspicious transactions involving their Cards and Accounts (including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff or Class Member's Card and Account transaction history and past Account access behaviors), and (iv) failing to promptly issue EDD Debit Cards with EMV chips and to increase its efforts with respect to securing personal information, fraud monitoring, and otherwise safeguarding benefits in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic; (b) failing to ensure its customer service operation was capable of providing effective assistance to EDD Debit Cardholders who experience fraud on their EDD Debit Card or Account, including during the COVID-19 pandemic; (c) failing to warn or notify EDD Debit Cardholders that their EDD benefits were and remain subject to, or at risk of being subject to, actual or suspected unauthorized use; (d) failing to timely or adequately process and investigate EDD Debit Cardholders' claims regarding unauthorized transactions; (e) failing to extend provisional credit in cases where EDD Debit Cardholders' fraud claims are not timely resolved; (f) freezing or blocking EDD Debit Card Accounts without a reasonable basis for believing that the Cardholders

themselves had committed fraud, and for longer than it would reasonably take to investigate any such belief, (g) failing to provide EDD Debit Cardholders any reasonable means of contesting the Bank's purported basis for freezing their EDD Debit Card Accounts or for otherwise getting their Accounts unfrozen; and (h) freezing or blocking EDD Debit Card Accounts not to protect the Cardholders, but rather to protect the Bank itself, from liability for third-party fraud.

649.    As a direct and proximate result of Bank of America's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and other Class Members have suffered actual losses and damages.

650.    Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

<u>**THIRTEENTH CLAIM FOR RELIEF**</u>

**VIOLATIONS OF FEDERAL DUE PROCESS UNDER THE 14TH AMENDMENT**

**42 U.S.C. §1983**

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, and *Robinson* Actions)

651.    Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

652.    The Due Process Clause of the Fourteenth Amendments prohibits any state actor from "depriv[ing] any person of . . . property, without due process of law." U.S. Const. amend. XIV.

653.    "Every person who, under color of [law], subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," is "liable to the party injured in an action as law [or] suit in equity." 42 U.S.C. §1983.

654.    For purposes of the actions alleged herein, Bank of America is a state actor and acted "under color" of law because it is engaged in a joint undertaking with the State to provide and administer UI and other EDD benefits under a

1   mutually beneficial relationship and because it performs a function that is both

2   traditionally and exclusively governmental.

3       655.   Plaintiffs' and Class Members' unemployment benefits and other EDD

4   benefits are constitutionally protected property interests.

5       656.   By freezing Plaintiffs' and Class Members' EDD Debit Card

6   Accounts, Bank of America (a) cuts off their access to EDD benefits already

7   deposited to their Accounts and (b) suspends their receipt of any future EDD

8   benefits to which they may be entitled.

9       657.   By blocking Plaintiffs' and Class Members' EDD Debit Card

10  Accounts, Bank of America cuts off their access to EDD benefits already deposited

11  to their Accounts as well as their access to any continuing EDD benefits EDD

12  subsequently deposits into their Account.

13      658.   The Bank claims to have a policy and practice of notifying EDD when

14  the Bank independently freezes a Cardholder's Account without having received

15  authorization or direction from EDD to do so, and a policy and practice of

16  requesting EDD to review to review and to verify the eligibility for EDD benefits

17  of Cardholders whose Accounts the Bank has independently frozen.

18      659.   The Bank performs a traditional and exclusively governmental

19  function in administering the EDD benefits payments programs as alleged herein

20  pursuant to contractual authority generally delegated to it by EDD, including when

21  it blocks or freezes Cardholder Accounts without specific authorization from EDD

22  to do so and in violation of Cardholders' rights.

23      660.   Bank of America's policy and/or practice of automatically freezing or

24  blocking the Plaintiffs' and Class Members' EDD Debit Card Accounts when they

25  report unauthorized transactions without affording them any prior notice or pre-

26  deprivation hearing, or any prompt and meaningful post-deprivation opportunity to

27  be heard, violates Plaintiffs' and Class Members' due process rights under the

28  Fourteenth Amendment to the U.S. Constitution.

661.   Plaintiffs, on behalf of themselves and the Class, seek an injunction barring Bank of America from freezing or blocking EDD Debit Card Accounts without prior notice and a pre-deprivation hearing. Plaintiffs, on behalf of themselves and the applicable Subclasses, further seek the following relief: (a) actual damages; (b) nominal damages; (c) restitution of all EDD benefits funds improperly frozen or blocked by Bank of America; and (d) incidental and consequential damages suffered due to their inability to pay bills or otherwise use their unemployment funds.

## FOURTEENTH CLAIM FOR RELIEF

### VIOLATIONS OF THE CALIFORNIA DUE PROCESS CLAUSE

### Cal. Const. art. I, §7(a)

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, and *Robinson* Actions)

662.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

663.   The California Constitution's due process clause provides: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws." Cal. Const. art. I, §7(a).

664.   Plaintiffs' and Class Members' EDD benefits are constitutionally protected property interests.

665.   Bank of America's policy and/or practice of automatically and indefinitely freezing or blocking Plaintiffs' and Class Members' EDD Debit Card Accounts when they report unauthorized transactions without affording them any prior notice or pre-deprivation hearing, or any prompt and meaningful post-deprivation opportunity to be heard, violates Plaintiffs' and Class Members' due process rights under the California Constitution.

666.   Plaintiffs, on behalf of themselves and the Class, seek an injunction barring Bank of America from freezing or blocking EDD Debit Card Accounts

without prior notice and a pre-deprivation hearing. Plaintiffs, on behalf of themselves and the applicable Subclasses, further seek the following relief: (a) actual damages; (b) nominal damages; (c) restitution of all EDD benefits funds improperly frozen or blocked by Bank of America; and (d) incidental and consequential damages suffered due to their inability to pay bills or otherwise use their unemployment funds.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for the following relief:

(1)    For an order certifying the Class and Subclasses as defined above and such additional subclasses as may be appropriate, appointing Plaintiffs as representative for the Class, and appointing Plaintiffs' counsel as counsel for the Class;

(2)    For declaratory and preliminary and permanent injunctive relief prohibiting Bank of America from engaging in the wrongful conduct alleged herein, including but not limited to an order making the existing Preliminary Injunction permanent and such other preliminary and permanent injunctive relief as necessary to remedy the violations alleged herein;

(3)    For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Class Members, including treble damages where authorized by law, disgorgement, unjust enrichment, restitution, a declaration that the Bank holds the Account funds in constructive trust for the benefit of Plaintiffs and the Class Members, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiffs and Class Members were deprived of funds in their EDD Debit Card Accounts due to unauthorized transactions;

(4)    For an award of punitive damages pursuant to applicable law;

(5)    For reasonable attorney's fees and expenses as permitted by

California Code of Civil Procedure §1021.5, 42 U.S.C. §1988, and any other applicable statute or law;

   (6)   For taxable costs;

   (7)   For pre- and post-judgment interest as allowed by law; and

   (8)   For any other relief the Court deems just.

### VIII. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Dated: August 17, 2021        **COTCHETT, PITRE & McCARTHY, LLP**

                              By:    /s/ *Brian Danitz*
                                     JOSEPH W. COTCHETT
                                     BRIAN DANITZ
                                     KARIN B. SWOPE
                                     ANDREW F. KIRTLEY
                                     KEVIN J. BOUTIN


                              *Interim Co-Lead Counsel and Attorneys for*
                              *Plaintiffs Jennifer Yick, Vanessa Rivera, Candace*
                              *Koole, Azuri Moon, Stephanie Smith, Alan*
                              *Karam, Zinaida Petrova, Claire Blankenship, and*
                              *the Proposed Class*


Dated: August 17, 2021        **ALTSHULER BERZON LLP**

                              By:    /s/ *Michael Rubin*
                                     MICHAEL RUBIN
                                     STACEY M. LEYTON
                                     MATTHEW MURRAY
                                     CONNIE K. CHAN


                              *Interim Co-Lead Counsel and Attorneys for*
                              *Plaintiffs Roland Oosthuizen, Rosemary Mathews,*
                              *Luis Perez, and the Proposed Class*


                    *[Additional Counsel Listed Below]*

DAVID S. CASEY, JR. (SBN 060768)
dcasey@cglaw.com
GAYLE M. BLATT (SBN 122048)
gmb@cglaw.com
JEREMY ROBINSON (SBN 188325)
jrobinson@cglaw.com
P. CAMILLE GUERRA (SBN 326546)
camille@cglaw.com
CATHERINE McBAIN (SBN 303911)
kmcbain@cglaw.com
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT &**
**PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Fax: (619) 544-9232

*Interim Liaison Counsel for the Class*
*Plaintiffs and Attorneys for Plaintiff*
*Carlos Rodriguez and the Proposed*
*Class*

JEAN S. MARTIN
jmartin@ForThePeople.com
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505

*Attorneys for Plaintiff Carlos*
*Rodriguez and the Proposed Class*

NATASHA N. SERINO (SBN 284711)
natashaserino@schacklawgroup.com
SHANNON F. NOCON (SBN 316523)
shannonnocon@schacklawgroup.com
**SCHACK LAW GROUP**
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: (858) 485-6535
Fax: (858) 485-0608

FRANCIS A. BOTTINI, JR. (SBN 175783)
fbottini@bottinilaw.com
ANNE B. BESTE (SBN 326881)
abeste@bottinilaw.com
ALBERT Y. CHANG (SBN 296065)
achang@bottinilaw.com
YURY A. KOLESNIKOV (SBN 271173)
ykolesnikov@bottinilaw.com
**BOTTINI & BOTTINI, INC.**
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Fax: (858) 914-2002

*Attorneys for Plaintiff Lindsay McClure*
*and the Proposed Class*

ADAM MCNEILE (SBN 280296)
adam@kbklegal.com
KRISTIN KEMNITZER (SBN 278946)
kristin@kbklegal.com
**KEMNITZER, BARRON & KRIEG, LLP**
42 Miller Avenue, 3rd Floor
Mill Valley, CA 94941
Telephone: (415) 632-1900
Fax: (415) 632-1901

*Attorneys for Plaintiffs Roland*
*Oosthuizen, Rosemary Mathews, and the*
*Proposed Class*

THOMAS E. FRAYSSE (SBN 104436)
tef@knoxricksen.com
MAISIE C. SOKOLOVE (SBN 239665)
mcs@knoxricksen.com
AMANDA M. PLOWMAN (SBN 317462)
amp@knoxricksen.com
**KNOX RICKSEN LLP**
2033 N. Main Street, Suite 340
Walnut Creek, CA 94596
Telephone: (925) 433-2500
Fax: (925) 433-2505

1    *Attorneys for Plaintiff J. Michael*
2    *Willrich and the Proposed Class*

3    P. TERRY ANDERLINI (SBN 44783)
4    tanderlini@amlawoffice.com
     JOSEPH M. GOETHALS (SBN
5    242889)
6    jgoethals@amlawoffice.com
     JACKSON D. MORGUS (SBN
7    318453)
8    jmorgus@amlawoffice.com
     **ANDERLINI & McSWEENEY LLP**
9    66 Bovet Road, Suite 285
10   San Mateo, CA 94402
     Telephone: (650) 212-0001
11   Fax: (650) 212-0081
12
     *Attorneys for Plaintiff Christopher*
13   *Mosson and the Proposed Class*

14   Daniel L. Warshaw
15   dwarshaw@pswlaw.com
     Bobby Pouya
16   bpouya@pswlaw.com
17   **PEARSON, SIMON & WARSHAW,**
     **LLP**
18   15165 Ventura Boulevard, Suite 400
19   Sherman Oaks, CA 91403
     Telephone: (818) 788-8300
20   Fax: (818) 788-8104
21
22   Raymond P. Boucher
     ray@boucher.la
23   **BOUCHER LLP**
24   21600 Oxnard Street, Suite 600
     Woodland Hills, CA 91367
25   Telephone: (818) 340-5400
26   Fax: (818) 340-5401
27   *Attorneys for Plaintiffs Jonathan Smith*
28   *and Alex Yuan and Proposed Class*

*Attorneys for Plaintiff Robert L. Wilson*
*and the Proposed Class*

MARY E. ALEXANDER (SBN 104173)
malexander@maryalexanderlaw.com
BRENDAN D.S. WAY (SBN 261705)
bway@maryalexanderlaw.com
ARIN R. SCAPA (SBN 283400)
ascapa@maryalexanderlaw.com
CATALINA S. MUÑOZ (SBN 317856)
cmunoz@maryalexanderlaw.com
**MARY ALEXANDER &**
**ASSOCIATES, P.C.**
44 Montgomery Street, Suite 1303
San Francisco, CA 94104
Telephone: (415) 433-4440
Fax: (415) 433-5440

*Attorneys for Plaintiff Clara Cajas*
*and the Proposed Class*

Christopher J. Hamner
chamner@hamnerlaw.com
Evelina M. Serafini
eserafini@hamnerlaw.com
**HAMNER LAW OFFICES, APLC**
26565 West Agoura Road, Suite 200
Calabasas, CA  91302
Telephone: (888) 416-6654

*Attorneys for Plaintiffs Jory Zoelle,*
*Cindy Baker, Ursula Auburn, and the*
*Proposed Class*

Benjamin Gubernick
**GUBERNICK LAW, P.L.L.C.**
10720 W. Indian School Rd.
Suite 19, PMB 12
Phoenix, AZ 85037
Telephone: (734) 678-5169
ben@gubernicklaw.com

James V. Nolan
jvnolan@yololaw.com
Christopher R. Hugo
Robert P. Nakken
David W. Janes
**GARDNER, JANES, NAKKEN, HUGO & NOLAN LAWYERS**
429 First Street
Woodland, CA  95695
Telephone: (530) 662-7367
Telephone: (530) 662-2859
Fax: (530) 666-9116

*Attorneys for Plaintiff Brian Wiggins and the Proposed Class*

Joshua Brandon Swigart
josh@swigartlawgroup.com
Juliana G. Blaha
juliana@swigartlawgroup.com
**SWIGART LAW GROUP, APC**
2221 Camino Del Rio South
Suite 308
San Diego, CA 92108
(866) 219-3343
Fax: (866) 219-8344

Daniel G. Shay
DanielShay@TCPAFDCPA.com
**LAW OFFICE OF DANIEL G. SHAY**
2221 Camino Del Rio South
Suite 308
San Diego, CA 92108
Telephone: (619) 222-7429
Fax: (866) 431-3292

*Co-Interim Liaison Counsel for the Individual Plaintiffs and Attorneys for Individual Plaintiffs in the Abarr, Brotman, Meza, Morrell, Payton, Robinson, and Talia Actions*

David N. Lake
david@lakelawpc.com
**LAW OFFICES OF DAVID N. LAKE**
16130 Ventura Boulevard, Suite 650
Encino, CA 91436
Telephone: (818) 788-5100
Fax: (818) 479-9990

*Attorneys for Julie Hick, Plaintiffs Kuang Ting Chong, Stephanie Moore, and the Proposed Class*

Andre L. Verdun
Andre@VerdunLaw.com
1777 N. Ventura Avenue
Ventura, CA  93001
Telephone: (619) 880-0110
Fax: (866) 786-6993

*Attorneys for Individual Plaintiffs Rosa Alvarez, Elana Martina Rojas de Charolet, and Jessie Verdun*

G. Thomas Martin, III
tom@mblawapc.com
Nicholas J. Bontrager
nick@mblawapc.com
**MARTIN & BONTRAGER, APC**
4605 Lankershim Blvd., Suite 535
Toluca Lake, CA 91602
Telephone: 323.940.1700
Fax: 323.328.8095

*Attorneys for Individual Plaintiff Steven Hart*

1

2

## SIGNATURE ATTESTATION

3

Pursuant to section 2(f)(4) of the Electronic Case Filing Administrative

4

Policies and Procedures Manual, I, Brian Danitz, attest that the other signatories

5

listed, and on whose behalf this filing is submitted, concur in the filing content and

6

have authorized this filing.

7

By:    */s/ Brian Danitz*

8

Brian Danitz

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER YICK, et al., | Case No. 21-cv-00376-VC |
| Plaintiffs, | |
| v. | **ORDER RE PRELIMINARY INJUNCTION** |
| BANK OF AMERICA, N.A., | Re: Dkt. No. 64 |
| Defendant. | |

Because of the time-sensitivity involved, this ruling assumes that the reader is familiar with the applicable legal standards, the parties' arguments, the evidence in the record, and the discussion that took place at the preliminary injunction hearing on May 13, 2021.

1. The plaintiffs have demonstrated a strong likelihood of success on their claims that Bank of America (BofA) has violated, and continues to violate, the Electronic Fund Transfers Act by failing to conduct an adequate, good faith investigation when cardholders report unauthorized charges, and often simply freezing cardholder accounts based on a faulty screening process. 15 U.S.C. § 1693f. This has resulted (and will likely continue to result) in the improper denial of cardholders' reimbursement claims for unauthorized charges, the unlawful deprivation of provisional credits for such charges, and the inability to access benefits to which cardholders are entitled. For similar reasons, the plaintiffs have demonstrated a strong likelihood of success on their claims that BofA is systematically breaching its contracts with cardholders and violating California's Unfair Competition Law.

2. Provisional certification of a class of all cardholders who call to report unauthorized charges to their accounts is warranted for purposes of a preliminary injunction. *See, e.g.*, *Zepeda*

*Rivas v. Jennings*, 445 F. Supp. 3d 36, 39 (N.D. Cal. 2020); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1201-05 (N.D. Cal. 2017), *affirmed as Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

3. BofA is wrong to argue that the named plaintiffs or the class are categorically barred from obtaining interim relief. There is Article III standing because many of the named plaintiffs were being injured by the conduct described in Section 1 at the time they filed their lawsuits, and some of the named plaintiffs continue to suffer injury today. *Buckeye Tree Lodge v. Expedia, Inc.*, 2020 WL 5372246, at *2 (N.D. Cal. Sept. 9, 2020); *see Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 184 (2000). And the evidence presented by BofA in response to this preliminary injunction motion does not refute the plaintiffs' strong showing that class members are likely to suffer similar violations in the future.

4. The harm being suffered by the class members is irreparable. The class is comprised of people who depend on unemployment benefits to get through the pandemic. As the plaintiffs' evidence shows, continued denial of these benefits will seriously hinder the ability of many class members to feed their families and keep a roof over their heads. Thus, although the general rule is that financial harm is not "irreparable" (because plaintiffs can generally recoup the money if they ultimately prevail), this is precisely the type of case where the exception to the general rule applies. Just as companies can establish irreparable harm by showing that losing money will likely cause them to shut down, human beings can establish irreparable harm by showing that losing wages or benefits will likely cause them to be evicted, go hungry, or be denied necessary medical care. *Cf. Carrillo v. Schneider Logistics, Inc.*, 823 F. Supp. 2d 1040, 1045 (C.D. Cal. 2011) ("Because plaintiffs are low-wage workers, and lost wages or delays in compensation threaten or impair their ability to meet basic needs, such harms are irreparable."); *see also United Steelworkers of America, AFL-CIO v. Fort Pitt Steel Casting, Division of Conval-Penn, Division of Conval Corp.*, 598 F.2d 1273, 1280 (3d Cir. 1979).[1]

---

[1] In some cases involving wages or benefits, courts have intoned the general rule about financial injury without acknowledging the exception, perhaps because the exception did not apply on

5. The balance of hardships and the public interest almost certainly support some form of preliminary injunctive relief. *See, e.g.*, *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ("'Faced with . . . a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly' in favor of the latter." (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983))). But it ultimately depends on the nature of the relief sought. At the hearing, the Court suggested that the parties participate in a settlement conference with a Magistrate Judge to carefully review and discuss the plaintiffs' proposed preliminary injunction to ensure that it does not interfere with BofA's operations more than is necessary to sufficiently minimize the risk of innocent cardholders being improperly deprived of their benefits, and also to carefully review and discuss the proposed injunction to ensure that it does not unduly hinder BofA from freezing the accounts of people who are likely to have obtained their cards through fraud. Both sides accepted this invitation. Accordingly, the case is referred to Judge Sallie Kim for a settlement conference to take place on May 26 and May 27, 2021. The parties are ordered to work as much as possible before the conference, including with one another, to maximize the chances of coming out of the conference with a joint proposal. A joint proposal or competing proposals should be filed with the Court no later than May 28. As stated at the hearing, BofA's participation in this conference, which is designed primarily to ensure that any relief ordered is not overbroad, does not constitute a waiver of its right to challenge the validity any preliminary injunction that is ultimately issued.

---

those facts. *See, e.g.*, *Hale v. Wood*, 89 F.3d 840 (8th Cir. 1996) ("Hale failed to establish a threat of irreparable harm because the injuries he alleged as the basis for his claim for relief—wrongfully withheld wages, statutorily inadequate wages, and termination of his work assignment—were compensable through his section 1983 claim for money damages."); *Johnson v. City of San Francisco*, 2010 WL 3078635, at *3 (N.D. Cal. Aug. 5, 2010) ("Lost wages alone do not constitute a claim for irreparable harm as money damages would be sufficient to remedy the wrong should one ultimately be found to have been committed."); *see also Ahuruonye v. U.S. Department of Interior*, 312 F. Supp. 3d 1, 23-24 (D.D.C. 2018). But those cases should not be read to suggest that the loss of wages or benefits can never constitute irreparable harm. When a case involves the deprivation of wages or benefits to low-income people living hand to mouth, a preliminary injunction may well be warranted (depending, of course, upon the strength of the plaintiffs' claims on the merits and other factors).

**IT IS SO ORDERED.**

Dated: May 17, 2021

VINCE CHHABRIA
United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER YICK, et al., | Case No. 21-cv-00376-VC |
| Plaintiffs, | |
| v. | **PRELIMINARY INJUNCTION** |
| | Re: Dkt. Nos. 64, 100 |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

With the assistance of Magistrate Judge Kim, the plaintiffs and defendants worked together to craft preliminary injunction language that is designed to protect the class members from future harm while minimizing disruption to the defendant's operations. This language is an improvement over what was presented by the plaintiffs in support of their motion. The hardship to the defendant from this injunction is outweighed by its benefits to the class members. The injunction is also in the public interest. Accordingly, in accordance with the language submitted by the parties, and for the reasons discussed in the order issued on May 17, 2021:

Bank of America, N.A. (the "Bank"), and the Bank's officers, directors, agents, employees, representatives, and all persons acting under, in concert or participation with, or for them ("Defendant") are preliminarily enjoined in the administration of prepaid debit cards for Employment Development Department ("EDD") unemployment or disability benefits issued by Defendant to members of the certified class as follows:

(1) Defendant shall be prohibited from considering the results of the Bank's initial automated claims fraud filter (Claim Fraud Filter) in investigating or resolving unauthorized transaction error claims (*see* 12 C.F.R. 1005.11) (Claims).

(2) a.  Defendant shall be prohibited from denying or closing Claims or denying provisional or permanent credit to claimants' accounts without conducting and concluding an investigation into the alleged unauthorized transaction, pursuant to EFTA and Regulation E.

b.  Defendant shall be prohibited from denying or closing claims without providing the claimant a written explanation of the findings of its investigation, pursuant to EFTA and Regulation E.

(3)  Defendant shall not consider the results of the Bank's Claim Fraud Filter as a basis for freezing card accounts of any Class Member.

(4) a.  Beginning ten (10) days after the entry of this Order, Defendant shall reopen any Claim that it closed or denied based solely upon the results of its Claim Fraud Filter and that it has not previously paid or previously reopened and investigated (Previously Closed Claim). Defendant may stagger the reopening of such Claims in roughly equal amounts over thirty (30) additional days.

b.  For Previously Closed Claims filed by a class member who has not yet authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, Defendant shall, within ten (10) days of reopening, and thereafter at least weekly for five weeks, send the class member a written notice (by mail and email, if available) explaining the basis for the original denial; that the claim has been reopened; what steps they need to take to authenticate their identity (which may include presenting identification at a Bank branch or by calling the dedicated toll free number for the Fraud Call Center referred to in paragraph 9); that if they do not authenticate their identity within 45 calendar days of the original notice, the claim will be denied; and that if they authenticate their identity, the Bank will commence and complete the investigation and resolve the claim within 45 calendar days of the authentication and, if such claim has not been resolved within 10 business days of the authentication, provide provisional credit in the amount of the alleged error(s) to the account.  Persons subject to this Paragraph 4(b) are subject to Paragraph 5(a) if they authenticate.

(5)  a.  For Previously Closed Claims that were filed by a class member who has

authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, Defendant shall complete the investigation and resolve the claim within 45 calendar days of the entry of this Order (or of the date the class member authenticates their identity, if later) and, if the claim has not been resolved within 10 business days of the entry of this Order (or of the date the class member authenticates their identity, if later), provide provisional credit in the amount of the alleged error(s).

      b.  For any Previously Closed Claims that were filed by a class member who has authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, but the Claim has never been reopened, Defendant shall reopen such Claim within ten (10) days of the entry of this Order and Defendant shall complete the investigation and resolve the claim within 45 calendar days of reopening and, if the claim has not been resolved within 10 business days of reopening, provide provisional credit in the amount of the alleged error(s).

      (6)  In addition to Claims that Defendant reopens pursuant to paragraphs 4 and 5(b), Defendant shall, upon request from the affected cardholder, reopen any Claim that it closed or denied on or after January 1, 2020.

      (7)  Within 10 days of the entry of this Order (by mail and email, if available) or after the date of the blocking (by mail, within three (3) business days, and email, if available, within one (1) business day), whichever is later, Defendant shall give written notice to class members whose accounts are blocked solely based upon its Claims Fraud Filter that explains that the Bank will promptly unblock their account if the class member authenticates their identity. The written notice shall explain: the basis for the previous block; what steps the class member needs to take to authenticate their identity (which may include presenting identification at a Bank branch or by calling the dedicated toll free number at the Fraud Call Center referred to in paragraph 9); that if they do not authenticate their identity, their account will remain blocked or will be closed; and that they have the right to ask EDD to issue future benefits payments by paper check instead of by the Bank Debit Card.

      (8)  Defendant shall:

a.  As soon as practicable, and in no event later than twenty (20) days of the entry of this Order, establish a dedicated toll-free number to enable class members to directly reach the Claims Initiation Call Center, which shall be staffed by customer service representatives (CSRs) who are trained to handle Claims intake;

b.  Within thirty (30) days of the entry of this Order, the Claims Initiation Call Center hours to receive calls shall consist of at least fourteen (14) hours on weekdays and ten (10) hours on Saturdays, which shall be expanded within forty-five days of the entry of this Order to include ten (10) hours on Sundays, and expanded within sixty days of the entry of this Order to include 24 hours per day, 7 days per week coverage; and

c.  As soon as practicable after the establishment and successful testing of the dedicated toll-free number for the Claims Initiation Call Center, but in no event later than ten (10) days thereafter, and at least monthly thereafter, provide written notices (by mail and email, if available) to all class members regarding the available toll free number and providing the information in paragraphs 6, and (8)(a) and (b).

(9)  Defendant shall:

a.  As soon as practicable, and in no event later than twenty (20) days after the entry of this Order, establish a dedicated toll-free number to enable class members to directly reach the Fraud Call Center, which shall be available 24 hours per day, 7 days per week, and which shall be staffed by CSRs who are trained to authenticate identity and resolve challenges to blocked accounts.

b.  As soon as practicable after the establishment and successful testing of the dedicated toll-free number for the Fraud Call Center, but in no event later than ten (10) days thereafter, and thereafter at least weekly, provide written notice (by mail and email, if available) to all class members whose accounts are blocked of the availability of this dedicated toll-free number.

(10)  Defendant shall, within 20 days of the entry of this Order:

a.  Staff the Claims Initiation Call Center and Fraud Call Centers, such that the average speed to answer calls from Class Members for these centers is no more than five minutes, 90% of

the time, separately measured for the Claims Initiation and Fraud Call Centers and based on all callers to such centers (rather than just calls by Class Members).

      b.  Train and require CSRs in the Claims Initiation Call Center to request email contact information from a claimant at the time a claim is filed (if email is not already available for that claimant), so that the Bank may use that information to contact the claimant regarding authentication, if and to the extent this is consented to by EDD.

      c.  Train and require CSRs in the Fraud Call Center to immediately inform cardholders who are unable to authenticate their identity by phone that they have the option of authenticating their identity at a Bank branch.

      (11)  Within 10 business days of the entry of this Order, Defendants shall provide email and mail notice to all Class Members of their rights under paragraphs (1) through (7) of this Order.

      (12)  Paragraphs 2 and 4 of this Order shall not apply to,

      a.  Claims made with respect to accounts that EDD has found to be disqualified or not entitled to benefits, or has requested an account freeze; or

      b.  Claims made with respect to accounts that Defendant has frozen or blocked based on (i) receipt of legal process or (ii) information provided or made available by law enforcement, or (iii) the outcome of an investigation of suspicious facts and circumstances related to an individual cardholder developed independent of the Claim (if such cardholder has been sent a notice that the action has occurred and a statement of what the cardholder can do in response).

      Defendant shall implement the requirement of paragraph 1 as soon as practicable but in no event more than seven (7) days from the entry of this Order.

      There shall be no bond required.

      **IT IS SO ORDERED.**

Dated: June 2, 2021

                             _____
                             VINCE CHHABRIA
                             United States District Judge