**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION | Case No.: 21-md-2992-LAB-MSB **ORDER:** **(1) GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS MASTER CONSOLIDATED COMPLAINT, [Dkt. 64];** **(2) GRANTING IN PART AND DENYING IN PART REQUEST FOR JUDICIAL NOTICE, [Dkt. 84-2]; and** **(3) GRANTING REQUEST FOR JUDICIAL NOTICE, [Dkt. 90-1]** |

This multi-district litigation arises from a wave of transaction fraud that targeted California's public benefits programs in mid-2020. Numerous class and individual actions have been brought against Defendant Bank of America, N.A. ("BANA") over its administration of California's electronic benefits payment system. Those actions were transferred to this Court for consolidated pretrial

proceedings by the Judicial Panel on Multidistrict Litigation. (Dkt. 1). Following the Court's Case Management Order, (Dkt. 48), Plaintiffs filed a Master Consolidated Complaint ("MCC"), (*see* Dkt. 72, MCC), which BANA now moves to dismiss in its entirety. (Dkt. 84). BANA also filed a request for judicial notice in support of its motion. (Dkt. 84-2). Plaintiffs oppose BANA's motion and request for judicial notice, (Dkt. 90, 90-2), and filed their own request for judicial notice in support of their opposition, (Dkt. 90-1).

Having considered the parties' submissions and the relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** BANA's motion to dismiss; **GRANTS IN PART** and **DENIES IN PART** BANA's request for judicial notice; and **GRANTS** Plaintiffs' request for judicial notice.

## I.    BACKGROUND

### A.    BANA's Contract to Provide Public Benefits in California

Bank of America, N.A., is a financial institution incorporated in Delaware and headquartered in North Carolina. (MCC ¶ 35). In 2010, BANA entered into an exclusive contract to provide electronic benefits payment services for the California Employment Development Department ("EDD"). (*Id.* ¶ 39). EDD is the state agency responsible for administering numerous benefits programs, including providing unemployment insurance, pandemic unemployment assistance, pandemic emergency unemployment compensation, disability insurance, and paid family leave. (*Id.* ¶ 38). EDD extended BANA's exclusive contract in 2015 and entered into the current BANA-EDD Contract. (*Id.* ¶ 42). The BANA-EDD Contract expressly provides that the contracting parties entered into the agreement "for the purpose of [BANA] establishing, operating and maintaining a comprehensive Electronic Benefit Payment (EBP) service for the EDD." (Chestnut Decl., Ex. 2 at 6; Danitz Decl., Ex. B at 15).

Under the terms of the BANA-EDD Contract, approved applicants receive periodic EDD benefit payments through prepaid debit cards ("EDD Debit Cards")

issued and administered by BANA. (*Id.* ¶ 2). These cards are linked to individual BANA deposit accounts. (*Id.*). EDD Debit Cards are the default means of receiving EDD benefits, (*id.* ¶¶ 41, 47), and EDD presents them as the exclusive means of receiving benefits payments, (*id.* ¶ 47 n.1). The cards issued by BANA use magnetic stripe technology, which allows a cardholder to make payments by swiping his or her card. (*Id.* ¶¶ 59, 69). Magnetic stripes, while once the industry standard for debit cards, have more recently fallen out of favor because they are easily readable and highly susceptible to misuse. (*Id.* ¶ 61). The current industry standard for debit card security is the Europay, Mastercard and Visa ("EMV") chip, a technology that is substantially more secure that magnetic stripes. (*Id.* ¶¶ 66–68). BANA has used EMV chips in corporate cards since 2011, and all consumer debit cards since 2014, but didn't use the technology in its EDD Debit Cards. (*Id.* ¶¶ 64–65, 68–69).

BANA hired various subcontractors to assist it in completing its obligations under the BANA-EDD Contract. (*Id.* ¶ 595). One of these subcontractors, TTEC Holdings, Inc. ("TTEC"), provided customer service and ran call center operations for BANA. (*Id.*). TTEC hired hundreds of employees without conducting background checks. (*Id.*). These employees were granted access to Cardholders' account and personal information. (*Id.*).

To receive an EDD Debit Card, BANA requires every EDD Cardholder to disclose personal information and enter into a uniform written contract entitled California Employment Development Department Debit Card Account Agreement ("Account Agreement"). (*Id.* ¶ 71; *see also* Dkt. 90-3, Danitz Decl., Ex. A).[1] The

---

[1] Both parties filed versions of the account agreement with their requests for judicial notice. (*See* Dkt. 84-3, Chestnut Decl., Ex. 1 (BANA's version); 90-3, Danitz Decl., Ex. A (Plaintiffs' version)). For the reasons discussed in the analysis of Plaintiffs' contract claim, the version submitted by Plaintiffs is incorporated by reference into the MCC. *See infra* Section III.F.1.

Account Agreement details when funds become available and outlines BANA's right to place a "freeze" on a Cardholder's account if BANA "suspect[s] irregular, unauthorized, or unlawful activities." (Danitz Decl., Ex. A § 2). The freeze may continue until BANA completes an investigation. (*Id.*). The document also sets forth detailed procedures Cardholders must follow to report unauthorized transactions, (*id.* § 9), or errors in account statements, (*id.* § 11). These procedures include BANA's "zero liability" policy for unauthorized transactions, which provides EDD Cardholders will incur no liability for unauthorized transactions reported "within a reasonable time." (*Id.* § 9, MCC ¶ 71). What constitutes a "reasonable time" is determined at BANA's sole discretion, but is no less than 60 days. (Danitz Decl., Ex. A § 9; MCC ¶ 71). Cardholders must report any other error within 60 days of the date BANA sends the statement on which the error first appears. (Danitz Decl., Ex. A § 11; MCC ¶ 71). The Account Agreement provides both a phone number and mailing address for Cardholders to report unauthorized transactions or errors, and notes that "[t]elephoning is the best way of keeping your possible losses down." (Danitz Decl., Ex. A §§ 10–11; MCC ¶ 71).

Once BANA receives notice of an error, the Account Agreement provides that BANA "will determine whether an error occurred within 10 business days," but reserves the right to "take up to 45 days to investigate" if it "need[s] more time," in which case BANA promises to credit the Cardholder's account within "10 business days for the amount [of the reported] error, so that [the Cardholder] will have the money" while BANA completes the investigation. (Danitz Decl., Ex. A § 11; MCC ¶ 72).

### B. Fraud on EDD Debit Card Accounts and BANA's Response

In the spring of 2020, California's unemployment rate increased exponentially as a result of the COVID-19 pandemic and subsequent state and county closure orders. (MCC ¶ 74). Since March 2020, EDD received at least

18.5 million claims for EDD benefits, and BANA issued more than 9 million EDD Debit Cards to individuals found eligible for benefits. (*Id.* ¶ 75). During this time, there was a marked increase in fraud targeting EDD Cardholders, with thousands of benefits recipients experiencing substantial financial losses due to unauthorized transactions. (*Id.* ¶¶ 76–77). Plaintiffs in this consolidated action were among those affected by the fraud. (*See generally id.* ¶¶ 114–285 (Class Plaintiffs' allegations); 286–526 (individual Plaintiffs' allegations)). Plaintiffs report experiencing either: (1) the loss of account funds due to unauthorized transactions, (*see, e.g.*, *id.* ¶ 310); (2) fraud on their accounts, (*see, e.g.*, *id.* ¶ 292); or (3) account freezes, which prevented Plaintiffs from accessing their EDD benefits, (*see, e.g.*, *id.* ¶ 309).

Corresponding with the surge in fraud, BANA experienced a steep increase in reports of unauthorized transactions and errors from EDD Cardholders, including from Plaintiffs. Wait times on BANA's customer service phone lines increased substantially as the number of calls grew. (*Id.* ¶¶ 87–88, 99). Some Plaintiffs waited on hold for hours, (*see, e.g.*, *id.* ¶¶ 116–20), or had to call back multiple days in a row to reach a customer service representative, (*see, e.g.*, *id.*). When Plaintiffs successfully reported unauthorized transactions, BANA often denied the claims within one or two days using form letters. (*Id.* ¶¶ 89–91; *see, e.g.*, *id.* ¶¶ 130, 218). Some Plaintiffs were given "permanent" credits for stolen funds, only to have those credits later reversed without warning or explanation. (*Id.* ¶ 92; *see, e.g.*, *id.* ¶¶ 127–35).

Starting in October 2020, BANA implemented a new policy of automatically freezing the account of any EDD Cardholder who reported experiencing fraud, without notice or explanation. (*Id.* ¶ 93). Many accounts were frozen for months; some remain frozen. (*Id.* ¶¶ 94, 96).

//

//

### C.    Procedural History

On January 14, 2021, Class Plaintiff Jennifer Yick commenced the class action titled *Yick v. Bank of America, N.A.*, No. 3:21-cv-376, in the U.S. District Court for the Northern District of California. (MCC ¶ 106). Eight additional class actions were subsequently filed and consolidated with *Yick* on March 29, 2021. (*Id.*). On April 1, 2021, the Class Plaintiffs in the *Yick* class action sought a preliminary injunction enjoining BANA from automatically denying fraud claims and freezing claimants accounts. The *Yick* court granted a preliminary injunction on May 17, 2021, and provisionally certified a class of all EDD Cardholders who call BANA to report unauthorized charges. (MCC, Ex. A). On June 1, 2021, following negotiations between the parties, the *Yick* court entered a preliminary injunction which: (1) barred BANA from considering the results of its Claim Fraud Filter when investigating claims; (2) prohibited BANA from denying claims without an investigation and providing the claimant with a written explanation; (3) prohibited BANA from freezing any account based on the results of the Claim Fraud Filter; (4) required BANA to reopen any claims previously denied based on the results of the Claim Fraud Filter; and (5) required BANA to establish dedicated toll-free numbers for Class Members seeking assistance with fraud claims or frozen accounts. (*Id.*). Around that same time, numerous individuals initiated actions against BANA for injuries stemming from the same alleged conduct.

On June 4, 2021, the Judicial Panel on Multidistrict Litigation transferred the *Yick* class action and individually filed actions to this Court for consolidated pretrial proceedings. (Dkt. 1). Plaintiffs filed the MCC on August 17, 2021. The MCC includes the following claims:

1.    Violation of the Electronic Funds Transfer Act, 15 U.S.C. §§ 1963 *et seq.*, and Regulation E ,12 C.F.R. §§ 1005.1 *et seq.*;

2.    Violation of the California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*;

3.    Violation of the California Customer Records Act, Cal. Civ. Code §§ 1798.80 *et seq.*;

4.    Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

5.    Negligence;

6.    Negligent hiring, supervision, and retention;

7.    Breach of contract;

8.    Breach of implied contract;

9.    Breach of the implied covenant of good faith and fair dealing;

10.   Breach of fiduciary duty;

11.   Third-party beneficiary breach of contract;

12.   Third-party beneficiary breach of the implied covenant of good faith and fair dealing;

13.   Violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution; and

14.   Violation of the Due Process Clause of the California Constitution.

(*See generally* MCC). BANA now moves to dismiss the MCC in its entirety. (Dkt. 84). BANA also filed a request for judicial notice in support of its motion. (Dkt. 84-2). Plaintiffs oppose BANA's motion and request for judicial notice. (Dkt. 90, 90-2). They also filed a request for judicial notice support of their opposition. (Dkt. 90-1).

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6): Failure to State a Claim

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim

is plausible if the factual allegations supporting it permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations need not be detailed; instead, the plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. The plausibility standard isn't a "'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). Courts aren't required to accept legal conclusions couched as factual allegations and "formulaic recitation[s] of the elements of a cause of action" aren't sufficient. *Twombly*, 550 U.S. at 555. The Court accepts as true all facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012). Ultimately, a court must determine whether the plaintiff's alleged facts, if proven, permit the court to grant the requested relief. *See Iqbal*, 556 U.S. at 666; Fed. R. Civ. P. 8(a)(2).

### B. Rule 12(b)(1): Lack of Standing

A motion to dismiss for lack of standing is "properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("[S]tanding . . . pertain[s] to federal courts' subject matter jurisdiction."). To have standing to bring a suit in federal court, a plaintiff must show: (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish injury in fact, a plaintiff must show she suffered "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal marks and citations omitted).

//
//
//
//

21-md-2992-LAB-MSB

1   **III.   DISCUSSION**

2       **A.   Electronic Funds Transfer Act and Regulation E (Claim 1)**

3           The MCC's first claim alleges BANA violated the Electronic Funds Transfer

4   Act ("EFTA"), 15 U.S.C. §§ 1963 *et seq.*, and Regulation E ("Reg E"), 12 C.F.R.

5   §§ 1005.1 *et seq.*, by failing to comply with the required error resolution procedure.

6   (MCC ¶¶ 533–45).[2] The EFTA is a federal consumer protection law "establishing

7   the rights, liabilities, and responsibilities of participants in electronic fund and

8   remittance transfer systems." 15 U.S.C. § 1693(a). The EFTA, together with its

9   implementing regulation, Reg E, regulates electronic fund transfers which directly

10  affect consumer accounts. § 1963(a)(7). Under § 1693f(a), which details the

11  EFTA's error resolution procedures, when a consumer notifies a financial

12  institution that the consumer believes an "error" has occurred in his or her account,

13  the "financial institution shall investigate the alleged error, determine whether an

14  error has occurred, and report or mail the results of such investigation and

15  determination to the consumer within ten business days." § 1693f(a). The EFTA

16  mandates specific steps the financial institution must take depending on the

17  results of its investigation, as well as the time frames in which the steps must be

18  taken. § 1693f(b)–(d).

19          **1.   Sufficiency of Notice**

20          BANA first argues that Plaintiffs failed to provide notice sufficient to trigger

21  BANA's obligations under the EFTA, 15 U.S.C. § 1693f, and Reg E, 12 C.F.R

22  § 1005.11. (Dkt. 84-1 at 17–18). A financial institution is only required to act if the

23  consumer meets certain notice requirements. *See* 15 U.S.C. § 1693f(a); 12 C.F.R.

24  § 1005.11(b). Crucially, the notice must identify a qualifying error as defined by

25  the EFTA, 15 U.S.C. § 1693f(f), and Reg E, 12 C.F.R. § 1005.11(a). Additionally,

26  the notice must: (i) be received by the financial institution no later than 60 days

27  _____

28  [2] The EFTA claim is brought by all Plaintiffs. (*See* MCC at 236).

after the institution sends the documentation reflecting the error; (ii) "[e]nable[] the institution to identify the consumer's name and account number"; and (iii) "[i]ndicate[] why the consumer believes an error exists and include[] to the extent possible the type, date, and amount of the error." 12 C.F.R. § 1005.11(b)(1)(i)–(iii); *see also* 15 U.S.C. § 1693f(a)(1)–(3). Requests for additional information or documentation don't need to include the amount of the error. 12 C.F.R. § 1005.11(b)(1)(iii).

### i.   Timely Notice

The EFTA requires consumers to report any alleged errors to a financial institution within 60 days of the date the institution sends the written documentation first reflecting the error. *See Camacho v. JPMorgan Chase Bank*, No. 5:14-CV-04048-EJD, 2015 WL 5262022, at *3 (N.D. Cal. Sept. 9, 2015) (citing 15 U.S.C. § 1693f(a)). A complaint that doesn't allege that a consumer provided timely notice doesn't state a claim under the EFTA. *Id.* at *4 (dismissing EFTA claim when consumer didn't notify bank within 60 days of receiving documentation reflecting the error). At the pleading stage, a complaint must state sufficient facts, construed in the light most favorable to the plaintiff, to plausibly allege timely notice. *Id.* at *2, *4.

BANA argues several Plaintiffs fail to state claims under the EFTA because they don't sufficiently allege that timely notice was provided. (Dkt. 84-1 at 18). The Court agrees in part, and holds that two groups of individual Plaintiffs haven't plausibly alleged providing timely notice. First, those individual Plaintiffs who have failed to allege notifying BANA at all haven't stated a claim under the EFTA. (*See* MCC ¶¶ 302 (Christal Ayala); 325 (Randy Chase); 387 (Ivan Harris); 394 (Ruben Hernandez); 399 (Terrance Howze); 407 (Robert Jaurigue, Jr.); 467 (Mykela Raiff); 470 (Nehemiah Rima-Fleurima); 473 (Miguel Roa); 474 (Carmen Robinson); 483 (Frankie Saldate); 485 (Timothy Schmitz); 488 (Jenna Silva); 505 (Thomas Turner); 526 (Christopher Zettlemoyer)).

Second, those individual Plaintiffs who allege discovering and reporting fraud more than 60 days after they would have plausibly been sent documentation containing the error haven't plausibly alleged providing timely notice. The 60-day notification period starts when the financial institution sends a consumer the periodic statement which first reflects the error. *See* 15 U.S.C. § 1693f(b)(1)(i); 12 C.F.R. § 1005.11(b)(1)(i). Here, BANA provided Plaintiffs with monthly account statements reflecting the previous month's transactions. (*See, e.g.*, MCC ¶ 274). Construing this allegation in the light most favorable to Plaintiffs, the 60-day period started at the end of the month a statement was received. Any notification made after the 60-day period was untimely, didn't trigger BANA's obligations under the EFTA, and can't support a claim under the statute. (*See* MCC ¶¶ 312 (James Brooks alleges fraud occurred in June 2020 and July 2020, but that he didn't discover and report the fraud until January 2021, despite having access to his account starting in July 2020); 422 (Ernie Loredo alleges fraud occurred in June 2020, but that he didn't discover and report the fraud until March 2021); 435 (Travis Middleton alleges fraud occurred in April 2020, but that he didn't discover and report the fraud until December 2021); 491 (Denise Smith alleges fraud occurred in November 2020, but that she didn't discover and report the fraud until May 2021)).

BANA's motion to dismiss the MCC's EFTA claims as untimely is **GRANTED** as to the individual Plaintiffs referenced above. Their EFTA claims are **DISMISSED WITH LEAVE TO AMEND** for failure to provide timely notice.[3]

---

[3] BANA's motion to dismiss the EFTA claims as untimely is **DENIED** as to any Plaintiff who alleges he or she attempted to call BANA to report fraud, but that BANA never answered. (*See, e.g.*, MCC ¶¶ 287 ("In March 2021, [Kobe Abbot] attempted to report the fraud to Bank of America; however, Bank of America has never answered a single call."); 472 ("In August 2020, [Israel Rivera] attempted to report the fraud to Bank of America via phone. Bank of America has yet to respond

BANA also moves to dismiss Flouzel Paningbatan's EFTA claim due to untimely notice. (Dkt. 84-1 at 18 (discussing MCC ¶ 451)). Paningbatan alleges fraud occurred in her account between May 2020 and October 2020, but that she didn't discover and report the fraud to BANA until December 2020. (MCC ¶ 451). Construing this allegation in the light most favorable to Paningbatan, the latest she could have learned of the fraud was when she received her November 2020 statement. Thus, the 60-day notification period would have expired in January 2021. The Court finds these allegations plausibly support the inference that Paningbatan's notice was timely. BANA's motion to dismiss Paningbatan's EFTA claim as untimely is therefore **DENIED**. (*See also id.* ¶ 456 (Kenyon Perkins alleges fraud occurred between April 2020 and September 2020, but that he didn't discover and report the fraud until December 2020)).

## ii. Qualifying Error

BANA also argues that a number of individual Plaintiffs' EFTA claims should be dismissed for failure to report an error as defined by the statute. (Dkt. 84-1). To trigger a financial institution's obligations under the EFTA, consumers must identify a qualifying error—general allegations of fraud aren't sufficient. *See* 15 U.S.C. § 1693f(a); 12 C.F.R. § 1005.11(b). Qualifying errors include: "unauthorized electronic fund transfer[s]," 12 C.F.R. § 1005.11(a)(1)(i); "[t]he omission of an electronic fund transfer from a periodic statement," § 1005.11(a)(1)(iii); "[t]he consumer's request for documentation required by . . . § 1005.10(a) or for additional information or clarification concerning an electronic fund transfer, including a request the consumer makes to determine whether an error exists," § 1005.11(a)(1)(vii). *See also* 15 U.S.C. § 1693f(f)(1), (3), (6) (EFTA

to a single phone call.")); *see also Jacobs v. Tenneco W., Inc.*, 186 Cal. App. 3d 1413, 1418 (1986) ("A party who prevents fulfillment of a condition of his own obligation . . . cannot rely on such condition to defeat his liability.") (citations omitted).

section listing errors). Under the EFTA, an "unauthorized electronic transfer" is defined as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693a(12); *see also* 12 C.F.R. § 1005.2(m) (same). The definition of unauthorized electronic transfer doesn't include any electronic fund transfer:

> (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized,

> (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or

> (C) which constitutes an error committed by a financial institution.

15 U.S.C. § 1693a(12)(A)–(C); *see also* 12 C.F.R. § 1005.2(m)(1)–(3) (same).

A bare allegation that "fraud" occurred and was subsequently reported to the financial institution is insufficient to support an inference that the consumer reported a qualifying error. *See, e.g.*, *Hardin v. Bank of Am., N.A.*, No. 2:22-cv-10023, 2022 WL 3568568, at *3 (E.D. Mich. Aug. 18, 2022). Individual Plaintiffs who allege they "experienced fraud on [their] account[s]" and reported the fraud to BANA, but didn't report a qualifying error, therefore haven't stated claims under the EFTA. (*See* MCC ¶¶ 292 (Kevin Alvarez); 296 (Rebekah Anderson); 297 (Amanda Andrade); 298 (Samuel De Los Angeles, Sr. ); 300 (Robert Arnoldstarr); 301 (Vanessa Arrey); 303 (Celina Back); 305 (Douglas Beckham); 306 (Sky Beehler); 307 (Amber Bennett); 308 (Forrest Berlt); 317 (Mario Bynum); 321 (Kimberly Carpenter); 322 (Patricia Castillo); 326 (Angela Chavez); 337 (Michell de Vera); 343 (Lorina Dones); 345 (Benjamin Douglass); 352 (Juan Estrada); 355 (Jacob Flores); 359 (Meredith Friday); 365 (George Laquitta); 395 (Vanessa Hernandez); 404 (Juanita Isles); 454 (Ann Perez); 462 (Tina Pomeroy); 464

(Joshua Pummill); 469 (Kawana Reed); 476 (Joe Robles); 524 (Matthew Yeats); 525 (Glen Young)).

Similarly, an allegation that a third party applied for benefits in another consumer's name or gained access to a consumer's account, while likely fraudulent, doesn't constitute a "qualifying error" under the statute. 15 U.S.C. § 1693f(f); 12 C.F.R. § 1005.11(a). Individual Plaintiffs who allege that they notified BANA that fraud occurred on their account after a third party applied for and/or received EDD benefits in their name therefore didn't report a qualifying error. (*See, e.g.*, MCC ¶¶ 346 (Kayli Duey); 348 (Peter Echeverria); 383 (Micah Haney); 390 (Bahram Hassanshahi); 424 (Mario Madrid); 440 (Sharise Morgan); 456 (Kenyon Perkins); 506 (Reina Valadez); 512 (Norman Walker); 518 (Tyrisha Williams)). The same holds true for individual Plaintiffs who allege they "experienced fraud" and notified BANA of fraud after: (1) a third party tried to change their account address, (*see id.* ¶¶ 335 (Teresa D'Agostino Criado); 336 (Heather Dale)); (2) their account information or card was stolen, (*id.* ¶¶ 423 (Raina Madrid alleging she experienced fraud when her phone containing her account information was stolen); 431 (Christina McCafferty alleging she experienced fraud when her phone and EDD card were stolen)); or (3) after they were unable to access their accounts; (*id.* ¶¶ 445 (Sarah Murphy alleging fraud when she was unable to sign into her account); 481 (Raylene Salaz alleging fraud when she was unable to access her account)).

BANA's motion to dismiss the MCC's EFTA claims for failure to report a qualifying error is **GRANTED** as to the individual Plaintiffs identified above. Those EFTA claims are **DISMISSED WITH LEAVE TO AMEND**.

On the other hand, allegations that a consumer: (1) identified a fraudulent or unauthorized transaction or withdrawal (including by looking at their account or transaction history); and (2) reported "fraud" to the financial institution are sufficient to support the reasonable inference that the consumer reported an

unauthorized transaction or withdrawal (both of which qualify as errors within the meaning of the EFTA) when reporting the "fraud." *See Iqbal*, 556 U.S. at 678. BANA's motion to dismiss is **DENIED** as to those individual Plaintiffs making such allegations. (S*ee, e.g.*, MCC ¶¶ 304 (Mark Barnettte); 310 (Dean Bommel); 375 (Jeffrey Guadalajara); 471 (Rhonda Ritchey); 384 (Preston Hanna); *see also id.* ¶¶ 382 (James Hanes alleging he received a text alert following "fraud"); 500 (same for Tonya Taylor)).

Additionally, BANA's motion to dismiss is **DENIED** as to Anthony Franks, who alleges he contacted BANA after he discovered his account didn't contain expected funds from EDD. (*Id.* ¶ 358). Franks's allegation supports the reasonable inference that he notified BANA of "[t]he omission of an electronic fund transfer from a periodic statement," which constitutes error under the EFTA. 12 C.F.R. § 1005.11(a)(1)(iii); *see also* 15 U.S.C. § 1693f(f)(3) (same).

BANA also maintains that individual Plaintiffs who reported account freezes alone should be dismissed for failing to report a qualifying error. (Dkt. 84-1 at 17). Neither EFTA nor Reg E lists account freezes as a qualifying error. *See* 15 U.S.C. § 1693f(f); 12 C.F.R. § 1005.11(a)(1); *Hardin*, 2022 WL 3568568, at *3 ("[T]he EFTA does not regulate account freezes; it regulates electronic funds transfers. . . . And the regulation does not define account freezes as an 'error' covered under the EFTA."). Plaintiffs argue that reporting an account freeze constitutes a qualifying error because each individual Plaintiff who reported an account freeze was also requesting additional information to determine whether there was an incorrect or omitted EDD benefits transfer into the account. (Dkt. 90 at 13 & n.18). While Plaintiffs are correct that a request for "additional information or clarification concerning an electronic fund transfer, including a request [made] to determine whether an error exists," is a qualifying error, *see* 12 C.F.R. § 1005.11(a)(1)(vii); *see also* 15 U.S.C. § 1693f(f)(6) (same); 12 C.F.R. § 1005, Supp. I at 11(a) (Official Interpretation of § 1005.11(a)) ("A request for

documentation or other information must be treated as an error unless it is clear that the consumer is requesting a duplicate copy for tax or other record-keeping purposes."), the MCC doesn't allege that any individual Plaintiff reporting an account freeze also requested additional information. Because those allegations aren't in the MCC, the Court can't consider them. *Davis*, 691 F.3d at 1159 (noting that courts consider the factual allegations *in the complaint* when deciding a motion to dismiss). Without allegations that they specifically requested additional information, any individual Plaintiff who reported only an account freeze failed to report a qualifying error, and doesn't state a claim under the EFTA (*See* MCC ¶¶ 309 (Stone Blacksands); 344 (Anthony Douglas); 357 (Stephanie Flores); 376 (Noah Guirguis); 392 (Gretchen Heinz); 402 (Quoc Huynh); 413 (Victoria Jones); 418 (Sabrina Laxton); 419 (Tonya Lind); 420 (Limmie Littles); 448 (Frank Ortiz, Jr.); 497 (Danny Talia); 514 (Cameren Wilburn); 516 (Terrence Wilkins); 517 (Zacharia Williams); 523 (Colton Wood)). BANA's motion to dismiss the MCC's EFTA claims for failure to report a qualifying error is **GRANTED** as to the individual Plaintiffs, identified above, who reported account freezes only. Those EFTA claims are **DISMISSED WITH LEAVE TO AMEND**.

### iii.   Explanation of Belief an Error Exists

BANA next argues that the remaining Plaintiffs failed to notify BANA of the "reason why [they] believe[d] an error exist[ed]." (Dkt. 84-1 at 18 (quoting 12 C.F.R. § 1005.11(b)(1)(iii)). To trigger a financial institution's obligations under the EFTA, a consumer's notice must "[i]ndicate[] why the consumer believes an error exists and include[] to the extent possible the type, date, and amount of the error." 12 C.F.R. § 1005.11(b)(1)(iii); *see also* 15 U.S.C. § 1693f(a)(3). Requests for additional information or documentation don't need to include the amount of the error. 12 C.F.R. § 1005.11(b)(1)(iii).

BANA argues that in order to state a claim under the EFTA a consumer's notice to the financial institution must specifically indicate the reason for the

consumer's belief that an error exists. (Dkt. 84-1 at 18). BANA contends that generalized allegations, such as allegations that a consumer "reported the fraud," are insufficient. (*Id.*); *see also Ghalchi v. U.S. Bank, N.A.*, No. 2:14-cv-6619-PSG-CW, 2015 WL 12655402, at *8 (C.D. Cal. Jan. 8, 2015) (dismissing the plaintiff's EFTA claim for failure to "pled that she informed Defendant of the type of error that triggers Defendant's duties under the EFTA or that she notified Defendant with the specificity that triggers those duties" when the complaint's "description of her notice to Defendant only indicates that she 'notified' Defendant of 'unauthorized withdrawals' from her Checking Account"). In response, Plaintiffs argue that their "allegations show, and at minimum give rise to a plausible inference, that Plaintiffs conveyed their stated reasons for claiming fraud . . . and are far more detailed than the bare-bones allegations held insufficient in [BANA's] cited cases." (Dkt. 90 at 6).

The allegations in the cases BANA cites are significantly less detailed than the allegations here. *Compare* Compl. ¶ 28, *Ghalchi v. U.S. Bank, N.A*, No. 2:14-cv-6619-PSG-CW (C.D. Cal. Aug. 22, 2014), ECF No. 1 (Plaintiff notified U.S. Bank, N.A., "that there were, among other things, unauthorized withdrawals from the Account."), *with, e.g.*, (MCC ¶¶ 152–55 (Class Plaintiff Roland Oosthuizen identified five $1,000 withdrawals he didn't make or authorize. When he called BANA the day after discovering the withdrawals, he "made a fraud claim concerning the missing $5,000."); 177–80 (Class Plaintiff J. Michael Willrich identified $4,000–$5,000 in unauthorized transactions and contacted BANA to speak to a "Bank representative and submit a fraud claim regarding the unauthorized transactions. Willrich and the Bank representative spent approximately one hour going through every charge during a three-month period to ensure all fraudulent activity was accounted for."); 286 (Individual Plaintiff Paul Abarr identified "fraudulent transactions on his Account totaling approximately $8,000. . . . [H]e reported the fraud to Bank of America via phone.").

21-md-2992-LAB-MSB

Additionally, while BANA is correct that Plaintiffs haven't set out factual allegations specifically demonstrating their notice included a reason for their belief an error exists, (*see* Dkt. 92 at 9), the assertion that such detail is required by the Federal Rules of Civil Procedure is incorrect, *Twombly*, 550 at 555 n.3 (noting that "the Federal Rules eliminated the cumbersome requirement that a claimant 'set out in detail the facts upon which he bases his claim'") (citation omitted). Instead, a plaintiff must "state[] the circumstances, occurrences, and events in support of the claim presented." *Id.* (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1202 (3d ed. 2004)). Factual allegations sufficient to support a plausible inference are sufficient to state a claim under the Federal Rules. *See Davis*, 691 F.3d at 1159.

The Court holds that Plaintiffs' allegations as to the remaining EFTA claims are sufficient to support an inference that each Plaintiff notified BANA of the reason for his or her belief an error existed. For example, Class Plaintiff Roland Oosthuizen alleges he identified five $1,000 withdrawals he didn't make or authorize, (MCC ¶ 152), and that he called BANA and "made a fraud claim concerning the missing $5,000," (*id.* ¶ 155). Those allegations are more than enough to permit the Court to infer that Oosthuizen "indicated why [he] believe[d] an error exist[ed]" during his call with BANA. 12 C.F.R. § 1005.11(b)(1)(iii). The same is true for the other Plaintiffs with remaining EFTA claims. BANA's motion to dismiss the remaining EFTA claims for failure to allege "why the consumer believes an error exists" is **DENIED**.

### 2.    Violation of EFTA

BANA next argues that the MCC fails to identify conduct that violated the EFTA or Reg E. (Dkt. 84-1 at 19–20). Plaintiffs disagree, arguing the MCC alleges BANA failed to conduct a reasonable, good faith investigation and failed to provide documentation required by the statute. (Dkt. 90 at 8–10). Section 1693f requires that a financial institution investigate any qualifying error reported by the

consumer within ten business days of receiving notice of such error. 15 U.S.C. § 1693f(a). For reports of unauthorized electronic fund transfers, "[t]he financial institution bears the burden of establishing that a transaction was authorized." *Green v. Cap. One, N.A.*, 557 F. Supp. 3d 441, 450 (S.D.N.Y. 2021); *see also* 15 U.S.C. § 1963g(b).

Section 1693f offers little guidance on what constitutes a reasonable investigation of a properly reported error. However, Reg E provides that "a financial institution's review of its own records regarding an alleged error" satisfies § 1963f's investigation requirement if:

> (i) The alleged error concerns a transfer to or from a third party; and

> (ii) There is no agreement between the institution and the third party for the type of electronic fund transfer involved.

12 C.F.R. § 1005.11(c)(4). The Official Interpretation of § 1005.11(c)(4) provides additional detail on financial institutions' investigative obligations under Reg E:

> When there is no agreement between the institution and the third party for the type of [electronic fund transfer] involved, the financial institution must review any relevant information within the institution's own records for the particular account to resolve the consumer's claim. The extent of the investigation required may vary depending on the facts and circumstances. However, a financial institution may not limit its investigation solely to the payment instructions where additional information within its own records pertaining to the particular account in question could help to resolve a consumer's claim.

12 C.F.R. § 1005, Supp. I at 11(c)(4) (Official Interpretation of § 1005.11(c)(4)). "[W]hen read in conjunction with the implementing regulations and Official Interpretation, § 1693f requires that any investigation under the statute include a reasonable review of the financial institution's own records." *Green*, 577 F. Supp. 3d at 450–51.

Plaintiffs contend that BANA's investigations into their error reports were inadequate for at least two reasons. First, they argue BANA summarily denied their claims without completing the required investigations. (Dkt. 90 at 8). In support of this argument, Plaintiffs point to information which, if reviewed, would have led BANA to grant Plaintiffs' claims. (*Id.*; *see, e.g.*, MCC ¶ 310 (Dean Bommel, a California resident, reported $5,000 of unauthorized, overseas transactions)). They also contend the rapid denial of claims and use of boilerplate denial letters lends additional support to their allegation. (Dkt. 90 at 8). Second, Plaintiffs argue their allegation that BANA's admitted "policy and practice of (a) subjecting every EDD Debit Cardholder who submitted a claim of unauthorized transaction to an initial 'Claim Fraud Filter[]' [and] (b) automatically and without investigation denying the fraud claim of any EDD Debit Cardholder flagged by the Claim Fraud Filter," (MCC ¶ 108), plausibly suggests BANA wasn't conducting individualized investigations. (Dkt. 90 at 9).

BANA argues these allegations are insufficient to state a claim because they are conclusory and not specific to each Plaintiff. (Dkt. 84-1 at 19). It also argues that the EFTA doesn't bar the use of automated investigative tools, such as the Claim Fraud Filter. (*Id.*). BANA doesn't, however, make any "affirmative argument regarding any review it actually conducted of its own records. Rather, [BANA's] moving brief is silent as to what its investigation entailed." *Green*, 557 F. Supp. 3d at 452.

Each remaining Plaintiff alleges either specific unauthorized transactions or generalized "fraud" that impacted their accounts. Accepting those allegations as true, it is reasonable to infer that BANA's records reflect the unauthorized nature of the reported transactions and that, if reviewed, those records would have resulted in different outcomes. Additionally, while the MCC's allegations could be more detailed as to what specific information should have been reviewed, none of the allegations (including the correspondence from BANA to Plaintiffs) indicate

21-md-2992-LAB-MSB

that BANA reviewed its own records in any meaningful way as required by § 1693f. *See Green*, 557 F. Supp. 3d at 453 (finding that "because Capital One's correspondence with Green shows no indication that its own records were reviewed (and it makes no other representations this regard), Green has plausibly alleged that it indeed failed to review this information"). Further, the allegations that Plaintiffs' claims were denied within one to two days based on the results of an unreliable Claim Fraud Filter, and that BANA issued form letters lacking individualized information support the inference BANA didn't conduct a reasonable review, including by not reviewing its own records. (*See* MCC ¶¶ 89, 130, 140, 156, 164, 181, 188, 218). Taking all the allegations as true and drawing all inferences in favor of Plaintiffs, the MCC provides enough information to state a plausible claim that BANA didn't review its records when conducting its investigation.[4] Because the Court holds Plaintiffs state a plausible claim that BANA's investigation was inadequate, it doesn't need to consider whether the use of the Claim Fraud Filter alone constituted a violation of the EFTA.

The MCC also states a plausible claim that BANA didn't provide the results of its investigations of Plaintiffs' claims. (MCC ¶ 536(h)). The EFTA provides that after a financial institution completes its investigation of a consumer's reported error, the financial institution must "report or mail the results of such investigation and determination to the consumer within ten business days." 15 U.S.C. § 1693f(a).[5] Numerous Plaintiffs allege they received brief letters informing them

---

[4] While it's possible that BANA did review its records as part of its investigation, that information isn't before the Court at this time. In deciding this motion to dismiss, the Court declines to speculate about what this potential evidence will show.

[5] *See also* 15 U.S.C. § 1693f(d) ("If the financial institution determines after its investigation . . . that an error did not occur, it shall deliver or mail to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the

only that their claim was closed or denied, (*see, e.g.*, MCC ¶ 196 (Clara Cajas "received a letter from the Bank . . . informing her that her fraud claim related to the $700 ATM withdrawal had been closed"), while others allege they received letters containing very limited explanations, (*see, e.g.*, *id.* ¶ 283 (Clare Blankship alleges the letter she received stated: "We've completed our review of the above referenced claim and have determined that no error has occurred in this instance. We now consider your claim resolved. [¶] What you need to know [¶] The transaction activity in question was authorized and posted correctly to your account.")). Further, many individual Plaintiffs allege they didn't receive any letter, (*see, e.g.*, *id.* ¶ 293 (Courtney Alvarez)), permitting the inference the required letters weren't sent. These allegations plausibly allege that Plaintiffs "got a 'determination' but not 'the results of [the required] investigation' or the supporting documentation," *Gale v. Hyde Park Bank*, 384 F.3d 451, 453 (7th Cir. 2004), and are sufficient to state a claim under the EFTA.

BANA's motion to dismiss the MCC's EFTA claims for failure to allege facts showing a violation of that statute is **DENIED**.[6]

### 3. Mootness

BANA last moves to dismiss the EFTA claim of any Plaintiff that has been fully reimbursed for lack of Article III standing. (Dkt. 84-1 at 18–19). BANA challenges only injury in fact for the reimbursed Plaintiffs. (*Id.*). To establish injury in fact, a plaintiff must show she suffered "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent,

---

consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur. The financial institution shall include notice of the right to request reproductions with the explanation of its findings.").

[6] Because the Court has already dismissed the EFTA claims of those Plaintiffs that allege reporting only an account freeze (and not fraud), the Court doesn't need to consider BANA's argument that account freezes aren't prohibited by the EFTA. (*See* Dkt. 84-1 at 20).

not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal marks and citations omitted).

Here, BANA has identified 59 Plaintiffs who have been fully reimbursed, including 20 of the 25 Class Plaintiffs. (*See* Dkt. 84-1, App'x Column 4). BANA argues those Plaintiffs lack a concrete injury sufficient for Article III standing. (*Id.* at 18–19). BANA also argues that any reimbursement payment that didn't include interest nonetheless eliminates any § 1963f claim because, under § 1963g(a), a consumer can still be liable for up to $50 of a properly reported error, and the MCC doesn't allege any Plaintiff claims more than $50 in interest. (Dkt. 92 at 11–12).

BANA, however, fails to address the actual damages Plaintiffs suffered as a result of the delayed reimbursements. A financial institution that fails to comply with the EFTA is liable for "any actual damages sustained by a consumer as a result of such failure," including the failure to properly resolve an error reported under § 1963f. 15 U.S.C. § 1963m(a)(1). Possible compliance failures include: (1) provisionally crediting a consumer pursuant to § 1963f(c) *but failing to provide the consumer full use of the credited funds for the pendency of the investigation*, § 1963f(c); (2) provisionally crediting a consumer *but failing to complete the investigation within the extended 45 day resolution period (including by rescinding a provisional credit and then issuing a reimbursement later)*, *id.*; or (3) reimbursing the consumer after the initial 10 business day resolution period expires *without having issued a provisional credit*, § 1963(a), (b).

Of the Plaintiffs who received full reimbursements, all but one plausibly allege that BANA failed to comply with § 1963f's procedures when issuing the reimbursement. (*See, e.g.*, MCC ¶ 314 (James Bruno alleges that he reported an error in December 2020, but didn't receive any credit until May 2021)). These Plaintiffs allege that, as a result of BANA's failure to comply with § 1963f's error resolution procedures, they sustained actual damages beyond the amount of the reported error. (*See, e.g.*, MCC ¶ 299 (Shelia Anistik alleges that, due to BANA's

failure to make provisionally credited funds available during the investigation, she had to sell her home after missing a $1,200 mortgage payment and was unable to pay her electric, gas, water, and cell phone bills). These alleged injuries—regardless of amount—constitute actual, concrete harms sufficient to support Article III standing. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *see, e.g.*, *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008) (noting that the loss of "a dollar or two" is sufficient to confer standing); *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) (holding the loss of $3.76 in interest was sufficient to confer standing). BANA's motion to dismiss the fully reimbursed Plaintiffs' EFTA claims for lack of standing is **DENIED** except as to Misty Pointer. (MCC ¶ 461 (Pointer alleges she reported an unauthorized transaction to BANA on May 12, 2021, and that, on May 24, 2021 (less than ten business days later), BANA credited her account). BANA's motion to dismiss Pointer's EFTA claim for lack of standing is **GRANTED**, and that claim is **DISMISSED WITH PREJUDICE**.

*   *   *

BANA's motion to dismiss the MCC's EFTA claims is **GRANTED IN PART** and **DENIED IN PART**. The EFTA claims of the individual Plaintiffs identified above are **DISMISSED WITH LEAVE TO AMEND**.[7]

## B.    California Consumer Privacy Act (Claim 2)

The MCC's third claim alleges BANA violated the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100 *et seq.*, by: (1) "issuing EDD Debit Cards to Plaintiffs and Class Members with magnetic stripes but without EMV chip technology"; (2) "collecting," "transmitting," and "storing" Plaintiffs'

---

[7] For a summary of which Plaintiffs' EFTA claims are dismissed, see Column 1 of the chart attached as Appendix A to this Order.

personal information in an inadequately secure manner; and (3) failing to ensure its subcontractors maintained the confidentiality of Plaintiffs' personal information. (MCC ¶¶ 546–561).[8] The CCPA creates a cause of action for:

> Any consumer whose nonencrypted and nonredacted personal information . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information.

Cal. Civ. Code § 1798.150. BANA contests each of Plaintiffs' theories in turn.

First, it argues that the CCPA doesn't impose a duty to issue debit cards with EMV chips. (Dkt. 84-1 at 29). "The CCPA does not 'impose[]' a new duty, but rather incorporates 'existing law requir[ing] a business . . . to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.'" (Id. (quoting S. Judiciary Comm. Rep. on A.B. 375 (June 25, 2018), at 5 (citing Cal. Civ. Code § 1798.81.5(b), (e)) (emphasis added))). Because there is no existing duty for financial institutions to issue debit cards with EMV chips, BANA had no duty to issue EDD cards with chips. (Id. at 29–30). In response, Plaintiffs point to Dugas v. Starwood Hotels & Resorts Worldwide, Inc., No. 16-cv-14-GPC-BLM, 2016 WL 6523428 (S.D. Cal. Nov. 3, 2016).[9] (Dkt. 90 at 25–26). In Dugas, the court held the plaintiff "sufficiently alleged, at the pleading stage, a legal duty and a corresponding breach" based on the defendant's alleged

---

[8] The CCPA claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the Abarr, Alvarez, Brotman, Meza, Morrell, Payton, Robinson, Rojas de Charolet, Talia, and Verdun actions. (See MCC at 240).

[9] Although the claim in Dugas was brought under the California Customer Records Act ("CCRA"), Cal. Civ. Code §§ 1798.80 et seq., see Dugas, 2016 WL 6523428, at *10, its analysis is still applicable to claims under the CCPA because that statute's private right of action arises from the CCRA. See § 1798.150(a)(1) (citing § 1798.81.5 of the CCRA) (CCPA private right of action).

failure to use industry-standard encryption. 2016 WL 6523428, at *10–11.

BANA attempts to distinguish *Dugas*, arguing that case "involved an alleged failure to maintain reasonable cybersecurity practices after the plaintiff provided personal identifying information to the defendant—it did not recognize any separate duty to issue chip cards." (Dkt. 92 at 19). While BANA is technically correct that *Dugas* didn't recognize a duty to issue debit cards with EMV chips, that argument largely misses the point. Plaintiffs cite *Dugas* to support the proposition that, at the pleading stage, allegations the defendant failed to utilize industry-standard encryption are sufficient to allege a legal duty and corresponding breach. (Dkt. 90 at 25–26); *Dugas*, 2016 WL 6523428, at *11.

Here, the MCC alleges BANA acknowledges EMV chip technology is the industry-standard for debit card security. (*See generally* MCC ¶¶ 56–69 (discussing BANA's implementation of EMV chips)). Specifically, the MCC alleges that BANA's website states that EMV chip technology "has been around for over 20 years and is the credit and debit card security standard in many countries around the world." (*Id.* ¶ 68). Despite BANA's prior history with EMV chips, the EDD Debit Cards it issued included the much less secure magnetic stripes. (*Id.* ¶ 69). As in *Dugas*, because Plaintiffs allege that BANA "failed to employ reasonable security measures to protect [their personal information], such as the utilization of industry-standard encryption[, such as EMV chips], the Court finds that Plaintiff[s] [have] sufficiently alleged a legal duty and a corresponding breach at this stage." *See Dugas*, 2016 WL 6523428, at *11; *see also In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 966 (S.D. Cal. 2014) (holding that plaintiffs adequately pled a breach of duty to provide reasonable security by alleging they gave personal information to Sony as part of commercial transaction and that Sony failed to employ reasonable security measures to protect the information, including failing to use industry-standard encryption).

Additionally, BANA argues that Plaintiffs "have not alleged facts to show that they suffered any 'unauthorized access . . . as a result of' the use of the magnetic strip [sic] cards." (Dkt. 84-1 at 30 n.18). This argument ignores the MCC's allegations that: (1) Plaintiffs' cards were susceptible to skimming (a process by which a physical device collects information on a card's magnetic stripe); (2) at least one Class Plaintiff alleges her card was skimmed; and (3) cards with EMV chips are less susceptible to this form of attack. (*See* MCC ¶ 61; *see also, e.g.*, *id.* ¶ 187 (Lindsay McClure alleges her account was the subject of fraudulent charges after her EDD Debit Card was skimmed)). These alleged facts are sufficient to support the inference that Plaintiffs' personal information was "subject to an unauthorized access and exfiltration, theft, or disclosure" as a result of the use of magnetic stripes. *See* Cal. Civ. Code § 1798.150(a)(1). BANA's motion to dismiss Plaintiffs' CCPA claim is **DENIED** to the extent that claim is based on BANA issuing debit cards without EMV chips. (*See* MCC ¶ 553(a)).

Second, BANA argues that Plaintiffs' theory that BANA violated the CCPA by "collecting," "transmitting," and "storing" Plaintiffs' personal information in an inadequately secure manner lacks sufficient factual support to state a plausible claim. (Dkt. 84-1 at 29). The MCC alleges: "On information and belief, Bank of America collected, stored, and/or transmitted Plaintiffs' and Class Members' personal information in a nonencrypted and nonredacted form or in some other form that permitted unauthorized third parties to access that information in violation of the CCPA." (MCC ¶ 511; *see also id.* ¶¶ 55–58). Plaintiffs point to Class Plaintiff Stephanie Smith's allegation that her EDD benefits were fraudulently transferred from her account, even though she never used her debit card and kept it at home in a locked safe, arguing that allegation is sufficient to infer BANA "collect[ed]," "transmitt[ed]," and "stor[ed]" Plaintiffs' personal information in an inadequately secure manner. (*See* Dkt. 90 at 27 (citing MCC ¶¶ 58, 200)). The Court disagrees that these bare allegations are sufficient to state

a claim. While Smith's allegations certainly suggest a *possibility* that inadequately secure collection, transmission, and storage may be the reason Smith's data was stolen, they aren't the only or even the most plausible inference supported by the allegations. *See Iqbal*, 556 U.S. at 678 (holding that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation. . . . Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true.") (citation omitted). BANA's motion to dismiss Plaintiffs' CCPA claim is **GRANTED** to the extent that claim is based on BANA "collecting," "transmitting," and "storing" Plaintiffs' personal information in an inadequately secure manner. (*See* MCC ¶ 553(b)–(d)).

Third, BANA again argues that Plaintiffs' theory that BANA violated the CCPA by failing to ensure its subcontractors maintained the confidentiality of Plaintiffs' personal information lacks sufficient factual support to state a plausible claim. (Dkt. 84-1 at 29). In support of this theory, the MCC alleges that BANA:

> Fail[ed] to take reasonable steps to ensure that its subcontractors and their employees and agents, including [customer service representatives] and other Call Center agents, maintained the confidentiality of Cardholders' personal information, including by failing to ensure that all such agents were subject to background checks before or after being hired and failing to provide such agents proper training and supervision regarding their handling and maintaining the confidentiality of Cardholders' personal information, and by failing to secure Cardholders' personal information from unnecessary and unauthorized access by subcontractors' employees and others.

(MCC ¶ 553(e); *see also id.* ¶ 55 (substantially the same)). The Court agrees that

these allegations are specific and concrete, and sufficient to state a claim. (Dkt. 90 at 27). The allegations—particularly the allegation that BANA failed to ensure its agents were subjected to background checks—are sufficient to allege that BANA failed "to implement and maintain reasonable security procedures and practices." Cal. Civ. Code § 1798.150; *see also Dugas*, 2016 WL 6523428, at *11. BANA's motion to dismiss Plaintiffs' CCPA claim is **DENIED** to the extent that claim is based on BANA's failure to ensure its subcontractors maintained the confidentiality of Plaintiffs' personal information.

BANA also argues that the MCC fails to plead facts showing that the personal information at issue here was "nonencrypted or nonredacted," a necessary condition for liability under the CCPA. *See* Cal. Civ. Code § 1798.150(a)(1). However, the MCC alleges that the information contained on magnetic stripes is "easily readable" and that, after a successful skimming attack, recipients of the information can "use the information [from the magnetic stripe] to clone the consumer's card, conduct unauthorized transactions, and access the bank account connected to the card." (MCC ¶ 61). The allegation that at least one Class Plaintiff's information was stolen and used following a skimming attack strongly supports an inference that Plaintiffs' information was readable or useable immediately after a skimming attack. (*See, e.g.*, *id.* ¶ 187). These allegations are sufficient to state a claim that Plaintiffs' personal information was "nonencrypted or nonredacted." *See* § 1798.150(a)(1).

BANA's motion to dismiss the MCC's CCPA claim is **GRANTED IN PART** and **DENIED IN PART**. To the extent that claim is dismissed, it is **DISMISSED WITH LEAVE TO AMEND**.

### C.   California Customer Records Act (Claim 3)

The MCC's third claim alleges BANA violated the California Customer Records Act ("CCRA"), Cal. Civ. Code §§ 1798.80 *et seq.*, by failing to notify Plaintiffs when BANA suffered a data breach and that Plaintiffs' unencrypted

personal data was obtained by unauthorized persons. (MCC ¶¶ 562–574).[10] The CCRA provides, in relevant part:

> A person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose a breach of the security of the system following discovery or notification of the breach in the security of the data to a resident of California (1) whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person. . . . The disclosure shall be made in the most expedient time possible and without unreasonable delay.

Cal. Civ. Code § 1798.82(a). The CCRA also describes the information that must be included in the notification and the form the notification must take. *See* § 1798.82(d).

The CCRA requires a business to notify customers only after the security of system containing a customer's personal data is breached. *See* § 1798.82(a). Thus, to state a claim under the statute, a complaint must plausibly allege such a breach occurred. *See In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1300 (S.D. Cal. 2020) (collecting cases in which plaintiffs made specific allegations supporting the occurrence of a data breach). BANA argues that the MCC makes only conclusory and speculative allegations that a security breach occurred, and that such allegations are insufficient to state a claim under the CCRA. (Dkt. 84-1 at 30–31). As the Court found regarding Plaintiffs' CCPA claim, the MCC states sufficient facts to adequately allege that Plaintiffs' personal information was "subject to an unauthorized access and exfiltration, theft, or disclosure" as a result of the use of magnetic stripes. § 1798.150(a)(1). This is also sufficient to allege "a breach of

---

[10] The CCRA claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, and *Robinson* actions. (*See* MCC at 244).

the security of [a] system" that includes Plaintiffs' personal data, as required under the CCRA. § 1798.82(a).

However, the CCRA requires businesses to notify customers of a breach "without unreasonable delay" after the business "discover[s]" or is "notif[ied]" of the breach. *See id.* And the MCC doesn't contain any facts alleging when BANA "discover[ed]" or was "notif[ied]" of the alleged data breach. *See id.* Without alleging when the alleged breach occurred or when BANA learned of it, the MCC doesn't adequately allege that BANA "unreasonably delay[ed]" in notifying Plaintiffs. *See id.*; *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-2752-LHK, 2017 WL 3727318, at *38 (N.D. Cal. Aug. 30, 2017) ("[A]bsent any allegations in the [complaint] suggesting when Defendants learned of the 2013 breach, Plaintiffs have not adequately alleged that Defendants 'unreasonably delay[ed]' in notifying Plaintiffs of the 2013 Breach."). Plaintiffs argue reliance on *Yahoo!* is misplaced because here, unlike in *Yahoo!*, the MCC alleges that BANA's agents were responsible for the breach and therefore, BANA should have known the breach occurred. (Dkt. 90 at 27–28). Even assuming that's true, the MCC doesn't allege when the breach occurred, so it fails to adequately allege BANA "unreasonably delay[ed]" in notifying Plaintiffs. *See* § 1798.82(a).

BANA's motion to dismiss the MCC's CCRA claim is **GRANTED**, and that claim is **DISMISSED WITH LEAVE TO AMEND**.

### D.   California's Unfair Competition Law (Claim 4)

The MCC's fourth claim alleges BANA violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.* (MCC ¶¶ 575–584).[11] The UCL is a consumer protection statute that broadly prohibits "any unlawful, unfair or fraudulent business act or practice." § 17200. "Each of

---

[11] The UCL claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Alvarez*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, *Rojas de Charolet*, *Talia*, and *Verdun* actions. (*See* MCC at 246).

these three adjectives captures 'a separate and distinct theory of liability.'" *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009)). The MCC alleges that BANA is liable under the UCL for both "unfair" and "unlawful" conduct, (*see* MCC ¶¶ 577, 579), and seeks "restitution, disgorgement, and other equitable relief, including injunctive relief," (*id.* ¶ 584). BANA argues Plaintiffs' UCL claim should be dismissed for multiple reasons, including for failing to establish the inadequacy of legal remedies. (Dkt. 84-1 at 31–32).

A plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) (citing *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1266 (1992)) ("A UCL action is equitable in nature; damages cannot be recovered."); *Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law.") (ellipsis in original); *see also, e.g.*, *Schroeder v. United States*, 569 F.3d 956, 963 (9th Cir. 2009) ("[E]quitable relief is not appropriate where an adequate remedy exists at law.").

Plaintiffs oppose the application of *Sonner* to their UCL claims, arguing that the argument is premature and that the Court should permit them to plead a UCL claim in the alternative because this case is in a different procedural posture from *Sonner*. (Dkt. 90 at 43 (citing *Edleson v. Travel Insured Int'l, Inc.*, No. 21-cv-323-WQH-AGS, 2021 WL 4334075, at *6 (S.D. Cal. Sept. 23, 2021) ("[N]o controlling authority prevents a plaintiff from asserting alternative legal remedies at the pleading stage."))). But *Sonner's* holding applies regardless of a case's procedural posture. *See Rivera v. Jeld-Wen, Inc.*, No. 21-cv-1816-AJB-AHG, 2022 WL

3702934, at *12 (S.D. Cal. Feb. 4, 2022) (collecting cases rejecting arguments distinguishing *Sonner* based on procedural posture); *see also Lisner v. Sparc Grp. LLC*, No. 21-cv-5713-AB-GJS, 2021 WL 6284158, at *8 (C.D. Cal. Dec. 29, 2021) (collecting cases and holding that "*Sonner's* reasoning applies at the pleading stage"). *But see Edleson v. Travel Insured Int'l, Inc.*, 2021 WL 4334075, at *6. And, under *Sonner*, "[t]he issue is not whether a pleading may seek distinct forms of relief in the alternative, but rather whether a prayer for equitable relief states a claim if the pleading does not demonstrate the inadequacy of a legal remedy. On that point, *Sonner* holds that it does not." *Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 907 (N.D. Cal. 2021) (citing *Sonner*, 971 F.3d at 844).

Here, the MCC pleads claims for equitable relief under the UCL but doesn't allege inadequate legal remedies. (MCC ¶¶ 575–584). The MCC therefore fails to state a UCL claim under *Sonner*. *Accord Sharma*, 524 F. Supp. 3d at 907. BANA's motion to dismiss the MCC's UCL claim is **GRANTED** and that claim is **DISMISSED WITH PREJUDICE**.

### E.    Negligence (Claims 5 & 6)

The MCC's fifth claim alleges BANA breached its duty of care to Plaintiffs by failing to: (1) maintain the security of their personal and account information; (2) issue EDD Debit Cards with EMV chips; (3) employ reasonable fraud prevention and notification practices; (4) provide effective customer service; (5) process and investigate claims in a timely manner; and (6) provide provisional credits while investigating fraud claims. (MCC ¶¶ 585–593). The MCC's sixth claim alleges BANA was negligent in its hiring, supervision, and retention of its subcontractors. (MCC ¶¶ 594–600).[12]

---

[12] The negligence claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Alvarez*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, *Rojas de Charolet*, *Talia*, and *Verdun* actions. (*See* MCC at 252). The negligent hiring,

Under California law, the elements of a negligence claim are (1) duty, (2) breach, (3) causation, and (4) injury. *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017). BANA argues Plaintiffs' claims are barred by the economic loss doctrine. (Dkt. 84-1 at 24–25). BANA also argues that the MCC fails to allege facts sufficient to establish the duty and causation elements of a negligence claim. (*Id.* at 25–27).

### 1.   Economic Loss Doctrine & Duty

BANA first argues that the economic loss doctrine bars Plaintiffs' claims. (*Id.* at 24–25). "In California, the 'general rule' is that people owe a duty of care to avoid causing harm to others and that they are thus usually liable for injuries their negligence inflicts." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 398 (2019). However, "[i]n the absence of personal injury, physical damage to property, a special relationship between the parties, or some other common law exception to the rule, recovery of purely economic loss for negligence is foreclosed." *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 913 (S.D. Cal. 2020) (citing *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803–04 (1979)); *S. Cal. Gas*, 7 Cal. 5th at 400 ("[L]iability in negligence for purely economic losses . . . is 'the exception, not the rule.'"). Plaintiffs argue their negligence claims aren't barred because: (i) they allege non-economic injuries; (ii) the independent duty exception applies; and (iii) the "special relationship" exception applies. (Dkt. 90 at 29–33).

### i.   Non-Economic Injury

Plaintiffs first argue that the economic loss doctrine doesn't apply here because the MCC adequately alleges non-economic injuries, "including the denial of access to necessary information and wasted time caused by grossly inadequate customer service." (Dkt. 90 at 29; *see also, e.g.*, MCC ¶¶ 140, 158,

_____

supervision, and retention claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the *Alvarez*, *Rojas de Charolet*, and *Verdun* actions. (*See* MCC at 255).

166, 218, 240, 283–84 (alleging BANA failed to respond to requests for information); 117–26, 133, 141, 145–50, 179–84, 198, 209–13, 221–23, 251 (alleging extremely long phone wait times and inadequate customer service)).

For the most part, district courts in California have treated time lost responding to a data breach as a purely economic injury for which recovery is barred by the economic loss doctrine, including when the breach exposed personal financial information, such as credit card numbers. *See, e.g.*, *Dugas*, 2016 WL 6523428, at *12 (finding unauthorized credit card transactions, "theft of [the plaintiff's] credit card information, costs associated with prevention of identity theft, and costs associated with time spent and loss of productivity" were purely economic injuries); *Gardiner v. Walmart Inc.*, No. 20-CV-04618-JSW, 2021 WL 2520103, at *8 (N.D. Cal. Mar. 5, 2021) (finding time lost responding to a data breach that exposed the plaintiff's personal information was a purely economic injury). However, some courts have treated lost time as a non-economic injury when the data breach exposes medical information or leads to an increase in spam or phishing attempts. *See, e.g.*, *Stasi*, 501 F. Supp. 3d at 913 (distinguishing *Dugas* and finding lost time a non-economic injury when the data breach exposed medical information and increased spam/phishing attempts); *In re Solara*, 613 F. Supp. 3d at 1294–95 (same); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019) (finding time lost responding to spam emails following a breach that disclosed non-financial personal information was a non-economic injury).

The situation here is closest to the facts in *Dugas*, 2016 WL 6523428. There, the plaintiff alleged his credit card number and other personal information was obtained by an unknown third party in a data breach and "used for unauthorized purchases, exposing him to losses, frustration and on-going requirements to protect himself from identity theft." *Id.* at *1. The court found those loses were purely economic injuries and that recovery under a negligence theory was barred by the economic loss doctrine. *Id.* at *12. Here, the MCC alleges Plaintiffs' account

and personal information was obtained by unknown third parties and used for unauthorized transactions, forcing them to spend significant time responding to the breach. (*See, e.g.*, MCC ¶¶ 117–26, 133, 141, 145–50, 179–84, 198, 209–13, 221–23, 251). It also alleges BANA denied them access to information. (*See, e.g.*, *id.* ¶¶ 140, 158, 166, 218, 240, 283–84). As in *Dugas*, the loss of money through fraudulent transactions and time due to responding to the breach are purely economic injuries. *See Dugas*, 2016 WL 6523428, at *12. Therefore, the Court holds the MCC doesn't allege non-economic injuries sufficient to overcome the economic loss doctrine.

### ii.    Independent Duty

Plaintiffs next argue the economic loss doctrine doesn't apply because the "independent duty exception" applies to their claims. (Dkt. 90 at 29–30). "The independent duty exception to the economic loss rule applies where the defendant's conduct 'violates a duty independent of the contract arising from principles of tort law.'" *R Power Biofuels, LLC v. Chemex LLC*, No. 16-cv-716-LHK, 2016 WL 6663002, at *10 (N.D. Cal. Nov. 11, 2016) (quoting *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999)). But, "[a]s the California Supreme Court has explained, the exception 'focus[es] on intentional conduct.'" *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1040 (N.D. Cal. 2021) (quoting *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004)) (second alteration in original). Plaintiffs' negligence claims aren't based on intentional misconduct. Therefore, the independent duty exception doesn't overcome the economic loss doctrine. *See also NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1030 (E.D. Cal. 2013) (rejecting application of independent duty exception to negligence claim).

//

//

//

### iii.  Special Relationship

Plaintiffs last argue the economic loss doctrine doesn't apply because the "special relationship exception" applies. (Dkt. 90 at 30–33). "The primary exception to the general rule of no-recovery for negligently inflicted purely economic losses is where the plaintiff and the defendant have a 'special relationship.'" *S. Cal. Gas*, 7 Cal. 5th at 400. Courts consider six factors to determine whether a special relationship exists:

> (i) "the extent to which the transaction was intended to affect the plaintiff," . . . (ii) "the foreseeability of harm to the plaintiff," (iii) "the degree of certainty that the plaintiff suffered injury," (iv) "the closeness of the connection between the defendant's conduct and the injury suffered," (v) "the moral blame attached to the defendant's conduct," and (vi) "the policy of preventing future harm."

*Id.* at 401 (quoting *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979)); *see also Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968) (articulating an earlier version of the factors). "[T]he inquiry hinges not on mere rote application of these . . . factors, but instead on a comprehensive look at the . . . sum total of the policy considerations at play in the context before [the court]." *S. Cal. Gas*, 7 Cal. 5th at 399 (internal quotation marks omitted). If a plaintiff demonstrates a special relationship under the *Rowland* factors, such a showing is sufficient to both overcome the economic loss doctrine and show the defendant owed the plaintiff a duty of care. *See, e.g.*, *Castillo v. Seagate Tech., LLC*, No. 16-cv-1958-RS, 2016 WL 9280242, at *3 (N.D. Cal. Sept. 14, 2016) (applying *Rowland* factors to determine whether Defendants owed Plaintiffs a duty of care in a negligence action); *Fabian v. LeMahieu*, No. 19-cv-54-YGR, 2019 WL 4918431, at *12 (N.D. Cal. Oct. 4, 2019) (same).

Applying the special relationship factors here counsels in favor of finding BANA owed Plaintiffs a duty of care. The first factor is "the extent to which the transaction was intended to affect the plaintiff." *J'Aire*, 24 Cal. 3d at 804. BANA

was the exclusive provider of electronic benefits payments for EDD, (MCC ¶ 39), and Plaintiffs had to provide BANA their personal information to receive benefits payments, (*id.* ¶¶ 46–47). This is sufficient to satisfy the first factor. *Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 655 (N.D. Cal. 2020) (collecting cases finding that "the first factor is met when plaintiffs share personal data with a company with the understanding that the company will protect that data").

The second factor is "the foreseeability of harm to the plaintiff." *J'Aire*, 24 Cal. 3d at 804. Courts "determine foreseeability not by reference to specific parties but instead based on the general sort of conduct at issue." *S. Cal. Gas*, 7 Cal. 5th at 401 n.5. The MCC alleges BANA failed to use appropriate security procedures to protect Plaintiffs' account and personal information, including by failing to issue EDD Debit Cards with EMV chips. (*See generally* MCC ¶¶ 59–69 (discussing EMV chips)). Because it was foreseeable Plaintiffs would be subject to fraud if BANA didn't adequately protect their account information, *see, e.g.*, *Huynh*, 508 F. Supp. 3d at 657 (finding it foreseeable that the plaintiff would suffer injury if the defendant failed to adequately protect the plaintiff's personal information); *In re Yahoo!*, 313 F. Supp. 3d at 1132 (same); *Terpin v. AT&T Mobility, LLC,* 399 F. Supp. 3d 1035, 1120, 1049 (C.D. Cal. 2019) (same), this factor is also met.

The third factor is "the degree of certainty that the plaintiff suffered injury" and the fourth factor is "the closeness of the connection between the defendant's conduct and the injury suffered". *J'Aire*, 24 Cal. 3d at 804. The MCC alleges Plaintiffs were injured by the theft of their EDD benefits and their injuries were made possible by BANA's alleged failure to protect their account information. (MCC ¶¶ 4, 591–92). Those allegations are sufficient to satisfy these factors. *See Corona v. Sony Pictures Ent., Inc.*, No. 14-cv-9600-RGK-EX, 2015 WL 3916744, at *3, *5 (C.D. Cal. June 15, 2015) (finding third factor satisfied by "inability to use credit and assets frozen" due to fraud); *Huynh*, 508 F. Supp. 3d at 657–58 (finding fourth factor satisfied by allegations injury stemmed from the defendant's failure

to protect personal information).

The fifth factor is "the moral blame attached to the defendant's conduct." *J'Aire*, 24 Cal. 3d at 804. The MCC alleges that BANA issued EDD Debit Cards without EMV chips that were vulnerable to skimming and other forms of attack at the same time it was issuing normal consumer debits card with EMV chips. (*See generally* MCC ¶¶ 59–69 (discussing EMV chips)). In other words, the MCC alleges that BANA issued Plaintiffs—recipients of public benefits—less secure cards than its paying customers. Although Plaintiffs don't impute an economic incentive to BANA for this, the disparity in treatment is sufficient to satisfy the fifth factor. *AFL v. EDD*, 88 Cal. App. 3d 811, 821 (1979) (noting that unemployment benefits are made available to newly unemployed workers to allow them to survive at a subsistence level).

The sixth factor is "the policy of preventing future harm." *J'Aire*, 24 Cal. 3d at 804. The Court agrees with Plaintiffs that imposing liability for the alleged negligence would encourage companies facing similar circumstances in the future to act more carefully. (*See* Dkt. 90 at 32); *Huynh*, 508 F. Supp. 3d at 658 (finding sixth factor satisfied when imposing liability would encourage similar companies to better safeguard consumers' personal information); *In re Sony Gaming*, 996 F. Supp. 2d at 972 (finding that "imposing liability might influence other businesses to take the necessary precautions").

BANA responds to only a few of Plaintiffs' arguments regarding the *Rowland* factors, instead primarily arguing that Plaintiffs' "special relationship" argument rests on the mistaken premise that BANA-issued debit cards were the only way to obtain EDD benefits. (Dkt. 92 at 15–16). BANA has held the exclusive contractual right to provide electronic benefits payments for EDD since 2010, (MCC ¶ 39), and the MCC plausibly alleges that EDD presented BANA debit cards as the "exclusive means" to receive EDD benefits, (*see id.* ¶ 47 ("EDD Debit Cards are the default payment method for EDD benefits, and EDD's website presents EDD

Debit Cards as the exclusive means of receiving EDD benefits.")). Accepting these allegations as true, the MCC plausibly alleges that Plaintiff had to provide BANA their personal information in order to obtain EDD benefits. This is sufficient to permit the application of the special relationship factors. *See Corona*, 2015 WL 3916744, at *5 (applying special relationship factors when Plaintiffs alleged having to provide their personal information to receive employment benefits).

BANA also argues that, as a bank, it doesn't owe Plaintiffs any duty of care and that it doesn't have a "special relationship" with Plaintiffs, its depositors. (*See* Dkt. 84-1 at 25; Dkt. 92 at 15–16). BANA cites to cases supporting the proposition that "the bank-depositor relationship is not a 'special relationship.'" (*See, e.g.*, Dkt. 84-1 (quoting *Belluomini v. Citigroup, Inc.*, No. CV 13-01743 CRB, 2013 WL 3855589, at *5 (N.D. Cal. July 24, 2013)). But that conclusion is qualified, with courts noting that the bank-depositor relationship isn't a "special relationship" under *ordinary circumstances*. *Copesky v. Superior Ct.*, 229 Cal. App. 3d 678, 694 (1991) ("It is thus our conclusion that banks, *in general* and in this case, are not fiduciaries for their depositors; and that the bank-depositor relationship is not a 'special relationship' . . . such as to give rise to tort damages.") (emphasis added); *Lawrence v. Bank of America*, 163 Cal. App. 3d 431, 437 (1985) ("*[U]nder ordinary circumstances* the relationship between a bank and its depositor is that of debtor-creditor, and is not a fiduciary one.") (emphasis added). BANA's relationship with Plaintiffs is clearly not an "ordinary" banking relationship. Plaintiffs aren't typical depositors because their only relationship with BANA is for the purpose of facilitating the receipt of public benefits. And BANA isn't operating as a normal bank because it is distributing public benefit funds, as opposed to holding funds deposited by Plaintiffs.

Having balanced the *Rowland* factors, the Court holds they weigh in favor of finding a special relationship between BANA and Plaintiffs. Accordingly, the Court holds the economic loss doctrine doesn't bar Plaintiffs' claims. Further, the

Court holds that Plaintiffs have sufficiently alleged that BANA owed Plaintiffs a duty to exercise reasonable care with respect to their administration of EDD benefits.

*   *   *

BANA's motion to dismiss the MCC's negligence claims as barred by the economic loss doctrine or for failure to allege a duty is **DENIED**.

### 2.   Causation

BANA argues the MCC fails to adequately allege causation for Plaintiffs' negligence claim, (MCC ¶¶ 585–593), and negligent hiring, supervision, and retention claim, (*id.* ¶¶ 594–600). (Dkt. 84-1 at 26–27).

### i.   Negligence

With respect to the negligence claim, BANA contends that the MCC's allegations are too speculative to support an inference that the lack of EMV chips caused Plaintiffs' injuries. (Dkt. 84-1 at 26). Specifically, BANA argues that the allegations that some Plaintiffs experienced fraud after using their cards and that one Plaintiff believes her card was skimmed are insufficient the state a claim. (*Id.*; Dkt. 92 at 17). The MCC alleges that the EDD Debit Cards were more susceptible to skimming attacks than cards with EMV chips. (*See* MCC ¶ 61); *supra* Section III.B. Plaintiffs also allege that Lindsay McClure's EDD Debit Card was skimmed when she used it at a gas station on December 1, 2020. (*Id.* ¶ 187). These facts are sufficient to plausibly allege McClure's injuries occurred due to the lack of EMV chips, which in turn supports an inference that other Plaintiffs were also injured by the lack of chips. Additional facts about the prevalence of skimming attacks and other alleged security failures are likely in BANA's possession. *See Flores-Mendez v. Zoosk, Inc.*, No. C 20-4929 WHA, 2021 WL 308543, at *4 (N.D. Cal. Jan. 30, 2021) (finding causation allegations sufficient to survive a motion to dismiss when the complaint alleged a data breach occurred and

additional information about security system was likely held by the defendant).[13]

BANA also argues that the MCC's allegations don't plausibly allege BANA's conduct caused Plaintiffs' injuries because the MCC doesn't rule out other possible causes, including security breaches at EDD. (Dkt. 92 at 25 (citing MCC ¶ 62)). BANA argues Plaintiffs' negligence claim must be dismissed because Plaintiffs fail to allege facts "tending to exclude the possibility that [an] alternative explanation is true." (*Id.* (quoting *In re Century Aluminum*, 729 F.3d at 1108)). The MCC's allegations about skimming are sufficient to satisfy that standard. (*See* MCC ¶ 187). Accepting those allegations as true tends to exclude the possibility that a separate data breach was a more likely cause of Plaintiffs' injuries than the lack of EMV chips. *See In re Century Aluminum*, 729 F.3d at 1108; *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").

With respect to the MCC's negligence *per se* theories, BANA argues that Plaintiffs fail to allege sufficient facts to support an inference BANA violated any of the four statutes cited in the MCC. (Dkt. 84-1 at 25–26).[14] Plaintiffs' negligence

---

[13] *See also Flores-Mendez*, 2021 WL 308543, at *4 ("[V]irtually all of the details that defendants insist on are in possession of the defendants, and not in possession of plaintiff. It is unreasonable for defendant to insist that the details be laid out in the initial complaint. The common law doctrine of *res ipsa loquitur* has some application here. The consuming public has come to believe that the internet companies, which take in their private information, have taken adequate security steps to protect the security of that information from any and all hackers or interventions. The ordinary consumer, however, has no clue what internet companies' security steps are. There would be no way for users to know what security steps were actually in place. Therefore, when a breach occurs, the thing speaks for itself. The breach would not have occurred but for inadequate security measures, or so it can be reasonably inferred at the pleadings stage.").

[14] BANA also argues negligence *per se* doesn't support an independent cause of action absent a viable negligence claim. (Dkt. 84-1 at 25). BANA is correct, but

*per se* theories are based on alleged violations of: the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.*; the California Financial Information Privacy Act, Cal. Fin. Code §§ 4050 *et seq.*; the California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*; and the California Consumer Records Act, *id.* §§ 1798.80 *et seq.* (MCC ¶ 589). To allege a violation of the Gramm-Leach-Bliley Act ("GLBA"), a complaint must allege a bank failed to satisfy certain regulatory requirements regarding the way information is stored and transmitted. *See* 15 U.S.C. § 6801; 16 C.F.R. §§ 314.3, 314.4. The MCC makes only conclusory allegations about how BANA stored and transmitted Plaintiffs' personal information. (*See* MCC ¶¶ 55–58, 580–81, 589–90). These allegations are insufficient to allege BANA violated the GLBA. To allege a violation of the California Financial Information Privacy Act ("CFIPA"), a complaint must allege a bank disclosed or shared a consumer's nonpublic personal information with an unauthorized third party. Cal. Fin. Code §§ 4052–4052.5, 4057. The MCC's only allegations of such disclosures are entirely conclusory and don't adequately state a claim under the CFIPA. (*See* MCC ¶¶ 582, 589–90). As for the California Customer Records Act ("CCRA"), the Court has already found the MCC fails to state a claim under the statute. *See infra* Section III.C. And the Court has already found the MCC adequately states a claim under the California Consumer Privacy Act ("CCPA"). *See infra* Section III.B.

BANA's motion to dismiss the MCC's negligence claim for failing to adequately allege causation is **GRANTED IN PART** and **DENIED IN PART**. The claim is **DISMISSED WITH LEAVE TO AMEND** to the extent it relies on allegations that BANA violated the GLBA, CFIPA, or CCRA.

---

that conclusion has no effect here because, for the reasons discussed above, Plaintiffs plead a viable negligence claim and, therefore don't assert an independent negligence *per se* claim. *See California v. Kinder Morgan Energy Partners, L.P.*, 569 F. Supp. 2d 1073, 1087 (S.D. Cal. 2008) ("[N]egligence per se is merely an evidentiary doctrine and not an independent cause of action.").

### ii.    Negligent Hiring, Supervision, & Retention

With respect to the MCC's negligent hiring claim, BANA argues Plaintiffs make only speculative claims that BANA's contractors committed a series of internal data breaches without the support of any concrete allegations. (Dkt. 84-1 at 26–27). The MCC alleges that BANA, acting through its agent TTEC Holdings, Inc. ("TTEC"), "hired hundreds if not thousands of employees *en masse* to perform services for [BANA] without ever conducting a background check on these individuals" who were subsequently given access to Plaintiffs' personal and account information. (MCC ¶¶ 596 (emphasis in original); 55 (substantially the same)). Plaintiffs further allege the lack of background checks "harmed and continues to harm Plaintiffs and Class Members by subjecting them to unreasonable risk of fraud and exfiltration of their Cardholder Information and enabled a series of internal data breaches committed by TTEC employees within the scope of their employment." (*Id.* ¶ 598). While the MCC could be more detailed as to how the lack of background checks caused Plaintiffs' injuries, at the pleading stage, these allegations are sufficient to support the inference that data breaches "likely occurred due to problems with [BANA's] cybersecurity practices and procedures." *Top Trade v. Grocery Outlet*, No. 2:17-cv-8467-SVW-MRW, 2018 WL 6038297, at *4 (C.D. Cal. May 9, 2018).

BANA's motion to dismiss the MCC's negligent hiring, supervision, and retention claim is **DENIED**.

### iii.    Standing to Pursue Injunctive Relief

BANA also argues that Plaintiffs lack standing to seek injunctive relief based on their negligence claim because they allege only a conjectural and hypothetical future harm (Dkt. 84-1 at 27). To establish Article III standing, a plaintiff must show: (1) injury in fact; (2) causation; and (3) redressability. *Lujan*, 504 U.S. at 560–61. "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not "conjectural" or "hypothetical."'" *Susan*

*B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Allegations that a plaintiff faces a continued threat of future harm stemming from the prior theft of personal information can constitute injury in fact sufficient to confer standing. *See In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1216 (N.D. Cal. 2014) (finding "increased risk of future harm" from theft of personal injury sufficient for Article III standing when Plaintiffs allege their "stolen data ha[d] already been misused"); *see also Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) (finding employees alleged "a credible threat of real and immediate harm stemming from the theft of a laptop containing their unencrypted personal data"). Other circuits have held the threat of future unauthorized transactions is sufficient to show Article III standing when the complaint alleges the theft of card information has already resulted in unauthorized transactions. *See, e.g.*, *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 965, 967 (7th Cir. 2016) (finding the theft of card information created an "increased risk of fraudulent charges and identity theft" sufficient to confer standing when one named plaintiff alleged unauthorized charges); *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 690, 693 (7th Cir. 2015) (finding allegations of theft of credit card information and fraudulent charges sufficient to support inference of "substantial risk of harm" that conferred class standing).

Here, the MCC alleges Plaintiffs' account and personal information has been stolen and that Plaintiffs have already experienced unauthorized transactions. (*See, e.g.*, MCC ¶ 137). Additionally, the MCC alleges that most Plaintiffs continue to receive EDD benefits from BANA, (*see, e.g.*, *id.* ¶ 143), and that Plaintiffs continue to experience unauthorized transactions, (*see id.* ¶ 113). These allegations are sufficient to allege a "substantial risk" that Plaintiffs will

21-md-2992-LAB-MSB

suffer future harm stemming from the data breach, which is sufficient to establish Article III standing to seek injunctive relief. *See, e.g.*, *In re Adobe*, 66 F. Supp. 3d at 1216.

BANA's motion to dismiss the MCC negligence claims to the extent they seek prospective injunctive relief is **DENIED**.

## F.   Contract (Claim 7)

The MCC's seventh claim alleges BANA breached its contract with Plaintiffs by: (1) violating the contract's claims investigation, reimbursement, and error resolution provisions; (2) freezing or blocking Plaintiffs' accounts; or (3) failing to make funds available when instructed to do so by EDD. (MCC ¶¶ 603–10).[15] BANA moves to dismiss Plaintiffs' direct contract claims in their entirety. (Dkt. 84-1 at 7–14). To state a claim for breach of contract under California law, a complaint must plead sufficient facts to plausibly demonstrate "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820 (2011). Here, the parties don't dispute the existence of a contract. (MCC ¶¶ 70–73).

Under California law, "[t]he interpretation of a written instrument, even though it involves what might properly be called questions of fact, is essentially a judicial function." *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965) (citation omitted). Similarly, "[t]he determination of whether a written contract is ambiguous is a question of law for the court." *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995). A contract provision is considered ambiguous when it is capable of two or more reasonable constructions. *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (quoting *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995)). "But

---

[15] The contract claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* actions. (*See* MCC at 257).

language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id.*

The Court first considers which contract forms the basis of Plaintiffs' contract claims before turning to the merits of those claims.

### 1.   Governing Account Agreement

First the Court must determine which account agreement should be considered when analyzing the MCC's contract claim. BANA requests the Court take judicial notice of one version, (*see* Dkt. 84-3, Chestnut Decl., Ex. 1), and Plaintiffs request the Court take judicial notice of another, (*see* Dkt. 90-3, Danitz Decl., Ex. A). Each party opposes the other's request for judicial notice. (*See* Dkt. 90-2 (opposing BANA's request); 92-1 (opposing Plaintiffs' request)). "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside of the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003); *see also* Fed. R. Civ. P. 12(b). However, a court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Ritchie*, 342 F.3d at 908 (citations omitted). A document not attached to the complaint "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* Generally, a document should only be treated as part of the complaint if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). "[T]he district court may treat [an incorporated document] as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

988, 1003 (9th Cir. 2018).

Additionally, in ruling on a Rule 12(b)(6) motion, courts may consider relevant matters subject to judicial notice. *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). A court may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

As the parties concede, the two versions of the account agreements are nearly identical. (Dkt. 90-1 at 2 n.1; 92-1 at 2). There is, however, one critical difference: the version submitted by BANA states that North Carolina law governs the contract, while the version submitted by Plaintiffs states that California law governs. (*Compare* Chestnut Decl., Ex. 1 § 18, *with* Danitz Decl., Ex. A § 18). The Account Agreement at issue here covered individuals receiving EDD benefits from California, and Plaintiffs represent the version they provide—which states California law governs the contract—was obtained from BANA's website for EDD Cardholders. (Dkt. 90-2). Due to the discrepancy in the governing law provision, Plaintiffs' dispute the authenticity of the version filed by BANA, rendering it inappropriate for incorporation by reference. *See Marder*, 450 F.3d at 448. Additionally, because BANA's version is subject to reasonable dispute by Plaintiffs, it isn't an appropriate subject of judicial notice. Fed. R. Evid. 201(b). On the other hand, Plaintiffs' version includes identical provisions to BANA's version, and BANA doesn't provide any reason to question the authenticity of a version of the Account Agreement provided on its website. (*See* Dkt. 92-1 at 2). Accordingly, BANA's request for judicial notice is **DENIED** as to Exhibit 1 of to the Chestnut Declaration, (Dkt. 84-2); and Plaintiffs' request for judicial notice is **GRANTED** as to Exhibit A of the Danitz Declaration, (Dkt. 90-1). The Court holds that the version of the Account Agreement provided by Plaintiffs is incorporated by reference into the complaint and appropriately assumed to be true for the purposes of this Order.

1    *See Ritchie*, 342 F.3d at 908; (Danitz Decl., Ex. A).

2              **2.     Breach of Contract Claim**

3                   **i.     Claims Investigation and Reimbursement**

4         Sections 9 and 11 of the Account Agreement provide the contractually

5    mandated procedures for investigation claims of unauthorized transactions or

6    error. (Danitz Decl., Ex. A §§ 9, 11). BANA argues that the MCC fails to allege

7    sufficiently that it breached Sections 9 or 11. (Dkt. 84-1 at 8–12). BANA advances

8    three separate arguments, which the Court addresses in turn.

9         First, BANA argues all Plaintiffs fail to allege facts sufficient to trigger

10   BANA's obligations under the contract. Specifically, it argues Plaintiffs failed to

11   identify an "unauthorized transaction" under Section 9 or an "error" under

12   Section 11, including by making bare allegations that "fraud" occurred; failed to

13   provide BANA timely notification; and failed to provide the information required

14   under the Account Agreement. (*Id.* at 9). The Account Agreement uses nearly

15   identical definitions of "unauthorized transaction" and "error" as those in the EFTA

16   and Reg E. (*Compare* Danitz Decl., Ex. A § 9 (unauthorized transaction))*, with*

17   15 U.S.C. § 1693a(12) (same)*, and* 12 C.F.R. § 1005.2(m) (same); (*compare*

18   Danitz Decl., Ex. A § 11 (error))*, with* 15 U.S.C. § 1693f(f) (same)*, and* 12 C.F.R.

19   § 1005.11(a)(1) (same). The Court holds that any Plaintiff failing to allege notifying

20   BANA of an unauthorized transaction or error within the meaning of the EFTA also

21   fails to make such an allegation within the meaning of the Account Agreement.

22   BANA's motion to dismiss the MCC's breach of contract is **GRANTED** as to any

23   Plaintiff failing to allege either an unauthorized transaction or error, and the

24   contract claim of any such Plaintiff is **DISMISSED WITH LEAVE TO AMEND**.

25   BANA's motion to dismiss is **DENIED** as to any Plaintiff found to have adequately

26   alleged a claim under the EFTA.

27        BANA also argues that many Plaintiffs failed to provide timely notice of

28   fraud. The Account Agreement requires notice be provided soon after fraud

occurs. (*See* Danitz Decl., Ex. A § 9 (requiring notice of unauthorized transactions "within a reasonable time," to "be determined in [BANA's] sole discretion"); § 11 (requiring notice of error no later than 60 days after the first statement on which the error appeared)). The notice period closely tracks the EFTA's notice period. *See* 15 U.S.C. § 1693f(a) (error must be reported to financial institution within 60 days of the consumer having been sent written documentation containing the error). The Court holds that any Plaintiff failing to allege timely notice under the EFTA also fails to allege timely notice under the Account Agreement. BANA's motion to dismiss the contract claim of any Plaintiff who provided untimely notice is **GRANTED**, and the contract claim of any such Plaintiff is **DISMISSED WITH LEAVE TO AMEND**.

Additionally, BANA argues that many Plaintiffs failed to provide the information required by the Account Agreement, including why they believe an error occurred and the dollar amount involved. (*See* Danitz Decl., Ex. A § 11). Here, the Account Agreement is slightly more restrictive than the EFTA. While the EFTA also requires that a consumer's notice "[i]ndicate[] why the consumer believes an error exists," the statute only requires consumers to include the amount of the error "to the extent possible." *See* 12 C.F.R. § 1005.11(b)(1)(iii); 15 U.S.C. § 1693f(a)(3). Every Plaintiff who sufficiently alleges providing the reason for their belief under the EFTA also makes that showing here. However, to state a claim for breach of Section 11 of the Account Agreement, each plaintiff must allege they provided BANA with the amount of any error. Numerous Plaintiffs fail to include such allegations. Therefore, BANA's motion to dismiss the MCC's breach of contract claim is **GRANTED** as to Plaintiffs who didn't allege notifying BANA of the amount of the reported error. Those Plaintiffs' claims are **DISMISSED WITH LEAVE TO AMEND**.

Second, BANA argues that any Plaintiff who has been fully reimbursed fails to state a claim for breach of contract because they can't allege damages.

(Dkt. 84-1 at 9). Unlike the EFTA, which allows a consumer to recover actual damages in limited circumstances, *see* 15 U.S.C. § 1963m(a)(1), Section 9 of the Account Agreement limits BANA's liability to the amount of any unauthorized transaction and precludes liability for special, indirect, or consequential damages, (*see* Danitz Decl., Ex. A § 9). Therefore, any Plaintiff that has been completely reimbursed can't recover contract damages, and can't state a claim for breach of contract. *Loiseau v. VISA USA Inc.*, No. 09-cv-H-JMA, 2010 WL 4542896, at *2 (S.D. Cal. Feb. 10, 2010) ("Plaintiff cannot state a breach of contract claim as to either [defendant], because he fails to allege damages."). BANA's motion to dismiss the claims of any fully reimbursed Plaintiff is **GRANTED**, and the contract claim of any such Plaintiff is **DISMISSED WITH PREJUDICE**.[16]

Third, BANA argues Plaintiffs fail to allege violations of Sections 9 or 11 of the Account Agreement. (Dkt. 84-1 at 10–11). Section 9 provides that BANA's "Zero Liability" policy doesn't apply to transactions that aren't considered "unauthorized," and allows BANA to determine a transaction is "unauthorized"

---

[16] For Plaintiffs affected by this dismissal, see (MCC ¶¶ 136–43 (Candace Koole); 144–51 (Azuri Moon); 152–59 (Roland Oosthuizen); 160–70 (Rosemary Mathews); 171–76 (Carlos Rodriguez); 177–86 (J. Michael Willrich); 187–91 (Lindsay McClure); 192–94 (Robert L. Wilson); 195–99 (Clara Cajas); 203–15 (Alan Karam); 216–24 (Luis Perez); 225–28 (Brian Wiggins); 229–36 (Jonathan Smith); 250–53 (Cindy Baker); 254–57 (Ursula Auburn); 261–67 (Kuang Ting Chong); 268–73 (Stephanie Moore); 308 (Forrest Berlt); 313 (Adam Brotman); 314 (James Bruno); 321 (Kimberly Carpenter); 322 (Patricia Castillo); 345 (Benjamin Douglass); 350 (Maritza Escalante); 353 (Dawn Farina); 359 (Meredith Friday); 366 (Elizabeth Giddens); 367 (Seante Glassflowers); 369 (Barton Gonzalez); 382 (James Hanes); 384 (Preston Hanna); 388 (Markee Harris); 392 (Gretchen Heinz); 396 (Anthony Hollingsworth); 406 (Shreel Jackson); 409 (Evett Johnson); 417 (Corey Lawson); 431 (Christina McCafferty); 434 (Michael McCrary); 436 (Linda Miller); 441 (Tiffiany Morrell); 444 (Robert Murphy); 450 (Mark Owensby); 452 (Laura Payton); 457 (Melanie Piette); 461 (Misty Pointer); 465 (Andrea Quesada); 469 (Kawana Reed); 472 (Israel Rivera); 479 (Jose Rodriguez Romo); 482 (Miguel Salazar); 484 (Michael Schmidt); 498 (Cesar Tamayo); 499 (Michelle Taylor); 502 (Tasha Trammel); 515 (Denise Wilds)).

when it "conclude[s] that the facts and circumstances do not reasonably support a claim of unauthorized use." (Danitz Decl., Ex. A § 9). All BANA must do to trigger Section 9 is reach such a conclusion. Similarly, Section 11 provides BANA great flexibility in investigating allegations of error. (*See id.* § 11). To perform under Section 11, all BANA must do is "determine whether an error occurred." (*Id.*). The allegations in the MCC don't sufficiently allege BANA failed to reach the conclusion as required by Section 9 or conduct the investigation required by Section 11. (*See, e.g.*, MCC ¶ 283 (Plaintiff alleges receiving letter from BANA stating it had "determined that no error has occurred")). Based on the plain language of the contract, Plaintiffs can't allege BANA breached its obligations under the Account Agreement simply by disagreeing with the outcome.

BANA concedes that there are a handful of Plaintiffs who have alleged they didn't receive any determination from BANA. (*See id.* ¶¶ 114–26 (Jennifer Yick), 200–02 (Stephanie Smith), 315 (Beth Burns), 337 (Michell de Vera); 346 (Kayli Duey); 384 (Preston Hanna), 398 (Crystal Horath), 440 (Sharise Morgan)). However, de Vera, Duey, Hanna, and Morgan's claims under Section 9 and 11 have already been dismissed for other reasons.

BANA's motion to dismiss the MCC's claim for breach of Sections 9 and 11 of the Account Agreement is **GRANTED** as to all Plaintiffs except Jennifer Yick, Stephanie Smith, Beth Burns, and Crystal Horath. All other claims for breach of Section 9 and 11 of the Account Agreement are **DISMISSED WITH LEAVE TO AMEND**.[17]

### ii.    Account Freezes

Section 2 of the Account Agreement permits BANA to freeze an EDD Cardholder's account if it "suspect[s] irregular, unauthorized, or unlawful activities

---

[17] For a summary of which Plaintiffs' contract claims are dismissed, see Column 2 of the chart attached as Appendix A to this Order.

involved" in the account. (Danitz Decl., Ex. A § 2). BANA is permitted to continue the freeze until the end of its investigations into its suspicions. (*Id.*). Plaintiffs allege BANA breached this section by automatically freezing accounts without a reasonable basis to do so based on the results of an unreliable Claim Fraud Filter. (MCC ¶¶ 93, 108). Additionally, Plaintiffs allege BANA breached Section 2 by maintaining freezes longer than necessary to complete investigations. (*Id.* ¶¶ 94–96, 108, 680(e)). BANA argues Plaintiffs' allegations fail to make non-conclusory allegations that BANA acted for any reason other than suspicions of fraud or that it maintained account freezes for longer than necessary. (Dkt. 84-1 at 12). The Court agrees. The MCC doesn't allege that BANA lacked the requisite suspicion when freezing accounts. The Account Agreement doesn't bar BANA from forming its suspicion with the help of a claim filter, so the use of one doesn't constitute breach. As for the length of freezes, only two Plaintiffs allege that BANA completed its investigation and then failed to lift an account freeze, but they don't allege how long BANA delayed between the resolution of the investigation and unfreezing their accounts. (MCC ¶¶ 211, 259). BANA's motion to dismiss the MCC's claims BANA breached Section 2 of the Account Agreement by issuing account freezes is **GRANTED**, and those claims are **DISMISSED WITH LEAVE TO AMEND**.

### iii.    EDD Instructions

Section 2 of the Account Agreement requires BANA to "make funds available" in accordance with EDD instructions. (Danitz Decl., Ex. A § 2). Plaintiffs allege BANA breached Section 2 by failing to make funds available when instructed by EDD by freezing Plaintiffs' access to their accounts. (MCC ¶ 608(g)–(h)). Based on the plain language of the Account Agreement, this argument fails. In addition to Section 2's funding language, the Account Agreement also contains numerous provisions that allow BANA to restrict access to accounts—and therefore EDD benefits. (Danitz Decl., Ex. A § 2 (right to freeze,

right to withdraw funds the cardholder is "not entitled to," delays for emergencies); § 3 (right to "restrict access" to card in light of "suspicious activities," limits on frequency and types of transactions); § 4 (no illegal transactions); § 16 (right to "close or suspend" account "at any time")). Adopting Plaintiffs' interpretation would render large portions of the Account Agreement of no effect. The Court avoids adopting this construction. *In re Outlaw Lab'ys, LP Litig.*, No. 18-cv-840-GPC-BGS, 2021 WL 1198652, at *3 (S.D. Cal. Mar. 30, 2021) (quoting 11 Williston on Contracts § 32:5 (4th ed. 2015)) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable."). BANA's motion to dismiss the MCC's claims BANA breached Section 2 of the Account Agreement by failing to follow EDD instructions is **GRANTED**, and those claims are **DISMISSED WITH LEAVE TO AMEND**.

### G.    Implied Contract (Claim 8)

The MCC's eighth claim alleges BANA breached its implied contract with Plaintiffs by failing "to take reasonable steps to ensure that [EDD Cardholders' accounts] were secure against unauthorized transactions and that any claims regarding unauthorized transactions were adequately investigated and resolved." (MCC ¶¶ 611–18).[18] BANA argues this claim should be dismissed because: (1) it's duplicative of Plaintiffs' express contract claim, (Dkt. 84-1 at 16–17); and (2) the MCC doesn't allege facts suggesting BANA assented to the implied contract, (*id.* at 17). Plaintiffs respond that, as a bank, BANA was bound by a contractual duty of care that is implied in all contracts between banks and their depositors. (Dkt. 90 at 16–18).

Under California law, "[i]t is well established that a bank has 'a duty to act

---

[18] The implied contract claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* actions. (*See* MCC at 259).

with reasonable care in its transactions with its depositors.'" *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 543 (1998) (quoting *Bullis v. Sec. Pac. Nat. Bank*, 21 Cal. 3d 801, 808 (1978). "The duty is an implied term in the contract between the bank and its depositor." *Id.* (citing *Barclay Kitchen, Inc. v. Cal. Bank*, 208 Cal. App. 2d 347, 353 (1962)).

Plaintiffs argue this implied duty of care is sufficient to adequately allege the existence and breach of an implied contract. However, all of the cases Plaintiffs cite in support of this theory rely on the implied duty to support *negligence* claims, not implied contract claims. *See Chazen*, 61 Cal. App. 4th 543 (analyzing implied duty to establish duty for a negligence claim); *Webster v. HSBC Bank USA Nat'l Ass'n*, No. CV 11-10798-DMG-AGRx, 2012 WL 13012700, at *3 (C.D. Cal. Mar. 5, 2012) (finding implied duty sufficient to establish duty for negligence claim); *Hawkins v. Bank of Am., N.A.*, No. 17-cv-1954-BAS-AGS, 2018 WL 1316160, at *3 (S.D. Mar. 14, 2018) (same).

BANA's motion to dismiss the MCC's implied contract claim is **GRANTED**, and that claim is **DISMISSED WITH PREJUDICE**.

## H. Implied Covenant of Good Faith and Fair Dealing (Claim 9)

The MCC's ninth claim alleges BANA breached the implied covenant of good faith and fair dealing by: (1) failing to "safeguard" EDD benefits, including by issuing cards without EMV chips; (2) failing to ensure "effective" customer service; (3) failing to warn or notify Plaintiffs of unauthorized use of their cards; (4) failing to investigate unauthorized transaction claims or provide provisional credits; (5) failing to employ "reasonable practices and procedures" to safeguard Plaintiffs' personal information; and (6) freezing accounts without a "reasonable basis" and without providing a means to contest the freeze. (MCC ¶¶ 619–24).[19] BANA

---

[19] The implied covenant of good faith and fair dealing claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* actions. (*See* MCC at 261).

argues Plaintiffs' claims under the implied covenant fail for three reasons: (1) the implied covenant can't "impose new obligations that extend beyond or contradict the Account Agreement," (Dkt. 84-1 at 14–15); (2) an implied covenant claim can't be based on the same allegations as those in the express breach of contract claim, (*id.* at 15–16); and (3) the claim is too vaguely asserted to state a claim, (*id.* at 16)).

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (1988) (quoting *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958)). The covenant can't be used to extend or create obligations not contained in the original contract." *McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir. 2009) (quoting *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1033 (2009)). Instead, the implied covenant "prevent[s] a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Love v. Fire Ins. Exchange*, 221 Cal. App. 3d 1136, 1153 (1990).

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020) (quoting *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372 (1992)). "The party with discretionary power must exercise such power in good faith and through 'objectively reasonable conduct.'" *Id.* (quoting *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796 (1998)). "The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.'" *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 508 (2001) (quoting *Paulfrey v. Blue Chip Stamps* 150 Cal. App. 3d 187, 194 (1983)).

Here, the MCC alleges BANA breached the implied covenant by: issuing Plaintiffs inadequately secure debit cards, (MCC ¶ 622(a)(i)); unreasonably denying Plaintiffs' unauthorized transaction claims, (*id.* ¶ 622(d)); freezing Plaintiffs' accounts without a reasonable basis, (*id.* ¶ 662(f)); and failing to provide reasonably adequate customer service to assist Plaintiffs in responding to reported fraud or account freezes, (*id.* ¶ 622(b), (g)). The Account Agreement contains no reference to either cards with EMV chips or the adequacy of customer service. A claim under the implied covenant can't create new obligations not contemplated by the underlying contract, so the MCC's claim under the implied covenant is **DISMISSED WITH LEAVE TO AMEND** to the extent it relies on either the security of debit cards or the adequacy of customer service. *McKnight*, 563 F.3d at 893.

In contrast, the Court finds the MCC's allegations that BANA unreasonably denied claims or froze accounts sufficient to state a claim under the implied covenant. When analyzing the MCC's EFTA claim, the Court found that the MCC's allegations were sufficient to support the plausible inference that BANA failed to conduct a reasonable investigation before denying Plaintiffs' unauthorized transaction and error claims. *See supra* Section III.A.2. Specifically, the Court found support for that inference in the MCC's allegations that many Plaintiffs' claims were denied within one or two days and that BANA issued form letters lacking individualized information about each Plaintiff's claims. (S*ee* MCC ¶¶ 89, 130, 140, 156, 164, 181, 188, 218). The same allegations are sufficient to support an inference BANA failed to exercise its discretionary power under the contract "in good faith and through 'objectively reasonable conduct.'" *3500 Sepulveda*, 980 F.3d at 1324 (quoting *Badie*, 67 Cal. App. 4th at 796), which is sufficient to allege a violation of the implied covenant.

BANA argues this claim seeks to expand on BANA's obligations under the Account Agreement and that it duplicates Plaintiffs' direct contract claim.

(Dkt. 84-1 at 14–16). The Court disagrees. The Account Agreement allows BANA great discretion to deny an EDD Cardholder's claim, (*see* Danitz Decl., Ex. A §§ 9, 11), or to freeze a Cardholder's account, (*see id.* § 2). Plaintiffs' implied covenant claim doesn't expand or add to these obligations; instead, it alleges BANA failed to exercise its "discretionary power . . . in good faith and through 'objectively reasonable conduct.'" *3500 Sepulveda*, 980 F.3d at 1324 (quoting *Badie*, 67 Cal. App. 4th at 796). This is a permissible claim under the implied covenant theory. Nor does this claim duplicate Plaintiffs' contract claim. To state a breach of contract claim, Plaintiffs had to allege BANA denied claims without conducting any investigation or froze accounts without any suspicion of fraud. To state a breach of the implied covenant, Plaintiffs must allege BANA exercised its discretion unreasonably. These are distinct theories of liability that don't simply duplicate each other.

BANA's motion to dismiss the MCC's claim under the implied covenant is **GRANTED IN PART** and **DENIED IN PART**. That claim is **DISMISSED WITH LEAVE TO AMEND** as to the allegations BANA breached the implied covenant by failing to provide debits cards with EMV chips or adequate customer service.

## I.    Fiduciary Duty (Claim 10)

The MCC's tenth claim alleges BANA breached its fiduciary duties to Plaintiffs by failing to: (1) ensure Plaintiffs weren't denied access to their benefits; (2) maintain the confidentiality of Plaintiffs' personal information; (3) disclose the theft of Plaintiffs' personal information; and (4) disclose that it had failed to protect Plaintiffs from fraudulent transactions. (MCC ¶¶ 625–36).[20] BANA argues this claim should be dismissed because the MCC doesn't adequately allege that BANA owed Plaintiffs a fiduciary duty. (Dkt. 84-1 at 29–31). Plaintiffs don't dispute

---

[20] The fiduciary duty claim is brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* actions. (*See* MCC at 263).

that premise, arguing instead that the MCC plausibly alleges that the relationship between BANA and Plaintiffs isn't an ordinary bank-depositor relationship. (Dkt. 90 at 38–39).

"[U]nder ordinary circumstances the relationship between a Bank and its depositor is that of debtor-creditor, and is not a fiduciary one." *Lawrence v. Bank of Am.*, 163 Cal. App. 3d 431, 437 (1985); *see also Oaks Mgmt. Corp. v. Superior Ct.*, 145 Cal. App. 4th 453, 466 (2006) ("[I]n ordinary banking transactions the 'bank is in no sense a true fiduciary.'"); *Simi Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1100 (N.D. Cal. 2013). ("A bank has limited duties to its customers. The relationship between the two is not fiduciary, but rather is contractual in nature."). However, California courts recognize that, under "special circumstances," a bank may enter into a "special relationship" with a depositor and owe fiduciary duties. *Copesky*, 229 Cal. App. 3d at 691 n.12. A bank enters into a "special relationship" with a depositor either by "affirmatively offer[ing] trust and other specifically fiduciary services," *id.*, or when the relationship involves characteristics of a "special relationship": "(1) inherently unequal bargaining positions; (2) nonprofit motivation [of the depositor], *i.e.*, objective of securing peace of mind, security; (3) inadequacy of ordinary contract damages; (4) special vulnerability of one party to harm as a result of breach of trust of the other; and (5) awareness by the other of this special vulnerability," *id.* at 687 n.7 (quoting *Wallis v. Superior Ct.*, 160 Cal. App. 1109, 1118 (1984)).

Applying the "special relationship" factors to the relationship here, the Court holds the MCC adequately alleges that BANA plausibly owed Plaintiffs a fiduciary duty. The Court analyzes the *Wallis* factors in turn. First, BANA holds the exclusive right to provide electronic benefits payment services for EDD. (MCC ¶ 39). Under the terms of the BANA–EDD Contract, Plaintiffs couldn't seek similar services elsewhere (eliminating competition) and BANA wasn't providing a standard product. This is sufficient to allege "inherently unequal bargaining positions." *Cf.*

*Copesky*, 229 Cal. App. 3d at 691 (holding the parties had equal bargaining power when the defendant bank faced competition and offered a standard product).

Second, Plaintiffs used their EDD benefits "to pay for housing, food, and other daily necessities." (MCC ¶ 630). This is sufficient to allege Plaintiffs had a "nonprofit motivation." *Cf. Copesky*, 229 Cal. App. 3d at 691 (finding a depositor had a profit motivation when the account was his business account).

Third, the EDD benefits Plaintiffs were to receive are unemployment insurance or other public benefits. (MCC ¶ 626). This is sufficient to allege the "inadequacy of ordinary contract damages." *Cf. Copesky*, 229 Cal. App. 3d at 691 (noting this factor isn't ordinarily satisfied for actions in commercial disputes); *see also AFL*, 88 Cal. App. 3d at 821 ("A lump sum payment, which claimants who successfully appeal a denial of continuing benefits receive, defeats the purpose of unemployment insurance.").

Fourth, the MCC alleges Plaintiffs, "as public benefits recipients, are members of a uniquely vulnerable segment of the population." (MCC ¶ 626); *see also AFL*, 88 Cal. App. 3d at 821 (quoting *Cal. Hum. Res. Dept. v. Java*, 402 U.S. 121, 131–32 (1971)) ("These [unemployment] benefits 'provide cash to a newly unemployed worker "at a time when otherwise he would have nothing to spend," serving to maintain the recipient at subsistence levels.'"). And relatedly, fifth, BANA was aware of this vulnerability. *Cf. Copesky*, 229 Cal. App. 3d at 691 (holding that an ordinary checking account doesn't suggest a "special vulnerability").

BANA argues the Court should reject Plaintiffs' argument because it "would also apply to any bank accepting direct deposits: as unemployment benefits are not need-based but act as a substitute for income, it necessarily follows that if a bank holding unemployment benefits is a fiduciary, then so is an institution that holds paychecks." (Dkt. 92 at 18). The Court disagrees that an ordinary banking relationship would qualify under this test. For example, it's unlikely a complaint

against a bank accepting direct deposits of paychecks could adequately allege facts demonstrating "inherently unequal bargaining positions." *See Copesky*, 229 Cal. App. 3d at 687 n.7.

Plaintiffs also argue that BANA owed EDD Cardholders fiduciary duties because the BANA–EDD Contract expressly provides that BANA will hold EDD Cardholders' funds "'in trust' . . . for the cardholders." (Dkt. 90 at 39 (quoting Dkt. 90-3, Danitz Decl., Ex. B at 19 (BANA-EDD Contract)).[21] BANA responds that the provision Plaintiffs rely on refers to a "Contractor's Trust Account" held in BANA's name and isn't "sufficient to establish that BANA held funds in trust or provided fiduciary services for any individual Plaintiff. (Dkt. 92 at 18 n.24). The full provision Plaintiffs rely on is from a section of the BANA-EDD Contract defining various terms and reads:

| Contractor's Trust Account | For the purpose of calculating revenue share, the average collected daily balance is the total of the daily collected balance on all funds held *"in trust"* (aggregated amount) *for the cardholders* each month divided by the number of days in the month. The contractor may maintain balances in individual accounts or one "trust account", but the average collected daily balance calculation is based on the combined total of all cardholder funds. |
|---|---|

---

[21] Plaintiffs ask the Court to take judicial notice of excerpts of the BANA-EDD Contract filed with their opposition. (Dkt. 90-1). As discussed previously, *see supra* Section III.F.1, a document may be incorporated by reference if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448. Here, the MCC's breach of fiduciary duty claim relies, in part, on the BANA-EDD Contract. (MCC ¶ 627). BANA doesn't dispute the authenticity of the page relevant to this claim. (*See* Dkt. 92 at 18 n.24 (citing Danitz Decl., Ex. B at 19). The Court finds the EDD-BANA Contract: (1) "forms the basis of the plaintiff's claim"; (2) is incorporated by reference into the MCC; and (3) is appropriately assumed to be true for the purposes of this Order. *Ritchie*, 342 F.3d at 908. Plaintiffs' request for judicial notice is **GRANTED** only as to Page 19 of Exhibit B to the Danitz Declaration. (Dkt. 90-1).

(Danitz Decl., Ex. B at 19 (emphasis added)). The second sentence clearly requires BANA to maintain either one or multiple "trust account[(s)]." However, the first sentence's reference to "all funds held 'in trust' . . . for the cardholders" is less clear. Plaintiffs' interpretation—that BANA was required to hold EDD Cardholders' funds in trust—is a plausible reading of the provision. Assuming that reading is correct, BANA, as the trustee of the funds, would owe EDD Cardholders fiduciary duties. *See Chang v. Redding Bank of Com.*, 29 Cal. App. 4th 673, 684 (1994) ("A trust is a fiduciary relationship with respect to property") (internal quotation marks omitted). At the pleading stage, this is sufficient to allege BANA owed Plaintiffs a fiduciary duty.

BANA's motion to dismiss the MCC's breach of fiduciary duty claim is **DENIED**.

### J.   Third-Party Beneficiary Claims (Claims 11 & 12)

The MCC's eleventh claim alleges BANA breached its contract with EDD and that Plaintiffs were third-party beneficiaries to that contract. (MCC ¶¶ 637–44). The MCC's twelfth claim alleges BANA breached the implied covenant of good faith and fair dealing with EDD and that Plaintiffs were third-party beneficiaries. (*Id.* ¶¶ 645–50).[22] BANA argues these claims should be dismissed because: (1) Plaintiffs aren't third-party beneficiaries of the EDD-BANA Contract, (Dkt. 84-1 at 20–22); and (2) Plaintiffs failed to sufficiently allege breach of either the contract or the implied covenant, (*id.* at 22–23).

#### 1.   Governing BANA-EDD Contract

As for the MCC's direct contract claims, *see supra* Section III.F.1, the Court must again first determine which contract to consider when analyzing the MCC's

---

[22] The third-party contract and implied covenant of good faith and fair dealing claims are brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Robinson*, and *Talia* actions. (*See* MCC at 267, 269).

third-party contract claims. As before, BANA requests the Court take judicial notice of one version, (*see* Dkt. 84-3, Chestnut Decl., Ex. 2), and Plaintiffs request the Court take judicial notice of a similar version, (*see* Dkt. 90-3, Danitz Decl., Ex. B). The Court incorporates its earlier discussion of the standard for incorporation by reference, *see supra* Section III.F.1, noting that a document should generally only be incorporated by reference if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448.

The parties appear to agree that the competing excerpts of the BANA-EDD Contract are substantively identical. (Dkt. 90-1 at 2; 92-1 at 3).[23] Among other things, the excerpts in question include portions of EDD's request for proposals ("RFP") (including the cover page), (Chestnut Decl., Ex. 2 at 8; Danitz Decl., Ex. B at 17), and the cover page of BANA's response to the RFP, (Chestnut Decl., Ex. 2 at 10; Danitz Decl., Ex. B at 20). There are two differences the parties identify. First, the cover page to EDD's RFP included in BANA's version has a visible redline change to the date. (Chestnut Decl., Ex. 2 at 8). Second, the versions have different dates on the cover page of BANA's response to the RFP. (Chestnut Decl., Ex. 2 at 10 (August 21, 2015); Danitz Decl., Ex. B at 20 (July 10, 2015)).

Plaintiffs argue BANA's version can't be incorporated by reference because it includes redline changes, indicating it is a draft version and placing its authenticity in doubt. (Dkt. 90-2 at 3 (citing *Dual Diagnosis Treatment Ctr., Inc. v. Blue Cross of Cal.*, No. SA CV 15-0736-DOC-DFM, 2016 WL 6892140, at *23 (C.D. Cal. Nov. 22, 2016) ("Where an offered [document] still has redlining or edits in the document, the Court is unwilling to accept the authenticity of the document

---

[23] The excerpt provided by Plaintiffs has one additional page not included in the excerpt submitted by BANA. (*See* Danitz Decl., Ex. B at 19). The Court has already found that page to be incorporated by reference. *See supra* note 21.

even where no party has objected.")))). BANA argues that the authenticity of Plaintiffs' version is doubtful because it is clearly out of date. Because each Party questions the authenticity of the other's version of the BANA-EDD agreement, neither can appropriately be incorporated by reference into the MCC. *See Marder*, 450 F.3d at 448. However, because the versions contain identical substantive information, the accuracy of which isn't questioned by either party, the Court will take judicial notice of both versions. *See* Fed. R. Evid. 201(b); *Selznick v. Wells Fargo Bank, N.A.*, No. CV-15-812-MWF-MANx, 2015 WL 4069076, *2 (C.D. Cal. July 1, 2015) (taking judicial notice of the parties' "somewhat different" versions of the same document where the relied-upon portion was the same, as it did "not matter whether the Court relie[d] on [Defendant's] or Plaintiff's version"). The Court **GRANTS** both BANA's request for judicial notice of Exhibit 2 of the Chestnut Declaration, (Dkt. 84-2), and Plaintiffs' request for judicial notice of Exhibit B of the Danitz Declaration, (Dkt. 90-1).[24]

### 2.    Intended or Incidental Beneficiary

"[O]nly a party to a contract or an intended third-party beneficiary may sue to enforce the terms of a contract or obtain an appropriate remedy for breach." *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat. Ass'n*, 671 F.3d 1027, 1033 (9th Cir. 2012). "When a government contract is at issue, plaintiffs must overcome a presumption that nonparties who benefit from the contract are incidental, rather than intended, beneficiaries." *Jafari v. FDIC*, No. 12-cv-2982-LAB-RBB, 2015 WL 3604443, at *6 (S.D. Cal. June 8, 2015) (citing *GECCMC 2005-C1*, 671 F.3d at 1033–34). Intended third-party beneficiary

---

[24] Because the Court finds Plaintiffs aren't third-party beneficiaries of the BANA-EDD Contract, *see infra* Section III.J.2, it doesn't need to consider whether the August 24, 2020 letter agreement between BANA and EDD ("Letter Agreement") is incorporated by reference into the MCC or properly the subject of judicial notice. (*See* Chestnut Decl., Ex. 3). Therefore, BANA's request for judicial notice is **DENIED AS MOOT** as to the Letter Agreement. (Dkt. 84-2).

status isn't established by "a contract's recitation of interested constituencies, vague hortatory pronouncements, statements of purpose, explicit reference[s] to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind." *GECCMC 2005-C1*, 671 F.3d at 1033 (citations, brackets, and quotations omitted). Instead, the language of the contract must show a "'clear intent' to rebut the presumption that the [third parties] are merely incidental beneficiaries." *Orff v. United States*, 358 F.3d 1137, 1145 (9th Cir. 2004).

Here, the plain language of the BANA-EDD Contract states that BANA and EDD entered into the agreement "for the purpose of [BANA] establishing, operating and maintaining a comprehensive Electronic Benefit Payment (EBP) service *for the EDD*." (Chestnut Decl., Ex. 2 at 6 (emphasis added); Danitz Decl., Ex. B at 15 (same)). Plaintiffs point to numerous provisions of the BANA-EDD Contract that benefit only EDD Cardholders and argue they are third-party beneficiaries even though they aren't the primary beneficiaries of the contract. (Dkt. 90 at 20–22 (citing MCC ¶¶ 42–44)). But, "explicit reference[s] to a third party" or "a showing that the contract operates to the third parties' benefit and was entered into with them in mind" are both insufficient to show "a clear intent to rebut the presumption that the third parties are merely incidental beneficiaries." *Jafari*, 2015 WL 3604443, at *6; *Martinez v. Socoma Cos.*, 11 Cal. 3d 394, 402 (1974) (holding government contracts don't create third-party beneficiaries when the "contracts manifest no intent that the defendants pay damages to compensate plaintiffs or other members of the public for [the contractor's] nonperformance"); *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 835 (2019) (holding employee wasn't a third-party beneficiary of her employer's contract with a payroll company when the "relevant motivating purpose" was to distribute payroll checks). The Court holds that the language of the BANA-EDD Contract doesn't show a "clear intent" that Plaintiffs were intended beneficiaries of the contract. *See Orff*, 358 F.3d at

1145. Because Plaintiffs aren't intended third-party beneficiaries of the BANA-EDD Contract, they can't bring a claim to enforce the terms of that agreement. *See Jafari*, 2015 WL 3604443, at *6 (quoting *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011)) ("Thus, while there may have been 'an intention to benefit a third party,' Plaintiffs can't show 'an intention that the third party should have the right to enforce that intention.'").

BANA's motion to dismiss the MCC's third-party beneficiary claims for breach of contract and breach of the implied covenant is **GRANTED**, and those claims are **DISMISSED WITH PREJUDICE**.

### K.   Due Process (Claims 13 & 14)

The MCC's thirteenth and fourteenth claims allege BANA violated Plaintiffs' rights under the Due Process Clauses of the Fourteenth Amendment to the United States Constitution, (MCC ¶¶ 651–61), and California Constitution, (*id.* ¶¶ 662–66), by depriving them of constitutionally protected interested without due process.[25] BANA moves to dismiss both claims, arguing Plaintiffs (1) fail adequately allege BANA was acting as state actor; and (2) fail to allege facts showing a due process violation. (Dkt. 84-1 at 36–40).

#### 1.   State Action

BANA contends it wasn't acting as a state actor when it allegedly froze Plaintiffs' accounts. (Dkt. 84-1 at 36–39). Plaintiffs bring their Fourteenth Amendment claim under 42 U.S.C. § 1983. (MCC ¶ 653). To state a claim under § 1983, a complaint must allege facts showing the plaintiff was "deprived of a right secured by the Constitution or laws of the United States," and that "the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). The requirements under the California

---

[25] The Due Process claims are brought only by the Class Plaintiffs and the individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, and *Robinson* actions. (*See* MCC at 272, 274).

Constitution are the same. *See Kruger v. Wells Fargo Bank*, 11 Cal. 3d 352, 356 (1974). In other words, to state a claim under either the United States or California constitutions, Plaintiffs must plead facts showing BANA was acting as a state actor. To make that showing, Plaintiffs allege BANA was (1) "perform[ing] a function that is both traditionally and exclusively governmental," and (2) "engaged in a joint undertaking with the State to provide and administer [unemployment insurance] and other EDD benefits under a mutually beneficial relationship." (MCC ¶ 654). Either theory is sufficient to satisfy the state action requirement. *See Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) ("Satisfaction of any one test [of the four used in the Ninth Circuit] is sufficient to find state action.").

"The public function test is satisfied only on a showing that the function at issue is 'both traditionally and exclusively governmental.'" *Rawson v. Recovery Innovations, Inc.,* 975 F.3d 742, 748 (9th Cir. 2020) (quoting *Kirtley*, 326 F.3d at 1093). "At bottom, the inquiry is always whether the defendant has 'exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."'" *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)).

BANA argues that its conduct—servicing Plaintiffs' EDD Debit Cards—is a classic function of private bank, and that its conduct shouldn't be treated as state action simply because it is a government contractor. (Dkt. 84-1 at 37 (citing *Belue v. Keefe Commissary Grp., LLC*, No. 1:20-cv-540-DCN, 2021 WL 1197749, at *3 (D. Idaho Mar. 29, 2021) ("[M]aintaining or managing financial accounts is not a function that is traditionally and exclusively performed by the government."); *Venegas v. Bianco*, No. EDCV 19-01260-JLS-SHK, 2019 WL 10301094, at *9 (C.D. Cal. Aug. 26, 2019) (same); *Hester v. Regions Bank*, No. 2:09cv908–WHA, 2010 WL 2232158, at *5 (M.D. Ala. June 3, 2010) ("[T]he actions in question are the freezing of private bank accounts, and the transfer of funds, which are not traditionally the exclusive prerogative of the state."); *Renderall-Baker v. Kohn*, 457

U.S. 830, 842 (1982) ("[S]erv[ing] the public does not make [a private actor's actions] state action."); *Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244, 248 (1st Cir. 2012) (holding a private entity does not become a state actor merely because it manages government funds))).

Classifying BANA's function as that of a "private bank," "government contractor," or money manager understates BANA's role in California's EDD benefits system. The MCC alleges, and BANA doesn't dispute, that since 2010, BANA has held the exclusive contractual right and duty to provide electronic benefits payment services for EDD. (MCC ¶ 39). Additionally, the MCC plausibly alleges that EDD presents BANA debit cards as the "exclusive means" to receive EDD benefits. (*See id.* ¶ 47 ("EDD Debit Cards are the default payment method for EDD benefits, and EDD's website presents EDD Debit Cards as the exclusive means of receiving EDD benefits.")). Accepting these allegations as true—which the Court must at this stage—the MCC plausibly alleges that BANA is responsible for the administration and distribution of California's EDD benefits. That leaves the question of whether the distribution of such benefits is a function that is "both traditionally and exclusively governmental." *Kirtley*, 326 F.3d at 1093.

Plaintiffs cite two cases to support their argument that BANA has performed a function that is traditionally and exclusively reserved to the state. First, they cite *Cahoo v. SAS Inst. Inc.*, 322 F. Supp. 3d 772, 793 (E.D. Mich. 2018), *aff'd in part, rev'd in part on other grounds*, 912 F.3d 887 (6th Cir. 2019). (*See* Dkt 90 at 44–45). In *Cahoo*, the district court found that unemployment insurance claimants whose applications were incorrectly flagged as fraudulent by the state's automated fraud detection system stated a claim against the state contractor that administered the system. 322 F. Supp. 3d at 793. BANA urges that *Cahoo* is inapposite because the government contractor there not only had the power to detect fraud (a power BANA possesses), but also made determinations that claimants acted unlawfully and assessed penalties (a power BANA lacks).

(Dkt. 92 at 22 (citing *Cahoo*, 322 F. Supp. 3d at 785–86, 801–02)). While BANA is correct that the contractor in *Cahoo* possessed greater power than BANA has here, BANA is still invested with the power to distribute EDD benefits payments and, if it freezes an account, to suspend a claimant's access to those benefits which have already been distributed. *See Cahoo*, 322 F. Supp. 3d at 793 ("[T]there is no question that the administration of unemployment benefits is a power traditionally exclusively reserved to the State.").

Plaintiffs also cite *Brown v. Stored Value Cards, Inc.*, No. 3:15-cv-1370-MO, 2016 WL 4491836 (D. Or. Aug. 25, 2016), rev'd on other grounds, 953 F.3d 567, 575 (9th Cir. 2020). (*See* Dkt 90 at 45). In *Brown*, the plaintiff was briefly held in state custody and, when she was released, given a preloaded debit card with a balance equivalent to the cash in her possession when she was booked. 2016 WL 4491836, at *1. The district court found that the complaint plausibly stated a claim that the government contractor responsible for administering the debit card was a state actor because the relationship between the plaintiff and the defendant contractor "could only come about through the exercise of the state's power." *Id.* at *2. BANA argues *Brown* is distinguishable because the plaintiff there had "no choice on how to retrieve" her funds, whereas Plaintiffs here have the option to receive a paper check—an option that some Plaintiffs took. (Dkt. 92 at 23 (quoting *Brown*, 2016 WL 4491836, at *2)). But, as the Court has already discussed, the MCC plausibly alleges that EDD presents BANA debit cards as the "exclusive means" to receive EDD benefits. (*See* MCC ¶ 47). And while a small number of Plaintiffs allege they eventually obtained paper checks directly from EDD, all Plaintiffs allege that BANA's conduct prevented them from receiving benefits to which they were legally entitled for at least some period of time. (*See, e.g.*, *id.* ¶¶ 174–74 (Carlos Rodriquez alleging he obtained paper checks from EDD after he was unable to access his benefits for two months because his account was frozen)). Because BANA-provided debit cards were held out as the exclusive

means of receiving EDD benefits, the MCC plausibly alleges that the relationship between Plaintiffs and BANA only came about "through the exercise of the state's power." *Brown*, 2016 WL 4491836, at *2.

The Court holds the MCC plausibly alleges that BANA's role in administering the distribution of EDD benefits is a function that is "both traditionally and exclusively governmental." *Kirtley*, 326 F.3d at 1093. Because the Court holds that the MCC satisfies the public function test, it need not consider whether the MCC alleges sufficient facts to satisfy the joint action test. *See id.* at 1092.

### 2.    Deprivation of Due Process

To state a claim for a procedural due process violation, the complaint must allege "two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). BANA can't seriously dispute that Plaintiffs have a constitutionally protected property interest in the EDD benefits for which they were approved. *See AFL*, 88 Cal. App. 3d at 820 ("It is clear then that unemployment insurance benefits are a type of property interest protected by the due process clause."); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (holding the procedural due process protections attach to the "withdrawal of public assistance benefits" and "disqualification for unemployment compensation").

With respect to future benefits—*i.e.* those payments not yet deposited in a BANA account by EDD—BANA argues that, because the MCC establishes that Plaintiffs could have requested an alternative method to receive their benefits payments, there is no deprivation of a property interest, and therefore no due process claim. (Dkt. 90 at 24 (citing *Tate v. Univ. Med. Ctr. of S. Nev.*, 637 F. Supp. 2d 892, 898 (D. Nev. 2009) (finding no deprivation of property interest where Defendants "limited one of several avenues" by which Plaintiff could exercise his clinical privileges, but did not "limit the privilege itself"))).

The situation here is distinct from *Tate*. There, the only inference the complaint permitted was that the defendants limited "one of several avenues" the plaintiff doctor had for exercising his clinical privileges. *See Tate*, 637 F. Supp. 2d at 898. Here, the only plausible inference the MCC permits is that EDD presented BANA debit cards as the "exclusive means" of receiving EDD benefits. (*See* MCC ¶ 47 ("EDD Debit Cards are the default payment method for EDD benefits, and EDD's website presents EDD Debit Cards as the exclusive means of receiving EDD benefits."); *see also id.* ¶ 39 (alleging BANA and EDD "entered into an exclusive contract . . . for the provision of Electronic Benefits Payment . . . Services")). Thus, when BANA froze or otherwise restricted Plaintiffs' accounts, BANA effectively denied them the benefit by blocking the only known method of access. Allegations that a handful of Plaintiffs were able to request paper checks directly from EDD don't change that conclusion. (*See id.* ¶¶ 174, 223, 433, 452, 475 (Plaintiffs alleging they started receiving paper checks directly from EDD after requested that form of payment)). These allegations are sufficient to allege the "deprivation of a constitutionally protected . . . property interest." *Brewster*, 149 F.3d at 982.

That leaves the question of whether the MCC plausibly alleges that BANA failed to conform to the requirements of due process. To determine whether procedural protections are adequate, the Ninth Circuit applies the three-part balancing test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g.*, *Franceschi v. Yee*, 887 F.3d 927, 936–37 (9th Cir. 2018) (applying the *Mathews* test). "Under Mathews we consider (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) the government's interest in minimizing the cost and burden of additional or substitute procedures." *Id.* (quoting *Mathews*, 424 U.S. at 335).

Applying the *Mathews* factors to the EDD benefits at issue here, the MCC plausibly alleges that BANA's procedures for freezing accounts failed to comply with the requirements of due process. First, the private interests at issue here are EDD benefits, including unemployment insurance, pandemic unemployment assistance, pandemic emergency unemployment compensation, disability insurance, and paid family leave. (MCC ¶ 38). While access to public benefits such as these isn't a fundamental right, once EDD determined that Plaintiffs were eligible, Plaintiffs had a protected property interest in the benefits. *See, e.g.*, *Goldberg*, 397 U.S. at 262, 267–68 (holding the "termination" of public benefits payments "involves state action that adjudicates important rights" and requires a hearing). The nature of the protected interest is illustrated by the harms Plaintiffs allege they experienced after their accounts were frozen. (*See, e.g.*, MCC ¶ 433 (Jennifer Meza alleges that she and her daughter became homeless after her account was frozen)).[26]

Second, the MCC plausibly alleges that the risk the challenged procedure will result in erroneous deprivation of protected interests is high. It isn't entirely clear what, if any, process BANA provides before or after instituting an account freeze. BANA's briefing appears to admit that neither notice nor an opportunity to be heard were provided to Plaintiffs before their accounts were frozen. (*See*

---

[26] *See also Goldberg*, 397 U.S. at 264 ("[W]hen welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process. For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care. Thus the crucial factor in this context—a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.").

Dkt. 84-1 at 39–40; Dkt. 92 at 25). And the MCC alleges that, starting in October 2020, BANA implemented a policy of freezing accounts without providing any notice. (*See* MCC ¶¶ 93–95, 108). Plaintiffs allege this practice continues to this day. (*See id.* ¶¶ 111–12). The MCC also alleges that BANA's "procedures" frequently resulted in the erroneous deprivation of EDD benefits. For example, numerous Plaintiffs allege that BANA froze their accounts before unfreezing them months later with no explanation, or reversed course on whether to issue credits for funds. (S*ee, e.g.*, *id.* ¶¶ 127–35 (Vanessa Rivera alleges her fraud claim was denied and her account was frozen in February 2021, and that she was reimbursed and her account was unfrozen only in April 2021, after the class action suit was filed)). Allegations such as these strongly support an inference that the lack of procedures resulted in erroneous deprivations of EDD benefits. The second step of the *Mathews* framework also considers "the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Many of the account freezes described in the MCC involve circumstances that, if raised in a pre-deprivation procedure, would have plausibly prevented the erroneous deprivation. (*See, e.g.*, MCC ¶ 313 (Adam Brotman alleges his account was frozen after he reported a fraudulent transaction that occurred in Birmingham, England, the same day he, a San Diego County resident, conducted a transaction in San Diego)). The Court holds that the MCC's allegations plausibly support an interference that additional procedures could have prevented erroneous deprivations.

Third, BANA, acting on behalf of the State of California, obviously has a strong interest in preventing fraud. BANA argues that if additional pre-deprivation procedures were instituted, bad actors would take advantage of any additional notice and move quickly to steal more money from the government. (Dkt. 84-1 at 40 (arguing it is reasonable and logical to "freeze accounts without advance notice to 'avoid the risk that [the cardholder] would dissipate his assets or attempt

to put them beyond the government's reach'") (quoting *Spiegel v. Ryan*, 946 F.2d 1435, 1440 (9th Cir. 1991)). It also argues that its efforts to prevent EDD fraud falls within the exception carved out by *FDIC v. Mallen*, 486 U.S. 230, 240 (1988), which holds: "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." (*See* Dkt. 84-1 at 40 (quoting *Mallen*, 486 U.S. at 240)). While it's possible facts uncovered during discovery will demonstrate that this exception applies here, the allegations in the MCC don't suggest that BANA provided any post-deprivation notice or opportunity to be heard.

Upon consideration of the *Mathews* factors, the Court holds that the MCC states a claim for a due process violation by alleging BANA deprived Plaintiffs of a protected property interest without providing adequate due process.

\* \* \*

BANA's motion to dismiss the MCC's due process claims is **DENIED**.

//
//
//
//
//
//
//
//
//
//
//
//
//

## IV.   CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** BANA's motion to dismiss the MCC. The MCC's fourth, eleventh, and twelfth claims are **DISMISSED WITH PREJUDICE**. The MCC's third and eighth claims are **DISMISSED WITH LEAVE TO AMEND**. The MCC's first, second, fifth, seventh, and ninth claims are **DISMISSED IN PART WITH LEAVE TO AMEND** as described herein. Plaintiffs may file an Amended Master Consolidated Complaint addressing the deficiencies identified in this order by June 6, 2023.

Further, to ensure this action continues to progress promptly, the discovery stay is lifted and Magistrate Judge Michael Berg is directed to issue a Case Management Order regulating discovery forthwith.

**IT IS SO ORDERED.**

Dated:  May 25, 2023

_____
**Hon. Larry Alan Burns**
United States District Judge

# Appendix A

| Plaintiff | | | Claim | |
|---|---|---|---|---|
| **Last Name** | **First Name** | **MCC Paragraphs** | **Column 1: EFTA (Claim 1)** | **Column 2: Contract (Claim 7)[27]** |
| **Abarr** | **Paul** | ¶ 286 | | |
| **Abbot** | **Kobe** | ¶ 287 | | |
| **Adams** | **Michael** | ¶ 289 | | ██████████ |
| **Aders** | **Jordan** | ¶ 288 | | |
| **Aguirre** | **Jonathan** | ¶ 290 | | |
| **Allison** | **Christopher** | ¶ 291 | | |
| **Alvarez** | **Kevin** | ¶ 292 | X – No qualifying error | X – No qualifying error |
| **Alvarez** | **Courtney** | ¶ 293 | | |
| **Alvarez** | **Rosa** | ¶ 294 | | ██████████ |
| **Anderson** | **David** | ¶ 295 | | |
| **Anderson** | **Rebekah** | ¶ 296 | X – No qualifying error | X – No qualifying error |
| **Andrade** | **Amanda** | ¶ 297 | X – No qualifying error | X – No qualifying error |
| **Anistik** | **Sheila** | ¶ 299 | | |
| **Arnoldstarr** | **Robert** | ¶ 300 | X – No qualifying error | X – No qualifying error |
| **Arrey** | **Vanessa** | ¶ 301 | | |
| **Auburn** | **Ursula** | ¶¶ 254–57 | | X – Reimbursed |
| **Ayala** | **Christal** | ¶ 302 | X -No notice | X -No notice |
| **Back** | **Celina** | ¶ 303 | X – No qualifying error | X – No qualifying error |
| **Baker** | **Cindy** | ¶¶ 250–53 | | X – Reimbursed |
| **Barnettete** | **Mark** | ¶ 304 | | |
| **Beckham** | **Douglas** | ¶ 305 | X – No qualifying error | X – No qualifying error |
| **Beehler** | **Sky** | ¶ 306 | X – No qualifying error | X – No qualifying error |
| **Bennett** | **Amber** | ¶ 307 | X – No qualifying error | X – No qualifying error |
| **Berlt** | **Forrest** | ¶ 308 | X – No qualifying error | X – No qualifying error<br>X – Reimbursed |
| **Blacksands** | **Stone** | ¶ 309 | X – Freeze | X – Freeze |
| **Blankenship** | **Claire** | ¶¶ 279–84 | | |
| **Bommel** | **Dean** | ¶ 310 | | |
| **Brady** | **Nicholas** | ¶ 311 | | |
| **Brooks** | **James** | ¶ 312 | X -Untimely | X -Untimely |
| **Brotman** | **Adam** | ¶ 313 | | X – Reimbursed |
| **Bruno** | **James** | ¶ 314 | | X – Reimbursed |
| **Burns** | **Beth** | ¶ 315 | | **Not dismissed** |
| **Burrow** | **Dwight** | ¶ 316 | | |
| **Bynum** | **Mario** | ¶ 317 | X – No qualifying error | X – No qualifying error |
| **Byrn** | **Daniel** | ¶ 318 | | |
| **Cajas** | **Clara** | ¶¶ 195–99 | | X – Reimbursed |
| **Calzado** | **Joseph** | ¶ 319 | | |
| **Camberos** | **Stacey** | ¶ 320 | | |
| **Cardenas Cortez** | **Victor** | ¶ 333 | | |
| **Carpenter** | **Kimberly** | ¶ 321 | X – No qualifying error | X – No qualifying error<br>X – Reimbursed |
| **Castillo** | **Patricia** | ¶ 322 | X – No qualifying error | X – No qualifying error<br>X – Reimbursed |
| **Caton** | **Richard** | ¶ 323 | | |
| **Chapple** | **Susan** | ¶ 324 | | |
| **Chase** | **Randy** | ¶ 325 | X -No notice | X -No notice |
| **Chavez** | **Angela** | ¶ 326 | X – No qualifying error | X – No qualifying error |

[27] Unless otherwise indicated, all the MCC's contract claims are also dismissed for failure to state a violation of Section 9 or 11 of the Account Agreement. *See supra* Section III.F.2.i.

| Plaintiff | | | Claim | |
| --- | --- | --- | --- | --- |
| **Last Name** | **First Name** | **MCC Paragraphs** | **Column 1: EFTA (Claim 1)** | **Column 2: Contract (Claim 7)[27]** |
| Chavez | Phillip | ¶ 327 | | |
| Chong | Kuang Ting | ¶¶ 261–67 | | X – Reimbursed |
| Cochran | Tiffany | ¶ 328 | | |
| Collins | LaMar | ¶ 329 | | |
| Contreras | Jennifer | ¶ 330 | | |
| Contreras | Jose | ¶ 331 | | |
| Corella | Donmonique | ¶ 332 | | |
| Cortez-Gonzalez | Crystal | ¶ 334 | | |
| D'Agostino Criado | Teresa | ¶ 335 | X - No qualifying error | X - No qualifying error |
| Dale | Heather | ¶ 336 | X - No qualifying error | X - No qualifying error |
| De Hoyos | Marcus | ¶ 400 | | |
| De Los Angeles, Sr. | Samuel | ¶ 298 | X - No qualifying error | X - No qualifying error |
| de Vera | Michell | ¶ 337 | X - No qualifying error | X - No qualifying error |
| Deasy | Timothy | ¶ 338 | | |
| Delariva | Luis | ¶ 339 | | |
| Delgado | Delbert | ¶ 340 | | |
| Delgado | Selena | ¶ 341 | | |
| Dirickson | Nickolaus | ¶ 342 | | |
| Dones | Lorina | ¶ 343 | X - No qualifying error | X - No qualifying error |
| Douglas | Anthony | ¶ 344 | X – Freeze | X – Freeze |
| Douglass | Benjamin | ¶ 345 | X - No qualifying error | X - No qualifying error X - Reimbursed |
| Duey | Kayli | ¶ 346 | X - No qualifying error | X - No qualifying error |
| Eason | Roxanne | ¶ 347 | | |
| Echeverria | Peter | ¶ 348 | X - No qualifying error | X - No qualifying error |
| Edwards | Linda | ¶ 349 | | |
| Escalante | Maritza | ¶ 350 | | X - Reimbursed |
| Espalin | Marley | ¶ 351 | | |
| Estrada | Juan | ¶ 352 | X - No qualifying error | X - No qualifying error |
| Farina | Dawn | ¶ 353 | | X - Reimbursed |
| Ferraro | Cody | ¶ 354 | | |
| Flores | Jacob | ¶ 355 | X - No qualifying error | X - No qualifying error |
| Flores | Arnold | ¶ 356 | | |
| Flores | Stephanie | ¶ 357 | X - Freeze | X - Freeze |
| Franks | Anthony | ¶ 358 | | |
| Friday | Meredith | ¶ 359 | X - No qualifying error | X - No qualifying error X - Reimbursed |
| Friend | Joseph | ¶ 360 | | |
| Gage | Latisha | ¶ 362 | | |
| Galicia | Abigail | ¶ 361 | | |
| Garcia | Monica | ¶ 363 | | |
| Gaynor | Glynda | ¶ 364 | | |
| George | Laquitta | ¶ 365 | X - No qualifying error | X - No qualifying error |
| Giddens | Elizabeth | ¶ 366 | | X - Reimbursed |
| Glassflowers | Seante | ¶ 367 | | X - Reimbursed |
| Gonzalez | Angela | ¶ 368 | | |
| Gonzalez | Barton | ¶ 369 | | X - Reimbursed |
| Gonzalez | Lizet | ¶ 370 | | |
| Graham | Lainie Ann | ¶ 371 | | |
| Grant | Audrey | ¶ 372 | | |
| Gray | Willie | ¶ 373 | | |
| Grimes | Sean | ¶ 374 | | |
| Guadalajara | Jeffrey | ¶ 375 | | |
| Guirguis | Noah | ¶ 376 | X - Freeze | X – Freeze |
| Gutcher | Lyndsey | ¶ 377 | | |

| Plaintiff | | | Claim | |
|---|---|---|---|---|
| **Last Name** | **First Name** | **MCC Paragraphs** | **Column 1: EFTA (Claim 1)** | **Column 2: Contract (Claim 7)[27]** |
| Gutierrez | Andres | ¶ 378 | | |
| Gutierrez | Angelica | ¶ 379 | | |
| Gutierrez | Crystal | ¶ 380 | | |
| Hakopian | Shant | ¶ 381 | | |
| Hanes | James | ¶ 382 | | X - Reimbursed |
| Haney | Micah | ¶ 383 | X - No qualifying error | X - No qualifying error |
| Hanna | Preston | ¶ 384 | | X - Reimbursed |
| Harden | Rebecca | ¶ 385 | | |
| Harper | Johnny | ¶ 386 | | |
| Harris | Ivan | ¶ 387 | X -No notice | X -No notice |
| Harris | Markee | ¶ 388 | | X - Reimbursed |
| Hart | Steven | ¶ 389 | | |
| Hassanshahi | Bahram | ¶ 390 | X - No qualifying error | X - No qualifying error |
| Hayden | Kaytricia | ¶ 391 | | |
| Heinz | Gretchen | ¶ 392 | X - Freeze | X - Freeze<br>X - Reimbursed |
| Hernandez | Ronnie | ¶ 393 | | |
| Hernandez | Ruben | ¶ 394 | X -No notice | X -No notice |
| Hernandez | Vanessa | ¶ 395 | X - No qualifying error | X - No qualifying error |
| Hicks | Julie | ¶¶ 258–60 | | |
| Hollingsworth | Anthony | ¶ 396 | | X - Reimbursed |
| Holloway | Lindsie | ¶ 397 | | |
| Horath | Crystal | ¶ 398 | | **Not dismissed** |
| Howze | Terrance | ¶ 399 | X -No notice | X -No notice |
| Hutchins | Sharonna | ¶ 401 | | |
| Huynh | Quoc | ¶ 402 | X - Freeze | X - Freeze |
| Idemudia | John | ¶ 403 | | |
| Isles | Juanita | ¶ 404 | X - No qualifying error | X - No qualifying error |
| Jabara | Derrick | ¶ 405 | | |
| Jackson | Shreel | ¶ 406 | | X - Reimbursed |
| Jaurigue, Jr. | Robert | ¶ 407 | X -No notice | X -No notice |
| Jeff | Anthony | ¶ 408 | | |
| Johnson | Evett | ¶ 409 | | X - Reimbursed |
| Johnson | Lester | ¶ 410 | | |
| Johnson | Terrell | ¶ 411 | | |
| Jones | Brian | ¶ 412 | | |
| Jones | Victoria | ¶ 413 | X - Freeze | X - Freeze |
| Karam | Alan | ¶¶ 203–15 | | X - Reimbursed |
| Kelly | Olivia | ¶ 414 | | |
| Kessler | Erick | ¶ 415 | | |
| Knight | Deandre | ¶ 416 | | |
| Koole | Candace | ¶¶ 136–43 | | X - Reimbursed |
| Lawson | Corey | ¶ 417 | | X - Reimbursed |
| Laxton | Sabrina | ¶ 418 | X - Freeze | X - Freeze |
| Lind | Tonya | ¶ 419 | X - Freeze | X - Freeze |
| Littles | Limmie | ¶ 420 | X - Freeze | X - Freeze |
| Lopez | Ronda | ¶ 421 | | |
| Loredo | Ernie | ¶ 422 | X -Untimely | X -Untimely |
| Madrid | Raina | ¶ 423 | X - No qualifying error | X - No qualifying error |
| Madrid | Mario | ¶ 424 | X - No qualifying error | X - No qualifying error |
| Magallan | Joseph | ¶ 425 | | |
| Main | Joseph | ¶ 426 | | |
| Martinez | Danela | ¶ 427 | | |
| Mathews | Rosemary | ¶¶ 160–70 | | X - Reimbursed |
| Matson, Jr. | Russell | ¶ 428 | | |

| Plaintiff | | | Claim | |
|---|---|---|---|---|
| **Last Name** | **First Name** | **MCC Paragraphs** | **Column 1: EFTA (Claim 1)** | **Column 2: Contract (Claim 7)[27]** |
| Matthews | Vernon | ¶ 429 | | |
| Maurer | Janelle | ¶ 430 | | |
| McCafferty | Christina | ¶ 431 | X - No qualifying error | X - No qualifying error X - Reimbursed |
| McCann | Brenda | ¶ 432 | | |
| McClure | Lindsay | ¶¶ 187–91 | | X - Reimbursed |
| McCrary | Michael | ¶ 434 | | X - Reimbursed |
| Meza | Jennifer | ¶ 433 | | |
| Middleton | Travis | ¶ 435 | X -Untimely | X -Untimely |
| Miller | Linda | ¶ 436 | | X - Reimbursed |
| Moon | Azuri | ¶¶ 144–51 | | X - Reimbursed |
| Moore | Stephanie | ¶¶ 268–73 | | X - Reimbursed |
| Moore | Lavell | ¶ 437 | | |
| Morales | Sara | ¶ 438 | | |
| Morales | Albert | ¶ 439 | | |
| Morgan | Sharise | ¶ 440 | X - No qualifying error | X - No qualifying error |
| Morrell | Tiffany | ¶ 441 | | X - Reimbursed |
| Morris | Heather | ¶ 442 | | |
| Mouck | Janette | ¶ 443 | | |
| Murphy | Robert | ¶ 444 | | X - Reimbursed |
| Murphy | Sarah | ¶ 445 | X - No qualifying error | X - No qualifying error |
| Nicholson | Kimberly | ¶ 446 | | |
| Ojeda | Lelanya | ¶ 447 | | |
| Oosthuizen | Roland | ¶¶ 152–59 | | X - Reimbursed |
| Ortiz, Jr. | Frank | ¶ 448 | X - Freeze | X – Freeze |
| Owen | Kelly | ¶ 449 | | |
| Owensby | Mark | ¶ 450 | | X - Reimbursed |
| Paningbatan | Flouzel | ¶ 451 | | |
| Payton | Laura | ¶ 452 | | X - Reimbursed |
| Pena, Jr. | Ismael | ¶ 453 | | |
| Perez | Luis | ¶¶ 216–24 | | X - Reimbursed |
| Perez | Ann | ¶ 454 | X - No qualifying error | X - No qualifying error |
| Perez | Paul | ¶ 455 | | |
| Perkins | Kenyon | ¶ 456 | X - No qualifying error | X - No qualifying error |
| Petrova | Zinaida | ¶¶ 274–78 | | |
| Piette | Melanie | ¶ 457 | | X - Reimbursed |
| Pita | Ryan | ¶ 458 | | |
| Pitts | Darnell | ¶ 459 | | |
| Pitts | Vannessa | ¶ 460 | | |
| Pointer | Misty | ¶ 461 | X - Moot | X - Reimbursed |
| Pomeroy | Tina | ¶ 462 | X - No qualifying error | X - No qualifying error |
| Posten | Randle | ¶ 463 | | |
| Pummill | Joshua | ¶ 464 | X - No qualifying error | X - No qualifying error |
| Quesada | Andrea | ¶ 465 | | X - Reimbursed |
| Quiroz | Maurilio | ¶ 466 | | |
| Raiff | Mykela | ¶ 467 | X -No notice | X -No notice |
| Ray | Moaney | ¶ 468 | | |
| Reed | Kawana | ¶ 469 | X - No qualifying error | X - No qualifying error X - Reimbursed |
| Rima-Fleurima | Nehemiah | ¶ 470 | X -No notice | X -No notice |
| Ritchey | Rhonda | ¶ 471 | | |
| Rivera | Vanessa | ¶¶ 127–35 | | |
| Rivera | Israel | ¶ 472 | | X - Reimbursed |
| Roa | Miguel | ¶ 473 | X -No notice | X -No notice |
| Robinson | Carmen | ¶ 474 | X -No notice | X -No notice |

| Plaintiff | | | Claim | |
|---|---|---|---|---|
| **Last Name** | **First Name** | **MCC Paragraphs** | **Column 1: EFTA (Claim 1)** | **Column 2: Contract (Claim 7)[27]** |
| Robinson | Stanley | ¶ 475 | | |
| Robles | Joe | ¶ 476 | X - No qualifying error | X - No qualifying error |
| Rodriguez | Carlos | ¶¶ 171–76 | | |
| Rodriguez | Catrina | ¶ 477 | | |
| Rodriguez Romo | Jose | ¶ 479 | | X - Reimbursed |
| Rojas de Charolet | Elana Martina | ¶ 478 | | ████████ |
| Royston | Melissa | ¶ 480 | | |
| Salaz | Raylene | ¶ 481 | X - No qualifying error | X - No qualifying error |
| Salazar | Miguel | ¶ 482 | | X - Reimbursed |
| Saldate | Frankie | ¶ 483 | X -No notice | X -No notice |
| Schmidt | Michael | ¶ 484 | | X - Reimbursed |
| Schmitz | Timothy | ¶ 485 | X -No notice | X -No notice |
| Serrato | Melissa | ¶ 486 | | |
| Sevilla | Arminda | ¶ 487 | | |
| Silva | Jenna | ¶ 488 | X -No notice | X -No notice |
| Simpson | Jessica | ¶ 489 | | |
| Sims II | Michael | ¶ 490 | | |
| Smith | Stephanie | ¶¶ 200–02 | | **Not dismissed** |
| Smith | Jonathan | ¶¶ 229–36 | | X - Reimbursed |
| Smith | Denise | ¶ 491 | X -Untimely | X -Untimely |
| Smith | Nicole | ¶ 492 | | |
| Sparks | Jonathan | ¶ 493 | | |
| Stanfill | Amy | ¶ 494 | | |
| Stephens | Lucas | ¶ 495 | | |
| Stidham | Crystal | ¶ 496 | | |
| Talia | Danny | ¶ 497 | X - Freeze | X - Freeze |
| Tamayo | Cesar | ¶ 498 | | X - Reimbursed |
| Taylor | Michelle | ¶ 499 | | X - Reimbursed |
| Taylor | Tonya | ¶ 500 | | |
| Tonna | Nicholas | ¶ 501 | | |
| Trammel | Tasha | ¶ 502 | | X - Reimbursed |
| Tressler | Jimmy | ¶ 503 | | |
| Turnbull | Jason | ¶ 504 | | |
| Turner | Thomas | ¶ 505 | X -No notice | X -No notice |
| Valadez | Reina | ¶ 506 | X - No qualifying error | X - No qualifying error |
| Valenzuela | Juan | ¶ 507 | | |
| Vasquez | David | ¶ 508 | | |
| Verdun | Jessie | ¶ 509 | | ████████ |
| Villagomez | Manuel | ¶ 510 | | |
| Viramontes | Luis | ¶ 511 | | |
| Walker | Norman | ¶ 512 | X - No qualifying error | X - No qualifying error |
| Wallace | Jason | ¶ 513 | | |
| Wiggins | Brian | ¶¶ 225–28 | | X - Reimbursed |
| Wilburn | Cameren | ¶ 514 | X - Freeze | X - Freeze |
| Wilds | Denise | ¶ 515 | | X - Reimbursed |
| Wilkins | Terrence | ¶ 516 | X - Freeze | X - Freeze |
| Williams | Zacharia | ¶ 517 | X - Freeze | X - Freeze |
| Williams | Tyrisha | ¶ 518 | X - No qualifying error | X - No qualifying error |
| Williams | Willie | ¶ 519 | | |
| Williamson | Latasha | ¶ 520 | | |
| Willis | Leanna | ¶ 521 | | |
| Willrich | J. Michael | ¶¶ 177–86 | | X - Reimbursed |
| Wilson | Robert L. | ¶¶ 192–94 | | X - Reimbursed |
| Wise | Lacey | ¶ 522 | | |

| Plaintiff | | | Claim | |
|---|---|---|---|---|
| Last Name | First Name | MCC Paragraphs | Column 1: EFTA (Claim 1) | Column 2: Contract (Claim 7)[27] |
| Wood | Colton | ¶ 523 | X - Freeze | X - Freeze |
| Yeats | Matthew | ¶ 524 | X - No qualifying error | X - No qualifying error |
| Yick | Jennifer | ¶¶ 114–26 | | **Not dismissed** |
| Young | Glen | ¶ 525 | X - No qualifying error | X - No qualifying error |
| Yuan | Alex | ¶¶ 237–45 | | |
| Zettlemoyer | Christopher | ¶ 526 | X -No notice | X -No notice |
| Zoelle | Jory | ¶¶ 246–49 | | |