JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
KARIN B. SWOPE (Pro Hac Vice)
kswope@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
VASTI S. MONTIEL (SBN 346409)
vmontiel@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
STACEY M. LEYTON (SBN 203827)
sleyton@altber.com
CONNIE K. CHAN (SBN 284230)
cchan@altber.com
KATHERINE G. BASS (SBN 344748)
kbass@altber.com
COLIN C. JONES (SBN 354301)
cjones@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Fax: (415) 362-8064

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION | Case No. 3:21-md-02992-GPC-MSB |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| | Judge: Hon. Gonzalo P. Curiel<br>Ctrm: 2D (2nd Floor)<br>Date: January 17, 2025<br>Time: 1:30pm |
| This Document Relates to All Actions | ORAL ARGUMENT REQUESTED |

REDACTED PUBLIC VERSION

## **Table of Contents**

**Page**

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL BACKGROUND.................................................................4

    A.    The Bank had an exclusive contract to distribute EDD benefits......................4

    B.    The Bank issued EDD cardholders unencrypted cards lacking EMV chips, enabling criminals to steal hundreds of millions of dollars in EDD benefits....5

    C.    Before the Class Period, the Bank followed its standard operating procedures for conducting EFTA-compliant claims investigations. ................6

    D.    The Bank abandoned its standard procedures and adopted a new policy of summarily denying without investigation all ATM claims by EDD cardholders...................................................................................................7

    E.    The Bank implemented a policy of summarily rescinding previously paid permanent credits on all ATM claims by EDD cardholders. .........................10

    F.    The Bank implemented a policy of automatically freezing the account of any EDD cardholder whose claim included a disputed ATM withdrawal......10

    G.    The Bank deliberately and systematically understaffed its Claims call center....................................................................................................11

    H.    Despite knowing its policies were harming thousands of legitimate EDD cardholders, the Bank continued to use the CFF until enjoined in June 2021.12

    I.    CFPB and OCC Consent Orders in July 2022....................................14

III.  LEGAL STANDARD..........................................................................15

IV.   ARGUMENT.......................................................................................15

    A.    Plaintiffs Satisfy All Rule 23(a) Requirements. ...............................15

        1. Numerosity.............................................................................15

        2. Commonality..........................................................................16

        3. Typicality. .............................................................................18

        4. Adequacy. .............................................................................19

    B.    Certification Is Warranted under Rule 23(b)(3). ...............................................19

        1. Common Issues Predominate for Plaintiffs' Claims. ...................................19

           a.    Electronic Fund Transfer Act (EFTA) ...........................................20

           b.    Due Process .......................................................................................23

           c.    Breach of Fiduciary Duty .................................................................26

           d.    Negligence .........................................................................................29

           e.    Breach of the Implied Covenant of Good Faith and Fair Dealing .......31

           f.    California Consumer Privacy Act (CCPA) .........................................34

           g.    Unfair Competition Law (UCL) ..........................................................35

           h.    Damages Can Be Calculated Using a Common Methodology. ............36

              i.    Actual Damages .................................................................37

              ii.    Treble Damages .................................................................40

              iii.  Statutory Damages ...........................................................40

               iv.  Punitive Damages ..............................................................41

               v.    Restitution .........................................................................42

              vi.  Disgorgement ....................................................................43

         2. A Class Action is Superior to Individual Adjudications. ...........................43

**V.    CONCLUSION .........................................................................................45**

## Table Of Authorities

**Page(s)**

**Cases**

*3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*,
   980 F.3d 1317 (9th Cir. 2020) ................................................................. 32, 33

*Aguayo v. U.S. Bank*,
   200 F. Supp. 3d 1075 (S.D. Cal. 2016)........................................................ 42

*Aho v. AmeriCredit Fin. Servs., Inc.*,
   277 F.R.D. 609 (S.D. Cal. 2011) ................................................................. 45

*Alkayali v. Hoed*,
   No. 3:18-cv-777-H-JMA, 2018 WL 3425980 (S.D. Cal. July 16, 2018).................... 43

*Almon v. Conduent Bus. Servs., LLC*,
   No. SA-19-CV-01075, 2022 WL 4545530 (W.D. Tex. Sept. 28, 2022)............... 20, 40

*Am. Fed. of Lab. v. Emp. Dev. Dep't*,
   88 Cal.App.3d 811 (1979) .................................................................... 24, 25

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................................ 43

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)............................................................................ 4, 19

*Andrews v. Plains All Am. Pipeline, L.P.*,
   No. CV-15-4113-PSG, 2018 WL 2717833 (C.D. Cal. Apr. 17, 2018) ...................... 30

*Anwar v. Fairfield Greenwich Ltd.*,
   306 F.R.D. 134 (S.D.N.Y. 2015) ................................................................. 30

*Arthur Young & Co. v. U.S. Dist. Ct.*,
   549 F.2d 686 (9th Cir. 1977) .................................................................... 38

*B.P. v. Balwani*,
   2021 WL 4077008 (9th Cir. Sept. 8, 2021) .................................................. 15

*Barefield v. Chevron, U.S.A.*,
   No. C 86-2427 TEH, 1988 WL 188433 (N.D. Cal. Dec. 6, 1988)............................ 41

*Bazarganfard v. Club 360 LLC*,
  344 F.R.D. 411 (C.D. Cal. 2023)...................................................................38

*Beaver v. Omni Hotels Mgmt. Corp.*,
  No. 20-cv-00191-AJB-DEB, 2023 WL 6120685 (S.D. Cal. Sept. 18, 2023)......26, 28, 45

*Bisbey v. D.C. Nat'l Bank*,
  793 F.2d 315 (D.C. Cir. 1986)......................................................................40

*In re BofI Holding, Inc. Sec. Litig.*,
  No. 3:15-cv-02324-GPC-KSC, 2021 WL 3742924 (S.D. Cal. Aug. 24, 2021)...16, 19, 38

*Bostick v. Herbalife Int'l of Am., Inc.*,
  No. CV 13-2488-BRO, 2015 WL 12731932 (C.D. Cal. May 14, 2015) ....................43

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*,
  149 F.3d 971 (9th Cir. 1998).........................................................................23

*Brown v. Stored Value Cards, Inc.*,
  No. 3:15-cv-01370-MO, 2016 WL 4491836 (D. Or. Aug. 25, 2016),
  *rev'd on other grounds*, 953 F.3d 567 (9th Cir. 2020)....................................26

*Cahoo v. SAS Inst. Inc.*,
  322 F. Supp. 3d 772 (E.D. Mich. 2018),
  *aff'd in part, rev'd in part on other grounds*, 912 F.3d 887 (6th Cir. 2019)...............26

*Cal. Dep't of Human Resources Dev. v. Java*,
  402 U.S. 121 (1971).....................................................................................25

*Candelore v. Tinder, Inc.*,
  19 Cal.App.5th 1138 (2018) .........................................................................36

*Cates Constr., Inc. v. Talbot Partners*,
  21 Cal.4th 28 (1999) ....................................................................................41

*In re Chase Bank USA, N.A. Check Loan Cont. Litig.*,
  274 F.R.D. 286 (N.D. Cal. 2011)...................................................................31

*Childress v. JPMorgan Chase & Co.*,
  No. 5:15-CV-298-BO, 2019 WL 2865848 (E.D.N.C. July 2, 2019) ....................26, 28

*Clemmer v. Key Bank Nat'l Ass'n*,
  539 F.3d 349 (6th Cir. 2008) ........................................................................20

*Cohen v. Trump*,
303 F.R.D. 376 (S.D. Cal. 2014) ................................................................. 18, 40

*Collins v. Missouri Elec. Coop. Emps. Credit Union*,
No. 1:05CV0009 ERW, 2006 WL 2189693 (E.D. Mo. July 26, 2006) ...................... 22

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................................................................ 37

*Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*,
57 Cal.App.5th 1108 (2020) .......................................................................... 43

*Dang v. Cross*,
422 F.3d 800 (9th Cir. 2005) ......................................................................... 41

*Dieffenbach v. Barnes & Noble, Inc.*,
887 F.3d 826 (7th Cir. 2018) ......................................................................... 39

*Doe v. Mindgeek USA Inc.*,
702 F.Supp.3d 937 (C.D. Cal. 2023) .......................................................... 37, 41

*Durgan v. U-Haul Int'l Inc.*,
No. CV-22-01565-PHX-MTL, 2023 WL 7114622 (D. Ariz. 2023) ........................... 35

*DZ Reserve v. Meta Platforms, Inc.*,
96 F.4th 1223 (9th Cir. 2024) ........................................................................ 19

*Edleson v. Travel Insured Int'l, Inc.*,
No. 21-cv-323-WQH-SBC, 2023 WL 8251336 (S.D. Cal. Nov. 20, 2023) ............... 44

*Egan v. Mut. of Omaha Ins. Co.*,
24 Cal.3d 809 (1979) .................................................................................... 32

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (N.D. Cal. 2012) .................................................................... 41

*Espejo v. Copley Press, Inc.*,
13 Cal.App.5th 329 (2017) ............................................................................ 42

*In re Exxon Valdez*,
270 F.3d 1215 (9th Cir. 2001) ................................................................... 15, 38

*Friedman v. 24 Hour Fitness USA, Inc.*,
No. CV 06-6282 AHM, 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009) ................... 38

*Giroux v. Essex Prop. Tr., Inc.*,
No. 16-cv-01722-HSG, 2018 WL 2463107 (N.D. Cal. June 1, 2018)........................31

*In re Glumetza Antitrust Litig.*,
336 F.R.D. 468 (N.D. Cal. 2020)................................................................................45

*Goldberg v. Kelly*,
397 U.S. 254 (1970)..............................................................................................24, 25

*Grace v. Apple, Inc.*,
328 F.R.D. 320 (N.D. Cal. 2018)................................................................................36

*Green v. Cap. One, N.A.*,
557 F.Supp.3d 441 (S.D.N.Y. 2021) ..........................................................................21

*Guzman v. Polaris Indus., Inc.*,
345 F.R.D. 174 (C.D. Cal. 2023)................................................................................44

*Hilario v. Allstate Ins. Co.*,
642 F. Supp. 3d 1048 (N.D. Cal. 2022),
*aff'd*, 2024 WL 615567 (9th Cir. Feb. 14, 2024)........................................................30

*Hilsley v. Ocean Spray Cranberries, Inc.*,
No. 17-cv-2336-GPC-MDD, 2018 WL 6300479 (S.D. Cal. Nov. 29, 2018) ..............20

*Hobbs v. Bateman Eichler, Hill Richards, Inc.*,
164 Cal.App.3d 174 (1985) ........................................................................................41

*Houston v. Fifth Third Bank*,
No. 18-cv-5981, 2019 WL 3002965 (N.D. Ill. July 10, 2019)................................2, 22

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) .....................................................................................19

*Jabbari v. Farmer*,
965 F.3d 1001 (9th Cir. 2020) ...................................................................................35

*Jacobs Farm/Del Cabo, Inc. v. W. Farm Serv., Inc.*,
190 Cal.App.4th 1502 (2010) .....................................................................................30

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ....................................................................................37

*Juarez v. Arcadia Fin., Ltd.*,
152 Cal. App. 4th 889 (2007) .....................................................................................43

*Just Film, Inc. v. Buono,*
    847 F.3d 1108 (9th Cir. 2017) .................................................................. 18, 37, 38

*Kellman v. Spokeo, Inc.,*
    No. 21-cv-08976-WHO, 2024 WL 2788418 (N.D. Cal. 2024) ............................. 44, 45

*Knutson v. Schwan's Home Serv., Inc.,*
    No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763 (S.D. Cal. Sept. 5, 2013) .............. 44

*Korea Supply Co. v. Lockheed Martin Corp.,*
    29 Cal.4th 1134 (2003) ................................................................................. 42

*Krueger v. Wyeth, Inc.,*
    396 F.Supp.3d 931 (S.D. Cal. 2019) ................................................................. 43

*Leyva v. Medline Indus., Inc.,*
    716 F.3d 510 (9th Cir. 2013) ........................................................................... 37

*Lozano v. AT&T Wireless Servs., Inc.,*
    504 F.3d 718 (9th Cir. 2007) ........................................................................... 36

*Lytle v. Nutramax Lab'ys., Inc.,*
    99 F.4th 557 (9th Cir. 2024) ............................................................................ 38

*Mariscal v. Old Republic Life Ins. Co.,*
    42 Cal.App.4th 1617 (1996) ............................................................................ 32

*Marquess v. Pa. State Emps. Credit Union,*
    No. 09-4256, 2010 WL 3448086 (E.D. Pa. Aug. 31, 2010),
    *rev'd on other grounds*, 427 F.App'x 188 (3d Cir. 2011) ...................................... 40

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ...................................................................................... 25

*Menagerie Prods. v. Citysearch,*
    No. CV 08-4263-CAS (FMO), 2009 WL 3770668 (C.D. Cal. Nov. 9, 2009) ............. 32

*Miller v. Travel Guard Grp., Inc.,*
    No. 21-cv-09751-TLT, 2023 WL 7106479 (N.D. Cal. Sept. 15, 2023) ..................... 36

*Morgan v. Rohr, Inc.,*
    No. 20-cv-574-GPC-AHG, 2022 WL 974334 (S.D. Cal. Mar. 31, 2022) .................. 16

*Neal v. Farmers Ins. Exch.,*
    21 Cal.3d 910 (1978) ..................................................................................... 41

*Nguyen v. Nissan N. Am., Inc.*,
    932 F.3d 811 (9th Cir. 2019) ......................................................................... 37

*Nguyen v. Wescom Central Credit Union*,
    No. SACV 22-01520-CJC, 2023 WL 9019022 (C.D. Cal. Nov. 15, 2023) ................ 21

*Nozzi v. Housing Authority of City of L.A.*,
    CV 07-380 PA, 2016 WL 2647677 (C.D. Cal. May 6, 2016) .................................... 38

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ..................................................................... 4, 15, 16

*Owino v. CoreCivic, Inc.*,
    60 F.4th 437 (9th Cir. 2022) ........................................................................ 37

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ........................................................................ 37

*Rawson v. Recovery Innovations, Inc.*,
    975 F.3d 742 (9th Cir. 2020) ........................................................................ 26

*Rushing v. Williams-Sonoma, Inc.*,
    No. 16-cv-01421-WHO, 2024 WL 779601 (N.D. Cal. 2024) ................................. 44

*In re Sequoia Benefits & Ins. Data Breach Litig.*,
    No. 22-cv-8217-RFL, 2024 WL 1091195 (N.D. Cal. Feb. 22, 2024) ........................ 35

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) .................................................................................... 15

*Smith v. Wade*,
    461 U.S. 30 (1983) ...................................................................................... 41

*In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*,
    613 F. Supp. 3d 1284 (S.D. Cal. 2020) ............................................................. 40

*Sparks v. Mills*,
    626 F. Supp. 3d 131 (D. Me. 2022) .................................................................. 25

*Spresterbach v. Holland*,
    215 Cal.App.4th 255 (2013) .......................................................................... 30

*Stasi v. Immediata Health Grp. Corp.*,
    501 F. Supp. 3d 898 (S.D. Cal. 2020) ............................................................... 39

*Stout v. FreeScore, LLC*,
   743 F.3d 680 (9th Cir. 2014) ...................................................................... 20

*Taha v. County. of Bucks*,
   862 F.3d 292 (3d Cir. 2017) ........................................................................ 41

*In re Talis Biomed. Corp. Sec. Litig.*,
   No. 22-cv-00105-SI, 2024 WL 536303 (N.D. Cal. Feb. 9, 2024).............. 45

*Taulbee v. EJ Distrib. Corp.*,
   35 Cal.App.5th 590 (2019) .......................................................................... 30

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)...................................................................................... 19

*Vasilenko v. Grace Fam. Church*,
   3 Cal.5th 1077 (2017) .................................................................................. 29

*Victorino v. FCA US LLC*,
   322 F.R.D. 403 (S.D. Cal. 2017) ................................................................ 19

*Victorino v. FCA US LLC*,
   No. 16-cv-1617-GPC-JLB, 2019 WL 5268670 (S.D. Cal. Oct. 17, 2019) ................. 16

*Wallace v. Countrywide Home Loans, Inc.*,
   No. SACV 08-1463-JST, 2013 WL 1944458 (C.D. Cal. Apr. 29, 2013) ................... 42

*Wilson v. 21st Century Ins. Co.*,
   42 Cal.4th 713 (2007) .................................................................................. 32

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) .................................................................... 44

*Yick v. Bank of Am., N.A.*,
   No. 21-cv-00376-VC (N.D. Cal.) ...................................................... 4, 8, 13, 14

*Youngevity Int'l v. Smith*,
   No. 16-CV-704-BTM-JLB, 2019 WL 1131876 (S.D. Cal. Mar. 11, 2019)................ 26

*Zeiger v. WellPet LLC*,
   526 F.Supp.3d 652 (N.D. Cal. 2021)........................................................... 36

**Statutes**

U.S. Code:

12 U.S.C. §5565(a)(3)...................................................................................... 15
15 U.S.C. §1693a(12) ...................................................................................... 20
15 U.S.C. §1693(b) .......................................................................................... 20
15 U.S.C. §1693f ........................................................................................ 16, 20
15 U.S.C. §1693f(a)-(d) .............................................................. 17, 21, 22, 23
15 U.S.C. §1693f(e)(1) .................................................................................... 16
15 U.S.C. §1693g ..................................................................................... 20, 21, 22
15 U.S.C. §1693m(a) .................................................................................. 21, 40
15 U.S.C. §1693o(a) ........................................................................................ 15
15 U.S.C. §6801(b) .......................................................................................... 31
15 U.S.C. §6801-09 .......................................................................................... 31
42 U.S.C. §1983 ............................................................................................... 23

California Civ. Code:

§1798.81.5(d)(1)(A)(iii) .................................................................................. 35
§1798.100(e) ................................................................................................... 31
§1798.150(a) .............................................................................................. 34, 40
§3294(a), (c) ................................................................................................... 41

Gramm-Leach-Bliley Act ............................................................................ 30, 31

Racketeer Influenced and Corrupt Organizations Act (RICO)................... 15, 40

Unfair Competition Law ........................................................................... *passim*

**Regulations**

Code of Federal Regulations:

12 C.F.R. §1005.6 ............................................................................................ 20
12 C.F.R. §1005.11 .................................................................................. 20, 21, 22
12 C.F.R. §1005.11(c)(1)-(2) ......................................................................... 21
12 C.F.R. §1005.11(c)(4) ............................................................................... 21
12 C.F.R. §1005.11(d)(1) .......................................................................... 21, 23
16 C.F.R. §314.3(b)(1)-(3) ............................................................................ 31

**Rules**

Federal Rules of Civil Procedure:

Rule 23(a)...........................................................................................4, 15, 19
Rule 23(a)(1)................................................................................................15
Rule 23(a)(3)................................................................................................18
Rule 23(a)(4)................................................................................................19\
Rule 23(b)(2)................................................................................................13
Rule 23(b)(3)........................................................................................*passim*
Rule 23(c)(4)..................................................................................................4
Rule 23(g) ...................................................................................................19

**Other Authorities**

California Constitution Article I, §7 ..............................................................23

Restatement (Third) of Restitution and Unjust Enrichment §39 (Am. L. Inst. 2011).......43

*In the Matter of Bank of Am., N.A.*,
    No. 2022-CFPB-0004 (July 14, 2022)..................................................14, 15

*In the Matter of Bank of Am., N.A.*,
    No. AA-ENF-2022-21 (July 14, 2022)..................................................14, 15

## I.    INTRODUCTION

Plaintiffs in these consolidated MDL proceedings seek Rule 23 certification of their constitutional, statutory, and common law claims that challenge a series of unlawful policies and practices that Defendant Bank of America, N.A. (the "Bank") implemented at the height of the Covid pandemic in 2020-2021 to protect *itself* from financial losses at the expense of some of its most vulnerable customers. Those policies and practices deprived more than ███████ Californians of access to critical unemployment insurance ("UI") and other public benefits for which they had been approved by California's Employment Development Department ("EDD"), and which the Bank had been entrusted to distribute through Bank-issued prepaid debit cards ("EDD debit cards"). Because the Bank applied its challenged policies and practices to all Plaintiffs and class members in the same uniform manner, common issues of law and fact predominate and a class action is the fairest and most efficient way of adjudicating the pending claims.

Plaintiffs, like so many others, lost their jobs during the Covid pandemic and were approved by EDD to receive UI and other public benefits. Pursuant to its exclusive contract with EDD, the Bank distributed these benefits through EDD debit cards, which the Bank touted as a fast, convenient, and secure way to receive benefits. But soon into the pandemic, thousands of EDD cardholders discovered to their horror—often when their card was declined while trying to buy groceries or other necessities—that their EDD accounts had been drained through unauthorized ATM withdrawals and other unauthorized transactions.

When cardholders reported these unauthorized transactions to the Bank, the Electronic Fund Transfer Act ("EFTA") and its EDD Cardholder Agreement required the Bank to: (1) investigate the disputed transactions by reviewing available evidence in its records, such as ATM footage and cardholder transaction history, (2) complete its investigation or issue provisional credit (in the disputed amount) to the affected account within 10 business days, and (3) issue permanent credit within 45 days unless the Bank obtained evidence that the cardholder had authorized or benefitted from the transaction.

Instead, in September 2020, senior Bank executives instructed their employees to devise a "filter" that would "systemically deny" all EDD cardholder unauthorized-transaction claims meeting certain threshold criteria, without conducting an investigation or paying provisional credit. To avoid its legal obligation to credit EDD cardholders for unauthorized withdrawals from their accounts, the Bank chose to implement the "██████ ███████" option presented, thereby prioritizing its own financial interests over the rights and well-being of EDD cardholder customers.

Thus, on September 28, 2020, the Bank activated what it called a Claim Fraud Filter ("CFF") consisting of three "Indicators." As relevant to this motion, Indicator 1 of the CFF flagged every unauthorized-transaction claim submitted by an EDD cardholder that involved an ATM withdrawal ("Indicator 1" or "CFF-1"). The Bank then summarily rejected those claims through three related policies, the effect of which was not just to summarily deny all such claims without investigation, but to deprive tens of thousands of EDD cardholders of access to their critically needed public benefits.

*First*, the Bank used CFF-1 as the *sole* basis for summarily denying, without investigation, every EDD cardholder claim involving an unauthorized ATM withdrawal ("Claim Denial Policy"), thereby abandoning its longstanding procedures for conducting EFTA-compliant claims investigations.

*Second*, the Bank applied CFF-1 to summarily rescind all permanent credits paid during the *prior* six months to EDD cardholders whose claims had included an unauthorized ATM withdrawal ("Credit Rescission Policy").

*Third*, the Bank froze the EDD debit card account of every EDD cardholder whose claim the Bank summarily denied or whose permanent credit the Bank rescinded due to CFF-1, preventing them from accessing their existing and continuing benefits unless they first re-verified their identities with EDD (despite knowing EDD's overwhelmed call centers were at the time answering only 0.1% of calls) ("Account Freeze Policy").

Each of these policies was contrary to industry standards and the Bank's past practices for handling unauthorized-transaction claims. *See* Ex. 1 (Expert Report of J.

Daniel Kreis) ¶¶9-16. Compounding the harm, at the same time the Bank implemented these policies (which it knew would result in an increase in calls from impacted cardholders), the Bank knowingly understaffed its Claims call center, subjecting EDD cardholders trying to submit claims or obtain reconsideration of the Bank's actions to wait times "rarely, if ever, seen in the call center industry." Ex. 3 (Expert Report of Jay Minnucci) ¶12.

As a result of the Bank's classwide policies and practices, more than ▮▮▮ Californians lost access to nearly $▮▮▮ in crucially important public benefits during the height of the pandemic, often for months on end. While the Bank asserts that its CFF-1 identified individuals who likely committed benefits-enrollment fraud using stolen identities, the Bank knew, both before and during implementation, that CFF-1 was a woefully inaccurate and over-inclusive tool that would erroneously deny the claims and freeze the accounts of legitimate EDD cardholders.

The Bank's decision to rely on CFF-1 as its sole basis for denying claims, rescinding credits, and freezing accounts was particularly egregious given the Bank's knowledge that, due to its own cost-saving decision to issue EDD cardholders unencrypted, easily-counterfeited "magnetic-stripe only" cards (rather than the far more secure, industry-standard EMV chip cards the Bank had been issuing its consumer and business account customers since 2014), many EDD cardholders reporting unauthorized ATM withdrawals were innocent victims of card "skimming" and counterfeit card fraud. *See* Ex. 2 (Expert Report of Jane Cloninger) ¶¶14, 42, 45, 69-85, 87, 91, 96.

As a result of the preliminary injunction obtained in this case and Consent Orders by the Bank's federal regulators, the Bank was required to identify and compensate all wronged cardholders—a process that resulted in the Bank's own records showing that ▮% of EDD cardholders whose claims the Bank denied under its CFF-1 Policies were in fact legitimate cardholder claimants. Ex. 4 (Expert Report of Greg J. Regan) ¶35.[1]

Plaintiffs seek to represent five related classes: (1) Claim Denial class; (2) Credit

---

[1] The remaining ▮▮▮ are excluded from the class definitions.

1    Rescission class; (3) Account Freeze class; (4) Customer Service class; and (5) EMV Chip

2    class. Rule 23(a) is readily satisfied. Numerosity exists because each class comprises many

3    thousands of members who are ascertainable through the Bank's records. Commonality

4    and typicality are satisfied because of the uniform nature of the Bank's conduct. Adequacy

5    is satisfied by the manner in which the Class Plaintiffs have prosecuted the class claims,

6    initially in *Yick* and now in this MDL proceeding.

7    　　　Plaintiffs also readily satisfy Rule 23(b)'s predominance and superiority

8    requirements because the Bank's liability depends on its uniform, classwide policies and

9    practices and because, as shown by the expert report of Greg Regan (Ex. 4), classwide

10   damages can be calculated based on the Bank's internal records, discovery responses, and

11   publicly available data. Because common questions of law and fact predominate over any

12   individual issues, all requirements of Rule 23(b)(3) are satisfied. *Olean Wholesale Grocery*

13   *Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663, 666-67 (9th Cir. 2022).[2]

14   **II.    FACTUAL BACKGROUND**

15   **A.    The Bank had an exclusive contract to distribute EDD benefits.**

16   　　　From 2011 to February 2024, the Bank had exclusive contracts with EDD to

17   distribute UI, disability insurance, and paid family leave benefits to Californians through

18   Bank-issued EDD debit cards. Ex. 15 (Chestnut Tr.) 54:19-24, 75:8-13, 76:3-7, 129:2-13;

19   ECF 225-2 (Lennon Dec.) ¶3. The relevant contract ("EDD-Bank Contract"), in effect from

20   August 2016 through July 2021, included a revenue-share agreement (Ex. 22 at Attach.

21   V1.1; Ex. 15 (Chestnut Tr.) 42:8-10,) and multiple "promise[s]" about services the Bank

22   would provide EDD cardholders, including with regard to card and account security (Ex.

23   22 at 251-56), transaction fraud prevention (*id.*), compliance with EFTA and Reg E's error

24   resolution procedures (*id.* at 175, 199, 235), and customer service (*id.* at 7-13, 21, 191-

25   222). Ex. 103; Ex. 15 (Chestnut Tr.) 79:13-80:6, 85:20-86:9, 87:11-15. The Bank

26

27   ──────────────────

28   [2] The Court may also bifurcate damages claims or certify liability and certain damages
     issues pursuant to Rule 23(c)(4). *See* Ex. 157 (Trial Plan).

acknowledges cardholders "████████████████████████████

████████████████████████." Ex. 17 (Letson Tr.) 100:13-22.

**B.    The Bank issued EDD cardholders unencrypted cards lacking EMV chips, enabling criminals to steal hundreds of millions of dollars in EDD benefits.**

Although the Bank since 2014 had included "EMV chips"—a security technology that encrypts card and transaction data and is virtually impossible to counterfeit—on its other consumer and business account customers' debit cards, it chose to issue EDD cardholders far less secure "magnetic-stripe only" cards that lacked an EMV chip. Ex. 23; Ex. 16 (Martin Tr.) 61:19-23, 64:7-13, 65:4-66:3.[3] Because mag-stripe only cards are unencrypted, they are notoriously easy for criminals to "skim" and counterfeit. Ex. 2 (Cloninger Rep.) ¶¶14(a), 16-27, 69-73. Criminals use counterfeit cards to make unauthorized transactions, including ATM withdrawals. *Id.* ¶25.

By September 2019, the vast majority of the U.S. debit card market had converted to EMV chips, making EMV chips the well-established industry standard, and making the remaining mag-stripe only cards "████████████████████████" for fraud. Ex. 24 at -123235; *see also* Ex. 25 at -167021; Ex. 2 (Cloninger Rep.) ¶¶14(c)-(f), 36-45, 69-74, 85, 92. In January 2020, the Bank acknowledged that "████████████████

████████████████████████████████████" Ex. 26 at -370154; *see also* Ex. 16 (Martin Tr.) 81:7-83:13, 84:16-85:6. The incremental cost of adding EMV chips to EDD debit cards was only $███ per card. Ex. 27 at -351839-40; Ex. 16 (Martin Tr.) 82:8-83:13. Yet instead of making this modest investment, the Bank used mag-stripe cards' known vulnerability as ████████████████████████

████████████████████████. Ex. 24 at -123235; Ex. 25 at -167020-24; Ex. 28 at -116001; Ex. 29 at -124142; Ex. 30 at -352396. After ████████

████████████, the Bank decided not to add EMV chips to its EDD debit cards, making those cards—and Plaintiffs and class members—an easy target for fraudsters. Ex. 28 at -

---

[3] The Bank did not begin issuing EMV chip cards to its EDD cardholders until July 2021. Ex. 16 (Martin Tr.) 65:8-14; *see* Ex. 31 at -59312.

116001; Ex. 2 (Cloninger Rep.) ¶¶14(f), 58-65, 85, 91-92.

Predictably, the Bank's mag-stripe only EDD debit cards became magnets for fraud as criminals drained tens of millions of dollars from EDD cardholder accounts, including through ATM withdrawals. Ex. 2 (Cloninger Rep.) ¶¶14(f), 69-75, 87, 91, 92, 95. Bank documents confirm ▮▮▮▮▮▮▮▮ of this vulnerability and its consequences.[4] Tens of thousands of cardholders victimized by theft followed the instructions on the back of their cards and called the Bank to make claims. Ex. 3 (Minnucci Rep.) ¶¶23, 28 & Appx. F.

**D.    Before the Class Period, the Bank followed its standard operating procedures for conducting EFTA-compliant claims investigations.**

Before September 2020, the Bank had consistently applied its longstanding written procedures for conducting EFTA-compliant investigations of unauthorized-transaction claims, as set forth in the Bank's ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮—reflecting "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 14 (Daniels Tr.) 124:24-125:6; *see also id.* , 123:7-21, 133:16-134:11, 135:21-136:10; Ex. 35 at -1312 (AISOP); Ex. 36 at -4543; Ex. 82. To ensure that the Bank's claims analysts would review all relevant records, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 14 (Daniels Tr.) 120:16-121:1, 122:24-123:6, 147:21-150:11. Within each claim type, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 36 at -4539, 4549; Ex. 14 (Daniels Tr.) 137:9-25, 147:21-150:11; 150:13-151:20; Ex. 1 (Kreis Rep.) ¶¶30-36.

The Bank's training materials emphasize that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] *See, e.g.*, Ex. 32 at -228914 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 33 at -455617 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 34 at -297295 ("▮▮▮▮▮▮▮▮▮▮▮."); Ex. 2 (Cloninger Rep.) ¶¶14(g), 51, 61-63, 75-85, 95.

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ██████████████████████████████████████████████.” Ex. 36 at -

4  4542; *accord id.* at -4543 (██████████████████████”); Ex.

5  14 (Daniels Tr.) 136:11-24, 141:14-142:15. The Bank understood that absent evidence that

6  the cardholder authorized the disputed transaction, the Bank was required to provide

7  permanent credit in the amount of the claim, which it deemed "████████████████."

8  Ex. 37 at -290332; Ex. 14 (Daniels Tr.) 202:23-203:13; Ex. 15 (Chestnut Tr.) 88:9-14; Ex.

9  17 (Letson Tr.) 245:25-249:14.

10  **E.    The Bank abandoned its standard procedures and adopted a new policy of**
11  **summarily denying without investigation all ATM claims by EDD cardholders.**

12          In mid-September 2020, the Bank's senior officials received reports that the Bank

13  ████████████████████████████ EFTA-required credits to EDD

14  cardholders who submitted unauthorized-transaction claims, and they directed their

15  subordinates to develop ████████████████

16  ██████████████████████████████████████████████."

17  Ex. 38 at -630836; Ex. 39 at -371977; Ex. 17 (Letson Tr.) 236:3-240:24, 249:16-251:14;

18  Ex. 153 at -421427 (week before CFF implemented, Bank CEO and COO discussed

19  ████████████████████████████████████████████████

20  ████████████████████████") . Upon learning of the Bank's ██████████

21  ████████████████████████████████████████████████

22  ██████████████████████████." Ex. 39 at -371977. The next day, one of

23  those executives told other managers he was "████████████████████

24  ██████████████████████████████████." Ex. 41 at -

25  694889-90. The Bank's employees hastily ████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████. Ex. 38 at -630836; Ex. 43 at -87750. On

28  September 26, 2020, the Bank ████████████████████████████

1    █████████████████████████████████" suggested in the hope of

2    saving the Bank ████████████ of dollars it would otherwise have been required to

3    pay under EFTA. Ex. 43 at -87750; Ex. 44 at -450517; Ex. 45 at -125863; Ex. 46 at -

4    497803-04 (████████████████████████████); Ex. 17 (Letson Tr.)

5    257:6-258:9, 262:9-263:7, 264:9-266:16.

6        The Bank implemented that "█████████████████" the next business day,

7    September 28, 2020. From then until the effective date of the *Yick* preliminary injunction,

8    the Bank subjected each day's unauthorized-transaction claims from EDD cardholders (but

9    *not* from any of the Bank's non-UI customers) to the CFF. *See* Ex. 14 (Daniels Tr.) 42:3-

10   8, 56:12-15; Ex. 16 (Martin Tr.) 124:20-125:17, 173:7-23, 177:6-178:12. If a claim

11   triggered any of the CFF's indicators, it was summarily denied without *any* human review

12   or consideration of the Bank's mandatory ██████ investigation points. Ex. 14 (Daniels Tr.)

13   21:6-16, 52:21-53:9, 234:13-21; Ex. 16 (Martin Tr.) 124:20-125:17, 162:1-25; *see* Ex. 104

14   at -663735 ("██████████████████,[5] a █████████████████

15   ██████████"); Ex. 36 at -4539; Ex. 47 -at 100644, -100649; Ex. 48 at -90696; Kreis Rep.

16   ¶¶42-46.

17       As relevant here, CFF Indicator 1 screened for every claim involving an

18   unauthorized ATM withdrawal.[6] Thus, during the class period, the Bank's policy was to

19   summarily deny without any investigation all EDD cardholder claims involving an

20   unauthorized ATM withdrawal, solely because the claim triggered CFF-1 ("Claim Denial

21   Policy"). Ex. 17 (Letson Tr.) 92:15-94:5, 178:7-20, 192:7-14. By denying all such EDD

22

---

23   [5] Because the Bank's Global Banking and Markets ("GBAM") team developed the CFF, it was
24   known internally as "███████████," and a CFF-based claim denial as a "GBAM/systemic
     denial." Ex. 14 (Daniels Tr.) 177:16-19, 209:25-210:4, 210:22-211:5; Ex. 47 at -100634.
     [6] CFF Indicator 1 applied to all "████████████████████
25   ████████████████████," which the Bank interpreted as applying only to any claim that
26   included an ATM withdrawal. Ex. 49 (Bank's Resp. Rog 28); Ex. 47 at -100649 (Indicator
     1 applied to "████████████████████████"); Ex. 14 (Daniels Tr.) 285:22-286:24; Ex.
27   17 (Letson Tr.) 92:15-94:5.This included claims with a combination of ATM and POS
     transactions, called "████████████████." Ex. 50 at -90640, -90643; Ex. 17 (Letson Tr.)
28   92:19-23.

cardholder claims within ██████████ of submission, the Bank ensured it would never pay provisional credit on them. Ex. 14 (Daniels Tr.) 49:24-50:6, 51:14-24; 282:17-23; Ex. 16 (Martin Tr.) 125:6-14, 132:20-133:3; Ex. 156 at -426935, -426938 (CFF will result in "████████████████████████████████████████████████████").

After the Bank "systemically denied" an EDD cardholder's claim based on CFF-1, it would automatically generate and mail the cardholder a form letter, typically dated 1-2 business days after claim submission, stating, "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity," with no further detail or explanation. Exs. 52-53; Ex. 14 (Daniels Tr.) 53:2-54:12, 220:12-221:11, 225:13-231:1; Ex. 16 (Martin Tr.) 132:20-133:3. The letter stated the cardholder could call to "request that we reopen your claim for further consideration" (Exs. 52-53), but the Bank considered this "reconsideration" process ████████████████████████ ████████████████████. Ex. 14 (Daniels Tr.) 247:16-248:12. Cardholders who called the Bank and reached a live agent were instructed that the Bank could not help them unless and until they reauthenticated their identity with EDD—part of the Bank's related policy of using the CFF to automatically freeze EDD Cardholder accounts. *See infra* §II.G.

The Bank continued to implement its Claim Denial Policy for over eight months until enjoined, even though it *knew* its mag-stripe only EDD debit cards were particularly vulnerable to card skimming and counterfeiting and that many EDD cardholders submitting claims of unauthorized ATM withdrawals were true victims of fraud whose claims the Bank was wrongfully denying. Ex. 50 at -90640 (████████ ████████████████████ ████████████████████████████████████████ ██████████████████); Ex. 54 at -273305; Ex. 55 at -163307; Ex. 56 at -172471; Ex. 57 at -107327; Ex. 58 at -90683; Ex. 16 (Martin Tr.) 286:22-288:8, 308:9-18; Ex. 2 (Cloninger Rep.) ¶¶14(f), 14(i), 69-85, 87, 91, 96.

The Bank's discovery responses identify each member of the Claim Denial class— those who made claims that the Bank denied based solely on CFF Indicator 1 from September 28, 2020 through June 8, 2021, and who are not excluded from the proposed class. Ex. 4 (Regan Rep.) ¶¶31-35. The Bank's discovery responses identify approximately

█████ members of the Claim Denial class, with $█████ in claims denied as a result of the Bank's Claim Denial Policy. Ex. 4 (Regan Rep.) ¶¶36, 38. This includes the claims of Plaintiffs Koole, McClure, Moon, Oosthuizen, Rivera, Willrich, and Yuan.[7]

**F.    The Bank implemented a policy of summarily rescinding previously paid permanent credits on all ATM claims by EDD cardholders.**

Beginning September 28, 2020, the Bank retroactively applied its new CFF to all claims submitted since April 1, 2020 that it had previously investigated *and resolved in EDD cardholders' favor* pursuant to its █████ procedures. Ex. 16 (Martin Tr.) 179:13-180:1; Ex. 14 (Daniels Tr.) 234:24-236:5. Despite having previously told those cardholders the Bank had "completed [its] investigation" and the credit issued was "permanent,"[8] if any claims triggered CFF-1 (i.e., because they included an ATM withdrawal), the Bank summarily *rescinded* those permanent credits ("Credit Rescission Policy"). Ex. 16 (Martin Tr.) 178:13-23, ; Ex. 14 (Daniels Tr.) 234:24-236:5. The Bank did so despite warnings ████████████████████████████████████████████████████████████ ████████████████████████████████████." Ex. 78 at -129422; Ex. 105 at -169912. Bank discovery responses identify approximately █████ members of the Credit Rescission class, with $█████ in permanent credit rescinded due to the Credit Rescission Policy. Ex. 4 (Regan Rep.) ¶¶81-83. This includes the claims of Class Plaintiffs Chong and Moore.[9]

**G.    The Bank implemented a policy of automatically freezing the account of any EDD cardholder whose claim included a disputed ATM withdrawal.**

From September 28, 2020 to March 17, 2021, when a claim triggered CFF-1 because it involved an unauthorized ATM withdrawal, the Bank also automatically and indefinitely *froze* the associated account ("Account Freeze Policy"). Ex. 16 (Martin Tr.) 159:15-18,

---

[7] Ex. 59 (Bank's Resp. Rog 21, Supp. Exhibit 6, Part 1) (identifying each affected cardholder by unique "Card Alias ID"); Ex. 60 (providing Class Plaintiffs' Card Alias IDs); Ex. 6 (Koole Dec.) ¶6; Ex. 7 (McClure Dec.) ¶7; Ex. 8 (Moon Dec.) ¶8; Ex. 10 (Oosthuizen Dec.) ¶6; Ex. 11 (Rivera Dec.) ¶8; Ex. 12 (Willrich Dec.) ¶8; Ex. 13 (Yuan Dec.) ¶18.
[8] *See, e.g.*, Ex. 61 at Moore_S_0000367; Ex. 62 at PLFF00000011.
[9] *See* Ex. 59 (Bank's Resp. Rog 21, Supp. Exhibit 6, Part 2) (identifying each affected cardholder by Card Alias ID); Ex. 60 (providing Class Plaintiffs' Card Alias IDs); Ex. 5 (Chong Dec.) ¶11; Ex. 9 (Moore Dec.) ¶9.

221:11-224:4, 224:17-225:2. An account freeze deprived the cardholder of all access to all EDD benefits in their account and prevented EDD from depositing new benefits. Ex. 16 (Martin Tr.) 224:5-16. The Bank instructed its customer service representatives ("CSRs") to tell cardholders with frozen accounts that the Bank could do nothing to help them unless they re-authenticated their identity *with EDD*—even though the Bank knew by September 2020 that EDD's call centers were so "overwhelmed" that no more than "1 in 1,000 people that are trying to reach [the EDD] call center on a given day are getting through," resulting in "600,000 unique callers a month [] waiting on hold for hours without a statistically significant chance of being served." Ex. 15 (Chestnut Tr.) 154:11-157:14; Ex. 63 at 17-18; Ex. 66 at -874570. Although huge numbers of frustrated EDD cardholders called back the Bank to complain they could not reach EDD, the Bank held firm, reiterating that their account would remain frozen until they re-authenticated with EDD, subjecting those callers to a "███████████" of fruitless calls to EDD and the Bank. Ex. 16 (Martin Tr.) 226:17-227:18, 235:15-236:1, 272:16-274:13; Ex. 18 (Golden Tr.) 146:7-147:19, 149:10-21, 150:20-151:6, 165:18-167:17; Ex. 64 at -90722; Ex. 65 at -452795.

As a result of the Bank's Account Freeze Policy (in effect September 28, 2020 to March 17, 2021),[10] approximately ██████ EDD cardholders were summarily deprived of $██████ in public benefits, often for months on end, Ex. 16 (Martin Tr.) 224:5-16, simply because their claims included an ATM withdrawal. Ex. 4 (Regan Rep.) ¶¶94-99. This includes Class Plaintiffs Chong, Koole, McClure, Moon, Moore, Rivera, and Yuan.[11]

//

//

---

[10] Beginning March 18, 2021, the Bank stopped using the CFF to automatically freeze EDD cardholder accounts and instead used it to "block" those accounts, which still prevented cardholders from accessing their accounts but allowed them to regain access (i.e., "unblock" their accounts) by calling the Bank and authenticating their identity with a Bank CSR. Ex. 91at -125921; Ex. 16 (Martin Tr.) 301:18-302:25.

[11] *See* Ex. 59 (Bank's Resp. Rog 21, Supp. Exhibit 6, Part 3) (identifying each affected cardholder by Card Alias ID); Ex. 60 (providing Class Plaintiffs' Card Alias IDs); Ex. 5 (Chong Dec.) ¶9; Ex. 6 (Koole Dec.) ¶7; Ex. 7 (McClure Dec.) ¶9; Ex. 8 (Moon Dec.) ¶11-12; Ex. 9 (Moore Dec.) ¶8; Ex. 11 (Rivera Dec.) ¶9-10; Ex. 13 (Yuan Dec.) ¶19.

**H.      The Bank deliberately and systematically understaffed its Claims call center.**

Contemporaneously with the Bank's implementation of its Claim Denial and Credit Rescission Policies, which foreseeably caused an increase in calls from desperate cardholders, the Bank deliberately understaffed its Claims call center (which handled calls relating to claims), forcing EDD cardholders to endure "wait times rarely, if ever, seen in the call center industry." Ex. 3 (Minnucci Rep.) ¶12; *id.* ¶¶15, 42-46, 50-64, 101, Appx. F. From September 13 to November 21, 2020, the Claims call center's average speed to answer ("ASA") (i.e. the time each caller had to wait for their call to be answered) was nearly ████████, in contrast to the average ASA of 1.25 minutes among 214 call centers surveyed in 2020. *Id.* ¶¶12, 43-46. The Bank *intentionally* ████████████████ ██████████████████████████████████████████. *Id.* ¶¶58-60; Ex. 77 at -118438; Ex. 134 at -106094. Call center performance ███████████████ █████████████████████. Ex. 3 (Minnucci Rep.) ¶¶50, 46 (fig. 1), 64 (fig. 3). Not only did the Bank fail to ██████████████ to accommodate the predictable growth in call volume, but it deliberately ████████████████ to grossly inadequate levels to add "████████" to the process, accepting the adverse effects of those delays on needy EDD cardholders because those "████████████████████████████████████." Ex. 77 at -118438; Ex. 3 (Minnucci Rep.) ¶60; Ex. 18 (Golden Tr.) 75:8-22; 124:22-125:1. Average wait times for the Claims call center reached more than ████████ in October 2020. Ex. 3 (Minnucci Rep.) ¶49 (fig. 1) & Appx. F.

Between September 13 and November 21, 2020, approximately ████████ Claim Denial and Credit Rescission class members (including Plaintiffs Chong, Moon, Moore, Oosthuizen, Willrich, and Yuan) called the Bank to submit a claim, and many more likely called again after their claims were denied and credits rescinded based on CFF-1. Ex. 4 (Regan Rep.) ¶¶110-112.[12] Collectively, they waited on hold at least ████████████ longer than if the Bank had provided industry-standard call center service. *Id.* ¶112, 114.

_____

[12] *See* Ex. 5 (Chong Dec.) ¶13; Ex. 8 (Moon Dec.) ¶9; Ex. 9 (Moore Dec.) ¶11; Ex. 10 (Oosthuizen Dec.) ¶9; Ex. 12 (Willrich Dec.) ¶10 Ex. 13 (Yuan Dec.) ¶12.

**I.    Despite knowing its policies were harming thousands of legitimate EDD cardholders, the Bank continued to use the CFF until enjoined in June 2021.**

The Bank knew its CFF-1 Policies would erroneously deny claims, rescind credits, and freeze accounts of many legitimate EDD cardholders, but it implemented those policies anyway. Ex. 17 (Letson Tr.) 165:1-10, 192:15-193:9, 283:14-21; Ex. 16 (Martin Tr.) 286:22-288:8, 308:9-18; Ex. 67 at -452826 ("████████████████████████ ██████████████████████████████████████████████████████ ████████████████"); Ex. 68 at -630754-55 (██████████████████████ ██████████████████████████████████████████████████████ ████████████████"). Soon after implementation, the Bank's data confirmed its CFF-1 Policies were, in fact, ███████████████████████ ██████████████████████████████, yet the Bank did not modify or terminate its CFF-1 Policies. *See* Ex. 47 at -100641, -100644 (████████ ██████████████████████████████████████████████████████ ████████████████████████). Senior Bank leaders ██████████ ██████████████████████████████████████████. *See, e.g.*, Ex. 50 at -90640 (█████ ████████████████████████████ ████████ ████████); Ex. 54 at -273305 (████████████████████████ ██████████████████████████████████████████████████████ ████████████████████").

In January 2021, several putative class action lawsuits were filed and consolidated in the Northern District of California. *Yick v. Bank of Am., N.A.*, No. 21-cv-00376-VC. On May 17, 2021, the *Yick* court granted Plaintiffs' motion for preliminary injunction and provisionally certified a Rule 23(b)(2) class, holding that Plaintiffs' EFTA and UCL claims had a "strong likelihood of success" because the Bank had "fail[ed] to conduct an adequate, good faith investigation when [EDD] cardholders report[ed] unauthorized charges," and instead relied on "a faulty screening process" (i.e., the CFF) as the sole basis for denying claims and freezing accounts. Ex. 70 at 1. The court also found irreparable injury, because "[t]he class is comprised of people who depend on unemployment benefits to get through

the pandemic," and Plaintiffs' evidence (including declarations from 50 EDD cardholders) had shown the Bank's "continued denial of these benefits will seriously hinder the ability of many class members to feed their families and keep a roof over their heads." *Id.* at 2.

This was followed on June 1, 2021 by a detailed Preliminary Injunction, which provided significant relief to the class effective June 8, 2021. Ex. 71 ("PI Order"). Among other things, the PI Order prohibited the Bank from using its CFF to deny claims and freeze accounts and from denying claims or provisional credit without an investigation. *Id.* ¶¶1-3. The PI Order also required the Bank to reopen claims it previously used the CFF to deny, to provide provisional credit for those claims within 10 business days of reopening, and to properly investigate and resolve all such claims within 45 days. *Id.* ¶¶4-6. The PI Order also required significant improvements to the Bank's call center operations and staffing. *Id.* ¶¶7-10. Pursuant to this Order, the Bank stopped using its CFF to auto-deny claims and auto-freeze accounts, and it reopened tens of thousands of summarily denied claims, resulting in class members being reimbursed tens of millions of dollars.[13]

## J.    CFPB and OCC Consent Orders in July 2022

More than a year later, the CFPB and OCC, based on factual findings similar to those underlying the PI Order, fined the Bank $225 million for violations of federal law, and entered into two Consent Orders with the Bank. Ex. 72, Consent Order, *In the Matter of Bank of Am., N.A.*, No. 2022-CFPB-0004 (July 14, 2022) ("CFPB Order"); Ex. 73, Consent Order, *In the Matter of Bank of Am., N.A.*, No. AA-ENF-2022-21 (July 14, 2022) ("OCC Order"). Among other things, regulators found the Bank "violated the requirement to conduct a reasonable Error Resolution Investigation under … EFTA," CFPB Order ¶58; "violated EFTA and Regulation E by failing to timely investigate EDD cardholders'

---

[13] On June 4, 2021**,** three days after the PI Order, the JPML transferred the consolidated *Yick* action and related actions to this Court. ECF 1. The procedural history of this MDL is set forth in prior orders. *See* ECF 126 at 6-7; ECF 297 at 2-4; ECF 298 at 2. Key filings are the Master Consolidated Complaint ("MCC") (ECF 72), the Court's May 2023 ruling on the motion to dismiss the MCC ("MTD Order") (ECF 126), the First Amended MCC ("FAMCC") (ECF 136), the Court's June 2024 rulings on the motion to dismiss the FAMCC and motion to reconsider dismissal of the UCL claim (ECF 297), the operative Second Amended MCC ("SAMCC") (ECF 304), and the Bank's Answer (ECF 316).

notices of error," *id.* ¶83; "took unreasonable advantage of EDD cardholders' inability to protect their interests" by "reversing the permanent credits," *id.* ¶53; and subjected EDD cardholders to "transfers, dropped calls, and misinformation," which "impeded their ability to successfully file notices of error" under EFTA and the Bank's EDD Debit Cardholder Agreement, *id.* ¶72; *see also* Ex. 73 (OCC Order) Art. II (3)-(5).

Although the CFPB's findings fully support an award of treble and punitive damages,[14] the CFPB is not statutorily authorized to obtain them. *See* 12 U.S.C. §5565(a)(3); 15 U.S.C. §1693o(a)(5). Thus, the payments made to class members pursuant to the *Yick* PI Order and the Remediation Plan developed by the Bank pursuant to the Consent Orders, Ex. 72 (CFPB Order) ¶¶93, 99; Ex. 73 (OCC Order) Arts. IX-X, fall far short of the available relief sought in this MDL. *See In re Exxon Valdez*, 270 F.3d 1215, 1225-26 (9th Cir. 2001) (prior criminal and civil penalties and restitution awards did not bar punitive damages award in class action); *B.P. v. Balwani*, 2021 WL 4077008, at *2-3 (9th Cir. Sept. 8, 2021) (consent decree did not bar RICO treble damages in class action).

## III. LEGAL STANDARD

Certification is appropriate under Rule 23(b)(3) if the requirements of Rule 23(a) (i.e., numerosity, commonality, typicality, and adequacy of representation) are satisfied, "questions of law or fact common to the class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(a), (b)(3); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 398 (2010); *see Olean*, 31 F.4th at 663-64. All of those requirements are met here.

---

[14] *See, e.g.*, Ex. 72 (CFPB Order) ¶¶55-58 (finding Bank's use of its "Fraud Filter to determine no error had occurred for approximately 188,000 notices of error submitted by Affected Consumers nationwide concerning alleged unauthorized EFTs, without any further investigation or considering any other [relevant] information," violated Bank's EFTA obligations to "conduct[] a 'good faith investigation of the alleged error'" and to have "a reasonable basis for believing that the consumer's account was not in error" (quoting 15 U.S.C. §1693f(e)(1)); *id.* ¶53 (finding Bank "took unreasonable advantage of EDD Cardholders' inability to protect their interests").

1  **IV.    ARGUMENT**

2  **A.    Plaintiffs Satisfy All Rule 23(a) Requirements.**

3      **1. Numerosity.** Rule 23(a)(1) requires the class to be "so numerous that joinder of

4  all members is impracticable." Courts "have routinely found the numerosity requirement

5  satisfied when the class comprises forty or more members." *Morgan v. Rohr, Inc*., No. 20-

6  cv-574-GPC-AHG, 2022 WL 974334, at *5 (S.D. Cal. Mar. 31, 2022) (citing examples).

7  That requirement is easily satisfied here: there are approximately ██████ Claim Denial

8  class members; ██████ Credit Rescission class members; ██████ Account Freeze class

9  members; at least ██████ Customer Service class members; and ██████ EMV Chip class

10  members, each of whom is ascertainable from the Bank's own records. Ex. 4 (Regan Rep.)

11  ¶¶36, 82, 97, 112, 119.

12      **2. Commonality.** "Commonality is established if plaintiffs and class members'

13  claims 'depend upon a common contention ... capable of class-wide resolution—which

14  means that determination of its truth or falsity will resolve an issue that is central to the

15  validity of each one of the claims in one stroke.'" *In re BofI Holding, Inc. Sec. Litig.*, No.

16  3:15-cv-02324-GPC-KSC, 2021 WL 3742924, at *2-3 (S.D. Cal. Aug. 24, 2021) (quoting

17  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Commonality requires only

18  that "a common question is *capable* of class-wide resolution," not that the evidence "in

19  fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67; *see Victorino

20  v. FCA US LLC,* No. 16-cv-1617-GPC-JLB, 2019 WL 5268670, at *9 (S.D. Cal. Oct. 17,

21  2019). Below is a non-exhaustive list of common issues raised by Plaintiffs' claims.

22      <u>*EFTA* (Claim Denial and Credit Rescission Classes).</u> Common issues include:

23  (1) whether the Bank had a policy of summarily denying cardholders' unauthorized-

24  transaction claims based solely on CFF-1; (2) whether the Bank automatically rescinded

25  previously paid permanent credits based solely on the results of CFF-1; (3) whether the

26  Bank's automated claim denial procedures violated EFTA's "investigation" requirement,

27  15 U.S.C. §1693f; (4) whether the Bank's use of CFF-1 to summarily deny claims violated

28  its EFTA obligation to pay provisional credit, *id.* §1693f(e)(1); (5) whether, by using CFF-

1 to automatically deny claims and rescind permanent credits, the Bank "did not make a good faith investigation of the alleged error" or "knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time," *id.* §1693f(e); and (6) whether the form letters the Bank sent every cardholder whose claim it auto-denied or auto-rescinded under CFF-1 failed to provide an "explanation of its [investigation] findings," *id.* §1693f(d). *See infra* at §IV.B.1.a.

*Due Process* (Credit Rescission and Account Freeze Classes). Common issues include: (1) whether the Bank had a policy and/or practice of automatically freezing the accounts, or rescinding the previously awarded credits, of EDD cardholders who submitted claims involving unauthorized ATM withdrawals; (2) whether cardholders have a constitutionally protected property interest in the EDD benefits the Bank froze and/or rescinded; (3) whether the Bank's policies and procedures for freezing accounts and rescinding credits based solely on CFF-1 were constitutionally inadequate; and (4) whether the Bank acted under color of law. *See infra* at §IV.B.1.b.

*Breach of Fiduciary Duty* (All Classes). Common issues include: (1) whether the Bank entered into a "special relationship" with EDD cardholders and thereby incurred fiduciary obligations; and (2) whether the Bank breached its fiduciary duties by prioritizing its own financial self-interest above the interests of EDD cardholders by choosing not to include industry-standard EMV chips in EDD debit cards and by implementing its CFF-1 Claim Denial, Credit Rescission, and Account Freeze Policies. *See infra* at §IV.B.1.c.

*Negligence* (All Classes). Common issues include: (1) whether the Bank had a "special relationship" with class members and owed them a duty of care; (2) whether the Bank breached that duty by using CFF-1 to auto-deny claims, auto-rescind permanent credits, and auto-freeze accounts; (3) whether the Bank breached its duty by grossly understaffing its Claims call center; and (4) whether the Bank breached its duty by failing to include industry-standard EMV chips in EDD debit cards. *See infra* at §IV.B.1.d.

*Breach of the Implied Covenant* (Claim Denial, Credit Rescission, Account Freeze,

and Customer Service Classes). Common issues include: (1) whether the Bank had a policy or practice of automatically denying and rescinding unauthorized-transaction claims and freezing accounts based solely on CFF-1; (2) whether the Bank's decision to auto-deny unauthorized-transaction claims, rescind grants of permanent credit, and freeze cardholder accounts based solely on CFF-1 was objectively reasonable; (3) whether the Bank subjectively lacked belief in the validity of its decision to implement its CFF-1 Policies; and (4) whether the Bank reduced call center staffing knowing or intending the resulting impairment of class members' rights. *See infra* at §IV.B.1.e.

*CCPA* (EMV Chip class). Common issues include: (1) whether all EDD debit cards issued during the class period were mag-stripe only cards; (2) whether the unencrypted information on EDD debit cards' mag-stripes is "personal information" ("PI") under the CCPA; (3) whether EMV chip technology was an industry-standard security measure; and (4) whether EDD cardholders' PI was "subject to unauthorized access and exfiltration, theft, or disclosure" due to the Bank's issuance of mag-stripe only cards. *See infra* at §IV.B.1.f.

*UCL* (Claim Denial, Credit Rescission, and Account Freeze classes). Common issues include: (1) whether the Claim Denial, Credit Rescission, and Account Freeze Policies were "unfair" to class members under any of the UCL's three tests for unfairness; and (2) whether class members, if they do not prevail on their damages claims, lack an adequate legal remedy and can therefore be awarded restitution. *See infra* at §IV.B.1.g.

**3. Typicality.** Typicality considers whether "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Cohen v. Trump*, 303 F.R.D. 376, 382 (S.D. Cal. 2014) (citation omitted).[15] Plaintiffs' claims are typical of those

---

[15] "The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017).

of the class members they seek to represent and their claims and injuries all arise from (1) the Bank's classwide Claim Denial, Credit Rescission, and Account Freeze Policies, and (2) the Bank's intentional and uniform practices of understaffing its Claims call center and failing to include industry-standard EMV chips on its EDD debit cards.

**4. Adequacy.** Representative parties must be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy asks, "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re BofI Holding, Inc. Sec. Litig*., 2021 WL 3742924, at *3 (quoting *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012)). These requirements are satisfied, as the nine proposed class representatives have demonstrated their ability to litigate this action vigorously on behalf of class members and they have no interests adverse to the class. Exs. 5-13 (Class Rep. Decs.). Also, proposed Class Counsel satisfy Rule 23(g), which is part of the Rule 23(a)(4) adequacy analysis. *See Victorino v. FCA US LLC*, 322 F.R.D. 403, 406 (S.D. Cal. 2017); Joint Decl. ¶¶3-30, exhibits A & B.

**B.    Certification Is Warranted under Rule 23(b)(3).**

**1.    Common Issues Predominate for Plaintiffs' Claims.**

"The requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a): the plaintiffs must prove that there are questions of law or fact common to class members that can be determined in one stroke, in order to prove that such common questions predominate over individualized ones." *DZ Reserve v. Meta Platforms, Inc*., 96 F.4th 1223, 1233 (9th Cir. 2024) (quoting *Olean*, 31 F.4th at 664). Questions are common when "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* §4:50 (5th ed. 2012)).

"Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (cleaned up). Courts may certify a Rule

23(b)(3) class "even if just one common question predominates … 'even though other important matters will have to be tried separately,'" *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (quoting *Tyson Foods*, 577 U.S. at 453-54), "such as damages or some affirmative defenses peculiar to some individual class members." *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17-cv-2336-GPC-MDD, 2018 WL 6300479, at *11 (S.D. Cal. Nov. 29, 2018). Here, Plaintiffs' claims turn on common issues of fact and law that can be determined through common proof and that predominate over individual issues.

### a.    Electronic Fund Transfer Act (EFTA)

Common issues predominate for Plaintiffs' EFTA claims because they arise from the Bank's classwide policies and practices of using CFF-1 as the exclusive basis for automatically: (1) denying EDD cardholders' claims involving ATM withdrawals and (2) rescinding any previously issued "permanent" credits on such claims, from September 28, 2020 until preliminarily enjoined on June 8, 2021. *See supra* at §§II.E-F.

EFTA's "primary objective … is the provision of individual consumer rights," 15 U.S.C. §1693(b), and it must be "accorded 'a broad, liberal construction in favor of the consumer.'" *Almon v. Conduent Bus. Servs., LLC*, No. SA-19-CV-01075, 2022 WL 4545530, at *1 (W.D. Tex. Sept. 28, 2022) (quoting *Begala v. PNC Bank, Ohio, N.A.*, 163 F.3d 948, 950 (6th Cir. 1998)) (certifying EFTA class).[16] EFTA and its implementing Regulation E, 12 C.F.R. pt. 1005, require financial institutions to timely investigate and resolve "errors" on consumer financial accounts, including "unauthorized electronic fund transfer[s]." 15 U.S.C. §§1693a(12), 1693f, 1693g; 12 C.F.R. §§1005.6, 1005.11.

When a consumer notifies their bank of an unauthorized transaction, EFTA and Reg E require the bank to credit the consumer's account in the amount of the disputed transaction unless the Bank conducts an investigation of the disputed transaction that is (1)

---

[16] EFTA and other statutes that are part of the Consumer Credit Protection Act share a "common purpose … to protect consumers with respect to financial credit." *Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 353 (6th Cir. 2008); *Stout v. FreeScore, LLC*, 743 F.3d 680, 684 (9th Cir. 2014) ("Congress intended for courts to broadly construe [the Act] in accordance with its remedial purpose.").

reasonable, (2) timely, and (3) reveals evidence the consumer authorized the transaction.
*See* 15 U.S.C. §§1693f, 1693g; 12 C.F.R. §1005.11. To be reasonable, the investigation
"must review any relevant information within [the Bank's] own records." CFPB, Official
Interpretation of 12 C.F.R. §1005.11(c)(4) (listing examples such as the account's
"transaction history," "information … within the control of the institution's third-party
service providers," and "[a]ny other information appropriate to resolve the claim"). To be
timely, the Bank must complete its investigation within 10 business days or issue
provisional credit to the consumer and complete its investigation within 45 calendar days.
15 U.S.C. §1693f(c) (timelines begin when bank "receives notice of an error"); 12 C.F.R.
§1005.11(c)(1)-(2). To deny a claim, "the burden of proof is upon the [bank] to show the
[disputed transaction] was authorized." 15 U.S.C. §1693g(b); *accord Green v. Cap. One,
N.A.*, 557 F.Supp.3d 441, 450 (S.D.N.Y. 2021). Whenever a claim is denied, the Bank must
send the consumer written notice with "an explanation of its findings" (i.e., the reason it
denied the claim). 15 U.S.C. §1693f(d); 12 C.F.R. §1005.11(d)(1). Failure to comply with
any of these requirements triggers liability for actual and statutory damages, 15 U.S.C.
§1693m(a), and potentially, treble damages, *id.* §1693f(e).

The Bank did not satisfy any of these requirements. Instead, it systematically
violated the EFTA rights of all Claim Denial and Credit Rescission class members in the
following ways, each of which presents predominating common issues of law and fact.

*Claim Denial Class.* Plaintiffs allege the Bank systematically violated the EFTA
rights of Claim Denial class members by failing to reasonably investigate their claims, and
instead summarily denying them based solely on CFF-1. As discussed above, common
evidence, including the Bank's own documents, testimony, and discovery responses, will
confirm the existence and operation of the CFF-1 Claim Denial Policy and identify which
claims were denied under this policy. Ex. 4 (Regan Rep.) ¶¶31-35. The Bank's liability to
the Claim Denial class thus rests on a common question of law: whether the Bank's Claim
Denial Policy violated its EFTA and Reg E obligations not to deny claims without a
reasonable investigation into all relevant available information that demonstrated the

consumer had authorized the transaction. 15 U.S.C. §§1693f(a)-(d), 1693g; 12 C.F.R. §1005.11; *see* ECF 126 ("MTD Order") at 18-21; *Nguyen v. Wescom Central Credit Union*, No. SACV 22-01520-CJC, 2023 WL 9019022, at *4 (C.D. Cal. Nov. 15, 2023).

<u>*Credit Rescission Class.*</u> Plaintiffs allege that the Bank systematically violated the EFTA and Reg E rights of Credit Rescission class members by using CFF-1 as the sole basis for rescinding class members' "permanent" credits, in violation of 15 U.S.C. §§1693f(a)-(d), 1693g and 12 C.F.R. §1005.11. Common evidence, including the Bank's own documents, testimony, and discovery responses, will confirm the existence and operation of the Bank's Credit Rescission Policy and will identify which credits were rescinded pursuant to this policy. Ex. 16 (Martin Tr.) 175:10-14, 178:13-23; Ex. 14 (Daniels Tr.) 234:24-236:5; Ex. 4 (Regan Rep.) ¶¶81-82. The Bank's liability to the Credit Rescission class thus rests on a common, classwide issue: whether its Credit Rescission Policy violated 15 U.S.C. §1693f(a)-(d) and 12 C.F.R. §1005.11.

<u>*Treble Damages.*</u> EFTA provides three independent scenarios in which "the consumer shall be entitled to treble damages": the bank (1) failed to timely issue provisional credit and "did not make a good faith investigation of the alleged error," (2) failed to timely issue provisional credit and "did not have a reasonable basis for believing that the consumer's account was not in error," or (3) "knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation." *Id.* §1693f(e).[17] The Bank's liability for treble damages to the Claim Denial and Credit Rescission class members thus turns on common questions: whether any of those scenarios encompass the Bank's Claim Denial and/or Credit Rescission Policies. These predominating issues can be proven in one stroke by common evidence, including

---

[17] *See, e.g.*, *Collins v. Missouri Elec. Coop. Emps. Credit Union*, No. 1:05CV0009 ERW, 2006 WL 2189693, at *5, *7 (E.D. Mo. July 26, 2006) (bank violates EFTA by failing to conduct good-faith investigation despite logistical difficulties); *Houston v. Fifth Third Bank*, No. 18-cv-5981, 2019 WL 3002965 at *3-4 (N.D. Ill. July 10, 2019) (EFTA violation was knowing and willful when bank did not investigate representations by claimant).

1    expert testimony that the Bank's use of CFF-1 was contrary to industry standard

2    investigation practices, and Bank documents showing it knew CFF-1 had high error rates.

3    *See* Ex. 1 (Kreis Rep.) ¶¶47-50, 57, 64-66, 67-75; *see supra* §II.I.

4        *Failure to Provide Written Explanation of Findings.* Plaintiffs also allege that the

5    Bank systematically violated the EFTA rights of Claim Denial and Credit Rescission class

6    members by denying their claims without providing them "the results of [its] investigation"

7    and a written "explanation of [the Bank's] findings" that caused their claims to be denied.

8    15 U.S.C. §1693f(a), (d); 12 C.F.R. §1005.11(d)(1); *see* MTD Order at 22 (plaintiffs stated

9    claim by alleging they "got a 'determination' but not 'the results of [the required]

10   investigation'") (quoting *Gale v. Hyde Park Bank*, 384 F.3d 451, 453 (7th Cir. 2004)).

11       The Bank's policy and practice was to send a substantively identical form letter to

12   each EDD cardholder whose claim was denied or rescinded which, instead of providing an

13   actual "explanation of … findings," stated only the vague conclusion that "Your claim has

14   been closed because we believe the account or the claim have been the subject of fraud or

15   suspicious activity." Exs. 52-53. Common evidence, including expert testimony, will show

16   that these statements are contrary to industry standards and legally inadequate. *See* Ex. 1

17   (Kreis Rep.) ¶¶76-79. The Bank's liability to class members for EFTA statutory damages

18   and other relief for this practice thus turns on the predominating common, classwide

19   question of whether the standardized boilerplate in those notices violated the Bank's

20   obligations under 15 U.S.C. §§1693f(a), (d) and 12 C.F.R. §1005.11(d)(1).

21       **b.    Due Process**

22       Common issues also predominate on Plaintiffs' claims that the Bank violated their

23   due process rights under the 14th Amendment (enforceable through 42 U.S.C. §1983) and

24   Article I, §7 of the California Constitution by seizing previously awarded permanent credits

25   from their EDD debit card accounts (Credit Rescission Class) and freezing those accounts

26   (Account Freeze Class) based solely on CFF-1, without providing pre-deprivation notice

27   or a meaningful opportunity to be heard, or even reasonable post-deprivation procedures.

28   *See* MTD Order at 66-74 (Plaintiffs stated valid due process claims).

To establish a due process violation, Plaintiffs must show the Bank (1) deprived them of a constitutionally protected property or liberty interest (2) without adequate procedural safeguards, (3) acting under color of state law. *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998); MTD Order at 66-67, 70. Each element presents a common issue that may be resolved through common evidence.

First, whether the Bank deprived the Credit Rescission and Account Freeze classes of access to their EDD benefits, and whether those benefits are constitutionally protected property, are predominating common classwide issues. The Bank accounts at issue held EDD-deposited benefits payments exclusively; and as Judge Burns ruled, the Bank "can't seriously dispute that Plaintiffs have a constitutionally protected property interest in the EDD benefits for which they were approved." MTD Order at 70; *see Am. Fed. of Lab. v. Emp. Dev. Dep't* ("*AFL*"), 88 Cal.App.3d 811, 820 & n.5 (1979); *see also Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).

Second, common evidence will establish on a classwide basis that the Bank rescinded credits and froze accounts pursuant to uniform policies and procedures. Bank documents and testimony will establish that the Bank had policies and practices of (1) freezing accounts and rescinding credits based on CFF-1 without providing the affected cardholders *any* pre-deprivation notice or opportunity to be heard, *see, e.g.*, Ex. 16 (Martin Tr.) 159:15-18, 221:11-224:4, 224:17-23; Ex. 19 (Lennon Tr.) 188:14-23; (2) denying frozen-account cardholders any post-deprivation opportunity to regain access to their funds directly through the Bank, and instead requiring them to contact EDD to verify their identity despite knowing EDD lacked capacity to answer cardholder calls and that EDD often told those who managed to get through to seek assistance from the Bank instead, *see, e.g.*, Ex. 15 (Chestnut Tr.) 154:11-157:14; Ex. 63 at 17-18; Ex. 16 (Martin Tr.) 272:7-15, 294:23-295:10; Ex. 65 at -452795; Ex. 64 at -90722 (acknowledging EDD cardholders caught in "███████████" between Bank and EDD); Ex. 66 at -874570; (3) denying post-deprivation opportunity to recover rescinded credits while accounts remained frozen; and (4) systematically understaffing its Claims call center, thus subjecting cardholders seeking

restoration of their rescinded credits to hours-long wait times, *see* Ex. 3 (Minnucci Rep.)
¶¶15, 42-45, 46 (fig. 1), 50-64, 101.

Whether these common policies and procedures were constitutionally inadequate is a predominating common question. *See, e.g.*, *Sparks v. Mills*, 626 F.Supp.3d 131, 139 (D. Me. 2022) (certifying Rule 23(b)(3) class for due process claim where UI benefits were terminated or removed from accounts without notice, and common issues predominated as to pre-deprivation process). To determine what process is due, courts consider (1) the property interest at stake, (2) the risk of erroneous deprivation weighed against the value of additional or substitute safeguards, and (3) the public interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Goldberg*, 397 U.S. at 267-68 (14th Amendment requires pre-deprivation notice and meaningful opportunity to be heard for welfare payments); *AFL*, 88 Cal.App.3d at 819, 820 n.5 (extending *Goldberg* to UI benefits under California Constitution, requiring pre-deprivation notice and hearing). Here, class members' property interests in their public benefits were of paramount importance. *See* MTD Order at 72; *Cal. Dep't of Human Resources Dev. v. Java*, 402 U.S. 121, 131-32 (1971) (emphasizing critical importance of prompt payment of UI benefits). Common evidence will show the Bank knew that CFF-1, on which it relied in freezing accounts and rescinding credits, was highly inaccurate, resulting in an extreme risk of erroneous deprivation. *See* Ex. 1 (Kreis Rep.) ¶¶69-75. Common evidence will identify alternative procedures the Bank could have adopted to minimize fraud while protecting the interests of legitimate cardholders and reducing the risk of erroneous deprivation. *See* Ex. 1 (Kreis Rep.) ¶¶51-53, 65-66; Ex. 17 (Letson Tr.) 207:15-208:15; 232:20-233:6; Ex. 75 at -225377 (fraud prevention alternative to CFF-1).

Third, whether the Bank was a state actor when it froze accounts and rescinded credits is another predominating issue that turns on common evidence. Plaintiffs can establish state action by showing the Bank *either* (1) "'perform[ed] a function that is both traditionally and exclusively governmental,'" *or* (2) "'engaged in a joint undertaking with the State to provide and administer [UI] and other EDD benefits under a mutually

beneficial relationship.'" MTD Order at 67. "Either theory is sufficient to satisfy the state action requirement." *Id.* (citing *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003)).[18] Both state-action tests thus turn on common evidence about the scope of the Bank's authority and its relationship with EDD, requiring no individualized inquiries. Finally, the damages caused by the Bank's due process violations are susceptible to common proof as well. *See* Ex. 4 (Regan Rep.) ¶¶83, 85-89, 98, 100-108; *infra* at §§IV.B.1.h.i, iv.

### c.    Breach of Fiduciary Duty

To prevail on their breach of fiduciary duty claims (SAMCC ¶¶625-36), Plaintiffs must prove "the existence of a fiduciary duty, its breach, and damages resulting therefrom." *Youngevity Int'l v. Smith*, No. 16-CV-704-BTM-JLB, 2019 WL 1131876, at *2 (S.D. Cal. Mar. 11, 2019) (citing *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445, 483 (1998)). Each element presents a common issue that may be resolved through common evidence.

First, whether the Bank entered into a "special relationship" with EDD cardholders and thereby incurred fiduciary obligations is a predominating common issue that may be resolved through common evidence. *See Beaver v. Omni Hotels Mgmt. Corp.*, No. 20-cv-00191-AJB-DEB, 2023 WL 6120685, at *14 (S.D. Cal. Sept. 18, 2023) (existence of fiduciary relationship was predominating common issue); *Childress v. JPMorgan Chase & Co.*, No. 5:15-CV-298-BO, 2019 WL 2865848, at *10 (E.D.N.C. July 2, 2019) (same)). As Judge Burns explained, while banks do not ordinarily owe depositors a fiduciary duty, "[a] bank enters into a 'special relationship' with a depositor" giving rise to fiduciary duties "when the relationship involves characteristics of a 'special relationship': '(1) inherently unequal bargaining positions; (2) nonprofit motivation [of the depositor], *i.e.*, objective of

---

[18] *See also Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020); *Cahoo v. SAS Inst. Inc.*, 322 F.Supp.3d 772, 793 (E.D. Mich. 2018), *aff'd in part, rev'd in part on other grounds*, 912 F.3d 887 (6th Cir. 2019) ("administration of unemployment benefits is a power traditionally exclusively reserved to the State"); *Brown v. Stored Value Cards, Inc.*, No. 3:15-cv-01370-MO, 2016 WL 4491836, at *2 (D. Or. Aug. 25, 2016), *rev'd on other grounds*, 953 F.3d 567, 570, 575 (9th Cir. 2020) (company contracted to return released inmates' funds via prepaid debit cards performs public function).

securing peace of mind, security; (3) inadequacy of ordinary contract damages; (4) special vulnerability of one party to harm as a result of breach of trust of the other; and (5) awareness by the other of this special vulnerability.'" MTD Order at 59 (quoting *Copesky v. Superior Ct.*, 229 Cal.App.3d 678, 687 n.7, 691 n.12 (1991) (citation omitted)).

Each special relationship factor is susceptible to common proof on a classwide basis. For example, common evidence will show that the Bank held "the exclusive right to provide electronic benefits payment services for EDD" and "Plaintiffs couldn't seek similar services elsewhere," establishing the parties' unequal bargaining positions. MTD Order at 59; *see* Ex. 15 (Chestnut Tr.) 75:8-13. EDD cardholders use their benefits "'to pay for housing, food, and other daily necessities,'" which establishes their nonprofit motivation. MTD Order at 60 (quoting MCC ¶630). EDD cardholders receive "unemployment insurance or other public benefits" on their cards, which establishes the "inadequacy of ordinary contract damages." MTD Order at 60; *see* Ex. 26 (EDD-Bank Contract) at 1; Ex. 19 (Lennon Tr.) 184:1-185:12 (all cards receive unemployment, disability, or family leave benefits). Also, "'as public benefits recipients,'" EDD cardholders are "members of a uniquely vulnerable segment of the population,'" as the Bank "was aware." MTD Order at 60 (quoting MCC ¶626; citing *AFL*, 88 Cal.App.3d at 821); *see* Ex. 17 (Letson Tr.) 100:13-22; Ex. 22 at Cover Letter p.3 ("We [the Bank] understand that it is critical for claimants to have reliable, consistent and convenient access to funds").

Second, whether the Bank breached its fiduciary duties is another predominating issue that can be resolved through common evidence. As Judge Burns ruled (MTD Order at 58-62), Plaintiffs adequately alleged the Bank breached those fiduciary duties by, among other things: (1) failing to take all reasonable and necessary steps "to protect, preserve, and secure Plaintiffs' and class members' private data and confidential information from unauthorized access, fraud, or theft," including by "encrypting such information" and using industry-standard EMV chips, SAMCC ¶¶632-33; (2) "failing to take all adequate and necessary steps to ensure legitimate benefits recipients are not denied access to their Account funds without reasonable basis," *id.* ¶633; and (3) placing its own self-interest in

achieving greater profits ahead of the interests of class members, *id.* ¶634. Whether the Bank established and maintained each of its challenged policies and practices in breach of these fiduciary duties can be proven with common evidence.

*Claim Denial, Credit Rescission, Account Freeze,* and *Customer Service Classes.* Common evidence, including Bank documents and testimony, can establish that the Bank breached its fiduciary duties to each of these classes by implementing and maintaining its Claim Denial, Credit Rescission, and Account Freeze Policies, and did so despite knowing these policies were contrary to the Bank's own past practices and industry norms and would harm vulnerable EDD cardholders who were victims of fraud and depended on their EDD benefits, denying them critical funds access for weeks and months on end. *See* Ex. 1 (Kreis Rep.) ¶¶42-50, 54-64; Ex. 3 (Minnucci Rep.) ¶¶15, 51-69, 94.

Common evidence can further establish the Bank implemented and maintained each of these policies principally to protect its *own* economic self-interest at the expense of class members' needs and interests. The Bank's documents and testimony will show the Bank was singularly focused on minimizing operational losses that would result from EFTA compliance, and deliberately chose the "most aggressive" approach for automatically denying unauthorized-transaction claims despite the foreseeably devastating impacts of these policies on tens of thousands of public benefits recipients. *See* Ex. 81; Ex. 17 (Letson Tr.) 239:3-243:5. Whether the Bank's self-serving and industry-anomalous policies breached its fiduciary duty to the Classes is another predominating common issue. *See Beaver*, 2023 WL 6120685, at *14; *Childress*, 2019 WL 2865848, at *10.

*EMV Chip Class.* EMV chips protect debit cards from skimming and counterfeit card fraud (including unauthorized ATM and point-of-sale transactions). For that reason, EMV chips have been the industry standard for payment card security in the U.S. and abroad since at least 2019. Ex. 2 (Cloninger Rep.) ¶¶14(c), 29-45. Bank documents show that the Bank had embedded EMV chips in its *non*-prepaid consumer debit cards since 2014 and that, by 2020, the Bank was aware its mag-stripe only EDD cards were vulnerable to counterfeit fraud. *Supra* §II.B. Additional common evidence, including the Bank's own

documents and testimony, will establish that the Bank made a deliberate, profit-driven decision in early 2020 to not include EMV chips in EDD debit cards, despite knowing that (1) many EDD cardholders were falling victim to card skimming and counterfeit card fraud that EMV chips would prevent, Ex. 29 at -124142; (2) EDD cardholders are a vulnerable population who may suffer particularly significant hardship when they lose access to their funds as a result of card skimming and counterfeit card fraud, Ex. 24 at -123235; Ex. 25 at -167022; and (3) the incremental cost of adding EMV chips to EDD debit cards was merely $██ per card, and the return on that investment would have yielded the Bank net savings. Ex. 27 at -351839-40; Ex. 16 (Martin Tr.) 82:8-83:13. Internal Bank communications show the Bank ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████). *Supra* §II.B.

Finally, damages from the Bank's breaches can be established through common evidence. Bank records establish that implementation of its CFF-1 policies deprived class members of access to their EDD benefits. That scheme harmed each class member, whose damages can be calculated from Bank records showing the amount of withheld funds and length of time the funds were withheld. *See* Ex. 4 (Regan Rep.) ¶¶37-75, 83-89, 98-108. In addition, expert testimony can establish that the Bank's failure to issue EMV chip cards to class members enabled the unauthorized ATM transactions to which they fell victim. *See* Ex. 2 (Cloninger Rep.) ¶¶14(d), 29-35, 47, 85, 91, 94-95. These and other damages can be calculated classwide with the Bank's data and records. *Id.*; *see infra* at §§IV.B.1.h.i, iv, vi.

### d. Negligence

The elements of negligence are duty, breach, causation, and injury. *Vasilenko v. Grace Fam. Church*, 3 Cal.5th 1077, 1083 (2017). Plaintiffs' claim rests on predominating common issues as to whether the Bank owed Plaintiffs a duty of care under the "special relationship" exception to the economic-loss rule. For reasons stated above (*supra* §IV.B.1.c), whether the Bank and EDD cardholders had a "special relationship" that supports an exception to the economic-loss rule (*see* MTD Order at 37-41) is a

1   predominating issue of law and fact that will produce the same answer for every EDD

2   Cardholder. *See Andrews v. Plains All Am. Pipeline, L.P.*, No. CV-15-4113-PSG, 2018 WL

3   2717833, at *10 (C.D. Cal. Apr. 17, 2018) (special relationship is "a merits question that

4   is amenable to a common legal answer and does not require individualized inquiries").

5        Whether the Bank breached its duty of care to class members through its uniformly

6   applied policies and practices and whether those breaches caused harm to members of the

7   five classes also raise predominating common issues that can be resolved through common

8   evidence and largely mirror the analysis under Plaintiffs' fiduciary duty claim. *See supra*

9   §IV.B.1.c; *see, e.g.*, *Hilario v. Allstate Ins. Co.*, 642 F.Supp.3d 1048, 1063 (N.D. Cal.

10  2022), *aff'd*, 2024 WL 615567 (9th Cir. Feb. 14, 2024) (certifying negligence claim because

11  of uniformity of insurer's conduct toward policyholders); *cf. Anwar v. Fairfield Greenwich*

12  *Ltd.*, 306 F.R.D. 134, 141-146 (S.D.N.Y. 2015) (whether fund administrator and auditors

13  negligently injured investors could be resolved through common proof).

14       The same is true of Plaintiffs' EMV-related negligence per se theories under the

15  California Consumer Privacy Act ("CCPA") and Gramm-Leach-Bliley Act ("GLBA"). To

16  prevail on these theories, Plaintiffs need only show that (1) the Bank's policy of issuing

17  cards without EMV chips "violated a statute … or regulation," (2) the violation

18  "proximately caused … injury," (3) the injury "resulted from an occurrence the nature of

19  which the [law] was designed to prevent," and (4) EMV Chip class members are among

20  "the class of persons for whose protection the [law] was adopted." *Taulbee v. EJ Distrib.*

21  *Corp.*, 35 Cal.App.5th 590, 596 (2019); *see also Jacobs Farm/Del Cabo, Inc. v. W. Farm*

22  *Serv., Inc.*, 190 Cal.App.4th 1502, 1526 (2010) (first two elements decided by trier of fact,

23  last two decided by court as matter of law). Satisfying these elements creates "a

24  presumption of negligence." *Spresterbach v. Holland*, 215 Cal.App.4th 255, 263 (2013).

25       Under the CCPA, predominating common issues include whether the Bank's

26  decision to issue EDD debit cards without EMV chips violated its duty to "implement

27  reasonable security procedures and practices appropriate to the nature of [consumers']

28  personal information to protect the personal information from unauthorized or illegal

access," "disclosure" or "use," Cal. Civ. Code §1798.100(e) and whether that was a substantial factor in causing unauthorized access of PI. These issues can be resolved through common evidence, including expert testimony that EMV chips were the industry standard for debit card security, and that including EMV chips would have prevented unauthorized "access," "disclosure," and "use" of cardholder PI through card skimming and counterfeiting. *See infra* §IV.B.1.f; *cf. Giroux v. Essex Prop. Tr., Inc.*, No. 16-cv-01722-HSG, 2018 WL 2463107, at *4 (N.D. Cal. June 1, 2018) (certifying negligence claim in data breach case where defendant's actions predominated).

Common issues also predominate on Plaintiffs' negligence per se theory under the GLBA, 15 U.S.C. §§6801-09, and GLBA Safeguards Rule, 16 C.F.R. pt. 314, which obligated the Bank to "insure the security and confidentiality" of EDD Cardholders' nonpublic PI by protecting it from "any anticipated threats or hazards" and from "unauthorized access to or use of such … information which could result in substantial harm or inconvenience to any customer." 15 U.S.C. §§6801(b)(1)-(3); *see also* 16 C.F.R. §§314.3(b)(1)-(3); *and id.* §§314.4(b)-(c) (similar). This theory involves essentially the same predominating common issues, such as whether card skimming and counterfeiting were foreseeable "threats" to the security and confidentiality of class members' financial PI and whether the Bank's issuance of mag-stripe only EDD debit cards violated its duty to protect that information from "unauthorized disclosure" and "misuse," issues that can be resolved through the same common evidence as the CCPA claim.

###### e.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Common issues predominate for Plaintiffs' implied covenant claims because the Bank's challenged conduct, which Plaintiffs contend was an objectively unreasonable exercise of the Bank's discretionary contractual authority, was directed against each class in the same manner and pursuant to the same form contracts. *See* Ex. 76 (Cardholder agreement); *see, e.g.*, *In re Chase Bank USA, N.A. Check Loan Cont. Litig.*, 274 F.R.D. 286, 290 (N.D. Cal. 2011). The implied covenant precludes a contracting party from "do[ing] anything which will injure the right of the other to receive the benefits of the

agreement." *3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020) (quoting *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 684 (1988)). Where a contracting party "is invested with a discretionary power affecting the rights of another," failing to "exercise such power in good faith and through 'objectively reasonable conduct'" breaches the covenant. *3500 Sepulveda*, 980 F.3d at 1324 (quoting *Badie v. Bank of Am.*, 67 Cal.App.4th 779, 796 (1998)); *see* MTD Order at 56. Where, as here, a defendant exercises its contractual discretion by adopting policies and practices that apply to all class members in the same manner, liability "can be established without resort to individualized proof" by showing that the defendant "subjectively lack[ed] belief in the validity of its act" or exercised that authority in an "objectively unreasonable" manner. *See, e.g.*, *Menagerie Prods. v. Citysearch*, No. CV 08-4263-CAS (FMO), 2009 WL 3770668, at *10-11 (C.D. Cal. Nov. 9, 2009) (certifying implied-covenant claim) (citation omitted). That is exactly what Plaintiffs have alleged and can establish through common, classwide evidence.[19]

    *Claim Denial and Credit Recission Classes.* The Bank's form EDD Cardholder Agreements guaranteed that class members would "incur no liability for unauthorized use of [their] Card" and gave the Bank discretionary authority to deny claims if "for any other reason [the Bank] conclude[s] that the facts and circumstances do not reasonably support a claim of unauthorized use." Ex. 76 (Cardholder agreement) ¶9. The implied covenant required the Bank to exercise this discretionary authority in a good faith and objectively reasonable manner, including by reasonably investigating claims. *Cf. Egan v. Mut. of Omaha Ins. Co.*, 24 Cal.3d 809, 819 (1979) (covenant breached where defendant "failed to properly investigate plaintiff's claim"); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 721 (2007) ("[D]enial of a claim on a basis unfounded in the facts … or contradicted by those facts, may be deemed unreasonable"); *Mariscal v. Old Republic Life Ins. Co.*, 42

---

[19] The Court found Plaintiffs stated a claim that the Bank breached the implied covenant by, among other things, unreasonably denying Plaintiffs' unauthorized-transaction claims and freezing accounts without reasonable basis. MTD Order at 57. The Court also allowed Plaintiffs to amend their allegations that the Bank breached the implied covenant by failing to provide reasonably adequate and effective customer service. *Id.* The Bank did not renew its Motion to Dismiss after Plaintiffs so amended. *See* FAMCC ¶621(b); SAMCC ¶621(b).

Cal.App.4th 1617, 1623 (1996) ("The insurer may not just focus on those facts which justify denial of the claim."). Instead, the Bank applied a uniform policy of automatically denying all Claim Denial class members' claims and automatically rescinding all Credit Rescission class members' previously issued claim credits based on a single factor (CFF-1) without considering any other available evidence. *See supra* §§II.E-F.

*Account Freeze Class.* The Cardholder Agreement gave the Bank discretionary authority if it "suspect[ed] irregular, unauthorized, or unlawful activities may be involved with [an] Account" to "'freeze' (or place a hold on) the balance pending an investigation of such suspected activities." Ex. 76 (Cardholder agreement) ¶1. The implied covenant required the Bank to exercise this discretionary authority in "good faith," to freeze a class member's account only based on an "objectively reasonable" suspicion, and to maintain that freeze only pending a reasonable investigation. *See 3500 Sepulveda,* 980 F.3d at 1324 (quoting *Badie*, 67 Cal.App.4th at 796). Instead, as common evidence will establish, the Bank implemented a uniform policy of automatically freezing class members' accounts based solely on CFF-1 and maintaining those freezes for indefinite periods while purposefully obstructed cardholders' ability to regain access to their accounts. *See* Ex. 16 (Martin Tr.) 159:15-18, 177:25-178:7; *supra* §II.G.

*Customer Service Class.* The Cardholder Agreements instructed class members to contact the Bank by calling the telephone numbers listed on the back of their cards to report unauthorized transactions. *See* Ex. 76 (Cardholder agreement) ¶¶10-11. The Bank knew that its call centers were the ███████████████████████████ of such claims were submitted. Ex. 14 (Daniels Tr.) 65:19-66:5. Yet common, classwide evidence (including the Bank's call-center records, internal communications, and expert testimony) will show the Bank deliberately reduced its call-center staffing in Fall 2020 to inject "███████████████████—to discourage class members from pursuing those claims, and it kept call center staffing levels far below what was needed to provide reasonable service to cardholders seeking assistance with their unauthorized-transaction claims. Ex. 3 (Minnucci Rep.) ¶¶51-69; *supra* §II.H.

Expert testimony can establish that each of the Bank's challenged policies and practices was grossly inadequate to meet industry standards and thus objectively unreasonable. *See* Ex. 1 (Kreis Rep.) ¶¶9-16, 47-50, 57, 64, 71-73, 79; Ex. 3 (Minnucci Rep.) ¶¶12-14, 42-50, 53-69, 101. The Bank's own documents and testimony establish a lack of good faith, as they show that the Bank's principal motivation in implementing these policies and practices was to protect its own financial interests at the expense of class members' rightful access to their public benefits. Whether the Bank's exercise of its contractual discretion in implementing these policies and practices was "objectively unreasonable" or lacked good faith turns on common evidence and is the predominating issue that will resolve Plaintiffs' implied covenant claims classwide. The damages caused by the Bank's breaches can be readily calculated classwide as well, using the Bank's data and records. *See infra* at §IV.B.1.h.i, iv, vi.

### f.      California Consumer Privacy Act (CCPA)

The CCPA imposes civil liability on any business whose customers' "[1] nonencrypted and nonredacted [2] personal information … [3] is subject to an unauthorized access and exfiltration, theft, or disclosure [4] as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information …." Cal. Civ. Code §1798.150(a)(1) (brackets added).

Plaintiffs seek to certify CCPA claims on behalf of the Claim Denial and Credit Rescission classes based on the Bank's failure to issue EDD debit cards with EMV chip technology, *see* SAMCC ¶553(a), a cost-saving decision that predictably drew the attention of criminals who targeted vulnerable mag-stripe only cards. Ex. 2 (Cloninger Rep.) ¶¶14(f), 69-85, 92. Without EMV, criminals could skim class members' EDD debit cards, thereby obtaining the cardholder's PI, and create and use counterfeit cards in conjunction with stolen PINs to make unauthorized ATM withdrawals and other card-present transactions. Ex. 2 (Cloninger Rep.) ¶¶14(g), 16-25, 28. Common evidence will show that the Bank's failure to issue industry-standard EMV chips on EDD debit cards subjected class members to unauthorized access and theft of their PI. Ex. 16 (Martin Tr.)

53:3-14; Ex. 2 (Cloninger Rep.) ¶¶14(f), 16-25, 28, 69-85, 91-92, 95.

The Bank's CCPA liability will turn on such predominating common issues as whether all EDD debit cards it issued through the end of the class period were mag-stripe only; whether the standardized information encoded on those cards' mag stripes was "personal information" under the CCPA (Cal. Civ. Code §1798.81.5(d)(1)(A)(iii))—a legal issue that is "central to the resolution of the claims and capable of resolution in one fell swoop," *see Jabbari v. Farmer*, 965 F.3d 1001, 1006 (9th Cir. 2020); whether the Bank's issuance of mag-stripe only cards made class members' PI "subject to an unauthorized access and exfiltration, theft, or disclosure" through skimming. Ex. 16 (Martin Tr.) 49:11-24, 50:3-6; Ex. 2 (Cloninger Rep.) ¶¶14(g), 16-25, 28, 91-92, 95.

Finally, whether the Bank failed to implement "reasonable" data security practices turns on the common question of whether EMV chip technology was part of the industry standard or industry best practices for debit card security. *See In re Sequoia Benefits & Ins. Data Breach Litig.,* No. 22-cv-8217-RFL, 2024 WL 1091195, at *7 (N.D. Cal. Feb. 22, 2024) (violation of CCPA duty to implement "reasonable" data security practices may be shown by failure to follow "industry standards"); *Durgan v. U-Haul Int'l Inc.*, No. CV-22-01565-PHX-MTL, 2023 WL 7114622, at *6 (D. Ariz. 2023) (same with respect to industry "best-practices"); *see also* MTD Order at 26.

### g.    Unfair Competition Law (UCL)

The UCL's unfair prong creates an "intentionally … broad" cause of action for any "business practice that is unfair even if not proscribed by some other law," thus enabling "judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." ECF 297 at 12:7-9 (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003) (quotation marks omitted)). Plaintiffs seek to certify their UCL unfair prong claim for restitution, as an alternative to their legal claims for damages, with respect to the Claim Denial, Credit Rescission, and Account Freeze Classes. *See* SAMCC ¶¶581(a)-(c), 582(a)-(c), 584. The claim should be certified for three principal reasons corresponding to the three standards for establishing "unfairness" under the UCL.

Whether the Bank's uniform policies and practices of using CFF-1 to deny claims, rescind credits, and freeze accounts were "unfair" under UCL's Balancing, Immoral, or Tethering test, *see* ECF 297 at 12:14-13:5 (citing *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020)), will have the same answer for all class members. Under the Balancing test, the "impact" or "gravity of the harm to the alleged victim," *Candelore v. Tinder, Inc.*, 19 Cal.App.5th 1138, 1155 (2018), can be quantified on a classwide basis based on Bank records showing how long class members were deprived of access to benefits while "the utility" of Bank policies (including its "reasons, justifications and motives," *id.*) will have the same answer for all class members. *Cf.* SAMCC ¶582, 582(a)(i), (b)(i), (c)(i).[20] Common questions under the Immoral and Tethering tests include whether the policies were immoral (e.g., because the Bank applied them only to EDD cardholders despite contrary promises it made to EDD to obtain the EDD-Bank Contract, *see id.* ¶582(a)(ii), (b)(ii), (c)(ii), and whether those policies violated declared public policy under EFTA and Reg E, state and federal statutes governing EDD benefits, and due process. *See id.* ¶582(g)(i)-(iii); *Miller v. Travel Guard Grp., Inc.*, No. 21-cv-09751-TLT, 2023 WL 7106479, at *16 (N.D. Cal. Sept. 15, 2023) (predominance because whether defendant's hidden-fee practices "violate … public policy is universal to the class").

Additionally, whether class members lack an adequate legal remedy will have the same answer for all class members because the UCL unfairness claim will only come into play if the Bank's challenged practices are found not to be unlawful, in which case class members would have *no* remedy at law (because no "law" would have been violated).[21] Finally, UCL restitution can be calculated on a classwide basis. *See infra* at §IV.B.1.h.v.

### h. Damages Can Be Calculated Using a Common Methodology.

Predominance is also satisfied because the requested damages and restitution "arise

---

[20] *See Grace v. Apple, Inc.*, 328 F.R.D. 320, 336-37, 337 n.4 (N.D. Cal. 2018) (certifying UCL unfairness claim under balancing test); *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735-37 (9th Cir. 2007) (affirming class certification under balancing test).

[21] *See Zeiger v. WellPet LLC*, 526 F.Supp.3d 652, 687 (N.D. Cal. 2021) (courts "foreclose equitable relief" only where plaintiff *has* a legal remedy and that remedy is "*adequate*").

from a course of conduct that impacted the class" and "are capable of measurement on a classwide basis" using the Bank's records and common methodologies. *Just Film*, 847 F.3d at 1120 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). As described below and in the accompanying Regan report, Plaintiffs' actual damages under their EFTA, due process, and common law claims, and restitution under the UCL, can "feasibly and efficiently be calculated" using common methodologies and the Bank's databases containing detailed information about the amount of each CFF-denied claim and CFF-rescinded credit of each Claim Denial and Credit Rescission class member, the amount frozen in each Account Freeze class member's CFF-frozen account, the length of time each class member was deprived of benefits, and the number of times each Customer Service class member called during the relevant time period, among other relevant data. *See, e.g.*, *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (reversing denial of class certification where damages could be calculated from defendant's records); *Owino v. CoreCivic, Inc.*, 60 F.4th 437, 447-48 (9th Cir. 2022); Ex. 4 (Regan Rep.) ¶¶8, 12, 16, 18. Trebling the damages amounts under EFTA for the Claim Denial and Credit Rescission classes is simple arithmetic. Plaintiffs also seek statutory damages under EFTA and the CCPA; punitive damages for their due process, breach of fiduciary duty and breach of implied covenant claims; and disgorgement of profits for their breach of fiduciary duty, breach of implied covenant, and negligence claims, all of which turn on the Bank's uniform conduct and require no individualized calculation. *See infra* at §IV.B.1.h. "[A]ny need for individual calculations does not override the predominating common issues in this case." *Doe v. Mindgeek USA Inc.*,702 F.Supp.3d 937, 950-51 (C.D. Cal. 2023) (certifying 23(b)(3) class seeking statutory, punitive and compensatory damages and restitution).

### i. Actual Damages

The Ninth Circuit has made clear that "*Comcast* did not alter our holding that individualized damages issues do not alone defeat certification." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir.

2014) ("So long as the plaintiffs were harmed by the same conduct, disparities in how or by how much they were harmed [does] not defeat class certification."); *Nozzi v. Housing Authority of City of L.A.*, CV 07-380 PA, 2016 WL 2647677, at *5 (C.D. Cal. May 6, 2016). At the class certification stage, Plaintiffs need only "establish that damages are *capable* of measurement on a classwide basis" and "may rely on an unexecuted damages model" to do so. *Lytle v. Nutramax Lab'ys., Inc.*, 99 F.4th 557, 570 (9th Cir. 2024) (cleaned up); *Just Film*, 847 F.3d at 1121 ("At this stage, Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability."). "[U]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *5 (citing *Nguyen*, 932 F.3d at 817).[22]

The Regan Report demonstrates how damages for each Class, under each proposed theory of liability, can be calculated on a classwide basis using Bank data and common methodologies. *See* Ex. 4 (Regan Rep.) ¶¶8-22, 37-79, 83-92, 98-109, 113-117, 120-122.

*Claim Denial and Credit Rescission Classes.* The principal damages suffered by these class members is the amount of each claim the Bank denied (or each permanent credit it rescinded) based on CFF-1, which can easily be determined from the Bank's records. *See* Ex. 4 (Regan Rep.) ¶¶37, 83; *see, e.g.*, *Bazarganfard v. Club 360 LLC*, 344 F.R.D. 411, 425-27 (C.D. Cal. 2023) (certifying Rule 23(b)(3) class seeking actual and statutory damages under EFTA, including reimbursement of amount of unauthorized transfer); *Friedman v. 24 Hour Fitness USA, Inc.*, No. CV 06-6282 AHM (CTx), 2009 WL 2711956, at *4 (C.D.

---

[22] To the extent any class members seek extraordinary consequential damages above those amounts calculable on a classwide basis, they could be determined in Phase II proceedings, after resolution of classwide liability, treble and punitive damages, and common damages. *See* Ex. 154 (Trial Plan) at 2-4; *Arthur Young & Co. v. U.S. Dist. Ct.*, 549 F.2d 686, 697 (9th Cir. 1977) (it is "permissible to separate the individual damage issues from trial of the class issues"); Manual for Complex Litigation §21.5 (4th ed. 2004)) ("[T]he court may consider trying common issues first, preserving individual issues for later determination."); *In re Exxon Valdez*, 270 F.3d at 1225 (affirming multi-phase trial plan for resolving multiple class and individual actions, in which amount of punitive damages and class compensatory damages were determined before individual damages proceedings).

Cal. Aug. 25, 2009) (same; "possibility of individual variations in actual damages does not overwhelm the common issues arising from Defendant's standardized conduct"). Consequential damages resulting from losing access to this principal amount can be calculated on a classwide basis using a compound interest rate—a widely accepted methodology for calculating harm resulting from denial of access to funds. Ex. 4 (Regan Rep.) ¶¶39-75, 85. Alternatively, consequential damages can be calculated based on classwide formulas for measuring the harm experienced by EDD cardholders based on a conservative measure of the cost of borrowing replacement funds. *Id.* ¶¶63-75, 86-89. This alternative methodology for calculating classwide damages is nearly identical to the methodology the Bank itself used in calculating the same consequential harms under the Remediation Plan that it developed pursuant to the CFPB and OCC Consent Orders, demonstrating this is a reasonable alternative method for calculating classwide damages.

*Account Freeze Class.* The principal damages suffered by these class members is the amount of funds in each class member's account when frozen based on CFF-1. This is readily determined from the Bank's records, as is the length of time the accounts remained frozen. *See* Ex. 4 (Regan Rep.) ¶98. Consequential damages resulting from the length of time class members were deprived of access to their funds can be calculated in the same manner as for the Claim Denial and Credit Rescission classes. *Id.* ¶¶100-08. Account Freeze class members also incurred additional time-value-of-money costs when EDD was unable to disburse continuing benefits to them through their Bank-frozen accounts. These additional damages can be measured using a common methodology based on the length of the delay in receipt of benefits payments caused by the Bank's account freeze. *Id.*

*Customer Service Class.* These class members waited on hold 80 minutes longer on average per call to the Claims call center, compared to industry standard hold times. Ex. 3 (Minnucci Rep.) ¶¶13, 43-46. This lost time is compensable as a measure of damages. *See, e.g.*, *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018) ("the value of one's own time ... is a loss from an opportunity-cost perspective"); *Stasi v. Immediata Health Grp. Corp.*, 501 F.Supp.3d 898, 916-18 (S.D. Cal. 2020) (lost time damages

available); *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F.Supp.3d 1284, 1295-96 (S.D. Cal. 2020) (same). Damages can be calculated from the Bank's records reflecting how many times each class member called during the relevant time period, multiplied by 80 minutes (the average length of time on hold in excess of an industry standard average), multiplied by the applicable minimum wage or other reasonable metric. Ex. 4 (Regan Rep.) ¶¶113-14; Ex. 3 (Minnucci Rep.) ¶¶94-100.

*EMV Chip Class.* The damages for this class can be calculated in the same manner as for the Claim Denial and Credit Rescission classes. *Id.* ¶120.

### ii.  Treble Damages

Whether Plaintiffs and the Claim Denial and Credit Rescission classes are entitled to treble damages under EFTA presents a predominating common question of law. *See supra* §IV.B.1.a. If liability is established, calculating treble damages will be a matter of simple arithmetic. *See Cohen v. Trump*, 303 F.R.D. at 389 (certifying class seeking RICO treble damages); *Marquess v. Pa. State Emps. Credit Union*, No. 09-4256, 2010 WL 3448086, at \*8 (E.D. Pa. Aug. 31, 2010), *rev'd on other grounds*, 427 F.App'x 188 (3d Cir. 2011) (treble damages mandatory if liability established).

### iii.  Statutory Damages

Common issues predominate for Plaintiffs' statutory damages claims on behalf of the Claim Denial and Credit Rescission classes under EFTA and the EMV Chip class under the CCPA. EFTA provides for statutory damages of up to $500,000 "in any class action … arising out of the same failure to comply [with EFTA] by the same person …." 15 U.S.C. §1693m(a)(2)(B). Statutory damage claims under "EFTA and Regulation E [] are particularly well suited to be class actions," as they flow directly from a finding of liability. *Almon*, 2022 WL 4545530, at \*17; *Bisbey v. D.C. Nat'l Bank*, 793 F.2d 315, 318-19 (D.C. Cir. 1986) (proof of injury not required for EFTA statutory damages). Similarly, the CCPA provides statutory damages of $100 to $750 per violation per consumer, or actual damages, whichever is greater. Cal. Civ. Code §1798.150(a). These formulaic calculations can be performed for the EMV Chip class using the Bank's data. *See* Ex. 4 (Regan Rep.) ¶121.

### iv. Punitive Damages

Plaintiffs' entitlement to punitive damages is another predominating common issue that turns entirely on common evidence.[23] Because "the purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant, … the focus of a punitive damages claim is not on the facts unique to each class member, but on the defendant's conduct toward the class as a whole." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 541-44 (N.D. Cal. 2012) (certifying 23(b)(3) class claim for punitive damages) (cleaned up).[24] Plaintiffs' entitlement to punitive damages thus turns on the Bank's conduct and motives, not class members' individual circumstances, making class certification particularly appropriate. *See, e.g.*, *Barefield v. Chevron, U.S.A.*, No. C 86-2427 TEH, 1988 WL 188433, at *3 (N.D. Cal. Dec. 6, 1988); *Mindgeek*, 702 F.Supp.3d at 951.

At trial, Plaintiffs' entitlement to punitive damages can be established through common evidence about the Bank's conduct and motives, including Bank documents and testimony showing: (1) the Bank knew its decision not to include EMV chips in EDD debit

---

[23] Plaintiffs are entitled to punitive damages on their due process claim if the Bank's conduct was (1) "malicious," (2) "oppressive," *i.e.*, "done in a manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity" through "misuse of authority or power or exploitation of a plaintiff's weakness"; or (3) "in reckless disregard of the plaintiff's rights," *i.e.*, done with "'complete indifference to the plaintiff's safety [or] rights,'" or "in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law." *Dang v. Cross*, 422 F.3d 800, 806-10 (9th Cir. 2005) (citing 9th Cir. Model Civ. Jury Instr.7.5 (2002)); *see Smith v. Wade*, 461 U.S. 30, 56 (1983) (punitive damages available under §1983 when defendant's conduct "involves reckless or callous indifference to the federally protected rights of others"). Plaintiffs are entitled to punitive damages on their breach of fiduciary duty and implied covenant claims if the Bank acted with "oppression, fraud, or malice." Cal. Civ. Code §3294(a), (c); *Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 164 Cal.App.3d 174, 194-95 (1985) (punitive damages not excessive where defendant acted in conscious disregard of client's rights); *cf. Cates Constr., Inc. v. Talbot Partners*, 21 Cal.4th 28, 43 (1999) (tort recovery may be appropriate on implied covenant claim where contract has "elements of adhesion and unequal bargaining power, public interest and fiduciary responsibility").

[24] *See also Dang*, 422 F.3d at 810 ("Punitive damages serve to punish the defendant for wrongful conduct and to deter the defendant and others from repeating that wrong.") (citation omitted); *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 922 (1978) (punitive damages turns on defendant's "motive and intent"); *cf. Taha v. County. of Bucks*, 862 F.3d 292, 308-09 (3d Cir. 2017) (affirming certification of class seeking only punitive damages).

cards made EDD cardholders vulnerable to fraud, including unauthorized ATM transactions, *supra* §II.B; *see also, e.g.*, Ex. 34 at -297295 ("[████ ████ ████████ ████████] (2) the Bank knew CFF-1 was inaccurate and not a basis for a finding of fraud and that relying on CFF-1 as the sole basis for automatically denying claims, rescinding credits, and freezing accounts would result in the erroneous deprivation of benefits for many legitimate EDD cardholders, *see supra* §II.E; (3) the Bank knew that "████ ████████████████ ████████" Ex. 17 (Letson Tr.) 100:13-22; *see also* Ex. 77 at -118438 (email to ████████ ████████████ ████████"); (4) the Bank's senior executives nevertheless chose to implement the hastily-devised, "████████" CFF policy because it would ████ ████████ to the Bank by enabling it to avoid paying EFTA-required credits. Ex. 43; Ex. 17 (Letson Tr.) 257:6-258:9; Ex. 51 at -426935, -426938; Ex. 78 at -129422.

### v. Restitution

Plaintiffs seek restitution under the UCL's "unfair" prong, as an alternative to their legal claims for damages, to recover the money lost by the Claim Denial, Credit Rescission, and Account Freeze classes. *See* SAMCC ¶¶583-84; *supra* §IV.B.1.g. The restitution sought comprises (1) money in which class members have a vested ownership interest but which the Bank wrongfully withheld from class members (i.e., the amount of the denied claims, rescinded credits, and frozen funds), *see Korea Supply Co.*, 29 Cal.4th at 1148-49; (2) prejudgment interest of 7% per annum for the periods the Bank wrongfully withheld from class members the money attributable to denied claims, rescinded credits, and frozen accounts, *cf. Espejo v. Copley Press, Inc.*, 13 Cal.App.5th 329, 375-76 (2017) (awarding 7% prejudgment interest as component of UCL restitution); *Wallace v. Countrywide Home Loans, Inc.*, No. SACV 08-1463-JST (MLGx), 2013 WL 1944458, at *8 (C.D. Cal. Apr. 29, 2013) (same); and (3) restitutionary disgorgement of the float revenue the Bank earned on wrongfully withheld funds, *see Aguayo v. U.S. Bank*, 200 F.Supp.3d 1075, 1076-77

(S.D. Cal. 2016) (UCL permits restitutionary disgorgement "where defendant's profits stem from money unlawfully obtained from the plaintiffs"); *Juarez v. Arcadia Fin., Ltd.*, 152 Cal.App.4th 889, 914-15 (2007) (similar). Calculation of such restitution is ascertainable from the Bank's records. Ex. 4 (Regan Rep.) ¶¶37, 83, 98, 78-79.

### vi. Disgorgement

Plaintiffs also seek disgorgement of the Bank's unjustly earned profits attributable to its breach of fiduciary duty, breach of the implied covenant, and negligence.[25] The Bank earned a profit on all funds on deposit with the Bank, and thus on the amounts it wrongfully withheld from Plaintiffs and class members. The Bank also earned profits, in the form of avoided costs, by deliberately understaffing its Claims call center and issuing cards without EMV chips. Calculation of these profits is readily ascertainable from the Bank's own records and does not depend on any individualized inquiries. *See* Ex. 4 (Regan Rep.) ¶¶115-17, 122; Ex. 3 (Minnucci Rep.) ¶¶94-100; *cf. Bostick v. Herbalife Int'l of Am., Inc.*, No. CV 13-2488-BRO (SHx), 2015 WL 12731932, at *15 (C.D. Cal. May 14, 2015) (disgorgement can "be readily fashioned on a class-wide basis and [does] not require individual proof, as the disgorgement remedy depends upon [defendant's] own profits").

### 2. A Class Action is Superior to Individual Adjudications.

Because Plaintiffs' claims rest on the Bank's uniform policies and practices, a single classwide trial is far superior to the alternative of adjudicating the Bank's liability in tens of thousands of individual proceedings. Rule 23(b)(3)'s superiority prong is satisfied because classwide adjudication will achieve "economies of time, effort, and expense" and promote "uniformity of decisions as to persons similarly situated." *Amchem Prods., Inc. v.*

---

[25] *See, e.g., Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 57 Cal.App.5th 1108, 1125-31 (2020) (disgorgement available for breach of fiduciary duty); *Krueger v. Wyeth, Inc.*, 396 F.Supp.3d 931, 954-55 (S.D. Cal. 2019) (UCL violations); *Alkayali v. Hoed*, No. 3:18-cv-777-H-JMA, 2018 WL 3425980, at *6-7 (S.D. Cal. July 16, 2018) (breach of contract); Restatement (Third) of Restitution and Unjust Enrichment §39 (Am. L. Inst. 2011) (opportunistic breach of contract); *id.* §51 (breach of fiduciary duty); *id.* §52(1)(a) (negligence); *Alkayali v. Hoed*, No. 3:18-cv-777-H-JMA, 2018 WL 3425980 at *6 n.5 (S.D. Cal. July 16, 2018) ("California courts follow the general principles stated in the Restatement of Restitution and Unjust Enrichment").

*Windsor*, 521 U.S. 591, 615 (1997) (citation omitted).

First, "class members' interests in pursuing and controlling their own litigation are lessened here, where the questions of law and fact are common and must be addressed whether the case is brought by an individual or a class." *Kellman v. Spokeo, Inc*., No. 21-cv-08976-WHO, 2024 WL 2788418, at *12-13 (N.D. Cal. 2024); *see also Rushing v. Williams-Sonoma, Inc*., No. 16-cv-01421-WHO, 2024 WL 779601, at *12-13 (N.D. Cal. 2024) ("plaintiffs have identified numerous common questions that predominate, making treating this as a class case superior"). It is "far more efficient" to litigate Plaintiffs' claims based on the Bank's uniform conduct "on a classwide basis rather than in thousands," or tens of thousands, of "individual and overlapping lawsuits." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1176 (9th Cir. 2010).

Second, Plaintiffs have identified more than ███ EDD cardholders impacted by the Bank's CFF-1 and other uniform policies. The only related litigation is already pending before this Court; and the number of those individual cases is a *de minimis* fraction of class members (<███—and many of those individuals, including those whose claims are already stayed or who have moved for a stay, may not even be class members). ECF 311.

Third, the high cost of pursuing claims against the Bank, including significant discovery and motion practice, outweighs the potential recovery for any individual class members. Class counsel have already expended thousands of hours and substantial sums litigating this case against an extremely well-heeled and sophisticated defendant. Joint Decl. ¶12. "If plaintiffs cannot proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover." *Knutson v. Schwan's Home Serv., Inc*., No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763, at *10 (S.D. Cal. Sept. 5, 2013) (quoting *Culinary/Bartender Tr. Fund v. L.V. Sands, Inc*., 244 F.3d 1152, 1163 (9th Cir. 2001)); *see also Guzman v. Polaris Indus., Inc*., 345 F.R.D. 174, 188 (C.D. Cal. 2023) ("[t]he alternative to a class action suit is the likely abandonment of claims by most class members"); *Edleson v. Travel Insured Int'l, Inc*., No. 21-cv-323-WQH-SBC, 2023 WL 8251336, at *9-10 (S.D. Cal. Nov. 20,

2023) ("A class action would offer those with small claims the opportunity for meaningful redress."); *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 483 (N.D. Cal. 2020) (superiority existed even if "the largest purchasers … elected to go it alone"); *Aho v. AmeriCredit Fin. Servs., Inc*., 277 F.R.D. 609, 624 (S.D. Cal. 2011) (finding it "more efficient to litigate this case on a class-wide basis," and class members "who desire to pursue restitution and other claims individually may opt out and do so").

Finally, "this case does not clearly present manageability issues above and beyond those typically associated with class actions." *Kellman*, 2024 WL 2788418, at \*12-13. "[T]he complexities of class action treatment do not outweigh the benefits of considering common issues in one trial." *In re Talis Biomed. Corp. Sec. Litig.*, No. 22-cv-00105-SI, 2024 WL 536303, at \*7-8 (N.D. Cal. Feb. 9, 2024); *cf. Beaver*, 2023 WL 6120685, at \*22 ("there is a presumption against dismissing a class action on manageability grounds"). For all these reasons, a class action is the superior method of adjudicating this case.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed classes, appoint Plaintiffs as class representatives, and appoint class counsel as set forth above and in the accompanying Notice of Motion.

Respectfully submitted,

Dated:  August 29, 2024

**COTCHETT, PITRE & McCARTHY, LLP**

By:    /s/ *Brian Danitz*
JOSEPH W. COTCHETT
BRIAN DANITZ
KARIN B. SWOPE
ANDREW F. KIRTLEY
VASTI S. MONTIEL

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

Dated:  August 29, 2024          **ALTSHULER BERZON LLP**

By:    <u>/s/ *Michael Rubin*   </u>
        MICHAEL RUBIN
        STACEY M. LEYTON
        CONNIE K. CHAN
        KATHERINE G. BASS
        COLIN C. JONES

*Co-Lead Counsel for Plaintiffs and the Proposed Class*