JAMES W. MCGARRY (pro hac vice)
*JMcGarry@goodwinlaw.com*
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000
Fax: +1 617 523 1231

SABRINA M. ROSE-SMITH (pro hac vice)
*SRoseSmith@goodwinlaw.com*
MATTHEW L. RIFFEE (pro hac vice)
*MRiffee@goodwinlaw.com*
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: +1 202 346 4000
Fax: +1 202 346 4444

Attorneys for Defendant
BANK OF AMERICA, N.A.

[*ADDITIONAL COUNSEL LISTED IN SIGNATURE BLOCK*]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SAN DIEGO DIVISION

| | |
|---|---|
| IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION | Case No. 1-MD-02992-GPC-MSB<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: January 17, 2025<br>Time: 1:30 p.m.<br>Ctrm: 2D – 2nd Floor<br>Judge: Hon. Gonzalo P. Curiel<br><br>ORAL ARGUMENT REQUESTED<br><br>FILED PROVISIONALLY UNDER SEAL PURSUANT TO STIPULATED PROTECTIVE ORDER |

# **TABLE OF CONTENTS**

Page

BACKGROUND ......................................................................................... 6

    A.    The Pandemic Benefit Scams ...................................................... 6
    B.    The "Magnetic Stripe" Red Herring ....................................... 10
    C.    The Complaints And Centralization ...................................... 12
    D.    The Regulatory Consent Orders And Remediation Plan .................. 12
    E.    The Dismissal Ruling and Amended Complaints ............................ 14
    F.    The "Best" Class Representatives and the Ex–Class Representatives ....................................................................... 15

STANDARD OF LAW ............................................................................. 17

ARGUMENT ............................................................................................. 18

I.    Plaintiffs' "common questions" cannot drive the resolution of this litigation. ......................................................................................... 18

    A.    Essential elements of Plaintiffs' EFTA claim require individual evidence. ...................................................................... 18

        1.    Essential questions about fraudulent benefits claims are not common. ...................................................................... 19
        2.    Essential questions about transaction authorizations are not common. ...................................................................... 19
        3.    Essential questions about adequate notice are not common. ...................................................................... 24
        4.    "The evidence available" on each account is not common. ...... 25

    B.    Essential elements of Plaintiffs' other claims also require individual proof. ................................................................... 27

        1. Due process .......................................................................... 27
        2. California Consumer Privacy Act .......................................... 28
        3. Common-law claims .............................................................. 29
        4. Unfair Competition Law ....................................................... 33
        5. Punitive damages ................................................................. 33

II.    Individual issues will predominate. ............................................... 34

A.    The issues turning on individual cardholders are predominating ones. .................................................................................. 34

B.    Plaintiffs have no valid classwide damages methodology. ................ 37

  1.    Plaintiffs have no valid measure of economic damages ........... 37

  2.    Plaintiffs have no valid classwide measure of "customer service" harm. ................................................................... 40

  3.    Plaintiffs have no valid classwide measure of "emv chip" harm. ....................................................................... 42

III.    The "best" Plaintiffs cannot be typical or adequate class representatives. ..................................................................... 42

IV.    A class action is not superior to a comprehensive regulatory remediation. ........................................................................ 44

CONCLUSION .......................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Hawaii State Dep't of Educ.*,
  30 F.4th 828 (9th Cir. 2022) .......................................................................42, 43

*Abikar v. Bristol Bay Native Corp.*,
  2018 WL 6593747 (S.D. Cal. Dec. 14, 2018) (Curiel, J.)................................34

*Almon v. Conduent Bus. Servs., LLC*,
  2022 WL 4545530 (W.D. Tex. Sept. 28, 2022)........................................23, 24

*In re Bank of Am. Cal. Unemployment Bens. Litig.*,
  544 F. Supp. 3d 1366 (J.P.M.L. 2021) ............................................................12

*In re Bank of Am. Cal. Unemployment Bens. Litig.*,
  674 F. Supp. 3d 884 (S.D. Cal. 2023) ..............................................................14

*Bayer v. Neiman Marcus Grp.*,
  861 F.3d 853 (9th Cir. 2017)............................................................................38

*Berger v. Home Depot USA, Inc.*,
  741 F.3d 1061 (9th Cir. 2014)..........................................................................30

*Broussard v. Meineke Discount Muffler Shops*,
  155 F.3d 331 (4th Cir. 1998)......................................................................26, 27

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...............................................................................4, 37, 42

*Conde v. Sensa*,
  2018 WL 4297056 (S.D. Cal. Sept. 10, 2018) .................................................45

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust
  Litig.*,
  691 F.2d 1335 (9th Cir. 1982).............................................................24, 30, 31

*Cordoba v. DirecTV, LLC*,
  942 F.3d 1259 (11th Cir. 2019).................................................................35, 38

*Daskalea v. Wash. Humane Soc'y*,
  275 F.R.D. 346 (D.D.C. Aug. 10, 2011) ..........................................................28

*Derrick v. Glen Mills Sch.*,
   2024 WL 2133440 (E.D. Pa. May 13, 2024) ........................................................ 28

*In re Digital Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) ............................................................................ 43

*Duncan v. Northwest Airlines, Inc.*,
   203 F.R.D. 601 (W.D. Wash. 2001) ..................................................................... 30

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) ......................................................................... 34

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ................................................................................ 44

*English v. Apple Inc.*,
   2016 WL 1188200 (N.D. Cal. Jan. 5, 2016) ........................................................ 30

*In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*,
   194 F.R.D. 484 (D.N.J. 2000) .............................................................................. 32

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011) ................................................................................. 40

*Gen'l Tel. Co. of S.W. v. Falcon*,
   457 U.S. 147 (1982) .............................................................................................. 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) .............................................................................................. 17

*In re Hannaford Bros. Co. Cust. Data Sec. Breach Litig.*,
   4 A.3d 492 (Me. 2010) .......................................................................................... 41

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ................................................................................ 43

*Hansen v. Ticket Track, Inc.*,
   280 F. Supp. 2d 1196 (W.D. Wash. 2003) .......................................................... 19

*Herskowitz v. Apple, Inc.*,
   301 F.R.D. 460 (N.D. Cal. 2014) .................................................................. 33, 37

*Houston v. Fifth Third Bank*,
   2019 WL 1200574 (N.D. Ill. Mar. 14, 2019), 2019 WL 3002965
   (N.D. Ill. July 10, 2019) ................................................................................ 25, 29

*James v. Uber Techs. Inc.*,
   338 F.R.D. 123 (N.D. Cal. 2021) ........................................................ 43

*Kamm v. Cal. Dev. Co.*,
   509 F.2d 205 (9th Cir. 1975) ......................................................... 5, 45

*Kleef v. Goodman Mfg. Co., L.P.*,
   2015 WL 4512200 (E.D. Ark. July 24, 2015) ............................... 40, 41

*Knerr v. Fed'l Land Bank*,
   1991 U.S. App. LEXIS 2964 (9th Cir. Feb. 25, 1991) ......................... 31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................ 40

*Manion v. N.C. Med. Bd.*,
   693 F. App'x 178 (4th Cir. 2017) ................................................ 27, 28

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................ 35

*Melnick v. TAMKO Bldg. Prod. LLC*,
   347 F.R.D. 79 (D. Kan. 2024) ........................................................... 32

*Merisier v. Bank of Am., N.A.*,
   688 F.3d 1203 (11th Cir. 2012) ........................................................ 20

*Moore v. Southtrust Corp.*,
   2005 U.S. Dist. LEXIS 42062 (E.D. Va. June 10, 2005) ............ 20, 23, 29

*Nelson v. Conduent Bus. Servs. LLC*,
   2020 WL 5587450 (N.D. Ga. Sept. 18, 2020) ................................... 23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (*en banc*) ............................................. 35

*Park v. Webloyalty.com, Inc.*,
   2019 WL 1227062 (S.D. Cal. Mar. 15, 2019) .......................... 24, 25, 38, 40

*Pedersen v. State Farm Mut. Auto. Ins. Co.*,
   2022 WL 2304042 (D. Mont. June 27, 2022) .................................... 31

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
   214 F.R.D. 614 (W.D. Wash. 2003) .............................................. 44, 45

*In re Prempro*,
  230 F.R.D. 555 (E.D. Ark. 2005) ................................................................ 32

*Rosenfeld v. JPMorgan Chase Bank, N.A.*,
  732 F. Supp. 2d 952 (N.D. Cal. 2010) ........................................................ 33

*Rowe v. E.I. Dupont de Nemours & Co.*,
  262 F.R.D. 451 (D.N.J. 2009) .................................................................... 32

*Roz v. Nestle Waters N. Am., Inc.*,
  2017 WL 6942657 (C.D. Cal. Sept. 13, 2017) ........................................... 30

*SleekEZ, LLC v. Horton*,
  2018 U.S. Dist. LEXIS 33858 (D. Mont. Jan. 8, 2018) .............................. 31

*Stockwell v. City & Cnty. of S.F.*,
  749 F.3d 1107 (9th Cir. 2014) .................................................................... 18

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ........................................................................... 4, 34

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) .......................................................................... 34, 39

*U.S. v. Thomas*,
  No. 23-0062, ECF 1 (N.D. Ohio Feb. 9, 2023) .......................................... 36

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................ 2, 18, 27

*Webb v. Carter's Inc.*,
  272 F.R.D. 489 (C.D. Cal. 2011) ........................................................ 44, 45

*White v. Symetra Assigned Bens. Serv. Co.*,
  104 F.4th 1182 (9th Cir. 2024) ..................................................... 29, 30, 34

*Williams v. Warner Music Grp.*,
  858 F.3d 385 (9th Cir. 2021) ...................................................................... 44

*Yick v. Bank of Am., N.A.*,
  No. 21-0376 (N.D. Cal.) .............................................................................. 12

**Statutes**

15 U.S.C. § 1693 *et seq.* ............................................................................... 12

15 U.S.C. § 1693a(12)(B) ...................................................................................... 20

15 U.S.C. § 1693g(a) ............................................................................................. 19

15 U.S.C. § 1693g(b) ............................................................................................. 13

28 U.S.C. § 2072(b) ............................................................................................... 39

**Other Authorities**

12 C.F.R. § 1005, Supp. I at 11(c)(4) ............................................................. 15, 25

12 C.F.R. § 1005.2(b)(1) ....................................................................................... 19

12 C.F.R. § 1105.11(c) .......................................................................................... 24

FED. R. CIV. P. 12(b)(6) ............................................................................. 14, 24, 31

FED. R. CIV. P. 23 ........................................................................................... *passim*

This multidistrict litigation arises from an explosion in criminal fraud targeting California's unemployment benefits program during the COVID-19 pandemic. When many unemployed Californians relied on government assistance, over a million fraudsters—including organized crime rackets, gangs, international money launderers, prison inmates, petty thieves, and even regular citizens seizing opportunities to game the system—targeted the agency providing assistance with fraudulent benefits claims. The State Auditor called it a "criminal assault on the benefits system." DX 10. Estimates of the amounts stolen in California exceed $32 *billion*. *See* DX 11.

A decade before the pandemic, California's Employment Development Department (EDD) contracted with Bank of America (BANA) to issue the prepaid debit cards that millions of legitimate beneficiaries used to receive and spend their benefits. But after the attacks on EDD, cardholders also included—unknown to BANA—over a million fraudsters. Not content only to reap unearned benefits from the government, many of these criminals perpetrated ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████.

Presently before the Court is a motion by Plaintiffs to certify a class of cardholders complaining about BANA's efforts to police these frauds. ECF 324 ("Mot."). Fatally, however, Plaintiffs do not limit their putative classes to legitimate cardholders with *bona fide* claims, and they propose no effective and clear method to ensure that criminal fraudsters will not share in a class recovery. Nor could they. Fraud artists are very good at what they do—after all, they convinced EDD to approve their fake benefit applications and then evaded detection long enough to steal tens of billions of dollars. ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████

To fight this cascade of fraud perpetrated on EDD, which then became

1    BANA's shared challenge because every approved applicant received a BANA pre-

2    paid card loaded with benefits, BANA launched and pursued a universe of vigorous

3    antifraud efforts; these included, among other features, ███████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████ .

6    Ironically, Plaintiffs' ostensible hook for gathering these "many thousands" of dis-

7    parate cardholders into a class whose claims can be resolved with the requisite "one

8    stroke" of common evidence is to define their putative class based on a single aspect

9    of one fraud-prevention process BANA deployed in the worst days of the crisis, in

10    September 2020. Mot. at 2, 4; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

11          This is a significant and surprising revision of the theories of liability Plaintiffs

12    previously pursued and pled in their complaint. Plaintiffs initiated these lawsuits

13    challenging BANA's pandemic response very broadly. They imagined that every sin-

14    gle EDD cardholder had some grievance against BANA and sought to certify a class

15    of millions. Now their challenge relates to a single criterion BANA used in its "fraud

16    filter." ████████████████████████████████████████████████

17    ████████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████████

19    ████████████████████████████████████████████████████████████

20    ████████████████████████████████████████████████████████████

21    ████████████████████████████████

22          Plaintiffs argue that their legal claims will rise or fall on the "common" ques-

23    tion of whether Indicator 1 was a reasonable anti-fraud device. But that approach

24    does not remove the individualized circumstances and facts that are critical to resolv-

25    ing their legal claims. ████████████████████████████████████████

26    ████████████████████████████████████████████████████████ does

27    not resolve the problem that Plaintiffs do not automatically win even if their critiques

28    of BANA's efforts to fight crime are correct; for example, even legitimate benefits

recipients falsely reported transactions as unauthorized—some with fraudulent intent, some by pure, honest mistake—or reported their disputes too late or too vaguely to invoke the legal protections on which their claims are based.

Plaintiffs' strategy for clearing those obstacles relies on regulatory inquiries BANA settled through consent orders in 2022 with the Consumer Financial Protection Bureau and the Office of the Comptroller of the Currency. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

But that assumption is wrong. The settlements cannot be used to end-run Plaintiffs' burden of proving with common evidence, in the requisite single stroke, that every member of their putative classes had a legitimate account and a valid dispute that BANA improperly denied. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

The class-action device does not let Plaintiffs leverage this *settlement* as a method of proving their legal claims. The burden is on Plaintiffs to furnish some method of weeding out putative class members with no claim and no compensable

injury, without individual inquiries predominating. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). And instead of trying to carry that burden, they just attempt a shortcut around it, pretending the obvious heterogeneity within the putative class does not exist. The result is that Plaintiffs would award windfall damages to many criminals who were very likely committing fraud. The record submitted with this opposition shows the class, as *they* define it, ██████████████████████ ████████████████████████████████████████████—and whose claims, therefore, cannot be adjudicated by a wave of the hand toward the fraud filter or consent order. ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████ Even if Indicator 1 weren't in use, these claims would likely have been disallowed under ██████████ ███████████████████████████████. These and other individual inquiries—based on Plaintiffs' *own* statements of the elements of their claims and the questions they raise—negate Plaintiffs' contentions that common evidence can resolve their claims in a single stroke.

A separate insurmountable hurdle arises because Plaintiffs also have the burden of proposing a methodology to calculate damages on a classwide basis. *See Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Here, too, they try to use the settlements to shortcut, rather than carry, that burden. Their damages methodology consists of a purported "expert" saying that the putative classes' damages consist of what they were already paid under the settlements. But instead of taking that premise to its logical (and legal) conclusion and determining that they have no more damages warranting compensation, Plaintiffs insist that they be paid that money they have already been paid *again* (and again, and again, and again—their "expert" duplicates the same measure for the same alleged harms under multiple categories of damages).

This undue reliance on the regulatory settlements raises the question of why this case should even be a class action at all. The problem is not only the predominating individual inquiries into whether people paid under the settlement were necessarily entitled to it. Equally problematic is that Plaintiffs are trying to win payouts for classes definitionally limited to people *who already got fully compensated (* ██ ██████████████████████ *).* Rule 23 not only requires this Court to assess whether a class action is administratively feasible, but whether it is the superior method of resolving a controversy. This requirement is not met where a parallel regulatory proceeding has already provided significant relief. *See Kamm v. Cal. Dev. Co.*, 509 F.2d 205 (9th Cir. 1975). Plaintiffs actually *admit* that not merely significant relief, but full compensation, has already been paid, and further admit that the sole *raison d'être* for this case is to subject that compensation to a treble-damages multiplier (on top of their already-duplicative and excessive compensatory-damages calculations). Mot. at 15. Their candor is refreshing, but it does not pass the *Kamm* test.

There are no putative class members before the Court with unpaid damages. But there *are* putative class members with *no* claim and *no* damages. And there *are* putative class members who took part in the massive fraud on the State of California, the taxpayers, and BANA, and now stand to compound their ill-gotten gains with an ill-gotten share of a class recovery. In the context of a national emergency, there might have been reasons for EDD to prioritize getting money out the door as fast as possible, even at the cost of approving fraudsters; ████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████ But in the context of a court proceeding, this beneficence reaches its constitutional limit. Article III and Rule 23 do not allow the class-action device to pay criminals, the uninjured, and others with no valid claims just because it is administratively easier. BANA thus respectfully submits that however valid some individual grievances might be, this is a case where class certification is not merely

inappropriate, but harmful. Plaintiffs' motion should be denied.

## BACKGROUND

**A. The Pandemic Benefit Scams**

In March 2020, the COVID-19 pandemic drove the economy into a sudden and deep recession. As unemployment rose to nearly 15%, the federal government passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which funded a unique benefits program called Pandemic Unemployment Assistance. PUA opened unemployment benefits to workers not previously eligible under traditional programs (*e.g.*, self-employed, contract workers, gig workers, and *under*-employed workers). ██████████████████████████████████████████████████████████████████████████████████████████████████ At the same time, California loosened its verification requirements for benefits. █████████████████████████████████████████████████████████████████████████████

The unprecedented situation exposed the system to massive fraud. By January 2021, California estimated incurring between $11.4 and $31 billion in fraud losses, and attributed 95% of it to the PUA program's "lower standard of identity and wage information," "due to federal policymakers' decision to prioritize immediate assistance." DX 13 at 5. Subsequently, the U.S. GAO estimated that 11 to 15% of unemployment benefits paid during the pandemic were fraudulent, and the Department of Labor (DOL) reported in August 2023 that PUA had an improper payment rate of 35.9%. DX 14 at 6. Other estimates have improper PUA payments reaching as high as *$400 billion* nationwide (about a 40% loss rate for the taxpayers). DX 15 at 2.

EDD was not without fault in exacerbating the problem. It adopted a "pay and chase" policy, instructing its agents not to let eligibility checks delay getting benefits out the door. DX 14 at 7, 28. The State Auditor and House Oversight Committee members found that EDD failed to implement fraud detection or identity verification

technology until far too late, ignored repeated Inspector General warnings, and approved at least $10.4 billion in benefits without verifying recipients' identities. *Id*. at 7. Also at fault was the State's decision to let claimants self-certify prior wages and employment history. *Id*. at 16. "With the lack of verifiable criteria regarding eligibility," EDD would later report, "fraud increased." DX 16 at 3. Additionally, as reported by the State Auditor, EDD mailed at least 51 million documents to unemployment claimants between 2017 and 2020 that included their full Social Security numbers, exposing them to identity theft. DX 17 at 1–3.

Hundreds of thousands of accounts were frozen based on EDD information, but too late to prevent the theft of tens of billions in State and federal funds.

EFTA protects debit-card users from certain losses if the use of the card was unauthorized. BANA, like most institutions, generally implemented these protections by . That process works fine in ordinary circumstances but was ill-suited to addressing a tsunami of new card accounts and the related

1   massive crime spree targeting the provisional credits. ████████████████

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ██████████████████████████████████████

6        Plaintiffs devote an entire expert report to praising the investigation procedures

7   for unauthorized-transaction claims that BANA followed at this time—████████████

8   ████████████████████████████████████—as industry-standard. *See*

9   PX 1. But BANA's claims analysts were overwhelmed by the massive fraud-driven

10   spike in cardholders and disputes. So too were BANA's customer-service resources.

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████

23        Plaintiffs attack BANA for deciding "to protect *itself*" from these frauds, but

24   grudgingly acknowledge the frauds targeted *State and federal* money, so BANA was

25   also protecting California and U.S. taxpayers, ████████████████████████

26   ████████████████████ Those efforts culminated in new antifraud procedures Plain-

27   tiffs criticize as "aggressive" and "hastily devised." Mot. at 8, 42. The loaded words

28   "aggressive" and "hastily" do most of Plaintiffs' heavy lifting, but ████████



Plaintiffs do not propose any *timid* response that would have been capable of addressing a problem of that scale. And Plaintiffs' abandonment of their challenge to most of the new procedures implicitly concedes they were not too "aggressive" after all.

These procedures included a fraud filter as the first step in the investigation process. The filter identified transactions and accounts that

1  ████████████████████████████████████████████████████████  Meanwhile, FinCEN

2  and the Secret Service continued issuing alerts to BANA and others about rising ben-

3  efits fraud, encouraging financial institutions to perform additional inquiries and in-

4  vestigations where appropriate to identify "red flags indicating [UI] fraud," including

5  suspicious, rapid disbursements from benefits accounts. DX 2 ¶ 33.

6  **B. The "Magnetic Stripe" Red Herring**

7        Since the proliferation of criminal fraudsters in Plaintiffs' putative classes un-

8  dermines their plea for class treatment, Plaintiffs need some explanation for the ex-

9  plosion in unauthorized-charge reports that diverts attention from cardholder fraud.

10  The explanation they propose is that the EDD cards were vulnerable to theft because

11  they had traditional magnetic stripes instead of EMV chips. Plaintiffs also claim (and

12  have their purported experts *assume*) that EMV chips would have prevented *every*

13  purportedly unauthorized ATM withdrawal. PX 2 ¶ 118.



The biggest source of fraud was fraudulent claims on the benefits

1  themselves. *See supra* Part A. None of these frauds have anything to do with mag-

2  netic stripes.

## C. The Complaints and Centralization

This matter originated in ten lawsuits filed on behalf of plaintiffs claiming to have been erroneously caught up in BANA's efforts to mitigate the fraud surge. The lead case, *Yick v. Bank of Am., N.A.*, No. 21-0376 (N.D. Cal.), pled a putative class broadly encompassing "[a]ll persons who were issued or who used a BANA debit card for the purpose of accessing EDD benefits deposited into a BANA account," on the dubious premise that BANA's antifraud efforts had somehow harmed *every* cardholder without catching a *single* actual fraudster. *Id.*, ECF 63, ¶ 185.

The putative classes Plaintiffs seek to certify now are much narrower. The road from there to here begins with the parties negotiating a preliminary injunction which had BANA expand its call-center capacity, commit to reopen investigations into disputed transactions that were closed or denied based on fraud-filter determinations, and agree not to consider the fraud-filter results in investigating claims. *See Yick*, ECF 100. (The injunction was dissolved as of June 1, 2024. ECF 255.)

On June 4, 2021, the Judicial Panel on Multidistrict Litigation granted the *Yick* plaintiffs' motion to centralize it with nine related actions, and transferred them to Judge Burns. *See In re Bank of Am. Cal. Unemployment Bens. Litig.*, 544 F. Supp. 3d 1366 (J.P.M.L. 2021). A number of tagalongs followed. *See* ECF 17–24, 27, 54, 62, 96, 100, 104, 109, 111, 113, 117. On August 17, 2021, Plaintiffs filed a consolidated complaint on behalf of 25 class representatives and 240 more named Plaintiffs, asserting fourteen causes of action under EFTA, 15 U.S.C. § 1693 *et seq.*, California law, and the federal and California due-process clauses. *See* ECF 72.

## D. The Regulatory Consent Orders and Remediation Plan

In July 2022, BANA entered into consent orders with its two primary regulators, the CFPB and the OCC, that Plaintiffs describe as "resolv[ing] issues and claims that substantially overlap with many of the claims and requests for relief before this Court in the MDL." ECF 106 at 2. As part of the settlements, BANA committed to a remediation plan ████████████████████████████████



That process is ongoing.

**E. The Dismissal Ruling and Amended Complaints**

On May 25, 2023, Judge Burns granted in part and denied in part a motion to dismiss. *See In re Bank of Am. Cal. Unemployment Bens. Litig.*, 674 F. Supp. 3d 884 (S.D. Cal. 2023). The Court dismissed 83 Plaintiffs, consisting of:

- 15 Plaintiffs who failed to allege "provid[ing] timely notice" EFTA requires of "the consumer's belief . . . that an error exists."

- 4 Plaintiffs whose notices came "after the 60-day period," which "can't support a claim under the statute."

- 31 Plaintiffs whose dispute notices were too vague and "general."

- 16 Plaintiffs whose notices were specific enough, but didn't "constitute a 'qualifying error' under the statute," including 10 where "a third party applied for and/or received EDD benefits in their name," two where "a third party tried to change their account address," one who alleged "her phone containing her account information was stolen," one who alleged her card was stolen, and two who "allege[d] fraud when [they] w[ere] unable to access [their] account[s]." The Court declined to dismiss others who arguably provided insufficient notice, not because their notices were sufficient, but because they didn't need "such detail" at the Rule 12(b)(6) stage.

- 16 Plaintiffs "who reported account freezes alone," because "EFTA . . . does not define account freezes as an 'error'" and these Plaintiffs did not allege making any other requests when they reported account freezes.

- One Plaintiff who received prompt credit for her unauthorized transaction and thus "lack[ed] a concrete injury sufficient for Article III standing." But the Court declined to dismiss other Plaintiffs whose standing [BANA] challenged on the ground that they were "fully reimbursed," finding they had additional damages like missing mortgage payments and utility bills.

*Id.* at 906–14. The Court declined to dismiss the complaint for failure to plead BANA's investigations were unreasonable. Referencing an official interpretation of Regulation E providing that an investigation must encompass "information within [the financial institution's] own records pertaining to the particular account in question," the Court found that the complaint "could be more detailed as to what specific information should have been reviewed" but had said enough for Rule 12(b)(6)

1  purposes. *Id*. at 911–12; 12 C.F.R. § 1005, Supp. I at 11(c)(4).

2       Plaintiffs filed an amended complaint on June 13, 2023 on behalf of the same

3  265 Plaintiffs. *See* ECF 136. But then—faced with having to produce discovery and

4  testify under oath about their claims—109 of them decided instead to dismiss them-

5  selves from the case. Some reserved their rights "to participate and/or recover as a

6  class member in this action" (*e.g.*, ECF 149, 193, 206, 216, 230, 235, 253, 263), but

7  most were part of a group that told the Court they "don't want to be part of a class

8  action." ECF 55 at 4. On July 16, 2024, Plaintiffs filed a second amended complaint,

9  reducing the putative class representatives from 25 to 21 and the number of addi-

10  tional, individually named Plaintiffs to 133. At a status conference, Plaintiffs told

11  Magistrate Judge Berg that this reflected an effort to reduce the class representatives

12  to "the best" class representatives—effectively conceding individualized issues with

13  the other class representatives and individual Plaintiffs (many of whom still belong

14  to Plaintiffs' putative classes). *See* DX 44; *see also* Brys Decl. ¶ 126.

15  **F.  The "Best" Class Representatives and the Ex–Class Representatives**

16       The instant motion reduces the number of putative class representatives still

17  further, from 21 to 9. *See* Mot. at 19. The motion no longer defines the putative class

18  to encompass every one of the millions of EDD cardholders without limitation, nor

19  even every cardholder affected by the fraud filter. Instead, class membership is based

20  solely on the ████████████████. Plaintiffs move to certify (*see* Mot. at 16):



- ███████████████████████████████████████

The nine remaining putative class representatives are **Kuang Ting Chong**, **Candace Koole**, **Lindsay McClure**, **Azuri Moon**, **Stephanie Moore**, **Roland Oosthuizen**, **Vanessa Rivera**, **J. Michael Willrich**, and **Alex Yuan**. Each alleges ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. More specifically:

- **Willrich** and **Moore** challenge retail-store charges on their cards in addition to the PIN-enabled ATM withdrawals.
- **Chong** and **Moore** allege being credited right away, but having those credits reversed before BANA credited them back two months later, and are proffered as representatives of the putative "**Credit Rescission**" class.
- The rest claim their credits were denied at first, then approved a few months later, and seek to represent the putative "**Claim Denial**" class.
- All except **Oosthuizen** and **Willrich** claim their accounts were frozen for a few days to a few weeks while their disputes were pending, and seek to represent the "**Account Freeze**" putative class.
- **Chong**, **Moon**, **Moore**, **Oosthuizen**, **Willrich**, and **Yuan** allege frustrations reaching customer-service representatives, and seek to represent the putative "**Customer Service**" class.
- All nine complain that the cards had magnetic stripes instead of EMV Chips and seek to represent the putative "**EMV Chip**" class.

*See* ECF 324-8–16.

The *ex*–class representatives have less tidy stories. **Zinaida Petrova**'s claim denial was upheld after a manual investigation. *See* DX 45. **Carlos Rodriguez** blamed BANA's customer service for his troubles getting his account unfrozen, ███ ████████████████████████████████████████████████████████ ████████████████████████████████ **Jennifer Yick** (the original lead Plaintiff), **Rosemary Mathews**, **Brian Wiggins**, **Clare Cajas**, **Jonathan Smith**, and **Cindy Baker** all started out blaming BANA's customer service for problems accessing their frozen accounts, ████████████████████████████████████████████ ████████████████████████ **Stephanie Smith** indisputably cannot blame her disputed

transactions on the cards' magnetic stripes because she claimed she never used her cards, anywhere. ECF 304 ¶ 200; DX 53 at 9–10.

As for the facts behind the rest of the putative class, it is anybody's guess. The only thing that can be said for sure is that each putative class member ████████ ████████████████████████████████████████████████████. Plaintiffs have no evidence whether these or any other disputes were valid, let alone how many were actually criminal frauds. Nor do Plaintiffs have any evidence of how many putative class members were entitled to EDD benefits in the first place.

Recognizing these fatal obstacles to defining a putative class uniformly entitled to damages based on common evidence, Plaintiffs ground their motion on the theory that the CFPB remediation plan already solves that problem for them. ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ As already shown, that isn't true. Some portion were arguably "wronged" (if Plaintiffs prove their case), and were paid for it; others weren't, but were paid anyway. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ BANA would obviously learn of many more if every putative class member had to submit to discovery and depositions and undergo the same careful review BANA gave to Plaintiffs. Under these circumstances, the foundational assumption that they can carry their Rule 23 burdens by outsourcing them to BANA's remediation plan crumbles.

## STANDARD OF LAW

As the proponents of certification, Plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). The Court may grant certification only if it concludes, "after a rigorous analysis, that the prerequisites" of Rule 23 have been met. *Gen'l Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982).

## ARGUMENT

### I.    Plaintiffs' "common questions" cannot drive the resolution of this litigation.

Rule 23(a) requires Plaintiffs to proffer a common contention "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Plaintiffs try to carry this burden with a list of 28 questions they say can be resolved without reference to individual facts. *See* Mot. at 16–18. It does not suffice. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. Plaintiffs' 28 questions might amount to a mini-drove, but they are not apt to drive the resolution of the litigation when *other* questions central to the validity of each claim *cannot* be resolved with common evidence.

Assessing commonality begins with "identify[ing] the elements of the class members' case-in-chief." *Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1114 (9th Cir. 2014). Comparing the elements of each cause of action with Plaintiffs' proposed "common questions" leaves a Venn diagram with far too little overlap for those questions to drive the resolution of the litigation. The proposed "common questions" both (i) include elements that are *not* actually "common" and (ii) *omit* elements "central to the validity" of each individual claim—which *also* aren't common.

### A. Essential elements of Plaintiffs' EFTA claim require individual evidence.

The "common questions" Plaintiffs pose about their primary EFTA claim include five questions about the existence and nature of bank "polic[ies]" and one question about whether BANA's conclusion "that the customer's account was not in error . . . could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation." Mot. at 16–17 (quoting 15 U.S.C. § 1693f(e)). That question is not "common" at all. "[T]he evidence available" in each individual account file is necessarily individualized. Meanwhile, Plaintiffs' list of

questions *omits* other questions central to the validity of an EFTA claim, which *also* aren't common. These include core questions we *know* cannot generate common answers across a class of a hundred thousand because they *already* generated disparate answers just among the Plaintiffs who have already disappeared from this case.

### 1. Essential questions about fraudulent benefits claims are not common.

To assert EFTA claims, plaintiffs must show their accounts were "established primarily for personal, family, or household purposes," not criminal purposes. 12 C.F.R. § 1005.2(b)(1). Fraudulently obtained accounts get no protection. This analysis of "'personal, family, or household purposes' is a fact driven one, and should be decided on a case-by-case [] basis." *Hansen v. Ticket Track, Inc.*, 280 F. Supp. 2d 1196, 1204 (W.D. Wash. 2003). That is fatal to commonality. Plaintiffs propose no method to prove in "one stroke" that their hundred-thousand-person putative class population has been 100% purged of criminal fraudsters.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████  The DOL said it "trusts that states have done all they can to track down fraudulent payments yet has no mechanism to determine if this action has actually occurred." DX 14 at 30. It manifestly hasn't occurred to anywhere near the full extent of the fraud, given the DOL estimates that 35.9% of all PUA benefits paid were illegitimate and that states had managed to recover only $6.8 billion out of at least $191 billion in improper benefits payments. DX 54; 14 at 6. That is just a small fraction of the amount stolen in California alone. There is no scenario in which this litigation can do in "one stroke" what the federal and California governments failed to do with all of the resources available to them.

### 2. Essential questions about transaction authorizations are not common.

Equally central to the resolution of Plaintiffs' EFTA claims is whether the transactions challenged by each individual cardholder were in fact "unauthorized." 15 U.S.C. § 1693g(a). Plaintiffs' claims hinge on allegations that they were and that

1   BANA's alleged failure to credit them therefore violated EFTA. *See*, *e.g.*, ECF 304

2   ¶ 536(i). Putative class members who authorized the challenged withdrawals, either

3   intending to file fraudulent disputes or who simply reported authorized transactions

4   by mistake, cannot recover. *See* 15 U.S.C. § 1693a(12)(B) (transaction "initiated with

5   fraudulent intent" cannot be appealed to card issuer as "unauthorized"); *Merisier v.*

6   *Bank of Am., N.A.*, 688 F.3d 1203, 1210 (11th Cir. 2012) ("withdrawal does not be-

7   come an 'error' simply because a customer later disputes it—particularly when the

8   error was manufactured as part of a fraudulent scheme").

9          This cannot be done with common evidence. Fraudulent intent is a case-by-

10  case inquiry. *See*, *e.g.*, *Moore v. Southtrust Corp.*, 2005 U.S. Dist. LEXIS 42062, at

11  *27–28 (E.D. Va. June 10, 2005) (concluding that "the plaintiff had fraudulent intent

12  with regard to the alleged unauthorized transactions" based on "a history of filing

13  fraud claims for provisional credit with other banks" and testimony "admit[ting] that

14  his wife actually made the charges for which he received provisional credit"). █████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████

19      ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████

25  ██████████████████████████  The examples that follow demonstrate that there are factual is-

26  sues about whether some or all of these cardholders (and countless others) deserved

27  to have had their claim denied, and common evidence will not resolve them.

28      ████████████████████████████████████████████████████████████







Perhaps some of these individuals were engaged in deliberate fraud. Or perhaps they made honest mistakes when they filed their disputes.

; *see, e.g., Moore*, 2005 U.S. Dist. LEXIS 42062, at \*24–47 ("the plaintiff's EFTA claim must fail" because "the plaintiff admitted in his deposition that he, in fact, initiated several of the transactions that he originally claimed were unauthorized").

These inquiries defeat commonality. Denying class certification of identically theorized claims, one court reasoned:

> Nelson seeks to represent a putative class of cardholders who "reported fraudulent charges on their accounts and were denied a refund of such charges. . . ." The breadth of this proposed class definition includes customers who reported a transaction that was not, in fact, fraudulent or unauthorized. Put another way, some putative class members may have no legitimate claim for a refund. Courts routinely decline to certify such overbroadly defined classes.

*Nelson v. Conduent Bus. Servs. LLC*, 2020 WL 5587450, at \*6 (N.D. Ga. Sept. 18, 2020); *see also, e.g., Almon v. Conduent Bus. Servs., LLC*, 2022 WL 4545530, at \*14-15 (W.D. Tex. Sept. 28, 2022) ("Defendants must be afforded the opportunity to prove that the reported transactions were authorized. The threshold question of whether fraud occurred at all is a fact-intensive inquiry that will vary with the

1  circumstances of each case. . . .").[2]

2  ### 3. Essential questions about adequate notice are not common.

3  Another essential EFTA element that Plaintiffs do not propose to litigate with

4  common evidence is the statutory requirement of a timely, adequate notice of error

5  in order to benefit from the protections of Regulation E, including the investigation

6  duty, which lie at the heart of the EFTA claim. 12 C.F.R. § 1105.11(c). As already

7  shown, about a quarter of the named Plaintiffs were already dismissed for failure to

8  satisfy this requirement. The outcomes of that ruling varied so significantly based on

9  individual facts that Judge Burns thought it wise to append a six-page table just to

10 keep track of them all. ECF 126 at 76–81. Outcomes for the putative class population

11 will vary at least as much, especially now that the case is past the Rule 12(b)(6) stage

12 and the court must "consider the nature and range of proof necessary to establish [the

13 complaint's] allegations." *In re Coordinated Pretrial Proceedings in Petroleum*

14 *Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982). ████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████ Figuring out which

17 putative class members can satisfy the notice element is "thorny and fact-intensive"

18 because the start of the clock may hinge on "the particulars of [their] online banking

19 ───────────────────

20 [2] Plaintiffs cite *Almon* in passing in their brief for the proposition that "[s]tatutory damage claims under 'EFTA and Regulation E [] are particularly well suited to be

21 class actions.'" Mot. at 40. And it is true that *Almon* certified an EFTA class, but the EFTA claim in that case was very different from the one Plaintiffs press here. The

22 claim *Almon* certified for class treatment concerned "the timeliness of the investigation" and issuance of "provisional credits," not the merits of whether the transaction

23 was authorized or not. *Id.* at *8. Meanwhile, the Court *denied* certification of a claim that *did* put at issue whether the transactions were authorized. "Whether the reported

24 loss was the result of an unauthorized use is a question of fact," the Court ruled, and agreed with the defendants that "individual questions permeate [that] claim." *Id.* at

25 *14. That same individual fact question is an element of Plaintiffs' EFTA claim here, making *Almon* a precedent *against* class treatment, not for it.

26

27 3

28 ████████████████████████████████████████████████

habits." *Park v. Webloyalty.com, Inc.*, 2019 WL 1227062, at *8, *14 (S.D. Cal. Mar. 15, 2019) ("individual issues predominate" on EFTA claim; finding plaintiff atypical because the timeliness issue was "based on facts unique to him").

**4. "The evidence available" on each account is not common.**

Plaintiffs cannot prevail on the alleged failure to honor a claim that a transaction was unauthorized unless the trier of fact concludes that it *was* unauthorized. Plaintiffs also seek treble damages with a showing that BANA "knowingly and willfully" denied their disputes "when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time." Mot. at 17 (quoting 15 U.S.C. § 1693f(e)). By its own terms, the conclusions that could reasonably have been drawn from the evidence available" on each "consumer's account" depend on each individual consumer's account. Indeed, Judge Burns' 2023 ruling cited regulatory guidance expressly stating that the reasonability of BANA's determinations must be adjudicated by reference to its records "*pertaining to the particular account in question.*" 674 F. Supp. 3d at 911–12 (quoting 12 C.F.R. § 1005, Supp. I at 11(c)(4)). This is not common evidence and will not generate common answers.

We have already seen what "the evidence available" on individual accounts looks like. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████ None of this can be evaluated for "███████████████" claims in "one stroke." Mot. at 16. A trial in which Plaintiffs put forward evidence about the nine "best" handpicked class representatives will not drive the resolution of the claims Plaintiffs assert on behalf of R.R.S., D.D.D., M.M.G., Y.L., K.L.S., or any other putative class member. All of these claims depend on "the evidence available" on their accounts. *See*, *e.g.*, *Houston v. Fifth Third Bank*, 2019 WL 1200574, at *3–4 (N.D. Ill. Mar. 14, 2019) (dismissing EFTA claim because "evidence available" on the account "undermine[d] Plaintiff's

1   allegation that he was at lifeguard tryouts at the time 'many of the transactions oc-

2   curred'"), 2019 WL 3002965, at *3 (N.D. Ill. July 10, 2019) (reinstating repleaded

3   EFTA claim because plaintiff supplied further evidence he "remained at the high

4   school" after lifeguard tryouts).

5        The discovery record *already* contains evidence about individual Plaintiffs

6   whose claims would likely fall on the basis of the evidence available on their indi-

7   vidual accounts, much like the absent class member examples. For example, Plaintiff

8   **Tiffany Cochran** claims to have suffered $30,000 in unauthorized transactions and

9   that "she never received" multiple promised replacement cards. ECF 136 ¶ 328.

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ██████████████████████ Plaintiff **Amy Stanfill** alleges $5,000 in unauthorized transac-

14  tions. ECF 136 ¶ 494. ████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████

18        Plaintiffs' response to these inconvenient episodes has been to narrow their

19  class representatives to the ones with the "best" facts, and even to narrow their class

20  definition in an effort to exclude some of the more easily proven fraud cases. For

21  example, narrowing the putative class to ██████████ probably disqualifies Stanfill

22  because her disputes also triggered ████████████████████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ██████████████████████████ *See supra* Part I.A.2. Withdrawing class rep-

26  resentatives and voluntarily dismissing Plaintiffs who balked at subjecting their

27  claims to discovery might obscure Plaintiffs' commonality problem, but it does not

28  eliminate it. *See, e.g., Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331,

344 (4th Cir. 1998) (reversing class certification where "plaintiffs enjoyed the prac-tical advantage of being able to litigate not on behalf of themselves but on behalf of a 'perfect plaintiff' pieced together" from "the most dramatic" cases).

"[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart*, 564 U.S. at 367. All of the above defenses are defenses BANA is entitled to litigate, and none can be litigated in a single stroke with common evidence.

**B. Essential elements of Plaintiffs' other claims also require individual proof.**

The same deficiencies infect Plaintiffs' non-EFTA causes of action. Their droves of purportedly common questions either aren't actually common, or omit es-sential elements of the claims that pose individual questions.

**1. Due process.** For their constitutional cause of action, Plaintiffs assert, as a purportedly common question, "whether the Bank's policies and procedures for freezing accounts" of cardholders who reported fraudulent ATM withdrawals "were constitutionally adequate." Mot. at 17. But as Plaintiffs admit further down, whether those procedures "were constitutionally adequate" turns on whether cardholders had "a meaningful opportunity to be heard" or "reasonable post-deprivation procedures." *Id*. at 23. Plaintiffs' own account of how they plan to establish they were deprived an "opportunity to be heard" involves a complaint that cardholders were required "to contact EDD to verify their identity" and that "EDD lacked capacity to answer card-holder calls." *Id*. at 24. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Relatedly, a plaintiff claiming a failure to provide due process "must have taken advantage of the processes that are available to him," and not every Plaintiff did. *Manion v. N.C. Med. Bd.*, 693 F. App'x 178, 181

---

4 ████████████████████████████████████████████████████

1    (4th Cir. 2017) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).[5]

2         For this reason, courts regularly find that the "opportunity to be heard" is a
3    predominating individualized issue precluding class certification. *E.g.*, *Derrick v.*
4    *Glen Mills Sch.*, 2024 WL 2133440, at *19 (E.D. Pa. May 13, 2024) (whether de-
5    fendant provided "notice and an opportunity to be heard" required "individualized
6    determinations"); *Daskalea v. Wash. Humane Soc'y*, 275 F.R.D. 346, 362 (D.D.C.
7    Aug. 10, 2011) (denying certification because "the opportunity to be heard" was not
8    "consistent or even similar across the class"). In *Daskalea*, the court found the plain-
9    tiffs' statement of the "common" issues underlying their due-process claim to "re-
10   duce to an empty invocation of the legal standard governing procedural due process
11   claims generally," and amount to "a perfect illustration of the [D.C. Circuit]'s sensi-
12   ble observation that, 'at a sufficiently abstract level of generalization, almost any set
13   of claims can be said to display commonality.'" 275 F.R.D. at 362 (citing *Love v.*
14   *Johanns*, 439 F.3d 723 (D.C. Cir. 2006)). By the same token, Plaintiffs' contentions
15   that the constitutional adequacy of BANA's policy is a "common" due-process issue
16   only holds up at the most "abstract level of generalization," but falls apart once one
17   considers the *specific* facts they would have to prove to establish that individual call-
18   center experiences fell short of the requisite "opportunity to be heard."

19        **2. California Consumer Privacy Act.** Plaintiffs hinge their CCPA claim, as-
20   serted on behalf of the EMV Chip putative class, on the supposed "common issue"
21   of "whether EDD cardholders' PI [personal information] was 'subject to unauthor-
22   ized access and exfiltration, theft, or disclosure' due to the Bank's issuance of mag-
23   stripe only cards." Mot. at 18. This is manifestly not a common issue. It is not even
24   a common issue whether cardholders' information was exfiltrated at all—those who
25   disputed their own authorized transactions have no exfiltration to complain about.

26        As to those whose account information *was* somehow compromised, there is

27   _____

28   5 ████████████████████████████████████████
     ████████████████████████████████████████████

no common answer on whether it was "due to" the magnetic stripe at all, much less "due to" the cards' lacking EMV chips. ███████████████████████████ ████████████████████████████████████████████████████████████ Plaintiffs and putative class members have in-person card swipes among their disputes, which EMV chips would not have prevented. EMV chips do not protect cards from being physically lost or stolen, either, as many Plaintiffs claim to have experienced. ████████████████████████████████████████████████████████████ *see also Houston*, 2019 WL 1200574, at *4 (allegations of "frequent" skimming attacks "fail to save Plaintiff's claim from dismissal because Plaintiff does not say that his own account was subjected to skimming or hacking," so "Plaintiff is left only to speculate that his transactions '*could have been*' part of a skimming or hacking scheme").

Plaintiffs' logic seems to be that chips would at least have prevented disputed ATM withdrawals. That does not follow. Chipped cards still get lost or stolen. ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████ *See Moore*, 2005 U.S. Dist. LEXIS 42062, at *26–27 (transactions were authorized because "the plaintiff allowed his wife to have access to his card"). Or it might be "due to" cardholders keeping their PIN scrawled on a Post-It note on the card or in their wallet, or committing fraud and disputing their own transactions. In any event, the answer varies from case to case.

**3. Common-law claims.** Plaintiffs recycle their complaints about magnetic stripes for their common-law claims, and the proposed "common issues" suffer from the same problem. *See* Mot. at 17. Each cause of action has a causation element that Plaintiffs neglect to include among their purportedly common questions. *See*, *e.g.*,

*White v. Symetra Assigned Bens. Serv. Co.*, 104 F.4th 1182, 1193 (9th Cir. 2024). It
is frequently observed that causation questions central to legal claims "require[] an
individualized examination." *Duncan v. Northwest Airlines, Inc.*, 203 F.R.D. 601,
612 (W.D. Wash. 2001) (citing *Abuan v. GE*, 3 F.3d 329, 334 (9th Cir. 1993)). That
defeats commonality, because whether there is any causal connection between mag-
netic stripes and Plaintiffs' claimed injuries turns on each individual's facts, just as
the CCPA causation inquiry turns on each individual's facts. *See supra* Part I.B.2.

      Along similar lines, Plaintiffs describe their negligence claim as resting on the
purportedly "common" question of "whether the Bank . . . understaff[ed] its Claims
call center," but this question has no material place in the causal chain for cardholders
with no complaints about the call center. That includes three of the nine remaining
class representatives, so if they are indeed "representative" (a big if), then a third of
the putative class also has no such grievance. Plaintiffs certainly have no basis for
surmising that every single one of the ▮▮▮▮ people they put in this putative class
just for calling BANA within a two-month period has any grievance with the service
they received (much less the *same* grievance). "No two calls were the same," *Roz v.
Nestle Waters N. Am., Inc.*, 2017 WL 6942657, at *5 (C.D. Cal. Sept. 13, 2017), and
thus the evidence necessary to prove that ▮▮▮▮ people have grievances associated
with an "understaff[ed]" call center is not going to be the same across the putative
class, either.[6] The putative class representatives' own declarations make claims about
their individual experiences that won't apply to others.[7] Most don't describe the

---

[6] *See, e.g., Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069–70 (9th Cir. 2014)
(customer-service grievances require "individualized determination" because "oral"
communications are "necessarily . . . unique"); *English v. Apple Inc.*, 2016 WL
1188200, at *10 (N.D. Cal. Jan. 5, 2016) (denying certification due to "significant
and material variations" in consumer interactions).

[7] *Compare* ECF 324-11 ¶ 7 (**Moon** alleging customer-service representative told him
he "was liable for the disputed transactions"), *with* ECF 324-15 ¶ 11 (**Willrich** alleg-
ing representative "gave [him] conflicting information," "that there had been a glitch
in the system and my funds would be returned shortly," and that "the investigation
was reopened" but he "never received any" documentation on it).

substance of their customer-service interactions at all.

Recognizing this defect, Plaintiffs now reframe their negligence theory to concern not the substance of their customer-service experiences, but the amount of time they spent on hold. *See* Mot. at 12. The six proffered representatives of this putative class all assert, in basically identical words, to have called BANA repeatedly and "spent more than an hour on hold each time." ECF 324-8 ¶ 13, 324-11 ¶ 9, 324-12 ¶ 11, 324-15 ¶ 10, 324-16 ¶ 12. Plaintiffs have no evidence this is true for all █████ putative class members and thus rely on assertions about "average" hold times "likely" experienced by "many" of the █████ members of this putative class. Mot. at 12. Neither this supposition nor the reliance on a purported "average" can substitute for actual evidence of what class members *uniformly*, rather than "likely," experienced. *See infra* Part II.B (addressing Plaintiffs' damages methodology).

Elements specific to the individual claims also cannot be established with common proof. On the fiduciary-duty claim, Plaintiffs assert the alleged existence of a "special relationship" between BANA and EDD cardholders is a common question. Mot. at 17. It isn't. There is usually no "special relationship" in the "arms-length" relationship between a bank and consumer. *Knerr v. Fed'l Land Bank*, 1991 U.S. App. LEXIS 2964, at *12 (9th Cir. Feb. 25, 1991). "[T]o determine the existence of a special relationship where it normally does not exist may require a fact intensive inquiry." *SleekEZ, LLC v. Horton*, 2018 U.S. Dist. LEXIS 33858, at *9 (D. Mont. Jan. 8, 2018). It requires evidence of the bank "act[ing] as a financial advisor in some capacity." *Knerr*, *supra*. That necessarily turns on the content of specific communications between the bank and individual cardholders, and thus "Plaintiffs' motion fails to demonstrate that the special relationship inquiry could be answered in one stroke." *Pedersen v. State Farm Mut. Auto. Ins. Co.*, 2022 WL 2304042, at *24 (D. Mont. June 27, 2022). Judge Burns' ruling at the Rule 12(b)(6) stage that Plaintiffs plausibly *alleged* a special relationship, 674 F. Supp. 3d at 934–35, does not carry them past the certification and trial stages where the Court must "consider the nature

1    and range of proof necessary to establish those allegations." *Petrol Prods.*, *supra*.

2    Plaintiffs also claim the "breach" element of the negligence claim as a common

3    question. Mot. at 17. Again, it is not. In Plaintiffs' own terms, the requisite "breach"

4    consists of actions as varying as failing to provide "reasonably timely and effective"

5    "customer service" and failing to process claims "in a reasonably timely and adequate

6    manner." ECF 304 ¶ 587. Each of these are different alleged "breaches" that either

7    did or did not happen to any individual cardholder. ████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10    For the same reason the causation element is fatal for Plaintiffs, common-law

11    affirmative defenses like contributory negligence defeat commonality even if Plain-

12    tiffs could advance their affirmative case with common evidence.[8] Putative class

13    members who compromised their own accounts by, for example, giving friends or

14    family access to their cards or PINs cannot prevail without litigating their own con-

15    tributory negligence. *See, e.g.*, DX 78 (**Aders**' admission that a close friend he con-

16    sidered a "brother" had access to his card and may have made the unauthorized trans-

17    actions). Other affirmative defenses that destroy commonality include sophistication

18    and lack of reliance, both relevant to the fiduciary-duty claim.

19    Lastly, half the allegedly "common" questions Plaintiffs list on their claim al-

20    leging breach of the covenant of good faith and fair dealing are not common by their

21    own terms. Whether BANA's denial of putative class member disputes "was objec-

22    tively reasonable" (Mot. at 18) poses the same questions turning on individual ac-

23    count records as the EFTA claim. *See supra* Part I.A. Whether putative "class mem-

24    bers' rights" were impaired by "reduced call center staffing" (Mot. at 18) likewise

25    ────────────

26    [8] *See, e.g.*, *Melnick v. TAMKO Bldg. Prod. LLC*, 347 F.R.D. 79, 108 (D. Kan. 2024)
    (denying certification because "contributory negligence" requires "consideration of

27    individualized evidence and present[s] individualized inquiries"); *In re Prempro*, 230
    F.R.D. 555, 567 (E.D. Ark. 2005) (same, because "contributory negligence, . . . re-

28    quire[s] individual determinations"); *In re Ford Motor Co. Ignition Switch Prod.
    Liab. Litig.*, 194 F.R.D. 484, 490 (D.N.J. 2000) (same).

poses the same individual questions about their call-center experiences already addressed. Plaintiffs also omit mentioning other essential elements of the claim, such as whether cardholders fulfilled their own contractual obligations. *See Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010). Cardholders who lent their cards and disclosed their secret PINs to their friends breached those contractual obligations and cannot recover. *See* DX 22.

**4. Unfair Competition Law.** Plaintiffs seek to certify their UCL claims on the ground that BANA's policies were "unfair" under the statute's "balancing," "immoral," or "tethering" tests. Mot. at 36. The effort once again breaks down given the putative class definitions' inability to distinguish between legitimate cardholders and criminal fraudsters, who obviously cannot be held to be treated "unfairly" from losing access to the money they were trying to steal. There is also no "unfairness" towards legitimate cardholders who were simply mistaken, whose dispute notices were untimely or insufficient, or who reported transactions made by someone whom they let access to their cards. Separately, Plaintiffs' own statements of the purportedly common issues these tests involve do not describe issues capable of resolution with common evidence. Balancing the "gravity of the harm to the alleged victim" against "'the utility' of Bank policies" (Mot. at 36) involves *two* individual inquiries: Individual harms are obviously "unlikely to be susceptible to common resolution," and "determining utility will likely require individualized determinations tailored to the particular circumstances of each class member's transaction." *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 476 (N.D. Cal. 2014); *see also infra* Part II.B.

**5. Punitive damages.** Lastly, Plaintiffs argue that their entitlement to punitive damages is a common issue because it depends on abstract moral questions, "not class members' individual circumstances." Mot. at 41. That is false on multiple levels. Plaintiffs expressly put cardholders' "individual circumstances" at issue, claiming punitive damages turn on how "vulnerable" they are. *Id.* Separately, punitive damages must of course be tethered to putative class members' actual damages (or

1    lack thereof), so BANA is "entitled to individualized determinations of each [putative

2    class member]'s eligibility." *Abikar v. Bristol Bay Native Corp.*, 2018 WL 6593747,

3    at *9 (S.D. Cal. Dec. 14, 2018) (Curiel, J.). Plaintiffs' own authority recognizes this.

4    *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 544 (N.D. Cal. 2012) (defend-

5    ant would have "the opportunity to present . . . individualized defenses which could

6    defeat any individual class member's claim to punitive damages").

7    **II. Individual issues will predominate.**

8         "[E]ven if plaintiffs demonstrate that there are common questions of law or

9    fact . . . , this does not perforce establish that these questions predominate over indi-

10   vidualized questions." *White*, 104 F.4th at 1193–94. While "[t]he commonality and

11   predominance inquiries overlap," the latter imposes the higher bar and requires Plain-

12   tiffs to show that "common, aggregation-enabling, issues in the case are more prev-

13   alent or important than the non-common, aggregation-defeating, individual issues."

14   *Id*. at 1191–92 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

15       **A. The issues turning on individual cardholders are predominating ones.**

16        As already shown, evidence on individual accounts is capable of proving that

17   transactions putative class members reported as unauthorized were in fact authorized.

18   Some of these were likely honest mistakes on the cardholders' part. Others were

19   surely a part of the massive fraud against the EDD program. These criminals de-

20   frauded the government with false claims for benefits, defrauded BANA with false

21   transaction disputes, or both. Certifying a class in this case would extend an untold

22   number of these thefts and mistaken windfalls from a double-dip to a quadruple dip:

23   whether by mistake or brazen fraud, these individuals have already collected benefits

24   for which they were ineligible and/or account credits for which they were ineligible,

25   and would stand to receive a class-action check for which they are *also* ineligible.

26        *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), establishes that "[e]very

27   class member must have Article III standing"—*i.e.*, a "concrete injury in fact"—"in

28   order to recover individual damages." *Id*. at 2208-09. This Circuit, like most, once

enforced this requirement with a bright-line rule that "no class may be certified that contains members lacking Article III standing." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012). After *TransUnion*, the Circuit rule remains that all members of any certified class must have injury sufficient to support standing. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 n.12 (9th Cir. 2022) (*en banc*). To this end, "questions relat[ing] to the injury status of class members" require denying class certification when "individualized inquiries about such matters would predominate over common issues." *Id*. at 668.

Plaintiffs' putative classes include multiple types of cardholders with no injury: (i) criminals who defrauded the EDD with fraudulent benefits claims; (ii) legitimate beneficiaries and criminals alike who defrauded BANA with fraudulent transaction disputes; (iii) legitimate cardholders who disputed their own transactions by honest mistake; and (iv) legitimate cardholders already compensated for their potential injuries (*see infra* Part II.B). "At some point before it may order any form of relief to the putative class members, the court will have to sort out those plaintiffs who were actually injured from those who were not." *Cordoba v. DirecTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019). The process needed to do so here defeats predominance.

The foundational premise of Plaintiffs' class-certification argument is that neither they nor the Court need to worry about sorting out the uninjured, because BANA has already done it under the remediation plan. They contend that BANA "identif[ied] and compensated all wronged cardholders—a process that resulted in the Bank's own records showing that ███% of EDD Cardholders whose claims the Bank denied under its CFF-1 Policies were in fact legitimate cardholder claimants." Mot. at 3. So their proposed method of satisfying predominance is just to exclude "[t]he remaining ███% . . . from the class definitions." *Id*. at 3 n.1. But Plaintiffs' claim about the ███% simply isn't true. ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████████ Nor

could it. Applications and other eligibility information reside with EDD, and *EDD still hasn't managed to sort it all out*—as shown by the fact EDD is still retroactively disqualifying many cardholders each month. Criminal investigations continue, even with the pandemic and prepaid program behind us. *See*, *e.g.*, *U.S. v. Thomas*, No. 23-0062, ECF 1 (N.D. Ohio Feb. 9, 2023) (criminal indictment for defrauding BANA, California, and multiple other states with fraudulent benefits claims). The federal government concedes it has no way to assess whether or not the million or more people who defrauded EDD have or ever will be caught. *See* DX 79.

In these circumstances, and in the context of a regulatory settlement, ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

Plaintiffs cannot, therefore, argue that the remediation plan is a proxy for "legitimate . . . claimants." The sleight of hand confuses (i) what happened under the regulatory settlements, where the Bank agreed to take certain steps for cardholders, and (ii) what entitles a cardholder to win a legal lawsuit in court, after defeating the Bank's defenses. For this lawsuit to proceed, illegitimate claimants still need to be sorted out, and those who remain still need to prove they would have prevailed on their error claim (had the filter not been used) under the law and contract that constrained their legally enforceable rights. Both of these steps will require a detailed process that is fact-intensive and draws on personal eligibility information, security-camera footage, transaction history and location data, other sources of circumstantial evidence like social-media posts, and questioning the cardholders directly to determine if they lied, made mistakes, or authorized others to use their card. Nor can the

consent order plans even be used as a *presumption* of legitimacy. As long as BANA "is entitled to challenge its liability as to every individual class member"—as it indisputably is—then "the [] Court will face the same set of individualized issues as if the Plaintiffs' presumption . . . did not exist." *Herskowitz*, 301 F.R.D. at 472–73.

### B. Plaintiffs have no valid classwide damages methodology.

Rule 23(b)(3) also places the burden on Plaintiffs of proffering a "common methodology" for measuring damages "on a classwide basis." *Comcast*, 569 U.S. at 42. Plaintiffs rely primarily on a report from financial consultant Greg Regan to carry this burden. *See* PX 4. But Regan's methods are legally invalid and untethered to the amounts recoverable on Plaintiffs' underlying claims. He also recycles the same proposed methods repeatedly from one putative class to the next, and proffers them as *cumulative* damages calculations when in fact they double-count the same alleged harms over and over again. *Id.* ¶¶ 8–22.

### 1. Plaintiffs have no valid measure of economic damages.

Regan opines that damages for the Claim Denial, Credit Rescission, and Account Freeze putative can be measured first by "the total dollar value" of each claim BANA denied or rescinded, or "the total dollar value" in the frozen accounts. *Id.* ¶¶ 38–39, 84–85, 98–100. Then he adds "consequential damages," purporting to measure the cost to consumers for the period they lacked access to their funds. *Id.*

"[T]he total dollar value" of each claim at issue is manifestly an invalid measure of damages. As a threshold matter, it fails to distinguish between cardholders entitled to be paid on their claims and those who made fraudulent or otherwise invalid claims BANA correctly denied. *See supra* Part I.A.2. But even were the Court to indulge Plaintiffs' argument that they've accounted for this by relying on ███████████ ███████████████████████, it is *still* an invalid measure of damages. Putative class members were *already paid that dollar value*. Likewise, the Account Freeze putative class is definitionally limited to cardholders whose accounts were *un*-frozen. Paying them the "total dollar value" would therefore pay them the same money twice. It is

hornbook law that compensatory damages are the amount necessary "to return the plaintiff to the position he or she would have occupied had the harm not occurred." *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 872 (9th Cir. 2017). Paying people money they were already paid does not return them to the position they would have been in absent the alleged harm—it gives them a windfall. *See also Park*, 2019 WL 1227062, at *3 ("It is difficult to see how Park has standing to seek an order requiring [the defendant] to refund money it already refunded.").

The same problem infects Regan's consequential-damages analysis. He proposes calculating them with a method "similar" to how ███████████████████ ███████████████████████████. PX 4 ¶ 75. So Plaintiffs are again seeking to collect money that many have already been paid. *See* DX 1 ¶ 83. But those payments were without regard to whether or not cardholders even *had* any consequential damages (*see* Background, *supra*, Part D), and Plaintiffs propose no way "to sort out those plaintiffs who were actually injured from those who were not." *Cordoba*, *supra*.

Instead, Regan proposes to measure the cost of cardholders' being "deprived of the use of their funds . . . over the period the claim was denied" by starting with the assumption that cardholders "most likely" incurred "costs associated with obtaining substitute funds (*e.g.*, interest costs), as well as fees associated with late payments or overdrafts." PX 4 ¶¶ 39, 41, 47. He further assumes that recipients of EDD benefits "tended to earn less than the median wage" and "were less likely to have available savings to bridge the time until re-employment." Regan does not contend that these assumptions are *uniformly* true classwide, nor could he. ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ It even

---
9 ███████████████████████

includes cardholders with *substantial* assets who needed no bridge loans, as *Politico* reported in coverage headlined, "Unemployment assistance to millionaires soared during pandemic." DX 83. That's because most of the funds at issue were PUA funds, which had no means-testing and extended to consultants and business owners.

Because, as Regan concedes (PX 4 ¶¶ 49–51), the putative class necessarily includes consumers with varying credit profiles and financial circumstances, it also includes people who—*if* they sought substitute funds—turned to commensurately varying sources, and incurred commensurately varying costs in doing so. As U.C. Davis economist Victor Stango concludes in response:

> Furthermore, Mr. Regan's methodology does not just obscure variation in "costs associated with obtaining substitute funds" for proposed class members, it also overstates such costs for many proposed class members. It will necessarily overstate costs for consumers who do not borrow at rates as high as those assumed by Mr. Regan. It will overstate costs for proposed class members who cover substitute expenses out of zero-interest funds. It will overstate costs for consumers who cut back on expenses. It will overstate costs for proposed class members who can obtain funds from friends and family. It will overstate costs for consumers who can repay credit card debt before incurring an interest charge. And so on.

DX 1 ¶ 68.

No putative class member could come to this Court in an *individual*, non-class case, refuse to produce any evidence he or she ever sought any credit, and then claim damages based on the "average" or "median" cost of credit, as Regan proposes. Because the class-action device does not "abridge, enlarge or modify any substantive right" (28 U.S.C. § 2072(b)), it follows that Plaintiffs cannot do that when aggregated together as a class, either. *See Tyson Foods, Inc.*, 577 U.S. at 454–55 ("representative or statistical" evidence proper in a class action only if "each class member could have relied on that sample to establish liability if he or she had brought an individual action"). In *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 260 (3d Cir. 2011), plaintiffs sought to represent a putative class claiming chemical exposure with expert testimony about "the average amount of exposure for residents of the village." The Third

Circuit affirmed that "averag[ing] the class members exposures" was "unsuitable as common proof" and not "probative of any individual's claim because any one class member may have an exposure level well above or below the average." *Id*. at 261, 266. Regan's "averages" and "medians" are squarely analogous. Any putative class member might never have accessed credit at all, or have done so at a cost "well above or below the average." *Id*.; *see* DX 1 ¶¶ 55–70.

Similarly individualized are the damages calculations Regan purports to make based on "the time value of money" for the period in which cardholders allegedly lacked access to frozen funds. PX 4 ¶ 100. Here, Regan proposes individual damages calculations based on how long each account was frozen. *Id*. ¶¶ 102–06. But Regan continues to rely on statistics about average interest rates to attach a monetary value to those time periods. This is improper. Harm (if any) from lacking access to funds requires evidence about the actual consumer, not generic averages. *See Park*, 2019 WL 1227062, at *9 ("damages for temporary deprivation of [] money" cannot be calculated "on a classwide basis; determining the amount of interest forgone or the value of lost opportunities would necessarily entail highly individualized fact-finding"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 496 (S.D.N.Y. 2018) ("time-value damages" not subject to "formulaic calculation" because putative class members do not "all share[] the same time-value of money").

### 2. Plaintiffs have no valid classwide measure of "customer service" harm.

Regan proposes to calculate "actual damages" for the Customer Service putative class by multiplying alleged "average excess" times cardholders spent on hold by "the applicable minimum wage—or other reasonable metric—to calculate the total value of class members' lost time." PX 4 ¶ 114. This is defective on multiple levels. As a threshold matter, the Court is not required to ignore the fact that this is a legally invalid and utterly unprecedented damages theory that cannot be the basis for any recovery. *See*, *e.g.*, *Kleef v. Goodman Mfg. Co., L.P.*, 2015 WL 4512200, at *3 (E.D. Ark. July 24, 2015) (rejecting plaintiff's "contention that he should be

compensated for the time lost in coordinating and waiting for repairs" because otherwise "consumers could bring a lawsuit every time they were on hold with a company's customer service line while they waited to resolve a problem"); *In re Hannaford Bros. Co. Cust. Data Sec. Breach Litig.*, 4 A.3d 492, ¶¶ 1, 11 (Me. 2010) ("time and effort to identify and remediate fraudulent charges on their credit and debit card accounts" is not a compensable harm). Even setting that aside, though, it is not a figure Plaintiffs can establish with common evidence.

First, it relies on more impermissible averaging in lieu of the requisite individual evidence, because Plaintiffs have no data on the amount of time any individual spent on hold. Second, Plaintiffs have no valid basis for labeling even this average as excessive. Their purported expert opines that a reasonable hold time is a mere minute and twenty five seconds. *See* PX 3 ¶ 46. He derives this from a 2020 survey of call centers across myriad different industries. *See id.* ¶ 64. Importantly, financial services accounted for only 14% of the call centers included, with the rest including retail, manufacturing, and—significantly—the *travel* industry. As industry expert Steve Hindle points out in response, "what is considered a good call and reasonable [Speed to Answer] depends on the industry," "especially in 2020 after outbreak of the global pandemic," and the same factors that led to a spike in call volume to BANA led to a precipitous *decline* in call volume to the travel industry as people stopped traveling. DX 5 ¶ 23. Assessing the reasonability of BANA's handling of a historically high call volume against baselines derived from historically *low* call volumes is not valid.

That baseline is not the only essential factor in the equation that is either groundless or undefined. Regan says the "average excess" time will be multiplied by the "applicable minimum wage—or other reasonable metric." PX 4 ¶ 114. So maybe it will be the minimum wage, maybe something else. Regan leaves it unstated. In neither case does Regan offer any basis for concluding that it represents the *actual* value of "lost time" to any individual. Of course, it does not. *See* DX 1 ¶¶ 97–105.

More fundamentally, there is a fatal disconnect between the damages

methodology and Plaintiffs' theory of liability. Regan proposes to measure damages based on hold times just because Plaintiffs happen to have data on hold times. But the alleged customer-service grievances aren't based simply on hold times; they allege failures to "address . . . concerns about fraudulent or unauthorized transactions" (ECF 304 ¶ 586) and related grievances. "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to th[e] plaintiffs'] theory" of liability. *Comcast*, 569 U.S. at 35. Regan's model does not.

### 3. Plaintiffs have no valid classwide measure of "EMV chip" harm.

Finally, Regan's purported measure of "actual damages" for the EMV Chip putative class recycles his claimed "actual damages" for the putative Claim Denial and Credit Rescission classes. Regan simply assumes EMV chips "would have prevented" every "unauthorized ATM withdrawal[]" that was "the subject of Claim Denial and Credit Rescission class members' claims," and says the "actual damages" are the full amount *not only* of the unauthorized ATM withdrawals but of every other transaction the cardholder disputed at the same time, including "point-of-sale transaction[s]." PX 4 ¶¶ 118–20. Both the premise (that EMV chips would have prevented every such transaction) and the conclusion (that the actual damages are the full amount of every disputed claim) are false, which makes the damages methodology incapable of carrying Plaintiffs' burden. We have already seen a variety of reasons why EMV chips would not have prevented every transaction at issue. *See supra* Part I.B.2. Since Plaintiffs cannot prove these transactions were all caused by cards' lacking chips, it follows they cannot base their damages on those transactions. Regan's conclusion that the damages for lacking the chips equal the full amount of every disputed claim is also unsustainable to the extent class members *have already been paid back* on those claims, and so lack the alleged damages altogether.

## III.  The "best" Plaintiffs cannot be typical or adequate class representatives.

Rule 23 requires the class representatives' claims to be "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). This requirement "tend[s] to

merge" with commonality because "the considerations underlying the two require-ments overlap considerably." *A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 839 (9th Cir. 2022) (quoting *Falcon*, 457 U.S. at 157 n.13). It also "tend[s] to significantly overlap" with Rule 23(a)(4) adequacy and become "a single inquiry." *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 133 (N.D. Cal. 2021).

This MDL has included hundreds of Plaintiffs, and dozens proposed as class representatives at one point or another. We have already seen Plaintiffs and putative class members subject to defenses they do not share with the nine surviving Plaintiffs now anointed as proposed class representatives. *See supra* Background, F. This was by design—in trying to reduce the class representatives to those with the "best" facts, Plaintiffs were obviously not going to proffer anyone who was likely defrauding BANA and the State or otherwise had an unattractive set of facts. But their putative *class* still contains many people whose factual record is far from the "best," and better resembles those whose claims were dismissed, withdrawn, or pushed aside by the lawyers. "The test of typicality is whether other members have the same or similar injury," *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992), and class representatives cherry-picked as the best examples of their alleged injuries obviously can't be typical of putative class members with *no* injury. *See, e.g.*, *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 88 (S.D.N.Y. 2017) ("[C]lass certification is inappropriate not only where Proposed Class Representatives are subject to unique defenses, . . . but also proposed class members.").

The *Digital Music* case is closely analogous to what Plaintiffs are pressing here. The plaintiffs there sought to certify a class of digital music purchasers who allegedly overpaid for downloaded songs, but the proposed class was tainted by "large numbers of [] proposed class members [who] engaged in illegal downloading" and were therefore subject to an unclean-hands defense. *See id.* After the plaintiffs "dedicated years of th[e] litigation to adding and withdrawing Proposed Class Rep-resentatives in order to find individuals who can both provide proof of music

download purchases during the class period and did not engage in illegal download-ing," the Court ruled that the class representatives "failed to satisfy the typicality requirement" because "the focus of the litigation" would be on the defenses *not* applicable to the "cherry-picked" class-representatives. *Id*. at 87–89. So too here.

This cherry-picking is not Plaintiffs' only typicality problem. The selected few putative class representatives also suffer from being "subject to unique defenses." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). The flaws in Plaintiffs' damages methodology addressed *supra* Part III.B are not merely hypothet-ical but actual defenses to putative class representatives' individual claims. For ex-ample, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████ More broadly, Plaintiffs seek to recover damages based on the cost of having to borrow substitute funds to cover expenses while waiting for account credits—but seven of the nine class representatives (███████████████) incurred no such costs. They will, presumably, go before the Court relying on Regan's report to say they get dam-ages based on the average cost of credit, and BANA will respond that their actual cost-of-credit damages are zero, not a statistical average. "[A]bsent class members will suffer" if their wagons are hitched to class representatives who "would not be entitled to damages." *Williams v. Warner Music Grp.*, 858 F.3d 385, 385–86 (9th Cir. 2021).

## IV. A class action is not superior to a comprehensive regulatory remediation.

The requirement that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy" is seldom decisive all by itself. FED. R. CIV. P. 23(b)(3). This case presents an unusual exception. *Everybody* Plain-tiffs seek to represent has already been fully compensated (and in many cases, more than fully compensated) or slated for it. That is fatal. *See, e.g.*, *Webb v. Carter's Inc.*, 272 F.R.D. 489, 504–05 (C.D. Cal. 2011) ("a class action is not superior because [defendant] is already offering the very relief that Plaintiffs seek," "without requiring

any documentation"); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 622 (W.D. Wash. 2003) ("It makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress.").

By Plaintiffs' own admission, the point of litigating their claims by class action is to get the treble damages "the CFPB is not statutorily authorized to obtain." Mot. at 15. This is not a legitimate basis for certifying a class. The Ninth Circuit in *Kamm* set forth a variety of factors bearing on whether class-action litigation is superior to "administrative methods" of settling the dispute, and a key factor is whether "[s]ignificant relief had [already] been realized" in a regulatory matter. 509 F.2d at 211–12*; accord, e.g.*, *Conde v. Sensa*, 2018 WL 4297056, at *15–16 (S.D. Cal. Sept. 10, 2018) (using "*Kamm* factors" to determine that superiority was lacking in light of prior FTC settlement that already provided "significant relief"). Seeking a follow-on class action just to exploit a treble-damages provision is not even a close case under *Kamm*. The test is whether relief already realized is "significant," not whether Plaintiffs have scrounged up every last penny. Accordingly, *Conde* found superiority lacking notwithstanding the plaintiff's protestations that "the FTC settlement did not provide as much money as Plaintiff and the class members seek." *Id.*

*Kamm* also requires inquiries into whether the "class action would require substantial expenditure of judicial time which would largely duplicate and possibly to some extent negate the work" already done in the regulatory matter and whether a class action "would prove costly to defendants and duplicate in part the work extended over a considerable period of time in the [regulatory] action." 509 F.2d at 212. Insofar as Plaintiffs seek to retread the same ground here, a class trial would be fatally duplicative. Insofar as the individualized issues threaten to produce different outcomes (as, of course, they do), it is fatally "costly" and threatens not just to duplicate but to "negate" the work done in the regulatory matter. *Id.*

## CONCLUSION

Plaintiffs do not satisfy Rule 23, and their motion should be denied.

Dated: October 24, 2024    Respectfully submitted,

By: *s/ James W. McGarry*

JAMES W. MCGARRY (*pro hac vice*)
*JMcGarry@goodwinlaw.com*
**GOODWIN PROCTER** LLP
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000
Fax: +1 617 523 1231

THOMAS M. HEFFERON (*pro hac vice*)
*THefferon@goodwinlaw.com*
SABRINA M. ROSE-SMITH (*pro hac vice*)
*SRoseSmith@goodwinlaw.com*
MATTHEW L. RIFFEE (*pro hac vice*)
*MRiffee@goodwinlaw.com*
**GOODWIN PROCTER** LLP
1900 N St. NW
Washington, DC 20036
Tel: +1 202 346 4000
Fax: +1 202 346 4444

LAURA G. BRYS (SBN 242100)
*LBrys@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 S Figueroa St., Suite 4100
Los Angeles, CA 90017
Tel.: +1 213 426 2500
Fax: +1 617 346 4444

YVONNE W. CHAN (*pro hac vice*)
*YChan@jonesday.com*
**JONES DAY**
100 High Street
Boston, MA 02110
Tel.: +1 617 960 3939
Fax: +1 617 449 6999

JANICE P. BROWN (SBN 114433)
*jbrown@myersnave.com*
MATTHEW B. NAZARETH (SBN 278405)
*mnazareth@myersnave.com*
**MEYERS NAVE**
600 B Street, Suite 1650
San Diego, CA 92101

Attorneys for Defendant
**BANK OF AMERICA, N.A.**

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the clerk of the court for the United States District Court for the Southern District of California by using the CM/ECF system on October 24, 2024. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I certify under penalty of perjury that the foregoing is true and correct.

Executed:    October 24, 2024        *s/ James W. McGarry*