# EXHIBIT 1

# FILED
# PROVISIONALLY
# UNDER SEAL WITH
# REDACTIONS
# PURSUANT TO
# STIPULATED
# PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SAN DIEGO DIVISION

| | |
|---|---|
| IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION | Case No. 3:21-MD-02992-GPC-MSB |

## EXPERT REPORT OF VICTOR STANGO
### October 24, 2024

FILED PROVISIONALLY UNDER SEAL

PURSUANT TO STIPULATED PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Table of Contents

I.      Qualifications ................................................................................................ 1

II.     Assignment ................................................................................................... 2

III.    Summary of Opinions .................................................................................. 2

IV.     Background ................................................................................................... 4

        A.      Fraud and the Claims Fraud Filter ................................................... 4

        B.      The Remediation Plan and Associated Repayments............................ 5

        C.      Plaintiff's Allegations and Proposed Classes ................................... 6

V.      Summary of Mr. Regan's Opinions and Damages Methodologies ................... 7

VI.     Mr. Regan's Proposed Claim Denial Class Damages Methodology Does Not Distinguish
        Harmed from Unharmed Consumers, Ignores Important Consumer Heterogeneity That
        Would Require Individual Inquiry, Overstates Damages for Many Consumers, and Does
        Not Reliably Estimate Profits ................................................................... 11

        A.      The Proposed Claim Denial Class Methodology Does Not Distinguish Consumers
                Harmed as a Result of the Bank's Alleged Misconduct From Consumers Unharmed as a
                Result of the Bank's Alleged Misconduct ....................................... 11

        B.      Mr. Regan's Methodology for Calculating Alleged "Actual Damages" Overstates
                Damages by Failing to Account for Funds Paid and to Be Paid to Proposed Class
                Members ................................................................................. 13

                1.      BANA Has Already Paid 100% of Mr. Regan's "Principal Amount of
                        Actual Damages" ............................................................. 13

                2.      Mr. Regan's Methodology Overstates "Consequential Damages" Because
                        It Fails to Account for Funds Paid or To Be Paid to Proposed Class Members
                        According to the Remediation Plan ...................................... 14

        C.      Mr. Regan's "Consequential Damages" Methodology Ignores Important
                Consumer Heterogeneity, Overstates Harm for Many Consumers and Cannot Measure
                Consumer Economic Harm on a Class-Wide Basis........................... 15

                1.      The Economic Circumstances of Consumers in the Proposed Class, and
                        Any Potential Economic Impact of Claim Denials Would be Highly
                        Individualized ............................................................... 17

                2.      Proposed Class Members' "Costs Associated with Obtaining Substitute
                        Funds" Would be Highly Individualized and are Overstated for Many Consumers
                        Under Mr. Regan's Methodology ........................................ 23

                3.      Proposed Class Members' Credit Card Late Fees Associated with Claim
                        Denial, if Any, Would Be Highly Individualized and Overstated for Many
                        Consumers Under Mr. Regan's Methodology ....................... 30

D.    Because Mr. Regan's Methodology Overstates "Actual Damages," It Necessarily Overstates "Treble Damages" ................................................................... 34

E.    The Claim Denial Damages Methodology Does Not Calculate "Profits" Associated with Claim Denials on a Class-Wide Basis .................................... 34

VII.    Mr. Regan's Proposed Credit Rescission Class Methodology Does Not Distinguish Harmed From Unharmed Consumers, Ignores Important Consumer Heterogeneity That Would Require Individual Inquiry, Overstates Damages for Many Consumers, and Does Not Reliably Estimate Profits ............................................................ 35

A.    The Proposed Credit Rescission Class Damages Methodology Does Not Distinguish Consumers Harmed as a Result of the Bank's Alleged Misconduct From Consumers Unharmed as a Result of the Bank's Alleged Misconduct .......................... 35

B.    Mr. Regan's Methodology for Calculating Alleged "Actual Damages" Overstates Damages by Failing to Account for Funds Paid and to Be Paid to Proposed Class Members .................................................................................................. 36

C.    Mr. Regan's "Consequential Damages" Methodology Ignores Important Consumer Heterogeneity, Overstates Harm for Many Consumers and Cannot Measure Consumer Economic Harm on a Class-Wide Basis .......................................... 37

D.    Because Mr. Regan's Methodology Overstates "Actual Damages," It Necessarily Overstates "Treble Damages" ................................................................... 37

E.    Mr. Regan's Methodology Does Not Calculate "Profits" Associated with Credit Rescissions on a Class-Wide Basis ........................................................... 38

VIII.    Mr. Regan's Damages Methodology for the Proposed Account Freeze Class Ignores Important Consumer Heterogeneity That Would Require Individual Inquiry, Overstates Damages for Many Consumers, and Does Not Reliably Estimate Profits ...................... 38

A.    Mr. Regan's Methodology for Calculating Alleged "Actual Damages" Overstates Damages by Failing to Account for Funds Paid and to Be Paid to Proposed Class Members .................................................................................................. 38

B.    Mr. Regan's "Consequential Damages" Methodology Ignores Important Consumer Heterogeneity, Overstates Harm for Many Consumers and Cannot Measure Consumer Economic Harm on a Class-Wide Basis .......................................... 39

C.    Mr. Regan's Methodology Does Not Calculate "Profits" Associated with Account Freezes on a Class-Wide Basis ........................................................................ 41

IX.    Mr. Regan's Damages Methodology for the Proposed Customer Service Class Ignores Important Consumer Heterogeneity and Fails to Propose a Damages Methodology that Reliably Measures Economic Harm on a Class-Wide Basis ........................................... 41

X.    Mr. Regan's Proposed EMV Chip Class Damages Methodology Does Not Distinguish Harmed from Unharmed Consumers, Ignores Important Consumer Heterogeneity That Would Require Individual Inquiry, Overstates Damages for Many Consumers, and Does Not Reliably Estimate Profits ................................................................................. 45

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

XI.    Mr. Regan's Damages Methodology for the Members of the Proposed Credit Rescission, Claim Denial, Account Freeze and EMV Chip Classes Assesses Damages Multiple Times to the same Consumers ................................................................................................ 46

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.      Qualifications

1.      I am a Professor of Management at the University of California, Davis. I am also a Visiting Scholar at the Federal Reserve Bank of Philadelphia Consumer Finance Institute. Since receiving my Ph.D. in Economics from the University of California, Davis, in 1996, I have taught at the Tuck School of Business at Dartmouth College, the Graduate School of Business at the University of Chicago, the Haas School of Business at the University of California, Berkeley, and the University of Tennessee. I have also been an Economist and Senior Economist at the Federal Reserve Bank of Chicago, and a Visiting Senior Economist at the Federal Reserve Bank of New York.

2.      My research focus and area of expertise is consumer behavior in financial services markets. I have published more than 20 articles in leading academic finance and economics journals, including the *American Economic Review*, the *Journal of Finance*, and the *Review of Financial Studies*. My articles have covered topics such as consumer deposit account and credit card usage, consumers' costs of credit card borrowing, the incidence of credit card and deposit account fees, and topics related to consumer saving and borrowing behavior.

3.      I have received grants from the National Science Foundation, Russell Sage Foundation, Networks, Electronic Commerce, and Telecommunications ("NET") Institute, Filene Institute, and the FDIC in support of my research. I have presented my research at the Consumer Financial Protection Bureau (CFPB), the National Bureau of Economic Research, the American Economic Association, and other venues.

4.      **Appendix A** contains my curriculum vitae. A list of materials I relied upon in forming my opinion in the current matter is included as **Appendix B**. A list of my prior testimony for the past four years is included as **Appendix C.**

5.      I am being compensated at $1,200 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected billings for work its employees perform supporting me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion, the results of my analysis, or the outcome of this or any other matter.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## II.    Assignment

6.      I have been retained in this matter by Goodwin Procter LLP, counsel for Bank of America, N.A. ("BANA"). I have been asked to review and respond to certain opinions expressed by Greg J. Regan in his Report submitted on August 29, 2024 (the "Regan Report") and to opine on whether Mr. Regan's proposed "methodologies to calculate classwide damages available to each of the five Classes" can be reliably applied on a class-wide basis.[1] Specifically, I have been asked to assess whether Mr. Regan's damages methodologies can distinguish individuals who have been harmed from individuals who were unharmed by BANA's alleged misconduct, and whether those same damages methodologies can measure class-wide economic harm to proposed class members as a result of BANA's alleged misconduct. I have also been asked to assess whether Mr. Regan's methodologies for calculating disgorgement can be applied on a class-wide basis for the proposed Claim Denial, Credit Rescission, and Account Freeze classes.

7.      This report does not respond to all of the opinions in the Regan Report or any opinions in other plaintiff expert reports. It only responds to those specific opinions or assumptions that counsel has asked me to respond to for purposes of opposing Plaintiffs' Motion for Class Certification.  I reserve the right to respond to additional opinions or assumptions in the Regan Report or other plaintiff expert reports if asked to do so by counsel in the future.

## III.    Summary of Opinions

8.      Mr. Regan proposes damages methodologies for each of five proposed classes. I discuss each of the proposed classes in detail below. Before doing so, I offer a summary of the principal methodological flaws in the Regan Report.

9.      To start, Mr. Regan's methodology to identify members of the proposed Claim Denial, Credit Rescission, and EMV Chip classes does not explain how to ████████████████████ ████████████████████████████████ For the proposed Claim Denial and

---

[1] Expert Class Certification Report of Greg J. Regan, CPA/CFF, CFE, August 29, 2024, Backup Materials, and Materials listed in Appendix B (PX 4, "Regan Report"), ¶ 5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EMV Chip classes, Mr. Regan further fails to demonstrate that all claims denied by the Bank based solely on Indicator 1 would have been paid absent the use of Indicator 1. See Sections VI.A, VII.A, and X.

10.    Second, Mr. Regan's estimated "[a]ctual damages" for the proposed Claim Denial, Credit Rescission, Account Freeze, and EMV Chip classes overstate damages by failing to account for funds that BANA has already paid to proposed class members, and Mr. Regan fails to investigate whether any proposed class member remains harmed after receiving those payments from BANA. See Sections VI.B, VII.B, VIII.A, and X.

11.    Third, Mr. Regan's proposed "consequential damages" methodologies for the proposed Claim Denial, Credit Rescission, Account Freeze, and EMV Chip classes are flawed approaches to estimating economic harm on a class-wide basis. Both Mr. Regan's Methodology 1 and Methodology 2 erroneously assume average class-wide "inputs" that are not derived from class data, may be non-representative of proposed class members' economic circumstances, and fail to capture the highly individualized nature of the proposed class members' actual input values. Because Mr. Regan's broad-brush assumptions obscure important heterogeneity in alleged damages across proposed class members and overstate harm for many proposed class members, his proposed methodology cannot identify economic harm class-wide. See Sections VI.C, VII.C, VIII.B, and X.

12.    Fourth, Mr. Regan's proposed "actual damages" methodology for the proposed Customer Service class assumes that one could value proposed Customer Service class members' time using a "minimum wage" or "other reasonable metric" applied identically to all proposed class members. Such an assumption does not constitute a reliable class-wide method for measuring economic harm, as the value of alleged "lost time" would vary among individuals in the proposed class, and an individualized inquiry would be required to measure any alleged harm. See Section IX.

13.    Fifth, Mr. Regan's proposed "incremental Float Revenue" calculations for the proposed Claim Denial, Credit Rescission and Account Freeze classes erroneously assume that consumers would have withdrawn the full claim amount or frozen account balance immediately after the claim denial, credit rescission, or account freeze had the denial, rescission, or freeze not occurred. In my opinion, it would require individual inquiry to determine what the account

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

balance of each proposed class member would have been absent BANA's use of Indicator 1 of the Claims Fraud Filter. Therefore, Mr. Regan's methodology cannot be applied on a class-wide basis. See Sections VI.E, VII.E, VIII.C, and X.

14.    Finally, Mr. Regan's damages methodologies assess damages multiple times for some cardholders who are members of the proposed Claim Denial, Credit Rescission, and Account Freeze classes and for all members of the proposed EMV Chip class. By double-counting "actual damages" between the proposed Claim Denial, Credit Rescission, and EMV Chip classes and also repeatedly assessing late fees for concurrent claims in multiple proposed classes and for concurrent claims in the same proposed class, Mr. Regan overstates damages to proposed class members. See Section XI.

15.    While I do not opine on the legal question of whether any damages in this matter should be trebled, the flaws in Mr. Regan's damages methodologies carry through to his estimated treble damages for the proposed Claim Denial and Credit Rescission classes. Mr. Regan estimates "[t]reble damages … by simply multiplying each class member's actual damages by three," so Mr. Regan's errors in estimating "actual damages" for many proposed class members imply similarly proportional errors in his estimated treble damages.[2] See Sections VI.D and VII.D.

## IV.    Background

### A.    Fraud and the Claims Fraud Filter

16.    BANA launched the Claims Fraud Filter ("CFF") on September 28, 2020 █████████
████████████████████████████████ ██████████████████████████████
██████████████████████████████
██████████████████████████████████████████
██████████████████████████████

---

[2] Regan Report, ¶¶ 9, 13, 76, 90.

[3] Bank of America's Responses and Objections to Plaintiff Yick's Fourth Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 2, 2024, with Exhibits (PX 49, "Bank of America's Responses and Objections to Plaintiff Yick's Fourth Set of Interrogatories"), p. 8:2–3.

[4] Bank of America's Responses and Objections to Plaintiff Yick's Fourth Set of Interrogatories, p. 8:2–9.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

████████████████████████████████████████████████████████████[5]

As of June 9, 2021, BANA discontinued using the CFF to close error claims.[6]

### B.    The Remediation Plan and Associated Repayments

17.    In October 2022, BANA submitted a Remediation Plan to the Consumer Financial Production Bureau and Office of the Comptroller of the Currency ████████████████████ ████████████████████████████████████████████ ███████████████████████████████ Under the Remediation Plan, BANA committed to provide ███████████████████████████████████████████████

18.    BANA noted that the ████████████████████████████████████ ████████████████████████and that the Remediation Plan was intended to ████████████████ ████████████ BANA clarified that ██████████████████████████████████ ██████████████████████████████as it was ███████████████████ ████████████████████████████████ Jennifer Lennon, a BANA Senior Vice President and Product Management and State Liaison, described the implementation of the Remediation Plan as being ███████████████████████████████████

19.    According to the Remediation Plan, ██████████████████████████████ ██████████████[12] Nevertheless, the plan ████████████████████████████████

---

[5] Bank of America's Responses and Objections to Plaintiff Yick's Fourth Set of Interrogatories, p. 8:14–15. This criterion was amended on June 14, 2021. Bank of America's Responses and Objections to Plaintiff Yick's Fourth Set of Interrogatories, p. 9:9–11.

[6] Bank of America's Responses and Objections to Plaintiff Yick's Fourth Set of Interrogatories, p. 8:6–9.

[7] Bank of America, "Unemployment Insurance Prepaid Card Program Remediation Plan," Submitted October 6, 2022 to the Office of the Comptroller of the Currency and October 12, 2022 to the Consumer Financial Protection Bureau, BANA_EDD_MDL-00102554–577 (PX 74, "Remediation Plan"), p. 1.

[8] Remediation Plan, p. 2.

[9] Remediation Plan, fn 16, p. 15.

[10] Remediation Plan, p. 12.

[11] Declaration of Jennifer Lennon in Support of Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, *In Re: Bank of America California Unemployment Benefits Litigation*, October 23, 2024, Appendix of Exhibits to the Declaration of Laura Brys in Support of Defendant's Opposition to Plaintiffs' Motion for Class Certification, *In Re: Bank of America California Unemployment Benefits Litigation*, October 24, 2024, Ex. ("DX") 8 ("Lennon Declaration"), ¶¶ 1, 11.

[12] Remediation Plan, p. 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



███████████████ and ████████████████████████████
███████████████████ [13]

20.    In the Remediation Plan, ███████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████ [14] The Remediation Plan also ███████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████
█████████ I understand that ██████████████████████████████
███████████████████████████████████████████.

C.    **Plaintiff's Allegations and Proposed Classes**

21.    Plaintiffs allege that there were "a series of unlawful policies and practices that
Defendant Bank of America, N.A. (the 'Bank') implemented at the height of the Covid pandemic
in 2020-2021" related to Indicator 1 of the CFF.[16] According to Plaintiffs, "[t]hose policies and
practices deprived more than ██████Californians of access to critical unemployment insurance
('UI') and other public benefits for which they had been approved by California's Employment
Development Department ('EDD'), and which the Bank had been entrusted to distribute through
Bank-issued prepaid debit cards."[17]

22.    Plaintiffs "seek to represent five related classes":[18]

    a.    Claim Denial Class: This class consists of "[a]ll Bank of America EDD
          cardholders who notified the Bank that an unauthorized transaction had occurred
          on their Bank of America EDD debit card account ('Claim') at an automated
          teller machine ('ATM'), and whose Claim the Bank denied or closed at any time

---

[13] ████████████, p. 6.

[14] ████████████, p. 2.

[15] ████████████ p. 2.

[16] Memorandum of Points and Authorities in Support of Motion for Class Certification, *In Re Bank of America California Unemployment Benefits Litigation*, August 29, 2024 ("Motion for Class Certification"), p. 1:3–5. *See also* Motion for Class Certification, p. 2:8–14.

[17] Motion for Class Certification, p. 1:6–10.

[18] Motion for Class Certification, p. 3:27.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's CFF."[19]

    b.    Credit Rescission Class: This class consists of "[a]ll Bank of America EDD cardholders who received permanent credit from the Bank in connection with their Claim, which credit the Bank rescinded at any time from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's CFF."[20]

    c.    Account Freeze Class: This class consists of "[a]ll Bank of America EDD cardholders whose EDD debit card account ("Account") the Bank froze at any time from September 28, 2020 through March 18, 2021, based solely on Indicator 1 of the Bank's CFF, and whose Account the Bank (i) subsequently unfroze, or (ii) subsequently converted from frozen to blocked status on or after March 18, 2021, and then unblocked."[21]

    d.    Customer Service Class: This class consists of "[a]ll members of the Claim Denial Class and/or the Credit Rescission Class who telephoned the Bank's customer service phone number for Bank of America EDD cardholders at any time between September 13, 2020 and November 21, 2020, inclusive, and whose telephone call was routed to the Bank's Claims Call Center."[22]

    e.    EMV Chip Class: This class consists of "[a]ll members of the Claim Denial Class and/or the Credit Rescission Class whose EDD debit card did not include an EMV chip prior to June 9, 2021."[23]

## V.    Summary of Mr. Regan's Opinions and Damages Methodologies

23.    Mr. Regan was assigned to "evaluate appropriate methodologies to measure the impact on each Class of the Bank's policies and practices, as alleged by Plaintiffs."[24] In particular, Mr.

---

[19] Regan Report, ¶¶ 4, 31. *See also* Motion for Class Certification, pp. 9:25–10:3.

[20] Regan Report, ¶¶ 4, 81. *See also* Motion for Class Certification, p. 10:6–18.

[21] Regan Report, ¶¶ 4, 93. *See also* Motion for Class Certification, pp. 10:21–11:20.

[22] Regan Report, ¶¶ 4, 110. *See also* Motion for Class Certification, p. 12:2–26.

[23] Regan Report, ¶¶ 4, 119.

[24] Regan Report, ¶ 5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Regan was retained to "provide methodologies to calculate classwide damages available to each of the… five Classes" described above in Section IV. Mr. Regan proposes damages methodologies to measure a combination of (1) "actual damages," (2) statutory damages, (3) treble damages, and (4) disgorgement. Mr. Regan opines that these damage categories can be calculated on a class-wide basis.[25]

24.     For the proposed Claim Denial, Credit Rescission, Account Freeze, and EMV Chip classes, Mr. Regan defines "actual damages" as being comprised of "the principal amount of damages" and "consequential damages."[26]

25.     Mr. Regan estimates "the principal amount of damages" for the proposed Claim Denial, Credit Rescission and Account Freeze classes as the total dollar amounts of denied claims, rescinded credit, and frozen balances respectively, thereby classifying as damages funds that were later repaid or released to proposed class members.[27] For the proposed EMV Chip class, Mr. Regan estimates principal damages as the sum of denied claims and rescinded credit in the proposed Claim Denial and Credit Rescission classes.[28]

26.     Mr. Regan also proposes methodologies to estimate alleged "consequential damages" for the proposed Claim Denial, Credit Rescission, Account Freeze, and EMV Chip classes. The methodologies are similar for all four proposed classes. Mr. Regan opines that "financial harm after a denial of the reimbursement of [proposed class members'] stolen funds … was most likely to occur in the form of costs associated with obtaining substitute funds (e.g., interest costs), as well as fees associated with late payments or overdrafts" and proposes two methodologies to estimate that harm.[29]

   a.   The first methodology ("Methodology 1") allegedly "reflects the time value of money for this population of cardholders" by assessing compound interest on the principal amounts of the claims or account balances.[30] Mr. Regan opines that the

---

[25] Regan Report, ¶ 5.

[26] Regan Report, ¶¶ 8, 12, 16, 20.

[27] Regan Report, ¶¶ 37, 83, 98.

[28] Regan Report, ¶ 120.

[29] Regan Report, ¶ 41.

[30] Regan Report, ¶¶ 45, 47, 51. Mr. Regan also describes Methodology 1 as measuring "economic harm" in addition to "financial harm." *See* Regan Report ¶ 46.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

time value of money represents economic harm resulting from "the lost ability to use [proposed class members'] funds."[31] He performs this calculation with two interest rates, each applied identically to every proposed class member: (1) 10%, which he states "is consistent with the interest rate applied to judgements in California,"[32] and (2) 20%, which he opines "illustrate[s] the cost of the time value of money."[33]

b.  The second methodology ("Methodology 2") estimates the cost for proposed class members to "borrow[] substitute funds" on credit cards and is similarly applied identically to all proposed class members without regard to whether they had to borrow funds, whether they would do so on credit cards, and if so, at what interest rate they might borrow.

c.  Methodology 2 goes further than Methodology 1 by also attempting to estimate credit card late fees incurred by proposed class members as a consequence of their claim denial, credit rescission, or account freeze. The method assumes all proposed class members who were allegedly denied access to their funds ███ ████████████████████████████████████████ again without considering whether an individual proposed class member had credit cards, used them, or incurred late fees due to their denial, rescission, or freeze. Methodology 2 then calculates estimated damages based on the amount of time customers' funds were unavailable and an assumed average late fee.[34]

d.  Methodology 2 further attempts to estimate the cost of delayed benefit payments for the proposed Account Freeze class. Mr. Regan performs this calculation by assuming that cardholders whose accounts were frozen for longer than ██████ would have been unable to receive deposits of additional EDD funds into their accounts and would have needed to wait until ██████ after their account was

---

[31] [FN 505] Regan Report, ¶ 46.

[32] Regan Report, ¶ 47.

[33] Regan Report, ¶ 51. Mr. Regan also claims that "[t]his 20% rate is consistent with my prior experience studying unsecured consumer debt such as credit cards, and lower than APRs associated with alternative lending sources frequently accessed by the impacted consumers."

[34] Regan Report, ¶¶ 53–60.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

frozen to receive their next ██ benefit payments, without considering whether any of those cardholders continued to be eligible for benefits at all during that time. Mr. Regan assumes that proposed class members would have needed to "access alternative funds" at a cost of 20% interest, again without considering whether each class member needed to access alternative funds at all.[35] Mr. Regan applies these assumptions identically to all proposed Account Freeze class members.

27.     For the proposed Claim Denial and Credit Rescission classes, Mr. Regan also estimates "treble damages." He claims that "[t]reble damages under EFTA, 15 U.S.C. §1693f(e), can be calculated on a classwide basis by simply multiplying each class member's actual damages by three."[36]

28.     Mr. Regan's methodology to calculate actual damages for the proposed Customer Service class is to provide "compensation for the value of Plaintiffs' and class members' lost time spent on hold with the Bank's Claims call center" that was greater than "the reasonable wait-on-hold time by industry standards."[37] Mr. Regan proposes to calculate this proposed compensation by multiplying an "average excess hold time" by "the applicable minimum wage – or other reasonable metric," without clarifying what "the applicable minimum wage" or the "other reasonable metric" would be, for all proposed Customer Service class members.[38]

29.     Mr. Regan's methodology for disgorgement for the proposed Claim Denial, Credit Rescission, and Account Freeze classes proposes to measure the profits that BANA earned on amounts withheld from proposed class members, estimated as the ███████████████ ███████████████████████████████████.██ For the proposed Customer Service class, Mr. Regan claims that disgorgement of profits equals the avoided costs that were realized by "understaffing [BANA's] Claims call center."[40] For the proposed EMV Chip class, Mr. Regan

---

[35] Regan Report, ¶¶ 105–106.

[36] [FN 500] Regan Report, ¶¶ 9, 13, 76, 90.

[37] Regan Report, ¶ 18.

[38] Regan Report, ¶ 18.

[39] Regan Report, ¶ 79. *See also* Regan Report, ¶¶ 92, 109.

[40] Regan Report, ¶ 115.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

claims that that disgorgement of profits for the proposed EMV Chip class equals the avoided costs that were realized by "not including EMV chips in its EDD debit cards."[41]

30.     Mr. Regan provides methodologies to calculate alleged statutory damages for certain proposed classes. As I note in Section II, I have not been assigned to respond to these opinions.

31.     Mr. Regan asserts that the methodologies he described can be used to measure alleged economic damages on a class-wide basis.

## VI.     Mr. Regan's Proposed Claim Denial Class Damages Methodology Does Not Distinguish Harmed from Unharmed Consumers, Ignores Important Consumer Heterogeneity That Would Require Individual Inquiry, Overstates Damages for Many Consumers, and Does Not Reliably Estimate Profits

### A.     The Proposed Claim Denial Class Methodology Does Not Distinguish Consumers Harmed as a Result of the Bank's Alleged Misconduct From Consumers Unharmed as a Result of the Bank's Alleged Misconduct

32.     Mr. Regan describes the proposed Claim Denial class as consisting of all EDD cardholders who made a fraud claim which BANA closed or denied during the Relevant Period based on its use of Indicator 1 of the fraud filter.[42] He acknowledges that certain individuals ("Excluded Cardholders") are excluded from the proposed class, ███████████████████████ ████████████████  However, Mr. Regan's methodology to identify members of the proposed Claim Denial class does not explain how to ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████

33.     Specifically, according to the Remediation Plan, ████████████████████████ ████████████████████████████████████████████████████████

---

[41] Regan Report, ¶ 122.

[42] Regan Report, ¶ 31. Plaintiffs cite this definition to define the proposed Claim Denial class in their motion for class certification. *See* Motion for Class Certification, p. 9:25–28.

[43] Regan Report, ¶ 31 ("Excluded from the class is any person whom the Bank has determined, pursuant to its Remediation Plan under the CFPB Consent Order, ███████████████████████████████████ ████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████"[44] and BANA's responses to Plaintiff's interrogatories describe

████████████████████████████████████████████.[45] BANA's Remediation Plan

explains that ███████████████████████████████████████████████████████

██████████ and to ███████████████████████████████████.[46] Identifying any

███████████████████████████████████████████ would require individual inquiry. As

of October 14, 2024, BANA has identified ████ EDD cardholders (who have already been

reimbursed for the value of their claims) for further review to ██████████████████████

████████████████████████████████████████████████████████████

███████████"[47]

████████████████████████████████████████████████████████████

████████████████████████████.[48]

34.    Furthermore, Mr. Regan fails to demonstrate that all claims denied by the Bank based

solely on Indicator 1 would have been approved absent the use of Indicator 1, meaning that the

Bank's use of Indicator 1 may not have represented a change in how those claims were treated.

For example, plaintiff Jennifer Meza mistakenly filed a claim on a transaction that she later

recalled making herself, which was denied.[49] If transactions such as Plaintiff Meza's would also

have not been paid under an alternative investigation process, their treatment under Indicator 1

would not represent economic harm as a result of the Bank's alleged misconduct. Identifying

how any denied claim would have been treated under a different investigation process would

require individual inquiry, and Mr. Regan does not address this issue.

35.    By ignoring these factors, Mr. Regan's proposed method for identifying proposed class

members does not clearly distinguish individuals who were harmed by the Bank's alleged

---

[44] Remediation Plan, p. 4.

[45] Bank of America's Second Set of Responses and Objections to Plaintiff Yick's Seventh Set of Interrogatories (Interrogs. 39 & 42), *In Re Bank of America California Unemployment Benefits Litigation*, April 23, 2024, 8:18–10:5.

[46] Remediation Plan, fn 16.

[47] Declaration of William Martin in Support of Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, *In Re: Bank of America California Unemployment Benefits Litigation*, October 2024 (DX 7, "Martin Declaration"), ¶¶ 8, 12.

[48] Martin Declaration, ¶ 12.

[49] Deposition of Jennifer Meza, April 30, 2024, p. 294:20–25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

misconduct from those who were unharmed, rendering it an unreliable method for isolating the harm from the alleged misconduct on a class-wide basis.

> **B.      Mr. Regan's Methodology for Calculating Alleged "Actual Damages" Overstates Damages by Failing to Account for Funds Paid and to Be Paid to Proposed Class Members**

36.      Mr. Regan estimates "[a]ctual damages" for the proposed Claim Denial class as the sum of "[t]he principal amount of damages," and "[c]onsequential damages resulting from loss of access to this principal amount."[50] However, Mr. Regan's damages methodology fails to account for funds that BANA has already paid to proposed class members, and Mr. Regan fails to investigate whether any proposed class member remains harmed after receiving those payments from BANA.

> **1.      BANA Has Already Paid 100% of Mr. Regan's "Principal Amount of Actual Damages"**

37.      Mr. Regan defines the "principal amount of actual damages" for the proposed Claim Denial class as "the amount of the class members' claim that the Bank denied based on Indicator 1 of its Claim Fraud Filter." Those claims total ███████████.[51] While Mr. Regan acknowledges that his estimated damages "may require an offset for amounts that ██████████████████ ███████████████████████████████████████████████" he does not explain that █████████ ████████████████████████████████████████████████████, a fact shown in Mr. Regan's Schedule 1.[52] Mr. Regan's damages methodology, the results of which are shown in his tables in Section II.B.3, is indifferent to that fact. This is economically illogical; because consumers have been fully repaid for the principal amounts of damages, they are no longer economically damaged by those amounts, and the entire ████████████ should be excluded from Mr. Regan's estimation of alleged damages.

---

[50] Regan Report, ¶ 8.

[51] Regan Report, ¶¶ 37–38.

[52] Bank of America's Revised Second Supplemental Responses and Objections to Plaintiff Yick's First Set of Interrogatories (Interrogatories 2-6, 14-15), *In Re Bank of America California Unemployment Benefits Litigation,* December 1, 2023 ("Bank of America's Revised Second Supplemental Responses and Objections to Plaintiff Yick's First Set of Interrogatories"), Revised Exhibit 1 - BANA Response to Interrogs. 2 and 6. *See also* Regan Report, Schedule 1.

**2.      Mr. Regan's Methodology Overstates "Consequential Damages" Because It Fails to Account for** ███████████

38.     In the second part of his "actual damages" methodology, Mr. Regan estimates ██████ ██████ "[c]onsequential damages resulting from loss of access to this principal amount resulting from the Bank's denial of claims based on CFF Indicator 1," as discussed in Section V above.[53, 54]

39.     Mr. Regan acknowledges in a footnote that the "consequential damages" "amounts presented in the table … may require an offset for ██████████████████ ████████████████████."[55] But as with the principal amounts, Mr. Regan includes his "consequential damages" estimates in the tables in Section II.B.3 without showing any offsets or acknowledging that as a matter of economics, ████████ ████████████████████████. Such offsets would entirely wipe away Mr. Regan's estimated "consequential damages" for a significant majority of consumers, ████████████████████████ ██[56] Indeed, ████████████████████████ ████████████████████[57] fully offset Mr. Regan's



---

[53] Regan Report, ¶ 8.

[54] Regan Report, ¶¶ 52, 62. Mr. Regan estimates ██████ million in "consequential damages" under Methodology 1 and $18.5 million in "consequential damages" under Methodology 2.

[55] Regan Report, fn 55 ("The amounts presented in the table below and other tables in this report for the purpose of illustrating damages may require an offset for amounts that the Bank has paid or presently expects to pay pursuant to the Remediation Plan.").

[56] Regan Report, ¶ 8 ("[Methodology 2] resembles ████████████████████████ ██████"). Note that Mr. Regan's Methodology 2 only appears to resemble *See* Remediation Plan, Section 2. ████████ *See* Remediation Plan, Section 5. ████ Therefore, the critiques laid out here related to Methodology 2 also apply to Methodology 1. *See* Regan Report, ¶¶ 52, 62.

[57] Remediation Plan, p. 12.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"consequential damages" for ████ of cardholders.[58] In aggregate, ████████████
████████████████████████████████████

40.    In contrast to the issue with Mr. Regan's "principal amounts," however, ████████
████████████████████████████████████████████████
████████████████ against the estimated "consequential damages"
figures in the Regan methodology. As I explain below, Mr. Regan's estimated "consequential
damages" both obscure individual variation in actual economic harm for proposed Claim Denial
class members and overstate economic harm for many proposed Claim Denial class members.
For such consumers, ████████████████████ would offset economic harm to
varying degrees not captured by the Regan methodology and could *more than* compensate many
proposed class members for any economic harm associated with claim denials. The figures put
forward by Mr. Regan in Section II.B.3 therefore unequivocally overstate economic harm by
████████████████, and they do so in ways that are highly individualized and
not captured anywhere in the Regan methodology.



C.    **Mr. Regan's "Consequential Damages" Methodology Ignores Important
Consumer Heterogeneity, Overstates Harm for Many Consumers and
Cannot Measure Consumer Economic Harm on a Class-Wide Basis**

41.    Mr. Regan opines that consequential harm "was most likely to occur in the form of costs
associated with obtaining substitute funds (e.g., interest costs), as well as fees associated with
late payments or overdrafts" and proposes two methodologies to calculate alleged "consequential
damages."[60] His first methodology applies a compound interest rate of 10% or 20% to the
principal amounts, arguing that such interest rates "reflect[] the time value of money for this

---

[58] *See* Regan Report, Schedule 1; Bank of America's Revised Second Supplemental Responses and Objections to Plaintiff Yick's
First Set of Interrogatories, Revised Exhibit 4 - BANA Response to Interrogs. 14 and 15 (Direct Comp). Of ████ cardholders
identified in the Regan Report Schedule 1, ████████████████

[59] *See* Regan Report, Schedule 1; Bank of America's Revised Second Supplemental Responses and Objections to Plaintiff Yick's
First Set of Interrogatories, Revised Exhibit 4 - BANA Response to Interrogs. 14 and 15 (Direct Comp). The Regan Report
Schedule 1 includes ████████ total in "consequential damages," while Revised Exhibit 4 includes ████████████
████████████████████

[60] Regan Report, ¶¶ 41, 44.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

population of cardholders."[61] In his second methodology, he purports to estimate the cost of the "inability to access impacted funds" and the cost of late fees based on the amount of time customers had their funds unavailable based on alleged average late fee rates.[62]

42.     Both of Mr. Regan's methodologies for estimating "consequential damages" are flawed approaches to estimating economic harm on a class-wide basis. Both Mr. Regan's Methodology 1 and Methodology 2, which estimate damages ranging from ███████████ erroneously assume average values for various class-wide "inputs" that are not derived from class data, may be non-representative of proposed class members' economic circumstances, and fail to capture the highly individualized nature of the proposed class members' actual input values.[63]

43.     As I describe below, proposed class members' individual circumstances would generate diversity in whether or not proposed class members accessed "substitute funds" by borrowing on credit cards due to the Bank's alleged misconduct and would overstate harm for proposed class members who could have accessed substitute funds without borrowing. Further, Mr. Regan's assumed interest rates also obscure heterogeneity in harm and overstate harm for many proposed class members because many consumers could have faced lower interest rates than those assumed in Mr. Regan's methodology. Similarly, whether or not proposed class members incurred credit card late fees due to the Bank's alleged misconduct would vary across consumers, and Mr. Regan's methodology would overstate economic harm for any proposed class members who did not incur late fees due to the Bank's alleged misconduct.

44.     Because Mr. Regan's broad-brush assumptions obscure important heterogeneity in alleged damages across proposed class members and overstate harm for many proposed class members, his proposed methodology cannot identify economic harm class-wide.

---

[61] Regan Report, ¶¶ 45, 47, 51. Mr. Regan justifies the 10% interest rates as "consistent with the interest rate applied to judgments in California." In other words, this is a statutory figure and not derived using any data or information from the proposed class. Mr. Regan justifies the 20% interest rate as "consistent with my prior experience studying unsecured consumer debt such as credit cards." I discuss below why this assumption ignores heterogeneity among proposed class members and overstates damages for many of them.

[62] Regan Report, ¶¶ 54–60.

[63] [FN 506] Regan attempts to justify his use of average values for various inputs by claiming that ███████████ ███████████████████████████ See Regan Report, ¶ 71. However, BANA noted in the Remediation Plan that ████████ as it Plan that ██████ was ██████████████████ See Remediation Plan, p. 12.

Case 3:21-md-02992-GPC-MSB    Document 350-2    Filed 10/24/24    PageID.10903
Page 22 of 63

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1.    **The Economic Circumstances of Consumers in the Proposed Class, and Any Potential Economic Impact of Claim Denials Would be Highly Individualized**

45.    Mr. Regan's assertions regarding proposed class members' likely economic circumstances, which frame his economic assumptions underlying his "consequential damages" methodology, obscure what would be considerable heterogeneity in the class on each dimension he discusses. That heterogeneity would exist in terms of consumer wages, available savings consumers could have accessed during their claim denial, and claim denial amounts relative to those figures.

46.    First, in discussing proposed class members' likely economic circumstances, Mr. Regan opines that "consumers who lost their jobs during the pandemic and received unemployment insurance tended to earn less than the median wage."[64] Mr. Regan does not document that the characteristics of proposed Claim Denial class members would match the characteristics of consumers more broadly who "lost their jobs during the pandemic and received unemployment insurance," in terms of whether they would have "tended to earn less than the median wage."[65]

47.    To the contrary, proposed class members who received EDD benefits in California likely would have come from different places in the wage distribution and included both unemployment and underemployment.[66] For example, proposed class member ███████████ had ███████ payroll deposits of █████ into his EDD account through the end of the class period.[67] By contrast, proposed class member ███████ largely had ████████ payroll deposits of ████ into his EDD account through the end of the class period.[68] Beyond class-specific evidence, people who submitted unemployment claims to the EDD during the class period

---

[64] Regan Report, ¶ 39.

[65] Regan Report, ¶ 39.

[66] Sarah Bohn, Marisol Cuellar Mejia, and Julien Lafortune, "Unemployment Benefits in the COVID-19 Pandemic," *Public Policy Institute of California*, April 9, 2020, https://www.ppic.org/blog/unemployment-benefits-in-the-covid-19-pandemic/. *See also* "Eligibility Requirements," *State of California Employment Development Department,* https://edd.ca.gov/ui_eligibility/, accessed October 21, 2024 ("When applying for unemployment benefits, you must … [b]e totally or partially unemployed.").

[67] BANA_EDD_MDL-00694814; Regan Report, Schedule 1.

[68] BANA_EDD_MDL-00694814; Regan Report, Schedule 1. ████████ had an initial payroll deposit of █████ on █████████, and a payroll deposit of █████ on █████████████. BANA_EDD_MDL-00694814.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

spanned 20 distinct industry sectors, ranging from construction to finance and insurance.[69] Evidence from the Federal Reserve of New York's Consumer Expectations Survey ("SCE") indicates that 42% of respondents who indicated that they were "[n]ot working, but would like to work" or "[t]emporarily laid off" during September 2020–June 2021 were categorized as earning household incomes of greater than $50,000 a year at the time.[70] Even millionaires collected unemployment benefits in 2020.[71]

48.     Evidence from the class illustrates this heterogeneity. Some class members were full-time students working part-time, while others were business owners. For example, prior to receiving unemployment benefits, Azuri Moon was ████████████████████████████████████████ ████████████████████████████████████ [72] By contrast, Stephanie Moore ████████████████████████████████████████ [73] Still other class members were contractors, while others were self-employed or worked one or more jobs.[74]

49.     Second, proposed class members would not uniformly have been "less likely to have available savings,"[75] as asserted by Mr. Regan, but rather likely would have had varying levels of savings. One study by the Federal Reserve finds considerable variation across households in

---

[69] *See* "California Unemployment Industry & Demographics Data Dashboard," *State of California Employment Development Department*, September 2024, https://edd.ca.gov/siteassets/files/newsroom/facts-and-stats/excel/ada-county-and-statewide-demographics--industry-data-9-21-24.xlsx.

[70] *See* "Center for Microeconomic Data: Survey of Consumer Expectations," *Federal Reserve Bank of New York*, 2020–2023, https://www newyorkfed.org/microeconomics/sce#/. Of the 281 respondents to the survey during this period who indicated they were "[n]ot working, but would like to work" or "[t]emporarily laid off," 119 respondents reported household incomes of greater than $50,000 at some point in the period. Responses are weighted by the Federal Reserve to reflect differences between the survey sample and the general population.

[71] Brian Faler, "Unemployment Assistance to Millionaires Soared During Pandemic," *Politico*, November 22, 2022, https://www.politico.com/news/2022/11/22/unemployment-assistance-millionaires-covid-pandemic-2020-00070446.

[72] Plaintiff Azuri Moon's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation,* January 2, 2024 ("Plaintiff Azuri Moon's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories"), p. 6:24–26.

[73] Plaintiff Stephanie Moore's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation,* January 29, 2024, p. 6:24–27.

[74] Alex Yuan worked as a ████████████████ before he began receiving unemployment benefits. *See* Plaintiff Alex Yuan's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation,* January 29, 2024 ("Plaintiff Alex Yuan's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories"), p. 6:24–28. Candace Koole was ████ ████████████████████████████████████. *See* Plaintiff Candace Koole's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation,* January 4, 2024 ("Plaintiff Candace Koole's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories"), pp. 6:25–26, 20:16–17. Vanessa Rivera worked as a ████████████. *See* Plaintiff Vanessa Rivera Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation,* January 29, 2024 ("Plaintiff Vanessa Rivera's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories"), p. 9:3–6.

[75] Regan Report, ¶ 39.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the amount they have saved in "liquid savings," or readily accessible cash to use for unanticipated expenses: roughly 60% of households have one month of recurring expenses saved, 40% have three months, and other households have nine or twelve months' worth of savings.[76] Another study observes that households' median weekly checking account balances varies substantially.[77] The Federal Reserve study notes that "quasi-liquid" savings balances may be greater.[78]

50.     Beyond this heterogeneity, studies find that during the proposed class period many consumers' liquid assets increased substantively: "Household asset holdings and overall wealth expanded rapidly in the two years following the onset of the pandemic recession."[79] Overall, household savings rates increased substantially during the class period.[80] During 2020, consumption expenditures fell for some households and rose for others, but fell on average.[81] Other household expenses fell for many households as mortgage, credit card, auto, and student

---

[76] Neil Bhutta, and Lisa Dettling, "Money in the Bank? Assessing Families' Liquid Savings using the Survey of Consumer Finances," *FEDS Notes*, November 19, 2018, https://www.federalreserve.gov/econres/notes/feds-notes/assessing-families-liquid-savings-using-the-survey-of-consumer-finances-20181119 html ("Bhutta and Dettling (2018)").

[77] Fiona Greig, Erica Deadman, and Tanya Sonthalia, "Household Cash Balance Pulse: Family Edition," *JPMorgan Chase Institute*, November 2021, https://www.jpmorganchase.com/institute/all-topics/financial-health-wealth-creation/household-cash-balance-pulse-families.

[78] Bhutta and Dettling (2018).

[79] Hamza Abdelrahman, Luiz E. Oliveira, and Adam Hale Shapiro, "The Rise and Fall of Pandemic Excess Wealth," *FRBSF Economic Letter 2024-06,* February 26, 2024, https://www frbsf.org/wp-content/uploads/el2024-06.pdf.

[80] "Personal Saving Rate," *Federal Reserve Bank of St. Louis, FRED Economic Data*, https://fred.stlouisfed.org/graph/?g=FhxV#, accessed September 27, 2024.

[81] Cotton, Christopher D., Vaishali Garga, and Justin Rohan, "Consumption Heterogeneity by Occupation: Understanding the Impact of Occupation on Personal Consumption During the COVID-19 Pandemic," *Federal Reserve Bank of Boston Working Papers*, no. 20–16, 2020, pp. 1–2. *See also* Diana Farrell, et al., "Policy Brief: The Unemployment Benefit Boost: Trends in Spending and Saving When the $600 Supplement Ended," *JPMorgan Chase & Co. Institute*, October 2020, https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/Institute-UI-Benefits-Boost-Policy-Brief_ADA.pdf ("Families who began receiving unemployment benefits in April of 2020 exhibited a 22 percent year-on-year spending increase upon benefit receipt, relative to spending of the employed… It is also surprising in light of the fact that average spending during this timeframe remained roughly 10 percent below baseline in July and August as a result of the pandemic."). *See also* "Personal Consumption Expenditures by State, 2020," *Bureau of Economic Analysis*, October 8, 2021, https://www.bea.gov/news/2021/personal-consumption-expenditures-state-2020.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

loan lenders engaged in forbearance.[82] Data from the U.S. Census Bureau's Household Pulse Survey indicates that many respondent households at the end of January 2021 who indicated that they were "laid off due to coronavirus pandemic" or whose "employer went out of business due to the coronavirus pandemic" used their COVID-19 stimulus payment to primarily pay off debt (66%) or primarily increase their savings (12%), consistent with the idea that these households were covering their living expenses with other sources of income.[83] For lower-income consumers, pandemic-era unemployment benefits may have increased unemployed consumers' income relative to their wages prior to unemployment, leading to increased savings among this population.[84] All of these factors suggest that savings would have varied for individuals in the proposed class.

51.     Evidence of this is found in literature cited by Mr. Regan. For example, he claims that "the Federal Reserve's data indicat[e] that lower income consumers increased credit card spending following the onset of the pandemic."[85] However, the study clarifies that this effect did

---

[82] Rajashri Chakrabarti, et al., "Who Received Forbearance Relief?" *Federal Reserve Bank of New York Liberty Street Economics*, August 2, 2021, https://libertystreeteconomics.newyorkfed.org/2021/08/who-received-forbearance-relief/ ("Forbearance on debt repayment was a key provision of the CARES Act, legislation intended to combat the widespread economic losses stemming from the COVID-19 pandemic. This pause on required payments for federally guaranteed mortgages and student loans has provided temporary relief to those affected by the COVID-19 pandemic, and servicers of nonfederal loans often provided forbearances or other relief on request as well. … Across all markets, households that lost income and thus faced financial hardship were more likely to receive forbearance relief than other households."); Daniel Sexton, "An In-Depth Look at Mortgage Forbearance Data," *Federal Reserve Bank of Atlanta*, February 22, 2021, https://www.atlantafed.org/blogs/macroblog/2021/02/22/in-depth-look-at-mortgage-forbearance-data ("Looking at the ZIP code-level map makes it plain that lower-income areas of most major cities have estimated [mortgage] forbearance rates substantially greater than rates in higher-income areas."); "The Consumer Credit Card Market," *Bureau of Consumer Financial Protection,* September 2021, https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2021.pdf ("CFPB (2021)") ("Large numbers of consumers benefitted from issuers' relief programs in 2020. Bureau data indicate that approximately 25 million consumer credit card accounts entered relief programs in 2020… Payment-deferral programs were the major driver of the robust increase in relief, though fee reversals and waivers or interest rate reductions were also more common in 2020… The scale of this relief and the speed with which it was deployed therefore likely represented substantial benefits to the consumers who received it, allowing them to redeploy their limited and, likely in many cases, interrupted or diminished flow of income and other incoming funds towards other urgent needs… accounts held by consumers with lower scores received payment deferrals at the highest rates of any credit score tier – nearly one-in-six subprime and deep subprime accounts received a payment deferral, compared to roughly one in-ten among near-prime, one-in-twenty among prime, and just one-in-one-hundred among superprime accounts.").

[83] *See* "Household Pulse Survey Public Use File: January 20 – February 1, 2021," *U.S. Census Bureau*, https://www2.census.gov/programs-surveys/demo/datasets/hhp/2021/wk23/HPS_Week23_PUF_CSV.zip, accessed October 7, 2024. Of the 5,207,469 respondents to the Census Bureau who indicated they were "laid off due to coronavirus pandemic" or did not work in the past seven days because their employer "went out of business," "experienced a reduction in business (including furlough)," or "closed temporarily" due to the coronavirus pandemic and received a COVID-19 stimulus payment, 3,417,137 respondents mostly used their payment to pay down debt, and 633,287 respondents mostly used their payment to increase savings. Responses are weighted by the Census Bureau to reflect differences between the survey sample and the general population of households.

[84] Sarah Bohn, Marisol Cuellar Mejia, and Julien Lafortune, "Unemployment Benefits in the COVID-19 Pandemic," *Public Policy Institute of California*, April 9, 2020, https://www.ppic.org/blog/unemployment-benefits-in-the-covid-19-pandemic/.

[85] Regan Report, ¶ 48.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

not begin until "the second quarter of 2021," and excess savings continued to increase until August 2021.[86] Prior to March 2021, the Federal reserve study states that savings increased during the pandemic:

> During the COVID-19 pandemic, consumers reduced their spending due to mobility restrictions, while at the same time their income increased with the help of government stimulus checks and debt forgiveness on obligations such as rent and student loans.

> As a result, consumers in all income cohorts accumulated excess savings in their bank accounts relative to their pre-pandemic levels.[87]

52.    Plaintiffs exhibit varying levels of access to liquid funds. For example, around the time he submitted a claim, Azuri Moon had ████████████████████████[88] Other plaintiffs had more liquid funds available. For example, Roland Oosthuizen had ████████████████████



████.[89] Michael Willrich and Alex Yuan ████████████████████████████████████.[90] And similarly, consumers in the proposed Claim Denial class likely would have had different levels of savings. The amount of liquid funds available to each proposed class member at the time of the claim denial would be highly individualized and would impact the likelihood of borrowing on a credit card or incurring credit card late fees due to the Bank's alleged misconduct.

---

[86] Joanna Stavins, "Credit Card Spending and Borrowing Since the Start of the Covid-19 Pandemic," *Federal Reserve Bank of Boston*, October 19, 2023, https://www.bostonfed.org/publications/current-policy-perspectives/2023/credit-card-spending-and-borrowing-since-the-start-of-the-covid-19-pandemic.aspx ("Stavins (2023)"), pp. 2–3.

[87] Stavins (2023), p. 3.

[88] Plaintiff Azuri Moon's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 30:4–6.

[89] Plaintiff Roland Oosthuizen's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation,* January 29, 2024 ("Plaintiff Roland Oosthuizen's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories"), p. 26:1–6.

[90] Plaintiff J. Michael Willrich's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation,* January 29, 2024 ("Plaintiff J. Michael Willrich's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories"), p. 33:15–16; Plaintiff Alex Yuan's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 29:24–25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

53.     Mr. Regan also fails to compare, or provide a method for comparing, liquid funds to claim denial amounts, which also would have varied among the proposed class members. Consumers' varying levels of savings and claim amounts would generate heterogeneity in how claims affected their borrowing and risks of late fees. As an example, one consumer with a $500 claim denial and $5,000 in their checking account could spend out of their available funds without borrowing on a credit card or missing a credit card payment. Another with a similar $500 claim and $300 in savings might have to borrow and could risk missing a payment—but a third with the same $300 in savings and a $200 claim would not. These three consumers could have different economic harms associated with the denial of their claims, but one would need to know not just how their individualized claims varied, but how those claims compared to their individualized available liquid funds and other economic circumstances. Mr. Regan's methodology neither measures such heterogeneity nor provides a method for measuring such heterogeneity, but rather assumes that *all* proposed class members needed to borrow an identical share of their claim amount and would be identically certain to incur credit card late fees. This applies even for a claim denial amount as small as $10.00, which could be covered by the vast majority of savings levels documented in the literature I discuss above.[91]

54.     All of this heterogeneity in economic circumstances is crucial to understand, as it would generate similar diversity in whether or not proposed class members accessed "substitute funds" by borrowing on credit cards due to the Bank's alleged misconduct. It would also generate diversity in whether or not proposed class members incurred credit card late fees due to the Bank's alleged misconduct, as assumed in Mr. Regan's methodology. As I show in the next two sections, diversity in those things would be substantial and require individual inquiry to understand. I also discuss how Mr. Regan's assumptions would overstate both the cost of obtaining substitute funds and the incidence of credit card late fees for many proposed class members.

---

[91] *See* Chris Wheat, Erica Deadman, and Daniel M. Sullivan, "How Vulnerable Are Americans to Unexpected Expenses?" *JPMorgan Chase Institute,* July 30, 2024, https://www.jpmorganchase.com/institute/all-topics/financial-health-wealth-creation/how-vulnerable-are-americans-to-unexpected-expenses ("Wheat, Deadman, and Sullivan (2024)"); Bhutta and Dettling (2018); "Economic Well-Being of U.S. Households in 2022," *Board of Governors of the Federal Reserve System*, May 2023, https://www.federalreserve.gov/publications/files/2022-report-economic-well-being-us-households-202305.pdf ("Federal Reserve (2022)").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2.    **Proposed Class Members' "Costs Associated with Obtaining Substitute Funds" Would be Highly Individualized and are Overstated for Many Consumers Under Mr. Regan's Methodology**

55.    For a given consumer, the "costs associated with obtaining substitute funds" depends on two factors: the source(s) of funds, and the associated interest cost of each source. As I describe above in Section V, Mr. Regan's approach generalizes on both counts: it considers one specific source of funds (credit cards) for all proposed class members, and it assumes a uniform interest cost for that source of funds for all consumers. Both generalizations are inappropriate, and Mr. Regan fails to explain how such an approach could measure economic harm on a class-wide basis.

56.    It is well-established in the academic literature in household finance that "costs of obtaining substitute funds" are highly individualized—both because consumers borrow using different sources of funds and because consumers face varying interest rates for borrowing, even within the same broad "source" of funds such as credit cards.[92] That finding also applies to costs associated with unanticipated expenses or liquidity, in particular.[93] Mr. Regan's assumptions fail to capture that heterogeneity and do not represent an applicable class-wide method for calculating "consequential damages" associated with obtaining substitute funds.

57.    As a starting point, consumers can fund unanticipated expenses (or analogously, fund expected expenses following an unanticipated drop in income) from a variety of sources other than credit cards. They can use available cash or other liquid assets such as savings and money market account funds. They can also borrow from friends/family, cut back on spending, use a bank loan or line of credit, or turn to other sources of short-term borrowing.[94] Each of these specific sources of funds can have a different interest rate, and even within a category (such as loans), interest rates can differ across consumers. A given customer may even have multiple

---

[92] Zinman, Jonathan, "Household Debt: Facts, Puzzles, Theories, and Policies," *Annual Review of Economics* 7, no. 2, 2015, pp. 251–276, p. 260. *See* "Economic Well-Being of U.S. Households in 2021," *Board of Governors of the Federal Reserve System*, May 2022, https://www.federalreserve.gov/publications/files/2021-report-economic-well-being-us-households-202205.pdf ("Federal Reserve (2021)"); Stavins, Joanna, "Unprepared for Financial Shocks: Emergency Savings and Credit Card Debt," *Contemporary Economic Policy* 39, no. 1, 2021, pp. 59–82 ("Stavins (2021)"), p. 59–60.

[93] Stavins (2021), p. 75.

[94] Federal Reserve (2021); Stavins (2021), p. 62.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

credit cards, each with a different applicable interest rate.[95] Mr. Regan admits in his report that credit card rates vary across consumers.[96]

58.     Notably, the most liquid funds—checking, cash and the like—will have lower or zero account interest rates.[97] A consumer who funds unanticipated expenses out of zero-interest funds would incur zero "consequential damages" associated with interest costs. Mr. Regan grants this possibility in his report, as his Methodology 2 assumes that consumers fund half of their claim denial expenses via a source other than credit card borrowing.[98] While he does not specify the source of funds for the other half of expenses, Mr. Regan's calculation implicitly assumes that those funds are obtained at a 0% interest rate.[99] Mr. Regan's method therefore grants both that cardholders could use sources other than credit cards for "substitute funds," and grants that those sources would have zero interest rates.[100]

59.     Accepted research finds considerable diversity in how consumers would fund such expenses. Some consumers indicate they could fund unanticipated expenses entirely from zero-interest sources, even amounting to three or six months' worth of total household expenses, meaning that their "consequential damages" for this component of the Regan damages

---

[95] Gathergood, John, et al., "How Do Individuals Repay Their Debt? The Balance-Matching Heuristic," *American Economic Review* 109, no. 3, 2019, pp. 844–875, pp. 844–845.

[96] Regan Report, ¶ 49. One study finds that "many individuals actually hold cards with very different APRs." Stango, Victor, and Jonathan Zinman, "Borrowing High vs. Borrowing Higher: Sources and Consequences of Dispersion in Individual Borrowing Costs," *National Bureau of Economic Research Working Paper*, no. 19069, 2013, pp. 1–53, p. 21.

[97] Stango, Victor, and Jonathan Zinman, "What Do Consumers Really Pay on Their Checking and Credit Card Accounts? Explicit, Implicit, and Avoidable Costs? Explicit, Implicit, and Avoidable Costs," *American Economic Review: Papers & Proceedings* 99, no. 2, 2009, pp. 424–429, p. 424 ("Many consumers pay checking account fees per month that are zero or close to zero and forgo little interest by holding bank account balances.").

[98] Regan Report, ¶¶ 55–56. Mr. Regan assumes that proposed class members would have the same available remaining credit as the average consumer with a deep sub-prime credit rating. He does not rely on any data on proposed class members to make this determination. While this methodology is ████████████████████████████████████████████ Lennon Declaration, ¶ 12.

[99] For example, if a proposed class member had a $900 claim denied, they would need to obtain $900 in substitute funds until the claim is paid back, according to Mr. Regan. However, Mr. Regan estimates the cost of obtaining those substitute funds to be 20% interest on only half of the denied claim amount, $450. Therefore, Mr. Regan's methodology implicitly assumes that the proposed class member obtains the other $450 of substitute funds at no financial cost, or 0% interest.

[100] Further, Mr. Regan claims that his Methodology 2 calculation ██████████████████████████. Regan Report, ¶ 71. BANA stated that its assumption that cardholders incurred credit card charges for up to half of their funds at a 20% APR was not based on evidence that cardholders actually incurred this cost. Rather, BANA ████████████████████████████████████████████████████████████████████████ Remediation Plan, pp. 7–8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

methodology would be zero.[101] A 2022 survey noted that more than half of consumers (57%) could fund an unanticipated expense of $1,000 or more out of savings.[102] Other consumers indicate they would use different sources of funds, or multiple sources in varying combinations. One study shows that in 2021, 68% of consumers state that they would meet an unanticipated $400 expense by using "cash or its equivalent"—which has a zero interest cost.[103] Of the remainder, 14% of consumers would use credit cards.[104] Another 2017 study found that for an unanticipated $2,000 expense, consumers reported using funds from cash (19%), checking (38%), or savings (34%) more than reported using a credit card (18%) to meet those expenses.[105]

60.    Another study expands the scope beyond focusing on cash as the only ready source of liquidity, observing "considering cash savings alone as a source of financial resiliency leads to an unnecessarily pessimistic view of financial resilience and how many households are living paycheck-to-paycheck. For example, households that contribute to a retirement plan and have an established rainy-day fund may comfortably spend most of their income every month and still be very resilient to emergency expenses."[106] Using that framework, that study finds that 92% of households can cover a $400 expense, with the significant majority of those funds (87%) coming from cash and disposable income. The study also finds significant heterogeneity, with those shares varying by the amount of the expense and income level.[107] In the lowest income quartile, approximately 72% of households can weather a $400 expense and approximately 29% can weather a $1,600 expense using a combination of cash, disposable income, and credit cards they pay off before incurring interest.[108]

61.    To give an example illustrating how this would affect "costs of obtaining substitute funds," suppose two proposed class members each required $900 in substitute funds, and that

---

[101] Bhutta and Dettling (2018).

[102] Federal Reserve (2022).

[103] Federal Reserve (2021).

[104] Mr. Regan opines that consumers "may have turned to other alternative sources such as… payday lenders," with "APRs substantially in excess of 20%," but in a study by the Federal Reserve 1% of consumers reported turning to such options for an unanticipated expense. Regan Report, fn 54; Federal Reserve (2022). Those data contradict Mr. Regan's claim that such sources of funds are "alternative lending sources frequently accessed by the impacted consumers." Regan Report, ¶ 51.

[105] Stavins (2021), p. 62.

[106] Wheat, Deadman, and Sullivan (2024).

[107] Wheat, Deadman, and Sullivan (2024).

[108] Wheat, Deadman, and Sullivan (2024).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

each similarly would borrow at a 21% credit card rate. A consumer who could cover the $900 out of savings would pay a 0% interest rate. A consumer who could cover $600 would pay interest on only one third of the amount, for an "effective interest rate" of 7% on the expenses covered. Other values would of course generate different effective interest rates—even among consumers who carried credit cards with identical contract APRs. Heterogeneity in those contract APRs would further individualize "costs of obtaining substitute funds."

62.      Evidence from the class is consistent with such heterogeneity in costs associated with obtaining substitute funds. Some class members obtained funds from friends and family to cover expenses. For example, Lindsay McClure ███████████████████████████████████ ████.[109] Similarly, Vanessa Rivera ███████████████████████████████████████████ [110] Azuri Moon ████████████████████████████████████.[111] Other class members paid for expenses using their savings. For example, Roland Oosthuizen ████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.[112] Michael Willrich and Alex Yuan ███████████████████████████████████.[113] Candace Koole ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████.[114]

63.      Alternatively, some class members cut back on expenses. For example, Michael Willrich ████████████████████████████████████████████████████████████

[109] Plaintiff Lindsay McClure's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 2, 2024 ("Plaintiff Lindsay McClure's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories"), p. 29:12–16.

[110] Plaintiff Vanessa Rivera Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 37:2–4.

[111] Plaintiff Azuri Moon's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 30:25.

[112] Plaintiff Roland Oosthuizen's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 26:2–6.

[113] Plaintiff J. Michael Willrich's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 33:15–16; Plaintiff Alex Yuan's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 29:24–25.

[114] Plaintiff Candace Koole's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 32:18–22.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

██████████████████████████████.[115] Mr. Regan's methodology does not measure the impact of cutting back on expenses.

64.    Even for households that use credit cards to fund expenses, one study notes credit card interest costs could be below the 20% figure assumed by Mr. Regan, because consumers can repay their debt quickly enough to avoid interest charges before falling out of the card's "grace period" for repayment: "households can access a portion of their future disposable income by tapping any available credit on their open and current credit cards. If the household has enough disposable income to pay the amount back within one month, then this short-term use of credit does not incur any interest charges."[116] Research shows that during the class period, fewer than half of credit card accounts "revolved" or incurred interest charges, while the remainder did not incur interest charges.[117] One study notes that in the two lowest income brackets it surveyed in 2021, fewer than half of households had credit card balances that incurred interest charges.[118]

65.    Evidence from the proposed class indicates that many consumers could have been situated similarly to consumers in such studies. A review of claim data shows that ████ claims in the proposed Claim Denial class, ████ of the total, had a claim denial period of less than ████ ██.[119] In contrast, Mr. Regan's methodology assumes prospective class members would have incurred credit card interest on some portion of their denied claims even when there was only a *single day* between when the claim was denied and paid out to the consumer. ███████████████████████ ████████████████████████████████████████████████████ Mr. Regan assesses his alleged "consequential damages" on this claim under both Methodology 1

---

[115] Plaintiff J. Michael Willrich's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, p. 33:13–15.

[116] Wheat, Deadman, and Sullivan (2024).

[117] "Credit Cards: Pandemic Assistance Likely Helped Reduce Balances, and Credit Terms Varied among Demographic Groups," *United States Government Accountability Office, Report to Congressional Committees*, September 2023, https://www.gao.gov/assets/d23105269.pdf.

[118] Federal Reserve (2022).

[119] See Regan Report, Schedule 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and Methodology 2.[120] In fact, based on my review, ███████████████████████
████████████████████████████████████████[121]

66.     All of this diversity in available savings, claim amounts, and access to credit cards and other sources of funds would generate variation in "costs associated with obtaining substitute funds." A consumer who funded unanticipated claim denial expenses out of their checking account would have zero "costs associated with obtaining substitute funds." A consumer who funded 70% of expenses out of zero-interest funds and borrowed the remainder from a family member might have higher costs, albeit lower than in Mr. Regan's methodology. A consumer whose income was supplemented by other forms of public assistance could have lower or zero costs. Some consumers may have obtained "substitute funds" using credit cards, but not incurred interest charges to do so because they were in their grace period. Understanding which consumers actually did so, and at the 20% rate assumed by Mr. Regan, would require individual inquiry given all of the variation that would exist in available savings, other liquid assets, claim amounts, and costs of debt from various sources.

67.     As described in Section VI.B, Mr. Regan notes that Methodology 2 ████████████
████████████████████████████████████████████[122] However, that resemblance does not bear on the issues I discuss here. BANA's Remediation Plan was ████████████████████████████████████████████████████████████████
████████████████████████████████████[123] As described in the plan, the ████████████████████████████████████████████████████████████
███████████████████ The plan also acknowledges that it ████████████████████████

---

[120] Regan Report, Schedule 1. *See also*, e.g., claim numbers 210503300513, 210512301167, and 210524301686.

[121] *See*, e.g., Plaintiff Kuang Ting Chong's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 29, 2024; Plaintiff Candace Koole's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff Lindsay McClure's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff Roland Oosthuizen's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff Vanessa Rivera's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff J. Michael Willrich's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff Alex Yuan's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories.

[122] Regan Report, ¶ 8.

[123] Remediation Plan, p. 12; Lennon Declaration, ¶ 11.

[124] Remediation Plan, p. 12. ████████████████████████████
████████████████████████████████████████████
         *See* Remediation Plan, p. 5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

For example, the plan acknowledges that █████████████████████████

████████████████████████████████████████████████

████████████████"[125] The plan recognizes that ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ And the plan specifically allows ████████████

████████████████████████████████████████████████

████████ Mr. Regan's Methodology 2 does not capture these individualized components of

each cardholder's experience. Mr. Regan's Methodology 1, which captures even fewer

components of any cardholder's experience, is similarly ineffective. To measure economic harm,

individualized inquiry is necessary.

68.      Furthermore, Mr. Regan's methodology does not just obscure variation in "costs

associated with obtaining substitute funds" for proposed class members, it also overstates such

costs for many proposed class members. It will necessarily overstate costs for consumers who do

not borrow at rates as high as those assumed by Mr. Regan. It will overstate costs for proposed

class members who cover substitute expenses out of zero-interest funds. It will overstate costs

for consumers who cut back on expenses. It will overstate costs for proposed class members who

can obtain funds from friends and family. It will overstate costs for consumers who can repay

credit card debt before incurring an interest charge. And so on.

69.      Additionally, data from the remediation process indicate that few affected consumers

claimed harm beyond the direct compensation payments to which Mr. Regan likens his

"consequential damages."[128] The Remediation Plan ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████[29] As of October 21, 2024, ████████████████████████

---

[125] Remediation Plan, p. 7.
[126] Remediation Plan, pp. 7–8.
[127] Remediation Plan, p. 8.
[128] Regan Report, ¶ 8 █████████████████████████████████████████████████████
█████████████████████████
[129] Remediation Plan, p. 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



70.    Mr. Regan acknowledges aspects of this heterogeneity in his report, then fails to incorporate it into his calculations.[132] For example, he acknowledges credit cards have differing APRs across consumers, yet applies 20% identically to all proposed class members.[133] As such, Mr. Regan, by his own admission, does not capture the "costs of obtaining substitute funds" for proposed class members. In my opinion, individualized inquiry would be necessary to measure actual economic harms to consumers, given the demonstrated heterogeneity discussed in this section.

### 3.    Proposed Class Members' Credit Card Late Fees Associated with Claim Denial, if Any, Would Be Highly Individualized and Overstated for Many Consumers Under Mr. Regan's Methodology

71.    Mr. Regan's Methodology 2 calculation for alleged "consequential damages" assumes that all proposed class members whose claim denials "persisted for more than thirty days" identically incurred one late fee per month.[134] Mr. Regan assumes that the first late fee equals $26 and subsequent late fees equal $35, for up to six months between the claim denial date and

---

[130] Lennon Declaration, ¶¶ 14–15.

[131] Lennon Declaration, ¶ 16.

[132] *See*, e.g., Regan Report, fn 54. Regan lists alternatives to credit card borrowing, though he only discusses more expensive alternatives to credit card borrowing. He does not acknowledge the less expensive alternatives described in the literature and the documentary record of this matter I discuss herein.

[133] Regan Report, ¶¶ 49–51.

[134] Regan Report, ¶ 59.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the claim paid date.[135] Mr. Regan's late fee methodology again obscures important consumer heterogeneity, would overstate harm for many class members, and fails as a method for calculating economic harm on a class-wide basis.

72.     Mr. Regan's methodology assumes that 100% of proposed class members whose claims were denied for 30 days or more would have incurred late fees on their credit cards in 100% of months following their claim denials. However, as a threshold matter Mr. Regan does not establish, or proffer a method for establishing, that consumers in the proposed Claim Denial class would universally have possessed active credit cards. As an example, Azuri Moon, ███████ and ███████ each testified in deposition that they did not have a credit card during the pandemic.[136]

73.     More generally, research shows diversity in whether consumers hold credit cards.[137] Proposed class members without credit cards could not possibly have incurred credit card late fees, much less credit card late fees associated with claim denials. Mr. Regan does not acknowledge this, estimate card ownership within the proposed class, or propose a class-wide method by which one could identify credit card ownership. Doing so would require individual inquiry.

74.     Mr. Regan's method also seemingly ignores that consumers can avoid credit card late fees by paying the minimum balance due, which is generally set at a fraction of the total balance due, with a minimum value of 1–4% of the cardholder's total balance, or in some cases a fixed

---

[135] Regan Report, ¶¶ 58–60. ███████████████████████ *See* Regan Report, ¶ 74. ███████████████
*See* Remediation Plan, p. 23.
[136] Deposition of Azuri Moon, February 27, 2024, p. 168:13–19 ████████████████ p. 169:3–5 ("Q Did you have any credit cards? MS. SWOPE: Objection. Form. THE WITNESS: I did not."); Deposition of Juanita Isles, May 2, 2024, p. 62:3–9 ("Q. Do you have any credit cards? A. No. Q. Have you ever had a credit card? A. Years ago. Q. Okay. A. I had prepaid cards, but that's not a bank account credit card."); Deposition of Miguel Salazar, May 3, 2024, p. 102:19–22 ("Q. Do you have any other debit cards or credit cards other than when you had your EDD account, Bank of America credit card -- debit card? A. No.").
[137] Federal Reserve (2022); Zinman, Jonathan, "Household Debt: Facts, Puzzles, Theories, and Policies," *Annual Review of Economics* 7, no. 2, 2015, pp. 251–276 at, p. 252.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

amount such as $25 or $35.[138] Many consumers pay the minimum amount due each month, and as many as 30-40% of payments in 2020 were at 10% or less of the total account balance.[139] If a hypothetical proposed class member borrowed $900 in substitute funds with a credit card, the minimum payment due on that balance to avoid a late fee would likely be $35 or less per month.[140] As discussed above, many consumers have liquid balances from which they can repay credit cards. If 65% of households in the lowest income quartile can weather a $400 expense with a combination of cash and disposable income, those consumers would be even more capable of making a $40 minimum payment—and perhaps even several such payments over a few months—using the same sources.[141] In fact, based on my review, ███████████████████████
███████████████████████████████████████████████████ [142]

75.     Beyond that, it would not be enough to show that a consumer paid a late fee during the class period. For the fee to represent harm tied to claim denial, it must be the case that the consumer would not otherwise have incurred the fee. For example, late fees incurred by consumers who simply forgot to pay their credit card bills on time would not represent harm in this context. Accepted research on credit card late fees finds that consumers incur late fees for

---

[138] Keys, Benjamin, and Jialan Wang, "Minimum Payments and Debt Paydown in Consumer Credit Cards," *National Bureau of Economic Research Working Paper*, 2016, fn 1 ("Typical minimum payments are between 1–4% of the balance."); Evelyn Waugh, "How Is a Credit Card Minimum Payment Calculated?" *Experian*, May 28, 2023, https://www.experian.com/blogs/ask-experian/how-is-your-credit-card-minimum-payment-calculated/, accessed October 21, 2024 ("If your card issuer charges a flat percentage, your minimum payment could be anywhere from 2% to 4% of your total balance… In some cases, however, such as when your account balance is under a certain amount, you may be charged a fixed amount, such as $25 or $35.").

[139] Keys, Benjamin, and Jialan Wang, "Minimum Payments and Debt Paydown in Consumer Credit Cards," *National Bureau of Economic Research Working Paper*, 2016, p. 3; CFPB (2021).

[140] Evelyn Waugh, "How Is a Credit Card Minimum Payment Calculated?" *Experian*, May 28, 2023, https://www.experian.com/blogs/ask-experian/how-is-your-credit-card-minimum-payment-calculated/, accessed October 21, 2024.

[141] Wheat, Deadman, and Sullivan (2024).

[142] *See*, e.g., Plaintiff Kuang Ting Chong's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 29, 2024; Plaintiff Candace Koole's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff Lindsay McClure's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff Roland Oosthuizen's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff Vanessa Rivera's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff J. Michael Willrich's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories; Plaintiff Alex Yuan's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reasons other than lack of available funds, i.e., due to inattention or for other reasons.[143] An individualized inquiry would be required to learn the reason that a particular consumer incurred a late fee, and specifically whether a claim denial led to the late payment.

76.    Even for the subset of proposed class members who incurred a late fee associated with a claim denial, many lenders offered waivers and other opportunities during the pandemic for consumers to recoup late fees they incurred: "In response to pandemic-related hardship, issuers provided a considerable number of payment deferrals and fee waivers to their cardholders in 2020."[144] One study notes "about 25 million consumer credit card accounts (with a total of $68 billion in balances) enrolled in payment relief programs in 2020."[145] As with the other necessary steps for a consumer to experience economic harm associated with the late fee, consumers would be diverse in whether they sought and/or received such payment relief, and an individualized inquiry would be necessary to assess harm for each consumer.[146]

77.    As with the "costs associated with obtaining substitute funds," Mr. Regan's late fee methodology not only obscures important heterogeneity with the class, but also would overstate economic damages for many proposed class members. It would overstate damages for consumers who did not increase credit card borrowing because they funded their expenses from less

---

[143] Gathergood et al. found that late payments are concentrated among new cardholders and cardholders who do not set up automatic payments for their credit card bills. They further found that the adoption of autopay, and thus the avoidance of late fees, was not "driven by occasional borrowing needs or liquidity constraints" and "suggests a role for myopia." Gathergood, John, et al., "How Do Consumers Avoid Penalty Fees? Evidence From Credit Cards," *Management Science* 67, no. 4, 2020, pp. 2565–2578, p. 2563 ("We find that late payment fees are front-loaded, peaking in the first month of card life and then declining sharply over the following months. … We show that the *average* decline in late payment fees across all consumers over time is wholly attributable to a subset of consumers who activate autopay in the month following a late payment. By adopting autopay, these card holders override the need to remember to pay the minimum payment, therefore avoiding future late payment events. Although adopting autopay all but eliminates the likelihood of future fees, we find that among nonadopters, the probability of fee payment remains as high as it was before these consumers incurred their first fee, at approximately 20% *per month*. … [w]e show that nonadopters in our data actually have lower levels of debt, lower utilization, and slightly *higher* average repayments compared with adopters, indicating that their failure to adopt autopay does not arise due to liquidity constraints.").

[144] CFPB (2021).

[145] "Credit Cards: Pandemic Assistance Likely Helped Reduce Balances, and Credit Terms Varied among Demographic Groups," *United States Government Accountability Office, Report to Congressional Committees*, September 2023, https://www.gao.gov/assets/d23105269.pdf.

[146] Mr. Regan makes other claims at odds with likely consumer experiences in the pandemic-era credit card market. He mentions that consumers could have incurred "penalty rates," but a CFPB report notes "[u]pward repricing declined to near-zero in 2019 and 2020." *See* Regan Report, fn 68; CFPB (2021). He opines that late payments could lead to a "credit score decline if the delinquency was reported to credit bureaus," but the CARES Act prevented some credit reporting that would have reduced credit scores. *See* Regan Report, ¶ 60; Liane Fiano, "Protecting Your Credit During the Coronavirus Pandemic," *Consumer Financial Protection Bureau,* July 29, 2020, https://www.consumerfinance.gov/about-us/blog/protecting-your-credit-during-coronavirus-pandemic/;Stefan Lembo Stolba, "How the CARES Act Affects Credit Reports and Scores," *Experian*, April 24, 2020, https://www.experian.com/blogs/ask-experian/how-the-cares-act-affects-credit-reports-and-scores/. Whether or not any consumer experienced these things would require individual inquiry.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

expensive sources. It would overstate harm for consumers who may have funded expenses using credit cards but did not incur late fees. And it would overstate harm for consumers who would have incurred late fees independent of any claim denials. Understanding the extent to which the Regan methodology overstates damages for consumers throughout the proposed class would require individual inquiry of those consumers.

**D.    Because Mr. Regan's Methodology Overstates "Actual Damages," It Necessarily Overstates "Treble Damages"**

78.         As mentioned in Section II, I have not been asked to opine on the legal question of whether any damages in this matter should be trebled. However, if they should be trebled, Mr. Regan's methodology carries through to his estimated treble damages for the proposed Claim Denial class is unreliable, and his estimates are overstated.

79.    In Sections VI.A–C, I have described how Mr. Regan's "actual damages" methodology overstates harm by failing to distinguish (and exclude) proposed class members who were not harmed, failing to account for funds paid and to be paid to proposed class members, and overstating "consequential damages" for many consumers. The flaws in Mr. Regan's damages methodologies carry through to his estimated treble damages for the proposed Claim Denial class. Mr. Regan estimates "[t]reble damages … by simply multiplying each class member's actual damages by three,"[147] so Mr. Regan's errors in estimating "actual damages" for many proposed class members imply similarly proportional errors in his estimated treble damages.

**E.    The Claim Denial Damages Methodology Does Not Calculate "Profits" Associated with Claim Denials on a Class-Wide Basis**

80.    Mr. Regan defines ███████████████████████████████████████
████████████████████████████████████ and opines that ████████████████
████████████████████████████████████████████████████████████████████

---

[147] [FN 808] Regan Report, ¶ 76.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████[148] He further opines that "[t]he Bank's records may be used to

███████████████████████████████████████████████████████████████

██████████[149]

81.    Mr. Regan's proposed "incremental Float Revenue" calculation erroneously assume that

████████████████████████████████████████████████████████████████

████████████████ At most, ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.[150] However, as shown by data in

Schedule 1 of the Regan Report, not all proposed class members withdrew all available funds

from their EDD accounts.[151] In my opinion, it would require individual inquiry to determine

what the account balance of each proposed class member would have been absent BANA's use

of Indicator 1 of the Claims Fraud Filter. Therefore, Mr. Regan's methodology cannot be applied

on a class-wide basis.

## VII.  Mr. Regan's Proposed Credit Rescission Class Methodology Does Not Distinguish Harmed From Unharmed Consumers, Ignores Important Consumer Heterogeneity That Would Require Individual Inquiry, Overstates Damages for Many Consumers, and Does Not Reliably Estimate Profits

### A.  The Proposed Credit Rescission Class Damages Methodology Does Not Distinguish Consumers Harmed as a Result of the Bank's Alleged

---

[148] Regan Report, ¶ 79 ("The Bank referred to ██████████████████████████████ The Bank generated ███████████████████████████████████████████

[149] Regan Report, ¶ 79.

[150] According to the cardholder agreement, funds were credited back on to the cardholder's EDD account if BANA determined that a transaction was unauthorized. *See* "California Employment Development Department Debit Card Account Agreement," *Bank of America*, March 1, 2018, p. 9 ("We will determine whether an error occurred within 10 business days after we hear from you—and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation.").

[151] *See* Regan Report, Schedule 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Misconduct From Consumers Unharmed as a Result of the Bank's Alleged Misconduct**

82.     Mr. Regan describes the proposed Credit Rescission class as consisting of "[a]ll Bank of America EDD cardholders who received permanent credit from the Bank in connection with their Claim, which credit the Bank rescinded at any time from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's CFF."[152] As with the proposed Claims Denial class, Mr. Regan's methodology to identify members of the proposed Credit Rescission class does not explain how to exclude ████████████████ that were paid under BANA's Remediation Plan. See Section VI.A.

**B.     Mr. Regan's Methodology for Calculating Alleged "Actual Damages" Overstates Damages by Failing to Account for Funds Paid and to Be Paid to Proposed Class Members**

83.     Mr. Regan estimates "[a]ctual damages" for the proposed Credit Rescission class as the sum of "[t]he principal amount of damages," and "[c]onsequential damages."[153] As with the proposed Claim Denial class, Mr. Regan's damages methodology fails to account for funds that BANA has already paid to proposed class members, and Mr. Regan fails to investigate whether any proposed class member remains harmed after receiving those payments from BANA. The critiques of his methodology for calculating alleged "actual damages" for the proposed Claim Denial class described in Section VI.B apply equally here.

84.     First, BANA ████████████████████████████ Mr. Regan estimates in "Principal Amount of Actual Damages."[154] Mr. Regan's damages methodology is flawed and illogical as it is ████████████████████████████████████.

85.     Second, Mr. Regan's methodology overstates alleged "consequential damages" because it fails to account for ████████████████████████████ ██████████████     As noted above in Section VI.B,███████████████████████

---

[152] Regan Report, ¶ 4, 81. *See also* Motion for Class Certification, p. 10:6–18.

[153] Regan Report, ¶ 12.

[154] Bank of America's Revised Second Supplemental Responses and Objections to Plaintiff Yick's First Set of Interrogatories, Revised Exhibit 2 - BANA Response to Interrog. 3. *See also* Regan Report, Schedule 1. According to Regan Report Schedule 1, there are 126 claims in the proposed Credit Rescission class that may not have been paid. These claims have a total principal amount of $0.2 million.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

██████████████████████████████████████████████ and in aggregate, the Remediation
Plan ██████████████████████████████ than Mr. Regan has estimated in Schedule 1. As
with the principal amounts of damages, dollars paid (or to be paid) to consumers are an
economic benefit to consumers—or an offset to economic harm.

### C. Mr. Regan's "Consequential Damages" Methodology Ignores Important Consumer Heterogeneity, Overstates Harm for Many Consumers and Cannot Measure Consumer Economic Harm on a Class-Wide Basis

86.     For the proposed Credit Rescission class, Mr. Regan applies a "consequential damages"
methodology similar to that for the proposed Claim Denial class.[155] Accordingly, the critiques of
his methodology for calculating alleged "consequential damages" for the proposed Claim Denial
class described in Section VI.C apply equally here. First, the economic circumstances of
consumers in the proposed class, and any potential economic impact of credit rescission would
be highly individualized. Second, proposed class members' "costs associated with obtaining
substitute funds" would be highly individualized and are overstated for many consumers under
Mr. Regan's methodology. Third, proposed class members' credit card late fees associated with
credit rescission, if any, would be highly individualized and overstated for many consumers
under Mr. Regan's methodology. Mr. Regan does not engage with any of these issues and fails to
provide a methodology that can reliably measure damages on a class-wide basis.

### D. Because Mr. Regan's Methodology Overstates "Actual Damages," It Necessarily Overstates "Treble Damages"

87.     As mentioned in Section II, I have not been asked to offer any opinion regarding
whether treble damages are available in this matter. However, if they are available, Mr. Regan's
methodology to calculate treble damages for the proposed Credit Rescission class is unreliable,

---

[155] Regan Report, ¶ 85 ("One methodology to measure Credit Recision class damages is by using a compound interest rate
reflecting the time value of money for this population of cardholders as described in § II.B.2.a) above."), ¶ 87 ("Accordingly, for
the same reasons as the Claim Denial class members (see § II.B.2.b)(1)), the members of the Credit Rescission class would likely
have been required to obtain alternative funds to mitigate the inability to access the credited funds that the Bank had rescinded
from their accounts. I have applied the same methodology as described therein to calculate the cost of the inability to access
impacted funds for the Credit Rescission class."), ¶ 88 ("Similarly, the members of the Credit Recision class also would likely
have experienced late or overdraft fees for the same reasons as the Claim Denial class and the Account Freeze class members
(see § II.B.2.b)(2)). Accordingly, I have applied the same methodology as described therein to calculate the cost of late or
overdraft fees experienced by members of the Credit Recision class.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and his estimates are overstated for the same reasons described for the proposed Claim Denial class in Section VI.D.

### E. Mr. Regan's Methodology Does Not Calculate "Profits" Associated with Credit Rescissions on a Class-Wide Basis

88.     Mr. Regan applies the same methodology for calculating alleged "disgorgement of profits" for the proposed Claim Denial class to the proposed Credit Rescission class.[156] Accordingly, the critiques of his methodology for calculating alleged "disgorgement" for the proposed Claim Denial class described in Section VI.D apply equally here.

## VIII. Mr. Regan's Damages Methodology for the Proposed Account Freeze Class Ignores Important Consumer Heterogeneity That Would Require Individual Inquiry, Overstates Damages for Many Consumers, and Does Not Reliably Estimate Profits

### A. Mr. Regan's Methodology for Calculating Alleged "Actual Damages" Overstates Damages by Failing to Account for Funds Paid and to Be Paid to Proposed Class Members

89.     Mr. Regan estimates "[a]ctual damages" for the proposed Account Freeze class as the sum of "[t]he principal amount of damages," and "[c]onsequential damages."[157] Similar to Mr. Regan's methodology for the proposed Claim Denial class, Mr. Regan's damages methodology fails to account for funds to which proposed class members have already regained access, and Mr. Regan fails to investigate whether any proposed class member remains harmed after regaining access to those funds in their EDD accounts. The critiques of his methodology for calculating alleged "actual damages" for the proposed Claim Denial class described in Section VI.B apply analogously here.

90.     First, proposed class members have already ███████████████████████████████
Mr. Regan estimates in "Principal Amount of Actual Damages."[158] Mr. Regan's damages

---

[156] Regan Report, ¶ 92.

[157] Regan Report, ¶ 12.

[158] Regan Report, ¶ 99.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

methodology is flawed and illogical as it is indifferent to the fact that proposed class members' accounts are no longer frozen.

91.    Second, Mr. Regan's methodology overstates alleged "consequential damages" because it fails to account for funds paid and to be paid to proposed class members through the Remediation Plan. As noted above in Section VI.B, ████████████████████████████████ ████████████████████████████████, and in aggregate, the Remediation Plan has ████████████████████ than Mr. Regan has estimated in Schedule 1. As with the principal amounts of damages, dollars paid (or to be paid) to consumers are an economic benefit to consumers—or an offset to economic harm.

**B.    Mr. Regan's "Consequential Damages" Methodology Ignores Important Consumer Heterogeneity, Overstates Harm for Many Consumers and Cannot Measure Consumer Economic Harm on a Class-Wide Basis**

92.    For the proposed Account Freeze class, Mr. Regan applies a "consequential damages" methodology similar to that for the proposed Claim Denial class.[159] Accordingly, the critiques of his methodology for calculating alleged "consequential damages" for the proposed Claim Denial class described in Section VI.C apply equally here. First, the economic circumstances of consumers in the proposed class, and any potential economic impact of accounting freezes would be highly individualized. Second, proposed class members' "costs associated with obtaining substitute funds" would be highly individualized and are overstated for many consumers under Mr. Regan's methodology. Third, proposed class members' credit card late fees associated with accounting freezes, if any, would be highly individualized and overstated for many consumers under Mr. Regan's methodology. Mr. Regan does not engage with any of these issues and fails to provide a methodology that can reliably measure damages on a class-wide basis.

---

[159] Regan Report, ¶ 100 ("One methodology to measure the Account Freeze class's consequential damages is to apply a compound interest rate that reflects the time value of money for this population of cardholders. I have applied the same methodology described in § II.B.2.a) above to make these illustrative calculations."), ¶ 102 ("For the same reasons as the Claim Denial class members (see § II.B.2.b)(1)), the members of the Account Freeze class would likely have been required to obtain alternative funds to mitigate the inability to access their funds in their then-frozen Bank-controlled EDD accounts that otherwise would have been available. Following the same methodology described therein, I have identified the amount and duration data specific to each impacted cardholder for this calculation using the Bank's data."), ¶ 104 ("For the same reasons as the Claim Denial class members (see § II.B.2.b)(2)), the members of the Account Freeze class would likely have incurred late or overdraft fees while unable to access their funds otherwise available in their then-frozen Bank-controlled EDD accounts. I have applied the same methodology as described therein to make the example calculations of the cost incurred by each EDD Cardholder attributable to such late fees.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

93.     Beyond those issues, for the proposed Account Freeze class Mr. Regan also estimates the "Cost of Delayed Benefit Payments."[160] He opines that "[i]f a cardholder's account ███████████ ████████████████████████████████████████████████████"[161] Instead, according to Mr. Regan, ██████████████████████ █████████████████████████████████████████████████[162] Mr. Regan asserts that he can calculate ███████████████████████████ as a function of ██████████████████████████████████████████████████████ ████████████████████████████████[163] as well as the 20% APR he assumes based on his estimate of "costs associated with obtaining substitute funds."[164]

94.     As an initial matter, proposed class members' "costs associated with obtaining substitute funds" would be highly individualized and are overstated for many consumers under Mr. Regan's methodology, as described in my critique of his methodology for calculating alleged "consequential damages" for the proposed Claim Denial class in Section VI.C.

95.     Beyond that, Mr. Regan's methodology for this class does not explain how to determine the "length of the delayed receipt" for any proposed class member. Mr. Regan "illustrate[s]" his calculation with a ███████████████████ which includes ████████████████████████ █████████████████████████████████████[165] Mr. Regan is silent on how he plans to calculate, on a class-wide basis, ████████████████████████████████████████████ ███████████████████████████████████████████████████████████████In my opinion, making such a determination would require individual inquiry, and Mr. Regan could not perform this calculation on a class-wide basis.

---

[160] Regan Report, Section IV.B.2.b.3.

[161] Regan Report, ¶ 105.

[162] Regan Report, ¶ 105.

[163] Regan Report, ¶ 106.

[164] Regan Report, fn 140, ¶¶ 41, 51.

[165] Regan Report, fn 140, ¶ 106. Mr. Regan's delayed benefit payment calculation also implicitly assumes that the proposed class member remained eligible for benefits for 30 days after their account was frozen, although he does not acknowledge or support this assumption.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C.    Mr. Regan's Methodology Does Not Calculate "Profits" Associated with Account Freezes on a Class-Wide Basis

96.    Mr. Regan applies the same methodology for calculating alleged "disgorgement of profits" for the proposed Claim Denial class to the proposed Account Freeze class.[166] Accordingly, the critiques of his methodology for calculating alleged "disgorgement" for the proposed Claim Denial class described in Section VI.D apply equally here.

### IX.    Mr. Regan's Damages Methodology for the Proposed Customer Service Class Ignores Important Consumer Heterogeneity and Fails to Propose a Damages Methodology that Reliably Measures Economic Harm on a Class-Wide Basis

97.    Mr. Regan's proposed "actual damages" methodology for the proposed Customer Service class assumes that one could value proposed Customer Service class members' time using a "minimum wage" or "other reasonable metric" applied identically to all proposed class members. Such an assumption does not constitute a reliable class-wide method for measuring economic harm, as the value of alleged "lost time" would vary among individuals in the proposed class, and an individualized inquiry would be required to measure any alleged harm. Mr. Regan does not provide any calculation of "actual damages." Nor does he specify what would be the "applicable minimum wage," or how one could construct some "other reasonable metric."

98.    As a preliminary observation, while the "applicable minimum wage" would not measure the value of time for individual consumers, as I discuss below, even understanding what minimum wage would be "applicable" to a proposed class member requires individual inquiry. In California the minimum wage a consumer faces can vary based on the consumer's place of work or other factors.[167] For example, the minimum wage in Belmont, California on January 1, 2021 was $15.90; in Oakland, it was $14.36; and in Mountain View, it was $16.30.[168] Learning where a proposed class member worked would require individual inquiry. A further source of

---

[166] Regan Report, ¶ 109.

[167] During 2020-2021, employers were required to pay a different minimum wage depending on how many employees they hired. Also, some localities in California imposed higher minimum wages than required by federal or state law. "Minimum Wage Frequently Asked Questions," *State of California Department of Industrial Relations*, July 2024, https://www.dir.ca.gov/dlse/faq_minimumwage.htm.

[168] "California City and County Minimum Wages as of 7/1/2021," *UC Berkeley Labor Center*, July 1, 2021, https://laborcenter.berkeley.edu/california-city-and-county-minimum-wages-as-of-7-1-2021/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

heterogeneity in applicable wages derives from the fact that proposed class members are, by dint of receiving UI benefits, no longer fully employed. Mr. Regan does not specify whether the "applicable" minimum wage would be that associated with the proposed class member's pre-benefit employment, the job the consumer *would* have after becoming re-employed, or something else. Finally, whether the minimum wage or some other wage earned or potentially earned by the proposed class member would be the "applicable minimum wage" or "other reasonable metric" would require individualized inquiry.[169]

99.     More crucially, as Mr. Regan states, the appropriate metric for compensation would be the value of lost time for each class member.[170] Those values will be highly individualized, require individualized inquiry to understand, and, more importantly, may not be captured by wages for many consumers.

100.     In economics, it is accepted that a consumer's value of time ("VOT") may not equal their wage (or hypothetical wage, as assumed in the Regan methodology). One reason for this is practical, as consumers may not be able to flexibly trade time for labor income. One study explains: "[a]ssuming the average wage is the appropriate opportunity cost of time presumes that the individual faces no constraints on hours worked, derives no utility or disutility from work, and has a linear wage function."[171] Another study notes "we learn very little about the value of time for individuals without flexible work hours."[172] Yet another study notes that applying a wage-based VOT obscures important labor market heterogeneity: "[m]ore fundamentally, wages may be a poor proxy for VOT for people who are outside the formal labor market such as the unemployed, the retired, or students. Implicitly income-based measures value their time at zero."[173]

---

[169] The actual wage earned by a proposed class member could differ from the applicable minimum wage.

[170] Regan Report, ¶ 18.

[171] Larson, Douglas M., and Sabina L. Shaikh, "Recreation Demand Choices and Revealed Values of Leisure Time," *Economic Inquiry* 42, no. 2, 2004, pp. 264–278, pp. 264–265.

[172] Palmquist, Raymond B., Daniel J. Phaneuf, and V. Kerry Smith, "Short Run Constraints and the Increasing Marginal Value of Time in Recreation," *National Bureau of Economic Research Working Paper,* no. 14986, 2009, p. 5.

[173] Lloyd-Smith, Patrick, et al., "Decoupling the Value of Leisure Time from Labor Market Returns in Travel Cost Models," *Journal of the Association of Environmental and Resource Economists* 6, no. 2, 2019, pp. 1–28 ("Lloyd-Smith et al. (2019)"), pp. 2–3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

101.    As alternatives, studies have proposed assessing how consumers *value* their time on an individual basis, finding that those values can be substantially different from wages, in principle and practice. One study observes "[p]eople do not simply equate the value of their time with their wage rate or some monetary equivalent."[174] Another notes, emphasizing that VOTs are heterogeneous, "[w]e find that respondents value their leisure time heterogeneously and substantially differently from their implied wage rate," and "the majority of individual-level differences in the VOT are not explained by reference to their return on the labor market."[175] The study concludes "[t]hese findings raise concerns with the common practice of solely relying on labor market information to value people's leisure time."[176] Studies estimating VOTs find heterogeneity across consumers, particularly when alternatives such as leisure or home production are considered.[177] Some studies find that consumers "value their leisure time at one quarter of their take home pay."[178] Another notes "[t]ime, on the other hand, is not as liquid and furthermore highly perishable, which makes the opportunity cost more difficult to estimate and more dependent on context."[179] This heterogeneity can arise due to differences in whether consumers are employed: "[o]n average, [willingness-to-accept] values for unpaid work and leisure time were [] higher for the subgroup of respondents with paid work than for those not in paid employment."[180]

102.    Some research on the value of time specifically assesses how consumers value their time spent waiting, as would apply in this matter. That work similarly observes that the VOT can differ from wages, and similarly observes heterogeneity. One study observes "[h]owever, determining the value of time is not straightforward, because it is highly flexible…" and "[t]he value of time is what people believe their time is worth which varies across situations and

---

[174] Caruelle, Delphine, Line Lervik-Olsen, and Anders Gustafsson, "The Clock is Ticking—Or is it? Customer Satisfaction Response to Waiting Shorter vs. Longer Than Expected During a Service Encounter," *Journal of Retailing* 99, 2023, pp. 247–264 ("Caruelle, Lervik-Olsen, Gustafsson (2023)"), p. 249.

[175] Lloyd-Smith et al. (2019), pp. 1, 25.

[176] Lloyd-Smith et al. (2019), p. 1.

[177] Verbooy, Kaya, et al., "Time is Money: Investigating the Value of Leisure Time and Unpaid Work," *Value in Health* 21, 2018, pp. 1428–1436 ("Verbooy, et al. (2018)"), pp. 1428–1429, 1432, 1434.

[178] McDonald, Aleecia M., and Lorrie Faith Cranor, "The Cost of Reading Privacy Policies," *I/S: A Journal of Law and Policy for the Information Society* 4, no. 3, 2008, pp. 543–568, p. 562.

[179] Okada, Erica Mina, and Stephen J. Hoch, "Spending Time versus Spending Money," *Journal of Consumer Research* 31, no. 2, 2004, pp. 313–323, p. 321.

[180] Verbooy, et al. (2018), p. 1432.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

contexts."[181] As such, proposed Customer Service class members' valuations of time spent waiting would also be heterogeneous, and require individualized inquiry to understand.

103.    A further nuance to assessing consumers' values of time spent waiting is that values of time may depend not just on the absolute time spent, but on how that compares to consumer expectations. One study observes "the same wait duration might have different effects on customers depending on whether it is shorter or longer than what customers expected."[182] And, that compared to waiting shorter than expected, "waiting longer than expected leads to a minor decrease in satisfaction."[183] To the extent that proposed Customer Service class members valued their time similarly and had varying expectations of wait times, this would only amplify heterogeneity and the need for individual inquiry to understand any potential consumer harm.

104.    A final potential source of heterogeneity in consumer values of time in this context is that research shows that many consumers "multi-task" while on hold, engaging in other activities that can affect their value of time while on hold. Conceptually, one study notes "the amount of multi-tasking may have a considerable impact on the VOT" and in "the early days of time use research, [researchers] stressed the importance of recording so-called secondary activities that are carried out during the primary activity."[184] A study of consumer behavior while on hold notes "79% of callers engaged in some form of secondary activity while on hold. These activities were diverse, with the majority of participants reporting different types of secondary activities."[185] Those activities included emailing or doing other computer work, "doing work or homework," making other calls, exercising, and others.[186] The study concludes: "[m]ost of these callers actively perform some secondary activity that, with the exception of doodling, was an activity that they would normally engage in as a primary activity if they were not on hold."[187] To the extent that proposed Customer Service class members behaved similarly, and both engaged in different

---

[181] Caruelle, Lervik-Olsen, Gustafsson (2023), p. 249.

[182] Caruelle, Lervik-Olsen, Gustafsson (2023), p. 247.

[183] Caruelle, Lervik-Olsen, Gustafsson (2023), p. 247.

[184] Ettema, Dick, and Laura Verschuren, "Multitasking and Value of Travel Time Savings," *Transportation Research Record* 2010, no. 1, 2007, pp. 19–25, pp. 19, 25.

[185] Kortum, Philip, and S. Camille Peres, "A Survey of Secondary Activities of Telephone Callers Who Are Put on Hold," *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting*, 2007, pp. 1153–1157 ("Kortum and Peres (2007)"), p. 1153.

[186] Kortum and Peres (2007), p. 1154.

[187] Kortum and Peres (2007), p. 1155.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

secondary activities and valued the secondary activities differently, actual consumers' VOTs would be further individualized.

105.     Summing up, Mr. Regan's assumption that one could value proposed Customer Service class members' time using "the minimum wage" or other "reasonable metric" does not constitute a method that could measure economic harm from waiting time on a class-wide basis. The individuals in the proposed class would vary in terms of the value of any "lost time," and an individualized inquiry would be required to measure any alleged harm.

**X.     Mr. Regan's Proposed EMV Chip Class Damages Methodology Does Not Distinguish Harmed from Unharmed Consumers, Ignores Important Consumer Heterogeneity That Would Require Individual Inquiry, Overstates Damages for Many Consumers, and Does Not Reliably Estimate Profits**

106.     Mr. Regan's "actual damages" methodology for the proposed EMV Chip Class is identical to his methodology for the proposed Claim Denial and Credit Rescission classes with an extended period for "consequential damages."[188] First, to identify members of the proposed EMV Chip Class, Mr. Regan was "asked to assume that the EMV Chip class consists of all members of the Claim Denial class and all members of the Credit Rescission class."[189] Next, Mr. Regan estimates "actual damages" for the proposed EMV Chip Class as the sum of "[t]he principal amount of damages" and "[c]onsequential damages,"[190] and he defines "[t]he principal amount of damages" the exact same way as he does for the proposed Claim Denial class: "the amount of the class member's claim that the Bank denied based on Indicator 1 of its Claim Fraud Filter."[191] Finally, as with the proposed Credit Rescission class, Mr. Regan claims that

---

[188] Mr. Regan estimates "consequential damages" for the proposed Claim Denial and Credit Rescission classes for the period "from the application of the CFF … to the paid date." *See* Regan Report, ¶ 43. Mr. Regan estimates "consequential damages" for the proposed EMV Chip class for the period "from the date the Bank opened the claim until the date the Bank finally reimbursed the class member for the value of the claim." *See* Regan Report, ¶ 120.

[189] Regan Report, ¶ 119.

[190] Regan Report, ¶ 120.

[191] Regan Report, ¶¶ 37, 120. Mr. Regan says that he has "been asked to assume that EMV chips would have prevented the unauthorized ATM withdrawals that were the subject of Claim Denial and Credit Rescission class members' claims that triggered the Bank's CFF Indicator 1." *See* Regan Report, ¶ 118. I am not opining on whether this assumption is accurate. However, to the extent this assumption is inaccurate, the methodology Mr. Regan describes in Section VI of his report would not measure harm attributable to the alleged misconduct. Furthermore, even though Mr. Regan only assumes that the unauthorized ATM withdrawals would have been prevented by EMV chips, he also includes amounts from unauthorized point-of-sale transactions in his "principal amount of damages" for the proposed EMV Chip class. Mr. Regan does not explain how these unauthorized point-of-sale transactions are relevant to the alleged misconduct.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"[c]onsequential damages can be calculated using the same two alternative methodologies described above with respect to the Claim Denial class."[192]

107.    Therefore, Mr. Regan's methodology for the proposed EMV Chip class is subject to the same critiques described above in Sections VI and VII.

## XI.    Mr. Regan's Damages Methodology for the Members of the Proposed Credit Rescission, Claim Denial, Account Freeze and EMV Chip Classes Assesses Damages Multiple Times to the same Consumers

108.    Mr. Regan's damages methodologies assess damages multiple times for some cardholders who are members of the proposed Claim Denial, Credit Rescission, and Account Freeze classes and for all members of the proposed EMV Chip class.

109.    First, to the extent Mr. Regan is opining that the harm of members of multiple proposed classes is measured as the sum of the damages he estimates in each class, Mr. Regan's damages methodology for the proposed EMV Chip class double-counts damages already calculated for the proposed Claim Denial and Credit Rescission classes. As described in Section X, Mr. Regan's "actual damages" methodology for the proposed EMV Chip Class is identical to his methodology for the proposed Claim Denial and Credit Rescission classes, with an extended period for "consequential damages." Therefore, the "actual damages" Mr. Regan estimates for every member of the proposed Claim Denial and Credit Rescission classes are double counted in his "actual damages" for the proposed EMV Chip class. By double-counting damages between the proposed EMV Chip, Claim Denial, and Credit Rescission classes, Mr. Regan overstates overall damages to proposed class members.

110.    Second, Mr. Regan's methodology for estimating credit card late fees repeatedly assesses late fees for proposed class members with concurrent claims in multiple classes.[193] As discussed in Section V, Mr. Regan attempts to approximate the cost of credit card late fees based on the amount of time customers' funds were unavailable and the alleged average late fee rates for the proposed Claim Denial, Credit Rescission, and Account Freeze classes. When the period that a

---

[192] Regan Report, ¶ 120.

[193] As in the first point, this only applies to the extent that Mr. Regan is opining that the harm of members of multiple proposed classes is measured as the sum of the damages he estimates in each class.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

proposed class member's claim was denied (or credit was rescinded) overlaps with the period their account was frozen, Mr. Regan's methodology assesses late fees during this overlapping period twice for that consumer. Of the ███████████ in late fees Mr. Regan estimates across all claims in the proposed Claim Denial, Credit Rescission, and Account Freeze classes, ██ ████████ are double counted across classes in this manner.[194]

111.    Mr. Regan's methodology for estimating credit card late fees also repeatedly assesses late fees for proposed class members with multiple concurrent claims in the *same* proposed class. This is problematic regardless of whether Mr. Regan is opining that members of multiple proposed classes are entitled to the damages he estimates in each class. For example, Mr. Regan identifies ████████████████ as a proposed class member of the Claim Denial and Credit Rescission classes. Of their claims assigned to the proposed Claim Denial class, █████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████[195] Mr. Regan's method assesses ██████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ even though the claims are for the same cardholder during the same months.[196] By assessing overlapping late fees for overlapping claims, Mr. Regan overstates the credit card late fees some proposed class members may have faced.

Executed this 24th day of October, 2024

_____

Victor Stango

---

[194] *See* Regan Report, Schedule 1. For a given claim, duplicate late fees are computed by determining the number of overlapping days for which the claim denial period and account freeze period overlap. If this overlapping period is at least 30 days, a duplicate late fee of $26 is computed, with additional late fees of $35 computer for every subsequent month up to six months.
[195] *See* Regan Report, Schedule 1.
[196] *See* Regan Report, Schedule 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix A

Professor Victor Stango
Graduate School of Management
University of California, Davis
Davis, California 95616
Email: vstango@ucdavis.edu
Phone: (530) 752-3535
Web: https://gsm.ucdavis.edu/profile/victor-stango

---

**FIELDS**

Household finance, behavioral economics, banking.

**CURRENT AND PAST FULL-TIME POSITIONS**

- Professor, UC Davis Graduate School of Management, Davis California USA August 2017-present
- Associate Professor, UC Davis Graduate School of Management, Davis California USA August 2008-July 2016
- Associate Professor, Tuck School of Business, Hanover New Hampshire USA August 2004-July 2008
- Economist/Senior Economist, Federal Reserve Bank of Chicago, Chicago Illinois USA August 2001- July 2004
- Assistant Professor, University of Tennessee, Knoxville Tennessee USA August 1996- July 2001

**JOURNAL PUBLICATIONS**

1. "We are all behavioral, more or less: A taxonomy of consumer decision making" (with Jon Zinman), *The Review of Economic Studies* 90:3, May 2023: 1470–1498.

2. "Borrowing High vs. Borrowing Higher: Price Dispersion and Shopping Behavior in the US Credit Card Market" (with Jon Zinman), *Review of Financial Studies* 29:4, 2016: 979-1006.

3. "Limited and Varying Consumer Attention: Evidence from Shocks to the Salience of Overdraft Fees" (with Jon Zinman), *Review of Financial Studies* 27:4, 2014: 990-1030.

4. "Celebrity Endorsements, Reputation Risk and Firm Value: Evidence from the Tiger Woods Scandal" (with Chris Knittel). *Management Science* 60(1), 2014: 21-37.

5. "Fuzzy Math, Disclosure Regulation and Credit Market Outcomes: Evidence from Truth in Lending Reform" (with Jon Zinman), *Review of Financial Studies* 24(2), 2011: 506-534.

6. "Strategic Incompatibility in ATM Markets" (with Chris Knittel), *Journal of Banking and Finance* 35(10), October 2011: 2627- 2636.

7. "Some New Evidence on Competition in Payday Lending Markets," *Contemporary Economic Policy*, March 2011.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

8. "Exponential Growth Bias and Household Finance" (with Jon Zinman), *Journal of Finance* 64(6), December 2009: 2807-2849.

9. "How Does Incompatibility Affect Prices? Evidence from ATMs" (with Chris Knittel), *Journal of Industrial Economics* LVII (3), September 2009: 557-582.

10. "What Do Consumers Really Pay on Their Checking and Credit Card Accounts? Explicit, Implicit and Avoidable Costs" (with Jon Zinman), *American Economic Review Papers and Proceedings* 99 (2), May 2009: 424-429.

11. "Incompatibility, Product Attributes and Consumer Welfare: Evidence from ATMs" (with Chris Knittel), *BE Journal of Economic Analysis and Policy* 8(1) (Advances), 2008.

12. "The Causes of Bargaining Failure: Evidence from Major League Baseball" (with Amy Farmer and Paul Pecorino), *Journal of Law and Economics* XLVII(2), October 2004: 543-568.

13. "Ask Prices, Offers and Time-to-Sale in an Online Exchange" (with Amy Farmer), *Economic Inquiry* 42(1), January 2004: 14-28.

14. "The Economics of Standards Wars," *Review of Network Economics* 3(1), March 2004:1-19.

15. "Price Ceilings, Focal Points, and Tacit Collusion: Evidence from Credit Cards" (with Chris Knittel), *American Economic Review* 93(5), December 2003: 1703-1729.

16. "Strategic Responses to Regulatory Threat in the Credit Card Market," *Journal of Law and Economics* XLVI (2), October 2003: 427-452.

17. "Pricing with Consumer Switching Costs: Evidence from the Credit Card Market," *Journal of Industrial Economics* 50(4), December 2002: 475-492.

18. "Competition and Pricing in the Credit Card Market," *Review of Economics and Statistics* 82(3), August 2000: 499-508.

19. "Environmental Regulation as an Entry Barrier for Small Manufacturing Establishments: A Longitudinal Examination," *Journal of Environmental Economics and Management* 40, 2000: 56-75. (with Tom Dean and Robert Brown).

20. "Ranking Graduate Programs by Graduate Publications," *Economic Inquiry* 38(2), April 2000, 358-367. (with Jeffery T. Collins and Richard G. Cox).

21. "The Tax Reform Act of 1986 and the Composition of Consumer Debt," *National Tax Journal* LII (4), December 1999, 717-739.

**OTHER PUBLICATIONS**

22. "Debit or Credit: How People Choose to Pay" (with Jon Zinman), Research Monograph, Filene Institute, November 2008.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

23. "The Economics and Strategy of Standards and Standardization" (with Shane Greenstein), in Scott Shane (ed.), *Handbook of Technology and Innovation Management*: Blackwell, Oxford, UK 2008.

24. "Outsource or Die," Research Monograph, Filene Institute, August 2007.

25. "Credit Cards," (with Julian Wright), *New Palgrave Dictionary of Economics*: MacMillan, Hampshire, UK, 2007.

26. *Standards and Public Policy* (ed., with Shane Greenstein), Cambridge Press, 2006.

27. "Outsourcing, Firm Size and Product Complexity," (with Yukako Ono), *Federal Reserve Bank of Chicago Economic Perspectives*, 1st Quarter 2005: 2-11.

28. "Emerging Payment Standards and Public Policy," (with Tom Ciesielski and Carrie Jankowski), Federal Reserve Bank of Chicago *Annual Report*, 2004.

29. "The Economics of Standards: Public Policy and Market Performance" (with Carrie Jankowski), Federal Reserve Bank of Chicago *Fed Letter*, August 2004.

EDUCATION
UC Davis (1996), Ph.D. in Economics.
University of Pennsylvania (1991), B.A. in Economics and Political Science.

GRANTS AND AWARDS
Michigan Retirement Research Center (MRRC) Grant "Behavioral Factors and Long-Run Financial Well-Being," 2016-2017.
Pension Research Council/TIAA Institute Grant "Behavioral Factors and Long-Run Financial Well-Being," 2016-2017.
Russell Sage Foundation Grant "Behavioral Biases in Household Financial Decision-making," 2011-2012.
Finalist, UCD GSM Professor of the Year, 2010.
National Science Foundation Grant "Information Technology, Outsourcing and Productivity," 2008-2010.
NET Institute Research Grant, Summer 2004, Summer 2006.
Filene Institute Research Grant "Outsource or Die," 2006-2007.
Filene Institute Research Grant "Payment Choices," 2006-2008.
FDIC Research Grant, 2006.
Allen H. Keally Teaching Award, University of Tennessee, 1999-2000.
Club 6 (High Teaching Evaluations), Haas School, UC Berkeley, 1998.
Finalist, Allen H. Keally Teaching Award, University of Tennessee, 1997-98.

OTHER PROFESSIONAL POSITIONS
Visiting Scholar, Federal Reserve Bank of Philadelphia Consumer Finance Institute, 2018-present; Associate Editor, International Journal of Industrial Organization (2004-present); Consulting Economist, Chicago Fed (2007-10); Research Economist, NBER (2009-2011); Visiting Senior Economist, New York Fed (2004); Adjunct Professor, Chicago GSB (2001-2003); Visiting Professor, Haas School (1998).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix B
# Documents Considered List

**Academic Articles**

- Caruelle, Delphine, Line Lervik-Olsen, and Anders Gustafsson, "The Clock is Ticking—Or is it? Customer Satisfaction Response to Waiting Shorter vs. Longer Than Expected During a Service Encounter," *Journal of Retailing* 99, 2023, pp. 247–264

- Cotton, Christopher D., Vaishali Garga, and Justin Rohan, "Consumption Heterogeneity by Occupation: Understanding the Impact of Occupation on Personal Consumption During the COVID-19 Pandemic," *Federal Reserve Bank of Boston Working Papers*, no. 20–16, 2020

- Ettema, Dick, and Laura Verschuren, "Multitasking and Value of Travel Time Savings," *Transportation Research Record* 2010, no. 1, 2007, pp. 19–25

- Gathergood, John, et al., "How Do Consumers Avoid Penalty Fees? Evidence From Credit Cards," *Management Science* 67, no. 4, 2020, pp. 2565–2578

- Gathergood, John, et al., "How Do Individuals Repay Their Debt? The Balance-Matching Heuristic," *American Economic Review* 109, no. 3, 2019, pp. 844–875

- Keys, Benjamin J., and Jialan Wang, "Minimum Payments and Debt Paydown in Consumer Credit Cards," *National Bureau of Economic Research Working Paper*, 2016

- Kortum, Philip, and S. Camille Peres, "A Survey of Secondary Activities of Telephone Callers Who Are Put on Hold," *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting*, 2007, pp. 1153–1157

- Larson, Douglas M., and Sabina L. Shaikh, "Recreation Demand Choices and Revealed Values of Leisure Time," *Economic Inquiry* 42, no. 2, 2004, pp. 264–278

- Lloyd-Smith, Patrick, et al., "Decoupling the Value of Leisure Time from Labor Market Returns in Travel Cost Models," *Journal of the Association of Environmental and Resource Economists* 6, no. 2, 2019, pp. 1–28

- McDonald, Aleecia M., and Lorrie Faith Cranor, "The Cost of Reading Privacy Policies," *I/S: A Journal of Law and Policy for the Information Society* 4, no. 3, 2008, pp. 543–568

- Okada, Erica Mina, and Stephen J. Hoch, "Spending Time versus Spending Money," *Journal of Consumer Research* 31, no. 2, 2004, pp. 313–323

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Palmquist, Raymond B., Daniel J. Phaneuf, and V. Kerry Smith, "Short Run Constraints and the Increasing Marginal Value of Time in Recreation," *National Bureau of Economic Research Working Paper*, no. 14986, 2009

- Stango, Victor, and Jonathan Zinman, "Borrowing High vs. Borrowing Higher: Sources and Consequences of Dispersion in Individual Borrowing Costs," *National Bureau of Economic Research Working Paper*, no. 19069, 2013

- Stango, Victor, and Jonathan Zinman, "What Do Consumers Really Pay on Their Checking and Credit Card Accounts? Explicit, Implicit, and Avoidable Costs," *American Economic Review: Papers & Proceedings* 99, no. 2, 2009, pp. 424–429

- Stavins, Joanna, "Unprepared for Financial Shocks: Emergency Savings and Credit Card Debt," *Contemporary Economic Policy* 39, no. 1, 2021, pp. 59–82

- Verbooy, Kaya, et al., "Time is Money: Investigating the Value of Leisure Time and Unpaid Work," *Value in Health* 21, 2018, pp. 1428–1436

- Zinman, Jonathan, "Household Debt: Facts, Puzzles, Theories, and Policies," *Annual Review of Economics* 7, no. 2, 2015, pp. 251–276

**Bates Stamped Documents**

- BANA_EDD_MDL-00694814

- Bank of America, "Unemployment Insurance Prepaid Card Program Remediation Plan," Submitted October 6, 2022 to the Office of the Comptroller of the Currency and October 12, 2022 to the Consumer Financial Protection Bureau, BANA_EDD_MDL-00102554–577

**Data**

- "California Unemployment Industry & Demographics Data Dashboard," *State of California Employment Development Department,* September 2024, https://edd.ca.gov/siteassets/files/newsroom/facts-and-stats/excel/ada-county-and-statewide-demographics--industry-data-9-21-24.xlsx

- "Center for Microeconomic Data: Survey of Consumer Expectations," *Federal Reserve Bank of New York*, 2020–2023, https://www.newyorkfed.org/microeconomics/sce#/

- "Household Pulse Survey Public Use File: January 20 – February 1, 2021," *U.S. Census Bureau*, https://www2.census.gov/programs-surveys/demo/datasets/hhp/2021/wk23/HPS_Week23_PUF_CSV.zip, accessed October 7, 2024

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Depositions**

- Deposition of Azuri Moon, February 27, 2024

- Deposition of Jennifer Meza, April 30, 2024

- Deposition of Juanita Isles, May 2, 2024

- Deposition of Miguel Salazar, May 3, 2024

**Declarations**

- Declaration of Jennifer Lennon in Support of Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, *In Re: Bank of America California Unemployment Benefits Litigation*, October 23, 2024

- Appendix of Exhibits to the Declaration of Laura Brys in Support of Defendant's Opposition to Plaintiffs' Motion for Class Certification, *In Re: Bank of America California Unemployment Benefits Litigation*, October 24, 2024

- Declaration of William Martin in Support of Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, *In Re: Bank of America California Unemployment Benefits Litigation*, October 2024

**Expert Reports**

- Expert Class Certification Report of Greg J. Regan, CPA/CFF, CFE, August 29, 2024, Backup Materials, and Materials listed in Appendix B

**Legal Documents**

- Bank of America's Responses and Objections to Plaintiff Yick's Fourth Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 2, 2024, with Exhibits

- Bank of America's Second Set of Responses and Objections to Plaintiff Yick's Seventh Set of Interrogatories (Interrogs. 39 & 42), *In Re Bank of America California Unemployment Benefits Litigation*, April 23, 2024

- Bank of America's Revised Second Supplemental Responses and Objections to Plaintiff Yick's First Set of Interrogatories (Interrogatories 2-6, 14-15), *In Re Bank of America California Unemployment Benefits Litigation*, December 1, 2023, with Exhibits

- Memorandum of Points and Authorities in Support of Motion for Class Certification, *In Re Bank of America California Unemployment Benefits Litigation*, August 29, 2024

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Plaintiff Alex Yuan's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 29, 2024

- Plaintiff Azuri Moon's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 2, 2024

- Plaintiff Candace Koole's Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 4, 2024

- Plaintiff J. Michael Willrich's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 29, 2024

- Plaintiff Kuang Ting Chong's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 2, 2024

- Plaintiff Lindsay McClure's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 2, 2024

- Plaintiff Roland Oosthuizen Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 29, 2024

- Plaintiff Stephanie Moore's Supplemental Objections and Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 29, 2024

- Plaintiff Vanessa Rivera Objections and Supplemental Responses to Bank of America, N.A.'s First Set of Interrogatories, *In Re Bank of America California Unemployment Benefits Litigation*, January 29, 2024

**Online Public Press Articles and Other Web Content**

- "California City and County Minimum Wages as of 7/1/2021," *UC Berkeley Labor Center*, July 1, 2021, https://laborcenter.berkeley.edu/california-city-and-county-minimum-wages-as-of-7-1-2021/

- "COVID-19 Tenant Relief Act," *State of California Business, Consumer Services, and Housing Agency*, https://www.bcsh.ca.gov/covidrelief/, accessed October 22, 2024.

- "Credit Cards: Pandemic Assistance Likely Helped Reduce Balances, and Credit Terms Varied among Demographic Groups," *United States Government*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Accountability Office, Report to Congressional Committees*, September 2023,
https://www.gao.gov/assets/d23105269.pdf

- "Economic Well-Being of U.S. Households in 2021," *Board of Governors of the Federal Reserve System*, May 2022,
https://www.federalreserve.gov/publications/files/2021-report-economic-well-being-us-households-202205.pdf

- "Economic Well-Being of U.S. Households in 2022," *Board of Governors of the Federal Reserve System*, May 2023,
https://www.federalreserve.gov/publications/files/2022-report-economic-well-being-us-households-202305.pdf

- "Eligibility Requirements," *State of California Employment Development Department,* https://edd.ca.gov/ui_eligibility/, accessed October 21, 2024

- "Minimum Wage Frequently Asked Questions," *State of California Department of Industrial Relations*, July 2024, https://www.dir.ca.gov/dlse/faq_minimumwage.htm

- "Personal Consumption Expenditures by State, 2020," *Bureau of Economic Analysis*, October 8, 2021, https://www.bea.gov/news/2021/personal-consumption-expenditures-state-2020

- "Personal Saving Rate," *Federal Reserve Bank of St. Louis*, *FRED Economic Data*, https://fred.stlouisfed.org/graph/?g=FhxV#, accessed September 27, 2024

- "The Consumer Credit Card Market," *Bureau of Consumer Financial Protection*, September 2021, https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2021.pdf

- Brian Faler, "Unemployment Assistance to Millionaires Soared During Pandemic," *Politico*, November 22, 2022,
https://www.politico.com/news/2022/11/22/unemployment-assistance-millionaires-covid-pandemic-2020-00070446

- Chris Wheat, Erica Deadman, and Daniel M. Sullivan, "How Vulnerable Are Americans to Unexpected Expenses?" *JP Morgan Chase Institute*, July 30, 2024, https://www.jpmorganchase.com/institute/all-topics/financial-health-wealth-creation/how-vulnerable-are-americans-to-unexpected-expenses

- Daniel Sexton, "An In-Depth Look at Mortgage Forbearance Data," *Federal Reserve Bank of Atlanta*, February 22, 2021,
https://www.atlantafed.org/blogs/macroblog/2021/02/22/in-depth-look-at-mortgage-forbearance-data

- Diana Farrell, et al., "Policy Brief: The Unemployment Benefit Boost: Trends in Spending and Saving When the $600 Supplement Ended," *JP Morgan Chase & Co. Institute*, October 2020,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/Institute-UI-Benefits-Boost-Policy-Brief_ADA.pdf

- Evelyn Waugh, "How Is a Credit Card Minimum Payment Calculated?" *Experian*, May 28, 2023, https://www.experian.com/blogs/ask-experian/how-is-your-credit-card-minimum-payment-calculated/, accessed October 21, 2024

- Fiona Greig, Erica Deadman, and Tanya Sonthalia, "Household Cash Balance Pulse: Family Edition," *JP Morgan Chase Institute*, November 2021, https://www.jpmorganchase.com/institute/all-topics/financial-health-wealth-creation/household-cash-balance-pulse-families

- Hamza Abdelrahman, Luiz E. Oliveira, and Adam Hale Shapiro, "The Rise and Fall of Pandemic Excess Wealth," *FRBSF Economic Letter 2024-06*, February 26, 2024, https://www.frbsf.org/wp-content/uploads/el2024-06.pdf

- Joanna Stavins, "Credit Card Spending and Borrowing Since the Start of the Covid-19 Pandemic," *Federal Reserve Bank of Boston*, October 19, 2023, https://www.bostonfed.org/publications/current-policy-perspectives/2023/credit-card-spending-and-borrowing-since-the-start-of-the-covid-19-pandemic.aspx

- Liane Fiano, "Protecting Your Credit During the Coronavirus Pandemic," *Consumer Financial Protection Bureau*, July 29, 2020, https://www.consumerfinance.gov/about-us/blog/protecting-your-credit-during-coronavirus-pandemic/

- Neil Bhutta, and Lisa Dettling, "Money in the Bank? Assessing Families' Liquid Savings using the Survey of Consumer Finances," *FEDS Notes*, November 19, 2018, https://www.federalreserve.gov/econres/notes/feds-notes/assessing-families-liquid-savings-using-the-survey-of-consumer-finances-20181119.html

- Rajashri Chakrabarti, et al., "Who Received Forbearance Relief?" *Federal Reserve Bank of New York Liberty Street Economics*, August 2, 2021, https://libertystreeteconomics.newyorkfed.org/2021/08/who-received-forbearance-relief

- Sarah Bohn, Marisol Cuellar Mejia, and Julien Lafortune, "Unemployment Benefits in the COVID-19 Pandemic," *Public Policy Institute of California*, April 9, 2020, https://www.ppic.org/blog/unemployment-benefits-in-the-covid-19-pandemic/

- Stefan Lembo Stolba, "How the CARES Act Affects Credit Reports and Scores," *Experian*, April 24, 2020, https://www.experian.com/blogs/ask-experian/how-the-cares-act-affects-credit-reports-and-scores/

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Publicly Available Documents**

- "California Employment Development Department Debit Card Account Agreement," *Bank of America,* March 1, 2018

**Note: In addition to the documents on this list, I considered all documents cited in my report to form my opinions.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix C

**List of cases in which Victor Stango testified**

**as an expert by trial or by deposition in the past four years**

*Charles Daniel Bickerstaff, as executor of the estate of Jeff Bickerstaff, Jr., on behalf of himself and all persons similarly situated, v. SunTrust Bank, State Court of Georgia, Fulton County. Case No. 10-ev-010485-H. Deposition, November 28, 2023*

*Bureau of Consumer Financial Protection v. Progrexion Marketing Inc., et al., United States District Court for the District of Utah. Deposition, December 14, 2021*

*Moss v BMO Harris Bank, N.A. et al., United States District Court for the Eastern District of New York. Case No. 2:13-cv-05438. Deposition, December 10, 2021*

*Kristen Schertzer, et al. v. Bank of America et al., United States District Court for the Southern District of California. Case No. 3:19-cv-00264-JM-MSB. Deposition, November 20, 2021*

*Robert Trepeta, et al. v. National Consumer Telecom and Utilities Exchange, Inc., and Equifax Information Services, LLC, United States District Court for the Eastern District of Virginia. Case No. 2:19-cv-00405-MSD-LRL. Deposition, October 22, 2020*