JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
KARIN B. SWOPE (Pro Hac Vice)
kswope@cpmlegal.com
BLAIR V. KITTLE (SBN 336367)
bkittle@cpmlegal.com
VASTI S. MONTIEL (SBN 346409)
vmontiel@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
STACEY M. LEYTON (SBN 203827)
sleyton@altber.com
CONNIE K. CHAN (SBN 284230)
cchan@altber.com
KATHERINE G. BASS (SBN 344748)
kbass@altber.com
COLIN C. JONES (SBN 354301)
cjones@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Fax: (415) 362-8064

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*
*(Additional Counsel Listed Below)*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION** | Case No. 3:21-md-02992-GPC-MSB |
| | **THIRD AMENDED MASTER CONSOLIDATED COMPLAINT** |
| This Document Relates to All Actions | **JURY TRIAL DEMANDED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    **INTRODUCTION** ................................................................. 3

II.   **JURISDICTION AND VENUE** ....................................... 6

III.  **THE PARTIES** ..................................................................... 7

    A.  Class Representative Plaintiffs .................................... 7

    B.  Individual Plaintiffs ..................................................... 15

    C.  Defendants ................................................................... 15

IV.  **FACTUAL ALLEGATIONS** ............................................. 16

    A.  The Bank's Contract with EDD ................................... 16

    B.  The Bank's Failure to Secure EDD Debit Cardholder Information ...... 22

    C.  The Bank's Use of Outdated, Vulnerable Magnetic Stripe Technology .. 24

    D.  The Bank's Contractual Promises and Representations to Cardholders ... 27

    E.  The Rampant Third-Party Fraud on EDD Debit Card Accounts .......... 28

    F.  The Bank's Evasive and Ineffectual Response Prior to the Filing of Plaintiffs' Initial Class Action Complaint and The Court's Issuance of a Preliminary Injunction ................... 32

        1.  The Bank's Policy and Practice of Not Employing Reasonable Practices and Procedures to Monitor for, Detect, Stop, and Promptly Notify Cardholders about Suspicious Transactions Involving their Cards and Accounts ................... 33

        2.  The Bank's Policy and Practice of Making it Difficult for Cardholders to Report Unauthorized Transactions ............ 35

        3.  The Bank's Policy and Practice of Automatically Denying Unauthorized Transaction Claims Without Reasonable Investigation or Explanation, Including Based Solely on a Highly Flawed "Claim Fraud Filter" ................... 36

4. The Bank's Policy and Practice of Automatically and Indefinitely Freezing Cardholders' Accounts When They Report Unauthorized Transactions, Based on a Highly Flawed "Claim Fraud Filter" ....... 39

5. The Bank's Policy and Practice of Denying Reasonable Customer Service to Cardholders Seeking Assistance with Fraud Claims and the Unfreezing of Accounts ............................................................. 41

6. The Court Preliminarily Enjoins the Bank's Policies and Practices ..... 44

7. The Bank's Policies and Practices Continue to Harm Cardholders ..... 47

G. Class Representative Plaintiffs' Allegations ......................................... 48

1. Jennifer Yick ........................................................................................ 48

2. Vanessa Rivera ..................................................................................... 51

3. Candace Koole ...................................................................................... 53

4. Azuri Moon ........................................................................................... 55

5. Roland Oosthuizen ................................................................................ 57

6. Rosemary Mathews ............................................................................... 59

7. Carlos Rodriguez .................................................................................. 61

8. J. Michael Willrich ............................................................................... 63

9. Lindsay McClure ................................................................................... 65

10. Clara Cajas ........................................................................................... 67

11. Stephanie Smith .................................................................................... 68

12. Alan Karam ........................................................................................... 69

13. Brian Wiggins ....................................................................................... 73

14. Jonathan Smith ...................................................................................... 73

15. Alex Yuan ............................................................................................. 75

16. Jory Zoelle ............................................................................................ 77

17. Cindy Baker .......................................................................................... 78

18. Ursula Auburn ....................................................................................... 78

19. Kuang Ting Chong ................................................................................ 80

20. Stephanie Moore .................................................................................... 81

21. Zinaida Petrova ..................................................................................... 82

H. Individual Plaintiffs' Allegations ........................................................ 84

V. CLASS ACTION ALLEGATIONS ................................................................. 190

**VI.    CLAIMS FOR RELIEF** .................................................................**197**

**FIRST CLAIM FOR RELIEF**
Violations of the Electronic Fund Transfers Act
15 U.S.C. §§1693 et seq.; 12 C.F.R. §§1005.1 et seq. ...............................197

**SECOND CLAIM FOR RELIEF**
Violations of the California Consumer Privacy Act
Cal. Civ. Code §§1798.100 et seq....................................................................202

**THIRD CLAIM FOR RELIEF** *
*[Removed]*...........................................................................................................205

**FOURTH CLAIM FOR RELIEF**
Violations of the California Unfair Competition Law
Cal. Bus. & Prof. Code §§17200 et seq............................................................206

**FIFTH CLAIM FOR RELIEF**
Negligence and Negligence Per Se ...................................................................232

**SIXTH CLAIM FOR RELIEF**
Negligent Hiring, Supervision, and Retention ..................................................239

**SEVENTH CLAIM FOR RELIEF**
Breach of Contract............................................................................................241

**EIGHTH CLAIM FOR RELIEF** *
*[Removed]* ..........................................................................................................242

**NINTH CLAIM FOR RELIEF**
Breach of Implied Covenant of Good Faith and Fair Dealing ...............................243

**TENTH CLAIM FOR RELIEF**
Breach of Fiduciary Duty..................................................................................246

---

* Asterisk indicates a dismissal with prejudice and that the allegations within those claims for relief have been removed from this TAMCC. *See infra* note 1.

**ELEVENTH CLAIM FOR RELIEF**[*]

*[Removed]*......................................................................................251

**TWELFTH CLAIM FOR RELIEF**[*]

*[Removed]*......................................................................................251

**THIRTEENTH CLAIM FOR RELIEF**

Violations of Federal Due Process under the 14th Amendment
42 U.S.C. §1983......................................................................252

**FOURTEENTH CLAIM FOR RELIEF**

Violations of the California Due Process Clause
Cal. Const. art. I, §7(A)........................................................254

**VII.    PRAYER FOR RELIEF**.......................................................**255**

**VIII.   JURY TRIAL DEMAND**......................................................**256**

Plaintiffs, by and through Plaintiffs' Interim Co-Lead Counsel, hereby file this Third Amended Master Consolidated Complaint for both the Class Action and Individual Cases ("TAMCC").[1] This TAMCC is submitted to serve the administrative functions of efficiency and economy and to present certain common

---

[1] This TAMCC, which is filed pursuant to the Court's order granting leave to amend (Dkt. No. 405) following the January 17, 2025 hearing on Plaintiffs' Motion for Class Certification, contains the same paragraph numbering as in the Second Amended Master Consolidated Complaint ("SAMCC") (Dkt. No. 304), First Amended Master Consolidated Complaint ("FAMCC") (Dkt. No. 136) and the Master Consolidated Complaint ("MCC") (Dkt. No. 72). Pursuant to the Court's order and guidance at the hearing, the only amendments made herein are to the Tenth, Thirteenth, and Fourteenth Claims for Relief (¶¶630, 633–634, 656, 660–661, 665–666). Previously, the SAMCC made three categories of substantive amendments consistent with the Court's June 25, 2024 Order Granting in Part and Denying in Part Defendant's Motion to Dismiss and Granting Plaintiffs' Motion for Reconsideration ("Order") (Dkt. No. 297): (1) amending the UCL claim for relief to cure deficiencies in the "unfair" prong claim and to allege an inadequate remedy at law regarding restitution (*see infra* ¶¶581–582, 584; Order at 16:22–24, 17:14–15); (2) removing claims for relief and legal theories that have been dismissed with prejudice by replacing the text of paragraphs pertaining to such causes of action and theories with "*[Removed]*" (*see infra* ¶¶553(b)–(d), 562–574, 606, 608(e)–(h), 611–618, 637–650; Order at 10:23–11:4; ECF 126 at 55:15–16, 66:7–9, 75:3–4); and (3) replacing the text of paragraphs pertaining to those Plaintiffs whose claims have been voluntarily dismissed with "*[Removed]*". *See* Dkt. Nos. 150, 194, 208, 217 & *infra* ¶¶18, 22, 29, 33, 192–194, 216–224, 258–260, 279–284 (4 Class Representative Plaintiffs); Dkt. Nos. 240, 254, 268 & *infra* ¶¶287–288, 293, 295–296, 299, 301–302, 305–310, 314–315, 318–319, 326–327, 330, 333–338, 340, 343, 346–349, 351, 353, 356–357, 359–361, 363–365, 369, 373, 375, 378, 380, 384, 388, 390, 395–396, 400, 407–408, 411, 413–417, 419–420, 422–423, 429–432, 435–437, 446, 448–449, 455, 457–458, 461, 463–464, 466, 468–469, 472, 475–476, 486–487, 489, 491–495, 503–504, 510, 513–514, 516–517, 520–522, 525–526 (108 Individual Plaintiffs). Plaintiffs have made no other substantive amendments, consistent with Plaintiffs' understanding that the Order to file the SAMCC and the Order granting leave to file this TAMCC did not envision widespread amendments to update allegations throughout the complaint. Thus, for example, the amendments do not delete references to Plaintiffs' requests for injunctive relief even though Plaintiffs have conceded that their request for permanent injunctive relief has now been mooted by EDD's termination of the EDD-Bank Contract, and do not modify related allegations that the Bank's policies and practices are ongoing (*see, e.g.*, *infra* §IV(F)(7)).

claims and common questions of fact and law for appropriate action by the Court in the context of this multidistrict proceeding, pursuant to the Order Re Case Management (Dkt. No. 48). The filing of this TAMCC does not constitute a waiver or dismissal of the underlying actions or claims therein.

Class representative plaintiffs Jennifer Yick, Vanessa Rivera, Candace Koole, Azuri Moon, Roland Oosthuizen, Rosemary Mathews, Carlos Rodriguez, J. Michael Willrich, Lindsay McClure, Clara Cajas, Stephanie Smith, Alan Karam, Brian Wiggins, Jonathan Smith, Alex Yuan, Jory Zoelle, Cindy Baker, Ursula Auburn, Kuang Ting Chong, Stephanie Moore, and Zinaida Petrova (collectively, "Class Representative Plaintiffs"), on behalf of themselves and all other similarly situated individuals whose California unemployment and other public benefits are or were paid through debit cards issued by Defendant Bank of America, N.A. ("Bank of America" or "Bank") bring this class action against the Bank for violations of the Electronic Funds Transfer Act at 15 U.S.C. §§1693 et seq. ("EFTA") and its implementing regulations at 12 C.F.R. Part 1005 ("Regulation E"), violations of the Due Process Clauses of the U.S. and California Constitutions, breach of contract, negligence, and other state common law and statutory claims, to remedy Bank of America's egregious maladministration of its obligations under the California Employment Development Department's ("EDD") benefits payment programs. Additionally, 133 individual plaintiffs (collectively, "Individual Plaintiffs") bring the same causes of action against Bank of America on behalf of themselves only. In violation of its constitutional, statutory, common law, and contractual obligations to Plaintiffs and Class Members, the Bank has failed to take reasonable steps to protect Plaintiffs' and Class Members' benefits from fraud, has deprived them of their statutory right to public benefits without providing them with notice or an opportunity to be heard, and has otherwise failed to ensure that they are able to receive and access the public benefits to which they are lawfully entitled.

# I.    INTRODUCTION

1.    Like millions of other Californians, Plaintiffs lost their jobs through no fault of their own during the COVID-19 pandemic. Plaintiffs and Class Members applied for unemployment and other public benefits through programs administered by California's EDD ("EDD benefits"). They were found eligible by EDD to receive, and initially did receive, the benefits to which they were and are lawfully entitled. Throughout the COVID-19 pandemic, Plaintiffs and Class Members have relied on these subsistence benefits to pay for food, housing, and other necessities of life.

2.    Pursuant to an exclusive contract between EDD and Bank of America, Plaintiffs and Class Members received their periodic benefits payments not from EDD directly, but through Bank-issued and Bank-administered prepaid debit cards ("EDD Debit Cards" or "Cards"), which are linked to individual Bank depository accounts ("EDD Debit Card Accounts" or "Accounts"). Although the Bank was entrusted with administering these critical EDD benefits, on which millions of vulnerable Californians' lives depend, and although the Bank was legally required to take necessary and reasonable steps to protect Plaintiffs' and Class Members' EDD Debit Cards and Accounts from fraudulent access by third parties, the Bank failed to do so and indeed treated these Cards and Accounts with *less* care than it affords its regular consumer debit and credit cardholders. Among other things, the Bank failed to secure Plaintiffs' and Class Members' sensitive Card and Account information and issued them EDD Debit Cards without the industry-standard, fraud-preventing EMV chip technology that the Bank has used on all its *regular consumer* customers' debit and credit cards since 2014. Instead, for its *government benefits* customers, the Bank chose to issue debit cards with only outdated magnetic stripe technology, which makes those cards far more susceptible to skimming, cloning, and other schemes that have allowed third parties to fraudulently use and access Plaintiffs' and Class Members' EDD Debit Cards and Accounts. The Bank further breached its duties through its systemic practice of failing to take reasonable

steps to secure Plaintiffs' and Class Members' personal and financial information, including failing to ensure that this information was appropriately handled and not misappropriated by the Bank's subcontractors and their employees and agents, including by customer service representatives and other call center agents. The Bank's systemically lax security practices enabled unauthorized persons to access Plaintiffs' and Class Members' personal and financial information and to make fraudulent, unauthorized transactions involving Plaintiffs' and Class Members' EDD Debit Cards and Accounts.

3.    In addition to the Bank acting negligently and in breach of its statutory and common law obligations to Plaintiffs and Class Members by failing to protect their EDD Debit Cards and Accounts, the Bank also has violated its statutory and common law obligations to Plaintiffs and Class Members by failing to implement adequate and reasonable systems, measures, and protections to permit: prompt and effective identification of fraud on Plaintiffs' and Class Members' Cards and Accounts, prompt submission of fraud claims (also referred to herein as unauthorized transaction claims), provisional access to already-approved benefits during the course of the Bank's investigations of fraud claims, prompt and accurate resolution of those claims, and prompt reimbursement of funds stolen from Plaintiffs' and Class Members' Accounts. For example, instead of providing an effective and timely process for Plaintiffs and Class Members to report fraud claims, the Bank adopted a series of "customer service" practices and policies that have required Plaintiffs and Class Members to spend dozens of hours on the phone with customer service, and that have otherwise frustrated and obstructed Plaintiffs' and Class Members' efforts to submit such claims. When those Plaintiffs and Class Members who persevered were finally able to reach the Bank's customer service representatives to report that unauthorized transactions had fraudulently been conducted on their EDD Debit Card Accounts, the Bank then violated their statutory, common law, and constitutional due process rights by denying their fraud

1  claims without investigation or explanation and freezing their Accounts

2  indefinitely, thereby depriving them of access to their past *and future* disbursements

3  of EDD benefits without any prior notice or an opportunity to be heard.

4      4.    The cardholder agreement between Bank of America and each Plaintiff

5  and Class Member ("Cardholder Agreement") sets forth the Bank's "Zero Liability"

6  policy, which promises to protect each Plaintiff and Class Member from adverse

7  financial consequences if their EDD Debit Cards or Accounts are fraudulently used

8  or accessed by third parties. The Bank has not implemented this policy as promised,

9  which has caused Plaintiffs and Class Members to suffer significant financial losses

10  from third-party fraud, including by the Bank failing to have reasonable procedures

11  in place to identify and receive notifications of fraud, failing to adequately monitor

12  its customer service, establishing procedures that frustrate and obstruct timely

13  submission of fraud claims by Plaintiffs and Class Members, closing fraud claim

14  investigations without having conducted a reasonable investigation, and failing to

15  extend provisional credit to Plaintiffs and Class Members as required by law while

16  fraud claim investigations are underway. The Bank has also deprived Plaintiffs and

17  Class Members of their constitutional rights to notice and an opportunity to be heard

18  before causing their EDD Debit Cards and Accounts to be frozen or blocked for

19  extended periods of time, thereby depriving Plaintiffs and Class Members of access

20  to past, present, and future disbursements of unemployment and other government

21  benefits for which they have been found eligible.

22      5.    By the acts and omissions alleged here, Bank of America has violated

23  federal and state constitutional due process protections; violated EFTA and its

24  implementing Regulation E; violated California's Consumer Privacy Act, Customer

25  Records Act, and Unfair Competition Law; acted negligently; and breached its

26  Cardholder Agreement with Plaintiffs and Class Members, its contract with EDD

27  (to which Plaintiffs and Class Members are intended third-party beneficiaries), the

28  implied covenant of good faith and fair dealing under those contracts, and its

fiduciary duties to Plaintiffs and Class Members. These acts and omissions have caused substantial financial and other harm to Plaintiffs and Class Members, and unless promptly enjoined will cause them and the public to suffer immediate and irreparable harm.

## II.    JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C. §1331 because this action arises under the federal Due Process Clause and the Electronic Fund Transfers Act, 15 U.S.C. §§1693 et seq.; (b) 28 U.S.C. §1332(d) because this is a class action in which the amount in controversy exceeds $5,000,000, there are more than 100 putative Class Members, and the majority of putative Class Members are citizens of a state different than the state of which Bank of America is a citizen; (c) 28 U.S.C. §1332(a) because Plaintiffs and Class Members are citizens of California, Bank of America is incorporated under the laws of Delaware and has its principal place of business in North Carolina, and the amount in controversy exceeds $75,000; and (d) supplemental jurisdiction under 28 U.S.C. §1367 with respect to the claims for relief arising under state law.

7.     This Court has specific personal jurisdiction over Bank of America because the Bank has sufficient minimum contacts with California, has purposely availed itself of the benefits and protection of California law, and conducts a substantial amount of business in and with the State of California (including with EDD), such that the Court's exercise of personal jurisdiction over the Bank is reasonable and accords with due process.

8.     Venue is proper in this District pursuant to 28 U.S.C. §1407 and the Judicial Panel of Multidistrict Litigation's Transfer Order transferring the actions comprising this multidistrict litigation to this Court for coordinated or consolidated pretrial proceedings. *See* Dkt. No. 1. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because a substantial portion of the acts or omissions giving rise

to the claims alleged occurred in this District, and because Bank of America is subject to the Court's personal jurisdiction with respect to this action.

### III.    THE PARTIES

**A.    Class Representative Plaintiffs**

9.    Class Representative Plaintiff Jennifer Yick resides in San Francisco, California. She is a real estate professional who found herself out of work during the COVID-19 pandemic. She then applied for and was found eligible by EDD to receive unemployment benefits in or about April 2020. Yick received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. She was then the victim of unauthorized transactions on her EDD Debit Card Account in November 2020. Yick promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Yick to suffer immediate and irreparable injury. *See infra* ¶¶114–126. Yick is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

10.    Class Representative Plaintiff Vanessa Rivera resides in Rancho Cucamonga, California. She worked as a lien negotiator until early 2020, when she became unemployed. She then applied for and was found eligible by EDD to receive unemployment benefits in or about January 2020. Soon thereafter, she received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. On or about January 29, 2021, she was then the victim of an unauthorized $800 ATM withdrawal from her EDD Debit Card Account, which occurred at a Bank of America ATM. Rivera promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Rivera to suffer immediate and irreparable injury. *See infra* ¶¶127–135. Rivera is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

11.     Class Representative Plaintiff Candace Koole resides in Temecula, California. She is a doula and a nanny who found herself out of work during the COVID-19 pandemic. She applied for and was found eligible by EDD to receive unemployment benefits. Soon thereafter, she received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. In December 2020, she was then the victim of unauthorized transactions on her EDD Debit Card Account. Koole promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Koole to suffer immediate and irreparable injury. *See infra* ¶¶136–143. Koole is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

12.     Class Representative Plaintiff Azuri Moon resides in Los Angeles, California. He is a music educator and a live and studio guitarist. He became unemployed early in the COVID-19 pandemic. He then applied for and was found eligible by EDD to receive unemployment benefits. Soon thereafter, in or about June 2020, he received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In October 2020, he was the victim of two unauthorized ATM withdrawals on his EDD Debit Card Account totaling $1,800. Moon promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Moon to suffer immediate and irreparable injury. *See infra* ¶¶144–151. Moon is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

13.     Class Representative Plaintiff Roland Oosthuizen resides in Lawndale, California. He was furloughed from his job working for ABM at Los Angeles International Airport in or about April 2020 due to the COVID-19 pandemic. He then applied for and was found eligible by EDD to receive unemployment benefits. Oosthuizen received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In or about September 2020, Oosthuizen

was the victim of five separate unauthorized transactions on his EDD Debit Card Account on five successive days in the amount of $1,000 each. Oosthuizen promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Oosthuizen to suffer immediate and irreparable injury. *See infra* ¶¶152–159. Oosthuizen is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

14.     Class Representative Plaintiff Rosemary Mathews resides in Lawndale, California. She lost her employment with the Staples Center catering department and with a yoga studio in March 2020 due to the COVID-19 pandemic. She then applied for and was found eligible by EDD to receive unemployment benefits. Mathews received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. In or about October 2020, Mathews was the victim of an unauthorized transaction on her EDD Debit Card Account in the amount of $1,000. Mathews promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Mathews to suffer immediate and irreparable injury. *See infra* ¶¶160–170. Mathews is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

15.     Class Representative Plaintiff Carlos Rodriguez resides in Chula Vista, California. Rodriguez's job as a real estate agent slowed to almost a complete stop during the COVID-19 pandemic. Rodriguez then applied for and was found eligible by EDD to receive unemployment benefits. Rodriguez received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In December 2020, Rodriguez was the victim of unauthorized transactions that removed $1,130 from his EDD Debit Card Account. Rodriguez promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Rodriguez to suffer immediate

and irreparable injury. *See infra* ¶¶171–176. Rodriguez is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

16.    Class Representative Plaintiff J. Michael Willrich resides in San Diego, California. He is a hospitality professional who found himself out of work during the COVID-19 pandemic. He then applied for and was found eligible by EDD to receive unemployment benefits. Soon thereafter, he received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. He was then the victim of unauthorized transactions that removed $5,083.75 from his EDD Debit Card Account. Willrich promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Willrich to suffer immediate and irreparable injury. *See infra* ¶¶177–186. Willrich is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

17.    Class Representative Plaintiff Lindsay McClure resides in California. She is a visual merchandiser at Nordstrom who found herself out of work during the COVID-19 pandemic. She then applied for and was found eligible by EDD to receive unemployment benefits. Soon thereafter, she received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. McClure experienced fraudulent charges on her EDD Debit Card Account on or around December 1, 2020. McClure promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing McClure to suffer immediate and irreparable injury. *See infra* ¶¶187–191. McClure is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

18.    *[Removed]*

19.    Class Representative Plaintiff Clara Cajas resides in California. Cajas is a registered dental assistant who works as an instructor, who found herself out of work during the pandemic. She then applied for and was found eligible by EDD to

receive unemployment benefits. Soon thereafter, she received a Bank of America EDD Debit Card with a magnetic stripe (no EMV chip) to access her benefits. She was then twice the victim of unauthorized transactions on her EDD Debit Card Account. Cajas promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Cajas to suffer immediate and irreparable injury. *See infra* ¶¶195–199. Cajas is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

20.    Class Representative Plaintiff Stephanie Smith resides in Tracy, California. Smith was a salesperson who lost her job in March 2020 because of the COVID-19 pandemic. She then applied for and was found eligible by EDD to receive unemployment benefits. In or about June 2020, she received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. Despite never having used her Card for a purchase, ATM withdrawal, or other transaction (i.e., she only conducted online transfers through Bank of America's website), unauthorized transactions appeared on her EDD Debit Card Account in late November 2020. Upon discovering the unauthorized transactions, Smith immediately reported them to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Smith to suffer immediate and irreparable injury. *See infra* ¶¶200–202. Smith is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

21.    Class Representative Plaintiff Alan Karam resides in Downey, California. He operates a food truck in the Los Angeles area, but he found himself out of work due to the COVID-19 pandemic. Karam then applied for and was found eligible by EDD to receive unemployment benefits. In or about June 2020, he received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In August 2020, his EDD Debit Card Account was subject to over $2,000 in unauthorized transactions, all of which occurred in New

York while Karam was in California with his Card in his possession. Karam promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Karam to suffer immediate and irreparable injury. *See infra* ¶¶203–215. Karam is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

22.    *[Removed]*

23.    Class Representative Plaintiff Brian Wiggins resides in Elk Grove, California. He worked as a security guard until he found himself out of work during the COVID-19 pandemic. He applied for and was found eligible by EDD to receive unemployment benefits. In August 2020, Wiggins received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In November 2020, he was the victim of unauthorized ATM withdrawals on his EDD Debit Card Account, including one in Georgia. Wiggins promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Wiggins to suffer immediate and irreparable injury. *See infra* ¶¶225–228. Wiggins is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

24.    Class Representative Plaintiff Jonathan Smith resides in Los Angeles, California. He applied for and was found eligible by EDD to receive unemployment benefits. Smith received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. He was then the victim of unauthorized transactions on his EDD Debit Card Account. Smith promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Smith to suffer immediate and irreparable injury. *See infra* ¶¶229–236. Smith is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

25.     Class Representative Plaintiff Alex Yuan resides in San Jose, California. He applied for and was found eligible by EDD to receive unemployment benefits. Yuan received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. He was then the victim of unauthorized transactions on his EDD Debit Card Account. Yuan promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Yuan to suffer immediate and irreparable injury. *See infra* ¶¶237–245. Yuan is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

26.     Class Representative Plaintiff Jory Zoelle resides in California. She applied for and was found eligible by EDD to receive unemployment benefits. Zoelle received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. She was then the victim of unauthorized transactions on his EDD Debit Card Account. Zoelle reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Zoelle to suffer immediate and irreparable injury. *See infra* ¶¶246–249. Zoelle is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

27.     Class Representative Plaintiff Cindy Baker resides in California. She applied for and was found eligible by EDD to receive unemployment benefits. Baker received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. She was then the victim of unauthorized transactions on her EDD Debit Card Account. Baker reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Baker to suffer immediate and irreparable injury. *See infra* ¶¶250–253. Baker is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

28.    Class Representative Plaintiff Ursula Auburn resides in California. She applied for and was found eligible by EDD to receive unemployment benefits. Auburn received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. She was then the victim of unauthorized transactions on her EDD Debit Card Account. Auburn reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Auburn to suffer immediate and irreparable injury. *See infra* ¶¶254–257. Auburn is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

29.    *[Removed]*

30.    Class Representative Plaintiff Kuang Ting Chong resides in Los Angeles County, California. He applied for and was found eligible by EDD to receive unemployment benefits. Chong received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. In July 2020, he was the victim of unauthorized transactions on his EDD Debit Card Account. Chong promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Chong to suffer immediate and irreparable injury. *See infra* ¶¶261–267. Chong is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

31.    Class Representative Plaintiff Stephanie Moore resides in Los Angeles County, California. She applied for and was found eligible by EDD to receive unemployment benefits. Moore received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. In July 2020, she was the victim of unauthorized transactions on her EDD Debit Card Account. Moore promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Moore to suffer immediate and irreparable injury. *See infra* ¶¶268–273. Moore is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

32.    Class Representative Plaintiff Zinaida Petrova resides in Big Bear City, California. She applied for and was found eligible by EDD to receive unemployment benefits. She received an EDD Debit Card with a magnetic stripe (but no EMV chip) to access her benefits. In May 2021, she was the victim of unauthorized transactions on her EDD Debit Card Account. Petrova promptly reported the unauthorized transaction to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Petrova to suffer immediate and irreparable injury. *See infra* ¶¶274–278. Petrova is pursuing the claims alleged herein on her own behalf and as a representative of all Class Members.

33.    *[Removed]*

**B.    Individual Plaintiffs**

34.    The 241 Individual Plaintiffs (*see infra* ¶¶286–526) bring actions against Bank of America on behalf of themselves only, and not in a representative capacity on behalf of any of the putative classes alleged herein.

**C.    Defendants**

35.    Defendant Bank of America, N.A., is a financial institution incorporated in the State of Delaware and headquartered in North Carolina that conducts a substantial amount of business in California, including pursuant to its exclusive contract with the State of California EDD to administer unemployment benefits and other benefit payments through EDD Debit Cards and Accounts.

36.    The true names and capacities of Defendants Does 1 through 50, inclusive, are currently unknown to Plaintiffs. Accordingly, Plaintiffs sue each and every Doe Defendant by such fictitious names. Each Doe Defendant, individually and collectively, is responsible in some manner for the unlawful acts alleged herein. Plaintiffs will seek leave of this Court to amend this TAMCC to reflect the true names and capacities of the Doe Defendants when their identities become known.

37.    Plaintiffs allege that at all times relevant to the events giving rise to this action, each and every Defendant was acting as an agent or employee of each

of the other Defendants. Plaintiffs further allege that at all times relevant to those events, each and every Defendant was acting within the course and scope of that agency or employment at the direction of or with the full knowledge, permission, or consent of each and every other Defendant. In addition, each of the acts or omissions of each and every Defendant was made known to, and ratified by, each of the other Defendants.

## IV.    FACTUAL ALLEGATIONS

### A.    The Bank's Contract with EDD

38.    EDD is an agency of the State of California that is responsible for administering numerous benefits programs for low-income, unemployed, and other Californians, including programs providing Californians with EDD benefits, such as unemployment insurance ("UI") benefits, pandemic unemployment assistance ("PUA") benefits, pandemic emergency unemployment compensation benefits, disability insurance benefits, and paid family leave benefits.

39.    In 2010, Bank of America entered into an exclusive contract with EDD for the provision of Electronic Benefits Payment ("EBP") services, including issuance of Bank of America EDD Debit Cards through which individuals entitled to receive EDD benefits could access those benefits.

40.    On information and belief, Bank of America obtained that contract in part by falsely representing to EDD that it would provide "best-in-class" fraud monitoring.

41.    Beginning in or about July 2011, EDD began distributing EDD benefits pursuant to its contract with Bank of America, under which the default means of distributing EDD benefits payments has been through Bank-issued and Bank-administered EDD Debit Cards, rather than paper checks or other forms of payment.

42.    In or about 2015, Bank of America submitted a response to EDD's Request for Proposals ("2015 RFP Response" or "2015 Proposal") to extend the

scope and duration of the contract. The 2015 Proposal was accepted by EDD and incorporated by reference into a new contract for EBP Services entered into between EDD and the Bank, with an initial term of August 1, 2016 through July 31, 2021 ("EDD–Bank Contract"). In its 2015 Proposal, the Bank represented that it had applied and would continue to apply "the most rigorous fraud detection procedures," including "the highest level of security and fraud safeguards" based on "multiple layers of extensive security" to ensure that EDD Debit Cardholders do not become the victims of fraud. The Bank's 2015 Proposal also represented that the Bank has provided and will continue to provide "fraud monitoring" as part of its "multi-faceted approach" to preventing and combatting fraud, and that it would provide "immediate response to emerging fraud trends" to ensure that fraudulent transactions would be "declined in real time." The 2015 Proposal further represented that the Bank would provide "industry best-in-class" fraud investigations services, "applying specialized processes and tools to resolve fraud," and that "Bank of America is committed to being at the forefront of fraud and data security strategies, benefiting the EDD and [EDD's] claimants."

43.    In its 2015 Proposal, the Bank also represented that it would fully protect EDD Debit Cardholders in case they became victims of fraud. Specifically, the Bank represented that it would comply with all EFTA and Regulation E requirements and timelines with respect to error resolution and it provided assurance that its EDD Debit Cardholders (which includes Plaintiffs and Class Members) "should feel comfortable in dealing with disputed transactions knowing that we extend our Zero Liability protection on disputed claims, including ATM and pinned POS [point-of-sale] transactions." The Bank described its error resolution process as follows: "A Claimant can file a dispute by calling the Customer Service Center for complete instructions. . . . After selecting the 'dispute a transaction' option within our IVR [Interactive Voice Response], the cardholder will immediately speak with a live representative who will further review the

transaction and any other possible fraudulent transactions with the cardholder. . . . Once a dispute is requested in our system, a case will be created within our claims tracking system and tracked until final resolution. Per Regulation E, within 10 business days of the initial dispute, we will promptly correct the error. . . . If more time is needed, we will temporarily credit the cardholder's account within 10 business days of the initiated dispute for the full disputed amount. There is no limitation or maximum to the credit amount provided. This will allow the account holder to use the funds while the claim is being resolved."

44.    The Bank's 2015 Proposal also made representations about the "[s]uperb customer service" levels it would guarantee EDD Debit Cardholders, boasting that "[w]e set the bar high and pride ourselves on serving each caller with swift, responsive service," and providing assurances that "[l]ong call hold waits and busy signals are not tolerated at Bank of America. Your program's average speed of answer is 30 seconds and your average handle time is 230 seconds." Pursuant to the EDD–Bank Contract, the Bank promised, among other things, to provide an IVR system and live Customer Service Representative ("CSR") support available "24 hours a day, seven days a week." The Bank promised that live CSR agents would be available 24/7 to assist EDD Debit Cardholders with "[i]nvestigat[ing] transactions (fraud security, use)," "[p]rocess[ing] lost/stolen/damaged card reports," and "[c]heck[ing] on the Status of Disputed Transactions." The Bank further promised that "no call [would be] transferred to voicemail or automatically disconnected from the queue," that "calls [would] not [be] immediately placed on hold," that "the average wait time to speak to a live CSR" agent would be "no more than 30 seconds for 70 percent of the calls, and no more than two (2) minutes for all calls," and that the Bank would "monitor Customer Service calls to ensure quality service and address Customer complaints."

45.    On information and belief, EDD entered into the EDD–Bank Contract because of, and in reliance on, the Bank's representations in its 2015 Proposal.

46.    Pursuant to the terms of the EDD–Bank Contract, EDD and the Bank are engaged in a joint undertaking to administer the EDD benefits programs and to distribute EDD benefits payments to eligible claimants through EDD Debit Cards.

47.    EDD Debit Cards are the default payment method for EDD benefits, and EDD's website presents EDD Debit Cards as the exclusive means of receiving EDD benefits.[2] EDD promotes EDD Debit Cards as "a fast, convenient, and secure way to get your benefit payments," and advertises the many purported benefits of EDD Debit Cards, including: "Get your money sooner"; "Use it everywhere VISA is accepted (in stores, online, and by phone)"; "Withdraw cash at ATMs, banks, and stores with cash back options"; "Transfer funds to the financial institution of your choice at no additional cost"; "Be notified when a deposit is made to your card, or when you have a low balance"; and "Receive fraud protection from a Zero Liability Policy."[3]

48.    The EDD has delegated to the Bank the public functions of distributing EDD benefits to Cardholders. EDD Debit Cards and Accounts are an integral part of EDD's benefits distribution and administration system. Under the terms of the EDD–Bank Contract, those Accounts can only receive deposits from the EDD and no commingling of EDD benefits payments with other funds is permitted. The EDD–Bank Contract provides that the Bank "shall disburse to each claimant the

_____

[2] *See, e.g.*, EDD website, *Unemployment Insurance – After You File a Claim*, https://www.edd.ca.gov/unemployment/After_you_Filed.htm#receive ("When your first benefit payment is available, you will receive a debit card in the mail."); EDD Website, *Guide to Applying for Unemployment Benefits*, https://unemployment.edd.ca.gov/guide/receive-benefits ("Benefit payments for Unemployment Insurance, Pandemic Unemployment Assistance (PUA), Disability Insurance, and Paid Family Leave are all made using the Bank Debit Card."). While it is possible for Cardholders to contact EDD to receive their benefits via paper checks instead of through EDD Debit Cards, that option is neither publicized nor easily accessed.

[3] EDD website, *Debit Card*, https://www.edd.ca.gov/about_edd/The_EDD_Debit_Card.htm.

1  entire amount the EDD authorizes" and "shall process all benefit payment amounts
2  provided by the EDD without alteration or adjustment."

3      49.    The EDD–Bank Contract, which contains an express revenue-sharing
4  agreement, creates a relationship of financial interdependency between EDD and
5  Bank of America. Under the revenue-sharing agreement, the State of California
6  benefits from delegating the administrative burdens of EDD benefits distribution to
7  the Bank at no cost to the State, while the Bank benefits from collecting point-of-
8  sale transaction fees and other fees from millions of EDD Debit Cardholders and
9  vendors and from earning interest on EDD benefits funds that have been deposited
10  into EDD Debit Card Accounts but that remain unspent by Cardholders (commonly
11  referred to as "float").

12      50.    The EDD–Bank Contract also authorizes and obligates the Bank to
13  work jointly with EDD to combat EDD benefits enrollment fraud. Pursuant to those
14  contractual responsibilities, the Bank purports to engage in a joint fraud-prevention
15  undertaking with EDD. Pursuant to EDD's instructions, the Bank froze a number
16  of Accounts for suspected enrollment fraud between approximately September
17  2020 and March 2021. None of those EDD-initiated freezes are at issue in this case.

18      51.    Between approximately September 2020 and February 2021, the Bank
19  itself independently froze approximately 75,000 EDD Debit Card Accounts based
20  on the Bank's assertions that those Cardholders had engaged in enrollment fraud.
21  On information and belief, the Bank has since then independently frozen or blocked
22  tens of thousands more Accounts and continues to do so, without EDD direction or
23  authorization to freeze those Accounts. These are the Account freezes at issue in
24  this case. The Bank has earned, and continues to earn, interest on funds in the Bank-
25  frozen Accounts.

26      52.    If a Cardholder's Account is frozen by the Bank and the Cardholder
27  contacts the Bank, the Bank informs the Cardholder that they must re-authenticate
28  their identity and re-verify their EDD benefits eligibility with EDD before the Bank

will unfreeze their Account—regardless of whether EDD itself has raised any question regarding the Cardholder's identity or benefits eligibility. When Plaintiffs and Class Members contacted EDD and were actually able to get through to a live representative, they were frequently told that there was no issue with their identity or benefits eligibility from EDD's perspective and that the issue was with Bank of America. Nevertheless, these Plaintiffs and Class Members continued to be unable to access the funds in their EDD Debit Card Accounts, which remained frozen.

53.    On October 15, 2020, after EDD had informed the Bank that it had identified Cardholders whose Accounts should be unfrozen, EDD sent the Bank a letter expressing concern that the Bank had neither confirmed compliance with EDD's requests that those Accounts be unfrozen, nor explained why it had not complied. EDD further informed the Bank that it had become aware that the Bank was itself freezing additional Accounts based on the Bank's own suspicions but that the Bank had not notified EDD's fraud investigation division of such suspicions despite its contractual obligations to do so. EDD instructed the Bank to cease freezing additional Accounts and to explain why it had continued to freeze Accounts without EDD's authorization, and to reverse any such freezes. Finally, EDD informed the Bank that it was aware that the Bank had sent EDD draft notices to Cardholders whose Accounts the Bank had frozen and that the EDD had objected to the content of those notices, and asked for confirmation that the Bank would not send further notices without an understanding as to which Accounts would receive the notice and the language that would be used, to ensure that the language conformed to the language in EDD's own notices.

54.    The EDD–Bank Contract relieves EDD of any liability for "fraud, misuse, and lost or stolen debit cards," leaving the Bank solely liable for such fraud, misuse, loss, or theft. This potential liability creates a financial incentive for the Bank to circumvent its EFTA and other legal obligations to provide provisional

1  credit and permanent reimbursement for fraudulent transactions that occur in EDD
2  Debit Card Accounts.

3  **B.    The Bank's Failure to Secure EDD Debit Cardholder Information**

4  55.    Bank of America has failed to store, share, transmit, or otherwise use
5  EDD Debit Cardholders' personally identifiable information, Card and Account
6  information, and other financial data and information, including any such data or
7  information learned in the course of providing customer service to Cardholders
8  (collectively, "Cardholder Information") in a reasonably secure manner and
9  consistent with the Bank's obligations to EDD and to Plaintiffs and Class Members.
10  The Bank has also failed to act reasonably in its hiring, supervision, training, and
11  retention of its agents, including its subcontractors and its subcontractors'
12  employees and agents, who have access to Cardholder Information, including as a
13  result of staffing the Bank's Call Centers, interacting with Cardholders, and
14  reviewing Cardholders' unauthorized transaction claims. The Bank has failed to
15  take reasonable steps to ensure that its subcontractors and their employees and
16  agents, including CSRs and other Call Center agents, maintain the security and
17  confidentiality of Cardholder Information, including by failing to ensure: that all
18  such agents were subject to reasonable background checks, that all such agents
19  received reasonable training on maintaining the security and confidentiality of
20  Cardholder Information, and that the Bank's subcontractors took reasonable steps
21  to secure Cardholder Information from unnecessary or unauthorized access,
22  disclosure, and exfiltration, including by the subcontractors' agents and employees.

23  56.    As a result of the Bank's acts and omissions alleged herein, Cardholder
24  Information has been obtained by unauthorized third parties in a series of security
25  breaches that have allowed Plaintiffs' and Class Members' benefits to be stolen out
26  of their Accounts through unauthorized transactions. The Bank's repeated and
27  ongoing failure to secure Plaintiffs' and Class Members' Cardholder Information
28  violated and continues to violate the California Consumer Privacy Act, the Gramm-

Leach-Bliley Act and rules and regulations promulgated thereunder that require the Bank to protect the security and confidentiality of its customers' nonpublic personal information, and the Bank's common law duty to take reasonable steps to protect Cardholder Information from unauthorized access, disclosure, and exfiltration, including by the Bank's own agents.

57.    Some EDD Debit Cardholders who have had money stolen from their Debit Card Accounts through unauthorized transactions received and activated their EDD Debit Cards, but never used their Cards.[4] Such unauthorized transactions could only have occurred if the Bank failed to store, share, transmit, or otherwise use Cardholder Information in a reasonably secure manner.

58.    For example, Plaintiff Stephanie Smith received her EDD Debit Card in or about June 2020 and activated it on Bank of America's website the same day that she received it. Immediately after activating the Card, she locked the Card in a safe inside her home, and she did not subsequently take the Card out of the safe or use it in any way. Her only activity on her EDD Debit Card Account thereafter was to use Bank of America's website to transfer funds from her Account to her personal consumer bank account (also with Bank of America). She never used the Card at an ATM, for an online purchase, at a retail store, or for any other transaction. Despite never using the Card, an unknown person or persons used the Cardholder Information associated with Smith's EDD Debit Card and/or Account to make unauthorized transactions in November 2020. Smith's Cardholder Information was stolen due to the Bank's failure to prevent such thefts by its own agents.

---

[4] *See, e.g.*, David Gotfredson, "California Unemployment: Fraudulent Charges Keep Popping up on Bank Debit Card Accounts," *ABC10 Sacramento (KXTV)* (Jan. 21, 2021), *available at* https://www.abc10.com/article/money/fraudulent-charges-edd-debit-card-accounts/509-5a8b0958-0b56-41fe-81af-e3ce446d0690 (reporting that an EDD Debit Cardholder experienced fraud despite the fact that he "never . . . used the card" and "only used the account number to transfer money to [his] credit union").

## C.    The Bank's Use of Outdated, Vulnerable Magnetic Stripe Technology

59.    When a debit or credit cardholder seeks to access funds on the card, for example at a point-of-sale terminal or ATM, the Cardholder Information stored on the card is first sent through a processing network operated by Visa. The first step in that process occurs at the point of sale, where the card must either be swiped or inserted into a card reader. The reader obtains the Cardholder Information stored on the card and transmits it to the financial services provider through a computer network, either at the time of the transaction or later in a "batch" with other transactions.

60.    From the 1960s until approximately 10 years ago, magnetic stripes were the standard for storing consumer information on debit cards and credit cards in the United States. A magnetic stripe contains static data about the card, including the cardholder's name, the card number, and the card expiration date. This data is printed directly on the outside of the card and recorded on the magnetic stripe. When swiped through a reader, this data is collected and transmitted as part of the transaction process.

61.    Because the data on a magnetic stripe are static and easily readable, magnetic stripe cards are highly susceptible to fraud. One of several common methods of stealing information from magnetic stripe cards is called "skimming," a process by which a wireless transmitter affixed to a card reader collects the information on the magnetic stripe when the card is swiped or inserted and sends it to a nearby computer. The recipient can then use the information to clone the consumer's card, conduct unauthorized transactions, and access the bank account connected to the card.

62.    Personal data on magnetic stripe cards can also be captured by hackers on a large scale. For example, in 2013, hackers infiltrated the retailer Target's payment terminals and systematically captured the information of every swiped card for weeks, ultimately gathering the card information of tens of millions of

people.[5] Card data collected in this manner can be sold on an underground market, where the stolen data can be used to make fraudulent purchases.

63.    Over the past decade, in an effort to stem the consumer fraud enabled by magnetic stripes, the financial services industry in the United States has adopted EMV chip technology as the industry standard. While magnetic stripes are "static," with the same card-identifying information provided for every transaction, EMV chips are "dynamic," meaning the data they contain can be interacted with, altered, and updated. An EMV chip creates a unique electronic signature for each transaction, making data from past EMV chip card purchases useless to would-be thieves, thereby significantly reducing the risk of unauthorized transactions.

64.    In 2011, the same year the Bank began issuing EDD Debit Cards, the Bank announced it would offer EMV chips in corporate credit cards to its U.S. business customers who regularly traveled outside the United States.

65.    On September 30, 2014, the Bank announced that it would include EMV chip technology on "all new and reissued" consumer debit cards. In announcing this shift, a Bank of America executive stated that "chip technology is an important tool in increasing card security, and we want our customers to have the best possible experience when using their payment cards." The executive added that the "new chip-enabled cards will improve security of customers' transactions."[6]

66.    In 2015, card issuers and processors began a nationwide shift to EMV chip cards. By 2017, an estimated 855 million EMV chip cards had been issued to U.S. consumers, and such cards are now standard in the industry.

---

[5] Elise Hu, "Target Hack a Tipping Point in Moving Away from Magnetic Stripes," *NPR* (Jan. 23, 2014), *available at* https://www.npr.org/sections/alltechconsidered/2014/01/23/264910138/target-hack-a-tipping-point-in-moving-away-from-magnetic-stripes.

[6] Bank of America Press Release, "Bank of America Begins Rollout of Chip Debit Cards" (Sept. 30, 2014), *BusinessWire*, available *at* https://www.businesswire.com/news/home/20140930005292/en/Bank-of-America-Begins-Rollout-of-Chip-Debit-Cards.

67.     In 2015, card-issuing banks and payment networks introduced a new policy that shifted liability for fraudulent transactions away from themselves and onto retailers and card issuers. As of October 1, 2015, retail merchants who did not have certified EMV chip readers became liable for fraudulent transactions if the consumer presented an EMV chip card. In essence, this meant that liability for consumer card fraud would fall on either the retailer or the card issuer, whichever was the least compliant with the EMV protocol.

68.     Bank of America acknowledges on its website that EMV chip technology "has been around for over 20 years and is the credit and debit card security standard in many countries around the world. When purchases are made using the chip feature at chip-enabled terminals, the transaction is more secure because of the process used to determine if the card is authentic. This makes the card more difficult to counterfeit or copy." The Bank also assures Cardholders on its website that "whether you use the magnetic stripe or the chip to make your purchase, you can have confidence in the protection and security features we provide for all credit and debit accounts."

69.     Bank of America has been aware for many years that EMV chip cards are significantly more secure than magnetic stripe cards and that EMV chip cards are the "debit card security standard." Despite that knowledge and despite the Bank's representations to EDD that it will "focus on claimants" while leveraging "rapidly evolving payment technology" and staying "at the forefront of payments innovation," the Bank chose to issue EDD Debit Cards using old, vulnerable magnetic stripe technology to hundreds of thousands of the most financially vulnerable Californians—Plaintiffs and Class Members. To this day, the Bank continues to issue EDD Debit Cards with no EMV chip, notwithstanding its announcement nearly seven years ago that it would include EMV chip technology on all consumer debit cards to help prevent fraud. Predictably, the issuance of EDD Debit Cards without EMV chips has led to rampant fraud, resulting in the ongoing

1  loss of millions of dollars in EDD benefits intended to assist Californians who lost

2  their jobs, including during the COVID-19 pandemic.

3  **D.    The Bank's Contractual Promises and Representations to Cardholders**

4          70.    Bank of America represented to Plaintiffs and Class Members, in its

5  Cardholder Agreement and on its website, that they would not be responsible for

6  unauthorized transactions on their EDD Debit Cards or Accounts because of the

7  Bank's "Zero Liability" policy, under which the Bank would fully protect them

8  against, and would reimburse them for, any unauthorized transactions. The Bank

9  also represented to Plaintiffs and Class Members that they could call the Bank 24

10  hours a day 7 days a week to report any unauthorized transaction to live customer

11  services representatives, and that the Bank would promptly investigate the

12  transaction and determine whether it was unauthorized within 10 business days

13  thereafter, except that if the Bank took longer than 10 business days (but in no event

14  longer than 45 calendar days) to investigate the transaction, the Bank "will credit

15  your Account within 10 business days for the amount you think is in error, so that

16  you will have the money during the time it takes us to complete our investigation."

17          71.    In the Bank's California Employment Development Department Debit

18  Card Account Agreement ("Cardholder Agreement"), to which all EDD Debit

19  Cardholders must agree, Bank of America sets forth the above promises in detail.

20  The Cardholder Agreement has an effective date of March 1, 2018, and thus has

21  been effective throughout the Class Period, as defined below. The Cardholder

22  Agreement states: "Under the Bank of America 'zero liability' policy, you may

23  incur no liability for unauthorized use of your Card up to the amount of the

24  unauthorized transaction, provided you notify us within a reasonable time . . . ." The

25  Cardholder Agreement advises the Cardholder to "contact us at the number listed

26  below AT ONCE if you believe your Card has been lost or stolen or if you believe

27  that someone may use or has used your PIN assigned to your card without your

28  permission. Telephoning is the best way of keeping your possible losses down."

1   The Cardholder Agreement requires Cardholders to call or write to report an
2   unauthorized transaction "no later than 60 days" after the Bank sent the statement
3   on which the transaction appeared.

4        72.   The Cardholder Agreement promises that Bank of America "will
5   determine whether an error occurred within 10 business days" after an unauthorized
6   transaction is reported. The Cardholder Agreement reserves the right to "take up to
7   45 days to investigate" if the Bank "need[s] more time," in which case the Bank
8   promises that "we will credit your Account within 10 business days for the amount
9   you think is in error, so that you will have the money during the time it takes us to
10  complete our investigation."

11       73.   Bank of America represents to EDD Debit Cardholders that the Bank's
12  customer service department representatives are continuously available to assist
13  with suspected fraud. On Bank of America's EDD Debit Card FAQ webpage, in
14  response to the question "What are the Bank of America EDD Debit Card Customer
15  Service hours?" Bank of America claims that "[f]or your convenience," Bank of
16  America's "dedicated customer service representatives are available 24 hours [a]
17  day, 7 days a week" by phone. The webpage further explains that the Bank's
18  customer service representatives can help with the following: "Resolve a question
19  about your account statement," "Investigate transactions," "Process
20  lost/stolen/damaged card reports," and "Request an emergency cash transfer." In its
21  Cardholder Agreement, Bank of America advises EDD Debit Cardholders that
22  "Telephoning is the best way of keeping your possible losses down." In addition,
23  Bank of America provides each EDD Debit Cardholder with a "Quick Reference
24  Guide," which prominently states that "customer service is available 24/7."

25  **E.   The Rampant Third-Party Fraud on EDD Debit Card Accounts**

26       74.   In the spring of 2020, the COVID-19 pandemic devastated California's
27  economy, and millions of workers lost their jobs due to business closures and mass
28  layoffs. The state's unemployment rate skyrocketed from 3.9% in January 2020 to

16.4% in April 2020, following closure orders issued by Governor Gavin Newsom and county health officials. Industries such as hospitality, food service, retail trade,



and educational services were especially hard hit.

75.    As a result, millions of Californians turned to the EDD unemployment benefits programs administered by Bank of America to pay their bills and make ends meet. Since the start of the COVID-19 pandemic in March 2020, EDD has received at least 18.5 million claims for various unemployment benefits. In the first week of December 2020, EDD received 341,813 claims, a 600% increase from December 2019. Bank of America has issued more than 9 million EDD Debit Cards to individuals found by EDD to be eligible for unemployment benefits.

76.    As widely reported in the media and as described by California state legislators who report having heard from thousands of constituents, tens of thousands of EDD Debit Cardholders have been the victims of fraud throughout the pandemic, resulting in tens of millions of dollars having been stolen from their Accounts, including through fraudulent ATM withdrawals, such as many Plaintiffs

and Class Members experienced.

77.    EDD Debit Cardholders have reported thousands of dollars stolen through unauthorized use of their EDD Debit Cards. These unauthorized transactions have taken various forms, including massive ATM withdrawals in distant states and countries,[7] thousand-dollar charges at luxury vendors, and repeated transactions with food delivery services. Regardless of how or where the fraud has been carried out, the Bank's EDD Debit Cards have proven highly susceptible to unauthorized use.

78.    After criminals exploit the security vulnerabilities of the Bank's EDD Debit Cards and Accounts and misappropriate Cardholder Information, that information can be sold on the dark web, allowing the buyers to engage in unauthorized use of funds belonging to Plaintiffs and Class Members.[8]

79.    Such rampant third-party fraud was readily foreseeable given the rapid growth of the number of new unemployment benefits claims, as well as reports from early in the pandemic warning of the potential for fraud and exploitation of the unemployment benefits system by criminals. It is well known in the financial industry that crises such as economic recessions lead to an increase in scams, fraud, and other financial crimes. The early months of the COVID-19 pandemic in the United States—March through May 2020—made clear that the pandemic would be no exception. In late March 2020, the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law, injecting $2.2 trillion of relief into the American economy, including $260 billion in increased unemployment benefits, and hundreds of billions of dollars more in one-time cash

---

[7] *See, e.g.*, CBSLA Staff, "Bank of America Freezes EDD Accounts of Nearly 350,000 Unemployed Californians for Suspected Fraud," *CBS Los Angeles* (Oct. 29, 2020), *available at* https://losangeles.cbslocal.com/2020/10/29/bank-of-america-freezes-edd-accounts-of-nearly-350000-unemployed-californians-for-suspected-fraud/.

[8] *See id.*

payments to taxpayers and forgivable Paycheck Protection Program ("PPP") loans. This rapid influx of pandemic relief to individuals and businesses, combined with rapid growth in the number of new claims for UI, PUA, and other public benefits created a "perfect environment" for fraud that was widely reported in the American media,[9] and that led to a flood of warnings from government agencies and expert nongovernmental organizations about major increases in malicious cyber activity and financial fraud, including fraud targeting government unemployment benefits and consumer banking and credit services.[10] Reporting during the early months of

[9] Ari Shapiro & Martin Kaste, "The Pandemic Creates A Perfect Environment For New Types Of Fraud," *NPR All Things Considered* (May 21, 2020), https://www.npr.org/2020/05/21/860584461/the-pandemic-creates-a-perfect-environment-for-new-types-of-fraud (reporting experts saying that there was a "bonanza" and "gold rush right now" in pandemic-related financial crimes); Steve Inskeep & Martin Kaste, Washington State Hit Hard by Unemployment Fraud, *NPR Morning Edition* (May 22, 2020) ("scams thriving nationwide in the uncertain conditions created by the pandemic," including hundreds of millions of dollars lost by Washington state to fraudulent unemployment claims).

[10] *See, e.g.*, National Governor's Association, *Memorandum To: All Governors Re: COVID-19 and Cybersecurity* at 1 (Apr. 28, 2020) ("State agencies, critical infrastructure sectors, and the general public are experiencing waves of COVID-themed malicious cyber activity."); Greg Iacurci, "If there's coronavirus relief money, scammers will try and steal it," *CNBC* (May 6, 2020), https://www.cnbc.com/2020/05/06/scammers-are-looking-to-steal-your-coronavirus-relief-money.html ("Federal agencies like the IRS, Federal Trade Commission, Social Security Administration and FBI have warned consumers and business owners in recent weeks to be vigilant as fraudsters try to take advantage of them during the coronavirus pandemic," including by targeting government financial relief such as unemployment benefits); U.S. Dept. of Labor Press Release, *U.S. Department Of Labor Issues Guidance And Reminders To States To Ensure Integrity Of Unemployment Insurance Programs* (May 11, 2020), https://www.dol.gov/newsroom/releases/eta/eta20200511-1 (announcing new "targeted guidance and reminders . . . to help states guard against fraud and abuse of their unemployment insurance systems"); Mike Baker, "Feds Suspect Vast Fraud Network Is Targeting U.S. Unemployment Systems," *The New York Times* (May 16, 2020), *available at* https://www.nytimes.com/2020/05/16/us/coronavirus-unemployment-fraud-secret-service-washington.html; AnnaMaria Andriotis &

the pandemic also noted that the major increases in fraudulent financial activity had, predictably, caused a corresponding increase in demand on customer service phone lines, causing many agencies and companies to hire additional customer service representatives.[11] Bank of America nonetheless failed to take reasonable measures to prepare for, prevent, or respond to the readily foreseeable wave of transactional fraud affecting its EDD Debit Cards and Accounts.

**F.    The Bank's Evasive and Ineffectual Response Prior to the Filing of Plaintiffs' Initial Class Action Complaint and The Court's Issuance of a Preliminary Injunction**

80.    Bank of America's ineffective response to the rampant transactional fraud on EDD Debit Cards and Accounts has taken various forms, as detailed herein, including failing to employ reasonable practices and procedures for monitoring, detecting, stopping, and notifying Plaintiffs and Class Members about highly suspicious transactions in their Accounts; not answering the customer service phone lines it advises Cardholders to call; establishing "customer service" procedures that frustrate and obstruct Plaintiffs' and Class Members' efforts to file fraud claims; opening fraud claims and then promptly closing them without conducting a reasonable and good faith investigation; unilaterally reversing "permanent" credits previously granted for unauthorized transactions without a reasonable and good faith basis and without advance notice to the Cardholder;

_____

Orla McCaffrey, "Borrower, Beware: Credit-Card Fraud Attempts Rise During the Coronavirus Crisis," *The Wall Street Journal* (May 27, 2020), *available at* https://www.wsj.com/articles/borrower-beware-credit-card-fraud-attempts-rise-during-the-coronavirus-crisis-11590571800 (reporting on the "big jump in attempted credit- and debit-card fraud since coronavirus shut down the U.S. economy" and that "[b]anks have increased their fraud projections for 2020").

[11] *See, e.g.*, Baker, *supra* note 9 (phone calls reporting fraud "flooded" Washington state unemployment benefits agency and "forced the state to hire more people to answer the phones"); Andriotis *et al.*, *supra* note 9 (cardholders of major credit card issuers experiencing difficulty "getting customer-service representatives on the phone to remove charges and replace cards").

failing to extend provisional credit to Cardholders without a reasonable and good faith basis; and indefinitely freezing or blocking the Accounts of Cardholders who call Bank of America to report third-party fraud on their Accounts.[12]

      **1.**    **The Bank's Policy and Practice of Not Employing Reasonable Practices and Procedures to Monitor for, Detect, Stop, and Promptly Notify Cardholders about Suspicious Transactions Involving their Cards and Accounts**

81.    In its 2015 Proposal, Bank of America represented to EDD that, if EDD were to extend its contract to distribute EDD benefits through EDD Debit Cards and Accounts, the Bank "fully intend[s] to apply the most rigorous fraud detection procedures," including "employ[ing] the highest level of security and fraud safeguards" based on "multiple layers of extensive security" and a "multi-faceted approach to combat fraud." The Bank's 2015 Proposal specifically promises that Bank of America would provide "fraud monitoring" for all EDD Debit Cards and Accounts, and to employ technology that would provide "immediate response to emerging fraud trends" and allow fraudulent transactions to be "declined in real time." On information and belief, the Bank did not keep any of these promises with respect to Plaintiffs' and Class Members' Accounts during the Class Period (as defined herein), resulting in a flood of unauthorized transactions occurring on Plaintiffs' and Class Members' Accounts which went unchecked by the Bank.

82.    For example, at all relevant times, Bank of America knew that the vast majority of Plaintiffs and Class Members were residents of California based on a variety of information sources, including Plaintiffs' and Class Members' contact

---

[12] Kenny Choi, "Victims of Bank of America Bank Debit Card Fraud Tell Stories of Fake Charges, Long Waits, Closed Claims," *KPIX–CBS SF Bay Area* (Dec. 22, 2020), *available at* https://sanfrancisco.cbslocal.com/2020/12/22/victims-of-bank-of-america-edd-debit-card-fraud-tell-stories-of-closed-claims-frustration-loss/.

information, their EDD Debit Card and Account transaction histories, and the fact
that EDD had determined them to be eligible to receive EDD benefits.

83.    The Bank also knew about the COVID-19 pandemic and the fact that
people were engaging in much less long-distance travel (including long-distance in-
state, out-of-state, and out-of-country travel) during the pandemic, whether because
of pandemic-related fears, pandemic-related travel restrictions imposed by state,
national, and foreign governments, or other reasons. The Bank had a legal
obligation, but failed, to use this knowledge to monitor for, detect, stop, and notify
Cardholders about transactions involving their Card or Account that were
suspicious because they were made during the pandemic at a significant distance
from where a particular Cardholder resided—especially with respect to transactions
being made hundreds of miles away or in another country.

84.    The Bank also had access to Plaintiffs' and Class Members' individual
EDD Debit Card and Account transaction histories. The Bank had an obligation,
but failed, to use this knowledge to monitor for, detect, stop, and notify Cardholders
about multiple transactions involving their Card or Account that were suspicious
because the multiple transactions were made close in time but at a great physical
distance away from one another. For example, in November 2020, Class
Representative Plaintiff Jennifer Yick used her EDD Debit Card for in-person
transactions at stores in the San Francisco Bay Area on the same day or within one
day of unauthorized DoorDash transactions that occurred in New York, Texas, and
hundreds of miles away in Southern California. Yet the Bank failed to flag any of
these transactions as suspicious, stop them, or promptly notify Yick about them.

85.    The Bank also had an obligation, but failed, to use Plaintiffs' and Class
Members' individual EDD Debit Card and Account transaction histories and past
Account access behaviors (e.g., logging into Accounts online, checking Account
balances) to monitor for, detect, stop, and notify Cardholders about transactions
involving their Card or Account and about Account access behaviors that were

suspicious because they were significantly inconsistent with how the Cardholder had previously used their Card and Account. For example, Jennifer Yick had never used her EDD Debit Card for transactions from DoorDash or to make any online transactions, but rather had always used her Card over the course of several months for purchasing necessities from brick-and-mortar stores located in or around the San Francisco Bay Area, such as gas stations, grocery stores, and retail stores like Target and Costco. Yet, Bank of America failed to flag as suspicious, stop, or notify her about the four unauthorized DoorDash transactions that occurred within two weeks of each other in November 2020 in New York, Texas, and Southern California.

86.    Indeed, at all relevant times, the Bank had the obligation, but failed, to employ reasonable policies and procedures for monitoring for, detecting, stopping, and promptly notifying Cardholders about highly suspicious transactions involving their Cards and Accounts, including but limited to using all the information at its disposal to satisfy its constitutional, statutory, common law, and contractual obligations to Plaintiffs and Class Members to monitor for, detect, stop, and promptly notify Cardholders about suspicious activity involving their Card or Account.

## 2.    The Bank's Policy and Practice of Making it Difficult for Cardholders to Report Unauthorized Transactions

87.    The Bank has prevented many Plaintiffs and Class Members from being able to report fraud in a timely manner, or even at all. For starters, the Bank has established EDD Debit Card customer service phone lines as the virtually exclusive means for EDD Debit Cardholders to seek help regarding issues with their Cards or Accounts. Many Plaintiffs and Class Members, for example, have gone to Bank of America branches seeking assistance with their Cards or Accounts, only for Bank branch employees to tell them that they cannot assist EDD Debit Cardholders, and that the Cardholder must call the phone number on the back of their Card for assistance. Similarly, the Bank has generally not provided EDD Debit

Cardholders with the option of communicating their customer service to the Bank by email, online chat, in-app chat, text, or other means now commonly available to customers of financial institutions. Instead, EDD Debit Cardholders are largely limited to calling.

88.     Calling the Bank's EDD Debit Card customer service phone lines, however, has often required Cardholders to endure hours-long wait times (with no option to receive a callback when a customer service agent becomes available), a variety of mishaps, and customer service agent incompetence. Notwithstanding the foreseeable spike in calls that the Bank knew or should have known would inevitably accompany the dramatic increase in unemployment benefits recipients during the pandemic, the Bank failed to appropriately staff its customer service call centers in a manner that would enable the Bank to honor its contractual commitments under the EDD–Bank Contract and to provide reasonable levels of assistance to the predictably large volume of EDD Debit Cardholders seeking assistance. As a result, Plaintiffs and Class Members attempting to report fraud or to inquire about potential fraud have been kept on hold for hours, have been disconnected without warning, have waited long periods of time to speak with someone only to be told to call back later, have been transferred to various departments with no apparent end or sent to voicemail, have had to deal with unhelpful automated agents, and have unsuccessfully attempted to reach the Bank by email.

### 3.     The Bank's Policy and Practice of Automatically Denying Unauthorized Transaction Claims Without Reasonable Investigation or Explanation, Including Based Solely on a Highly Flawed "Claim Fraud Filter"

89.     Even when Plaintiffs and Class Members have been able to report unauthorized transactions to the Bank, the Bank has had a policy and practice since at least October 2020 of automatically and summarily denying the fraud claims of EDD Debit Cardholders without adequate investigation or explanation, including

based solely and exclusively on the results of the Bank's highly flawed and unreliable automated "fraud filter" ("Claim Fraud Filter"), which it applies whenever an EDD Debit Cardholder reports an unauthorized transaction on their Account, purportedly to determine if the claimant is using a stolen identity. Pursuant to this policy and/or practice, the Bank has failed to provide provisional credit to tens or hundreds of thousands of Cardholders who filed a fraud claim and were flagged by the Bank's Claim Fraud Filter. Instead of investigating the claim and providing provisional credit as required by law, the Bank sent those Cardholders a form letter, often dated the very same day or within a day or two of the Cardholder's report of the unauthorized transactions, closing the Cardholder's claim. The form letter states: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any." The form letter does not provide any individualized information explaining what the Bank's investigation, if any, entailed, nor does it explain the basis for the Bank's determination.

90.    The Bank's form letter provides a telephone number that Cardholders should call if they wish to "request that [the Bank] reopen your claim for further consideration," but EDD Debit Cardholders who have called the Bank at that number to make such a request have been given erroneous information or have been told they cannot be helped. Even those who have submitted detailed documentation to the Bank substantiating their fraud claims, such as sworn statements, police reports, and documentary proof of their whereabouts at the time the fraudulent transactions occurred (e.g., that they were nowhere near the ATM from which their funds were withdrawn), have been often ignored and forced to go months without receiving any update from the Bank regarding the status of their claim. Some who submitted additional information simply received yet another form letter from the

1    Bank summarily reaffirming without explanation the Bank's original decision
2    denying the fraud claim. Even those Cardholders whose claims have been reopened
3    were not issued provisional credit pending completion of the Bank's investigation
4    and were not guaranteed that the Bank's investigation would be completed within
5    a certain number of days.

6       91.    The Bank adopted its policy and practice of automatically denying the
7    fraud claims of EDD Debit Cardholders in an attempt to circumvent its obligations
8    under EFTA and Regulation E, which require the Bank to issue provisional credit
9    if it has not completed a good-faith investigation within 10 business days of a
10   Cardholder giving notice of an unauthorized transaction on their Account, to
11   complete a good-faith investigation of the claim within no more than 45 days, and
12   to permanently credit the Cardholder's Account for the amount of the transaction
13   unless the Bank has a reasonable basis for believing that the Cardholder authorized
14   or benefitted from the transaction. In implementing this unlawful policy and
15   practice, the Bank sought to protect its own financial interests at the expense of
16   legitimate claimants whose life-sustaining public benefits had been stolen from
17   their Bank of America Account.

18      92.    The Bank also implemented its policy and practice of automatically
19   denying the fraud claims of EDD Debit Cardholders *retroactively* by rescinding
20   "permanent" credits that the Bank had previously paid. Thus, many Plaintiffs and
21   Class Members who previously had been "permanently" credited with the amount
22   of the funds that had been stolen from them and who had been previously informed
23   by the Bank that their fraud claims were favorably resolved suddenly and without
24   explanation had that same amount *debited* from their Accounts, sometimes leaving
25   their Accounts with a negative balance. As a result, when those Cardholders received
26   their next EDD benefits payment deposit into their Account, they were not actually
27   able to access those benefits because the new EDD benefits payments were credited
28   against the negative balance in their Account that resulted from the Bank's actions.

### 4. The Bank's Policy and Practice of Automatically and Indefinitely Freezing Cardholders' Accounts When They Report Unauthorized Transactions, Based on a Highly Flawed "Claim Fraud Filter"

93.    In and around October 2020, the Bank implemented an additional policy and practice of responding to EDD Debit Cardholders who report unauthorized transactions by automatically and indefinitely freezing or blocking their Accounts without any prior notice, explanation, or opportunity to be heard, including based solely on the results of the Bank's highly flawed and unreliable automated Claim Fraud Filter. A Cardholder whose Account is frozen or blocked cannot access any funds in their Account; moreover, the Bank will not accept EDD benefits payments from EDD for deposit into a frozen Account. Thus, many Class Members have had the experience of reporting that they were **the victims** of fraudulent transactions and receiving assurances from the Bank that it will cancel their old EDD Debit Card and issue them a new one, only to discover that their new Card is useless because the Bank has frozen (or blocked) their Account. The Bank implements this policy and practice of freezing or blocking Accounts without any prior notice, thus depriving Cardholders of access to any EDD benefits that may have been in the Account at the time of the freeze or block. Moreover, the Bank's practice of freezing or blocking Accounts cuts off the affected EDD Debit Cardholders' access to any continuing benefits that the EDD deposits into the Cardholder's blocked Account or attempts to deposit into the Cardholder's frozen Account—EDD benefits to which EDD has determined the Cardholder is entitled. As a result, many EDD Debit Cardholders who are the victims of third-party fraud and who turn to the Bank for help, find themselves indefinitely deprived of access to *all* their EDD benefits and treated as if *they* are the criminals.

94.    Bank of America has frozen many Cardholders' Accounts for months on end, without providing them any information as to when their Accounts will be

unfrozen or how they can facilitate that unfreezing. Some EDD Debit Cardholders whose Accounts are frozen in this manner have eventually received a letter from the Bank weeks or months after the fact, but that letter simply states: "It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result . . . a freeze (or hold) has been placed on your account." The letter states that once the Bank freezes your Account, you "will be unable to use the prepaid debit card or access the money in your account," and that the Account "will not be available to receive any additional benefits that may be issued to you by [EDD]." The letter further states: "If a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and your balance will become available in accordance with the terms of the card account agreement and state agency guidelines," but the letter does not advise the affected Cardholder as to what steps they can take to regain access to their Account.

95.    After Bank of America has frozen an EDD Debit Card Account in response to a report of transactional fraud, the Bank has had a policy and practice of telling the affected Cardholder that they are required to re-authenticate their identity and re-verify their benefits eligibility with EDD as a condition of unfreezing their Account—even if EDD itself has not raised any question regarding the individual's identity or eligibility for benefits. Bank of America has imposed this onerous and unreasonable condition on Cardholders who report third-party transactional fraud regardless of whether there is a reasonable basis for suspecting them of having committed benefits eligibility fraud, and despite knowing that EDD's call center has been completely overwhelmed by the surge in calls from unemployment benefits recipients throughout the pandemic and that many individuals who call EDD will never get through to a live agent. According to the State Auditor, EDD agents answered just 1.4% (697,132 of 50,251,351) of calls received in July 2020, and just 6.3% (230,301 of 3,649,193) of calls received in October 2020.

96.    Even after Cardholders have complied with this onerous and unreasonable Bank-imposed requirement of contacting EDD and obtaining confirmation from EDD that they either do not need to re-verify or have successfully re-verified their benefits eligibility, Bank of America *still* has not unfrozen their EDD Debit Card Account, continuing without explanation to deprive Cardholders of access to their EDD benefits and refusing to process their fraud claims or refund their stolen money, sometimes for months longer.

### 5.    The Bank's Policy and Practice of Denying Reasonable Customer Service to Cardholders Seeking Assistance with Fraud Claims and the Unfreezing of Accounts

97.    Desperate and confused, EDD Debit Cardholders whose fraud claims have been summarily denied and/or whose EDD Debit Card Accounts have been suddenly frozen have spent months calling the Bank's customer service hotline, to no avail.

98.    The Bank has failed to appropriately staff its customer service call centers in a manner that would allow it to honor its contractual commitments under the EDD–Bank Contract and to provide reasonable levels of assistance to the predictably large volume of EDD Debit Cardholders seeking assistance during this pandemic. Further, the Bank has a policy and practice of failing to provide its customer service representatives the tools or authority necessary to assist Cardholders who call seeking assistance in resolving their fraud claims or unfreezing their Accounts. Although the Bank at some point in the Fall of 2020 hired additional customer service agents, on information and belief those newly hired customer service agents are not adequately trained and are not empowered to investigate or resolve fraud claims, and the number of customer service agents continued to be too low to handle incoming calls, resulting in hours-long wait times if Cardholders can get through at all.

99.    Despite the Bank's promise of 24/7 customer service, Plaintiffs and Class Members have found themselves repeatedly kept on hold, sometimes for hours, waiting to speak to a live agent. Plaintiffs and Class Members have routinely been disconnected, hung up on, and treated rudely by overworked and overwhelmed agents. They often spend hours on hold with customer service, despite the Bank having represented in its Cardholder Agreement that "[t]elephoning is the best way of keeping your possible losses down." Even when Plaintiffs and Class Members finally reach customer service representatives, those representatives are unable to offer any meaningful assistance, often conveying false information and contradicting one another.

100.    The Bank's representatives also often provide erroneous information to Plaintiffs and Class Members regarding the source of their Account freezes. Countless Class Members have been told that the Bank has no control over the freeze, that EDD is the entity responsible for the freeze, and that only EDD has the power to unfreeze their Account. But when Class Members call EDD, EDD informs them that it has no control over their Account and that the freeze is entirely within Bank of America's control. Even when Class Members re-verify their identity with EDD, when EDD confirms their eligibility for benefits, and when EDD or Class Members convey this information to the Bank, the Bank *still* does not unfreeze their Accounts. In some cases, EDD has resumed paying benefits to Class Members through paper checks at the Class Members' request, but those Class Members continue to be unable to access funds in their Accounts, which remain frozen.

101.    The EDD has publicly stated that the responsibility to prevent fraudulent transactions and to address claims of unauthorized transactions lies entirely with Bank of America, stating on October 29, 2020, that EDD "has no direct access to debit funds on any accounts" and that those impacted by card issues should

1  contact Bank of America.[13] The agency has stated that it has no means to intervene

2  in Bank of America's procedures.

3      102.   Bank of America's inadequate response to EDD Debit Cardholders'

4  issues with fraud on their Cards and Accounts results from the Bank's failure to

5  adequately staff its customer-service and fraud-investigation departments, and from

6  Bank procedures that are designed to, or that the Bank knows or reasonably should

7  know will, frustrate and obstruct Cardholders' efforts to submit their claims and to

8  obtain reimbursement under EFTA and the Bank's "Zero Liability" policy.

9      103.   Many EDD Debit Cardholders have characterized their efforts to

10  obtain relief from the Bank for the wrongful conduct alleged herein as an "unofficial

11  full-time job trying to get the money back." One defrauded EDD Debit Cardholder

12  reported: "It's kind of like a nightmare . . . . Every day I'm wondering what's more

13  important. Do I get on the phone with the bank and try again so I have a place to

14  sleep tomorrow, or do I just accept that I'm going to be on the street and focus on

15  my job search? Because you can't do both."[14]

16      104.   A Bank of America customer service worker, addressing the Bank's

17  response to the influx of reports of third-party debit card fraud, stated: "We're

18  actually no longer allowed to tell them a timeframe, because we have no clue . . . .

19  Every day, I talk to 30 people with the same story. I just pray for them after my

20  shift, honestly."[15]

21

22

---

23      [13] Matt Fountain, "Bank of America Froze SLO County Residents'
   Unemployment Benefits Because of Fraud," *San Luis Obispo Tribune* (Dec. 17,
24  2020), *available at* https://www.sanluisobispo.com/news/local
   /article247729155.html.
25
      [14] Lauren Hepler & Stephen Council, "How Bank of America Helped Fuel
26  California's Unemployment Meltdown," *CalMatters* (Nov. 20, 2020), *available at*
   https://calmatters.org/economy/2020/11/how-bank-of-america-helped-fuel-
27  californias-unemployment-meltdown/.

28      [15] *Id.*

---

105.    Bank of America's disregard for EDD Debit Cardholders' issues with fraud and the Bank's inadequate response contradicts the representations it made to the State in its proposal to administer the EDD public benefits program, in which the Bank represented, "we pride ourselves on providing stellar customer service to every caller. Long call hold waits and busy signals are not tolerated at Bank of America."

### 6.    The Court Preliminarily Enjoins the Bank's Policies and Practices

106.    On January 14, 2021, Plaintiff Jennifer Yick commenced the class action titled *Yick v. Bank of America, N.A.*, No. 3:21-cv-00376, in the U.S. District Court for the Northern District of California. *See Yick*, Dkt. No. 1. Eight related class actions were subsequently filed in the Northern District of California,[16] which the Court consolidated into *Yick* for all purposes on March 29, 2021.

107.    Shortly after Plaintiffs put the Bank on notice of their intent to move for a preliminary injunction, on or around March 18, 2021, the Bank announced that it was adopting a new policy and practice of "blocking" rather than "freezing" the Accounts of EDD Debit Cardholders who reported unauthorized transactions on their Account and who were flagged by the Bank's Claim Fraud Filter, and that it was converting some "frozen" Accounts to "blocked" status. According to the Bank, this new policy permits a Cardholder with a "blocked" Account to regain access to their Account by contacting the Bank and passing a Bank-administered

---

[16] *See Rodriguez v. Bank of America, N.A.*, No. 21-cv-00494 (N.D. Cal. filed Jan. 20, 2021); *Willrich v. Bank of America, N.A.*, No. 21-cv-00547 (N.D. Cal. filed Jan. 22, 2021); *McClure v. Bank of America, N.A.*, No. 21-cv-00572 (N.D. Cal. filed Jan. 25, 2021); *Oosthuizen v. Bank of America, N.A.*, No. 21-cv-00615 (N.D. Cal. filed Jan. 26, 2021); *Wilson v. Bank of America, N.A.*, No. 21-cv-00699 (N.D. Cal. filed Jan. 28, 2021); *Mosson v. Bank of America, N.A.*, No. 21-cv-00743 (N.D. Cal. filed Jan. 29, 2021); *Cajas v. Bank of America, N.A.*, No. 21-cv-00869 (N.D. Cal. filed Feb. 3, 2021); *Smith v. Bank of America, N.A.*, No. 21-cv-01466 (N.D. Cal. filed Mar. 1, 2021).

identity-verification process. At the same time, the Bank sent some Accountholders form letters dated March 18, 2021, informing them about this new policy. However, the Bank still does not provide Cardholders advance notice of the intended block (which, like a "freeze," denies the Cardholder access to all funds in their Account), and the Bank continues to block the Accounts of legitimate Cardholders based solely on the results of the Bank's Claim Fraud Filter, without any reasonable investigation.

108.   On April 1, 2021, Plaintiffs in the nine consolidated *Yick* class action cases filed a Motion for Preliminary Injunction and Provisional Class Certification under Rule 23(b)(2), seeking to enjoin the Bank's practices described herein. In opposing the motion, Bank of America confirmed that since October 2020, the Bank had maintained a policy and practice of (a) subjecting every EDD Debit Cardholder who submitted a claim of unauthorized transaction to an initial "Claim Fraud Filter," (b) automatically and without investigation denying the fraud claim of any EDD Debit Cardholder flagged by the Claim Fraud Filter, and (c) automatically and without investigation freezing or blocking the Account of any EDD Debit Cardholder flagged by the Claim Fraud Filter. The Bank further confirmed that between October 2020 and March 2021, it denied the fraud claims and froze or blocked the Accounts of tens of thousands of legitimate EDD Debit Cardholders based solely on the erroneous results of its Claim Fraud Filter. The Bank's Claim Fraud Filter has an extremely high false positive rate, and erroneously flagged tens of thousands of claimants as criminals using stolen identities when they were in fact legitimate EDD Debit Cardholders entitled to EDD benefits and who were wrongfully deprived of those statutory benefits as a result of the Bank's unlawful policies and practices.

109.   On May 17, 2021, the district court in *Yick* issued an Order Re Preliminary Injunction, holding that Plaintiffs "have demonstrated a strong likelihood of success" on claims for violations of the federal Electronic Fund

Transfers Act, for violations of California's Unfair Competition Law, and for breach of contract; and that Plaintiffs had shown irreparable injury. The district court provisionally certified a Rule 23(b)(2) class of all EDD Debit Cardholders who call the Bank to report unauthorized charges to their Accounts and ordered the parties to meet and confer regarding the appropriate scope of a preliminary injunction. *Yick*, Dkt. No. 89 (**Exhibit A**).

110.    On June 1, 2021, after the *Yick* parties engaged in an extensive meet-and-confer process, including a two-day settlement conference before U.S. Magistrate Judge Sallie Kim, the district court entered the parties' joint submission as a Preliminary Injunction. *Id.*, Dkt. No. 103 (**Exhibit B**). Among other things, the Preliminary Injunction: (a) prohibits the Bank from considering the results of the Bank's Claim Fraud Filter in investigating or resolving unauthorized transaction error claims ("Claims"); (b) prohibits the Bank from denying or closing Claims or denying provisional or permanent credit to claimants' Accounts without conducting and concluding an investigation into the alleged unauthorized transaction pursuant to EFTA and Regulation E; (c) prohibits the Bank from denying or closing Claims without providing the claimant a written explanation of the findings of its investigation, pursuant to EFTA and Regulation E; (d) prohibits the Bank from considering the results of the Bank's Claim Fraud Filter as a basis for freezing any Class Member's Account; (e) requires the Bank to reopen any Claim that it closed or denied based solely on the results of the Claim Fraud Filter and that it has not previously paid or previously reopened and investigated; (f) requires the Bank to investigate and resolve all such previously closed claims within specified time periods after the Class Member authenticates their identity with the Bank, and to issue provisional credit in the amount of the alleged error if the Bank's investigation is not completed within specified time limits; and (g) requires the Bank to establish dedicated toll-free numbers for Class Members seeking assistance with fraud claims (Claims Initiation Call Center) or frozen and blocked Accounts (Fraud Call Center),

to expand its Claims Initiation Call Center and Fraud Call Center hours to 24 hours per day, 7 days per week, to provide specified training to its Customer Service Representatives, and to staff its Claims Initiation Call Center and Fraud Call Centers to ensure an average speed to answer of no more than five minutes, 90 percent of the time.

### 7. The Bank's Policies and Practices Continue to Harm Cardholders

111.   Notwithstanding the Preliminary Injunction prohibiting the Bank from considering the results of the Claim Fraud Filter as a basis for denying or closing unauthorized transaction claims or as a basis for "freezing" any Class Member's Account, the Bank continues to apply the Claim Fraud Filter to every Class Member who reports an unauthorized transaction and continues to rely on the results of the Claim Fraud Filter as a basis for "blocking" those Class Members' Accounts. Just as Class Members whose Accounts are "frozen" are denied access to funds in their Accounts, Class Members whose Accounts are "blocked" are likewise unable to access any EDD benefits still remaining in their Account and are unable to access any continuing EDD benefits that EDD deposits into their Account while their Account is blocked.

112.   On information and belief, the Bank continues to block the Accounts of thousands if not tens of thousands of Class Members *each month* based solely on the results of the Bank's highly flawed and unreliable Claim Fraud Filter, thus depriving Class Members of access to critical unemployment and other public benefits to which the EDD has found they are entitled and on which they and their families depend for food, shelter, and other basic life necessities.

113.   Moreover, Class Members continue to experience unauthorized transactions on their EDD Debit Card Accounts.

## G.    Class Representative Plaintiffs' Allegations

### 1.    Jennifer Yick

114.    In late November 2020, Yick was surprised when her EDD Debit Card was declined at a grocery store in the San Francisco Bay Area. She subsequently viewed her Account online and discovered that her Account balance, which she knew should have been over $400, had been drained to 70 cents due to four unauthorized transactions with DoorDash, a food delivery service, for what appeared to be orders from restaurants located in Texas, New York, and Southern California totaling over $400. The transactions posted to Yick's Account on November 2, 5, 8, and 16. Yick did not have a DoorDash account and did not make or authorize these transactions. Yick had never authorized anyone to use her Card, and she had never disclosed her Card PIN to anyone.

115.    Yick is a long-time San Francisco resident. She did not travel to Texas, New York, Southern California, or anywhere else outside the San Francisco Bay Area during or around the period in November 2020 when the unauthorized transactions occurred, and during which time there was a nationwide surge of COVID-19 cases and related California and federal government restrictions on travel. Indeed, Yick used her EDD Debit Card for in-person transactions at stores in the San Francisco Bay Area on the same day or within one day of three of the unauthorized transactions. Additionally, Yick had never used her EDD Debit Card for transactions from DoorDash or restaurants, and had never used her Card to make an online transaction. Rather, she had always used her Card for purchasing necessities from brick-and-mortar stores located in or around the San Francisco Bay Area, such as gas stations, grocery stores, and retail stores like Target and Costco.

116.    Bank of America knew or should have known about Yick's EDD Debit Card transaction history, that she appeared to be in the San Francisco Bay Area at the time of the unauthorized transactions, and that the COVID-19 pandemic and related fears and travel restrictions made it highly unlikely that Yick would have

been in Texas, New York, and Southern California at the time of the unauthorized transactions. Given this, Bank of America should have detected and flagged the unauthorized transactions as highly suspicious, stopped them, and notified Yick about them, but the Bank did none of these things. Instead, it just allowed the unauthorized transactions to happen.

117. Over the course of more than a month, Yick repeatedly sought assistance through Bank of America's customer service phone lines, to no avail. She repeatedly waited on hold before being disconnected from the line; waited to speak to someone only to be told to call back later; was transferred to various departments without receiving any information; was sent to voicemail; was forced to deal with unhelpful automated agents; and unsuccessfully attempted to reach Bank of America by email. To date, Yick has not been reimbursed for the unauthorized transactions on her EDD Debit Card, nor has Bank of America provisionally credited her Account.

118. Yick's experience seeking reimbursement from the Bank for the unauthorized transactions on her Account demonstrates the futility of EDD Debit Cardholders turning to Bank of America's customer service department for assistance. After discovering the fraudulent charges on her EDD Debit Card on December 1, 2020, Yick tried for days to contact a Bank of America agent who would assist her with the fraud on her Card. After calling the number on the back of her EDD Debit Card and waiting on hold, Yick eventually reached an agent who told her that her call needed to go to "claims." Despite Bank of America's representations of "24/7" customer service, the agent informed Yick that she would need to call back during business hours and provided her with a number to call. Yick called that number three times the following day, December 2, 2020, waiting on hold each time, only to have the system repeatedly hang up on her.

119. Yick found another Bank of America customer service number and called it, only to again wait on hold before the system hung up on her. Calling this

number led Yick to an automated customer service agent which asked Yick for her Card number. Even though Yick provided her Card number when asked, the automated agent continued to repeat its request for Yick's Card number, without offering any sort of assistance.

120.    On December 3, 2020, Yick tried once again to contact Bank of America by calling the number on the back of her EDD Debit Card. This time she reached a live customer service agent, who stated that she was adding notes to Yick's file to indicate that Yick was disputing the four DoorDash transactions and advised Yick to describe her claim in an email to a long email address involving a string of abbreviated words, which the agent read to her over the phone.

121.    This email address does not appear in Yick's Cardholder Agreement, the "Quick Reference Guide" which accompanied her Card, or the Bank's EDD Debit Card FAQ webpage. Nevertheless, when Yick finally reached a live customer service representative, she was advised that sending an email to this previously undisclosed email address represented her best chance of recovering the funds stolen from her EDD Debit Card Account.

122.    On December 6, 2020, Yick sent an email to that address, providing Bank of America with her name, address, partial Card number, and a summary of the disputed charges. The following evening, Yick's email provider (Gmail) sent her an email stating there was trouble delivering her email to that address, and that the system would attempt to deliver it for 45 more hours before sending a notification that delivery had failed.

123.    On December 8, 2020, concerned with Bank of America's failures to respond, Yick filed a police report at her neighborhood precinct in San Francisco concerning the fraudulent charges on her EDD Debit Card Account.

124.    On December 9, 2020, Gmail sent Yick a message reading: "Message not delivered . . . . The recipient server did not accept our requests to connect."

125. On December 22, 2020, when Yick had not received further assistance or communication from Bank of America, she again attempted to email a summary of her claim to the same email address. She was notified three days later that her email was not delivered and that "[t]he recipient server did not accept our requests to connect."

126. In short, Yick followed the instructions in her Cardholder Agreement, and made consistent, diligent efforts to recover the funds stolen from her EDD Debit Card Account by multiple telephone calls and emails. Despite this, Bank of America's customer service department never offered Yick any meaningful response or assistance, but rather stymied her efforts at every turn. After Yick filed a class action lawsuit and obtained a preliminary injunction against the Bank, the Bank finally reimbursed Yick $409.26 for the unauthorized transactions on or about December 20, 2021.

**2.    Vanessa Rivera**

127. Rivera received her EDD Debit Card in January 2020. It was her lifeline—she used it to buy essentials like gas and food for her and her young son.

128. On January 29, 2021, someone fraudulently withdrew $800 from Rivera's EDD Debit Card Account at a Bank of America ATM. She received a message that the balance in her Account was $4.17, when she knew she should have had over $800 in the Account. She only received this message because she had set up her Account settings to automatically notify her if her Account balance fell below $30—it was not an alert from the Bank about suspected fraud. Rivera's Card was in her possession when the fraudulent withdrawal occurred, and she had never authorized anyone to use her Card or disclosed her Card PIN to anyone.

129. That same day, Rivera logged into her Account online to see if there might have been a mistake and found that someone had conducted a balance inquiry from an ATM about an hour away from where she lives and then withdrew the $800. She immediately called Bank of America to submit a claim disputing the

transaction. The Bank representative she spoke with gave her a claim number, and Rivera assumed the claim would be investigated.

130.   On February 4, 2021, Rivera called Bank of America again and was surprised to learn that the representative she had spoken with on January 29 never actually submitted her fraud claim and, instead, just put a "note" in her Account and mailed her a new Card. The Bank representative that Rivera spoke with on February 4 told Rivera that she (the February 4 representative) successfully submitted her fraud claim for investigation. The next week Rivera received in the mail a letter from the Bank stating that her claim was closed. The letter was dated February 5, 2021, just one day after her claim was submitted for investigation. On information and belief, the Bank failed to conduct a good-faith investigation of Rivera's fraud claim and did not have a reasonable basis for its determination that Rivera had authorized or benefitted from the transaction.

131.   On February 6, 2021, Rivera received her replacement Card in the mail. She tried activating it online, but Bank of America's website indicated she was not allowed access to her Account. Rivera then called the number on the back of the Card to activate it and a Bank representative told her that her Account had been frozen due to fraudulent charges.

132.   On March 3, 2021, Rivera received a letter from Bank of America stating that there had been fraud on her Account and informing her that her Account would remain frozen. This letter did not provide her with any useful information as to why her Account would remain frozen, but only stated that fraud is what had caused her Account to be frozen initially.

133.   Rivera has spent at least 30 hours on the phone with Bank of America customer service about her $800 unauthorized transaction claim and trying to get her Account unfrozen. During these phone calls, she has felt belittled and treated like a criminal by Bank representatives, who have stated or implied that she was responsible for the fraud. On one occasion, a Bank of America representative told

her that she had done nothing wrong, but that her Account was frozen because of a Bank policy or protocol that requires Bank employees or agents to freeze an Account when an unauthorized transaction occurs on the Account.

134. Bank of America's summary denial of Rivera's unauthorized transaction claim and freezing of her Account caused Rivera extreme financial hardship and desperation. She went days without eating a full meal or eating only once a day. She had to break her young son's piggy bank so that she could have money to buy them food. She had her phone disconnected because she could not pay the bill, and did not have money for gas or public transportation, making it impossible for her to go to a job interview or to have a job requiring that she commute to and from work.

135. On April 1, 2021, Rivera became a class representative plaintiff in the *Yick* action (pursuant to an Amended Consolidated Complaint filed in that case) and submitted a declaration in support of the consolidated *Yick* plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification. Only then did Bank of America finally "reconsider" her months-old fraud claim, reimburse her the $800 at issue, and unfreeze her Account.

**3.    Candace Koole**

136. Koole started receiving EDD unemployment benefits through a Bank of America EDD Debit Card during the COVID-19 pandemic. She generally used her Card to pay for essentials like food, rent, medicine, and toiletries. She also used it to pay for hospital visits and dental work.

137. On December 30, 2020, Koole tried to use her EDD Debit Card at a grocery store to buy food for her and her young son, and the Card was repeatedly declined at the checkout stand. She left the groceries at the store and went home to check her Account balance. She was shocked to find her Account had just $7 in it, down from approximately $9,000 the week before. Her online Account statement showed that $8,760 had been fraudulent taken out of her Account by ATM

withdrawals—mostly withdrawals of the daily maximum of $1,000 per day at several different ATM locations around Southern California until her Account was nearly empty. She did not authorize these withdrawals, and her Card was in her possession when they occurred. She also had never disclosed her Card PIN to anyone and had never authorized anyone to use her Card.

138.    The same day, Koole called the Bank and submitted a claim disputing the fraudulent transactions. During that call, a Bank representative told Koole that her EDD Debit Card Account would be frozen as a result of her reporting fraud, and Koole's Account was frozen that day. The Bank representative told Koole that she was responsible for proving that she had not committed the fraud on her Account and advised her to file a police report in support of her fraud claim.

139.    Immediately after speaking with the Bank, Koole attempted to file a police report with the Riverside County Sheriff's Department. She could not complete the report, however, because she did not know the "terminal ID numbers" corresponding to the ATMs where money had been fraudulently withdrawn from her Account. And because Koole's Account was frozen, she could not access her Account online and, thus, could not access any details about the fraudulent transactions, including the information necessary to complete the police report.

140.    In early January 2021, Koole received a letter from the Bank dated December 31, 2020—just one day after she submitted her claim disputing the fraudulent transactions—denying her claim. The only explanation in the letter for why the Bank had denied her claim was the same generic explanation that the Bank sent numerous other Plaintiffs and Class Members upon denying their claims: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity." On information and belief, the Bank failed to conduct a good-faith investigation of Koole's fraud claim and did not have a reasonable basis for its determination that Koole had authorized or benefitted from the transaction.

141.   In the months after the Bank rejected Koole's fraud claim and froze her Account, Koole repeatedly called the Bank about addressing these issues. Some Bank representatives said the status of her claim was pending, others that she needs to communicate with EDD, and others that her Account is completely closed. Many times, Bank representatives have told Koole that she needs to contact EDD to tell the agency to communicate with the Bank to unfreeze her Account. But she has called EDD and been told by EDD that their system does not show any issues with her Account. Koole has spent approximately 100 hours on the phone trying to resolve the issues relating to her Account.

142.   As a result of Bank of America's acts and failures to act, Koole's life changed drastically. Koole is a single mother with a young son. She was forced to live week to week, rationing out food for her child. She also had no way to get a job because of the COVID-19 pandemic, and every day she wondered if she would soon be homeless.

143.   On April 1, 2021, Koole became a class representative plaintiff in the *Yick* action (pursuant to an Amended Consolidated Complaint filed in that case) and submitted a declaration in support of the consolidated *Yick* plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification. Only then did Bank of America finally "reconsider" her months-old fraud claim. By letter dated April 6, 2021, the Bank informed Koole that it was granting her $8,760 fraud claim and that her Account would be permanently credited in that amount. Approximately one month after that, in or about early May 2021, the Bank finally restored Koole's access to her Account.

**4.     Azuri Moon**

144.   On or around October 20, 2020, when Moon tried to buy lunch at a restaurant, he was informed that his Bank Debit Card had insufficient funds. Knowing he should have had around two thousand dollars in his Account, he immediately checked his Account online and saw two separate ATM withdrawals

totaling $1,800, leaving him with virtually no money in his Account. Moon had never disclosed his Card PIN to anyone, and had never authorized anyone to use his Card, and did not authorize these ATM withdrawals.

145.    On October 21, 2020, Moon called Bank of America to report these unauthorized transactions. He spent 11 hours on the phone before he was able to get through to the claims department. Moon then submitted a fraud claim and a Bank of America representative told him that a decision would be made on his case in 30 days or so.

146.    In or about mid-November 2020, nearly a month after making his claim, Moon had not received any communication from the Bank, and so he contacted the Bank to get an update on his claim. Moon was shocked when a Bank of America representative told him that he was liable for the disputed transactions, and the Bank would not be returning the money. On information and belief, the Bank failed to conduct a good-faith investigation of Moon's fraud claim and did not have a reasonable basis for its determination that Moon had authorized or benefitted from the transaction. During that same phone call, the Bank representative told Moon that he could file a police report, write a detailed description of what happened, and fax it to Bank of America with his name, case number, and Card number. Having received no written communications from Bank of America, and thus forced to rely only on his personal notes, it was extremely difficult for him to file a police report. But he ultimately compiled everything that the Bank had asked for and faxed it to the Bank.

147.    From approximately November 15 to December 15, 2020, Moon was forced to live in his car because the funds he would have used to pay rent were stolen from his Account and not reimbursed by the Bank. He had to rely on the generosity of others to begin sleeping in a bed again. He routinely had to choose which bills to pay and which ones not to, resulting in significant late fees and interest charges.

148. In or about mid-December 2020, nearly a month after faxing the Bank the police report and other documents that the Bank had requested, and having received no communication from the Bank, Moon called the Bank again to get an update. A representative told him that the Bank never received his fax. It turned out that a Bank representative had provided Moon with his *claim* number but mistakenly told him it was his *case* number, and the information in his fax reflected this mistake, derailing his fraud claim. Moon was told the Bank would not be able to process his claim until this was corrected. He then re-faxed everything with the information they requested.

149. In late December 2020 or early January 2021, with his claim still unresolved, the Bank froze Moon's Account with no explanation. He called the Bank, and was informed that, as a result of the freeze, the Bank could not do anything to address his fraud claim.

150. From the time he made his fraud claim in late October 2020 through late March 2021, Moon spent at least 50–60 hours on the phone with Bank of America trying to resolve the issues with his claim and the freezing of his Account, to no avail.

151. On April 1, 2021, Moon became a class representative plaintiff in the *Yick* action (pursuant to an Amended Consolidated Complaint filed in that case) and submitted a declaration in support of the consolidated *Yick* plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification. Only then did Bank of America finally "reconsider" his fraud claim, reimburse his Account the $1,800, and unfreeze his Account.

### 5. Roland Oosthuizen

152. Every day from September 24 to 28, 2020, an unauthorized third party or parties withdrew $1,000 from Oosthuizen's EDD Debit Card Account, using Bank of America ATMs in the Los Angeles area. Oosthuizen did not make the withdrawals himself, did not authorize the withdrawals, and only learned about the

withdrawals when he logged into his EDD Debit Card Account on Bank of America's website to find that $5,000 was missing.

153.   Oosthuizen has always kept his original EDD Debit Card in his wallet. He does not know how unauthorized third parties gained access to his EDD Debit Card Account, but he believes his EDD Debit Card was fraudulently cloned.

154.   The Bank never notified Oosthuizen of this fraud, notwithstanding the highly suspicious withdrawal of the maximum daily ATM limit under the Cardholder Agreement of $1,000 per day for five straight days at different ATMs, which was a completely different pattern of withdrawal than Oosthuizen himself had ever undertaken.

155.   After discovering the fraudulent withdrawals from his EDD Debit Card Account on September 29, 2020, Oosthuizen promptly suspended his EDD Debit Card using the Bank of America online portal. The next day, Oosthuizen called Bank of America and—after waiting on hold for three hours—made a fraud claim concerning the missing $5,000. A Bank of America representative named Kaitlyn told Oosthuizen he should wait to hear back from Bank of America concerning his claim.

156.   Approximately two weeks later, Oosthuizen received a letter in the mail from Bank of America dated October 1, 2020—just two days after Oosthuizen had reported the fraud—which summarily closed his claim and failed to provide any substantive information concerning what Bank of America did to investigate his claim or its reason for closing the claim. On information and belief, the Bank failed to conduct a good-faith investigation of Oosthuizen's fraud claim and did not have a reasonable basis for its determination that Oosthuizen had authorized or benefitted from the transactions.

157.   Over the following months, Oosthuizen called Bank of America multiple times, typically waiting on hold for hours before, on occasion, reaching a live person. Oosthuizen spoke with a Bank representative named Tara on October

14, 2020. He requested that Bank of America re-open his case. Tara assured him during that call that his claim would be "escalated." Tara also requested that Oosthuizen fax the Bank documentation supporting his claim.

158.   On November 5, 2020, Oosthuizen faxed Bank of America a written statement regarding the theft, a police report information statement from when he made a report of the theft to the Los Angeles Sherriff's Department, and other documentation. In his fax, Oosthuizen specifically requested that Bank of America provide him with whatever documentation the Bank had relied upon when it denied his fraud claim. He did not receive a response to his fax. At no time during this process did the Bank provide him any provisional credit, causing him severe hardship. On information and belief, the Bank failed to a conduct good-faith investigation of Oosthuizen's fraud claim and did not have a reasonable basis for its determination that Oosthuizen had authorized or benefitted from the transactions.

159.   Only after Oosthuizen filed a class action lawsuit against Bank of America on January 26, 2021 did he receive a letter from the Bank dated January 27, 2021, stating that the Bank had performed an additional review of his claim and had credited him for the $5,000 that had been stolen from his EDD Debit Card Account. The Bank did not pay him any interest on the $5,000.

### 6.    Rosemary Mathews

160.   On October 12, 2020, an unauthorized third party or parties withdrew $1,000 from Mathews' EDD Debit Card Account, using a Bank of America ATM that Mathews has never herself used, leaving her with less than $500 in her Account.

161.   Mathews has always kept her EDD Debit Card with her, never let anyone borrow her Card, and has not disclosed her Card PIN to anyone. Mathews does not know how unauthorized third parties gained access to her EDD Debit Card Account, but she believes her Card was fraudulently cloned.

162.  The Bank never notified Mathews of the unauthorized withdrawal from her Account. She only realized that the theft occurred when she checked her Account balance on October 18, 2020, and found it was below $500. She was horrified because she did not have enough money left to cover basic necessities.

163.  After discovering the fraudulent withdrawal of $1,000 from her Account, Mathews on October 18, 2020 telephoned Bank of America at the number on the back of her EDD Debit Card, only to be told that the claims department was not open that day. The next day, she called and, after waiting on hold, made a claim.

164.  Approximately two weeks passed before Mathews received a letter in the mail from Bank of America summarily closing her claim while failing to provide any other information. On information and belief, the Bank failed to conduct a good-faith investigation of Mathew's fraud claim and did not have a reasonable basis for its determination that Mathews had authorized or benefitted from the transactions.

165.  Over the following months, Mathews called Bank of America multiple times, typically waiting on hold for hours before, on occasion, reaching a live representative.

166.  On November 5, 2020, Mathews faxed to Bank of America a written statement regarding the theft, a police report information statement from when she made a report of the theft to the Los Angeles Sherriff's Department, and other documentation. Mathews specifically requested that Bank of America provide her with the documentation that the Bank purportedly relied upon when it denied her fraud claim. She did not receive a response to her November 5, 2020 fax, and at no time during this process did the Bank provide her any provisional credit, causing her severe hardship.

167.  On or about December 22, 2020, Mathews realized that her EDD Debit Card Account was frozen. She called the Bank, which told her that it had frozen her Account on or about December 17, 2020.

168.    Only after Mathews filed a class action lawsuit against Bank of America on January 26, 2021, did she finally receive a letter from the Bank dated January 27, 2021 stating that the Bank had performed an additional review of her claim and had credited her with the $1,000 that had been fraudulently stolen from her EDD Debit Card Account.

169.    Even after receiving the Bank's letter dated January 27, 2021, Mathews was still unable to access those credited funds because her EDD Debit Card Account remained frozen. Although her Account had been frozen since December 2020, she did not receive a written notice from the Bank regarding the freeze until February 1, 2021. The notice did not provide her any details or information specific to her as to why her Account had been frozen. Sometime thereafter, without notification, the Bank unfroze her Account, which allowed her to withdraw the $1,000 from her Account. The Bank never credited her any interest on the $1,000. Mathews estimates she spent more than 100 hours calling the Bank in her attempts to recover the $1,000 or have her Account unfrozen.

170.    It was an extreme hardship for Mathews not to have access to her unemployment benefits. She had to borrow money from her son and other family members and suffered great stress trying to pay her bills each month. She began seeing a counselor because of depression and stress due to not receiving the unemployment benefits to which she was entitled.

**7.    Carlos Rodriguez**

171.    Plaintiff Carlos Rodriguez received $900 on his EDD Debit Card every two weeks after being found eligible for unemployment benefits during the COVID-19 pandemic.

172.    On or about December 17, 2020, Rodriguez started calling Bank of America to inquire about EDD benefits that should have already been, but did not appear to have been, deposited into his EDD Debit Card Account. For the previous couple of days, Rodriguez had been checking his Account to confirm receipt of the

deposit, but the funds were not there. Concerned about the whereabouts of those funds, Rodriguez researched his Account transaction history and noticed a $230 ATM withdrawal on December 10, 2020, and a $900 ATM withdrawal on December 17, 2020. Neither withdrawal was made or authorized by Rodriguez. The withdrawals were made at one or more ATMs in Los Angeles, while Rodriguez was in San Diego. Rodriguez further noticed that some unidentified person or persons had checked his Account balance without his authorization on November 30, 2020, and many times throughout December 2020.

173.    Alarmed by these transactions and the missing funds, Rodriguez promptly called Bank of America. The Bank replied that it had never received funds for his Account from the EDD. Rodriguez then called the EDD, which stated that it had deposited the $900 to his EDD Debit Card Account as scheduled. When Rodriguez followed up with the Bank, the Bank froze his Account and told him that 22,000 other individuals who receive their EDD unemployment benefits through EDD Debit Cards had also had funds stolen from their EDD Debit Card Accounts.

174.    In or about mid-February 2021, Rodriguez started receiving, at his request, bi-weekly EDD benefits payments in the form of paper checks that EDD mailed to him. EDD also paid Rodriguez via check for EDD benefits that were owed to him from the time that Bank of America froze his EDD Debit Card Account until the time he started receiving paper checks from EDD. He did not receive any interest on those funds.

175.    After Rodriguez filed a class action lawsuit against Bank of America in the Northern District of California in January 2021, and shortly after the Northern District Plaintiffs put the Bank on notice of their intent to move for a preliminary injunction, Rodriguez received a letter from Bank of America dated March 18, 2021, informing him of a new way to remove the hold (i.e., remove the freeze or block) on his EDD Debit Card Account. In April 2021, while the parties were briefing the Northern District Plaintiffs' Motion for Preliminary Injunction

1    and Provisional Class Certification, the Bank finally unfroze or unblocked

2    Rodriguez's Account, thereby restoring his access to his Account for the first time

3    since it was frozen many months earlier.

4    176.    Also in April 2021, the Bank sent Rodriguez a letter dated April 20,

5    2021—i.e., just one day before the Bank filed its opposition to the motion for

6    preliminary injunction on April 21 (*see Yick*, Dkt. No. 72)—informing him that the

7    Bank was issuing him a temporary credit for the funds that had been fraudulently

8    withdrawn from his Account. On April 22, the Bank made the credit permanent,

9    which it reported to the Court when it re-filed its opposition to the motion for

10    preliminary injunction on April 23 (*Yick*, Dkt. No. 76-16 at 5).

11    **8.    J. Michael Willrich**

12    177.    In late September or early October 2020, Willrich discovered that

13    $4,000 to $5,000 was missing from his EDD Debit Card Account. Bank of America

14    did not notify him of the fraud. Willrich had never disclosed his PIN to anyone and

15    had never authorized another person to his Card.

16    178.    Upon learning of the fraud, Willrich immediately went to a Bank of

17    America branch and reported it to a Bank representative. The Bank representative

18    told him that the Bank only "sponsors" the EDD Debit Card and that he should call

19    the phone number on the back of his Card for assistance.

20    179.    Over the course of months, Willrich repeatedly sought assistance

21    through Bank of America's customer service phone lines, but to no avail. When

22    Willrich was able to get through to a customer service representative, he was

23    informed that he needed to speak with the Claims Department. He asked if he could

24    file a claim online but was told by the representative that he could not. He was then

25    transferred to the Bank's Claims Department, where he waited on hold for three-

26    and-a-half hours before the system hung up on him. The day after that, Willrich

27    waited on hold for another hour before he had to terminate the call due to time

28    constraints.

180.   On the fourth day after discovering the fraud, Willrich awoke at 5:00 A.M. PST to call the Claims Department and was finally able to reach a Bank representative and submit a fraud claim regarding the unauthorized transactions. Willrich and the Bank representative spent approximately one hour going through every charge during a three-month period to ensure all fraudulent activity was accounted for.

181.   Approximately 3–4 days after submitting his claim, Willrich received a letter from Bank of America stating that his claim had been denied due to suspected fraud. On information and belief, the Bank failed to conduct a good-faith investigation of Willrich's fraud claim and did not have a reasonable basis for its determination that Willrich had authorized or benefitted from the transactions.

182.   In early November 2020, Willrich again got up at 5:00 A.M. PST to call the Bank of America Claims Department. He spoke with a Bank representative and explained that he had submitted a fraud claim that had been denied by Bank of America. He asked the representative to explain why his claim had been denied. The representative told Willrich that the letter that was sent to him was the result of a "glitch" and that many people were calling about the same issue. The representative then re-opened Willrich's initial claim and told Willrich to wait and see what happened.

183.   Willrich waited as instructed, but he received no communication from the Bank.

184.   It was not until approximately January 12, 2021, when Willrich attempted to withdraw money from his EDD Debit Card Account, that Willrich learned that money had been credited to his Account. At no point between the early November 2020 phone call and January 2021 did Willrich receive any communication from Bank of America regarding the status of his fraud claim, such as the status of the Bank's investigation or its determination.

185.   In or around January and February 2021, there were at least three occasions when Willrich attempted to use his EDD Debit Card to withdraw money from a Bank of America ATM and was denied. On these occasions, the ATM displayed the following message: "Your transaction has been cancelled." On at least one of these occasions, Willrich then went into the Bank of America branch where the ATM was located and asked a Bank employee for assistance. The employee told Willrich that his EDD Debit Card Account had been frozen again and that he needed to call the number on the back of his EDD Debit Card to receive assistance. Willrich called the phone number as instructed and, after a lengthy process, a Bank representative told him that the issue that had caused his Account to be frozen had been fixed. However, when Willrich returned to an ATM and attempted to use his EDD Debit Card to withdraw money from his Account, he was again denied, and the ATM displayed the same error message as it had before. After spending two days on the phone with Bank of America and numerous representatives, Willrich finally secured the ability to make electronic transfers from his Account. To the extent Willrich was able to obtain funds from his Account, it was only by transferring them out of his Account electronically.

186.   After Willrich filed a class action lawsuit against Bank of America on January 22, 2021, the Bank finally unfroze his Account.

**9.    Lindsay McClure**

187.   McClure experienced $1,003 in fraudulent charges on her EDD Debit Card Account on or around December 1, 2020, after her Card was skimmed, she believes, at a gas station where she had used her Card, and where reports indicated that other debit and/or credit cards had been skimmed. After becoming aware of the fraudulent and unauthorized charges on her Account, McClure repeatedly called to seek assistance through Bank of America's customer service, to no avail.

188.   McClure first called the Bank on December 1, 2020, as soon as possible after discovering the unauthorized transactions to report them as

fraudulent. She presented evidence over the phone regarding the unauthorized transactions, which the Bank representative acknowledged was indicative of fraud. The representative told her that a fraud investigation would take place over the following 30–45 days. Yet shortly thereafter, she received a letter from Bank of America dated December 2, 2020, indicating that the Bank had closed her fraud claim the day after she submitted it. On information and belief, the Bank failed to conduct a good-faith investigation of McClure's fraud claim and did not have a reasonable basis for its determination that McClure had authorized or benefitted from the transactions.

189.   She then followed up with the Bank to inquire about her fraud claim, and a Bank representative told her that Bank of America was investigating it. When she asked how that was possible considering the Bank's letter stating the claim had been closed, the Bank representative hung up on her.

190.   Several weeks later, without reaching any resolution regarding her fraud claim, Bank of America froze McClure's Account without any notice. McClure did not find out her Account was frozen until December 20, 2020, when she tried to use her Card at a drive-through and discovered that she could not access her funds. When McClure called Bank of America to inquire about this, a Bank representative told her that EDD had frozen her Account due to fraud on the Account. On information and belief, this statement was false. When McClure then contacted EDD, an EDD representative told her that the agency had no evidence of any fraud on her Account. McClure subsequently phoned Bank of America to convey to the Bank what EDD had told her, but her Account remained frozen.

191.   Only after McClure filed a class action lawsuit against Bank of America on January 25, 2021, did she finally receive a letter from the Bank dated January 27, 2021, stating that the Bank had performed an "additional review" of her claim and had credited her the $1,003 stolen from her Account; however, her Account remained frozen. At some time before the end of March 2021, the Bank

finally unfroze her Account, at which point McClure was finally able to regain access to the funds in her Account.

192.   *[Removed]*

193.   *[Removed]*

194.   *[Removed]*

**10.    Clara Cajas**

195.    On or about January 12, 2021, an unauthorized ATM cash withdrawal in the amount of $700 was made from Cajas's EDD Debit Card Account. Cajas had never disclosed her Card PIN to anyone and had never authorized anyone to use her Card. Cajas reported the fraudulent withdrawal to the Bank within 24 hours of its occurrence. The Bank responded that it would send her a new EDD Debit Card within 24 hours.

196.    When Cajas did not receive the new Card, she called the Bank to inquire about the status of the new Card and was told that she would not receive a new Card because her Account had been frozen. Cajas subsequently received a letter from the Bank, dated January 14, 2021, informing her that her fraud claim related to the $700 ATM withdrawal had been closed. On information and belief, the Bank failed to conduct a good-faith investigation of Cajas's fraud claim and did not have a reasonable basis for its determination that Cajas had authorized or benefitted from the transactions.

197.    Cajas did not understand how Bank of America could have concluded its investigation within 48 hours of the fraudulent ATM withdrawal. She called the Bank and was told by another Bank agent that the agent could not talk to her because her Account was frozen.

198.    Following the unauthorized ATM withdrawal, and the freezing of her Account, Cajas repeatedly sought assistance through Bank of America's customer service phone lines, to no avail. Each time Cajas called the Bank, she spoke to a different agent. Even though she fully documented her claim, each call was treated

as if she were calling for the first time. The agents were either unable or unwilling to assist Cajas in any meaningful way regarding her $700 fraud claim or helping her regain access to any of the remaining balance in her Account. She repeatedly waited on hold for extended periods; was repeatedly disconnected from the line; waited to speak to someone only to be told to call back later; was transferred to various departments without being provided any meaningful assistance or helpful information; was sent to voicemail; dealt with unhelpful automated agents; and unsuccessfully attempted to sort out the issues with her Account in person at Bank of America branches.

199.    On April 1, 2021, Cajas and the other plaintiffs in the consolidated *Yick* action filed their Motion for Preliminary Injunction and Provisional Class Certification. Only then did Bank of America "reconsider" Cajas's fraud claim. On or about April 28, 2021, Bank of America finally issued Cajas a permanent credit for the $700 at issue and unfroze her Account, thereby allowing Cajas to access her Account for the first time in more than three months.

**11.    Stephanie Smith**

200.    Smith received her EDD Debit Card in or about June 2020 and activated it on Bank of America's website the same day that she received it. Immediately after activating the Card, she locked the Card in a safe inside her home, and she did not subsequently take the Card out of the safe or use it in any way. Her only activity on her EDD Debit Card Account thereafter was to use Bank of America's website to transfer funds from her EDD Debit Card Account to her personal consumer bank account (also with Bank of America). She never used the Card at an ATM, for an online purchase, at a retail store, or for any other transaction. She also never disclosed her Card number or PIN to anyone and never authorized anyone to use her Card. Despite all this, an unknown person or persons used the Cardholder Information associated with her EDD Debit Card and/or Account to

make three unauthorized transactions with DoorDash on or about November 23, 27, and 30, 2020, totaling $225.84.

201.  On or about December 22, 2020, Smith discovered the three unauthorized transactions and promptly called Bank of America. During the phone call, she informed a Bank representative that she did not authorize the transactions, and she submitted unauthorized transaction claims. During the phone call, a Bank representative asked Smith various questions to verify her identity, including asking Smith to provide her full social security number, all of which Smith answered to the representative's satisfaction. After the phone call, Smith did not receive any information from the Bank to track her claims or any communication confirming that the Bank would investigate her claims. Ever since, Smith's claims have languished for months at the Bank without being resolved.

202.  To date, Smith has not received any communication from the Bank regarding her unauthorized transaction claims, has received no provisional credits from the Bank, and has not been reimbursed for the unauthorized transactions. On information and belief, the Bank failed to conduct a good-faith investigation of Smith's fraud claim and has no reasonable basis for a determination that Smith had authorized or benefitted from the transactions.

**12.  Alan Karam**

203.  In or around June 2020, Karam began receiving EDD benefits via a Bank of America EDD Debit Card. During the next two months or so, he used the Card to make small in-person purchases (primarily food and groceries) and to withdraw cash from ATMs, all within the State the California. All or virtually all the transactions that Karam made using his Card and Account from June 2020 through August 2020 were for $100 or less. He never disclosed his Card PIN to anyone and never authorized anyone to use his Card.

204.  On or around August 21, 2020, Karam checked his Account balance online and was shocked to discover that over $2,000 in fraudulent transactions had

occurred on his Account. His online Account statement showed two purchases from Target for $954 each, another purchase from Target for $442.69, and one purchase from McDonald's for $4.34. All of these unauthorized transactions had been made in New York while Karam was in California with his Card in his possession.

205.    Karam is a life-long California resident. He did not travel to New York or anywhere else outside California at any time since the COVID-19 pandemic began in March 2020, and during which time there were significant California and federal government restrictions on travel.

206.    Bank of America knew or should have known about Karam's EDD Debit Card transaction history, that he appeared to be in California at the time of the unauthorized transactions, that the size of the transactions were significantly and suspiciously higher than his past transactions, and that the COVID-19 pandemic and related fears and travel restrictions made it highly unlikely that Karam or anyone authorized by him were making these transactions in New York. Given this, Bank of America should have detected and flagged the unauthorized transactions on Karam's account as highly suspicious, stopped them, and notified Karam about them, but the Bank did none of these things.

207.    On August 21, 2020, the same day that he discovered the unauthorized transactions on his Account, Karam called the Bank's customer service department and submitted by phone a fraud claim disputing the unauthorized transactions. By August 24, the fraudulent charges had been credited back to his Account. Karam understood those to be permanent credits. To the extent the Bank considered them to be provisional credits under EFTA and Regulation E, those credits became permanent on October 6, 2021, after the Bank's 45-day period to investigate Karam's claims expired under those same laws.

208.    On November 17, 2020, however, Bank of America—without notice or explanation—debited the previously reimbursed funds from Karam's Account,

causing his Account balance to go negative, and closed the investigation into his fraud claim.

209.    Upon discovering this, Karam immediately called Bank of America. Despite the Bank's promises of "24/7" customer service in its Cardholder Agreement and EDD–Bank Contract, the Bank representative with whom Karam spoke informed him that he would need to speak with the claims department, but that the claims department was closed and he would need to call back the next day.

210.    The next morning at 6:30 A.M. PST, Karam called the Bank again and was placed on hold for 45 minutes before being connected to a claims representative, who told Karam that there was nothing she could do for him and she would transfer him to someone else. Karam was then transferred to a mailbox requiring a code, which he did not know. The call then disconnected.

211.    Karam immediately called back and waited on hold for another 45 minutes before speaking with another Bank of America representative. This time Karam asked for the representative's extension in case the call was disconnected. The representative responded that he did not have one. Karam then asked for the representative's identification number, and the representative said that he did not have one of those either. When Karam asked for his name, the representative hung up.

212.    After being hung up on, Karam called back a third time. After waiting on hold for another extended period, he spoke with a representative named Delijah, who transferred him to a representative named Jane, who transferred him to a representative named Brandon, who transferred him to a female supervisor whose name Karam does not remember. At this point, this third phone call alone had lasted multiple hours. The female supervisor advised Karam to file a police report regarding the fraudulent transactions on his Account, and to submit written statements about each of the fraudulent transactions, both of which he did.

213.    In December 2020, Bank of America "reopened" one of Karam's fraud claims only to close it again without reimbursing him. On information and belief,

the Bank failed to conduct a good-faith investigation of Karam's fraud claim during this "reopened" investigation and did not have a reasonable basis for its determination that Karam had authorized or benefitted from the transaction. The Bank did not provide Karam with provisional credit in connection with this reopened investigation or indeed in connection with any of his fraud claims after the Bank, in November 2020, summarily reversed its prior credits to Karam's Account. For weeks, Karam continued to call Bank of America and ask why his fraud claims had been closed, but he was never given a clear answer.

214.   In January 2021, frustrated with Bank of America, Karam sought out and obtained legal counsel. On January 25, 2021, Karam's counsel sent Bank of America a letter on behalf of Karam, co-Plaintiff Stephanie Smith, and all other similarly situated persons, notifying the Bank of its violations of the California Consumer Privacy Act, Cal. Civ. Code §1798.150(a), and demanding that the Bank cure those violations by taking specific actions within 30 days. That letter was delivered to the Bank by FedEx the following morning, on January 26.

215.   On or about January 28, 2021, the Bank finally credited Karam's Account for the funds stolen from his Account in August 2020. The credits did not include any interest for the time during which the Bank had deprived Karam of access to those funds.

216.   *[Removed]*

217.   *[Removed]*

218.   *[Removed]*

219.   *[Removed]*

220.   *[Removed]*

221.   *[Removed]*

222.   *[Removed]*

223.   *[Removed]*

224.   *[Removed]*

### 13. Brian Wiggins

225. In November 2020, Wiggins discovered unauthorized ATM withdrawals from his EDD Debit Card Account, totaling $1,512, which were made in Santa Rosa, California, and Atlanta, Georgia.

226. Wiggins promptly reported the fraud to Bank of America, but rather than the Bank investigating his unauthorized transaction claims and crediting his Account, the Bank froze his Account due to the fraud. A Bank of America customer service representative told him that EDD was responsible for freezing his Account, but an EDD representative later told Wiggins that was not true. On information and belief, it was not EDD but Bank of America who made the decision to freeze Wiggins's Account. While his Account was frozen, Wiggins had no access to his unemployment benefits.

227. Wiggins received no written or formal communication from Bank of America over the many months that his Account was frozen. In the meantime, his numerous attempts to resolve his issues through Bank of America's customer service were unsuccessful. He spent hours on hold trying to reach a live agent and was hung up on. On the occasions when he managed to reach a live agent, they consistently failed to give clear answers to his questions or to otherwise provide any meaningful assistance.

228. Only after Wiggins filed a class action lawsuit against Bank of America in the U.S. District Court for the Eastern District of California were his Account issues finally resolved. On or about May 26, 2021, Wiggins received a letter from Bank of America stating that the Bank was issuing a permanent $1,512 credit to his Account.

### 14. Jonathan Smith

229. Smith became unemployed as a result of the COVID-19 pandemic and applied for unemployment benefits from the EDD. The EDD approved his application, and Bank of America issued him an EDD Debit Card.

230.    Sometime in the fall of 2020, Smith attempted to use his Card at a Bank of America ATM and was surprised to learn that his EDD Debit Card Account displayed a negative balance. Smith quickly realized that he had been the victim of two unauthorized withdrawals totaling $1,721.78 in July 2020. Bank of America did not notify Smith of the unauthorized withdrawals; he made the unsettling discovery himself only after the ATM displayed an Account balance far lower than he expected.

231.    Smith promptly reported the fraud to Bank of America. The Bank temporarily credited the disputed amount to his Account. After later determining that Smith had been the victim of fraud and had not authorized the withdrawals, the Bank made the credit permanent.

232.    Approximately one month later, however, Bank of America reversed the $1,721.78 "permanent" credit, without any notice or explanation. On information and belief, the Bank's reversal of the credit was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that Smith had authorized or benefitted from the transactions. As with the fraudulent withdrawals, Smith discovered the credit reversal himself, only after his Card was declined for insufficient funds.

233.    The Bank's reversal of the credit caused Smith's Account balance to go negative. Subsequent deposits into Smith's Account were applied against the negative balance, depriving him of hundreds of dollars in critical benefits.

234.    Besides reversing the "permanent" credit, Bank of America also froze Smith's Account—once again, without any notice or explanation. Smith repeatedly contacted Bank of America's EDD customer service phone number for assistance with the matter. Like many other EDD Debit Cardholders, Smith was subjected to inordinately long wait times and dropped calls. On the rare occasion that Smith managed to get into contact with a live customer service representative, the

representatives often treated him rudely and unprofessionally, including accusing him of lying without any reasonable basis for the accusation.

235.    With his EDD Debit Card Account frozen, Smith was unable to access his unemployment benefits, causing him severe stress and anxiety about how he would be able to pay for basic necessities, such as rent, groceries, and therapy. Smith was ultimately forced to borrow money from friends and family to cover these costs.

236.    Although Bank of America ultimately re-issued Smith a permanent credit for the amount of the unauthorized transaction, significant damage was done. He suffered needlessly for months as a direct result of Bank of America's decisions to leave EDD Debit Cards susceptible to fraud and unauthorized use, to deprive him of the $1,721.78 associated with his unauthorized transaction claims, to freeze his Account without providing any clear process or recourse for Smith to regain access to his Account, and to commit the other unlawful acts and omissions alleged herein.

**15.    Alex Yuan**

237.    Yuan became unemployed as a result of the COVID-19 pandemic and applied for unemployment benefits from the EDD. The EDD approved his application, and Bank of America issued him an EDD Debit Card.

238.    In or around August 2020, two separate $900 unauthorized ATM withdrawals were made from Yuan's EDD Debit Card Account in Los Angeles, California.

239.    Yuan promptly reported the fraud to Bank of America. In September 2020, the Bank temporarily credited $1,800 to his Account. In October 2020, the Bank determined that Yuan had been the victim of fraud and had not authorized the two $900 withdrawals, and the Bank made the $1,800 credit permanent.

240.    Shortly thereafter, however, Bank of America reversed the $1,800 "permanent" credit, without any notice or explanation. On information and belief, the Bank's reversal of the $1,800 credit was not the result of a reasonable

investigation, and the Bank had no reasonable basis for believing that Yuan had authorized or benefitted from the transactions. As with the fraudulent $1,800 withdrawal, Yuan discovered the credit reversal himself.

241.    The Bank's reversal of the credit caused Yuan's Account balance to go negative. Subsequent deposits by the EDD into Smith's Account were applied against the negative balance, depriving him of hundreds of dollars in critical unemployment benefits.

242.    Yuan repeatedly contacted Bank of America's EDD Debit Card customer service phone number for assistance with the matter. Like many other EDD Debit Cardholders, Yuan experienced long wait times, dropped calls, and elusive answers as to why the purportedly "permanent" credit had been reversed and when and how the matter would be resolved.

243.    While continuing to deal with the impact of the first two fraudulent withdrawals, Yuan's Account experienced yet another $900 unauthorized withdrawal, which he also promptly reported to the Bank, bringing the total amount of fraudulent withdrawals from his Account to $2,700. Because Bank of America was failing to adequately safeguard his Account, Yuan then set up automated transfers, so that any unemployment benefits deposited into his Account would be transferred to a different, more secure bank account.

244.    In December 2020, Bank of America notified Yuan by mail that it had frozen his Account due to fraud. Thereafter, Bank of America—without any notice to Yuan—unfroze his Account, at which point EDD resumed making deposits of unemployment benefits to his Account, though without Yuan being aware of it.

245.    After the consolidated *Yick* plaintiffs obtained a preliminary injunction against the Bank, the Bank finally reimbursed Yuan $1,800 without interest on or about March 9, 2022, but Yuan still has not been reimbursed for $900 in connection with his unauthorized transaction claims. On information and belief, the Bank did not conduct reasonable good-faith investigations of these claims, and the Bank had

no reasonable basis for believing that Yuan had authorized or benefitted from the transactions.

### 16. Jory Zoelle

246.   In or about June or July 2020, Zoelle was the victim of unauthorized transactions on her EDD Debit Card Account totaling approximately $1,052.60 from a Target store in New Jersey. Zoelle reported the fraudulent transactions to the Bank, which reimbursed her by crediting her Account for the amount of the transactions in or about September 2020. That same month, however, the Bank froze her Account for several weeks, depriving her of access to the funds in her Account. On information and belief, the Bank lacked a reasonable basis to freeze her Account.

247.   In or about October 2020, after having frozen Zoelle's Account, the Bank took back its previous credits by debiting her Account for the amount of the unauthorized transactions, causing her Account balance to go negative. This left her without much needed EDD benefits because the Bank applied EDD's subsequent deposits of benefits into her Account against the negative balance.

248.   This began Zoelle's ordeal of repeatedly calling Bank of America to get the credits reinstated, often spending three to four hours on the phone waiting to speak to a Bank representative, and not getting clear answers to her questions. On approximately Zoelle's fifth or sixth such call, one Bank representative stated her belief that Zoelle's unauthorized transaction claim appeared to be completely legitimate, and further stated that she would do everything in her power to get the credits reinstated to Zoelle's Account. Months later, however, Zoelle received a letter from the Bank denying her claim.

249.   The Bank eventually reinstated the credits to Zoelle's Account without interest. However, on information and belief, the Bank's denial of her unauthorized transaction claim was not the result of a reasonable investigation, and the Bank had

no reasonable basis for believing that she had authorized or benefitted from the transaction.

### 17. Cindy Baker

250. On or about February 9 and 10, 2021, Baker was the victim of two consecutive unauthorized transactions on her EDD Debit Card Account, both of which were fraudulent ATM withdrawals of $1,000 (i.e., the EDD Debit Card's daily limit for ATM withdrawals), for a total of $2,000. She promptly reported the unauthorized transactions to Bank of America. On February 10, 2021, Bank of America froze her Account.

251. This began Baker's ordeal of repeatedly calling Bank of America to try to resolve these issues with her Account. She spent at least 30 hours on the phone with Bank of America, regularly receiving information from Bank of America representatives that conflicted with what other representatives had told her and with the information contained in letters she received from Bank of America.

252. The Bank initially denied her unauthorized transaction claims. On information and belief, the Bank's denial of her unauthorized transaction claim was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that she had authorized or benefitted from the transaction.

253. It was not until approximately June 2, 2021, after Baker had continued to maintain her class action lawsuit against Bank of America, that the Bank reversed its prior decision and finally credited her Account for the $2,000 that had been stolen nearly four months earlier.

### 18. Ursula Auburn

254. On July 31, 2020, Auburn was the victim of six unauthorized transactions on her EDD Debit Card Account, all of which were transactions from what appears (based on her Account statement) to be a single Walgreens store in New York. The individual transactions were in the amounts of $507.03, $511.38,

$455.95, $505.95, $505.95, and $505.95. She promptly reported the unauthorized transactions to Bank of America.

255.   On August 13, 2020, the Bank provisionally credited Auburn's Account for the amount of each of the unauthorized transactions. On October 9, 2020, however, the Bank reversed those provisional credits, creating a negative balance in her Account. This left her without much needed EDD benefits because the Bank applied EDD's subsequent deposits of benefits into her Account against the negative balance.

256.   On information and belief, the Bank's denial of her unauthorized transaction claim was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that she had authorized or benefitted from the transaction. Indeed, on October 10, 202, the day after the Bank reversed the prior credits to her Account, Auburn called the Walgreens in New York where the fraud had occurred and spoke with a manager, who informed her that the store had video surveillance footage of the unauthorized transactions, and that those transactions had consisted of person using a physical card in the store to purchase gift cards. The manager told Auburn that neither Bank of America nor anyone else had contacted the store to ask about or investigate the transactions, and that Auburn's phone call to the store was the first communication that the manager had received about the transactions.

257.   On October 27, 2020, after speaking with Auburn, a reporter with ABC 7 (Los Angeles) contacted Bank of America to inquire about the unauthorized transactions on Auburn's Account. That very same day, Bank of America credited Auburn's Account in the amounts of the unauthorized transactions.

258.   *[Removed]*

259.   *[Removed]*

260.   *[Removed]*

### 19.    Kuang Ting Chong

261.    On or about July 20, 2020, an unknown person used a cloned debit card to steal $1,000 in unemployment benefits from Chong's EDD Debit Card Account. Chong discovered the fraud on his Account and contacted Bank of America to report the fraud that same day.

262.    On July 21, 2020, Chong filed a police report with the Alhambra police department. The officer Chong spoke to initially confused him with another EDD Debit Cardholder who had also just had funds stolen from his Account.

263.    On July 31, 2020, Bank of America credited the $1,000 at issue to Chong's EDD Debit Card Account. On September 2, 2020, Chong received a notice from the Bank that it had completed its investigation, and that the $1,000 credit to his Account was now permanent.

264.    Despite having issued Chong a permanent credit, however, Bank of America subsequently sent a letter to Chong dated October 2, 2020, stating that the Bank was rescinding the $1,000 credit. The Bank rescinded the credit on October 4, 2020, creating a negative balance in his Account. While Chong continued receiving EDD direct deposits into his Account thereafter, he was denied access to some of these funds because they were applied against the negative Account balance created by Bank of America.

265.    With respect to the $1,000 debit that occurred on October 4, the transaction description in Chong's online Account on Bank of America's website claimed that the debit was made by "State of CA EDD Unemployment." On information and belief, this transaction description was false and misleading, as the debit was made by and at the direction of Bank of America.

266.    Chong repeatedly contacted the Bank and EDD in an effort to obtain access to his $1,000 in unemployment benefits that had been stolen out of his Account and was now being withheld by Bank of America. In an October 15, 2020

1  phone call with the Bank's claims department, Chong was told his issue would be
2  resolved "in the order it was received."

3      267.   Only after Chong filed a class action lawsuit against Bank of America
4  in the U.S. District Court for the Central District of California in November 2020
5  were his Account issues finally resolved. The following month, in December 2020,
6  the Bank finally granted his unauthorized transaction claim and re-issued him a
7  permanent credit for the $1,000 at issue.

8      **20.   Stephanie Moore**

9      268.   On July 18, 2020, Moore was the victim of a fraudulent $1,000
10 withdrawal from an ATM machine and a separate fraudulent transaction of $482 at
11 a Target retail store. These transactions depleted all the funds from her EDD Debit
12 Card Account. Moore did not authorize these transactions and received no benefit
13 from them. Moore discovered the fraud on July 18, 2020, when she tried to use her
14 EDD Debit Card to make a purchase and her Card was declined.

15     269.   That same day, within minutes of discovering that unknown persons
16 had depleted the funds in her Account, Moore reported the fraudulent withdrawal
17 to Bank of America. On or about July 30, 2020, the Bank provisionally credited
18 $1,482 to Moore's Account. On or about August 7 or 8, 2020, the Bank informed
19 Moore in writing that it had made the $1,482 credit permanent.

20     270.   On September 30, 2020, Moore attempted to use her EDD Debit Card
21 to purchase a tire for her vehicle. The transaction was declined. Moore attempted to
22 check the balance of her Account but was unable to log into her Account. On
23 information and belief, Bank of America froze Moore's Account on or about
24 September 30, 2020, without providing notice to Moore.

25     271.   Despite having received a permanent $1,482 credit from the Bank in
26 August 2020, Moore received a letter from the Bank on or about October 2, 2020,
27 stating that the Bank was rescinding the $1,482 credit. The Bank rescinded the
28 credit on October 4, 2020, creating a negative balance in her Account.

272.   The transaction description for the October 4 debit in Moore's online Account on Bank of America's website claimed that the debit was made by "State of CA EDD Unemployment." On information and belief, this transaction description was false and misleading, as the debit was made by and at the direction of Bank of America. Indeed, on October 12, 2020, Moore spoke with Bank of America representative, who stated that it was Bank of America who debited the $1,482 from her Account.

273.   Only after Moore filed a class action lawsuit against Bank of America in the U.S. District Court for the Central District of California in November 2020 were her Account issues finally resolved. The following month, on or about December 1, 2020, the Bank finally granted her unauthorized transaction claim and re-issued her a permanent credit for the $1,482 at issue.

### 21.   Zinaida Petrova

274.   On May 30, 2021, Petrova viewed her monthly Account statement and was surprised to see two transfers from her Account totaling $9,500: (1) a $5,000 transfer on May 16, 2021, and (2) a $4,500 transfer on May 23, 2021. Petrova did not authorize or benefit from either of these transactions. On information and belief, these were online transfers by which an unauthorized third-party transferred money from Petrova's Account to an unknown non-EDD Debit Card bank account. Petrova has made online transfers from her EDD Debit Card into a consumer checking account she has at Union Bank, but the unauthorized transactions were not transferred to her Union Bank checking account and do not appear on her Union Bank account statements.

275.   Upon discovering the two unauthorized transactions, Petrova promptly called the phone number on the back of her EDD Debit Card to dispute the transactions. She spoke with a Bank representative and submitted a fraud claim. The representative told her the Bank would contact her regarding the findings of its investigation. On June 10, 14, 15, 17, 24 and July 6 and 7, 2021, Petrova called the

Bank's customer service line for an update about the status of her claim. Bank representatives told her that they either could not locate her claim or that her claim was still pending. At no point was Petrova's Account provisionally credited for the amount of the disputed transactions, or indeed for any amount.

276.    On or about July 13, 2021, Petrova received a letter from Bank of America dated July 6, 2021, stating that the Bank was denying her claim. The letter's explanation for the denial was as follows: "We confirmed that the transfers posted to the account you requested. We recommend you contact the person you sent the funds to directly for further assistance." This is impossible, however, because Petrova never transferred the funds, and because the Bank's representatives could not, did not know how, or refused to provide Petrova with the details of the transactions.

277.    On information and belief, the Bank's denial of her unauthorized transaction claims was not the result of a reasonable investigation, and the Bank had no reasonable basis for believing that Petrova had authorized or benefitted from any of the transactions.

278.    Petrova still has not been reimbursed for the $9,500 in fraudulent transactions on her Account.

279.    *[Removed]*

280.    *[Removed]*

281.    *[Removed]*

282.    *[Removed]*

283.    *[Removed]*

284.    *[Removed]*

\*      \*      \*

285.    In addition to the Class Representative Plaintiffs, countless other Class Members have similarly reported not receiving any notification or communication from Bank of America regarding fraudulent transactions in their EDD Debit Card

Accounts, and instead discovered it themselves. Bank of America's fraud monitoring and controls have proven to be completely inadequate and ineffectual, in direct contradiction to the Bank's representations to Plaintiffs, Class Members, and the State. Instead of resolving Class Representative Plaintiffs' claims for these unauthorized transactions, as it is required to do by law, the Bank summarily closed the claims, failed to provide provisional credit, and froze and blocked their Accounts for indefinite periods of time. Even where the Bank has eventually paid some Class Representative Plaintiffs for their unauthorized transactions claims or unfrozen or unblocked their Accounts, it has not paid any of them interest for the time period during which the Bank unreasonably deprived them of the use of their funds. As a result of the conduct and omissions alleged herein, and despite the Bank's "Zero Liability" policy, Plaintiffs and Class Members have been deprived of unemployment benefits and other public benefits to which they are entitled by law, for weeks or months, causing them great, immediate, and irreparable harm. Class Representative Plaintiffs' legal remedies are inadequate to prevent future harm from the Bank's unlawful and unfair conduct that is the subject of this Complaint, and that is or would be ongoing but for the preliminary injunction the consolidated *Yick* plaintiffs obtained in June 2021. Class Representative Plaintiffs thus seek, on behalf of themselves and all Class Members, injunctive relief against the Bank, in addition to all other relief prayed for herein.

**H.    Individual Plaintiffs' Allegations**[17]

286.   Paul Abarr is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In June 2020, he experienced fraudulent

---

[17] The substance of Individual Plaintiffs' allegations is presented here as set forth in each of their complaints, after meeting and conferring with Individual Plaintiffs' liaison counsel, including meeting and conferring about amended allegations to be included in the SAMCC. Unless otherwise indicated below, each Individual Plaintiff referenced herein (*see infra* ¶¶286–526) is a plaintiff in *Abarr v. Bank of America, N.A.*, No. 3:21-cv-01203-GPC-MSB ("*Abarr*").

transactions on his Account totaling approximately $8,000. In June 2020, he discovered the fraud. In June 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate the claim. In June 2020, Bank of America illegally froze his Account. In May 2021, Bank of America unfroze his Account. Since May 2020, Bank of America has not credited him any money. Due to Bank of America withholding his funds, he was evicted from several places because he has not been able to pay rent for twelve months, had several pre-paid phones shut off because he cannot afford to pay them, and was forced to beg for food.

287. *[Removed]*

288. *[Removed]*

289. Michael Adams[18] is a natural person residing in Los Angeles County, State of California. Adams has an EDD banking Account which Bank of America maintains supervision and control over per its contractual relationship with the State of California. Over the course of this relationship, Adams provided Bank of America with various pieces of personal identifiable information related to Adams, such as his personal finances. Such information includes, but is not limited to, Adams' name, address, social security number, date of birth, income level, and banking information (amounts and accounts). Upon receipt of this information, Bank of America stored or otherwise archived said information in some library, digital file, computer-based system or other technique, and thus at all times was entrusted with and maintained control of Adams highly sensitive information. At some point in 2020, a hacker was able to access Bank of America's technical system—presumably via a misconfiguration of a firewall (presuming Bank of America had a firewall in place). As such, this hacker was able to gain access to

---

[18] Adams is the plaintiff in *Adams v. Bank of America, N.A.*, No. 2:21-cv-05521-GPC-MSB, originally filed in the U.S. District Court for the Central District of California (No. 2:21-cv-05521-FMO-JPR) ("*Adams*").

banking account information for tens of thousands of EDD Debit Card Accounts which Bank of America maintains, supervises and controls per its contract with the State of California. In November of 2020, Adams checked his Account and discovered he had funds missing. Adams reviewed his Account activity and determined he had been a victim of fraud and made all reasonable attempts to notify Bank of America of this fraudulent activity. After Adams submitted his claim for fraud regarding the ATM withdrawal(s) at issue, Bank of America canceled or froze Adams' EDD Debit Card as a result of submitting his fraud claim. To Adams' shock and dismay, some unknown individual had made ATM withdrawal(s), in the amount of $2,303. Adams did not make these withdrawals himself, did not authorize anyone to make the withdrawal on his behalf, and was still in possession of his Card despite said withdrawals taking place. Adams submitted a fraud claim to Bank of America regarding the missing/stolen funds in June 2021. Bank of America did not provide a temporary credit/refund, so pursuant to EFTA, Bank of America had ten (10) days to properly investigate and remedy the fraud claim. Bank of America did neither. Bank of America sent Adams written correspondence dated June 4, 2021 denying his fraud claim, after allegedly performing a "reasonable" investigation. The basis for Bank of America's denial of Adams' claim is scant at best but nonetheless refused to refund or credit Adams the $2,303 sum. Despite Bank of America's efforts, Bank of America refused to perform any reasonable investigation regarding Adams' dispute and instead flatly denied Adams' claim. Bank of America's alleged "investigation" into Adams' dispute was clearly inadequate, not reasonable, not diligent, and failed to properly address Adams' issues regarding the $2,303 fraudulent withdrawal. Further evidencing Bank of America's woefully inadequate investigation is the fact that Bank of America has access to data, film, and other resources given that the fraudulent transaction took place at one of Bank of America's own financial centers (i.e., not a third-party ATM at convenience store, for example). Bank of America could have reasonably, easily

1   and swiftly confirmed the $2,303 transaction as fraudulent and refunded or credited
2   the funds over to Adams's Account. Instead, Bank of America failed to investigate
3   properly, refused to credit or refund the transaction, while still nonetheless
4   confirming that the withdrawal was subject to fraudulent activity.

5      290.   Jonathan Aguirre is a California resident. In December 2019, he began
6   receiving EDD Benefits through Bank of America. In May 2020, he experienced
7   fraud on his Account totaling approximately $806. In May 2020, he discovered the
8   fraud when he attempted to withdraw money from the Account but had insufficient
9   funds. In May 2020, he reported the fraud to Bank of America via phone. In
10   response, Bank of America told him he needed to speak with EDD regarding his
11   dispute. In May 2020, Bank of America froze his Account. The Account remained
12   frozen with no refund or credit for an entire year. In May 2021, Bank of America
13   credited $403 to his Account. Due to Bank of America withholding his funds, he
14   missed his rent payment in June 2020 and July 2020, missed his phone bill, missed
15   his credit card bill, and missed insurance payments. Bank of America also caused
16   him to not be able to purchase food or gas.

17      291.   Christopher Allison is a California resident. In July 2020, he began
18   receiving EDD benefits through Bank of America. In January 2021, Bank of
19   America froze him out of his Account due to alleged fraudulent activity. However,
20   there had been no such fraud on the Account. In January 2021, he discovered the
21   freeze when he tried to use his Card but was declined. In January 2021, he called
22   Bank of America to report the problem. In response, Bank of America told him to
23   talk to EDD regarding his dispute. In January 2021, Bank of America froze his
24   Account. Since January 2021, Bank of America has yet to unfreeze his Account.
25   Since January 2021, Bank of America has yet to credit him any money. Due to Bank
26   of America withholding his funds, he missed three $600 rent payments, only
27   avoiding eviction because he worked something out with his landlord. He cannot

28

pay his $300 PG&E monthly bill due since January 2021. He also has struggled with depression due to Bank of America's conduct and has had suicidal thoughts.

292.   Kevin Alvarez is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. Between July 2020 and November 2020, he experienced fraud on his Account, totaling approximately $10,000. In November 2020, he discovered the fraud on his November 2020 account statement and immediately reported it to Bank of America by phone in the month of November 2020. In November 2020 Alvarez filed four claims with Bank of America identifying fraudulent, unauthorized transactions occurring within the prior 60 days. During more than one telephone call in November 2020 Alvarez reported multiple unauthorized electronic fund transfers as well as requested documentation from Bank of America related to each unauthorized fund transfer. During these telephone calls in November 2020 Alvarez requested Bank of America conduct an investigation into the unauthorized transactions and provide all additional documentation Bank of America had in its possession with regard to the unauthorized transactions and/or clarification as to why they were allowed. It is estimated by Alvarez that he has attempted to contact Bank of America by telephone since September 2020 close to 500 times to report notification of unauthorized transactions. On many occasions when Alvarez attempted to call and be connected with a live agent to report the fraud he could not get through. On other occasions Alverez was simply hung up on. During other connected calls Alvarez was simply referred back to the EDD and informed Bank of American could do nothing for him in response to his claim of fraudulent, unauthorized transactions and requests for an investigation and additional information on his Account. Since July 2020, Bank of America has not credited him any of the stolen money. Due to Bank of America withholding his funds, he was forced out of his home after not being able to afford his rent at $950 per month for two months, he was forced to live on the streets (in

1    the back of his car), he has missed every phone payment since November 2020 at

2    $130 per month, and he cannot afford to buy food or gas.

3        293.    *[Removed]*

4        294.    Rosa Alvarez[19] is, and at all times relevant to the allegations below

5    was, a natural person residing in the Los Angeles, California. Beginning in April

6    1996, she worked as a Course Materials Manager at the Follet Bookstore at Cerritos

7    College. As a result of the COVID-19 pandemic, she was laid off just two weeks

8    shy of her 24th anniversary of working there. Unable to get another job, she began

9    receiving unemployment benefits, which were paid directly from the State of

10   California onto her Bank of America EDD Debit Card Account. On or about

11   Saturday, June 13, 2020, she was shopping and intended to pay for her purchase

12   using her Bank of American EDD Debit Card. After she ran her EDD Debit Card,

13   only $8.75 could be charged to her Card. She was not initially alarmed, believing it

14   was a mistake with the vendor. On Monday, June 15, 2020, she called Bank of

15   America to ensure that there were no problems with her Card. When she called, she

16   learned that her Account balance was zero. During the call, she was told that $160

17   was withdrawn from her Card from an ATM in Corona, California. She

18   immediately knew that the transaction was unauthorized because she had not been

19   to Corona. When she informed Bank of America that the withdrawal was an

20   unauthorized transaction, Bank of America instructed her to contact the Claims

21   department and provided her with claim #200615300845. She immediately

22   reviewed her Account statements from the Internet and highlighted all the

23   fraudulent transactions, which were all ATM cash withdrawals beginning on May

24   17, 2020. She called Bank of America back, provided claim #200615300845, and

25   notified the Bank about all the additional transactions that were fraudulent. Bank of

27       [19] Rosa Alvarez is the plaintiff in *Alvarez v. Bank of America, N.A.*, No. 3:21-

28   cv-01176-GPC-MSB, originally filed in the U.S. District Court for the Central
     District of California (No. 2:21-cv-04643-DOC-PLA) ("*Alvarez*").

America told her that she would be notified about the results of the Bank's investigation in 45 days. She called Bank of America on the week of July 6, 2020, to inquire about the status of the investigation. During that call, she spoke with Jester of Bank of America, who stated that the Bank had not done an investigation because she had not returned to the Bank the form that the Bank had sent her. She told Jester that she had not received anything in the mail from Bank of America. Jester told her that she was supposed to return the form to Bank of America within 10 days and that Jester was unable to resend the form. On or about July 10, 2020, she drove to the Bank of America branch in the city of Cerritos to see if she could complete the form in the Bank branch to process her identity theft claim. She was informed, however, that issues concerning EDD Debit Car Accounts cannot be handled in the branch, and that she could only resolve her issues by telephone. She asked if she could be provided a copy of the form that needed to be completed to process her identity theft claim, and she was told No, not in the branch. On or about July 11, 2020, she called the Los Angeles Police Department and reported the theft of money from her EDD Debit Card Account. After she received a copy of the police report, she completed an Identity Theft Affidavit and attached all the requested documents (copy of the police report, her state identification card, proof of residency) to the Affidavit. She then mailed the Affidavit to Bank of America by certified mail, return receipt requested, on August 14, 2020. She never received a response to her Identity Theft Affidavit. On or about December 2, 2020, she sent Bank of America a letter by certified mail, return receipt requested, informing the Bank that she had not received a response to her Identity Theft Affidavit. She asked Bank of America to inform her if Bank of America needed any other documents to complete its investigation. In that same letter, she also asked the Bank to send her a copy of its investigation results and the documents used to reach the result, if its investigation was completed. She never received a response to her December 2,

1  2020 letter. As a result of Bank of America's unlawful acts and omissions as stated
2  above, she suffered actual damages as described above.

3    295.  *[Removed]*

4    296.  *[Removed]*

5    297.  Amanda Andrade is a California resident. In March 2020, she began
6  receiving EDD benefits through Bank of America. In August 2020, she reviewed
7  her Account online and discovered a number of fraudulent transactions. Andrade
8  did not authorize any of these transactions. Immediately, in August of 2020,
9  Andrade contacted Bank of America by telephone to report the fraud and
10 unauthorized transactions, requested Bank of America conduct an investigation and
11 credit her back for those unauthorized charges. Bank of America was able to
12 identify both Andrade and the claimed unauthorized charges on her Account. In
13 response Bank of America never provided Andrade a provisional or permanent
14 credit, failed to provide her any additional information regarding the fraudulent
15 charges or the results of any investigation. In September 2020, Andrade was unable
16 to have access to any of her funds through Bank of America, which she verified had
17 approximately $19,000 in it. In response, Andrade contracted Bank of America in
18 September 2020 and requested additional information as to why she could not
19 access her funds. At the end of September 2020 Bank of America gave Andrade
20 back access to her funds, but then showed a <u>negative</u> balance of $19,000 instead.
21 She immediately called Bank of America in September 2020 to report the error.
22 Bank of America failed to provisionally credit or permanently credit Andrade the
23 missing $19,000 and attempted to hold her responsible for the alleged overdraft of
24 $19,000. Starting in September 2020, Andrade would contact Bank of America on
25 a daily basis to continue to report the error and ask for an investigation and
26 correction. She would occasionally wait on hold for over two hours without being
27 connected to a representative and unable to continue to report the banking error.
28 Due to Bank of America's actions, she was evicted from her home after not being

able to pay her rent from September 2020 to January 2021 at $1,500 per month. She also could not afford to pay her phone bill, car insurance, and gas bill because of Bank of America's actions.

298.   Samuel De Los Angeles, Sr. is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In April 2021, he experienced unauthorized charges on his Bank of America account. In May 2021, he discovered the unauthorized charges (all of which occurred in the prior 60 days). That same day in May 2021, he reported the unauthorized charges to Bank of America. Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. The first unauthorized charge was for $783 and the second was for $83. Both of these unauthorized transactions occurred in April of 2021. On May 7, 2021 (within 60 days of the occurrence of these two unauthorized transactions) De Los Angeles contacted Bank of America by telephone to report the occurrence of the unauthorized transactions. He was able to connect with a Bank of America representative who was able to identify De Los Angeles and his Account. De Los Angeles properly explained to the Bank of America representative that the two transactions identified above were unauthorized and Bank of America needed to conduct an investigation. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Due to Bank of America's actions, he was three weeks late on his $1,300 rent payment in June 2021, which carried a $100 penalty. He had to borrow money to pay his $105 cell phone bill. He could not afford food and gas.

299.   *[Removed]*

300.   Robert Arnoldstarr is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In December 2020, he

discovered five fraudulent transactions on his Bank of America EDD Account, totaling $5,000. Upon discovering the unauthorized transactions, he immediately contacted Bank of America the same month (December 2020) and reported the unauthorized debits from his Account via phone by identifying himself, his Account and the five transactions at issue. Arnoldstarr would often be on hold from one to three hours waiting for a representative to report these unauthorized transactions to. He would often be disconnected once a supervisor answered the line. Bank of America was able to identify him, his Account and the unauthorized transactions. He requested Bank of America research and investigate all five unauthorized transactions and report back its findings. Arnoldstarr never received a provisional or permanent credit for the $5,000. Instead of crediting his Account or providing Arnoldstarr the results of its investigation, Bank of America only responded to Arnoldstarr by telling him he had to call EDD for any type of relief. Separate and apart from failing to take the proper action regarding the five unauthorized transactions, later in the month of December 2020 Bank of America restricted electronic access to Arnoldstarr's Bank of America Account. The same day in December 2020 this occurred, Arnoldstarr contacted Bank of America by telephone and asked Bank of America to provide all the information it was relying upon in restricting his Account. Bank of America failed to provide any information it was relying upon to serve as the basis of why Arnoldstarr's account was restricted, despite the request for additional information from Arnoldstarr. Due to Bank of America's actions, he missed five $2,100 rent payments starting in January 2021 and was promptly evicted. He is now homeless. In April 2021, his car was repossessed after missing five car payments totaling $4,000. He could not pay his credit card bills for five months starting in January 2021. He could not pay his $130 phone bill since January 2021. He cannot afford to pay for food or gas. He also cannot pay for doctor's bills.

301. *[Removed]*

302.  *[Removed]*

303.  Celina Back is a California resident. In November 2020, she applied to receive EDD benefits through Bank of America; however, Bank of America did not send her a card with access to her funds until March 2021. After receiving her card and being able to use it, in March 2021, Bank of America restricted access to her Account after Back received notification from Bank of America that someone had ordered a replacement card. This replacement card request was not from Back. In March 2021 once her access was restricted, Back called Bank of America, almost on a daily basis, and requested additional information as to why her access was restricted. Bank of America would either not answer the telephone or inform her there was no additional information they could provide and that she needed to contact the EDD. Two months later in May 2021, access to her Account was granted by Bank of America and Back could access her funds electronically. Upon reviewing her Account she discovered that in May of 2021 there were a number of unauthorized electronic transactions that she did not authorize. The total of those transactions was approximately $17,000 (all of which occurred within the prior 60 days). She immediately contacted Bank of America by telephone and reported the fraudulent transactions. She was able to identify herself, her Account and the precise transactions to Bank of America. Bank of America did not provisionally or permanently credit Back for the identified unauthorized transactions reported. Due to Bank of America's actions, she has missed her $700 rent payment from April 2021 to present, her $236 car payments from April 2021 to present, her $100 monthly electric bill from April 2021 to present, and her $60 phone bill from April 2021 to present. She struggles to obtain food, gas, and clothing.

304.  Mark Barnette is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In June 2020, he experienced fraud on his Account. The fraudulent transactions were withdrawals totaling $8,000. In September 2020, he discovered the fraud. In September 2020, he

contacted Bank of America to report the fraud. In response, Bank of America did not believe him, even when he physically went into a bank branch to prove his identification. In September 2020, Bank of America froze his Account. In May 2021, Bank of America unfroze his Account. In February 2021, Bank of America credited him $6,200. Due to Bank of America's actions, he was evicted from his apartment in July 2020 and was forced to live on the streets in a tent. He missed seeing his daughter for the first time in seven years. He cannot afford food or gas. He has had to make two hospital visits as a result of living on the streets. His fiancé left him. He suffers from extreme emotional distress.

305. *[Removed]*

306. *[Removed]*

307. *[Removed]*

308. *[Removed]*

309. *[Removed]*

310. *[Removed]*

311. Nicholas Brady is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In June 2020, he began experiencing fraud on his Account. The fraudulent transactions totaled $2,000 from ATM cash withdrawals. In June 2020, he discovered the fraud. In June 2020, he contacted Bank of America to report the fraud via phone. In response, Bank of America told him to talk to EDD to resolve his issue. In October 2020, Bank of America froze his Account. In October 2020, Bank of America unfroze his Account. In December 2020, Bank of America again froze his Account. In January 2021, Bank of America unfroze his Account, for a second time. In July 2020, Bank of America credited him the $2,000 that was fraudulently taken from his Account; however, the Bank reversed the credit and put his Account into a negative balance. Since July 2020, Bank of America has yet to credit him the stolen money. Due to Bank of America's actions, he was evicted from his home in November 2020. He

could not pay his cell phone bill with Verizon at $60 per month since September 2020, and as a result, went into default where Verizon turned him into collections. He had his child support licensed suspended because he had no funds to pay. He cannot buy food and had to go to a homeless shelter just to eat dinner. He also suffers from depression and extreme humiliation.

312.    James Brooks is a California resident. In May 2020, he applied to receive EDD benefits through Bank of America. In June 2020 he began receiving his EDD benefits of approximately $767 per week. Starting in late June 2020 he did not receive his weekly electronic transfer of his benefits to his Account. This continued until late July 2020. In late July (within 60 days of the first error discovered in June 2020) he called Bank of America and reported these errors. Bank of America then began sending him renewed EDD benefits, through the use of electronic transactions, beginning in August of 2020 through January 2021. Despite the electronic transfer of his benefits starting again in August of 2020, Bank of America did not provisionally or permanently credit Brooks for the reported error to his Account in the June 2020 through July 2020 time period. In late January 2021, he attempted to use his EDD benefits card issued by Bank of America, but the transaction was declined. Brooks reviewed his online statement and believed there were still funds on the Account and could not figure out why the error occurred in declining his purchase. That same day in January 2021 Brooks contacted Bank of America by telephone to report the declined transaction and requested additional information upon which Bank of America relied upon to restrict electronic access to his Account. In response to this request for additional information Bank of America told Brooks that he had to contact EDD directly and that Bank of America would not provide any additional information. Due to Bank of America's actions, he missed his $800 rent payments from February 2021 to March 2021. He missed his phone bill, electric bill, and water bill from February 2021 to March 2021, totaling approximately $600. He struggles to buy food, gas, and clothing.

313.    Adam Brotman[20] resides in San Diego County, California. He was out of work during the COVID-19 pandemic. In June 2020 he then applied for and was found eligible by EDD to receive unemployment benefits administered through Bank of America. He received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access EDD benefits. On October 22, 2020, he was then the victim of unauthorized transactions on his EDD Debit Card Account (all of which occurred in the prior 60 days). He learned of the fraudulent transactions on October 27, 2020, and he promptly reported the unauthorized transaction(s) to Bank of America. The details of the first unauthorized transaction occurred at an ARCO gas station in San Diego, California and details of the second unauthorized transaction at an ATM in Birmingham, England for $990.50. Brotman, in dire need of his funds to help bridge the gap between employment during the pandemic, was confused why Bank of America approved the ATM transaction in England that occurred on the same day as his transaction in California. The fraudulent transaction of $990.50 in England drained his Account to $170.81 after the Bank's international transaction fees. The fraudster stole $990.50 from him which is a great deal of money to him. The same day as discovering the unauthorized transactions (and within 60 days of their occurrence) Brotman called Bank of America and was able to reach an account representative. Bank of America had no trouble verifying his identity, the Account in question, or the unauthorized transactions. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Bank of America told him to wait for a few days while it investigated the claim and stated it would get back to him. On October 28, 2020, just one day after his fraud report, the

---

[20] Brotman is the plaintiff in *Brotman v. Bank of America, N.A.*, No. 3:21-cv-00520-GPC-MSB ("*Brotman*").

Bank sent him a letter that read in part: "Your claim has been closed because we believe the account, or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any." The Bank's letter dated October 28, 2020, admits that Brotman's Account had been "the subject of fraud" and an error did occur. On information and belief, Bank of America never conducted a reasonable investigation and did not provide any information or the documents it relied upon in reaching its conclusions. It was required to correct the error within one business day under 15 U.S.C. §1693f(b). Not only was the Bank required to recredit the $990.50 resulting from the error, but it should also have refunded the $20.81 of international transaction fees it charged stemming from the error. Brotman called Bank of America almost daily to continually report the unauthorized transactions and he would remain on hold for long periods of time. Sometimes the call would become disconnected after being on hold for hours. Each time he reported the unauthorized transfer to agents at the Bank, he provided his name and other identifying information as required by 15 U.S.C. §1693f(a)(1). While the agents were able to locate his Account, they would not help him. He indicated to the Bank that he believed his Account contained errors in the form of an unauthorized electronic fund transfer under 15 U.S.C. §1693f(f)(1) and provided the amount and date of the transfer per 15 U.S.C. §1693f(a)(2). When he reported the fraud, he explained that the transfer occurred in England while he was in California. He set forth the reasons for his belief that the transfer was unauthorized and requested more information from the investigation into his fraud claim. Around November 2020, Brotman reached another agent by phone and again reported the fraud and asked for help in the form of a recredit or refund. The agent told him that the call needed to go to "claims." Despite Bank of America's representations of "24/7" customer service, the agent informed him that he needed to call back during

business hours and provided him with a number to call. Brotman called that number only to be put on hold for hours, and then hung up on. He was transferred to various departments to no apparent end, sent to voicemail, dealt with unhelpful automated agents, with no meaningful response. On December 17, 2020, Brotman discovered his Bank of America EDD Account access was restricted. That same day he contacted Bank of America to report this and request additional information. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Brotman never received a notice even after the Bank had restricted access to his Account or hundreds of thousands of other EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. In his numerous calls to the Bank going back to October 2020, Brotman repeatedly requested additional information, clarification and documentation concerning the unauthorized transfers, but the Bank refused to provide it as required under 15 U.S.C. §1693f(f)(6). Assuming the Bank had a valid reason for the freeze and needed to conduct an investigation, Brotman should have been able to access his funds, including the stolen $990.50, after ten days under the EFTA. But that was not the reality for him. He was held hostage by the Bank with the only option of calling the Bank repeatedly and being placed on hold for hours and hours. In late January 2021, he called Bank of America's Claims Department again. A representative named Chris answered the phone and informed Brotman that on January 19, 2021, his claim shifted from "closed" to "pending maintenance." Brotman received no correspondence about the shift in status of his claim. On February 1, 2021, the Bank mailed Brotman an additional letter informing him that his Account access had been restricted due to suspicious activity. On February 3, 2021, the Bank mailed him a letter stating his $990.50 had finally been returned and his Account was no longer restricted. However, Adam never received a provisional credit on the reported unauthorized transactions and only received a permanent

credit outside of the time requirements allowed by EFTA in late February 2021. The Bank did not return the $20.81 of international transaction fees it charged him in connection with the fraudulent transaction and did not credit him for interest as required by 15 U.S.C. §1693f(b). Brotman reported the unauthorized transaction to the Bank in October 2020. A good faith investigation by the Bank was required to be completed forty-five days later under 15 U.S.C. §1693f(c). If the Bank determined in a good faith investigation during the forty-five period that an error did not occur, it was required to deliver or mail him an explanation of its findings within three business days after the conclusion of that good faith investigation under 15 U.S.C. §1693f(c). Instead, the Bank sent him a form letter the next day after he reported the fraud. This indicates the Bank had not performed any sort of investigation, much less a good faith investigation. The letter seemed to be an attempt to shield the Bank from liability. In its letter dated October 28, 2020, Bank of America failed to enclose any supporting documents to support its position that Brotman had committed the fraud. The Bank did not make a good faith investigation of the error. It did not have a reasonable basis for believing that his Account was not in error per 15 U.S.C. §1693f(e)(1). Initially, and then again well after the forty-five-day investigation period allowed, the Bank concluded that his Account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to it at the time of its investigation per 15 U.S.C. §1693f(e)(2). Brotman upheld his end of the Cardholder Agreement and the requirements of the EFTA and made consistent diligent efforts to report and recover the funds stolen from the Account. He made many telephone calls reporting the fraud. In spite of this, Bank of America's customer service department never offered him any meaningful response or assistance, but rather stymied his efforts at every turn. Brotman was damaged as a result.

314.  *[Removed]*

315.  *[Removed]*

316. Dwight Burrow is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In December 2020, Bank of America illegally froze his Account, citing suspected fraudulent activity. In March 2021, Bank of America unfroze his Account. In March 2021, he experienced fraud on his Account, totaling approximately $200. In March 2021, he discovered the fraud after he checked his transaction history after reactivating his Account. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate and open a claim. In March 2021, Bank of America again froze his Account. In April 2021, Bank of America unfroze his Account. In March 2021, Bank of America credited him the fraudulently stolen money; however, Bank of America reversed the credit one week later. Due to Bank of America's actions, he missed two $500 rent payments, leading to eviction. He struggled to pay for food, gas, clothing, and other basic life necessities, such as medication. He suffers from emotional distress.

317. Mario Bynum is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In August 2020 he reviewed his statement with Bank of America online and discovered unauthorized transactions totaling $3,904 occurring within the prior 60 days. The same day in August 2020 he contacted Bank of America by telephone and reported these unauthorized transactions. He was able to identify himself to Bank of America and Bank of America acknowledged his identity, his Account and the specific transactions that were not authorized. Bank of America provisionally credited Bynum the $3,900 in approximately ten days from his original report of the unauthorized transactions. On October 4, 2020 he checked his Account electronically again and discovered an unauthorized transaction of $7,000 was taken from his Account within the prior 60 days. This left him with a negative balance of $2,000. The same day he contacted Bank of America by telephone to report the unauthorized withdrawal and error as well as requesting additional information surrounding the unauthorized withdrawal.

Bank of America refused to provide any additional information and would not provisionally or permanently credit the $7,000 unauthorized withdrawal. Due to Bank of America's actions, he missed his $1,000 rent from August 2020 to May 2021, leading to eviction in May 2021. He has struggled to make his $900 car payments since August 2020. He has struggled to pay his $40 phone bill since August 2020. He struggles to pay for food, gas, and clothing.

318.    *[Removed]*

319.    *[Removed]*

320.    Stacey Camberos is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In February 2021, she began experiencing fraud on her Account. The fraudulent transactions were purchases at a store totaling $439.61. In February 2021, she discovered the fraud on her Account. In February 2021, she reported the fraud to Bank of America by phone. In response, Bank of America told her to call them back in a few weeks to resolve her issue. In February 2021, Bank of America froze her Account which had $32 in the Account at the time. In May 2021, Bank of America unfroze her Account. Due to Bank of America's actions, she has missed every rent payment since February 2021, at $500 per month. She cannot afford to pay to fix her car at $355, forcing her to borrow her brother's car for transportation. She has been dropped by two cell phone carriers because she could not pay her phone bill. She can barely afford to buy food for her kids.

321.    Kimberly Carpenter is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In October 2020, she discovered unauthorized transactions totaling $200, which occurred within the prior 60 days. In October she reported these unauthorized transactions to Bank of America by telephone. Bank of America had no difficulty verifying her identity or accessing and reviewing the Account in question. In response, Bank of America said they would investigate the claim. Bank of America never provided a timely provisional

or a timely permanent credit related to the identified unauthorized transactions, as required by EFTA. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. In July 2020, Bank of America restricted access to her Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, she called Bank of America to inquire as to why a restriction was placed on her Account and requested additional information regarding the restriction. Bank of America had no difficulty verifying her identity or accessing and reviewing the Account in question. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Since July 2020, Bank of America has continued to release and then restrict her Account further at least six (6) times. Each time Carpenter calls Bank of America and requests additional information concerning the restrictions, but Bank of America never provides any information. Since June 2020, Bank of America has yet to unfreeze her Account. After at least 90-days from reporting the unauthorized transactions to Bank of America, Bank of America credited $200 to her Account. This credit was not made timely within the statutory constraints of EFTA. Due to Bank of America's actions, she missed two phone payments resulting in a phone shut off. She has missed two electrical bill payments. She has missed two water bill payments. She struggles to afford food and clothing. She also suffers from strokes, and Bank of America's actions has added extra stress onto her condition.

322.   Patricia Castillo is a California resident. In early 2020, she began receiving EDD benefits through Bank of America. In August 2020, she attempted to use her benefits card to make a transaction, but that transaction was declined. Perplexed as to why the transaction would be declined, she checked her Account online and discovered a number of unauthorized transactions totaling approximately $15,000 occurring within the prior 60 days. She reported these

unauthorized transactions to Bank of America immediately thereafter, in August of 2020. She identified herself to Bank of America in a sufficient manner where the Bank of America representative was able to pull up her Account and identify the unauthorized transactions which she identified, occurring in August of 2020. After identifying the unauthorized transactions to Bank of America, Bank of America did not provisionally credit Castillo's account within ten (10) business days or permanently credit her Account the $15,000. Bank of America never provided a timely provisional or a timely permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Separate and apart from the unauthorized transactions, Bank of America restricted access to Castillo's account beginning in January 2021. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, she called Bank of America to inquire as to why a restriction was placed on her Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. No answers were provided, and no additional information was sent by Bank of America in response. Out of the blue in March 2021 Bank of America credited approximately $4,000 of Castillo's unauthorized claimed amount without explanation. Another $900 deposit occurred in May 2021 (seven months after reporting the unauthorized transactions), without explanation. This credit was outside the time requirements required by EFTA after a report of unauthorized transactions. Castillo has still not received a provisional or permanent credit of over $10,000 related to timely reported unauthorized transactions from August 2020. The $10,000 outstanding due to unauthorized transactions all occurred within 60 days of the reported unauthorized transactions. Due to Bank of America's actions,

1    she had her car repossessed in February 2021. She has missed rent payments and

2    had her phone service ended after failing to pay her bill. She also cannot afford to

3    buy food. She also experiences extreme stress and anxiety.

4    323.    Richard Caton is a California resident. In April 2020, he began

5    receiving EDD benefits through Bank of America. In March 2021, he experienced

6    fraud on his Account. The fraudulent transactions totaled $4,500. In March 2021,

7    he discovered the fraud when he checked his Account online. In March 2021, he

8    reported the fraud to Bank of America via phone. In response, Bank of America

9    said they would investigate the claim and send him a new Card in the meantime.

10   Bank of America also told him he needed to submit a new claim. In March 2021,

11   Bank of America froze his Account. In May 2021, Bank of America unfroze his

12   Account. Since March 2021, Bank of America has yet to credit him the stolen

13   money. Due to Bank of America's actions, he could only pay $500 of his $800

14   monthly rent between March 2021 and May 2021. He struggled with food, clothing,

15   and phone bills. He also struggled with extreme emotional distress.

16   324.    Susan Chapple is a California resident. In April 2020, she began

17   receiving EDD benefits through Bank of America. In May 2020, she began

18   experiencing fraud on her Account. The fraudulent transactions totaled $400. In

19   May 2020, she discovered the fraud when she tried to withdraw money but was

20   declined. In May 2020, she reported the fraud to Bank of America via phone. In

21   response, Bank of America told her they would send her papers to fill out to verify

22   her identity. In April 2021, she again experienced fraud on her Account. The

23   fraudulent transactions totaled $500. In April 2021, she discovered the fraud when

24   she checked her online Account balance. In April 2021, she reported the fraud to

25   Bank of America via phone. In response, Bank or America told her they would file

26   another claim. In June 2020, Bank of America froze her Account. In August 2020,

27   Bank of America unfroze her Account. In June 2020, Bank of America credited

28   $200 to her Account. In October 2020, Bank of America again froze her Account.

In December 2020, Bank of America unfroze her Account. In June 2020, Bank of America credited $200 to her Account for the first fraudulent transactions. In April 2021, Bank of America credited $115 to her Account for the second fraudulent transactions. Due to Bank of America's actions, she missed three rent payments of $400. She missed three storage facility payments of $176. She lost personal property from that storage unit. She missed four insurance payments of $226. She had her vehicle repossessed. She suffered medically as she is handicapped and cannot make doctor's appointments to verify collection of disability. She cannot transport herself to and from rehab. She also suffers from emotional distress.

325.    Randy Chase is a California resident. In April 2020, he was approved to receive EDD benefits through Bank of America. On December 19, 2020, Bank of America restricted access to his EDD Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. At the time he had approximately $13,600 in his Account. Chase called Bank of America hundreds of times from December 2020 through January 2021 attempting to get a hold of any representative that could help him and provide additional information on the restriction placed on his Account. Many times he was on hold over an hour. Once he could reach a Bank of America representative, he would repeatedly ask for additional information on why his Account was restricted and why he could not access his funds. Bank of America never provided him with any additional information as to why his Account was restricted and why he could not access his funds. Bank of America's only response was to tell him to contact EDD because Bank of America had no information. Bank

of America has yet to grant access to his Account or provide him any additional information as to why, as he requested. Due to Bank of America's actions, he is homeless and forced to live in a car in Denver, Colorado. He cannot repair his vehicle. He is forced to beg for money and cannot pay for food. He also suffers from emotional distress.

326. *[Removed]*

327. *[Removed]*

328. Tiffany Cochran is a California resident. In February 2020, she began receiving EDD benefits through Bank of America. In August 2020 and September 2020, she began experiencing fraud on her Account. The fraudulent transactions totaled $30,000. In August 2020, she discovered the fraud when she failed to receive her EDD benefits. In August 2020, she contacted Bank of America and reported the fraud via phone. In response, Bank of America said they would send her a new Card with $15,000 credit; however, she never received the Card. This process happened two more times where Bank of America said would send her a Card with the $15,000 loaded onto it, however, she never received any of the Cards. In October 2020, Bank of America froze her Account, which had $16,055 in it at the time. On October 4, 2020, Cochran logged into her Account and found her Account was over-drawn approximately $44,000. She again called Bank of America who informed her to call California EDD. On October 5, 2020, her Account had $300 deposited into it. The $300 deposits continued weekly for the month of October until Cochran called and requested paper checks so that she could actually use the money as opposed to it going towards the overdrawn amount in her Account. Since August 2020, Bank of America has yet to credit her any of the money stolen from her Account. Due to Bank of America's actions, she has been unable to pay rent since September 2020. She is unable to pay bills including internet, power, car insurance, and medical. She has been unable to provide for her son. She is forced to go days

without eating. She cannot pay medical bills. She suffers from severe emotional distress.

329.    LaMar Collins is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In June 2020, he discovered fraud on his Account when he checked his transaction history. In June 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate his claims. In June 2020, Bank of America froze his Account. In July 2020, Bank of America unfroze his Account. Between October 2020 and December 2020, he again experienced fraud on his Account, totaling approximately $400. In December 2020, he discovered the fraud. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate. In December 2020, Bank of America froze his Account. In December 2020, Bank of America credited him $250 but denied another claim for $160. In February 2021, Bank of America unfroze his Account. Due to Bank of America's actions, he missed his $1,000 monthly rent payments from August 2020 to May 2021, leading to eviction in May 2021. He missed his car payments since August 2020. He missed his $40 phone bill since August 2020. He struggled to pay for food, gas, and clothing.

330.    *[Removed]*

331.    Jose Contreras is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account, totaling approximately $1,200. In October 2020, he discovered the fraud when he checked his online Account transactions. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would send him a new Card and contact him within a few weeks regarding its investigation. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any money.

Due to Bank of America's actions, he missed five $3,500 rent payments. He missed six $200 storage payments. He was late on a car insurance payment, leading to a $120 fee. He struggles to pay for food, gas, and clothing. He suffers from emotional distress.

332.    Donmonique Corella is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. Between June 2020 and August 2020, she experienced fraud on her Account, totaling approximately $12,000, putting her Account in a balance of negative $6,000. In August 2020, she discovered the fraud when she attempted to use her Card, but it was declined. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would open a claim and investigate. In August 2020, Bank of America froze her Account. In February 2021, Bank of America unfroze her Account; however, Bank of America immediately re-froze her Account. In October 2020, Bank of America credited $6,000 to her Account; however, Bank of America reversed the credit in December 2020, and even took an additional $3,000 from her Account, putting her Account at a balance of negative $9,000. Since December 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $1,600 rent payments from November 2020 to May 2021, leading to eviction. She missed her car payments from November 2020 to January 2021, leading to car repossession. She has struggled to pay her phone bills since November 2020, totaling $1,000. She has struggled to pay cable and internet bills from November 2020 to present, totaling over $600 owed. She struggles to pay for food and clothing.

333.    *[Removed]*

334.    *[Removed]*

335.    *[Removed]*

336.    *[Removed]*

337.    *[Removed]*

338.   *[Removed]*

339.   Luis Delariva is a California resident. In August 2020, he began receiving EDD benefits through Bank of America. In August 2020, he experienced fraud on his Account. The fraudulent transactions were all online purchases from stores such as Nike and Bed Bath & Beyond, totaling $6,000. In September 2020, he discovered the fraud when he checked his Account online. In September 2020, he contacted Bank of America to report the fraud via phone. In response, Bank of America told him to resolve his problem with EDD. In November 2020, Bank of America froze his Account when he could not verify himself and reversed the credit they gave him. After reversing the credit, Bank of America reported his Account at negative $6,511. Since November 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any funds. Due to Bank of America's actions, he could not pay his rent of $450 per month and was forced to be homeless in June 2020. He was dropped from his credit card because he was unable to make a payment since September 2020. He cannot even pay for his own food, relying on friends and family to provide. He also is suffering from serious depression.

340.   *[Removed]*

341.   Selena Delgado is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In June 2020, she experienced fraud on her Account. The fraudulent transactions were ATM withdrawals totaling $6,543. In June 2020, she discovered the fraud while making purchases that were declined due to insufficient funds. In June 2020, she reported the fraud to Bank of America via phone. In June 2021, she again experienced fraud on her Account. The fraudulent transactions totaled $14,000. In June 2021, she discovered the fraud when she checked her online Account balance. In June 2021, she reported the fraud to Bank of America via phone. In response, Bank of America claimed her issue was with EDD, after transferring her from department to department, claiming the next

would solve her issue for her. In August 2020, Bank of America froze her Account, which had approximately $10,584 in it at the time. Since August 2020, Bank of America has yet to unfreeze her Account. In August 2020, Bank of America provisionally credited her Account for the stolen money for four payments of $1,512, for a total of $6,048. On February 28, 2021, Bank of America removed the provisional credit for the stolen money that they originally provided from August 2020. Due to Bank of America's actions, from August 2020 to June 2021, she had difficulty paying rent, which was $475 per month, for a total of $5,225. From July 2020 to December 2020, she had missed car payments of $500 per month for a total of $3,000. Her car was repossessed in December 2020. From July 2020 to December 2020, she had difficulty paying her Boost cell phone bill of $110 per month for a total of $660. She struggles to buy food, gas, and clothing.

342.   Nickolaus Dirickson is a California resident. In October 2020, he began receiving EDD benefits through Bank of America. In November of 2020, Dirickson started experiencing fraud on his Account. The fraudulent transactions were withdrawals, totaling approximately $12,000. In January 2021, he discovered the fraud after he checked his online Account. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him this was an EDD issue, and he needed to verify his identification. In November 2020, Bank of America froze his Account. At the time Bank of America froze his Account, he had $4,200 in the Account. In March 2021, Bank of America unfroze his Account. In February 2021, Bank of America credited $4,600 to his Account due to Bank of America's actions, his credit score dropped 188 points within the last six months to which there are now marks on his credit. He was unable to purchase a car because of the low credit. He missed his rent payment in August 2020 through January 2021 at $1,800 per month, and as a result, became homeless. He was unable to pay car payments from November 2020 to January 2021, leading

to repossession of his car. He was behind on cell phone payments with Verizon of a total of $1,800 beginning in November 2020.

343. *[Removed]*

344. Anthony Douglas is a California resident and has two dependents minor children. In February 2021 Douglas applied for and was approved for EDD benefits administered by Bank of America. In April 2021 Douglas reviewed his online statement and identified a number of missing deposits which he concluded Bank of America had omitted in error (within the prior 60 days). Douglas identified those missing deposits as errors and contacted Bank of America to report the errors on his Account. Douglas reached a Bank of America representative in April 2021 to report the deposit errors and requested an investigation. Bank of America never provided a provisional or permanent credit related to the identified deposit errors. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. At the end of April 2021 during a follow up call with Bank of America, the representative told Douglas that Bank of America had corrected the missing deposits, which were originally omitted in error and that his Account was "fixed". Douglas then went online to verify the correct deposits and account adjustments were made by Bank of America. Douglas discovered the continued error that Bank of America had failed to properly credit his Account. Douglas then called Bank of America back to report these errors. This call took place at the end of April 2021 (well within the 60-day notice period required). Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. Bank of America never provided a provisional or permanent credit related to the identified deposit errors. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. The only instructions Bank of America provided to Douglas during

subsequent telephone calls was to contact EDD. Due to Bank of America's actions, he has missed utility bills since April 2021 totaling $800. He has missed rent since April 2021 at $1,750 per month. He has missed every phone payment to date since April 2020 at $100 per month. He has missed every insurance bill since April 2021 at $464 per month.

345.   Benjamin Douglass is a California resident. In January 2020, he began receiving EDD benefits through Bank of America. In April 2020 he logged onto his Bank of America account and identified a number of unauthorized transactions which had occurred within the prior 60 days. Those unauthorized transactions totaled about 50-70 transactions in the combined amount of approximately $4,000. That same day in April 2020, he contacted Bank of America by telephone to report the unauthorized transactions. He was able to connect with a Bank of America representative by telephone who verified his identity, his Account and the unauthorized transactions. Douglas never received a provisional credit on the reported unauthorized transactions and only received a permanent credit outside of the time requirements allowed by EFTA in late June 2020. Later that month of April 2020, Douglas attempted to use his Bank of America account electronically and found Bank of America had restricted access. He immediately called Bank of America that same day in April to report the restricted access on his Account and requested additional information from Bank of America. Bank of America never provided any additional information as to why his Account was restricted. Douglas continued to contact Bank of America by telephone multiple times per week and request additional information regarding his Account restriction. No additional information was ever received. In late June 2020, without explanation, Bank of America released any restrictions on his Account. Bank of America never provided additional information as to why a restriction was placed or ultimately released. Due to Bank of America's actions, he struggled to pay his $1,000 rent in April and

May 2020. He struggled to pay his $100 monthly phone bill in April and May 2020. He struggles to pay for food and clothing.

346.  *[Removed]*

347.  *[Removed]*

348.  *[Removed]*

349.  *[Removed]*

350.  Maritza Escalante is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In March 2021, she experienced fraud on her Account, totaling approximately $2,000. In March 2021, she discovered the fraud while checking her Account online. In March 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her the issue was with EDD and she needed to call them to resolve it. In April 2021 Bank of America froze her Account. In June 2021, Bank of America unfroze her Account. In June 2021, Bank of America credited her $2,000. Due to Bank of America's actions, she missed rent payments, missed phone bills, cannot afford to pay for food or gas. She also suffers from emotional distress.

351.  *[Removed]*

352.  Juan Estrada is a California resident. On May 31, 2020 Estrada applied for California EDD benefits administered through Bank of America. He was approved and benefits began on June 4, 2020. In November 2020 Estrada reviewed his Account and determined that a number of unauthorized transactions occurred in the prior 60 days, totaling approximately $5,780.00. On that same day Estrada attempted to contact Bank of America to report the unauthorized transactions but struggled to get through. Bank of America would repeatedly not answer the phone. Estrada was forced to call "countless" times and was kept on hold for hours. He was able to finally connect with a representative from Bank of America and reported the unauthorized transactions. Bank of America failed to provide a provisional or permanent credit for the unauthorized transactions. Instead Bank of America

informed Estrada that in order to proceed he was required to go to the police station and obtain a police report. Randomly, in February 2021 Bank of America then credited Estrada $2,680, but such credit was far outside the requirements set forth in EFTA. Due to Bank of America's actions, he suffers from emotional distress and cannot afford to buy food or other daily personal necessities.

353. *[Removed]*

354. Cody Ferraro is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In May 2021, he experienced fraud on his Account. In May 2021, he discovered the fraud when he attempted to withdraw cash from an ATM but had insufficient funds. In May 2021, he reported the fraud to Bank of America via phone, but Bank of America refuses to help him with his claim, often times dropping his calls. In May 2021, Bank of America froze his Account. Since May 2021, Bank of America has yet to unfreeze his Account. Since May 2021, Bank of America has yet to credit his Account, even after stating it was going to do so in June 2021. Due to Bank of America's actions, he missed a $200 storage payment. He is unable to pay his phone bill. He missed a rent payment of $800. He cannot pay for his car service or car insurance.

355. Jacob Flores is a California resident. In October 2020, he began receiving EDD benefits through Bank of America. In November 2020, he reviewed his Account and observed a number of unauthorized transactions which occurred in the prior 60 days. In November he contacted Bank of America by telephone to report all the unauthorized transactions (all which occurred in the prior 60 days). Flores was able to reach a Bank of America representative who was able to properly identify Flores, his Account and identify each of the unauthorized transactions on his Account, all which occurred in the prior 60 days. Bank of America failed to provisionally or permanently credit Flores' account. Bank of America never provided the results of its investigation or the documents it relied upon in reaching its conclusion. After Flores reported the unauthorized transactions in November

2020, Flores continued to use his Account. At the end of November Flores attempted to use his Bank of America issued debit card but his transactions were restricted. Flores immediately contacted Bank of America in November 2020 right after his Account was restricted to inquire what was going on with his Account. During this telephone call he requested Bank of America provide additional information concerning the restrictions on his Account. Flores continued to call Bank of America every day and would be placed on hold for hours, or disconnected. During each time he connected with a Bank of America representative he would ask for additional information surrounding the restrictions placed on his Account. A common response of Bank of America was that it was experiencing "back-end issues" and could not provide any additional information. Due to Bank of America's actions, he was late on $1,500 rental payments and fell behind from December 2020 through March 2021. He was late on car payments, missing January and February 2021. He was unable to timely pay his cell phone bill, cable bill and electric bill due to the frozen Account. His phone was turned off between January 2021 and March 2021 because he could not make the $200 monthly payments. He struggled to buy food and gas.

356.    *[Removed]*

357.    *[Removed]*

358.    Anthony Franks is a California resident. In August 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account. In October 2020, he discovered the fraud when he checked his Account and noticed he had not received his funds. In October 2020, he reported the fraud to Bank of America. In response, Bank of America told him he needed to re-verify his identity to access his funds. In October 2020, Bank of America froze his Account. Since October 2020, Bank of America has yet to unfreeze his Account. Since October 2020, Bank of America has yet to credit him any money. Due to bank of America's actions, he missed two $450 rent payments in November and

December 2020, forcing him to live on the streets. He has missed every $100 monthly phone bill since October 2020. His car was repossessed in May 2021.

359. *[Removed]*

360. *[Removed]*

361. *[Removed]*

362. Latisha Gage is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In September 2020, she experienced fraud on her Account, totaling $3,000. In September 2020, she discovered the fraud after checking her Account when her Card was declined. In September 2020, she reported the fraud to Bank of America via fraud. In response, Bank of America told her they would open a claim and that she needed to call EDD to resolve her issue. In September 2020, Bank of America froze her Account. Since September 2020, Bank of America has yet to unfreeze her Account. Since September 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she could not pay her $1,334 monthly rent payments from March 2021 to April 2021. She could not pay her $657 monthly car payment from March 2021 to April 2021. She could not pay her $300 monthly phone bill from March 2021 to April 2021. She struggles to afford food. She also suffers from emotional distress.

363. *[Removed]*

364. *[Removed]*

365. *[Removed]*

366. Elizabeth Giddens is a California resident. In March 2020, she applied to receive EDD benefits through Bank of America; however, she could not access her Account until August 2020. In August 2020, she experienced fraud on her Account, totaling $18,000. In August 2020, she discovered the fraud when she checked her Account balance after finally gaining access to the Account. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of

America told her they would open a claim and provisionally credit her Account. In August 2020, Bank of America froze her Account. In September 2020, Bank of America unfroze her Account. In October 2020, Bank of America again froze her Account. In April 2021, Bank of America unfroze her Account. In August 2020, Bank of America credited her $18,000. In October 2020, Bank of America reversed the credit, putting her Account into a balance of negative $18,000. In April 2021, Bank of America credited her back the $18,000 again, plus an additional $5,000 to make up for the benefits that went to paying off the negative balance Due to Bank of America's actions, she missed rent payments totaling $4,500 from October 2020 to April 2021, leading to her eventual eviction and forcing her to live in her car. She missed her $508 car payments from October 2020 to April 2021, leading to her car repossession in December 2020. She could not afford to provide for her children and was forced to send them away. She struggles to buy food and gas.

367.   Seante Glassflowers is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In November 2020, she experienced fraud on her Account, totaling $543. In November 2020, she discovered the fraud when she got a notification that money had been withdrawn from her Account. In November 2020, she reported the fraud to Bank of America. In response, Bank of America told her they would open a claim, but the claim could take months to investigate. In November 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited her $543. Due to Bank of America's actions, she could not pay her credit card or phone bill from November 2020 to May 2021. She could not afford food for herself or her children. She could not afford to pay her daughter's dentist bill. She could not afford to clean her children's clothes.

368.   Angela Gonzalez is a California resident. In April 2020, she applied to receive EDD benefits through Bank of America; however, Bank of America did not send her a Card with access to her funds until June 2020. In September 2020, she

experienced fraud on her Account, totaling $739. In September 2020, she discovered the fraud when she tried to withdraw funds and was declined. In September 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would send her a new debit Card and would start a claim for her. Bank of America further told her to resolve her issue with EDD. In September 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account and sent her a new Card. Since September 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed three $1,200 monthly rent payments leading to her eviction and subsequent homelessness. She was unable to pay car insurance bills and had her car repossessed. She could not afford to pay her storage facility fees, leading to a loss of personal items. She struggles to buy food and gas. She suffers from emotional distress.

369.  *[Removed]*

370.  Lizet Gonzalez is a California resident. In September 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on her Account, totaling $900. In October 2020, she discovered the fraud when she received a text stating her Account had a balance of $0. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would investigate the claim. They further told her that she needed to talk to EDD regarding her issue. In October 2020, Bank of America froze her Account. In late October or early November 2020, Bank of America unfroze her Account. Since October 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed two months of rent payments totaling $800. She has a phone bill debt of $1,400. She missed credit card payments totaling $460, leading to a credit score drop of 280 points. She cannot afford food or gas. She suffers from emotional distress.

371.   Lainie Ann Graham is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In November 2020, she experienced fraud on her Account. In November 2020, she discovered the fraud when she tried to use her Card but was declined. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her this was an EDD issue and to call them to resolve. In November 2020, Bank of America froze her Account. Since November 2020, Bank of America has yet to unfreeze her Account. Since November 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $1,600 rent payment in November 2020. She missed her $420 car payment in November and December 2020. Her Wells Fargo bank account was terminated, and she owes $204 in overdraft fees. She missed her $64 phone bill in November and December 2020. She struggles to pay for food, gas, and clothing.

372.   Audrey Grant is a California resident. In October 2020, she began receiving EDD benefits through Bank of America. In June 2021, she experienced fraud on her Account, totaling approximately $1,000. On June 7, 2021, she discovered the fraud when she attempted to withdraw money but was declined. On June 7, 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would send her a new Card. Since June 7, 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she was unable to pay her $3,000 monthly rent in June 2021.

373.   *[Removed]*

374.   Sean Grimes is a California resident. In January 2021, he began receiving EDD benefits through Bank of America. In January 2021, he experienced fraud on his Account. In January 2021, he discovered the fraud when he checked his Account balance online which read a balance of $0. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America kept sending him a new Card, however, each time a new Card was sent, more fraud would occur.

From January 2021 to April 2021, Bank of America would freeze his Account every time he reported fraud. From January 2021 to April 2021, Bank of America would unfreeze his Account every time they sent him a new Card. Since January 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed two $800 monthly rent payments. He missed his car insurance and electricity bill totaling $1,000 per month. He struggles to pay for food and gas. He struggles with emotional distress.

375.    *[Removed]*

376.    Noah Guirguis is a California resident and a single father with two dependent minor children. In July 2020 Guirguis applied for and started to receive California EDD benefits administered by Bank of America. In September 2020 Guirguis had his EDD benefits card stolen. He immediately reported it to Bank of America, requested that they cancel the card and send him a new one. On or about the same day in September 2030, he reviewed his Account and discovered a number of unauthorized transactions which occurred within the prior 60 days. Guirguis then contacted Bank of America the same day in September 2020 to report the unauthorized transactions. Bank of America was able to identify Guirguis, locate his Account and acknowledged the report of the unauthorized transactions. Bank of America did not provide provisional or permanent credit with regard to the September 2020 unauthorize transactions. Bank of America also did not provide any communications as the results of its investigation or any documents in which it relied upon in reaching its conclusion. Due to Bank of America's actions, he could not make his $800 rent payments from September 2020 to January 2021. He could not make his $60 monthly car payments from September 2020 to January 2021. He could not make his $80 phone payments from September 2020 to January 2021. He could not pay his $40 monthly water and electric bill from September 2020 to January 2021. He struggled to buy food, gas, and clothing.

377.   Lyndsey Gutcher is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In May 2020, she experienced fraud on her Account, totaling $5,430. In June 2020, she discovered the fraud when she checked her Account balance online. In June 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they could not send her a new Card until she verified her ID with EDD and that she should also file a police report. In June 2020, Bank of America froze her Account. In late January 2021 or early February 2021, Bank of America unfroze her Account. Since June 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed seven $1,000 rent payments, leading to eviction and subsequent homelessness. She missed three $111 car insurance payments. She struggles to buy food and gas. She suffers from emotional distress.

378.   *[Removed]*

379.   Angelica Gutierrez is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In August 2020, she experienced fraud on her Account. In August 2020, she discovered the fraud when she checked her Account balance after attempting to withdraw funds. In August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would credit her the money back. In August 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. Since August 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $800 rent payment from December 2020 to April 2021, only avoiding eviction by borrowing money. She could not pay her $268 car insurance from December 2020 to April 2021. She could not pay her $60 phone bill from December 2020 to April 2021. She also had to borrow money just to buy life necessities. She also suffers from extreme stress and has been in and out of the hospital as a result.

380.   *[Removed]*

381.   Shant Hakopian is a California resident. In March or April 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account. In October 2020, he discovered the fraud when he attempted to make a purchase and his Card was declined, leading him to call Bank of America. In October 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would freeze his Account while they investigated. In October 2020, Bank of America froze his Account. In October 2020, Bank of America unfroze his Account. Since October 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed a $1,000 car payment. He struggles to buy food and gas.

382.   James Hanes is a California resident. In September 2020, he began receiving EDD benefits through Bank of America. On December 4, 2020, he experienced fraud on his Account, totaling approximately $65. On December 4, 2020, he discovered the fraud when he received a text alert. On December 4, 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would investigate the claim. In December 2020, Bank of America froze his Account. In June 2021, Bank of America unfroze his Account. In June 2021, Bank of America credited $65 to his Account. Due to Bank of America's actions, he missed a $400 rent payment in June 2021. He struggles to pay for food. He suffers from emotional distress.

383.   Micah Haney is a California resident. In August 2020, he applied to receive EDD benefits through Bank of America. In August 2020, he discovered someone had opened an EDD Bank of America account in his name (which was not authorized). When he attempted to apply for benefits, he was rejected. In August 2020, he reported the fraud to Bank of America via phone requesting more information. In response, Bank of America told him he needed to speak to EDD to resolve his issue. In August 2020, Haney communicated with EDD to update his information in order to create a valid EDD Bank of America Account. He was able

to be approved for EDD benefits and have a legitimate account opened with Bank of America. Immediately upon trying to use his new account, Haney found he had restricted access. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Haney contacted Bank of America by phone every month reporting to Bank of America his inability to access his Account and continually requested additional information. Additionally, beginning in August 2020 and numerous times per week then on, Haney requested additional information resulting from any investigation that Bank of America performed as to why his access was restricted. Since August 2020, Bank of America has yet to allow Haney access to his Account, nor has Bank of America given Haney any information resulting from any investigation surrounding the placement of restrictions on his Bank of America account. Since August 2020, Haney has yet to be able to access his EDD funds totaling approximately $14,240.00 and has never received any additional information or documentation. Due to Bank of America's actions, he has not been able to pay his $400 monthly rent since August 2020. This left him homeless when he was evicted in April 2021. He has not been able to pay his $500 monthly car payments since August 2020, leading to car repossession in April 2021. He has been forced to borrow money to pay his $90 monthly phone bill. He struggles to buy food, gas, and clothing.

384.  *[Removed]*

385.  Rebecca Harden is a California resident. In January 2021, she began receiving EDD benefits through Bank of America. In January 2021, she experienced fraud on her Account, totaling $5,000. In January 2021, she discovered the fraud when she checked her Account balance and saw the fraudulent transfer. In January

2021, she reported the fraud to Bank of America via phone. In response, Bank of America said they would reimburse her the stolen money while they investigated. Since January 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she was unable to pay her $875 monthly rent payment from February 2021 to April 2021.

386.    Johnny Harper is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In February 2021, he experienced fraud on his Account, totaling $1,100. In March 2021, he discovered the fraud when he checked his balance online. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate, but gave no further information in the coming months. In February 2021, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. Since February 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed payments on his property tax. He missed a $595 car payment. He missed a $400 credit card payment. He missed a $186 cable bill.

387.    Ivan Harris is a California resident and has one child. In April 2020, he began receiving EDD benefits through Bank of America. On September 7, 2020, Bank of America restricted his access to his Account. Upon noticing his electronic funds were restricted in September 2020, Ivan immediately called Bank of America. Ivan spoke with a representative from Bank of America and gave them the required information to verify his Account. Once Bank of America found Ivan's account, he informed Bank of America that his access to his Account has been restricted and requested additional information and documentation. Bank of America did not give Harris any additional information, documents or the results from any investigation or reasoning as to why his Account access was restricted. Bank of America instructed Harris to contact EDD. On November 21, 2020, Bank of America removed the restricted access to his Account. Bank of America has yet to inform

1    Ivan as to why Bank of America restricted Ivan's access to his Account for over 60

2    days or provide him any of the additional information and documentation requested.

3    Due to Bank of America's actions, he missed his $600 monthly rent payment.

4        388.    *[Removed]*

5        389.    Steven Hart[21] is a natural person residing in Los Angeles County, State

6    of California. Hart has an EDD Debit Card Account which Bank of America

7    maintains supervision and control over per its contractual relationship with the State

8    of California. Over the course of this relationship, Hart provided Bank of America

9    with various pieces of personal identifiable information related to Hart, such as his

10   personal finances. Such information includes, but is not limited to, Hart's name,

11   address, social security number, date of birth, income level, and banking

12   information (amounts and accounts). Upon receipt of this information, Bank of

13   America stored or otherwise archived said information in some library, digital file,

14   computer-based system, or other storage medium, and thus at all times was

15   entrusted with and maintained control of Hart's highly sensitive information. At

16   some point in 2020, a hacker was able to access Bank of America's technical

17   system—presumably via a misconfiguration of a firewall (presuming Bank of

18   America had a firewall in place). As such, this hacker was able to gain access to

19   banking Account information for tens of thousands of EDD Debit Card Accounts

20   which Bank of America maintains, supervises, and controls per its contract with the

21   State of California. In April of 2021, Hart checked his Account and discovered he

22   had funds missing. Hart reviewed his Account activity and determined he had been

23   a victim of fraud and made all reasonable attempts to notify Bank of America of

24   this fraudulent activity. After Hart submitted his claim for fraud regarding the ATM

25   withdrawal(s) at issue. Bank of America canceled or froze Hart's Card as a result

26

27   [21] Hart is the plaintiff in *Hart v. Bank of America, N.A.*, No. 3:21-cv-01175-
     GPC-MSB, originally filed in the U.S. District Court for the Central District of
28   California (No. 2:21-cv-04678-GW-JC) ("*Hart*").

of submitting his fraud claim. To Hart's shock and dismay, some unknown individual had made ATM withdrawal(s) in the amount of $853. Hart did not make these withdrawals himself, did not authorize anyone to make the withdrawal on his behalf, and was still in possession of his Card despite said withdrawals taking place. Hart submitted a fraud claim to Bank of America regarding the missing/stolen funds on April 7, 2021. Bank of America did not provide a temporary credit/refund, so pursuant to EFTA, Bank of America had ten (10) days to properly investigate and remedy the fraud claim. Bank of America did neither. After allegedly performing an investigation into Hart's fraudulent activity, Bank of America sent Hart written correspondence denying Hart's fraud claim. Bank of America's denial letter was dated April 8, 2021—one (1) day after Bank of America allegedly performed a "reasonable" investigation. The basis for Bank of America's denial of Hart's claim is scant at best. However, Bank of America does indeed confirm that fraudulent or suspicious activity took place in regard to the fraudulent withdrawal, but nonetheless refused to refund or credit Hart the $853 sum. Despite Hart's efforts, Bank of America refused to perform any reasonable investigation regarding Hart's dispute and instead flatly denied Hart's claim one (1) day after he submitted said claim. Bank of America's alleged "investigation" into Hart's dispute was clearly inadequate, not reasonable, not diligent, and failed to properly address Hart's issues regarding the $853 fraudulent withdrawal. Further evidencing Bank of America's woefully inadequate investigation is the fact that Bank of America has access to data, film, and other resources given that the fraudulent transaction took place at one of Bank of America's own financial centers (i.e., not a third-party ATM at a convenience store, for example). Bank of America could have reasonably, easily and swiftly confirmed the $853 transaction as fraudulent and refunded or credited the funds over to Hart's Account. Instead, Bank of America failed to investigate properly, refused to credit or refund the transaction, while still nonetheless confirming that the withdrawal was subject to fraudulent activity. What is more,

Bank of America actually reversed its own decision and credited Hart the stolen funds on or about May 10, 2021. This further evidences that Bank of America did not perform a reasonable investigation within the requisite ten (10) days in violation of EFTA.

390.    *[Removed]*

391.    Kaytricia Hayden is a California resident. In August 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on her Account, totaling $500. In October 2020, she discovered the fraud when she checked her transaction history online. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to speak to the bank where the money was fraudulently sent. Since October 2020, Bank of America has yet to credit her any money.

392.    Gretchen Heinz is a California resident, a single mother with one minor dependent. In March 2020, she began receiving EDD benefits administered through Bank of America. On September 29, 2020 she attempted to use her EDD benefits card to make a purchase. At that time she found that her account was restricted, and she was unable to complete her purchase. On that same day she attempted to contact Bank of America by telephone, but she could not connect her call as Bank of America would not answer the phone. Heinz continued to attempt to get ahold of a representative at Bank of America over the next four days. She finally was able to get through to Bank of America on the fourth day. During this telephone call with Bank of America, the representative was able to properly identify Heinz, her Account and the fact that a restriction had been placed on the Account. During this telephone call Heinz requested from Bank of America additional information concerning the restrictions placed on her Account. Bank of America indicated that it did not have any additional information to provide, but verified that there was money in the Account of Heinz. The restrictions on Heinz's Account continued until the end of October when Bank of America sent Heinz a

Western Union for $1,317.00 and then issued her a new card. Bank of America never provided any additional information with regard to why her Account was restricted. Due to Bank of America's actions, she missed a $500 rent payment. She missed a $70 phone bill. She acquired a $2,000 debt owed to friends and family. She suffers from emotional distress.

393.    Ronnie Hernandez is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on his Account, totaling $600. In November 2020, he discovered the fraud when he attempted to withdraw funds from his Account. In November 2020, he reported the fraud to Bank of America by going into the bank and speaking with a representative. In response, the Bank of America representative told him he needed to speak with EDD to resolve his issue. In November 2020, Bank of America froze his Account. Since November 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed a $500 rent payment. He also suffers from emotional distress.

394.    Ruben Hernandez is a California resident. In August 2020, he applied and was approved to receive EDD benefits distributed through Bank of America. In November 2020, Ruben contacted Bank of America as to the status of his EDD Account, because Ruben had yet to receive any of his benefits ($900.00 every two weeks) which were scheduled to start in August 2020. Bank of America informed Ruben during his November 2020, that they had restricted Hernandez access to his Account for some reason undisclosed reason. Hernandez understood that this restriction was placed on his Account within the prior 60 days. During this telephone call with Bank of America he requested additional information and documentation concerning the restrictions placed on his Account. Despite requesting additional information from Bank of America, Bank of America never provided any. Bank of America told Hernandez to contact EDD to re-verify his

identity. Hernandez reverified his ID with EDD but his Account was still restricted by Bank of America, without explanation, despite the request for additional information. Hernandez called Bank of America over 200 times requesting the status of the investigation, and for additional information including as to why he was still not given access to his Account. In January 2021, Bank of America instructed Hernandez that the investigation was not "complete", and he still could not be given access to his Account. This conclusion was reached without providing Hernandez any additional information, as requested. Bank of America did instruct Ruben that if he dropped his fraud claim, and not request access to the funds in the Account from August until November ($900.00 every two weeks) Bank of America would give Ruben access to his Account moving forward. Due to Ruben not having any money and desperate for food and necessities Ruben agreed to drop his fraud claim as instructed by Bank of America was the only way Ruben could get access to his desperately needed relief funds. Bank of America removed the restricted access to Ruben's account in January 2021. Bank of America still has not given Ruben any results from their investigation or additional information concerning his restricted access. Since November 2020, Bank of America has yet to allow him access to his funds. Due to Bank of America's actions, he missed his $400 rent payment from August to September 2020, leading to eviction and subsequent homelessness. He cannot afford to maintain a phone each month. He struggles to obtain food and clothing. He suffers from emotional distress.

395.  *[Removed]*

396.  *[Removed]*

397.  Lindsie Holloway is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In July 2020, he experienced fraud on his Account, which left his Account with a balance of negative $13,000. In July 2020, he discovered the fraud when he checked his Account and noticed the balance. In July 2020, he reported the fraud to Bank of America. In response, Bank

of America said they would send out a replacement Card; however, Bank of America sent the Card to an incorrect address, even after he told Bank of America the address on file was fraudulent. In July 2020, Bank of America froze his Account. In March 2021, Bank of America unfroze his Account. Since July 2020, Bank of America has yet to credit him any of the stolen money. Due to Bank of America's actions, he was evicted from his home in June of 2020 and is forced to live in the back of his car. He has missed every phone payment to date since July 2020. He cannot afford food or gas. He also suffers from a recent Traumatic Brain Injury (TBI) and Bank of America's actions have worsened his condition.

398.   Crystal Horath is a California resident. In January or February 2020, she began receiving EDD benefits through Bank of America. In November 2020, she experienced fraud on her Account, totaling $300. In November 2020, she discovered the fraud when she checked her Account balance online. In November 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said there was nothing they could do regarding reimbursement, but they would send her a replacement Card. In December 2020, she again experienced fraud on her Account, totaling $200. In December 2020, she again discovered the fraud by checking her Account balance. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would freeze the Account until she verified her identification. In December 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited her $268. Due to Bank of America's actions, she missed two rent payments leading to her eviction. She missed car insurance bills, leading to her inability to utilize the car. She suffers from emotional distress.

399.   Terrance Howze is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In January 2021, he experienced restricted access to his Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he

called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Due to Bank of America's actions, he missed his $875 rent payments from January 2021 to May 2021, leading to eviction. He missed his $800 monthly utility bills from January 2021 to May 2021.

400. *[Removed]*

401. Sharonna Hutchins is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In late July or early August 2020, she experienced fraud on her Account, totaling approximately $3,000. In late July or early August 2020, she discovered the fraud when she attempted to use her Card but was declined due to insufficient funds. In late July or early August 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would send her a new Card to access her Account. In December 2020, she again experienced fraud on her Account, totaling $1,000. In December 2020, she discovered the fraud when she again tried to use her Card and was declined. In December 2020, she reported the fraud to Bank of America. In response, Bank of America told her they would send her a new Card, like they had done numerous times before. In September 2020, Bank of America froze her Account. In December 2020, Bank of America unfroze her Account. Since July 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed three $2,000 rent payments, leading to her eviction. She missed four $90 phone bills. She struggles to buy food, gas, and clothing.

402. Quoc Huynh is a California resident. Around May 2020, he began receiving EDD benefits through Bank of America. Around June 2020, he experienced restricted access to his Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted

use, Huynh immediately called Bank of America to inquire as to why a restriction was placed on Huynh's account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Huynh was able to view the account balance on his Account, but still experienced restricted access as of October 2020. During a review of his Account Huynh discovered approximately $17,000 in unauthorized transactions occurring within the prior 60 days. The same day as discovering the unauthorized transactions Huynh called Bank of America and was able to reach an account representative. Bank of America had no trouble verifying Huynh's identity, the Account in question, or the unauthorized transactions. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Huynh continued to call day after day and was forced to wait long hours before speaking with a Bank of America agent trying to get access and his Account credited. Bank of America agents stated that the banks were still investigating the missing $17,000, which was never credited to him. The bank never gave him an explanation or investigation results either. Due to Bank of America's actions, he missed his $900 rent payments from June 2020 to August 2020, leading to his eviction in August 2020 and subsequent homelessness. He missed his electric bill, water bill, and gas bill from June 2020 to August 2020, totaling $3,000.

403.    John Idemudia is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In September 2020, he experienced fraud on his Account, totaling approximately $1,700 from two separate transactions. In September 2020, he discovered the fraud when he received an email that a fraudulent person withdrew the funds. In September 2020, he reported the

fraud to Bank of America. In response, Bank of America told him they would investigate and open a claim. In September 2020, Bank of America froze his Account. In September or October 2020, Bank of America unfroze his Account. Since September 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he was unable to pay his $60 phone bill twice. He was unable to afford his $64 auto insurance twice. He was unable to pay his $800 rent for two months. He struggles to buy food, gas, and clothing.

404.    Juanita Isles is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In October 2020 when reviewing her Account, she discovered a series of unauthorized transactions totaling approximately $1,700 that occurred within the prior 60 days. That same day in October 2020, she called Bank of America who was able to locate her Account, identify her and the unauthorized transactions. She requested information, documentation, and credit which the bank refused to provide. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Bank of America told her there were many people experiencing issues and she needed to be patient to resolve her issue. Shortly thereafter, in October 2020, when attempting to use her benefits card administered by Bank of America, she experienced restricted access to her Account. She immediately called Bank of America who was able to locate her Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, restricting use, she immediately called Bank of America to inquire as to why a restriction was placed on her Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. She asked for

information, documents, and credit which the bank did not give her or provide any explanation or give additional documentation. Due to Bank of America's actions, she was late paying her cell phone bill and could barely afford to buy food, gas, and clothing.

405.   Derrick Jabara is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In March 2021, he experienced fraud on his Account, totaling approximately $3,600. In March 2021, he discovered the fraud when he checked his Account after his Card was declined. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to resolve his issue with EDD. In March 2021, Bank of America froze his Account. Since March 2021, Bank of America has yet to unfreeze his Account. Since March 2021, Bank of America has yet to credit him any money. Due to Bank of America, he was required to turn his phone into the finance company after failing to pay his phone bill. He missed two $350 car payments in April and May of 2021. He missed two $1,200 rent payments. He struggles to buy food, gas, and clothing.

406.   Shreel Jackson is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In February 2021, she experienced fraud on her Account, totaling $880. In February 2021, she discovered the fraud when she checked her Account balance online. In February 2021, she reported the fraud to Bank of America via phone. In response, Bank of America proceeded to blame EDD and told her she needed to talk to EDD to resolve her issue. In February 2021, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. In April 2021, Bank of America credited her for the stolen money. Due to Bank of America's actions, she was late on her $500 weekly payment between February 2021 to April 2021. She was late on her $457 car payment between February 2021 to April 2021. She was late on her $89 car insurance payment between February 2021 to April 2021. She was late on her $230

phone bill between February 2021 to April 2021, leading to cancellation. She missed her $89 storage payment between February 2021 to April 2021. She struggles to buy food, gas, and clothing. She suffers from emotional distress.

407. *[Removed]*

408. *[Removed]*

409. Evett Johnson is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $460. In December 2020, she discovered the fraud when she checked her Account balance online. In December 2020, she reported the fraud to Bank of America. In response, Bank of America transferred her from department to department and refused to give her a straight answer. In December 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. In April 2021, Bank of America credited $463 to her Account. Due to Bank of America's actions, she was unable to see her daughter. She struggles to buy food, gas, and clothing. She also suffers from emotional distress and depression.

410. Lester Johnson is a California resident. In January 2020, he began receiving EDD benefits through Bank of America. In March 2021, he experienced fraud on his Account, totaling approximately $800. In March 2021, he discovered the fraud when he called Bank of America to check on his Account balance. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to talk to EDD to resolve his issue. In May 2021, he again experienced fraud on his Account, totaling $680. In May 2021, he discovered the fraud when he attempted to buy groceries, but his Card was declined. In May 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they would need to freeze the Account once again. In March 2021, Bank of America froze his Account. In May 2021, Bank of America unfroze the Account. In May 2021, Bank of America again froze the Account. Since May 2021,

Bank of America has yet to unfreeze his Account. In May 2021, Bank of America credited him money from the first fraudulent transaction; however, Bank of America has yet to credit him the money from the second fraudulent transactions. Due to Bank of America's actions, he missed his rent payment three times. He missed three car insurance payments. He was unable to pay his cable bill, phone bill, and electric bill. He struggles to buy food, gas, and clothing.

411.   *[Removed]*

412.   Brian Jones is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced fraud on his Account, totaling approximately $6,000. In November 2020, he discovered the fraud when he checked his Account balance online. In November 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he should suspend his Card to avoid more fraudulent transactions. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since November 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he has been unable to pay $600 to repair his car. He struggles to purchase food, gas, and clothing.

413.   *[Removed]*

414.   *[Removed]*

415.   *[Removed]*

416.   *[Removed]*

417.   *[Removed]*

418.   Sabrina Laxton is a California resident. In February 2020, she began receiving EDD benefits through Bank of America. In September 2020, she experienced restricted access to her Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, Laxton immediately called Bank of America to inquire as to why a restriction

was placed on her Account and requested additional information regarding the restriction. She was able to finally contact a Bank of America representative after continuously calling, being disconnected or waiting hours on hold. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Due to Bank of America's actions, she was evicted from her home and became homeless. She was forced to sell her car just to afford food and other necessities.

419.   *[Removed]*

420.   *[Removed]*

421.   Ronda Lopez is a California resident. In March 2019, she began receiving EDD benefits through Bank of America; she began PUA benefits in July 2020 through Bank of America. In February 2021, she experienced fraud on her Account, totaling approximately $1,500. In February 2021, she discovered the fraud when she checked her Account. In February 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her they could not help her and she needed to talk to EDD to resolve her issue. In February 2021, Bank of America illegally froze her Account. Since February 2021, Bank of America has yet to unfreeze her Account. Since February 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed her $495 rent payments from February 2021 to May 2021, leading to her eviction in May 2021 and subsequent homelessness. She cannot afford to repair her broken down car. She missed her $60 monthly phone bill from February 2021 to May 2021. She could not afford her $60 monthly WIFI bill from February 2021 to May 2021. She struggles to afford food, gas, and clothing. She now owes money to family and friends.

422.   *[Removed]*

423.   *[Removed]*

424. Mario Madrid is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced restricted access to his EDD Account after his EDD card did not work. He knew there were funds on his Account and could not figure out why it was restricted. The same day in November 2020 and after discovering that Bank of America had placed a restriction on the EDD Account and restricted his use, he immediately called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on his Account. Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. He requested additional information, documentation, and access which the bank refused to provide, and never did provide. Due to Bank of America's actions, he was unable to pay for car repair payments totaling $1,200. He was unable to pay for his wife's medical bills, which were $1,100. He had to borrow money and was continually late on his rent payment, which was $950 per month. He had to live in the backyard of a friend's house. He struggled to pay for food, gas, and clothes.

425. Joseph Magallan is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling $80. In December 2020, he discovered the fraud when he checked his online Account. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would open an investigation on the claim and get back to him in forty-five days. In December 2020, Bank of America froze his Account. In February 2021, Bank of America unfroze his Account. Since December 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed four $1,200

1   rent payments, leading to eviction and subsequent homelessness. He has missed his

2   phone bills. He suffers from emotional distress.

3       426.    Joseph Main is a California resident. In February 2020, he began

4   receiving EDD benefits through Bank of America. In July 2020, he experienced

5   fraud on his Account, totaling approximately $5,000. In July 2020, he discovered

6   the fraud when he checked his transaction history on his Account. In July 2020, he

7   reported the fraud to Bank of America via phone. In response, Bank of America

8   would often tell him to talk to EDD to resolve his issue or would just drop his call

9   altogether. In October 2020, Bank of America froze his Account. Since October

10  2020, Bank of America has yet to unfreeze his Account. In October 2020, Bank of

11  America credited him $5,000; however, Bank of America immediately reversed the

12  credit, sending his balance to negative $5,000. Due to Bank of America's actions,

13  he missed two rent payments in July and August 2020 at $1,200, leading to eviction

14  in September 2020. He missed two car payments at $480 per month in July and

15  August 2020, leading to repossession of the car in September 2020. He missed cell

16  phone bill payments at $90 in July and August 2020. He missed credit card

17  payments. He struggles to buy food, gas, and clothing.

18      427.    Danela Martinez is a California resident. In March 2020, she began

19  receiving EDD benefits through Bank of America. In January 2021, Bank of

20  America froze her Account. In January 2021, she called Bank of America to

21  understand why, yet Bank of America only told her she needed to speak to EDD

22  and verify her identity with EDD before Bank of America could do anything. In

23  March 2021, Bank of America unfroze her Account. Since January 2021, Bank of

24  America has yet to credit her any money. Due to Bank of America's actions, she

25  missed eight $510 weekly rent payments. She missed two $60 monthly phone bills.

26  She struggles to pay for food.

27      428.    Russell Matson Jr. is a California resident. In March 2020, he began

28  receiving EDD benefits through Bank of America. In January 2021, he experienced

fraud on his Account, totaling approximately $560. In January 2021, he discovered the fraud when he checked his transaction history. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America, after transferring him between departments, told him to talk to EDD to resolve his issue. In January 2021, Bank of America froze his Account. In March 2021, Bank of America unfroze his Account. Since January 2021, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed two $2,250 rent payments in February and March 2021. He missed two electricity bill payments in February and March 2021 at $100. He missed two cell phone bills at $100, leading to Verizon cancelling his Account. He struggles to buy food, gas, and clothing.

429. *[Removed]*

430. *[Removed]*

431. *[Removed]*

432. *[Removed]*

433. Jennifer Meza[22] resides in Imperial County, California. Meza found herself out of work during the COVID-19 pandemic. Meza then applied for and was found eligible by EDD to receive unemployment benefits. Meza received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access EDD benefits. She was then the victim of unauthorized transactions on her EDD Debit Card Account. Meza promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Meza to suffer immediate and irreparable injury. In mid-2020, Meza applied for and began receiving unemployment benefits through EDD. Around September 2020, Meza was surprised when her Card was declined at an ATM due to insufficient funds. Meza subsequently viewed her Account and discovered that the

---

[22] Meza is the plaintiff in *Meza v. Bank of America, N.A.*, No. 3:21-cv-00484-GPC-MSB ("*Meza*").

balance, which should have been approximately $7,000, had been drained to $2.67 as a result of numerous unauthorized transactions with ride share companies and luxury stores such as Coach. These transactions were executed in multiple states including New York. Meza, a single mother living in Calexico, was in awe that Bank of America would not flag her Account or notify her of these unusual purchases. These fraudulent charges totaling $6,904.83 were approved by Bank of America, prior to Meza learning of her Account's depletion. Inexplicably, Meza did not receive a notification about these highly unusual transactions, indicating that Bank of America failed to detect the instances of fraud. In September 2020, right after Meza discovered the fraudulent charges on her Account, Meza called Bank of America to report the unauthorized transfers. Around that same day, Meza visited the El Centro branch of Bank of America in-person and reported the unauthorized transfers. At the branch, the tellers and bankers refused to assist Meza. Meza was merely directed to call the Bank's EDD phone line while inside the branch. No Bank of America employee in the branch would answer Meza's questions or help her. An employee at the branch instructed Meza to enter an unoccupied office to use their phone to call the Bank's EDD phone line. The employee left Meza in the office alone to fend for herself. Not surprisingly, Meza's call was unproductive, so Meza begged for help from the bank's employees at the branch. The employees stated there was nothing they could do for Meza. Meza believed she would be protected and covered by Bank of America and was utterly disappointed when the Bank did not return or recredit the money to Meza so that she could provide for her child. Meza's initial notices to the Bank occurred well-within the sixty-day time limit imposed by 15 U.S.C. §1693f(a). Meza reported the unauthorized transfers to the Bank many more times within sixty-days as outlined below. In response, all the Bank did was to continue to send Meza periodic statements, as required by 15 U.S.C. §1693f(a). The statements confirmed and showed the unauthorized transfers. From September 2020 to October 2020, Meza called Bank of America daily to

report the fraud and request a refund. Meza would sit on hold for hours a day. Sometimes the call would become disconnected after being on hold for hours. Each time Meza reported the unauthorized transfers to agents at the Bank, she would provide her name and other identifying information as required by 15 U.S.C. §1693f(a)(1). The agents were able to locate Meza's Account, but they would not help her. Meza indicated to the Bank that she believed her Account contained errors in the form of unauthorized electronic fund transfers under 15 U.S.C. §1693f(f)(1) and provided the amount and dates of the transfers per 15 U.S.C. §1693f(a)(2). When Meza reported the fraud, she set forth the reasons for her belief that the transfers were unauthorized errors on the Bank's part and were fraudulent per 15 U.S.C. §1693f(a)(3). Upon information and belief, the Bank did not conduct any investigation when Meza reported the errors. The Bank certainly did not report or mail Meza the results of any such investigation and determination within ten business days of notice as required by 15 U.S.C. §1693f(a)(3). The Bank did not provisionally recredit Meza's Account within ten business days after receiving notice of the unauthorized transfers as required by 15 U.S.C. §1693f(c). Around October 2020, Meza reached another agent and again reported the fraud and asked for help in the form of a recredit or refund. The agent told Meza that her call needed to go to "claims." Despite Bank of America's representations of "24/7" customer service, the agent informed Meza that she would need to call back during business hours and provided Meza with a number to call. Meza called that number only to be put on hold over two hours, and then hung up on. Meza was transferred to various departments to no apparent end, sent to voicemail, dealt with unhelpful automated agents, and sent Bank of America emails notifying the Bank of the fraud with no response. Around October 2020, Meza was able to speak with another Bank of America representative. Meza went through the transactions with the agent and reported a total of $6,904.83 fraudulent charges again. The agent told Meza that these funds would be flagged as fraudulent and the funds would be returned to

Meza, but that did not happen. At no point did Meza receive communication via mail, email, text, call or otherwise from Bank of America regarding the fraud on her Account or the ongoing widespread fraud affecting EDD Debit Cards or how defrauded EDD recipients should proceed. There was no warning even after the Bank had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. In her numerous calls to the Bank going back to September 2020, Meza repeatedly requested additional information, clarification and documentation concerning the unauthorized transfers, but the Bank refused to provide it re 15 U.S.C. §1693f(f)(6). Meza asked Bank of America for the written transaction history for her Account during the timeframe when the fraudulent transactions occurred, but the Bank denied Meza access to those records and refused to help Meza. To date, Bank of America still has not returned Meza's stolen funds totaling $6,904.83. Apart from the stolen funds, Meza's was receiving EDD benefits of $167 a week deposited into her Account because that was the only option. Around January 6, 2021, Bank of America completely froze Meza's Account without warning. This denied Meza access to her benefits, even though EDD was still depositing $167 a week (distributed biweekly) into Meza's Account. When Meza inquired about the freeze, Bank of America falsely told Meza that it was EDD who was not authorizing the funds to be withdrawn. Meza called EDD only to find that her Account was 100% compliant with EDD. It was in fact Bank of America that had frozen the Account unilaterally without EDD's knowledge. Even assuming the Bank had a valid reason for the freeze and needed to conduct an investigation, Meza should have been able to access her funds after ten days under the EFTA. But that was not the reality for Meza, who was left without any recourse. Meza was held hostage by Bank of America with the only option of calling the Bank repeatedly and being placed on hold for hours and hours. In early March 2021, the Bank un-froze Meza's Account and she was finally able to access some of her funds. Unfortunately, around March

15, 2021, Bank of America froze Meza's entire Account again without notice. There was roughly $900 of EDD benefits in the Account. Bank of America instructed Meza to re-verify her identity in order to un-freeze the Account. Meza had no choice but to comply and is now receiving her benefits by paper checks mailed to her by EDD. Meza is forced to cash the checks at a Bank of America branch because she does not have any other bank accounts. Bank of America charges Meza $8.00 to cash her checks at the branch, in addition to the huge hassle of having to drive to the branch through traffic and wait in line. This is all a result of the Bank's handling of Meza's Account. Around May 19, 2021, Meza received a devastating letter from Bank of America saying the $6,904.86 stolen from her will never be returned. In the letter, Bank of America stated: "we've completed an additional review of your case and concluded that our original decision was correct." This was the only letter or notice Meza ever received from the Bank related to the fraud. Meza reported the unauthorized transactions to the Bank in September 2020. Any investigation by the Bank was required to be completed forty-five days later under 15 U.S.C. §1693f(c). If the Bank determined in its investigation that an error did not occur, it was required to deliver or mail Meza an explanation of its findings within three business days after the conclusion of its investigation under 15 U.S.C. §1693f(c). In its letter, Bank of America failed to enclose any supporting documents to support its findings. In its letter, the Bank stated; "we relied on the enclosed documents to make our decision." But there were no enclosed documents with the letter. In its letter, the Bank stated; "based on this information, we're unable to credit your account and we now consider this dispute closed." But there was no information included or cited in the letter. In its letter, there was nothing to support Bank of America's decision to withhold Meza's $6,904.83. All Meza received was a single piece of paper stating that her Claim number 200918303156 was closed. The Bank did not make a good faith investigation of the errors. It did not have a reasonable basis for believing that Meza's Account was not in error per 15 U.S.C. §1693f(e)(1). Bank

of America knowingly and willfully concluded that Meza's Account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to it at the time of its investigation per 15 U.S.C. §1693f(e)(2). Meza has now lost all hope of recovering her stolen funds. Meza has accepted that she and her daughter are homeless and reduced to begging family to take them in. Meza could really use the $6,904.83 Bank of America refuses to return to her. Instead, Meza must attempt to provide for her daughter with the reduced EDD funds she receives after the Bank charges its check cashing fees. Meza upheld her end of the Cardholder Agreement and the requirements of the EFTA and made consistent diligent efforts to report and recover the funds stolen from her Account. She made many telephone calls and sent numerous emails reporting the fraud. In spite of this, Bank of America's customer service department never offered Meza any meaningful response or assistance, but rather stymied her efforts at every turn.

434.   Michael McCrary is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In February 2021, he experienced fraud on his Account, totaling approximately $900. In February 2021, he discovered the fraud after he tried to use his Card, but the Card was declined. In February 2021, he reported the fraud to Bank of America via phone. In response, Bank of America repeatedly told him he needed to resolve his issues with EDD. In February 2021, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. In May 2021, Bank of America credited $900 to his Account. Due to Bank of America's actions, he missed his $1,000 rent payment twice in March 2021 and April 2021. He could not pay his phone bill in March and April 2021 at $90. He could not pay his light bill in March and April 2021 at $110. He could not pay his water bill in March and April 2021 at $111. He could not pay his cable bill in March and April 2021 at $69.99. He could not pay his credit card bill in March and April 2021 between $40 to $110. He could not pay his trash bill in March and April 2021 at $88. He struggles to buy food, gas, and clothing.

435.  *[Removed]*

436.  *[Removed]*

437.  *[Removed]*

438.   Sara Morales is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In September 2020, she experienced fraud on her Account, totaling approximately $1,900. In September 2020, she discovered the fraud when Bank of America sent her a copy of her monthly transaction history. In September 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said she would be sent a new Card and given provisional credit. In December 2020, Bank of America froze her Account. In April 2021, Bank of America unfroze her Account. In November 2020, Bank of America credited $934.58 to her Account. Due to Bank of America's actions, she was evicted from her home. She could not afford her phone bills totaling $260. She suffers from emotional and physical distress. She struggles to pay for food, gas, and clothing.

439.   Albert Morales is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In July 2020, he experienced fraud on his Account, totaling approximately $9,000. In July 2020, he discovered the fraud when he checked his Account balance online. In July 2020, he reported the fraud to Bank of America via phone. In response, Bank of America repeatedly tells her she needs to resolve her issue with EDD. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. Since July 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his rent payment twice in December 2020 and January 2021 at $850 per month leading to eviction in February 2021. He missed two car payments in December 2020 and January 2021, at $350 per month leading to car repossession in March 2021. He cannot afford his PG&E bill at $1,500. He missed his phone bill in December 2020 and January 2021 at $90 per month. He struggles to pay for food, gas, and clothing.

440.    Sharise Morgan is a California resident. In late June or early July 2020, she began receiving EDD benefits through Bank of America. In December 2020, she identified a number of unauthorized transactions, all of which occurred in the prior 60 days. That same day in December 2020, she called Bank of America. Bank of America had no difficulty verifying her identity or accessing and reviewing the Account in question. During this call she asked Bank of America why they had placed a restriction on her EDD Account and restricted her use along with a request for additional information and documentation. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Bank of America told her there was nothing they could do and that she needed to resolve her issue with EDD. For a few days in early January she had momentary access to her Account. This short window of access was never explained by Bank of America and no supporting documentation or additional information was ever provided by Bank of America. Again in January 2021, she again experienced restricted access to her Account and contacted Bank of America again by telephone. Bank of America had no difficulty verifying her identity or accessing and reviewing the Account in question. She asked why Bank of America had placed a restriction on the EDD Account, which restricted use, to her Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. The restrictions were so severe that she was unable to pay for the necessities of life. Due to Bank of America's actions, she missed her $1,400 monthly rent payment from December 2020 to April 2021, her $80 monthly PG&E bill from December 2020 to April 2021, and her $100 monthly water and trash bill from December 2020 to April 2021.

441. Tiffany Morrell is a person residing in San Diego County.[23] Morrell became out of work and was unable to secure employment because of the COVID-19 pandemic. Morrell applied for and received EDD unemployment benefits in October 2020. Soon thereafter, Morrell received a Bank of America EDD Debit Card with a magnetic stripe (no EMV chip) to access Morrell's benefits; shortly thereafter Morrell was the victim of numerous unauthorized transactions on Morrell's Card; and despite its "Zero Liability" policy, and Morrell's repeated requests for help, Bank of America has been either unwilling or unable to return the funds fraudulently taken from Morrell's Account, nor remove the "Administrative Hold" on Morrell's Account. Morrell began collecting EDD benefits in March of 2020 when she was in need of funds to bridge the gap between employment during the pandemic. On or around October 17, 2020, Morrell went to a Bank of America ATM with the intention to take out funds in order to pay her credit card bill. Morrell was shocked to discover that her Account, which should have had $507, had been drained to $4.00. Morrell immediately called Bank of America's Customer Service number in attempt find out what happened to her Account. However, the Bank of America employee told Morrell to call that the claims department was closed and call back Monday, during business hours, 8:00 A.M. to 8:00 P.M. EST. Morrell called the Bank of America's claims department at 5:00 A.M. PST the following Monday to be first in line when Bank of America opened. Morrell was able to speak with a Bank of America representative that day who informed her that a fraudster had stolen funds out of her Account at a Citibank ATM in Grand Rapids, Illinois. The Bank of America employee told Morrell that a provisional credit for the stolen $503 would be disbursed to Morrell within a week along with a new Bank of America EDD Debit Card. After the conversation, Morrell was under the impression that the situation had been resolved and she would receive a new Card

---

[23] Morrell is the plaintiff in *Morrell v. Bank of America, N.A.*, No. 3:21-cv-00542-GPC-MSB ("*Morrell*").

with replacement funds shortly. On or around October 26, 2020, Morrell received two envelopes in the mail from Bank of America. The first was the Card she was expecting—a new EDD Debit Card to replace the Card that had been compromised. The second was a letter dated October 20, 2020, one day after Morrell spoke on the phone with Bank of America's claim department. The letter informed Morrell that she was responsible for the stolen $503 taken out of her Account in Illinois and Bank of America would not reimburse her for the stolen money. Morrell immediately went to the Bank of America ATM because she was confused as to whether the stolen funds had been replaced. To her disappointment they had not. Faced with extreme stress, fear, anxiety and frustration, Morrell again called Bank of America's claims department to figure out the reason Bank of America determined the stolen funds were Morrell's responsibility. On or around October 26, 2020, Morrell spoke with another Bank of America's claims department employee who told Morrell a glitch in the system triggered the letter to be sent to her. Therefore, the stolen funds were not deposited on her new Card and in order for Bank of America to reimburse the stolen funds, Morrell would have to restart the claims process. Morrell filed another fraud claim for the stolen $503 and was instructed to wait for her claim to be investigated. On or around November 2, 2020, approximately a week since Morrell had submitted her second claim to have the stolen funds reimbursed, Morrell began to grow anxious that Bank of America would force Morrell to restart the claims process again, or that Bank of America would not distribute the funds she needed in a timely manner or worse not at all. Therefore, Morrell decided to call Bank of America again in an attempt to get answers regarding the status of her fraud claim and when she could expect to receive her reimbursement for the stolen $503. That day Morrell waited on hold for six hours. While on hold Bank of America hung up on her multiple times, forcing Morrell to call back and be placed at the back of the line. That day, Morrell did not get through to any Bank of America representative. Little did Morrell know, this

experience would summarize her life for the next month. Morrell was aware that Bank of America's claims department was open only Monday through Friday from 8:00 A.M to 8:00 P.M. EST. Morrell would wake up at 5:00 A.M. PST in attempt to be the first in line. Despite Morrell's efforts, Morrell would spend nearly the entire day on hold with Bank of America. Eventually, Morrell did get through to a Bank of America employee. Morrell inquired into the status of her claim and was advised that it was being processed and to wait two business days, so Morrell did exactly that. By this time, Morrell was not surprised when two business days later the funds had not been distributed to her Account. Morrell was faced with the reality that she would again have to spend days on hold in order to get more information regarding her claim. Eventually, Morrell made contact with Bank of America again, and was advised that her claim would be processed in three to five business days. Morrell waited again and at the end of the 5th business day, her reimbursement was nowhere to be found. Morrell continued to wake up at 5:00 A.M. PST determined to track down the status of her claim and the stolen $503 out of her Account. Morrell, again after days of waiting on hold, reached a Bank of America employee who this time advised her that the funds would be disbursed to her in seven to ten business days. By this time, Morrell had little hope that the funds would be in her Account within the time frame, but Morrell did the only thing she could do and waited the 10 business days. Morrell was disappointed again when on the tenth day she had not been reimbursed for the money stolen out of her Account. The next day, Morrell started calling Bank of America again. On December 17, 2020, after days on hold, she reached a Bank of America employee who rudely told Morrell that Bank of America had no estimate as to when the funds would be distributed because Morrell needed to allow Bank of America time to thoroughly investigate her claim. Morrell submitted her first claim on October 19, 2020, for funds stolen out of her Account in Illinois while Morrell was in San Diego County. Bank of America had not reimbursed those funds by December 17, 2020, nearly two months later and

after Morrell had called more than 80 times. After the December 17, 2020, call, Morrell was extremely stressed, frustrated, and anxious. She had spent the past two months on the phone. Morrell has an ill 10-year-old daughter who requires Morrell's attention and regular medical treatment. Morrell decided to give up on her claim because she could no longer waste her days attempting to track down her stolen $503. On or around January 4, 2021, Morrell received two letters in the mail from Bank of America, both dated December 30, 2020. The first letter informed Morrell that Bank of America would be disbursing a temporary credit of $503 within two days while it conducts its investigation. The second letter informed Morrell that Bank of America had concluded its investigation and the $503 disbursement would be permanent. Morrell did in fact receive the stolen $503 on or around January 1, 2020. However, it was too little too late. This horrendous experience occurred after leaving funds in the Account for the first time. Now Morrell receives notifications when EDD her funds are deposited into her Account and no matter the time of the disbursement, Morrell immediately drives to a Bank of America ATM and pulls out as much as she can then goes to the Bank as soon as it opens to extract whatever is left to avoid going through a similar experience in the future. Bank of America's misconduct resulted in Morrell's inability to give her 10-year-old daughter the Christmas she deserved, and the attention she requires due to her condition. Morrell was late on rent and has only recently caught up with payments. Morrell, six months later, is still behind on her car note due to Bank of America's misconduct. Morrell followed the instructions on Morrell's Account agreement, and made consistent, diligent efforts to recover the funds stolen from Morrell's Account by making multiple telephone calls. Despite this, Bank of America's customer service department offered Morrell no meaningful response or assistance, and indeed has stymied Morrell's efforts at nearly every turn. At no point did Morrell received communication via mail, email, text, or otherwise from Bank of America regarding the ongoing widespread fraud affecting EDD Debit Cards or

how defrauded EDD recipients should proceed, even after Bank of America had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. The only option presented to individuals like Morrell has been to follow Bank of America's instructions to call the number on the debit Card in reliance on its representations of a "Zero Liability" policy and "24/7" customer service. Unfortunately, as Morrell has learned, Bank of America's representations are false. Proceeding in accordance with Bank of America's policies and recommendations offers scant hope of recovering lost funds timely. Per Bank of America's "Zero Liability" policy Morrell should have been able to access Morrell's funds after ten (10) days, even if there was an investigation that Bank of America deemed necessary. But that was not the reality for Morrell, who was left without recourse or other options. Morrell was held hostage by Bank of America with the only option of calling and being placed on hold repeatedly. Morrell was the victim of fraud resulting from Bank of America's lax security measures implemented to save money. Morrell followed all of Bank of America's designated procedures while attempting to recover stolen funds. Morrell cooperated with Bank of America by adhering to all its requests, which it said would allow Morrell to recover the money. Did it take ten days as promised? No, it took over four months.

442. Heather Morris is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $900. In December 2020, she discovered the fraud when her Card was declined for insufficient funds. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her they would open a claim and investigate the fraud. In December 2020, Bank of America illegally froze her Account. In February 2021, Bank of America unfroze her Account. In June 2021, Bank of America credited $468 to her Account. Due to Bank of America's actions, she missed three $750 rent

payments, forcing her to move out. She missed three $250 car payments, leading to vehicle repossession. She could not pay her credit card bill, leading to a ninety-three (93) point reduction of her credit score. She owes friends and family over $4,000. She suffers from emotional distress.

443.    Janette Mouck is a California resident. In March or April 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $900. In December 2020, she discovered the fraud when she attempted to use her Card for groceries and was declined. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would open an investigation. Other times Bank of America said she needed to talk to EDD as there was nothing Bank of America could do. In December 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited $200 to her Account. In June 2021, Bank of America again credited $200 to her Account. Due to Bank of America's actions, she missed three rent payments of $1,050. She missed three car lease payments of $400, leading to car repossession. She in turn lost her job because she had no car to get to work. She missed three cell phone bills of $100. She lost valuable personal items, including a wedding ring. She suffers from emotional distress. She struggles to purchase food and clothing.

444.    Robert Murphy is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling approximately $350. In December 2020, he discovered the fraud when he checked his online Account transactions. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America would transfer him between departments, eventually leading to a dropped call. In December 2020, Bank of America froze his Account. In early 2021, Bank of America unfroze his Account. In early 2021, Bank of America credited money to his Account. Due to Bank of America's actions, he missed three rent

payments, avoiding eviction by borrowing money from his grandparents. He missed his phone bills, leading to a shut off on his phone. He struggles to buy food, gas, and clothing.

445.   Sarah Murphy is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In April 2020, she identified a number of unauthorized transactions, all of which occurred in the prior 60 days, totaling approximately $5,000. Within a day of discovering these unauthorized transactions in April 2020, she called Bank of America. Bank of America had no difficulty verifying her identity or accessing and reviewing the Account in question. She requested information, documentation and credit which the bank refused to provide. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Bank of America told her she needed to resolve her issue with EDD and could not help further. Later in April 2020, she experienced restricted access to her Account. She immediately called the bank. Bank of America had no difficulty verifying her identity or accessing and reviewing the Account in question. She asked Bank of America when it had placed a restriction on her EDD Account, which restricted use, and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Bank of America informed her that this was an issue for EDD and to call them. She continually asked for additional information and documentation regarding the restriction placed on her Account, but Bank of America never provided any. The restricted access lasted for many months without explanation, completely locking Murphy out of her Account and restricting access to her funds. Bank of America has yet to send her information or documentation as to why her Account was

restricted despite her repeated and timely requests. Due to Bank of America's actions, she missed her $2,069 monthly rent payment in November 2020. She could not pay her $60 phone bill in November 2020. She could not pay her $100 car payment in November 2020. She struggled to buy food, gas, and clothing.

446. *[Removed]*

447. Lelanya Ojeda is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In July 2020 and August 2020, she experienced fraud on the Account, totaling approximately $2,000. In July 2020, she discovered the fraud when she checked her Account transaction history. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her she needed to contact EDD to resolve her issue, even when she physically went into the bank. In January 2021, Bank of America froze her Account. In January 2021, Bank of America unfroze her Account. Since July 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed gas bills, electricity bills, and phone bills, leading to a phone shut off. She was unable to buy her children clothes for school.

448. *[Removed]*

449. *[Removed]*

450. Mark Owensby is a California resident. In January 2021, he began receiving EDD benefits through Bank of America. In January 2021, he experienced fraud on his Account, totaling approximately $1,600. In January 2021, he discovered the fraud when he checked his Account transaction history. In January 2021, he reported the fraud to Bank of America via phone. In response, Bank of America told him to talk to EDD to resolve his issue. In February 2021, Bank of America froze his Account. Since February 2021, Bank of America has yet to unfreeze his Account. In May 2021, Bank of America credited him $1,600. Due to Bank of America's actions, he missed two rent payments at $1,500 each. He missed his cell phone bill at $300 per month. He has $700 in late credit card fees. He missed

his cable bill at $140 per month. He struggles to buy food, gas, and clothing for his family.

451.    Flouzel Paningbatan is a California resident. In February 2020, she began receiving EDD benefits through Bank of America. Between May 2020 to October 2020, she experienced fraud on her Account, totaling approximately $600. In December 2020, she discovered the fraud when she checked her Account transaction history. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to open claims, and they would investigate. In December 2020, Bank of America illegally froze her Account. In April 2021, Bank of America unfroze her Account. In April 2021, Bank of America credited $441 to her Account; however, in May 2021, Bank of America reversed the credit, sending her Account into a negative balance. In May 2021, Bank of America credited $500 to her Account. Due to Bank of America's actions, she missed her $500 rent payments from December 2020 to February 2021, leading to eviction. She missed her car payment in December 2020, leading to repossession.

452.    Laura Payton[24] is a person residing in San Diego County, California. Payton found herself out of work during, and unable to secure employment because of, the COVID-19 pandemic. Payton applied for and received EDD unemployment benefits in March 2020; soon thereafter, she received a Bank of America EDD Debit Card with a magnetic stripe (no EMV chip) to access Payton's benefits. Shortly thereafter Payton was the victim of unauthorized transactions on her Card; and despite its "Zero Liability" policy, and Payton's repeated requests for help, Bank of America has been either unwilling or unable to return the funds fraudulently taken from Payton's Account, nor remove the "Administrative Hold" on Payton's Account. In March of 2020, Payton began receiving EDD benefits when she needed funds to bridge the gap between employment during the pandemic. On November

---

[24] Payton is the plaintiff in *Payton v. Bank of America, N.A.*, No. 3:21-cv-00644-GPC-MSB ("*Payton*").

16, 2020, Payton received a payment of unemployment funds. Payton transferred $200 to Payton's Wells Fargo account, leaving $683 in Payton's Bank of America EDD Debit Card Account. On the same day, when Payton attempted to withdraw the remaining balance of Payton's Bank of America Account from an ATM, the ATM showed that the Account had zero funds. Immediately after noticing fraudulent activity on her Account, Payton began her tireless quest to recover her money from Bank of America. Payton promptly called Bank of America and notified them about the fraudulent activity. Payton was transferred to the claims department and was put on hold for hours and never connected with a person. The next day, November 17, 2020, Payton continued to attempt to file a fraud claim with Bank of America over the phone. Payton was met with seemingly endless wait times, spanning anywhere from two to five hours, only to have Bank of America unceremoniously hang up on Payton several times. After spending hours on the phone, Payton was able to open a claim with Bank of America. Bank of America informed Payton that a balance inquiry was made on her Account and her funds were withdrawn from the ATM in Chula Vista. Payton informed Bank of America that these activities did not correspond to Payton's normal activities, because Payton never made this type of inquiry and Payton does not live in Chula Vista. Payton persistently contacted Bank of America along with EDD and spent many hours on the phone attempting to have her benefits restored. However, Bank of America did not issue any sort of refund or credit for the funds it allowed to be stolen from Payton. Payton faced further difficulties from Bank of America in her attempt to recover her money. Bank of America repeatedly told Payton that it would not proceed with her claim until her ID had been verified with EDD. However, when contacting EDD, Payton was told that Payton's ID had already been verified. Bank of America continued to deny that Payton's ID had been verified, delaying Payton's ability to regain her benefits. Prior to November 30, 2020, Payton was able to obtain a new Card from Bank of America to receive her EDD benefits. On

November 30, 2020, Payton received an EDD payment on the new Card. In December 2020, Payton received another EDD payment on the new Card. Following the December payment, Bank of America froze her Account without notice. Bank of America froze the funds in the Account and Payton's future EDD deposits and prevented Payton from accessing her desperately needed money for almost three months. Bank of America has no reasonable method to identify and prevent fraud. The Bank froze Payton's Account and provided no notice, reason, or justification to Payton. Bank of America's draconian method of dealing with this alleged "fraud" was to totally freeze Payton's Account without giving any sort of credit Payton could use to buy food. Payton was again forced to repeatedly contact Bank of America to recover her benefits. When Payton contacted the Bank, the Bank explained that Payton's Account was frozen due to fraudulent activity. Payton informed Bank of America that the fraud occurred on Payton's previous Card in November and asked Bank of America to unfreeze the Card. Bank of America refused to unfreeze Payton's Account and instead, put the fault and responsibility of the freeze on EDD, who do not have control over Bank of America's debit cards. Payton had to re-start her exhausting pursuit of recovering her money from Bank of America, contacting Bank of American and EDD, back and forth, in order to have her ID verified and her Account unfrozen spending hours and hours on the phone. On February 1, 2021, Bank of American mailed Payton a letter informing Payton that a freeze was placed on Payton's Account. Due to this, Payton was unaware when she would be able to receive her seriously needed EDD benefits and was forced to cover her expenses in alternative ways (borrowing money from family, selling her car, etc.). Later, Payton was transitioned from electronic deposits to paper checks for EDD benefits. This further complicated Payton's situation as she now receives her benefits weeks later than expected, harming her ability to cover her expenses even more—all because Bank of America could not perform its obligations. On March 18, 2021, Bank of America mailed Payton another letter, this

time informing her that it had changed its process affecting Accounts that it had frozen and that it could work with Payton through a phone call to see if it could release the hold on her Card. Payton once again was forced to repeatedly contact Bank of America to unfreeze her Account and recover her benefits. Again, Payton had to spend hours of her day trying to contact Bank of America. To Bank of America, $683 might seem insignificant; however, for Payton that money was helping her pay rent, put food on the table, and stay afloat through the pandemic. Payton followed the instructions on Bank of America's Account agreement, and made consistent, diligent efforts to recover the funds stolen from Payton's Account by making multiple telephone calls. Despite this, Bank of America's customer service department offered Payton no meaningful response or assistance for almost four months, and indeed has stymied Payton's efforts at nearly every turn. In addition, at no point did Payton receive communication via mail, email, text, or otherwise from Bank of America regarding the ongoing widespread fraud affecting EDD Debit Cards or how defrauded EDD recipients should proceed, even after Bank of America had frozen hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to stem the effects of the fraud. The only option presented to individuals like Payton has been to follow Bank of America's instructions to call the number on the Card in reliance on its representations of a "Zero Liability" policy and "24/7" customer service. Unfortunately, as Payton has learned, Bank of America's representations are false. Proceeding in accordance with Bank of America's policies and recommendations offers scant hope of recovering lost funds timely. Per Bank of America's "Zero Liability" policy Payton should have been able to access Payton's funds after ten (10) days, even if there was an investigation that Bank of America deemed necessary. But that was not the reality for Payton, who was left without recourse or other options. Payton was held hostage by Bank of America with the only option of calling and being placed on hold repeatedly. Payton was the victim of fraud resulting from Bank of America's lax

security measures implemented to save money. Payton followed all of Bank of America's designated procedures while attempting to recover stolen funds. Payton cooperated with Bank of America by adhering to all its requests it said would allow Payton to recover the money. Did it take ten days as promised? No, it took over four months.

453. Ismael Pena, Jr. is a California resident. In July 2020, he began receiving EDD benefits through Bank of America. In September 2020, he experienced fraud on his Account, totaling approximately $2,400. In September 2020, he discovered the fraud when he checked his online Account history. In September 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said he needed to resolve his issue with EDD. In September 2020, Bank of America illegally froze his Account. Since September 2020, Bank of America has yet to unfreeze his Account. Since September 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed his $475 rent payments between September 2020 to April 2021, meaning he was charged an additional $200 in late fees. He missed her phone bill from September 2020 to April 2021. He missed his cable bill between September 2020 to April 2021. He missed his electricity bill from September 2020 to April 2021.

454. Ann Perez is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In September 2020, she identified a number of unauthorized transactions, all of which occurred in the prior 60 days, totaling approximately $14,000. Within a day of discovering the unauthorized transaction in September 2020, she called Bank of America. Bank of America had no difficulty verifying her identity or accessing and reviewing the Account in question. She reported the transactions and requested information, documentation and credit which the bank refused to provide. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or

otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Later in September 2020 she experienced restricted access to her Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, she immediately called Bank of America to inquire as to why a restriction was placed on her Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Since September 2020, Bank of America has yet to send her any information or documents, much less provide full access to her Account. Due to Bank of America's actions, she missed her rent payments for December 2020 to March 2021 at $600 per month. She missed her car payments in October, November, and December of 2020 at $325 per month.

455.  *[Removed]*

456.  Kenyon Perkins is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In December 2020, he identified a number of unauthorized transactions, all of which occurred in the prior 60 days, totaling approximately $13,000. The same day as discovering the unauthorized transactions he called Bank of America and was able to reach an account representative. Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. He requested information, documentation and credit which the bank refused to provide. Bank of America continuously told him to contact EDD to resolve his issue. Later in December 2020, he experienced restricted access to his EDD Account. Immediately after

discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Bank of America has yet to send him the information or documents he requested, much less credit him any money or release the restrictions placed on his Account. Due to Bank of America's actions, he missed his $1,750 monthly rent payments from December 2020 to February 2021. He missed his $469 monthly car payments from December 2020 to May 2021. He struggled to buy food, gas, and clothing.

457. *[Removed]*

458. *[Removed]*

459. Darnell Pitts is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In July 2020, he experienced fraud on his Account, totaling approximately $500. In July 2020, he discovered the fraud. In July 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would credit him the full amount taken from him. Bank of America did not credit him the full amount. In August 2020, he experienced fraud on his Account, totaling approximately $30. In August 2020, he discovered the fraud when he attempted to use his Card and it was declined. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him they would not credit him any money because Bank of America did not believe the transactions were fraud. In October 2020, he experienced fraud on his Account totaling approximately $600. In October 2020, he discovered the fraud. In October 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said they would investigate the claim. In April 2021, he experienced fraud for the last time, totaling approximately $430. In April 2021, he

discovered the fraud. In April 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would freeze his Account and send him a new Card. In December 2020, Bank of America froze his Account. In January 2021, Bank of America unfroze his Account. In April 2021, Bank of America again froze his Account. In May 2021, Bank of America unfroze his Account. In July 2020 and again in May 2021, Bank of America credited money to his Account. Bank of America only credited him $80 total. Due to Bank of America's actions, he missed six $300 rent payments, leading to eviction. He missed three $180 cable bills. He missed five $80 phone bills. He missed two infrastructure payments, totaling $525. He struggles to pay for food. He suffers from emotional distress.

460. Vannessa Pitts is a California resident. In July 2020, she began receiving EDD benefits through Bank of America. In July 2020, she experienced fraud on her Account, totaling approximately $1,800. In July 2020, she discovered the fraud when she checked her Account transaction history. In July 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said the Bank of America fraud investigation team would investigate her claim. In September 2020, Bank of America froze her Account. In January 2021, Bank of America unfroze her Account. In August 2020, Bank of America credited $1,525.22 to her Account. Due to Bank of America's actions, she had to borrow money to pay rent from August 2020 to February 2021. She could not pay her $650 renter's insurance in August 2020. She could not pay her $100 cell phone bill from August 2020 to February 2021. She struggled to buy food, gas, and clothing.

461. *[Removed]*

462. Tina Pomeroy is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In June 2020, she identified a number of unauthorized transactions, all of which occurred in the prior 60 days, totaling approximately $1,600. On or about that same day in June 2020 (but still

within the 60-day time period of the posting of all unauthorized transactions), she
called Bank of America. Bank of America had no difficulty verifying her identity
or accessing and reviewing the Account in question. She requested information,
documentation and credit which the bank refused to provide. Bank of America
never provided a provisional or permanent credit related to the identified
unauthorized transactions. Bank of America failed to provide any additional
notification, in writing or otherwise, as to how it reached its conclusion after
conducting a reasonable investigation or what documents it relied upon. Every time
she called the bank, Bank of America would either tell her to talk to EDD or would
abruptly end the call without giving her any information, much less documents or
credit. Starting in August 2020 and continuing through December 2020, she
experienced restricted access to her EDD Account. Each time after discovering that
Bank of America had placed a restriction on the EDD Account, which restricted
use, she immediately called Bank of America to inquire as to why a restriction was
placed on her Account and requested additional information regarding the
restriction. Bank of America failed to provide any information over the telephone
and has never provided any additional information as to why a restriction was
placed on the Account. This restriction on her Account which did not allow her to
access her money or make purchases. Each time a transaction failed due to this
restriction placed on the Account by Bank of America, she would immediately call
Bank of America and ask for additional information and any type of documentation
that would explain why such a restriction was on her Account. Bank of America
never provided her any additional information or documentation with regard to the
restrictions on her Account. Due to Bank of America's actions, she missed her rent
payment in September 2020 and October 2020 at $500 per month. She missed her
car payment in September 2020 and October 2020 at $348 per month, leading to
repossession. She could not pay her storage fee at $78 per month which resulted in
losing her personal items that were in the storage. She missed her phone payment

in September 2020 and October 2020 at $6 per month. She struggled to buy food, gas, and clothing.

463.    *[Removed]*

464.    *[Removed]*

465.    Andrea Quesada is a California resident. In November 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $600. In December 2020, she discovered the fraud when her Card was declined. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America said they would freeze her Account and send her new papers to fill out followed by a new Card. In December 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited her $600. Due to Bank of America's actions, she could not afford her electric bill from December 2020 to June 2021, owing a total of $600. She could not afford her $120 monthly phone bill from December 2020 to June 2021. She struggles to pay for food, gas, and clothing.

466.    *[Removed]*

467.    Mykela Raiff is a California resident. In August 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced restricted access to her EDD Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, she called Bank of America to inquire as to why a restriction was placed on her Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. From December 2020 to February 2021, Raiff called Bank of America persistently and explained that her access to her EDD Account had been completely restricted. Each time, she asked for additional information, documents and access

to her Account. Each time, Bank of America located her Account but denied her requests and never provided any additional information or documentation as to why the restriction was placed on her Account. It was not until late February 2021, that Bank of America finally credited approximately $3,000 to her Account. In February 2021 Raiff reviewed the $3,000 deposit, but this amount was incorrect. She immediately contacted Bank of America in February 2021 and notified Bank of America that she was missing at least an additional $3,000. Bank of America was non-responsive. Bank of America never provided a provisional or permanent credit related to the identified missing funds. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Due to Bank of America's actions, she missed four $800 rent payments, resulting in eviction. She missed four $60 phone bills and she struggled to buy food, gas, and clothing.

468.    *[Removed]*

469.    *[Removed]*

470.    Nehemiah Rima-Fleurima is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In May 2021 he experienced restricted access to his EDD Account. Immediately, in May 2021 he called Bank of America. Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. He requested additional information, documentation and access to his funds, which the bank refused to provide. Beginning in May 2021, he called Bank of America about 40-50 times and sent the bank letters requesting additional information. Each time he requested information, documentation Bank of America failed to respond. Due to Bank of America's actions, he was unable to pay his $70 monthly cell phone bill, his $150 monthly storage bill or his $70 parking ticket and he struggled to buy food, gas, and clothing.

471.   Rhonda Ritchey is a California resident. In December 2020, she began receiving EDD benefits through Bank of America. In January 2021, she experienced fraud on her Account, totaling approximately $8,000. In January 2021, she discovered the fraud when she logged into her Bank of America application on her phone. In January 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said Bank of America would send her a new Card and paperwork to fill out that would fix her issue. Bank of America never sent the Card or the papers. In January 2021, Bank of America froze her Account. In February 2021, Bank of America deactivated her Account. Since January 2021, Bank of America has yet to unfreeze her Account. Since January 2021, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed four $700 rent payments, leading to eviction and subsequent homelessness. She missed phone bills totaling $100. She missed her vehicle registration payment and car insurance payments. She lost her life insurance. Her credit score decreased as she was unable to pay her credit card payment. She struggles to keep up with personal hygiene and pay for food.

472.   *[Removed]*

473.   Miguel Roa is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In January 2021, he experienced restricted access to his Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he immediately called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. He immediately called Bank of America and asked for information, documentation and a credit which he did not receive, even though the bank was able

to locate his Account. He called Bank of America almost every day starting in January of 2021 and continued to April of 2021, continually requesting additional information concerning the restrictions placed on his Account. Each time, Bank of America would locate his Account, he would request information, documentation, but the bank would refuse to provide it. Due to Bank of America's actions, he missed two rental payments and was unable to pay his phone bill, cable bill, or electric bill.

474.   Carmen Robinson is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In March 2020, she noticed unauthorized transactions that she did not recognize totaling about $18,000, all of which occurred within the prior 60 days. The same day as discovering the unauthorized transactions Robinson called Bank of America and was able to reach an account representative. Bank of America had no trouble verifying her identity, the Account in question, or the unauthorized transactions. She requested information, documentation and credit, which the bank refused to provide. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Bank of America has yet to credit her any money. Due to Bank of America's actions, she has missed all phone payments. She was forced to sell her vehicle and other personal items to afford food and clothing for herself and her children.

475.   *[Removed]*

476.   *[Removed]*

477.   Catrina Rodriguez is a California resident. In May 2020, she began receiving EDD benefits through Bank of America. In January 2021, she experienced fraud on her Account, totaling approximately $6,000. In January 2021, she discovered the fraud when she logged onto her Account after failing to receive a

Card from Bank of America. In January 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her she needed to call EDD because Bank of America told her Bank of America was not in charge of freezing and unfreezing EDD Debit Card Accounts. In January 2021, Bank of America illegally froze her Account. In April 2021, Bank of America unfroze her Account. In April 2021, Bank of America credited $800 to her Account; however, Bank of America reversed the charge, putting her Account into a balance of negative $797.13. In June 2021, Bank of America credited $2.85 to her Account. Due to Bank of America's actions, she missed three $1,600 rent payments, leading to eviction and subsequent homelessness. She could not afford her $1,700 settlement fees. She had to borrow $3,000 from friends and family. She cannot afford her $250 storage fee, leading to her losing the storage and all personal items. She lost her children to the State. She cannot afford daily necessities. She suffers from emotional distress.

478.    Elana Martina Rojas de Charolet[25] is and at all times herein mentioned was a natural person residing in the City of Chula Vista, in the County of San Diego, in the United States of America. Rojas de Charolet is married to her husband, Marco, who suffers from Parkinson's Disease. Prior to the pandemic, Rojas de Charolet was a chef working at the Hyatt Hotel in Downtown San Diego. Rojas de Charolet's duties included cooking thousands of meals a day for the various conventions held at the Hyatt. Before his Parkinson's Disease became advanced, Marco Charolet was a structural engineer that worked on numerous projects in the San Diego County area. After, Marco's income was reduced to government disability only. As a result of Marco's illness, Rojas de Charolet became the only breadwinner of the family, supplemented only by Marco's disability income. In addition to being the sole earner of the family, Rojas de Charolet was also Marco's

---

[25] Rojas de Charolet is the plaintiff in *Rojas de Charolet v. Bank of America, N.A.*, No. 3:21-cv-00925-GPC-MSB ("*Rojas de Charolet*").

only caregiver. As a result of COVID-19, Mrs. Rojas de Charolet was laid off from her job as a chef at the Hyatt Hotel in Downtown San Diego. Rojas de Charolet was instructed by her employer to apply for unemployment through the State of California, and that she would be called back to work when operations at the Hotel resumed. Rojas de Charolet applied for and began receiving unemployment from the State of California. She received a Bank of America branded EDD Debit Card with instructions to activate the Card to receive her EDD benefits, which were to be loaded onto a Bank of America EDD Debit Card. Rojas de Charolet activated the Account but did not take any money from the Account. Instead, she intended to first utilize her savings before she accessed the income provided through unemployment insurance. As a result, Rojas de Charolet stored her Bank of America EDD Debit Card in her home, and did not initially use it—instead letting her the amount in the Account increase. Finally, on May 21, 2020, Rojas de Charolet withdrew $700 from her Card for the first time. On May 30, 2020, some unknown person withdrew $983 from Rojas de Charolet's Card using a Wells Fargo ATM. At the time of the May 30, 2020 withdrawal, Rojas de Charolet had her Card in her possession and had not given anyone the PIN number. On May 31, 2020, some unknown person then withdrew another $1,000 from a Bank of America ATM. At the time of the May 31, 2020 withdrawal, Rojas de Charolet had her Card in her possession and had not given anyone the PIN number. On June 1, 2020, some unknown person withdrew another $1,000 from a Bank of America ATM. At the time of the June 1, 2020 withdrawal, Rojas de Charolet had her Card in her possession and had not given anyone the PIN number. On June 2, 2020, some unknown person withdrew another $483 from a Citibank ATM. At the time of the June 2, 2020 withdrawal, Rojas de Charolet had her Card in her possession and had not given anyone the PIN number. Then, on June 2, 2020, Rojas de Charolet withdrew $500 from her EDD Debit Card from a Bank of America ATM. When Rojas de Charolet withdrew her money, she realized that her Account balance was $3,466 lower than it should be. This was the

first time she learned of the fraud. Rojas de Charolet immediately called and notified Bank of America of the identity theft on the same day she learned of the theft. Bank of America acknowledged that high numbers of theft were being reported, but that Rojas de Charolet needed to call another number to process her ID theft claim. Rojas de Charolet called the number Bank of America told her to and spent more than six hours waiting on hold for someone to answer. Finally, the call was disconnected without anyone answering the call. The following day, and less than 24 hours after learning of the fraud, Rojas de Charolet called Bank of America's fraud department again, and waited four hours on hold, but no one answered the phone. Rojas de Charolet called the Bank of America customer service number for EDD Debit Card Accounts again and, again, reported the theft. Rojas de Charolet reported to Bank of America that she had waited on hold two days in a row, for six and four hours respectively, and the customer service agent told Rojas de Charolet that she had been getting reports of long hold times. She then told Rojas de Charolet she needed to keep trying. Rojas de Charolet asked the customer service representative to freeze the Card due to the theft, and the representative locked the Card. Rojas de Charolet made numerous other attempts to contact the fraud department, but never could reach an operator. On or about July 13, 2020, Rojas de Charolet mailed an FTC fraud affidavit concerning the ID theft to Bank of America, via certified mail. Rojas de Charolet waited for a response from Bank of America, which could have been in the form of a credit of the stolen money to her Account or even a call from Bank of America to discuss the issue with her. Bank of America did nothing. It did not return the money stolen from the Account of Charolet de Rojas and it never contacted her in response to her an FTC fraud affidavit. On or about September 24, 2020, Rojas de Charolet wrote a letter to Bank of America to inquire about the results of the investigation of her stolen money. In that letter, Rojas de Charolet asked Bank of America to let her know if it needed any other documents to complete its investigation. Rojas de Charolet also stated that if its

investigation was completed, she wanted to know the result thereof, and she requested a copy of the documents used to reach that result. Bank of America never responded to Rojas de Charolet's September 24, 2020 letter.

479.   Jose Rodriguez Romo is a California resident. In February 2021, he began receiving EDD benefits through Bank of America. In March 2021, he experienced fraud on his Account, totaling approximately $1,000. In March 2021, he discovered the fraud when he tried to withdraw money from his Account. In March 2021, he reported the fraud to Bank of America via phone. In response, Bank of America said they were unable to help him, and he needed to contact EDD to resolve his issue. In March 2021, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. In April 2021, Bank of America credited $1,003 to his Account. Due to Bank of America's actions, he was unable to pay his $650 rent in March 2021. He was unable to pay his car insurance, cell phone bill, or repair his vehicle.

480.   Melissa Royston is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In September 2020, she experienced fraud on her Account, totaling approximately $1,400. In September 2020, she discovered the fraud when she checked her Account transaction history. In September 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her she would receive the credit for the fraudulently stolen money. In October 2020, Bank of America froze her Account. Since October 2020, Bank of America has yet to unfreeze her Account. In September 2020, Bank of America credited $1,300 - $1,400 to her Account; however, Bank of America reversed the credit and took the money back. Due to Bank of America's actions, she was unable to pay her $350 monthly rent from September 2020 to December 2020. She was unable to pay her $350 water and electric bill from September 2020 to December 2020. Her credit score dropped as a result of not paying her credit card bill. She struggles to pay for food for her children.

481. Raylene Salaz is a California resident. In June 2020, she began receiving EDD benefits through Bank of America. In August 2020, she noticed numerous unauthorized transactions that she did not recognize on her EDD Account totaling approximately $11,000 (all of which occurred in the proceeding 60 days). In August 2020, she called Bank of America to alert them of the unauthorized transactions and requested information and documentation. Bank of America had no difficulty verifying her identity or accessing and reviewing the Account in question. Despite Bank of America being able to locate her Account, Bank of America but refused to give the information or documentation she requested. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. In September 2020, she experienced restricted access to her EDD Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, she called Bank of America to inquire as to why a restriction was placed on her Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Due to Bank of America's actions, she missed her rent payments from November 2020 to January 2021, totaling $6,000, leading to her eviction in January 2021. She missed her car payments from November 2020 to January 2021, totaling $750, leading to car repossession in December 2020. She could not pay her cell phone bill or electric bill, totaling $475 and she struggled to buy food.

482. Miguel Salazar is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling approximately $4,000. In December

2020, he discovered the fraud when he checked his Account attempting to withdraw money. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America said he needed to resolve his issue with EDD, or Bank of America would disconnect his call. In December 2020, Bank of America froze his Account. Since December 2020, Bank of America has yet to unfreeze his Account. In April 2021, Bank of America credited $5,000 to his Account. Due to Bank of America's actions, he could not afford his phone bill, leading to a phone shut off. He could not afford to pay for his medication. He suffers from severe distress and mental health issues.

483.    Frankie Saldate is a California resident. In June 2020, he began receiving EDD benefits through Bank of America. In November 2020, he experienced restricted access to his Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. He contacted Bank of America more than 30 times via phone and email and was forced to be on hold for approximately 1-2 hours at a time and never received any of the additional information or documentation requested concerning the restriction placed on his Bank of America account. Due to Bank of America's actions, he missed his $400 rent payments from November 2020 to March 2021. He was unable to pay his $85 monthly cell phone bill from November 2020 to April 2021. He struggled to pay for medication for his son and buy food, gas, and clothing.

484.    Michael Schmidt is a California resident. In February 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account, totaling approximately $400. In October 2020, he discovered the fraud when he checked his Account balance. In October 2020, he reported the

fraud to Bank of America via phone. In response, Bank of America said Bank of America would send him a new Card. In April 2021, Bank of America credited $1,000 to his Account. Due to Bank of America's actions, he owes $3,000 to family members. He missed two $1,200 rent payments. He missed two $50 phone bills. She suffers from emotional distress.

485.   Timothy Schmitz is a California resident. In May 2020, he began receiving EDD benefits through Bank of America. In March 2021 he experienced restricted access to his Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Due to Bank of America's actions, he struggled to pay his bills because he could not access his funds due to Bank of America account restrictions. Bank of America never provided any additional information why his Account was restricted, despite his requests.

486.   *[Removed]*

487.   *[Removed]*

488.   Jenna Silva is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In March 2021, she experienced restricted access to her Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, she called Bank of America to inquire as to why a restriction was placed on her Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Due to Bank of America's actions, she missed her $500 rent payment in February 2021 because she

could not access her Account or funds. She missed her $130 phone bill in February 2021. She missed her $15 storage bill in February 2021.

489.    *[Removed]*

490.    Michael Sims II is a resident of California. In February 2020, he began receiving EDD benefits through Bank of America. Between August 2020 to September 2020, he experienced fraud on his Account, totaling approximately $2,000. In September 2020, he discovered the fraud. In September 2020, he reported the fraud to Bank of America via phone. In response, Bank of America refused to give him an answer, more often than not abruptly dropping his call. In September 2020, Bank of America froze his Account. In March 2021, Bank of America unfroze his Account. Since September 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he was evicted from his apartment in November 2020 after not being able to pay his $950 rent payment for two months. He had his vehicle repossessed in January 2021 after missing three monthly payments of $350. He cannot pay off his credit card bill which is now at $3,000. He cannot pay his phone bill at $100 per month. He struggles to buy food, gas, and clothing.

491.    *[Removed]*

492.    *[Removed]*

493.    *[Removed]*

494.    *[Removed]*

495.    *[Removed]*

496.    Crystal Stidham is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. In October 2020, she experienced fraud on her Account, totaling approximately $19,000. In October 2020, she discovered the fraud when she checked her Account balance. In October 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to resolve her issue with EDD. Due to Bank of America's actions,

she was evicted in October 2020 after not being able to afford her $575 monthly rent payment. She could not afford to pay to get her car out of a tow yard, a car which she purchased the week before for $4,400. She missed her cell phone bill three times from October 2020 to December 2020 at $62 per month. She struggles to buy food and clothing.

497.    Danny Talia[26] resides in San Diego County, California. Around June 2020, he applied and was approved to receive EDD benefits administered by Bank of America. Around August of 2020, he had roughly $11,000 in his Bank of America EDD Account. In September 2020 he attempted to make a purchase and discovered his Account was restricted without explanation or notice. Immediately after discovering that Bank of America had placed a restriction on his EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Talia called Bank of America hundreds of times requesting more information about why Bank of America restricted his Account. Bank of America's only response was for Talia to call EDD. Talia called EDD and they instructed him that there was no issue with his Account, and Bank of America should have received the funds that EDD allotted for Talia. He asked Bank of America for more information and documentation which it refused to provide. As of April 2021, Bank of America has still not returned or given Talia access to his $11,000.00. As of April 2021, Bank of America never provisionally credited Talia's account, nor has Bank of America given Talia any results from any investigation into why Bank of America restricted Talia's access to his Account. As a result, he could not pay rent and became homeless. He was late on his car payment

---

[26] Talia is the plaintiff in *Talia v. Bank of America, N.A.*, No. 3:21-cv-00676-GPC-MSB ("*Talia*").

and other bills like his cell phone bill. Due to Bank of America's actions, and restricting Talia's access to his Account, he has suffered economic damages, and emotional distress.

498.   Cesar Tamayo is a California resident. In December 2019, he began receiving EDD benefits through Bank of America. In December 2020, he experienced fraud on his Account, totaling approximately $160. In December 2020, he discovered the fraud when he checked his Account transaction history. In December 2020, he reported the fraud to Bank of America via phone. In response, Bank of America transferred him between departments, and would eventually drop his call. In December 2020, Bank of America froze his Account. In January 2021, Bank of America unfroze his Account. In January 2021, Bank of America credited $1,800 to his Account. Due to Bank of America's actions, he fell behind on his cable bills, light bills, and utility bills.

499.   Michelle Taylor is a California resident. In February 2021, she began receiving EDD benefits through Bank of America. In February 2021, she experienced fraud on her Account, totaling approximately $1,000. In February 2021, she discovered the fraud when she checked her transaction history. In February 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her to resolve her issue with EDD. In February 2021, Bank of America illegally froze her Account. In May 2021, Bank of America unfroze her Account. In June 2021, Bank of America credited $1,000 to her Account. Due to Bank of America's actions, she missed her $1,450 rent payment between February and June 2021. She missed her $365 car payment between February and June 2021. She missed her $225 car insurance payment in February 2021, leading to a loss of insurance. She was unable to pay her $254 cell phone bill in February and March 2021. She could not pay her $300 electric bill between February and June 2021. She could not pay her $300 internet bill from between February and June 2021. She struggles to buy food, gas, and clothing.

500.    Tonya Taylor is a California resident. In August 2020, she began receiving EDD benefits through Bank of America. In December 2020, she experienced fraud on her Account, totaling approximately $500. In December 2020, she discovered the fraud when she received a fraud alert text message. In December 2020, she reported the fraud to Bank of America via phone. In response, Bank of America told her to contact EDD to resolve her issue. In December 2020, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. Since December 2020, Bank of America has yet to credit her any money. Due to Bank of America's actions, she missed three rent payments. She has missed four car payments. She could not afford her cable which was shut off in January 2021. She struggles to buy food, gas, and clothing. She also suffers from emotional distress and severe depression.

501.    Nicholas Tonna is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. Between March 2020 and October 2020, he experienced fraud on his Account, totaling approximately $25,000. In October 2020, he discovered the fraud after checking his Account balance. In October 2020, he reported the fraud to Bank of America via phone. In response, Bank of America would either tell him they would investigate his claim or that he should resolve his issue with EDD. In December 2020, Bank of America illegally froze his Account. In April 2021, Bank of America unfroze his Account. Since October 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he is homeless and forced to live on the streets with his emotional support dog. He is a diabetic and cannot afford the proper medication. He cannot afford to pay $5,000 to get his car engine fixed so that he can go to work. He missed four cell phone bill payments at $45 per month. He struggles to pay for food, gas, and clothing.

502.    Tasha Trammel is a California resident. In April 2020, she began receiving EDD benefits through Bank of America. In March 2021, she experienced

fraud on her Account, totaling approximately $825. On March 8, 2021, she discovered the fraud when she attempted to use her Card at an ATM. On March 8, 2021, she reported the fraud to Bank of America via phone. In response, Bank of America told her to call back in a few days to apply for provisional credit. In March 2021, Bank of America froze her Account. In May 2021, Bank of America unfroze her Account. In May 2021, Bank of America credited money to her Account. Due to Bank of America's actions, she could not pay her full $1,100 rent payment in April and May 2021. She was late on her $377 car payment in April and May 2021. She could not afford to pay her cable bill, electric bill, and credit card bill. She struggles to pay for food, gas, and clothing.

503.  *[Removed]*

504.  *[Removed]*

505.  Thomas Turner is a California resident. In March 2021, he began receiving EDD benefits through Bank of America. In March 2021, he experienced restricted access to his Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Due to Bank of America's actions, he became homeless and was forced to live in his car. He struggled to buy food and clothing.

506.  Reina Valadez is a California resident that had EDD benefits administered by Bank of America. In August 2020 Valadez noticed a number of unauthorized transactions on her Account, occurring within the prior 60 days. The same day as discovering the unauthorized transactions she called Bank of America and was able to reach an account representative. Bank of America had no trouble verifying her identity, the Account in question, or the unauthorized transactions.

Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Again in November 2020, Valadez noticed a number of unauthorized transactions occurring within the prior 60 days. The same day as discovering the unauthorized transactions she called Bank of America and was able to reach an account representative. Bank of America had no trouble verifying her identity, the Account in question, or the unauthorized transactions. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. In January 2021, she experienced restricted access to her Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, she called Bank of America to inquire as to why a restriction was placed on her Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Due to Bank of America's actions, she missed three $1,250 rent payments, leading to homelessness. She struggled to buy food and clothing.

507.    Juan Valenzuela is a California resident. In October 2020, he began receiving EDD benefits through Bank of America. In October 2020, he experienced fraud on his Account. In October 2020, he discovered the fraud when he checked his transaction history. In October 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to resolve his issue with EDD. In October 2020, Bank of America froze his Account. In December 2020, Bank of America unfroze his Account. Since October 2020, Bank of America

1  has yet to provisionally credit him any money. Due to Bank of America's actions,
2  he struggles to buy food, clothing, and gas, having to borrow money for these daily
3  necessities.

4      508.    David Vasquez is a California resident. In April 2020, he began
5  receiving EDD benefits through Bank of America. In late November or early
6  December 2020, he experienced fraud on his Account, totaling approximately $886.
7  In late November or early December 2020, he discovered the fraud when he
8  attempted to use his Card, but his Account had insufficient funds. In late November
9  or early December 2020, he reported the fraud to Bank of America via phone. In
10  response, Bank of America told him they would freeze his Account and he needed
11  to go into a branch to verify his identification. In December 2020, Bank of America
12  froze his Account. In January 2021, Bank of America unfroze his Account. In
13  January 2021, Bank of America credited $357 to his Account; however, Bank of
14  America has not credited any other money to his Account and stopped applying his
15  benefits to his Account. Due to Bank of America's actions, he missed his rent
16  payment from December 2020 to March 2021, leading to his eviction and
17  subsequent homelessness. He is unable to afford the fee to remove his car from a
18  tow yard. He lost nearly all person belongings during the eviction. He struggles to
19  buy food and clothing. He suffers from emotional distress.

20      509.    Jessie Verdun[27] is and at all times herein mentioned was a natural
21  person residing in the City of Santa Paula, in the County of Ventura, in the United
22  States of America. In 2020, as a result of the COVID-19 pandemic, Verdun became
23  eligible for pandemic assistance income, and began receiving unemployment
24  benefits from the State of California, which were directly loaded onto Verdun's
25  Bank of America EDD Debit Card. On or about June 6, 2020, Verdun attempted to

26

27      [27] Verdun is the plaintiff in *Verdun v. Bank of America, N.A.*, No. 3:21-cv-
28  01196-GPC-MSB, originally filed in the U.S. District Court for the Central
    District of California (No. 2:21-cv-04494-AS) ("*Verdun*").

purchase food using his Bank of America EDD Debit Card, but the purchase was declined. After his purchase was declined, Verdun went home and accessed this Bank of America EDD website, but he was locked out. On June 6, 2020, minutes after learning he could not access his online Account, Verdun called Bank of America and was told by the person answering the phone that $4,100 was missing from his Account. During the June 6, 2020 call, the Bank of America representative told Verdun that Verdun had previously called Bank of America and requested that $4,100 to be transferred to his savings account. Verdun told Bank of America that he never called Bank of America to make any such request. Bank of America responded that its notes on the Account stated that someone called in, attempted the transfer money from Verdun's Account, but did not have the information to confirm the Account belonged to Verdun. The person pretending to be Verdun then called back, verified the Account, and requested a transfer of money from the Account. Verdun informed Bank of America that the caller was not him. He further asked Bank of America why it would transfer the money when the caller could not verify the Account on the first call. In response, Bank of America indicated it would only freeze the Account, but could not process any type of fraud claim. The operator stated that Verdun would have to call the claims department Monday to make a claim. On or about June 8, 2020, Verdun called Bank of America in order to make a claim in order to have his money returned to his Account. After waiting on hold for 8 hours, he was able to provide Bank of America with information relating to the fraud. However, all Bank of America would do was close his Account and open a new one. In order to have his EDD Debit Card reissued, Bank of America required that Verdun call a different number. Verdun called this number, and after waiting hours on hold, he was able to request the replacement Card. And then, in order to actually lodge a fraud claim with Bank of America that it would investigate, he had to call a third number. Verdun called this number, and despite being on hold for more than 8 hours, Bank of America never accepted his call. On June 8, 2020,

Verdun called back and waited on hold the entire day, but no one answered the phone. On June 9, 2020, Verdun called and again waited on hold for hours, but no one answered the phone. While waiting on hold, Verdun also called the Ventura Police Department and filed an identity theft police report. On August 24, 2020, Verdun was able to get a copy of the police report (which was delayed due to COVID-19) and sent the report along with a completed FTC fraud affidavit to Bank of America. On September 22, 2020, after receiving no response from Bank of America, Verdun mailed the documents to Bank of America a second time, via certified mail, and further wrote that he had not heard any results from Bank of America regarding his request for an investigation to his claim of identity theft. Bank of America has not responded to either of the two letters seeking information about the status of his fraud investigation, and has not otherwise contacted Verdun about the fraud or requested any additional information. And Bank of America has not returned the disputed amount to Verdun. As a result of Bank of America's unlawful acts and omissions as stated above, Verdun suffered actual damages as described above.

510. *[Removed]*

511. Luis Viramontes is a California resident. In March 2020, he began receiving EDD benefits through Bank of America. In May 2020, and then again in September 2020, he experienced fraud on his Account, totaling approximately $2,900. In May 2020, he discovered the fraud when he attempted to use his Card, but he had insufficient funds. In May 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him Bank of America experienced technical issues with regards to his Account. In May 2020, Bank of America froze his Account. In February 2021, Bank of America unfroze his Account. In February 2021, Bank of America credited $2,300 to his Account. Due to Bank of America's actions, he was evicted in September 2020 after failing to pay rent, forcing him to live in the back of his car. He missed car payments leading to

car repossession. He could not afford his phone payments, leading to a phone shut off. He struggles to pay for food, gas, and clothing. He also suffers from extreme stress and anxiety.

512.   Norman Walker is a California resident. In November 2020, he applied for EDD benefits administered by Bank of America and was approved for financial aid in the amount of $1,080.00 every two weeks. In January 2021, he experienced restricted access to his Account. Immediately after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Bank of America removed the restriction from Walker's account in April of 2021 six (6) months after the restriction was placed on the Account. Bank of America never provided Walker any results from the investigation as to why there was a restriction on his Account. In May 2021, he discovered numerous unauthorized transactions that he did not recognize totaling approximately $9,736 (all occurring within the prior 60 days). In May 2021, immediately after he discovered the unauthorized transactions, he called Bank of America to report the transactions and ask for more information and documentation which Bank of America refused to provide. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. Due to Bank of America's actions, he missed four $550 rent payments, leading to eviction, and subsequent homelessness. He lost most of his personal belongings during the eviction. He missed two $380 car payments. He had to borrow $1,300

from friends and family. He struggled to buy food, gas, and clothing. Because of Bank of America's actions Walker suffered damages.

513.    *[Removed]*

514.    *[Removed]*

515.    Denise Wilds is a California resident. In March 2020, she began receiving EDD benefits through Bank of America. On March 9, 2021, she experienced fraud on her Account, totaling approximately $200. On March 11, 2021, she discovered the fraud when she checked her Account history. On March 11, 2021, she reported the fraud to Bank of America via phone. In response, Bank of America said they would open a claim and investigate. In March 2021, Bank of America froze her Account. On April 15, 2021, Bank of America unfroze her Account. On April 27, 2021, Bank of America credited her $200. On May 25, 2021, Bank of America again illegally froze her Account. On May 31, 2021, Bank of America unfroze her Account. Due to Bank of America's actions, she missed a $2,480 rent payment. She missed a $553 car payment. She struggles to afford clothes for her children for school.

516.    *[Removed]*

517.    *[Removed]*

518.    Tyrisha Williams is a California resident that received EDD benefits through Bank of America. In July 2020, she discovered a number of unauthorized transactions, all occurring within the prior 60 days. The same day as discovering the unauthorized transactions Williams called Bank of America and was able to reach an account representative. Bank of America had no trouble verifying her identity, the Account in question, or the unauthorized transactions. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. The

unauthorized transactions continued over a series of months. Each time Williams would discovery an unauthorized transaction (occurring within the prior 60 days) she would call and report this to Bank of America. On each occurrence of reporting the unauthorized transactions Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its conclusion after conducting a reasonable investigation or what documents it relied upon. The Account was subsequently drained to $0 by someone other than Williams through continual unauthorized transactions. Due to Bank of America's actions, she was evicted from her home, after not being able to afford rent for three months. She was forced to let her children go and live with their father, because Williams could not afford to provide for them.

519.    Willie Williams is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. At the end of July 2020 or early August 2020, he experienced fraud on his Account, totaling approximately $10,000. In August 2020, he discovered the fraud when he attempted to make a purchase with his Card, yet the Card was declined. In August 2020, he reported the fraud to Bank of America via phone. In response, Bank of America told him he needed to wait ninety (90) days to receive a response from the Bank regarding its investigation. In August 2020, Bank of America froze his Account. In April 2021, Bank of America unfroze his Account. Since August 2020, Bank of America has yet to credit him any money. Due to Bank of America's actions, he missed four months of rent payment, leading to his eviction. His car was repossessed after he was unable to pay for the car payments. He was unable to pay his cable and electricity bill. He was unable to pay his phone bill, leading to his phone shut off. He struggles to pay for food, clothing, and gas for his family.

520.    *[Removed]*

521.    *[Removed]*

522.    *[Removed]*

523.    Colton Wood is a California resident. In April 2020, he began receiving EDD benefits through Bank of America. In December 2020 he discovered that his Account was restricted after an attempted transaction was declined. In December 2020, within 60 days, after discovering that Bank of America had placed a restriction on the EDD Account, which restricted use, he called Bank of America to inquire as to why a restriction was placed on his Account and requested additional information regarding the restriction. Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. Bank of America failed to provide any information over the telephone and has never provided any additional information as to why a restriction was placed on the Account. Due to Bank of America's actions, he missed his $680 rent payment, leading to eviction and subsequent homelessness. He could not afford his $92 monthly phone bill. He struggled to buy food, gas, and clothing.

524.    Matthew Yeats is a California resident living in Pasadena, California. In March 2020, he applied for, and started receiving, California EDD unemployment benefits at $1,060 bi-weekly because Yeats lost his job due to the Covid-19 pandemic. In December 2020, he saw transactions on his EDD Account that he did not recognize. There were three such unauthorized transactions, all cash withdrawals totaling $2,780 in Orange County, California. These transactions occurred within the prior 60 days of his discovery. In December 2020, he contacted Bank of America by phone to report the unauthorized transactions and ask for more information and documentation, which Bank of America did not send to him. Bank of America had no difficulty verifying his identity or accessing and reviewing the Account in question. Bank of America refused to credit any money that was taken from his Account. Bank of America never provided a provisional or permanent credit related to the identified unauthorized transactions. Bank of America failed to provide any additional notification, in writing or otherwise, as to how it reached its

conclusion after conducting a reasonable investigation or what documents it relied upon. Due to Bank of America's actions, he missed rent twice, totaling $1,600 in December 2020 and January 2021. He was late on two cell phone payments at $90 per month. He missed three child support payments at $300 per month between December 2020 and February 2021.

525.  *[Removed]*

526.  *[Removed]*

## V.    CLASS ACTION ALLEGATIONS

527.  Class Representative Plaintiffs bring this lawsuit individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking declaratory and injunctive relief and damages on behalf of a class defined as follows (the "Class"):

> All persons who were Bank of America EDD Debit Cardholders at any time between January 1, 2020 and the present ("Class Period"), and whose eligibility for benefits EDD has not revoked for failure to establish valid identity.

528.  Plaintiffs further seek declaratory and injunctive relief, restitution, disgorgement, and statutory and actual damages on behalf of the following Subclasses:

> **Claim Denial Subclass:** All Class Members who, during the Class Period, gave the Bank notice of a claim that an unauthorized transaction had occurred on their Account ("Claim") and whose Claim the Bank closed or denied based on application of the Claim Fraud Filter.

> **Credit Rescission Subclass:** All Class Members who, during the Class Period, received provisional or permanent credit from the Bank in connection with their Claim, which the Bank rescinded more than 45 days after the Class Member gave notice of the Claim.

> **Account Freeze Subclass:** All Class Members whose EDD Debit Card Account the Bank froze during the Class Period based on application of the Claim Fraud Filter and later unfroze or later converted from frozen to blocked status and then unblocked.

**Account Block Subclass:** All Class Members whose EDD Debit Card Account the Bank blocked during the Class Period based on application of the Claim Fraud Filter and later unblocked.

**Failure to Unfreeze Subclass:** All Class Members whose EDD Debit Card Account the Bank froze or blocked during the Class Period and did not unfreeze or unblock after EDD instructed the Bank to unfreeze the Class Member's Account or informed the Bank that EDD had verified the Class Member's identity.

**Security Breach Subclass:** All Class Members whose Card, Account, or other personal information in the possession of the Bank or its agents was, during the Class Period, accessed or taken by a third party without the Class Member's consent.

**EMV Chip Subclass:** All Class Members whose EDD Debit Card, during the Class Period, did not include an EMV chip, and whose Card, Account, or other personal information was accessed or taken from the Card by a third party without the Class Member's consent.

529.   Plaintiffs reserve the right under Rule 23 to amend or modify the Class and Subclass descriptions and/or add one or more subclasses based on information obtained in the course of this litigation.

530.   All Class Members have suffered or are threatened with imminent injury during the Class Period, caused by Defendants' wrongful acts and omissions, as alleged herein.

531.   This action has been brought and may properly be maintained as a class action against Defendants pursuant to the following provisions of Rule 23.

a.   **Numerosity (Rule 23(a)(1))**: The members of the Class and each Subclass are so numerous that their individual joinder is impracticable. Bank of America provided millions of EDD benefits recipients with EDD Debit Cards that used only outdated magnetic stripe technology (no EMV chip) and subjected these individuals to an undue risk of experiencing fraudulent transactions on their EDD Debit Cards and Accounts. The identities of, and contact information for,

those individuals may readily be obtained through the Bank's business records or the business records of its affiliated entities. Tens of thousands of EDD Debit Cardholders reported unauthorized transactions to the Bank and had their unauthorized transaction claims summarily closed or denied by the Bank without explanation and without issuance of provisional or permanent credit. Of those unauthorized transaction claims, at least 29,000 claims have since been reconsidered and paid, including under the Preliminary Injunction procedures. In addition, tens of thousands of EDD Debit Cardholders have had their Cards and Accounts frozen or blocked by the Bank.

b. **Commonality and Predominance (Rule 23(a)(2) and 23(b)(3))**: Many questions of law and fact are common to the Class and Subclasses. These questions predominate over any questions affecting only individual Class Members. These common legal and factual issues include, but are not limited to:

i. Whether the Bank had or has a policy and/or practice of denying EDD Debit Cardholders' unauthorized transaction claims without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction, including denying claims based solely on the results of the Claim Fraud Filter.

ii. Whether the Bank had or has a policy and/or practice of denying EDD Debit Cardholders' unauthorized transaction claims without providing the Cardholder with a report of the results of the Bank's investigation of the claim that includes a written explanation of the Bank's findings.

iii. Whether the Bank had or has a policy and/or practice of not provisionally or permanently crediting the Accounts of EDD Debit Cardholders in the amount of an unauthorized transaction

claim within 10 business days of the Bank receiving notice of the claim, and without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction.

    iv.    Whether the Bank had or has a policy and/or practice of knowingly and willfully denying EDD Debit Cardholders' unauthorized transaction claims.

    v.    Whether the Bank had or has a policy and/or practice of automatically freezing the EDD Debit Card Accounts of Cardholders who report unauthorized transactions, including based solely on the results of the Claim Fraud Filter.

    vi.    Whether the Bank had or has a policy and/or practice of failing to provide its customer service representatives with the training, tools, or authority necessary to reasonably assist EDD Debit Cardholders who call about resolving their unauthorized transaction claims or unfreezing their Accounts.

    vii.    Whether the Bank violated or is violating EFTA and Regulation E by having a policy and/or practice of denying EDD Debit Cardholders' unauthorized transaction claims without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction, including denying claims based solely on the results of the Claim Fraud Filter.

    viii.    Whether the Bank violated or is violating EFTA and Regulation E by having a policy and/or practice of denying EDD Debit Cardholders' unauthorized transaction claims without providing the Cardholder with a report of the results of the Bank's

investigation of the claim that includes a written explanation of the Bank's findings.

ix. Whether the Bank is violating or violated EFTA and Regulation E by having a policy and/or practice of not provisionally or permanently crediting the Accounts of EDD Debit Cardholders in the amount of an unauthorized transaction claim within 10 business days of the Bank receiving notice of the claim, and without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction.

x. Whether the Bank is a state actor under the "public function" test, the "joint action" test, or any other test for state action status.

xi. Whether the Bank violated Plaintiffs' and Class Members' federal or state due process rights by having a policy and/or practice of automatically and indefinitely freezing and/or blocking their EDD Debit Card Accounts, without providing them with adequate notice or an opportunity to be heard, when they report unauthorized transactions on their Accounts.

xii. Whether the Bank owed a duty of care to Plaintiffs and Class Members, including because of the fiduciary relationship between the Bank and its EDD Debit Cardholders, under the EDD–Bank Contract, under the Cardholder Agreement, or under any other contract between the Bank and Cardholders.

xiii. Whether Plaintiffs and Class Members are third-party beneficiaries of the EDD–Bank Contract.

xiv. Whether the Bank breached its duties to Plaintiffs and Class Members, including by using outdated fraud-prevention

technology in its EDD Debit Cards and Accounts, by not adequately monitoring EDD Debit Cards and Accounts for suspicious activity, by not conducting appropriate follow-up or investigation when unauthorized transaction claims were made, by failing to comply with EFTA and its own "Zero Liability" policy, and by otherwise failing to make Plaintiffs and Class Members whole for unauthorized transactions on their Accounts.

xv. Whether the Bank acted negligently in its hiring, supervision, and retention of TTEC and other subcontractors and agents who have access to Plaintiffs' and Class Members' sensitive Cardholder Information.

xvi. Whether TTEC was the Bank's actual, apparent, or ostensible agent in its negligent hiring, supervision, and retention of employees who mishandled or misappropriated Plaintiffs' and Class Members' sensitive Cardholder Information.

xvii. Whether the Bank should be enjoined from freezing EDD Debit Card Accounts or from failing to take the reasonable steps necessary to avoid causing additional future harm to Plaintiffs and Class Members as the result of the Bank's acts and omissions alleged herein.

xviii. Whether the Bank should pay damages and interest or provide restitution, reimbursement, and/or other relief to Plaintiffs and Class Members.

c. **Typicality (Rule 23(a)(3))**: Class Representative Plaintiffs' claims are typical of the claims of the members of the putative Class. Class Representative Plaintiffs, like all other members of the putative Class, sustained economic and other damages as a result of the Bank's wrongful acts and omissions

1   as alleged herein. Class Representative Plaintiffs and members of the putative Class

2   were and are similarly or identically harmed by the Bank's same unlawful,

3   deceptive, unfair, systematic, and pervasive pattern of misconduct as alleged herein.

4          d.    **Adequacy of Representation (Rule 23(a)(4))**:   Class

5   Representative Plaintiffs will fairly and adequately represent and protect the

6   interests of the putative Class Members and have retained competent and qualified

7   counsel with extensive experience in complex litigation and class action litigation.

8   There are no material conflicts between the claims of the Class Representative

9   Plaintiffs and the members of the putative Class that would make class certification

10  inappropriate. Counsel for the putative Class will vigorously prosecute the claims

11  of all putative Class Members.

12         532.   This action is properly maintained as a class action pursuant to Rule

13  23(b) of the Federal Rules of Civil Procedure for the following reasons:

14         a.    **Class Action Status (Rule 23(b)(1)):** Class action status is

15  appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each

16  of the thousands of putative Class Members would create a risk of establishing

17  incompatible standards of conduct for the Bank and inconsistent results for Class

18  Members. Class action status is also appropriate under Rule 23(b)(1)(B) because

19  prosecution of separate actions by putative Class Members would create a risk of

20  adjudication with respect to individual members of the Class that, as a practical

21  matter, would be dispositive of the interests of other members not parties to this

22  action or would substantially impair or impede their ability to protect their interests.

23         b.    **Declaratory and Injunctive Relief (Rule 23(b)(2))**:

24  Certification under Rule 23(b)(2) is appropriate because the Bank acted or refused

25  to act on grounds generally applicable to the putative Class, thereby making

26  appropriate final injunctive, declaratory, or other appropriate equitable relief with

27  respect to the putative Class as a whole.

28

c.  **Predominance and Superiority (Rule 23(b)(3))**: Certification of the Subclasses under Rule 23(b)(3) is appropriate because questions of law or fact common to putative Subclass Members predominate over any questions affecting only individual members, and because class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

d.  **Issue Certification (Rule 23(c)(4))**: Certification of issues of liability and statutory and treble damages under Rule 23(c)(4) is appropriate because these issues are common to putative Class Members and resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

e.  The Class and each Subclass is ascertainable from the Bank's own records, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member and each Subclass Member were infringed or violated in the same or similar fashion.

# VI.    CLAIMS FOR RELIEF[28]

## FIRST CLAIM FOR RELIEF

## VIOLATIONS OF THE ELECTRONIC FUND TRANSFERS ACT

## 15 U.S.C. §§1693 et seq.; 12 C.F.R. §§1005.1 et seq.

### (Brought by All Plaintiffs)

533.  Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

534.  Plaintiffs bring this cause of action pursuant to the Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. §§1693 et seq., and Regulation E of EFTA, 12 C.F.R. §§1005.1–1005.20.

---

[28] Class Representative Plaintiffs do not incorporate the Individual Plaintiffs' Allegations (appearing *supra* at ¶¶286–526) into any of the Claims for Relief brought by Class Representative Plaintiffs.

535.  Plaintiffs and Class Members provided notice to Bank of America within 60 days after Bank of America sent a period statement reflecting an unauthorized transaction (which is an "error" under Regulation E) consistent with 15 U.S.C. §1693f and 12 C.F.R. §1005.11. As reflected (or should be reflected in Bank of America's own records, absent the customer service failures alleged herein), Plaintiffs and Class Members provided sufficient information to identify the unauthorized transaction and reasons for their belief that the transaction was unauthorized.

536.  Bank of America violated 15 U.S.C. §1693f and 12 C.F.R. §1005.11, including but not limited to through its implementation of each of the following policies and/or practices:

a.    Adopting and implementing policies and practices designed to circumvent the Bank's statutory and regulatory obligations under 15 U.S.C. §1693f and Regulation E, including by frustrating and obstructing Plaintiffs' and Class Members' efforts to submit unauthorized transaction claims and by denying their claims without having conducted a reasonable investigation or having a reasonable basis for believing that the Cardholder had authorized or benefitted from the transaction in question;

b.    Failing to provide provisional credit to Plaintiffs and Class Members relating to error investigations that could not be resolved within 10 business days;

c.    Not issuing provisional credit to Plaintiffs and Class Members within 10 business days of the Bank receiving notice the Plaintiff's or Class Member's unauthorized transaction claim, despite the Bank having no intention of conducting a good-faith investigation of the claim within 10 business days, and despite not completing a good-faith investigation of the claim within 10 business days;

     d.    Failing to conduct good-faith investigations into alleged errors or unauthorized transactions that Plaintiffs and Class Members timely reported to the Bank;

     e.    Failing to conduct good-faith investigations into the alleged errors or unauthorized transactions within 45 days of the date that the Plaintiff or Class Member timely reported the alleged error or unauthorized transaction;

     f.    Denying Plaintiffs' and Class Members' claims of error without having conducted a good-faith investigation, including by denying claims based solely on the results of the Bank's automated and highly unreliable and inaccurate Claim Fraud Filter;

     g.    Denying Plaintiffs' and Class Members' claims of error without having a reasonable basis for concluding that their Accounts were not in error, and where the Bank could not reasonably have drawn its conclusion that no error occurred based on the evidence available to the Bank at the time;

     h.    Denying Plaintiffs' and Class Members' claims of error without providing a report of the results of the Bank's investigation of the claim that includes a written explanation of the Bank's findings.

     i.    Failing to credit Plaintiffs' and Class Members' EDD Debit Card Accounts with interest on the amounts of unauthorized transactions that Bank wrongly denied, for the period during which Plaintiffs and Class Members were without access to those funds;

     j.    Freezing Plaintiffs' and Class Members' EDD Debit Card Accounts in order to avoid the Bank's legal obligations and to prevent Plaintiffs and Class Members from accessing their funds; and

     k.    Unilaterally reopening claims of error long after they had already been resolved in the EDD Debit Cardholders' favor and debiting the amounts previously credited to the Cardholder's Account, without basis to do so.

537.    In situations where Bank of America has violated Regulation E by failing to provisionally credit Plaintiffs' and Class Members' EDD Debit Card Accounts within 10 business days of the reported error, the Bank has neither conducted a good faith investigation nor had a reasonable basis for believing that the Account was not in error. Plaintiffs and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

538.    Bank of America knowingly and willfully concluded that Plaintiffs' and Class Members' EDD Debit Card Accounts were not in error when such conclusion could not reasonably have been drawn from the evidence available to the Bank at the time of its investigation. Plaintiffs and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

539.    Bank of America violated EFTA and Regulation E by failing to limit Plaintiffs' and Class Members' liability as required by 15 U.S.C. §1693m and 12 C.F.R. §1005.6(b).

540.    Plaintiffs provided notice to Bank of America less than two business days after learning of the fraudulent transactions that occurred in their EDD Debit Card Accounts. Under 12 C.F.R. §1005.6(b)(1), Plaintiffs' and Class Members' liability is capped at $50 in these circumstances. Bank of America has subjected Plaintiffs and Class Members to far greater than $50 in liability through its wrongful conduct as alleged herein.

541.    Under 12 C.F.R. §1005.6(b)(2), $500 is the maximum liability that may be imposed on an accountholder who does not provide notice to the financial institution within two business days after learning of a suspected unauthorized transaction. Bank of America has subjected Plaintiffs and Class Members to far greater than $500 in liability through its wrongful conduct as alleged herein.

542.    Regarding any Class Members who did not provide Bank of America with actual notice within two business days of learning of a suspected unauthorized transaction,    the    Bank    was    on    constructive    notice,    under    12    C.F.R.

§1005.6(b)(5)(iii), of widespread unauthorized electronic fund transfers from EDD Debit Card Accounts since the beginning of the COVID-19 pandemic. Since that time, countless unauthorized fund transfers have occurred and continue to occur from those Accounts. The volume of calls from EDD Debit Cardholders to the Bank's customer service to report unauthorized transactions has been, and continues to be, so great, and the Bank's customer service department is so understaffed, that the Bank routinely causes EDD Debit Cardholders to wait on hold for multiple hours. The widespread fraud specifically targeting EDD Debit Cardholders has been widely reported in the media and has been the subject of significant attention from California legislators.

543. In no event should any Class Member be liable for over $500 of damages under 12 C.F.R. §1005.6. Bank of America has violated 12 C.F.R. §1005.6 by imposing hundreds and thousands of dollars of liability on unemployed Californians.

544. As a direct and proximate result of Bank of America violations of Regulation E, Plaintiffs and Class Members have lost money.

545. Plaintiffs, on behalf of themselves and the Class, seek an injunction barring Bank of America from denying provisional credit and denying fraud claims without having timely conducted a good faith investigation of the alleged fraud and without a reasonable basis for believing that the transaction was authorized, and barring Bank of America from otherwise violating EFTA and Regulation E. Plaintiffs, on behalf of themselves and the applicable Subclasses, further seek the following relief: (a) actual damages with interest; (b) restitution of all EDD benefits funds improperly debited by Bank of America; (c) statutory damages pursuant to 15 U.S.C. §1693m; (d) treble damages pursuant to 15 U.S.C. §1693f(e); and (e) incidental and consequential damages suffered due to their inability to pay bills or otherwise use their unemployment funds.

## SECOND CLAIM FOR RELIEF

### VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT

### Cal. Civ. Code §§1798.100 et seq.

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Alvarez*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Rojas de Charolet*, *Talia*, and *Verdun* Actions)

546.    Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

547.    The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§1798.100 et seq., imposes a duty on businesses to take reasonable steps to protect consumers' nonencrypted and nonredacted personal information, and provides a private right of action to consumers whose nonencrypted and nonredacted personal information has been subjected to unauthorized access and exfiltration, theft, or disclosure as a result of a defendant business's breach of its duty to take reasonable steps to protect that information.

548.    Plaintiffs and Class Members are "consumers" as defined in the CCPA.

549.    Bank of America is a "business" as defined in the CCPA.

550.    Bank of America directly or indirectly collected Plaintiffs' and Class Members' personal information as defined in Cal. Civ. Code §1798.81.5(d)(1)(A), including but not limited to Plaintiffs' and Class Member's first names or first initials, last names, and account numbers or credit or debit card numbers (including but not limited to Plaintiffs' and Class Members' EDD Debit Card and Account numbers), in combination with any required security codes, access codes, or passwords that would permit access to Plaintiffs' and Class Members' financial accounts.

551.    On information and belief, Bank of America collected, stored, and/or transmitted Plaintiffs' and Class Members' personal information in a nonencrypted

and nonredacted form or in some other form that permitted unauthorized third parties to access that information in violation of the CCPA.

552.   Bank of America had a duty under the CCPA to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiffs' and Class Members' personal information.

553.   Bank of America breached its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiffs' and Class Members' personal information by, among other things: (a) issuing EDD Debit Cards to Plaintiffs and Class Members with magnetic stripes but without EMV chip technology; (b) *[removed]*; (c) *[removed]*; (d) *[removed]*; and (e) failing to take reasonable steps to ensure that its subcontractors and their employees and agents, including CSRs and other Call Center agents, maintained the confidentiality of Cardholders' personal information, including by failing to ensure that all such agents were subject to background checks before or after being hired and failing to provide such agents proper training and supervision regarding their handling and maintaining the confidentiality of Cardholders' personal information, and by failing to secure Cardholders' personal information from unnecessary and unauthorized access by subcontractors' employees and others.

554.   Bank of America further failed to implement and maintain reasonable security measures by transmitting information regarding Plaintiffs' and Class Members' EDD Debit Cards to, and storing it on, unsecured or inadequately secured data storage devices, including at EDD.

555.   As a direct and proximate result of Bank of America's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiffs' and Class Members' personal information, Plaintiffs and Class Members suffered unauthorized access and exfiltration, theft, or disclosure of their nonencrypted and nonredacted personal information. Plaintiffs and Class Members never authorized such disclosure of their personal information.

556.    Bank of America knew or should have known that issuing EDD Debit Cards with magnetic stripes but without EMV chip technology was not a reasonable security procedure or practice appropriate to the nature of Plaintiffs' and Class Members' personal information and that a data breach resulting in the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and Class Members' personal information was clearly foreseeable.

557.    As a direct and proximate result of the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and Class Members' nonencrypted and nonredacted personal information, Plaintiffs and Class Members were injured and lost and continue to lose money or property, including but not limited to the monetary value of unauthorized transactions on the EDD Debit Cards issued by the Bank, the loss of Plaintiffs' and Class Members' protected privacy interests in the confidentiality and privacy of their personal information, nominal damages, and additional losses as described above.

558.    Plaintiffs and Class Members seek relief under Cal. Civ. Code §1798.150(a), including but not limited to recovery of actual damages, injunctive relief, declaratory relief, their costs of suit, attorney's fees pursuant to Cal. Code Civ. Proc. §1021.5 or other appliable law, and any other relief the Court deems proper.

559.    On January 25, 2021, Class Representative Plaintiffs Smith and Karam, through their undersigned counsel, on behalf of themselves and all others similarly situated, sent a letter to Bank of America's registered agent for service of process via FedEx, notifying Bank of America of its violations of Cal. Civ. Code §1798.150(a) and demanding that the Bank cure them. That letter was delivered by FedEx the following morning, on January 26, 2021. Bank of America did not respond to the letter, and did not cure the noticed violations or provide Plaintiffs with an express written statement that the violations had been cured and that no further violations would occur, within 30 days after receiving the letter. Thereafter,

1    on March 1, 2021, Smith and Karam filed their Class Action Complaint in an action

2    that has now been consolidated into this matter. As a result, class-wide statutory

3    damages may be initiated against the Bank pursuant to Civ. Code §1798.150(b).

4        560.    On or about January 26, 2021, Plaintiffs Oosthuizen and Mathews,

5    through their undersigned counsel, each submitted a notice to Bank of America

6    pursuant to Cal. Civ. Code §1798.150(b) on behalf of themselves and all others

7    similarly situated, informing the Bank of its violations of the CCPA. The Bank did

8    not cure those violations or provide Plaintiffs with an express written statement that

9    the violations had been cured and that no further violations shall occur, as required

10   by the CCPA within 30 days after such notice. As a result, class-wide statutory

11   damages may be initiated against the Bank pursuant to Cal. Civ. Code

12   §1798.150(b).

13       561.    Plaintiffs, on behalf of themselves and the Class and applicable

14   Subclasses, seek relief under Cal. Civ. Code §1798.150(a), including but not limited

15   to recovery of actual damages, statutory damages, injunctive relief, declaratory

16   relief, their costs of suit, attorney's fees pursuant to Cal. Code Civ. Proc. §1021.5

17   or other appliable law, and any other relief the Court deems proper.

## THIRD CLAIM FOR RELIEF

### VIOLATIONS OF THE CALIFORNIA CUSTOMER RECORDS ACT

### Cal. Civ. Code §§1798.80 et seq.

21       562.    *[Removed]*

22       563.    *[Removed]*

23       564.    *[Removed]*

24       565.    *[Removed]*

25       566.    *[Removed]*

26       567.    *[Removed]*

27       568.    *[Removed]*

28       569.    *[Removed]*

570.   *[Removed]*

571.   *[Removed]*

572.   *[Removed]*

573.   *[Removed]*

574.   *[Removed]*

**FOURTH CLAIM FOR RELIEF**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**Cal. Bus. & Prof. Code §§17200 et seq.**

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Alvarez*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Rojas de Charolet*, *Talia*, and *Verdun* Actions)

575.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

576.   California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §§17200 et seq.

577.   The Bank has engaged in "unlawful" business acts and practices by violating, as set forth in this TAMCC: the Electronic Fund Transfers Act, 15 U.S.C. §1693, and Regulation E; the California Consumer Privacy Act, Cal. Civ. Code §§1798.100 et seq.; the Due Process Clauses of the U.S. and California Constitutions; and its common law obligations. The Bank has further engaged in "unlawful" business acts and practices by violating the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§6801 et seq., and regulations promulgated thereunder (*see, e.g.*, 16 C.F.R. Parts 313, 314), which prohibit the Bank from disclosing its customers' nonpublic personal information to a nonaffiliated third party and require the Bank to take reasonable steps to protect the security and confidentiality of its customers' nonpublic personal information against anticipated security threats or hazards and unauthorized access or use (*see infra* ¶¶578–579), and the California

Financial Information Privacy Act ("CFIPA"), Cal. Fin. Code §§4050 et seq., which prohibits the Bank from negligently disclosing or sharing a consumer's nonpublic personal information with nonaffiliated third parties without the consumer's explicit prior consent (*see infra* ¶580).

578.    The Bank is subject to the GLBA because it is a financial institution as defined under 15 U.S.C. §6809(3)(A), and is subject to the GLBA Safeguards Rule, 16 C.F.R. Part 314, because it is a financial institution that handles and maintains nonpublic personal information, as defined by 16 C.F.R. §313.3(n), including Plaintiffs' and Class Members' nonpublic personal information. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. §6801(b), requires financial institutions such as the Bank to protect the security, confidentiality, and integrity of customer information by developing, implementing, and maintaining a written comprehensive information security program that contains administrative, technical, and physical safeguards appropriate to the financial institution's size and complexity, the nature and scope of its activities, and the sensitivity of the customer information at issue, including by (a) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (b) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (c) overseeing service providers by taking reasonable steps to select and retain service providers that are capable of maintaining appropriate safeguards for customer information, and requiring service providers by contract to implement such safeguards; and (d) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§314.3, 314.4.

579.   Throughout the Class Period, the Bank has violated each of the above requirements of the GLBA Safeguards Rule by failing to adequately secure Plaintiffs' and Class Members' nonpublic personal information, including when the Bank transferred that information to EDD and to the Bank's service providers, including but not limited to TTEC, and by failing to oversee its service providers' compliance with the Safeguards Rule in connection with Plaintiffs' and Class Members' nonpublic personal information. Specifically, the Bank failed to take adequate steps to evaluate whether its service providers, including but not limited to TTEC, were capable of and actually were reasonably protecting Cardholders' nonpublic personal information. This failure violated the Safeguards Rule. On information and belief, the Bank also failed to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and failed to assess the sufficiency of any its own and its service providers' safeguards in place to control those risks. These failures also violated the Safeguards Rule.

580.   The Bank is subject to the CFIPA because it is a financial institution as defined under Cal. Fin. Code §4052(c). The CFIPA prohibits the Bank from selling, sharing, transferring, or otherwise disclosing a consumer's nonpublic personal information to third parties without the consumer's explicit prior consent. *Id.* §§4052–4052.5, 4057. Nonpublic personal information under CFIPA is defined broadly to include any nonpublic personal financial information about the consumer that the Bank obtains from any source, including from the consumer, from transacting with the consumer, or from performing a service for the consumer. *Id.* §4052(a). Throughout the Class Period, the Bank violated the CFIPA because it disclosed Plaintiffs' and Class Members' nonpublic personal information to third parties without Plaintiffs' and Class Members' prior consent. As a result of the Bank's violations, Plaintiffs' and Class Members' nonpublic personal information

fell into criminal hands, depriving Plaintiffs and Class Members of the EDD benefits to which they were lawfully entitled.

581.   The Bank has engaged in "unfair" business acts and practices under the UCL, including by: (a) using its Claim Fraud Filter to automatically deny all claims of unauthorized ATM withdrawals and other claims that triggered the Claim Fraud Filter's flawed criteria, without conducting a reasonable review of relevant Bank records or having a reasonable basis for concluding that Plaintiffs and Class Members had made or had benefitted from the transactions in question ("Claim Denial Policy"); (b) using its Claim Fraud Filter to automatically rescind "permanent" credits the Bank had previously paid to Plaintiffs and Class Members, without conducting a reasonable review of relevant Bank records or having a reasonable basis for concluding that Plaintiffs and Class Members had made or had benefitted from the transactions in question ("Credit Rescission Policy"); (c) using its Claim Fraud Filter to automatically and indefinitely freeze and/or block Plaintiffs' and Class Members' EDD Debit Card Accounts, without conducting a reasonable review of relevant Bank records or having a reasonable basis for concluding that those Plaintiffs and Class Members were themselves engaged in fraud or other financial crimes, and without providing any reasonable notice or means for those Plaintiffs and Class Members to contest the purported basis for the Account freeze or to otherwise regain access to their Account ("Account Freeze Policy"); (d) failing to provide reasonable customer service to Plaintiffs and other Class Members seeking assistance related to unauthorized transactions or to the freezing of their Accounts, including by grossly understaffing its call centers and thereby subjecting Plaintiffs and Class Members to excessive call-wait times ("Call Center Understaffing Policy"); (e) failing to implement reasonable practices and procedures to monitor for, detect, stop, and promptly notify Plaintiffs and Class Members about suspicious transactions involving their Cards and Accounts ("Deficient Fraud Monitoring Policy"); and (f) issuing magnetic-stripe-only EDD

1  Debit Cards without industry-standard EMV chips to Plaintiffs and Class Members
2  at least through the end of June 2021, thereby subjecting EDD Debit Cardholders
3  to significantly increased risk and incidents of fraud ("No EMV Chip Policy"). The
4  foregoing unfair business acts and practices are referred to collectively as the
5  Bank's "Unfair Business Practices."

6      582.    Each of the Bank's Unfair Business Practices were unfair because of
7  the following facts, each of which the Bank knew or reasonably should have known
8  at all times relevant to this action: (1) surveys and studies consistently show that a
9  significant percentage of U.S. working-age adults have no or virtually no
10  emergency savings, are living paycheck-to-paycheck, would experience financial
11  hardship if their income were reduced or if payment of their income were delayed,
12  and that persons who became unemployed during the COVID-19 pandemic
13  experienced a deterioration of their often already-precarious financial condition and
14  ability to pay basic living expenses; (2) EDD Debit Cardholders were among the
15  Bank's most financially insecure and vulnerable customers; (3) EDD Debit
16  Cardholders relied on the EDD benefits to be able to pay for basic life necessities
17  (such as food, shelter, utilities, clothing, medicine, medical care, gas, and
18  transportation) for themselves and their dependents, and thus would foreseeably
19  suffer substantial injury and hardship if deprived of their EDD benefits; (4) EDD
20  Debit Cardholders' reliance on EDD benefits resulted in them having a
21  correspondingly heightened interest and need to be able to securely, reliably, and
22  consistently obtain timely access to their EDD benefits, as well as a correspondingly
23  heightened interest and need to not lose access to the EDD benefits in their EDD
24  Debit Card Accounts, including due to unauthorized transactions, summary denials
25  of their unauthorized transaction claims, rescission of previously-issued permanent
26  credits, the freezing of their Accounts, or inadequate customer service; and (5) each
27  of the facts stated below.

28

1      a.    **Claim Denial Policy.** The Bank's Claim Denial Policy (*supra*

2  ¶581(a)) was unfair under each of the three tests cited in *Doe v. CVS Pharm.*, 982

3  F.3d 1204, 1214-15 (9th Cir. 2020)—the Balancing test, the Immoral test, and the

4  Tethering test—for the following reasons:

5      i.    *The Balancing Test.* The Claim Denial Policy was unfair

6  under the Balancing test because the harmful impacts to EDD Debit Cardholders,

7  including Plaintiffs and Class Members, outweighed the potential benefits and any

8  potentially legitimate reasons the Bank could have had for engaging in that policy

9  and practice, as shown by all facts alleged above (*see, e.g.*, ¶¶3, 43, 70, 89-92,

10  582(1)–(4)), plus the following facts, each of which the Bank knew or reasonably

11  should have known: (A) the Bank's historical policies, practices, and standard

12  operating procedures for investigating unauthorized-transaction claims resulted in

13  investigations that were much more detailed and based on a much more substantial

14  body of documents and evidence, and therefore much more likely to be correct, than

15  the simplistic and highly unreliable Claim Fraud Filter criteria the Bank

16  implemented to automatically deny unauthorized-transaction claims, including all

17  claims of unauthorized ATM withdrawals; (B) there were reasonably available

18  alternatives to the Bank that would have furthered the Bank's legitimate business

19  interests, including but not limited to: refraining from using its unprecedented and

20  highly inaccurate and flawed Claim Fraud Filter to summarily deny claims without

21  any human review or any review of Bank records containing relevant information

22  critical to reaching an accurate claim decision in compliance with the Bank's

23  obligations under the letter and spirit of EFTA and Regulation E; hiring additional

24  numbers of employees and contractors sufficient to perform timely and adequate

25  claims investigations as required by the letter and spirit of EFTA and Regulation E;

26  prioritizing the investigation of higher-dollar-value or more suspicious claims of

27  unauthorized transactions to ensure that those claims were decisioned within 10

28  business days, paying provisional credit on all claims that were not decisioned

within 10 business days as required by EFTA and Regulation E; auto-paying lower-dollar and less suspicious claims to ensure that remaining claims would receive timely and adequate investigations; and implementing other strategies for managing high claims volume of which the Bank was undoubtedly aware from its decades of experience and accumulated expertise investigating and decisioning unauthorized-transactions claims in the years since EFTA was enacted in the late 1970s; and (C) the Bank's use of its Claim Fraud Filter to automatically deny unauthorized-transaction claims, including all claims of unauthorized ATM withdrawals of EDD Cardholders from late September 2020 through early June 2021, (on the one hand) caused significant foreseeable harm to Plaintiffs and Class Members, and (on the other hand) achieved cost savings for the Bank by violating the law and disregarding the significant legitimate interests of financially vulnerable EDD Debit Cardholders.

ii.     *The Immoral Test.* The Bank's Claim Denial Policy was unfair under the Immoral test because that policy and practice was immoral, unethical, oppressive, unscrupulous, and substantially injurious for the same reasons it was unfair under the Balancing test (*supra* ¶582(a)(i)), plus the following facts, each of which the Bank knew or reasonably should have known were true: (A) the Bank obtained EDD's agreement to the EDD-Bank Contract in 2015, in part, by making promises to comply with all EFTA and Regulation E error resolution requirements and timelines and to provide Cardholders additional "Zero Liability" protection related to unauthorized transactions, including unauthorized ATM withdrawals (*see supra* ¶¶43, 70), and the Bank immorally, unethically, oppressively, and unscrupulously broke those promises by implementing its policy and practice as alleged above, which (*inter alia*) resulted in the automatic denial of all claims of unauthorized ATM withdrawals without the Bank conducting any review of relevant Bank records, and which constituted a radical departure from the Bank's prior long-standing standard operating procedures for conducting EFTA-

compliant investigations and making EFTA-compliant claims decisions, causing significant foreseeable harm to Plaintiffs and Class Members; (C) on information and belief, the Bank never subjected its non-prepaid consumer customers to the Claim Fraud Filter or any other filter for automatically denying unauthorized transaction claims, including claims of unauthorized ATM withdrawals, without conducting a reasonable review of relevant Bank records, effectively treating EDD Debit Cardholders as second-class customers whose legitimate interests in having their unauthorized-transaction claims adequately investigated and not automatically denied were less important and less worthy of the Bank's consideration than the interests of the Bank's "regular" customers; and (D) the Bank's intentional conduct deprived vulnerable EDD benefits recipients of critical EDD benefits to which they were entitled at a time when they were most in need.

    iii. *The Tethering Test.* The Bank's Claim Denial Policy was unfair under the Tethering test for the reasons set forth in ¶582(g), *infra*.

   b. **Credit Rescission Policy.** The Bank's Credit Rescission Policy (*supra* ¶581(b)), was unfair under each of the three tests identified above for the following reasons:

    i. *The Balancing Test.* The Credit Rescission Policy was unfair under the Balancing test because the harmful impacts to EDD Debit Cardholders, including Plaintiffs and Class Members, outweighed the potential benefits and any potentially legitimate reasons the Bank could have had for engaging that policy and practice, as shown by all facts alleged above (*see, e.g.*, ¶¶80, 92, 582(1)–(4)), plus the following facts, each of which the Bank knew or reasonably should have known were true: (A) the investigation that led the Bank to pay permanent credit to the affected Plaintiffs and Class Members was much more detailed and based on a much more substantial body of documents and evidence, and therefore much more likely to be correct, than the simplistic and highly unreliable Claim Fraud Filter criteria that the Bank implemented to automatically

rescind permanent credits, including all permanent credits issued during a specified period in connection with claims of unauthorized ATM withdrawals; (B) there were reasonably available alternatives to the Bank that would have furthered the Bank's legitimate business interests, namely refraining from rescinding permanent credits in violation of the letter and spirit of EFTA and Regulation E, the Bank's "Zero Liability" policy, and the Bank's own representations to Cardholders that the credits the Bank had issued were "permanent"; and (C) the Bank's policy and practice of using its Claim Fraud Filter to rescind permanent credits, including those issued in connection with claims of ATM withdrawals, (on the one hand) caused significant foreseeable harm to Plaintiffs and Class Members, and (on the other hand) achieved cost savings for the Bank based on pursuing an illegitimate business purpose of systemically clawing back previously issued "permanent" payments to which the Bank had no legitimate claim.

ii.    *The Immoral Test.* The Bank's Credit Rescission Policy was unfair under the Immoral test because it was immoral, unethical, oppressive, unscrupulous, and substantially injurious for the same reasons it was unfair under the Balancing test (*supra* ¶582(b)(i)), plus the following facts, each of which the Bank knew or reasonably should have known: (A) the Bank obtained the EDD's agreement to the EDD-Bank Contract in 2015, in part, by making promises to comply with all EFTA and Regulation E error resolution requirements and timelines and to provide EDD Debit Cardholders additional "Zero Liability" protection on disputed claims, including ATM transactions (*see supra* ¶¶43, 70), and the Bank immorally, unethically, oppressively, and unscrupulously broke those promises by rescinding prior permanent credits, causing significant foreseeable harm to Plaintiffs and Class Members; (B) the Bank informed Plaintiffs and Class Members who were paid permanent credit that the credit was "permanent," which constituted a representation to the affected Plaintiff or Class Member that the credit the Bank provided was theirs to keep forever and that the Bank was forever giving up any

right that it may have to claw back or rescind the credit at any time in the future, which representation the Bank violated by rescinding the permanent credit; (C) on information and belief, the Bank never subjected its non-prepaid consumer customers to its Claim Fraud Filter or to any policy and practice of systematically rescinding large volumes of permanent credits issued in connection with unauthorized-transaction claims, effectively treating EDD Debit Cardholders as second-class customers whose legitimate interests and security in retaining any permanent credits issued to them and in not suddenly discovering that their Account balance was negative and that they had no funds in their Account to purchase basic necessities due to the Bank rescinding permanent credits, were less important and less worthy of the Bank's consideration than the interests of the Bank's "regular" customers; and (D) the Bank's intentional conduct deprived vulnerable EDD benefits recipients of critical EDD benefits to which they were entitled at a time when they were most in need.

        iii.    *The Tethering Test.* The Bank's Credit Rescission Policy was unfair under the Tethering test for the reasons set forth in ¶582(g), *infra*.

        c.  **Account Freeze Policy.** The Bank's Account Freeze Policy (*supra* ¶581(c)) was unfair under each of the three tests identified above for the following reasons:

        i.    *The Balancing Test.* The Account Freeze Policy was unfair under the Balancing test because the harmful impacts to EDD Debit Cardholders, including Plaintiffs and Class Members, outweighed the potential benefits and any potentially legitimate reasons the Bank could have had for engaging that policy and practice, as shown by all facts alleged above (*see, e.g.*, ¶¶3-4, 53, 93-96, 100, 582(1)–(4)), plus the following facts, each of which the Bank knew or reasonably should have known: (A) the Bank's historical policies, practices, and standard operating procedures for freezing accounts were much more detailed and based on a much more substantial body of documents and evidence,

and therefore much more likely to result in a correct decision about whether to freeze the Account, than the simplistic and highly unreliable Claim Fraud Filter criteria the Bank implemented to automatically freeze Accounts associated with unauthorized-transaction claims denied by the Claim Fraud Filter, including all claims of unauthorized ATM withdrawals; (B) part of the Bank's Account Freeze Policy was to require Plaintiffs and Class Members whose Accounts were frozen to reverify their identity with EDD at a time when the Bank knew EDD's call centers were overwhelmed and that it would be virtually impossible for callers to reach EDD, to nonetheless refer them again to EDD even after the Cardholder informed the Bank that EDD had informed the Cardholder that there was no need for EDD to reverify their identity and/or that any problem with their Account could only be resolved the Bank, which significantly frustrated Plaintiffs' and Class Members' ability to obtain customer service and foreseeably caused Plaintiffs and Class Members to experience significant stress, anxiety, and suffering, without any legitimate countervailing benefit; (C) there were reasonably available alternatives to the Bank that would have furthered the Bank's legitimate business interests, namely refraining from freezing Accounts without a reasonable investigation and reasonable factual basis for believing the affected Account was involved in criminal activity; and (D) the Bank's policy and practice of using its Claim Fraud Filter to freeze Accounts (on the one hand) caused significant foreseeable harm to Plaintiffs and Class Members, and (on the other hand) achieved cost savings for the Bank based on pursuing an illegitimate business purpose.

ii. *The Immoral Test.* The Bank's Account Freeze Policy was unfair under the Immoral test because it was immoral, unethical, oppressive, unscrupulous, and substantially injurious for the same reasons that policy and practice was unfair under the Balancing test (*supra* ¶582(c)(i)), plus the following facts, each of which the Bank knew or reasonably should have known: (A) the Bank obtained EDD's agreement to the EDD-Bank Contract in 2015, in part, by making

promises to provide a "safer, more convenient way" for EDD Debit Cardholders "to receive [their] Unemployment, Disability and Paid Family Leave benefits," including by providing Cardholders "instant access to [their] benefits on each payment date," by "disburs[ing] to each [Cardholder] the entire amount EDD authorizes," and by taking "unprecedented steps to adjust our standard processes and customize procedures in an effort to ensure [Cardholders] have reliable, convenient and secure access to their funds," and the Bank immorally, unethically, oppressively, and unscrupulously broke those promises by using its Claim Fraud Filter to automatically freeze and/or block Accounts, causing significant foreseeable harm to Plaintiffs and Class Members by depriving them of access to EDD benefit funds in their Accounts at the time they were frozen, as well as future EDD benefit payments that EDD was unable to deposit into their Accounts so long as they remained frozen; (B) on information and belief, the Bank never subjected its non-prepaid consumer customers to the Claim Fraud Filter or any other similar fraud filter for automatically and indefinitely freezing customer accounts based on suspected fraud without conducting any human review of relevant Bank records or conducting any other investigation, effectively treating EDD Debit Cardholders as second-class customers whose legitimate interests in having access to their funds on deposit and to be deposited in the future were less important and less worthy of the Bank's consideration than the interests of the Bank's "regular" customers; and (C) the Bank's intentional conduct deprived vulnerable EDD benefits recipients of critical EDD benefits to which they were entitled at a time when they were most in need.

iii.    *The Tethering Test.* The Bank's Account Freeze Policy was unfair under the Tethering test for the reasons set forth in ¶582(g), *infra*.

d.    **Call Center Understaffing Policy.** The Bank's Call Center Understaffing Policy (*supra* ¶581(d)), was unfair under each of the three tests identified above for the following reasons:

i.   *The Balancing Test.* The Call Center Understaffing Policy was unfair under the Balancing test because the harmful impacts to Plaintiffs and Class Members outweighed the potential benefits and any potentially legitimate reasons the Bank could have had for engaging in it, as shown by all facts alleged above (*see, e.g.*, ¶¶3-4, 52, 87-88, 97-105, 582(1)–(4)), plus the following facts, each of which the Bank knew or reasonably should have known: (A) Plaintiffs and Class Members attempting to report fraud, make or follow-up on unauthorized transaction claims, or regain access to their frozen Accounts were kept on hold for hours, had their calls disconnected, and waited unreasonably long periods of time to speak with someone only to be told to call back later or call EDD instead; (B) Plaintiffs and Class Members had no way to avoid these harms because the Bank's prepaid customer service phone lines were the only option (except for mailing a letter to P.O. Box) for EDD Debit Cardholders to report unauthorized transactions, file unauthorized-transaction claims, follow-up on such claims, seek assistance with Account blocks and freezes, and otherwise obtain customer service; (C) the Bank had access to, and employed persons to analyze, data about the California unemployment rate, the number of EDD Debit Cards, the amount of funds loaded onto those Cards, the number of unauthorized transaction claims, and other data that would have allowed it to forecast customer service call volume and adequately staff its call centers; (D) there were reasonably available alternatives to the Bank that would have furthered the Bank's legitimate business interests, namely ensuring reasonable and adequate call center performance by using available data to forecast likely future call volume and likely future call center staffing needs, and refraining from understaffing the call centers in a manner that the Bank knew or reasonably should have known would make it unreasonably difficult for Plaintiffs and Class Members to obtain reasonable and adequate customer service with issues related to unauthorized transactions and to the freezing and blocking of their Cards and Accounts; and (E) the Bank's failure to provide reasonable and adequate customer

service (on the one hand) caused significant foreseeable harm to Plaintiffs and Class Members, and (on the other hand) achieved cost savings for the Bank based on pursuing an illegitimate business purpose of forcing Plaintiffs and Class Members often to wait for hours on hold and to otherwise deprive them of any access to reasonable and adequate customer service or recourse to address the Bank's improper automatic denial of their unauthorized-transaction claims, rescission of previously-issued permanent credits, and freezing of their Accounts.

ii.     *The Immoral Test.* The Bank's Call Center Understaffing Policy was unfair under the Immoral test because it was immoral, unethical, oppressive, unscrupulous, and substantially injurious for the same reasons it was unfair under the Balancing test (*supra* ¶582(d)(i)), plus the following facts, each of which the Bank knew or reasonably should have known: (A) the Bank obtained EDD's agreement to the EDD-Bank Contract in 2015, in part, by making promises to provide EDD Debit Cardholders "[s]uperb," "swift," and "responsive" live customer service support available "24/7" with an "average speed to answer of "no more than 30 seconds for 70 percent of the calls, and no more than two (2) minutes for all calls" (*see supra* ¶¶43-44, 70, 73, 98, 105) and the Bank immorally, unethically, oppressively, and unscrupulously broke those promises by grossly understaffing its customer service call centers during the Class Period in order to save the Bank money and to deter and slow the filing and processing of unauthorized transaction claims, all at the expense of EDD Debit Cardholders, including Plaintiffs and Class Members; (B) the Bank made similar promises and representations regarding customer service directly to Cardholders (*see supra* ¶¶70, 73), and the Bank immorally, unethically, oppressively, and unscrupulously broke those promises by failing to adequately staff its customer service call centers during the Class Period in order to save the Bank money at the expense of Cardholders, including Plaintiffs and Class Members; (C) the Bank did not have a policy of materially understaffing the customer service call centers used by its non-prepaid

consumer customers, nor did it have a policy of its branch employees refusing to assist its non-prepaid customers (as it did for EDD Debit Cardholders), effectively treating its EDD Debit Cardholders as second-class customers whose legitimate interests in obtaining reasonable customer service were less important and less worthy of the Bank's consideration than the interests of the Bank's "regular" customers; and (D) the Bank's intentional conduct foreseeably caused vulnerable EDD benefits recipients to be deprived of critical EDD benefits to which they were entitled at a time when they were most in need.

iii.    *The Tethering Test.* The Bank's Call Center Understaffing Policy was unfair under the Tethering test for the reasons set forth in ¶582(g), *infra*.

e.    **Deficient Fraud Monitoring Policy.** The Bank's Deficient Fraud Monitoring Policy (*supra* ¶581(e)) was unfair under each of the three tests identified above for the following reasons:

i.    *The Balancing Test.* The Deficient Fraud Monitoring Policy was unfair under the Balancing test because the harmful impacts to EDD Debit Cardholders, including Plaintiffs and Class Members, outweighed the potential benefits and any potentially legitimate reasons the Bank could have had for engaging in it, as shown by all facts alleged above (*see, e.g.*, ¶¶4, 81-86, 582(1)–(4)), and the following facts, each of which the Bank knew or reasonably should have known: (A) throughout the Class Period, EDD Debit Card Accounts were routinely experiencing transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff's or Class Member's Card and Account transaction history and past Account access behaviors; (B) the Bank's fraud monitoring and detection systems were not flagging and blocking a substantial number of these obviously suspicious transactions; (C) the Bank failed to take reasonably responsive action to correct these problems; (D) there were reasonably

available alternatives to the Bank that would have furthered the Bank's legitimate business interests, namely implementing the same fraud detection, monitoring, and response tools and systems that the Bank used with respect to its consumer accounts; and (C) the Bank's unfair business acts and practices at issue caused (on the one hand) significant foreseeable harm to EDD Debit Cardholders, including due to failure to detect and stop obviously suspicious transactions (such as high-dollar ATM withdrawals inconsistent with the Cardholder's location and transaction history, or that were part of a rapid series of ATM withdrawals from the same ATM terminal such as would be consistent with a single person using a stack of counterfeit EDD Debit Cards to make consecutive ATM withdrawals), and (on the other hand) achieved cost savings for the Bank that were comparatively minor, negligible, or non-existent.

ii.     *The Immoral Test.* The Bank's Deficient Fraud Monitoring Policy was unfair under the Immoral test because it was immoral, unethical, oppressive, unscrupulous, and substantially injurious for the same reasons it was unfair under the Balancing test (*supra* ¶582(e)(i)), plus the following facts, each of which the Bank knew or reasonably should have known: (A) the Bank obtained EDD's agreement to the EDD-Bank Contract in 2015, in part, by making promises to provide "best-in-class" fraud monitoring that would provide "immediate response to emerging fraud trends" and "decline[] [fraudulent transactions] in real time," and to apply "the most rigorous fraud detection procedures" including "the highest level of security and fraud safeguards" based on "multiple layers of extensive security" to ensure that EDD Debit Cardholders did not become victims of fraud (*see supra* ¶¶40, 42, 81), and the Bank immorally, unethically, oppressively, and unscrupulously broke those promises, causing significant foreseeable harm to Plaintiffs and Class Members; (B) on information and belief, the Bank provided its non-prepaid consumer customers significantly greater fraud detection and prevention services in connection with their non-prepaid

accounts than it provided to EDD Debit Cardholders in connection with their Accounts, effectively treating EDD Debit Cardholders as second-class customers whose legitimate interests in not falling victim to unauthorized or otherwise fraudulent transactions were less important and less worthy of the Bank's consideration than the interests of the Bank's "regular" customers; and (C) the Bank's intentional conduct foreseeably caused vulnerable EDD benefits recipients to be deprived of critical EDD benefits to which they were entitled at a time when they were most in need.

iii.    *The Tethering Test.* The Bank's Deficient Fraud Monitoring Policy was unfair under the Tethering test for the reasons set forth in ¶582(g), *infra*.

f.    **No EMV Chip Policy.** The Bank's No EMV Chip Policy (*supra* ¶581(f)) was unfair under each of the three tests identified above for the following reasons:

i.    *The Balancing Test.* The No EMV Chip Policy was unfair under the Balancing test because the harmful impacts to EDD Debit Cardholders, including Plaintiffs and Class Members, outweighed the potential benefits and any potentially legitimate reasons the Bank could have had for engaging in it, as shown by all facts alleged above (*see, e.g.*, ¶¶2, 59-69, 582(1)–(4)), plus the following facts, each of which the Bank knew or reasonably should have known: (A) debit cards without EMV chips have a heightened vulnerability to the criminal practices of card skimming and card counterfeiting, resulting in a continuous and ongoing material risk of substantial injury to EDD Debit Cardholders to whom the Bank issued a mag-stripe-only EDD Debit Card without an EMV chip; (B) card skimming and card counterfeiting foreseeably impacted EDD Debit Cards and caused substantial injury to legitimate EDD Debit Cardholders in the months and years preceding the Class Period; (C) card skimming and card counterfeiting continued to foreseeably impact EDD Debit Cards and foreseeably cause substantial

injury to Plaintiffs, Class Members, and other legitimate EDD Debit Cardholders during the Class Period, including throughout the months leading up to the Bank's implementation of its Claim Fraud Filter and throughout the period that the Bank used its Claim Fraud Filter to automatically deny unauthorized-transaction claims and automatically freeze Accounts; (D) even when the Bank paid a claim of an unauthorized-transaction claim that an EMV chip would have prevented (such as an unauthorized ATM withdrawal committed using a counterfeit card), there were inevitable and foreseeable costs and hardships experienced by the affected Plaintiffs, Class Members, or other EDD Debit Cardholders, including stress, inconvenience, and lost time from dealing with the unauthorized transaction, including but not limited to time spent reporting and otherwise communicating with the Bank's often understaffed and dysfunctional customer service call centers about the unauthorized transaction, time spent reviewing and monitoring the affected Account for additional unauthorized transactions, and not having a physical EDD Debit Card to make card-present transactions during the period between when the transaction was reported and when a replacement card arrived in the mail; (E) adding EMV chips to EDD Debit Cards would have foreseeably resulted in significantly fewer EDD Debit Cards being skimmed and thus significantly fewer incidents of skimmed EDD Debit Card information being used to effect unauthorized transactions that negatively impacted Plaintiffs and Class Members; (F) adding EMV chips to EDD Debit Cards would have foreseeably made it actually or virtually impossible for criminals to counterfeit EDD Debit Cards, and thereby would have foreseeably made it actually or virtually impossible for criminals to use counterfeit EDD Debit Cards to make unauthorized ATM withdrawals that negatively impacted Plaintiffs and Class Members; (G) nearly all Plaintiffs' and Class Members' claims of unauthorized ATM withdrawals were the result of third parties using counterfeit EDD Debit Cards to make the ATM withdrawals; (H) EMV chip technology was not just a best practice but had become part of the

industry standard for debit card security in the United States in the years before the Class Period began, in significant part because of EMV chip technology's effectiveness in preventing card-present transaction fraud committed using counterfeit cards; (I) the cost to the Bank of adding EMV chips to EDD Debit Cards would have been relatively insignificant, especially given the Bank's purchasing power, and would have resulted in foreseeable net savings to the Bank because having EDD debit cards with embedded EMV chips would have protected EDD Debit Cardholders from experiencing unauthorized transactions and having to make unauthorized-transaction claims that the Bank should have been obligated to pay under EFTA and Regulation E; (J) those net savings from adding EMV chips to EDD Debit Cards would likely have increased during the pandemic, as the total number and total monetary amount of legitimate unauthorized-transactions claims affecting EDD Debit Cardholders increased and as criminals increasingly targeted the vulnerable mag-stripe-only EDD Debit Cards, yet the Bank did not begin adding EMV chips to EDD Debit Cards until after June 2021; (K) there were reasonably available alternatives to the Bank's policy and practice of issuing EDD Debit Cards without EMV chips that would have furthered the Bank's legitimate business interests, namely issuing EDD Debit Cards with embedded EMV chips; and (L) the Bank's policy and practice of issuing EDD Debit Cardholders mag-stripe-only EDD Debit Cards without EMV chips caused (on the one hand) significant foreseeable harm to EDD Debit Cardholders, and caused (on the other hand) benefits and cost savings to the Bank that were comparatively minor, negligible, or non-existent.

ii.    *The Immoral Test.* The Bank's No EMV Chip Policy was unfair under the Immoral test because it was immoral, unethical, oppressive, unscrupulous, and substantially injurious, for the same reasons as it was unfair under Balancing test (*supra* ¶582(f)(i)), plus the following facts, each of which the Bank knew or reasonably should have known: (A) the Bank obtained EDD's agreement to the EDD-Bank Contract in 2015, in part, by promising to remain "at

the forefront of fraud and data security strategies benefiting the EDD and [EDD Debit Cardholders]" (*see supra* ¶¶42, 69), and the Bank immorally, unethically, oppressively, and unscrupulously broke that promise by continuing to issue EDD debit cards without EMV chips at least through the end of June 2021, causing significant foreseeable harm to Plaintiffs and Class Members; (B) in 2014, the Bank began providing debit cards with embedded EMV chips to its non-prepaid consumer customers because of the EMV chips' fraud-prevention benefits (*see supra* ¶¶2, 65), but the Bank immorally, unethically, oppressively, and unscrupulously continued to provide its more vulnerable EDD Debit Cardholder customers with fraud-susceptible mag-stripe-only EDD Debit Cards without EMV chips at least through the end of June 2021, effectively treating EDD Debit Cardholders as second-class customers whose legitimate interests were less important and less worthy of the Bank's consideration than the interests of the Bank's "regular" customers; (C) the Bank's only reason for failing to include industry-standard EMV chips was their marginal cost, which was de minimis compared to the cost of unauthorized transactions and harm to EDD Debit Cardholders caused by issuing cards without EMV chips; and (D) the Bank's intentional conduct foreseeably caused vulnerable EDD benefits recipients to be deprived of critical EDD benefits to which they were entitled at a time when they were most in need.

    iii. *The Tethering Test.* The Bank's No EMV Chip Policy was unfair under the Tethering test for the reasons set forth in ¶582(g), *infra*.

    g. **The Tethering Test.** The Bank's Unfair Business Practices (i.e., its Claim Denial Policy, Credit Rescission Policy, Account Freeze Policy, Customer Service Understaffing Policy, Deficient Fraud Monitoring Policy, and No EMV Chip Policy) were each unfair under the Tethering test for the following reasons, both individually and in combination:

    i. *EFTA and Regulation E.* The Bank's Claim Denial

Policy, Credit Rescission Policy, Account Freeze Policy, and Customer Service Understaffing Policy violated the public policy set forth in EFTA and Regulation E for each of the following reasons: (A) EFTA and Regulation E "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund … systems," and has the "primary objective" of "the provision of individual consumer rights." 15 U.S.C. §1693(b). EFTA reflects a strong public policy and Congress's considered judgment that consumers should be protected from, and promptly reimbursed for, unauthorized electronic fund transfers, and that financial institutions rather than consumers should bear the risks and liabilities of unauthorized transactions occurring on consumer accounts. *See, e.g.*, 15 U.S.C. §§1693f, 1693g(b) (providing that, to deny a consumer's unauthorized transaction claim, "the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized"); 12 C.F.R. §1005.11. The Bank's *Claim Denial Policy* and *Credit Rescission Policy* violated the public policy underlying EFTA and Regulation E because the Bank used its Claim Fraud Filter to summarily deny claims without a reasonable review of relevant Bank records, and because the Claim Fraud Filter made no attempt to differentiate between legitimate claims of unauthorized ATM withdrawals made by legitimate EDD benefits recipients who were victims of counterfeit card fraud, on the one hand, and fraudulent claims of unauthorized ATM withdrawals made by criminals who had fraudulently obtained unemployment insurance benefits using stolen identities, on the other hand. Instead, the Bank treated both groups as criminals by using the Claim Fraud Filter to simply deny all claims of unauthorized ATM withdrawals, thereby causing significant foreseeable injury to the very consumers EFTA and Regulation are intended to protect. The Bank's *Account Freeze Policy* and *Customer Service Understaffing Policy* further violated the public policy underlying EFTA and Regulation E by effectively punishing Plaintiffs and Class Members merely for seeking to exercise their rights under EFTA and Regulation E

by submitting unauthorized transaction claims. (B) EFTA and Regulation E require that covered financial institutions issue permanent credit to claimants unless the financial institution's investigation (which must be completed within 45 days after the submission of a claim of an unauthorized ATM withdrawal) establishes that the claimant made or benefitted from the transaction, reflecting a public policy that financial institutions' investigations and resolutions of consumers' unauthorized transaction claims be concluded with both promptness and finality. The Bank's *Credit Rescission Policy* violated this public policy of finality by rescinding permanent credits. (C) Implicit in EFTA's framework is a public policy that covered financial institutions must provide a reasonable means for consumers to submit claims of unauthorized transactions and otherwise communicate with the financial institution about those claims. The Bank's *Customer Service Understaffing Policy* violated this public policy because it subjected Plaintiffs and Class Members to hours-long wait times, dropped calls, otherwise significantly frustrated Plaintiffs' and Class Members' ability to obtain customer service, and effectively punished Plaintiffs and Class Members merely for seeking to exercise their rights under EFTA and Regulation E by submitting unauthorized transaction claims. The Bank's *Account Freeze Policy* also violated this public policy for the same reasons, plus the additional reasons that it required Plaintiffs and Class Members whose Accounts were frozen to reverify their identity with EDD at a time when the Bank knew EDD's call centers were overwhelmed and that it would be virtually impossible for callers to reach EDD, referred them again to EDD even after the Cardholder informed the Bank that EDD had informed the Cardholder that there was no need for EDD to reverify their identity and/or that any problem with their Account could only be resolved the Bank. (D) EFTA and Regulation E apply to government benefit accounts, including EDD Debit Card Accounts, because "all consumers using EFT [electronic fund transfer] services should receive substantially the same protection under the EFTA and Regulation E." 59 Fed. Reg. 10678, 10678-80 (1994). The

Bank's *Claim Denial Policy*, *Credit Rescission Policy*, *Account Freeze Policy*, and *Customer Service Understaffing Policy* further violated this public policy because the Bank applied its Claim Fraud Filter only to claims by EDD Debit Cardholders and not to claims by its regular consumer customers, thereby depriving EDD Debit Cardholders of substantially the same protection under EFTA and Regulation that it afforded to its consumer customers.

    ii. *EDD Benefits Statutes.* Each of the Bank's Unfair Business Practices violated the public policies underlying the public benefits statutes authorizing the EDD benefits that were to be disbursed to Plaintiffs and Class Members through their EDD Debit Cards and Accounts. These statutes include, for example, the Social Security Act of 1935, the CARES (Coronavirus Aid, Relief, and Economic Security) Act, and the California Unemployment Insurance Code. (A) These public benefits statutes reflect the "considered judgment" that "the public good and the general welfare of the citizens of the State [of California] require ... the compulsory setting aside of funds to be used for a system of unemployment insurance providing benefits for persons unemployed through no fault of their own, and to reduce involuntary unemployment and the suffering caused thereby to a minimum." Cal. Unemployment Ins. Code §100. Each of the Bank's *Unfair Business Practices* violated that public policy by implementing business practices that caused significant foreseeable harm to Plaintiffs and Class Members, and thereby *increased* Plaintiffs' and Class Members' suffering resulting from their involuntary unemployment. (B) Federal law requires that state unemployment compensation programs be "reasonably calculated to insure full payment of unemployment compensation when due." 42 U.S.C. §503(a)(1). The statutory term "'when due' was intended to mean at the earliest stage of unemployment that such payments were administratively feasible," which reflects Congress's "purpose … to give prompt if only partial replacement of wages to the unemployed, to enable workers 'to tide themselves over, until they

1  get back to their old work or find other employment … at a time when otherwise he

2  would have nothing to spend, serving to maintain the recipient at subsistence levels

3  without the necessity of his turning to welfare or private charity," "to prevent a

4  decline in the purchasing power of the unemployed," and to provide the

5  unemployed the financial means to find employment. *California Dept. of Human*

6  *Res. Dev. v. Java*, 401 U.S. 121, 131–32 (1971) (internal quotation marks and

7  citations omitted); *see also id.* at 133 (policy that "suspends payments for a median

8  period of seven weeks pending appeal, after an initial determination of eligibility

9  has been made," violates the statute). As reflected in *Java*, the statutory requirement

10  is based in a recognition that many unemployment benefits recipients urgently need

11  those benefits to pay for basic life necessities to avoid suffering and reflects a public

12  policy that they receive the full amount of benefits to which they are entitled as soon

13  as they are entitled to receive those benefits. Each of the Bank's Unfair Business

14  Practices violated this public policy by depriving Plaintiffs and Class Members of

15  already-paid benefits to which they were entitled (*Claim Denial Policy*, *Credit*

16  *Rescission Policy*, *Account Freeze Policy*, *Deficient Fraud Monitoring Policy*, and

17  *No EMV Chip Policy*), prevented them from future benefits payments when due

18  (*Account Freeze Policy*), and otherwise increased and prolonged the harm caused

19  by the Bank's Unfair Business Practices (*Account Freeze Policy* and *Customer*

20  *Service Understaffing Policy*).

21  iii.    *Federal and State Due Process Rights.* The Bank's Unfair

22  Business Practices also violated the public policy set forth in the Due Process

23  Clauses of the U.S. and California Constitutions, which prohibit state deprivations

24  of property without notice and an opportunity to be heard. UI and other EDD

25  benefits that were distributed to Plaintiffs and Class Members through EDD Debit

26  Cards are constitutionally protected property that cannot be taken from EDD

27  benefits recipients without *pre*-deprivation notice and a meaningful opportunity to

28  be heard. *See Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970); *Am. Fed. of Labor*

1    *v. Employment Dev. Dept.* ("*AFL*"), 88 Cal.App.3d 811, 820 & n.5 (1979). The

2    Bank's Unfair Business Practices, and especially the *Credit Rescission Policy*,

3    *Account Freeze Policy*, and *Customer Service Understaffing Policy*, violated both

4    the letter and the spirit of both requirements.

5                    iv.    *California Constitution and Related Privacy Statutes*.

6    The Bank's *No EMV Chip Policy* also violated the public policy underlying the right

7    to privacy articulated in the California Constitution and privacy statutes. The

8    California Constitution declares an "inalienable" right to "pursu[e] and obtain[]

9    safety, happiness, and privacy." Cal. Const. art. I, §1. This constitutional right

10   "protects the privacy of California citizens from unwarranted intrusions into their

11   private and personal lives." Cal. Fin. Code §4051.5(a)(1) (CFIPA). One of the

12   "principal mischiefs" at which the constitutional right is directed is "the improper

13   use of information properly obtained . . . or the disclosure of it to some third party,"

14   and it thus seeks to impose "effective restraints on the information activities of

15   government and business." *White v. Davis*, 13 Cal.3d 757, 774, 775 (1975).

16   Building on this strong public policy in favor of protecting individual privacy

17   articulated in the state constitution, the California Legislature has enacted an array

18   of privacy-protecting statutes including the CCPA, CFIPA, Comprehensive

19   Computer Data Access and Fraud Act, and Invasion of Privacy Act, which together

20   "evidence California's serious concern with consumer protection and data privacy."

21   *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1045 (S.D. Cal. 2023). The CCPA,

22   for example, articulates a far-reaching policy of protecting consumer privacy,

23   directing that "provisions of the law that afford the greatest protection for the right

24   of privacy for consumers shall control." Cal. Civ. Code. § 1798.175. The Bank's

25   *No EMV Chip Policy* violated the public policy underlying the California

26   Constitution and the CCPA, CFIPA, and other privacy-protecting statutes because

27   the Bank knew that mag-stripe-only debit cards without EMV chips were outdated

28   and would leave Cardholders needlessly vulnerable to fraud, and that EMV chips

had long been part of the industry standard for debit card security because of their effectiveness in protecting consumers from card skimming and card counterfeiting, and yet the Bank issued Plaintiffs and Class Members outdated mag-stripe-only EDD Debit Cards without EMV chips anyway, causing significant foreseeable harm to Plaintiffs and Class Members. The *No EMV Chip Policy* further violated California's public policy of protecting the nonpublic personal data of *all* Californians, regardless of income, and yet the Bank issued EMV-chip cards to its wealthier non-prepaid consumer customers, while issuing non-EMV-chip cards to its EDD Debit Cardholders.

583.   As a result of Bank of America's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to the funds lost to fraud that have not been reimbursed, the lost time value of money not timely reimbursed by Bank of America, fees paid to Bank of America, and lost interest that would have accrued on funds during the period of time when the funds were unavailable due to Bank of America's failure to timely and adequately investigate claims of unauthorized transactions and other violations of the UCL.

584.   Plaintiffs' legal remedies are inadequate. With respect to restitution, Plaintiffs' and Class Members' legal remedies are inadequate because damages are not available to Plaintiffs and Class Members for conduct that is "unlawful" under the GLBA Safeguards Rule or for conduct that is determined not to be "unlawful" but to nonetheless violate the UCL because it is "unfair." Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, thus seek the following relief under the UCL in addition to, or in the alternative to, damages: restitution, restitutionary disgorgement, prejudgment interest, and all other available equitable relief.

# FIFTH CLAIM FOR RELIEF

## NEGLIGENCE AND NEGLIGENCE PER SE

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Alvarez*, *Brotman*, *Meza*, *Morrell*, *Payton*, *Rojas de Charolet*, *Talia*, and *Verdun* Actions)

585.  Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

586.  Plaintiffs and Bank of America have a special relationship that gives rise to the Bank's duties to Plaintiffs and Class Members to act reasonably to: (a) safeguard their UI and other EDD benefits; (b) protect their Cards and Accounts from fraudulent access by unauthorized third parties, including by employing reasonable practices and procedures to protect the confidentiality and security of their Cardholder Information and by employing reasonable practices and procedures to monitor for, detect, stop, and promptly notify Cardholders about suspicious transactions involving their Cards and Accounts; (c) provide them reasonable and adequate notice that their EDD Debit Cards and Accounts were at risk of being subject to unauthorized use or had been subjected to unauthorized use; (d) protect them from unreasonable interference with their right and ability to continue to collect, receive, and access the EDD benefits to which they were entitled; (e) ensure that the Bank's customer service staffing levels, technology, and operations were capable of providing Plaintiffs and Class Members reasonably timely and effective customer service, including to address those customers' concerns about fraudulent or unauthorized transactions related to their EDD Debit Cards or Accounts; (f) timely and adequately investigate and resolve Plaintiffs' and Class Members' claims regarding unauthorized or fraudulent transactions; and (g) extend to Plaintiffs and Class Members provisional credit in cases where the Bank failed to timely resolve their fraud-related claims.

587.   Bank of America breached its duty to Plaintiffs and Class Members by, among other things: (a) failing to maintain, store, share, transmit, or otherwise use their personal information (as defined under the CCPA) and Cardholder Information in a secure manner; (b) failing to issue them EDD Debit Cards with EMV chips, despite having been well aware for years of the risks associated with magnetic stripe technology; (c) failing to protect their Accounts from fraudulent access by unauthorized third parties; (d) failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify them about suspicious transactions involving their Cards and Accounts, including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff or Class Member's Card and Account transaction history and past Account access behaviors; (e) failing to give them reasonable and adequate notice that their EDD benefits were and remain at risk of being vulnerable to fraudulent and unauthorized transactions; (f) failing to respond to the dramatic increase in EDD benefits and EDD benefits recipients caused by or related to the COVID-19 pandemic by issuing EDD Debit Cards with EMV chips to all new and existing EDD Debit Cardholders and by taking other reasonably prudent security measures to prevent fraudulent and unauthorized transactions; (g) failing to ensure its customer service operation was capable of providing reasonably timely and effective assistance to Plaintiffs and Class Members, including when they were victims of fraudulent or unauthorized transactions; (h) failing to process Plaintiffs' and Class Members' claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner, including by unreasonably automatically freezing EDD Debit Card Accounts without prior notice, reasonable investigation, or an opportunity to be heard; and (i) failing to extend provisional credit to Plaintiffs and Class Members when Bank of America failed to resolve their claims regarding

fraudulent or unauthorized transactions in a reasonably timely and adequate manner. Bank of America's misconduct was intended to adversely affect Plaintiffs and Class Members, who rely on Bank of America to access their UI and other EDD benefits through their EDD Debit Cardholder Accounts managed exclusively by Bank of America.

588.    Bank of America's misconduct concerning its failure to safeguard EDD Debit Cardholders' funds is contrary to industry standards, which include prescribing use of EMV chip technology in debit cards, as well as its own policies and procedures for its *non*-EDD debit and credit cards and accounts, each of which are secured through EMV chip technology.

589.    Bank of America's misconduct concerning its failure to adequately protect Plaintiffs' and Class Members' data also violates, as set forth in more detail, its obligations under the California Consumer Privacy Act, Cal. Civ. Code §§1798.100 et seq., and the Gramm-Leach-Bliley Act, 15 U.S.C. §§6801 et seq. Plaintiffs and Class Members are within the classes of persons that each of these statutes are designed to protect, and Bank of America's conduct caused the precise harm to Plaintiffs and Class Members that each of these statutes was designed to prevent. As to the GLBA in particular:

a.    Section 501 of the GLBA imposes on every covered financial institution, including the Bank, "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information," and requires that various federal agencies and authorities establish appropriate standards that covered financial institutions must follow to fulfill their statutory obligation. 15 U.S.C. §6801. To implement section 501's mandate, the Federal Trade Commission ("FTC") promulgated the Safeguards Rule. 16 C.F.R. §§314.3, 314.4. The Bank is subject to the GLBA because it is a financial institution as defined under 15 U.S.C. §6809(3)(A), and it is subject to the Safeguards Rule because it is a financial

institution that handles and maintains nonpublic personal information as defined under 16 C.F.R. §313.3(n), including Plaintiffs' and Class Members' nonpublic personal information.

b.    The Safeguards Rule requires that the Bank and other covered financial institutions protect the security, confidentiality, and integrity of customer information by developing, implementing, and maintaining a written, comprehensive information security program that establishes administrative, technical, and physical safeguards that are appropriate to the financial institution's size and complexity, the nature and scope of its activities, and the sensitivity of the customer information at issue, including by: (i) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information; (ii) assessing the sufficiency of any safeguards in place to control those risks; (iii) designing and implementing information safeguards to control and minimize the risks identified through risk assessment; (iv) regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (v) overseeing the financial institution's service providers by taking reasonable steps to select and retain service providers that will maintain appropriate safeguards for customer information, and by requiring those service providers, by contract, to maintain and implement such safeguards; and (vi) evaluating and adjusting the financial institution's information security program to incorporate the results of the institution's testing and monitoring activities, any changes to the financial institution's business operation, and other relevant circumstances. 16 C.F.R. §§314.3, 314.4.

c.    Throughout the class period, the Bank has repeatedly and consistently violated the Safeguards Rule with respect to Plaintiffs' and Class Members' nonpublic personal information by, among other things: (i) failing to issue industry standard EMV-chipped credit cards to EDD Debit Cardholders, including Plaintiffs and Class Members (*see supra* ¶¶59–69); and (ii) selecting and

1   retaining subcontractors to carry out its customer service obligations without taking
2   reasonable steps to ensure that those subcontractors performed background checks
3   on their employees, and were adequately maintaining the security of customers'
4   nonpublic personal information (*see supra* ¶55; *see also infra* ¶¶596–598).

5          d.     The Bank's actions and inactions alleged herein have violated
6   the provisions of the Safeguards Rule that require the Bank and other covered
7   financial institutions to "[b]ase [their] information security programs on a risk
8   assessment that identifies reasonably foreseeable internal and external risks"—in
9   particular, the reasonably foreseeable and anticipated risks associated with issuing
10  debit cards without industry standard security protection and with entrusting
11  customers' nonpublic personal information to companies that did not perform
12  background checks or utilize appropriate security practices and technologies. 16
13  C.F.R. §314.4(b).

14         e.     The Bank's actions and inactions as alleged herein, including its
15  failure to ensure that its contractors, subcontractors, and all others acting under its
16  direction and control adequately protect its customers' nonpublic personal
17  information, further violated the provisions of the Safeguards Rule requiring the
18  Bank to (i) "[o]versee service providers, by . . . [t]aking reasonable steps to select
19  and retain service providers that are capable of maintaining appropriate safeguards
20  for the customer information at issue," 16 C.F.R. §314.4(f)(1); and
21  (ii) "[i]mplement policies and procedures to ensure that personnel are able to enact
22  your information security program by: (1) Providing your personnel with security
23  awareness training that is updated as necessary to reflect risks identified by the risk
24  assessment; (2) Utilizing qualified information security personnel employed by you
25  or an affiliate or service provider sufficient to manage your information security
26  risks and to perform or oversee the information security program; (3) Providing
27  information security personnel with security updates and training sufficient to
28  address relevant security risks; and (4) Verifying that key information security

1  personnel take steps to maintain current knowledge of changing information
2  security threats and countermeasures," *id.* §314.4(e).

3          f.      The Bank's actions and inactions alleged herein further violated
4  its "continuing obligation" under the GLBA to protect the privacy of its customers
5  by failing to monitor and to update the efficacy of its information security programs
6  in the wake of the significant and rampant security breaches of which it was aware
7  and should have been aware. The Safeguards Rule specifically requires the Bank to
8  (i) "periodically perform additional risk assessments that reexamine the reasonably
9  foreseeable internal and external risks to the security, confidentiality, and integrity
10 of customer information that could result in the authorized disclosure . . . or other
11 compromise of such information, and reassess the sufficiency of any safeguards in
12 place," 16 C.F.R. §314.4(b)(2); (ii) "[i]mplement policies and procedures and
13 controls designed to monitor and log the activity of authorized users and detect
14 unauthorized access or use of, or tampering with, customer information by such
15 users," *id.* §314.4(c)(8); (iii) "[r]egularly test or otherwise monitor the effectiveness
16 of the safeguards' key controls, systems, and procedures," *id.* §314.4(d)(1); and
17 (iv) "[o]versee service providers by . . . [p]eriodically assessing your service
18 providers based on the risk they present and the continued adequacy of their
19 safeguards, *id.* §314.4(f)(3). For the reasons alleged herein, the Bank failed to
20 comply with those regulatory requirements as well.

21         g.      The Bank has been on notice since at least October 2020, and
22 likely before October 2020, that its existing information security programs were
23 inadequate to protect against the wave of security breaches that affected and caused
24 economic and other harms to EDD recipients. *See supra* ¶¶52–69, 77–105. Despite
25 the Bank's statutory and regulatory obligations under the GLBA and Safeguards
26 Rule to monitor and to update its security policies based on new information, the
27 Bank failed to adequately and materially modify its practices as necessary to
28 comply with those obligations.

590.   Bank of America's failure to comply with the California Consumer Privacy Act, the Gramm-Leach-Bliley Act, the California Financial Information Privacy Act, and the California Consumer Records Act constitutes negligence per se.

591.   The harms inflicted upon Plaintiffs and other Class Members were reasonably foreseeable because the Bank was and is well aware of the security risks associated with magnetic stripe technology, and knew or should have known that its customer service resources and/or procedures were insufficient to consider, evaluate, and appropriately resolve issues stemming from the significant increase in EDD benefits and EDD benefits recipients due to the sharp rise in unemployment in the State of California caused by or related to the COVID-19 pandemic, as well as the sharp, well-publicized rise in financial fraud during the COVID-19 pandemic, both of which would foreseeably lead to an increased demand for customer service by Plaintiffs and Class Members for all purposes, including for the purposes of reporting and attempting to resolve claims of fraudulent or unauthorized transactions. It was a near certainty, which the Bank knew or should have known, that Plaintiffs and Class Members would suffer significant and irreparable harm as a result of the Bank's morally blameworthy actions that caused tens of thousands of unemployed Californians to lose access to past, present, and future EDD benefits for which they had been found eligible and on which they relied for their survival during the pandemic.

592.   As a direct and proximate result of Bank of America's misconduct, Plaintiffs and Class Members have been deprived of their EDD benefits and have failed to receive accrued interest thereon.

593.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

### SIXTH CLAIM FOR RELIEF

### NEGLIGENT HIRING, SUPERVISION, AND RETENTION

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the
*Alvarez*, *Rojas de Charolet*, and *Verdun* Actions)

594.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

595.   Bank of America hired various subcontractors, including but not limited to TTEC Holdings, Inc. ("TTEC"), to provide customer service, call center operations, and other services for the Bank and to perform various functions and services under the terms of the EDD–Bank Contract. These subcontractors and their employees and agents, including Customer Service Representatives, have access to highly sensitive and confidential EDD Debit Cardholder Information, including Plaintiffs' and Class Members' personally identifiable information, Card and Account data, and other financial data and information.

596.   Acting as the Bank's agent, TTEC negligently hired hundreds if not thousands of employees *en masse* to perform services for the Bank without ever conducting a background check on these individuals. Bank of America granted these unvetted agents access to EDD Debit Cardholders' highly sensitive and confidential Cardholder Information, and further failed to take reasonable steps to secure Cardholder Information from unnecessary or unauthorized access, disclosure, and exfiltration, including by its subcontractors' agents and employees. Neither Bank of America itself nor TTEC provided proper training or supervision to these agents regarding handling and maintaining the confidentiality of Cardholder Information.

597.   Given the Bank's and TTEC's failure to conduct background checks or to take other reasonable security measures in hiring employees *en masse* to serve as Bank of America Customer Service Representatives and other Bank agents, it was reasonably foreseeable that such unvetted agents would compromise the

1   security of Plaintiffs' and Class Members' confidential Cardholder Information.

2   598.    Bank of America's and its subcontractors' negligent hiring, training,

3   supervision, and retention of Customer Service Representatives and other agents

4   who have access to highly confidential Cardholder Information harmed and

5   continues to harm Plaintiffs and Class Members by subjecting them to unreasonable

6   risk of fraud and exfiltration of their Cardholder Information and enabled a series

7   of internal data breaches committed by TTEC employees within the scope of their

8   employment, which harmed the Class Members whose information was

9   compromised.

10   599.    Under the terms of the EDD–Bank Contract, Bank of America is

11   required to track and report all incidents or security breach exposures of confidential

12   information that may have compromised an EDD Debit Cardholder's confidential

13   Cardholder Information or the integrity and secure delivery of EDD benefits to the

14   Cardholder. Bank of America thus knew or should have known that TTEC was or

15   became unfit or incompetent to perform the work for which it was hired, including

16   as a result of its negligent hiring, training, supervision, and retention of agents with

17   access to confidential Cardholder Information, yet Bank of America continued to

18   retain TTEC as a subcontractor to perform services under the EDD–Bank Contract.

19   600.    TTEC at all relevant times has been the actual, apparent, and ostensible

20   agent of Bank of America, who has ratified TTEC's actions.

21   601.    As a direct and proximate result of Bank of America's and its agents'

22   misconduct, Plaintiffs and Class Members have been deprived of their EDD

23   benefits and have failed to receive accrued interest thereon.

24   602.    Plaintiffs, on behalf of themselves and the Class and applicable

25   Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

26

27

28

## SEVENTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

(Brought by Class Representative Plaintiff Stephanie Smith and

Individual Plaintiff Crystal Horath)

603.    Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

604.    Each Plaintiff and Class Member entered into a Cardholder Agreement with the Bank that requires the Bank to administer EDD benefits to them through prepaid debit cards.

605.    The Cardholder Agreement provides, among other things: "Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to the amount of the transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions" (§9). The Cardholder Agreement further provides: "We will determine whether an error occurred within 10 business days after we hear from you — and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation" (§11).

606.    *[Removed]*

607.    Plaintiffs and Class Members performed all or substantially all of the material requirements that their Cardholder Agreement with Bank of America imposed on them, and they fulfilled all conditions precedent to Bank of America's performance, including, among other things, by contacting or attempting to contact Bank of America to reimburse them for fraudulently appropriated funds within the time specified in the Cardholder Agreement.

608.    Bank of America breached its promises to Class Plaintiff Stephanie Smith and Individual Plaintiff Cystal Horath in its Cardholder Agreement by, among other things: (a) failing to timely and reasonably investigate and resolve their fraud claims; (b) failing to reimburse them for unauthorized transactions; (c) failing to provide them with provisional credit when the Bank's investigation into their fraud claims exceeds 10 business days; (d) failing to limit their liability for unauthorized transactions; (e) *[removed]*; (f) *[removed]*; (g) *[removed]*; and (h) *[removed]*.

609.    Class Plaintiff Stephanie Smith and Individual Plaintiff Cystal Horath were harmed by Bank of America's conduct and have suffered actual damages in an amount equal to the difference in the value of the banking services for which they provided valuable consideration and the banking services they received.

610.    Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## EIGHTH CLAIM FOR RELIEF

### BREACH OF IMPLIED CONTRACT

611.    *[Removed]*

612.    *[Removed]*

613.    *[Removed]*

614.    *[Removed]*

615.    *[Removed]*

616.    *[Removed]*

617.    *[Removed]*

618.    *[Removed]*

**<u>NINTH CLAIM FOR RELIEF</u>**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the

*Abarr*, *Brotman*, *Meza*, *Morrell*, *Payton*, and *Talia* Actions)

619.    Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

620.    There is a covenant of good faith and fair dealing implied in every contract and every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

621.    The covenant of good faith and fair dealing implied in the Bank's Cardholder Agreement with Plaintiffs and Class Members obligated the Bank, at a minimum:

a.    to take reasonable and necessary steps to safeguard Plaintiffs' and Class Members' EDD benefits, including in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic;

b.    to ensure that its customer service operation was capable of providing reasonably adequate and effective assistance to EDD Debit Cardholders who experienced or claimed to have experienced fraud on their EDD Debit Cards or Accounts, particularly given that the Cardholder Agreement (i) provides, among other things, that "Regulation E . . . covers accounts that involve the use of a Card" and that the Bank's "zero liability policy . . . regarding unauthorized transactions may give you more protection, provided you report the transactions promptly," *see supra* ¶605; (ii) provides that "in case of errors or questions about your transactions," EDD Debit Cardholders should telephone the Bank at the telephone

number provided, (866) 692-9374; (iii) expressly instructs Cardholders to "contact us at the numbers listed below AT ONCE if you believe your Card has been lost or stolen, or if you believe that someone may use or has used your PIN assigned to your Card without your permission"; and (iv) advises Cardholders that "[t]elephoning is the best way of keeping your possible losses down" in the event the Cardholder believes that they have been the victim of an unauthorized transaction or other wrongful conduct;

c.    to warn or notify Plaintiffs and Class Members if their public benefit funds were subject to, or at risk of being subject to, actual or suspected unauthorized use;

d.    to timely and adequately investigate and resolve claims of unauthorized transactions involving Plaintiffs' and Class Members' EDD Debit Cards or Accounts;

e.    to extend provisional credit to Plaintiffs and Class Members in cases where their fraud claims are not timely resolved;

f.    to freeze or block EDD Debit Card Accounts only to protect them from third-party fraud and only for the period necessary to conduct a reasonable investigation into whether third-party fraud occurred;

g.    to make EDD benefits deposited into EDD Debit Card Accounts immediately available to Cardholders and not to freeze or block Accounts without a reasonable basis for believing that the Cardholders themselves have committed fraud; and

h.    to not freeze or block Accounts out of concern for the Bank's own potential liability for third-party fraud.

622.    Bank of America breached the implied covenant of good faith and fair dealing by, among other things:

a.    failing to take reasonable and necessary steps to safeguard Plaintiffs' and Class Members' EDD benefits, including but not limited to (i) failing

to issue EDD Debit Cards with EMV chip technology, (ii) failing to employ reasonable practices and procedures to secure Plaintiffs' and Class Members' Cardholder Information and other sensitive personal information that could be used by third parties to effect unauthorized transactions, (iii) failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify Plaintiffs and Class Members about suspicious transactions involving their Cards and Accounts (including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff or Class Member's Card and Account transaction history and past Account access behaviors), and (iv) failing to promptly issue EDD Debit Cards with EMV chips and to increase its efforts with respect to securing personal information, fraud monitoring, and otherwise safeguarding benefits in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic;

b.     failing to ensure, including during the COVID-19 pandemic, that EDD Debit Cardholders could reach the Bank's customer service operations in a timely and effective manner at the telephone number(s) the Bank had provided in its Cardholder Agreements and had instructed Cardholders to call in order to report unauthorized transactions and other wrongful conduct and to otherwise seek to enforce their contractual rights and regain access to their stolen benefit funds, which the Bank owed Plaintiffs and Class Members a fiduciary duty to protect (*see infra* ¶¶625–636), thereby depriving EDD Debit Cardholders of the benefit of their contractual bargain (*see, e.g.*, *supra* ¶¶87–88, 90, 97–105, 116–120, 128–133, 144–151, 207–213, 217–222, 231–234);

      c.     failing to warn or notify EDD Debit Cardholders that their EDD benefits were and remain subject to, or at risk of being subject to, actual or suspected unauthorized use;

      d.     failing to timely or adequately process and investigate EDD Debit Cardholders' claims regarding unauthorized transactions;

      e.     failing to extend provisional credit in cases where EDD Debit Cardholders' fraud claims are not timely resolved;

      f.     freezing or blocking EDD Debit Card Accounts without a reasonable basis for believing that the Cardholders themselves had committed fraud, and for longer than it would reasonably take to investigate any such belief;

      g.     failing to provide EDD Debit Cardholders any reasonable means of contesting the Bank's purported basis for freezing their EDD Debit Card Accounts or for otherwise getting their Accounts unfrozen; and

      h.     freezing or blocking EDD Debit Card Accounts not to protect the Cardholders, but rather to protect the Bank itself, from liability for third-party fraud.

623.   As a direct and proximate result of Bank of America's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered actual losses and damages.

624.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## TENTH CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the *Abarr*, *Brotman*, *Meza*, *Morrell*, and *Payton* Actions)

625.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

626.   Bank of America knows and at all relevant times has known that Plaintiffs and Class Members, as public benefits recipients, are members of a uniquely vulnerable segment of the population, who depend on the prompt and accurate payment of the unemployment benefits and other EDD benefits to obtain their basic necessities of life, including food and shelter.

627.   When Plaintiffs and Class Members submitted their claims for unemployment and other EDD benefits to EDD and were found eligible to receive those benefits, they were not given the choice of receiving those benefits through debit cards issued by any financial institution other than Bank of America. Bank of America holds the exclusive contract to implement and administer EDD's public benefits programs and is the only financial institution authorized to pay EDD benefits to program beneficiaries through the use of prepaid debit cards.

628.   In order to obtain the Bank-issued EDD Debit Cards needed to access their EDD Debit Card Accounts, which is the default way of receiving EDD benefits, Plaintiffs and Class Members were required to provide the Bank with private and confidential personal and financial information, including information pertaining to their income, public benefits, employment status, finances, social security numbers, addresses, emails, telephone numbers, and all debit card account information.

629.   The Bank, in turn, was provided access to all such personal, confidential, and financial information from Plaintiffs and Class Members, which the Bank stored and maintained, purportedly in confidence, and which the Bank was required to strictly maintain in confidence without public access or other disclosure absent the EDD Debit Cardholders' written consent. The Bank was also delegated the responsibility and authority to determine when, why, and how to deny Plaintiffs and Class Members access to EDD benefits to which they are entitled by freezing EDD Debit Card Accounts.

630.    Plaintiffs and Class Members, as EDD benefits recipients who did not opt out of the default option of receiving their EDD benefits payments through EDD Debit Cards, were repeatedly assured that a EDD Debit Card was a "[f]aster, easier and more secure" way to receive their benefit payments and that the EDD Debit Cards and Accounts were secure from fraud. The Bank also assured them that if they called the Bank's call center to report fraud on their EDD Debit Card, the Bank would promptly assist them and protect them from losses pursuant to Regulation E and the Bank's zero liability policy. The Bank promised to provide EDD Debit Cardholders "[s]uperb," "swift," and "responsive" live customer service support available "24/7" with an "average speed to answer of "no more than 30 seconds for 70 percent of the calls, and no more than two (2) minutes for all calls," and advised EDD Debit Cardholders that "[t]elephoning is the best way of keeping your possible losses down." *See supra* ¶¶43-44, 70-71, 73, 98, 105. Plaintiffs and Class Members reposed their trust and confidence in the Bank at all material times, including with respect to all of their personal, confidential, and financial information and with respect to the Bank's ongoing maintenance of that information in confidence, without secretion or divulgence absent Plaintiffs' and Class Members' express written consent. Plaintiffs and Class Members entered into a contractual relationship with Bank of America solely to secure their peace of mind in accessing the subsistence EDD benefits to which they had been found eligible and on which they relied to pay for housing, food, and other daily necessities.

631.    Bank of America owes and continues to owe a fiduciary duty to Plaintiffs and Class Members. By virtue of its unequal bargaining power and its position as the financial institution charged with implementing EDD benefits programs, which gave the Bank delegated authority to determine when, why, and how to deny Plaintiffs and Class Members access to EDD benefits to which they are entitled by freezing EDD Debit Card Accounts, as well as unbridled access to Plaintiffs' and Class Members' personal, confidential, and financial information,

and because of the Bank's superior knowledge, business responsibilities and duties—including those provided by law or statute—and its absolute ability to control or otherwise manipulate Plaintiffs' and Class Members' EDD Debit Card Account data in its system, the Bank assumed a fiduciary duty to Plaintiffs and Class Members not to deny them access to their Account funds without reasonable basis, and to secure and maintain the personal, confidential, and financial information that it received from Plaintiffs and Class Members, free from unauthorized intrusion, theft, or other disclosure.

632.   As a result of this relationship of trust and confidence, the unique nature of the EDD Debit Card Accounts that contain only EDD benefits, and the highly confidential nature of the records and data pertaining to Plaintiffs' and Class Members' EDD Debit Cards Accounts, and the Bank's duties to maintain the privacy of such information, the Bank owed Plaintiffs and Class Members the highest degree of loyalty, honesty, fidelity, trust, and due care in its fiduciary obligations with respect to ensuring legitimate benefits recipients are not denied access to their Account funds, and with respect to securing and maintaining the privacy of their personal, confidential, and financial data in the Bank's possession. In order to comply with such duty, the Bank was required to use its utmost ability to ensure that legitimate benefits recipients are not denied access to their Account funds, and to protect, preserve, and secure Plaintiffs' and Class Members' private data and confidential information from unauthorized access, fraud, or theft and to take all necessary steps in order to do so, including encrypting such information and deploying sufficient data access security controls, EMV chips, and other measures, to frustrate and disable hackers, skimmers, cloners, or others from accessing such information for their personal profit or unlawful goals.

633.   Based on the acts or omissions alleged above, Bank of America breached its fiduciary duties to Plaintiffs and Class Members by failing to take all adequate and necessary steps to ensure legitimate benefits recipients are not denied

access to their Account funds without reasonable basis, to provide reasonably effective and prompt customer service to Plaintiffs and Class Members seeking to access their Account funds, and to preserve, secure, and maintain the confidentiality and privacy of Plaintiffs' and Class Members' EDD Debit Cards and Accounts and their personal, confidential, and financial information. The Bank independently breached its fiduciary duties to Plaintiffs and Class Members by failing to timely, fully, and adequately disclose that it had not taken the necessary steps to protect such information from unauthorized or fraudulent access and theft and that such information was at a heightened risk of breach by virtue of the Bank's data security failings and policies. The Bank also independently breached its fiduciary duties to Plaintiffs and Class Members by failing to timely, fully, and adequately disclose that it had not taken the necessary steps to monitor for, detect, stop, and promptly notify Plaintiffs and Class Members about suspicious transactions involving their Cards and Accounts.

634.  Bank of America recklessly or knowingly breached its fiduciary duty and consciously denied legitimate EDD benefits recipients' access to their EDD Debit Card Account funds without reasonable basis. The Bank also recklessly or knowingly breached its fiduciary duty and consciously impeded EDD Debit Cardholders' efforts to seek assistance from the Bank in regaining access to their stolen EDD benefits by deliberately understaffing its call centers and subjecting Cardholders to extraordinarily long wait times. The Bank also created an environment that made its data systems and Plaintiffs' and Class Members' EDD Debit Card Accounts and their access to EDD benefits prey to criminal hackers and thieves. Alternatively, and without prejudice to the foregoing, the Bank also breached its fiduciary duty by placing its own desire to achieve greater profits ahead of the financial security, privacy, and data security interests of Plaintiffs and Class Members.

635.  As a direct and proximate result of the Bank's violations of its

fiduciary duty, Plaintiffs and Class Members have been injured and have suffered and will continue to suffer economic and non-economic losses in an amount to be determined according to proof at trial, and a constructive trust has been formed in which the Bank is an involuntary trustee for the benefit of Plaintiffs and Class Members concerning the Account funds that Plaintiffs and Class Members have lost or been unable to access.

636.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## ELEVENTH CLAIM FOR RELIEF

## BREACH OF CONTRACT (THIRD-PARTY BENEFICIARIES)

637.   *[Removed]*

638.   *[Removed]*

639.   *[Removed]*

640.   *[Removed]*

641.   *[Removed]*

642.   *[Removed]*

643.   *[Removed]*

644.   *[Removed]*

## TWELFTH CLAIM FOR RELIEF

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

## (THIRD-PARTY BENEFICIARIES)

645.   *[Removed]*

646.   *[Removed]*

647.   *[Removed]*

648.   *[Removed]*

649.   *[Removed]*

650.   *[Removed]*

## THIRTEENTH CLAIM FOR RELIEF

## VIOLATIONS OF FEDERAL DUE PROCESS UNDER THE 14TH AMENDMENT

### 42 U.S.C. §1983

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the
*Abarr*, *Brotman*, *Meza*, *Morrell*, and *Payton* Actions)

651.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

652.   The Due Process Clause of the Fourteenth Amendments prohibits any state actor from "depriv[ing] any person of . . . property, without due process of law." U.S. Const. amend. XIV.

653.   "Every person who, under color of [law], subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," is "liable to the party injured in an action as law [or] suit in equity." 42 U.S.C. §1983.

654.   For purposes of the actions alleged herein, Bank of America is a state actor and acted "under color" of law because it is engaged in a joint undertaking with the State to provide and administer UI and other EDD benefits under a mutually beneficial relationship and because it performs a function that is both traditionally and exclusively governmental.

655.   Plaintiffs' and Class Members' unemployment benefits and other EDD benefits are constitutionally protected property interests.

656.   By rescinding (i.e. debiting) from Plaintiffs' and Class Members' EDD Debit Card Accounts permanent credits previously paid on their unauthorized transaction claims, Bank of America seized and deprived Cardholders of access to their constitutionally protected EDD benefits. In addition, by freezing Plaintiffs' and Class Members' EDD Debit Card Accounts, Bank of America (a) cuts off their access to EDD benefits already deposited to their Accounts and (b) suspends their receipt of any future EDD benefits to which they may be entitled.

657. By blocking Plaintiffs' and Class Members' EDD Debit Card Accounts, Bank of America cuts off their access to EDD benefits already deposited to their Accounts as well as their access to any continuing EDD benefits EDD subsequently deposits into their Account.

658. The Bank claims to have a policy and practice of notifying EDD when the Bank independently freezes a Cardholder's Account without having received authorization or direction from EDD to do so, and a policy and practice of requesting EDD to review to review and to verify the eligibility for EDD benefits of Cardholders whose Accounts the Bank has independently frozen.

659. The Bank performs a traditional and exclusively governmental function in administering the EDD benefits payments programs as alleged herein pursuant to contractual authority generally delegated to it by EDD, including when it blocks or freezes Cardholder Accounts without specific authorization from EDD to do so and in violation of Cardholders' rights.

660. Bank of America's policy and/or practice of rescinding previously paid permanent credits on EDD Debit Cardholders' unauthorized transaction claims, and of automatically freezing or blocking the Plaintiffs' and Class Members' EDD Debit Card Accounts when they report unauthorized transactions, without affording them any prior notice or pre-deprivation hearing, or any prompt and meaningful post-deprivation opportunity to be heard, violates Plaintiffs' and Class Members' due process rights under the Fourteenth Amendment to the U.S. Constitution.

661. Plaintiffs, on behalf of themselves and the Class, seek an injunction barring Bank of America from rescinding previously paid permanent credits or freezing or blocking EDD Debit Card Accounts without prior notice and a pre-deprivation hearing. Plaintiffs, on behalf of themselves and the applicable Subclasses, further seek the following relief: (a) actual damages; (b) nominal damages; (c) restitution of all EDD benefits funds improperly frozen or blocked by Bank of America; and (d) incidental and consequential damages suffered due to

their inability to pay bills or otherwise use their unemployment funds.

## FOURTEENTH CLAIM FOR RELIEF

### VIOLATIONS OF THE CALIFORNIA DUE PROCESS CLAUSE

### Cal. Const. art. I, §7(a)

(Brought by Class Representative Plaintiffs and Individual Plaintiffs in the
*Abarr*, *Brotman*, *Meza*, *Morrell*, and *Payton* Actions)

662.   Plaintiffs repeat and incorporate by reference each and every allegation set forth above, as though fully set forth here.

663.   The California Constitution's due process clause provides: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws." Cal. Const. art. I, §7(a).

664.   Plaintiffs' and Class Members' EDD benefits are constitutionally protected property interests.

665.   Bank of America's policy and/or practice of rescinding previously paid permanent credits on EDD Debit Cardholders' unauthorized transaction claims, and of automatically and indefinitely freezing or blocking Plaintiffs' and Class Members' EDD Debit Card Accounts when they report unauthorized transactions, without affording them any prior notice or pre-deprivation hearing, or any prompt and meaningful post-deprivation opportunity to be heard, violates Plaintiffs' and Class Members' due process rights under the California Constitution.

666.   Plaintiffs, on behalf of themselves and the Class, seek an injunction barring Bank of America from rescinding previously paid permanent credits or freezing or blocking EDD Debit Card Accounts without prior notice and a pre-deprivation hearing. Plaintiffs, on behalf of themselves and the applicable Subclasses, further seek the following relief: (a) actual damages; (b) nominal damages; (c) restitution of all EDD benefits funds improperly frozen or blocked by Bank of America; and (d) incidental and consequential damages suffered due to their inability to pay bills or otherwise use their unemployment funds.

## VII.   PRAYER FOR RELIEF

667.   WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for the following relief:

(1)    For an order certifying the Class and Subclasses as defined above and such additional subclasses as may be appropriate, appointing Plaintiffs as representative for the Class, and appointing Plaintiffs' counsel as counsel for the Class;

(2)    For declaratory and preliminary and permanent injunctive relief prohibiting Bank of America from engaging in the wrongful conduct alleged herein, including but not limited to an order making the existing Preliminary Injunction permanent and such other preliminary and permanent injunctive relief as necessary to remedy the violations alleged herein;

(3)    For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Class Members, including treble damages where authorized by law, disgorgement, unjust enrichment, restitution, a declaration that the Bank holds the Account funds in constructive trust for the benefit of Plaintiffs and the Class Members, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiffs and Class Members were deprived of funds in their EDD Debit Card Accounts due to unauthorized transactions;

(4)    For an award of punitive damages pursuant to applicable law;

(5)    For reasonable attorney's fees and expenses as permitted by California Code of Civil Procedure §1021.5, 42 U.S.C. §1988, and any other applicable statute or law;

(6)    For taxable costs;

(7)    For pre- and post-judgment interest as allowed by law; and

(8)    For any other relief the Court deems just.

1

## VIII. JURY TRIAL DEMAND

2  Plaintiffs demand a trial by jury on all issues so triable.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated: January 24, 2025          **COTCHETT, PITRE & McCARTHY, LLP**

2

3                                    By:    /s/ *Brian Danitz*
                                           JOSEPH W. COTCHETT
4                                          BRIAN DANITZ
                                           KARIN B. SWOPE
5                                          BLAIR V. KITTLE
                                           VASTI S. MONTIEL
6

7                                    *Interim Co-Lead Counsel and Attorneys for*
                                     *Plaintiffs Jennifer Yick, Vanessa Rivera, Candace*
8                                    *Koole, Azuri Moon, Stephanie Smith, Alan*
                                     *Karam, Zinaida Petrova, Brian Wiggins and the*
9                                    *Proposed Class*
10

11

12  Dated: January 24, 2025          **ALTSHULER BERZON LLP**

13                                   By:    /s/ *Michael Rubin*
                                           MICHAEL RUBIN
14                                         STACEY M. LEYTON
                                           CONNIE K. CHAN
15                                         KATHERINE G. BASS
                                           COLIN C. JONES
16

17

18                                   *Interim Co-Lead Counsel and Attorneys for*
                                     *Plaintiffs Roland Oosthuizen, Rosemary Mathews,*
19                                   *and the Proposed Class*

20

21

22                                   *[Additional Counsel Listed Below]*

23

24

25

26

27

28

David S. Casey, Jr. (SBN 060768)
dcasey@cglaw.com
Gayle M. Blatt (SBN 122048)
gmb@cglaw.com
Jeremy Robinson (SBN 188325)
jrobinson@cglaw.com
P. Camille Guerra (SBN 326546)
camille@cglaw.com
Catherine McBain (SBN 303911)
kmcbain@cglaw.com
**CASEY GERRY SCHENK
FRANCAVILLA BLATT &
PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Fax: (619) 544-9232

*Interim Liaison Counsel for the Class
Plaintiffs and Attorneys for Plaintiff
Carlos Rodriguez and the Proposed Class*

Jean S. Martin
jeanmartin@forthepeople.com
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505

*Attorneys for Plaintiff Carlos Rodriguez
and the Proposed Class*

Natasha N. Serino (SBN 284711)
natashaserino@schacklawgroup.com
Shannon F. Nocon (SBN 316523)
shannonnocon@schacklawgroup.com
**SCHACK LAW GROUP**
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: (858) 485-6535
Fax: (858) 485-0608

*Attorneys for Plaintiff J. Michael
Willrich and the Proposed Class*

Francis A. Bottini, Jr. (SBN 175783)
fbottini@bottinilaw.com
Anne B. Beste (SBN 326881)
abeste@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
**BOTTINI & BOTTINI, INC.**
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Fax: (858) 914-2002

*Attorneys for Plaintiff Lindsay McClure
and the Proposed Class*

Adam McNeile (SBN 280296)
adam@kbklegal.com
Kristin Kemnitzer (SBN 278946)
kristin@kbklegal.com
**KEMNITZER, BARRON & KRIEG, LLP**
1120 Mar West Street, Suite C2
Tiburon, CA 94920
Telephone: (415) 632-1900
Fax: (415) 632-1901

*Attorneys for Plaintiffs Roland Oosthuizen,
Rosemary Mathews, and the Proposed
Class*

Mary E. Alexander (SBN 104173)
malexander@maryalexanderlaw.com
Brendan D.S. Way (SBN 261705)
bway@maryalexanderlaw.com
Catalina S. Muñoz (SBN 317856)
cmunoz@maryalexanderlaw.com
**MARY ALEXANDER &
ASSOCIATES, P.C.**
44 Montgomery Street, Suite 1303
San Francisco, CA 94104
Telephone: (415) 433-4440
Fax: (415) 433-5440

*Attorneys for Plaintiff Clara Cajas
and the Proposed Class*

Daniel L. Warshaw (SBN 185365)
dwarshaw@pswlaw.com
Bobby Pouya (SBN 245527)
bpouya@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Fax: (818) 788-8104

Raymond P. Boucher (SBN 115364)
ray@boucher.la
**BOUCHER LLP**
21600 Oxnard Street, Suite 600
Woodland Hills, CA 91367
Telephone: (818) 340-5400
Fax: (818) 340-5401

*Attorneys for Plaintiffs Jonathan Smith,
Alex Yuan, and the Proposed Class*

Joshua B. Swigart (SBN 225557)
josh@swigartlawgroup.com
**SWIGART LAW GROUP, APC**
2221 Camino Del Rio South, Ste. 308
San Diego, CA 92108
Telephone: (866) 219-3343
Fax: (866) 219-8344

Daniel G. Shay (SBN 250548)
DanielShay@TCPAFDCPA.com
**LAW OFFICE OF DANIEL G. SHAY**
2221 Camino Del Rio South, Ste. 308
San Diego, CA 92108
Telephone: (619) 222-7429

Christopher J. Hamner (SBN 197117)
chamner@hamnerlaw.com
Evelina M. Serafini (SBN 187137)
eserafini@hamnerlaw.com
**HAMNER LAW OFFICES, APLC**
26565 West Agoura Road, Suite 200
Calabasas, CA 91302
Telephone: (888) 416-6654

*Attorneys for Plaintiffs Jory Zoelle,
Cindy Baker, Ursula Auburn, and the
Proposed Class*

Benjamin Gubernick (SBN 321883)
ben@gubernicklaw.com
**GUBERNICK LAW, P.L.L.C.**
10720 W. Indian School Rd.
Suite 19, PMB 12
Phoenix, AZ 85037
Telephone: (734) 678-5169

David N. Lake (SBN 180775)
david@lakelawpc.com
**LAW OFFICES OF DAVID N. LAKE**
16130 Ventura Boulevard, Suite 650
Encino, CA 91436
Telephone: (818) 788-5100
Fax: (818) 479-9990

*Attorneys for Plaintiffs Kuang Ting
Chong, Stephanie Moore, and the
Proposed Class*

Andre L. Verdun (SBN 365436)
Andre@VerdunLaw.com
1777 N. Ventura Avenue
Ventura, CA 93001
Telephone: (619) 880-0110
Fax: (866) 786-6993

*Attorneys for Individual Plaintiffs Rosa
Alvarez, Elana Martina Rojas de
Charolet, and Jessie Verdun*

Fax: (866) 431-3292

*Co-Interim Liaison Counsel for the
Individual Plaintiffs and Attorneys for
Individual Plaintiffs in the Abarr,
Brotman, Meza, Morrell, Payton, and
Talia Actions*

G. Thomas Martin, III (SBN 218456)
tom@mblawapc.com
Nicholas J. Bontrager (SBN 252114)
nick@mblawapc.com
**MARTIN & BONTRAGER, APC**
4605 Lankershim Blvd., Suite 535
Toluca Lake, CA 91602
Telephone: (323) 940-1700
Fax: (323) 328-8095

*Attorneys for Individual Plaintiff Steven
Hart*

1

## SIGNATURE ATTESTATION

2      Pursuant to section 2(f)(4) of the Electronic Case Filing Administrative

3  Policies and Procedures Manual, I, Brian Danitz, attest that the other signatories

4  listed, and on whose behalf this filing is submitted, concur in the filing content and

5  have authorized this filing.

6

                                        By:    */s/ Brian Danitz*

7                                                Brian Danitz

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER YICK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | Case No.  21-cv-00376-VC<br><br>**ORDER RE PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 64 |

Because of the time-sensitivity involved, this ruling assumes that the reader is familiar with the applicable legal standards, the parties' arguments, the evidence in the record, and the discussion that took place at the preliminary injunction hearing on May 13, 2021.

1. The plaintiffs have demonstrated a strong likelihood of success on their claims that Bank of America (BofA) has violated, and continues to violate, the Electronic Fund Transfers Act by failing to conduct an adequate, good faith investigation when cardholders report unauthorized charges, and often simply freezing cardholder accounts based on a faulty screening process. 15 U.S.C. § 1693f. This has resulted (and will likely continue to result) in the improper denial of cardholders' reimbursement claims for unauthorized charges, the unlawful deprivation of provisional credits for such charges, and the inability to access benefits to which cardholders are entitled. For similar reasons, the plaintiffs have demonstrated a strong likelihood of success on their claims that BofA is systematically breaching its contracts with cardholders and violating California's Unfair Competition Law.

2. Provisional certification of a class of all cardholders who call to report unauthorized charges to their accounts is warranted for purposes of a preliminary injunction. *See, e.g.*, *Zepeda*

*Rivas v. Jennings*, 445 F. Supp. 3d 36, 39 (N.D. Cal. 2020); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1201-05 (N.D. Cal. 2017), *affirmed as Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

3. BofA is wrong to argue that the named plaintiffs or the class are categorically barred from obtaining interim relief. There is Article III standing because many of the named plaintiffs were being injured by the conduct described in Section 1 at the time they filed their lawsuits, and some of the named plaintiffs continue to suffer injury today. *Buckeye Tree Lodge v. Expedia, Inc.*, 2020 WL 5372246, at *2 (N.D. Cal. Sept. 9, 2020); *see Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 184 (2000). And the evidence presented by BofA in response to this preliminary injunction motion does not refute the plaintiffs' strong showing that class members are likely to suffer similar violations in the future.

4. The harm being suffered by the class members is irreparable. The class is comprised of people who depend on unemployment benefits to get through the pandemic. As the plaintiffs' evidence shows, continued denial of these benefits will seriously hinder the ability of many class members to feed their families and keep a roof over their heads. Thus, although the general rule is that financial harm is not "irreparable" (because plaintiffs can generally recoup the money if they ultimately prevail), this is precisely the type of case where the exception to the general rule applies. Just as companies can establish irreparable harm by showing that losing money will likely cause them to shut down, human beings can establish irreparable harm by showing that losing wages or benefits will likely cause them to be evicted, go hungry, or be denied necessary medical care. *Cf. Carrillo v. Schneider Logistics, Inc.*, 823 F. Supp. 2d 1040, 1045 (C.D. Cal. 2011) ("Because plaintiffs are low-wage workers, and lost wages or delays in compensation threaten or impair their ability to meet basic needs, such harms are irreparable."); *see also United Steelworkers of America, AFL-CIO v. Fort Pitt Steel Casting, Division of Conval-Penn, Division of Conval Corp.*, 598 F.2d 1273, 1280 (3d Cir. 1979).[1]

---

[1] In some cases involving wages or benefits, courts have intoned the general rule about financial injury without acknowledging the exception, perhaps because the exception did not apply on

5. The balance of hardships and the public interest almost certainly support some form of preliminary injunctive relief. *See, e.g.*, *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ("'Faced with . . . a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly' in favor of the latter." (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983))). But it ultimately depends on the nature of the relief sought. At the hearing, the Court suggested that the parties participate in a settlement conference with a Magistrate Judge to carefully review and discuss the plaintiffs' proposed preliminary injunction to ensure that it does not interfere with BofA's operations more than is necessary to sufficiently minimize the risk of innocent cardholders being improperly deprived of their benefits, and also to carefully review and discuss the proposed injunction to ensure that it does not unduly hinder BofA from freezing the accounts of people who are likely to have obtained their cards through fraud. Both sides accepted this invitation. Accordingly, the case is referred to Judge Sallie Kim for a settlement conference to take place on May 26 and May 27, 2021. The parties are ordered to work as much as possible before the conference, including with one another, to maximize the chances of coming out of the conference with a joint proposal. A joint proposal or competing proposals should be filed with the Court no later than May 28. As stated at the hearing, BofA's participation in this conference, which is designed primarily to ensure that any relief ordered is not overbroad, does not constitute a waiver of its right to challenge the validity any preliminary injunction that is ultimately issued.

---

those facts. *See, e.g.*, *Hale v. Wood*, 89 F.3d 840 (8th Cir. 1996) ("Hale failed to establish a threat of irreparable harm because the injuries he alleged as the basis for his claim for relief—wrongfully withheld wages, statutorily inadequate wages, and termination of his work assignment—were compensable through his section 1983 claim for money damages."); *Johnson v. City of San Francisco*, 2010 WL 3078635, at *3 (N.D. Cal. Aug. 5, 2010) ("Lost wages alone do not constitute a claim for irreparable harm as money damages would be sufficient to remedy the wrong should one ultimately be found to have been committed."); *see also Ahuruonye v. U.S. Department of Interior*, 312 F. Supp. 3d 1, 23-24 (D.D.C. 2018). But those cases should not be read to suggest that the loss of wages or benefits can never constitute irreparable harm. When a case involves the deprivation of wages or benefits to low-income people living hand to mouth, a preliminary injunction may well be warranted (depending, of course, upon the strength of the plaintiffs' claims on the merits and other factors).

3

**IT IS SO ORDERED.**

Dated: May 17, 2021

VINCE CHHABRIA
United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER YICK, et al., | Case No. 21-cv-00376-VC |
| Plaintiffs, | |
| v. | **PRELIMINARY INJUNCTION** |
| | Re: Dkt. Nos. 64, 100 |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

With the assistance of Magistrate Judge Kim, the plaintiffs and defendants worked together to craft preliminary injunction language that is designed to protect the class members from future harm while minimizing disruption to the defendant's operations. This language is an improvement over what was presented by the plaintiffs in support of their motion. The hardship to the defendant from this injunction is outweighed by its benefits to the class members. The injunction is also in the public interest. Accordingly, in accordance with the language submitted by the parties, and for the reasons discussed in the order issued on May 17, 2021:

Bank of America, N.A. (the "Bank"), and the Bank's officers, directors, agents, employees, representatives, and all persons acting under, in concert or participation with, or for them ("Defendant") are preliminarily enjoined in the administration of prepaid debit cards for Employment Development Department ("EDD") unemployment or disability benefits issued by Defendant to members of the certified class as follows:

(1) Defendant shall be prohibited from considering the results of the Bank's initial automated claims fraud filter (Claim Fraud Filter) in investigating or resolving unauthorized transaction error claims (*see* 12 C.F.R. 1005.11) (Claims).

(2) a.  Defendant shall be prohibited from denying or closing Claims or denying provisional or permanent credit to claimants' accounts without conducting and concluding an investigation into the alleged unauthorized transaction, pursuant to EFTA and Regulation E.

b.  Defendant shall be prohibited from denying or closing claims without providing the claimant a written explanation of the findings of its investigation, pursuant to EFTA and Regulation E.

(3)  Defendant shall not consider the results of the Bank's Claim Fraud Filter as a basis for freezing card accounts of any Class Member.

(4) a.  Beginning ten (10) days after the entry of this Order, Defendant shall reopen any Claim that it closed or denied based solely upon the results of its Claim Fraud Filter and that it has not previously paid or previously reopened and investigated (Previously Closed Claim). Defendant may stagger the reopening of such Claims in roughly equal amounts over thirty (30) additional days.

b.  For Previously Closed Claims filed by a class member who has not yet authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, Defendant shall, within ten (10) days of reopening, and thereafter at least weekly for five weeks, send the class member a written notice (by mail and email, if available) explaining the basis for the original denial; that the claim has been reopened; what steps they need to take to authenticate their identity (which may include presenting identification at a Bank branch or by calling the dedicated toll free number for the Fraud Call Center referred to in paragraph 9); that if they do not authenticate their identity within 45 calendar days of the original notice, the claim will be denied; and that if they authenticate their identity, the Bank will commence and complete the investigation and resolve the claim within 45 calendar days of the authentication and, if such claim has not been resolved within 10 business days of the authentication, provide provisional credit in the amount of the alleged error(s) to the account.  Persons subject to this Paragraph 4(b) are subject to Paragraph 5(a) if they authenticate.

(5)   a.  For Previously Closed Claims that were filed by a class member who has

authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, Defendant shall complete the investigation and resolve the claim within 45 calendar days of the entry of this Order (or of the date the class member authenticates their identity, if later) and, if the claim has not been resolved within 10 business days of the entry of this Order (or of the date the class member authenticates their identity, if later), provide provisional credit in the amount of the alleged error(s).

b. For any Previously Closed Claims that were filed by a class member who has authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, but the Claim has never been reopened, Defendant shall reopen such Claim within ten (10) days of the entry of this Order and Defendant shall complete the investigation and resolve the claim within 45 calendar days of reopening and, if the claim has not been resolved within 10 business days of reopening, provide provisional credit in the amount of the alleged error(s).

(6) In addition to Claims that Defendant reopens pursuant to paragraphs 4 and 5(b), Defendant shall, upon request from the affected cardholder, reopen any Claim that it closed or denied on or after January 1, 2020.

(7) Within 10 days of the entry of this Order (by mail and email, if available) or after the date of the blocking (by mail, within three (3) business days, and email, if available, within one (1) business day), whichever is later, Defendant shall give written notice to class members whose accounts are blocked solely based upon its Claims Fraud Filter that explains that the Bank will promptly unblock their account if the class member authenticates their identity. The written notice shall explain: the basis for the previous block; what steps the class member needs to take to authenticate their identity (which may include presenting identification at a Bank branch or by calling the dedicated toll free number at the Fraud Call Center referred to in paragraph 9); that if they do not authenticate their identity, their account will remain blocked or will be closed; and that they have the right to ask EDD to issue future benefits payments by paper check instead of by the Bank Debit Card.

(8) Defendant shall:

a. As soon as practicable, and in no event later than twenty (20) days of the entry of this Order, establish a dedicated toll-free number to enable class members to directly reach the Claims Initiation Call Center, which shall be staffed by customer service representatives (CSRs) who are trained to handle Claims intake;

b. Within thirty (30) days of the entry of this Order, the Claims Initiation Call Center hours to receive calls shall consist of at least fourteen (14) hours on weekdays and ten (10) hours on Saturdays, which shall be expanded within forty-five days of the entry of this Order to include ten (10) hours on Sundays, and expanded within sixty days of the entry of this Order to include 24 hours per day, 7 days per week coverage; and

c. As soon as practicable after the establishment and successful testing of the dedicated toll-free number for the Claims Initiation Call Center, but in no event later than ten (10) days thereafter, and at least monthly thereafter, provide written notices (by mail and email, if available) to all class members regarding the available toll free number and providing the information in paragraphs 6, and (8)(a) and (b).

(9)  Defendant shall:

a. As soon as practicable, and in no event later than twenty (20) days after the entry of this Order, establish a dedicated toll-free number to enable class members to directly reach the Fraud Call Center, which shall be available 24 hours per day, 7 days per week, and which shall be staffed by CSRs who are trained to authenticate identity and resolve challenges to blocked accounts.

b. As soon as practicable after the establishment and successful testing of the dedicated toll-free number for the Fraud Call Center, but in no event later than ten (10) days thereafter, and thereafter at least weekly, provide written notice (by mail and email, if available) to all class members whose accounts are blocked of the availability of this dedicated toll-free number.

(10)  Defendant shall, within 20 days of the entry of this Order:

a. Staff the Claims Initiation Call Center and Fraud Call Centers, such that the average speed to answer calls from Class Members for these centers is no more than five minutes, 90% of

4

the time, separately measured for the Claims Initiation and Fraud Call Centers and based on all callers to such centers (rather than just calls by Class Members).

b. Train and require CSRs in the Claims Initiation Call Center to request email contact information from a claimant at the time a claim is filed (if email is not already available for that claimant), so that the Bank may use that information to contact the claimant regarding authentication, if and to the extent this is consented to by EDD.

c. Train and require CSRs in the Fraud Call Center to immediately inform cardholders who are unable to authenticate their identity by phone that they have the option of authenticating their identity at a Bank branch.

(11) Within 10 business days of the entry of this Order, Defendants shall provide email and mail notice to all Class Members of their rights under paragraphs (1) through (7) of this Order.

(12) Paragraphs 2 and 4 of this Order shall not apply to,

a. Claims made with respect to accounts that EDD has found to be disqualified or not entitled to benefits, or has requested an account freeze; or

b. Claims made with respect to accounts that Defendant has frozen or blocked based on (i) receipt of legal process or (ii) information provided or made available by law enforcement, or (iii) the outcome of an investigation of suspicious facts and circumstances related to an individual cardholder developed independent of the Claim (if such cardholder has been sent a notice that the action has occurred and a statement of what the cardholder can do in response).

Defendant shall implement the requirement of paragraph 1 as soon as practicable but in no event more than seven (7) days from the entry of this Order.

There shall be no bond required.

**IT IS SO ORDERED.**

Dated: June 2, 2021

_____
VINCE CHHABRIA
United States District Judge

5