UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION, | Case No.: 21MD2992-GPC(MSB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PROTECTIVE ORDER**<br>**[REDACTED VERSION ORIGINAL FILED UNDER SEAL]**<br><br>**[Dkt. No. 453.]** |

Before the Court is Defendant's motion for a protective order precluding the deposition of its two top executives, Brian Moynihan ("Mr. Moynihan"), Chief Executive Officer ("CEO"), and Thomas Montag ("Mr. Montag"), former Chief Operating Officer ("COO") and former President of Global Banking and Markets. (Dkt. No. 453.) Class Plaintiffs filed an opposition, (Dkt. No. 465), and Defendant replied, (Dkt. No. 472).[1] Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion for protective order.

---

[1] Class Plaintiffs also filed an ex parte motion for leave to file a surreply and Defendant opposed. (Dkt. Nos. 479, 483.) Because the surreply was not necessary for the Court's ruling, the Court DENIES the ex parte motion as MOOT.

1

21MD2992-GPC(MSB)

## Procedural Background

This multidistrict litigation ("MDL") arises from numerous class and individual actions brought against Defendant Bank of America, N.A. ("BANA") over its administration of the electronic benefits payment system for California's Employment Development Department ("EDD") during the COVID-19 pandemic. EDD, the administrator of unemployment benefits in California, entered into an exclusive contract with BANA, to distribute those benefits through bank-issued and bank-administered prepaid debit cards which are linked to individual bank depository accounts. (Dkt. No. 406, Third Amended Master Consolidated Complaint ("TAMCC") ¶¶ 1, 2, 39.)

Class Plaintiffs, like other millions of Californians, lost their jobs during the COVID-19 pandemic and were found eligible by EDD for unemployment and other public benefits. (*Id.* ¶ 1.) The state's unemployment rate skyrocketed from 3.9% in January 2020 to 16.4% in April 2020 following Governor Gavin Newsom's closure orders. (*Id.* ¶ 74.) As such, EDD received an unprecedented dramatic increase in applications for unemployment benefits. (*Id.* ¶ 75.) These bank-issued and bank-administered prepaid debit cards were subject to rampant third-party fraud during the COVID-19 pandemic and tens of millions of dollars have been stolen from these bank accounts. (*Id.* ¶¶ 76-78.) According to Class Plaintiffs, in order to combat the fraud, on September 28, 2020, BANA implemented a Claim Fraud Filter ("CFF") to automatically deny error claims, freeze, and/or block EDD prepaid accounts without adequate investigation. (*Id.* ¶¶ 89-96.) In addition, they claim that BANA intentionally made it difficult for cardholders to report unauthorized transactions by understaffing its call centers. (*Id.* ¶¶ 87-88.)

Based on discovery to date, Class Plaintiffs claim that Mr. Moynihan and Mr. Montag were personally involved in critical decisions and communications concerning implementation of the CFF and the understaffing of its call centers and as such, their knowledge, motive and intent in adopting these policies are relevant to support punitive

damages for their due process, breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing causes of action. (Dkt. No. 465 at 5.[2])

Prior to the instant motion for protective order, Class Plaintiffs had sought to compel ESI discovery from Mr. Moynihan and Mr. Montag. (Dkt. Nos. 209, 212, 214, 215, 268, 278, 287, 292.) After full briefing by the parties, a decision by the Magistrate Judge, an appeal of Magistrate Judge's order, and objections to it, the Court allowed the ESI discovery of Mr. Moynihan and Mr. Montag because the motive, intent or knowledge to support punitive damages concerning the development, implementation, and authorization of the CFF can only be obtained by them and not from sources already designated. (Dkt. No. 298 at 11.) By mid-August 2024, BANA produced 556 ESI documents from Mr. Moynihan and Mr. Montag's custodial files. (Dkt. No. 454, Riffee Decl. ¶ 6.)

Then, on October 11, 2024, Class Plaintiffs served notices of depositions for Mr. Moynihan and Mr. Montag. (Dkt. No. 454, Riffee Decl. ¶ 14.) Because BANA disputed the taking of their depositions, the parties engaged in informal briefing with Magistrate Judge Berg. (*Id.* ¶¶ 23-24.) On December 23, 2024, Magistrate Judge Berg held a discovery conference, (Dkt. No. 400), and issued a tentative ruling granting BANA's request for a protective order because Class Plaintiffs had not exhausted efforts to take the discovery through less burdensome means by deposing individuals involved in the development, approval, and implementation of the CFF and directed Class Plaintiffs to take further depositions of witnesses involved in the development, approval and implementation of the CFF before he would reconsider Plaintiffs' request to depose Mr. Moynihan and Mr. Montag. (Dkt. No. 454, Riffee Decl. ¶ 25.) The parties agreed to the tentative ruling. (*Id.*)

---

[2] Page numbers are based on the CM/ECF pagination.

In response to the ruling, Class Plaintiffs deposed the following four mid-level executives who were involved in the "initial development, implementation, and /or approval of the Claims Fraud Filter", (Dkt. No. 468-7, Riffee Decl., Ex. 7, BANA's Interrog. Resp. No. 11 at 5): (1) Paul Simpson, Managing Director of Global Operations; (2) William Fox, Global Head of Global Financial Crimes ("GFC"), the group primarily responsible for the development of the fraud filter; (3) Jennifer Ehresman, Head of Consumer Client Protection, the group responsible for overseeing claims; and (4) Melissa Ramirez (formerly Gargagliano), a business banking operations executive in Commercial Card Fulfillment, Service, & Operations. (Dkt. No. 453-1 at 9; Dkt. No. 454, Riffee Decl. ¶ 26; Dkt. No. 465 at 7-8; Dkt. No. 455, Ruiz Decl. ¶¶ 18, 19, 20, 21.) During this time, they also deposed Faiz Ahmad, Head of Global Transaction Services ("GTS"), responsible for the prepaid card business, and who reported to Mr. Montag; and Anne Holt, Director of GFC. (Dkt. No. 453-1 at 9; Dkt. No. 454, Riffee Decl. ¶ 26; Dkt. No. 468-7, Riffee Decl., Ex. 7, BANA's Interrog. Resp. No. 11 at 5.)

On March 7, 2025, after completing these depositions, Class Plaintiffs indicated they still sought to depose Mr. Moynihan and Mr. Montag and BANA renewed its request for a protective order barring the depositions. (Dkt. No. 454, Riffee Decl. ¶ 28.) The parties submitted additional informal briefing and Magistrate Judge Berg held another informal discovery conference on March 12, 2025, (Dkt. No. 417), and issued a tentative ruling allowing Class Plaintiffs to depose Mr. Moynihan for two hours and Mr. Montag for one hours with both depositions limited to the issue of punitive damages. (Dkt. No. 454, Riffee Decl. ¶ 30.) Later that day, Plaintiffs rejected the tentative ruling and requested formal briefing with this Court. (*Id.* ¶ 31.)

## Discussion

### A. Legal Standard on Motion for Protective Order

Federal district courts have broad discretion over discovery. *See Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002). Rule 26 permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to

the needs of the case." Fed. R. Civ. P. 26(b)(1).  But, the court must limit or deny discovery if it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive[.]" Fed. R. Civ. P. 26(b)(2)(C).

Under Rule 26(c)(1), when a party moves for a protective order, the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" and includes "forbidding" a deposition or "limiting" its scope. Fed. R. Civ. P. 26(c)(1).  The party seeking a protective order must make a strong showing of good cause before a party is denied the right to take a deposition. *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).  "For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002). In demonstrating "good cause", "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quoting *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)).

When a party seeks the deposition of a high-level executive or "apex deposition", district courts have recognized that such discovery can lead to potential abuse or harassment. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012).  As a result, district courts in this circuit have exercised discretion under Rule 26(c) and applied the apex deposition doctrine, a judicially created doctrine, to protect high-level corporate officers. *Id.*; *Est. of Levingston v. Cnty. of Kern*, 320 F.R.D. 520, 525 (E.D. Cal. 2017) (citing *Apple Inc.*, 282 F.R.D. at 263); *In re Google Litig.*, No. C 08–03172 RMW (PSG), 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011) ("When a party seeks the deposition of a high-level executive (a so-called 'apex' deposition), the court may exercise its discretion under the federal rules to limit discovery.").

|   |   |
|---|---|
| 1 | "In determining whether to allow an apex deposition, courts consider (1) whether |
| 2 | the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the |
| 3 | case and (2) whether the party seeking the deposition has exhausted other less intrusive |
| 4 | discovery methods." *Apple Inc.*, 282 F.R.D. at 263 (citations omitted). "When a witness |
| 5 | has personal knowledge of facts relevant to the lawsuit, even a corporate president or |
| 6 | CEO is subject to deposition." *WebSideStory, Inc. v. NetRatings*, Civil No. 06cv408 |
| 7 | WQH(AJB), 2007 WL 1120567, at *2 (S.D. Cal. Apr. 6, 2007) (citations omitted). "A |
| 8 | claimed lack of knowledge, by itself, is insufficient to preclude a deposition." *Id.* |
| 9 | (citations omitted). "Moreover, the fact that the apex witness has a busy schedule is |
| 10 | simply not a basis for foreclosing otherwise proper discovery." *Id.* (citation omitted). |
| 11 | While district courts have applied the apex deposition doctrine to high level |
| 12 | executives, the Ninth Circuit has not yet endorsed the doctrine. *See In re Uber Techs.,* |
| 13 | *Inc., Passenger Sexual Assault Litig.*, Case No. 23-md-03084-CRB (LJC), 2025 WL |
| 14 | 896412, at *1 (N.D. Cal. Mar. 24, 2025) ("As far as this Court is aware, the Supreme |
| 15 | Court has never used that term, and neither the Ninth Circuit nor the Supreme Court has |
| 16 | ever used the terms "apex witness," "apex deposition," or "apex testimony."). Yet, the |
| 17 | Ninth Circuit has analyzed the deposition of high-level executives under a Rule 26(c) |
| 18 | motion for protective order. *See Blankenship*, 519 F.2d at 429 (publisher of newspaper); |
| 19 | *Anderson v. Air W., Inc.*, 542 F.2d 1090, 1092-93 (9th Cir. 1976) (sole shareholder of |
| 20 | airline). The Court looks to these two cases for guidance as to the application of the apex |
| 21 | deposition doctrine. |
| 22 | In *Blankenship*, the Ninth Circuit permitted the plaintiff, a newspaper distributor of |
| 23 | Defendant Hearst Corporation to depose George Hearst ("Mr. Hearst"), the publisher of |
| 24 | the Herald Examiner, concerning the newspaper's alleged price-fixing policies in |
| 25 | violation of the anti-trust laws. 519 F.2d at 429. The court rejected the defendants' only |
| 26 | objection that Mr. Hearst's testimony might be repetitive of what the plaintiff had learned |
| 27 | from other sources and allowed his deposition to go forward on remand because the |
| 28 | plaintiff had suggested that Mr. Hearst may have information that others did not. *Id.* |

1 Relying on Rule 26(c), the Ninth Circuit concluded that the defendants' failed to carry
2 the heavy burden of showing why discovery should be denied. *Id.* In another Ninth
3 Circuit case addressing the deposition of the sole shareholder, the court, relying on Rule
4 26(c), held that the district court properly denied the defendant's motion for a protective
5 order because "Hughes probably had some knowledge of the 1970 acquisition, which
6 finding is supported by the record." *Anderson v. Air W., Inc.*, 542 F.2d 1090, 1093 (9th
7 Cir. 1976).

**B.   Analysis**

The parties do not dispute that Mr. Moynihan, BANA's CEO, and Mr. Montag, former COO and President of Global Banking and Markets until December 2021, (*see* Dkt. No. 455, Ruiz Decl. ¶¶ 4, 5, 6), are high-level executives and subject to the apex deposition doctrine.

As a threshold matter, the parties disagree on who bears the burden on a motion for protective order concerning an apex deposition. On the one hand, BANA argues that Class Plaintiffs, the party seeking to depose apex witnesses, bear the burden to show the deponents have "unique first-hand, non-repetitive knowledge of the facts at issue in the case" and they have "exhausted other less intrusive discovery methods." (Dkt. No. 453-1 at 11 (citing *Greer v. Cnty. of San Diego*, Case No.: 19-cv-378-JO-DEB, 2022 WL 2134601, at *3 (S.D. Cal. June 14, 2022) (on a motion to compel the court stated "the burden is placed on the party seeking the deposition of the Sheriff to show extraordinary circumstances justify the deposition")). On the other hand, Class Plaintiffs argue BANA has not demonstrated "good cause" for the issuance of a protective order under Rule 26(c). (Dkt. No. 465 at 8 (citing *Blankenship*, 519 F.2d at 429 ("a strong showing is required before a party will be denied entirely the right to take a deposition."))).

In this case, because BANA moves for a protective order under Rule 26(c)(1), under settled law, the moving party, BANA, has the burden to show "good cause" which

requires "that specific prejudice or harm will result" if a protective order is not granted.[3] *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003); *see also Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) ("For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted.") (citation omitted). Even when a party seeks a protective order barring an apex deposition, it retains the "heavy" burden to show "good cause" for a protective order. *See Blankenship*, 519 F.2d at 429 (holding that the defendants failed to meet their "heavy burden" demonstrating good cause why the deposition of Mr. Hearst should be precluded); *see also In Re Nat'l W. Life Ins. Deferred Annuities Litig.*, Civil No. 05–CV–1018–AJB (WVG), 2011 WL 1304587, at *4 n. 2 (S.D. Cal. Apr. 6, 2011) ("the burden is on the defendants to show why the depositions should not be taken, not the other way around. The burden under the apex principle is supplied by the general rule applicable to a party that seeks to avoid discovery in general. The apex deposition principle is not an automatic bar that the plaintiffs must overcome by a showing of good cause. Rather, it is a protective tool that is selectively employed on a case by case basis when deemed appropriate."); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C–07–05634 CRB (DMR), 2014 WL 939287, at *2 (N.D. Cal. Mar. 6, 2014) ("the party opposing discovery . . . bears the burden of showing that the deposition should not be allowed") (citations omitted); *Mansourian v. Bd. of Regents of Univ. of Cal. at Davis*, No. CIVS 03–2591 FCD EFB, 2007 WL 4557104, at *3 (E.D. Cal. Dec. 21, 2007) (noting that there is "no binding Ninth Circuit or Supreme Court precedent requiring th[e] result" that the burden be shifted to the party seeking discovery by deposition of a high level

---

[3] The Court recognizes that the burdens on a motion to compel and motion for protective order are reversed. *See Food Mkt. Merch., Inc. v. Cal. Milk Processor Bd.*, No. 2:15-CV-1083-TLN-CKD, 2022 WL 1811076, at *4 n.5 (E.D. Cal. June 2, 2022) ("the burdens on a motion to compel versus a motion for protective order are reversed"). Therefore, Defendant's reliance on *Greer* is not on point because that case concerned a motion to compel an apex deposition of a government offical.

business executive and the Court may consider these as factors and not prerequisites.); *Serrano v. Cintas Corp.*, 699 F.3d 884, 902 (6th Cir. 2012) (vacating and remanding the magistrate judge's decision where he considered only the CEO's knowledge relevant to the claims and "failed to analyze, as required by Rule 26(c)(1), what harm [the CEO] would suffer by sitting to the deposition").

The Court concludes that BANA has not articulated any specific prejudice or harm if a protective order is not granted. The absence of prejudice weighs against Defendant's motion for a protective order. *Cf. Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 629 (C.D. Cal. 2005) ("Since plaintiff has the burden under Rule 26(c) to show good cause for the issuance of a protective order . . . and it has presented absolutely no evidence showing a specific and particular need for such protective order, its request is without merit.") Nonetheless, the Court also considers the factor[4] of whether Mr. Moynihan and Mr. Montag have "unique first-hand, non-repetitive knowledge" about the development, implementation and/or approval of the CFF and about the alleged intentional policy of understaffing the customer service call centers subjecting cardholders to hours of wait time and maintaining these policies despite knowing they were harming large numbers of legitimate cardholders.[5] (Dkt. No. 465 at 6-7.)

As discussed in the prior order on Mr. Moynihan and Mr. Montag's ESI discovery, punitive damages may be awarded under federal and state law. *See Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005); Cal. Civ. Code § 3294(a). Under federal law "a 'jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Dang*, 422 F.3d at 807. Under California law,

---

[4] The parties do not dispute that Class Plaintiffs have exhausted other less intrusive discovery methods when Magistrate Judge Berg directed them to depose mid-level executives before seeking the depositions of Mr. Moynihan and Mr. Montag. (*See* Dkt. No. 400; Dkt. No. 454, Riffee Decl. ¶ 25.)

[5] Even if the burden is switched, Class Plaintiffs have shown that the deponents have "unique first-hand, non-repetitive knowledge of the facts at issue in the case."

plaintiffs are entitled to punitive damages where they can show by "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a).[6] When the defendant is a corporation, the oppression, fraud, or malice must be perpetrated, authorized, or knowingly ratified by an officer, director, or managing agent of the corporation. Cal. Civ. Code § 3294(b). Class Plaintiffs seek to depose Mr. Moynihan and Mr. Montag for the purposes of questioning them about their "motive, intent or knowledge and ratification" concerning the development, implementation, and/or authorization of the CFF, and allegedly understaffing the customer service call center during the height of customer service complaints about fraud to support an award of punitive damages.

To depose an apex executive, the record need only be sufficient to create an inference that the apex deponent has "unique first-hand, non-repetitive knowledge"; otherwise, the point of taking the deposition would be unnecessary. *See Powertech Tech., Inc. v. Tessera, Inc.*, No. C 11–6121 CW, 2013 WL 3884254 at *2 (N.D. Cal. July 26, 2013) (noting that the party seeking deposition "was not required to prove that [deponent] certainly has [relevant] information; [the moving party] cannot be certain that he does or does not until it has taken his deposition."); *In re Glumetza Antitrust Litig.*, Case No. 19-cv-05822-WHA (RMI) 2020 WL 3498067, at *9 (N.D. Cal. June 29, 2020) ("Thus, the Purchasers have presented sufficient evidence to at least infer that Mr. Nilesh Gupta is in possession of some unique knowledge on a number of issues relevant to the Purchasers' claims."); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 106 (S.D.N.Y. 2001) (deposition of CEO of Sony Corporation allowed where the plaintiff "presented sufficient evidence to infer that [CEO] had some unique

---

[6] "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294.

knowledge on several issues related to its claims."). As long as the apex executive has some first-hand knowledge of relevant facts, the deposition should be allowed. *See Blankenship,* 519 F.2d at 429 (district court erred in granting protective order ordering plaintiff not to depose Herald–Examiner's publisher when plaintiff suggested possible information publisher might have that others did not)*; Air W.,* 542 F.2d at 1092-93 (plaintiffs may depose high level executive who "probably had some knowledge" regarding substance of the plaintiffs' claims); *Hunt v. Cont'l Cas. Co.*, Case No. 13–cv–05966–HSG, 2015 WL 1518067, at *2 (N.D. Cal. Apr. 3, 2015) ("'where a corporate officer may have *any* first-hand knowledge of relevant facts, the deposition should be allowed.'") (quoting *Grateful Dead Prods. v. Sagan*, No. C 06–7727(JW) PVT, 2007 WL 2155693, at *1, n.5 (N.D. Cal. July 26, 2007)). Thus, it is very unusual "for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances." *Apple Inc.*, 282 F.R.D. at 263. However, when "a high-level decision maker 'removed from the daily subjects of the litigation' has no unique personal knowledge of the facts at issue, a deposition of the official is improper." *Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4174 MMC(JL), 2007 WL 205067 at *3 (N.D. Cal. Jan. 25, 2007) (citation omitted).

1. **Authorization and Implementation of the CFF – Mr. Moynihan and Mr. Montag**[7]

The Court is persuaded that Mr. Moynihan and Mr. Montag likely have first-hand knowledge about the approval and/or implementation of the CFF and may have been involved in directing its approval on September 28, 2020. ███████████████████████████████████████████████████████████████████████.[8] (Dkt. No. 469-51, Danitz Decl., Ex. 51, Fox Depo. at 66:4-

---

[7] The Court notes that the record presented by each party is selective based on their positions and the Court has attempted to piece together relevant facts but recognizes its limitations on what was presented.

[8] The GBRC ███████████████████████████████████████ (Dkt. No. 458-5, Riffee Decl., Ex. 5, Ahmad Depo. at 217:6-13.) GMRC ███████████████████████████████████████. (*Id.* at 14-17.)

67:21; 69:7-21.) However, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (Dkt. No. 468-5, Riffee Decl., Ex. 5, Ahmad Depo. at 218:3-229:25.) Therefore, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, (Dkt. No. 469-51, Danitz Decl., Ex. 51, Fox Depo. at 22:6-10), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Dkt. No. 468-5, Riffee Decl., Ex. 5, Ahmad Depo. at 70:8-14; 71:2-23.) Mr. Montag ▮▮▮▮▮▮▮▮, (Dkt. No. 468-5, Riffee Decl., Ex. 5, Ahmad Depo at 218:10-16), second in command, (Dkt. No. 455, Ruiz Decl. ¶ 6), the former head of Global Banking and Markets ("GBAM"), the group that headed the prepaid UI card program, (Dkt. No. 469-61, Danitz Decl., Ex. 61), and part of the MTM. Despite the depositions of mid-level executives, none appear to know who authorized the implementation of the CFF on September, 28, 2020.

Other communications in the record also raise an inference that Mr. Moynihan may have been more than a mere recipient of information as BANA contends and may have been involved in the decision to approve and implement the CFF. For instance, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[9] (Dkt. No. 469-5, Danitz Decl., Ex. 5 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").) Though Faiz Ahmad, the head of GTS, was a recipient of the email, he testified that he did not participate in this ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[10] (Dkt. No. 469-50, Danitz Decl., Ex. 50, Ahmad Depo. at 181:2-182:7.) William Fox, Global Head of Global Financial Crimes ("GFC"), (Dkt. No. 455, Ruiz Decl. ¶ 19),

---

[9] BTM refers to Mr. Moynihan. (Dkt. No. 469-50, Danitz Decl., Ex. 50, Ahmad Depo. 100:22-24.)
[10] Faiz Ahmad ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkt. No. 469-50, Danitz Decl., Ex. 50, Ahmad Depo at 131:7-22.)

1 | further testified ████████████████████████████████████████
2 | ████████ (Dkt. No. 469-51, Danitz Decl., Ex. 51, Fox Depo. at 12:15-21; 55:7-23.)
3 | Then, on the same day, ██████████████████████████████████
4 | ████████████████████████████████████████████████████████
5 | ████████████████████████████████████ (Dkt. No. 478-2, Hoyle
6 | Decl., Ex. 18; Dkt. No. 478-4, Hoyle Decl., Ex. 20, Ahmad Depo. at 193:19-196:8.)
7 | ██████████████████████████████████████████████ (Dkt. No.
8 | 478-2, Hoyle Decl., Ex. 18.) ████████████████████████████
9 | ████████████. (Dkt. No. 478-4, Hoyle Decl., Ex. 20, Ahmad Depo. at 195:8-
10 | 196:8.) ██████████████████████████████████████████████
11 | ████████████████████████████████████████████████
12 | ████████████████████████████████████████████████
13 | ████████████████████.
14 | On September 28, 2020, ████████████████████████████
15 | ████████████████████████████████████████████████
16 | ████████████████████████████████████████████████
17 | ██████████████████████████████.[11] (Dkt. No. 469-14, Danitz Decl.,
18 | Ex. 14 ("████████████████████████████████████████████
19 | ████████████████████████████████████████.) In that same
20 | chat exchange, ██████████████████████████████████████
21 | ████████████████████████████████████████████████
22 | ████████████████████ (Dkt. No. 469-14, Danitz Decl., Ex. 14.) Bradley
23 | Garfield responded ██████████████████████████████████
24 | ████████████████████████████████████████████████
25 | ██████████████████ (*Id.*)
26 |
27 | ─────────────────────
28 | [11] While the chat messages are contained in an email dated September 29, 2020, Class Plaintiffs' opposition states the chat is from September 28, 2020. (Dkt. No. 465 at 11.)

On September 28, 2020, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬, Managing Director of Business Executive Operations, (Dkt. No. 455, Ruiz Decl. ¶ 21), ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Dkt. No. 469-60, Danitz Decl., Ex. 60.) According to William Fox, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Dkt. No. 469-60, Danitz Decl., Ex. 51, Fox Depo. at 65:6-66:13.) When asked about this email, ▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, (Dkt. No. 469-51, Danitz Decl., Ex. 51, Fox Depo. at 43:13-20), ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*See* Dkt. No. 469-51, Danitz Decl., Ex. 51, Fox Depo. at 71:2-10.) Ahmad also testified ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. (Dkt. No. 469-50, Danitz Decl., Ex. 50, Ahmad Depo. at 365:15-366:10.) When further prompted, ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*Id.* at 366:11-20.) On September 28, 2020 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Dkt. No. 469-65, Danitz Decl., Ex. 65.) It is unclear who, Mr. Moynihan or some in the MTM, approved the implementation of the CFF on September 28, 2020. But because Mr. Moynihan was head of the MTM, even if a member of MTM approved the use of the CFF, an inference arises that the direction, or ratification could have come from Mr. Moynihan.[12]  Thus, Mr. Moynihan may have personal unique knowledge about who approved the CFF and the intent, and motive behind approving it.

BANA argues that Mr. Moynihan did not approve the CFF because ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. (Dkt.

---

[12] There is no evidence about the relationship between Mr. Moynihan and the MTM and how decisions were made amongst them and directed to the mid-level executives.

No. 472 at 6 (citing Dkt. No. 468-5, Riffee Decl., Ex. 5, Ahmad Depo. at 244:19-22; 93:25-94:20).) However, Faiz Ahmad ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Dkt. No. 468-5, Riffee Decl., Ex. 5, Ahmad Depo. at 244:18-245:4.)

On ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Dkt. No. 469-51, Danitz Decl., Ex. 51, Fox Depo. at 69:7-21; 70:23-71:6.) Mr. Montag, William Fox and Faiz Ahmad ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* at 72:12-18; Dkt. No. 468-5, Riffee Decl., Ex. 5, Ahmad Depo. at 218:3-229:25.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Dkt. No. 468-5, Riffee Decl., Ex. 5, Ahmad Depo. at 218:3-229:25.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as a member of the GMRC.

Contrary to BANA's assertion that Class Plaintiffs rely on pure speculation, the evidence supports an inference that Mr. Moynihan and Mr. Montag were involved in meetings and/or discussions about authorization or implementation of the CFF. Further, to the extent the mid-level executives that Class Plaintiffs deposed do not recall who authorized implementation or what was discussed at meetings, (*see* Dkt. No. 465 at 28), the depositions of Mr. Moynihan and Mr. Montag become necessary and constitute unique first hand knowledge about these issues. *See Gen. Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 83-84 (S.D.N.Y. 2002) (denying protective order when lower level employee did not have knowledge about the relevant issues and "[a]s a matter of logic, a top executive who issues a corporate policy will likely have knowledge of the reasons for the issuance of the policy that a subordinate will not."); *Mulvey v. Chrysler Corp.,* 106 F.R.D. 364, 366 (D.R.I. 1985) (court may order oral deposition if defendant puts up a "screen of evasion and disavowal" in written interrogatories).

/ / /
/ / /

## 2. Customer Service Call Center – Mr. Moynihan and Mr. Montag

According to an email, ███████████████████████████████ ███████████████████████████████. (Dkt. No. 469-62, Danitz Decl., Ex. 62 ("███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████."). The record suggests that Mr. Moynihan may have been more actively involved than merely being a recipient of information about the customer call center as BANA claims, (*see* Dkt. No. 469-4, Danitz Decl., Ex. 4 at 4-5 ("███████████████████████████████ ███████████████████████████████ For example, on September 28, 2020, ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ (Dkt. No. 469-13, Danitz Decl., Ex. 13 at 3.) This was at a time when the waiting time for the call center was at its longest. (*See* Dkt. No. 386-1 (Customer Service Class includes members who telephoned the customer service during September 13, 2020 through November 21, 2020.) Therefore, because Mr. Moynihan may have unique first hand knowledge about the long wait times with the call center, Class Plaintiffs should have the opportunity to question Mr. Moynihan about what considerations he undertook in his decision to extend the contract with TTEC and whether he was involved in any of the decisions concerning the long hold times as well as his awareness of customer complaints and whether they impacted any of his alleged decisions. (Dkt. Nos. 469-22 to 469-39.)

Mr. Montag also appears to have been involved ███████████████████ ███████████████████████████████ ███████████████████ (Dkt. No. 469-43, Danitz Decl., Ex. 43 at 4-5.) In response, ███████████████████████████████

1  ▇. (*Id.*) ▇
2  ▇, an inference arises that Mr. Moynihan and Mr. Montag may have
3  directed some of the policies relating to the customer service call center.

### 3.  Other Topics related to CFF – Mr. Moynihan

Mr. Moynihan may also have directed the push that may have resulted in the implementation of the CFF. Mr. Moynihan is mentioned in emails among mid-level executives where they sought to gather and present information ▇ ▇ ▇ (*See* Dkt. No. 469-6, Danitz Decl., Ex. 6; Dkt. No. 469-7, Danitz Decl., Ex. 7; Dkt. No. 469-8, Danitz Decl., Ex. 8; Dkt. No. 469-6, Danitz Decl., Ex. 9; Dkt. No. 469-10, Danitz Decl., Ex. 10; Dkt. No. 469-11, Danitz Decl., Ex. 11; Dkt. No. 469-15, Danitz Decl., Ex. 15; Dkt. No. 469-19, Danitz Decl., Ex. 19.) These emails among mid-level executives creates a reasonable inference that Mr. Moynihan has personal knowledge and may have directed the CFF policies. *See Kennedy v. Jackson Nat'l Life Ins. Co.*, No. C 07–0371 CW (MEJ), 2010 WL 1644944, at *2 (N.D. Cal. Apr. 22, 2010) ("where the testimony of lower level employees indicates that the apex deponent may have some relevant personal knowledge, the party seeking protection will not likely meet the high burden necessary to warrant a protective order.").

### 4.  Board of Director Meetings – Mr. Moynihan and Mr. Montag

From October 2020 to November 2020, Mr. Moynihan chaired Board of Director Meetings ▇ ▇ ▇ ▇ (Dkt. No. 469-1, Danitz Decl., Ex. 1.) Among many other issues, he also discussed the ▇ ▇

██████████████████ (*Id.*; *see also* Dkt. No. 469-2, Danitz Decl., Ex. 2; Dkt. No., 469-2, Danitz Decl., Ex. 3.)  Mr. Montag also attended these board meetings.

The board minutes additionally show that Mr. Moynihan and Mr. Montag have unique, first-hand knowledge of the issues relevant in this case, and discussions made at those meetings could provide insight as their motive, intent or knowledge and ratification of the CFF.  *See Six W.*, 203 F.R.D. at 103 (relying on brief board minutes, and concluding CEO may be deposed as he attended the Board of Directors' meeting where discussions were held as to the issues related to the litigation and he should be questioned about his understanding of the issues and his role in the discussions).

Ultimately, the development, authorization and implementation of the CFF involved executive decisions.  The customer call center contract and staffing also appear to have also involved decisions by top executives.  BANA claims Mr. Moynihan and Mr. Montag were merely recipients of information from their staff but after consideration of the overall record presented, Mr. Moynihan and Mr. Montag appear to have been more involved directing policies than BANA claims.  This is not the case where Mr. Moynihan and Mr. Montag were far removed from any of the conduct at issue in this case concerning the CFF and the call centers.  Class Plaintiffs should be provided an opportunity to depose them as to their knowledge, motive and intent concerning these topics which are relevant on the issue of punitive damages.  *See In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, Case No. 23-md-03084-CRB (LJC), 2025 WL 896412, at *3 (N.D. Cal. Mar. 24, 2025) (corporate executives' subjective intent can be relevant to punitive damages and would inform the Court's decision).  Even though BANA did not articulate any burdens on Mr. Moynihan and Mr. Montag for sitting for a deposition, the Court recognizes the burdens it may cause, and limits them as described below.

Accordingly, the Court GRANTS in part and DENIES in part BANA's motion for protective order.[13]

## Conclusion

Based on the reasoning above, the Court GRANTS in part and DENIES in part BANA's motion for protective order. Class Plaintiffs may depose Mr. Moynihan for no more than four hours and may depose Mr. Montage for no more than two hours. The scope of the deposition shall be limited to punitive damages.

IT IS SO ORDERED.

Dated: May 29, 2025

Hon. Gonzalo P. Curiel
United States District Judge

---

[13] In reply, BANA. in the event the Court allows the depositions to go forward, asks the Court to defer these depositions until after a ruling on dispositive motions because punitive damages may only be permitted after Class Plaintiffs prevail on liability and compensatory damages. (Dkt. No. 472 at 11 n.4.) Because this request was made for the first time in a reply, the Court declines to address it. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) "[D]istrict court[s] need not consider arguments raised for the first time in a reply brief.") (citation omitted).