UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE: BANK OF AMERICA
CALIFORNIA UNEMPLOYMENT
BENEFITS LITIGATION,

Case No.:  21MD2992-GPC(MSB)

**ORDER GRANTING CLASS
PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION; APPOINTING
CLASS REPRESENTATIVES; AND
APPOINTING CO-LEAD CLASS
COUNSEL**

**[REDACTED]**

**[Dkt. No. 324.]**

Before the Court is Class Plaintiffs' motion for class certification, appointing them as class representatives for each of the classes and appointing Cotchett Pitre & McCarthy LLP and Altshuler Berzon LLP to serve as co-lead class counsel.  (Dkt. No. 324.) Defendant Bank of America, N.A. filed an opposition and Class Plaintiffs replied.  (Dkt. Nos. 349, 378.)  A hearing was held on January 17, 2025.  (Dkt. No. 405.)  Based on discussions during the hearing, Class Plaintiffs filed a third amended master consolidated complaint on January 24, 2025.  (Dkt. No. 406.)

On February 7, 2025, Defendant filed a motion to stay the case pending the United States Supreme Court review in *Lab'y Corp. of Am. Holdings v. Davis*, No. 24-0304.

21MD2992-GPC(MSB)

(Dkt. No. 415.)  After full briefing and hearing oral argument, (Dkt. Nos. 427, 433, 446), the Court granted in part and denied in part Defendant's motion to stay proceedings pending Supreme Court review.  (Dkt. No. 448.)  The Court granted a stay as it concerned class certification and dispositive motion practice but denied it as to expert discovery and any discovery disputes.  (*Id.* at 9.)

On June 5, 2025, the Supreme Court dismissed the writ of certiorari in the *Davis* case as improvidently granted.  *Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. __, 2025 WL 1583302, at *1 (2025).  As such, on the same day, the Court lifted the stay and indicated it would issue its decision on Class Plaintiffs' motion for class certification. (Dkt. No. 492.)

Based on a review of the briefs, the supporting documentation, the applicable law, and hearing oral argument, the Court GRANTS Class Plaintiffs' motion for class certification, appoints Plaintiffs to be class representatives and appoints Cotchett Pitre & McCarthy LLP and Altshuler Berzon LLP to serve as co-lead class counsel.

## Background

Class Plaintiffs Kuang Ting Chong, Candace Koole, Lindsay McClure, Azuri Moon, Stephanie Moore, Roland Oosthuizen, Vanessa Rivera, J. Michael Willrich, and Alex Yuan (collectively "Plaintiffs" or "Class Plaintiffs"), individually and on behalf of a putative class, bring the operative third amended master consolidated complaint ("TAMCC") against Defendant Bank of America, N.A. ("Defendant" or "BANA") for allegedly mishandling, through unlawful policies and practices, reports of unauthorized transaction claims, involving an ATM, brought by prepaid debit cardholders ("EDD cardholders") who were deemed eligible and received unemployment insurance benefits with California's Employment Development Department ("EDD") during the height of the COVID-19 pandemic in 2020-21 and causing them harm.  They allege, among other things, that BANA violated its statutory and regulatory obligations under the Electronic Funds Transfer Act ("EFTA") by using its newly created automated fraud monitoring program, Claim Fraud Filter, Indicator 1 ("CFF-1") as the sole basis for summarily

denying every EDD cardholders' unauthorized transaction claims involving an ATM without the mandated manual investigations.  (Dkt. No. 406, TAMCC.)  By relying solely on the automated CFF-1 to combat the exponential increase of fraud during the COVID-19 pandemic, Plaintiffs claim that BANA also summarily reversed or rescinded all permanent credits issued to EDD cardholders and summarily froze EDD cardholders' accounts.  (*Id.*)  Further, Class Plaintiffs complain that BANA knowingly understaffed its Claims call center subjecting EDD cardholders to significant wait times in violation of California common law.  (*Id.*)  Finally, they allege that BANA's decision to provide magnetic-stripe ("mag-stripe") only debit cards, and not industry-standard EMV chip cards, exposed EDD cardholders to significant fraud due to card "skimming" and counterfeit card fraud violating California statutory and common law.  (*Id.*)

California's EDD administers unemployment benefits in California, and between 2011 to February 2024, it exclusively contracted with BANA to distribute unemployment insurance, disability insurance and paid family leave benefits to Californians through bank-issued EDD prepaid debit cards.  (Dkt. No. 393-3, Chan Decl., Ex. 15, Chestnut Depo. at 54:19-24; 75:8-13; 76:3-7; 129:2-13[1] (UNDER SEAL); Dkt. No. 225-2, Lennon Decl. ¶ 3.)  As part of the contract, individuals receiving unemployment insurance benefits from EDD were able to access their benefits through an EDD prepaid debit card issued by BANA.  BANA's relationship with EDD Cardholders was governed by the EDD debit card account agreement which included the process through which EDD cardholders could file disputes with BANA regarding alleged unauthorized transactions on their accounts.  (Dkt. No. 350-10**,** Brys Decl., Ex. 9, Lorenzen Decl. ¶ 5; Dkt. No. 379-5, Chan Decl., Ex. 76.)

The relevant contract at issue, in effect from August 1, 2016 through July 31, 2021, included a revenue-share agreement.  (Dkt. No. 393-3, Chan Decl., Ex. 15, Chestnut

---

[1] Deposition page numbers are based on the pagination of the deposition transcript.

Depo. at 42:8-10.)  Initially, all EDD debit cards were mag-stripe only cards.  (Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 65:8-14 (UNDER SEAL).)  During the COVID-19 pandemic ("pandemic"), these pre-paid debit cards were subject to rampant third-party fraud and tens of millions of dollars were stolen from these bank accounts. (*See* Dkt. No. 350-7, Brys Decl., Ex. 6, Letson Decl. ¶¶ 12, 15.)

The EDD prepaid debit cards are subject to the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq*., and its implementing Regulation E ("Reg E"), 12 C.F.R. §§ 1005.1 *et seq*. which regulates electronic fund transfers that directly affect consumer accounts.  In brief, under the EFTA, once a consumer notifies BANA of any "error" or "unauthorized electronic fund transfer transaction," 15 U.S.C. § 1693f(f)(1), BANA is required to "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days."  15 U.S.C. § 1693f(a).  A bank's investigation includes a review of its own records.  12 C.F.R. § 1005.11(c)(4); 12 C.F.R. § 1005, Supp. I at 11(c)(4).

If the institution cannot complete the investigation within ten business days, it may "provisionally recredit" the consumer's account within ten business days of receiving notice of an error and complete its investigation within forty-five days.  15 U.S.C. § 1693f(c).  If the financial institution discovers that an error occurred, it must promptly, no later than one business day after the discovery, correct the error, 15 U.S.C. § 1693f(b), but if the financial institution concludes after its investigation that an error did not occur, it must provide an explanation of findings to the consumer within three business days after the conclusion of the investigation.  15 U.S.C. § 1693f(d).  Ultimately, "the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is

upon the financial institution to establish that the conditions of liability set forth in subsection (a)[2] have been met."  15 U.S.C. § 1693g(b).

**A.    BANA's Use of AISOP[3] - EFTA Investigations Prior to September 28, 2020**

Prior to September 28, 2020, BANA had applied its ███████████████████ ███████████████████████████████████ which it claims adhered to the requirements under Reg E.[4]  (Dkt. No. 362-4, Brys Decl., Ex. 14, Daniels Depo. at 120:16-121:1; 124:24-125:6 (UNDER SEAL); Dkt. No. 366-11, Chan Decl., Ex. 35 ██████ (UNDER SEAL); Dkt. No. 366-12, Chan Decl., Ex. 36 (UNDER SEAL); Dkt. No. 367-13, Chan Decl., Ex. 82 (UNDER SEAL).) █████████████████████████████████ ████████████████████████████████████████████████. (Dkt. No. 362-4, Chan Decl., Ex. 14, Daniels Depo. at 122:13-123:6 (UNDER SEAL).) ███████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████. (Dkt. No. 362-4, Chan Decl., Ex. 14, Daniels Depo. at 147:25-148:19; 150:13-151:20 (UNDER SEAL); Dkt. No. 366-12, Chan Decl., Ex. 36 at -4539 (UNDER SEAL).) ████████████ ████████████████████████████████████. (Dkt. No. 362-4, Chan Decl., Ex. 14, Daniels Depo. at 147:25-148:19 (UNDER SEAL); Dkt. No. 366-12, Ex. 36 at -4549 (UNDER SEAL).)

**B.    BANA's Use of CFF-1 - EFTA Investigations After September 28, 2020**

BANA recognizes it has statutory and regulatory duties to address fraudulent transactions, and therefore, ██████████████████████████

---

[2] Subsection (a) requires the consumer to notify the financial institution within 60 days of receiving documentation of the error and the consumer's reasons.  15 U.S.C. § 1693g(a).

[3] ████████████████████████████████.

[4] Plaintiffs do not dispute that ██████ complied with the investigation mandates of the EFTA.

[5] ████████████████████████████████████ ██████.

5

████████. (Dkt. No. 382-2, Brys Decl., Ex. 6, Letson Decl. ¶ 6 at 209[6] (UNDER SEAL).) BANA also realize a fraud strategy cannot be 100% effective at identifying only fraudulent activity and acknowledges that its fraud strategy may inconvenience cardholders whose card activities appear to be fraudulent but are not. (Dkt. No. 350-7, Brys Decl., Ex. 6, Letson Decl. ¶ 7.) Therefore, BANA, in implementing fraud strategies, has to balance between protecting legitimate customers and combatting fraud. (*Id.* ¶ 8.)

Starting in the Spring of 2020, BANA noticed and was informed by law enforcement agencies and other third-party sources about unprecedented, enormous large-scale fraud in the unemployment insurance ("UI") programs due to the opportunities created by the pandemic for benefits eligibility fraud and unauthorized transaction claims that had not ever been seen. (Dkt. No. 350-7, Brys Decl., Ex. 6, Letson Decl. ¶ 12.) As of January 2021, California's State Auditor estimated nearly $10.4 billion in fraudulent claims and over $32 billion of unemployment benefits stolen and illegally issued in California. (*Id.* ¶ 15.)

In May 2020, BANA learned of massive benefits eligibility fraud against state unemployment programs where ███████████████████████ ███████████████████████████████████ ████████████████████████████. (Dkt. No. 382-2, Brys Decl., Ex. 6, Letson Decl. ¶ 14 at 212 (UNDER SEAL).)

Because EDD was responsible for determining eligibility based on cardholders' applications, ████████████████████████████ ██████. (*Id.* ¶ 17 at 213 (UNDER SEAL).) BANA's Global Financial Crimes ("GFC") team ███████████████████████████████ ███████████████████████████

---

[6] Unless otherwise noted, page numbers are based on the CM/ECF pagination.

1    ███████████████████████████████████████████. (*Id.* ¶¶ 18, 19 at 213-14

2    (UNDER SEAL).)  This information was also publicly available on YouTube and other

3    social messaging platforms.  (Dkt. No. 350-7, Brys Decl., Ex. 6, Letson Decl. ¶ 19.)

4         During the first six months of the pandemic, BANA noted two key features in

5    fraud activity in State UI programs using BANA's prepaid cards: 1) ███████████████

6    ████████████████████████████████████████████████████

7    ████████████████████; and 2) ████████████████████████

8    █████████████████████████████████████████████████████████

9    ████████████████████████████████████████████

10   █████████████████████████. (Dkt. No. 382-2, Brys Decl., Ex. 6, Letson

11   Decl. ¶ 21 at 214 (UNDER SEAL).)  While BANA ████████████████████████

12   ██████████████████████████████████████████

13   ██████████████████████████████████████████

14   █████████████████████████████████. (*Id.* ¶¶ 22, 23 at 215 (UNDER SEAL).)

15        BANA's fraud strategies for the UI programs created during the pandemic ████████

16   ██████████████████████. (*Id.* ¶ 25 at 216 (UNDER SEAL.)  At issue in this case

17   was a fraud strategy ████████████████████████████████████████████

18   ████████████████████████████████████████████. (*Id.* at 216-

19   17 (UNDER SEAL).)  The CFF ████████████████████████████████████

20   ████████████████████████████████████████

21   ████. (*Id.* at 217 (UNDER SEAL).)

22        Starting in June 2020, unauthorized claims submitted by EDD cardholders

23   █████████████████████████████████████████████████████████████.

24   (*Id.* ¶ 26 at 217 (UNDER SEAL).)  BANA's GFC, the Global Information Security

25   ("GIS") and BANA's Global Banking and Markets ("GBAM") ██████████████████

26   █████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28   ████████████████████████████████████████████. (*Id.* ¶ 27 at 217

1  (UNDER SEAL).) ████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ██████████████████. (*Id.* (UNDER SEAL).) ██████████████████

4  ████████████████████████████████████. (*Id.* (UNDER

5  SEAL).) ██████████████████████████████. (*Id.* (UNDER

6  SEAL).)

7       Another type of fraud identified was ██████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  ██████████████████████████. (*Id.* ¶ 28 at 218 (UNDER SEAL).) ████

11  ████████████████████████████████████████████████████

12  ████████████████████. (*Id.* (UNDER SEAL).)

13       In order to combat the fraud, in late summer of 2020, the GFC and GIS teams were

14  directed to develop a fraud strategy █████████████████████

15  ██████████. (*Id.* ¶ 30 at 218 (UNDER SEAL).)  They determined that ████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ██████████████████████ (*Id.* ¶ 31 at 219 (UNDER SEAL).)  The Fraud

19  Filter was ████████████████████████████████████████████

20  ████████████████████████████. (*Id.* ¶ 32 at

21  219 (UNDER SEAL).) ██████████████████ the Fraud Filter ██████████████

22  ██████████████████████████ (*Id.* (UNDER SEAL).)

23  The fraud filter was approved for use in the UI prepaid card programs in late September

24  2020.  (*Id.* ¶ 35 at 220 (UNDER SEAL).)

25      ██████████████████████████████████

26  ██████████████████, BANA determined that the Fraud Filter ████████████████

27  ████████████████████████████████████. (*Id.* ¶

28  37 at 220 (UNDER SEAL).) ████████████████████████████

21MD2992-GPC(MSB)

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████████

3 ██████████████████████. (*Id.* ¶ 36 at 220 (UNDER SEAL).) ████████████

4 ██████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████████

6 ████████████████████████████████████████. (*Id.*

7 (UNDER SEAL).)

From September 28, 2020 until June 8, 2021, when the PI was imposed, BANA implemented the CFF as a basis to investigate and make decisions on certain error claims or unauthorized transaction claims.  (Dkt. No. 366-24, Chan Decl., Ex. 49, BANA's Resp. to Interrog. 28 at 9-10 (UNDER SEAL); Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 124:20-125:14 (UNDER SEAL).)  The CFF involved three indicators, Indicator 1, Indicator 2 and Indicator 3, but only Indicator 1 ("CFF-1") is relevant and subject to this litigation.[7]  CFF Indicator 1 was triggered when a claim involved "PIN enabled transactions claiming a PIN compromise."  (Dkt. No. 366-24, Chan Decl., Ex. 49, BANA's Resp. to Interrog. 28 at 9-10 (UNDER SEAL); *see also* Dkt. No. 366-22, Chan Decl., Ex. 47 at 17 (UNDER SEAL).)  This meant the CFF-1 applied to ATM withdrawals requiring the use of a PIN ██████████████████████████ ██████████████████████████. (Dkt. No. 393-4, Chan

---

[7] Indicator 2 was applied to ██████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██ ██████████████████████████████████ ████████ ████████████████████ ████████████████████

(Dkt. No. 366-24, Chan Decl., Ex. 49, BANA's Resp. to Interrog. 28 at 9-10 (UNDER SEAL).)

21MD2992-GPC(MSB)

1   Decl., Ex. 17, Letson Depo. at 92:15-23 (UNDER SEAL); Dkt. No. 362-2, Chan Decl.,

2   Ex. 16, Martin Depo. at 125:18-126:8 (UNDER SEAL).)

3       Under this new anti-fraud system, once an EDD debit cardholder submits an

4   authorized transaction claim, the CFF is run ███████████████, and if triggered,

5   the claim is automatically denied ██████████████, the cardholders receives a letter

6   denying the claim and giving them the option to submit a reconsideration request.  (Dkt.

7   No. 362, Chan Decl., Ex. 14, Daniels Depo. at 52:21-53:9; 234:13-21 (UNDER SEAL);

8   (Dkt. No. 366-24, Chan Decl., Ex. 49, BANA's Resp. to Interrog. 28 at 9 (UNDER

9   SEAL).)

10      The denial letter was a template form letter that automatically populated the

11  cardholder's information.  (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 53:12-

12  54:12; 220:12-221:11 (UNDER SEAL).)  The uniform template denial letter which was

13  provided to all EDD cardholders' unauthorized transaction claims involving an ATM

14  stated, "Your claim has been closed because we believe the account or the claim have

15  been the subject of fraud or suspicious activity.  Any temporary credit that was applied to

16  your account related to this claim, including any related reimbursement of fees, has been

17  or will be debited from your account and reflected in your available balance, if any."

18  (Dkt. No. 324-55, Chan Decl., Ex. 52.)  The letter further stated, "If you contact us by

19  phone or in writing, you may request that we reopen your claim for further consideration.

20  You will be asked to give us information, including any documents you may have, to

21  support your claim.  You have the right to request documents, if any, that we relied on in

22  making our determination."  (*Id.*)

23      If a cardholder submitted an unauthorized transaction claim based on an ATM

24  withdrawal, it automatically triggered CFF-1 and the claim was summarily denied

25  ████████████████████████████████████████.

26  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 162:1-25 (UNDER SEAL); Dkt.

27  No. 393-4, Chan Decl., Ex. 17, Letson Depo. at 93:20-94:5, 192:7-14 (UNDER SEAL).)

28  CFF-1 did not take into account the ████████████████████████

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████

7  █████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████.

10  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 129:16-132:4 (UNDER SEAL).)

11  CFF was merely ██████████████████████████████. (*Id.* (UNDER SEAL.).)

12    While the CFF was in effect, it was the bank's policy and practice to apply the CFF

13  to 100% of incoming unauthorized transaction claims brought by EDD debit cardholders.

14  (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 42:3-8 (UNDER SEAL).)  Further,

15  because ████████████████████████████████████████████████

16  █████████████████████████. (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 49:24-

17  50:6 (UNDER SEAL); Dkt. No. 368-36, Chan Decl., Ex. 156 at -426938 (UNDER

18  SEAL).)  According to BANA, █████████████████████████████████

19  ████████████████████████████████████████████████████

20  ██████████████████████████████████████████████

21  ██████████████. (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 247:16-248:14.)

22  **C.    BANA's Use of CFF-1 to Rescind Permanent Credits Paid on ATM claims**

23    Starting on September 28, 2020, BANA also retroactively applied its CFF to all

24  claims submitted since April 1, 2020 that it had previously investigated and resolved in

25  EDD cardholders' favor ██████████████████████; therefore, despite the prior

26  investigation, if the claim triggered the CFF, the account was frozen and the claims

27  denied.  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 179:13-180:1 (UNDER

28  SEAL); Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 234:24-236:5 (UNDER

21MD2992-GPC(MSB)

SEAL).)  This applied to claims brought before the CFF took effect and who had their prior unauthorized claims paid with permanent credits.  (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 234:24-235:9.)  The accounts were frozen and permanent credits rescinded without any notice.  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 224:17-225:2.)

**D.    BANA's Use of CFF-1 to Freeze Account**

BANA ███████████████████████████████████████████ ██████████████████████████████████████████.  (Dkt. No. 382-2, Brys Decl., Ex. 6, Letson Decl. ¶ 9 (UNDER SEAL); Dkt. No. 382-2, Brys Decl., Ex. 7, Martin Decl. ¶ 4 (UNDER SEAL).) ██████████████████████ ████████████████████████.  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 180:10-22 (UNDER SEAL).)  For the cardholder, ████████████████████ ████████████████████████.  (*Id.* at 182:11-15 (UNDER SEAL).) ███████████████████████████████████████████████ ███████████████████████████████████ ██████████.  (Dkt. No. 382-2, Brys Decl., Ex. 6, Letson Decl. ¶ 9 (UNDER SEAL); Dkt. No. 382-2, Brys Decl., Ex. 7, Martin Decl. ¶ 4 (UNDER SEAL).) ██████████ ████████████████████████████████████████ ██████████████.  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 183:3-6 (UNDER SEAL).) ████████████████████████████████ ██████████████.  (Dkt. No. 382-2, Brys Decl., Ex. 6, Letson Decl. ¶ 9 (UNDER SEAL); Dkt. No. 382-2, Brys Decl., Ex. 7, Martin Decl. ¶ 4 (UNDER SEAL).) ██████████ ███████████████████████████████████████████████ ████████████████████████████████████████.  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 182:25-183:2 (UNDER SEAL).)  Once frozen, the cardholders were directed to EDD to authenticate their identities in order to unfreeze their accounts because BANA believed that EDD would be better positioned to authenticate

accounts in order to restore access.  (Dkt. No. 382-2, Brys Decl., Ex. 7, Martin Decl. ¶ 5 (UNDER SEAL).)  However, at the time, EDD was unable to handle the incoming inquiries from cardholders about their accounts ███████████████████████████

████████████████████████████████████.  (Dkt. No. 382-2, Brys Decl., Ex. 7, Martin Decl. ¶ 6 (UNDER SEAL).)

Between September 28, 2020 to March 18, 2021, BANA automatically froze accounts that triggered the CFF.  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 221:11-18 (UNDER SEAL).)  At first, accounts were initially frozen on September 28, 2020, then unfrozen from October 2020 through December 2020, and then later frozen again from December 2020 to March 18, 2021.  (*Id.* at 222:9-12; 223:1-224:4 (UNDER SEAL).)  No notice was provided to cardholders before freezing their accounts but a letter was sent a few days after the freeze.  (*Id.* at 224:17-225:14.)  The freeze prevented cardholders from accessing the funds in their accounts and barred EDD from depositing on-going benefits.  (*Id.* at 224:5-16.)  BANA explains that when the CFF was first implemented, cards that triggered the CFF were frozen because ██████████████

████████████████████████████████████████████████

██████.  (Dkt. No. 382-2, Brys Decl., Ex. 7, Martin Decl. ¶ 5 (UNDER SEAL).)

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████.  (Dkt. No. 382-2, Brys Decl., Ex. 7, Martin Decl. ¶ 6 (UNDER SEAL).)

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████.  (*Id.* (UNDER SEAL).)  Therefore, cardholders could regain access by ██████████████

████████████████████████████████████████████

██████.  (*Id.* ¶ 7 (UNDER SEAL.)

21MD2992-GPC(MSB)

Starting March 18, 2021, BANA stopped using the CFF to automatically freeze EDD cardholder accounts and instead "blocked" the accounts which prevented cardholders from accessing funds in their account.  (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo at 301:18-302:25 (UNDER SEAL).) ██████████████████████████ ██████████████████████████████████████████████████████████. (*Id.* (UNDER SEAL).)

**E.    Understaffing Claims Call Center**

While BANA was implementing its new CFF fraud strategies, ████████████ ████████████████████████████████████. (Dkt. No. 393-1, Chan Decl. Ex. 3, Minnucci Expert Report ¶ 43 (UNDER SEAL).)  From September 13, 2020 to November 21, 2020, the average speed to answer ("ASA"), "an industry-standard metric that reflects the average amount of time a customer is kept waiting on hold before their call is initially answered", was ████████████ in contrast to the average ASA of 1.25 minutes among 214 call centers surveyed in 2020.  (*Id.* ¶¶ 12, 43-46 (UNDER SEAL).) The wait times for all EDD debit cardholders during this two-month period far exceeded any industry standard norms and on average cardholders waited ██████ minutes longer than they would have had BANA complied with industry-standard response times.  (*Id.* ¶ 13 (UNDER SEAL).)  According to Plaintiff's expert, BANA should have known that ████ ████████████████████████████████████████████████. (*Id.* ¶ 15 (UNDER SEAL).)

**F.    EMV Chip Card**

Initially, all EDD debit cards were mag-stripe only cards.  (Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 65:9-14 (UNDER SEAL).  Yet, since 2014, BANA included EMV chips on its other consumer and small business debit card accounts.  (Dkt. No. 324-26, Chan Decl., Ex. 23; Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 61:19-23.)  BANA was aware, as of 2014, that EMV chips increase security and protect cardholders from fraud.  (Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 64:7-13.) ████████████████████████████████████████████████████████████

1 ██████████████████████████████████ (Dkt. No. 366, Chan Decl., Ex. 24 at 2

2 (UNDER SEAL).) ████████████████████████████████████████████

3 ████████████████████████████████████████████████. (Dkt. No. 366-4, Chan Decl. Ex. 28 at 2 (UNDER SEAL).)

4 ████████████████████.

5        In July 2021, BANA began issuing EDD debit cards with EMV chips.  (Dkt. No.

6 362-2, Chan Decl., Ex 16, Martin Depo. at 65:4-7 (UNDER SEAL).)  Initially the EDD

7 debit cards did not have EMV chips because the contract with EDD did not provide for

8 chips and BANA needed to get permission and work with EDD to provide the EMV

9 chips.  (*Id*. at 65:15-20 (UNDER SEAL).)

10       The parties provide competing experts disputing the reasons why ████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████.  (*Compare* Dkt. No. 324-5, Chan Decl.,

13 Ex. 2 Cloninger Expert Report *with* Dkt. No. 350-5, Brys Decl., Ex. 4, Joseph Expert

14 Report.)  Those factual disputes going to the merits of the claim are not to be resolved at

15 class certification.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*

16 ("*Olean*"), 31 F.4th 651, 664-65 (9th Cir. 2022) (*en banc*) ("district court is limited to

17 resolving whether the evidence establishes that a common question is *capable* of class-

18 wide resolution, not whether the evidence in fact establishes that plaintiffs would win at

19 trial.  While such an analysis may entail some overlap with the merits of the plaintiff's

20 underlying claim, the [m]erits questions may be considered [only] to the extent [ ] that

21 they are relevant to determining whether the Rule 23 prerequisites for class certification

22 are satisfied[.]") (internal citations and quotation marks omitted)).

23 **G.    Class Plaintiffs' Experiences with CFF-1**

24       **1.    Kuang Ting Chong**

25       Kuang Ting Chong ("Chong") began receiving EDD unemployment insurance

26 benefits through a BANA EDD debit card with a magnetic stripe that was linked to a

27 BANA EDD debit card account in June 2020.  (Dkt. No. 324-8, Chan Decl., Ex. 5, Chong

28 Decl. ¶¶ 2, 3.)  On July 20, 2020, when Chong tried to withdraw cash from his EDD debit

21MD2992-GPC(MSB)

card account at a BANA branch ATM in Monterey Park, CA, the ATM screen stated that he had reached his daily withdrawal limit. (*Id.* ¶ 4.) He realized there was an unauthorized ATM withdrawal because he had not withdrawn any cash earlier that day. (*Id.*) He immediately went home, checked his EDD debit card account and saw one ATM withdrawal for $1,000 on the same day that he had not authorized and was not aware. (*Id.*) He then printed out the transaction record, went to a BANA branch location but the teller informed him that the branch could not help him and instructed him to call BANA instead. (*Id.* ¶ 5.) After leaving the branch, he called BANA's customer service and filed a claim for the unauthorized transaction informing the representative that he did not make or authorize the $1,000 withdrawal and sought credit for the amount taken. (*Id.* ¶ 6.) He also informed the representative that the $1,000 withdrawal was made in Alhambra, a different city than his usual transactions and the amount was about double his typical transactions. (*Id.*) Around July 30, 2020, BANA provisionally credited his account $1,000. (*Id.* ¶ 7.) On September 2, 2020, BANA mailed a letter that informed him that the investigation of the disputed transaction was completed and the $1,000 provisional credit was now permanent. (*Id.* ¶ 8.) However, on September 28, 2020, BANA froze his account and it remained frozen until October 4, 2020. (*Id.* ¶ 9.) He was not provided with any notice that BANA would freeze his account or an explanation why it was frozen. (*Id.*) In a letter dated October 2, 2020, BANA informed him that the unauthorized transaction he had reported had been closed stating "we believe the account or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, had been or will be debited from your account and reflected in your available balance, if any." (*Id.* ¶ 10.) On October 4, 2020, BANA rescinded the $1,000 permanent credit creating a negative balance in his account. (*Id.* ¶ 11.) Even though he continued receiving EDD benefits in his EDD debit card account, BANA denied him access because the funds were applied against the negative account balance created by it. (*Id.*) He repeatedly called BANA to obtain the $1,000 permanent credit

that had been rescinded as well as the additional EDD funds that he was unable to access due to the negative balance BANA created in his account when it rescinded the $1,000. (*Id.* ¶ 12.)  Between September 28, 2020 and November 15, 2020, Chong called BANA at least seven separate occasions, sometimes making multiple calls, waiting on hold for hours and being shuffled between multiple agents in one day.  (*Id.* ¶ 13.)  He estimates that he spent more than one hour on hold each time he called and nearly three hours on the phone with a BANA representative to resolve these issues.  (*Id.*)

Chong filed a class action lawsuit in the Central District of California in November 2020.  (*Id.* ¶ 14.)  In a letter dated December 10, 2020, BANA stated that it had performed an additional review of his claim and had credited him the $1,000 which was received 143 days after he submitted his unauthorized transaction claim and 67 days after BANA rescinded the $1,000 credit.  (*Id.*)

### 2.    Candace Koole

Candace Koole ("Koole") began receiving EDD unemployment insurance benefits through a BANA EDD debit card with a magnetic stripe that was linked to a BANA EDD debit card account in April 2020.  (Dkt. No. 324-9, Chan Decl., Ex. 6, Koole Decl. ¶¶ 2, 3.)  On December 30, 2020, when she tried to use her EDD debit card to buy groceries, the card was repeatedly declined at checkout.  (*Id.* ¶ 4.)  She left the groceries at the store, went home to check her EDD debit card account balance, and was surprised that her account had only $8.37, down from over $9,000 the week before.  (*Id.*)  Her online account statement showed that daily $1,000 ATM withdrawals were made from December 19 to 26, 2020 and an ATM withdrawal on December 27, 2020 for $760 totaling $8,760 of ATM withdrawals that she had not authorized and was unaware.  (*Id.*)

Koole immediately contacted BANA to ask about the status of her account, report the unauthorized transactions, and sought to get reimbursed for the money that had been taken out of her account.  (*Id.* ¶ 5.)  Later that same day, BANA froze her account.  (*Id.*)

In early January 2021, Koole received a letter from BANA dated December

31, 2020, one business day after she had submitted her unauthorized transaction claim, stating that it had closed her claim and would not be reimbursing her the $8,760 taken from her account.  (*Id.* ¶ 6.)  The letter did not provide an explanation for the denial stating only: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity." (*Id.*)

Koole's EDD debit card account remained frozen for 77 days, from December 31, 2020, to March 18, 2021.  (*Id.* ¶ 7.)  During that period, she could not access the EDD benefits that were in her account at the time of the freeze, and she could not receive or access any new periodic EDD benefits payments that she would have received and would have been able to use if BANA had not frozen her account.  (*Id.*)  Through discovery in this litigation, she learned that on March 18, 2021, BANA converted her account status from frozen to blocked but it still prevented her from being able to access any of the EDD benefits that were in her account.  (*Id.*)  BANA unblocked her account on April 5, 2021, after she filed this lawsuit.  (*Id.*)

On April 6, 2021, five days after the Consolidated Class Action Complaint was filed and 96 days after she submitted her unauthorized transaction claim to BANA, BANA credited her the $8,760 that had been stolen from her.  (*Id.* ¶ 8.)  She received a letter stating that BANA had "completed an additional review" of her claim and that her account would be credited in the full claim amount "[a]s a result of [BANA's] research." (*Id.*)

### 3.    Lindsay McClure

Lindsay McClure ("McClure") began receiving EDD unemployment insurance benefits through a BANA EDD debit card with a magnetic stripe that was linked to a BANA EDD debit card account in April 2020.  (Dkt. No. 324-10, Chan Decl., Ex. 7, McClure Decl. ¶¶ 2, 3.)  On November 30, 2020, she received a text notification of a balance inquiry and cash withdrawal of $1,003 from her EDD debit card account at an ATM in Los Angeles, CA.  (*Id.* ¶ 4.)  At the time of the unauthorized ATM withdrawal, she was in El Cajon, CA about 127 miles away from Los Angeles.  (*Id.*)  Immediately

after receiving the text notification, she called BANA to report the unauthorized transaction of $1,003 and to get reimbursed for the money that had been taken out of her account. (*Id.*) When she reached the claims department, the representative responded that she needed to call back the following morning to the claims department at 5:00 a.m. (*Id.*)

The following morning on December 1, 2020, she called BANA back around 5:00 a.m. to initiate a claim. (*Id.* ¶ 6.) She informed the BANA representative that the $1,003 withdrawal was not made or authorized by her, that it was made more than 100 miles from where she lived and where she typically used her BANA EDD debit card, and that she did not even know it was possible to withdraw more than a few hundred dollars at a time. (*Id.*) The BANA representative confirmed McClure had successfully filed a claim and said that it would take 30 to 45 business days to complete a thorough investigation. (*Id.*) McClure subsequently received a letter from BANA dated December 2, 2020, just one business day after she submitted her unauthorized transaction claim, stating that BANA had closed her claim and would not be reimbursing her the $1,003 taken from her account. (*Id.* ¶ 7.) The letter did not provide an explanation for the denial, stating only: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity." (*Id.*)

On December 20, 2020, she could no longer access the benefits in her EDD debit card account after her EDD debit card was declined at a drive-through. (*Id.* ¶ 8.) At the time, her unemployment insurance benefits were in the amount of about $660 biweekly. (*Id.*) Immediately after, she called BANA's customer service department, and a customer service representative informed that her account had been frozen. (*Id.* ¶ 9.) The representative also told her that, because of the freeze, BANA could not do anything further and she would have to contact EDD to unfreeze her account. (*Id.*) She was not provided any notice about the freeze of her account. (*Id.* ¶ 8.) Weeks later, she received a letter from the BANA dated February 1, 2021, stating that a "freeze (or hold) has been placed in your account." (*Id.* ¶ 9.) The letter further stated that she would be unable to

use her EDD debit card or access the money in her EDD debit card account while the freeze was in place.  (*Id.*)

After she filed a class action lawsuit against BANA on January 26, 2021, she received a letter from BANA dated January 27, 2021, 57 days after she submitted her unauthorized transaction claim, stating her EDD debit card account was credited the $1,003 that had been stolen.  (*Id.* ¶ 10.)  But her account remained frozen and she remained unable to access those reimbursed funds.  (*Id.*)  Her EDD debit card account remained frozen for 55 days, from December 17, 2020, to February 10, 2021.  (*Id.* ¶ 11.)  At the time of the freeze, her account balance was $229.31.  (*Id.*)  During that period, she could not access any of the EDD benefits as of the time of the freeze, and she could not receive or access any new periodic EDD benefits payments that she would have received and would have been able to use if BANA had not frozen her account including her $1,003 claim credit received on January 27, 2021.  (*Id.*)

### 4.    Azuri Moon

Azuri Moon ("Moon") began receiving EDD unemployment insurance benefits through a BANA EDD debit card with a magnetic stripe that was linked to a BANA EDD debit card account in June 2020.  (Dkt. No. 324-11, Chan Decl., Ex. 8, Moon Decl. ¶¶ 2, 3.)  Around October 20, 2020, he tried to buy lunch at a restaurant with his EDD debit card, but the transaction was declined for insufficient funds.  (*Id.* ¶ 4.)  When he checked his EDD debit card account, he saw two ATM withdrawals totaling $1,800 that he had not authorized.  (*Id.*)

On October 23, 2020, after several previous attempts to reach someone at BANA by calling the number listed on the back of his card, he was finally able to get through to BANA's customer service department to report these unauthorized transactions and sought a credit for the $1,800 that was stolen.  (*Id.* ¶ 5.)  Between October 20 and 23, 2020, he spent approximately eleven hours on the phone, on multiple calls, before he was able to get through to anyone in BANA's claims department.  (*Id.*)  When he finally reached the claims department, he made a claim concerning the two

unauthorized ATM withdrawals totaling $1,800 explaining that he had never given or disclosed the PIN for his EDD debit card to anyone, had never authorized anyone to use his EDD debit card, and did not authorize the two ATM withdrawals. (*Id.* ¶ 6.) BANA's representative told him that BANA had opened his claim and would investigate and make a decision on his claim within 30-45 days. (*Id.*)

In mid-November, since he had not received any communication from BANA, he contacted BANA to get an update. (*Id.* ¶ 7.) He was told that BANA would not be returning the money because he was liable for the disputed transactions. (*Id.*) The BANA representative told him that she should file a police report, write a detailed description of what happened and fax it to BANA. (*Id.*) He complied with BANA's directions and faxed a police report. (*Id.*)

He later learned during discovery that BANA had mailed him a letter dated October 28, 2020, which he did not receive, informing that it had closed his claim and would not be reimbursing the $1,800 taken from his account. (*Id.* ¶ 8.) The letter did not provide an explanation for the denial, stating only: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity." (*Id.*) During October 20, 2020 and November 15, 2020, he repeatedly called BANA's customer service to obtain assistance with his unauthorized transaction claim and estimates he spent over an hour on hold each time he called and several more hours on the phone with BANA's representative trying to resolve the issues. (*Id.* ¶ 9.)

In mid-December 2020, nearly a month after faxing the police report and other requested documents to BANA, he called to get an update. (*Id.* ¶ 10.) BANA's representative told him it did not receive his fax. (*Id.*) Due to the confusion between claim number and case number and because the information on the fax reflected a mistake, it derailed his fraud claim. (*Id.*) He then re-faxed everything that BANA requested. (*Id.*)

On December 17, 2020, he could no longer access his EDD benefits which was about $600 biweekly. (*Id.* ¶ 11.) Shortly after he discovered that his account had been

frozen, he contacted BANA's customer service department, and after calling multiple times and waiting on hold for more than an hour each time, he finally reached a customer service representative who said that his account had been frozen.  (*Id.* ¶ 12.)  The BANA representative also told him that, because his account was frozen, it could not do anything further either to address his earlier unauthorized transaction claim or to enable him to access his frozen benefits funds.  (*Id.*)  BANA froze his account without any notice or explanation.  (*Id.* ¶ 13.)  He later learned, through discovery in this case, that BANA froze his account on December 17, 2020, based on the application of its Claim Fraud Filter.  (*Id.*)  Moon's EDD debit card account remained frozen for 91 days, from December 17, 2020, to March 18, 2021.  (*Id.* ¶ 14.)  During that period, he could not access any of the EDD benefits that were in his account as of the time of the freeze and could not receive or access any new periodic EDD benefits payments that he would have received and would have been able to use if BANA had not frozen his account.  (*Id.*)  Through discovery in this litigation, he learned that on March 18, 2021, BANA converted his account status from frozen to blocked but he was still not able to access any of the EDD benefits that were in his account.  (*Id.*)  BANA finally unblocked his account on April 15, 2021, after he filed this lawsuit.  (*Id.*)  On April 5, 2021, four days after the Consolidated Class Action Complaint was filed and 164 days after he submitted his unauthorized transaction claim to BANA, it finally credited his debit card account the $1,800 that had been stolen from him in October 2020.  (*Id.*)

### 5. Stephanie Moore

Stephanie Moore ("Moore") began receiving EDD unemployment insurance benefits through a BANA EDD debit card with a magnetic stripe that was linked to a BANA EDD debit card account in June 2020.  (Dkt. No. 324-12, Chan Decl., Ex. 9, Moore Decl. ¶¶ 2, 3.)  On July 18, 2020, her EDD debit card was declined when she tried to make a purchase.  (*Id.* ¶ 4.)  She checked her EDD debit card account and saw two transactions from the same day, an ATM withdrawal in the amount of $1000 and a purchase from Target in the amount of $482.13, that she had not authorized.  (*Id.*)

Within minutes of discovering the unauthorized transactions, she called BANA and reported the unauthorized transactions and asked for credit in the amount of $1,482.13 that was stolen. (*Id.* ¶¶ 5-6.) Around July 30, 2020, BANA provisionally credited the $1,482.13 to her account, and on August 31, 2020, BANA mailed a letter informing her that the $1,482.13 provisional credit was now permanent and that "We've completed our investigation of this disputed transaction. The provisionally issued credit for $1,482.13 is now permanent." (*Id.* ¶ 7.)

On September 30, 2020, when she attempted to use her EDD debit card to purchase a tire for her vehicle, the transaction was declined. (*Id.* ¶ 8.) She then attempted to check the balance on her EDD debit card account but was unable to log into her account. (*Id.*) Through discovery produced in this litigation, she learned BANA froze her account between September 28, 2020 and October 4, 2020. (*Id.*) Then, on October 4, 2020, BANA rescinded the $1,482.13 permanent credit creating a negative balance in her account. (*Id.* ¶ 9.) On October 5, 2020, she called BANA's customer service to ask about the rescinded $1,482.13 credit and was informed that the funds were taken back by EDD, and because of this, BANA would not be able to assist her any further. (*Id.* ¶ 10.)

Between September 30, 2020, and November 15, 2020, Moore called BANA at least 15 separate times in an attempt to resolve the issues stemming from the rescinded credit and freeze of her EDD debit card account and estimates she spent over an hour on hold each time she called BANA during that time. (*Id.* ¶ 11.) Further, during those calls, BANA gave her conflicting information but never afforded her a way to regain access to her rescinded credits. (*Id.*) One BANA representative told her that there had been a glitch in the system and her funds would be returned shortly, but they were not. (*Id.*) At a later point, she was told the investigation was reopened. (*Id.*) She even asked for documentation regarding the investigation, but never received any. (*Id.*)

After she filed a class action lawsuit against BANA in November 2020, she

21MD2992-GPC(MSB)

received a letter from BANA dated December 9, 2020, stating that it had conducted an additional review of her claim and had credited her the $1,482.13 that had been stolen from her in September 2020. (*Id.* ¶ 12.) She received the credit 144 days after she submitted her claim for unauthorized transaction and 66 days after BANA rescinded the $1,482.13 credit. (*Id.*)

### 6. Roland Oosthuizen

Roland Oosthuizen ("Oosthuizen") began receiving EDD unemployment insurance benefits through a BANA EDD debit card with a magnetic stripe that was linked to a BANA EDD debit card account in April 2020. (Dkt. No. 324-13, Chan Decl., Ex. 10, Oosthuizen Decl. ¶¶ 2, 3.) Around September 28, 2020, he logged in his EDD debit card account online and noticed daily unauthorized withdrawals from BANA's ATMs on five consecutive days beginning September 24, 2020 through September 28, 2020 in the amount of $1,000 each, totaling $5,000. (*Id.* ¶ 4.) Immediately, Oosthuizen used the online portal to suspend his card and then called BANA to report the unauthorized withdrawals and get reimbursed for the money taken from his account. (*Id.* ¶ 5.) He spent three hours on hold before being disconnected. (*Id.*) The next day, after holding for about two and a half hours, he reached a representative in the claims department. (*Id.*) He identified the specific ATM unauthorized withdrawals and informed the representative that he had the card in his possession and did not authorize anyone to make the withdrawals. (*Id.*) He was told that his claim had been filed and would be investigated. (*Id.*)

In mid-October 2020, he received a letter from BANA dated October 1, 2020, one business day after he filed his claim, informing him that BANA had closed his claim and would not be reimbursing the $5,000 taken from his account. (*Id.* ¶ 6.) The letter provided no explanation and stated only that "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity." (*Id.*) After receiving BANA's letter denying his claim, he called BANA to re-open his claim. (*Id.*) A BANA representative advised him to send information about his claim

and any police report he had filed.  (*Id.* ¶ 7.)  On November 5, 2020, he faxed a written statement about the theft, a request to re-open his claim with information about the police report he filed, and other documentation showing he was at work when some of the unauthorized ATM withdrawals occurred.  (*Id.* ¶ 8.)  He also asked BANA to provide him with the information it had discovered in any investigation it conducted before denying his fraud claims but he never received a response.  (*Id.*)

After he filed a class action lawsuit against BANA on January 26, 2021, he received a letter from BANA dated January 27, 2021, stating that it "completed an additional review" of his claim and, "[a]s a result of [BANA's] research" credited him with the $5,000 that had been stolen from him the previous September.  (*Id.* ¶ 10.)  He received the credit 120 days after he submitted his unauthorized transaction claim to BANA.  (*Id.*)  Between September 28, 2020 and November 15, 2020, he called BANA on multiple occasions concerning the unauthorized transaction claims typically waiting on hold for more than an hour and often not being able to reach a representative.  (*Id.* ¶ 9.)

### 7.    Vanessa Rivera

Vanessa Rivera ("Rivera") began receiving EDD unemployment insurance benefits through a BANA EDD debit card with a magnetic stripe that was linked to a BANA EDD debit card account in January 2020 and from April 2020 to August 2021.  (Dkt. No. 324-14, Chan Decl., Ex. 11, Rivera Decl. ¶¶ 2, 3.)

On January 29, 2021, Rivera got a text notification that the balance on her EDD debit card account was $4.17.  (*Id.* ¶ 4.)  She was shocked because she knew she had over $800 remaining in the account.  (*Id.*)  She immediately logged into her EDD debit card account found that someone had conducted a balance inquiry from an ATM in Newport Beach, CA, about an hour away from where she lives and withdrew $800.  (*Id.*)   She then called BANA's number to report these unauthorized transactions and to credit her EDD debit card account for the $800 that was stolen.  (*Id.* ¶ 5.)

When she finally reached BANA, the first BANA representative transferred her to another department.  (*Id.* ¶ 6.)  She then spoke with a second BANA representative and

made a claim concerning the unauthorized ATM withdrawal totaling $800.  (*Id.*)  She explained that she did not make or authorize the $800 withdrawal, and she had never given or disclosed the PIN for her EDD debit card to anyone, had never authorized anyone to use her EDD debit card, and was not in Newport Beach, CA on the day of the unauthorized withdrawal.  (*Id.*)  She was provided a claim number and she understood that the claim would be investigated.  (*Id.*)

On February 4, 2021, she called BANA again and was told that the representative she had spoken with on January 29, 2021 never actually submitted a claim and that person had just put a "note" in her account and sent her a new card.  (*Id.* ¶ 7.)  The representative informed her that, this time, she had successfully submitted the fraud claim for investigation.  (*Id.*)

In a letter dated February 5, 2021, one day after the BANA representative submitted her fraud claim, BANA informed her that her claim was closed and she would not be reimbursed for the $800 taken from her account and without explanation stated, "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity."  (*Id.* ¶ 8.)

On February 6, 2021, she received a replacement card in the mail and when she tried to activate the card online, she was not allowed to access her account.  (*Id.* ¶ 9.)  She then called the number on the back of the card to activate it and a BANA representative told her that her account was frozen due to suspicious activity and fraudulent charges.  (*Id.*)  BANA did not provide any notice before freezing the account.  (*Id.*)  Her EDD debit card remained frozen for 41 days from February 5, 2021 to March 18, 2021.  (*Id.* ¶ 10.)  She was not able to access any of her EDD benefits that were in her account as of the time of the freeze and could not receive or access any new periodic EDD benefits payments she would have received and would have been able to use if BANA had not frozen her account.  (*Id.*)  She called BANA repeatedly informing she had verified her identity with EDD, expressed the extreme hardship this account freeze imposed on her, and received conflicting information from BANA representatives about what she could

do to get BANA to unfreeze her account.  (*Id.*)  Through documents produced in this litigation, she later learned that on March 18, 2021, BANA converted her account status from frozen to blocked but she was still not able to access her EDD benefits.  (*Id.*)  BANA unblocked her account on April 20, 2021 after she filed this litigation.  (*Id.*)

On June 21, 2021, after the Consolidated Class Action Complaint was filed and 140 days after she submitted her unauthorized transaction claim, BANA finally credited her the $800 to her EDD debit card account that had been stolen from her in January 2021.  (*Id.* ¶ 11.)

### 8.    J. Michael Willrich

J. Michael Willrich ("Willrich") began receiving EDD unemployment insurance benefits through a BANA EDD debit card with a magnetic stripe that was linked to a BANA EDD debit card account in April 2020.  (Dkt. No. 324-15, Chan Decl., Ex. 12, Willrich Decl. ¶¶ 2, 3.)  Around October 27, 2020, he discovered that there had been 27 unauthorized transactions on his EDD debit card account from October 10, 2020 to October 26, 2020.  (*Id.* ¶ 4.)  The unauthorized transactions included 21 charges at a store in the State of Washington that he had never heard of or shopped at, two ATM transactions for $1,000 each and a $700 ATM withdrawal in the State of Washington.  (*Id.*)  The unauthorized transactions totaled $5,083.75.  (*Id.*)  At the time of the unauthorized transactions, he was over 1,200 miles away in San Diego, CA, where he resides.  (*Id.*)

He immediately went to a BANA branch but the teller informed him that the branch could not help him and instructed him to call the number on the back of his EDD debit card.  (*Id.* ¶ 5.)  That same day, he called the number on the back of his card to report the unauthorized transactions and to seek reimbursement of the money that had been taken out of his account.  (*Id.* ¶ 6.)  After spending more than three hours on hold, he was disconnected before he was able to get through to the claims department.  (*Id.*)

The next morning, on October 29, 2020, he woke up at 5:00 am hoping to speak with a BANA representative.  (*Id.* ¶ 7.)  After holding, he was connected with a

representative in the claims department and spent about an hour on the phone going through each unauthorized transaction and explaining why each was not authorized. (*Id.*)

On October 30, 2020, just one business day after he reported the unauthorized transaction claim, BANA mailed a letter informing him that it had closed his claim and would not be reimbursing him for the $5,083.75 taken from his account. (*Id.* ¶ 8.) The letter stated: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity." (*Id.*) Over the next three weekends, he made several attempts to contact BANA's customer service, including waiting on hold for three or four hours before being disconnected at the end of BANA's business hours. (*Id.* ¶ 9.) On November 9, 2020, he again woke up before dawn and was able to connect with the claims department and request that his claim be reconsidered. (*Id.*) The BANA representative told him that baseless denials were a known issue, that many people were having the same problems, and that no human had ever looked at his claim. (*Id.*) He later learned that his claim had been denied based on the Claim Fraud Filter. (*Id.*)

Between October 27, 2020 and November 15, 2020, Willrich called BANA for assistance on at least six separate occasions, sometimes making multiple calls in a day, typically waiting on hold for at least an hour each time he called and being shuffled between multiple agents in one day. (*Id.* ¶ 10.) In total, he estimates he spent approximately three hours on the phone with BANA's representatives trying to resolve these issues, and at least eight hours on hold during this period. (*Id.*)

Around January 12, 2021, 75 days after he submitted his unauthorized transactions claim, he learned BANA finally credited his EDD debit card account the $5,083.75 that had been stolen from him the previous October. (*Id.* ¶ 11.)

### 9. Alex Yuan

Alex Yuan ("Yuan") began receiving EDD unemployment insurance benefits through a BANA EDD debit card with a magnetic stripe that was linked to a BANA EDD debit card account in May 2020. (Dkt. No. 324-16, Chan Decl., Ex. 13, Yuan Decl. ¶¶ 2,

3.) In September 2020, he discovered that two separate unauthorized ATM withdrawals of $900 each, totaling $1,800, were made from his EDD debit card. (*Id.* ¶ 4.) One withdrawal was made on August 24, 2020, in Los Angeles, CA, and another on September 7, 2020, in Pasadena, CA but at the time of the unauthorized ATM withdrawals, he was more than 300 miles away from Los Angeles and Pasadena in San Jose, CA. (*Id.*)

On September 10, 2020, he called BANA's customer service number to report these unauthorized ATM withdrawals and to ask BANA to credit his EDD debit card account for the $1,800 that was stolen. (*Id.* ¶ 5.) After spending more than one hour on hold, he spoke with a BANA representative in the claims department and identified the two unauthorized ATM withdrawals totaling $1,800, informed the BANA representative that he had never used an ATM anywhere near the ones used for the withdrawals, and confirmed that he had his debit card in his possession at all relevant times, and had not authorized anyone else to make the withdrawals. (*Id.* ¶ 6.) The BANA representative confirmed that his claim had been filed and would be investigated. (*Id.*)

On September 13, 2020, BANA provisionally credited his account $1,800 but on September 28, 2020, BANA froze his account and it remained frozen until October 4, 2020. (*Id.* ¶¶ 7, 8.) In a letter dated October 3, 2020, BANA informed Yuan that it had closed his claim and would be rescinding the $1,800 credit. (*Id.* ¶ 9.) The letter provided no explanation of BANA's findings stating only: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity" and that the credit applied to his account "has been or will be debited from [his] account." (*Id.*) Beginning on October 4, 2020, he called BANA on multiple occasions seeking to have the $1,800 unauthorized transaction claim reconsidered. (*Id.* ¶ 10.) During these calls, he experienced long wait times, dropped calls, and elusive responses concerning why the credit had been rescinded from his account, why his claim was denied, and when and how the matter would be resolved. (*Id.*)

After he made multiple calls to BANA seeking reconsideration of his claim, BANA sent a letter dated November 9, 2020, stating that BANA had "completed an additional review" of his claim and, "[a]s a result of [BANA's] research" had credited him the $1,800 that had been stolen from him.  Yuan received this credit approximately 60 days after he submitted his unauthorized transaction claim to BANA and 36 days after BANA rescinded the $1,800 credit.  (*Id.* ¶ 11.)

Between September 10, 2020 and November 15, 2020, he called BANA on at least seven separate occasions, sometimes making multiple calls and getting shuffled between multiple agents on the same day.  (*Id.* ¶ 12.)  He waited on hold for at least an hour each time he called trying to resolve these issues.  (*Id.*)

On or about October 26, 2020, Yuan experienced another $900 unauthorized ATM withdrawal from his EDD debit card account that occurred in North Hills, CA.  (*Id.* ¶ 13.) Around November 11, 2020, he called BANA's customer service to inquire about the $1,800 unauthorized transaction claim and also whether he could amend that claim to add a claim regarding the $900 unauthorized ATM withdrawal or whether he had to make a new claim for the $900 unauthorized transaction that occurred on October 26, 2020. (*Id.* ¶ 14.)  During this call, he learned that BANA had recently reimbursed the $1800 claim and so he was given a new claim number for the October 26, 2020 unauthorized transaction of $900.  (*Id.* ¶ 15.)

On November 18, 2020, he again called BANA's customer service to follow up on the $900 unauthorized transaction claim and to ask BANA to credit his EDD debit card account for the $900 that was stolen.  (*Id.* ¶ 16.)  After waiting on hold, he finally spoke with a BANA representative and identified the unauthorized ATM withdrawal totaling $900 and confirmed that he had the card in his possession at all relevant times and did not authorize anyone to make the withdrawals.  (*Id.* ¶ 17.)

In a letter dated November 19, 2020, one business day after he followed up on his claim disputing the unauthorized withdrawal, BANA had closed his claim and indicated it would not be reimbursing the $900 taken from his account.  (*Id.* ¶ 18.)  The letter

provided no explanation of BANA's investigation or findings, stating only: "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity." (*Id.*)

In December 2020, he received a letter from BANA notifying him that it had again frozen his account due to fraud. (*Id.* ¶ 19.) Through this litigation, Yuan learned that BANA froze his account on December 17, 2020 and the freeze remained in effect for 28 days until January 15, 2021. (*Id.*) During that period, he could not receive or access any new periodic EDD benefits payments that he would have received and would have been able to use if BANA had not frozen his account. (*Id.*)

After he made multiple calls to BANA seeking reconsideration of the $900 unauthorized transaction claim of October 26, 2020, he received a letter from BANA dated January 13, 2021, stating that the BANA had once again "completed an additional review" of his claim and, based on that research, had credited him the $900 that had been taken from him the previous October. (*Id.* ¶ 20.) He received this credit 56 days after he submitted his unauthorized transaction claim to BANA. (*Id.*)

### Procedural Background

On January 14, 2021, former Class Plaintiff Jennifer Yick commenced a purported class action in the United States District Court for the Northern District of California against BANA. (*See Yick v. Bank of Am.*, Case No. 21cv376-VC, Dkt. No. 1, Compl. (N.D. Cal. 2021).) Eight additional class actions were subsequently filed and consolidated with *Yick* on March 29, 2021. (*Id.*, Dkt. No. 60.) On April 1, 2021, Plaintiffs in the *Yick* consolidated class action sought a preliminary injunction enjoining BANA from automatically denying fraud claims based on its faulty "Claim Fraud Filter" and freezing or blocking claimants' accounts without investigation. (*Id.*, Dkt. No. 64.) The *Yick* court granted a preliminary injunction on May 17, 2021, and provisionally certified a class of all EDD Cardholders who called BANA to report unauthorized charges. (Dkt. No. 324-73, Chan Decl., Ex. 73.) On June 2, 2021, following negotiations between the parties and with the assistance of the magistrate judge, the *Yick* court entered

a preliminary injunction which: (1) barred BANA from considering the results of its CFF when investigating claims or resolving unauthorized transaction error claims; (2) prohibited BANA from denying claims or denying provisional or permanent credits without an investigation and providing the claimant with a written explanation; (3) prohibited BANA from freezing any account based on the results of the CFF; (4) required BANA to reopen any claims previously denied based on the results of the CFF and that it had not previously paid or previously reopened and investigated; and (5) required BANA to establish dedicated toll free numbers for Class Members to be available 24 hours per day, 7 days a week for those seeking assistance with claims intake and frozen accounts. (Dkt. No. 324-74, Chan Decl., Ex. 71.)  Around that same time, a number of individual plaintiffs initiated actions against BANA for injuries stemming from the same alleged conduct.  The injunction was eventually dissolved as of June 1, 2024 when EDD terminated its contract with BANA.  (Dkt. No. 255.)

In July 2022, the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") separately entered into Consent Orders with BANA regarding findings of violations of federal law related to its use of the CFF.  (Dkt. No. 324-75, Chan Decl., Ex. 72; Dkt. No. 324-76, Chan Decl. Ex. 73.)  In response to the Consent Orders, BANA created the Unemployment Insurance Prepaid Card Program Remediation Plan ("Remediation Plan") along with its Addendum and Second Addendum ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████.  (Dkt. No. 368-29, Chan Decl., Ex. 147 (UNDER SEAL).)

Under the Remediation Plan, ████████████████████████████ ████████████████████████████████████████████████ █████████████████████████.  (Dkt. No. 368-29, Chan Decl., Ex. 147 § III(B) at 6 & n.16 (UNDER SEAL).)  ███████████████████████████████████████.  (*Id.* at 7 (UNDER

SEAL).)  As of October 23, 2024, the review process was still ongoing.  (Dkt. No. 350-8, Brys Decl., Ex. 7, Martin Decl. ¶ 15.)

On June 4, 2021, the Judicial Panel on Multidistrict Litigation ("JPML") transferred the *Yick* class action and individually filed actions to this Court for consolidated pretrial proceedings.  (Dkt. No. 1.)  Pursuant to the Court's order following a case management conference, (Dkt. No. 48), Plaintiffs filed a Master Consolidated Complaint ("MCC") on August 17, 2021.  (Dkt. No. 72.)  On May 25, 2023, the Court granted in part and denied in part Defendant's motion to dismiss the MCC with leave to amend.  (Dkt. No. 126.)  On June 13, 2023, Plaintiffs filed a First Amended Master Consolidated Complaint ("FAMCC") against BANA.  (Dkt. No. 136.)

Subsequently, on July 11, 2023, Defendant filed a motion to dismiss certain claims of the FAMCC.  (Dkt. Nos. 146, 171, 175.)  On August 7, 2023, Plaintiffs filed a motion for reconsideration of the UCL claim that was dismissed with prejudice.  (Dkt. Nos. 151, 158, 161.)

On April 8, 2024, the case was transferred to the undersigned judge.  (Dkt. No. 261.)   On June 25, 2024, the Court granted in part and denied in part Defendant's motion to dismiss the FAMCC and granted Plaintiffs' motion for reconsideration with leave to amend.  (Dkt. No. 297.)

On July 16, 2024, Plaintiffs filed a Second Amended Master Consolidated Complaint ("SAMCC").  (Dkt. No. 304.)  After the hearing on class certification, on January 24, 2025, Class Plaintiffs file the operative Third Amended Master Consolidated Complaint, ("TAMCC").[8]  (Dkt. No. 406.)  The TAMCC alleges the following remaining claims:

---

[8] At the hearing, Class Plaintiffs sought leave to amend when the Court questioned whether Plaintiffs could seek class certification on a due process claim for the Credit Rescission Class when it was not raised in the SAMCC and whether Plaintiffs could raise the breach of fiduciary claim for the Customer Service Class when it was not alleged in the SAMCC.  (Dkt. No. 422 at 5-6.)  Plaintiffs filed the TAMCC to add the Credit Rescission Class to the due process claims and to add the Customer Service Class to the breach of fiduciary duty claim.  Defendant did not oppose.  (*Id.* at 6.)

1.   First Claim -violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1963 *et seq.,* and Regulation E ,12 C.F.R. §§ 1005.1 *et seq.*;

2.   Second Claim - violation of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100 *et seq.*;

3.   Fourth Claim - violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

4.   Fifth Claim - Negligence and Negligence Per Se;

5.   Sixth Claim - Negligent Hiring, Supervision, and Retention;

6.   Seventh Claim - Breach of Contract;

7.   Ninth Claim - Breach of the Implied Covenant of Good Faith and Fair Dealing;

8.   Tenth Claim - Breach of Fiduciary Duty;

9.   Thirteenth Claim - violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution; and

10.  Fourteenth Claim - violation of the Due Process Clause of the California Constitution.

(*Id.*)  On February 7, 2025, Defendant filed an answer.  (Dkt. No. 414.)

On August 29, 2024, Plaintiffs filed the instant motion for class certification which is fully briefed.[9]  (Dkt. Nos. 324, 349, 378.)

Class Plaintiffs seek to certify the following five classes:

1    **Claim Denial Class**: All Bank of America EDD cardholders who notified the Bank that an unauthorized transaction had occurred on their Bank of America EDD debit card account ("Claim") at an automated teller machine ("ATM"), and whose Claim the Bank denied or closed at any time from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's Claim Fraud Filter ("CFF").

2    **Credit Rescission Class**: All Bank of America EDD cardholders who received permanent credit from the Bank in connection with their Claim, which credit the Bank rescinded at any time from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's CFF.

3    **Account Freeze Class**: All Bank of America EDD cardholders whose EDD debit card account ("Account") the Bank froze at any time from September 28, 2020 through March 17, 2021, based solely on Indicator 1 of

---

[9] The filing of the TAMCC does not impact the Court's ruling on the motion for class certification as the parties briefed the two issues that were absent from the SAMCC.

the Bank's CFF, and whose Account the Bank (i) subsequently unfroze, or (ii) subsequently converted from frozen to blocked status on or after March 18, 2021 and then unblocked.

4      **Customer Service Class:** All members of the Claim Denial class and/or the Credit Rescission class who telephoned the Bank's customer service telephone number for its EDD cardholders at any time from September 13, 2020 through November 21, 2020, and whose telephone call was routed to the Bank's Claims call center.

5      **EMV Chip Class**: All members of the Claim Denial class and/or Credit Rescission class whose EDD debit card did not include an EMV chip prior to June 9, 2021.

Excluded from each class is any person whom the Bank has determined, pursuant to its Remediation Plan with the United States Consumer Financial Protection Bureau (CFPB) and Office of the Comptroller of the Currency (OCC), "(i) has been disqualified by the [S]tate [of California] from Program[10] eligibility; (ii) has previously engaged in fraudulent Program conduct, such as submission of fraudulent claims or other abuses of the claims process; or (iii) has had their card frozen due to legal order processes, as a result of Internal/Vendor fraud investigations, or by Global Financial Crimes Compliance." Also excluded from each class is any person whose Claim or Account the Bank closed, in whole or in part, because the State of California requested the Bank to close that person's Claim or Account.

(Dkt. No. 386-1.)

Specifically, Plaintiffs seek certification of the designated classes based on their claims for relief pursuant to:

(1) the Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. §§1693(a)-(r), and its implementing Regulation E ("Reg E"), 12 C.F.R. pt. 1005 (**Claim Denial and Credit Rescission Classes**);

(2) the due process clauses of the United States Constitution, amend. XIV (42 U.S.C. § 1983), and California Constitution, art. I § 7(a) (**Credit Rescission and Account Freeze Classes**);

---

[10] Program refers to Defendant's "Unemployment Benefits Prepaid Card Program." (Dkt. No. 367-6, Chan Decl., Ex. 74 at 3 (UNDER SEAL).)

(3) breach of fiduciary duty (**Claim Denial, Credit Rescission, and Account Freeze, and EMV Chip Classes**);[11]

(4) breach of the implied covenant of good faith and fair dealing under the Bank's account agreement with EDD cardholders (**Claim Denial, Credit Rescission, Account Freeze, and Customer Service Classes**);

(5) California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100-.199 (**EMV Chip Class);**

(6) negligence and negligence per se (**all Classes**); and

(7) the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§17200-17210. (**Claim Denial, Credit Rescission, and Account Freeze Classes**).

Plaintiffs also seek the appointment of Plaintiffs Koole, McClure, Moon, Oosthuizen, Rivera, Willrich, and Yuan as class representatives for the Claim Denial class; the appointment of Plaintiffs Chong and Moore as class representatives for the Credit Rescission class; the appointment of Plaintiffs Chong, Koole, McClure, Moon, Moore, Rivera, and Yuan as class representatives for the Account Freeze class; the appointment of Plaintiffs Chong, Moon, Moore, Oosthuizen, Willrich, and Yuan as class representatives for the Customer Service class; and the appointment of Plaintiffs Chong, Koole, McClure, Moon, Moore, Oosthuizen, Rivera, Willrich, and Yuan as class representatives for the EMV Chip class.  Finally, they seek the appointment of Cotchett Pitre & McCarthy LLP and Altshuler Berzon LLP to serve a co-lead Class Counsel.

/ / /

/ / /

/ / /

---

[11] In an order filed on January 27, 2025, the Court noted that the breach of fiduciary duty claim as to the Customer Service Class was not briefed in the motion for class certification and set a briefing schedule. (Dkt. No. 408 at 2; Dkt. No. 423.)  Subsequently, on February 28, 2025, Class Plaintiffs notified the Court that it will not seek to certify the breach of fiduciary duty claim as to the Customer Service Class. (Dkt. No. 434.)

21MD2992-GPC(MSB)

### Discussion

**A.     Legal Standard on Class Certification**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only.  In order to justify a departure from that rule, a class representative must be a part of the class and possess the same interest and suffer the same injury as the class members."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (internal quotation marks and citations omitted).  A plaintiff seeking class certification must affirmatively show the class meets the requirements of Federal Rule of Civil Procedure ("Rule") 23.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citing *Dukes*, 564 U.S. at 350-51).  To obtain certification, a plaintiff bears the burden of proving that the class meets all four requirements of Rule 23(a)--numerosity, commonality, typicality, and adequacy.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 979-80 (9th Cir. 2011).  If these prerequisites are met, the court must then decide whether the class action is maintainable under Rule 23(b).  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010).  This case involves Rule 23(b)(3), which authorizes certification when "questions of law or fact common to class members predominate over any questions affecting only individual class members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Plaintiffs must prove, by a preponderance of the evidence, that the prerequisites of Rule 23 have been satisfied. *Olean*, 31 F.4th at 665.  The Court exercises discretion in granting or denying a motion for class certification.  *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003).

The Court is required to perform a "rigorous analysis," which may require it "to probe behind the pleadings before coming to rest on the certification question." *Dukes*, 564 U.S. at 350-51.  "[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class.  More importantly, it is not correct to say a district court may consider the merits to the extent that they overlap with

class certification issues; rather, a district court must consider the merits if they overlap with Rule 23(a) requirements." *Ellis*, 657 F.3d at 981.  Nonetheless, the district court does not conduct a mini-trial to determine if the class "could actually prevail on the merits of their claims."  *Id.* at 983 n.8; *United Steel*, 593 F.3d at 808 (citation omitted) (court may inquire into substance of case to apply the Rule 23 factors, however, "[t]he court may not go so far . . . as to judge the validity of these claims.").

## B.     Federal Rule of Civil Procedure 23(a)

### 1.     Numerosity

Plaintiffs maintain that the numerosity factor is easily met because there are significantly more than forty members.  (Dkt. No. 324-1 at 28.)  Defendant does not challenge that numerosity has been satisfied.  (*See* Dkt. No. 349.)

To establish numerosity, a plaintiff must show that the represented class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); *Bates v. United Parcel Serv.,* 204 F.R.D. 440, 444 (N.D. Cal. 2001).  A court may reasonably infer based on the facts of each particular case to determine if numerosity is satisfied. *Ikonen v. Hartz Mtn. Corp.,* 122 F.R.D. 258, 262 (S.D. Cal. 1988).  "As a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."  *Id.*

Because the proposed claim members, in each proposed class, are in the thousands, the Court finds that numerosity has been satisfied.

### 2.     Commonality

Because the requirements of Rule 23(a)(2)'s "commonality" overlaps with the predominance requirements of Rule 23(b)(3) requiring questions common to the class must predominate over individualized ones, the Court addresses commonality in its discussion of Rule 23(b)(3) below.  *See Olean,* 31 F.4th at 664 ("The requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a) . . . Therefore, courts must consider cases examining both subsections [Rule 23(a) and Rule 23(b)(3)] in performing a Rule 23(b)(3) analysis[ ]"); *see Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir.

38

2017) (addressing Rule 23(a) and Rule 23(b)(3) requirements concurrently); *see also Raines v. U.S. Healthworks Med. Grp.*, Case No.: 19-cv-1539-DMS-DEB, 2024 WL 3850812, at *5 (S.D. Cal. Aug. 16, 2024) (addressing commonality with predominance).

### 3.    Typicality

Under typicality, the Court must determine whether the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). Typicality focuses on ensuring that the interests of the class representatives "aligns with the interests of the class." *Just Film, Inc.*, 847 F.3d at 1116 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Id.* (citation and internal quotation marks omitted). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (quoting *Hanon,* 976 F.2d at 508). Recognizing that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation", the Ninth Circuit held that "class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon*, 976 F.2d at 508 (citation omitted).

Class Plaintiffs argue that they are typical of those class members they seek to represent because their claims and injuries all arise from BANA's Claim Denial, Credit Rescission and Account Freeze policies applied to all EDD cardholders; BANA's intentional and uniform practice of understaffing its Claims call center; and BANA's failure to include industry-standard EMV chips on its EDD debit cards. (Dkt. No. 324-1 at 30-31.) Defendant contends the class includes putative class members who are subject to defenses that they do not share with the nine representative Class Plaintiffs. (Dkt. No.

349 at 50-51.)  In reply, Plaintiffs maintain that typicality focuses on whether the named plaintiff will be subject to defenses unique to it and not the reverse.  (Dkt. No. 378 at 11 n.2.)

The Court agrees with Class Plaintiffs that the question on typicality is whether they will be subject to defenses that are unique to them which will threaten to become the focus of the litigation, and not, as BANA argues, whether the putative class members have defenses unique to them.[12]  *See Hanon*, 976 F.2d at 508 ("Typicality refers to the nature of the claim or defense of the class representative."); *Nitsch v. Dreamworks Animation SKG Inc*., 315 F.R.D. 270, 284 (N.D. Cal. 2016) ("Thus, the fact that Defendants may have affirmative defenses against some absent class members does not affect the Court's typicality analysis."); *Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*, 270 F.R.D. 488, 494 (N.D. Cal. 2010) ("More generally, defenses that may bar recovery for some members of the putative class, but that are not applicable to the class representative do not render a class representative atypical under Rule 23.") (citing *In re Live Concert Antitrust Litig*., 247 F.R.D. 98, 117 (C.D. Cal. 2007) (holding that unique defenses against some class members do not make a class representative atypical) and *Winkler v. DTE, Inc*., 205 F.R.D. 235, 241-42 (D. Ariz. 2001) (holding that typicality requirement met even though the defendant argued "it ha[d] valid defenses and counterclaims it may assert against some class members but not the named representative")).  Therefore, Defendant's argument that putative class members may have defenses unique to them is not relevant to the question of typicality.

BANA additionally contends that Class Plaintiffs are subject to unique defenses because each Class Plaintiff will be subject to different damages depending on the facts and absent class members may be harmed by relying on a Class Plaintiff who is not

---

[12] BANA relies on *In re Digital Music Antitrust Litig*., 321 F.R.D. 64, 88 (S.D.N.Y. 2017) where it held that typicality considers the unique defenses of the putative class members but without any legal analysis.  (*See* Dkt. No. 349 at 51.)  *In re Digital Music Antitrust Litig*. is not in line with the Ninth Circuit's ruling in *Hanon* and the Court declines to adopt its conclusion.

entitled to damages.  (Dkt. No. 349 at 52 (citing *Williams v. Warner Music Grp*., 884 Fed App'x 284, 285 (9th Cir. 2021) ("Plaintiffs were atypical class members because they apparently would not be entitled to damages.").)  The Court again disagrees.  First, there is no indication that any of the Class Plaintiffs would not be entitled to damages.  Moreover, typicality relates to the nature of the lead plaintiff's "claims and defenses," not to the amount of damages.  *See* Fed. R. Civ. P. 23(a)(3).  Differences related to Class Plaintiffs' potential damages and potential damages of the putative class members do not defeat typicality as long as the alleged injury is common to the putative class members.  *See Coppel v. SeaWorld Parks & Ent.,* 347 F.R.D. 338, 357 (S.D. Cal. 2024) ("Although the losses attributable could differ from participant to participant, individual damages should not defeat typicality.") (quoting *Kanawi v. Bechtel Corp*., 254 F.R.D. 102, 110 (N.D. Cal. 2008)); *Mendoza v. Zirkle Fruit Co*., 222 F.R.D. 439, 446 (D. Wash. 2004) ("The fact that damage claims will vary among [class members] does not defeat typicality."); *Carlos v. Wal-Mart Assocs., Inc*., Case No. 5:21-CV-00294-AB (KKx), 2022 WL 17885691, at *8 (C.D. Cal. Sept. 6, 2022) (typicality satisfied because the alleged injury was common to plaintiff and the putative class members, and rejecting the defendant's argument that differences in the plaintiff's and putative class members potential damages defeat typicality).

As discussed below on commonality, Class Plaintiffs have claimed that they and all putative class members were subject to and injured by BANA's uniform practice and policy of implementing CFF-1 when it automatically denied claims, rescinded permanent credits and froze accounts.  Further, they and the putative class members were injured by BANA's practice of understaffing its Claims call center and failing to include industry-standard EMV chips on all its EDD debit cards.  Thus, Plaintiffs have shown their claims are typical of the claims and defenses of the putative class members.

### 4.    Adequacy

As to adequacy, Rule 23(a)(4) provides that class representatives must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In analyzing

whether Rule 23(a)(4) has been met, the Court must ask two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting *Hanlon,* 150 F.3d at 1020).

Plaintiffs argue that they have shown their ability to litigate the case vigorously on behalf of class members and have no interests adverse to the class.  (Dkt. No. 324-1 at 31.)  Further, they maintain that proposed Co-Lead Class Counsel satisfy the adequacy requirement.  (*Id.*)  In response, BANA repeats the same argument raised on typicality raising differences in defenses between the Class Plaintiffs and the putative class members.[13]  (Dkt. No. 349 at 51.)

Contrary to BANA's argument, "a named plaintiff is not rendered inadequate merely because he or she is not subject to every affirmative defense that a defendant may assert against particular absent class members."  *Nitsch*, 315 F.R.D. at 285 (citing *Barnes*, 270 F.R.D. at 495 (holding that "the potential existence of [affirmative] defenses against absent class members does not, standing alone, make [the named plaintiff] inadequate"); *see also Boyd v. Bank of Am. Corp*., 300 F.R.D. 431, 439 (C.D. Cal. 2014) (noting that "there is no authority for the proposition that an affirmative defense, which may affect some members of the class, creates a conflict that otherwise defeats the adequacy of a proposed class representative") (quotation marks omitted).

In support of adequacy, Class Plaintiffs have declared that they do not have any conflicts of interest with other class members and will prosecute the action vigorously on behalf of the class.  (*See* Dkt. No. 324-8, Chan Decl., Ex. 5, Chong Decl. ¶¶ 16, 17; Dkt. No. 324-9, Chan Decl., Ex. 6, Koole Decl. ¶¶ 10, 11; Dkt. No. 324-10, Chan Decl., Ex. 7,

---

[13] BANA does not provide a separate, distinct argument on adequacy because typicality and adequacy become a "single inquiry."  (*See* Dkt. No. 349 at 51 (citing *James v. Uber Tech. Inc*., 338 F.R.D. 123, 133 (N.D. Cal. 2021)).

McClure Decl. ¶¶ 13, 14; Dkt. No. 324-11, Chan Decl., Ex. 8, Moon Decl. ¶¶ 17, 18;
Dkt. No. 324-12, Chan Decl., Ex. 9, Moore Decl. ¶¶ 14, 15; Dkt. No. 324-13, Chan Decl.,
Ex. 10, Oosthuizen Decl. ¶¶ 12, 13; Dkt. No. 324-14, Chan Decl., Ex. 11, Rivera Decl. ¶¶
13, 14; Dkt. No. 324-15, Chan Decl., Ex. 12, Willrich Decl. ¶¶ 12, 13; Dkt. No. 324-16,
Chan Decl., Ex. 13, Yuan Decl. ¶¶ 22, 23.)  Defendant does not challenge any of these
Class Plaintiffs' assertions.  Thus, the Court finds that Class Plaintiffs have demonstrated
they are adequate representatives.

As to adequacy of counsel, Rule 23(g)(4) requires that "[c]lass counsel must fairly
and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  BANA
does not dispute the adequacy of proposed Co-Lead Class Counsel.  In the *Yick*
consolidated case, the district court appointed Cotchett Pitre & McCarthy ("CPM") and
Altshuler Berzon LLP as interim co-lead counsel.  (Dkt. No. 324-161, Jt. Decl. ¶ 2.)
Once the JPML ordered that these cases be transferred to this district, on July 20, 2021,
the court appointed them as Interim Co-Lead Counsel in this case.  (*Id.*; *see also* Dkt. No.
48 at 2.)  Based on these prior designations as well as the joint declaration of counsel
providing support for CPM and Altshuler Berzon LLP to be co-lead class counsel, the
Court finds that the adequacy requirement is satisfied with respect to both counsel.

## C.    Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

The commonality prerequisite of Rule 23(a)(2) requires that plaintiffs show that
"there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).
Commonality requires the plaintiff to demonstrate that the class members 'have suffered
the same injury.'"  *Dukes*, 564 U.S. at 350.  "That common contention . . . must be of
such a nature that it is capable of classwide resolution – which means that determination
of its truth or falsity will resolve an issue that is central to the validity of each one of the
claims in one stroke."  *Id.*  "'What matters to class certification . . . is not the raising of
common 'questions' . . . but, rather the capacity of a classwide proceeding to generate
common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the
proposed class are what have the potential to impede the generation of common

answers.'"  *Id.*  (emphasis in original) (citation omitted).  "Therefore, to prove there is a common question of law or fact that relates to a central issue [in this case], plaintiffs must establish that the "essential elements of the cause of action . . . are capable of being established through a common body of evidence, applicable to the whole class."  *Olean*, 31 F.4th at 666 (internal quotation marks and citation omitted).  "Commonality mandates there be a common question of law or fact among the class members 'where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Small v. Allianz Life Ins. Co. of N. Amer.,* 122 F.4th 1182, 1198 (9th Cir. 2024) (quoting *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 11134, 1138 (2022) (alteration in original) (internal quotation marks and citation omitted)).

Once Plaintiffs show that there are "questions of law or fact common to class members," then they must prove, under Rule 23(b)(3), that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3); *see Olean*, 31 F.4th at 664.  "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).  Rule 23(b)(3) requires the court to make a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove the common question in one stroke."  *Olean,* 31 F.4th at 666 (internal quotation marks and citation omitted).

A key concern of the Rule 23(b)(3) requirement is whether "adjudication of common issues will help achieve judicial economy."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).  The predominance inquiry focuses on whether the proposed class is "sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623 (citation omitted).

When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc.*, 577 U.S. at 453 (citation omitted).  In short, "Rule 23(a)(2) asks whether there are issues common to the class, and Rule 23(b)(3) asks whether these common questions predominate." *Abdullah v. U.S. Sec. Assocs., Inc*., 731 F.3d 952, 957 (9th Cir. 2013). "By contrast, an individual question is one where members of a proposed class will need to present evidence that varies from member to member." *Olean*, 31 F.4th at 663 (citing *Tyson Foods, Inc.*, 577 U.S. at 453).

Ultimately, Plaintiffs must prove by a preponderance of evidence that common questions predominate over questions affecting only individual members, and that the common questions relate to "a central issue in the plaintiffs' claim." *Olean*, 31 F.4th at 665.  Therefore, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Id.* at 665 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

### 1.    EFTA (Claim Denial and Credit Rescission Classes)

As discussed briefly above, the EFTA is a federal consumer protection law "establishing the rights, liabilities, and responsibilities of participants in electronic fund . . . transfer systems." 15 U.S.C. § 1693(b).  Congress enacted the EFTA due to the increasing use of electronic banking transactions and recognized these transactions as "much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment method." *Bank of Am. v. City and Cnty. of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002) (quoting H.R. Rep. No. 95-1315, at 2 (1978)).  Reg E implements the EFTA.  12 C.F.R. § 205.1.  An "electronic fund transfer" is "any transfer of funds . . . initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an

21MD2992-GPC(MSB)

account." 15 U.S.C. § 1693a(7). To achieve its purpose of providing for individual consumer rights, the EFTA grants consumers a private cause of action against "any person who fails to comply with any provision" of the EFTA. *Id.* § 1693m.

Among their many provisions, the EFTA and Reg E require financial institutions to timely investigate and resolve "errors" on electronic fund transfers. 15 U.S.C. § 1693f; 12 C.F.R. § 1005.11. In order to invoke the protections of the EFTA and Reg E, the consumer must notify the bank, orally or in writing, of any "errors" concerning an electronic fund transfer within 60 days of receipt of a bank statement or other document detailing the alleged erroneous electronic fund transfer. 15 U.S.C. § 1693f(a); 12 C.F.R. § 1005.11. Once the bank is properly notified, it must "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." 15 U.S.C. § 1693f(a). However, if the institution cannot complete the investigation within 10 days as required under §§ 1693f(a) and (b), it may "provisionally recredit" the consumer's account within ten business days of receiving notice of an error and complete its investigation within 45 days. 15 U.S.C. § 1693f(c). If a provisional credit is issued, the consumer has full use of the funds during the pendency of the investigation. *Id.*

If the financial institution discovers that an error occurred, it must promptly, no later than one business day after the discovery, correct the error, and must include interest, if applicable. 15 U.S.C. § 1693f(b). If the financial institution concludes after its investigation that an error did not occur, it shall deliver or mail its explanation of findings to the consumer within three business days after the conclusion of the investigation. 15 U.S.C. § 1693f(d). "[T]he burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution

to establish that the conditions of liability set forth in subsection (a)[14] have been met."  15

U.S.C. § 1693g(b).

If a bank fails to comply with any provisions of the statute, it is liable for damages.

15 U.S.C. §§ 1693f(e); 1693m(a).  Additionally, a consumer is entitled to treble damages

if "the court finds that-- (1) the financial institution did not provisionally recredit a

consumer's account within the ten-day period . . . and the financial institution (A) did not

make a good faith investigation of the alleged error, or (B) did not have a reasonable

basis for believing that the consumer's account was not in error.  15 U.S.C. § 1693f(e)(1).

Treble damages are also warranted when "the financial institution knowingly and

willfully concluded that the consumer's account was not in error when such conclusion

could not reasonably have been drawn from the evidence available to the financial

institution at the time of its investigation."  15 U.S.C. § 1693f(e)(2).

Reg E provides that "a financial institution's review of its own records regarding

an alleged error" satisfies § 1693f's investigation requirement.  *See* 12 C.F.R. §

1005.11(c)(4); *see Green v. Capitol One, N.A.*, 557 F. Supp. 3d 441, 451 (S.D.N.Y. 2021)

---

[14] Subsection (a) of 15 U.S.C. § 1693g provides,

> A consumer shall be liable for any unauthorized electronic fund transfer involving the
> account of such consumer only if the card or other means of access utilized for such
> transfer was an accepted card or other mean[s] of access and if the issuer of such card,
> code, or other means of access has provided a means whereby the user of such card, code,
> or other means of access can be identified as the person authorized to use it, such as by
> signature, photograph, or fingerprint or by electronic or mechanical confirmation. In no
> event, however, shall a consumer's liability for an unauthorized transfer exceed the lesser
> of--
> (1) $50; or
> (2) the amount of money or value of property or services obtained in such unauthorized
> electronic fund transfer prior to the time the financial institution is notified of, or
> otherwise becomes aware of, circumstances which lead to the reasonable belief that an
> unauthorized electronic fund transfer involving the consumer's account has been or may
> be effected. Notice under this paragraph is sufficient when such steps have been taken as
> may be reasonably required in the ordinary course of business to provide the financial
> institution with the pertinent information, whether or not any particular officer, employee,
> or agent of the financial institution does in fact receive such information.

("[W]hen read in conjunction with the implementing regulations and Official Interpretation, § 1693f requires that any investigation under the statute include a reasonable review of the financial institution's own records.").

### a.    Commonality

Class Plaintiffs seek to certify the Claim Denial and Credit Rescission Classes alleging BANA violated the EFTA and Reg E.  (Dkt. No. 324-1 at 32-35.)  Because BANA applied the same uniform policy, CFF-1, to all EDD cardholders, Plaintiffs claim that common issues include "(1) whether the Bank had a policy of summarily denying cardholders' unauthorized transaction claims based solely on CFF-1; (2) whether the Bank automatically rescinded previously paid permanent credits based solely on the results of CFF-1; (3) whether the Bank's automated claim denial procedures violated EFTA's 'investigation' requirement, 15 U.S.C. §1693f; (4) whether the Bank's use of CFF-1 to summarily deny claims violated its EFTA obligation to pay provisional credit, *id.* §1693f(e)(1); (5) whether, by using CFF-1 to automatically deny claims and rescind permanent credits, the Bank 'did not make a good faith investigation of the alleged error' or 'knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time,' *id.* §1693f(e); and (6) whether the form letters the Bank sent every cardholder whose claim it auto-denied or auto-rescinded under CFF-1 failed to provide an 'explanation of its [investigation] findings,' *id*. § 1693f(d)."  (*Id.* at 28-29.) Plaintiffs argue that common evidence, including BANA's own documents, will confirm the existence and implementation of the Claim Denial and Claim Rescission policies. (*Id.* at 33-35.)

BANA does not challenge the common questions raised by Plaintiffs that it uniformly denied all cardholders' unauthorized transactions claims based on CFF-1, it uniformly rescinded all cardholders' permanent credits based on use of the CFF-1, uniformly provided all putative class members the same letter without an explanation of its findings, and that these actions may be subject to treble damages under the EFTA.

48

Instead, BANA responds that Plaintiffs omits disparate questions concerning elements to prove an EFTA violation.[15]  (Dkt. No. 349 at 26-35.)

First, BANA argues that Plaintiffs must demonstrate that their accounts were "established for personal, family, or household purposes," not criminal purposes and this issue cannot be common with every class member because it is a fact-driven one.  (Dkt. No. 349 at 27 (citing 12 C.F.R. § 1005.2(b)(1).[16])  In reply, Plaintiffs argue that their accounts are not subject to 12 C.F.R. § 1005.2(b)(1) as BANA claims; rather their accounts are prepaid accounts or "government benefit accounts" subject to 12 C.F.R. § 1005.2(b)(3)(i)(B)[17] which is defined as "an account established by a government agency for distributing government benefits to a consumer electronically, such as through automated teller machines or point-of-sale terminals . . . ."  12 C.F.R. § 1005.15(a)(2).

At the hearing, BANA, relying on its statutory construction, argued that "government benefit accounts" fall under the definition of an "account" requiring a showing that it was established primarily for person, family or household purposes.  The Court disagrees.

Under the definition section of Reg E, subsection (b) defines an "account."  12 C.F.R. § 1005.2(b).  Under subsection (b), there are three distinct paragraphs defining what an account is or is not.  12 C.F.R. §§ 1005.2(b)(1), (2), & (3).  The first paragraph defines account as a "demand deposit (checking), savings, or other consumer asset account . . . held . . . by a financial institution and established primarily for personal,

---

[15] Some of Defendant's arguments on commonality would have been more appropriately raised under predominance because commonality focuses simply on identifying at least one common issue of fact or law, Rule 23(a)(2); *see Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2), even a single common question will do.") (internal quotation marks omitted), while predominance looks at whether these common questions of law or fact predominate over individual ones, Rule 23(b)(3).  *See Olean*, 31 F.4th at 663-66.

[16] "'Account' means a demand deposit (checking), savings, or other consumer asset account . . . held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes."  12 C.F.R. § 1005.2(b)(1).

[17] "(3) The term [account] includes a prepaid account. (i) 'Prepaid account' means: . . . . (B) A 'government benefit account,' as defined in § 1005.15(a)(2)."  12 C.F.R. § 1005.2(b)(3)(i)(B)

21MD2992-GPC(MSB)

family, or household purposes." 12 C.F.R. § 1005.2(b)(1).  Under the second paragraph, an account is not one "held by a financial institution under a bona fide trust agreement." 12 C.F.R. § 1005.2(b)(2).  Lastly, the third paragraph states that an "account" includes a prepaid account.  12 C.F.R. §§ 1005.2(b)(3).  Prepaid account is then described in four subparagraphs.  *See* 12 C.F.R. § 1005.2(b)(3)(A)-(D).  Subparagraph B includes a "government benefit account" which is at issue in this case.  Contrary to Defendant's interpretation, the Court views each paragraph as distinct definitions of an "account." One account is opened by an individual for personal or family purposes while the government benefit account is being established by a government entity to distribute government benefits.  It is not logical to impose the requirement that all "accounts" be established "primarily for personal, family, or household purposes" on government benefit accounts.  Because EDD cardholders' accounts are "government benefit accounts", the Court concludes there is no required showing that the accounts were created for personal, family or household purposes; thus, BANA's argument is unavailing.

Second, BANA maintains that Plaintiffs must show that each challenged transaction was in fact "unauthorized", 15 U.S.C. § 1693a(12)(b)[18] because class members who filed fraudulent disputes cannot recover, relying on 15 U.S.C. § 1693g(a).[19]  (Dkt. No. 349 at 27-28.)  As such, it maintains that Plaintiffs cannot prove

---

[18]  "The term 'unauthorized electronic fund transfer' means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit, but the term does not include any electronic fund transfer (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or (C) which constitutes an error committed by a financial institution."  15 U.S.C. § 1693a(12).

[19]  "A consumer shall be liable for any unauthorized electronic fund transfer involving the account of such consumer only if the card or other means of access utilized for such transfer was an accepted card or other mean[s] of access and if the issuer of such card, code, or other means of access has provided a means whereby the user of such card, code, or other means of access can be identified as the person

21MD2992-GPC(MSB)

fraudulent intent with common evidence.  (*Id.* at 28.)  In reply, Plaintiffs assert that all putative class members were subject to the same uniform policies and practices, and BANA has only demonstrated a possibility of a de minimis number of fraudulent or mistaken claims which does not defeat commonality.  (Dkt. No. 378 at 9-10.)

BANA misunderstands what showing Plaintiffs must present on a prima facie violation of the EFTA in order to satisfy commonality.  *See Small*, 122 F.4th at 1198 (commonality looks at whether "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."). Contrary to BANA's argument, the burden of proving each disputed transaction was "unauthorized" is on BANA, not Plaintiffs, the EDD debit cardholders.  The EFTA expressly states that "the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability set forth in subsection (a) have been met."  15 U.S.C. § 1693g(b).  BANA, not EDD cardholders, has to "to show that claims are unauthorized before denying claims[.]"  *Merisier v. Bank of Am., N.A.*, 688 F.3d 1203, 1210 (11th Cir. 2012).  In order to invoke the protections of the EFTA, Class Plaintiffs are only required to timely notify BANA and provide information about the unauthorized transaction.  *See* 15 U.S.C. § 1693f(a).  Once that notice is provided, the bank must investigate within ten business days, or within 45 days if the bank provisionally recredits the consumers' account within ten business days.  *See* 15 U.S.C. §§ 1693f(a) & (c).  It is during this investigation that the bank determines whether an unauthorized transaction occurred or not.  *See* 15 U.S.C. §§ 1693f(b) & (d).  Therefore, contrary to BANA's position, on a

---

authorized to use it, such as by signature, photograph, or fingerprint or by electronic or mechanical confirmation."  15 U.S.C. § 1693g(a).

prima facie case, Plaintiffs do not have to demonstrate that their challenged transactions were "unauthorized"[20] or show each of the cardholders lacked fraudulent intent, and its argument does not defeat commonality.

Third, BANA argues that individual questions exist about adequate notice because discovery revealed multiple individual plaintiffs whose account records show untimely notices despite their allegations in the consolidated complaint to the contrary. (Dkt. No. 349 at 32.) Therefore, according to BANA, determining which putative class members satisfy the notice element is fact-intensive and dependent on each EDD cardholders' online banking habits. (*Id.* at 32-33.) In reply, Plaintiffs argue that BANA has only identified two members[21] of the roughly 104,300 members in the Claim Denial Class who did not provide adequate notice and has not identified any members of the Credit Rescission class who submitted a claim outside the 60-day period. (Dkt. No. 378 at 13.) Further, they argue that BANA's records can easily establish if the notice requirement was met. (*Id.*)

In order to invoke the protections of the EFTA, a plaintiff must provide notice within 60 days of receipt of a bank statement or other document detailing the alleged erroneous electronic fund transfer. *See* 12 C.F.R. § 1005.11(c). Here, whether a proposed class member has met the 60-day notice requirement can easily be determined by a review of BANA's records which include ███████████████████████████ ████████████████████████████████████████. (Dkt. No. 393-2, Chan

---

[20]BANA's relies on *Nelson* and *Almon* to support its argument that Plaintiffs must demonstrate the alleged transactions are unauthorized. The two cases are inapplicable because they did not address the EFTA, a strict liability statute, but, rather, breach of contract claims. *See Nelson v. Conduent Bus. Servs. LLC*, Civil Action No. 1:18cv669-SDG, 2020 WL 5587450, at *6 (N.D. Ga. Sept. 18, 2020); *Almon v. Conduent Bus. Servs., LLC,* SA-19-CV-1075-XR, 2022 WL 4545530, at *14-15 (W.D. Tex. Sept. 28, 2022) ("Unlike the rights granted under the EFTA and Regulation E, however, Section 8 [of the contract] does not afford a cardholder a procedural protection.").

[21]███████████████████████████████████████████. *(See* Dkt. No. 393-2, Chan Decl., Ex. 4, Regan Expert Report, Sch. I (UNDER SEAL).)

Decl., Ex. 4, Regan Expert Report ¶¶ 32, 34 (UNDER SEAL); Dkt. No. 378-23, Chan Suppl. Decl., Ex. 178 (Account History).)

Therefore, commonality is not defeated by individual questions on whether putative class members provided timely notice to BANA because ascertaining members of the Claim Denial Class can be addressed and easily determined at the claims stage. *See e.g., Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121, 1131-32 (9th Cir. 2017) (defendants can "challenge the claims of absent class members if and when they file claims for damages" explaining that parties have "long relied on 'claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court' to validate claims.")

Lastly, BANA contends that the evidence concerning treble damages is not common because it will depend on each individual account and as such, it will not generate common answers. (Dkt. No. 349 at 33-35.) According to BANA, discovery has already revealed individual Plaintiffs' claims would likely fail based on evidence on their individual accounts. (*Id.* at 34.) Plaintiffs reply that treble damages can be determined on a classwide basis because it is not disputed that BANA failed to provide provisional credit within the 10-day period as to all in the Class Denial class and it summarily rescinded permanent credits as to all in the Credit Rescission class. (Dkt. No. 378 at 13-14.)

Under the EFTA, a consumer is entitled to treble damages under two circumstances. First, a consumer is entitled to treble damages if "the court finds that-- (1) the financial institution did not provisionally recredit a consumer's account within the ten-day period . . . and the financial institution (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error. 15 U.S.C. § 1693f(e)(1). Second, treble damages are warranted when "the financial institution knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably

53

have been drawn from the evidence available to the financial institution at the time of its investigation."  15 U.S.C. § 1693f(e)(2).

Here, Plaintiffs' theory is that BANA failed to conduct *any* investigation and summarily denied EDD cardholders' unauthorized transaction claims and rescinded permanent credits ███████████████████; therefore, whether its failure to investigate subjects it to treble damages is a classwide common question that predominates.  BANA's argument on treble damages is without merit.

Other courts have similarly found that a financial institution's failure to comply with the EFTA satisfies commonality.  *See Almon, LLC*, 2022 WL 4545530, at *11 (violations of EFTA and Reg E's timeliness of investigation and credits satisfied commonality that affects all or a large number of putative class members); *Nelpia v. TD Bank,* 21cv1092, 2024 WL 3017141, at *15-16 (E.D.N.Y.  June 17, 2024) (commonality met where the bank "maintains a policy and procedure of denying claims where the accountholder approves the subject transactions or otherwise provides access to their account" and the putative class members "were subject to the same unitary course of conduct, which is sufficient to establish commonality.").

In conclusion, because the EFTA claim relies on BANA's uniform policy and practice applicable to all EDD cardholders, commonality is easily satisfied and BANA does not dispute that common evidence from its own records reveal this uniform practice and policy.  *See Beaver v. Omni Hotels Mgmt. Corp*., Case No.:20cv191-AJB-DEB, 2023 WL 6120685, at *5 (S.D. Cal. Sept. 18, 2023) ("[w]here common questions stem from the same source, or focus on the defendant's conduct, commonality is generally satisfied) (citing *Just Film, Inc.*, 847 F.3d at 1124 n.3 ("These issues are appropriate for classwide litigation because they focus on Leasing Defendants' conduct.")); *Baghdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 388 (C.D. Cal. 2009) (finding commonality where "the claims of all members of the class 'stem from the same source'"); *Haley v. Medtronic, Inc*., 169 F.R.D. 643, 650-51 (C.D. Cal. 1996); *see e.g., Small,* 122 F.4th at

1   1198 (whether an insurance company violated a statute giving rise to the action can be a

2   common question to the class”).

3               **b.      Predominance**

4        On predominance, BANA similarly argues that questions regarding whether the

5   alleged error claims were “authorized” will require individual inquiries whether the

6   transactions were honest mistakes or fraudulent.  (Dkt. No. 349 at 42.)  According to

7   BANA, “(i) criminals who defrauded the EDD with fraudulent benefits claims; (ii)

8   legitimate beneficiaries and criminals alike who defrauded BANA with fraudulent

9   transaction disputes; (iii) legitimate cardholders who disputed their own transactions by

10  honest mistake; and (iv) legitimate cardholders already compensated for their potential

11  injuries” will be in the class and subject to windfalls from double-dipping or quadruple

12  dipping.  (*Id.* at 43.)  Plaintiffs reply that BANA relies on speculation and fails to support

13  its argument with evidence.  (Dkt. No. 378 at 22.)  Further, they argue that to the extent

14  BANA has provided evidence, it has cited only a de minimis number of uninjured class

15  members which does not defeat predominance.  (*Id.*)

16       In *Ruiz Torres*, the Ninth Circuit rejected the argument that “a class cannot be

17  certified if it contains both injured and non-injured parties” explaining that a “well-

18  defined class may inevitably contain some individuals who have suffered no harm as a

19  result of a defendant’s unlawful conduct.”  *Ruiz Torres v. Mercer Canyons Inc*., 835 F.3d

20  1125, 1137 (9th Cir. 2016) (citing Newberg on Class Actions § 2:3) and *Messner v.*

21  *Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) (“[S]ome class

22  members' claims will fail on the merits if and when damages are decided, a fact generally

23  irrelevant to the district court’s decision on class certification.”)).  The *Ruiz* court

24  acknowledged “the possibility that an injurious course of conduct may sometimes fail to

25  cause injury to certain class members.”  *Id.* at 1136.

26       Similarly, here, all putative class members were subject to Defendant’s uniform

27  practice and policy of applying CFF-1 which automatically denied EDD cardholders’

28  error claims and rescinded permanent credits.  Therefore, the legal issue of whether these

policies violate the EFTA predominates over a handful of identified class members who were not injured.  *See id.* at 1134 ("more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class.").  In addition, identifying non-injured class members may be done at the claims and/or damages phase.  *See id.* at 1137 ("that such fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition.").

The Court also disagrees with BANA's assessment that individual questions, concerning non-injured and/or fraudulent class members, will predominate over common issues for several reasons.  First, the proposed Class definition already excludes any person who "(i) has been disqualified by the [S]tate [of California] from Program[22] eligibility; [or] (ii) has previously engaged in fraudulent Program conduct, such as submission of fraudulent claims or other abuses of the claims process[.]"  (Dkt. No. 384-1, Notice of Mot. at 3.)

Second, when the CFF was first implemented, if the EDD cardholders' claims were denied based on CFF-1, they could seek reconsideration of their denials.  (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 52:21-53:9; 234:13-21 (UNDER SEAL); (Dkt. No. 366-24, Chan Decl., Ex. 49, BANA's Resp. to Interrog. 28 at 9 (UNDER SEAL).)

██████████████████████████████████████████████████████

████████████████████████.  (*See* Dkt No. 382-2, Brys Decl., Ex. 6, Letson Decl. ¶ 36 at 220 (UNDER SEAL); Dkt. No., 382-2, Brys Decl., Ex. 43 at 400 (UNDER SEAL).)

Third, under the PI order in *Yick*, dated June 2, 2021, BANA was required, within 10 days of the Order, to reopen any claims it closed or denied based solely on the results

---

[22] Program means "the Bank's Unemployment Benefits Prepaid Card Program."  (Dkt. No. 367-6, Chan Decl., Ex. 74 at 5 (UNDER SEAL).)

of the CFF and that it had not previously paid or previously reopened and investigated, and conduct an investigation within 10 business days or 45 calendar days, if provisional credits in the amount of the alleged error were provided.  (Dkt. No. 324-74, Chan Decl., Ex. 71.)  BANA was also required to provide notice to class members whose accounts were blocked solely due to CFF and the accounts would be unblocked if the class members authenticate their identities.  (*Id.*)  Implementing the PI was an opportunity for BANA to further investigate claims that were denied due to the CFF.

Then, in response to the Consent Orders in July 2022 between BANA and the CFPB and the OCC, (Dkt. No. 324-75, Chan Decl., Ex. 72; Dkt. No. 324-76, Chan Decl. Ex. 73), in October 2022, BANA implemented the Remediation Plan ██████████ ████████████████████████████████.  (Dkt. No. 367-6, Chan Decl., Ex. 74 (UNDER SEAL).  Under the Remediation Plan, █████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████.  (Dkt. No. 367-6, Chan Decl., Ex. 74, at 6 (UNDER SEAL).)  But on this population, ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████.  (Dkt. No. 367-6, Chan Decl., Ex. 74 at 6 (UNDER SEAL).)  Then, ██████████████████████████████████████ ███████████████████████████████████████████.  (Dkt. No. 367-6, Chan Decl., Ex. 74 at 7 (UNDER SEAL).)  According to the Remediation Plan, ██████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████.  (*Id.* at 6 (UNDER SEAL).)

Through the reconsideration process, the PI and the Remediation Plan, ████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████.  There is no evidence

that many unearthed fraudulent claims will arise.  In a declaration dated October 23, 2024, William M. Martin, Senior Vice President of Fraud Operations and a Prepaid Fraud Operations Executive, states that in connection with the Remediation Plan, ███████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████ ████. (Dkt. No. 382-2, Brys Decl., Ex. 7, Martin Decl. ¶ 8 at 225 (UNDER SEAL).) Martin declares that ███████████████████████████████████████ ██████████████████████████████████████████████████. (*Id.* ¶ 9 at 226 (UNDER SEAL).) ████████████████████████████ ████████████████████████████. (*Id.* ¶ 12 at 227 (UNDER SEAL).) ████████████ ████████████████████████. (*Id.* (UNDER SEAL).) ████████████████ █████████████████████████████████. (*Id.* (UNDER SEAL).) ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████. (*Id.* (UNDER SEAL).) ██████████████████████████████████████████ ████████████████████████. (*Id.* (UNDER SEAL).) ████████████ ████████████████████████. (*Id.* (UNDER SEAL).) ██████████ ████████████████████████████████████████████████████. (*Id.* (UNDER SEAL).)  BANA states ████████████████████████████████████ ████████████████████████. (*Id.* (UNDER SEAL).)  At the hearing, BANA asserted ██████████████████████████████.

Plaintiffs respond that a careful review of Martin's declaration reveal ██████████ ████████████████████████████████████████ are actual class members because ██████████ ██████████████████████████████████████████████████████

21MD2992-GPC(MSB)

1    ███████████. (Dkt. No. 378 at 23.)  It is true that Martin has not stated ████████

2    █████████████████████████████████████████████████████████

3    █████████.  At the hearing, when the Court raised this question, ███████████

4    ████████████████████████████████████████████████

5    █████████████████████████████████████████████████████

6    ███████████████████████████████████████████

7    ███████████████████████, it amounts to a de minimis number of

8    uninjured class members.  *See Olean*, 31 F.4th at 669 (no per se rule preventing district

9    courts from certifying a class that may include more than a de minimis number of

10   uninjured class members).

11       The Court agrees with Plaintiffs that BANA has not sufficiently demonstrated with

12   evidence that individual issues will predominate on the EFTA claim.  *See Van v. LLR,*

13   *Inc.*, 61 F.4th 1053, 1067 (9th Cir. 2023) ("If the plaintiff demonstrates that class issues

14   exist, the defendant must invoke individualized issues and provide sufficient evidence

15   that the individualized issues bar recovery on at least some claims, thus raising the

16   spectre of class-member-by-class-member adjudication of the issue."); *True Health*

17   *Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 932 (9th Cir. 2018) ("[W]e do not

18   consider . . . defenses that [the defendant] might advance or for which it has presented no

19   evidence.").  Martin's declaration, nor other evidence, support BANA's position that

20   individual inquiries will predominate over common ones.

21       BANA also maintains that the Remediation Plan is ████████████████

22   ████████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████

26   ███████████████████████.  (*See* Dkt. No. 367-6, Chan Decl., Ex. 74 at

27   6 (UNDER SEAL).)  At the hearing, BANA argued ████████████████████

28   █████████████████████████████████████████████

1 ███████████████████████████████████████████████████

2 ████████. (*See* Dkt. No. 382-2, Brys Decl., Ex. 43 at 406 (UNDER SEAL).)

3  However, the evidence does not support BANA's claim.  In response to Plaintiffs'

4 Interrogatory No. 39 to ██████████████████████████████████████

5 ███████████████████████████████████████████████████

6 ████████████████████████████████████ (*Id.* at 404

7 (UNDER SEAL)), BANA states it ████████████████████████

8 ███████████████████████████████████████████████████

9 █████████████████████████. (*Id.* at 406.)  BANA also states

10 that it ██████████████████████████████████████████

11 ████████████████████████████████████████████

12 ███████████████████████████████. (*Id.* at 406.)

13 BANA's response to Interrogatory No. 39 does not ████████████████████

14 ███████████████████████████████████████████.

15 Therefore, BANA has not shown, with evidence, that individual inquiries will

16 predominate over common ones.

17  BANA also incorrectly claims that illegitimate cardholders still need to be sorted

18 out and "those who remain still need to prove they would have prevailed on their error

19 claims (had the filter not been used) under the law and contract that constrained their

20 legally enforceable rights."  (Dkt. No. 349 at 44.)  However, as noted above, the

21 claimants do not need to prove their unauthorized transaction claim, it is BANA that

22 needs to conduct the investigation by reviewing its own records.  Individual inquiries to

23 EDD cardholders will not be necessary.

24  Even if fraudulent claimants need to be sorted out, the process of fact-intensive

25 analysis will come from BANA and EDD's records and not any evidence that a class

26 member will need to present; therefore, additional discovery or many mini-trials will not

27 overwhelm the proceedings.  *See Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469

28 (9th Cir. 2023) (ordering the de-certification of a class action where the trial of the

individualized issues would be "prohibitively cumbersome" and the plaintiff had failed to prove that the class issues nevertheless predominated over the individualized issues). Predominance is not defeated in a case where there may be some individual inquiries which can be determined by a review of Defendant's records rather than a "prohibitively cumbersome" trial of individualized issues.  *See id.*

The Court concludes that the putative class members are linked by a significant operative fact, having been denied a claim or having their permanent credits rescinded, and a primary legal issue, whether the subject policy violated the EFTA and whether each class member suffered the same statutory injury.  *See Mabary v. Hometown Bank, N.A.* Civ. No. 4:10–cv–3936, 2011 WL 5864325, at *3 (S.D. Tex. Nov. 22, 2011) (predominance satisfied where plaintiff and potential class assert the same statutory injury by the same course of conduct) (citing *Burns v. First Am. Bank*, No. 04–C–7682, 2006 WL 3754820, at *9 (N.D. Ill. Dec. 19, 2006) (observing, in the context of an EFTA suit against a bank, that "[w]hatever the ultimate merits of this claim, it will be decided predominately, if not entirely, based on common evidence of Defendant's conduct")).

Finally, BANA summarily argues that because each member of a certified class must have Article III standing, a class with uninjured class members cannot be certified because individual inquiries would predominate over common ones relying on *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).  (Dkt. No. 349 at 42-43.)

While the Supreme Court held "[e]very class member must have Article III standing in order to recover individual damages[,]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), the Court specifically did not address "the distinct question whether every class member must demonstrate standing *before* a court certifies a class. *Id.* at 431 n.4.  In fact, the Ninth Circuit held there is no per se rule preventing district courts from certifying a class that may include more than a de minimis number of uninjured class members.  *Olean*, 31 F.4th at 669 ("[W]e reject the dissent's argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.").  Therefore, the Court rejects

BANA's argument that prior to class certification, Plaintiffs must demonstrate that all class members have Article III standing. *See Weiner v. Ocwen Fin. Corp*., 343 F.R.D. 628, 631 (E.D. Cal. 2022) (granting reconsideration because court improperly held that Plaintiff was required to establish Article III standing at certification).

### 2. Due Process Violation under United States and California Constitution (Credit Rescission and Account Freeze Classes)

Plaintiffs move to certify the Credit Rescission Class and Account Freeze Class alleging their due process rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 and Article I, § 7 of the California Constitution were violated "by [BANA] seizing previously awarded permanent credits from their EDD debit card accounts (Credit Rescission Class) and freezing those accounts (Account Freeze Class) based solely on CFF-1, without providing pre-deprivation notice or a meaningful opportunity to be heard, or even reasonable post-deprivation procedures." (Dkt. No. 324-1 at 35.)

"The touchstone of procedural due process is notice and an opportunity to be heard" and "is a flexible concept that varies with the particular situation." *Miranda v. City of Casa Grande*, 15 F.4th 1219, 1225 (9th Cir. 2021) (citations omitted). A procedural due process claim has two elements: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Id.* at 1224-25 (citation omitted). Further, BANA must have been acting under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). Article 1, section 7 of the California Constitution protects persons from deprivation of "life, liberty, or property without due process of law," Cal. Const. art. I, § 7(a), and is "identical in scope with the federal due process clause." *Owens v. City of Signal Hill*, 154 Cal. App. 3d 123, 127 n. 2 (1984).

Plaintiffs propose the following questions common to the proposed class "(1) whether the Bank had a policy and/or practice of automatically freezing the accounts, or

1    rescinding the previously awarded credits, of EDD cardholders who submitted claims

2    involving unauthorized ATM withdrawals; (2) whether cardholders have a

3    constitutionally protected property interest in the EDD benefits the Bank froze and/or

4    rescinded; (3) whether the Bank's policies and procedures for freezing accounts and

5    rescinding credits based solely on CFF-1 were constitutionally inadequate; and (4)

6    whether the Bank acted under color of law." (Dkt. No. 324-1 at 29.)  They maintain

7    these common questions predominate as to the absence of pre-deprivation notice or a

8    meaningful opportunity to be heard as well as failing to provide these cardholders any

9    reasonable post-deprivation procedures to regain access to their funds through BANA.

10    (*Id.* at 36.)  Instead, the EDD cardholders were subject to an unending loop where BANA

11    would refer cardholders to EDD and EDD would refer cardholders back to BANA

12    causing delays in resolving the status of their accounts.  (*Id.*)

13        BANA does not challenge that its failure to provide any pre-deprivation notice or

14    opportunity to be heard is a common issue that predominates.  (*See* Dkt. No. 349 at 35-

15    36.)  Rather, BANA disputes Plaintiffs' claim that there are common questions as to its

16    failure to provide a reasonable post-deprivation procedure to regain access to

17    cardholders' funds through BANA because there were individuals whose issues EDD

18    handled and those it did not handle, cardholders who verified their identities with EDD

19    and those who did not, and cardholders who did not take advantage of the processes that

20    were available, all raising individual inquiries.  (*Id.* at 35, 36.)

21        A review of the evidence BANA provides to support the variation in EDD

22    cardholders' experience with resolving account freezes does not support BANA's claim.

23    The Account Freeze Class involves frozen accounts from September 28, 2020 to March

24    17, 2021. (Dkt. No. 386-1.)  First, as to whether EDD handled some cardholders' frozen

25    account status and did not handle others, none of the supporting documents provide

26    succor because the communications are not clear whether these class member cards were

27    frozen rather than blocked, and no dates are provided as to when the freeze occurred or

28    when their issues were resolved.  (Dkt. No. 350-49, Brys Decl., Ex. 48; Dkt. No. 382-2,

Brys Decl., Ex. 73 (UNDER SEAL); Dkt. No. 350-75, Brys Decl., Ex. 74 at 17-18; Dkt. No. 350-76, Brys Decl., Ex. 75 at 6-7; Dkt. No. 350-77, Brys Decl., Ex. 76 at 6-7.)

BANA's proposed evidence also does not show that ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████. (*See* Dkt. No. 382-2, Brys Decl., Ex. 36 at 364 (UNDER SEAL) ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████; Dkt. No. 382-2, Brys Decl., Ex. 38 at 367 (UNDER SEAL) ████████ ████████████████████████████████; Dkt. No. 392-2, Brys Decl., Ex. 77 at 476 (UNDER SEAL) ████████████████████████████████ ████████████████████████████████████████████████████████ ██████████. BANA has failed to show, by evidence, that individual issues predominate over common ones. *See Van*, 61 F.4th at 1067.

Instead, Plaintiffs have shown that common issues predominate on each element of a due process violation under the United States and California Constitutions based on BANA's uniform policy and practice of rescinding permanent credits and freezing accounts solely relying on CFF-1 without any prior notice and the question can be answered by common evidence. They have also demonstrated common issues predominate as to whether the post-deprivation due process procedures were adequate by requiring cardholders to call EDD rather than BANA to unfreeze their accounts which can be determined by common evidence because unfreezing accounts involved a uniform procedure.

### 3.    California Consumer Privacy Act (EMV Chip Class)

---

[23] BANA relies on call notes but they are hard to decipher and BANA has not provided any explanation or guidance as to abbreviations/terminology/acronyms to assist the Court on its review. The Court is only able to glean a general understanding of its contents.

Plaintiffs seek to certify an EMV Chip Class alleging a violation of California Consumer Privacy Act ("CCPA").

The CCPA provides a private right of action for actual or statutory damages to "[1] [a]ny consumer whose nonencrypted and nonredacted personal information . . . [2]  is subject to an unauthorized access and exfiltration, theft, or disclosure [3] as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information[.]"  Cal. Civ. Code § 1798.150(a)(1).

Plaintiffs assert that common issues include: "(1) whether all EDD debit cards issued during the class period were mag-stripe only cards; (2) whether the unencrypted information on EDD debit cards' mag-stripes is 'personal information' ("PI") under the CCPA; (3) whether EMV chip technology was an industry-standard security measure; and (4) whether EDD cardholders' PI was 'subject to unauthorized access and exfiltration, theft, or disclosure' due to the Bank's issuance of mag-stripe only cards.'" (Dkt. No. 324-1 at 30.)

Defendant disputes the fourth common question contending that individual issues prevail on whether EDD cardholder's PI was subject to an unauthorized access, exfiltration, theft or disclosure due to issuance of mag-stripe only cards because some cardholders who made an honest mistake disputed their own authorized transactions and other cardholders' PI was subject to unauthorized access because either they lost their cards or their cards were stolen.  (Dkt. No. 349 at 36-37.)  BANA presents eleven individuals who ███████████████████████.  (Dkt. No. 382-2, Brys Decl., Exs. 30-40 (UNDER SEAL).)

First, to the extent individual issues may exist as to those cardholders who reported lost or stolen cards, Plaintiffs are willing to amend the Class definition to remove cardholders who reported a lost or stolen card and this can easily be identified through BANA's records.  (Dkt. No. 392 at 20 n. 15.)  Second, BANA has not identified any

EDD cardholders who innocently reported an unauthorized transaction.  Therefore, Plaintiffs have shown that common questions exist.

The parties dispute whether class members' PI was subject to unauthorized access and exfiltration, theft, or disclosure' due to the Bank's issuance of mag-stripe only cards relying on their respective experts.   Ultimately, to resolve this question, the fact finder will have to consider the evidence of the two competing experts.  Jane Cloninger, Plaintiffs' expert on EMV chip cards, opines that from January 2020 to July 2021, BANA's decision to proceed without EMV chips in its EDD debit cards rendered the cardholders especially vulnerable to counterfeit card fraud.  (Dkt. No. 324-5, Chan Decl., Ex. 2, Cloninger Expert Report ¶¶ 14, 93-96.)  In contrast, Pamela Joseph, Defendant's expert, concludes that ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████.  (Dkt. No. 350-5, Brys Decl., Ex. 4, Joseph Expert Report ¶¶ 14-16, 93-94.)  This question can be resolved with common evidence using the parties' expert reports and documents produced by BANA.  As such, BANA has not shown that individual issues will prevail on whether EDD cardholders' PI was subject to an unauthorized access, exfiltration, theft or disclosure.

Accordingly, the Court amends the EMV Chip Class definition to exclude EDD cardholders who reported a lost or stolen card and concludes that Plaintiffs have shown that common questions predominate on the CCPA cause of action for the EMV Chip Class.

### 4.    Breach of Fiduciary Duty[24] (Claim Denial, Credit Rescission, Account Freeze, and EMV Chip Classes)

---

[24] In its opposition, under the heading "Common-law claims", BANA lumps the arguments on the breach of fiduciary duty, negligence and breach of the covenant of good faith and fair dealing together without separating out the elements of each cause of action and why commonality has not been satisfied as to each common law cause of action.  The Court did its best to decipher which argument corresponded to which cause of action.

1

2          Plaintiffs seek to certify the Claim Denial, Credit Rescission, Account Freeze, and

3  EMV Chip Classes alleging that BANA breached its fiduciary duty by failing to take all

4  reasonable and necessary steps to "protect, preserve, and secure Plaintiffs' and class

5  members' private data and confidential information from unauthorized access, fraud or

6  theft" and to ensure legitimate benefits recipients were not denied access to their account

7  funds by taking all necessary steps including encrypting such information, using EMV

8  chips and other measures.  (Dkt. No. 324-1 at 39; Dkt. No. 406, TAMCC ¶¶ 632-33.)

9  They also claim that BANA breached its duty by prioritizing its own financial self-

10  interest above the interests of EDD cardholders by utilizing mag-stripe only cards rather

11  than industry-standard EMV chips and by implementing its policy and practice of using

12  CFF-1 in denying claims, rescinding credits and freezing accounts.  (Dkt. No. 406,

13  TAMCC ¶ 634.)

14          In California, a plaintiff must prove the following elements to establish a cause of

15  action breach of fiduciary duty: "(1) existence of a fiduciary duty; (2) breach of the

16  fiduciary duty; and (3) damage proximately caused by the breach."  *Gutierrez v. Girardi*,

17  194 Cal. App. 4th 925, 932 (2011) (citation omitted).

18          Ordinarily, a relationship between a bank and its depositor is not a fiduciary one,

19  *Oaks Mgmt. Corp. v. Superior Ct*., 145 Cal. App. 4th 453, 466 (2006) ("[I]n ordinary

20  banking transactions the 'bank is in no sense a true fiduciary.'"), but courts recognize

21  that, under "special circumstances," a bank may enter into a "special relationship" with a

22  depositor and owe fiduciary duties.  *Copesky v. Superior Ct.*, 229 Cal. App. 3d 678, 691

23  n.12 (1991).  A bank enters into a "special relationship" with a depositor either by

24  "affirmatively offer[ing] trust and other specifically fiduciary services," *id.*, or when the

25  relationship involves characteristics of a "special relationship" such as "(1) inherently

26  unequal bargaining positions; (2) nonprofit motivation [of the depositor], i.e., objective of

27  securing peace of mind, security; (3) inadequacy of ordinary contract damages; (4)

28  special vulnerability of one party to harm as a result of breach of trust of the other; and

(5) awareness by the other of this special vulnerability." *Id.* at 687 n.7 (quoting *Wallis v. Superior Ct.*, 160 Cal. App. 3d 1109, 1118 (1984)).  In particular, "[m]any banks affirmatively offer trust and other specifically fiduciary services, and as such are in a position to do great harm if the trust agreement is broken in bad faith."  *Id.*

> A fiduciary relationship is any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party.  Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. . . .

*Wolf v. Superior Ct.*, 107 Cal. App. 4th 25, 29 (2003) (internal quotation marks and citations omitted).

According to Plaintiffs, common issues include: "(1) whether the Bank entered into a 'special relationship' with EDD cardholders and thereby incurred fiduciary obligations; and (2) whether the Bank breached its fiduciary duties by prioritizing its own financial self-interest above the interests of EDD cardholders by choosing not to include industry-standard EMV chips in EDD debit cards and by implementing its CFF-1 Claim Denial, Credit Rescission, and Account Freeze Policies."  (Dkt. No. 324-1 at 29.)

In opposition, BANA argues that the first common issue, whether there was a special relationship between BANA and EDD cardholders, will require fact intensive inquiries into each cardholders' communications with the bank to determine if a special relationship was established and is not subject to common proof.  (Dkt. No. 349 at 39.)  The Court disagrees.  BANA fails to explain or provide evidence that each cardholder had communications with it when it created the debit card accounts.  Instead, the putative class includes cardholders who uniformly received unemployment insurance benefits through debit cards issued by BANA pursuant to the exclusive contract between BANA and EDD.  BANA has not provided any evidence that the EDD cardholders had any

communications with BANA prior to receiving the debit cards. The question of whether there was a special relationship created from receiving unemployment insurance benefits through the debit card accounts with BANA is a common one that predominates and that can be resolved with common evidence. Accordingly, the Court finds predominance satisfied as to Plaintiffs' claim for breach of fiduciary duty.[25]

### 5.    Negligence/Negligence Per Se (all Classes)

Plaintiffs seek to certify all Classes alleging negligence claiming that Defendant breached its duty of care by failing to (1) maintain the security of their personal and account information; (2) issue EDD Debit Cards with EMV chips; (3) employ reasonable fraud prevention and notification practices; (4) provide timely and effective customer service; (5) process and investigate claims in a timely manner; and (6) provide provisional credits while investigating fraud claims. (Dkt. No. 324-1 at 41-43; Dkt. No. 406, TAMCC ¶¶ 586-87). They also seek to certify all Classes alleging negligence per se based on violations of (1) the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq*.; (2) the California Financial Information Privacy Act, Cal. Fin. Code §§ 4050 *et seq*.; (3) the California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq*.; and (4) the California Consumer Records Act, *id*. §§ 1798.80 *et seq*. (Dkt. No. 324-1 at 43; Dkt. No. 406, TAMCC ¶¶ 589-90.)

Under California law, the elements of a negligence claim are (1) duty, (2) breach, (3) causation, and (4) injury. *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083

---

[25] BANA argues, in one sentence, that the affirmative defenses of sophistication and lack of reliance defeat commonality as to the breach of fiduciary duty claim yet provides no explanation as how it applies to the facts of the case and does not provide any legal authority. (Dkt. No. 349 at 40.) The Court declines to consider a one-sentence argument. *See Mooney v. Roller Bearing Co. of Am., Inc.*, CASE NO. 2:20-cv-01030-LK, 2023 WL 6807198, at *6 (W.D. Wash. Oct. 2013) ("The Court also declines to consider that one-sentence argument because RBC did not elaborate on it or cite to anything in the record to support it.") (citing *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived.")); *Delashaw v. Seattle Times Co*., No. C18-0537-JLR, 2018 WL 4027078, at *14 (W.D. Wash. Aug. 23, 2018) (declining to address a party's "cursory argument" because the party did "not provide enough detail to allow the court to fully evaluate it.").

(2017). "In California, the 'general rule' is that people owe a duty of care to avoid causing harm to others and that they are thus usually liable for injuries their negligence inflicts." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 398 (2019). However, "[i]n the absence of personal injury, physical damage to property, a special relationship between the parties, or some other common law exception to the rule, recovery of purely economic loss for negligence is foreclosed." *Stasi v. Inmediata Health Grp. Corp*., 501 F. Supp. 3d 898, 913 (S.D. Cal. 2020) (citing *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803-04 (1979)); *S. Cal. Gas*, 7 Cal. 5th at 400 ("[L]iability in negligence for purely economic losses . . . is 'the exception, not the rule.'"). Negligence per se borrows statutes to prove duty of care and standard of care. *Elsner v. Uveges*, 34 Cal. 4th 915, 927 n.8 (2004); *David v. Hernandez*, 226 Cal. App. 4th 578, 584 (2014) ("Under the doctrine of negligence per se, the plaintiff 'borrows ' statutes to prove duty of care and standard of care."). Therefore, a presumption of negligence arises from a violation of a statute. *Id.*

Plaintiffs rely on the "special relationship" exception to the economic loss doctrine. "The primary exception to the general rule of no recovery for negligently inflicted purely economic losses is where the plaintiff and the defendant have a 'special relationship.'" *S. Cal. Gas*, 7 Cal. 5th at 400. "What we mean by special relationship is that the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out." *Id.* The California Supreme Court set out six factors to determine whether a special relationship exists:

> (i) the extent to which the transaction was intended to affect the plaintiff, . . . (ii) the foreseeability of harm to the plaintiff, (iii) the degree of certainty that the plaintiff suffered injury, (iv) the closeness of the connection between the defendant's conduct and the injury suffered, (v) the moral blame attached to the defendant's conduct, and (vi) the policy of preventing future harm.

*Id.* at 401 (internal quotations and citations omitted).

Here, Plaintiffs assert that common issues include "(1) whether the Bank had a 'special relationship' with class members and owed them a duty of care; (2) whether the

70

Bank breached that duty by using CFF-1 to auto-deny claims, auto-rescind permanent credits, and auto-freeze accounts; (3) whether the Bank breached its duty by grossly understaffing its Claims call center; and (4) whether the Bank breached its duty by failing to include industry-standard EMV chips in EDD debit cards."  (Dkt. No. 324-1 at 29.) They contend that these common issues predominate and can be demonstrated by common evidence.  (*Id.* at 41-43.)

In opposition, BANA only dispute that there are not common issues as to causation.  (Dkt. No. 349 at 37-38.)  However, Plaintiffs need not demonstrate that all elements to support a cause of action must be common; only one common issue suffices. *See Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2), even a single common question will do.") (internal quotation marks omitted); *Wang v. Chinese Daily News*, 737 F.3d 538, 544 (9th Cir. 2013) ("Plaintiffs need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution."); *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 589 (9th Cir. 2012) ("[C]ommonality only requires a single significant question of law or fact."); *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (Commonality is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.") (quoting *Baby Neal for & by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir. 1994)).

Nonetheless, in reply, Plaintiffs contend that BANA admits denying claims, rescinding permanent credits, and freezing accounts based solely on CFF-1; therefore, the Claim Denial, Credit Rescission and Account Freeze Class members suffered harm from BANA's uniform policy and practice demonstrating causation.  (Dkt. No. 392 at 18.) Further, Plaintiffs argue that the Customer Service Class members suffered unprecedented long wait times and BANA's use of mag-stripe only cards subjected each EMV Chip class member to a heightened risk of skimming.  (*Id.* at 19.)  The Court agrees and concludes that Plaintiffs have raised common questions on causation.

Next, BANA objects to the negligence claim as to the Customer Service Class arguing that not all class members had complaints about the call center, including three of

71

21MD2992-GPC(MSB)

the nine Class Plaintiffs.[26]  (Dkt. No. 349 at 38.)  However, the Court notes that the Customer Service Class includes members who telephoned the Claim call center between September 13, 2020 through November 21, 2020.  (*See* Dkt. No. 386-1.)  The three unidentified Class Plaintiffs BANA claims had no complaints about the call center, which the Court presumes is Class Plaintiffs Koole, McClure, and Rivera, are not members of the Customer Service Class as they called outside these dates and therefore, do not represent the Customer Service Class.

BANA next argues that there is no evidence that each of the 15,600 class members spent more than an hour on hold each time and relying on "average" hold times cannot suffice to demonstrate what class members actually experienced.  (Dkt. No. 349 at 39.)  Plaintiffs' theory on the Customer Service Class is that BANA made class members suffer elevated wait times, purposely in part to avoid issuing credits on claims, and common evidence will show that ████████████████████████████████ ████████████████████████████████.  (Dkt. No. 378-6, Chan Suppl. Decl., Ex. 161, Minnucci Rebuttal Expert Report ¶¶ 13-14.)

In *Tyson Foods*, the United States Supreme Court held that representative or statistical evidence can be used to show damages as long as the evidence is reliable. *Tyson Foods*, 577 U.S. at 454-55.  The Court explained that "[w]hether and when statistical evidence can be used to establish classwide liability will depend on the purpose for which the evidence is being introduced and on 'the elements of the underlying cause of action[.]'"  *Id.* at 455.  The statistical evidence was permitted, in *Tyson Foods*, because the employer failed to keep adequate time keeping records and the statistical evidence

---

[26] Even though BANA recognizes Plaintiffs' theory on the Claims call center has shifted from the original allegation that BANA failed to provide reasonably timely and effective customer service to BANA failed to staff its call centers causing EDD cardholders to spend an excessive amount of time on hold each time, it repeatedly argues that individual issues will predominate as the fact-finder will have to look at each cardholders' experience with the Claims call center.  (*See* Dkt. No. 349 at 38, 39, 41.)  As explained above, individual inquiries will not need to be made as to the alleged uniform excessive hold times.

was used to fill this evidentiary gap. *Id.* at 456. Further, the Court suggested that statistical evidence is a permissible method to prove classwide liability when the plaintiffs can "show[] that each class member could have relied on that sample to establish liability if he or she had brought an individual action." *Id.* at 455.

Here, it is disputed whether BANA's call records capture ███████████████. (*Compare* Dkt. No. 378-7, Chan Suppl. Decl., Ex. 162, Minnucci Rebuttal Expert Report ¶¶ 36-37 ("Bank's phone systems ███████████████████████████████████████████████████████████████████████████████████████") *with* Dkt. No. 382-2, Brys Decl., Ex. 5, Hindle Expert Report ¶ 18 (UNDER SEAL) ("Claim call center systems of record between September 13, 2020 and November 21, 2020 did not contain or retain data or information showing the time a particular, individual EDD prepaid cardholder spent on hold when calling the Claims call center during the Proposed Class Period").) The Court notes that expert discovery has not yet concluded and to the extent it remains an issue of fact, it will be presented to the factfinder at trial. (Dkt. No. 302.)

Nonetheless, Plaintiffs claim that the average excess hold time can still be used to determine classwide damages for the Customer Service Class. Mr. Minnucci analyzed the Claims call center data from 2020-21 which revealed that ██████████████ experienced an extremely long wait for service. (Dkt. No. 393-1, Chan Decl., Ex. 3, Minnucci Expert Report ¶¶ 42-50 & App'x F (UNDER SEAL).) To the extent that BANA does not have records that capture each caller's hold time, statistical evidence is permissible to show classwide damages in this case because Class Plaintiffs Chong, Moon, Moore, Oosthuizen, Willrich and Yuan contacted the Claim call center on multiple occasions. Therefore, if they were to prove their damages on an individual basis, they would be entitled to use statistical evidence to support their individual damages claim. *See Tysons Food*, 577 U.S. at 455 (statistical evidence permitted to show classwide damages where "each class member could have relied on [the average excess hold time] to establish liability if he or she had brought an individual action.").

To the extent BANA disputes the ASA calculated by Mr. Minnucci, (Dkt. No. 349 at 49), that question may be litigated at trial. *See Tysons Foods*, 577 U.S. at 459 ("Reasonable minds may differ as to whether the average time [ ] calculated is probative as to the time actually worked by each employee. Resolving that question, however, is the near-exclusive province of the jury.").

As to BANA's other arguments, similar with the analysis and conclusion above on breach of fiduciary duty, common issues predominate on whether there was a special relationship between BANA and the EDD cardholders because they uniformly received unemployment insurance benefits with EDD through debit cards issued by BANA pursuant to the exclusive contract between BANA and EDD. The same evidence can be used to make this determination.

As with the analysis and conclusion on the CCPA claim, common issues predominate on whether EDD cardholders' PI was subject to an unauthorized access and exfiltration, theft, or disclosure due to BANA's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information." *See* Cal. Civ. Code § 1798.150(a)(1).

BANA also summarily argue that affirmative defenses, like contributory negligence, such as those who compromised their own accounts by giving friends or family access to their cards or PINs and one cardholder who gave access to his card to his close friend defeats predominance. (Dkt. No. 349 at 40.) As discussed above, affirmative defenses can be determined at the claim or damages stage and does not defeat predominance. *See Ruiz Torres,* 835 F.3d 1125. In conclusion, the Court finds that Plaintiffs have demonstrated that common issues predominate on the negligence/negligence per se cause of action.

**6.     Breach of the Implied Covenant of Good Faith and Fair Dealing (Claim Denial, Credit Rescission, Account Freeze and Customer Service Classes)**

21MD2992-GPC(MSB)

1    Plaintiffs seek to certify the Claim Denial, Credit Rescission, Account Freeze and

2    Customer Service Classes alleging BANA breached the implied covenant of good faith

3    and fair dealing.  (*See* Dkt. No. 406, TAMCC ¶¶ 619-623.)

4    "There is an implied covenant of good faith and fair dealing in every contract that

5    neither party will do anything which will injure the right of the other to receive the

6    benefits of the agreement."  *Foley v. Interactive Data Corp*., 47 Cal. 3d 654, 684 (1988)

7    (quoting *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958)).  The implied

8    covenant "prevent[s] a contracting party from engaging in conduct which (while not

9    technically transgressing the express covenants) frustrates the other party's rights to the

10   benefits of the contract."  *Love v. Fire Ins. Exchange*, 221 Cal. App. 3d 1136, 1153

11   (1990).

12   The elements to support a claim for breach of the covenant of good faith and fair

13   dealing are: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his

14   obligations under the contract; (3) any conditions precedent to the defendant's

15   performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to

16   receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's

17   conduct."  *Rosenfeld v. JPMorgan Chase Bank, N.A.,* 732 F. Supp. 2d 952, 968 (N.D.

18   Cal. 2010) (citing Judicial Council of California Civil Jury Instruction No. 325).

19   "The covenant of good faith finds particular application in situations where one

20   party is invested with a discretionary power affecting the rights of another."  *3500*

21   *Sepulveda, LLC v. Macy's W. Stores, Inc*., 980 F.3d 1317, 1324 (9th Cir. 2020) (quoting

22   *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc*., 2 Cal. 4th 342, 372 (1992)).  "The

23   party with discretionary power must exercise such power in good faith and through

24   'objectively reasonable conduct.'"  *Id.* (quoting *Badie v. Bank of Am*., 67 Cal. App. 4th

25   779, 796 (1998)).  "A party violates the covenant if it subjectively lacks belief in the

26   validity of its act or if its conduct is objectively unreasonable."  *Carma Devs.,* 2 Cal. 4th

27   at 372.  "In the case of a discretionary power, it has been suggested the covenant requires

28   the party holding such power to exercise it 'for any purpose within the reasonable

75

contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively.'" *Id.* (citation omitted).

Plaintiffs contend common issues include: "(1) whether the Bank had a policy or practice of automatically denying and rescinding unauthorized-transaction claims and freezing accounts based solely on CFF-1; (2) whether the Bank's decision to auto-deny unauthorized-transaction claims, rescind grants of permanent credit, and freeze cardholder accounts based solely on CFF-1 was objectively reasonable; (3) whether the Bank subjectively lacked belief in the validity of its decision to implement its CFF-1 Policies; and (4) whether the Bank reduced call center staffing knowing or intending the resulting impairment of class members' rights." (Dkt. No. 324-1 at 30.)  They contend that common issues predominate because BANA engaged in objectively unreasonable exercise of its discretionary contractual authority by adopting policies and practices applicable to all class members in the same manner and pursuant to the same form contract.  (*Id.* at 43-44.)

For the reasons stated above on the EFTA claims and the Customer Service Class claims, the Court rejects Defendant's argument that the question of whether its denial of error claims was objectively reasonable will require looking at individual account records to determine a violation of the EFTA claim and looking at individual call center experiences to determine if each class members' rights was impaired by reduced call center staffing.  (Dkt. No. 349 at 40-41.)

The Agreement granted BANA discretion which applied to all EDD cardholders. On the Claim Denial and Credit Recission Classes, the relevant provisions under the California EDD Debit Card Account Agreement ("Agreement") provided that "you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use . . . ."  (Dkt. No. 379-5, Chan Decl., Ex. 76 at ¶ 9.)  A transaction is not considered "unauthorized" . . . "for any other reason

we conclude that the facts and circumstances do not reasonably support a claim for unauthorized use." (*Id.*)

Further, as to Account Freeze Class, the Agreement provided BANA with discretion if we "suspect irregular, unauthorized, or unlawful activities may be involved with your Account, we may 'freeze' (or place a hold on) the balance pending an investigation of such suspected activities. If we freeze your Account, we will give you a notice required by law." (*Id.* ¶ 2.)

Finally, as to the Customer Service Class, the Agreement stated,

Please contact us at the numbers listed below AT ONCE if you believe your Card has been lost or stolen, or if you believe that someone may use or has used your PIN assigned to your Card without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your Account. If you tell us within two business days after you learn of the loss or theft, you can lose no more than $50 for an unauthorized transaction or a series of related unauthorized transfers should someone use your Card or PIN.

If you believe your Card has been lost or stolen, telephone us at 1.866.692.9374, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.), or write to: Bank of America. P.O. Box 8488, Gray, TN 37615-8488.

(*Id.* ¶¶ 10-11.)

Therefore, based on the discretion granted to BANA under the Agreement applicable to all EDD cardholders, the Court concludes that common issues predominate on whether BANA's uniform practice and policy of automatically denying unauthorized transaction claims, rescinding permanent credits, and freezing cardholder accounts based solely on CFF-1 was objectively reasonable; whether BANA subjectively lacked belief in the validity of its decision to implement its CFF-1 Policies; and whether BANA reduced its call center staffing knowingly to impair class members' rights. Further, because the same form contract was used for all EDD cardholders and California law applies an objective standard, the duty of good faith and fair dealing is amenable to class action.

*See Vaccarino v. Midland Life Ins. Co*., No. CV 11–5858 CAS (MANx), 2013 WL
3200500, at *19 (C.D. Cal. June 17, 2013) (common issues predominated as to breach of
implied covenant claims against insurer with regard to annuity contracts) (citing *Lazar v.
Hertz Corp*., 143 Cal. App. 3d 128, 141 (1983) (holding that "[t]he essence of the good
faith covenant is objectively reasonable conduct," and certifying class on this claim));
*Yue v. Conseco Life Ins. Co*., 282 F.R.D. 469, 476 (2012) (individual issues do not
predominate on whether the defendant breached the implied covenant of good faith and
fair dealing because it is determined by an objective standard).

Finally, BANA contends those cardholders who did not fulfill their own
contractual obligations by lending their cards and disclosing their PINs to friends are not
subject to recovery. (Dkt. No. 349 at 41.) The Court agrees; however, Defendant has not
shown with evidence that cardholders lent their debit cards to friends with the PINs.

Therefore, the Court concludes that Plaintiffs have demonstrated common issues
will predominate over individual ones on the claim for breach of the implied covenant of
good faith and fair dealing.

### 7.    UCL (Claim Denial, Credit Rescission and Account Freeze Classes)

Plaintiffs move to certify the Claim Denial, Credit Rescission and Account Freeze
Classes with respect to UCL claim under the Balancing, Immoral or Tethering tests of the
"unfair" prong. (Dkt. No. 406, TAMCC ¶¶ 581(a)-(c), 582(a)-(c), 584.)

The UCL prohibits "any [1] unlawful, [2] unfair or [3] fraudulent business act or
practice." Cal. Bus. & Prof. Code § 17200. The "unfair" prong of the UCL creates a
cause of action for a business practice that is unfair even if not proscribed by some other
law. *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1143 (2003). The
Ninth Circuit has identified the following three tests that California courts have
considered in addressing the "unfair" prong in a consumer case: "(1) whether the
challenged conduct is 'tethered to any underlying constitutional, statutory or regulatory
provision, or that it threatens an incipient violation of an antitrust law, or violates the
policy or spirit of an antitrust law,' [the Tethering test] ; (2) whether the practice is

'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers,' [the Immoral test]; or (3) whether the practice's impact on the victim outweighs "the reasons, justifications and motives of the alleged wrongdoer [the Balancing test]." *Doe v. CVS Pharm.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020) (internal citations omitted).

Plaintiffs propose that common issues include: "(1) whether the Claim Denial, Credit Rescission, and Account Freeze Policies were 'unfair' to class members under any of the UCL's three tests for unfairness; and (2) whether class members, if they do not prevail on their damages claims, lack an adequate legal remedy and can therefore be awarded restitution." (Dkt. No. 324-1 at 30.) In addition, they assert common issues will predominate because the answers will be the same for all class members. (*Id.* at 47-48.) Finally, they advance the argument that whether class members lack an adequate legal remedy will be answered the same for all class members and UCL restitution can also be calculated on a class wide basis. (*Id.* at 48.)

BANA repeats its argument that the class definition does not distinguish between legitimate cardholders and criminal fraudsters; therefore, fraudsters were not treated "unfairly." (Dkt. No. 349 at 41.) Further, BANA claims that legitimate cardholders who made innocent mistakes, those whose notices were untimely or those who reported unauthorized transactions made by someone whom they let access their cards were not treated unfairly. (*Id.*) But, as discussed above on the EFTA claim, the Class excludes those who engaged in fraudulent conduct, and to the extent that not all fraudsters have been identified, BANA has not provided evidence that the individual numbers of fraudsters would predominate. BANA has already conducted reviews of Class members' claims that were denied during the reconsideration process, while the PI was in effect and during the implementation of the Remediation Plan ███████████. Furthermore, BANA retains documents to make these determinations, thereby, forgoing the need for hundreds of mini-trials that would defeat predominance.

BANA also simply argues that when conducting an analysis on the "balancing test", questions regarding "gravity of the harm to the alleged victim" with the "reasons,

justifications and motives" of BANA's policies will inevitably require individualized determinations relying on *Herskowitz v. Apple, Inc*., 301 F.R.D. 460, 476 (N.D. Cal. 2014); however, in that case, the court found individual questions will predominate because "Plaintiffs have failed to provide any evidence to support the existence of a uniform business practice or series of practices respecting refunds in cases of double-billing." *Id.*  In contrast, here, Plaintiffs have provided evidence of a uniform policy and practice by BANA using CFF-1 to deny claims, rescind permanent credits and freeze accounts; therefore, these common issues predominate as all EDD cardholders suffered the same harm of being denied access to their funds through these policies and the reasons, justification and motives for the Bank's policy of using CFF-1 will also be common.  *See Lozano v. AT&T Wireless Servs., Inc*., 504 F.3d 718, 737 (9th Cir. 2007) (affirming class certification where court found common issues predominated on the unfair prong of UCL claim because claim was based on "uniform disclosures made" to all consumers).  BANA's records also show how long class members were deprived of their funds.

In addition, district courts routinely certify classes under the unfair prong of the UCL based on the uniform conduct by the defendant.  *See Brooks v. Thomson Reuters Corp*., Case No. 21-cv-01418-EMC, 2023 WL 9316647, at *8 (N.D. Cal. Aug. 10, 2023); *Gaudin v. Saxon Mortg. Servs., Inc.*, 417 F.R.D. 417, 430 (N.D. Cal. 2013) (finding common issues predominate under the unfair prong of the UCL based on "Defendant's uniform practices"); *Vaccarino v. Midland Nat. Life Ins. Co*., No. CV 11-5858 CAS MANX, 2013 WL 3200500, at *15-16 (C.D. Cal. June 17, 2013) (finding common issues predominate for common law fraud and the fraud prong of the UCL where "all class members here received uniform representations, and [Defendant] treated the proposed class the same").  Accordingly, the Court concludes that Plaintiffs have demonstrated common issues will predominate on the unfair prong of the UCL.

/ / /

21MD2992-GPC(MSB)

### 8.     Whether the Damages Models Satisfy Predominance

Plaintiffs bear the burden of providing a damages model showing that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.  The damages model "must measure only those damages attributable to" the plaintiff's theory of liability.  *Id.*  Plaintiffs "must be able to show that [their] damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus., Inc*., 716 F.3d 510, 514 (9th Cir. 2013).  While a plaintiff must present the likely method for determining class damages, "it is not necessary to show that [this] method will work with certainty at this time."  *Chavez v. Blue Sky Natural Beverage Co*., 268 F.R.D. 365, 379 (N.D. Cal. 2010).  Furthermore, Plaintiffs "need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability", that any "uncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages", and  "precise [data] is unnecessary for class certification" because "the question is only whether [plaintiff] has presented a workable method."  *See Lytle v. Nutramax Labs, Inc*., 114 F.4th 1011, 1025 (9th Cir. 2024) (citations omitted) (class treatment appropriate if damages could be calculated on a classwide basis, "even where such calculations have not yet been performed.")  Class certification should not be denied "even if plaintiffs may have to prove individualized damages at trial, a conclusion implicitly based on the determination that such individualized issues do not predominate over common ones."  *Vaquero v. Ashley Furniture Indus., Inc*., 824 F.3d 1150, 1155 (9th Cir. 2016); *see also Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 988 (9th Cir. 2015) ("differences in damage calculations do not defeat class certification" survives *Comcast*.)

### a.     Actual Damages for Credit Denial, Credit Rescission, Account Freeze and EMV Chip Classes

Plaintiffs seek actual damages under the EFTA, due process, breach of fiduciary duty, negligence, and breach of the implied covenant of good faith and fair dealing

claims.  (*See* Dkt. No. 406, TAMCC.)  They argue that damages can be calculated using
common methodologies using BANA's databases which contain detailed information
about the amount of each denied claim, rescinded credit, and frozen account, and the
length of time each class member was deprived of the benefits.  (Dkt. No. 324-1 at 49-
52.)  According to Plaintiffs, actual damages is calculated by adding the principal amount
of actual damages with consequential damages.

> **i.      Principal Amount of Actual Damages for the Credit Denial,
> Credit Rescission, Account Freeze and EMV Chip Classes**

Plaintiffs propose that the principal amount of actual damages for the Claim
Denial, Credit Rescission and Account Freeze Classes equal the total dollar amount of
each claim BANA denied, the total dollar amount of credit rescinded, and the total dollar
amount of frozen balances based on CFF-1 which are readily available using BANA's
documents.  (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 8, 12, 16, 32-
34, 37, 81, 83, 94-96, 98, 111, 119 (UNDER SEAL).)

On this calculation, BANA presents two arguments.  First, it objects asserting the
"total dollar value" of each claim fails to distinguish between fraudulent and valid claims
made by EDD cardholders.  (Dkt. No. 349 at 45.)  Second, even if those fraudulent
claims were accounted for ███████████████████, the putative class
members have already been paid the total dollar value, and as such, they would receive a
windfall.  (*Id.*)

BANA does not dispute that Plaintiffs' damages model stems from BANA's
actions that created the legal liability.  Instead, BANA challenges the determination of
who among the class member are entitled to actual damages which courts have repeatedly
held does not defeat predominance.  *See Vaquero*, 824 F.3d at 1155; *Lytle*, 114 F.4th at
1026-27 (holding "that individual questions of damages do not necessarily defeat class
certification" and "the possibility that an ascertainable portion of the class may be unable
to recover . . . does not in itself demonstrate class certification was improper.") (citing
*Olean*, 31 F.4th at 680-81 (holding that the possibility some class members suffered no

injury does not, by itself, defeat class certification); *Just Film*, 847 F.3d at 1120 ("To gain class certification, Plaintiffs need to be able to allege that their damages arise from a course of conduct that impacted the class. But they need not show that each members' damages from that conduct are identical.")).  Moreover, as discussed above, BANA has not demonstrated that individual questions will predominate on whether the putative class members' claims were fraudulent or not.  BANA's concern about uninjured class members can be resolved at the claims or damages phase.  *See Ruiz Torres*, 835 F.3d at 1137.

Second, BANA contends that even if Plaintiffs' actual damages model can be a valid measure of damages, the class members in the Class Denial, Credit Rescission and Account Freeze Classes were already paid the actual dollar value of their claims.  (Dkt. No. 349 at 45-46; *see* Dkt No. 350-2, Brys Decl., Ex. 1, Stango Expert Report ¶ 37 ("because consumers have been fully repaid for the principal amounts of damages, they are no longer economically damaged by those amounts").)  Plaintiffs are not in disagreement with BANA that EDD cardholders are not entitled to a windfall or double recovery of actual damages and is acknowledged in Mr. Regan's expert report explaining that any overlapping recoveries will be de-duplicated.[27]  (Dkt.  No. 378-7, Chan Suppl. Decl., Ex. 162, Regan Rebuttal Report ¶ 15; *see also* Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶ 62 n. 70; ¶ 104, n. 133.)

While not expressly argued or analyzed, BANA seems to suggest that because ███████████████████████████████████████████████████████████████, they are no longer economically damaged and are

---

[27] Mr. Regan explains that he calculated damages on an independent, standalone basis for each claim so that damages could be easily calculated if a claim were to be dismissed or if damages were to be awarded for only one of the proposed classes.  (Dkt. No. 378-7, Chan Suppl. Decl., Ex. 162, Regan Rebuttal Report ¶ 15 ("Therefore, if an award is made, and depending on the nature of the award, it may be appropriate to disaggregate the damage amounts"); *see also* Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶ 62 n. 70 ("if damages are awarded to the Claim Denial Class and the Account Freeze Class, it is appropriate to disaggregate the damages amount"); *id.* ¶ 104, n. 133.)

21MD2992-GPC(MSB)

1   not entitled to any additional damages without a showing of further harm.  (Dkt. No 349

2   at 45-46; *see also* Dkt No. 350-2, Brys Decl., Ex. 1, Stango Expert Report ¶ 36 ("Mr.

3   Regan's damages methodology fails to account for funds that BANA has already paid to

4   proposed class members, and Mr. Regan fails to investigate whether any proposed class

5   member remains harmed after receiving those payments from BANA.").)  According to

6   BANA's damages expert, Mr. Victor Stango reports that ████████████████████████

7   ██████████████ representing the total dollar amount Mr. Regan claims are owed to the

8   Claim Denial Class, (Dkt. No. 382-2, Brys Decl., Ex. 1, Stango Expert Report ¶ 37);

9   therefore, because the class members have already been fully compensated for the dollar

10  amounts denied by BANA, they have no damages.  (*Id.*)  In reply, as to treble damages,

11  Plaintiffs respond that damages must be trebled before any offset is applied.  (Dkt. No.

12  392 at 26.)

13          The question raised by BANA is whether Plaintiffs are entitled to an offset from

14  the principal amount of actual damages or from the total amount of total damages which

15  may include treble or punitive damages.  An "offset should be subtracted from the total

16  amount of damages *after* trebling.  In actions like this where treble damages are available,

17  the plaintiff is entitled to full satisfaction of the claim for harm done. The amount

18  awarded as damages is then trebled as punishment to the defendant.  If the offset were

19  subtracted from the initial damage award, the class members would be denied the full

20  satisfaction of their claim." *Van Vranken v. Atlantic Richfield Co.*, 699 F. Supp. 1420,

21  1428 (N.D. Cal. 1988) (emphasis in original); *see e.g., McCall v. Four Star Music Co.*, 51

22  Cal. App. 4th 1394, 1399 (1996) (a "plaintiff is only entitled to a single recovery of *full*

23  compensatory damages for a single injury") (emphasis in original); *Uthe Tech. Corp. v.

24  Aetrium, Inc.*, 808 F.3d 755, 762 (9th Cir. 2015) (the plaintiff was not barred from

25  pursuing treble damages against the defendant as long as there was an offset for the sums

26  paid under the foreign arbitral award and pursuing treble damages does not amount to

27  double recover but "full satisfaction" to which the plaintiff were entitled).

28

Similarly, as to punitive damages, where "a claimant's award of compensatory damages was completely offset, he could still receive punitive damages." *Colaco v. Cavotec SA*, 25 Cal. App. 5th 1172, 1205 (2018) (rejecting argument that because the offset wipes out liability for compensatory damages, the punitive damages award must be reversed because the satisfaction of a compensatory damage award by offset does not mean those damages were never awarded, it means the award was effectively paid).

To the extent that Plaintiffs demonstrate liability and have shown they are entitled to treble damages and punitive damages, they will be entitled to those damages ████████ ██████████████████████████████████████████████. The calculation of the offset to damages already paid by BANA can be determined at trial or after. *See Peters v. Equifax Info. Servs. LLC*, Case No. EDCV 12–1837–TJH (OPx), 2013 WL 12169355, at *3 (C.D. Cal. 2013) (offset issues, if any, could be handled post-trial by the trial judge if necessary); *Cheetham v. Specialized Loan Servicing LLC*, CASE NO. 2:20-CV-762-JCC-DWC, 2021 WL 2137823, at *2 (W.D. Wash. May 26, 2021) ("[E]ven if the 'one satisfaction rule' does apply, offset issues can be resolved post-trial."). Therefore, the Court concludes that Plaintiffs have proposed a valid model for actual damages.

### ii    Consequential Damages for the Credit Denial, Credit Rescission, Account Freeze and EMV Chip Classes

Plaintiffs' damages expert, Mr. Regan, proposes two methodologies to determine consequential damages for the Claim Denial, Credit Rescission and Account Freeze Classes. (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 45-60, 85-89; 100-07, 120.) Plaintiffs propose that consequential damages measure the economic value of the time class members were deprived of the use of their funds (lost "time value of money") or loss of access to the principal amount due to CFF-1. (*Id*. ¶¶ 8, 39, 44, 52.) BANA argues that calculating each class members' lost time value of money will require individual inquiries rather than a method to assess classwide damages.

21MD2992-GPC(MSB)

The Ninth Circuit has recognized injury in the form of "the lost time value of money" and an award of interest as a way of measuring and remedying that injury. *Van v. LLR Inc.*, 962 F.3d 1160, 1165 (9th Cir. 2020) ("*Van I*"); *see also W. Va. v. United States*, 479 U.S. 305, 310-11 n.2 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress.").[28]

According to Mr. Regan, Methodology 1 is multiplying the principal amount of actual damages (the total dollar amount of each claim denied, of credit rescinded and total dollar amount when accounts were frozen) with a compound interest rate that reflects the "time value of money . . . based on the total length of time the class members were denied access to those funds." (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶ 45.) Mr. Regan applied two different interest rates. First, he applied a 10% interest rate, the rate applied to judgments in California. (*Id.* ¶¶ 48, 49.) But he asserts the 10% interest rate understates the costs the cardholder would have incurred in the form of increased borrowing through use of their credit cards, with average APRs between 17.4% to 23.5% during that time period until the amounts denied was credited. (*Id.*) Cardholders also incurred costs based on their inability to pay down existing debt. Mr. Regan also applied a 20% interest rate to reflect the representative APR for the lost time value of money. (*Id.* ¶ 51.)

BANA does not dispute Methodology 1, only the interest rate used; however, which interest rates should be applied is an issue for the factfinder, not a determination to be made at class certification. Therefore, Methodology 1, Plaintiffs' damages model for assessing consequential damages for lost time value of money measures damages

---

[28] BANA relies on *Park v. Webloyalty.com, Inc.*, Case No.: 12cv1380-LAB (LL), 2019 WL 1227062, at *3 (S.D. Cal. Mar. 15, 2019) arguing Plaintiffs lack standing because they have already been refunded, (Dkt. No. 349 at 46), but that case pre-dates the ruling in *Van* which held that injury due to the "lost time value of money" confers Article III standing. *Van I*, 962 F.3d at 1165.

attributable to their theory of liability and can be calculated classwide.  *See Van*, 962 F.3d at 1161, 1164 (noting district court used an interest rate of 4.35% per year).

Methodology 2 is an alternative method to calculate financial harms experienced by cardholders impacted by BANA's use of CFF-1 and to assess the financial cost of borrowing substitute funds, (*see* Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 54-57), as well as late or overdraft fees due to BANA's denial of their claims and their inability to access funds, (*id.* ¶¶ 58-60).  Mr. Regan asserts ███████████████
███████████████.  (*Id.* ¶ 53 & n.56.)

In rebuttal, Mr. Stango challenges Methodology 2 arguing that because ███████
██████████████████████████████████████████
██████████████████████.  (Dkt No. 350-2, Brys Decl., Ex. 1, Stango Expert Report ¶ 39.)  Mr. Stango also opines that consumer heterogeneity cannot measure economic harm on a class-wide basis due to the varying economic circumstances of each cardholder where the costs associated with obtaining substitute funds and credit card late fees will depend on the financial circumstance of each EDD cardholder.  (*Id.* ¶¶ 45-77.)

First, the Court agrees that the Remediation Plan does not support a damages model that satisfies *Comcast*.  While the Remediation Plan ███████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████ (Dkt. No. 367-6, Chan Decl., Ex. 74 at III.C.4 at 13-14 (UNDER SEAL).)

Additionally, the Court agrees with BANA that Mr. Regan's assumptions about class members in arriving at Methodology 2 may not be true classwide as he has not provided any evidence in support.  In explaining this methodology, Mr. Regan stated that EDD cardholders "tended to earn less than the median wage (i.e., were less likely to have available savings to bridge the time until re-employment)[]", (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶ 39); "impacted cardholders would likely have

21MD2992-GPC(MSB)

1    needed alternative funds to mitigate the inability to access their funds" and "[t]he most

2    likely source of credit for these consumers was increased utilization of credit cards", (*id.*

3    ¶ 54); and as to late fees, he stated "it is likely that Claim Denial class members relied on

4    their EDD funds to make timely payments and avoid late fees . . . As a result, it is likely

5    that the impacted cardholders incurred late fees during the time, (*id.* ¶ 58). Based on

6    these statements, Mr. Regan conducts an analysis of the cost of the inability to access

7    impacted funds and the cost of late or overdraft fees based on the "typical consumer".

8    (*Id.* ¶¶ 53-60.) Mr. Regan has not supported Methodology 2 with evidence showing that

9    these assumptions are true as to most or even any of the EDD cardholders' experience.

10    Therefore, as to Methodology 2, the Court concludes that Plaintiffs have not

11    demonstrates that this method measures damages across the entire class and that they

12    stem from BANA's actions that created the legal liability. *See Comcast*, 569 U.S. at 35.

### iii.    Principal Amount of Actual Damages for Customer Service Class

15    As to the Customer Service Class, Plaintiffs seek actual damages in the form of

16    "compensation for the value of class members' lost time spent on hold with the Bank's

17    claims call center that was greater than the reasonable wait-on-hold time by industry

18    standards." (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 113.)

19    According to Mr. Regan's calculations, damages can be calculated from BANA's records

20    showing ███████████████████████████████████████████████████████

21    ████████████████████████████████████████████████████████████████

22    █████████████████. (*Id.* ¶ 114; *see also* Dkt. No.

23    393-1, Chan Decl., Ex. 3, Minnucci Expert Report ¶¶ 12, 94-100 (UNDER SEAL).)

24    BANA first argues that the customer service theory of liability is legally invalid

25    because damages are not recoverable for lost time relying on *Kleef v. Goodman Mgf. Co.,*

26    *L.P.*, CASE NO. 4:15CV00176 BSM, 2015 WL 4512200, at *3 (E.D. Ark. July 24,

27    2015). In *Kleef,* the plaintiff purchased air condition units and HVAC equipment that he

28    alleged were defective. *Id.* at *1. He sought damages, *inter alia*, for the lost time he

spent coordinating and waiting for repairs which the court rejected explaining consumers could bring a lawsuit every time they were on hold with a company's customer service line while they waited to resolve a problem. *Id.* at *3. "Thus, to say that damages for lost time are recoverable in a products liability action makes no sense, and it is not commercially practicable." *Id.*

However, in this case, the Customer Service Class seeks relief under negligence and breach of the implied covenant of good faith and fair dealing which provide for liability and damages distinct from a products liability case. *See e.g., Conte v. Wyeth, Inc.*, 168 Cal. App. 4th 89, 101 (2008) ("Negligence and strict products liability are separate and distinct bases for liability that do not automatically collapse into each other . . . ."). The Customer Service Class alleges that BANA breached a duty to provide effective customer service and to process and investigate claims in a timely manner and the reduced call center staffing impaired their rights under the EDD Debit Card Account Agreement. Further, the damages sought in this case is not just time lost but an excessive amount of lost time. *See Stasi v. Immediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 916-18 (S.D. Cal. 2020) (lost time spent making sure she did not become further victimized due to data breach of medial information stated plausible lost time damages for negligence); *Dieffenbach v. Barnes & Nobles, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018) (plaintiffs suffered injuries "because the data theft may have led them to pay money for credit-monitoring services, because unauthorized withdrawals from their accounts cause a loss (the time value of money) even when banks later restore the principal, and because the value of one's own time needed to set things straight is a loss from an opportunity-cost perspective."); *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig*, 613 F. Supp. 3d 1284, 1296 (S.D. Cal 2020) (increased time spent monitoring one's credit and other tasks associated with responding to a data breach have been found by others courts to be specific, concrete, and non-speculative).

Here, Mr. Regan asserts that actual damages for the Customer Service Class will measure the "value of class members' lost time spent on hold with the Bank's Claims call

1  center that was greater than the reasonable wait-on-hold time by industry standards."

2  (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶ 113.)  He relied on Plaintiffs'

3  Claims call center expert, Mr. Jay Minnucci, finding that the ASA of the Bank's Claims

4  call center yielded an average excess hold time of ████ minutes per call.  (*Id.* ¶ 114;

5  (Dkt. No. 393-1, Chan Decl., Ex. 3, Minnucci Expert Report ¶ 12 (UNDER SEAL).)

6  BANA's records show ██████████████████████████████████████████

7  ██████████████.  Therefore, Regan proposed that ████████████████████

8  ██████████████████████████████████████████████████████████

9  ██████████████████████████████████████████ is a method to

10  calculate the total value of class members' lost time.  (Dkt. No. 386-4, Chan Decl., Ex. 4,

11  Regan Expert Report ¶ 114.)

12       Next, BANA challenges the equation proposed by Mr. Regan to use the "average

13  excess" time multiplied by the "applicable minimum wage—or other reasonable metric"

14  arguing it does not represent the "actual" value of "lost time" to any individual with

15  varying backgrounds and fails to define "other reasonable metric".  (Dkt. No. 349 at 49;

16  *see also* Dkt No. 350-2, Brys Decl., Ex. 1, Stango Expert Report ¶¶ 97-105.)  As

17  discussed above on negligence, the Court concluded that Plaintiffs' use of statistical

18  evidence, the average excess hold time, was permissible at this stage.  Next, Mr. Regan's

19  proposal to use the applicable minimum wage provides a metric to calculate the actual

20  damages for the Customer Service Class which can be applied classwide.  However,

21  "other reasonable metric" is not currently defined but "precise [data] is unnecessary for

22  class certification" because "the question is only whether [plaintiff] has presented a

23  workable method."  *See Lambert v. Nutraceutical Corp.,* 870 F.3d 1170, 1183 (9th Cir.

24  2017), *rev'd and remanded on other grounds by* 586 U.S. 188 (2019) ("Although

25  Lambert did not present evidence of the actual average retail price, he did present

26  evidence of both unit sales and the suggested retail price over the relevant time period.

27  There may well be additional evidence that Lambert could present at trial to support an

28

average retail price.").   The Court concludes that at this stage, predominance has been satisfied as to actual damages on the issues raised by the Customer Service Class.

### b.    Treble and Statutory Damages

Plaintiffs argue common questions predominate on whether they are entitled to treble damages for the Claim Denial and Credit Rescission Classes under the EFTA which can be calculated by simple arithmetic.  (Dkt. No. 324-1 at 52; *see* Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 76, 90.)  As to statutory damages, Plaintiffs argue that common issue predominate for statutory damages on behalf of the Claim Denial and Credit Rescission classes under the EFTA and the EMV Chip class under the CCPA.  (*Id*.)  The EFTA provides for statutory damages of up to $500,000 in a class action and the CCPA provides for damages of $100 to $750 per violation per consumer, or actual damages, whichever is greater.  Cal. Civ. Code § 1798.150(a).  Both are formulaic and can be calculated using BANA's records.  (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 77, 91, 121.)   BANA does not dispute that treble and statutory damages are susceptible to being measured across the entire class.  Thus, because Plaintiffs' treble damages and statutory damages methodology measure damages attributable to BANA's conduct and can be formulaically calculated using Defendant's records, predominance has been met.

### c.    Punitive Damages

Plaintiffs maintain they are entitled to punitive damages for their due process, breach of fiduciary duty and breach of implied covenant of good faith and fair dealing claims.  (Dkt. No. 324-1 at 53 & n.23.)  Defendant argues that entitlement to punitive damages turns on class members' actual damages so BANA is entitled to individualized determinations of each putative class members' eligibility.  (Dkt. No. 349 at 41-42.)

Punitive damages may be awarded under § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Punitive damages are also allowable for the breach of fiduciary duty and

breach of the implied covenant of good faith and fair dealing.  *See* Cal. Civ. Code § 3294(a) ("In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.").

Because the Court concluded that actual damages can be assessed on a classwide basis, punitive damages can also be calculated on a classwide basis.  Moreover, punitive damages typically can be assessed classwide because punitive damages focuses on the defendant's conduct and state of mind and not any individual conduct of class members. *See Ellis v. Costco Wholesale Corp*., 285 F.R.D. 492, 543 (N.D. Cal. 2012) (citing *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 987 (9th Cir. 2011) (punitive damages claims "do not require an individual determination"); *Doe v. Mindgeek USA Inc.*, 702 F. Supp. 3d 937, 951 (C.D. Cal. 2023) (punitive damages do not bar  predominance because "[t]he availability of punitive damages here 'hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole.'") (quoting *Opperman v. Path, Inc*., Case No. 13-cv-00453-JST, 2016 WL 3844326, at *16 (N.D. Cal. July 15, 2016)).  BANA has not shown that the determination on punitive damages will defeat predominance.

### d.    Restitution under UCL

Plaintiffs pursue restitution under the UCL's unfair prong as an alternative to their legal claims for damages.  (Dkt. No. 324-1 at 54.)  BANA does not challenge the alternative equitable damages of restitution under the UCL.  (*See* Dkt. No. 349.)

Plaintiffs seek restitution in the form of "(1) money in which class members have a vested ownership interest but which the Bank wrongfully withheld from class members (i.e., the amount of the denied claims, rescinded credits, and frozen funds), . . . (2) prejudgment interest of 7% per annum for the periods the Bank wrongfully withheld from class members the money attributable to denied claims, rescinded credits, and frozen accounts . . . and (3) restitutionary disgorgement of the float revenue the Bank earned on

21MD2992-GPC(MSB)

wrongfully withheld funds." (Dkt. No. 324-1 at 54.) They claim that calculations can be based on BANA's records.

Restitution is "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1149 (2003) (quotation marks and citation omitted). The purpose of restitution "is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id.*

The Court concludes that Plaintiffs have shown that restitution based on BANA's alleged liability can be calculated on a classwide basis using Defendant's records. (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 37 78-79, 83, 98.)

### e. Disgorgement

Plaintiffs seek disgorgement of BANA's unjustly earned profits as to its breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing and negligence causes of action. (Dkt. No. 324-1 at 55.) According to Plaintiffs, BANA earned profits on funds on deposit and amounts it wrongfully withheld from Plaintiffs and putative class members as well as profits in the form of avoided costs by intentionally understaffing its Claim call centers and issuing debit cards without EMV chips. (*Id*.) Calculation of avoided costs is readily ascertainable from the Bank's own records and does not depend on any individualized inquiries. (*See* Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 79, 92, 109, 116, 122; Dkt. No. 393-1, Chan Decl., Ex. 3 (Minnucci Rep.) ¶¶ 94-100 (UNDER SEAL).) BANA does not dispute Plaintiffs' damages model for disgorgement. (*See* Dkt. No. 349.) Accordingly, the Court concludes that Plaintiffs' disgorgement damages model satisfies predominance.

### 9. Superiority Under Rule 23(b)(3)

Under Rule 23(b)(3), the plaintiff must also demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3).  Superiority requires a consideration of "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(a)-(d); *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180 (9th Cir. 2001).

Plaintiffs maintain that the class action is superior to proceeding individually because BANA engaged in uniform policies and practices discussed above and classwide adjudication will achieve "economies of time, effort and expense" and promote "uniformity of decisions as to persons similarly situated."  (Dkt. No. 324-1 at 55.)  Specifically, they contend that class members' interest in pursuing and controlling their own litigation is reduced where the questions of law and fact are common.  (*Id*. at 56.)  Second, they have identified more than 100,000 EDD cardholders impacted by BANA's uniform policies and the only related litigation are the Individual Plaintiffs who have filed cases in this MDL and these cases are currently stayed pending the Class Plaintiffs' claims.  (*Id*.)  Third, the high cost of pursuing claims against BANA outweighs any potential recovery in an individual case.  (*Id*.)  Finally, Plaintiffs assert the likely difficulties in maintaining a class action is not outweighed by the benefits of considering common issues in one action.  (*Id*. at 57.)  BANA solely disputes the second factor arguing that this action is not superior to the Consent Decrees with the CFBP and OCC because ███████████████████████████ under the Remediation Plan.  (Dkt. No. 349 at 52-53.)

The existence of a prior consent decree is relevant to the superiority question. *Doninger v. Pac. Nw. Bell, Inc*., 564 F.2d 1304, 1314 (9th Cir. 1977) (citing *Kamm v. Cal. City Dev. Co*., 509 F.2d 205 (9th Cir. 1975)).  In *Doninger,* the court noted the consent decree was similar "in scope" as the class action litigation and "[p]rior similar litigation is often the critical factor in denying (b)(3) certification."  *Id*. at 1314.  In

*Doninger*, the plaintiffs were 31 females suing the defendant for sex discrimination in the workplace under Title VII and the Equal Pay Act seeking injunctive relief and backpay awards as remedies. *Id*. at 1306. The defendant had entered into a consent decree with the Equal Employment Opportunity Commission ("EEOC") in the United States District Court for the Eastern District of Pennsylvania and resolved issues against AT&T and 22 operating entities arising from alleged violations of the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, and the Equal Employment Opportunity Act. *Id.* at 1306-07. The consent decree provided for back payments and directed "implementation of affirmative action programs to prevent discrimination in employment, including setting goals and timetables for the programs covering transfers, promotions, layoffs, recalls, employee information, testing, promotion pay, hiring of female college graduates directly into management, and pay rate adjustments." *Id.* at 1306-07. Individuals who opted to avail themselves to the remedies under the consent decree had to sign a waiver, release, and covenant not to sue defendants regarding any claims for violations of any federal or state fair employment practice law or regulation. *Id.* at 1307. At class certification, the defendant argued that class treatment was not appropriate because many individuals had accepted the benefits available, and waived their right to bring suit, and would be precluded from seeking certain remedies sought by individuals. *Id.* The Ninth Circuit held that the district court did not abuse its discretion in denying class certification based on superiority because the consent decree was "similar in scope" and "the effect of the consent decree would be drastically to reduce and fragment the potential class." *Id.* at 1314.

Similarly, in *Kamm,* the district court held that the class action was "not superior to other available methods for the fair and efficient adjudication of the controversy . . . especially in light of the proceedings already brought by the California Attorney General and Real Estate Commissioner . . . the relationship of these proceedings to the facts and posture of this particular case." *Kamm*, 509 F.2d at 209. In *Kamm*, per the settlement between the Attorney General and Real Estate Commissioner and the defendant, those

21MD2992-GPC(MSB)

that accepted the settlement offer also executed a release "from instituting action against the defendants or otherwise seeking recovery for any alleged damage." *Id.* at 208. Therefore, the Ninth Circuit held the district court did not err in dismissing the class action based on superiority. *Id.* at 213.

In contrast, in *B.P. v. Balwani*, No. 20-15974, No. 20-15976, 2021 WL 4077008, at *2 (9th Cir. Sept. 8, 2021), the Ninth Circuit held that the district court did not abuse its discretion in concluding that superiority had not been defeated because it concluded "that the Arizona Consent Decree 'did not comprehend the full scope of damages that might be available,' and that it did not include a battery or medical battery claim.'" *Id.* at *2. The court also noted that Plaintiffs' California statutory claims were also unaffected by the Arizona Consent Decree." *Id.*

Similarly, in this case, the CFBP and OCC Consent Decrees, while they provided compensatory damages to EDD cardholders, they carved out a provision preserving class members' rights to pursue additional remedies. (*See e.g.,* Dkt. No. 324-75, Chan Decl., Ex. 72, CFBP Consent Decree ¶ 98.) Further, unlike the plaintiffs in *Doninger* and *Kamm,* EDD cardholders subject to the Remediation Plan ███████████████████
██████████████████████. Therefore, BANA's argument on superiority is not convincing and not legally supported. Accordingly, the Court concludes Plaintiffs have demonstrated that this class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).

## Conclusion

Based on the reasoning above, the Court GRANTS Plaintiffs' motion for class certification and CERTIFIES the following five classes:

1    **Claim Denial Class**: All Bank of America EDD cardholders who notified the Bank that an unauthorized transaction had occurred on their Bank of America EDD debit card account ("Claim") at an automated teller machine ("ATM"), and whose Claim the Bank denied or closed at any time

96

from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's Claim Fraud Filter ("CFF").

2      **Credit Rescission Class**: All Bank of America EDD cardholders who received permanent credit from the Bank in connection with their Claim, which credit the Bank rescinded at any time from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's CFF.

3      **Account Freeze Class**: All Bank of America EDD cardholders whose EDD debit card account ("Account") the Bank froze at any time from September 28, 2020 through March 17, 2021, based solely on Indicator 1 of the Bank's CFF, and whose Account the Bank (i) subsequently unfroze, or (ii) subsequently converted from frozen to blocked status on or after March 18, 2021 and then unblocked.

4      **Customer Service Class:** All members of the Claim Denial class and/or the Credit Rescission class who telephoned the Bank's customer service telephone number for its EDD cardholders at any time from September 13, 2020 through November 21, 2020, and whose telephone call was routed to the Bank's Claims call center.

5      **EMV Chip Class**: All members of the Claim Denial class and/or Credit Rescission class whose EDD debit card did not include an EMV chip prior to June 9, 2021.  Excluded are EDD cardholders who reported not having the card in their possession at the time of the unauthorized transaction or who never received their card, including those who reported a lost or stolen card.

Excluded from each class is any person whom the Bank has determined, pursuant to its Remediation Plan with the United States Consumer Financial Protection Bureau (CFPB) and Office of the Comptroller of the Currency (OCC), "(i) has been disqualified by the [S]tate [of California] from Program[29] eligibility; (ii) has previously engaged in fraudulent Program conduct, such as submission of fraudulent claims or other abuses of the claims process; or (iii) has had their card frozen due to legal order processes, as a result of Internal/Vendor fraud investigations, or by Global Financial Crimes Compliance."  Also excluded from each class is any person whose Claim or Account the Bank closed, in whole or in part, because the State of California requested the Bank to close that person's Claim or Account.

---

[29] Program refers to Defendant's "Unemployment Benefits Prepaid Card Program."  Dkt. No. 367-6, Chan Decl., Ex. 74 at 3 (UNDER SEAL).)

The Court also appoints Plaintiffs Koole, McClure, Moon, Oosthuizen, Rivera, Willrich, and Yuan as class representatives for the Claim Denial class; the appointment of Plaintiffs Chong and Moore as class representatives for the Credit Rescission class; the appointment of Plaintiffs Chong, Koole, McClure, Moon, Moore, Rivera, and Yuan as class representatives for the Account Freeze class; the appointment of Plaintiffs Chong, Moon, Moore, Oosthuizen, Willrich, and Yuan as class representatives for the Customer Service class; and the appointment of Plaintiffs Chong, Koole, McClure, Moon, Moore, Oosthuizen, Rivera, Willrich, and Yuan as class representatives for the EMV Chip class. Finally, the Court appoints Cotchett Pitre & McCarthy LLP and Altshuler Berzon LLP to serve a co-lead class counsel.

Rule 23 provides that for any class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The parties shall meet and confer regarding the form of a proposed notice pursuant to Rule 23(c)(2)(B) and shall submit a stipulation or a joint update describing the parties' positions within thirty days of this Order.

IT IS SO ORDERED.

Dated: June 16, 2025

Hon. Gonzalo P. Curiel
United States District Judge

21MD2992-GPC(MSB)