JAMES W. MCGARRY (*pro hac vice*)
*JMcGarry@goodwinlaw.com*
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000
Fax: +1 617 523 1231

SABRINA M. ROSE-SMITH (*pro hac vice*)
*SRoseSmith@goodwinlaw.com*
MATTHEW L. RIFFEE (*pro hac vice*)
*MRiffee@goodwinlaw.com*
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: +1 202 346 4000
Fax: +1 202 346 4444

Attorneys for Defendant
**BANK OF AMERICA, N.A.**

[*ADDITIONAL COUNSEL LISTED IN SIGNATURE BLOCK*]

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

## SAN DIEGO DIVISION

| | |
|---|---|
| IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION | Case No. 21-MD-02992-GPC-MSB<br><br>**DEFENDANT BANK OF AMERICA, N.A.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE PURPORTED EXPERT OPINIONS OF CHLOE N. EAST**<br><br>Date:     April 17, 2026<br>Time:    1:30 p.m.<br>Ctrm:   12A – 12th Floor<br>Judge:  Hon. Gonzalo P. Curiel<br><br>ORAL ARGUMENT REQUESTED<br><br>FILED PROVISIONALLY UNDER SEAL PURSUANT TO STIPULATED PROTECTIVE ORDER |

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

BANA'S MEM. ISO MOT. TO EXCLUDE EAST          CASE NO. 21-MD-02992-GPC-MSB

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

I.     Plaintiffs' Claims and Damages Theories.....................................................2

II.    The East Report ............................................................................................4

III.   The McCrary Rebuttal...................................................................................5

STANDARD OF LAW ..........................................................................................................6

ARGUMENT ..........................................................................................................................7

I.     East's Use of a Credit Card Interest Rate Is Unreliable and
Unsupported. ..................................................................................................8

CONCLUSION ....................................................................................................................14

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

BANA'S MEM. ISO MOT. TO EXCLUDE EAST          CASE NO. 21-MD-02992-GPC-MSB

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayers v. Robinson*,
887 F. Supp. 1049 (N.D. Ill. 1995).........................................................................9

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) ......................................................11

*In re Blackbaud, Inc. Cust. Data Breach Litig.*,
2024 WL 2155221 (D.S.C. May 14, 2024) ...........................................................12

*Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*,
923 F. Supp. 2d 1245 (S.D. Cal. 2013) (Curiel, J.).........................................7, 12

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...............................................................................................11

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...................................................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ............................................................................................6, 13

*Daubert v. Merrell Dow Pharms, Inc.* (*Daubert II*),
43 F.3d 1311 (9th Cir. 1995)...................................................................................7

*Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2022)...................................................................................7

*United States ex rel. Fitzer v. Allergan, Inc.*,
2024 WL 1156310 (D. Md. Mar. 18, 2024)............................................................8

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .........................................................................................10, 13

*Guardant Health, Inc. v. Found. Med., Inc.*,
2020 WL 2461551 (D. Del. May 7, 2020) ..............................................................9

*Gutierrez v. Girardi*,
194 Cal. App. 4th 925 (2011)...................................................................................7

*Kewazinga Corp. v. Google LLC*,
2024 WL 4894840 (S.D.N.Y. Oct. 17, 2024) .......................................................13

*Kolcraft Enters. v. Chicco USA, Inc.*,
2018 WL 10772693 (N.D. Ill. July 16, 2018) ........................................................9

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

ii

*Munoz v. JLO Automotive, Inc.*,
  2020 WL 6607789 (D. Conn. Nov. 12, 2020)......................................................14

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
  165 F. Supp. 3d 937 (S.D. Cal. 2016) ..................................................................7

*Orshan v. Apple Inc.*,
  2024 WL 4353034 (N.D. Cal. Sept. 30, 2024).....................................................8

*Sabicer v. Ford Motor Co.*,
  362 F. Supp. 3d 837 (C.D. Cal. 2019) ..................................................................7

*Stephens v. Union Pac. R. Co.*,
  935 F.3d 852 (9th Cir. 2019) ...............................................................................11

*Stokes v. John Deere Seeding Grp.*,
  2014 WL 675820 (C.D. Ill. Feb. 21, 2014) ..........................................................9

*Unwired Planet, LLC v. Apple Inc.*,
  2017 WL 589195 (N.D. Cal. Feb. 14, 2017).....................................................8, 9

*Van v. LLR, Inc.*,
  962 F.3d 1160 (9th Cir. 2020) .............................................................................14

**Statutes**

15 U.S.C. § 1693m .....................................................................................................7

**Rules**

FED. R. EVID. 702........................................................................................................7

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

Plaintiffs cannot survive summary judgment without carrying the burden of producing evidence of actual damages for themselves and their classes. Economist Chloe N. East is one of the purported "experts" on whom they rely for this purpose. Plaintiffs and their classes consist of prepaid debit cardholders who temporarily lost access to a portion of their unemployment (UI) benefits payments when Bank of America (BANA) denied their disputes of allegedly unauthorized charges. Those charges have all since been credited back to them (███████), so their claims for actual damages rest on claims of being injured by the delay.

East opines that these alleged damages can be calculated based on a 20.8% credit card interest rate applied to the period of time class members lacked access to portions of their UI benefits. She does not contend that any individual Plaintiffs or any class members *actually* borrowed money on credit cards and paid 20.8% interest. Instead, she contends that the credit card interest rate is an "appropriate *minimum bound*" for calculating consequential damages in the aggregate. As her analysis makes clear, East has no idea what actual damages were suffered by the representative Plaintiffs or by any other class member, nor does she care. She instead proposes the credit card interest rate as a "conservative estimate of the aggregate costs faced by the class while waiting for their UI benefits." But an expert's duty is to produce a reliable and accurate analysis, not a "conservative" one.

East's purported damages analysis fails the *Daubert* criteria for relevance and reliability for several reasons. The analysis does not even attempt to calculate Plaintiffs' actual damages, or account for the actual real world behavior of the class members. Indeed, ████████████████████████████████████████ ████████████████████████████ East disregards this, and instead relies on assumptions—not evidence—about how class members would have behaved based on academic literature addressing an altogether different context: patterns of behavior in circumstances where UI recipients had their benefits expire or get fully cut off. But here, the class members' UI benefits did not expire or get fully cut off. They

merely lacked access to portions of their funds, *temporarily*—in some cases in amounts less than ███ and/or for time periods of ███████████. Research findings that address a total and permanent deprivation of UI benefits are therefore insufficiently tethered to the facts of this case to inform the issues at hand. But this irrelevant material is the sole asserted basis for East's opinions.

Plaintiffs carry the burden of producing evidence of their damages individually, and producing evidence that the same evidence applies classwide. As East's analysis does neither, it should be excluded from the record.

## **BACKGROUND**

## **I.    Plaintiffs' Claims and Damages Theories**

On June 16, 2025, this Court certified five classes of California UI benefits recipients alleging that they contacted BANA claiming unauthorized use of their benefits prepaid debit card, but had those claims denied because BANA's records showed that the disputed transactions were made in-person at ATMs requiring the cardholder's physical card and a claim that their private PIN passcode was somehow compromised. ECF 494 at 96–97. The relevant time period runs about seven-and-a-half months, from September 28, 2020, when BANA implemented the challenged fraud-detection process ("CFF-1"), to June 8, 2021, when BANA ceased using CFF-1 to deny claims. *See id.*

Separately, in July 2022, BANA entered into a settlement agreement with the Office of the Comptroller of the Currency (OCC) and the Consumer Financial Protection Bureau (CFPB) that included a framework providing full compensation for cardholders whose claims might have been inaccurately decisioned by the filter. *See generally* HX[1] 28; HX 29 . ████████████████████████████

████████████████████████████████ *See* HX 30

at 77:7–17 (testifying that BANA "███████████████████████

████████████████████████████████

---

[1] Exhibits to the Delcaration of Lindsay E. Hoyle shall be referred to as "HX."

[redacted]). Following that settlement agreement, [redacted]

[redacted]

[redacted]

[redacted] HX 31 at 4 n.16; ECF 350-8 ¶¶ 9–14. In addition to paying cardholders the full value of their disputed claims, [redacted]

[redacted]

[redacted]

[redacted] HX 31 at 5–13. BANA used [redacted] [redacted] even though it [redacted]

[redacted] and determined such a rate to be [redacted]

[redacted] *Id*. at 7, 9, 13. The Remediation Plan did not attempt to [redacted]

[redacted]., at 12, but cardholders were [redacted]

[redacted] *Id*. [redacted]

[redacted] *See* ECF 350-9 ¶¶ 14–15.

Plaintiffs assert that everyone who [redacted]

[redacted]

[redacted] But the Court determined that "the Remediation Plan does not support a damages model" that carries Plaintiffs' burden because [redacted]

[redacted] ECF 494 at 87. In particular, the Court rejected a proposed method of basing damage calculations on assumptions that class members "would likely have needed alternative funds" [redacted] and would "most likely" have used credit card borrowing to obtain them, on the ground that Plaintiffs lacked "evidence showing that these assumptions are true as to most or even any of the EDD cardholders." *Id*. at 87–88.

East makes those same assumptions, and also lacks evidence for them.

## II.     The East Report

East claims expertise in the field of "U.S. safety net and social insurance programs including Unemployment Insurance" and teaches at the University of Colorado. HX 32 ¶¶ 1, 4. Plaintiffs proffer her as a damages expert, to opine on "the vulnerability of UI recipients and the importance of UI benefits," "the impacts of denying UI beneficiaries access to their UI funds," and an "appropriate compound interest rate that can be used under a common methodology to calculate the consequential damages" to class members resulting from their temporary inability to access those benefits. *Id*. ¶ 5. East explained her approach as follows:

> I review research and conduct my own analysis to come up with the 20.8 credit card interest rate as appropriate, if anything, [an] underestimate of the cost faced by class members. And because my report is focused on providing this interest rate that will lead to an aggregate damages calculation, the important thing is that the 20.8 percent is representative of a larger—large number of class members, and so there might be some class members that have slightly lower interest rates that they face or slightly higher interest rates that they face. But when applying this average measure to the entire class and aggregating up, it will be just as good as taking those slightly lower or slightly higher and aggregating all of those up. It will lead to the same estimate.

HX 33 at 176:25–177:15. Thus the "appropriate *minimum bound*" that East proposes is not intended to measure the actual damages sustained by the class or anyone in it, but instead to guess at an average that might apply to some unspecified portion of the class.

East's chosen interest rate is based on unsupported assumptions that the behavior of class members would mirror that of other UI beneficiaries in very different circumstances. For example, East relies on research discussing a complete absence or expiration of traditional (non-pandemic-related) UI benefits (as opposed to the temporary loss of access to a portion of funds at issue here) in *pre*-pandemic time periods to conclude that UI recipients during the pandemic relied on them to pay "essential expenses." HX 32 ¶¶ 11–23. On that basis, she concludes that they would have resorted to credit card borrowing during the pandemic if faced with a temporary loss of benefit access of any duration or amount. *See id.* ¶¶ 21, 23.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

4

Because she is solely concerned with finding a way to generate a number that constitutes a broadly applicable "*minimum bound*"—that is, a dollar figure that she believes is *lower than* actual damages for some, but not all, class members—class members' individual circumstances are of no concern to East. She recommends using the 20.8% interest rate universally, regardless of whether class members actually borrowed money on their credit cards at that rate, or the length of time they were unable to access their UI benefits, or the amount of UI benefits at issue. HX 33 at 134:24–11; 136:4–10; *see id*. at 38:20–39:4; 142:6–17. But East's refusal to consider the real-world facts and circumstances of the Plaintiffs or their actual responses to the temporary loss of access to UI benefits at issue here leaves her with no basis to conclude that a 20.8% interest rate is appropriate or representative of a "large number of class members."

## III.   The McCrary Rebuttal

Economist Justin McCrary addressed East's conclusions and methods in a rebuttal report. He considered East's claim of a 20.8% opportunity cost of temporarily lost funds based on the credit card interest rate "unsupported and inflated" for multiple reasons. HX 34 ¶ 17. Among other things, there was "evidence to suggest proposed class members would have ███████████████████ ████████████████████████████████████████" *Id*. ¶ 73 (emphasis in original). East did not consider these alternative sources of capital, which "would have no or lower cost of borrowing than the average credit card rate," or whether the class representatives availed themselves of them in her analysis. *Id.*.

The discovery record shows that, of "the nine class representatives . . . ██ ████████████████████████████████████████ ████████████████████████████████████████ *Id*. ¶ 75 (emphasis in original). ██████████ ████████████████████████████████████████ ████████████████████████████████████████

████████████████████████ *Id.* Of the remaining class representatives, ██████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

*Id.* ¶¶ 75–76. Among the larger group of named Plaintiffs not proffered as class representatives, 48 provided interrogatory responses on their claimed damages, and ████████████████████████████████ *Id.* ¶ 77.

Furthermore, East primarily based her conclusion concerning beneficiary behavior when UI benefits promptly expire on studies of benefit use before COVID—not the COVID-era benefits at issue here. *See* HX 32 ¶¶ 13–18, 23; HX 34 ¶¶ 50–58. This distinction is significant because the "pandemic-related stimulus resulted in many households *increasing* their savings"—unlike the typical UI benefits recipient in years prior—and because many of the essential expenses that recipients might otherwise have needed UI benefits to pay were no longer due and owing. *Id.* ¶ 80 (emphasis added); *see id.* ¶¶ 50–58. For example, borrowers could benefit from a year-long forbearance on making mortgage-loan payments, three-and-a-half years of forbearance on making student-loan payments, and similar forbearance on auto loans. *Id.* ¶¶ 36, 38, 41. Contrary to East's opinion that UI recipients "*will* turn to borrowing" generally and "credit cards" in particular (HX 32 ¶ 10b (emphasis added)), many did *not*. Instead, the COVID era saw credit card borrowing *decrease* as consumers used the various forms of available assistance to pay down their credit card debt. HX 34 ¶¶ 57, 67. Thus, "far from being conservative, the credit card borrowing rate . . . represents an *inflated* cost of the temporary inability to access a portion of UI benefits for the proposed class members." *Id.* ¶ 103 (emphasis added).

## STANDARD OF LAW

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), "impose[] a special 'gatekeeping obligation' on trial judges"

presented with expert testimony. *Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*, 923 F. Supp. 2d 1245, 1253 (S.D. Cal. 2013) (Curiel, J.). Under Rule 702, a witness proffered as an expert must satisfy the following requirements:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under *Daubert*, district courts must "carefully apply[] Federal Rule of Evidence 702 to ensure that specialized and technical evidence is 'not only relevant, but reliable.'" *Brighton Collectibles*, 923 F. Supp. 2d at 1253. The reliability standard tests:

> (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community.

*Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2022). In addition, "[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms, Inc.* (*Daubert II*), 43 F.3d 1311, 1317 (9th Cir. 1995).

"[T]he burden of proving the expert's testimony satisfies Rule 702" and the *Daubert* standard rests on the Plaintiffs, as "[t]he proponent of the evidence." *Brighton Collectibles*, 923 F. Supp. 2d at 1253.

## ARGUMENT

The law requires Plaintiffs to furnish evidence of their "actual damage" resulting from the challenged conduct. *See* 15 U.S.C. § 1693m(a)(1).[2] Because

---

[2] *See also Sabicer v. Ford Motor Co.*, 362 F. Supp. 3d 837, 840 (C.D. Cal. 2019) (negligence claim requires damages); *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 165 F. Supp. 3d 937, 947 (S.D. Cal. 2016) (plaintiff must "establish a loss or deprivation of money or property sufficient to qualify as injury in fact" under Unfair Competition Law); *Gutierrez v. Girardi*, 194 Cal. App. 4th 925, 932 (2011) (fiduciary duty requires showing of "damage proximately caused by the breach") (internal quotation omitted).

Plaintiffs assert their claims on behalf of a class, the method they use to evidence actual damages must measure damages "across the entire class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). East's proposal to estimate an appropriate "minimum bound" for class damages using a 20.8% credit card interest rate is not admissible for this purpose. It does not even pretend to measure the "actual damage sustained" by any Plaintiff, or the "entire class" of Plaintiffs, and simply posits that, whatever the correct measure of damages is for the class as a whole, it will be higher than the measure calculated using the 20.8% rate she suggests. But the arbitrary selection of a "minimum bound" is not a recognized or reliable means of measuring actual damages (and does not purport to do so), and East's opinion is therefore not relevant to the Court or a factfinder in assessing whether Plaintiffs have the evidence of actual damages they need.

## I.    East's Use of a Credit Card Interest Rate Is Unreliable and Unsupported.

East's characterization of the 20.8% credit card interest rate she recommends as "conservative" (HX 32 ¶ 37) does not make it reliable. "*Daubert* asks whether expert opinions are reliable and relevant, not whether they are conservative." *Orshan v. Apple Inc.*, 2024 WL 4353034, *3 (N.D. Cal. Sept. 30, 2024). "If a damage model could survive *Daubert* by simply underestimating true damages, an expert could avoid having a court exclude her opinions by picking an arbitrary damage figure that is comfortably below any reasonable amount of true damages even though such an opinion would be plainly unreliable." *Id*. But that is all East's analysis is designed to achieve, and Plaintiffs cannot "sneak" the analysis "past *Daubert*" in this manner. *Id*.

The case law is unequivocal: "Just because an approach is conservative does not mean it is reliable." *United States ex rel. Fitzer v. Allergan, Inc.*, 2024 WL 1156310, *5 (D. Md. Mar. 18, 2024); *accord*, *e.g.*, *Unwired Planet, LLC v. Apple Inc.*, 2017 WL 589195, *2 (N.D. Cal. Feb. 14, 2017) ("Nor does the fact that the . . . model yields relatively conservative results offer assurance that those figures are useful or reliable.") If anything, "by shrouding the results in an air of legitimacy,"

East's labelling of her methodology as conservative "raise[s] the risk of juror confusion, making it all the more essential that the Court exercise its gatekeeping function until admission is adequately supported." *Unwired Planet*, 2017 WL 58915, *2.[3]

East does not claim that every class member (or any class member) was damaged in the amount of the credit card interest rate because they paid credit card interest. Rather, she claims that the figure that can be derived using the 20.8% rate constitutes a "conservative estimate" of "aggregate costs" without any understanding of how the class members actually responded to the temporary loss of benefit access and without any consideration of what their actual aggregate costs were. HX 32 ¶ 37. But nothing about the class members' alleged or actual damages has anything to do with the 20.8% interest rate—the rate has no connection at all to any class member's alleged or actual damages apart from East's supposition that the rate is an "appropriate *minimum bound*" on them. *Id.* ¶ 35. This is fatal.

If, for example, the class were limited to people who actually paid interest on loans, it would be fair to assume that the lower bound on what they paid is the lowest interest rate available. But here, the class is ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ *See* HX 34 ¶¶ 75–77. Thus, East's selection of the 20.8% rate as the minimum bound for "a conservative estimate of . . . aggregate costs" is completely arbitrary. *See, e.g., Kolcraft Enters. v. Chicco USA, Inc.*, 2018 WL

---

[3] *See also Guardant Health, Inc. v. Found. Med., Inc.*, 2020 WL 2461551, *18 (D. Del. May 7, 2020) ("merely labelling a value 'conservative' is no substitute for a showing that there is an evidentiary foundation for the particular percentage selected"); *Stokes v. John Deere Seeding Grp.*, 2014 WL 675820, *4 (C.D. Ill. Feb. 21, 2014) ("the fact that an opinion is conservative does not make it scientific"); *Ayers v. Robinson*, 887 F. Supp. 1049, 1060–61 (N.D. Ill. 1995) ("a conservative opinion . . . does not equate to a scientific one. Someone who states on the basis of a dull pain in his right knee that he thinks it is going to rain less than .1 inch expresses a conservative, but surely an unscientific, opinion.").

10772693, *4 (N.D. Ill. July 16, 2018) ("the arbitrary baseline taints the entire damages calculation"). In other words, the selected interest rate "is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). It is proffered as a "minimum bound" of Plaintiffs' costs only because East says so.

East's opinion that the behavior of UI recipients during COVID would essentially be identical to the pre-COVID behavior of UI recipients (*see* HX 32 ¶¶ 10a-d) is purely speculative. First, East relies on research pertaining to *other* benefits programs that predate COVID pandemic assistance and that does not account for the unique circumstances in which UI beneficiaries found themselves during that period. In particular, this research does not and cannot account for the numerous stimulus payments and other programs that were designed to provide financial relief during the pandemic. East conceded at her deposition that she was familiar with the following:

- the Federal Pandemic Unemployment Compensation Program which initially provided UI benefit supplements for up to four months;
- the Pandemic Emergency Unemployment Compensation Program, which provided an additional 13 weeks of UI benefits between March 29 and December 26, 2020;
- the COVID-Related Tax Relief Act of 2020 that provided for an additional $600 for eligible individuals and up to $600 for qualifying children under the age of 17 in January 2021;
- the American Rescue Plan Act of 2021 that provided payments up to $1,400 for eligible individuals, $2800 for married couples filing jointly, and $1,400 for qualifying dependents;
- the Golden State Stimulus Program which provided additional stimulus payments to certain low-income Californians during the pandemic; and
- the moratorium in California on the disconnection of essential services for non-payment and waiver of late payment fees.

*See* HX 33 at 76:2–80:22. But she never explains how the research on which she relies to justify her opinions, which discusses how UI recipients would have responded to a loss of UI benefits before any of these programs came into existence, has any bearing on how UI recipients would have responded after receiving some or

all of the stimulus payments listed above, or, more importantly, how the class members would have responded. East simply assumes that the pre-COVID and COVID-era behavior of UI recipients would be exactly the same, despite the terms of the benefits programs being different and the profiles of the eligible recipients being different. This is not sufficient under *Daubert*. *See Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, *20 (C.D. Cal. Mar. 7, 2011) (excluding damages calculation based on expert's "factual assumptions that are entirely unsupported in the record").

Second, East ignores record data establishing that certain class members lost access to their UI benefits for ████████ and/or could not access ████ ████████████████████. It is not reasonable to assume that these individuals faced a "financial hardship that cannot easily be undone" that would have caused them to adopt the same borrowing strategies as UI beneficiaries who experienced a permanent loss of benefits, assuming interest-bearing debt on ████████. HX 32 ¶ 28. But, because she was unburdened by any facts relating to the class plaintiffs' actual experiences at the time she wrote her report, East's opinion simply assumes that they would. Where, as here, "indisputable record facts contradict or otherwise render [an] opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, (1993); *see Stephens v. Union Pac. R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (finding expert opinions failed to create a material issue of fact on summary judgment where experts made assumptions on key points that were not supported by evidence).

Third, East's opinion ignores portions of the record that undermine her supposition that a "large number of class members" borrowed on their credit cards and paid 20.8% interest in response to a temporary account freeze or claim denial. Discovery of the class representatives revealed ████████████████ ████████████████████████████████████ ████████████████████████████████████

███████████████████████████████████████ HX 34 ¶¶ 75–77. East's failure even to consider this data makes her recommendation of the 20.8% interest rate uninformed and unhelpful to the Court or a factfinder. *See*, *e.g.*, *Brighton Collectibles*, 923 F. Supp. 2d at 1255 (excluding damages calculation where expert had "not grounded his assumption with the real world facts of [the] case," and finding expert's "speculation would not help the jury but could mislead them"). Indeed, this Court, as noted, already rejected a proposed damages methodology for making "assumptions about class members" that "may not be true classwide," and for lacking "evidence in support" of the same assumptions about borrowing behavior made by East. ECF 494 at 87–88.

The inapplicability of East's proposed method to the actual class representatives is highly significant to assessing the relevance and reliability of her analysis under the *Daubert* standard. A "key question" under *Daubert* is whether the expert's method "can be (and has been) tested." 509 U.S. at 593. A method that does not produce reliable and accurate conclusions as applied to the class representatives or some other sample of the class *ipso facto* cannot serve as a reliable and accurate method as applied to the class as a whole. *See*, *e.g.*, *In re Blackbaud, Inc. Cust. Data Breach Litig.*, 2024 WL 2155221, *10, 13–14 (D.S.C. May 14, 2024) (excluding expert who "tested his method on three named plaintiffs," failed to "indicate whether or how he verified the accuracy of the [method] for those three individuals," and "chose not to conduct any testing beyond [the] three named plaintiffs").

Applying East's method to the entire class, as she urges, merely exacerbates its unreliability. As already shown, East admits her method was designed to capture the experience only of a "large number of class members," although East has no facts or data to support that claim, and never quantifies or even gestures at just how many class members she has in mind. By relying on these sweeping generalizations and not validating them by reference to the specific facts and circumstances of even a single class representative, individual Plaintiff, or proposed class member, East fails to base

her method on "sufficient facts or data" as required by Federal Rule of Evidence 702(b). *See Kewazinga Corp. v. Google LLC*, 2024 WL 4894840, *4 (S.D.N.Y. Oct. 17, 2024) (striking damages computation as not based on "sufficient facts or data," because "a very high-level view" "does not mean that those numbers are sufficiently reliable to develop a ratio to compute damages"). Because East's opinions are "connected to existing data only by the *ipse dixit* of the expert," her opinions are also irrelevant and inadmissible. *Joiner*, 522 U.S. at 146.

Lastly, *Daubert* asks whether a proffered expert's methods enjoy "general acceptance" in the field. 509 U.S. at 594. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." *Id*. (citation omitted). East does not make any claim that using a credit card interest rate to calculate damages for a class of people █████████████████████████████ enjoys any such general acceptance. The most she offers are citations to academic studies for the proposition that "when UI benefits are abruptly cut off," UI households will either borrow or cut back, or both, and that borrowing on credit cards "is the most common source of borrowing among people who receive UI." HX 32 ¶¶ 29, 30. That falls far short of indicating any general acceptance for her proposed method here, ████████████████████████████████ ████████████████████████████████ And, as McCrary pointed out in rebuttal, this case does not present a situation where "UI payments disappear[ed]"—the only claim is that "████████████████████ ████████████████████████████████." HX 34 ¶¶ 48, 73. East does not present any studies that measure the opportunity costs of that scenario, much less any studies that do so using the method she proposes. East thus fails to demonstrate any general acceptance of her method in the field of economic damage analysis.

Nor does East's method enjoy any acceptance as a matter of law. The cases do

not permit plaintiffs to claim interest expenses as damages with no evidence of actually paying them. *See*, *e.g.*, *Munoz v. JLO Automotive, Inc.*, 2020 WL 6607789, *3 (D. Conn. Nov. 12, 2020) (interest charges not cognizable as "actual damages" with "no evidence in the record" that plaintiff "actually incurred those interest charges"). To the contrary, in *Van v. LLR, Inc.*, 962 F.3d 1160, 1161–65 (9th Cir. 2020), the Ninth Circuit assessed "time value of money" damages for a delayed reimbursement based on the 4.35% interest the plaintiff would have *earned* on the money, not the interest the plaintiff would have paid to *borrow* the money. *See* ECF 494 at 86–87. This Court found *Van*'s logic applicable here, but rejected the notion that the interest rate could be based on assumptions about "increased utilization of credit cards" where Plaintiffs had no "evidence showing these assumptions are true as to most or even any of the EDD cardholders' experience." *Id*. at 88. The same applies to East, who relies on assumptions about UI beneficiary behavior that are unsupported by any evidence to show that they are true for "most or even any" of the class members here. In sum, East's method is neither a reliable measure of Plaintiffs' actual damages nor relevant to the Court, since it sets forth no material factual evidence about the actual damages suffered by any Plaintiff or the Plaintiff class as a whole on which the Court or a factfinder can rely.

Defendant thus respectfully submits that East's unreliable and irrelevant analysis should be stricken from the record.

## CONCLUSION

For the foregoing reasons, the Court should strike each and all of East's unreliable and irrelevant opinions from the record.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

14

Dated: October 17, 2025          Respectfully submitted,

By:   */s/ Matthew L. Riffee*

MATTHEW L. RIFFEE (*pro hac vice*)
*MRiffee@goodwinlaw.com*
SABRINA M. ROSE-SMITH (*pro hac vice*)
*SRoseSmith@goodwinlaw.com*
KEITH LEVENBERG (*pro hac vice*)
*KLevenberg@goodwinlaw.com*
**GOODWIN PROCTER LLP**
1900 N St. NW
Washington, DC 20036
Tel: +1 202 346 4000
Fax: +1 202 346 4444

JAMES W. MCGARRY (*pro hac vice*)
*JMcGarry@goodwinlaw.com*
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000
Fax: + 1 617 523 1231

LAURA G. BRYS (SBN 242100)
*LBrys@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S Figueroa St., Suite 4100
Los Angeles, CA 90017
Tel.: +1 213 426 2500
Fax: +1 617 346 4444

VALERIE A. HAGGANS (*pro hac vice*)
*VHaggans@goodwinlaw.com*
LINDSAY E. HOYLE (*pro hac vice*)
*LHoyle@goodwinlaw.com*
**GOODWIN PROCTER LLP**
620 Eighth Avenue
New York, NY 10018
Tel: +1 212 813-8800
Fax: +1 212 355-3333

YVONNE W. CHAN (*pro hac vice*)
*YChan@jonesday.com*
**JONES DAY**
100 High Street
Boston, MA 02110
Tel.: +1 617 960 3939
Fax: +1 617 449 6999

JANICE P. BROWN (SBN 114433)
*jbrown@myersnave.com*
MATTHEW B. NAZARETH (SBN 278405)
*mnazareth@myersnave.com*
**MEYERS NAVE**

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

600 B Street, Suite 1650
San Diego, CA 92101

Attorneys for Defendant
BANK OF AMERICA, N.A.

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the clerk of the court for the United States District Court for the Southern District of California by using the CM/ECF system on October 17, 2025. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I certify under penalty of perjury that the foregoing is true and correct.


Executed:    October 17, 2025              *s/ Matthew L. Riffee*