JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
KARIN B. SWOPE (Pro Hac Vice)
kswope@cpmlegal.com
VASTI S. MONTIEL (SBN 346409)
vmontiel@cpmlegal.com
CAROLINE A. YUEN (SBN 354388)
cyuen@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
STACEY M. LEYTON (SBN 203827)
sleyton@altber.com
CONNIE K. CHAN (SBN 284230)
cchan@altber.com
JAMES BALTZER (SBN 332232)
jbaltzer@altber.com
KATHERINE BASS (SBN 344748)
kbass@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Fax: (415) 362-8064

*Co-Lead Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION**<br><br><br>This Document Relates to All Actions | Case No. 3:21-md-02992-GPC-MSB<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS OF CHLOE N. EAST**<br><br>Date:      April 17, 2026<br>Time:     1:30 p.m.<br>Judge:   Hon. Gonzalo P. Curiel<br>Ctrm:    2D (2nd Floor) |

REDACTED PUBLIC VERSION

# Table of Contents

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND ..................................................................................................2

III.   LEGAL STANDARD .........................................................................................4

IV.    ARGUMENT .......................................................................................................5

    A.  Dr. East's testimony will help the trier of fact determine damages using a method the Court already accepted. .........................................................5

    B.  Dr. East's testimony is based on sufficient facts or data. ...................................6

        a.  Contrary to the Bank's assertions, Dr. East has not simply made assumptions but has instead relied on actual data. .........................................6

        b.  The Bank's factual disagreements with Dr. East are not a basis for excluding her expert opinion. .........................................................................7

    C.  Dr. East's testimony is the product of reliable principles and methods. ............10

        a.  The Court has already approved using an interest-rate method to calculate damages based on lost access to principal amounts. ...................10

        b.  Dr. East uses the interest-rate method that the Court accepted. .................12

        c.  Dr. East's reliable method should not be excluded merely because it is conservative. .....................................................................................12

    D.  Dr. East applies reliable methods to the facts of this case. ..............................14

V.     CONCLUSION .................................................................................................17

## Table of Authorities

**Cases**                                                                                                                          **Page(s)**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013) ...................................................................................................4

*Ayers v. Robinson*,
    887 F. Supp. 1049 (N.D. Ill. 1995) .......................................................................................14

*Bazemore v. Friday*,
    478 U.S. 385 (1986)..................................................................................................................9

*Beijing Meishe Network Tech. Co. v. TikTok Inc.*,
    2025 WL 2522375 (N.D. Cal. Sept. 2, 2025)..........................................................................13

*Belyea v. GreenSky, Inc.*,
    No. 20-CV-01693-JSC, 2025 WL 589037 (N.D. Cal. Feb. 24, 2025)..................................14, 15

*In re Blackbaud, Inc. Cust. Data Breach Litig.*,
    2024 WL 2155221 (D.S.C. May 14, 2024) ................................................................................16

*Bonner v. ISP Tech., Inc.*,
    259 F.3d 924 (8th Cir. 2001) ....................................................................................5, 16, 17

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
    923 F. Supp. 2d 1245 (S.D. Cal. 2013).........................................................................................11

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ................................................................................................15

*City of Pomona v. SQM North America Corp.*,
    750 F.3d 1036 (9th Cir. 2014) .....................................................................................5, 8, 17

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)......................................................................................................................5

*In re ConAgra Foods, Inc.*,
    90 F.Supp.3d 919 (C.D. Cal. 2015) .........................................................................................16

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..............................................................................................1, 4, 13, 16

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ..............................................................................................7, 14

*United States ex rel. Fitzer v. Allergan, Inc.*,
No. 1:17-CV-00668-SAG, 2024 WL 1156310 (D. Md. Mar. 18, 2024) ....................13

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*,
326 F.R.D 592 (N.D. Cal 2018)...................................................................................15

*Hangarter v. Provident Life and Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .......................................................................................9

*Hartley v. Dillard's, Inc.*,
310 F.3d 1054 (8th Cir. 2002) .............................................................................16, 17

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) .....................................................................................9

*Jinro America, Inc. v Secure Investments, Inc.*,
266 F.3d 993 (9th Cir. 2001) .......................................................................................1

*M. G. v. Bodum USA, Inc.*,
2021 WL 718839 (N.D. Cal. Feb. 24, 2021) ..............................................................13

*McMorrow v. Mondelez International, Inc.*,
2021 WL 859137 (S.D. Cal. March 8, 2021) ..............................................................15

*Nguyen v. Nissan North America, Inc.*,
932 F.3d 811 (9th Cir. 2019) .....................................................................................15

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ......................................................................................14

*Orshan v. Apple Inc.*,
2024 WL 4353034 (N.D. Cal. Sept. 30, 2024).............................................................13

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) .........................................................................4, 12, 16

*Rodriguez v. Google LLC*,
2024 WL 38302 (N.D. Cal., January 3, 2024)..............................................................13

*San Francisco Baykeeper v. City of Sunnyvale*,
627 F.Supp.3d 1085 (N.D. Cal. 2022)........................................................................12

*Sentius Int'l, LLC v. Microsoft Corp.*,
2015 WL 451950 (N.D. Cal. Jan. 27, 2015).................................................................13

*Stokes v. John Deere Seeding Group*,
2014 WL 675820 (C.D. Ill. 2014) ...............................................................................14

*Todd v. Tempur-Sealy Int'l, Inc.*,
2016 WL 5462428 (N.D. Cal. Sept. 28, 2016) .............................................................13

*U.S. v. 17.69 Acres of Land*,
2004 WL 5632928 (S.D. Cal. 2004) ...............................................................................4

*United States v. Romero-Lobato*,
379 F.Supp.3d 1111 (D. Nev. 2019) ............................................................................13

*United States v. Sandoval-Mendoza*,
472 F.3d 645 (9th Cir. 2006) ......................................................................................12

*Unwired Planet, LLC v. Apple Inc.*,
2017 WL 589195 (N.D. Cal. Feb. 14, 2017) ...............................................................13

*Van v. LLR, Inc.*,
61 F.4th 1053 (9th Cir. 2023) (*Van II*) .................................................................10, 11

*Van v. LLR Inc.*,
962 F.3d 1160 (9th Cir. 2020) (*Van I*) ..................................................................10, 11

**Other Authorities**

Federal Rule of Evidence 401 ........................................................................................5

Federal Rule of Evidence 702 ...............................................................................1, 4, 13

## I.  INTRODUCTION

In her expert report, Dr. Chloe East offers three opinions: (1) unemployment insurance ("UI") benefits provide a critical safety net for individuals experiencing involuntary job loss, (2) the typical UI recipient does not have enough savings to survive abruptly losing access to UI benefits without incurring costs elsewhere, and (3) the credit card interest rate is an appropriate, conservative estimate of the costs faced by the classes of UI recipients who lost access to their benefits. The Bank does not contest her first opinion, and its challenges to her second and third opinions go to weight, not admissibility.

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), expert testimony is admissible if it can "assist the trier of fact to understand the evidence or determine a fact in issue."  The Bank contends that Dr. East's calculation of classwide damages are not sufficiently tied to the specific experiences of individual class members. But expert witnesses are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," so long as "the expert's opinion [has] a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592; *see also, e.g.*, *Jinro America, Inc. v Secure Investments, Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). Dr. East, who is undisputedly qualified to testify as a labor economist, applied reliable principles and methods that are widely accepted in her discipline to the facts and data she reviewed. Her opinions are fully consistent with this Court's ruling on class certification that the Bank's classwide damages liability may be calculated by multiplying the principal amount by a compound interest rate that approximates, on a classwide basis, the time value of the money to which class members were denied access. ECF 494 at 86-87. As the Court previously recognized, the question of "which interest rates should be applied is an issue for the fact finder," ECF 494 at 86, and the Bank's arguments go only to the weight the fact finder should assign to Dr. East's testimony—not to its admissibility. The Bank's motion should be denied.

## II.   BACKGROUND

This class action challenges Bank of America's treatment of unauthorized transaction claims by unemployed Californians during the COVID-19 pandemic. From 2011 to February 2024, the California Employment Development Department ("EDD") exclusively contracted with the Bank to distribute unemployment insurance, disability insurance and paid family leave benefits to Californians through bank-issued EDD prepaid debit cards. Plaintiffs allege that the Bank implemented practices that systemically deprived more than 100,000 Californians of access to their benefits. On June 16, 2025, this Court certified five classes of California UI benefit recipients who contacted the Bank claiming unauthorized use of their EDD prepaid debit cards issued by the Bank: (1) claim denial class, (2) credit recission class, (3) account freeze class, (4) customer service class, and (5) EMV Chip Class. ECF 494 at 2-3, 96-97. The class period is from September 28, 2020, when the Bank implemented the Claim Fraud Filter Indicator 1 ("CFF-1"), to June 8, 2021, when the court-ordered Preliminary Injunction was imposed, preventing the Bank from continuing to use CFF-1 to automatically deny unauthorized transaction claims. *Id.* at 9.

In its order on class certification, this Court held that consequential damages for the Credit Denial, Credit Rescission, Account Freeze, and EMV Chip classes could be calculated by multiplying the principal amount of actual damages by a compound interest rate. ECF 494 at 85. The Court held that the precise compound interest rate to be applied was "an issue for the fact finder." *Id.* at 86. As discussed further in Plaintiffs' opposition to the Bank's motion to exclude the testimony of Greg Regan, the Court rejected a second methodology proposed by Mr. Regan ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *Id.* at 86-87.

Dr. Chloe East is an economist and an expert in U.S. safety net and social insurance

programs, including unemployment insurance. Ex. 1 (East Report) ¶¶ 1-4 & App. A.[1] She was retained by Plaintiffs to draw upon her economic expertise to opine on (1) the vulnerability of UI recipients and the importance of UI benefits in mitigating the harms that would otherwise be suffered by those who lose their jobs, (2) the impacts of denying UI beneficiaries access to their UI funds, and (3) an appropriate compound interest rate that could be used to approximate the lost time value of the UI benefits to which class members were denied access  as a result of the Bank's challenged policies and practices. *Id.* ¶ 5 & App. B. The Bank does not dispute her qualifications as an economic expert.

Dr. East does not purport to opine on the legal question of whether the use of such a compound interest rate is a permissible methodology by which to approximate damages on a classwide basis—a question this Court has already settled. ECF 494 at 86-87. Instead, she draws upon extensive labor economics literature and upon data prepared by the U.S. Census Bureau to suggest what an appropriate compound interest rate would be. In particular, she explains that, in the field of economics, generalizations are supportable when they are based on "aggregate data"; to be reliable, economic generalizations may look to the "average experience" while rejecting "extreme values." Ex. A ¶¶ 15-16, 19. Based on her analysis of the considerable scholarship concerning the financial circumstances of the median UI recipient, as well as national and California-specific data for 2020-2021 UI recipients from the Survey of Income and Program Participation, the Federal Reserve Survey of Household Economics and Decisionmaking, and the Household Pulse Survey, she finds that the typical California UI recipient during the relevant period had "low levels of savings" and would therefore likely have needed to resort to "borrowing, or cutting back on necessities, or some combination of the two" if they lost access to their UI benefits. *Id.* ¶¶ 16-27.

Relying on that same literature and data—which shows that the population of UI recipients is especially likely to be denied credit, to receive less credit than they seek, and to be forced to cut spending on necessities such as food and medical care—Dr. East

---

[1] "Ex." refers to Exhibits to the Declaration of Regina Wang.

concludes that a 20.8% interest rate (the credit card interest rate most likely to be faced by the majority of UI recipients, to the extent they could obtain credit at all) would be a conservative approximation of the time value of UI benefit money for the median UI recipient. *Id.* ¶¶ 28-37. After all, class members who lost access to the benefits on which they depended could not have known in advance, at the time of the deprivation, *when* those benefits might be returned to them, much less that they would be returned only after a preliminary injunction or after the Bank entered into Consent Decrees with its regulators—a fact that surely compounded the "stress and anxiety" associated with the dire circumstances they faced. *See, e.g.*, *id.* ¶¶ 32-35.

## III.    LEGAL STANDARD

Under Federal Rule of Evidence 702, a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may testify if the proponent demonstrates it is more likely than not that (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." As the Supreme Court has explained, Rule 702's application must be "consistent with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert*, 509 U.S. at 588 (cleaned up).

Under this standard, a district court's task is not to "decid[e] whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013). Expert testimony "need not establish every element the plaintiff must prove[] in order to be admissible." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). "As a general rule, questions relating to the basis and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *U.S. v. 17.69 Acres of Land*, 2004 WL 5632928 at *1 (S.D. Cal. 2004)

(emphasis added). "[I]t is up to the opposing party to examine the factual basis for the opinion in cross examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (citations omitted); *see also City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Challenges that go to the weight of the evidence are within the province of the fact finder… A district court should not make credibility determinations that are reserved for the jury.")

## IV.   ARGUMENT

### A.   <u>Dr. East's testimony will help the trier of fact determine damages using a method the Court already accepted.</u>

Members of the Credit Denial, Credit Rescission, and Account Freeze class contend that in addition to the Bank having wrongfully deprived them of the principal amounts of their UI benefits, it also caused them to suffer harm based on the lost time value of those funds, i.e., the economic value of being denied access to funds upon which they depended for a period of time, which the Court held could be measured under Methodology 1 by applying a compound interest rate to the withheld principal amounts for the duration of the deprivation. ECF 494 at 86-87. Dr. East's opinion "measure[s] only those damages attributable to that theory." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Her testimony will therefore be helpful to the factfinder in calculating Plaintiffs' classwide damages. *See* Fed. R. Evid. 401 (defining evidence as "relevant if it "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action"). After all, this Court already noted at class certification that damages may be calculated by multiplying the principal amount of actual damages (the total dollar amount of each claim denied, credit rescinded, and account frozen) by a compound interest rate. ECF 494 at 86-87. Dr. East was retained to provide, among other things, an appropriate compound interest rate to calculate the lost value to class members of the UI benefits, and she calculated that the credit card interest rate was an appropriate figure to calculate the cost to class members. Ex. 1 ¶¶ 5, 10a-f, 37. Her

testimony will help the jury determine the amount of damages using a method the Court already accepted.

**B.**   **<u>Dr. East's testimony is based on sufficient facts or data.</u>**

     a.   <u>Contrary to the Bank's assertions, Dr. East has not simply made assumptions but has instead relied on actual data.</u>

As explained above, *see supra* at 2-3, Dr. East's opinions are based on her analysis of extensive economic literature and of both national and California-specific data concerning the financial circumstances of the median UI recipient from the period of 2020-2021. These are the same sources she customarily relies upon in formulating her opinions and analysis as a professor of labor economics. Ex. Ex. 1 ¶¶ 1, 4, 7. She concludes that (1) UI provides a critical safety net for individuals who lose their jobs, (2) the typical UI recipient does not have enough savings to handle loss of UI benefits without increasing their borrowing or cutting their consumption, and (3) the cost to UI recipients of losing access to their UI benefits is at least as high as the interest rates faced when borrowing on a credit card, because UI recipients are less likely to be able to access credit and more likely to be forced to incur the higher costs associated with forgoing spending on basic necessities and (4) the average credit card interest rate of 20.8% would be a conservative approximation of the lost time value of money for the median UI recipient who was denied access to their UI benefits.

To arrive at her conclusions about the impact of denying beneficiaries access to their UI funds, Dr. East drew upon published research—both her own and others'—concerning the importance of UI in enabling households to cover essential expenses in the face of unemployment, an economic study specific to the pandemic period to determine how changes to UI benefits affected spending, and her own calculations using Census Household Pulse data on how UI recipients specifically in California used UI benefits to cover their spending needs in 2020. Ex. 1 ¶¶ 24-27. Dr. East also reviewed national economic literature demonstrating that when UI benefits are abruptly cut off, as they were here by the Bank's challenged practices, households are forced to adjust their finances

either by turning to methods of borrowing to finance their expenses or by cutting back on these expenses, potentially subjecting them to the significant costs associated with late bill payments, food insecurity, and other consequences. *Id.* ¶ 29.

Dr. East determined the cost of borrowing by reviewing statistics on UI recipients from the Survey of Income and Program Participation ("SIPP") and Federal Reserve Survey of Household Economics and Decisionmaking ("SHED") and articles on alternative borrowing methods and the consequences of unemployment. *Id.* ¶¶ 30-31. As Dr. East explained, such reliance on aggregate data is not only standard but necessary in the discipline of economics. *Id.* ¶¶15-16, 18. Consistent with the principles and methods of her discipline, Dr. East reviewed SHED data about UI recipients who apply for credit, economic theory on the cost of losing UI benefits, and literature on the association between UI and food security and health care spending to determine that cutting consumption is at least as costly to UI recipients as borrowing. *Id.* ¶¶ 32-34. She used statistics from SHED data to determine a borrowing rate of 20.8% as a conservative measure of the lost time value of money for UI recipients who were denied access to their UI benefits, even for a short period of time. *Id.* ¶¶ 28, 36. In addition to these widely accepted sources of data and analysis, "[a]n expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022). Dr. East did not make unsupported assumptions; instead, she reached her conclusions by reviewing relevant data and literature with her specialized knowledge and experience.

      b. <u>The Bank's factual disagreements with Dr. East are not a basis for excluding her expert opinion.</u>

The Bank seeks to exclude certain opinions of Dr. East based upon its disagreement with the underlying factual basis for some of her opinions. For example, the Bank contends that the factfinder should not be allowed to consider her analysis because she did not adequately account for the unique circumstances in which UI beneficiaries found themselves during the pandemic. In fact, Dr. East relied on SIPP data to evaluate the net

liquid wealth of UI recipients in California during the pandemic, and she relied on SHED data to determine household finances during this same period. Ex. 1 ¶¶ 18, 21; Ex. 2 (East Depo) at 88:18-21, 102:12-18, 112:3-13. While the Bank points out that several social safety net programs were expanded during the early years of the pandemic, Bank Mot. 10, Dr. East explained that even with these programs, the financial circumstances of the median UI benefit recipient remained precarious, Ex. 2 at 75:19-21, 76:14-18, 77:7-10, 78:1-6, 79:3-6, 20-23, 80:11-13, 23-25, 88:18-21, 89:9-11.

In support of her opinion that the cost to the median UI recipient of lost access to UI benefits was at least as high as the credit card interest rate, Dr. East relied on SHED and SIPP data and academic literature to show that savings levels among UI recipients (making UI benefits more valuable when due than later, when the recipients may have  regained employment) are low, that UI recipients commonly use credit cards when denied access to UI benefits, and that UI recipients would have needed to use more expensive borrowing methods and/or cut consumption if the credit they sought to make ends meet was unavailable. Ex. 1 ¶¶ 10a-d.

The Bank contends that Dr. East has provided a "purely speculative" "opinion that the behavior of UI recipients during COVID would essentially be identical to the pre-COVID behavior of UI recipients." Bank Mot. 10 (citing Ex. 1 ¶¶ 10a-d). To the contrary, Dr. East relied on SHED data to determine that UI recipients who received benefits in California between 2020 and 2021 (during COVID) had very similar net wealth as a percentage of their income compared to UI recipients in the entire country in 2019 (before COVID). Ex. 1 ¶¶ 21-22. Dr. East considered the academic literature and used SIPP data to calculate that even after receiving stimulus payments, most UI recipients in California still had less than one month's worth of income in net household wealth. *Id.* ¶ 23. Her opinion is thus supported by expert analysis of data; it is not speculation. The Bank may dispute this factual basis, but "[a] factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat." *City of Pomona*, 750 F.3d at 1049. "The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility,

and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n. 14 (9th Cir. 2004) (citation omitted).

The Bank also contends that Dr. East's analysis failed to consider that some class members did not borrow funds or lost access to only small amounts of money or for short periods of time. Bank Mot. 9, 11. But as Dr. East explained, in the discipline of economics, "it is not appropriate to predict the effects on the mean or median person based on results from extreme values"; rather, economists "look to aggregate data…and draw conclusions about the average experience." Ex. 1 ¶ 16. Here, Dr. East applied the standard economic technique of "windsoriz[ing]"—"a statistical process that replaces the most extreme values in the data with representative values"—to reduce the impact of extreme outliers (including households with enough savings to cover their temporary loss of UI benefits) on her conclusions, especially given that the UI recipients who were denied the benefits to which they were entitled could not have known when, if ever, those benefits might have been restored. Ex. 1 ¶¶ 9, 18 & n.16; *see also supra* at 3-4. Dr. East also explained that she focused on median UI recipients rather than on extremes on either end of the distribution to provide an economic analysis representative of most people in the population—an approach also taken in the ample literature she cites. Ex. 1 ¶ 16; Ex. 2 at 147:25-148:8.

The Bank does not dispute that Dr. East's techniques and modes of analysis are supported by the economic literature upon which she relies. It does not engage with that literature at all. But to the extent the Bank contends that Dr. East's analysis should have given more weight to extreme outliers in proposing an appropriate compound interest rate, it can make that argument on cross-examination. As the Supreme Court has explained, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). "In other words, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002).

## C.      Dr. East's testimony is the product of reliable principles and methods.

a.   The Court has already approved using an interest-rate method to calculate damages based on lost access to principal amounts.

This Court has already held that lost-time-value damages may be calculated on a classwide basis by multiplying the total dollar amount of each claim denied, credit rescinded, and account frozen times a compound interest rate times the length of time the funds were withheld. ECF 494 at 86-87 (citing *Van v. LLR Inc.*, 962 F.3d 1160, 1165 (9th Cir. 2020) (*Van I*). An interest rate—*any* interest rate—necessarily reflects a generalization about the time value of money that is not strictly tied to the specific economic circumstances of each individual to whom it is paid. In *Van I*, for example, there was surely variation in the economic circumstances of the class members who were deprived for different lengths of time of the sales taxes they were unlawfully required to pay. A lucky few may have been able to borrow "from friends and family at a *zero* percent interest rate," Bank Mot. 11, while others were forced to forgo spending on basic necessities. Like the Bank here, the defendant in *Van I* argued that plaintiffs' failure to make "specific allegations about how [each class member] would have earned interest on the money but for the defendant's wrongful conduct" defeated their claims. *Van I*, 962 F.3d at 1164. The Ninth Circuit rejected that argument, holding that it "misstate[d] Van's claimed injury," explaining:

> Van does not assert that she is injured because she lost interest income. She asserts that she is injured because she lost the use of her money… Interest is simply a way of measuring and remedying Van's injury, not the injury itself.

*Id.* at 1165. In *Van I*, then, the inevitable individual variations in the class members' economic situations did not preclude the use of a uniformly applied interest rate to

Opposition to Def's Motion to Exclude Opinions of Chloe N. East;          10
Case No. 3:21-md-02992-GPC-MSB

approximate the lost time value of money on a classwide basis. *Van v. LLR, Inc.*, 61 F.4th 1053, 1061 (9th Cir. 2023) (*Van II*).[2]

Although the Bank acknowledges this Court's previous reliance on *Van I* and *Van II*, it contends that those holdings were limited to approving the use of a classwide interest rate only for "interest the plaintiff would have *earned* on the money, not interest the plaintiff would have paid to *borrow* the money." Bank Mot. 14 (emphases in original). But nothing in *Van I* or *Van II* supports such a limitation. As the above-quoted passage from *Van I* makes clear, Van was "injured because she lost the use of her money," *not* "because she lost interest income." *Van I*, 962 F.3d at 1164-65. The particular interest rate to be used as "a way of measuring and remedying [plaintiffs'] injury" was not there disputed. *Id.* at 1165; *see also Van II*, 61 F.4th at 1061. Where, as here, the appropriate interest rate to be applied *is* disputed, the question of "which interest rates should be applied is an issue for the fact finder." ECF 494 at 86.

Against this backdrop, the Bank's reliance on cases like *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1256 (S.D. Cal. 2013), where the expert "could not identify the factual basis for his assumptions or provide any assurance that his conclusion is based upon a method that is generally accepted in the field," must be rejected. First, the Bank's position, fairly stated, is that *no* classwide interest rate could *ever* be supported by a factual basis due to variations in class members' individual financial situations—a proposition that is incompatible with the reasoning and holdings of *Van I* and *Van II*. Second, as Dr. East explains and as the forgoing discussion establishes, using generalizations based on "aggregate data" to "draw conclusions about the average

---

[2] For the same reasons, the Bank's reliance on class representatives' interrogatory responses indicating that they did not actually borrow at the particular interest rates proposed by East misses the point. No class representative in *Van I* claimed to have actually experienced a loss of interest income at precisely the classwide interest rate ultimately embraced by the court either. As the Ninth Circuit explained, "[i]nterest is simply a way of measuring [the] injury, not the injury itself." *Van I*, 962 F.3d at 1165.

Opposition to Def's Motion to Exclude Opinions of Chloe N. East;      11
Case No. 3:21-md-02992-GPC-MSB

experience" *is* a generally accepted methodology in the discipline of economics. *See supra* at 3.

b. Dr. East uses the interest-rate method that the Court accepted.

The Bank attempts to equate Dr. East's damages analysis with "Methodology 2," the alternative damages methodology proposed by Plaintiffs' expert CPA, Greg Regan, which ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████. But Dr. East's methodology for calculating a classwide interest rate (as permitted by Methodology I, which the Court accepted) is not based on any unsupported assumptions underlying the Remediation Plan. Every conclusion she draws concerning California EDD cardholders during the relevant period is supported by data and the academic literature, as discussed above. Dr. East used SHED data to determine that UI recipients who received benefits in California during COVID had very similar net wealth as a percentage of their income compared to UI recipients in the entire country before COVID, and she analyzed the economic literature and used SIPP data to calculate the net household wealth of UI recipients in California during COVID. Ex. 1 ¶¶ 21-23.

c. Dr. East's reliable method should not be excluded merely because it is conservative.

The Bank describes Dr. East as characterizing her opinions as reliable *because* they are conservative, but Dr. East's opinions are in fact both reliable *and* conservative. The Ninth Circuit recognizes that "[e]xpert opinion testimony is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565; *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655-56 (9th Cir. 2006) (reversing district court's decision to exclude relevant opinion testimony by experts who were well qualified and had sufficient expertise and foundation even though "the jury could have decided to disbelieve them"). Courts do not exclude expert testimony simply because it is conservative. *See, e.g., San Francisco Baykeeper v. City of Sunnyvale*, 627 F.Supp.3d 1085, 1101 (N.D. Cal. 2022) (rejecting argument that

expert's opinion was unreliable "for using the highest possible compliance costs" and "trying to assess the highest possible figure because he was being conservative" and holding that this "conservative approach is not an analytical gap").[3] As the Bank's own case states, "*Daubert* asks whether expert opinions are reliable and relevant, not whether they are conservative." *Orshan v. Apple Inc.*, 2024 WL 4353034, at *3 (N.D. Cal. Sept. 30, 2024).

Each of the cases relied upon by the Bank involves expert opinions that rest on demonstrably incorrect assumptions or analytical gaps that have no bearing on East's opinions. In *Orshan*, the district court found the expert's opinion unreliable because it "makes an assumption that even [the expert] admits is wrong." *Id.* In *United States ex rel. Fitzer v. Allergan, Inc.*, No. 1:17-CV-00668-SAG, 2024 WL 1156310, at *4-5 (D. Md. Mar. 18, 2024), the expert's opinion rested upon a "faulty premise" and failed to account

---

[3] *See also, e.g.*, *Beijing Meishe Network Tech. Co. v. TikTok Inc.*, 2025 WL 2522375, at *5 (N.D. Cal. Sept. 2, 2025) (denying motion to exclude where defendant argued expert was "dressing up his revised damages calculation in a 'cloak of conservativism,'" finding "these concerns go to the weight, not the admissibility, of Dr. Putnam's report."); *M. G. v. Bodum USA, Inc.*, 2021 WL 718839, at *13 (N.D. Cal. Feb. 24, 2021) (denying motion to exclude where "Dr. Ganot appears to have accounted for variations . . . including adopting the most conservative values possible . . . This is sufficient to satisfy the requirements of Rule 702."); *United States v. Romero-Lobato*, 379 F.Supp.3d 1111, 1121 (D. Nev. 2019) (denying motion to exclude where the "CMS method was later modified and refined to establish a 'conservative quantitative criteria for identification'"); *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000) (affirming decision to admit expert's testimony that "he used the low-end figure cited by the Narcotics Information Network to estimate conservatively the wholesale value of the marijuana seized"); *Sentius Int'l, LLC v. Microsoft Corp.*, 2015 WL 451950, at *9 (N.D. Cal. Jan. 27, 2015) (denying motion to exclude expert's opinion that 'an effective $0.44 per-copy royalty is a 'conservative outcome'"); *Todd v. Tempur-Sealy Int'l, Inc.*, 2016 WL 5462428, at *6 (N.D. Cal. Sept. 28, 2016) (denying motion to strike expert opinions, finding arguments regarding expert's "conservative estimate" [] "should be raised on cross-examination, not at the Daubert stage"); *Rodriguez v. Google LLC*, 2024 WL 38302 (N.D. Cal., January 3, 2024) (denying motion to exclude expert opinion because expert's reference to "$3 valuation as 'conservative' in his deposition'" did not mean it was inaccurate where expert provided sufficient analysis to explain why he settled on...the $3 figure).

for a "critical element of causation." The "conservative" nature of the opinion was irrelevant to the question of whether it was *reliable*. Similarly, in *Unwired Planet, LLC v. Apple Inc.*, 2017 WL 589195, at *2 (N.D. Cal. Feb. 14, 2017), the party offering the expert testimony had largely "not even attempted to explain—the basis for and importance of the assumptions supporting [the expert]'s approach," so "the Court has no way of determining how and to what extent [the expert]'s assumptions affect the model's results."[4]

### D.    Dr. East applies reliable methods to the facts of this case.

Finally, the Bank argues that Dr. East's testimony is inadmissible because it is not sufficiently tied to the particular financial circumstances of individual class members. This argument misstates the law. As explained below, it is commonplace for experts—especially *economics* experts—to rely on data and draw conclusions that are not specific to any particular party. Courts routinely reject attempts to exclude expert testimony on the ground that the testimony is "speculative" or "not sufficiently corroborated" as such "concerns go to the weight of the testimony and its credibility, not its admissibility." *Elosu*, 26 F.4th at 1025-28 (citations omitted).

Here, Dr. East has used her specialized knowledge and experience to evaluate the relevant facts and data, using an established methodology for labor economists that is fully consistent with the approach this Court found acceptable in its class certification order. A defendant's aggregate classwide damages liability may be calculated based on a single number, such as an interest rate, applied across the class, if the evidence shows that number is a reasonable and defensible proxy for the class members' aggregate loss, without requiring tens or hundreds of thousands of individual damages calculations. *See, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 679, 682

---

[4] *See also Guardant Health, Inc. v. Found. Med.*, Inc., 2020 WL 2461551, *18 (D. Del. May 7, 2020) (excluding expert opinion that did not provide "an evidentiary foundation for the particular percentage selected"); *Stokes v. John Deere Seeding Group*, 2014 WL 675820, at *4 (C.D. Ill. 2014) (expert provided no "explanation or method for calculating the conservative factor based on data or theories originating from economic research"); *Ayers v. Robinson*, 887 F. Supp. 1049, 1060-61 (N.D. Ill. 1995) (excluding figure based on "a simple eyeballing technique").

n.31 (9th Cir. 2022) (allowing expert to calculate damages using a uniform overcharge rate of 10.28 percent); *Belyea v. GreenSky, Inc.*, No. 20-CV-01693-JSC, 2025 WL 589037, at *23 (N.D. Cal. Feb. 24, 2025), *opinion clarified*, No. 20-CV-01693-JSC, 2025 WL 1507093 (N.D. Cal. May 27, 2025) ("courts have granted class certification when damages would be calculated using a single overpayment percentage").

For example, in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), the Ninth Circuit held that it was consistent with due process for plaintiffs to measure, on a classwide basis, the aggregate liability attributable to an allegedly false representation that certain cooking oils were "100% natural" by "(1) calculating the price premium attributable to the allegedly false statement…and (2) multiplying that premium by the total number of units sold during the class period." *Id.* at 1132; *accord Nguyen v. Nissan North America, Inc.*, 932 F.3d 811, 821 (9th Cir. 2019) (approving classwide benefit-of-the-bargain damages in defective auto part case, in which plaintiffs proposed using average cost of replacing defective clutch system as proxy for the amounts of customer overpayment, despite classwide variations in cost, timing, and fact of replacement). In *ConAgra Foods*, the individual circumstances of class members necessarily varied; after all, not everyone could be expected to attach precisely the same value to a representation that a cooking oil is 100% natural. The Ninth Circuit nonetheless found it permissible to determine the defendant's aggregate liability, regardless of each class member's individual circumstances and belief systems, based on a specific amount per unit that it attributed to the defendant's misrepresentation based on generalizations about the economic behavior of the relevant population. *Id.*[5] Notably, ConAgra had attempted in the district court to exclude a damages

---

[5] *See also, e.g.*, *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 326 F.R.D 592 (N.D. Cal 2018) (certifying a 23(b)(3) class and approving the use of market data to calculate a "price premium" approximating the value to consumers of Dr. Pepper's false representation that a beverage was "made from real ginger"); *McMorrow v. Mondelez International, Inc.*, 2021 WL 859137 (S.D. Cal. March 8, 2021) (approving a classwide damages model approximating the value to consumers of the representation that a product was "nutritious."); *Belyea v. GreenSky, Inc.*, 2025 WL 589037 at *6 (N.D. Cal., 2025) (denying motion to exclude damages expert and finding that, although individualized

expert on the ground that her proposed analysis would impermissibly seek to approximate the value to consumers of the allegedly false representation by relying in part on "future data"—that is, by relying on data concerning the market behavior of persons *outside* the class to make classwide generalizations untethered from the specific circumstances of any particular class member. *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919, 1028 (C.D. Cal. 2015). The district court held that plaintiffs' experts' proposed generalizations based on market data that was not specific to class members "d[id] not make her methodology unreliable." *Id.*

Similarly, in *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002), the defendant attempted to exclude an expert economist's proffered testimony—consisting of economic generalizations about national trends affecting "mall and retail store sales"—because it did not address the "specific financial conditions" of the defendant's retail store. The Eighth Circuit nonetheless held that "the jury could consider" such economic generalizations and that "it [was] up to the opposing party to examine the factual basis for the opinion in cross-examination"—not through a *Daubert* motion. *Id.* (citing *Bonner*, 259 F.3d at 929-30).

The Bank's reliance on *In re Blackbaud, Inc. Cust. Data Breach Litig.*, 2024 WL 2155221 (D.S.C. May 14, 2024), is also misguided. In that case, the expert's testimony concerned a multi-step method for identifying class members, which changed during the course of the litigation, could not be replicated, and was not shown to be valid on a large scale across a wide number of data sources. *Id.* at *8-14. In contrast, the question here is not administrative feasibility; it is what interest rate the trier of fact could find appropriate for calculating classwide damages attributable to the class members' lost access to their UI funds.

---

questions as to damages may be relevant to the appropriateness of class certification, "they are not a basis for challenging reliability of [the expert's] assessments of classwide damages").

Finally, to the extent the Bank asserts that Dr. East's methodology is insufficiently supported by the sources upon which she relies, "[l]ack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano*, 598 F.3d at 565. The factfinder should therefore be permitted to "consider" Dr. East's conclusions and to give them whatever persuasive weight is appropriate, even though they are not—and realistically, could not be—based on the "specific financial conditions" of each of the approximately 109,000 individual class members. *Hartley*, 310 F.3d at 1061. At trial, the Bank may challenge Dr. East's testimony through cross-examination or through the presentation of its own experts' testimony (testimony which includes those experts' own economic generalizations about class members, which are also not rooted in any class member's specific financial situation). *Bonner*, 259 F.3d at 929-30.[6] Such arguments necessarily go to the weight the factfinder should give the experts' testimony—not to admissibility. *City of Pomona*, 750 F.3d at 1044.

## V.    CONCLUSION

Dr. East has provided a relevant and reliable method for calculating damages. For that reason, the Bank's motion to exclude Dr. East's testimony should be denied.

Respectfully submitted,

Dated:  January 8, 2026                    **COTCHETT, PITRE & McCARTHY, LLP**

By:    */s/ Brian Danitz*
       JOSEPH W. COTCHETT
       BRIAN DANITZ
       KARIN B. SWOPE
       BLAIR V. KITTLE
       VASTI S. MONTIEL
       CAROLINE A. YUEN
       REGINA WANG

---

[6] *See, e.g.*, McCrary Report ¶13 (asserting that, in general, "federal, state, and privately-owned support programs offered financial assistance" that "enhanced income and reduced expenses faced by many during the pandemic"); ¶17 & n.23 (asserting that Regan's proposed 20% interest rate is "likely an overestimate for many proposed class members" based on assumptions about the availability to class members of potential "lower cost sources of funds, such as savings and borrowing from friends and family.")

Dated:  January 8, 2026

**ALTSHULER BERZON LLP**

By:   */s/ Michael Rubin*
     MICHAEL RUBIN
     STACEY M. LEYTON
     CONNIE K. CHAN
     JAMES BALTZER
     KATHERINE BASS

*Co-Lead Counsel for Plaintiffs and the Class*

**SIGNATURE ATTESTATION**

Pursuant to section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I, Brian Danitz, attest that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing content and have authorized this filing.

Dated: January 8, 2026                              */s/ Brian Danitz*
                                                          BRIAN DANITZ