UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION,

Case No.: 21MD2992-GPC(MSB)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS OF JANE CLONINGER**

**[Dkt. No. 563.]**

Before the Court is Defendant's motion to exclude certain expert opinions of Jane Cloninger. (Dkt. No. 563.) Class Plaintiffs filed a response, (Dkt. No. 623), and Defendant replied. (Dkt. No. 672.) A hearing was held on June 11, 2026. (Dkt. No. 737.) Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion to exclude certain expert opinions of Jane Cloninger.

/ / /

/ / /

/ / /

/ / /

## Background

Class Plaintiffs[1] ("Plaintiffs"), individually and on behalf of five certified classes filed suit against Defendant Bank of America, N.A. ("Defendant" or "BANA") for allegedly mishandling, through unlawful policies and practices, reports of unauthorized PIN enabled ATM transactions related to their unemployment insurance ("UI") benefits from California's Employment Development Department[2] ("EDD") during the height of the COVID-19 pandemic in 2020-21. (Dkt. No. 406, TAMCC.) Between August 1, 2016 through July 31, 2021, EDD contracted with BANA to administer the electronic distribution of UI payments through prepaid debit cards. (Dkt. No. 632-31, Chan Decl., Ex. 33; Dkt. No. 632-32, Chan Decl., Ex. 34; Dkt. No. 591-98, Brys Decl., Ex. 39 at -2286.)

Plaintiffs were prepaid debit cardholders ("EDD cardholders") who were deemed eligible and received unemployment insurance benefits with EDD. (Dkt. No. 406, TAMCC.) They allege, among other things, that BANA violated its statutory and regulatory obligations under the Electronic Funds Transfer Act ("EFTA") by using its newly created automated fraud monitoring program, Claim Fraud Filter, Indicator 1 ("CFF-1") as the sole basis for summarily denying EDD cardholders' unauthorized transaction claims involving an ATM without the mandated manual investigations. *(Id.)* In addition, by relying solely on the automated CFF-1 to combat the exponential increase of fraud during the COVID-19 pandemic, Plaintiffs claim that BANA also summarily reversed or rescinded all permanent credits issued to EDD cardholders and summarily froze EDD cardholders' accounts. (*Id.*) Further, Class Plaintiffs complain that BANA knowingly understaffed its Claims call center subjecting EDD cardholders to significant wait times in violation of California common law. (*Id.*) Finally, they allege that

---

[1] The nine Class Plaintiffs are Kuang Ting Chong, Candace Koole, Lindsay McClure, Azuri Moon, Stephanie Moore, Roland Oosthuizen, Vanessa Rivera, J. Michael Willrich, and Alex Yuan

[2] California's EDD administers programs that provide unemployment insurance as well as additional services related to the employment of Californians. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2355.)

BANA's decision to provide magnetic-stripe ("mag-stripe") only debit cards, and not industry-standard EMV chip cards, exposed EDD cardholders to significant fraud due to card "skimming" and counterfeit card fraud violating California statutory and common law. (*Id.*)

On June 16, 2025, the Court certified five classes among the California EDD cardholders: (1) Claim Denial Class; (2) Credit Rescission Class; (3) Account Freeze Class; (4) Customer Service Class; and (5) EMV Chip Class.[3] (Dkt. No. 499 at 96-97.)

Relevant to this motion, the EMV Chip Class is defined as:

> All members of the Claim Denial class and/or Credit Rescission class whose EDD debit card did not include an EMV chip prior to June 9, 2021. Excluded are EDD cardholders who reported not having the card in their possession at the time of the unauthorized transaction or who never received their card, including those who reported a lost or stolen card.

(*Id.*) The class period for the EMV Chip Class is from September 28, 2020 to June 9, 2021. (*Id.*)

## Discussion

### A. *Daubert* Legal Standard

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence ("Rule") 702 to ensure specialized and technical evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 589 & n.7 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposed a special "gatekeeping obligation" on trial judges).

---

[3] Excluded from each class is any person whom the Bank has determined, pursuant to its Remediation Plan "(i) has been disqualified by the [S]tate [of California] from Program eligibility; (ii) has previously engaged in fraudulent Program conduct, such as submission of fraudulent claims or other abuses of the claims process; or (iii) has had their card frozen due to legal order processes, as a result of Internal/Vendor fraud investigations, or by Global Financial Crimes Compliance. Also excluded from each class is any person whose Claim or Account the Bank closed, in whole or in part, because the State of California requested the Bank to close that person's Claim or Account." (Dkt. No. 499 at 97.)

Under Rule 702, a witness, "qualified as an expert by knowledge, skill, experience, training, or education, may testify" . . . if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Lust By & Through Lust v. Merrell Dow Pharms., Inc*., 89 F.3d 594, 598 (9th Cir. 1996). The inquiry into the admissibility of an expert opinion under Federal Rule 702 is a "flexible one." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 592-94). An expert has wide latitude to offer opinions, "including those that are not based on firsthand knowledge or observation[]" and premised on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S.at 596). As such, the role of a district court is that of "a gatekeeper, not a fact finder." *Id.* at 565 (quotation marks omitted). Challenges to the factual foundation of an expert's opinions bear on the weight of the opinion, not its admissibility. *Higley v. Cessna Aircraft Co*., CV 10-3345-JCG, 2013 WL 12112167, at *4 (C.D. Cal. July 8, 2013).

Under *Daubert*, scientific evidence must be both reliable and relevant. *Daubert,* 509 U.S. at 590-91. First, scientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa,* 339 F.3d 1049, 1056 (9th Cir. 2003). However, expert testimony may also rest on personal knowledge or experience. *Kumho Tire Co.,* 526 U.S. at 150. In such a case, reliability depends on the knowledge, experience, education, and training of the expert. *Id.; see Hangarter v. Provident Life and Acc. Ins. Co.* 373 F.3d 998, 1018 (9th

Cir. 2004) (district court did not abuse its discretion concluding the expert's testimony reliable based on his knowledge and experience). The focus of the district court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595. In other words, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1318 (9th Cir. 1995). Second, the proposed expert testimony must be "relevant to the task at hand," meaning that it "logically advances a material aspect of the proposing party's case." *Daubert,* 509 U.S. at 597.

If an expert's opinion is reliable and relevant," then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1231 (9th Cir. 1998). "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'" *Id.* (quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995)).

**B. Motion to Exclude Certain Expert Opinion of Jane Cloninger**

Jane Cloninger has a B.S. in Economics from the University of Tennessee in Knoxville, TN and an MBA from UCLA's Anderson School of Management in Los Angeles, CA. (Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶ 9.) She has over 35 years of experience working in financial services, specifically in the payments industry, which coordinates the exchange of money for goods between customers, businesses, and financial institutions with a focus on product innovation for credit and debit cards, including EMV chips. (*Id.* ¶ 4.) In her prior employment, she gained expertise in the economic and operational features of the payments industry and helped clients prepare product roadmaps, strategic plans and business cases for new products and technology investment which included EMV chips. (*Id.* ¶¶ 5, 6.) She has advised clients on conversion to EMV chip cards. (*Id.* ¶ 6.) For 11 years, she focused on the business implications of EMV chip technology and worked to develop business cases for EMV migration and created models to understand the costs and benefits for the major

players in the payments landscape. (*Id.* ¶ 7.) She also developed fraud forecasts between using and not using EMV chips in order to guide her clients in deciding whether to convert to EMV chips. (*Id.*)

Ms. Cloninger was retained by Plaintiffs to opine on "[w]hether Bank of America's . . . failure to embed EMV chips in its EDD debit cards between March 2020 and June 2021 was consistent with industry standards for debit card security"; "[w]hether the Bank's failure to include EMV chips in its EDD debit cards between March 2020 and June 2021 foreseeably rendered those cards vulnerable to card skimming attacks and card-present counterfeit card fraud, including unauthorized withdrawals at Automated Teller Machines ("ATMs")"; "[w]hether EMV chips would have prevented the unauthorized ATM withdrawals and other card-present transactions that class members experienced;" "[w]hether the Bank's failure to equip EDD cards with EMV chips subjected class members to an increased risk of unauthorized access and exfiltration, theft, or disclosure of the cardholder's personal information;" and "[w]hether, between late September 2020 and June 2021, it would have been reasonable for the Bank to assume that all or almost all EDD debit cardholders who reported an unauthorized ATM withdrawal were likely fraudsters making false reports, rather than actual victims of counterfeit card fraud." (*Id*. ¶ 3.)

Ms. Cloninger opined that magnetic stripe debit cards are highly vulnerable to card skimming and card-present counterfeit fraud. (*Id.* ¶ 14a.) She stated that by 2019, EMV chip cards, which were created to prevent card-present counterfeit fraud on mag-stripe only cards, was an industry-standard security measure for the U.S. debit card market including debit cards used for administering government benefits. (*Id*. ¶¶ 14b, c.) She expressed that BANA's failure to include EMV chip cards in the EDD debit cards caused them to be less secure and more vulnerable to skimming and card-present counterfeit card fraud than EMV chip cards. (*Id.* ¶ 14d.) She asserted that BANA's failure to issue EMV chip enabled cards greatly increased the likelihood of unauthorized access, use, and disclosure of class member personal information through skimming and card-present

counterfeit fraud. (*Id.* ¶ 14g.) She opined that if BANA had added EMV chips to its EDD debit cards, it would have "prevented virtually all the card-present counterfeit fraud (including unauthorized ATM withdrawals) that class members experienced." (*Id.* ¶ 14j.) She also commented that any major financial institution in 2020-21 would have known that EDD cardholders who reported unauthorized ATM withdrawals during the pandemic were real victims of card skimming and/or card-present counterfeit card fraud. (*Id.* ¶ 14k.)

Defendant seeks to exclude Ms. Cloninger's opinions in her expert report dated March 5, 2025 and rebuttal expert report dated April 4, 2025 regarding "(1) any causal connection between BANA's issuance of EDD prepaid cards without EMV chip technology and the alleged fraud experienced by class members, and (2) the feasibility of implementing EMV chip technology prior to 2021." (Dkt. No. 563-1 at 18.) BANA also seeks to exclude her opinion that it was "highly foreseeable" to everyone in the industry that fraud would continue to increase during the pandemic. (*Id*. at 6.)

**1. Qualifications**

Defendant argues that Ms. Cloninger is not qualified to express opinions on the causes of fraud since she admits she is not a fraud expert, has no experience investigating fraud, and has no experience identifying or calculating the amount of fraud that could be prevented by EMV chip technology; rather, she relied on "fraud experts" to identify losses attributable to counterfeit fraud. (Dkt. No. 563-1 at 6-7.) BANA also argues Ms. Cloninger is not qualified to comment on the feasibility of EMV chip implementation because she has no experience in operational matters involving card issuance and has no special knowledge about implementing chip technology or even actual implementation of EMV chips especially in light of the unprecedented levels of fraud during the pandemic. (*Id.* at 14-15.)

Plaintiffs maintain that Ms. Cloninger's over 35 years in the payments industry and 11 years devoted to EMV technology allows her to provide expert opinions on the protections EMV technology would have provided class members in 2020 and the

feasibility of including EMV chips on EDD debit cards during the pandemic. (Dkt. No. 623 at 7-11.) Her professional experience and specialized knowledge of EMV technology qualifies her to testify about its technological ability to prevent fraud. (*Id.* at 7.) Further, her opinions on the feasibility of BANA to convert to EMV chips during the pandemic are based on her years consulting with industry clients about the costs, benefits, and feasibility of their own migration to EMV technology. (*Id.* at 11.)

Under Rule 702, a testifying expert must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In applying Rule 702, the Ninth Circuit "contemplates a *broad conception* of expert qualifications." *Hangarter*, 373 F.3d at 1015 (emphasis in original) (quoting *Thomas v. Newton Int'l Enters*., 42 F.3d 1266, 1269 (9th Cir. 1994)). Therefore, "[t]he threshold for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience suffices." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10–00544 JW, 2011 WL 5417090, at *4 (N.D. Cal. Oct. 27, 2011) (citing *Hangarter*, 373 F.3d at 1015-16). Also, "[a] witness can qualify as an expert through practical experience in a particular field, not just through academic training." *Rogers v. Raymark Indus., Inc*., 922 F.2d 1426, 1429 (9th Cir. 1991). "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy*, 161 F.3d at 1231. Further, an expert's lack of specialization affects the weight of his or her testimony and not its admissibility. *In re Silicone Gel Breast Implants Prods. Liab. Litig.,* 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004) (citing *Holbrook v. Lykes Bros. S.S. Co*., 80 F.3d 777, 782 (3d Cir. 1996)); *see also Hangarter*, 373 F.3d at 1015-16 (finding the district court did not abuse its discretion in permitting expert witness with 25 years of insurance industry in general as it provided the "minimal foundation of knowledge, skill, and experience" to testify specifically about bad faith claims); *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir. 1993) ("lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert.").

Ms. Cloninger opined that EMV chips caused EDD debit cards to be less secure and more vulnerable to skimming and because BANA failed to switch the mag-stripe only EDD debit cards to EMV chip cards, it increased the likelihood of unauthorized access, use and disclosure of cardholder's personal information. (Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶¶ 14d, 14g.) In her rebuttal report, Ms. Cloninger responds to Defendant's EMV chip expert Pamela Joseph's opinion that EMV chip migration in 2020 would have presented insurmountable challenges and concluded that it would have been feasible for BANA to implement EMV chips during the spring and summer of 2020. (Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Reb. Expert Report ¶¶ 6(e), 54, 56)

Ms. Cloninger has over 35 years of experience in financial services, focused on the payments industry and over 11 years of experience on EMV technology. (*Id.* ¶ 4.) She specializes in product innovations for credit and debit cards, including EMV chips. (*Id.*) She has worked at banks and consulting firms in the payments industry practice. (*Id.* ¶ 5.) While employed, she gained expertise in the economic and operations aspects of the payments industry and helped clients in preparing "product roadmaps, strategic plans, and business cases . . . for new products and technology investments, including EMV chips." (*Id.* ¶ 6.) She has advised clients converting to EMV chip cards. (*Id.*) For over 11 years, she worked on the business implication of EMV chip technology, which included developing a business case for EMV migration and developed industry-wide business cases for debit and credit cards. (*Id.* ¶ 7.) Her work involved "creating models that captured the costs (chip and card production costs, point of sale terminal, and ATM upgrade or replacement costs and expenses related to software changes) and the benefits (reduction of card-present counterfeit fraud)" for each issuer, acquirers, ATM operators, merchants, networks, and processors. (*Id.*)

Based on this, the Court finds that Ms. Cloninger has sufficient foundation of knowledge, skill, and experience to provide opinions on whether BANA's failure to convert EDD cardholders' debit cards to EMV chip cards caused the class members'

unauthorized transaction claims and whether it was feasible for BANA to convert to EMV chip technology in the spring and summer of 2020. *See Hangarter*, 373 F.3d at 1015-16. Her work analyzing the cost-benefit of EMV chips and guiding her business clients on the decision to implement EMV chip technology provide a foundation on her opinions of the impact of fraud by using EMV chips. Because EMV chips were created as a fraud prevention technology, experts analyzing the costs and benefits of migrating to EMV technology are necessarily knowledgeable in the improved anti-fraud security provided by EMV chips.

BANA also contends that Ms. Cloninger improperly relies on fraud data prepared by others; however, an expert may "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Ev. 703*; O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc*., 420 F. Supp. 2d 1070, 1088 (N.D. Cal. 2006) ("Rule 703 allows an expert to rely on facts or data relied upon by experts in the particular field in forming opinions or inferences upon the subject; an expert is not required to testify only upon data the expert has personally gathered or tested."). Here, Ms. Cloninger testified that while she was not involved in investigating fraud or fraud operations, she has talked with fraud experts and as such has become aware of concerns and trends regarding fraud. (Dkt. No. 625-4, Hoyle Decl., Ex. 3, Cloninger Depo. at 171:5-23.) In addition, as Plaintiffs point out, in opining on fraud trends, Ms. Cloninger relied on FBI and payments industry publications, including the Nilson Report, FICO and Equifax on skimming operations, and other industry sources and publications as well as [redacted] (*See* Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶¶ 20-45, 72-73. 79-84; Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Reb. Expert Report ¶¶ 74-81.) Accordingly, Defendant's argument challenging her qualifications as to her lack of specialization goes to the weight of her testimony, not admissibility. *See In re Silicone Gel Breast Implants Prods. Liab. Litig*., 318 F. Supp. 2d at 889.

### 2. Reliable Methodology

#### a. Causation Opinion

BANA argues that Ms. Cloninger's opinions establishing a causation between mag-stripe only cards and the fraud allegedly experienced by class members are not based on a reliable methodology, but merely beliefs and unsupported speculation, and her opinions are impermissible legal opinions. (Dkt. No. 563-1 at 8-12.) Plaintiffs maintain that Ms. Cloninger's opinions are based on her extensive professional experience in the payments industry, her specialized knowledge of EMV technology and her analysis of relevant BANA documents and industry publication. (Dkt. No. 623 at 13-14.)

An expert's experience, training and education can provide a sufficient foundation for reliability. *See Hangarter*, 373 F.3d at 1018. Reliability of an expert may be based on "personal knowledge or experience." *Kumho Tire*, 526 U.S. at 150; *see United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) ("The *Daubert* factors (peer review, publication, potential error rate, etc.") simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.").

Defendant's argument that Ms. Cloninger's causation opinion is not based on any methodology, actual data or specific math is mistaken. (Dkt. No. 563-1 at 8-10.) Ms. Cloninger's opinions are not based on science or methodology but based on her over 35 years of experience and knowledge in the payments industry and specifically, 11 years of experience on the business implication of EMV chip technology and assisting clients on their decision whether to convert to EMV technology. Her opinions are also supported by publicly available industry publications and BANA's records. Therefore, her opinions are based on "sufficient facts or data." *See* Fed. R. Evid. 702.

All of BANA's arguments go to the weight of Ms. Cloninger's opinions which can be challenged at trial. For instance, BANA argues that Ms. Cloninger failed to rule out other potential causes of fraud [redacted]. (Dkt. No.

563-1 at 11.) Plaintiffs respond that she addressed alternatives to skimming such as lost or stolen cards, data breaches, family fraud, or cardholder mistake. (Dkt. No. 623 at 16-17.) Contrary to Defendant's argument, Ms. Cloninger addresses other potential causes of fraud and explained why they do not explain the significant number of unauthorized transactions reported by class members. (Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶ 96 n. 126; ¶ 104 n.130; Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Rebuttal Report ¶¶ 73-75, 92-93.) To the extent BANA is not satisfied with her conclusions because they are not convincing or substantive enough, they may be challenged at trial.

Similarly, BANA argues that while Ms. Cloninger acknowledged that EMV chip cards can also be counterfeited and used to commit fraud she failed to consider the impact of fallback rules.[4] (Dkt. No. 563-1 at 11-12.) But, Plaintiffs maintain that Ms. Cloninger considered alternatives and the possibility of fallback transactions and explains such transactions are rare and closely governed by restrictive rules. (Dkt. No. 623 at 16-17.) She also explained that even though it is possible to create a counterfeit mag-stripe only version of the EMV chip card, that card cannot be used in any terminal with a chip reader, such as ATMs. (Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶ 34.) Again, BANA can challenge Ms. Cloninger's opinion on fallback transactions at trial.

Finally, BANA contends that Ms. Cloninger renders impermissible legal opinions on causation and foreseeability. (Dkt. No. 563-1 at 13.) Plaintiffs respond that Ms. Cloninger's opinions are not impermissible legal opinions. (Dkt. No. 623 at 20.)

---

[4] If a counterfeit mag-stripe only version of an EMV chip is swiped, and the transaction proceeds, no correct CVV code will be transmitted and the only possible way to proceed is a "fallback" transaction. (Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶ 34.) A "fallback" transaction occurs when the ATM allows a cardholder to "fallback" and use the mag-stripe of a detected chip card to make the transaction. (*Id.* ¶ 35.) When that happens, the ATM will typically send a code within the authorization request to the card issuer, and if they do not include the fallback code, the liability for any fraudulent fallback transactions falls on the merchant or ATM operator. (*Id.*)

Ms. Cloninger opined that "[s]kimming and card-present counterfeit fraud targeting California EDD cards increased as a result of the Bank's failure to issue EMV-chip-enabled cards and greatly increased the likelihood of unauthorized access, use, and disclosure of class member's personal information. (Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶ 14(g).) She also stated "it was also highly foreseeable that the lack of EMV chips on EDD debit cards would lead to increased counterfeit fraud specifically targeting EDD cardholders during the pandemic." (*Id*. ¶ 100; *see id*. ¶¶ 14.g, 120, 123, Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Rebuttal Report ¶ 65.)

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "That said, an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Nationwide v. Kass Info. Sys., Inc*., 523 F.3d 1051, 1059 (9th Cir. 2008) (quoting *Hangarter,* 373 F.3d 998, 1016 (9th Cir. 2004)); *Elsayed Mukhtar v. Cal. State Univ., Hayward,* 299 F.3d 1053, 1065 n.10 (9th Cir. 2002) *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020). "Thus, while an expert witness generally may give opinion testimony that embraces an ultimate issue to be decided by the trier of fact, that expert may not express a legal opinion as to the ultimate legal issue." *Wiles v. Dep't of Educ*., Civ. Nos. 04–00442 ACK–BMK, 05–00247 ACK–BMK, 2008 WL 4225846, at *1 (D. Haw. Sept. 11, 2008); *Hangarter*, 373 F.3d at 1016 ("While Caliri's testimony that Defendants deviated from industry standards supported a finding that they acted in bad faith, Caliri never testified that he had reached a legal conclusion that Defendants actually acted in bad faith (i.e., an ultimate issue of law.").

BANA does not articulate what causes of action Ms. Cloninger is rendering impermissible legal opinions on but it appears BANA is relying on the CCPA claim for the causation issue. On the CCPA cause of action, Plaintiffs must show their "nonencrypted and nonredacted personal information was subject to an unauthorized access and exfiltration, theft, or disclosure as a result of BANA's violation of the duty to implement and maintain reasonable security procedures." Cal. Civ. Code §

1798.150(a)(1). The question for the jury is whether an unauthorized access, and exfiltration theft or disclosure was a result of BANA's failure to implement and maintain reasonable security measures. That question is distinct from Ms. Cloninger's opinion that "[s]kimming and card-present counterfeit fraud targeting EDD cards increased as a result of the Bank's failure to issue EMV-chip-enabled cards and greatly increased the likelihood of unauthorized access, use and disclosure of class member personal information." (Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶ 14.g.) As such, she does not make a legal conclusion that BANA violated the CCPA. The Court DENIES Defendant's motion to exclude Ms. Cloninger's causation opinions as legally impermissible.

However, Ms. Cloninger's opinions that it was "highly foreseeable" to everyone in the industry, including BANA, that fraud against EDD debit cards would continue to increase during the pandemic, or that it was highly foreseeable that the lack of EMV chips on EDD debit cards would lead to increased counterfeit fraud targeting EDD cardholders during the pandemic, (Dkt. No. 563-4, Hoyle Decl., Ex. 1, Cloninger Expert Report ¶¶ 14.f, 100, 120, 123; Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Reb. Expert Report ¶ 65), are impermissible legal conclusions on the negligence claim.

The elements of negligence are duty, breach of duty, proximate cause, and damages. *Artiglio v. Corning Inc*., 18 Cal. 4th 604, 614 (1998). "Under California law, proximate cause exists if the defendant both (1) in fact caused the injury and (2) could reasonably foresee the risk of injury." *Fed. Deposit Ins. Corp. v. Imperial Bank*, 859 F.2d 101, 103 (9th Cir. 1988) (citing *Powell v. Standard Brands Paint Co*., 166 Cal. App. 3d 357, 363, (1985)). "[F]oreseeability may be relevant to the [trier of fact's] determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury.'" *Burns v. Neiman Marcus Grp., Inc*., 173 Cal. App. 4th 479, 488, fn. 8 (2009). Therefore, the Court concludes Ms. Cloninger's opinions on the foreseeability that lack of EMV chips on EDD debt cards would lead to increased counterfeit fraud impacting EDD cardholders is an impermissible legal opinion. As such,

the Court GRANTS Defendant's motion to exclude Ms. Cloninger's "foreseeability" opinions as impermissible legal conclusions.

**b. Feasibility Opinion**

Defendant maintains that Ms. Cloninger failed to employ a reliable methodology to conclude that the implementation of EMV technology would have been "feasible" in the spring and summer 2020 during height of the COVID-19 pandemic. (Dkt. No. 563-1 at 15.) Plaintiffs argue that BANA disagrees with Ms. Cloninger's rebuttal opinions which are well grounded in her professional experience and knowledge. (Dkt. No. 623 at 19.)

Ms. Cloninger's opinion on the feasibility of BANA to convert to EMV chips in the midst of the height of the COVID-19 pandemic is based on her years of experience and knowledge and industry related publications. (Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Rebuttal Report ¶¶ 58, 61-63.) She has worked in the operational aspects of the payments industry, and counseled clients on the costs and benefits of EMV chip conversion which included analyzing chip and card production costs, point of sale terminal, and ATM upgrade or replacement costs and expense to software. (*Id.* ¶ 7.) Ms. Cloninger has the requisite foundation based on experience and knowledge to opine on the feasibility of EMV chip conversion. Next, BANA's argues she has no experience with operational issues that BANA was facing at the onset of the COVID-19 pandemic, which she addresses in her rebuttal report, (Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Rebuttal Report ¶¶ 58-63), go to the weight not admissibility of the opinions. Accordingly, the Court DENIES Defendant's motion to exclude Ms. Cloninger's opinions on the feasibility of converting to EMV chips during the pandemic.

**Conclusion**

Based on the above, the Court GRANTS in part and in part DENIES Defendant's motion to exclude certain expert opinions of Jane Cloninger. Specifically, the Court GRANTS Defendant's motion to exclude Ms. Cloninger's "foreseeability" opinions as legally impermissible and include paragraphs 14.f, 100, 120 and 123 of her Expert Report and paragraph 65 of the Rebuttal Expert Report. (*See* Dkt. No. 563-4, Hoyle Decl., Ex. 1,

Cloninger Expert Report ¶¶ 14.f, 100, 120, 123; Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Reb. Expert Report ¶ 65.)

IT IS SO ORDERED.

Dated: July 28, 2026

Hon. Gonzalo P. Curiel
United States District Judge