UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION, | Case No.: 21MD2992-GPC(MSB)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS OF GREG J. REGAN;**<br><br>**(2) DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS OF CHLOE N. EAST AND**<br><br>**(3) DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS OF DAVID I. LEVINE**<br><br>**[**<br><br>**[Dkt Nos. 565, 566, 567.]** |

Before the Court is Defendant's motion to exclude the expert opinions of Greg J. Regan, Chloe N. East, Ph.D. and David I. Levine, Ph.D. (Dkt. Nos. 565, 566, 567.) Class Plaintiffs filed responses, (Dkt. Nos. 611, 617, 620), and Defendant replied. (Dkt.

Nos. 678, 681, 684.) A hearing was held on June 11, 2026. (Dkt. No. 737.) Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion to exclude expert opinions of Greg J. Regan, and DENIES Defendant's motion to exclude the expert opinions of Chloe N. East, Ph.D. and David I. Levine, Ph.D.

## Background

Class Plaintiffs[1] ("Plaintiffs"), individually and on behalf of five certified classes filed suit against Defendant Bank of America, N.A. ("Defendant" or "BANA") for allegedly mishandling, through unlawful policies and practices, reports of unauthorized PIN enabled ATM transactions related to their unemployment insurance ("UI") benefits from California's Employment Development Department[2] ("EDD") during the height of the COVID-19 pandemic in 2020-21. (Dkt. No. 406, TAMCC.) Between August 1, 2016 through July 31, 2021, EDD contracted with BANA to administer the electronic distribution of UI payments through prepaid debit cards. (Dkt. No. 632-31, Chan Decl., Ex. 33; Dkt. No. 632-32, Chan Decl., Ex. 34; Dkt. No. 591-98, Brys Decl., Ex. 39 at -2286.)

Plaintiffs were prepaid debit cardholders ("EDD cardholders") who were deemed eligible and received unemployment insurance ("UI") benefits with EDD during the height of the COVID-19 pandemic in 2020-21. (Dkt. No. 406, TAMCC.) They allege, among other things, that BANA violated its statutory and regulatory obligations under the Electronic Funds Transfer Act ("EFTA") by creating and implementing an automated fraud monitoring program, Claim Fraud Filter, Indicator 1 ("CFF-1") as the sole basis for summarily denying EDD cardholders' unauthorized transaction claims involving an ATM without the mandated manual investigations. *(Id.)* In addition, by relying solely on the automated CFF-1 to combat the exponential increase of fraud during the COVID-19

[1] The nine Class Plaintiffs are Kuang Ting Chong, Candace Koole, Lindsay McClure, Azuri Moon, Stephanie Moore, Roland Oosthuizen, Vanessa Rivera, J. Michael Willrich, and Alex Yuan.

[2] California's EDD administers programs that provide unemployment insurance as well as additional services related to the employment of Californians. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2355.)

pandemic, Plaintiffs claim that BANA also summarily reversed or rescinded all permanent credits issued to EDD cardholders and summarily froze EDD cardholders' accounts. (*Id.*) Further, Class Plaintiffs complain that BANA knowingly understaffed its Claims call center subjecting EDD cardholders to significant wait times in violation of California common law. (*Id.*) Finally, they allege that BANA's decision to provide magnetic-stripe ("mag-stripe") only debit cards, and not industry-standard EMV chip cards, exposed EDD cardholders to significant fraud due to card "skimming" and counterfeit card fraud violating California statutory and common law. (*Id.*)

The TAMCC alleges the following remaining claims:

1. First Claim -violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1963 *et seq.,* and Regulation E ,12 C.F.R. §§ 1005.1 *et seq*.;
2. Second Claim - violation of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100 *et seq*.;
3. Fourth Claim - violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*.;
4. Fifth Claim - Negligence and Negligence Per Se;
5. Sixth Claim - Negligent Hiring, Supervision, and Retention;
6. Seventh Claim - Breach of Contract;
7. Ninth Claim - Breach of the Implied Covenant of Good Faith and Fair Dealing;
8. Tenth Claim - Breach of Fiduciary Duty;
9. Thirteenth Claim - violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution; and
10. Fourteenth Claim - violation of the Due Process Clause of the California Constitution.

(*Id.*)

During the pendency of the case, in July 2022, the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") entered into Consent Orders with BANA regarding findings of violations of federal law related to its use of the CFF. (Dkt. No. 565-4, Hoyle Decl., Ex. 28; Dkt. No. 565-5, Hoyle Decl. Ex. 29.) In response to the Consent Orders, BANA [redacted]

[redacted] ("Remediation Plan") [redacted]. (Dkt. No. 627-3, Hoyle Decl., Ex. 31.)

On June 16, 2025, the Court certified the following five classes among the California EDD cardholders: (1) Claim Denial Class; (2) Credit Rescission Class;[3] (3) Account Freeze Class[4]; (4) Customer Service Class[5]; and (5) EMV Chip Class[6]. (Dkt. No. 494 at 96-97.) Excluded from each class is any person whom the Bank has determined, pursuant to its Remediation Plan "(i) has been disqualified by the [S]tate [of California] from Program eligibility; (ii) has previously engaged in fraudulent Program conduct, such as submission of fraudulent claims or other abuses of the claims process; or (iii) has had their card frozen due to legal order processes, as a result of Internal/Vendor fraud investigations, or by Global Financial Crimes Compliance. Also excluded from each class is any person whose Claim or Account the Bank closed, in whole or in part, because the State of California requested the Bank to close that person's Claim or Account." (*Id.* at 97.)

On summary judgment, Defendant seeks to exclude the expert opinions of Greg J. Regan on his methodology on damages, Chloe N. East, on her assessment of a compound interest rate to determine the lost time value of money, and David I. Levine, on his assessment of a compound interest rate to determine the lost time value of money as well as using the minimum wage to represent the "lost time" on hold for the Customer Service Class members.

---

[3] The class period is from September 28, 2020 through June 8, 2021 as to the Claim Denial Class and Credit Rescission Class.

[4] The class period is from September 28, 2000 through March 18, 2021 and whose account BANA subsequently unfroze or subsequently converted from frozen to blocked status on or after March 18, 2021, and then unblocked.

[5] The class period for the Customer Service Class is from September 13, 2000 to November 21, 2000.

[6] The class period for the EMV Chip Class is from September 28, 2020 to June 9, 2021.

## Discussion

### A. *Daubert* Legal Standard

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence ("Rule") 702 to ensure specialized and technical evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 589 & n.7 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposed a special "gatekeeping obligation" on trial judges).

Under Rule 702, a witness, "qualified as an expert by knowledge, skill, experience, training, or education, may testify" . . . if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Lust By & Through Lust v. Merrell Dow Pharms., Inc*., 89 F.3d 594, 598 (9th Cir. 1996). The inquiry into the admissibility of an expert opinion under Federal Rule 702 is a "flexible one." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 592-94). An expert has wide latitude to offer opinions, "including those that are not based on firsthand knowledge or observation[]" and premised on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S. at 596). As such, the role of a district court is that of "a gatekeeper, not a fact finder." *Id.* at 565 (quotation marks omitted). Challenges to the factual foundation of an expert's opinions bear on the weight of the opinion, not its admissibility. *Higley v. Cessna Aircraft Co*., CV 10-3345-JCG, 2013 WL 12112167, at *4 (C.D. Cal. July 8, 2013).

Under *Daubert*, scientific evidence must be both reliable and relevant. *Daubert,* 509 U.S. at 590-91. First, scientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa,* 339 F.3d 1049, 1056 (9th Cir. 2003). However, expert testimony may also rest on personal knowledge or experience and in such a case, reliability depends on the knowledge, experience, education, and training of the expert. *Kumho Tire Co.,* 526 U.S. at 150; *see Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1018 (2004) (district court did not abuse its discretion concluding the expert's testimony reliable based on his knowledge and experience). The focus of the district court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595. In other words, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1318 (9th Cir. 1995). Second, the proposed expert testimony must be "relevant to the task at hand," meaning that it "logically advances a material aspect of the proposing party's case." *Daubert,* 509 U.S. at 597.

If an expert's opinion is reliable and relevant," then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1231 (9th Cir. 1998). "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'" *Id.* (quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995)).

**B. Motion to Exclude Expert Opinions of Greg J. Regan**

Defendant seeks to exclude the March 4, 2025 expert opinions of Greg. J. Regan, Plaintiffs' damages expert. (Dkt. No. 567-1.)

Greg J. Regan ("Mr. Regan") has been a licensed Certified Public Account ("CPA") since 1998 and Certified in Financial Forensics ("CFF") from the AICPA, a national professional organization for CPAs, and is a Certified Fraud Examiner ("CFE") issued by the Association of Certified Fraud Examiners. (Dkt. No. 567-12, Hoyle Decl.,

Ex. 41, Regan Expert Report ¶ 24.) He has experience as an auditor, Controller and consultant. (*Id.* ¶ 25.) He has extensively analyzed various forms of economic damages and has substantial experience working with complex data systems. (*Id.*) He has been retained by large companies as well as a number of federal and state governmental agencies. (*Id.* ¶ 26.)

Mr. Regan was retained by Plaintiffs to provide a methodology to calculate classwide damages resulting from BANA's use of CFF-1 for the Claim Denial, Claim Rescission, Account Freeze Classes, Customer Service Class and EMV Chip Class. (*Id.* ¶ 5.)

For the Claim Denial, Claim Rescission and Account Freeze Classes, he determined that the principal amount of actual damages is the amount that BANA either denied, rescinded or froze based solely on CFF-1. (*Id.* ¶¶ 9, 13, 17.) He next opined that consequential damages resulting from the loss of access to the principal amount can be calculated by applying a compound interest rate to the principal amount. (*Id.* ¶¶ 9, 13, 17.) He explained that a compound interest rate represents the lost time value of money or economic loss resulting from the inability to access UI benefits and is a standard way to calculate the harm resulting from denial of access to funds. (*Id.* ¶ 9.) Therefore, the formula to assess consequential damages can be calculated by the principal amount (that was denied, rescinded or frozen) x time (duration of the denial, rescinded or frozen funds) x rate (compound interest rate). (*Id.* ¶¶ 44, 45, 46.) Mr. Regan also opined that disgorgement of profits can be assessed by [redacted]. (*Id.* ¶¶ 12, 61, 72, 87.)

For the Customer Service class, Mr. Regan explained that actual damages measures the value of class members' lost time spent on hold with the Customer Service Claims call center ("Claims call center") that was greater than the reasonable wait-on-hold time by industry standards. (*Id.* ¶ 19.) Relying on Plaintiffs' call center expert, Jay Minnucci, the Average Speed to Answer ("ASA") resulted in an average excess hold time

of about [redacted] per call. (*Id.* ¶¶ 19, 92.) [redacted] can be multiplied with the number of times each class member called, based on BANA's records along with the then-current California minimum wage determined by Plaintiffs' economist expert David Levine, or other reasonable metric, to represent a measure of the value of lost time spent waiting on hold in excess of the industry standard wait time. (*Id.* ¶¶ 19, 92, 93.) The formula to calculate damages for the Customer Service Class is multiplying the average excess hold time ([redacted]) x a measure of the value of lost time (minimum wage) x number of times each class member called. (*Id.* ¶¶ 19, 92. 93.)

**1. Reliable Methodology**

**a. Identifying Uninjured Class Members**

BANA argues that Mr. Regan's method of calculating class damages is inadmissible because he has not provided a reliable method of excluding non-injured class members. (Dkt. No. 567-1 at 10-11.[7]) Plaintiffs respond that BANA repeats arguments that the Court rejected at class certification and expert testimony need not establish every element of their claim. (Dkt. No. 620 at 8-9.) BANA replies that Plaintiffs have the burden to demonstrate "actual damages" including winnowing out at the damages phase any non-injured class members. (Dkt. No. 684 at 3.)

Ultimately, Mr. Regan was retained to offer a damages model that calculates classwide damages resulting from BANA's policies and practices for the Claim Denial, Claim Rescission, Account Freeze, Customer Service and EMV Chip Classes, and not to winnow out uninjured class members. (Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan Expert Report ¶¶ 5, 6.) Defendant does not challenge Mr. Regan's formulas to calculate damages for each of the Classes. The fact that Mr. Regan does not offer a methodology for identifying non-injured class members is not a basis to exclude Mr. Regan's opinions. *Primiano*, 598 F.3d at 565 ("Reliable expert testimony need only be relevant, and need

[7] Page numbers are based on the document's page numbers.

not establish every element that the plaintiff must prove, in order to be admissible."). Accordingly, the Court DENIES Defendant's motion to exclude Mr. Regan's opinions for failing to come up with a methodology of excluding non-injured class members.

**b. Consequential Damages Opinions – Cost of Inability to Access Frozen Funds**

BANA asserts that Regan's methodologies for consequential damage are inadmissible and not based on "sufficient facts or data" because they are not tethered to any class member's experiences with BANA's CFF-1 which, according to BANA, the Court rejected at class certification. (Dkt. No. 567-1 at 13, 16.) Specifically, BANA claims that the 20% interest rate Mr. Regan proposes is not a reliable measure of harm reflecting the cost of borrowing by EDD cardholders because Mr. Regan admits he did not review any records of class members to see if they incurred such expenses or were charged a 20% APR and that not every class member would have increased their credit card use or that every class member had to borrow money or that each class member even had a credit card. (*Id.* at 14-15.) BANA suggests that consumers can fund unanticipated expenses from a variety of sources other than credit cards. (*Id.* at 14.) Because Mr. Regan's assumptions based on consequential harm calculations are inconsistent with the experience of nearly all Class Plaintiffs, his opinions cannot assist the trier of fact. (*Id.* at 17-18.)

Plaintiffs argue that it is common for experts to rely on data and draw conclusions that are not specific to any particular party which is supported by Ninth Circuit precedent. (Dkt. No. 620 at 9-10.) In addition, the Court's prior ruling that a compound interest rate reflects the lost time value of money which necessarily reflects a generalization is not tied to a specific cardholder's circumstance. (*Id.* at 10.)

At class certification, in considering consequential damages, the Court, relying on *Van v. LLR Inc.*, 962 F.3d 1160, 1165 (9th Cir. 2020), recognized that an injury based on

the "lost time value of money" can be remedied through an award of an interest rate. (Dkt. No. 494 at 86.) As such, the Court concluded that Regan's Methodology 1,[8] multiplying the principal amount of actual damage with a compound interest rate, representing the lost time value of money, and the total length of time class members were denied access to UI benefits, was a damages model that complies with *Comcast*. (*Id.* at 86-87.)

BANA does not dispute Mr. Regan's formula to calculate consequential damages, or Methodology 1. There are three inputs. First, the principal amount of the denied, rescinded or frozen claim, the second input is the duration of time the funds were inaccessible, and the third input is the compound interest rate that reflects the lost time value of money for impacted cardholders. (Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan Expert Report ¶¶ 45-46.) Rather, BANA disputes the third input which are the two interest rates Mr. Regan uses for a compound interest rate.

Also, at the class certification stage, Mr. Regan offered Methodology 2 as an alternative method to calculate financial harms experienced by cardholders impacted by BANA's use of CFF-1 and to assess the financial cost of borrowing substitute funds, as well as late or overdraft fees due to BANA's denial of their claims and their inability to access funds. (Dkt. No. 386-4, Chan Decl., Ex. 4, Regan Expert Report ¶¶ 54-57.) However, the Court rejected Regan's Methodology 2 assessing the lost time value of money using the 20% interest rate [redacted]. (*Id.* at 87.) The Court rejected Mr. Regan's Methodology 2 because [redacted]. (*Id.* at 87-88.)

---

[8] Mr. Regan's two methodologies are explained in his expert report dated August 29, 2024 which was considered at class certification. (Dkt. No. 647-2, Baltzer Decl., Ex. B., Regan Expert Report.)

Now, "[t]o illustrate [his] methodology," Mr. Regan has selected a 10% rate which is applied to California judgments, and a 20% credit card average APR. (*Id.* ¶¶ 46, 47, 48.) He provided general reasons why 10% would not reflect the higher costs consumers incurred and why he selected 20%. (*Id.* ¶¶ 46, 49.) He then explained that his methodology [redacted] (*Id.* ¶¶ 52-57.) Unlike the expert opinions of Chloe East and David Levine, discussed below, the focus of Mr. Regan's opinion[9] is based on the cost of borrowing rather than evaluating the lost time value of money loss resulting from the inability to access UI benefits.

Therefore, because the 10% and 20% interest rates are based primarily on the cost of borrowing money and [redacted], the Court excludes Mr. Regan's testimony as to Methodology 2.

**c. Additional Consequential Damages for Account Freeze Class-Cost of Delayed Benefits Payment**

Defendant argues that as to the Account Freeze Class, Mr. Regan applied his interest rate calculation in an unreliable manner because he did not know the amount of each class members' bi-weekly benefit payment, did not know the length of the delayed receipt of subsequent benefit payments, did not verify that each class member remained eligible for EDD benefits after their accounts were frozen, and assumed that each cardholder had a [redacted] and is not factually supported. (Dkt. No. 567-1 at 20-22.) Plaintiffs do not address this argument.

In addition to a formula to address the cost of the inability to access frozen funds, Mr. Regan also calculated consequential damages for the cost of delayed benefit payments for the Account Freeze Class. (Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan

---

[9] Mr. Regan also summarily mentions the cost of reduced consumption or inability to pay down existing debt but without any meaningful analysis. (Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan Expert Report ¶ 46.)

Expert Report ¶¶ 83-85.) If a cardholder's account [redacted]; therefore, in such a case, the cardholder [redacted]. (*Id.* ¶ 83.) According to Mr. Regan, [redacted] (*Id.*) [redacted] (*Id.*)

According to Mr. Regan, the Account Freeze Class suffered harm not only from being denied access to amounts that were frozen but suffered additional harm due to the delayed payments due to the freeze. (*Id.*) Mr. Regan opined that the cost of delayed payments can be calculated based on the amount of each class member's bi-weekly benefit payment and the length of the delayed receipt of their subsequent benefit payments and a compound interest rate. (*Id.* ¶¶ 84, 85.)

BANA does not dispute Mr. Regan's formula to calculate the consequential damages for delayed benefit payments, rather, all its challenges go to the weight of his testimony, not admissibility and are questions for the jury. Accordingly, the Court DENIES Defendant's motion to exclude Mr. Regan's opinions on the delayed benefits payments for the Account Freeze Class.

**d. Customer Service Class**

BANA maintains that Mr. Regan's proposed methodology to calculate actual damages for the Customer Service Class cannot measure economic harm on a classwide basis because he assumes that "lost" time resulted in the same "economic harm" for each class member. (Dkt. No. 567-1 at 22-23.) In fact, it claims that Mr. Regan did not testify that any member of the class would have collected minimum wage if they had not been on hold with the Claims call center. (*Id.* at 23.) Plaintiffs respond that the issue is not whether they would have earned minimum wage income if they were not on hold, but

that the minimum wage is a reasonable metric to remedy the injury of lost time. (Dkt. No. 620 at 16.)

At class certification, Mr. Regan assessed an appropriate measure of classwide damages for the Customer Service Class members' "lost time spent on hold with the BANA's Claims call center waiting for their call to be answered that was greater than the reasonable wait-on-hold time by industry standards." (Dkt. No. 494 at 90; Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan Expert Report ¶¶ 19, 91.) Mr. Regan's methodology to calculate classwide damages for the Customer Service Class of "lost time" was to multiply the applicable California minimum wage, determined by David Levine, or other reasonable metric, by the alleged "average excess hold time" calculated by Plaintiffs' call center expert, Jay Minnucci, to be about [redacted], or another input, and the number of times each class member called, which according to Plaintiffs' call center expert is available within BANA's records. (Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan Expert Report ¶ 19 & n.19, ¶¶ 92, 93.)

The Court agrees with Plaintiffs. The minimum wage is a proxy for damages suffered by class members who spent an unreasonably amount of time on hold with the Claims call center and not that each class member would have earned minimum wage if they were not on hold. Here, Mr. Regan's came up with the formula to calculate damages for the Customer Service class which BANA does not dispute. Rather, BANA disputes the inputs generated from David Levine and Jay Minnucci which are raised in BANA's *Daubert* motions as to them. Any factual dispute as to the generation of inputs go to the weight of the testimony, not admissibility. *See Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 299 (N.D. Cal. 2020) (finding where "arguments largely turn on factual disputes over which inputs [an expert] should use in his model, rather than flaws in the model itself . . . [they] thus do little to undermine the reliability of the model"). Accordingly, Defendant's argument seeking to exclude Mr. Regan's opinion on the Customer Service class is without merit.

Defendant also claims [redacted]. (Dkt. No. 567-1 at 23 (citing Dkt. No. 350-6, Brys Decl., Ex. 5, Hindle Decl. ¶ 18.) Plaintiffs do not respond to this argument.

At class certification, BANA raised the same question and the Court noted it was a disputed issue of fact [redacted]. (*Compare* Dkt. No. 378-7, Chan Suppl. Decl., Ex. 162, Minnucci Rebuttal Expert Report ¶¶ 36-37 ("[redacted]") with Dkt. No. 382-2, Brys Decl., Ex. 5, Hindle Expert Report ¶ 18 ("[redacted]").) As the Court stated, if this issue remains disputed, it will be presented to the factfinder at trial. *See Apple Inc. v. Superior Ct*., 19 Cal. App. 5th 1101, 1114-115 (2018) (dispute whether expert calculation of profits could be based on defendant's documents necessary to Plaintiffs' experts analysis was for the jury). Therefore, Defendant's arguments are not a basis to exclude Mr. Regan's opinions on the Customer Service class.

**e. Disgorgement**

BANA contends that Mr. Regan's opinions on disgorgement should be excluded as flawed because he assumed that [redacted]. (Dkt. No. 567-1 at 24.) Instead, BANA claims that evidence shows that [redacted]. (*Id.*) Plaintiffs respond that BANA's argument is legally irrelevant because the purpose

of disgorgement is to “eliminate” even the “possibility of profit from conscious wrongdoing.” (Dkt. No. 620 at 14.) Therefore, by withholding the funds, BANA converted the funds from a potential source of bank revenue into a certain source of revenue, and all revenue generated is attributed to the underlying wrong. (*Id.*)

Mr. Regan explained that Plaintiffs seek disgorgement of profits that BANA earned on the claim amounts that it denied and withheld, rescinded and withheld, froze and withheld from class members based on CFF-1. (Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan Expert Report ¶¶ 60, 72, 87.) [redacted]. (*Id.* ¶ 61.) [redacted]. (*Id.*) [redacted]. (*Id.*)

“The object of the disgorgement remedy—to eliminate the possibility of profit from conscious wrongdoing—is one of the cornerstones of the law of restitution and unjust enrichment,” and “[t]he profit for which the wrongdoer is liable . . . is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong.” *Meister v. Mensinger,* 230 Cal. App. 4th 381, 399 (2014) (quoting Rest.3d Restitution and Unjust Enrichment, § 51(4)). The focus of disgorgement “is on the wrongdoer’s enrichment, not the victim’s losses. In particular, a person acting in conscious disregard of the rights of another should be required to disgorge *all* profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again.” *Id.* at 398-99 (emphasis added) (quoting *Cnty. of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (2007)).

Here, Defendant’s claim that Mr. Regan assumed that each class member withdrew their UI benefits immediately misses the mark. The purpose of disgorgement is to “eliminate the possibility of profit from conscious wrongdoing” of BANA. *See Meister*,

230 Cal. App. 4th at 399. Therefore, the focus of disgorgement is on the Defendant's enrichment, not the conduct of Plaintiffs. Mr. Regan's comment that the majority of the cardholders would have withdrawn the entirety of their balances immediately is used to illustrate that BANA would not have generated float revenue if the cardholders withdrew their funds. However, the question on disgorgement is determining the amount of Defendant's profits due to its allegedly unlawful use of CFF-1. Mr. Regan came up with a methodology to calculate BANA's profits, [redacted], under a disgorgement theory. He calculated the amount of [redacted] for the Claim Denial, Credit Rescission and Account Freeze classes [redacted]. (Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan Expert Report ¶¶ 62, 72, 87.) Defendant does not dispute that it [redacted] while funds were held in EDD cardholders' accounts. Therefore, the BANA's argument challenging disgorgement based on Mr. Regan's assumption about class members' behavior is without merit.

BANA also argues that Mr. Regan's opinion on disgorgement is not relevant because it fails to estimate its "net profits", or operation costs, and instead calculates "gross profits." (Dkt. No. 567-1 at 25.) Plaintiffs aver that any risk of uncertainty falls on the wrongdoer whose illegal conduct caused the uncertainty and even if BANA is correct, Mr. Regan's methodology would still be helpful to the trier of fact because such operational costs could be deducted from Mr. Regan's damages figures. (Dkt. No. 620 at 15.)

To determine disgorgement, or unjust enrichment in California, "the plaintiff may present evidence of the total or gross amount of the benefit, or a reasonable approximation thereof, and then the defendant may present evidence of costs, expenses, and other deductions to show the actual or net benefit the defendant received." *Meister,* 230 Cal. App. 4th at 399 (citing *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 894 (2010)); *see also Liu v. SEC*, 591 U.S. 71, 74 (2020) ("a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under

§ 78u(d)(5).”). Here, Plaintiffs have a method to calculate the gross amount of disgorgement damages. Defendant will then have an opportunity to present evidence of costs and expenses to arrive at net profits. Therefore, Defendant’s argument that Plaintiff must estimate net profits is not well taken. Accordingly, the Court DENIES BANA’s motion to exclude Mr. Regan’s expert opinions on disgorgement.

In sum, the Court GRANTS in part and DENIES in part Defendant’s motion to exclude the expert opinions of Mr. Regan.

**C. Motion to Exclude Expert Opinions of Chloe N. East**

Defendant seeks to exclude the testimony and expert report of Chloe N. East, Plaintiffs’ labor economist. (Dkt. No. 565-1.)

Chloe N. East, Ph.D. in economics, (“Dr. East”) is a labor economist and a nationally recognized expert in U.S. safety net and social insurance programs including UI. (Dkt. No. 565-8, Hoyle Decl., Ex. 32, East Expert Report ¶¶ 1-4.) She is an Associate Professor of Economics at the University of Colorado Denver and received her B.S. in Economics from the University of Texas at Austin, and an M.A. and Ph.D. in economics from the University of California, Davis. (*Id.* ¶ 1.) She founded and operates the Equitable Policy Research Lab, is a Research Associate at the Institute for Research on Poverty at the University of Wisconsin, a Non-Resident Fellow at the Brookings Institution, a Faculty Research Fellow at NBER, and a Research Fellow at IZA. (*Id.* ¶ 2.) She has published articles in top economic journals and her research has been featured in major media news outlets. (*Id.* ¶ 3.) She has studied UI since 2012 and published papers on the effects of UI as a cushion for people after they lose their jobs. (*Id.* ¶ 4.)

Dr. East was retained by Plaintiffs to opine on “1) the vulnerability of UI recipients and the importance of UI benefits in mitigating the harms that would otherwise be suffered by those who lose their jobs through no fault of their own, 2) the impacts of denying UI beneficiaries access to their UI funds, and 3) an appropriate compound interest rate that can be used under a common methodology to calculate the consequential damages, or lost value to class members of their UI benefits, resulting from their inability

to access their UI benefits at the time they were due as a result of the Bank's challenged policies and practices." (*Id.* ¶ 5.)

She offers the following opinions: UI benefits provide a critical safety net for individuals thrust into involuntary job loss so that they can afford food, healthcare, transportation, housing and other life necessities; the typical UI recipient does not have enough savings to survive an abrupt loss of UI benefits and will either increase borrowing or cut their consumption or both; and because the loss of UI benefits is valued higher in light of the low levels of savings among UI recipients than at a later point in time, the average credit card interest rate, 20.8%, is a conservative estimate of the costs faced by the class members who lost access to their benefits. (*Id.* ¶¶ 8-10.)

BANA contends that Dr. East's use of a 20.8% credit card interest rate to represent the lost time value of money is unreliable and not supported. (Dkt. No. 565-1 at 8.) First, it argues that Dr. East's calculation of 20.8% interest rate constituting a conservative estimate of "aggregate costs" is not based on any class member's alleged injuries; instead, it is completely arbitrary and based on pre-COVID-19 behaviors of UI recipients rather than the unique circumstances presented during COVID-19. (*Id.* at 10.) Second, BANA maintains that Dr. East ignores data that certain class members lost access to their UI benefits [redacted] and/or could not access [redacted] or less which highlights that her assessment is not tied to any facts related to Class Plaintiffs' actual experience and merely relies on unsupported assumptions. (*Id.* at 11.) Third, BANA asserts that Dr. East's opinions undermine her speculation that [redacted] (*Id.* at 11-12.) Fourth, it contends that Dr. East's methodology is not generally accepted in her field because "she does not assert that using a credit card interest rate to calculate damages for a class of people who did not pay credit card interest enjoys any such general acceptance." (*Id.* at 13.)

**1. Factual Basis for Opinion**

Rule 702(b) permits the introduction of expert testimony only if "the testimony is based on sufficient facts or data." Fed. R. Evid. 702(b). Expert testimony should not be admitted if it "is wholly speculative or unfounded[.]" *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022). On the other hand, an expert's specialized knowledge and experience can serve as the foundation of the "sufficient facts or data" upon which the expert relies. *Id.* at 1024. "Relatedly, the requirement of 'sufficient facts or data' does not preclude an expert from making projections based on reliable methodology." *Id.* at 1025 (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc*. 738 F.3d 960, 969 (9th Cir. 2013)).

Ultimately, "Rule 702's 'sufficient facts or data' element requires foundation, not corroboration." *Elosu*, 26 F.4th at 1025. "In other words, the key inquiry under Rule 702 is 'whether an expert had sufficient factual grounds on which to draw conclusions,' not whether the expert's 'hypothesis is correct' or 'corroborated by other evidence on the record.'" *Hyer v. City and Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (quoting *Elosu,* 26 F.4th at 1025-26). Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu,* 26 F.4th at 1026. "Countervailing considerations such as other evidence in the record which could be viewed as contrary to the expert's views and arguments that the expert relied too heavily on interested party evidence, that the report is not sufficiently corroborated, or the expert is biased, 'go to the weight of the testimony and its credibility, not its admissibility.'" *In re Packaged Seafood Prods. Antitrust Litig*., Case No.: 15-MD-2670 DMS (MSB), 2024 WL 1269863, at *6 (S.D. Cal. Mar. 25, 2024) (citing *Elosu,* 26 F.4th at 1028).

Dr. East's opinions are based on her extensive background and years of research on the impacts of UI as well as review of academic publications, economic and non-economic, the Survey of Income and Program Participation ("SIPP") data presented by

the U.S. Census Bureau that evaluates savings of UI recipients in California during 2020 and 2021, (*id.* ¶ 18), and data from the Federal Reserve Survey of Household Economics and Decisionmaking ("SHED"), (*id.* ¶ 21). (*Id.* ¶¶ 12-36; *see also* Dkt. No. 565-8, Hoyle Decl., Ex. 32, East Expert Report, App. B.) Her research looked at the national population and specifically Californians during the 2020-21 year. (Dkt. No. 365-8, Hoyle Decl., Ex. 32, East Expert Report ¶¶ 12-36.) Dr. East explained that the accepted methodology and practice in economics is empirical analyses relying on large, representative samples and aggregate data, which includes the mean or median, and average and not on extreme values. (*Id.* ¶¶ 15-16.)

BANA also argues that just because Dr. East states that the 20.8% interest rate proposed is conservative does not make it reliable. (Dkt. No. 565-1 at 8-9.) BANA makes the same argument as to Dr. Levine's opinions. (*See* Dkt. No. 566-1 at 10.) Plaintiffs respond that Dr. East and Dr. Levine's opinions are reliable and conservative. (Dkt. No. 611 at 12-13; Dkt. No. 617 at 8.) In her conclusion, Dr. East stated that using the credit card interest rate is "a conservative estimate of the aggregate costs faced by the class while waiting for the UI benefits." (Dkt. No. 565-8, Hoyle Decl., Ex. 32, East Expert Report ¶ 37.) Dr. Levine concluded that the interest rate of 15.9% as a compound interest rate is a "conservative lower bound on the average opportunity cost funds for UI recipients in California during the COVID pandemic." (Dkt. No. 566-9, Hoyle Decl., Ex. 35, Levine Expert Report ¶ 45.) *Daubert* asks whether expert opinions are reliable and relevant, not whether they are conservative. *See* Fed. R. Evid. 702. Defendant's request to exclude Dr. East and Dr. Levine's opinions because they are conservative is not compelling. Rather, an expert's calculations deemed conservative goes to the weight, not the admissibility. *See Beijing Meishe Network Tech. Co., Ltd. v. TikTok Inc.*, Case No. 23-cv-06012-SI, 2025 WL 2522375, at *5 (N.D. Cal. Sept. 2, 2025) (defendant's concern that plaintiffs attempt to revise damages calculation in a "cloak of conservativism" goes to the weight, not admissibility of expert report).

**2. Methodology**

According to Dr. East, the class-wide harm caused by delayed UI benefits can be measured, in part, by using an interest rate that represents the costs incurred by those class members when the UI benefits were abruptly taken away. (Dkt. No. 565-8, Hoyle Decl., Ex. 32, East Expert Report ¶ 37.) Dr. East explained that UI was critical to many recipients, who typically had little to no savings. (*Id.* ¶¶ 24-27.) Therefore, when UI benefits abruptly stopped due to BANA's challenged policies, recipients were forced to either incur debt by relying on credit card borrowing or cut back on necessities such as going without food, foregoing medical care or falling behind on bills. (*Id.* ¶¶ 28-35.) She also took into consideration the federal stimulus checks that replaced an individual's lost earnings by 100%; however, she concluded that even with these additional monies, most UI recipients in California still had less than one month's worth of income in net household wealth and could not rely on stimulus checks to cover their expenses without UI benefits. (*Id.* ¶ 23.)

Dr. East explains precisely how she went about arriving at her conclusions and points to objective sources to support the building blocks of her opinions and establishes the soundness of her methodology. Based on her methodology and analysis, Dr. East concluded that using the credit card interest rate is "a conservative estimate of the aggregate costs faced by the class while waiting for their UI benefits." (*Id.* ¶ 37.) [3]

**3. Compound Interest Rate**

Here, the key, foundational issue underlying all arguments in BANA's *Daubert* motion challenging Dr. East's expert opinion is that Dr. East did not tether her 20.8% interest rate to any class members' experience including the Class Plaintiffs. At class certification, the Court relied on *Van* where the Ninth Circuit recognized injury in the form of "the lost time value of money" which can be compensated either through "an award of damages or the payment of prejudgment interest." *Van v. LLR Inc.*, 962 F.3d 1160, 1164 (9th Cir. 2020). The Ninth Circuit rejected the defendant's argument that the plaintiffs failed to make "specific allegations regarding how each class member would have earned interest on the money but for the defendant's wrongful conduct." *Id.* at

1164. According to the Ninth Circuit, the plaintiff's injury was not that she lost interest income but that she lost the use of her money; therefore, the plaintiffs did not have to allege she had "specific plans to invest money into an interest-bearing asset." *Id.* at 1165. Therefore, contrary to Defendant's argument, applying a uniform compound interest rate, that is based on reliable data concerning California UI recipients during the COVID-19 pandemic, to measure the lost time value of money on a class wide basis is permissible.

Dr. East's assignment was to assess an "appropriate compound rate" to calculate consequential damage or the lost time value of the UI benefits EDD cardholders were unable to access due to CFF-1. These damages included an array of harms, such as being forced to incur debt through credit card borrowing, incur costs associated with late bill payments, cutting back on necessities such as food consumption, leading to food insecurity, or reduced spending on health care, leading to negative health outcomes. (Dkt. No. 565-8, Hoyle Decl., Ex. 32, East Expert Report ¶¶ 27, 32-34.) Additional identified harms from the loss of UI benefits include an increased risk of becoming uninsured or increase in medical debt. (*Id.* ¶ 34.)

According to Dr. East, the credit card interest rate of 20.8% is a measure of the lost time value of money when the UI benefits were withheld, not the class members' experience actually borrowing on their credit cards. Dr. East explains that the harm suffered from the lost time value of money was not just the cost of borrowing necessitated by the inability to pay for life essentials but for those that opted not to use their credit cards, those denied credit or those that did not have credit cards, they would have suffered the costs of cutting spending on essential necessities such as food and medical care. (*Id.* ¶¶ 32-35.) Dr. East opined that cutting spending to these vulnerable EDD cardholders was even more costly when UI benefits are lost because UI benefits do not generally make up for entire lost income. (*Id.* ¶ 32.) Therefore, losing UI benefits when EDD cardholders already have to cut their spending is more costly. (*Id.*) Because Dr. East's conclusion is supported by her extensive experience, data from the U.S. government, and academic and non-academic publications as it relates to Californians

during 2020-21, it is relevant, and reliable. Because there is a proper foundation to Dr. East's opinions, BANA's challenges as to the proposed interest rate of 20.8% as the compound interest rate go to the weight, not admissibility of her opinions. *See SPS Techs., LLC v. Briles Aerospace, Inc.,* No. CV 18-9536-MWF (ASX), 2021 WL 4913509, at *2 (C.D. Cal. Sept. 8, 2021) (citations omitted) ("Challenges to 'the factual basis of the [expert's] opinion rather than the methodology upon which it is based,' particularly when the facts 'are subject to reasonable dispute where, as here, there is sufficient basis for disagreement' go to the weight of the expert's opinion, not the admissibility."); *CZ Servs., Inc. v. Express Scripts Holding Co*., No. 3:18-CV-04217-JD, 2020 WL 4518978, at *8 (N.D. Cal. Aug. 5, 2020) ("These challenges take issue with the inputs . . . used, and not the model itself, and so go to the weight rather than admissibility of her testimony.") (citing *Alaska Rent-A-Car, Inc.*, 738 F.3d at 968-70). Accordingly, the Court DENIES Defendant's motion to exclude the expert opinions of Dr. Chloe N. East.

**D. Motion to Exclude Expert Opinions of David I. Levine**

Defendant seeks to exclude the testimony and expert report of David I. Levine, Plaintiffs' damages expert. (Dkt. No. 566-1.)

David I. Levine, Ph.D. in economics, ("Dr. Levine") has been a labor economist for 40 years, and focuses his research on decisions and risk. (Dkt. No. 566-9, Hoyle Decl., Ex. 35, Levine Expert Report ¶¶ 2, 3, 7.) He is the Trefethen Professor at the Haas School of Business, University of California, Berkeley and has been a professor at UC Berkeley since 1987. (*Id.* ¶ 1.) He received his Ph.D. in Economics from Harvard University and held visiting positions at the Sloan School, MIT, the U.S. Department of Labor and was a Senior Economist at the President's Council of Economic Advisors. (*Id.* ¶ 2.) He has also published extensively in labor economics and the economics of households. (*Id.* ¶ 3.)

He was retained by Plaintiffs to provide opinions on "(1) an appropriate methodology for determining the value of the lost opportunity costs to the class members whose access to UI benefits was delayed or denied by the Bank's challenged policies and

practices, and (2) an appropriate methodology for calculating the value of the time lost by class members who telephoned the Bank's customer service number for California UI recipients during the class period and were required to wait in excess of industry-standard wait time before the Bank answered their calls." (*Id.* ¶ 5.)

Dr. Levine explained that in the field of labor economics, it is common practice to use a measure of aggregate harm to estimate the effects of a policy which can be used to represent classwide harm. (*Id.* ¶¶ 7, 9.) He opined that a compound interest rate is an appropriate measure of the opportunity cost of delayed UI benefits; therefore, to measure harm caused by BANA's challenged policies is to take the principal amount of delayed funds with a compound interest rate and the length of time the funds were inaccessible. (*Id.* ¶¶ 10-11, 16-18, 30.) He also explained that the credit card interest rate is an appropriate proxy to represent class-wide harm suffered due to delays in receiving UI payments during COVID-19 and represents the cost to the typical class member of not receiving their benefits. (*Id.* ¶ 12.)

Because UI benefits are used for essential expenses such as food, housing and utilities, used to avoid incurring debt or high-cost borrowing, and used to maintain health insurance and avoid forgoing necessary medical care, UI recipients face harm when their funds are abruptly cut off. (*Id.* ¶¶ 17, 22.) During the COVID-19 pandemic, UI was even more important because of the unprecedented job losses and financial hardships for millions of Americans. (*Id.* ¶ 23.)

During the pandemic, the federal government provided an extra $600 per week in addition to UI benefits from late March to July 2020, to encourage people to stay safe at home and help them afford their bills and buy food without having to seek a job outside. (*Id.* ¶ 24.) From July 2020 to March 2021, UI recipients received an extra $300 per week on top of normal benefits. (*Id.*) However, studies and data from the U.S. Census Bureau show that the extra government funds were used to pay off credit card debt, and not to pay for essential expenses. (*Id.* ¶ 38.)

The UI benefits during the pandemic helped with food insecurity, helped individuals maintain health insurance and afford much-needed healthcare, reduced the likelihood of mortgage default, and falling behind on bills, and provided families with vital income support. (*Id.* ¶¶ 26-29.) Therefore, when these benefits were abruptly withheld, class members faced an opportunity cost as they sought other funds to prevent harm or they incurred costs by reducing consumption. (*Id.*)

Dr. Levine was tasked to come up with an interest rate that would calculate the aggregate harm to class members whose access to UI benefits was delayed by BANA's challenged actions and he assessed that a standard credit card interest rate is a conservative estimate of the aggregate harm caused by those delays. (*Id.* ¶ 31.) As such, he concluded that "[t]he credit card interest rate, applied to the principal amount of delayed funds and the length of time funds were inaccessible, is an appropriate methodology for measuring class-wide harm and supported by commonly used tools in labor economics." (*Id.)*

He arrived at the credit card interest rate based on research showing demographic and socio-economic features of the average Californian who received UI during COVID-19 and his analysis on how they likely coped with delayed UI benefits. (*Id.* ¶ 32.) Relying on academic literature, Dr. Levine concluded that every individual whose benefits were delayed or denied suffers harm. (*Id.* ¶ 33.) Particularly, during the pandemic, research shows that the UI benefits were used for household necessities, pay bills, rent, childcare and healthcare and because those individuals did not have enough savings to cover several months of expenses, "every class member who was denied their benefits suffered some harm." (*Id.*) According to Dr. Levine, each class member likely suffered at least the cost represented by the credit card interest rate during the time benefits were withheld because most class members would have turned to credit card borrowing to cover their essential expenses while others would have turned to higher cost forms of borrowing and others incurred even higher costs by forgoing food, housing and medical care. (*Id.* ¶¶ 34, 36.)

Dr. Levine opined that class members paid an effective interest of 15.9% after considering that people with lower credit scores on average pay higher credit card rates

and those who were unemployed during COVID-19 tended to have lower education which predicts lower credit scores, and Californians have slightly higher credit scores than the rest of the country. (*Id.* ¶ 45.) The credit card interest rate is a measure of the average opportunity cost of an impacted class member and is extremely conservative because it undervalues the damages to class members who were forced to take out payday loans or other high-cost forms of borrowing and undervalues the costs of extreme deprivations in food, medical care and other necessities. (*Id.* ¶ 44.)

He also opined that the harm suffered by the Customer Service Class can be calculated using the California state minimum wage as economists frequently use wage data to represent the value of time and minimum wage is a conservative measure of the average value of lost time for the Customer Service Class. (*Id.* ¶ 14.) Economists assess the value of time according to the median wage. (*Id.* ¶¶ 48, 49.) Research reveals that people do not like waiting on hold for customer service and are more frustrated when the response from customer service is not informative. (*Id.* ¶ 51.) Further, increased stress raises the value of time. (*Id.* ¶ 52.) Therefore, while the median wage or higher is used to represent the value of time, Dr. Levine relies on a conservative estimate, the minimum wage, to value the time UI recipients in the Customer Service Class spent waiting on hold with BANA. (*Id.* ¶ 53.) According to Dr. Levine, the minimum wage is an appropriate measure of the value of time Customer Service class members spent waiting on hold with the Claims call center. (*Id.* ¶ 46.)

**1. Relevant Opinions**

BANA argues that Dr. Levine's opinions are not relevant because his report fails to provide evidence of damages on a classwide basis. (Dkt. No. 566-1 at 14.) Plaintiffs contend that Dr. Levine's opinions are relevant to opining on a compound interest rate to measure the time value of money for those class members that unexpectedly lost access to their UI funds. (Dkt. No. 617 at 7.)

Here, Dr. Levine was not tasked with providing a methodology to measure damages on a classwide basis but was to provide an opinion on the appropriate method for

determining the value of the lost opportunity costs or lost time value of money when class members' access to their UI benefits were delayed or denied. (Dkt. No. 566-9, Hoyle Decl., Ex. 35, Levine Expert Report ¶ 5.) Because he opined that the credit card interest rate of 15.9% should be the compound interest rate that represents the harm suffered by class members, his opinions are relevant as it will assist the trier of fact to determine what interest rate should apply to Plaintiffs' damages model.

**2. Reliable Opinions**

BANA maintains that Dr. Levine's opinions are not reliable because his "conservative" estimate is untethered to any evidence in this case, and "lacks sufficient facts or data" because it is not based on any class member' experience. (Dkt. No. 566-1 at 10-20.) Plaintiffs disagree. (Dkt. No. 617 at 11-17.)

Defendant raises the same arguments raised in challenging Dr. East's opinions above. As explained, BANA's dispute that Dr. Levine did not tether the 15.9% interest rate to any of the class members' experience is not a basis for exclusion. Dr. Levine's opinions are supported by his own extensive 40 years of experience as a labor economist as well as a number of academic and non-academic literature, articles and studies from federal agencies and California state agencies and thus, based on "sufficient facts or data." Any challenges to the 15.9% interest rate he arrived are questions for the factfinder. *See Elosu*, 26 F.4th at 1026 (the "court's role is to determine 'the scientific validity' of an expert's 'principles and methodology,' not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record."). For the same reasons explained ruling on Dr. East's Daubert motion, the Court DENIES Defendant's motion to exclude Dr. Levine's opinions on the 15.9% interest rate to measure the class members' lost time value of money.

As to the Customer Service Class, Defendant similarly argues that there is no factual basis for Dr. Levine's conclusion of utilizing minimum wage as a measure of the "lost time" while waiting on hold with the Claims call center and is an arbitrary number even though he admits that every class member values their time differently. (Dkt. No. 566-1 at

13.) Plaintiffs oppose arguing that Dr. Levine carefully examined numerous scientific studies looking at how various populations value lost time and opined that the measure of damages is at least the minimum wage to represent the value of lost time. (Dkt. No. 617 at 18.)

While BANA may disagree with the minimum wage as a measure of the value of time, such challenges go to the weight, not admissibility. Here, Dr. Levine relies on scientific and economic studies supporting his conclusion that economists, in different fields, typically measure the value of time using a median wage even though the time is not spent at work. (Dkt. No. 566-9, Hoyle Decl., Ex. 35, Levine Expert Report ¶¶ 48, 49.) He also reviewed other literature and studies that show that people do not like to wait on hold for customer service, people value time spent unproductively higher, and people's increased stress can raise the value of time. (*Id.* ¶¶ 50-52.) Noting that leisure travelers even value their time shows that time is money and unemployed people value their time. (*Id.* ¶ 54.) He concluded that the minimum wage is a conservative estimate of the value of time that the Customer Service Class members spent waiting on hold for assistance. (*Id.* ¶¶ 53, 55.) Because Dr. Levine's opinions are relevant and reliable, the Court DENIES BANA's motion to exclude the expert opinions of Dr. Levine.

**Conclusion**

Based on the above, the Court GRANTS in part and DENIES in part Defendant's motion to exclude expert opinions of Greg J. Regan. In particular, the Court GRANTS the motion to exclude only as to Dr. Regan's Methodology 2 to represent the lost time value of money. The Court DENIES Defendant's motion to exclude the expert opinions of Chloe N. East and DENIES Defendant's motion to exclude the exclude expert opinions of David. I. Levine.

IT IS SO ORDERED.

Dated: July 28, 2026

Hon. Gonzalo P. Curiel
United States District Judge