UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION,

Case No.: 21MD2992-GPC(MSB)

**ORDER GRANTING PLAINTIFFS' MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS OF VICTOR STANGO**

**[Dkt. No. 571.]**

Before the Court is Class Plaintiffs' motion to exclude certain expert testimony of Victor Stango. (Dkt. No. 571.) Defendant filed a response, (Dkt. No. 659), and Class Plaintiffs replied. (Dkt. No. 691.) A hearing was held on June 11, 2026. (Dkt. No. 737.) Based on the reasoning below, the Court GRANTS Plaintiffs' motion to exclude certain expert testimony of Victor Stango.

/ / /

/ / /

/ / /

/ / /

/ / /

**Background**

Class Plaintiffs[1] ("Plaintiffs"), individually and on behalf of five certified classes filed suit against Defendant Bank of America, N.A. ("Defendant" or "BANA") for allegedly mishandling, through unlawful policies and practices, reports of unauthorized PIN enabled ATM transactions related to their unemployment insurance ("UI") benefits from California's Employment Development Department[2] ("EDD") during the height of the COVID-19 pandemic in 2020-21. (Dkt. No. 406, TAMCC.) Between August 1, 2016 through July 31, 2021, EDD contracted with BANA to administer the electronic distribution of UI payments through prepaid debit cards. (Dkt. No. 632-31, Chan Decl., Ex. 33; Dkt. No. 632-32, Chan Decl., Ex. 34; Dkt. No. 591-98, Brys Decl., Ex. 39 at -2286.)

Plaintiffs were prepaid debit cardholders ("EDD cardholders") who were deemed eligible and received unemployment insurance benefits with EDD during the height of the COVID-19 pandemic in 2020-21. (Dkt. No. 406, TAMCC.) They allege, among other things, that BANA violated its statutory and regulatory obligations under the Electronic Funds Transfer Act ("EFTA") by using its newly created automated fraud monitoring program, Claim Fraud Filter, Indicator 1 ("CFF-1") as the sole basis for summarily denying EDD cardholders' unauthorized transaction claims involving an ATM without the mandated manual investigations. *(Id.)* In addition, by relying solely on the automated CFF-1 to combat the exponential increase of fraud during the COVID-19 pandemic, Plaintiffs claim that BANA also summarily reversed or rescinded all permanent credits issued to EDD cardholders and summarily froze EDD cardholders' accounts. (*Id.*) Further, Class Plaintiffs complain that BANA knowingly understaffed its Claims call center subjecting EDD cardholders to significant wait times in violation of

---

[1] The nine Class Plaintiffs are Kuang Ting Chong, Candace Koole, Lindsay McClure, Azuri Moon, Stephanie Moore, Roland Oosthuizen, Vanessa Rivera, J. Michael Willrich, and Alex Yuan

[2] California's EDD administers programs that provide unemployment insurance as well as additional services related to the employment of Californians. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2355.)

California common law. (*Id.*) Finally, they allege that BANA's decision to provide magnetic-stripe ("mag-stripe") only debit cards, and not industry-standard EMV chip cards, exposed EDD cardholders to significant fraud due to card "skimming" and counterfeit card fraud violating California statutory and common law. (*Id.*)

The TAMCC alleges the following remaining claims:

1. First Claim -violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1963 *et seq.,* and Regulation E ,12 C.F.R. §§ 1005.1 *et seq*.;
2. Second Claim - violation of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100 *et seq*.;
3. Fourth Claim - violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*.;
4. Fifth Claim - Negligence and Negligence Per Se;
5. Sixth Claim - Negligent Hiring, Supervision, and Retention;
6. Seventh Claim - Breach of Contract;
7. Ninth Claim - Breach of the Implied Covenant of Good Faith and Fair Dealing;
8. Tenth Claim - Breach of Fiduciary Duty;
9. Thirteenth Claim - violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution; and
10. Fourteenth Claim - violation of the Due Process Clause of the California Constitution.

(*Id.*)

During the pendency of the case, in July 2022, the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") entered into Consent Orders with BANA after findings of violations of federal law related to its use of the CFF. (Dkt. No. 565-4, Hoyle Decl., Ex. 28; Dkt. No. 565-5, Hoyle Decl. Ex. 29.) In response to the Consent Orders, BANA [redacted] ("Remediation Plan") [redacted]. (Dkt. No. 627-3, Hoyle Decl., Ex. 31 (UNDER SEAL).)

On June 16, 2025, the Court certified five classes among the California EDD cardholders: (1) Claim Denial Class; (2) Credit Rescission Class; (3) Account Freeze Class; (4) Customer Service Class; and (5) EMV Chip Class. (Dkt. No. 494 at 96-97.) Excluded from each class is any person whom the Bank has determined, pursuant to its Remediation Plan "(i) has been disqualified by the [S]tate [of California] from Program eligibility; (ii) has previously engaged in fraudulent Program conduct, such as submission of fraudulent claims or other abuses of the claims process; or (iii) has had their card frozen due to legal order processes, as a result of Internal/Vendor fraud investigations, or by Global Financial Crimes Compliance. Also excluded from each class is any person whose Claim or Account the Bank closed, in whole or in part, because the State of California requested the Bank to close that person's Claim or Account." (*Id.* at 97.)

At class certification, the Court concluded that Plaintiffs' damages' model, proposed through their expert Greg J. Regan, is a valid model for actual damages under *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). (*Id.* at 81-82.) Regan determined that the principal amount of actual damages for the Credit Denial, Credit Rescission, and Account Freeze Classes equals the total dollar amount of each claim denied, the total dollar amount of credit rescinded, and total dollar amount of frozen balances.

## Discussion

### A. *Daubert* Legal Standard

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence ("Rule") 702 to ensure specialized and technical evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 589 & n.7 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposed a special "gatekeeping obligation" on trial judges).

Under Rule 702, a witness, "qualified as an expert by knowledge, skill, experience, training, or education, may testify" . . . if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the

testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Lust By & Through Lust v. Merrell Dow Pharms., Inc*., 89 F.3d 594, 598 (9th Cir. 1996). The inquiry into the admissibility of an expert opinion under Federal Rule 702 is a "flexible one." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 592-94). An expert has wide latitude to offer opinions, "including those that are not based on firsthand knowledge or observation[]" and premised on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S.at 596).

As such, the role of a district court is that of "a gatekeeper, not a fact finder." *Id.* at 565 (quotation marks omitted). Challenges to the factual foundation of an expert's opinions bear on the weight of the opinion, not its admissibility. *Higley v. Cessna Aircraft Co*., CV 10-3345-JCG, 2013 WL 12112167, at *4 (C.D. Cal. July 8, 2013).

Under *Daubert*, scientific evidence must be both reliable and relevant. *Daubert,* 509 U.S. at 590-91. First, scientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa,* 339 F.3d 1049, 1056 (9th Cir. 2003). However, expert testimony may also rest on personal knowledge or experience. *Kumho Tire Co., Ltd.,* 526 U.S. at 150. In such a case, reliability depends on the knowledge, experience, education, and training of the expert. *Id.; see Hangarter*, 373 F.3d at 1018 (district court did not abuse its discretion concluding the expert's testimony reliable based on his knowledge and experience). The focus of the district court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595. In other words, "the test under *Daubert* is not the correctness of the expert's conclusions but

the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1318 (9th Cir. 1995). Second, the proposed expert testimony must be "relevant to the task at hand," meaning that it "logically advances a material aspect of the proposing party's case." *Daubert,* 509 U.S. at 597.

If an expert's opinion is reliable and relevant," then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1231 (9th Cir. 1998). "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'" *Id.* (quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995)).

**B. Motion to Exclude Certain Expert Opinions of Victor Stango**

Victor Stango, Ph.D. in economics, ("Dr. Stango"), is a professor of management at the University of California, Davis and a visiting scholar at the Federal Reserve Bank of Philadelphia Consumer Finance Institute. (Dkt. No. 714-1, Baltzer Decl., Ex. 1, Stango Expert Report ¶ 1.) His area of research is consumer behavior in financial services markets and he has published articles on topics such as consumer deposit account and credit card usage, consumers' costs of credit card borrowing, the incident of credit card and deposit account fees, and topics related to consumer saving and borrowing behavior. (*Id.* ¶ 2.) He was retained by BANA as a rebuttal expert to respond to certain opinions of Greg J. Regan ("Mr. Regan"), Plaintiffs' damages expert. (*Id.* ¶ 6.)

Dr. Stango opines that Mr. Regan's methodology to calculate the "principal amount of damages" as the amount of funds that were denied, rescinded and frozen misrepresents the economic harm suffered by class members. (*Id.* ¶ 9.) Using an economic method of calculating damages, Dr. Stango assessed the "difference between actual consumer outcomes and consumer outcomes in a 'but-for' hypothetical world absent the at-issue conduct." (*Id.* ¶¶ 31, 32.) According to Dr. Stango, this method highlights the distinction between a consumer who has *lost funds* with a consumer who has *lost access to funds*. (*Id.* ¶ 32.) Relying on this distinction, Dr. Stango opines that

Mr. Regan treated the Class Denial, Credit Rescission and Account Freeze class members as though they lost their funds permanently and "provides no economic argument for why a dollar amount that was temporarily lost and then returned represents economic harm in the amount of the dollars to which the individual regained complete access." (*Id.*) He explains that Mr. Regan's damages model "acts as if" the value of their funds was never returned to them. (*Id.* ¶ 33.) Dr. Stango acknowledges that while Mr. Regan admits that his estimated damages may require an offset for the amounts that BANA has already paid [redacted] he does not explain that BANA has already paid all of the class members the funds taken, or withheld from them. (*Id.*) According to Mr. Stango, the class members lost access to their funds only for a period of time, not permanently as assessed by Mr. Regan. (*Id.*) In Mr. Stango's opinion, the only damage suffered by class members is the delay or the temporary loss of access to those funds. (*Id.* ¶ 35.)

Plaintiffs move to exclude paragraphs 31-35, 71-74, 82-83, 85-86, 89-90, 95-96 of Mr. Stango's expert report regarding his opinion that "any amounts Class Members have already been reimbursed for their denied claims, rescinded claims, and frozen accounts should be applied as an offset to reduce their actual damages *before c*alculating their treble damages under the . . . [EFTA] and before determining any punitive damages award." (Dkt. No. 571 at 1.[3]) Plaintiffs contend that Dr. Stango's opinion provides an impermissible legal conclusion and his opinions are not supported by the sources he relies on and not based on reliable principles and methods. (*Id.*) Defendant responds that Dr. Stango has not expressed any legal opinions, rather he provided opinions as an economic expert rebutting Mr. Regan's proposed measure of "actual damages". (Dkt. No. 659 at 8.) Defendant explains Dr. Stango's opinions are economic not legal, and that funds temporarily lost and then recovered do not impose the same economic harm as

[3] Page numbers are based on the document page number.

funds permanently lost. (*Id.* at 9.) Disputing Plaintiffs' argument, Defendant submits that Dr. Stango opined on what makes "economic sense" and what "represents economic harm" not on what the law requires or how the Court should proceed. (*Id.* at 6.)

At class certification, the Court concluded that Plaintiffs' proposed model for the principal amount of actual damages for the Credit Denial, Credit Rescission, and Account Freeze Classes, which equal the total dollar amount of each claim denied, the total dollar amount of credit rescinded, and total dollar amount of frozen balances, is a valid model for actual damages under *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). (Dkt. No. 499 at 81-85.) The Court disagreed with BANA's argument that because all EDD cardholders were fully compensated for the principal amounts of actual damages [redacted], their economic damages is $0, and if they suffered $0 in damages, then treble damages also equals $0. (*Id*. at 84-85.) Dr. Stango acknowledges that class members are entitled to damages for the temporary loss of the funds but that amount pales in comparison to the treble damages calculated from the principal amount of damages. (Dkt. No. 714-1, Baltzer Decl., Ex. 1, Stango Expert Report ¶¶ 73-74.)

Ultimately, the question raised by BANA and addressed by Dr. Stango is whether Plaintiffs are entitled to an offset from the principal amount of actual damages or from the total amount of damages which may include treble and punitive damages. At class certification, after review of relevant precedent, the Court concluded that the offset for the principal amount of actual damages already paid occurs from the total amount of damages that may include treble and punitive damages. (Dkt. No. 499 at 84-85.)

Dr. Stango's economic opinions as to the definition of actual damages or when it accrued, (*see* Dkt. No. 714-1, Baltzer Decl., Ex. 1, Stango Expert Report ¶ 34 (excluding delayed benefits from principal amount of damages based on actual world and but-for-world theory of economic damages); ¶ 72 (defining actual damages as the difference between what happened in the actual world and what happened in the but-for-world); ¶ 74 (Figure 2 recalculates total damages for the Claim Denial, Credit Rescission, and Account Freeze classes by netting out payments from the Remediation Plan), is contrary

to the damages provision of the EFTA and the Court's ruling relying on Mr. Regan's opinions that actual damages includes the principal amount of damages of the funds that were denied, rescinded or frozen. According to Dr. Stango, after subtracting [redacted] from the principal amount of damages, the damages of any class members whose payments were greater than their consequential damage is $0 and remain at $0 if trebling is warranted. (*Id.*) Because Dr. Stango seeks to replace the governing legal standard as to actual damages, and its sequencing as it relates to treble damages the Court endorsed in the class certification order, his opinions must be excluded as not relevant.[4]

As to Defendant's concern that lost funds are distinct from lost access to funds, the lost time value of money is embedded in the consequential damages calculations generated by Mr. Regan as it considers the period of time that the amounts denied, rescinded and frozen were withheld. (Dkt. No. 663-2, Hoyle Decl., Ex. 41, Regan Expert Report ¶¶ 44, 45.)

Defendant alternatively argues that even if the Court agrees with Plaintiffs about offsetting, BANA maintains his opinions are relevant as it relates to calculating what the offset should be. (Dkt. No. 659 at 12.) Plaintiffs do not respond. Because Plaintiffs' motion is limited to excluding Mr. Stango's opinions on offsetting and Plaintiffs do not object that Mr. Stango's opinions are relevant to calculating the offset, the Court concludes that Mr. Stango's opinions on the amount of offset is relevant.

## Conclusion

Based on the reasoning above, the Court GRANTS Plaintiffs' motion to exclude

/ / /

/ / /

/ / /

---

[4] Because the Court concludes that certain of Dr. Stango's opinions are not relevant, it need not rule on Plaintiffs' other arguments that his opinions are not reliable.

certain expert opinions of Victor Stango. Specifically, the Court excludes paragraphs 31-35, 71-74, 82-83, 85-86, 89-90, 95-96 of Mr. Stango's expert report.

IT IS SO ORDERED.

Dated: July 28, 2026

Hon. Gonzalo P. Curiel
United States District Judge