UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION,

Case No.: 21MD2992-GPC(MSB)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS OF JAY MINNUCCI**

**[Dkt. No. 564.]**

Before the Court is Defendant's motion to exclude the expert opinions of Jay Minnucci. (Dkt. No. 564.) Class Plaintiffs filed a response, (Dkt. No. 614), and Defendant replied. (Dkt. No. 675.) A hearing was held on June 11, 2026. (Dkt. No. 737.) Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion to exclude the expert opinions of Jay Minnucci.

## Background

Class Plaintiffs[1] ("Plaintiffs"), individually and on behalf of a putative class filed suit against Defendant Bank of America, N.A. ("Defendant" or "BANA" or "Bank") for

[1] The nine Class Plaintiffs are Kuang Ting Chong, Candace Koole, Lindsay McClure, Azuri Moon, Stephanie Moore, Roland Oosthuizen, Vanessa Rivera, J. Michael Willrich, and Alex Yuan

allegedly mishandling, through unlawful policies and practices, reports of unauthorized PIN enabled ATM transactions related to their unemployment insurance ("UI") benefits from California's Employment Development Department[2] ("EDD") during the height of the COVID-19 pandemic in 2020-21. (Dkt. No. 406, TAMCC.) Between August 1, 2016 through July 31, 2021, EDD contracted with BANA to administer the electronic distribution of UI payments through prepaid debit cards. (Dkt. No. 632-31, Chan Decl., Ex. 33; Dkt. No. 632-32, Chan Decl., Ex. 34; Dkt. No. 591-98, Brys Decl., Ex. 39 at -2286.)

Plaintiffs were prepaid debit cardholders ("EDD cardholders") who were deemed eligible and received unemployment insurance benefits with California's Employment Development Department ("EDD") during the height of the COVID-19 pandemic in 2020-21. (Dkt. No. 406, TAMCC.) They allege, among other things, that BANA violated its statutory and regulatory obligations under the Electronic Funds Transfer Act ("EFTA") by using its newly created automated fraud monitoring program, Claim Fraud Filter, Indicator 1 ("CFF-1") as the sole basis for summarily denying EDD cardholders' unauthorized transaction claims involving an ATM without the mandated manual investigations. (*Id.)* In addition, by relying solely on the automated CFF-1 to combat the exponential increase of fraud during the COVID-19 pandemic, Plaintiffs claim that BANA also summarily reversed or rescinded all permanent credits issued to EDD cardholders and summarily froze EDD cardholders' accounts. (*Id.*) Further, Class Plaintiffs complain that BANA knowingly understaffed its Claims call center subjecting EDD cardholders to significant wait times in violation of California common law. (*Id.*) Finally, they allege that BANA's decision to provide magnetic-stripe ("mag-stripe") only debit cards, and not industry-standard EMV chip cards, exposed EDD cardholders to

---

[2] California's EDD administers programs that provide unemployment insurance as well as additional services related to the employment of Californians. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2355.)

significant fraud due to card "skimming" and counterfeit card fraud violating California statutory and common law. (*Id.*)

On June 16, 2025, the Court certified five classes among the California EDD cardholders: (1) Claim Denial Class; (2) Credit Rescission Class; (3) Account Freeze Class; (4) Customer Service Class; and (5) EMV Chip Class.[3] (Dkt. No. 494 at 96-97.)

Relevant to this motion, the Customer Service Class is defined as:

> All members of the Claim Denial class and/or the Credit Rescission class who telephoned the Bank's customer service telephone number for its EDD cardholders at any time from September 13, 2020 through November 21, 2020, and whose telephone call was routed to the Bank's Claims call center.

(Id. at 97.)

**Discussion**

**A. *Daubert* Legal Standard**

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence ("Rule") 702 to ensure specialized and technical evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 589 & n.7 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposed a special "gatekeeping obligation" on trial judges).

Under Rule 702, a witness, "qualified as an expert by knowledge, skill, experience, training, or education, may testify" . . . if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion

---

[3] Excluded from each class is any person whom the Bank has determined, pursuant to its Remediation Plan "(i) has been disqualified by the [S]tate [of California] from Program eligibility; (ii) has previously engaged in fraudulent Program conduct, such as submission of fraudulent claims or other abuses of the claims process; or (iii) has had their card frozen due to legal order processes, as a result of Internal/Vendor fraud investigations, or by Global Financial Crimes Compliance. Also excluded from each class is any person whose Claim or Account the Bank closed, in whole or in part, because the State of California requested the Bank to close that person's Claim or Account." (Dkt. No. 499 at 97.)

reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The inquiry into the admissibility of an expert opinion under Federal Rule 702 is a "flexible one." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 592-94). An expert has wide latitude to offer opinions, "including those that are not based on firsthand knowledge or observation[]" and premised on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S.at 596).

As such, the role of a district court is that of "a gatekeeper, not a fact finder." *Id.* at 565 (quotation marks omitted). Challenges to the factual foundation of an expert's opinions bear on the weight of the opinion, not its admissibility. *Higley v. Cessna Aircraft Co*., CV 10-3345-JCG, 2013 WL 12112167, at *4 (C.D. Cal. July 8, 2013).

Under *Daubert*, scientific evidence must be both reliable and relevant. *Daubert,* 509 U.S. at 590-91. First, scientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa,* 339 F.3d 1049, 1056 (9th Cir. 2003). However, expert testimony may also rest on personal knowledge or experience. *Kumho Tire Co., Ltd.,* 526 U.S. at 150. In such a case, reliability depends on the knowledge, experience, education, and training of the expert. *Id.; see Hangarter v. Provident Life and Acc. Ins. Co.* 373 F.3d 998, 1018 (9th Cir. 2004) (district court did not abuse its discretion concluding the expert's testimony reliable based on his knowledge and experience). The focus of the district court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595. In other words, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."

*Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1318 (9th Cir. 1995). Second, the proposed expert testimony must be "relevant to the task at hand," meaning that it "logically advances a material aspect of the proposing party's case." *Daubert,* 509 U.S. at 597.

If an expert's opinion is reliable and relevant," then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1231 (9th Cir. 1998). "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'" *Id.* (quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995)).

**B. Motion to Exclude Expert Opinions of Jay Minnucci**

Jay Minnucci ("Mr. Minnucci") has a B.A. in Business Administration from Temple University, and in 2008, founded Service Agility, Inc. which provides consulting, training, and related services to the call center industry. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶¶ 3, 4.) He has spent more than 40 years in the call center industry working for and advising in-house departments and third-party vendors handling customer service calls. (*Id.* ¶ 5.) He spent 17 years in leadership positions in a call center and served as a consultant, speaker, author, and trainer for more than 20 years. (*Id.*) Specifically, he worked as a Director and Senior Director at a call center where he worked to maximize call center performance while minimizing expenses by meeting key performance metrics. (*Id.* ¶ 7.) He also developed the organization's first Workforce Management Team ("WFM"), which is responsible for forecasting incoming call volumes and average handling times and used it to determine staffing needs in order to meet targeted service level objectives. (*Id.*) He then worked as a call center consultant providing services to the Federal Reserve Bank, Charles Schwab, Wells Fargo and many more other companies. (*Id.* ¶ 8.) As the owner of Service Agility, Inc., he provides call center consulting services to over 100 clients. (*Id.*)

Mr. Minnucci was retained by Plaintiffs to opine on the following:

a. The Bank's Claims call center performance metrics during 2020 and 2021, as measured using industry standard metrics;
b. Whether the Bank's Claims call center performance metrics fell below industry standards, and if so, to what extent and during what period;
c. Whether the operational processes, including call forecasting and staffing, and technology the Bank utilized in its Claims call center in 2020 and 2021 fell below industry standards, norms, and best practices;
d. Whether there were reasonable alternative actions the Bank could have taken consistent with industry standard practices to avoid or mitigate the adverse impact on EDD debit cardholders who telephoned the Bank's customer service telephone number for its EDD debit cardholders at any time between September 13, 2020 and November 21, 2020.
e. The effects on EDD debit cardholders of the Bank's performance failures in its Claims call center between September 13, 2020 and November 21, 2020.

(*Id.* ¶¶ 2a – 2e.)

BANA's customer service operations [redacted]. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 22.) [redacted] (*Id.*) [redacted] (*Id.* ¶ 23.) [redacted]. (*Id.* ¶ 24.) [redacted]. (*Id.* ¶ 25.) [redacted]. (*Id.*) [redacted]

[redacted]. (*Id.* ¶ 27.) [redacted]. (*Id.* ¶ 26.) In June 2021, pursuant to the preliminary injunction, BANA was required to provide a dedicated phone number to EDD debit cardholders allowing them to access the Claims call center directly. (*Id.*)

Two metrics to evaluate call center performance are the average speed to answer ("ASA") and abandonment rate. (*Id.* ¶¶ 12, 36.) The ASA is an industry-standard metric that reflects the average amount of time, usually measured in seconds, that customers are waiting on hold before their calls are answered by a live CSR. (*Id.* ¶ 12.) The abandonment rate is the percentage of callers who hang up or are disconnected after their calls enter the hold queue but before the call is answered. (*Id.*) These are measurements companies collect from call center vendors to evaluate their call center performance. (*Id.*) BANA contracted with its vendor to provide an abandonment rate of no more than [redacted], which is a common industry target, and service level target of [redacted] of calls answered in [redacted], another common industry target. (*Id.* ¶ 37.)

Mr. Minnucci concluded the BANA's data shows that from September 13, 2020 through November 21, 2020, the performance of its Claims call center "was so substandard that it subjected cardholders to wait times rarely, if ever, seen in the call center industry." (*Id.* ¶ 114.) According to a survey conducted by ContactBabel, in 2020, the average ASA reported across 214 call centers was 75 seconds (1.25 minutes), which is consistent with (but on the higher end of) his understanding of the industry standard. (*Id.*) [redacted]. (*Id.*) [redacted]. (*Id.*)

[redacted]. (*Id.*)

According to Mr. Minnucci, almost all EDD debit cardholders who telephoned the Claims call center between September 13, 2020 and November 21, 2020 suffered lengthy wait times that far exceeded any industry standard norms. (*Id.* ¶ 13.) [redacted]. (*Id.* ¶ 13; *id.* ¶ 76, Table 6.)

The Claims call center's high ASA also resulted in very high abandonment rates. (*Id.* ¶ 14.) According to ContactBabel, the average abandonment rate in 2020 was 6.1% but [redacted]. (*Id.*) Therefore, because the abandonment rate is not included in the ASA data, the ASA significantly understates the actual amount of time on hold. (*Id.*)

[redacted]. (*Id.* ¶ 15.) [redacted]. (*Id.*) Because of BANA's conduct in understaffing its Claims call center and not using standard technology, it saved BANA a considerable amount of money in call center costs. (*Id.* ¶ 17.)

**1. Industry Standard Opinions**

BANA seeks to exclude Mr. Minnucci's opinions based on ContactBabel's data that the industry standard ASA was 1.25 minutes and the industry standard abandonment rate was 6.1% in 2020. (Dkt. No. 584-1 at 10.)

First, BANA argues that Mr. Minnucci's opinions on industry standard should be excluded because he relies on ContactBabel's survey data without conducting any analysis of the survey's underlying data to verify its accuracy. (Dkt. No. 584-1 at 10-11.) Plaintiffs respond that Mr. Minnucci was not required to review the underlying data of ContactBabel's survey because it is supported by his own over 40 years of experience in the call center industry. (Dkt. No. 617 at 9.)

Experts may rely on facts or data from others as long as the data is the type reasonably relied on by other experts in the field and need not be admissible. *See* Fed. R. Evid. 703; *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1088 (N.D. Cal. 2006) ("Rule 703 allows an expert to rely on facts or data relied upon by experts in the particular field in forming opinions or inferences upon the subject; an expert is not required to testify only upon data the expert has personally gathered or tested."). Further, an expert has wide latitude to offer opinions, "including those that are not based on firsthand knowledge or observation[]" and premised on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert,* 509 U.S. at 592.

ContactBabel publishes The U.S. Contact Center Decision-Makers' Guide, an annual survey studying the "performance, operations, technology and HR aspects of U.S. contact center operations." (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 12 n.1.) The 2020 survey included data from 214 U.S.-based call centers, including 29 from the Finance industry and 28 from the Outsourcing/Telemarketing industry. (*Id.*) According to its survey results, in 2020, the average ASA, among 214 call centers, was 75 seconds (1.25 minutes) and the average abandonment rate was 6.1%. (*Id.* ¶ 40.)

Mr. Minnucci relies on these survey results to determine the call center industry standard of ASA and abandonment rate, in 2020, to render his opinions on the Claims call center's ASA and abandonment rate and their impact on EDD debit cardholders attempt to reach the Claims call center during the Class Period. The survey results are

corroborated by Mr. Minnucci's over 40 years of experience. In other words, Mr. Minnucci confirms the reliability of ContactBabel's data by incorporating his own experience. For instance, he commented that based on his experience and familiarity with performance standards, an ASA of 1.25 minutes and an abandonment rate of 6.1% are consistent with industry standards, although on the higher end, for acceptable average performance levels across a single month. (*Id.* ¶ 40.) He also states, based on his experience across a number of industries, the most aggressive ASA target he has seen has been set at 10 seconds and least aggressive has been set at 300 seconds (5 minutes) and as to abandonment rates, the most aggressive targets are 2% and the least aggressive targets are 10%. (*Id.* ¶ 41.) Further, he testified that he uses the survey results of ContactBabel when his clients ask how their company is doing compared to others. (Dkt. No. 645-2, Wang Decl., Ex. 2, Minnucci Depo. at 210:10-22.)

Therefore, the Court concludes ContactBabel's survey data is reliable because it is supported by Mr. Minnucci's knowledge and experience of ASA and abandonment targets in the call center industry; therefore, he was not required to verify the data used in ContactBabel's survey results.

Second, BANA argues that Mr. Minnucci's industry average opinions should be excluded because he concedes that he and other industry participant do not rely on aggregate data across different industries to set performance targets. (Dkt. No. 564-1 at 12.) Plaintiffs point out that Mr. Minnucci has opined that it is standard practice for call center leaders to compare benchmarks across industries when establishing performance benchmarks and multi-industry call performance data is the best source to identify ASA and abandonment rate benchmarks for the Claims call center. (Dkt. No. 614 at 11.)

Defendant's argument that Mr. Minnucci testified that he does not rely on multi-industry data is not supported by its record. In fact, Mr. Minnucci testified that the best source for developing targets is looking at multi-industry call center performance but he

also considers what happens in a particular industry.[4] (Dkt. No. 645-2, Wang Decl., Ex. 2, Minnucci Depo. at 200:15-202:5.) Mr. Minnucci also testified that while he can assess a client's ASA or abandonment rate using mean averages from ContactBabel, he explained that the first step in his consulting work is to compare his client's call center metrics to his client's own targets which is what matters the most.[5] (Dkt. No. 645-2, Wang Decl., Ex. 2, Minnucci Depo. at 209:19-210:16.) Then, he explains that when clients raise questions about how they compare to others, sources such as ContactBabel become relevant. (*Id.* at 210:10-22.)

Mr. Minnucci opined that it is standard practice for call center leaders to consider cross-industry benchmarks when setting performance targets; therefore, ContactBabel's data that includes multi-industry call center performance data is the best source "for identifying industry-standard performance benchmarks that apply to all call centers, including specialty call centers like the Bank's Claims call center." (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 42.) Therefore, his testimony contradicts Defendant's contention that Mr. Minnucci does not use ContactBabel's multi-industry data to set performance standards for his own clients.

Third, Defendant asserts that the respondents in Contact Babel's surveys are not appropriate comparators for its Claims call center during the Class Period because the survey includes periods of time outside the Class Period, including January and February 2020 and does not account for the Claims call center's experience handling an unprecedented increase in call volume as well as 40% of the respondents experienced flat or decreased call volumes during the same time period. (Dkt. No. 564-1 at 12-14.) Plaintiffs argue that any differences between respondents in the call centers surveyed by

---

[4] The Court notes that Defendant's citation to lines 3-5 of page 202 of Mr. Minnucci's deposition testimony does not fully provide support for its argument as it only provides his three-sentence response without providing the question and the full answer to provide the full context of his answer. (Dkt. No. 564-1 at 12.) The Court relies on Plaintiffs' documents that provided the missing pages of Mr. Minnucci's full testimony on this question.

[5] BANA's records do not contain this page of Mr. Minnucci's deposition testimony.

ContactBabel and the Claims call center go to the weight, not admissibility of his opinion. (Dkt. No. 614 at 12.)

The Court agrees with Plaintiffs. Disagreement with the comparators used in a reliable survey go to the weight of the testimony, not admissibility. *See Robox Crop. v. WowWee Grp. Ltd*., Case No. 22-cv-04476-SI, 2024 WL 4057418, at *14 (N.D. Cal. Sept. 3, 2024) (dispute as to whether use of a license as a benchmark license was sufficiently comparable to the hypothetical license are disputes that go to weight and not admissibility). Further, Mr. Minnucci explains that BANA's Claims call center performance during the Class Period was indicative of its performance throughout 2020 and 2021. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶¶ 82-105.) BANA may attack the comparators used in the ContactBabel's survey at trial.

Finally, BANA complains that Mr. Minnucci's opinion that ContactBabel's survey provides the "industry standard" is not a reliable benchmark for BANA's Claim call center because the survey involved dissimilar call centers with dissimilar industries. (Dkt. No. 564-1 at 14.) BANA additionally argues that even though ContactBabel measured the ASA for financial call centers which are considerably higher than the cross-industry average, Mr. Minnucci still relies on the lower 75 second ASA for multi-industry average and must be excluded. (*Id*. at 15.)

Again, these challenges go to weight of Mr. Minnucci's testimony and not admissibility. Mr. Minnucci's method of applying cross-industry metrics to BANA's Claim call center is based on his over 40 years of experience in the call center industry. As discussed above, Mr. Minnucci explained that it is standard practice for call center leaders to look at cross-industry benchmarks when setting performance targets. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 42.) This is so because callers do not differentiate between industry specific call centers when developing their expectation as to how long they should hold before a call is answered. (*Id.*) According to him, the multi-industry call center performance data from ContactBabel is the best source for assessing ASA and abandonment rate benchmarks for the Claims call center. (*Id.* ¶¶ 42-

43.) He also commented that the ASA and abandonment rates in varying industries are not substantially different. (*Id.* ¶ 41.) Nonetheless, despite his opinion that the multi-industry call center performance data is the best source to identify ASA and abandonment rate benchmarks applicable to the Claims call center, he also reported the ASA among 29 Finance call centers was 145 seconds and 28 Outsourcers surveyed was 39 seconds. (*Id.* ¶ 43.) Defendant's dispute as to why Mr. Minnucci used the multi-industry ASA rather than the industry specific Finance call centers ASA go to the weight of his testimony and not admissibility.

Thus, Mr. Minnucci's years of experience supports the reliability of ContactBabel's survey data; thus, Defendant's challenges present a basis for cross-examining him, not excluding his opinions. *See Tyson Foods. Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016) ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury.").

**2. Aggregate Call Center Data**

Defendant argues that Mr. Minnucci's use of aggregate call center data is not reliable because they are speculative and have no reliable basis in the record. (Dkt. No. 564-1 at 15.) According to BANA, an ASA means that not all callers experienced the same wait times and some callers waited less than the average amount which would overcompensate them. (*Id.*) Further, BANA argues that aggregate call center data includes data from non-class members. (*Id.*) Plaintiffs contend that aggregate damages liability is permissibly based on averages and Mr. Minnucci explained, based on his experience, that [redacted]. (Dkt. No. 614 at 15-16.) Further, according to Mr. Minnucci, EDD cardholders experienced longer wait times because they were in California and would not have received the faster early morning service when the call center opened at 5:00 a.m. in Pacific time. (*Id.* at 16.)

The use of averages to prove common impact to a putative class is permissible. *See Tyson Foods.*, 577 U.S. at 456-460 (holding that representative proof from a sample, based on an expert witness's estimation of average time that employees spent donning and doffing protective gear, could be used to show predominance of common questions of law or fact in employment class action). Defendant raised the same argument that "average" hold times cannot suffice to demonstrate what each of the 15,600 class members actually experienced which the Court rejected at class certification. (Dkt. No. 499 at 73-74.)

[redacted]. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 28.) [redacted]. (*Id.*) [redacted]. (*Id.* ¶ 29.) [redacted]. (*Id.*) [redacted]. (*Id.* ¶ 30.) Therefore, [redacted]. (*Id.*)

As such, Mr. Minnucci's analysis of the average wait times is based on his extensive experience in the call center industry and BANA's call records and his conclusions are tailored to the facts of this case. Therefore, any disputes as to his conclusions that [redacted] go to the weight, not admissibility of his opinions and can be raised at trial.

### 3. Avoided Cost Opinions

Plaintiffs propose an avoided cost theory to support disgorgement of profits which is calculating the additional expenditures it would have required to staff its Claims call center from September 13, 2020 to November 21, 2020 in a manner sufficient to provide EDD cardholders an ASA consistent with industry standards. (Dkt. No. 567-12, Hoyle Decl., Ex. 41, Regan Expert Report ¶ 95.) Mr. Minnucci opines that the Claims call center's substandard performance allowed BANA to pay less for call center charges than it would have had it provided industry-standard service. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 108.) He calculates two different types of avoided costs during the Class Period: (1) "avoided workload" (time CSRs spent processing calls) and (2) "avoided idle time" (time CSRs are waiting for the next call to arrive). (*Id.* ¶ 108; *id.* ¶ 111, Table 10; *id.* ¶ 113, Table 11.)

Defendant repeats its argument and seeks to exclude Mr. Minnucci's avoided cost opinions because he relied on ContactBabel's survey results and [redacted] making them unreliable and inflating the purported avoided costs. (Dkt. No. 564-1 at 16.) For the reasons stated above, the Court DENIES Defendant's motion to exclude on the basis that the avoided costs opinions rely on ContactBabel's survey data which includes aggregate call center data which the Court found reliable.

#### a. Avoided Workload Charges

The avoided workload hours formula presented in Table 10 includes nine inputs that are calculated to arrive at Total Workload Charges Avoided. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 111, Table 10.) Neither party disputes the formula.

BANA moves to exclude Mr. Minnucci's avoided workload opinions as unreliable because as to one input, distinct caller demand, he does not rely on BANA's data but relies on data from unspecified clients of Mr. Minnucci from different industries during periods long before the pandemic and does not explain how that data relates to BANA's

Claims call center and the call volume spikes it experienced during the class period. (Dkt. No. 564-1 at 16-18.) BANA also objects because none of Mr. Minnucci's clients operated in the same industry and the same time period, and Mr. Minnucci did not verify his client's data. (*Id.* at 17-18.) Plaintiffs argue that because BANA did not have call record data that isolated distinct caller demand, Mr. Minnucci used the next best data which is call record data supplied by his consulting clients which he has also shared with other clients interested in distinct caller demand analysis. (Dkt. No. 614 at 17-18.)

Neither party, including Mr. Minnucci,[6] has clearly defined "distinct caller demand", and based on the record, the Court infers distinct caller demand to be the number of abandoned callers that do not call back. According to Mr. Minnucci, distinct caller demand is calculated by adding the percentage of abandoned calls that did not call back to the total number of answered calls. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 110.) However, [redacted], Mr. Minnucci used estimates of distinct callers using call record data from his consulting clients. (*Id.*; *id.*, Table 9; *see id.,* App'x H.)

Plaintiffs, nor Mr. Minnucci in his report, explain why distinct caller demand data generated from other companies' data provide a reliable distinct caller demand calculation in this case. In his deposition testimony, he merely testified generally that distinct caller rates are constant across industries and time and the specific data he used

---

[6] Mr. Minnucci explains "distinct caller demand" as the following: "Distinct caller demand calculations are done to account for the fact that some percent of abandoned callers will call back later in another attempt to get service, and thus one distinct caller shows up in the data as two offered calls. Normally, when a call center is providing service at or close to industry standard, the number of abandoned calls are small enough that attempting to isolate and account for these callbacks is deemed unnecessary because the added effort will have little impact on outcomes (i.e., distinct caller demand will be within a few percentage points of offered call totals). With the exceptional levels of abandonment seen at the Claims call center, though, an estimate of distinct caller demand will generate a more accurate assessment of the productive hour charges avoided by the Bank." (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 109.) This does not provide the Court with an understandable definition or understanding of distinct caller demand and its impact on the avoided workload charges formula.

had already been proven effective as a benchmark for his other clients. (Dkt. No. 614-4, Wang Decl., Ex. 2, Minnucci Depo. at 411:1-13; 419:19-420:6.)

Because Plaintiffs have not shown that use of distinct caller demand data generated from his clients are reliable to be used in this case, the Court GRANTS Defendant's motion to exclude Mr. Minnucci's avoided workload charges opinions.

**b. Avoided Idle Time Charges**

BANA also seeks to exclude Mr. Minnucci's avoided idle time opinions because they are also based on impermissible caller demand estimates from his clients. (Dkt. No. 564-1 at 20.) Because the Court concludes that the distinct caller demand data from his clients is not reliable, the Court also GRANTS BANA's motion to exclude Plaintiffs' calculation of avoided idle time charges as not reliable.

Additionally, BANA moves to exclude the idle time charges calculations based on Mr. Minnucci's use of Erlang-C, which is used to predict the number of agents a call center may need to service a given number of calls to achieve a certain service level. (*Id.* at 20-21.) According to Defendant, Mr. Minnucci improperly uses Erlang-C to calculate a retroactive estimate of BANA's staffing requirements for the actual call volume required to achieve industry standards. (*Id.* at 20-21.) It also argues the assumptions underlying Erlang-C were not present during the Class Period. (Dkt. No. 564-1 at 21-22.) Plaintiffs oppose. (Dkt. No. 614 at 21-22.)

According to Mr. Minnucci, BANA's avoided costs associated with agent idle time can be calculated classwide using the Erlang-C formula. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 112.) He asserts that Erlang-C formula is an industry standard formula used by call centers to estimate staffing needs. (*Id.*) The lack of idle time directly caused by the understaffing caused the poor performance of the Claims call center. (*Id.*) The amount of idle time can be calculated by applying the Erlang-C formula to half-hourly call volume and handle time distributions (call intensity) for an average day for a week. (*Id.* ¶ 113.)

Again, Mr. Minnucci fails to explain in detail and layman's term what Erlang-C formula entails, (*see* Table 11), and its use and purpose. Summarily stating that Erlang-C is used to estimate staffing needs at call centers does not provide the Court with the necessary information to determine if the use of Erlang-C was proper and reliable. As such, on an additional basis, the Court GRANTS Defendant's motion to exclude Mr. Minnucci's avoided idle time charges.

**4. WFM Model Opinions**

BANA claims that Mr. Minnucci's opinions that it could and should have used the WFM Model to forecast staffing needs for the Claims call center are uninformed and not helpful because its document shows [redacted]. (Dkt. No. 614 at 23.) In addition, BANA argues that [redacted]. (Dkt. No. 584-1 at 22.) Plaintiffs argue that BANA's arguments are without merit because [redacted] (Dkt. No. 614 at 23-24.)

Mr. Minnucci explained that within the call center industry, [redacted]. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 63.) [redacted]. (*Id.*) [redacted]. (*Id.*)

According to Mr. Minnucci, in April 2020, [redacted] (*Id.* ¶ 64.) [redacted]. (*Id.*) [redacted]. (*Id.*) Even though most call centers depend on multiple factors to project future volume, Mr. Minnucci explains [redacted]. (*Id.* ¶ 65.) He then explained that [redacted]. (*Id.*) [redacted] (*Id.* ¶ 66.)

Mr. Minnucci opinions on WFM, utilizing his over 40 years of experience in the industry and also establishing a WFM at his former job provide sufficient facts or data to support his opinion on BANA's WMF team. [redacted] (*Id.* ¶ 64; *see also* Dkt. No. 645-5, Wang Decl., Ex. 5 (September 9, 2020 email with the subject heading, "Updated Forecasting").) While [redacted]. (*Id.* ¶ 65.) Mr. Minnucci's opinions are based on reliable facts and data and any disputes as to whether forecasting of

future staffing for the Claims call center was possible or accurate go to the weight and not admissibility of his opinions.

**5. State of Mind Opinions**

Lastly, Defendant maintains that Mr. Minnucci's opinion that BANA "deliberately" understaffed the Claims call center are improper expert opinions that must be excluded. (Dkt. No. 584-1 at 24-25.) Plaintiffs disagree arguing that Mr. Minnucci may opine on BANA's deliberate understaffing of its Claim call center. (Dkt. No. 614 at 24.)

Mr. Minnucci opined that [redacted]. (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 15, 74, 78, 81, 113.[7])

"Courts routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a jury." *Gold v. Lumber Liquidators, Inc.,* 323 F.R.D. 280, 294 (N.D. Cal. 2017) (excluding state of mind opinion that defendant should have expected the alleged defects and later became aware of them) (citing *Siring v. Oregon State Bd. of Higher Ed. ex. rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (collecting cases)); *Stone Brewing Co., LLC v. MillerCoors LLC*, Case No.: 3:18-cv-00331-BEN-LL, 2020 WL 907060, at *4 (S.D. Cal. Feb. 25, 2020) ("the opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.").

Here, Mr. Minnucci's opinion that [redacted] is not permitted as it impinges on a jury's right to decide the issue on breach of the implied covenant of

[7] The other paragraphs BANA seeks to exclude do not include any opinions of Mr. Minnucci's intent or state of mind. (Dkt. No. 564-1 at 24.)

good faith and fair dealing. For example, Plaintiffs raised the common question "whether BANA reduced call center staffing knowing or intending the resulting impairment of class members' rights." (Dkt. No. 499 at 76.) Motive and intent are also relevant on the question of punitive damages. *See* Cal. Civ. Code § 3294(a) & (b). Mr. Minnucci's opinion that BANA deliberately understaffed its Claims call center to avoid paying for additional staff, (Dkt. No. 564-5, Hoyle Decl., Ex. 11, Minnucci Expert Report ¶ 113), and to slow or deter fraud and avoid issuing provisional credits, (*id.* ¶ 81) relate to fact questions for the jury.

Accordingly, the Court GRANTS Defendant's motion to exclude Mr. Minnucci's state of mind opinions that BANA "deliberately" understaffed its Claims call center.

**Conclusion**

Based on the reasoning above, the Court GRANTS in part and DENIES in part Defendant's motion to exclude the expert opinions of Jay Minnucci, Plaintiffs' call center expert.

IT IS SO ORDERED.

Dated: July 28, 2026

Hon. Gonzalo P. Curiel
United States District Judge