UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION, | Case No.: 21MD2992-GPC(MSB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[Dkt. No. 589.]** |

Before the Court is Defendant Bank of America, N.A.'s motion for partial summary judgment. (Dkt. No. 589.) An opposition and reply were filed. (Dkt. No. 652, 693.) A hearing was held on June 11, 2026.[1] (Dkt. No. 737.) After careful review of the

[1] On the evening of May 19, 2026, two days before the original scheduled hearing, Defendant filed a notice of new evidence concerning class members relevant to its pending motion for summary judgment, its motion to exclude experts and certification of the classes. (Dkt. No. 723.) On May 20, 2026, the Court vacated the hearing on the summary judgment and motions to exclude and instead set a status hearing for May 21, 2026. (Dkt. No. 725.) At the status hearing, the parties discussed the impact of Defendant's notice of new evidence and after hearing the parties' positions on whether the Court should proceed with ruling on the pending motions, the Court re-set the hearing on the summary judgment and motions to exclude to June 11, 2026. (Dkt. No. 726.)

briefs, the notice of new evidence, the voluminous supporting documents, the applicable law, and hearing oral argument, the Court GRANTS in part and DENIES in part Defendant's motion for partial summary judgment.

**Procedural Background**

Class Plaintiffs Kuang Ting Chong, Candace Koole, Lindsay McClure, Azuri Moon, Stephanie Moore, Roland Oosthuizen, Vanessa Rivera, J. Michael Willrich, and Alex Yuan (collectively "Plaintiffs" or "Class Plaintiffs"), individually and on behalf of five certified classes, filed the operative third amended master consolidated complaint against Defendant Bank of America, N.A. ("Defendant", "BANA" or "Bank") for allegedly mishandling, through unlawful policies and practices, reports of unauthorized PIN-enabled ATM transactions related to their unemployment insurance ("UI") benefits through California's Employment Development Department[2] ("EDD") during COVID-19 in 2020-21. (Dkt. No. 406, TAMCC.) Between August 1, 2016 to July 31, 2021, EDD contracted with BANA to administer the electronic distribution of UI payments through prepaid debit cards. (Dkt. No. 632-31, Chan Decl., Ex. 33; Dkt. No. 632-32, Chan Decl., Ex. 34; Dkt. No. 591-98, Brys Decl., Ex. 39 at -2286.[3])

Under this agreement, Plaintiffs or EDD cardholders, who were deemed eligible by EDD to receive unemployment insurance, received benefits electronically through BANA's prepaid debit cards that are linked to individual depository accounts. (Dkt. No. 406, TAMCC.) They allege, among other things, that BANA violated its statutory and regulatory obligations under the Electronic Funds Transfer Act ("EFTA") by creating and implementing an automated fraud monitoring program, Claim Fraud Filter, Indicator 1 ("CFF-1"), as the sole basis for summarily denying every EDD cardholders' unauthorized transaction claim involving an ATM using a PIN without the mandated manual

[2] California's EDD administers programs that provide unemployment insurance as well as additional services related to the employment of Californians. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2355.)
[3] Page numbers are based on the document page number.

investigations. (*Id.*) In addition, by relying solely on the automated CFF-1 to combat the exponential increase of fraud during the COVID-19 pandemic, Plaintiffs claim that BANA also summarily reversed or rescinded all permanent credits previously issued to EDD cardholders and summarily froze EDD cardholders' accounts. (*Id.*) Further, Class Plaintiffs complain that BANA knowingly understaffed its Customer Service Claims call center ("Claims call center") subjecting EDD cardholders to significant wait times in violation of California common law. (*Id.*) Finally, they allege that BANA's decision to provide magnetic stripe ("mag-stripe") only debit cards and not industry-standard EMV chip cards exposed EDD cardholders to significant fraud due to card "skimming" and counterfeit card fraud violating California statutory and common law. (*Id.*)

**A. Initial Case History**

The case originated on January 14, 2021 when former Class Plaintiff Jennifer Yick commenced a purported class action in the United States District Court for the Northern District of California. (*See Yick v. Bank of Am.*, Case No. 21cv376-VC, Dkt. No. 1, Compl. (N.D. Cal. 2021).) Eight additional class actions were subsequently filed and consolidated with *Yick* on March 29, 2021. (*Id.*, Dkt. No. 60.) On April 1, 2021, Plaintiffs in the *Yick* consolidated class action sought a preliminary injunction enjoining BANA from automatically denying fraud claims based on its alleged faulty "Claim Fraud Filter" and freezing or blocking their accounts without investigation. (*Id.*, Dkt. No. 64.) The *Yick* court granted a preliminary injunction ("PI") on May 17, 2021, and provisionally certified a class of all EDD Cardholders who called BANA to report unauthorized charges. (*Id.,* Dkt. No. 89.) On June 2, 2021, following negotiations between the parties and with the assistance of the magistrate judge, the *Yick* court entered a preliminary injunction which: (1) barred BANA from considering the results of its Claim Fraud Filter ("CFF") when investigating claims or resolving unauthorized transaction error claims; (2) prohibited BANA from denying claims or denying provisional or permanent credits without an investigation and providing the claimant with a written explanation; (3) prohibited BANA from freezing any account based on the

results of the CFF; (4) required BANA to reopen any claims previously denied based on the results of the CFF and that it had not previously paid, or previously reopened and investigated; and (5) required BANA to establish dedicated toll free numbers for Class Members to be available 24 hours per day, 7 days a week for those seeking assistance with claims intake and frozen accounts. (*Id.*, Dkt. No. 103.) Around that same time, a number of individual plaintiffs initiated actions against BANA for injuries stemming from the same alleged conduct. The injunction was eventually dissolved, three years later, on June 1, 2024 when EDD terminated its contract with BANA. (Dkt. No. 255.)

**B. Prior Consent Orders/Remediation Plan**

During the pendency of the case, in July 2022, the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") separately entered into Consent Orders with BANA regarding findings of violations of federal law related to its use of the CFF. (Dkt. No. 591-101, Brys Decl., Ex. 41; Dkt. No. 591-102, Brys Decl., Ex. 42.) In response to the Consent Orders, BANA [redacted] ("Remediation Plan") [redacted] (Dkt. No. 588-87, Brys Decl., Ex. 43.A; Dkt. No. 588-88, Brys Decl., Ex. 43.B; Dkt. No. 588-89, Brys Decl., Ex. 43.C.)

Pursuant to the Remediation Plan, [redacted] (Dkt. No. 588-87, Brys Decl., Ex. 43.A, Remediation Plan at -2556 n. 6; *id.* at -2556-64; Dkt. No. 588-9, Brys Decl., Ex. 7, Stango Decl. ¶ 6d.) [redacted]

[redacted]. (Dkt. No. 588-87, Brys Decl., Ex. 43.A, Remediation Plan at -2561.) It is undisputed that all members of the Class Denial Class and Credit Rescission Class members were reimbursed the principal amount of their error claims that triggered CFF-1 [redacted]. (Dkt. No. 655-1, Ps' Response to D's SUMF, Nos. 168, 172.) All members of the Claim Denial, Credit Rescission and Account Freeze Classes [redacted]." (*Id.*, No. 176.)

**C. Multi-District Litigation**

On June 4, 2021, the Judicial Panel on Multidistrict Litigation transferred the *Yick* class action and individually filed actions to this Court for consolidated pretrial proceedings. (Dkt. No. 1.) Pursuant to the Court's order following a case management conference, (Dkt. No. 48), Plaintiffs filed a master consolidated complaint on August 17, 2021. (Dkt. No. 72.)

On May 25, 2023, former District Judge Larry A. Burns issued an order granting in part and denying in part Defendant's motion to dismiss the master consolidated complaint.[4] (Dkt. No. 126.) On June 13, 2023, Plaintiffs filed a first amended master consolidated complaint. (Dkt. No. 136.) On June 25, 2024, the Court granted in part and denied in part Defendant's motion to dismiss and granted Plaintiffs' motion for reconsideration of dismissal with prejudice of the UCL claim. (Dkt. No. 297.) On July 16, 2024, Plaintiffs filed a second amended master consolidated complaint. (Dkt. No. 304.) At the hearing on class certification, the Court granted Plaintiffs leave to file a third amended master consolidated complaint in order to correct pleading errors noted by the Court.[5] (Dkt. No. 405; Dkt. No. 407 at 4-6.) On January 24, 2025, Plaintiffs filed the operative third amended master consolidated complaint ("TAMCC"). (Dkt. No. 406.) An answer was filed on February 7, 2025. (Dkt. No. 414.)

---

[4] The case was transferred to the undersigned judge on April 8, 2024. (Dkt. No. 261.)
[5] Defendant did not oppose the amendment.

On June 24, 2025, the Court granted Plaintiffs' motion for class certification.[6] (Dkt. No. 499.) The Court certified the following five classes:

1. **Claim Denial Class**: All Bank of America EDD cardholders who notified the Bank that an unauthorized transaction had occurred on their Bank of America EDD debit card account ("Claim") at an automated teller machine ("ATM"), and whose Claim the Bank denied or closed at any time from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's Claim Fraud Filter ("CFF").
2. **Credit Rescission Class**: All Bank of America EDD cardholders who received permanent credit from the Bank in connection with their Claim, which credit the Bank rescinded at any time from September 28, 2020 through June 8, 2021, based solely on Indicator 1 of the Bank's CFF.
3. **Account Freeze Class**: All Bank of America EDD cardholders whose EDD debit card account ("Account") the Bank froze at any time from September 28, 2020 through March 17, 2021, based solely on Indicator 1 of the Bank's CFF, and whose Account the Bank (i) subsequently unfroze, or (ii) subsequently converted from frozen to blocked status on or after March 18, 2021 and then unblocked.
4. **Customer Service Class:** All members of the Claim Denial class and/or the Credit Rescission class who telephoned the Bank's customer service telephone number for its EDD cardholders at any time from September 13, 2020 through November 21, 2020, and whose telephone call was routed to the Bank's Claims call center.
5. **EMV Chip Class**: All members of the Claim Denial class and/or Credit Rescission class whose EDD debit card did not include an EMV chip prior to June 9, 2021. Excluded are EDD cardholders who reported not having the card in their possession at the time of the unauthorized transaction or who never received their card, including those who reported a lost or stolen card.

Excluded from each class is any person whom the Bank has determined, pursuant to its Remediation Plan with the United States Consumer Financial Protection Bureau (CFPB) and Office of the Comptroller of the Currency (OCC), "(i) has been disqualified by the [S]tate [of California] from Program[7] eligibility; (ii) has previously engaged in fraudulent Program

[6] The sealed version of the Court's order was filed on June 16, 2025. (Dkt. No. 494.)
[7] Program refers to Defendant's "Unemployment Benefits Prepaid Card Program." (Dkt. No. 588-87, Chan Decl., Ex. 43.A at 1.)

> conduct, such as submission of fraudulent claims or other abuses of the claims process; or (iii) has had their card frozen due to legal order processes, as a result of Internal/Vendor fraud investigations, or by Global Financial Crimes Compliance." Also excluded from each class is any person whose Claim or Account the Bank closed, in whole or in part, because the State of California requested the Bank to close that person's Claim or Account.

(Dkt. No. 499 at 97.) The Court also appointed Plaintiffs Koole, McClure, Moon, Oosthuizen, Rivera, Willrich, and Yuan as class representatives for the Claim Denial class; the appointment of Plaintiffs Chong and Moore as class representatives for the Credit Rescission class; the appointment of Plaintiffs Chong, Koole, McClure, Moon, Moore, Rivera, and Yuan as class representatives for the Account Freeze class; the appointment of Plaintiffs Chong, Moon, Moore, Oosthuizen, Willrich, and Yuan as class representatives for the Customer Service class; and the appointment of Plaintiffs Chong, Koole, McClure, Moon, Moore, Oosthuizen, Rivera, Willrich, and Yuan as class representatives for the EMV Chip class. (*Id.* at 98.)

The TAMCC alleges the following remaining causes of action:

1. First Claim - violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1963 *et seq.,* and Regulation E ,12 C.F.R. §§ 1005.1 *et seq*.;
2. Second Claim - violation of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100 *et seq*.;
3. Fourth Claim - violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*.;
4. Fifth Claim - Negligence and Negligence Per Se;
5. Sixth Claim - Negligent Hiring, Supervision, and Retention;
6. Seventh Claim - Breach of Contract;
7. Ninth Claim - Breach of the Implied Covenant of Good Faith and Fair Dealing;
8. Tenth Claim - Breach of Fiduciary Duty;
9. Thirteenth Claim - violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution; and
10. Fourteenth Claim - violation of the Due Process Clause of the California Constitution.

(*Id.*)

Defendant moves for partial summary judgment on these remaining causes of action. (Dkt. No. 589-1.) Specifically, Defendant seeks summary judgment on the sixth claim for negligent hiring, supervision and retention and seventh claim for breach of contract arguing that because the Court did not certify them as classes, Plaintiffs cannot pursue them on behalf of the class. (*Id.* at 35.) BANA also seeks summary judgment on the same basis on the claim that BANA's subcontractors did not do enough to protect personal information, (Dkt. No. 406, TAMCC ¶ 553), and the breach of fiduciary duty claim for the Customer Service Class. (Dkt. No. 589-1 at 27 n.7; 37 n.22.) Plaintiffs oppose arguing that it would violate the class members' due process rights to have summary judgment entered against them on non-certified claims. (Dkt. No. 652 at 32 n.14.) Because Defendant has failed to provide legal authority that summary judgment is warranted merely because the issue or cause of action was not certified, the Court DENIES as legally unsupported Defendant's motion for summary judgment on the sixth and seventh causes of action as well as the claim that BANA's subcontractors did not do enough to protect personal information and the breach of fiduciary duty claim for the Customer Service Class. Defendant also requests summary judgment on the fourth cause of action for violations of the UCL as moot because BANA no longer provides prepaid card services for EDD and class members have already received full restitution. (Dkt. No. 589-1 at 39.) Plaintiffs agree that the UCL claim is moot. (Dkt. No. 652 at 60 n.29.) Thus, the Court GRANTS Defendant's unopposed motion for summary judgment the UCL claim as MOOT.

**Factual Background**[8]

California's EDD administers unemployment benefits in California, and from August 1, 2016 to July 31, 2021, entered into a contract with BANA to "establish[],

---

[8] The Court recites the facts largely from its Order granting Class Plaintiffs' motion for class certification. (Dkt. No. 499.)

operat[e], and maintain[ ] a comprehensive Electronic Benefit Payment (EBP)" service for the distribution of unemployment insurance ("UI") benefits to eligible Californians ("EDD Agreement"). (Dkt. No. 632-31, Chan Decl., Ex. 33; Dkt. No. 632-32, Chan Decl., Ex. 34; Dkt. No. 591-98, Brys Decl., Ex. 39 at -2286.) Initially, all EDD debit cards were mag-stripe only cards. (Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 65:8-14.[9])

BANA's relationship with EDD cardholders was governed by the California Employment Development Department Debit Card Account Agreement ("Account Agreement") which included the process through which EDD cardholders could file disputes with BANA regarding unauthorized transactions on their accounts. (Dkt. No. 591-100, Brys Decl., Ex. 40.B; Dkt. No. 350-10, Brys Decl., Ex. 9, Lorenzen Decl. ¶ 5.)

### A. BANA's Use of AISOP[10] - EFTA Investigations Prior to September 28, 2020

Prior to September 28, 2020, BANA had applied its Adequate Investigations Standard Operating Procedures ("AISOP") which it claims adhered to the requirements under Reg E.[11] (Dkt. No. 362-4, Brys Decl., Ex. 14, Daniels Depo. at 120:16-121:1; 124:24-125:6; Dkt. No. 366-11, Chan Decl., Ex. 35 (AISOP); Dkt. No. 366-12, Chan Decl., Ex. 36; Dkt. No. 367-13, Chan Decl., Ex. 82.) AISOP [redacted]. (Dkt. No. 362-4, Chan Decl., Ex. 14, Daniels Depo. at 122:13-123:6.) [redacted],[12] [redacted]. (Dkt. No. 362-4, Chan Decl., Ex.

[9] Deposition page numbers are based on the pagination of the deposition transcript.
[10] Adequate Investigations Standard Operating Procedures.
[11] Plaintiffs do not dispute that AISOP complied with the investigation mandates of the EFTA.
[12] [redacted].

14, Daniels Depo. at 147:25-148:19; 150:13-151:20; Dkt. No. 366-12, Chan Decl., Ex. 36 at -4539.) [redacted]. (Dkt. No. 362-4, Chan Decl., Ex. 14, Daniels Depo. at 147:25-148:19; Dkt. No. 366-12, Chan Decl., Ex. 36 at -4549.)

**B. BANA's Use of CFF-1 to Deny Error Claims**

BANA recognizes it has statutory and regulatory duties to address fraudulent transactions, and therefore, designs fraud strategies to address specific fraudulent behavior. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 5.) [redacted]. (*Id.* ¶ 7.) Therefore, BANA, in implementing fraud strategies, tried to protect legitimate customers' funds while also combatting fraud. (*Id.* ¶ 8.)

The U.S. unemployment rate rose from 4.4% in March 2020 to 14.7% in April 2020 and was over 16% in California. (Dkt. No. 655-1, Ps' Response to D's SUMF, No. 34.) In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") which created the Pandemic Unemployment Assistance ("PUA"). (*Id.*, No. 35.) The PUA expanded unemployment benefits to those not previously eligible and it no longer required claimants seeking UI to submit former employer verification of wage or salary history. (*Id.*, Nos. 36, 37.) In mid-March 2020, EDD relaxed its own requirements for verification of former employment prioritizing quick distribution of benefits. (*Id.*, No. 38.) In March 2020, there were [redacted]. (*Id.*, No. 39.) By September 2020, [redacted]. (*Id.*, Nos. 40, 41.)

Starting in the spring of 2020, [redacted]

created by the pandemic for benefits eligibility fraud and unauthorized transaction claims. (*Id.* ¶ 11.) As of January 2021, California's State Auditor estimated nearly $10.4 billion in fraudulent claims and over $32 billion of unemployment benefits were stolen and illegally issued in California. (*Id.* ¶ 14.) In May 2020, BANA learned of massive benefits eligibility fraud against state unemployment programs where [redacted]. (*Id.* ¶ 13.)

Because EDD was responsible for determining eligibility based on cardholders' applications, [redacted]. (*Id.* ¶ 16.) BANA's anti-fraud group, Global Financial Crimes ("GFC"), [redacted]. (*Id.* ¶¶ 17, 18.) This information was also publicly available on YouTube and other social messaging platforms. (*Id.* ¶ 19; Dkt. No. 591-23, D's RJN, Ex. 21; Dkt. No. 591-24, D's RJN, Ex. 22.)

During the first six months of the pandemic, BANA noted two key features in fraud activity taking place in State UI programs using BANA's prepaid cards: 1) [redacted]; and 2) [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 20.) While BANA [redacted]. (*Id.* ¶¶ 21, 22.)

BANA's fraud strategies for the UI programs created during the pandemic [redacted]. (*Id.* ¶ 24.) At issue in this case was a fraud strategy that

[redacted]. (*Id.*)

Starting in June 2020, unauthorized claims submitted by EDD cardholders [redacted]. (*Id.* ¶ 25.) BANA's GFC, the Global Information Security ("GIS") and BANA's Global Banking and Markets ("GBAM") [redacted]. (*Id.* ¶ 26.) [redacted]. (*Id.*) [redacted]. (*Id.*) [redacted]. (*Id.*)

Another type of fraud identified was [redacted]. (*Id.* ¶ 27.) [redacted]. (*Id.*)

In order to combat the fraud, in late summer of 2020, the GFC and GIS teams were directed to develop a fraud strategy [redacted]. (*Id.* ¶ 29.) They determined that "[redacted]" (*Id.* ¶ 30.) The CFF was [redacted]

[redacted]. (*Id.* ¶ 31.) [redacted] the Fraud Filter "[redacted]." (*Id.*)

The CFF-1 was approved for implementation [redacted] on September 28, 2020. (Dkt. No. 632-90, Chan Decl., Ex. 97 at -6417.) [redacted]. (Dkt. No. 588-192, Brys Decl., Ex. 149.) From September 28, 2020 until June 8, 2021, BANA implemented the CFF as a basis to investigate and make decisions on certain error claims or unauthorized transaction claims. (Dkt. No. 366-24, Chan Decl., Ex. 49, BANA's Resp. to Interrog. No. 28; Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 124:20-125:14.) The CFF involved three indicators, Indicator 1, Indicator 2 and Indicator 3, but only Indicator 1 ("CFF-1") is relevant and subject to this litigation. CFF Indicator 1 was triggered when a claim involved "[redacted]." (Dkt. No. 366-24, Chan Decl., Ex. 49, BANA's Resp. to Interrog. No. 28; *see also* Dkt. No. 366-22, Chan Decl., Ex. 47.)

Under this new anti-fraud system, once an EDD debit cardholder submits an authorized transaction claim, the CFF is run [redacted], and if triggered, the claim is automatically denied [redacted], the cardholders receives a letter denying the claim and giving them the option to submit a reconsideration request. (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 52:21-53:9; 234:13-21; Dkt. No. 366-24, Chan Decl., Ex. 49, BANA's Resp. to Interrog. No. 28.)

The denial letter was a template form letter that automatically populated the cardholder's information. (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 53:12-54:12; 220:12-221:11.) The uniform template denial letter was provided to all EDD cardholders' unauthorized transaction claims involving an ATM and stated, "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any." (Dkt. No.

324-55, Chan Decl., Ex. 52.) The letter further stated, "If you contact us by phone or in writing, you may request that we reopen your claim for further consideration. You will be asked to give us information, including any documents you may have, to support your claim. You have the right to request documents, if any, that we relied on in making our determination." (*Id.*)

According to BANA, [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 35.) During the first several months after CFF was implemented, [redacted] (*Id.*) In the first three months after CFF was implemented, [redacted]. (*Id.*) Within a month of implementation, [redacted]. (*Id.*)

If a cardholder submitted an unauthorized transaction claim based on an ATM withdrawal, it automatically triggered CFF-1 and the claim was summarily denied without any human review or consideration by the Bank's AISOP investigation points. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 162:1-25; Dkt. No. 393-4, Chan Decl., Ex. 17, Letson Depo. at 93:20-94:5, 192:7-14.) CFF-1 did not take into account [redacted]

[redacted] (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 129:16-132:4.) CFF was merely [redacted]. (*Id.*)

Due to the massive fraud that was exploiting BANA's obligation to [redacted], BANA determined that the CFF [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 36.) While the CFF was in effect, [redacted]. (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 42:3-8.) Further, because [redacted]. (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 49:24-50:6; Dkt. No. 368-36, Chan Decl., Ex. 156 at -426938.) According to BANA, [redacted] using the CFF, [redacted]. (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 247:16-248:14.)

**C. BANA's Use of CFF-1 to Rescind Permanent Credits Paid on Prior Claims**

Starting on September 28, 2020, BANA also retroactively applied its CFF to all claims submitted since April 1, 2020 that it had previously investigated and resolved in EDD cardholders' favor using the AISOP procedures. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 179:13-180:1; Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 234:24-236:5.) Despite the prior investigation, if the claim triggered the CFF, the accounts were frozen and the claims denied. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 179:13-180:1; Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 234:24-236:5.) This applied to claims brought before the CFF took effect and who had their prior unauthorized claims paid with permanent credits. (Dkt. No. 362, Chan Decl., Ex. 14, Daniels Depo. at 234:24-235:9.) The accounts were frozen and permanent credits

rescinded without any notice. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 224:17-225:2.)

**D. BANA's Use of CFF-1 to Freeze Account**

BANA [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 9; Dkt. No 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 4.) [redacted]. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 180:10-22.) For the cardholder, [redacted]. (*Id.* at 182:11-15.) [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 9; Dkt. No. 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 4.) [redacted]. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 183:3-6.)

[redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 9; Dkt. No. 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 4.) [redacted]. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 182:25-183:2.) Once frozen, the cardholders were directed to EDD to authenticate their identities in order to unfreeze their accounts because BANA believed that EDD would be better positioned to authenticate accounts in order to restore access. (Dkt. No. 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 5.) However, at the time, EDD was unable to handle the incoming inquiries from cardholders about their accounts including the cardholders with frozen accounts seeking to authenticate their identities and unfreeze their accounts. (Dkt. No. 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 6.)

Between September 28, 2020 to March 18, 2021, BANA automatically froze accounts that triggered the CFF. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo. at 221:11-18.) At first, accounts were initially frozen on September 28, 2020, then unfrozen from October 2020 through December 2020, and then later frozen again from December 2020 to March 18, 2021. (*Id.* at 222:9-12; 223:1-224:4.) No notice was provided to cardholders before freezing their accounts but a letter was sent a few days after the freeze. (*Id.* at 224:17-225:14.) The freeze prevented cardholders from accessing the funds in their accounts and barred EDD from depositing on-going benefits. (*Id.* at 224:5-16.) BANA explains that when the CFF was first implemented, cards that triggered the CFF were frozen because [redacted]. (Dkt. No. 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 5.)

[redacted] (Dkt. No. 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 6.) [redacted]. (*Id.*) Starting March 18, 2021, BANA stopped using the CFF to automatically freeze EDD cardholder accounts and instead "blocked" the accounts which prevented cardholders from accessing funds in their account. (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo at 301:18-302:25.) Therefore, cardholders could regain access by [redacted]. (Dkt. No. 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 7.) [redacted] allowed for an easier way to regain access by [redacted]

[redacted] (Dkt. No. 362-2, Chan Decl., Ex. 16, Martin Depo at 301:18-302:25.)

**E. Understaffing Claims Call Center**

When BANA implemented its new CFF fraud strategies, there was a significant increase in calls to the customer service call center. (Dkt. No. 632-3, Chan Decl., Ex. 3, Minnucci Expert Report ¶ 43.) From September 13, 2020 to November 21, 2020, the average speed to answer ("ASA"), "an industry-standard metric that reflects the average amount of time a customer is kept waiting on hold before their call is initially answered", was [redacted] in contrast to the average ASA of 1.25 minutes among 214 call centers surveyed in 2020. (*Id.* ¶¶ 12, 43-46.) The wait times for all EDD cardholders during this two-month period far exceeded any industry standard norms and on average cardholders waited [redacted] minutes longer than they would have had BANA complied with industry-standard response times. (*Id.* ¶ 13.) According to Plaintiffs' expert, Jay Minnucci ("Mr. Minnucci"), BANA should have known that more calls would likely occur once the CFF was implemented in late September 2020 that resulted in automatic denials of large numbers of claims. (*Id.* ¶ 15.)

**F. EMV Chip Card**

Initially, all EDD debit cards were mag-stripe only cards. (Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 65:9-14.) Initially the EDD debit cards did not have EMV chips because the contract with EDD did not provide for chip cards and BANA understood it needed to get permission and work with EDD to provide the EMV chips. (Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 65:15-20.) Yet, since 2014, BANA included EMV chips on its other consumer and small business debit card accounts. (Dkt. No. 324-26, Chan Decl., Ex. 23; Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 61:19-23.) BANA was aware, as of 2014, that EMV chips increase security and protect cardholders from fraud. (Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 64:7-13.)

[redacted] (Dkt. No. 366, Chan Decl., Ex. 24 at 2.)

[redacted],[13] [redacted]. (Dkt. No. 366-4, Chan Decl., Ex. 28 at 2.)

On March 17, 2021, [redacted]. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2850.) In July 2021, BANA began issuing EDD debit cards with EMV chips. (Dkt. No. 362-2, Chan Decl., Ex 16, Martin Depo. at 65:4-7.) As of February 15, 2024, BANA stopped issuing prepaid debit card and stopped receiving funds for cardholders from EDD. (Dkt. No. 636-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 10.) All EDD prepaid debit cards were closed on or before April 30, 2024. (*Id.*)

## Discussion

### A. Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.,* 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the

---

[13] "The EDD Agreement provided for a [redacted] (Dkt. No. 655-1, Ps' Response to D's SUMF, No. 19.)

burden of proof at trial. *Id.* at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

**B. Defendant's Request for Judicial Notice**

Defendant filed a request for judicial notice of twenty-two documents and include materials published by government entities, other publications on the Internet and YouTube videos. (Dkt. No. 590.) Plaintiffs did not file an opposition.

Federal Rule of Evidence 201 provides that a district court may take notice of facts not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

Exhibits 1-15 include government reports, government press releases and other government publications by federal and state government agencies and officials. (Dkt. No. 590-1, Brys Decl. ¶¶ 5-19.) The Court may take judicial notice of public records and publicly available government websites. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n.6 (9th Cir. 2006) (court may take judicial notice of matters of public

record); *Jones v. Pollard*, Case No.: 21CV162-GPC(BGS), 2023 WL 4728802, at *2 n.7 (S.D. Cal. July 24, 2023) (taking judicial notice of publicly available government website pages) (citing *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) ("It is appropriate to take judicial notice of this information, as it was made publicly available by government entities . . . , and neither party disputes the authenticity . . . or the accuracy of the information displayed therein.")).

Exhibits 16-20 are news articles on the Internet and/or Internet archives. (Dkt. No. 590-1, Brys Decl. ¶¶ 20-24.) These documents are also judicially noticeable. *See D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1191-92 (S.D. Cal. 2024) ("existence of . . . webpages [is] judicially noticeable."); *Kinnee v. TEI Biosciences Inc*., Case No.: 22-CV-604 JLS (DDL), 2023 WL 8191097, at *3 (S.D. Cal. Nov. 27, 2023) ("courts have taken judicial notice of internet archives in the past").

Finally, Defendant seeks to judicially notice Exhibits 21 and 22 which are YouTube videos to demonstrate their existence in the public domain and not for the truth of the matter. (Dkt. No. 590-1, Brys Decl. ¶¶ 25-26.) Courts take judicial notice of the existence of YouTube videos for the purpose of demonstrating what was available to the public at the time. *See Woodall v. Walt Disney Co.*, Case No.: CV 20-3772-CBM(Ex), 2024 WL 5337348, at *5 (C.D. Cal. Nov. 1, 2024) (taking judicial notice of YouTube videos for the existence of the videos and what was available to the public at the time, but not for the truth of the contents) (citing *Novation Sols., Inc. v. Issuance Inc*., Case No. 2:23-cv-00696-WLH-KSx, 2023 WL 6373871, at *14 (C.D. Cal. Aug. 16, 2023) (taking judicial notice of content of YouTube videos and the fact that the content was publicly available, but not for the truth of the matters asserted therein)); *Witt v. Bristol Farms*, Case No. 21-cv-00411-BAS-AGS, 2022 WL 6258296, at *5 (S.D. Cal. Oct. 7, 2022) (Courts may take judicial notice of "YouTube . . . to establish 'the existence of the website in the public realm.'") (citation omitted). Therefore, the Court takes judicial notice of the YouTube videos to demonstrate their existence in the public domain.

Accordingly, the Court finds that all Defendant's documents are subject to judicial notice, and GRANTS Defendant's request for judicial notice.

**C. First Cause of Action - Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq*.**

The first cause of action alleges violations of the EFTA and relates to the Claim Denial and Credit Rescission Classes. (Dkt. No. 499 at 35.)

**1. Reimbursed Principal Amount as Actual Damages**

First, Defendant seeks summary judgment arguing that Plaintiffs have no evidence of any recoverable "actual damages" because they have been fully compensated the principal amount through the Remediation Plan which also necessarily dooms their claim for treble damages. (Dkt. No. 589-1 at 16-17, 22-23) Plaintiffs respond that BANA raises issues the Court addressed at class certification that any amounts BANA reimbursed to class members can be offset after trebling not before and prior reimbursements do not eliminate treble damages exposure. (Dkt. No. 652 at 7-9.)

The EFTA, a federal consumer protection law "establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems", 15 U.S.C. § 1693(a), together with its implementing regulation, Reg E, 12 C.F.R. §§ 1005.1 *et seq*., regulate electronic fund transfers which directly affect consumer accounts. 15 U.S.C. § 1693(a)(7). Among their many provisions, the EFTA and Reg E require financial institutions to timely investigate and resolve "errors" or unauthorized transactions on electronic fund transfers. 15 U.S.C. § 1693f; 12 C.F.R. § 1005.11. In order to invoke the protections of the EFTA and Reg E, the consumer must notify the bank, orally or in writing, of any "errors" concerning an electronic fund transfer within 60 days of receipt of a bank statement or other document detailing the alleged erroneous electronic fund transfer. 15 U.S.C. § 1693f(a); 12 C.F.R. § 1005.11. Once the bank is properly notified, it must "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." 15 U.S.C. § 1693f(a). However, if the institution cannot complete the investigation within 10 days as required under §§ 1693f(a) and (b), it

may "provisionally recredit" the consumer's account within ten business days of receiving notice of an error and complete its investigation within 45 days. 15 U.S.C. § 1693f(c). If a provisional credit is issued, the consumer has full use of the funds during the pendency of the investigation. *Id.*

If the financial institution discovers that an error occurred, it must promptly, no later than one business day after the discovery, correct the error, and must include interest, if applicable. 15 U.S.C. § 1693f(b). If the financial institution concludes after its investigation that an error did not occur, it shall deliver or mail its explanation of findings to the consumer within three business days after the conclusion of the investigation. 15 U.S.C. § 1693f(d). "[T]he burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability set forth in subsection (a) have been met." 15 U.S.C. § 1693g(b).

A financial institution that fails to comply with any provision of the EFTA is liable for "any actual damages sustained by a consumer as a result of such failure," including the failure to properly resolve an error reported under § 1693f. 15 U.S.C. § 1693m(a)(1). Additionally, a consumer is entitled to treble damages determined under section 1693m(a)(1) if "the court finds that-- (1) the financial institution did not provisionally recredit a consumer's account within the ten-day period . . . and the financial institution (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error[.]" 15 U.S.C. § 1693f(e)(1). Treble damages are also warranted when "the financial institution knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation." 15 U.S.C. § 1693f(e)(2).

As a starting point, relying on Judge Burns' motion to dismiss order, BANA claims that Class Plaintiffs, who have all been fully reimbursed their actual damages, have

suffered no actual damages and their only conceivable EFTA damages are those incurred as a result of delayed reimbursements. (Dkt. No. 589-1 at 16-17.) Class Plaintiffs respond that Judge Burns addressed whether the EFTA claim was mooted by the prior payments made to EDD cardholders pursuant to the *Yick* injunction and the Remediation Plan but did not address actual damages and its offset with treble damages. (Dkt. No. 652 at 10.) In the motion to dismiss, Judge Burns was asked to address whether the reimbursed Plaintiffs had suffered an injury in fact to support Article III standing. (Dkt. No. 126 at 22-23.) Judge Burns did not address the impact on Plaintiffs who had been fully reimbursed and only found that the harm suffered by delayed reimbursements constitute actual, concrete harm sufficient to support Article III standing. (*Id.* at 24.) Therefore, Defendant's claim that Judge Burns ruled that Class Plaintiffs suffered no actual damages because they have been reimbursed is not persuasive.

The EFTA creates liability for actual damages sustained as a result of a financial institution's failure to comply with any provision of the EFTA. *See* 15 U.S.C. § 1693m(a)(1). Actual damages are sustained at the time of the violation of the EFTA. In this case, Class Plaintiffs suffered actual damages when BANA summarily denied all unauthorized PIN-enabled ATM transaction claims using CFF-1 and rescinded permanent credits and froze accounts without the mandated investigation and issuance of provisional credits. Then, actual damages in the form of loss time value of money continued to be incurred until the benefits were reimbursed. Under the EFTA, treble damages constitute actual damages that are calculated by applying the treble multiplier to the principle actual damages withheld plus damages incurred as a result of the loss of use of the benefits. BANA's attempt to limit actual damages to the lost time value of money runs contrary to the primary purpose of the EFTA which is for the protection of individual consumer rights, 15 U.S.C. § 1693(b), and the purpose of treble damages, which is to deter harmful conduct by financial institutions. If the Court were to adopt BANA's position, it would encourage the unlawful denial of unauthorized transaction claims without the mandated investigation procedures and allow financial institutions to

avoid or reduce monetary damages as long as the amounts denied, rescinded or frozen were eventually reimbursed to the claimants.

Defendant also relies on Mr. Stango's economic analysis to support its contention that Class Plaintiffs did not suffer any economic injury. (Dkt. No. 589-1 at 17.) In the accompanying order granting Plaintiffs' motion to exclude certain opinions of Victor Stango, the Court concludes that Dr. Stango's opinions regarding actual damages are legally inconsistent with the EFTA damages provision. In his report, Dr. Stango compared the "difference between actual outcomes and consumer outcomes in a 'but-for' hypothetical world absent the at-issue conduct." (Dkt. No. 588-10, Brys Decl., Ex. 7.A, Stango Expert Report ¶¶ 31, 32.) According to Dr. Stango, this method highlights the distinction between a consumer who has *lost funds* with a consumer who has *lost access to funds*, and because class members only lost temporary access to their funds, their economic losses are the temporary loss of the funds, not a permanent loss. (*Id.*) Therefore, according to Dr. Stango, actual damages are not equal to the amounts denied, rescinded and frozen as opined by Greg Regan, Plaintiffs' damages expert. (*Id.* ¶¶ 33, 83, 90.) Rather, he opines that class members were injured for the "lost access to their funds for a period of time." (*Id.*) Because Dr. Stango's economic opinions are contrary to the damages provision of the EFTA which dictates that BANA is liable for any actual damages as a result of its failure to comply with any provision of the EFTA, the Court excluded his opinions on class members' economic losses. As such, BANA's reliance on Dr. Stango's expert report is not supportive of its argument that the reimbursed class members suffered no actual damages in the principal amounts denied, rescinded and frozen.

Defendant also argues that class members were not actually damaged in the principal amounts denied, rescinded or frozen because they were reimbursed within the allowable 30 or 45 days permitted by Reg E as long as they submitted a request for reconsideration. (Dkt. No. 589-1 at 23 n.4; Dkt. No. 693 at 3.) Defendant's reasoning is not supported by the statutory language and obligations under the EFTA and Reg E.

Under the EFTA, once a consumer reports an unauthorized transaction, Defendant is liable for actual damages if it fails to investigate an error claim and provides the findings of its investigation within 10 business days or, if it fails to provide provisional credit of the amounts disputed within 10 business days even if it completes the investigation within 45 days. *See* 15 U.S.C. §§ 1693f(a); 1693f(c). Extensions of time are permitted as long as certain conditions are satisfied. *See* 12 C.F.R. § 1005.11(c)(2)-(3).

Defendant asserts [redacted] had their claims paid before the *Yick* injunction, and about [redacted] were paid after the injunction but before the consent orders. (Dkt. No. 693 at 3.) Further, because [redacted] of the Claim Denial Class members were fully credited their claim amount within 30 days of their dispute, BANA claims they have suffered no damages since that is less time than Reg E allows for an investigation. (*Id.* (citing 12 C.F.R. § 1005.11(c)(2)-(3).) Despite its attempt to show Plaintiffs were reimbursed in a "timely manner", Defendant fails to explain or provide evidence that it complied with the provisions of 15 U.S.C. § 1693f and 12 C.F.R. § 1005.11(c)(2)-(3). For instance, BANA fails to argue or provide proof that for those who were fully credited within 30 days of their dispute, BANA completed an investigation and provided cardholders a written report of the results of the investigations within 10 days or for those error claims that were resolved outside the 30 days, that BANA provisionally credited the class members within 10 business of receiving notice of the alleged unauthorized transaction. Merely reimbursing class members within 30 days of the dispute without conducting an investigation and providing provisional credit does not absolve BANA of liability under the EFTA.

One aspect relating to Defendant's argument that there "are no actual damages to treble," (Dkt. No. 589-1 at 22), concerns the sequencing of calculating actual damages as it relates to treble damages under the "one-satisfaction" rule. The equitable "one satisfaction" principle prevents plaintiffs from recovering compensatory damages more than once for the same injury. *Uthe Tech. Corp. v. Aetrium, Inc.*, 808 F.3d 755, 760-63

(9th Cir. 2015) (This "one satisfaction" principle prevents duplicative recovery of the same compensatory damages.); *Zenith Radio Corp. v. Hazeltine Rsch., Inc*., 401 U.S. 321, 348 (1971) (recognizing credit for settlement payments to avoid multiple recovery for the same injury). Neither party disputes the one satisfaction rule

Ninth Circuit precedent also establishes that in treble-damages cases, the proper order of operation is to determine actual damages, whether compensated before or after trial, apply the statutory treble multiplier, and if applicable, apply any offset. *Flintkote Co. v. Lysfjord*, 246 F.2d 369, 397-98 (9th Cir. 1957), *cert. denied*, 355 U.S. 835 (1957). In *Flintkote,* after the action was filed but before trial, the plaintiffs entered into a settlement agreement receiving $20,000 with certain, but not all co-conspirators. *Id.* at 397. The question before the Ninth Circuit was "whether the $20,000 should be subtracted from the actual damages fixed by the jury verdict ($50,000) before said damages are trebled, or whether the award should first be trebled and then the $20,000 deducted from the trebled amount of $150,000." *Id.* Noting this was an issue of first impression, the court explained, *inter alia*, that the treble damage provision "is a unique statutory penalty", and the offset should be made from the compensatory verdict. *Id*. at 398. The court reasoned that deducting before trebling would "do violence" to the statutory treble-damages scheme by reducing the deterrent effect against unlawful business practices intended by Congress. *Id.* Moreover, the court noted that "a contrary result would put a premium on litigation and discourage settlements. It is not the policy of the law to encourage litigation at the expense of compromise." *Id.* The Ninth Circuit reaffirmed this sequencing rule in *William Inglis & Sons Baking Co. v. ITT Continental Baking Co*., 981 F.2d 1023, 1024 (9th Cir. 1992) expressly stating that "under existing law settlement payments should be deducted from the damages after they have been trebled." *Id.* (citing *Flintkote Co*., 246 F.2d at 368).

In *Uthe Tech. Corp*., the Ninth Circuit again emphasized that prior compensatory payments do not eliminate treble-damages. *Uthe*, 808 F.3d at 760–63. In *Uthe Tech*., the plaintiff filed a RICO action against the defendants, including foreign Singaporean

defendants, and the case was subsequently stayed pending arbitration against the foreign defendants in Singapore. *Id.* at 756-57. The plaintiff won damages in arbitration against the foreign defendants in the Singapore arbitration for actual losses stemming from the conspiracy. *Id.* at 757. After the arbitration award, the plaintiff reinstated the action against the defendants seeking treble damages under RICO. *Id.* The Ninth Circuit held that the plaintiff was not barred from pursuing treble damages under RICO against the defendants under the one satisfaction rule as long as there is an offset for the sums already paid to the plaintiff by the foreign defendants due to the arbitration award. *Id.* at 762. The court explained, "[d]epending upon the order in which the two rules are applied, the one satisfaction rule could either offset part of Uthe's treble RICO damages, or it could fully extinguish Uthe's claim to those damages." *Id.* at 760. Because it was not possible for the plaintiff to obtain full satisfaction of its RICO claims in the Singapore arbitration, the court held that the plaintiff could pursue treble damages under RICO. *Id.* at 760-61; *see In re Nat'l Mortg. Equity Corp. Mortg. Pool*, 636 F. Supp. 1138, 1151-52 (C.D. Cal. 1986) ("Without exception, courts hold that the full award to which such plaintiffs are entitled is an amount three times the proven actual damages and that, to ensure that plaintiffs receive complete satisfaction of their claims, settlement payments should be deducted from the award against the non-settling defendant(s) after actual damages are trebled."). While the one satisfaction rule prevents double recovery, the full satisfaction rule requires that the plaintiffs be fully reimbursed for the harms suffered. Therefore, the Court reiterates its ruling at class certification that any amounts already paid to class members are to be offset after trebling and not before. (Dkt. 499 at 84-85.)

If treble damages are found by a jury to be warranted on the EFTA claim, Plaintiffs are entitled to "three times the proven actual damages" as any award less than that would provide incomplete recovery.[14] *See In re Nat'l Mortg. Equity Corp.*, 636 F. Supp. at 1152

---

[14] In fact, the Remediation Plan [redacted] (Dkt. No.

(did not matter that the plaintiffs' "actual damages were completely, rather than only partially, satisfied . . . .because the critical factor is that the 'full satisfaction' to which treble damage claimants are entitled is 'three times the proven actual damages' [and] any award less than that amount constitutes an incomplete recovery."); *In re Volkswagen "Clean Diesel" Mktg. Sales Pracs., and Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 4890594, at *4 (N.D. Cal. Oct. 30, 2017) (case not mooted by payment of full recovery due to settlement as the franchise dealers had not obtained full satisfaction under the RICO claim entitling it to treble damages). While "actual damages" include the principle amounts reimbursed to Plaintiffs, if BANA is ultimately found liable for treble damages, any reimbursed amounts paid to Plaintiffs must be deducted as an offset.

In sum, the Court DENIES Defendant's motion for summary judgment that Plaintiffs have no evidence of "actual damages."

**2. Classwide Damages Model as to Consequential Damages**

Defendant next argues that Plaintiffs have not demonstrated, with evidence, that they can prove classwide damages as it relates to consequential damages because their damages model expressed by their damages experts is not tied to any class members' experience. (Dkt. No. 589-1 at 17-20.) Plaintiffs respond that the Court approved Greg J. Regan's Methodology 1 which concluded that lost time value of money can be measured by a uniform, compound interest rate that can be applied to all class members. (Dkt. No. 652 at 11-14.)

In the class certification order, the Court, relying on *Van v. LLR Inc.*, 962 F.3d 1160, 1165 (9th Cir. 2020), concluded that a compound interest rate can be used to measure the "lost time value of money" to support consequential damages. (Dkt. No. 499 at 86.) Regan's Methodology 1, which the Court approved, multiplied the principal amount of actual damages with a compound interest rate (representing the lost time value

---

632-195, Chan Decl., Ex. 213, Remediation Plan at p. 11 n.32.) [redacted] Remediation Plan [redacted].

of money) with the total length of time class members were denied access to UI benefits.[15] (*Id.* at 86-87.) Plaintiffs' damages experts, Chloe N. East ("Dr. East") and David I. Levine ("Dr. Levine"), based on their extensive experience and research, present their respective opinions on a compound interest rate to measure the EDD cardholder's harm due to the lost time value of the UI benefits EDD cardholders were unable to access due to CFF-1.

Similar to the arguments raised in Defendant's *Daubert* motions to exclude the opinions of Dr. East and Dr. Levine, BANA argues that the compound interest rate generated by Dr. East and Dr. Levine are not tethered to any class members' experience. (Dkt. No. 589-1 at 18-20.) The Court denied both *Daubert* motions concluding both experts had a reliable foundation in which to render their opinions on a compound interest rate. Both Dr. East and Dr. Levine analyzed the UI recipients in California during COVID-19 and noted the importance of UI benefits as a critical safety net, the use of UI benefits for household necessities, bills, rent, childcare and healthcare, the typical UI recipient's financial state reflecting little or no savings, and the impact of a sudden loss of UI benefits. (Dkt. No. 565-8, Hoyle Decl., Ex. 32, East Expert Report ¶¶ 11-35; Dkt. No. 566-9, Hoyle Decl., Ex. 35, Levine Expert Report ¶¶ 19-29.) For both Dr. Levine and Dr. East, the compound interest rate they assessed was not meant to be based on any class members' experience but it was a measure or proxy that represented the lost time value of money of losing access to UI benefits. (Dkt. No. 565-8, Hoyle Decl., Ex. 32, East Expert Report ¶ 37; Dkt. No. 566-9, Hoyle Decl., Ex. 35, Levine Expert Report ¶¶ 12, 18.)

[15] The Court rejected Regan's Methodology 2 assessing the lost time value of money using the 20% interest rate derived from [redacted] the Remediation Plan. (Dkt. No. 499 at 87.) It explained that the Remediation Plan [redacted]. (*Id.* at 87-88.)

In *Opperman v. Path, Inc*., Case No. 13-cv-00453-JST, 2016 WL 3844326, at *14 (N.D. Cal. July 15, 2016), relied on by Defendant, the district court rejected Plaintiffs' class damages model valuing privacy because there was much "variation across individuals concerning their attitude and willingness to protect their privacy" and some even attached no value to their privacy and as such, may not be damaged. *Id.* at *14. The defendant argued that the plaintiffs' proposed damages model assumed every class member uniformly suffered damages when in fact each individual's preferences and values varied greatly. *Id.*

However, in this case, Plaintiffs have provided evidence that every class member was injured when their benefits were abruptly denied, rescinded or frozen and their harms were not contingent on their values or preferences. (Dkt. No. 566-9, Hoyle Decl., Ex. 35, Levine Expert Report ¶ 33 ("the delay or denial of UI benefits generates a cost for every individual whose benefits were denied[.]") According to Dr. East, these harms included not just the cost of borrowing necessitated by the inability to pay for life essentials but for those that opted not to use their credit cards, those denied credit or those that did not have credit cards, they would have suffered the costs of cutting spending on essential necessities such as food and medical care. (Dkt. No. 565-8, Hoyle Decl., Ex. 32, East Expert Report ¶¶ 32-35.) Similarly, Dr. Levine opined that UI benefits during the pandemic helped with food insecurity, helped individuals maintain health insurance and afford much-needed healthcare, reduced the likelihood of mortgage default and falling behind on bills, and provided families with vital income support. (Dkt. No. 566-9, Hoyle Decl., Ex. 35, Levine Expert Report ¶¶ 26-29.) Therefore, when these benefits were abruptly withheld, class members faced an opportunity cost when they sought other funds to prevent harms from occurring or they incurred costs by reducing consumption. (*Id.*) The compound interest rate measures these harms caused by the lost time value of money. *See Van,* 962 F.3d at 1165. Contrary to Defendant's argument, Plaintiffs have provided evidence of a damages model that can prove classwide damages as it concerns consequential damages.

### 3. Whether CFF-1 Caused Recoverable Damages

Defendant next contends that Plaintiffs cannot prove that their damages were incurred as a result of a failure to comply with the EFTA because there is no evidence that each individual actually made a legitimate claim. (Dkt. No. 589-1 at 21.) Plaintiffs disagree arguing that BANA's "causation" argument fails to consider the EFTA's burden-shifting framework. (Dkt. No. 652 at 14-15.)

Defendant's argument was raised at class certification when BANA argued that Plaintiffs must prove that each challenged transaction was in fact "unauthorized" as those who brought fraudulent claims cannot recover. (Dkt. No. 499 at 50.) The Court rejected BANA's argument and explained that Plaintiffs need only show they timely notified BANA and provide information about the unauthorized transaction. (*Id.* at 51.) Once notice is provided, the burden is on BANA to show the transaction was authorized or not. (*Id.* (citing 15 U.S.C. § 1693g(b).) Therefore, under the provisions of the EFTA, BANA's argument that Plaintiffs fail to provide evidence that each cardholder made a legitimate claim is again rejected.

At the hearing, BANA argued that Plaintiffs have not shown that they each made a legitimate claim, or in other words, were entitled to the benefit they are making a claim about. BANA's argument is based on the Remediation Plan [redacted]. (Dkt. No. 589-1 at 21.)

On summary judgment, the moving party must show that the nomoving party did not establish an element of his or her claim on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322-23. BANA has not identified which element of the EFTA Plaintiffs have failed to adequately support. Instead, BANA's argument relating to the need to identify fraudulent claimants relates to class certification, not summary judgment. This issue is in fact the subject of Defendant's pending motion for decertification. (*See* Dkt. No. 733.) Thus, the Court DENIES summary judgment based on this issue.

Next, even if the unauthorized transaction claims were legitimate, BANA contends that Plaintiffs cannot show that all their alleged harms were the result of alleged EFTA violations as opposed to their own failure to act because Plaintiffs were instructed on how to seek reconsideration. (Dkt. No. 589-1 at 21-22.) According to BANA, Plaintiffs cannot show actual damages when they failed to mitigate by seeking reconsideration. (*Id.* at 22.) Plaintiffs respond that whatever extra-statutory procedure BANA created is legally immaterial because they were injured when BANA failed to timely perform its EFTA investigations. (Dkt. No. 652 at 15.) Plaintiffs were only required to submit a claim, not to seek reconsideration after Defendant wrongfully denied their funds. (*Id.*) Further, even if relevant, Plaintiffs claim there is a disputed issue of material fact whether BANA offered class members a meaningful and accessible "reconsideration" process because they could not access the Claims call center without waiting on average [redacted] and requiring the Credit Freeze Class members to re-authenticate with EDD [redacted]. (*Id.* at 15-16.)

Under the EFTA, BANA is subject to liability because of its alleged failure to timely conduct its investigation when class members reported unauthorized transactions. *See* 15 U.S.C. § 1693m(a)(1) (financial institution subject to "any actual damage . . . as a result" of failing to comply with any provision of the EFTA). Here, Plaintiffs claim that Defendant failed to timely investigate their unauthorized transaction claims within the mandated timelines.

After class members reported their unauthorized transactions, BANA automatically denied these claims and sent denial letters providing class members an opportunity to seek reconsideration. However, Defendant has not shown that the EFTA required Plaintiffs to engage in any other conduct besides timely notifying BANA of the unauthorized transaction claims such as mitigate damages or seek reconsideration. Defendant's reliance on *Bartashnik v. Bridgeview Bancorp*, Inc., No. 05 C 2731, 2005 WL 3470315, at *3 (N.D. Ill Dec. 15, 2005) is not supportive. In that case, the plaintiff filed a purported class action alleging violations of the EFTA when the bank charged her

transaction fees at ATMs without posting a notice of those fees outside the ATMs. *Id.* at *1. The plaintiff filed a motion to strike the defendant's affirmative defense for failure to mitigate as improper because the EFTA is a strict liability statute. *Id.* The district court denied the motion to strike because the plaintiff did not provide authority that the EFTA is a strict liability statute and even so, failure to mitigate defense could impact the degree of liability. *Id.* at *3. The court engaged in no analysis as to whether there is a duty to mitigate under the EFTA. As such, the Court DENIES Defendant's motion for summary judgment based on its faulty argument that Plaintiffs failed to prove their actual damages were incurred as a result of their failure to comply with the EFTA.

**4. Whether Treble Damages is Warranted**

Under the EFTA, a consumer is entitled to treble damages if "the court finds that-- (1) the financial institution did not provisionally recredit a consumer's account within the ten-day period . . . and the financial institution (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error. 15 U.S.C. § 1693f(e)(1). Treble damages are also warranted when "the financial institution knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation." 15 U.S.C. § 1693f(e)(2).

**a. Credit Rescission Class**

BANA argues that Plaintiffs have failed to satisfy the statutory requirements to support treble damages as to the Credit Rescission Class because Plaintiffs had their permanent credits temporarily rescinded by mistake, and were automatically reimbursed following investigation. (Dkt. No. 589-1 at 24.) In response, Plaintiffs claim there is evidence that Defendant's rescission of permanent credits was intentional and not a mistake. (Dkt. No. 652 at 18-19.)

On September 28, 2020, the CFF-1 was used to rescind provisional and permanent credits that were provided to EDD cardholders for claims submitted between April –

September 2020. (Dkt. No. 588-121, Brys Decl., Ex. 76 at -7224.) According to an internal BANA document [redacted]. (*Id.*) BANA also provides an email dated April 29, 2021 from Bradley Garfield, head of commercial cards product management, as well as his deposition and that of Jennifer Ehresman asserting that [redacted]. (Dkt. No. 588-178, Brys Decl., Ex. 135 at -8995 ("[redacted]."); Dkt. No. 588-35, Brys Decl., Ex. 14.I, Garfield Depo. at 21:15-18; 248:2-249:14 ("[redacted]"); Dkt. No. 588-33, Brys Decl., Ex. 14.G, Ehresman Depo. at 113:25-114:8 ("[redacted].").)

In response, Plaintiffs assert that the "mistake" defense is belied by the fact that [redacted] extended over eight months and affected the rights of [redacted] who lost a total of [redacted] and aligned with an effort to [redacted] resulting from the Bank's previous EFTA-complaint policy. (Dkt. No. 652 at 17-18.) Plaintiffs point to the Bank's GBAM leaders [redacted] consistent with Bank Reg E obligations. (*Id.*) The GBAM leaders explained [redacted]." (Dkt. No. 632-57, Chan Decl., Ex. 64 at -9955 (emphasis added).) This evidence supports the Plaintiffs' position that the rescission was intentional and not an inadvertent mistake. The Court concludes a

material issue of fact exists whether BANA's rescission of permanent credits without investigation was a mistake.

BANA additionally argues that [redacted] to impacted cardholders in a short period of time, it demonstrates its conduct in rescinding permanent credits was not intentional. (Dkt. No. 589-1 at 24.) Plaintiffs respond that BANA did not [redacted]. (Dkt. No. 652 at 19.) Moreover, contrary to BANA's claim, Plaintiffs assert the record shows that Credit Rescission Class members were not reimbursed [redacted]. (*Id.*)

While BANA claims there was a [redacted], (*see* Dkt. No. 588-121, Brys Decl., Ex. 76 at -7224), the record shows that [redacted]. When the CFF-1 was implemented, BANA rescinded permanent credits [redacted]. (Dkt. No. 632-1, Chan Decl., Ex. 1, Kreis Expert Report ¶ 71.) [redacted]. (Dkt. No. 632-131, Chan Decl., Ex. 140 at -1310.) Then, [redacted], BANA [redacted] the week of December 14, 2020 [redacted]. (Dkt. No. 632-131, Chan Decl., Ex. 140 at -1310.) In response, BANA received [redacted]. (Dkt. No. 632-131, Chan Decl., Ex. 140 at -1309 -10; Dkt. No. 588-121, Brys Decl., Ex. 76 at -7224.) Of the 1[redacted] in mid-December, there was only [redacted]. Therefore, a majority of impacted cardholders [redacted]. (Dkt. No. 632-130, Chan Decl., Ex. 139.) Mr. Regan calculated that the median time of claim denial for Credit Rescission class members was [redacted] and about [redacted] of the claims were denied for [redacted]. (Dkt. No. 632-5, Chan Decl., Ex. 5, Regan Report ¶ 68.)

Plaintiffs have raised an issue of fact whether the Credit Rescission Class members were [redacted] thereby raising the disputed issue of fact whether BANA intentionally rescinded permanent credits.

**b. Claim Denial Class**

BANA maintains that Plaintiffs have not shown willful conduct to support treble damages for the Claim Denial Class; rather, based on the information available to it at the time, it reasonably believed [redacted] (Dkt. No. 589-1 at 25.) Further because it recognized that CFF-1 [redacted], BANA took steps to let cardholders challenge the CFF results and obtain [redacted]. *(Id.* at 25-26.) Plaintiffs respond that there is ample evidence that a reasonable jury could conclude that Defendant's violations of the EFTA by automatically denying unauthorized transaction claims were knowing, willful and made without any attempt to fulfill its obligation to conduct good faith investigations of unauthorized error claims. (Dkt. No. 652 at 17.)

Starting in the spring 2020, BANA was informed by law enforcement agencies and other third-party sources of massive fraud in the UI programs. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 11; Dkt. No. 588-15, Brys Decl., Ex. 11.B, Pesce Expert Report ¶¶ 32-36.) Starting in June 2020, unauthorized transaction claims began to climb significantly, increasing more than [redacted] in California in comparison to the four months prior. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 25.)

In May 2020, BANA was first alerted to benefits eligibility fraud that [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 13; Dkt. No. 590-7, D's RJN, Ex. 5.) As a result, the GFC team [redacted]

[redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 15; Dkt. No. 588-177, Brys Decl., Ex. 134 at -2981 -82; Dkt. No. 588-179, Brys Decl., Ex. 136 at -0162.) BANA analyzed the data to identify patterns and conduct evidencing likelihood of fraud and suspicious activity. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 17.)

By the summer 2020, GFC observed that (1) [redacted], and (2) [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 20; Dkt. No. 588-146, Brys Decl., Ex. 102 at -5117 -21.) GFC and GIS's research revealed [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 18; Dkt. No. 588-146, Brys Decl., Ex. 102 at -5117 -21; Dkt. No. 588-132, Brys Decl., Ex. 87; Dkt. No. 588-133, Brys Decl., Ex. 88.)

In July 2020, BANA [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 21.) BANA soon realized [redacted] (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 22.) On September 18, 2020, [redacted]. (Dkt. No. 588-185, Brys Decl., Ex. 142; Dkt. No. 588-203, Brys Decl., Ex. 161 at -7458; Dkt. No. 588-106, Brys Decl., Ex. 61; Dkt. No. 588-177, Brys Decl., Ex. 134 at -2985.)

In late summer of 2020, [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 29.) Based on their research, they noted certain characteristics of fraud, including [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 30; Dkt. No. 588-107, Brys Decl., Ex. 62; Dkt. No. 588-128, Brys Decl., Ex. 83; Dkt. No. 588-131, Brys Decl., Ex. 86.)

William Fox, head of GFC and former Director of FinCEN, and his team at GFC [redacted]. (Dkt. No. 588-34, Ex. 14.H, Fox Depo. at 43:13-25.) Mr. Fox testified that [redacted]. (Dkt. No. 588-34, Ex. 14.H, Fox Depo. at 52:3-53:8.) Its analyses concluded that [redacted]. (*Id.*) Mr. Fox testified [redacted] (*Id.* at 53:6-7)

Mr. Letson stated, [redacted] (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 31.) According to Mr. Letson, [redacted] (*Id.* ¶ 32.)

Because [redacted] was a major cause of claims fraud and criminals were [redacted], (Dkt. No. 588-182, Brys Decl., Ex. 139 at -6913 -14; Dkt. No. 588-179, Ex. 136 at -0149 -150; Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶¶ 25-28, 32), the CFF-1 was developed [redacted], or

in other words, "[redacted]"[16] and represented [redacted][17] of existing claims. (Dkt. No. 588-188, Brys Decl., Ex. 145 at -0517.) It was explained that if [redacted] (*Id.*) If CFF-1 was triggered, [redacted]. (Dkt. No. 588-42, Brys Decl., Ex. 14.Q, Letson Depo. at 177:1-180:23.) According to BANA, based on research, review of claims and data submitted, GFC, at the beginning, [redacted]. (Dkt. No. 588-34, Brys Decl., Ex. 14.H, Fox Depo. at 27:5-23; 47:5-17; Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 33.) CFF-1 was based on the assumption that [redacted]. (Dkt. No. 588-130, Brys Decl., Ex. 85 at -7772 -73.)

CFF-1 was also based on the assumption that [redacted]. (*Id.*) As such, BANA assumed there was a high likelihood that [redacted]. (Dkt. No. 588-130, Brys Decl., Ex. 85 at -7772 ("[redacted]"[18]); Dkt. No. 588-131, Brys Decl., Ex. 86 at -7776.) In other words, CFF-1 was based on the assumption that [redacted]

---

[16] [redacted]. (Dkt. No. 632-13, Chan Decl., Ex. 15, Letson Depo. at 145:14-19; Dkt. No. 632-21, Chan Decl., Ex. 23, Holt Depo. at 161:24-162:6.)

[17] The [redacted] represents the number of ATM claims, not [redacted]. (Dkt. No. 632-17, Chan Decl., Ex. 19, Schwartz Depo. at 212:6-213:13.)

[18] Anne Holt explained that [redacted]. (Dkt. No. 588-37, Brys Decl., Ex. 14.L, Holt Depo. at 193:6-194:11.)

[redacted]. (Dkt. No. 588-130, Brys Decl., Ex. 85 at -7772 -73; Dkt. No. 588-131, Brys Decl., Ex. 86 at -7776.) Therefore, CFF-1 automatically denied all unauthorized PIN-enabled ATM transaction claims because they were either fraudulent or violated the Account Agreement by [redacted]. (Dkt. No. 588-130, Brys Decl., Ex. 85 at -7772 -73; Dkt. No. 588-131, Brys Decl., Ex. 86 at -7776; Dkt. No. 588-70, Brys Decl., Ex 28, Response to Yick's Fourth Set of Interrog. No. 28.)

According to BANA, CFF-1 was also based on the understanding that a [redacted]. (Dkt. No. 588-44, Brys Decl., Ex. 14.Q, Martin Depo. at 50:22-51:7; Dkt. No. 588-16, Brys Decl., Ex. 12.A, Joseph Expert Report ¶ 103; Dkt. No. 588-17, Brys Decl., Ex. 12.B, Joseph Rebuttal Expert Report ¶¶ 39, 43-44.) Based on BANA's investigation, analysis and assumptions at the time, it believed it had a reasonable basis for [redacted].

On the other hand, Plaintiffs assert the fraud that impacted EDD cardholders was due to skimming of their vulnerable mag-stripe only debit cards at ATMs. (Dkt. No. 632-13, Chan Decl., Ex. 15, Letson Depo. at 165:1-10; Dkt. No. 632-2, Chan Decl., Ex. 2, Cloninger Expert Report ¶¶ 18-25.) Internal BANA emails between April 2020 through April 2021 reveal that [redacted]. (Dkt. No. 632-153, Chan Decl., Ex. 166 at -8914 ([redacted]); Dkt. No. 632-149, Chan Decl., Ex. 162 at -5617 ([redacted]); Dkt. No. 632-161, Chan Decl., Ex. 174 at -4043 ([redacted]); Dkt. No. 632-167, Chan Decl., Ex. 180 at -7295

([redacted]).)

Plaintiffs also show that Defendant [redacted] or did not know as of September 24, 2020 [redacted] because GFC did not conduct an assessment based on mathematical probability. (Dkt. No. 632-21, Chan Decl., Ex. 23, Holt Depo. at 179:5-181:16.) For instance, Ms. Holt testified [redacted]. (*Id.* at 179:5-9; 192:22-194:20.) Mr. Schwartz similarly testified [redacted]. (Dkt. No. 632-17, Chan Decl., Ex. 19, Schwartz Depo. at 37:20-38:12.) Contrary to Mr. Fox's deposition testimony and Mr. Letson's declaration [redacted], Mr. Schwartz testified [redacted]. (*Id.* at 37:20-38:12, 109:15-181:16.) Mr. Garfield also testified [redacted]. (Dkt. No. 632-18, Chan Decl., Ex. 20, Garfield Depo. at 282:4-23.)

Plaintiffs further show that [redacted] after its implementation on September 28, 2020. (Dkt. No. 632-21, Chan Decl., Ex. 23, Holt Depo. at 161:24-162:25; 179:5-181:16; 275:11-276:4; Dkt. No. 632-13, Chan Decl., Ex. 15, Letson Depo. at 144:11-145:3.) According to Ms. Holt, [redacted]. (Dkt. No. 632-21, Chan Decl., Ex. 23, Holt Depo. at 92:6-19.) Mr. Fox acknowledged [redacted]

[redacted]. (Dkt. No. 632-20, Chan Decl., Ex. 22, Fox Depo. at 49:20-50:13; *see also* Dkt. No. 588-203, Brys Decl., Ex. 161 at -7458 ([redacted].)

While Defendant believed the accuracy rate for the CFF-1 was [redacted] it did not turn out to be so over time. (Dkt. No. 588-51, Brys Decl., Ex. 14.Y, Pesce Depo. at 55:2-56; Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 33.) After implementation and based on reconsideration rates, [redacted].[19] (Dkt. No. 632-1, Chan Decl., Ex. 1, Kreis Expert Report ¶¶ 73, 74, 75; *see* Dkt. No. 632-206, Chan Decl., Ex. 227-206, Chan Decl., Ex. 227 at -9492 -93.) In fact, the Senior Vice President/Sr. Operation Project Manager noted [redacted]. (Dkt. No. 632-109, Chan Decl., Ex. 116 at -3305.) In response, another Senior Vice President responded [redacted].” (*Id.*)

Plaintiffs raise a disputed issue of fact whether BANA's implementation of CFF-1 to deny all PIN-enabled ATM unauthorized transaction claims "when such conclusion could not reasonably have been drawn from the evidence available to [BANA] at the time

[19] BANA argues that [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 35; Dkt. No. 588-37, Brys Decl., Ex. 14.L, Holt Depo. at 226:11-227:16.) In October 2020, [redacted]. (Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 35.) However, Plaintiffs raise questions [redacted] Further, Plaintiffs present evidence that because of the understaffed Claim call center where the average abandonment rate during the Class Period was [redacted] compared to [redacted] across all call centers in 2020, [redacted]. (Dkt. No. 632-3, Chan Decl., Ex. 3, Minnucci Expert Report ¶ 14.)

of its investigation." *See* 15 U.S.C. 1693f(e)(2). Therefore, the Court DENIES Defendant's motion for summary judgment on treble damages.

**D. Second Cause of Action California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq*.**

The second cause of action alleges a claim under the CCPA, (Dkt. No. 406, TAMCC ¶¶ 546-61), and the Court certified an EMV Chip Class whose EDD debit cards did not include an EMV chip prior to June 9, 2021. (Dkt. No. 499 at 97.)

The CCPA provides a private right of action for actual or statutory damages to "[1] [a]ny consumer whose nonencrypted and nonredacted personal information . . . [2] is subject to an unauthorized access and exfiltration**,** theft, or disclosure [3] as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information[.]" Cal. Civ. Code § 1798.150(a)(1). Personal information under the CCPA is defined to include the cardholder's name and debit card account number in combination with any required security code that allows access to an individual's account. Cal. Civ. Code § 1798.81.5(d)(1)(A)(iii).

**1. Whether Failure to Issue EMV Chip Cards Violated the CCPA**

Defendant maintains that no regulation, statute or rule required BANA to issue cards with EMV chips, and the EDD Agreement authorized BANA to use mag-stripe only cards.[20] (Dkt. No. 589-1 at 27-28.) Plaintiffs argue that the question is not whether BANA was required to issue EMV chip-enabled debit cards but whether BANA violated its "duty to implement and maintain reasonable security procedures and practices" to protect class members' personal identifying information ("PII") by failing to issue EMV chip debit cards. (Dkt. No. 652 at 27.)

---

[20] At the hearing, Defendant clarified that the question on the CCPA claim is whether it implemented and maintained reasonable security measures which is informed by whether EMV chips were industry standard in 2020 and whether there were contractual obligations requiring it to use EMV chips.

The question on the CCPA claim is whether BANA violated its "duty to implement and maintain reasonable security procedures and practices" to guard against the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' PII by failing to add EMV chips on EDD debit cards before July 2021. *See* Cal. Civ. Code § 1798.150(a)(1).

To answer this question, both parties, relying on their respective expert opinions, dispute whether EMV chips were industry standard in the payment card or prepaid debit card industry during the relevant time period in 2020-21. On the one hand, Defendant's EMV chip expert, Pamela Joseph, states during 2015, EMV chip technology was not industry standard for prepaid debit cards due to its lower-risk characteristics. (Dkt. No. 591-20, Brys Decl., Ex. 12.A, Joseph Expert Report ¶ 42.) Ms. Joseph relies on Federal Reserve data showing that in 2019, more than 74%, in 2020, more than 65%, and in 2021, more than 54% of in-person transactions using general purpose prepaid debit cards were completed without a chip. (*Id.* ¶ 45.) Therefore, Ms. Joseph concluded that the roll out for EMV chip technology took place gradually and EMV chips were not industry standard for prepaid debit cards in 2019 and 2020 where data shows, in 2019, that more than 74% of in-person transaction with general purpose prepaid cards and more than 75% of the dollar volume of those transaction were made without a chip. (*Id*. ¶ 123.) On the other hand, Plaintiffs' EMV chip expert, Jane Cloninger, opined that at least by 2019, use of EMV chips was the industry-standard for the debit card market, including debit cards used for the administration of federal government benefits. (Dkt. No. 632-2, Chan Decl., Ex. 2, Cloninger Expert Report ¶¶ 14c, 46-55.) In fact, in 2015, an Executive Order directed that all government agencies shift to use of EMV, including all prepaid debit cards used to distribute federal government benefits. (*Id.* ¶ 53.) The competing experts

raise disputed issues of material fact whether EMV chips were industry standard in 2020-2021.[21]

Next, BANA points out that the EDD Agreement provided only for mag-stripe debit cards, (Dkt No. 591-98, Brys Decl., Ex. 39 at -2462, -2741; Dkt. No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 17), not EMV chip cards, and the CFPB in 2015 did not mandate financial institutions to adopt EMV technology. (Dkt. No. 590-8, D's RJN, Ex. 6 at 270-73.) Yet, Plaintiffs raise an issue of fact challenging whether BANA had a duty to implement reasonable security practices by referencing BANA's commitment in the EDD Agreement where it agreed to provide "immediate response to emerging fraud trends," and the "highest level of security and fraud safeguards" and promised to be at "the forefront of fraud and data security strategies." (Dkt. No. 288-34, Brys Decl., Ex. 39 at -2760 -61.) As such, there is a disputed issue of material fact whether failing to convert to EMV chips sooner violated BANA's duty to maintain reasonable security procedures and practices under the CCPA even though mag-stripe only debit cards were authorized by the EDD Agreement.

Thus, the Court concludes there are material issues of disputed fact whether BANA breached its "duty to implement and maintain reasonable security procedures and practices" that was "appropriate to the nature of the information" in securing class members' PII by failing to issue prepaid debits cards with EMV chips barring summary judgment.

---

[21] The Court notes that there are also issues of disputed fact as to what types of cards are considered when determining industry standards. In making their opinions, both experts rely on a different universe of cards when determining whether EMV Chip cards were or were not industry standard in 2020-21 when referencing EDD debit cards. For example, Ms. Joseph looks at all prepaid cards in the U.S. market which includes reloadable prepaid cards, non-reloadable prepaid cards, payroll cards, government benefits cards, college ID cards, and gift cards. (Dkt. No. 623-5, Bass Decl., Ex. C, Joseph Expert Report. ¶¶ 42, 43, 45; Dkt. No. 563-5, Hoyle Decl., Ex. 2, Cloninger Reb. Expert Report ¶ 26), while Ms. Cloninger looks at the entire payment card industry which she explains is the appropriate grouping to assess the industry standard for EMV chips. (Dkt. No. 632-2, Chan Decl., Ex. 2, Cloninger Expert Report ¶¶ 46-55; Dkt. No. 632-9, Chan Decl., Ex. 11, Cloninger Reb. Expert Report ¶¶ 8-23.)

**2. Whether Lack of EMV Chip Caused the Violation of CCPA**

Defendant next argues that Plaintiffs have not provided any evidence that the lack of an EMV chip card caused the unauthorized access and exfiltration, theft or disclosure of the EMV Chip Class members' PII because the PINs on mag-stripe cards cannot be skimmed. (Dkt. No. 589-1 at 28.) And relatedly, it contends that Plaintiffs have no proof that [redacted]. (*Id.* at 29.) Plaintiffs disagree arguing the records, including BANA's own internal documents, support a finding the EMV Chip Class members were victims of skimming. (Dkt. No. 652 at 28.)

The magnetic stripes on debit cards contain easily readable data such as the cardholder's name, credit card number, expiration date and CVV number and its status with each transaction. (Dkt. No. 632-2, Chan Decl., Ex 2, Cloninger Expert Report ¶ 17.) A skimming device inserted into a card reader captures information on the back of the magnetic stripe. (Dkt. No. 588-44, Brys Decl., Ex. 14.S, Martin Depo at 50:2-25.) Criminals can clone mag-stripe cards by "skimming" the cards where the criminal installs a device capable of reading the information on the magnetic stripe on an ATM's card reader. (Dkt. No. 632-2, Chan Decl., Ex 2, Cloninger Expert Report ¶ 18.)

Skimming devices only capture a card number and are not able to capture PINs unless they are used with another device to capture the PIN. (Dkt. No. 588-44, Brys Decl., Ex. 14.S, Martin Depo. at 51:3-19; Dkt. No. 588-16, Brys Decl., Ex. 12.A, Joseph Expert Report ¶¶ 76, 79, 80. 84.) As such, skimming devices are often paired with PIN pad overlays or pinhole cameras to capture cardholder information and PIN. (Dkt. No. 632-2, Chan Decl., Ex. 2, Cloninger Expert Report ¶¶ 18-25; Dkt. No. 632-11, Brys Decl., Ex. 31, Joseph Depo. at 90:20-91:8.) From this information, criminals can create counterfeit or "cloned" cards to make unauthorized purchases or ATM withdrawals. (Dkt. No. 632-2, Chan Decl., Ex. 2, Cloninger Expert Report ¶¶ 18-25.) All ATM

transactions are PIN-enabled where the cards and PINs are used to facilitate payment. (Dkt. No. 588-44, Brys Decl., Ex. 12.A, Martin Depo at 125:22-126:8.)

In contrast, EMV chip cards have embedded chips that create a dynamic CVV code that is unique to each transaction. (Dkt. No. 632-2, Chan Decl., Ex. 2, Cloninger Expert Report ¶ 29.) As such, EMV chip cards are "next to impossible to counterfeit" because they contain private keys that cannot be copied. (*Id.* ¶¶ 29, 32.) While EMV chip cards still have a magnetic stripe and can be skimmed to create a mag-stripe only version of the EMV card; that card cannot be used to make transactions on a terminal that has a chip reader which includes all ATMs because no correct CVV code will be transmitted. (*Id.* ¶¶ 33, 34.)

Therefore, while it is not disputed that a PIN cannot be skimmed on a mag-stripe card, it is also not disputed that skimming devices are often paired with PIN pad overlays or pinhole cameras to capture the PIN. And while counterfeit cards can be cloned from the magnetic stripe of an EMV chip card, they cannot be used in subsequent ATM transactions as they lack an embedded chip capable of creating a dynamic CVV code. Therefore, counterfeit or cloned cards generated from the magnetic stripes of EMV chip cards and PINs captured by another device will be useless to fraudsters seeking to withdraw ATM funds from EDD cardholder accounts.

Internal BANA emails dated between April 24, 2020 and April 23, 2021 reveal that [redacted]. (Dkt. No. 632-153, Chan Decl., Ex. 166 at -8914 (April 24, 2020 email [redacted]); Dkt. No. 632-149, Chan Decl., Ex. 162 at -5617 (August 18, 2020 email [redacted]); Dkt. No. 632-161, Chan Decl., Ex. 174 at -4043 (September 9, 2020 email commenting [redacted]

[redacted]); Dkt. No. 632-167, Chan Decl., Ex. 180 at -7295 (April 23, 2021 email stating [redacted])

Moreover, many internal documents show [redacted]. (*See* Dkt. No. 632-162, Chan Decl., Ex. 175 at -6345 ("[redacted]); Dkt. No. 632-163, Chan Decl., Ex. 176 at -2377 ("[redacted]); Dkt. No. 632-166, Chan Decl., Ex. 179 at -7363 [redacted]

Therefore, Plaintiffs have raised a genuine issue of disputed material facts whether the absence of EMV chip cards caused Plaintiffs' PII to be accessed without authorization. (*Compare* Dkt. No. 588-16, Brys Decl., Ex. 12.A, Joseph Expert Report ¶ 79 ([redacted]), ¶ 94 ([redacted]), ¶ 97 (EMV chips cannot prevent cardholders making false reports), ¶ 100 (EMV chips cannot prevent mistaken claims), *with* Dkt. No. 632-2, Chan Decl., Ex. 2, Cloninger Expert Report ¶ 14j (EMV chips would have [redacted])

**3. Statutory Damages - Merits**

BANA argues there is no evidence that it acted unreasonably or willfully to subject it to statutory damages under the CCPA. (Dkt. No. 589-1 at 29.) It claims that it provided debit cards in compliance with the EDD Agreement, reasonably believed it did not have authority to implement EMV chips without EDD approval and had discussions with EDD about EMV chips which had to be paused due to the significant increase of UI benefit recipients during the pandemic. (*Id.*) Plaintiffs maintain that BANA's own records reveal that it acted unreasonably and willfully by delaying the implementation of EMV chips for EDD debit cardholders because [redacted]

[redacted]. (Dkt. No. 652 at 31.)

The CCPA provides for actual or statutory damages, whichever is greater. Cal. Civ. Code §§ 1798.150(a)(1)(A). For statutory damages, Plaintiffs are entitled to recover "damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident." *Id.* "In assessing the amount of statutory damages, the court shall consider . . . the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." *Id.* § 1798.150(a)(2).

The EDD Agreement between EDD and BANA provided that the prepaid cards must be equipped with "no less than an ISO 7811-compliant high coercivity magnetic strip." (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2462, -2741; Dkt. No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 17.) It also provided that "[i]f a significant change occurs to the project scope, the Contractor may submit a written change proposal to EDD's SPOC. The EDD shall review the change proposal and submit a proposed contract amendment to the Contractor for review and approval. All amendments to this Contract must be approved by the EDD and the Contractor in writing . . . ." (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2423, -2651; Dkt. No. 588-3, Brys Decl., Ex. 1 Chestnut Decl. ¶ 18.)

According to BANA, it understood that any changes to the EDD prepaid card technology, such as adding EMV chips, would require EDD approval and a contract amendment. (Dkt No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 18.) It points to a meeting it had with EDD on January 27, 2020 where [redacted]. (Dkt. No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 19; Dkt. No. 588-174, Brys Decl., Ex. 131.) However, BANA claims [redacted]

[redacted]. (Dkt. No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 20; Dkt. No. 588-222, Brys Decl., Ex. 169 at -8567; Dkt. No. 588-117, Brys Decl., Ex. 72; Dkt. No. 632-175, Chan Decl., Ex. 188, at -3034 [redacted]; Dkt. No. 632-175, Chan Decl., Ex. 188 at -3033 (April 2020 email stating [redacted]) It was not until March 17, 2021 when [redacted]. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2850; Dkt. No. 588-26, Brys Decl., Ex. 14.B, Chestnut Depo. at 188:17-190:2.)

In response, Plaintiffs provide competing evidence that an EDD representative testified that there was nothing in the EDD Agreement that barred BANA from switching to EMV chip technology. (Dkt. No. 632-27, Chan Decl., Ex. 29, Singh Depo. at 38:3-39:10; 39:12-40:17.) According to the EDD representative, [redacted]. (Dkt. No. 632-27, Chan Decl., Ex. 29, Singh Depo. at 61:9-62:17.) EDD's understanding that a letter agreement was not necessary prior to adding EMV chips is [redacted]. (Dkt. No. 632-187, Chan Decl., Ex. 201 at -9312 ([redacted]) Plaintiffs' evidence raises a genuine issue of material fact whether BANA believed it needed EDD approval and an amended EDD Agreement in order to switch to EMV chip cards.

Plaintiffs also provide rebuttal evidence that the delay in implementing EMV chip cards was due to [redacted] and not

because of the operational demands of COVID-19. In January 2020, BANA considered converting to EMV chip cards [redacted] (Dkt. No. 632-151, Chan Decl., Ex. 164 at -0150, -0154.) According to a cost-benefit analysis BANA conducted in January 2020, [redacted]. (Dkt. No. 632-168, Chan Decl., Ex. 181 at -1839 -40.) Therefore, at a January 2020 meeting with EDD, [redacted]. (*See* Dkt. No. 632-160, Chan Decl., Ex. 173 at -3235 (internal BANA email dated February 26, 2020 explaining [redacted]) When BANA [redacted] (Dkt. No. 632-169, Chan Decl., Ex. 182.)

In early 2020, discussions on EMV chip card transition with EDD was always accompanied with a [redacted] contingency. (Dkt. No. 632-246, Chan Decl., Ex. 269 at -8454 (February 2020 email discussing [redacted]); Dkt. No. 632-158, Chan Decl., Ex. 171 at -7019, -7023 (in March 2020, [redacted]

[redacted]); Dkt. No. 632-172, Chan Decl., Ex. 185 (February 21, 2020 email noting they [redacted]); Dkt. No. 632-173, Chan Decl., Ex. 186 at -2396 (March 3, 2020 email stating [redacted]); Dkt. No. 632-175, Chan Decl., Ex 188 at -3034 (April 2020 email stating [redacted]); Dkt No. 632-176, Chan Decl., Ex. 189 at -8774) (April 2020 email stating [redacted])

In February 2021, [redacted]. (Dkt. No. 588-205, Brys Decl., Ex. 163; Dkt. No. 588-206, Brys Decl., Ex. 164 at -4542 (Jan 2021 meeting).) Shortly thereafter, in March 2021, [redacted]. Plaintiffs have presented evidence raising disputed issues of material fact whether the reason why BANA paused discussions on implementing EMV chips, [redacted] was due to the operational demands of COVID-19 or because [redacted]. Therefore, disputed issues of fact remain whether Defendant's conduct in not transitioning to EMV chip cards until July 2021 constitutes misconduct subject to statutory damages.

**4. Statutory Damages – Pre-Suit Notice**

Defendant asserts that Plaintiffs are not entitled to statutory damages because they did not provide BANA with a pre-suit notice of the CCPA claim prior to filing the *Yick* case. (Dkt. No. 589-1 at 30.) Plaintiffs respond that Class Plaintiffs Oosthuizen and Mathews provided the mandated CCPA notice on behalf of themselves and the class. (Dkt. No. 652 at 31-32.)

To seek statutory damages, the CCPA requires a 30-day notice-and-cure procedure prior to initiating an action. Cal. Civ. Code § 1798.150(b). Prior to filing a complaint, "a consumer [must] provide[] a business 30 days' written notice identifying the specific provisions of this title the consumer alleges have been or are being violated." Cal. Civ. Code § 1798.150(b). "In the event a cure is possible, if within the 30 days the business actually cures the noticed violation and provides the consumer an express written statement that the violations have been cured and that no further violations shall occur, no action for individual statutory damages or class-wide statutory damages may be initiated against the business." *Id.*

In this case, on January 26, 2021, Plaintiffs Oosthuizen and Mathews provided their CCPA notice to BANA on behalf of themselves and the class. (Dkt. No. 634-259, Chan Decl., Ex. 258.) On the same day, they filed a complaint in the Northern District of California alleging a CCPA claim but did not assert statutory damages. Instead, in the complaint, they asserted that notice was provided to Defendant pursuant to section 1798.150(b) and they intended to amend the complaint to include statutory damages. (Complaint ¶ 58, *Oosthuizen v. Bank of Am., N.A.*, Case No. 21cv615-VC (N.D. Cal. Jan. 26, 2021), Dkt. No. 1.) The case was then consolidated with the *Yick* matter on March 29, 2021. (*Id.*, Dkt. No. 24.) On April 1, 2021, Plaintiffs, including Oosthuizen and Matthews, filed an amended complaint entitled "consolidated class action complaint" seeking statutory damages under the CCPA alleging that notice had been provided to BANA but it did not cure or expressly respond that the violations had been cured within 30 days of the January 26, 2021 notice. (Consolidated Class Action Complaint, ¶¶ 229-

30, *Yick v. Bank of Am., N.A*., Case No. 21cv376-VC (N.D. Cal. Apr. 1, 2021), Dkt. No. 63.)

Defendant relies on *In re San Francisco 49ers Data Breach Litig*., Case No. 3:22-cv-05138-JD, 2024 WL 3849336, at *3 (N.D. Cal. Aug. 15, 2024), but it does not support the facts of this case. In that case, the district court held that statutory damages under the CCPA were barred because the 30-day notice was sent after the litigation was initiated. *Id.* However, it did not address the propriety of seeking statutory damages in an amended complaint after the pre-suit notice and the original complaint had been filed absent statutory damages.

In *Eureka* and *Archambault,* the district courts allowed the plaintiffs to amend the complaint to add a CCPA claim that had not been asserted in the original complaint given the timing of the notice. *In re Eureka Casino Breach Litig.*, No. 2:23-cv-00276-CDS-BNW, 2024 WL 4253198, at *13 (D. Nev. Sept. 19, 2024); *Archambault v. Riverside Resort & Casino, Inc*., Case No. 2:24-cv-01691-GMN-DJA, 2025 WL 2614044, at *9 (D. Nev. Sept. 9, 2025); *but see Griffey v. Magellan Health Inc*., No. CV-20-01282-PHX-MTL, 2022 WL 1811165, at *6 (D. Ariz. June 2, 2022) (the court held that dismissal with prejudice was warranted where a plaintiff failed to provide pre-suit notice before his original complaint notwithstanding a later amended complaint).

In *Archambault* and *Eureka*, the plaintiffs initially filed complaints against the defendants without alleging statutory damages under the CCPA, and also simultaneously submitted their 30-day notice to the defendants. *See Archambault*, 2024 WL 2614044, at *9; *Eureka,* 2024 WL 4253198, at *13. Then, in both cases, the plaintiffs filed an amended complaint seeking statutory damages under the CCPA after the 30 day period to cure had passed. Both courts held the claims were permissible under the statute.

Similar to *Archambault*, and *Eureka*, on January 26, 2021, Plaintiffs Oosthuizen and Mathews provided the 30 day CCPA notice to BANA on behalf of themselves and the class, (Dkt. No. 634-259, Chan Decl., Ex. 258), and also filed a complaint alleging violations of the CCPA seeking actual damages, injunctive relief, declaratory relief, and

attorney's fees but not statutory damages. (Complaint ¶ 58, *Oosthuizen v. Bank of Am., N.A.*, Case No. 21cv615-VC (N.D. Cal. Jan. 26, 2021), Dkt. No. 1.) Then on April 1, 2021, after the 30-day notice expired and BANA did not cure the violations or provide express written statement that the violations had been cured, Class Plaintiffs, along with Oosthuizen and Matthews, filed a consolidated class action complaint seeking statutory damages under the CCPA. (Consolidated Class Action Complaint, ¶¶ 229-30, *Yick v. Bank of Am., N.A.*, Case No. 21cv376-VC (N.D. Cal. Apr. 1, 2021), Dkt. No. 63.) Because more than 30 days passed before they sought statutory damages in an amended complaint, Plaintiffs have complied with California Civil Code section 1798.150(b).

BANA's argument that the 30-day notice post-dated the complaint is premised on the *Yick* complaint, filed on January 14, 2021, where Yick sought statutory damages under the CCPA but did not provide BANA with the 30-day pre-suit notice. (Complaint, ¶ 85, *Yick v. Bank of Am., N.A.*, Case No. 21cv376-VC (N.D. Cal. Jan. 14, 2021), Dkt. No. 1.) However, Plaintiffs Oosthuizen and Mathews submitted the 30-day pre-suit notice on behalf of themselves and the class on January 26, 2021, and the Court looks to their complaint in seeking statutory damages.

In reply, BANA additionally argues that Plaintiffs have not offered evidence that BANA received the alleged notice and the notice did not explicitly state the basis for the CCPA claim, nor demand that EMV chips be added. (Dkt. No. 693 at 14 n.5.) Lastly, BANA contends that it cured the alleged CCPA violation when BANA and EDD agreed to implement EMV chips on new and replacement BANA-issued cards on March 17, 2021 and EMV chips cards were rolled out in July 2021. (*Id.; see also* Dkt. No. 652-1, Ps' Response to D's SSUF No. 240.)

These arguments are raised for the first time in the reply to which Plaintiffs have not had an opportunity to respond. Therefore, the Court declines to address whether BANA actually received the notice. However, even if BANA did not receive the 30-day notice, Plaintiffs Oosthuizen and Mathews alleged in their complaint that they provided the 30-day notice to BANA which serves as another source of notice. As to the next

argument regarding stating the basis of the CCPA claim, it only requires that the plaintiff identify the specific provisions of the title that are being violated not that the plaintiff propose a solution. *See* Cal. Civ. Code § 1798.150(b). Here, the 30-day notice specifies that Plaintiffs Oosthuizen and Mathews' EDD debit card funds were fraudulently taken from their accounts due to BANA's inadequate fraud prevention policies. They specifically claim that BANA "failed to maintain, store, share, or transfer these plaintiffs' and all similarly situated EDD benefits recipients' account data and other financial data and account information in a reasonably secure manner and consistent with the Bank's obligations to EDD and to Plaintiffs and others similarly situated." (Dkt. No. 634-259, Chan Decl., Ex. 258.) Plaintiffs' notice complies with California Civil Code section 1798.150(b). Finally, even though BANA and EDD agreed to implement EMV chips on March 17, 2021, BANA did not cure the violation within 30 days and provide a written response that the violation had been cured when the letter was sent on January 26, 2021. Therefore, the Court concludes that Plaintiffs have provided BANA with pre-suit notice of the CCPA claim; thus, statutory damages are available to Plaintiffs. The Court DENIES Defendant's motion for summary judgment on the availability of statutory damages.

**E. Tenth Cause of Action - Breach of Fiduciary Duty**

The tenth cause of action alleges breach of fiduciary duty, (Dkt. No. 406, TAMCC ¶¶ 625-36), and relates to the Claim Denial, Credit Rescission, Account Freeze and EMV Chip Classes. (Dkt. No. 499 at 36.) Plaintiffs allege Defendant breached its fiduciary duty by failing to: (1) ensure Plaintiffs were not denied access to their benefits without a reasonable basis; (2) maintain the confidentiality and privacy of Plaintiffs' personal information; (3) disclose the theft of Plaintiffs' personal information; and (4) timely disclose that it had failed to protect Plaintiffs from fraudulent transactions. (Dkt. No. 406, TAMCC ¶ 633.)

In California, a plaintiff must prove the following elements to establish a cause of action for breach of fiduciary duty: "(1) existence of a fiduciary duty; (2) breach of the

fiduciary duty; and (3) damage proximately caused by the breach." *Gutierrez v. Girardi*, 194 Cal. App. 4th 925, 932 (2011) (citation omitted). "Whether a fiduciary duty exists is generally a question of law." *Hodges v. Cnty. of Placer*, 41 Cal. App. 5th 537, 546 (2019) (citations omitted). Whether a defendant breaches that duty is a question of fact. *Marzec v. Public Employees' Retirement Sys*., 236 Cal. App. 4th 889, 915 (2015) (emphasis omitted).

> A fiduciary relationship is any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. . . .

*Wolf v. Superior Ct*., 107 Cal. App. 4th 25, 29 (2003) (internal quotation marks and citations omitted). "Traditional examples of fiduciary relationships in the commercial context include trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventurers, and agent/principal." *Id.* at 30 (citations omitted).

In general, the relationship between a bank and its customers is not fiduciary but contractual in nature. *Simi Mgmt. Corp. v. Bank of Am., N.A*., 930 F. Supp. 2d 1082, 1100 (N.D. Cal. 2013). However, California courts recognize that, under "special circumstances," a bank may enter into a "special relationship" with a depositor and owe fiduciary duties. *Copesky v. Superior Ct.*, 229 Cal. App. 3d 678, 691 n.12 (1991). A bank enters into a "special relationship" with a depositor either by "affirmatively offer[ing] trust and other specifically fiduciary services," *id*., or when the relationship involves characteristics such as "(1) inherently unequal bargaining positions; (2) nonprofit motivation [of the depositor], i.e., objective of securing peace of mind, security; (3) inadequacy of ordinary contract damages; (4) special vulnerability of one party to harm as a result of breach of trust of the other; and (5) awareness by the other of this

special vulnerability." *Id.* at 687 n.7 (quoting *Wallis v. Superior Ct*., 160 Cal. App. 3d 1109, 1118 (1984)). In particular, "[m]any banks affirmatively offer trust and other specifically fiduciary services, and as such are in a position to do great harm if the trust agreement is broken in bad faith." *Id.*

**1. Duty - Affirmative Offering of Trust Services**

First, Defendant argues that it did not offer EDD cardholders any special fiduciary services and the EDD Agreement provision defining "Trust Account" for EDD prepaid funds was for purposes of calculating EDD's revenue share and not offering EDD Cardholders "trust services." (Dkt. No. 589-1 at 38.) Plaintiffs, relying on their argument at the motion to dismiss stage, contend that BANA was required to hold EDD Cardholder's funds in trust is a plausible reading of the contract provision. (Dkt. No. 652 at 33.)

Under the terms of the EDD Agreement, the Contractor's Trust Account is defined as follows:

> For the purpose of calculating revenue share, the average collected daily balance is the total of the daily collected balance on all funds held "in trust" (aggregated amount) for the cardholders each month divided by the number of days in the month. The contractor may maintain balances in individual accounts or one "trust account", but the average collected daily balance calculation is based on the combined total of all cardholder funds.

(Dkt. No. 591-98, Brys Decl., Ex. 39 at -2518.) Both parties rely solely on the text of the EDD Agreement and do not rely on extrinsic evidence.[22]

"A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others, and if the latter voluntarily accepts or assumes to accept the confidence, he or she may not act so as to take advantage of the other's interest without that person's knowledge or consent." *Pierce v. Lyman*, 1 Cal. App. 4th 1093,

---

[22]Defendant cites to other provisions of the EDD Agreement concerning revenue sharing but none discuss the "trust" aspect of the Contractor's Trust Account. (*See* Dkt. No. 589-1 at 38.)

1101-02 (1991). A special relationship might exist if a bank offers any provision of trust or fiduciary services, or otherwise agrees to serve as a financial advisor. *Peterson Dev. Co. v. Torrey Pines Bank*, 233 Cal. App. 3d 103, 119 (1991) (relationship between borrower and lender was a normal commercial banking one and there were no triable issues whether borrower reasonably reposed particular trust and confidence in lender as a fiduciary, or whether lender accepted such particular reliance.); *Niederreuther v. Schifter*, No. C96–0126 TEH, C95–4411 THE, 1998 WL 409876, at *2 (N.D. Cal. July 14, 1998) (denying summary judgment as there is no evidence that Continental took on any "special relationship" with Dr. Niederreuther that would convert the bank into a fiduciary. Plaintiffs offer no evidence that Continental offered any provision of trust, fiduciary services, or otherwise agreed to serve as a special financial advisor regarding any investments.").

Plaintiffs have not presented any evidence that BANA specifically offered trust or fiduciary services, or on the flip side, that the class members were aware of a trust relationship with BANA or that they placed any trust and confidence in BANA. Mere use of a single phrase "in trust" in defining the Contractor's Trust Account in the EDD Agreement cannot raise a disputed issue of fact that BANA offered fiduciary or trust services to EDD cardholder. As such, the Court concludes that Plaintiffs have failed to raise a genuine issue of fact that BANA affirmatively offered any trust or fiduciary services to demonstrate a special relationship.

**2. Duty - Special Relationship**

Next, Defendant argues that Plaintiffs have failed to demonstrate the first *Wallis* factor of "inherently unequal bargaining positions" because each EDD cardholder had the ability to refuse BANA's services by opting to receive benefits by check. (Dkt. No. 589-1 at 38.) Plaintiffs disagree arguing that BANA had the exclusive right to distribute electronic benefits payments to EDD beneficiaries and it was not clear to EDD cardholders that payment by check was an option. (Dkt. No. 652 at 34.)

In the motion to dismiss order, the Court concluded that Plaintiffs had plausibly alleged a "special relationship" to support a fiduciary duty relying on the *Wallis* factors. (Dkt. No. 124 at 59-60.) As to the inherent unequal bargaining position, the Court held that because it was alleged that BANA held the exclusive right to provide electronic benefits payment services for EDD, and under the terms of the EDD Agreement, Plaintiffs could not seek similar services elsewhere, the allegations were sufficient to allege "inherently unequal bargaining positions." (*Id.*)

Under the EDD Agreement, BANA was to "establish[], operat[e], and maintain[ ] a comprehensive Electronic Benefit Payment (EBP)" service for the distribution of unemployment insurance ("UI") benefits to eligible Californians and as such was selected to be the exclusive provider for distributing EDD benefits through debit cards. (Dkt. No. 632-11, Chan Decl., Ex. 13, Chestnut Depo. at 75:4-13; Dkt. No. 632-32, Chan Decl., Ex. 34.)

According to BANA, EDD cardholders had the option to refuse its electronic services by opting to receive EDD benefits by checks. An EDD UI benefits booklet states that benefit payments may be issued by an EDD debit card or by check. (Dkt. No. 590-15, D's RJN, Ex. 13 at 6.) In order to receive payment by check, the EDD cardholder had to contact EDD. (*Id.*) Therefore, for those cardholders who did not opt to receive the benefits directly from EDD via check, EDD directed BANA to issue and fund debit cards. (Dkt. No. 636-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 7.) However, EDD's website titled "Guide to applying for unemployment benefits" states "Benefits payments . . . are all made using the EDD Debit Card." (Dkt. No. 634-38, Chan Decl., Ex. 37.) Another page on EDD's website titled "Unemployment Insurance -After You File a Claim" states that "When your first benefit payment is available, you will receive a debit card in the mail." (Dkt. No. 634-39, Chan Decl., Ex. 38.) Therefore, depending on whether an EDD cardholder viewed the EDD pamphlet or its website, if at all, it would not be clear that he or she had a choice to receive a paper check. The record shows that the default method of receiving EDD benefits was by debit card.

Further, even though Class Representative Rivera testified that she started receiving checks in March 2021, she was not aware that she could receive her benefits via check rather than a prepaid card. (Dkt. No. 588-22, Brys Decl., Ex. 14.AC, Rivera Depo. at 61:2-12.) Similarly, Class Representative McClure testified she never received information about the different ways she could receive her unemployment benefits, (Dkt. No. 634-42, Chan Decl., Ex. 41, McClure Depo. at 81:16-20), and the option of a paper check was not offered to her until she was victim of fraud in December 2020 and she elected to receive paper checks in January 2021. (*Id*. at 82:17-83:22.) While Defendant relies on Class Representatives' decisions to receive checks, it was not until their accounts were subject to fraud that they were offered the option to receive their UI benefits by checks. (Dkt. No. 588-45, Brys Decl., Ex. 14.T, McClure Depo at 83:5-84:1; Dkt. No. 588-19, Brys Decl., Ex. 14.A, Moon Depo. at 242:1-7; Dkt. No. 588-22, Brys Decl., Ex. 14.AC, Rivera Depo. at 61:8-12; Dkt. No. 588-54, Brys Decl., Ex. 16 at Koole Interrog. No. 3.) In addition, according to an internal BANA report dated June 11, 2020, [redacted]. (Dkt. No. 632-34, Chan Decl., Ex 39 at -2670.)

Plaintiffs have raised an issue of disputed material fact whether EDD cardholders knew they had a choice to receive benefits by check when they initially entered into a relationship with BANA to support the first *Wallis* factor of "inherently unequal bargaining positions." As such, this question is for the fact finder, and summary judgment is denied.

**3. Breach of Trust**

Defendant also claims that Plaintiffs cannot prove breach of any "trust" with any EDD cardholder; instead, BANA exercised its rights under Section 2 of the Account Agreement to prevent fraud. (Dkt. No. 589-1 at 38-39.) Plaintiffs dispute the applicability of Section 2 of the Account Agreement as to EDD cardholder's unauthorized transaction claims. (Dkt. No. 655-1, Ps' Response to D's SUMF Nos. 28-30.)

The Account Agreement between BANA and each EDD cardholder provided that if BANA "suspect[s] irregular, unauthorized, or unlawful activities may be involved with your Account, we may 'freeze' (or place a hold on) the balance pending an investigation of such suspected activities. If we freeze your Account, we will give you a notice required by law." (Dkt. No. 591-100, Brys Decl., Ex. 40B § 2.) The same section also provides that if "funds to which you are not entitled are deposited to your Account by mistake or otherwise, we may deduct these funds from your Account." (*Id.*)

The TAMCC alleges Defendant breached its fiduciary duty by failing to ensure Plaintiffs were not denied access to their benefits without a reasonable basis. (Dkt. No. 406, TAMCC ¶ 633.) While Section 2 allowed BANA to freeze a cardholder's account if it suspects irregular, unauthorized or unlawful activities with the account; it did not address the situation, in this case, where an EDD cardholder called BANA to report an unauthorized claim and the claim was automatically denied without any subsequent manual investigation. Further, [redacted]. (Dkt. No. 588-203, Brys Decl., Ex. 161 at -7458; Dkt. No. 632-20, Chan Decl., Ex. 22, Fox Depo. at 49:20-50:13; Dkt. No. 588-6, Brys Decl., Ex. 4, Letson Decl. ¶ 7.) BANA also believed [redacted] (Dkt. No. 588-31, Brys Decl., Ex. 14.E, Daniels Depo. at 18:17-25; Dkt. No. 588-192, Brys Decl., Ex. 149 at -7803.)

Whether Section 2 of the Account Agreement applies to this case is an issue of fact. Even if Section 2 applied, there is an issue of fact whether the denial of all unauthorized PIN-enabled ATM transaction claims or the freezing of EDD cardholder's account using CFF-1 rather than a manual investigation was a breach of BANA's duty to act in utmost good faith for the benefit of the EDD cardholders. Accordingly, the Court DENIES Defendant's motion for summary judgment on this issue.

/ / /

/ / /

**4. Damages**

Lastly, Defendant argues the breach of fiduciary duty claim fails because there are no damages to recover since class members have already been fully compensated, disgorgement is not available and there is no evidence to support punitive damages. (Dkt. No. 589-1 at 39.) Plaintiffs maintain that there are disputed issues of fact about the amount of any set-off on actual damages, and whether punitive damages are warranted. (Dkt. No. 652 at 34.) Also, they contend that disgorgement is available for breach of fiduciary duty under California law. (*Id.*)

Plaintiffs seek actual damages, disgorgement and punitive damages for the breach of fiduciary duty claim. (Dkt. No. 632-5, Chan Decl., Ex. 5, Regan Expert Report ¶ 5.) While Plaintiffs have been reimbursed the principal amounts of actual damages, (Dkt. No. 655-1, Ps' Response to D's SUMF, Nos. 168, 172), there is a disputed issue of fact whether [redacted] Remediation Plan [redacted]. (Dkt. No. 588-87, Brys Decl., Ex. 43.A, Remediation Plan at -2561.) Next, as discussed more fully below, disputed issues of fact remain whether Plaintiffs have shown they are entitled to punitive damages.

Finally, disgorgement is an equitable remedy and applies to a breach of fiduciary duty claim. *See Ctr. For Healthcare Educ. & Research, Inc. v. Int'l Congress for Joint Reconstruction, Inc.*, 57 Cal. App. 5th 1108, 1125 (2020) (disgorgement of profit available for breach of fiduciary duty claim). Defendant argues that unjust enrichment is not available as a remedy if there is an express contract between the parties. (Dkt. No. 589-1 at 34 (citing *Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004).)

"[I]n California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.' . . . When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citations

omitted). However, "[a]n action based on quasi-contract cannot lie where a valid express contract covering the same subject matter exists between the parties." *Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010) ("As a matter of law, an unjust enrichment claim does not lie where the parties have an enforceable express contract."). However, "[r]estitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004). "Alternatively, restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct" and chooses to seek restitution on a quasi-contract theory. *Id.*

Here, Plaintiffs seek disgorgement on their breach of fiduciary duty claim for the Claim Denial, Credit Rescission, Account Freeze and EMV Chip Classes. The breach of contract claim is limited to the Claim Denial Class alleging that Defendant breached the Account Agreement by "(a) failing to timely and reasonably investigate and resolve their fraud claims; (b) failing to reimburse them for unauthorized transactions; (c) failing to provide them with provisional credit when the Bank's investigation into their fraud claims exceeds 10 business days; (d) failing to limit their liability for unauthorized transactions[.]" (Dkt. No. 406, TAMCC ¶ 608.) Therefore, disgorgement for the Credit Rescission, Account Freeze and EMV Chip Classes are not impacted.

Nonetheless, "California courts have also permitted disgorgement of improperly obtained profits as [an alternative] remedy for breach of contract." *Kendon Indus. LLC v. Towblazer, Inc.*, Case No. 8:23-cv-00732-FWS-DFM, 2025 WL 574697, at *2 (C.D. Cal. Jan. 17, 2025) (citing *Ajaxo v. E*Trade Grp., Inc.*, 135 Cal. App. 4th 21, 56-57 (2005) (affirming award of $1.29 million in disgorgement attributable to the amount the defendant saved by breaching the parties' non-disclosure agreement and using proprietary information); *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 Fed. App'x 665, 668-69 (9th Cir. 2010) (concluding that the district court properly awarded disgorgement on a

breach of contract claim under California law where the plaintiff presented evidence that defendant "misused [the plaintiff's] information for its own profit") (emphasis omitted)); 1 Witkin, Summary 11th Contracts § 1050 (2018) ("Restitution may also be awarded in contract actions. . . ."). These cases have relied on the restitution principle that "a wrongdoer should not be able to retain illicit profits or savings obtained at the expense of another." *Kendon Indus.,* 2025 WL 574697, at *2.

In *Kendon*, the court found that the theory of disgorgement could be raised at trial based on the defendants' conduct of breaching the settlement agreement by selling certain trailers and as such, retained illicit profits. *Id.* at *2. Similarly, in this case, the restitution principle supports the disgorgement remedy for [redacted] because BANA allegedly failed to comply with the terms of the contract which incorporated provisions of the EFTA for the Claim Denial Class. Thus, the Court concludes that disgorgement is an available remedy for the breach of fiduciary duty claim. Further, to the extent the breach of contract claim is dismissed, disgorgement would then be an appropriate remedy.

Defendant also asserts that Plaintiffs cannot recover its "profits" because [redacted]. (Dkt. No. 589-1 at 39.[23]) In support, BANA provides evidence that [redacted]. (Dkt. No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 12; Dkt. No. 588-168, Brys Decl., Ex. 125.) But Plaintiffs point out that Thomas Montag testified that [redacted]. (Dkt. No. 632-25, Chan Decl., Ex. 27, Montag Depo. at 62:5-16.)

---

[23] Defendant references its negligence argument on disgorgement. (Dkt. No. 589-1 at 34.)

Therefore, the amount of disgorgement is an issue of fact that will need to be determined at trial. *See Meister v. Mensinger*, 230 Cal. App. 4th 381, 399 (2014) (plaintiff presents evidence of gross amount of disgorgement and then defendant may present evidence of costs, expenses to show the net benefit it received).

In conclusion, the Court DENIES Defendant's motion for summary judgment on the breach of fiduciary duty cause of action.

**F. Fifth and Sixth Causes of Action - Negligence and Negligence Per Se**

The fifth claim for relief alleges negligence and negligence per se and relates to all five Classes certified. (Dkt. No. 406, TAMCC ¶¶ 585-93; Dkt. No. 499 at 36.) The Court certified Plaintiffs' claim that BANA breached its duty of care by "failing to (1) maintain the security of their personal and account information; (2) issue EDD Debit Cards with EMV chips; (3) employ reasonable fraud prevention and notification practices; (4) provide timely and effective customer service; (5) process and investigate claims in a timely manner; and (6) provide provisional credits while investigating fraud claims." (Dkt. No. 499 at 69.)

Under California law, the elements of a negligence claim are (1) duty to use due care, (2) breach of that duty, (3) that the defendant's breach caused the injury suffered, and (4) the plaintiff suffered an injury. *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017). "In California, the 'general rule' is that people owe a duty of care to avoid causing harm to others and that they are thus usually liable for injuries their negligence inflicts." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 398 (2019); Cal. Civ. Code § 1714 ("Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary care of skill in the management of his or her property or person . . . ."). Section 1714 "establishes the default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.'" *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021). Whether a duty exists is a question of law to be determined by the court and a duty may arise through statute or by operation of common law. *Sheen v.*

*Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 920 (2022). Here, Plaintiffs allege a duty that arises by common law and statute. (Dkt. No. 652 at 37-38.)

**1. Economic Loss Rule**

BANA maintains the negligence and negligence per se claims are barred as a matter of law by the economic loss rule. (Dkt. No. 589-1 at 31-32.) Plaintiffs respond that California permits tort actions despite the economic loss rule because the "special characteristics" exception identified in insurance contracts apply to BANA's role as the exclusive distributor of electronic EDD benefits. (Dkt. No. 652 at 38.)

"In general, there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage." *Sheen,* 12 Cal. 5th at 922 (citations omitted). "Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate 'social policy.'" *Foley v. Interactive Data Corp*., 47 Cal. 3d 654, 683 (1988) (citation omitted). "The economic loss rule requires a [contractual party] to recover in contract for purely economic loss due to disappointed expectations, unless [the party] can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicoptor Co., Inc. v. Dana Corp*, 34 Cal. 4th 979, 988 (2004); *Sheen*, 12 Cal. 5th at 923. "[L]iability in negligence for purely economic losses . . . is 'the exception, not the rule.'" *S. Cal. Gas*, 7 Cal. 5th at 400.

In Judge Burns' order on the motion to dismiss, he relied on the *Biakanja*[24] factors to determine whether the exception to the economic loss rule of a "special relationship" between Plaintiffs and BANA applied. (Dkt. No. 126 at 37.) However, in *Sheen*, a case that post-dated the motion to dismiss briefing, the California Supreme Court held that the *Biakanja* factors to determine whether the exception to the economic loss rule or "special relationship" exists apply to parties not in privity with each other. *Sheen*, 12 Cal. 5th at

[24] The order cited *S. Cal. Gas,* 7 Cal. 5th at 402 which quoted *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979) which cited the factors in *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

922. Therefore, it is not disputed that the *Biakanja* factors do not apply in this case where Plaintiffs and BANA were in privity with each other. *See Ace American Ins. Co. v. Accesllion, Inc.*, Case No. 4:21-cv-09615-YGR, 2022 WL 2341155, at *7 (N.D. Cal. Apr. 11, 2022) ("plaintiff's reliance on the special relationship exception to the economic loss rule is unavailing in this case" where the negligence claim arises from a license agreement); *Moore v. Centrelake Med. Grp., Inc.,* 83 Cal. App. 5th 515, 535 (2022) (no need to analyze *Biakanja* special-relationship factors where parties are in contractual privity and plaintiff's claims arise from the contract).

*Sheen* recognized two exceptions to the economic loss rule: (1) insurance and professional services exception, which permits recovery for negligent economic loss in "some cases involving insurance policies and contracts for professional services", *Sheen*, 12 Cal. 5th at 929, and (2) the independent tort exception, which applies when the duty giving rise to tort liability either (a) is "completely independent of the contract" or (b) "arises from conduct which is both intentional and intended to harm." *Id.* at 923-24 (quoting *Erlich v Menezes*, 21 Cal. 4th 543, 552 (1999)).[25] Here, Plaintiffs rely on the insurance exception arguing that their relationship with BANA involved a special relationship permitting a negligence claim. (Dkt. No. 652 at 38.)

BANA argues the economic loss rule bars the negligence claim because *Sheen* only applies to contracting parties for insurance or professional services. (Dkt. No. 589-1 at 32.) Plaintiffs respond that *Sheen* applies to contractual relationships that share "special characteristics" with insurance contracts which is identical to the "special relationship" test under a breach of fiduciary duty claim. (Dkt. No. 652 at 38.)

The California Supreme Court has stated that "[t]he familiar paradigm of tortious breach of contract in this state is the insurance contract. There we relied on the covenant of good faith and fair dealing, implied in every contract, to justify tort liability." *Erlich*,

---

[25] Judge Burns concluded that the independent tort exception did not apply because Plaintiffs' negligence claim was not based on intentional conduct. (Dkt. No. 126 at 36.)

21 Cal. 4th at 552. In holding that a tort action is available for breach of the covenant in an insurance contract, the court explained that the 'special relationship' between insurer and insured is "characterized by elements of public interest, adhesion, and fiduciary responsibility." *Id.* at 552-53 (citation omitted). Applying the special elements of an insurance case to the mortgage modification context, in *Sheen*, the court held that a lender does not have a duty to the borrower to process, review and respond carefully and completely to a borrower's loan modification application. *Sheen*, 12 Cal. 5th at 948. *Sheen*'*s* analysis applying special characteristics of insurance contracts to a mortgage modification contract renders BANA's argument limiting *Sheen* to only insurance or professional services contracts unpersuasive. As such, the Court considers whether the contractual relationship between BANA and EDD cardholders share special characteristics that are akin to insurance contracts.

First, the court in *Sheen* considered "when an insurer in bad faith refuses to pay a claim or to accept a settlement offer within policy limits," "the insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred." *Id.* at 930 (citing *Foley v. Interactive Data Corp*., 47 Cal.3d 654, 692 (1988)). *Foley* involved breach of an employment contract, and in considering the special relationship test to determine whether tort remedies were permissible, the Court explained that "breach in the employment context does not place the employee in the same economic dilemma that an insured faces when an insurer in bad faith refuses to pay a claim or to accept a settlement offer within policy limits. When an insurer takes such actions, the insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred. The wrongfully terminated employee, on the other hand, can (and must, in order to mitigate damages [citation]) make reasonable efforts to seek alternative employment." *Foley*, 47 Cal. 3d at 692. Similarly, in this case, when BANA denied unauthorized transactions claims, rescinded permanent credits and/or froze EDD cardholders' accounts, Plaintiffs had no option to seek their UI benefits elsewhere.

Further, on this factor, the parties' argument regarding BANA being the "exclusive distributor of EDD benefits" on this factor echo the one raised above on the "inherently unequal bargaining power" for the breach of fiduciary duty claim where the Court found there is an issue of fact whether EDD cardholders knew they had the option to opt-out of receiving their benefits electronically from BANA. (*See* Dkt. No. 652 at 38 ("These special characteristics are identical to the "special . . . relationship" characteristics that determine whether the Bank owed class members a fiduciary duty."); Dkt. No. 693 at 15.) The special relationship between the insurer and insured is "often characterized by unequal bargaining power [citation] in which the insured must depend on the good faith and performance of the insurer [citations]." *Vu v. Prudential Prop. & Casualty Ins. Co*., 26 Cal. 4th 1142, 1151 (2001). At the hearing, Defendant argued that *Sheen* did not hold that the option to receive benefits by paper check had to be crystal clear only that another option existed. But *Sheen* did not hold that the other option had to merely exist. In determining whether there was unequal bargaining power between BANA and EDD cardholders, EDD cardholders' knowledge that they had the option to not use BANA's electronic benefits payment system is material. Accordingly, the Court concludes whether EDD cardholders knew whether they had the option to receive paper checks prior to their unauthorized transaction claims remains a disputed issue of material fact.

Second, "insurance policies are not purchased for profit or advantage; rather, they are obtained for peace of mind and security in the event of an accident or other catastrophe" thus making the role of the insurance companies "with whom individuals contract specifically in order to obtain protection from potential specified economic harm" quasi-public in nature. *Sheen,* 12 Cal. 5th at 930 (citations omitted). Judge Burns concluded that Plaintiffs had a "nonprofit motivation" because they used their EDD benefits to pay for daily necessities. (Dkt. No. 126 at 60.) Likewise, Plaintiffs' receipt of UI benefits was to provide "peace of mind and security" when they lost their jobs during the pandemic making BANA's role in distributing unemployment benefits quasi-public, or even public in nature.

Finally, *Sheen* considered that the insured and insurers have financial interests that are odds because paying a claim directly harms an insurer's bottom line. *Sheen,* 12 Cal. 5th at 930. Here, UI benefits that were subject to unauthorized transactions impacted BANA's bottom line. As such, BANA implemented CFF-1 to address the prevalence of fraud in the UI space. Because the contractual relationship between EDD cardholders and BANA has characteristics of insurance policies, the Court concludes that BANA's role as the exclusive distributor of electronic UI benefits to EDD cardholders places it within the exception of the economic loss rule.

**2. Negligence - Duty and Breach**

Defendant next maintains that Plaintiffs have no evidence that the alleged conduct constitutes a breach of any purported duty because the underlying breach of contract claim is virtually nonexistent and they have not shown that BANA breached any of its contractual obligations under the Account Agreement. (Dkt. No. 589-1 at 32-33.) Plaintiffs argue that there is considerable evidence that BANA operated well below industry and statutory standards demonstrating breach, and violation of a contractual provision is distinct from a duty to exercise reasonable care. (Dkt. No. 652 at 38.)

The Court agrees with Plaintiffs that the question on their negligence claim is whether BANA breached its duty to use due care, *see Vasilenko*, 3 Cal. 5th at 1083, not whether it breached the Account Agreement. The cases Defendant rely on hold that a bank's duty of care to act with reasonable care with its customers arises out of the bank's contract with its customers because the negligence claim was premised on a bank-depositor contract. (*See* Dkt. No. 589-1 at 32-33 (citing *Rodriguez v. Bank of the W.,* 162 Cal. App. 4th 454, 460 (2008) and *Across Amer. Ins. Servs., Inc. v. Bank of Am., N.A.*, Case No. SA CV 18-0874-DOC (PLAx), 2018 WL 5906674, at *5 (C.D. Cal. Sept. 24, 2018)). Here, the exception to the economic loss rule applies due to a "special relationship" between BANA and EDD cardholders marked by public interest, adhesion and fiduciary responsibility, and not based on a contract. Thus, Defendant's argument is not persuasive.

Defendant also summarily argues that Plaintiffs have not established that the lack of EMV chips proximately caused the unauthorized transactions relying on its earlier arguments on the CCPA cause of action. (Dkt. No. 589-1 at 33.) Plaintiffs rely on Ms. Cloninger's expert report arguing there are disputed facts whether EMV chips would have prevented the challenged transactions. (Dkt. No. 652 at 38.) For the same reasons stated above on the CCPA claim, summary judgment is denied on the negligence claim for the EMV chip issue.

As for the Customer Service Class, BANA summarily claims that there is no evidence that the alleged delays caused class members recoverable harm because each class member reached BANA and submitted a claim that was repaid [redacted] and Plaintiffs have no competent evidence of actual harm relying on its *Daubert* motion excluding Mr. Minnucci's opinions. (Dkt. No. 589-1 at 33-34.) Plaintiffs oppose relying on Mr. Minnucci's report where he raises an issue of fact whether the customer service delays caused them harm. (Dkt. No. 652 at 38.) Because the Court denies Defendant's motion to exclude Mr. Minnucci's expert opinions, whose opinions raise issues of fact whether the amount of time class members were on hold with the Claims call center caused them harm, the Court denies Defendant's motion for summary judgment on this issue.

Finally, Defendant argues that Plaintiffs cannot prove actual damages because they have already been reimbursed everything they seek and there is nothing to recover to which Plaintiffs oppose. (Dkt. No. 589-1 at 33-34; Dkt. No. 652 at 39.) On the negligence cause of action, Plaintiffs seek actual damages and disgorgement. (Dkt. No. 632-5, Chan Decl., Ex. 5, Regan Expert Report ¶ 5.) As discussed above on the breach of fiduciary duty claim, there remain fact issues whether Plaintiffs have been fully compensated for actual damages [redacted] Remediation Plan [redacted]. As such, the Court DENIES Defendant's motion for summary judgment on the common law negligence claim.

**3. Negligence Per Se**

Defendant argues that the negligence per se theory should be dismissed on summary judgment arguing Plaintiffs' underlying CCPA and Gramm-Leach-Biley Act ("GLBA") claims fails because there is no evidence of any violations. (Dkt. No. 589-1 at 33.) Plaintiffs oppose arguing the contrary. (Dkt. No. 652 at 37-38.)

"In California, negligence *per se* is 'a presumption of negligence [that] arises from the violation of a statute . . . enacted to protect a class of persons of which the plaintiff is a member against the type of harm which the plaintiff suffered as a result of the violation of the statute.'" *Cal. v. Kinder Morgan Energy Partners, L.P.*, 569 F. Supp. 2d 1073, 1087 (S.D. Cal. 2008) (quoting *Hoff v. Vacaville Unified Sch. Dist*., 19 Cal. 4th 925, 938 (1998)). Negligence per se is a codified evidentiary doctrine and is not an independent cause of action for tort liability. *Id.* Therefore, "an underlying claim of ordinary negligence must be viable before the presumption of negligence [per se] can be employed." *Cal. Serv. Station & Auto. Repair Ass'n v. Am. Home Assurance Co*., 62 Cal. App. 4th 1166, 1178 (1998). Negligence per se borrows statutes to prove a duty of care and standard of care. *Elsner v. Uveges*, 34 Cal. 4th 915, 927 n.8 (2004); *David v. Hernandez*, 226 Cal. App. 4th 578, 584 (2014) ("Under the doctrine of negligence per se, the plaintiff 'borrows' statutes to prove duty of care and standard of care."). Therefore, a presumption of negligence arises from a violation of a statute. *Id.*

Here, Plaintiffs rely on the CCPA and Gramm-Leach-Biley Act ("GLBA") to support a duty. (Dkt. No. 406, TAMCC ¶ 589.) First, Plaintiffs have not provided authority that the GLBA creates a duty of care for a negligence per se claim under California law. *See Terpin v. AT&T Mobility LLC*, 118 F.4th 1102, 1115 (9th Cir. 2024) ("But Terpin has not cited—nor have we found—any authority suggesting that this federal *statutory* duty creates a duty of care for a negligence claim under California law.") (emphasis in original); *see Fleshman v. Wells Fargo Bank, N.A.,* 27 F. Supp. 3d 1127, 1138-39 (D. Or. 2014) (dismissing negligence per se theory based on GLBA as Plaintiffs failed to establish that the statute's authors intended that the breach of a duty

give rise to tort liability). As such, the Court GRANTS Defendant's motion to dismiss the negligence per se cause of action based on the GLBA. As to the CCPA, because the Court concluded above there are genuine issues of material fact as to whether BANA violated the CCPA, the Court DENIES the motion to dismiss the negligence per se cause of action based on the CCPA.

Accordingly, the Court DENIES Defendant's motion for summary judgment on the negligence cause of action and GRANTS in part and DENIES in part the negligence per se cause of action.

**G. Ninth Cause of Action - Breach of the Implied Covenant of Good Faith and Fair Dealing**

Count nine alleges breach of the implied covenant of good faith and fair dealing, (Dkt. No. 406, TAMCC ¶¶ 619-24), which relates to the Claim Denial, Credit Rescission, Account Freeze and Customer Service Classes. (Dkt. No. 499 at 36.) The Court certified the breach of the implied covenant of good faith and fair dealing on "(1) whether the Bank had a policy or practice of automatically denying and rescinding unauthorized-transaction claims and freezing accounts based solely on CFF-1; (2) whether the Bank's decision to auto-deny unauthorized-transaction claims, rescind grants of permanent credit, and freeze cardholder accounts based solely on CFF-1 was objectively reasonable; (3) whether the Bank subjectively lacked belief in the validity of its decision to implement its CFF-1 Policies; and (4) whether the Bank reduced call center staffing knowing or intending the resulting impairment of class members' rights." (Dkt. No. 499 at 76.)

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Foley*, 47 Cal. 3d at 684 (quoting *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958)). The implied covenant "prevent[s] a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract."

*Love v. Fire Ins. Exchange*, 221 Cal. App. 3d 1136, 1153 (1990). The covenant can't be used to extend or create obligations not contained in the original contract." *McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir. 2009) (quoting *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1033 (2009)).

The elements to support a claim for breach of the covenant of good faith and fair dealing are: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.,* 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (citing Judicial Council of California Civil Jury Instruction No. 325).

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *3500 Sepulveda, LLC v. Macy's W. Stores, Inc*., 980 F.3d 1317, 1324 (9th Cir. 2020) (quoting *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc*., 2 Cal. 4th 342, 372 (1992)). "The party with discretionary power must exercise such power in good faith and through 'objectively reasonable conduct.'" *Id.* (quoting *Badie v. Bank of Am*., 67 Cal. App. 4th 779, 796 (1998)). "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." *Carma Devs.,* 2 Cal. 4th at 372. "In the case of a discretionary power, it has been suggested the covenant requires the party holding such power to exercise it 'for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively.'" *Id.* (citation omitted). "The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.'" *Hicks v. E.T. Legg & Assocs*., 89 Cal. App. 4th 496, 508 (2001) (quoting *Paulfrey v. Blue Chip Stamps*, 150 Cal. App. 3d 187, 194 (1983)).

Similar to the arguments raised above on the breach of fiduciary duty and negligence claims, Defendant again contends that there is no evidence of recoverable harm because Plaintiffs have been more than fully compensated, disgorgement is not available and there is no evidence of punitive damages. (Dkt. No. 589-1 at 35.) On the breach of the implied covenant of good faith and fair dealing, Plaintiffs seek actual damages, disgorgement and punitive damages. (Dkt. No. 632-5, Chan Decl., Ex. 5, Regan Expert Report ¶ 5.) For the same reasons articulated above, the Court DENIES Defendant's motion for summary judgment due to lack of damages.

Next, BANA argues that Plaintiffs cannot show that it unfairly interfered with Plaintiffs' rights to receive the benefits of the contract because Plaintiffs cannot show that the use of CFF-1 to deny unauthorized transaction claims or staffing of its Claims call center was done in bad faith. (Dkt. No. 589-1 at 36.) It also maintains that the rescission of EDD cardholders' permanent credits was an honest mistake. (*Id.*) Finally, as to the freezing of class members accounts, BANA argues that Plaintiffs are seeking to impose substantive duties or limits on the contracting parties beyond the terms of the Account Agreement. (*Id.*) Plaintiffs disagree arguing that BANA adopted CFF-1 to protect its "bottom line" without analyzing its reliability and knowing it would erroneously deny valid claims, that the rescission of permanent credits was intentional and not an "honest" mistake, that BANA had discretion to freeze accounts, and that there are disputed issues of fact whether the call center staffing [redacted] making it harder for EDD cardholders to pursue claims. (Dkt. No. 652 at 35-36.)

**1 Claim Denial and Claim Rescission Classes**

Based on the analysis above on the EFTA cause of action that there are disputed material issues of fact whether the use of CFF-1 was implemented knowingly and willfully and without a reasonable basis and whether the rescission of permanent credits was intentional or an honest mistake, the Court also concludes that Defendant's argument that Plaintiffs cannot show that the use of CFF-1 and the rescission of permanent credits

were implemented in bad faith cannot support summary judgment on the breach of the implied covenant of good faith and fair dealing.

**2. Customer Service Class**

Defendant argues that the Customer Service Class cannot assert a breach of the implied covenant of good faith and fair dealing because the Account Agreement did not provide for any customer service levels and EDD agreed to waive any service targets in the EDD Agreement due to the massive amounts of fraud. (Dkt. No. 588-1 at 36 n.19.) Plaintiffs contend that BANA failed to act in good faith and impaired the cardholders' receipt of the benefits of the Account Agreement when it [redacted] making it difficult for cardholders to pursue unauthorized transaction claims. (Dkt. No. 652 at 36.) Further, Plaintiffs maintain that lack of service targets in the Account Agreement is not pertinent because breach of the implied covenant required BANA to act in good faith and not impair the cardholders' receipt of the benefits of the agreement. (*Id.*)

"To begin with, breach of a specific provision of the contract is not a necessary prerequisite." *Carma Devs*., 2 Cal. 4th at 373. The Account Agreement provided,

> Please contact us at the numbers listed below AT ONCE if you believe your Card has been lost or stolen, or if you believe that someone may use or has used your PIN assigned to your Card without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your Account. If you tell us within two business days after you learn of the loss or theft, you can lose no more than $50 for an unauthorized transaction or a series of related unauthorized transfers should someone use your Card or PIN.
>
> If you believe your Card has been lost or stolen, telephone us at 1.866.692.9374, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.), or write to: Bank of America. P.O. Box 8488, Gray, TN 37615-8488.

(*Id.* ¶¶ 10-11.) Even though the Account Agreement did not establish any customer service levels, the Account Agreement provides a number for the Claims call center and

directs EDD cardholders to contact it if their cards are lost or stolen or subject to an unauthorized transaction. (*See* Dkt. No. 588-3, Chan Decl., Ex. 3, Minnucci Expert Report ¶¶ 23-27, 47; Dkt. No. 632-14, Chan Decl., Ex. 16, Golden Depo. at 100:2-9; Dkt. No. 591-100, Brys Decl., Ex. 40.B ¶¶ 9-11.) In order to obtain the benefits of communicating with the Claims call center when they reported unauthorized charges, the covenant of good faith and fair dealing required BANA to act in good faith in managing staffing levels at the Claims call center.

As asserted by BANA, in August 2020, [redacted]. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2845-49.) The Letter Agreement, between EDD and BANA, states that [redacted] *(Id.* at -2845.) [redacted] the Account Agreement grants BANA discretionary power to establish the Claims call center and as such, it must exercise that discretion "for any purpose within the reasonable contemplation of the parties at the time of formation – to capture opportunities that were preserved upon entering the contract, interpreted objectively." *See Carma Dev.*, 2 Cal. 4th at 372. Thus, BANA's discretion must be reasonably exercised so as not to reduce call center staffing knowingly and intentionally to impact the rights of class members to seek the benefits of the Account Agreement by being able to seek relief for unauthorized transactions.

BANA also asserts that it acted reasonably and [redacted] in the Claims call center in August 2020. (Dkt. No. 588-48, Brys Decl., Ex. 14.V, Montag Depo. at 57:6-60:2.) [redacted] (Dkt. No. 632-2, Brys Decl., Ex. 2, Golden Decl. ¶ 9; Dkt. No. 632-36, Brys Decl., Ex. 14.J, Golden Depo. at 278:17-20; Dkt. No. 632-164, Brys Decl., Ex. 121; Dkt. No. 632-167, Brys Decl., Ex. 124.)

In March 2020, BANA's UI prepaid Fraud and Claims call centers and Main Call Center for California were staffed with about [redacted] full-time equivalents ("FTE") handling about [redacted] calls per month with average wait time of [redacted]. (Dkt. No. 632-2, Brys Decl., Ex. 2, Golden Decl. ¶ 7.) In May 2020, calls increased to [redacted] across all BANA UI prepaid call centers and peaked at over [redacted] calls in September 2020, a more than [redacted] increase. (*Id.*) By the end of 2020, the UI prepaid call center had [redacted] representing a growth of nearly [redacted] from March to December 2020. (*Id.* ¶ 12.) In March 2020, the Claims call center, specifically, was staffed with about [redacted] FTEs with an ASA of about [redacted]. (*Id.* ¶ 14.) Between March and October, the Claims call center's call volume increased [redacted] from an average of [redacted] calls per week to as many as [redacted] calls per week in May 2020 and peaked to more than [redacted] calls per week in October 2020. (*Id.*) By December 2020, the Claims call center was staffed with [redacted] FTEs. (*Id.* ¶ 15.)

During September 13, 2020 through November 21, 2020, the class period for the Customer Service Class, [redacted]. (*Id.* ¶ 16.) William Golden, who oversaw the call center operations, stated [redacted]. (*Id.* ¶ 18.) Also, between August 2020 and November 2020, [redacted]. (*Id.* ¶ 19.) According to Mr. Golden, [redacted]. (*Id.* ¶ 20.) Teresa Pesce, Defendant's expert in financial crimes, testified that [redacted]. (Dkt. No. 588-51, Brys Decl., Ex. 14.Y at 76:17-77:3.) Mr. Ahmad testified that [redacted]. (Dkt. No. 588-19, Brys Decl., Ex. 14.A at 327:2-9.)

However, Plaintiffs point out that in July 2020, the Claims call center exceeded industry standard performance even after adjusting to remote work where it generated a [redacted] ASA and a [redacted] abandonment rate. (Dkt. No. 588-3, Chan Decl., Ex. 3, Minnucci Expert Report ¶ 67.) At that time, maintaining staff levels at or above [redacted] FTE would be required to cover the calls that reached [redacted] calls per week. (*Id.*) However, by September 13, 2020, the staffing levels dropped from [redacted] to [redacted] FTEs when [redacted]. (*Id.* ¶ 68.) By September 13, 2020, the Claim call center was [redacted]. (*Id.*) Then by September 27, 2020, total staffing dropped another [redacted] agents to [redacted] agents. (*Id.* ¶ 69.) According to Mr. Minnucci, [redacted]. (*Id.*) Mr. Minnucci reported that [redacted]. (*Id.* ¶¶ 63, 66.) [redacted] during the two weeks from September 13, 2020 to September 27, 2020 [redacted] per week which is [redacted] than the per week average for the call center industry in 2020, Mr. Minnucci opined that [redacted]. (*Id.* ¶ 70.) [redacted]. (*Id.* ¶¶ 72, 73.)

Plaintiffs also provide evidence that [redacted]. In an email dated November 29, 2020 and entitled "[redacted]", Jennifer Ehresman wrote,

[redacted]

[redacted]

(Dkt. No. 632-142, Chan Decl., Ex. 153 at -6094.) BANA explains that Ms. Ehresman, who was not involved in the Claim call center, testified that [redacted]. (Dkt. No. 632- 33, Brys Decl., Ex. 14.G at 20:25-21:5; 55:2-6, 57:20-58:2.) She testified that [redacted]. (*Id.* at 57:20-58:2.) As such, disputed issues of fact remain as to whether BANA's failure to properly staff the Claims call center between September 13, 2020 to November 21, 2020 interfered with EDD cardholders' rights to the benefits of the Account Agreement.

**3. Account Freeze Class**

Lastly, as to the Account Freeze Class, Plaintiffs and Defendant dispute the impact of Section 2 of the Account Agreement. The Account Agreement between BANA and each EDD cardholder provided that if BANA "suspect[s] irregular, unauthorized, or unlawful activities may be involved with your Account, we may 'freeze' (or place a hold on) the balance pending an investigation of such suspected activities. If we freeze your Account, we will give you a notice required by law." (Dkt. No. 591-100, Brys Decl., Ex. 40B § 2.) Defendant argues Section 2 of the Account Agreement granted them plenary discretion to freeze EDD cardholder accounts, (Dkt. No. 589-1 at 36), while Plaintiffs maintain that BANA failed to exercise its discretion to freeze account reasonably. (Dkt. No. 652 at 36.)

As discussed above on the breach of fiduciary duty claim, there is an issue of fact whether Section 2 of the Account Agreement applies to this case. To the extent Section 2

applies, the parties disagree on the application of *Haggarty v. Well Fargo Bank, N.A.*, No. C-10-02416-CRB, 2012 WL 4742815, at *6 (N.D. Cal. Oct. 3, 2012) where the court held that the lender's conduct was not subject to breach of the implied covenant of good faith and fair dealing because the implied covenant "does not override that express grant of plenary discretion." In the case, the court recognized the tension California courts note regarding "sole discretion" clauses stating,

> On the one hand, the covenant of good faith finds particular application in situations where one party is vested with a discretionary power affecting the rights of another. Such power must be exercised in good faith. On the other hand, the covenant cannot be read to prohibit a party from doing that which is expressly permitted by agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms.

*Id.* at *5 (quoting *Gabana Gulf Distrib., Ltd. v. Gap Int'l Sales, Inc*., No. 06–02584–CRB, 2008 WL 111223, at *7 (N.D. Cal. Jan. 9, 2008) (internal citations and quotation marks omitted)). In *Haggarty*, the contract between the lender and borrowers provided the lender with "sole discretion" to determine whether the Index to determine mortgage rates can be substantially recalculated. *Id.* at *5. The borrowers argued that the lender failed to act by substituting a new index under the provision at issue. *Id.* at *1. The court explained that there was adequate consideration between the parties and concluded the bank retained "sole discretion" to determine whether a substantial recalculation had occurred; therefore, the implied covenant of good faith and fair dealing could not survive summary judgment. *Id.* at *5.

In this case, the facts are inapposite. Plaintiffs do not claim that Section 2 granted BANA the power to refrain from acting at all, in other words, that BANA breached the implied covenant by freezing their accounts. *See Carma Devs*., 2 Cal. 4th at 374 (when "acts and conduct [are] authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct.") (citation and internal quotation marks omitted); *Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F. Supp. 2d 1138, 1152 (2012) (California courts examine "'whether the

contract gives the defendant merely the power to exercise discretion, or whether it gives the defendant the greater power to refrain from acting at all' and declining to apply the covenant in situations where the defendant has the power to refrain from acting altogether.") (citation omitted). Rather, Plaintiffs allege that BANA did not act objectively reasonably when it froze accounts based solely on CFF-1, and as such must exercise that discretion reasonably. Accordingly, BANA's argument that the breach of the implied covenant does not apply to the Account Freeze Class lacks merit.

In conclusion, the Court DENIES Defendant's motion for summary judgment on the breach of implied covenant of good faith and fair dealing.

**H. Thirteenth and Fourteenth Causes of Action - Due Process Clause of the Fourteenth Amendment of the United States Constitution and Due Process Clause of the California Constitution**

The thirteenth and fourteenth causes of action allege BANA violated Plaintiffs' rights under the due process clauses of the Fourteenth Amendment to the United States Constitution and California Constitution by depriving them of constitutionally protected interests without due process under 42 U.S.C. § 1983. (Dkt. No. 406, TAMCC ¶¶ 651-66.) The due process causes of action relate to the Credit Rescission and Credit Freeze classes. (Dkt. No. 499 at 35.)

Plaintiffs claim that by rescinding permanent credits previously paid on their unauthorized transaction claim, BANA deprived them of access to their constitutionally protected EDD benefits. (Dkt. No. 406, TAMCC ¶ 656.) Further, by freezing their EDD debit card accounts, BANA blocked Plaintiffs' access to their benefits already deposited in their account and suspended receipt of any future EDD benefits to which they were entitled. (*Id.*) Based on these claims, Plaintiffs complain that rescinding previously paid permanent credits and automatically freezing or blocking EDD cardholder accounts when they reported unauthorized transactions without notice and a pre-deprivation hearing as well as a post-deprivation hearing violated their due process rights. (*Id.* ¶ 660.)

The Fourteenth Amendment to the United States Constitution and Article 1 of the California Constitution prohibit state action that deprives a person of life, liberty, or property without due process of law. U.S. Const. amend XIV § 1; Cal. Const. art. 1, § 7(a). Because California state due process claims are coextensive with federal due process claims, the Court addresses the federal due process claim which will decide the state due process claim. *See Payne v. Superior Ct.*, 17 Cal. 3d 908, 914 n.3 (1976) (California constitution provides the same "basic guarantee" as the Fourteenth Amendment); *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 705 n.4 (9th Cir. 1992) (because rights under the federal and California state constitutions are co-extensive, "we resolve both the state and federal constitutional claims in our discussion of the scope of the federal constitutional right.").

Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives someone of a federal constitutional or statutory right. 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements, namely that: (1) "a right secured by the Constitution or laws of the United States" was violated and (2) the violation "was committed by a person acting under the color of state law." *See West v. Atkins*, 487 U.S. 42, 48 (1988). "As its text makes clear, this provision protects against acts attributable to a State, not those of a private person." *Lindke v. Freed*, 601 U.S. 187, 194 (2024)

**1. State Action**

Defendant argues that it was not a state actor subject to a § 1983 claim because BANA's servicing of benefits after distribution is not a traditional governmental function and the prepaid debit cards were not the "exclusive means" to obtain EDD benefits. (Dkt. No. 589 at 39.) Plaintiffs challenge Defendant's argument asserting there are disputed issues of fact as to whether BANA was a state actor by being the exclusive provider of electronic EDD UI benefits, which is a power traditionally and exclusively reserved to the state. (Dkt. No. 652 at 20-21.)

"[M]ost rights secured by the Constitution are protected only against infringement by governments." *Flagg Bros. v. Brooks*, 436 U.S. 149, 156 (1978). However, a private party may be liable under 42 U.S.C. § 1983 as long it was acting under color of state law when it violated the plaintiff's federal constitutional rights. *See West*, 487 U.S. at 48. A § 1983 plaintiff therefore must show that a defendant's actions causing the deprivation of a federal constitution right must be "fairly attributable" to the government. *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937 (1982).

"The Supreme Court has articulated four tests for determining whether a private [party's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." *Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1140 (9th Cir. 2012) (quoting *Franklin v. Fox*, 312 F.3d 423, 444–45 (9th Cir. 2002)). Even though Plaintiffs rely on the public function and joint action tests, (Dkt. No. 406, TAMCC ¶¶ 654, 659), BANA solely moves for summary judgment on the public function test.

"The public function test is satisfied only on a showing that the function at issue is both traditionally and exclusively governmental." *Florer v. Congregation Pidyon Shevuyim, N.A*., 639 F.3d 916, 924 (9th Cir. 2011) (internal quotation marks omitted); *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 352 (1974) (Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State."). Under the public function test, "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Lee v. Katz*, 276 F.3d 550, 554-55 (9th Cir. 2002) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)). However, a private entity that performs a function that serves the public does not make its acts state action. *See Lindke v. Freed*, 601 U.S. 187, 194 (2024) ("Yet the presence of state authority must be real, not a mirage."). The issue is not whether the defendant was performing a public function in the abstract, instead, the question is whether the function performed by BANA "has been

'traditionally the *exclusive* prerogative of the State.'" *Rendell–Baker v. Kohn*, 457 U.S. 830, 842 (1982) (emphasis in original) (quoting *Jackson v. Metropolitan Edison Co*., 419 U.S. 345, 353 (1974)). For example, in *West*, the Supreme Court found state action on the part of a private physician providing medical treatment to prisoners because (1) "the State bore an affirmative obligation to provide adequate medical care" to prisoners; (2) "the State delegated that function" to the physician; and (3) the physician "voluntarily assumed that obligation by contract." *West*, 487 U.S. at 56.

The threshold question is identifying the "specific conduct of which the plaintiff complains." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50-51 (1999) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). Here, the issue is whether BANA's use of CFF-1, to combat fraud, by rescinding EDD cardholders' permanent credits and freezing their accounts when they reported unauthorized transaction may be fairly attributable to the State. Plaintiffs rely on the case of *Cahoo v. SAS Inst. Inc*., 322 F. Supp. 3d 772, 793 (E.D. Mich. 2018) *aff'd in part, rev'd in part on other grounds*, 918 F.3d 887 (6th Cir. 2019) where the Sixth Circuit held that the defendants, engaged in the administration of unemployment benefits, a power "traditionally exclusively reserved to the State", were state actors, while Defendant relies on *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) where the United States Supreme Court held that a private insurer was not a state actor by withholding workers' compensation benefits for disputed medical treatment.

The administration of unemployment benefits is a power "traditionally exclusively reserved to the State." *Cahoo,* 322 F. Supp. 3d at 793. In *Cahoo,* the State of Michigan implemented a new automated system to detect fraud in unemployment insurance claims and contracted with the defendant companies and individuals to develop and maintain the automated system. *Id.* at 784, 787. Utilizing this automated system, the class plaintiffs were falsely charged with filing fraudulent claims after receiving unemployment benefits and not notified until much later, while others' tax refunds were seized. *Id.* at 785. The false fraud determination was without notice and an opportunity to present evidence. *Id.*

The court explained that the contractor's system was directly involved in the administration of unemployment benefits, which is a power "traditionally exclusively reserved to the State", and the defendants were therefore, state actors. *Id.* at 793; *but see Durso v. Kentucky Ass'n of Counties, Inc.,* 32 F. Supp. 2d 929, 931-32 (E.D. Ky. 1999) (county association that served as unemployment compensation fund's administrator was not performing a traditional public function).

In *American Mfrs. Mut. Ins. Co.*, the defendants were insurers who provided workers compensation benefits and conducted a utilization review to determine whether treatment was reasonable or necessary under the state's workers' compensation act, a highly regulated state regime. 526 U.S. at 55-58. The United States Supreme Court held there was nothing in the state constitution or statutory scheme that obligated the State to provide workers' compensation benefits to injured workers, rather the workers' compensation laws imposed that obligation on the employers and left the challenged decision whether to dispute medical treatment to the insurers. *Id.* at 55-56. The Court concluded that an "insurer's decision to withhold payment and seek utilization review of the reasonableness and necessity of particular medical treatment is not fairly attributable to the State." *Id.* at 58.

Unlike the workers compensation laws, the Social Security Act of 1935 provided strong incentives for states to enact their own unemployment insurance programs. *City of Sacramento v. State of California*, 50 Cal. 3d 51, 58 (1990). California enacted its unemployment system "on the eve of the adoption of the Social Security Act" in 1935 and has sought to maintain federal compliance. *Id.* "UI benefits are administered by the states, but the federal government provides a portion of the funding for state UI programs and imposes requirements on those programs as a condition of this funding." *Murguía v. Childers*, CASE NO. 5:20-CV-5221, 2021 WL 1601748, at *1 (W.D. Ark. Arp. 23, 2021). Given the historical backdrop and this statutory authority, the Court concludes that the administration, distribution, implementation and maintenance of unemployment insurance have been "traditionally the exclusive prerogative of the State."

EDD describes its UI benefits program as "established by federal law, administered by state law, and funded by employer tax contributions." (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2373, -2355-56.) EDD delegated its authority to administer the distribution of UI benefits to BANA, a private bank, when it entered into a contract with BANA to establish, operate and maintain a comprehensive electronic payment service for UI recipients. (Dkt. No. 591-98, Brys Decl., Ex. 39 at -2287.) EDD also delegated to BANA its investigation and fraud prevention practices. (*Id.* at -2758 to -2763.) While BANA's decision to use CFF-1 to address the rampant fraud that was generated during the COVID-19 pandemic [redacted], its decision was delegated by the State through its contract. Therefore, there are material issues of disputed facts whether BANA functioned as a state actor in monitoring and engaging in fraud prevention by implementing CFF-1 to rescind EDD cardholders' permanent credits and freeze their accounts.

Relying on the motion to dismiss order, (Dkt. No. 126 at 68-70), Defendant also argues it is not a state actor because prepaid cards were not the "exclusive means" to obtain EDD benefits, because cardholders had the option to receive benefits by paper checks. (Dkt. No. 589-1 at 39-40.) Plaintiffs argue this is a disputed issue of material fact. (Dkt. No. 652 at 20-21.)

Judge Burns relied on *Brown v. Stored Value Cards, Inc*., No. 3:15cv1370-MO, 2016 WL 4491836 (D. Or. Aug. 25, 2016), *rev'd on other grounds*, 953 F.3d 567, 575 (9th Cir. 2020) where the plaintiff had been arrested, held in county jail and released the next day. *Id.* at *1. She had $30.97 cash on her which was confiscated when she was booked. When she was released, she received a preloaded debit card with her money. *Id.* When she used the debit card, she incurred fees so she filed suit against the defendants who administered the debit card system. *Id.* On her 42 U.S.C. § 1983 takings clause claim, the district court found that under the public function test, while the function of charging fees for debit cards is not traditionally or exclusively governmental, charging fees for government service or for an arrestee's time in jail is a traditional governmental

function. *Id*. at *2. The court explained that the relationship between the plaintiff and defendants could only come about through the exercise of the state's power where the state confiscated her money and left her no option on how to retrieve her money. *Id.* Judge Burns concluded that because BANA's debit cards were held out as the exclusive means to receive EDD benefits, the complaint plausibly alleged the relationship between Plaintiffs and BANA came about "through the exercise of the state's power." (Dkt. No. 126 at 70.)

The Court concludes that *Brown* is inapplicable to this case. *Brown* concerned the imposition of fees on debit cards which is not a traditional governmental activity. Meanwhile, here, the unemployment insurance system is statutorily mandated and administered by the state and as such, the administration, distribution, implementation and maintenance of unemployment insurance are "traditionally the exclusive prerogative of the State." In this case, the public function test is not about whether prepaid cards were the "exclusive means" to obtain EDD benefits but whether the administration of distributing electronic UI benefits are exclusively governmental. The salient issue is whether BANA functioned as a state actor when it devised and used CFF-1 to combat fraud by rescinding EDD cardholders' permanent credits and freezing their accounts. Because there is a material issue of fact whether BANA was a state actor, the Court DENIES Defendant's motion for summary judgment.

**2. Due Process**

A plaintiff alleging a procedural due process claim must show "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist*., 149 F.3d 971, 982 (9th Cir. 1998). Defendant only challenges the second factor.

**a. Pre-Deprivation Procedural Process**

As raised earlier, Defendant argues that its use of CFF-1 to rescind permanent credits was a mistake; therefore, summary judgment is warranted on the pre-deprivation due process claim. (Dkt. No. 589-1 at 41.) Plaintiffs object as before arguing there are

disputed issues of fact on this issue. (Dkt. No. 652 at 23.) For the same reasons stated above, the Court concludes that there are disputes issued of material fact whether Defendant's use of CFF-1 to rescind permanent credits was a mistake and denies summary judgment on this issue.

As to the Account Freeze Class, Defendant argues it did not need to provide a pre-deprivation procedure due to the strong governmental interest in halting fraud attacks on EDD funds relying on *F.D.I.C. v. Mallen*, 486 U.S. 230, 240 (1988). (Dkt. No. 589-1 at 41-43.) Plaintiffs assert that BANA concedes it did not provide any pre-deprivation process to the Account Freeze Classes and is dispositive on summary judgment. (Dkt. No. 652 at 23.) Further, they argue there remain material issues of disputed facts whether the narrow and limited exception under *Mallen* applies to this case. (*Id.* at 23-24.)

In *Mallen,* the Supreme Court rejected a due process challenge to an order of the Federal Deposit Insurance Corporation ("FDIC") suspending a bank officer without a pre-deprivation hearing. *Mallen* concerned the removal of a president of an insured bank after he was indicted for making false statements to the FDIC and the bank for the purpose of influencing the FDIC. *Mallen*, 486 U.S. at 236, 238. Under statutory authority, the FDIC had the ability to suspend an indicted official who might pose a threat to the interest of the bank's depositors or might threaten to impair public confidence in the bank. *Id.* at 237-38. Under the statute, the suspended official was entitled to a hearing within 30 days of his written request and a final decision within 60 days of the hearing. *Id.* at 242. The Court found that because a grand jury determined that there was probable cause that the bank officer had committed a felony and the legislature issued congressional findings that a prompt suspension is important to the integrity of banking institutions, the failure to provide him with a pre-suspension hearing did not violate due process. *Id.* at 241. The Court held that "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Id.* at 240 ("The legislation

under scrutiny is premised on the congressional finding that prompt suspension of indicted bank officers may be necessary to protect the interests of depositors and to maintain public confidence in our banking institutions.") However, the Court held that the bank official was denied a sufficiently prompt post-deprivation hearing. *Id.* at 248.

In this case, BANA raises several arguments claiming (1) it had a strong interest to prevent fraud, (2) the Account Agreement expressly allowed BANA to freeze accounts if it suspected unauthorized activities, (3) the EDD agreement required BANA to flag accounts for further review, and (4) [redacted]. (Dkt. No. 589-1 at 42.) Therefore, BANA maintains a brief deprivation of funds experienced by the Account Freeze Class was not baseless or unwarranted but was necessary to prevent criminal and fraudulent activity. (*Id.* at 43.) Plaintiffs claim there are material factual disputes whether BANA's reliance on CFF-1 to freeze accounts provided "substantial assurance that the deprivation [was] not baseless or unwarranted" because [redacted]. (Dkt. No. 652 at 23-24.) As similarly concluded above on the EFTA cause of action on the Claim Denial Class, the Court concludes there are fact issues in dispute whether there was "substantial assurance" that using CFF-1 to automatically freeze accounts was warranted.

**b. Post-Deprivation Procedural Process**

Lastly, Defendant asserts that summary judgment should be granted because Plaintiffs cannot show that they were denied post-deprivation procedures or that these procedures were constitutionally inadequate because it provided Plaintiffs with notice and opportunities to regain access to their accounts. (Dkt. No. 589-1 at 43.) Plaintiffs argue there are material disputes as to whether BANA's post-freeze procedures created an unnecessarily high risk of prolonged deprivation and whether there were other reasonable alternatives to mitigate that risk. (Dkt. No. 652 at 26.)

BANA asserts that each member of the Credit Rescission Class had their denied claims [redacted]. (Dkt. No. 589-1 at 43.) Plaintiffs maintain their denied claims [redacted] and challenges BANA's reconsideration process as not constitutionally adequate given the excessive wait times with the Claims call center. (Dkt. No. 652 at 25.) Because the Court concluded above that there are material issues of disputed facts whether Credit Rescission Class members [redacted], the Court denies summary judgment.

Next, BANA presents evidence that every Account Freeze Class member [redacted]. (Dkt. No. 588-76, Brys Decl., Ex. 30.B at 16; Dkt. No. 588-87, Brys Decl., Ex. 43.A at -2563.) However, Plaintiffs show that [redacted]. (Dkt. No. 632-123, Chan Decl., Ex. 136 at -0725 ([redacted]). Further, BANA [redacted]. (Dkt. No. 632-11, Chan Decl., Ex. 13, Chestnut Depo. at 155:10-156:15.) Plaintiffs assert that [redacted]. Plaintiffs have raised questions of fact whether Plaintiffs received constitutionally adequate post-deprivation procedures [redacted].

Plaintiffs also present evidence that many class members' accounts remained frozen for months. (Dkt. No. 632-191, Chan Decl., Ex. 205; Dkt. No. 632-5, Chan Decl., Ex. 5, Regan Expert Report ¶¶ 74-76.) For example, on February 10, 2021, [redacted]. (Dkt. No. 588-126, Brys Decl., Ex. 81; Dkt. No. 588-127, Brys Decl., Ex. 82). Also, an email on January 21, 2021 between BANA and EDD discloses that [redacted]. (Dkt. No. 632-43, Chan Decl., Ex. 49 at -7556 [redacted] Whether Plaintiffs regained access to their frozen accounts in a timely manner and received adequate post-deprivation process are disputed issues of material fact.

BANA additionally argues that when CFF-1 rescinded credits or froze accounts, [redacted]. (Dkt. No. 589-1 at 43.) BANA presents evidence that from December 3, 2020 through March 17, 2021, if CFF was triggered, the card was frozen, and Plaintiffs received letters informing them how to contact EDD to remove the freeze. (Dkt. No. 588-70, Brys Decl., Ex. 28 at Interrog. No. 28; Dkt. No. 591-114, Brys Decl., Ex. 52 ("Your claim has been closed because we believe the account or the claims have been the subject of fraud or suspicious activity. . . If you contact us by phone or in writing, you may request that we reopen your claim for further consideration. You will be asked to give us information, including any documents you may have, to support your claim."); Dkt. No. 588-104, Brys Decl., Ex. 59; Dkt. No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 33.) However, Plaintiffs argue the form letters did not provide any specific reasons for the denial of their claims or the results of any investigation as required under the EFTA. Therefore, Plaintiffs have raised disputed

issues of fact whether the letter BANA provided after it automatically froze EDD cardholder accounts and rescinded permanent credits of EDD cardholders provided adequate constitutional notice of the deprivation and the process to regain access to their rescinded and frozen funds.

Lastly, BANA proffers evidence that it implemented a [redacted]. (Dkt. No. 588-165, Brys Decl., Ex. 122 ([redacted]); Dkt. No. 588-44, Brys Decl., Ex. 14.S, Martin Depo. at 232:13-20; 234:4-6; Dkt. No. 588-126, Brys Decl., Ex. 81 at -6931; Dkt. No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 34.) Plaintiffs respond that [redacted]. (Dkt. No. 632-216, Chan Decl., Ex. 238 at -1410 [redacted]; Dkt. No. 632-217, Chan Decl., Ex. 239 at -7312 [redacted].) The [redacted]. Therefore, whether the [redacted] provided an adequate post-deprivation procedure is a question of fact.

In conclusion, the Court DENIES Defendant's motion for summary the due process claims under the U.S. and California Constitutions.

**I. Punitive Damages**

Plaintiffs seek punitive damages for their breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and due process claims. (Dkt. No. 632-5, Chan Decl., Ex. 5, Regan Expert Report ¶ 5.)

/ / /

**1. Breach of Fiduciary Duty and Breach of the Implied Covenant**

For the common law claims, Plaintiffs are entitled to punitive damages where they can show by "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice" and in the case of a corporate defendant, the "advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." Cal. Civ. Code § 3294(a) & (b).

Plaintiffs seek punitive damages based on Defendant's malice and oppressive conduct. (Dkt. No. 652 at 40.) "Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). "Oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2). "Despicable conduct" is conduct that is "'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by most ordinary decent people.'" *Butte Fire Cases*, 24 Cal. App. 5th 1150, 1159 (2018) (citation omitted). "Conscious disregard" means "'that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences.'" *Id.* (citation omitted). In other words, the defendant must "have actual knowledge of the risk of harm it is creating and, in the face of that knowledge, fail to take steps it knows will reduce or eliminate the risk of harm." *Id.*

BANA argues that Plaintiffs cannot show that managing agents, Chief Executive Officer Brian Moynihan and former Chief Operating Officer Thomas Montag, or any other managing agents, were involved in the implementation of CFF-1, in any decision regarding understaffing the Claims call center, and that anyone intentionally withheld EMV chips with malice or oppression. (Dkt. No. 588-1 at 46-49.) Plaintiffs contend they do not need to show a particular managing agent acted with malice but that BANA,

as a whole, adopted these policies in conscious disregard of the harm they would cause class members. (Dkt. No. 652 at 49.) Further, they assert there are material disputes of fact barring summary judgment on punitive damages. (*Id.* at 39-48.)

It is a "fundamental misconception of the required proof" that Plaintiffs are "required to introduce clear and convincing proof that at least one particular . . . employee, officer, director or managing agent [of a defendant] had the requisite malicious state of mind." *Romo v. Ford Motor Co*., 99 Cal. App. 4th 1115, 1139 (2002) *cert. granted, judgment vacated*, 538 U.S. 1028 (2003), *aff'd*, 113 Cal. App. 4th 738 (2003) (*Romo I*)[26] (italics omitted). Where a large corporation involves "layers of management committees and the sheer size of the management structure", "[i]t is difficult to imagine how corporate malice could be shown in the case of a large corporation except by piecing together knowledge and acts of the corporation's multitude of managing agents." *Id.* at 1141. As such, a plaintiff need only show "[i]t is enough if the evidence permits a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in 'willful and conscious disregard of the rights or safety of others.'" *Id.* (substantial evidence supported an inference of corporate malice where policymakers decided to disregard safety standards to bring product to market); *see also Neal v. Farmers Ins. Exchange*, 21 Cal. 3d 910, 923 (1978) (substantial evidence supported an inference of corporate malice where insurer's denial of coverage was "part of a conscious course of conduct, firmly grounded in established company policy[.]").

In the context of a large corporation, a plaintiff may satisfy the "managing agent" requirement by presenting evidence "showing the information in the possession of the corporation and the structure of management decisionmaking that permits an inference

---

[26] *Romo I* "retains the ordinary precedential value of a published opinion of an intermediate appellate court and it remains the law of the case on all points other than the federal constitutional issue." *Romo v. Ford Motor Co*., 113 Cal. App. 4th 738, 746 n.1 (2003) (*Romo II*).

that the information in fact moved upward to a point where corporate policy was formulated." *Romo I*, 99 Cal. App. 4th at 1141.

While Defendant objects to the application of *Romo I*, its ruling aptly applies in this case where BANA, a large corporation, had a number of different divisions and groups managing the electronic distribution of UI benefits to EDD cardholders.[27] Plaintiffs have presented evidence that [redacted]. (*See* Dkt. No. 632-26, Chan Decl., Ex. 28, Moynihan Depo. at 16:24-23:19; 25:15-25.) For example, Mr. Ahmad was head of GTS [redacted]. (Dkt. No. 632-26, Chan Decl., Ex. 28, Moynihan Depo. 25:1-26:5). William Fox, head of GFS, [redacted]. (Dkt. No. 632-20, Chan Decl., Ex. 22, Fox Depo. at 12:15-21: 13:1-23.) Jennifer Ehresman was head of Consumer Client Protection [redacted]. (Dkt. No. 632-22, Chan Decl., Ex. 24, Ehresman Depo at 11:22-12:23; 22:22-24:17; 35:25-37:5.) These

---

[27] In reply, Defendant objects to Plaintiffs' corporate policy exception arguing it only applies to long-standing corporate policies resulting in death. (Dkt. No. 693 at 21.) The *Romo I* court did not expressly limits its holding to long-standing corporate policies that result in death and Defendant has not provided authority for *Romo I*'s supposed limiting application. Also, Defendant, in its motion, in fact, relies on *Romo I*'s rule statement asserting "the evidence must permit a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in willful and conscious disregard of the rights or safety of others." (Dkt. No. 589-1 at 47 (quoting *In re Pac. Fertility Ctr. Litg.,* Case No. 18-cv-01586-JSC, 2021 WL 2476799, at *2 (N.D. Cal. June 17, 2021) (quoting *Romo I,* 99 Cal. App. 4th at 1141).) Defendant's objection to *Romo I's* application in this case is not well founded.

examples show BANA was a behemoth corporate structure with layers of decision-making authority and Plaintiffs need not show malice or oppression by a particular managing agent.

In *Romo I*, the Romo family was riding in their 1978 Ford Bronco when it rolled over several times, collapsing a steel portion of the vehicle's roof and the fiberglass portion fell off. *Id.* at 1124. The collapse of the steel portion killed the driver, while the fiberglass portion struck and killed two other passengers. *Id.* The plaintiffs brought a products liability and negligence action and sought punitive damages against Ford Motor Co. *Id.* The *Romo I* court noted that the despicable conduct standard was met since it was obvious that "putting on the market a motor vehicle with a known propensity to roll over and, while giving the vehicle the appearance of sturdiness, consciously deciding not to provide adequate crush protection to properly belted passengers . . . constitutes despicable conduct. Such conduct could kill people." *Id.*

In coming to the determination that Ford's conduct could be construed as despicable, the *Romo I* court noted several factors such as disagreement within Ford over whether to include a roll bar to reinforce the fiberglass roof, as Ford's competitor did; evidence that Ford's engineers disregarded its own safety standards by which it had determined that the roof's crush resistance needed to be higher; the total absence of preproduction testing; and evidence that Ford's post-production testing showed that the roof failed to meet its own safety standards. *Id.* at 1444-45. This evidence sufficiently established that "corporate policymakers *in fact* compromised consumer safety by reducing costs or expediting production in *willful and conscious disregard* of consumer safety. *Id.* at 1146 (emphasis in original).

The Court considers these *Romo I* factors to determine if there is evidence, in this case, that raises genuine issues of fact whether BANA acted with malice or oppression

when it implemented CFF-1,[28] understaffed the Claims call center and failed to implement EMV chips sooner.

Here, similar to the factors in *Romo I*, Plaintiffs present evidence that BANA disregarded its own AISOP standards to investigate unauthorized transactions knowing it did not comply with the EFTA and Reg E when it created, developed and implemented CFF-1. BANA also [redacted], and in fact after implementation, [redacted].

There is also additional evidence that BANA denied all PIN-enabled ATM unauthorized transactions assuming the fraud was primarily attributable to benefits eligibility fraud [redacted] even though it [redacted]. The record shows that [redacted]. (Dkt. No. 632-13, Chan Decl., Ex. 15, Letson Depo. at 100:13-22.) Plaintiffs present evidence that [redacted]. Even though Defendant claims that it provided a letter to each EDD cardholders' denied claim and provided for a reconsideration process, it was a form letter that did not provide the reasons for the denial and EDD cardholders could not even access the understaffed Claims call center, that BANA created, to seek reconsideration due to the extremely long wait times. Therefore, a reasonable inference arises that BANA's automatic denial of all PIN-enabled ATM unauthorized transactions was willful and exhibited a conscious disregard of the EDD cardholder's access to critical UI funds

[28] Defendant only challenges punitive damages as to the claim denial and the rescission of permanent credits but does not address the freezing of accounts. (*See* Dkt. No. 589-1 at 46-49.)

during the COVID-19 pandemic as they were some of BANA's most vulnerable customers. (Dkt. No. 632-13, Chan Decl., Ex. 15, Letson Depo. at 100:13-22.) In other words, viewed together, this evidence supports an inference that BANA had knowledge of the risks to innocent EDD cardholders posed by CFF-1, and despite this knowledge, failed to take steps to reduce or eliminate the risk of harm. *See Butte Fire Cases*, 24 Cal. App. 5th at 1159. Therefore, whether BANA acted with malice or oppression in regards to the Claim Denial Class is a question to be decided by the trier of fact.

As to the Credit Rescission Class, despite Defendant's repeated argument that it did not rescind permanent credits intentionally, Plaintiffs provide evidence the rescission of permanent credits may have been intentional. They provide evidence that BANA [redacted]. Further, even though BANA claims it automatically reimbursed the permanent credits shortly after rescission, [redacted]. Accordingly, the evidence supports an inference to support malice or oppression because [redacted]

As to the Customer Service Class, Plaintiffs provide evidence that BANA may have [redacted] and [redacted] noting that [redacted]. However, there is evidence that in July 2020, during the pandemic, BANA had exceeded industry standard performance with a [redacted] ASA and a [redacted] abandoned rate with staffing around [redacted] FTE; however, staffing levels dropped dramatically to [redacted] FTE [redacted] agents by September 13, 2020 and then staffing dropped again by [redacted] agents by September 27, 2020 to [redacted] FTE. According to Mr. Minnucci, such a significant drop in staffing was not due to attrition. The reduction in staff occurred at the same time when the CFF-1 was implemented on

September 28, 2020 and when BANA would have expected an increase in call volume due to innocent EDD cardholders seeking relief from denial of their unauthorized transaction claim. As expected, in September 2020, BANA received about [redacted] error claims from EDD cardholders per week, a [redacted] increase from call volume in January 2020 when BANA received about [redacted] error claims per week. (Dkt. No. 588-75, Brys Decl., Ex. 30.A at No. 32.) As such, EDD cardholders were on hold on average for [redacted], with an abandoned rate of [redacted]. The evidence of significant attrition in call center staffing right when the CFF-1 was implemented permits a reasonable inference that BANA's conduct led to severe understaffing and constitutes malice or oppression.

As to the EMV Chip Class, BANA sought to convert the EDD's mag-stripe only cards to EMV chip cards due to the significant increase in fraud it saw in UI debit cards in January 2020. However, at that time, rather than making the change unilaterally, [redacted]. But EDD declined. Therefore, discussions on EMV chip conversion were not productive in 2020. In February 2021, [redacted]. As such, [redacted].

In sum, the Court DENIES Defendant's motion for summary judgment on punitive damages.

/ / /

/ / /

### 2. Federal Due Process Cause of Action

Punitive damages may be awarded under a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Both parties rely on the same arguments raised above as to the state law claims for the federal due process claims relating to the Claim Denial, Credit Recission and Account Freeze Classes. (*See* Dkt. No. 589-1 at 49-50; Dkt. No. 632 at 40-46.) As such, the Court also relies on its analysis above, and for the same reasons, DENIES Defendant's motion for summary judgment on punitive damages for the federal due process claim.

## J. Plaintiffs' Evidentiary Objections

Plaintiffs lodged forty-two objections to Defendant's evidence in support of its motion for partial summary judgment. (Dkt. No. 633-3.) Defendant filed a response. (Dkt. No. 693-1.)

"At summary judgment, 'a party does not necessarily have to produce evidence in a form that would be admissible at trial.'" *Nev. Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (quoting *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001)); *see* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Est. of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004)). At summary judgment, the evidence need only be "authentic or capable of being authenticated" to be considered. *Romero v. Nevada Dep't of Corr.*, 673 F. App'x 641, 648 (9th Cir. 2016); *Lucas v. Citizens Commc'ns Co.*, 409 F. Supp. 2d 1206, 1211 (D. Haw. 2005), *aff'd*, 244 F. App'x 774 (9th Cir. 2007) (noting that the evidence "need not be authenticated at summary judgment as long as the [c]ourt is

satisfied that it is capable of being authenticated at trial") (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) and *Fonseca v. Sysco Food Serv. of Ariz., Inc*., 374 F.3d 840, 846 (9th Cir. 2004)).

"For example, objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself; yet attorneys insist on using evidentiary objections as a vehicle for raising this point. A court can award summary judgment only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant." *Burch v. Regents of Univ. of Cal*., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Kekona v. City of San Diego*, Case No. 22-cv-0745-MMA-VET, 2024 WL 5227734, at *3 (Dec. 26, 2024) (overruling "objections such as lack of foundation, speculation, hearsay, relevance, or that evidence is argumentative or constitutes an improper legal conclusion" as duplicative of the summary judgment standard itself).

Here, Plaintiffs object to six declarations for lack of foundation, hearsay, best evidence rule, authenticity, legal conclusion/ultimate fact, relevance, lack of personal knowledge[29], improper opinion testimony, and mischaracterizes evidence. Because these objections address the form of the evidence rather than admissibility, the Court OVERRULES Plaintiffs' objections to Defendant's evidence. *See Burch*, 433 F. Supp. 2d at 1118-19 (lamenting overuse of evidentiary objections in motions for summary judgment).

**Conclusion**

[29] The declarants all state they have personal knowledge based on their positions at BANA and based upon review of BANA's records, and information gathered from other BANA employees. (*See* Dkt. No. 588-3, Brys Decl., Ex. 1, Chestnut Decl. ¶ 1; Dkt. No. 588-4, Brys Decl., Ex. 2, Golden Decl. ¶ 1; Dkt. No. 588-5, Brys Decl., Ex. 3, Lennon Decl. ¶ 1; Dkt. No. 588-6, Brys Decl. Ex. 4, Letson Decl. ¶ 1; Dkt. No. 588-7, Brys Decl., Ex. 5, Martin Decl. ¶ 1; Dkt. No. 588-8, Ex. 6, Robart Decl. ¶ 1.)

Based on the reasoning above, the Court GRANTS in part and DENIES in part Defendant's motion for partial summary judgment. Specifically, the Court

1) DENIES summary judgment on the first cause of action for violations of the EFTA;
2) DENIES summary judgment on the second cause of action for violations of the CCPA;
3) GRANTS summary judgment on the fourth cause of action on the UCL claim as moot;
4) DENIES summary judgment on the fifth cause of action for negligence and GRANTS in part and DENIES in part summary judgment on the fifth cause of action for negligence per se;
5) DENIES summary judgment on the sixth cause of action for negligent hiring, supervision and retention and seventh cause of action for breach of contract as well as the claims that BANA's subcontractors did not do enough to protect personal information and breach of fiduciary duty for the Customer Service Class.
6) DENIES summary judgment on the ninth cause of action for breach of the implied covenant of good faith and fair dealing;
7) DENIES summary judgment on the tenth cause of action for breach of fiduciary duty;
8) DENIES summary judgment on the thirteenth and fourteenth causes of action for violation of the due process clause of the United State Constitution and California Constitution; and
9) DENIES summary judgment on punitive damages.

The Clerk of Court shall file the unredacted version of this order UNDER SEAL.

IT IS SO ORDERED.

Dated: July 29, 2026

Hon. Gonzalo P. Curiel
United States District Judge